# In the United States Court of Federal Claims

No. 99-550 L

(into which has been consolidated No. 00-169 L)

(E-Filed: October 27, 2005)

_____

THE OSAGE TRIBE OF INDIANS
OF OKLAHOMA,

                 Plaintiff,

    v.

THE UNITED STATES,

                 Defendant.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Indian Trust Claim; Motion to
Dismiss for Lack of Jurisdiction;
Whether "An act for the division
of the lands and funds of the
Osage Indians in Oklahoma
Territory" (1906 Act) Mandated
the Collection by the Government
of Royalty Payments and Related
Late Fees in the Circumstances of
this Case; Whether the
Government Failed to Invest
Tribal Funds in the Manner
Required by 25 U.S.C. §§ 161a,
161b, and 162a.

Wilson K. Pipestem, Washington, DC, for plaintiff.

Brett D. Burton, with whom were Kelly A. Johnson, Acting Assistant Attorney General,
and Martin J. LaLonde, Environment & Natural Resources Division, U.S. Department of
Justice, Washington, DC, for defendant. Stephen Simpson, U.S. Department of the
Interior, Washington, DC, and Teresa E. Dawson, U.S. Department of the Treasury,
Washington DC, of counsel.

## OPINION AND ORDER

HEWITT, Judge

     Plaintiff, the Osage Tribe of Indians of Oklahoma (Osage or Tribe) seeks to
recover damages from defendant for its alleged failure to collect and invest revenues
generated from the Osage mineral estate.[1]  See Plaintiff's Statement of Trust Fund

---

[1] By Order dated April 15, 2005, plaintiff's claims were divided into two tranches.  Order
of 4/15/05 (filed in The Osage Nation and/or Tribe of Indians of Okla. v. United States, No. 00-
169 L) at 1.  The pending proceeding is restricted to "Tranche One" claims arising from

Mismanagement Claims for Tranche One (Pl.'s T1 Claims) at 5.  Before the court is Defendant's Motion to Dismiss, in Part, Plaintiff's Tranche One Claims (Def.'s Mot.), arguing that plaintiff's claims fall, at least in part, outside the jurisdictional parameters described in Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339 (Fed. Cir. 2004), cert. denied, 125 S. Ct. 1826 (2005) (Shoshone).  See Def.'s Mot. at 1; Defendant's Memorandum in Support of Defendant's Motion to Dismiss, in Part, Plaintiff's Tranche One Claims (Def.'s Mem.) at 3.  The additional briefing is: Plaintiff's Opposition to Defendant's Motion to Dismiss, in Part, Plaintiff's Tranche One Claims (Pl.'s Opp.); Defendant's Reply in Support of Motion to Dismiss, in Part, Plaintiff's Tranche One Claims (Def.'s Reply); Parties' Joint Appendix: Sources of Law (J.A.).  The court also has before it the Transcript of Oral Argument held on September 13, 2005 (Tr.).  For the following reasons, defendant's motion to dismiss is DENIED.

I.     Background

At the time of contact with French traders in the late 17th century, the Osage Tribe inhabited an area along the Osage River in what is today southwestern Missouri.  Garrick A. Bailey, Osage, in 13 Handbook of North American Indians 476, 476-78 (Smithsonian Institution, 2001).  The Tribe's hunting ranges stretched into southeastern Kansas, northeastern Oklahoma, and northwestern Arkansas.  Id. at 477.  Increasing pressure from white settlers and eastern tribes resettled to lands west of the Mississippi River following passage of the Indian Removal Act of 1830 led the Osage to yield their lands outside of a reservation created in southern Kansas in 1825.  Id. at 478.  With the influx of settlers into Kansas following the Homestead Act of 1862, the Osage reservation was again under pressure, leading to a treaty in 1870 that allowed the government to sell the Osage lands to farmers for $1.25 an acre.  Id.  Part of the proceeds from this land sale were used to purchase a 1,500,000 acre portion of the Cherokee Outlet in Indian Territory at a cost of $0.50 an acre.  In 1871, most of the members of the Tribe moved to the newly established Osage Reservation in northern Oklahoma.  Oil was discovered on the reservation in 1897 and, in 1900, following several years of persistent refusal to agree to allotment of the reservation, the Osage National Council was dissolved by the federal Indian Service.  Id. at 488.  The Indian Service created the Osage Business Committee in 1904 and a subsequent election was won by a pro-allotment faction.  Id.

On June 28, 1906, the United States Congress passed legislation with the approval of the Osage Business Committee that allotted nearly the entirety of the lands then held by the Osage to individual enrolled members of the Osage Tribe.  34 Stat. 539 (1906) (1906 Act).  The 1906 Act, titled "An act for the division of the lands and funds of the Osage

---

payments collected under five oil and gas leases with respect to six months within a period extending from January 1976 to October 1990.  See id.  Further proceedings in the case will be determined following judgment on plaintiff's Tranche One claims.

Indians in Oklahoma Territory, and for other purposes," provides, by section 2, "[t]hat all lands belonging to the Osage tribe . . . shall be divided among the members of said tribe" with minor exceptions for retaining small tracts primarily for administrative and educational facilities. 34 Stat. at 540. Section 3 of the 1906 Act reserved oil, gas, coal and other minerals to the Tribe for a period of twenty-five years and provides that "leases for all oil, gas, and other minerals . . . may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe." 34 Stat. at 543. This reservation of the mineral interests to the Tribe has been routinely extended over time,[2] and was made a reservation in perpetuity by the Act of October 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660. Section 4 of the 1906 Act provides that the United States is to hold in trust all funds belonging to the Tribe and all royalty and other moneys that were due or in the future became due to the Tribe. 34 Stat. at 544.

Plaintiff alleges that defendant mismanaged trust funds of the Osage by (1) failing to collect royalty payments and related late payment fees due the Tribe under the Tranche One leases, and (2) failing to invest the income it did collect in the manner required by law. Pl.'s T1 Claims at 4-6. Plaintiff seeks to recover monetary damages under the Tucker Act, 28 U.S.C. § 1491, and the Indian Tucker Act, 28 U.S.C. § 1505, for defendant's alleged breach of its fiduciary duties as trustee to collect payments due and to invest the income collected in the manner prescribed by law. Pl.'s T1 Claims at 5; Def.'s Mot. at 1.

Defendant has moved for dismissal, in part, of plaintiff's claims under Rule 12(b)(1) of the Rules of the Court of Federal Claims (RCFC) for lack of jurisdiction. Def.'s Mot. at 1. Defendant argues that plaintiff has failed to identify substantive law that establishes the specific fiduciary responsibility to perform the royalty and fee calculation and collection duties defendant is alleged to have breached, as required for jurisdiction under the Tucker Act and the Indian Tucker Act.[3] Id. Defendant also argues that

---

[2] The Act of June 28, 1906, ch. 3572, 34 Stat. 539 (1906), was subsequently amended and modified. See Act of March 3, 1921, ch. 120, 41 Stat. 1249; Act of March 2, 1929, ch. 493, 45 Stat. 1478; Act of June 24, 1938, ch. 645, 52 Stat. 1034; Act of July 25, 1947, ch. 334, 61 Stat. 459; Act of June 15, 1950, ch. 248, 64 Stat. 215; Act of October 6, 1964, Pub. L. No. 88-632, 78 Stat. 1008; and Act of October 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660.

[3] Defendant also challenged jurisdiction on the ground that plaintiff's claim related to royalty calculation and collection is before the Court of Federal Claims in a separately filed action. Def.'s Mem. at 31; see The Osage Nation and/or Tribe of Indians of Oklahoma v. United States, No. 99-550L (filed Aug. 2, 1999) (alleging mismanagement of Osage trust assets and Osage trust funds). The two underlying actions were consolidated by Order of the court in The Osage Tribe of Indians of Oklahoma v. United States, No. 99-550L (into which has now been consolidated No. 00-169L), filed on September 14, 2005. The consolidation order MOOTS this

plaintiff's royalty calculation claim is barred by the applicable six-year statute of limitations, 28 U.S.C. § 2501.  Id.  In regard to the investment-related claim, defendant argues that plaintiff has failed to articulate sufficiently the duties underlying the claim, that any duty owed to invest and manage plaintiff's funds is discretionary and therefore subject to review under an arbitrary and capricious or abuse of discretion standard, and that plaintiff has failed to show a duty to earn interest on funds between the time the funds are disbursed by defendant and the time they are received by the individual Indian beneficiary.  Id. at 2.

II.     Discussion

        A.     Standard of Review

        Through the Tucker Act, 28 U.S.C. § 1491, Congress authorized the United States Court of Federal Claims to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2000).  The Indian Tucker Act makes explicit that this court's jurisdiction extends to "any tribe, band, or other identifiable group of American Indians" for claims against the United States accruing after August 13, 1946.  28 U.S.C. § 1505 (2000) (collectively, the Tucker Act and the Indian Tucker Act are referred to as the Tucker Acts).  While the Tucker Acts provide the "clear statement from the United States waiving sovereign immunity" required to establish jurisdiction over a suit against the government, United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003), they do not in themselves create a substantive right enforceable against the United States for money damages, United States v. Mitchell, 445 U.S. 535, 538-40 (1980) (Mitchell I).

        The plaintiff bears the burden of establishing subject matter jurisdiction.  See Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936).  If the facts on which jurisdiction is predicated are challenged, the plaintiff must support the factual basis for jurisdiction by a preponderance of the evidence.  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988); McNutt, 298 U.S. at 189.  The court must dismiss the action if jurisdiction is found lacking.  RCFC 12(h)(3).  To establish jurisdiction, the plaintiff must ground its claim for relief in a constitutional provision, statute, federal agency regulation, or contract provision that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained."  United States v. Mitchell, 463 U.S. 206, 216-17 (1983) (Mitchell II) (citing United States v.

_____

aspect of defendant's jurisdictional challenge.

<u>Testan</u>, 424 U.S. 392, 400 (1976) (quoting <u>Eastport S.S. Corp. v. United States</u>, 372 F.2d 1002, 1009 (Ct. Cl. 1967))).

The Supreme Court in <u>White Mountain Apache</u> noted that this "fair interpretation" rule set the bar "demonstrably lower" than that required for the initial waiver of sovereign immunity, namely that the waiver be "unequivocally expressed." 537 U.S. at 472. Rather than require that the relevant statute or regulation expressly state a right to recovery, "[i]t is enough . . . that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages." <u>Id.</u> at 473. While the basis of a claim for money damages will not be "lightly inferred," a fair inference will do. <u>Samish Indian Nation v. United States</u>, 419 F.3d 1355, 1364 (Fed. Cir. 2005) (quoting <u>White Mountain Apache</u>, 537 U.S. at 472-73); <u>Fisher v. United States</u>, 402 F.3d 1167, 1173-74 (Fed. Cir. 2005) (<u>en banc</u>) (addressing plaintiff's burden in establishing jurisdiction under the Tucker Act).

B.      Whether a Fiduciary Duty Exists

Plaintiff bases its claim for money damages against the United States on an alleged failure to enforce fiduciary duties in the governing statutes, the body of regulations established by the Department of the Interior to manage the Osage mineral estate, and the terms of the Tranche One oil and gas leases. Pl.'s Opp. at 16. The primary source of substantive law on which the Osage rely is found in section 4 of the 1906 Act. Section 4 provides:

> That <u>all funds belonging to</u> the Osage tribe, and <u>all moneys due</u>, and <u>all moneys that may become due</u>, <u>or may hereafter be found to be due</u> the said Osage tribe of Indians, shall be held in trust by the United States . . . .
>
> . . . .
>
> Second.  That the royalty received from oil, gas, coal, and other mineral leases upon the lands for which selection and division are herein provided . . . shall be placed in the Treasury of the United States to the credit of the members of the Osage tribe of Indians as other moneys of said tribe are to be deposited under the provisions of this act . . . .

34 Stat. at 544 (emphases added).

Plaintiff argues on the basis of the plain language of the 1906 Act that all moneys then due the Tribe and all moneys that would later become due are subject to the trust relationship. Pl.'s Opp. at 16 ("The 1906 Act expressly places in trust . . . 'all' funds then due the Osage Nation as well as 'all' funds that may become due to the Osage Nation at a

later time."). Plaintiff also argues that because "the 1906 Act expressly provides that, as trustee, the Government 'shall' place in the United States Treasury 'the royalties received from oil, gas, coal, and other mineral leases' . . . the Government is under a clear, specific fiduciary duty to collect the full royalty due.") Id. (quoting 1906 Act, 34 Stat. at 544). Plaintiff concludes its jurisdictional argument by contending that defendant is answerable in damages for breaching the fiduciary duties plaintiff has identified in the language of the 1906 Act. Pl.'s Opp. at 16 ("Moreover, the duty must be understood as 'money mandating' because the duty relates specifically to the collection of money for the Osage Nation.").

Defendant acknowledges that the cited provisions create a limited trust relationship but argues that the provisions of the 1906 Act "do[] not create functional obligations to calculate or collect the moneys due." Def.'s Mem. at 20. Rather, defendant argues, the second subsection of section 4 of the 1906 Act establishes only the specific duty to deposit royalties that are received. Id. ("This provision [] places the specific duty on the United States to deposit royalties that are received.").

Because the question of jurisdiction in this case "turns on a statute and the intention of Congress, we look first to the statutory language." Toibb v. Radloff, 501 U.S. 157, 162 (1991) (quoting Blum v. Stenson, 465 U.S. 886, 896 (1984); Doyon, Ltd. v. United States, 214 F.3d 1309, 1314 (Fed. Cir. 2000). Only if the language is unclear is it necessary to turn to the legislative history. Toib, 501 U.S. at 162. Here, the plain language of the 1906 Act clearly distinguishes between "funds belonging to" the Osage, on the one hand, and "moneys due" the Tribe, on the other. Unlike funds on account and thereby "belonging to" the Tribe, "moneys due" represent outstanding obligations, that is, moneys "[o]wing or payable; constituting a debt." Black's Law Dictionary 538 (8th ed. 2004).

The prospective character of the words chosen by Congress in the 1906 Act–"all moneys due, and all moneys that may become due"–anticipates and provides for the treatment of the primary source of the Tribe's expected income, royalty from oil and gas leases. When used in the context of oil and gas, a royalty is "a right to oil and gas in place that entitles its owner to a specified fraction, in kind or in value, of the total production from the property, free of expense of development and operation." Getty Oil Co. v. United States, 399 F.2d 222, 225 (Ct. Cl. 1968) (quoting Breeding and Burton, Income Taxation of Oil and Gas Production § 203). This share of the product or profit is not a fixed or invariable payment; rather, the amount of a given payment will fluctuate with the volume of oil or gas sold and variations in allowable costs. The Tranche One leases provide for the lessor's royalty to be paid to defendant. See, e.g., Pl.'s T1 Claims, Ex. A at 11, § 2 (Blanket Oil Mining Lease, referred to in oral argument as the "Stanley Stringer lease" (Tr. at 17)). Selected lease provisions for royalty valuation and payment

for one of the Tranche One leases, the lease for the Stanley Stringer Unit, are presented below:

> Section 2.  The lessee agrees to pay, or cause to be paid, to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor as royalty;
>
> (a)  The sum of sixteen and two-thirds (16-2/3) per cent of the gross proceeds from the sales, after deducting the oil used as fuel in operating the lease, of the first eight hundred and fifty thousand (850,000) barrels of crude oil produced from the Burbank sand on the land described as follows [plat descriptions omitted] containing four hundred forty (440) acres, more or less, and [plat descriptions] containing nine hundred and sixty (960) acres, more or less, or a total of one thousand four hundred (1,400) acres, more or less.
>
> (b)  The sum of twelve and one-half (12-1/2) per cent of the gross proceeds from the sale of all crude oil produced from the Burbank Sand, in excess of the oil used for fuel in operating the lease and the volume of crude oil on which said sixteen and two-third (16-2/3) per cent is agreed to be paid as provided in (a) . . . above, and
>
> c) The sum of sixteen and two-thirds (16-2/3) per cent of the gross proceeds from sales, after deducting the oil used as fuel in operating the lease, of all oil produced and saved from the leased premises from sands other than the Burbank Sand; PROVIDED, if when the quantity of oil produced from sands other than the Burbank Sand during any calendar month is sufficient to average one hundred (100) or more barrels per well per day, the royalty on such oil shall be twenty (20) per cent.
>
> (d)  . . . Payment for the royalty hereunder shall be made at the time of sale or removal of the oil from leased premises, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at no less than the highest posted market price in the Mid-Continent Field on the day of sale or removal.

Pl.'s T1 Claims, Ex. A at 11-13.  Royalty payments due under the this Tranche One oil lease are derived by applying the contracted rates and terms to "the actual selling price, but at no less than the highest posted market price in the Mid-Continent Field on the day

of sale or removal."[4]  Id., Ex. A at 13.  The "value" of lease production in the Stanley Stringer Unit for royalty purposes is set by the comparison between the actual price at which the oil was sold and the highest posted price in the relevant field at the time of sale. Id. ("settlement shall be based on the actual selling price, but at no less than the highest posted market price in the Mid-Continent Field on the day of sale or removal").  The valuation formula codified by the Department of Interior in the Osage regulations applicable to the earliest month examined in the Tranche One leases provides that

> settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal.  Where different prices are paid simultaneously for oil from a lease and the highest such price exceeds the higher of the aforementioned prices, then that price shall be the basis of royalty on all oil from said lease.

25 C.F.R. § 183.11(a)(2) (1975), J.A. at Tab 10.[5]

The "moneys due" are the contractually-determined amounts "owing or payable" to the lessor and therefore "constituting a debt" owed to the Tribe.  The court finds that the plain language of section 4 of the 1906 Act establishes fiduciary duties that include both the proper management of Osage funds on deposit with the Treasury and the proper

---

[4]Royalty payments for gas leases are calculated in a similar manner but without reference to a comparison field price for establishing the value of lease production.  See 25 C.F.R. §§ 183.11(b)(1)-(b)(2) (1975), J.A. at Tab 10.

[5]The Osage regulations were redesignated in 1982 along with the entirety of Chapter 1 of Title 25 of the Code of Federal Regulations.  Part No. 183 was redesignated as Part No. 226, with most of the subsections remaining in the same order.  For example, 25 C.F.R. § 183.11(a)(2) became 25 C.F.R. § 226.11(a)(2) (1982).  See 47 Fed. Reg. 13326-28 (Mar. 30, 1982), J.A. at Tab 13.

In a proposed rule change in 1987, the reference region for determining the comparison price was changed from the Kansas-Oklahoma area to Osage County, Oklahoma, and the comparison was "based on the highest of the bona fide selling price, posted or offered price by a major purchaser (as defined in § 226.1(h)) in Osage County, Oklahoma, who purchases production from Osage Oil leases."  See 52 Fed. Reg. 38608, 38609 (Oct. 16, 1987), J.A. at Tab 14.  A subsequent rule change in 1994 in response to appeals by oil producers, 59 Fed. Reg. 22104 (April 28, 1994), J.A. at Tab 39, established the comparison as "based on the actual selling price, but at not less than the highest posted price."  Id.  This is the wording of the provision found in the current regulations, 25 C.F.R. § 226.11(a)(2) (2005).

accounting of "all moneys due, and all moneys that may become due," 34 Stat. at 544, in accordance with the terms of the oil and gas leases.

Defendant argues that section 4 of the Act imposes only "the specific duty on the United States to deposit royalties that are received."  Def.'s Mem. at 20.  The court believes that this argument confuses the specific duty with the tasks that may be required to carry out that duty.  The court agrees with the defendant that it has a specific duty to deposit royalties that are paid to the Superintendent of the Osage Agency as required by federal regulations and the terms of the lease.  However, defendant does not simply stand as a teller behind a bank counter and accept whatever is placed before him by a depositor.  Defendant's duty is not discharged by mechanically crediting the account holder with whatever amounts are paid in.  The plain language of the statute makes clear that defendant's duty is to hold in trust the moneys contractually owed, ("due and . . . that may become due"), to the Tribe, 134 Stat. at 544, not merely whatever amount is deposited by the Tribe's lessees.  Defendant's duty necessarily includes verification that the royalty paid is the amount contractually owed under the terms of the lease.

It is a cardinal rule of statutory construction that "no clause, sentence, or word shall be superfluous, void, or insignificant."  TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001); United States v. Menasche, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute . . . .") (internal citations omitted); James v. Santella, 328 F.3d 1374, 1381 (Fed. Cir. 2003) (acknowledging "the general rule against construing a statute in a way that renders one of its parts inoperative"); 2A Sutherland: Statutes and Statutory Construction § 46:06 (Norman J. Singer ed., 6th ed. 2000).  Were the court to accept defendant's argument that its only specific duty is to deposit funds paid in, Def.'s Mem. at 20, it would render superfluous the distinction made by Congress in section 4 of the 1906 Act between "funds belonging to" the Tribe and "moneys due, and . . . that may become due" the Tribe.  The court must avoid, if possible, an interpretation of the 1906 Act that disregards the distinct meaning of the various parts of the statute.  See Babbitt v. Sweet Home Chapter of Communities for a Great Ore., 515 U.S. 687, 698 (1995) (recognizing "a reluctance to treat statutory terms as surplusage").

What is lost by equating a payment made with the royalty owed the Tribe is the monetary difference, if any, between the amount of "all moneys due" in fact, and the amount that was paid in fact.  In determining the plain meaning of statutory language, the court must "assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'"  Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) (quoting Richards v. United States, 369 U.S. 1, 9 (1962); see also Jones v. Brown, 41 F.3d 634, 638 (Fed. Cir. 1994) ("In determining the plain meaning of statutory language, 'legislative purpose is expressed by the ordinary meaning of the words used.'") (citations omitted).  Congress could have provided that "all deposits shall be held in trust."  It did

not.  Rather, the express instruction in section 4 of the 1906 Act was that "all moneys due, and all moneys that may become due, or may hereafter be found to be due" were to be held in trust by the United States.  In order to preserve the original effect of the express wording chosen by Congress, the court concludes that the defendant, as trustee, has a specific duty to verify that "all moneys due" under the terms of the mineral leases were in fact paid to the government and deposited to the account of the trust beneficiary.[6]

C.     Whether the Duty is Money-Mandating

The analytic framework for determining whether a fiduciary duty established in statute, regulation or contract is money-mandating is addressed in Mitchell I and Mitchell II and, more recently, in White Mountain Apache and United States v. Navajo Nation, 537 U.S. 488 (2003) (Navajo Nation).  See, e.g., Navajo Nation, 537 U.S. at 503 (noting that "Mitchell I and Mitchell II are the pathmarking precedents" in determining the existence of a money-mandating duty); Fisher v. United States, 402 F.3d 1167, 1173-1174 (Fed. Cir. 2005) (reviewing the rearticulation of standards in White Mountain Apache and Navajo Nation regarding plaintiff's burden in establishing whether a duty is money-mandating); Shoshone Indian Tribe of the Wind River Reservation v. United States, 58 Fed. Cl. 77, 81 (2003) (noting that "[t]he framework within which this dispute must be resolved" had been restated in Navajo Nation and White Mountain Apache).

In Mitchell I, individual Indian allottees of land in the Quinault Reservation sought monetary damages from the United States for failure to manage timber resources on allotted land, an alleged breach of government's fiduciary duty under the General Allotment Act of 1887 (GAA).[7]  445 U.S. at 537.  The Court reviewed the language of the GAA and its legislative history and found that the intent of Congress expressed in the GAA was that the United States hold the land allotted to individual Indians in trust so as "to prevent alienation of the land" and to avoid state taxation of allotments.  Mitchell I, 445 U.S. at 544.  Management of the allotments was left to the allottees, not to the trustee, id. at 543, and the Court concluded that the express language of the General Allotment Act established only a limited trust relationship and "cannot be read as establishing that the United States has a fiduciary responsibility for management of allotted forest lands," id. at 546.

---

[6]Although this court finds the meaning of the statute clear from its face, the court notes that its interpretation does not appear to be contradicted by the legislative history.  See, e.g., H. Rep. No. 59-3219 (1906); S. Rep. No. 59-4210 (1906), J.A. at Tab 1.

[7]Indian General Allotment Act, Act of February 8, 1887, ch. 119, 24 Stat. 388, as amended, codified as amended at 25 U.S.C. §§ 331-358 (2000).

Having concluded in Mitchell I that the GAA did not create specific fiduciary duties regarding timber management, the Court then considered whether other sources of substantive law imposed such duties on the United States.  Mitchell II, 463 U.S. at 219-23.  Based on its review, the Court found that "[t]he timber management statutes and the regulations promulgated thereunder establish the 'comprehensive' responsibilities of the Federal Government in managing the harvesting of tribal timber."  Id. at 222 (citations omitted).  These fiduciary responsibilities in turn "directly support[] the existence of a fiduciary relationship."  Id. at 224.  The Court then addressed whether these duties were money mandating and concluded that "the statutes and regulations at issue here can fairly be interpreted as mandating compensation by the Federal Government for violations of its fiduciary responsibilities."  Id. at 228.  "Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties."  Id. at 226.  Although the substantive law that established these duties did not expressly declare that their breach would be compensable, the Court noted that "the substantive source of law may grant the claimant a right to recover damages either 'expressly or by implication.'"  Id. at 463 U.S. at 217 n.16 (citing Eastport S.S. Corp., 372 F.2d at 1007).

The Supreme Court revisited the "fair interpretation" test articulated in Mitchell II in a 2003 case involving the government's alleged failure to maintain facilities it held in trust for the White Mountain Apache Tribe on the former Fort Apache Military Reservation.  White Mountain Apache, 537 U.S. at 469, 474.  In White Mountain Apache, the Court noted that the governing statute went beyond the "bare" or limited trust in Mitchell I by "invest[ing] the United States with discretionary authority to make direct use of portions of the trust corpus."  537 U.S. at 475.  By exercising daily supervision and occupation of the trust property, the Court concluded that "the United States . . . has obtained control at least as plenary as its authority over the timber in Mitchell II."  Id.  The Court then found a money-mandating responsibility to manage and conserve the trust property in the common-law duty of a trustee to preserve and maintain trust assets, despite the absence of explicit language in the governing statute imposing a fiduciary duty of conservation and management.  Id.  "It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages."  Id. at 473.

In an opinion interpreting the Indian Mineral Leasing Act[8] handed down on the same day as White Mountain Apache, the Court was unable to find in the statutes and regulations governing coal mining leases the requisite "rights-creating or duty-imposing statutory or regulatory prescriptions" that could "fairly be interpreted as mandating compensation by the Federal Government for the damages sustained" from an alleged breach by the trustee.  Navajo Nation, 537 U.S. at 503, 506.  Far from finding money-

---

[8]Indian Mineral Leasing Act of 1938 (IMLA), 25 U.S.C. §§ 396a-396g (2000).

mandating provisions in the substantive law, the Court emphasized that "no provision of the [governing statute] or its regulations contains any trust language with respect to coal leasing." Id. at 508. While the Secretary of the Interior was required to approve leases negotiated between the Tribe and a third party, the approval function did not include a duty to ensure a rate of return higher than the minimum royalty specified in the regulations. Id. at 510-11. The rate negotiated by the Tribe and the lessee and incorporated in the lease approved by the Secretary exceeded the regulatory floor. Id. at 510. In brief, the lease was in conformity with the statute and regulations then in effect; the Secretary was not under any fiduciary or other duty to maximize the return to the Tribe from its coal leases and therefore, as in Mitchell I, the Court found that the government was not in breach of a money-mandating fiduciary duty. Id. at 514 ("[W]e have no warrant from any relevant statute or regulation to conclude that his conduct implicated a duty enforceable in an action for damages under the Indian Tucker Act.").

Defendant argues that plaintiff has failed to meet the threshold requirement under Navajo Nation of identifying "an unambiguous or specific fiduciary duty on the United States to calculate or collect royalties owing on oil and gas leases." Def.'s Mem. at 19, citing in support Wright v. United States, 32 Fed. Cl. 54, 56-58 (1994) (holding that relevant federal regulations and statutes did not give rise to a money-mandating fiduciary relationship because of the extremely limited role played by the government in leasing and permitting of allotted Indian land). Defendant characterizes the relationship established under the 1906 Act as "a limited trust relationship" similar to that found to be insufficient under Mitchell I as the basis for a claim for money damages. Def.'s Mem. at 20. Plaintiff counters that defendant, by requiring a "controlling provision" that unambiguously states the specific duty that has been allegedly breached, goes beyond the showing required under the governing case law. Pl.'s Opp. at 20-21 ("nothing in Mitchell I, Mitchell II, Navajo Nation, or White Mountain Apache require[s] that the trust enumerate the specific duties allegedly breached in order for this court to have jurisdiction over the case"). Plaintiff finds support in the court's discussion of the requirements for stating a claim in Wright. "What is required under Mitchell II is that the statutes and regulations defining the activity in question must show congressional intent to assume a trust relationship with specific contours." Pl.'s Opp. at 21 (quoting Wright, 32 Fed. Cl. at 57). Plaintiff also argues that "the Supreme Court made clear in White Mountain Apache [that] the statutes and regulations do not need to specify the duty, if such a duty is implicit in the Government's trust duties." Pl.'s Opp. at 21. The Osage Trust established under the Act of 1906, plaintiff contends, was not a bare trust as in Mitchell I but rather "a real trust that gives the Government extensive control over all aspects of the oil and gas leasing process, including the calculation and collection of royalties." Pl.'s Opp. at 22.

The court agrees with plaintiff that the trust relationship created by the Act of 1906 is not a "bare" or "limited" trust as found to exist in Mitchell I. The plain language of the

Act of 1906 establishes a specific duty to hold in trust all moneys due, now and in the future, to the Osage Tribe.  The court believes that this conclusion is consistent with both Navajo Nation and Mitchell I.  In both of those cases, the key finding of the Supreme Court was that the plain language of the relevant organic statutes failed to identify a duty to perform the functions that were the basis of the alleged breach of trust for which compensation was sought.  In Mitchell I, the Court found that the General Allotment Act did not contain language establishing a duty to manage timber resources on land allotted to individual Indians.  Mitchell I, 445 U.S. at 544-46.  The GAA did not address in any way the management of timber resources, but instead established a trust responsibility to "prevent alienation of the land and to ensure that allottees would be immune from state taxation."  Id. at 544.  In Navajo Nation, the Court emphasized that not only was there no specific duty to ensure that a lease negotiated by the Tribe and approved by the Secretary of Interior provided a higher rate of return than the statutory minimum, there was in fact no trust relationship implicated in the area of coal leasing.  Navajo Nation, 537 U.S. at 508 (finding that "no provision of the IMLA or its regulations contains any trust language with respect to coal leasing").

In contrast, the organic statute at issue here directly and expressly concerns "the lands and funds of the Osage Indians," as the title of the 1906 Act declares.  34 Stat. at 539.  The Osage mineral estate and the royalties generated and to be generated from it were and are a core part of the property interests and funds governed by the Act.  Section 3 of the 1906 Act reserved to the Osage Tribe the oil, gas, coal, and other minerals found on the land to be allotted and required approval of the Secretary of the Interior for any leases negotiated by the Tribe.  Id. at 543.  The leases were subject to the rules and regulations prescribed by the Secretary of the Interior, while royalty rates were determined by the President of the United States.  Id.  The moneys generated from the leases, which moneys were to be "placed in the Treasury of the United States," constituted in large measure the "moneys due, and all moneys that may become due, or may hereafter be found to be due" that the United States agreed to hold in trust for the Osage Tribe in section 4 of the 1906 Act.  Id. at 544.  Plaintiff passes the threshold test under Navajo Nation by identifying in the 1906 Act the specific fiduciary duty to hold in trust the moneys due the Tribe and by alleging that the Government has failed faithfully to ensure that the moneys due were paid.[9]

---

[9]"To state a claim cognizable under the Indian Tucker Act, Mitchell I and Mitchell II thus instruct, a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.  If that threshold is passed, the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties . . . .'"  Navajo Nation, 537 U.S. at 506 (citations omitted).

The second part of the jurisdictional determination is whether the statute and regulations "can fairly be interpreted as mandating compensation," as stated by the Court in <u>Mitchell II</u>, 463 U.S. at 219, or are "reasonably amenable to the reading" that a right of recovery in damages is mandated, as articulated in <u>White Mountain Apache</u>, 537 U.S. at 473. Defendant argues that neither the regulations established to manage the Osage mineral estate nor the terms of the oil and gas leases create a specific duty on the part of defendant to calculate and collect royalty and related late fee payments. Def.'s Mem. at 20-22. Rather, defendant contends, the duties related to the calculation and payment of royalties fall on the lessees according to the terms of the leases and applicable regulations. <u>Id.</u> at 22.

Defendant's extensive citations to specific provisions in both the federal regulations and the government-approved leases point to a complex and comprehensive regulatory system for managing the operations and finances of the Osage mineral estate.[10] While defendant correctly draws attention to the substantial and expanding participation of the tribal council in the area of oil and gas leasing (for example, in entering into and negotiating leases, determination of the royalty rate for each lease, the ability to waive late charges established in the regulations, and the ability to opt to take the royalty payment in kind), Def.'s Mem. at 24-26, these areas of tribal authority are limited and remain subject to the approval authority of the Secretary of the Interior. More important, defendant has failed to counter plaintiff's claim that "the Government has fully assumed management and operation of the Osage Trust with respect to the calculation and collection of royalties." Pl.'s Opp. at 23. This is the specific fiduciary duty that plaintiff alleges was established by the Act of 1906 and has since been breached by defendant. The contractual obligation of lessees to make payments to the designated representative of the government has remained largely unchanged in the nearly 100 year history of the

---

[10]The regulatory system established to carry out the terms of the 1906 Act consisted of detailed provisions for leasing, fee and royalty payment, and operational matters. The regulations and requisite forms ran to over fifty-four sections on twenty-two pages of text. <u>Regulations to Govern the Leasing of Lands in the Osage Reservation, Okla., for Oil and Gas Mining Purposes</u>, Approved July 3, 1912, J.A. at Tab 17. The governing regulations during the period covered by the Tranche One leases consisted of 45 to 46 sections on fourteen to seventeen pages of text. <u>See</u>, <u>e.g.</u>, 25 C.F.R. §§ 183.1-183.45 (1975), J.A. at Tab 10; renumbered as 25 C.F.R. §§ 226.1-226.45 (1991), J.A. at Tab 15.

1906 Act.[11]  Other provisions that have remained consistent throughout the history of
these regulations include the following.

§ 226.5        Leases issued pursuant to this part shall be subject to the
               current regulations of the Secretary, all of which are made a
               part of such leases:  <u>Provided</u>, That no amendment or change
               of such regulations made after the approval of any lease shall
               operate to affect the term of the lease, rate of royalty, rental,
               or acreage unless agreed to by both parties and approved by
               the Superintendent.

               . . . .

§ 226.7        Leases, assignments, and supporting instruments shall be in
               the form prescribed by the Secretary, and such forms are
               hereby made a part of the regulations.

               . . . .

§ 226.30         Lessee shall comply with all orders or instructions issued by
               the Superintendent.  The Superintendent or his representative
               may enter upon the leased premises for the purpose of
               inspection.  Lessee shall keep a full and correct account of all
               operations, receipts, and disbursements and make reports
               thereof, as required.  Lessee's books and records shall be
               available to the Superintendent for inspection.

25 C.F.R. as cited (1991), J.A. at Tab 15.  Leases are issued in the form prescribed by the
government, in keeping with regulations issued by the government.  Royalty payments are
made to the government.  Lessees are required to maintain financial records for inspection
by the government and to comply with all instructions issued by the government.  The
only change of significance between the quoted provisions and the wording in the original
regulations adopted to implement the 1906 Act operates further to restrict the authority of
the Tribe as lessor to enter and inspect leased premises.  In 25 C.F.R. § 226.30, quoted
above, the defendant and his representatives have the authority to enter the premises and

_____

[11]<u>Compare</u> <u>Regulations</u>, Section 21, J.A. at Tab 17 ("All rentals, royalties, damages, or
other amounts which may become due under leases approved in accordance with these
regulations shall be paid to the superintendent of the Osage Indian School at Pawhuska,
Okla[homa]."), <u>with</u> 25 C.F.R. § 226.4, J.A. at Tab 15 ("Sums due under a lease contract and/or
the regulations in this part shall be paid by cash or check made payable to the Bureau of Indian
Affairs and delivered to the Osage Agency, Pawhuska, Oklahoma 74056.").

inspect both the premises and the books of lessees.  In contrast, in the first post-1906 regulations, the representatives of both the lessor and the Superintendent were authorized to enter the leased premises for the purpose of inspection.  Then as now lessees were not obligated to open their books to the lessor or to his representatives or agents.[12]  It is clear that the government has taken on not only the principal, but the sole, responsibility for managing lease revenues.

Lessees have a contractual obligation to make an initial calculation of the royalty due according to the terms of the lease and then to make the payment to the defendant. This court does not share defendant's conclusion, however, that "[t]he ultimate duties to calculate and pay are specifically placed on the lessees . . . not the United States."  Def.'s Mem. at 23 (emphasis added).  Separate from the lessee's contractual obligation to pay is the government's fiduciary duty to hold in trust all moneys due the Tribe, now and in the future, established in section 4 of the 1906 Act.  To fulfill this duty, defendant must verify that the amount paid in by a lessee represents the full amount contractually due under the terms of the lease.  As the Supreme Court noted in Mitchell II, "It would be anomalous to conclude that these enactments create a right to the value of certain resources when the Secretary lives up to his duties, but no right to the value of the resources if the Secretary's duties are not performed."  Mitchell II, 463 U.S. at 227.  It would be equally anomalous to conclude that the authority that issues the governing regulations, sets the form of the lease, approves its terms, requires lessees to maintain financial records, holds the sole right to inspect those financial records, and is the mandated recipient of all royalty payments due the Tribe, has no obligation to perform the corresponding duties.  As the Court found in White Mountain Apache, if the government's position is carried to its conclusion, "it would read the trust relation out of Indian Tucker Act analysis."  537 U.S. at 477.  "A trusteeship would mean little if the beneficiaries were required to supervise the day-to-day management of their estate by the trustee or else be precluded from recovery for mismanagement."  Mitchell II, 463 U.S. at 227.  Because the statutes and regulations at issue here clearly establish a fiduciary duty to verify that lessees fulfill their contractual obligations to the Tribe by verifying the accuracy of payments made, the court

---

[12] The 1912 regulations provided:

> Lessees shall allow the agents and representatives of the lessor, or any authorized representative of the Interior Department, to enter, from time to time, upon and into all parts of the leased premises for the purpose of inspection . . . and their books and records showing manner of operations and persons interested shall be open at all times for the examination of such officers of the department as shall be instructed by the Secretary of the Interior to make such examinations.

Regulations, Section 48, J.A. at Tab 17.

finds that it "can fairly be interpreted as mandating compensation" for damages sustained from violations of those duties.  Mitchell II, 463 U.S. at 228.

       D.       The Statute of Limitations

The governing statute of limitations for plaintiff's claims establishes a six-year jurisdictional window from the date of accrual of a claim.[13]  Congress has clarified the meaning of the "date of accrual" of certain Indian trust claims in a series of appropriations acts beginning in 1990 and continuing to the present.  The Consolidated Appropriations Act of 2005, Pub. L. No. 108-447, 118 Stat. 2809 (Appropriations Act) provides in pertinent part that

> notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

118 Stat. at 3060-61.  The United States Court of Appeals for the Federal Circuit construed the language of the Appropriations Act in a similar case involving allegations of a failure by the trustee to collect trust funds due the plaintiff tribe from sand and gravel leases.  Shoshone, 364 F.3d at 1345-48.  In that case, the court found that "[b]y the plain language of the [Appropriations] Act, Congress has expressly waived its sovereign immunity and deferred the accrual of the Tribes' cause of action until an accounting is provided."  Id. at 1346.  The court noted that, traditionally, a cause of action for breach of trust accrues "when the trustee 'repudiates' the trust and the beneficiary has knowledge of that repudiation."  Id. at 1348 (citations omitted).  The beneficiary may also bring suit as soon as he learns of the breach of fiduciary responsibilities by the trustee.  Id.  Because the trustee can breach his duties without putting the beneficiary on notice of the breach, however, "[i]t is . . . common for the statute of limitations to not commence to run against the beneficiaries until a final accounting has occurred that establishes the deficit of the trust."  Id. (citations omitted).

Defendant argues that plaintiff's claims are time-barred in part because "the Tribe has long had knowledge of its potential claim," based on records that show the

---

[13]See 28 U.S.C. § 2501 (1994) ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.").

beneficiary suspected the trustee had failed for some time to carry out its trust responsibilities.  Def.'s Mot. at 36-37.  Whether the plaintiff knew or should have known of the alleged failures to enforce the contractual obligations of lessees is not the pertinent issue, according to the Federal Circuit's analysis in Shoshone.  364 F.3d at 1347 ("Beneficiaries of a trust are permitted to rely on the good faith and expertise of their trustees; because of this reliance, beneficiaries are under a lesser duty to discover malfeasance relating to their trust assets.").  The Appropriations Act requires more than simply a suspicion of malfeasance to commence the running of the statute of limitations.

> The clear intent of the Act is that the statute of limitations will not begin to run on a tribe's claims until an accounting is completed.  We therefore hold that the Act provides that claims falling within its ambit shall not accrue, i.e., "shall not commence to run," until the claimant is provided with a meaningful accounting.

Shoshone, 364 F.3d at 1347 (footnote omitted).  Defendant does not claim that such a "meaningful accounting" has been provided to the Osage Tribe.  The court therefore concludes that the plaintiff's claims that fall within the Appropriations Act are not time-barred.

Plaintiff argues that its claims relating to the defendant's failure to collect royalty payments due the Tribe place the case fully within the "ambit," Shoshone, 364 F.3d at 1347, of the Appropriations Act and cites in support of this proposition the Federal Circuit's conclusion that "losses to . . . trust funds," in the language of the Appropriations Act, means

> losses resulting from the Government's failure or delay in (1) collecting payments under the sand and gravel contracts, (2) depositing the collected monies into the Tribe's interest-bearing accounts, or (3) assessing penalties for late payment.  Fiduciary breaches such as these result in losses to trust funds that are separate and distinct from the mismanagement of trust funds once collected.

Pl.'s Opp. at 35-36 (quoting Shoshone, 364 F.3d at 1350-51).  Notwithstanding the apparent applicability of the Federal Circuit's holding in Shoshone to this case, defendant contends that plaintiff is in effect alleging that the United States failed to maximize the return to the Tribe from its mineral leases because the actual amount due and subject to collection is dependent upon the disputed royalty calculation claim.  Def.'s Mot. at 39.  The court fails to see in the plaintiff's statement of claims or its accompanying argument any indication that plaintiff seeks anything more than the amount owed from lessees based on the precise calculation required under the terms of the lease and relevant federal regulations.  As the court noted in Shoshone, "[i]n the context of the Act, 'losses to . . .

trust funds' may be understood to cover losses resulting from the Government's failure to timely collect amounts due and owing to the Tribes under its sand and gravel contracts." 364 F.3d at 1350.  The Osage Tribe has not advanced an asset maximization claim comparable to that found by the court in Shoshone to be outside the Act's ambit based on its reading of Navajo Nation.  Id.

Finally, defendant would time-bar plaintiff's claims based on the evidentiary requirements of assessing its calculation claim.  Def.'s Mot. at 40.  Defendant argues that the Tribe would be required to go "outside the accounting to compare prices received with historical price postings" and argues that "claims requiring such burdensome inquiries" were disallowed under the court's ruling in Shoshone.  Id.  Plaintiff contends that the "evidentiary advantages" identified in the court's dicta in Shoshone would in fact result from "an accounting that at least indicated how the Government calculated royalty payments, the volume of oil and gas produced in each month for each lease and how much royalty it collected from each lease in each month."  Pl.'s Opp. at 36.  According to representations made to the court during oral argument, the posted price information necessary to determine compliance with the lease requirement to pay a royalty calculated on the higher of the posted price or the actual price paid was available to the defendant at the time of receipt of royalty payments.  Tr. at 22.  According to plaintiff's counsel, for at least part of the period considered under the Tranche One leases, defendant itself issued a notice setting forth its determination of the highest posted price for a given area.  Tr. at 25.  This information was manifestly a part of the accounting required to be undertaken by the defendant as trustee.  A comparison of the mining leases with the data used by the defendant in its accounting, as directed by the Federal Circuit, should therefore "reveal what income was required to be received by the Government but was either not received or was received late."  Shoshone, 364 F.3d at 1351.  The court finds this accounting exercise to be within the scope of account verification contemplated by the Federal Circuit in Shoshone.

E.  Investment Claims

Plaintiff's second trust fund mismanagement claim involves defendant's alleged failure, as trustee, to invest funds held in trust for the Osage Tribe in the manner prescribed by law.  Pl.'s T1 Claims at 5.  Plaintiff identifies, by way of example, an alleged duty to invest found in 25 U.S.C. § 161a.  Id.  Plaintiff describes the alleged failure to invest in the following terms: (a) failure "to deposit funds in an interest bearing account within a reasonable time after [the defendant] received the funds"; (b) failure "to invest the funds as required by law"; and (c) failure "to credit the Osage Nation with the full amount of investment income that the funds earned prior to the time the funds were disbursed to the beneficiaries of the trust."  Id. at 6.  Plaintiff alleges that it was damaged by not receiving the investment income to which it was entitled, but has not determined the amount of these damages.  Id.

Defendant notes the lack of specifics on plaintiff's legal theory and supporting facts regarding the alleged duty to invest and its breach by defendant, and observes that "[plaintiff] has not specified the contours of that duty, defined the standard of care, or asserted facts supporting its theory that a duty has been breached." Def.'s Mem. at 41-42. Defendant also argues that government's authority to invest is discretionary and should be evaluated under an arbitrary and capricious or abuse of discretion standard, id. at 43, 48, citing in support of this position dicta from this court's decision in Mitchell v. United States, 664 F.2d 265, 274 (Ct. Cl. 1981) ("the standard by which Interior's actions are to be judicially tested is . . . the normal standard for government fiduciaries–were their actions in good faith and within the realm of their acceptable discretion, or were they arbitrary, capricious, an abuse of discretion, or contrary to law?").  Plaintiff, while acknowledging that the issue of standard of care has yet to be briefed, disagrees with defendant's proposed standard and argues for a "more exacting duty of care, particularly where the issues [are] related to the handling of and accounting for trust funds."  Pl.'s Opp. at 39-40 (citing Minn. Chippewa Tribe v. United States, 14 Cl. Ct. 116, 129-30 (1987)).

Because the court believes that the legal issues and facts regarding plaintiff's investment claim have not been sufficiently briefed, it would not be appropriate to determine the standard to which government should be held in this instance.  However, it is useful to distinguish between those duties that are mandated by treaty or statute and those that are left to the discretion of a given actor.  See Peoria Tribe of Indians of Okla. v. United States, 390 U.S. 468, 471 (1968) ("Under Article 7 of the treaty, the United States could at any time pay to the Tribe all or any part of the proceeds received from the sales of the lands at public auction.  But until the proceeds were paid over, the United States was obligated to invest them and pay the annual income to the Tribe.  The United States was not free merely to hold the proceeds without investing them."); Short v. United States, 50 F.3d 994, 999 (Fed. Cir. 1995) ("Here, as in Peoria Tribe, the government had a statutory obligation to hold funds for certain Indians.  The government was further obligated to accrue interest on those amounts until distribution.  See 25 U.S.C. §§ 161a, 161b, 162a.  The government violated its obligations by disbursing funds belonging to the plaintiffs . . . to the fiscal detriment of the plaintiff non-Hoopa Indians.  Therefore, the government owes the plaintiffs interest, not as interest on their damages, but as part of the damage award itself.").

Although plaintiff has not adequately articulated the contours of its investment claim, it is clear that at base its argument relies on the alleged breach by defendant of a duty found in the 1906 Act and in specific statutes to invest funds defendant holds in trust for the Osage Tribe.  Pl.'s Opp. at 38-39.  The court is bound by the holdings of the Federal Circuit and the Supreme Court, both of which have spoken sufficiently directly to the government's obligation to pay interest in similar statutory and factual circumstances to make dismissal of this claim unwarranted at this juncture.  See, e.g., Shoshone, 364

F.3d at 1353 ("We also find merit in the Tribes' argument that the general provisions for tribal trust management and interest accrual found in 25 U.S.C. §§ 161a, 161b, and 162a mandate the payment of interest.  When considered in conjunction with the Government's fiduciary duty to collect revenue from mineral leases . . .  these trust fund statutes create an obligation for the Government to pay interest on amounts that the Government failed to collect.").

III.    Conclusion

        Defendant's motion to dismiss, in part, plaintiff's Tranche One claims for lack of jurisdiction is DENIED.  Plaintiff shall, on or before November 18, 2005, file a brief clarifying the specific legal grounds for its investment claim against defendant, to which defendant shall, on or before December 2, 2005, reply.


        IT IS SO ORDERED.


                                        s/ Emily C. Hewitt
                                        EMILY C. HEWITT
                                        Judge