**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | Electronically Filed December 30, 2005 |
| | ) | Nos. 00-169 L & 99-550 |
| v. | ) | Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF OSAGE NATION'S OPPOSITION TO DEFENDANT'S THIRD MOTION TO DISMISS**

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. THE UNITED STATES' UNTIMELY ATTEMPT TO RELITIGATE ISSUES ALREADY DECIDED BY THE COURT SHOULD BE DENIED ........ 2

A. This Court Has Already Decided That It Has Jurisdiction over the Osage Nation's Investment Claims ........ 2

B. The United States' Third Motion to Dismiss Is Untimely ........ 5

II. THE UNITED STATES' ARGUMENTS FOR DISMISSING THE OSAGE NATION'S INVESTMENT CLAIMS FAIL ........ 6

A. The Court Should Deny the United States' Motion to Dismiss the Osage Nation's Investment Yield Claim ........ 7

1. The Investment Standard Articulated in Cheyenne-Arapaho Governs This Case ........ 8

2. The United States Has No Discretion to Breach Its Trust Duties or to Redefine Its Own Trust Duties ........ 10

B. The Court Should Deny the United States' Motion to Dismiss the Osage Nation's Disbursement Lag Time Claim ........ 13

1. The Money-Mandating Statutes Are Sufficiently Precise to Support the Disbursement Lag Time Claim ........ 15

2. Congressional Action with Respect to Canceled Checks Is Unrelated to Governmental Trust Duties ........ 16

3. The United States Misconstrues Its Common Law Duties as Trustee ........ 17

C. The Osage Nation's Lost Investment Income Claim Is Valid as Stated ........ 18

D. The Standards for Considering the Osage Nation's Deposit Lag Time Claim Cannot Be Determined Before Trial ........ 20

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .....................11

*Cheyenne-Arapaho Tribes of Indians v. United States*, 512 F.2d 1390 (Ct. Cl. 1975) ....................................................................................................... *passim*

*Coast Indian Cmty. v. United States*, 550 F.2d 639 (Ct. Cl. 1977)....................................12

*Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir. 2005) .....................................................11, 12

*Eastport S.S. Corp v. United States*, 372 F.2d 1002 (Ct. Cl. 1967).....................................5

*Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005) .................................................6, 7

*Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238 (N.D. Cal. 1973)........................................................................................................8

*Minnesota Chippewa Tribe v. United States*, 14 Cl. Ct. 116 (1987) ..........................8, 9, 12

*Mitchell v. United States*, 664 F.2d 265 (Ct. Cl. 1981) .......................................................9

*Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 336 (1986) ..........................................8

*Osage Tribe of Indians v. United States*, 68 Fed. Cl. 322 (2005)............................. *passim*

*Osage Nation v. United States*, 57 Fed. Cl. 392 (2003) ....................................................19

*Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F. Supp. 252 (D.D.C. 1972) .........12

*Seminole Nation v. United States*, 316 U.S. 286 (1942) ...................................................12

*Seneca Nation of Indians v. United States*, 173 Ct. Cl. 917 (1965) ..................................12

*Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed. Cir. 2004) ....................18, 19

*United States v. Mitchell*, 463 U.S. 206 (1983)...............................................................5, 9

*United States v. White Mt. Apache Tribe*, 537 U.S. 465 (2003) ..........................................5

*Yankton Sioux Tribe v. United States*, 623 F.2d 159 (Ct. Cl. 1980)...................................12

## STATE CASES

*Matter of Pelton*, 183 Cal. Rptr. 188 (Cal. App. 1982).....................................................17

## STATUTES

Act of June 28, 1906, 34 Stat. 539 ................................................................... *passim*

25 U.S.C. §§ 161a ........................................................................................... *passim*

25 U.S.C. §§ 162a ........................................................................................... *passim*

Competitive Equality Banking Act of 1987, 101 Stat. 552 ("CEBA") .............................16

## MISCELLANEOUS AUTHORITY

1A N.J. Singer, *Statutes and Statutory Construction* (6th Ed. 2002) ................................16

Restatement of Trusts, Second (1992) ..........................................................................10, 17

Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* (4th Ed. 1987) ..........................................................................................................17, 18

## INTRODUCTION

At earlier points in this litigation, the United States has twice moved unsuccessfully to dismiss this case on jurisdictional grounds. In a third bite at the apple, the United States again seeks dismissal, arguing that the Osage Nation has failed to provide the requisite statutory or regulatory grounding for its investment claims. This belated argument fails at the threshold for two reasons.

First, this Court has already ruled in its Opinion and Order of October 27, 2005 ("October 27, 2005 Opinion") that it has jurisdiction because the Osage Nation's investment claims assert a "breach by defendant of a duty found in the 1906 Act and in specific statutes to invest funds defendant holds in trust for the Osage Tribe." *Osage Tribe of Indians v. United States,* 68 Fed. Cl. 322, 336 (2005). The Osage Nation has not changed the statutory grounds of its investment claims. Thus, the Court has no reason to reconsider its finding of jurisdiction. If the United States is not satisfied with that result, its remedy is to appeal this Court's decision after trial.

Second, the United States' motion is untimely, having been filed approximately five and one-half months after the deadline established by the Court for such a motion. The United States did not seek leave of the Court to file its motion out of time, and has presented no justification for its late filing.

Beyond these two fatal flaws, the United States' arguments either are recycled versions of arguments previously rejected by the Court or rest on mistaken assumptions about the applicable legal principles, as detailed below. Accordingly, the United States' third Motion to Dismiss should be denied and the case allowed to proceed to trial.

# ARGUMENT

## I. THE UNITED STATES' UNTIMELY ATTEMPT TO RELITIGATE ISSUES ALREADY DECIDED BY THE COURT SHOULD BE DENIED

### A. This Court Has Already Decided That It Has Jurisdiction over the Osage Nation's Investment Claims

The United States' third Motion to Dismiss should be quickly dismissed because it rests on an argument the Court has already rejected – namely, that the Osage Nation "has failed to show a sufficient statutory or regulatory basis to support the Court's jurisdiction over certain of Plaintiff's claims." Defendant's Reply to Plaintiff Osage Nation's Brief Clarifying Legal Bases for Its Investment Claims and Memorandum in Support of Motion to Dismiss ("Def's Reply") at 1. That argument directly clashes with the Court's earlier ruling that the Osage Nation's investment claims allege a "breach by defendant of a duty found in the 1906 Act and in specific statutes to invest funds defendant holds in trust for the Osage Tribe." October 27, 2005 Opinion, 68 Fed. Cl. at 336.

The United States attempts to avoid the Court's holding by arguing that the Osage Nation's explanation of the detailed legal bases for and contours of its investment claims set forth in its Brief Clarifying Legal Bases for Its Investment Claims (filed Nov. 18, 2005) ("Legal Bases Br.") somehow reveals that it is relying on an "amorphous duty related to investments by virtue of the mere invocation of 25 U.S.C. §§ 161a and 162a" to establish jurisdiction, and then "import[ing] selectively" common-law principles to define the United States' duties. Def's Reply at 5. From this the United States concludes that "the Osage Nation is seeking to use broad common law precepts to create and impose trust fund duties on the United States, rather than using the common law to particularize an existing specific statutory duty." Def's Reply at 6. This line of argument provides no basis for overturning the Court's earlier determination that it has jurisdiction over the Osage Nation's investment claims.

The duties imposed by the 1906 Act and 25 U.S.C. §§ 161a and 162a are hardly "amorphous." Rather, those statutory provisions specifically obligate the United States to invest, and pay interest on, Osage trust funds. The express terms of those statutes, combined with decades of Indian Tucker Act jurisprudence, support the Court's ruling that "the government's obligation to pay interest in similar statutory and factual circumstances [makes] dismissal of this claim unwarranted at this juncture." October 27, 2005 Opinion, 68 Fed. Cl. at 336. The United States ignores that clear holding, blithely repeating its arguments as if the Court had not already rejected them.

Moreover, the Osage Nation has not simply cited broad common-law concepts that are disconnected from the specific statutory duties that form the basis of jurisdiction. At the Court's direction, the Osage Nation in its Legal Bases Brief provided greater detail about the legal bases of its investment claims. In providing that detail, the Osage Nation followed the Supreme Court's example in *United States v. White Mt. Apache Tribe*, 537 U.S. 465, 475 (2003), using common-law duties that relate directly to the general statutory duties to act as trustee and to invest, and earn interest on, funds held in trust. Under *White Mountain Apache*, such use of the common law is sufficient both to confer jurisdiction under the Indian Tucker Act *and* to state a claim on which relief can be granted. To use the standard the United States endorses, Def's Reply at 6, the Osage Nation used common-law principles to "particularize" the general statutory duty.

The United States' failure to explain *why* the common law principles cited by the Osage Nation do not particularize the United States' statutory duties reveals the hollowness of its position. Even a brief review of relevant common-law principles shows how they serve to refine and particularize the United States' statutory duties.

The 1906 Act imposes an unambiguous duty on the United States to act as a trustee over Osage funds and to earn interest on those funds. Act of June 28, 1906, 34 Stat. 539 ("1906 Act"), §§3, 4. 25 U.S.C. §§ 161a and 162a impose further duties to pay interest on those funds or to invest those funds in certain instruments if a higher yield can be so obtained. As is often the case with legislation, however, those statutes do not detail every issue relating to the execution of those statutory duties.

For example, although the statutes charge the United States with the duty of ensuring that trust funds earn interest, they do not specify when that duty ends. The common law provides particularized guidance on the duty's contours by directing a trustee to make trust assets productive by leaving funds in an interest-bearing account as long as possible. *See* Legal Bases Br. at 8-10. The common-law duty to earn interest on funds until the moment of withdrawal directly informs and gives focus to the statutory duty to earn interest. The Osage Nation's reliance on the common law in this manner in no way undermines the Court's determination that the United States' duty to earn interest on funds held in trust creates a money-mandating duty, a claim for breach of which may be brought in this Court. Similarly, it is clear that the Osage Nation's discussion of common-law duties regarding investment yield, *id.* at 10, and deposit lag time, *id.* at 12, serve only to particularize statutory duties to invest, and pay interest on, trust funds. Such reliance on the common law reinforces rather than undercuts this Court's prior finding of jurisdiction.

The United States also resurrects its previously rejected argument that all aspects of a trustee's duty must be explicitly set forth in a statute or regulation in order to establish a money-mandating fiduciary duty. Def's Reply at 5-6. This Court has already rejected that argument, stating that the United States, "by requiring a 'controlling provision' that

unambiguously states the specific duty that has been allegedly breached, goes beyond the showing required under the governing case law." October 27, 2005 Opinion, 68 Fed. Cl. at 330. In *Mitchell II*, the Court stated that "the substantive source of law may grant the claimant a right to recover damages either 'expressly or by implication.'" *United States v. Mitchell*, 463 U.S. 206, 217 n.16 (1983) (citing *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)). *See also White Mt. Apache Tribe*, 537 U.S. at 475 (drawing on common law to find an implied money-mandating duty). Not surprisingly, the United States avoids discussing those cases or the Court's ruling on this point, Def's Reply at 3-7, and once again fails to present any reason for the Court to modify its previous decision.

**B. The United States' Third Motion to Dismiss Is Untimely**

At the outset of Tranche One, this Court issued a scheduling order imposing specific deadlines. Because it recognized that the United States would likely seek dismissal of this case on jurisdictional grounds, the Court established a specific procedure for filing such a motion at the early stages of Tranche One. Specifically, the Court ordered:

> 2. <u>Identification of Issues.</u> Plaintiff shall file a statement identifying the issues to be resolved at trial on or before Thursday, May 12, 2005. This statement shall include the damages claimed, legal authorities supporting recovery, and time frames for which recovery is sought under each legal authority.
>
> 3. <u>Dispositive Motions.</u> Defendant shall file any dispositive motions with respect to legal authorities supporting recovery and time frames for which recovery is sought under each legal authority on or before Monday, June 13, 2005. Plaintiff shall file its response to defendant's motion(s) on or before Monday, July 11, 2005. Defendant shall file its reply to plaintiff's response on or before Monday, July 25, 2005.

Order of March 25, 2005 at 3.

In accordance with that Order, the Osage Nation filed its Statement of Trust Fund Mismanagement Claims for Tranche One. Subsequently, the United States complained that that Statement was not sufficient to allow it understand the nature and bases of the Osage Nation's

claims. In a telephonic conference on May 23, 2005, the Osage Nation, in response to questioning from the Court and the United States, provided further clarification of its claims. At the end of the conference, the Court concluded that the Osage Nation's claims had been sufficiently stated to allow the United States to file its dispositive motion, which the United States did. In that second Motion to Dismiss, the United States chose not to seek the dismissal of the Osage Nation's investment claims. That motion was briefed and argued, and the Court denied the motion in its decision of October 27, 2005.

Despite the Court's unambiguous directive that the United States file "***any*** dispositive motions with respect to legal authorities supporting recovery and time frames for which recovery is sought under each legal authority" by the date specified, the United States filed precisely such a motion on December 2, 2005, some five and one-half months ***after*** the Court's deadline. The United States did not seek leave of Court to file its motion out of time, nor did it provide any reason why it was unable to raise these issues earlier. Moreover, given the Court's scheduling order, the United State's third Motion to Dismiss has required the Osage Nation to divert resources from preparing for trial and complying with recent and approaching pre-trial deadlines. Accordingly, the United States' motion should be dismissed as untimely.

## II. THE UNITED STATES' ARGUMENTS FOR DISMISSING THE OSAGE NATION'S INVESTMENT CLAIMS FAIL

Although captioned as a motion to dismiss under both RCFC 12(b)(1) and 12(b)(6), the United States does not clearly distinguish between its arguments for dismissal for lack of jurisdiction and its arguments for dismissal for failure to state a claim on which relief may be granted. The apparent source of this imprecision is the United States' misinterpretation of *Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005). According to the United States, that case stands for the proposition that, if a claim is ultimately found not to "fit within the scope of the [statutory

and regulatory] source [of jurisdiction]," *id.* at 1175-76, it should be dismissed. Def's Reply at 3. Apparently the United States understands *Fisher* to create an independent basis for Rule 12(b)(6) dismissal on the ground that the asserted claim lacks the requisite connection with the statutory source of jurisdiction.

Contrary to the United States' position, *Fisher* stands for no such rule. In *Fisher*, the Federal Circuit simply noted that, when a plaintiff loses a case because the facts presented fail to show a violation of the United States' money-mandating duty, the court's jurisdiction is not somehow withdrawn; rather, the plaintiff simply loses on the merits. 402 F.3d at 1175-76. *Fisher* does not discuss or address Rule 12(b)(6) and cannot be understood to reduce the United States' burden to show that there is no set of facts that could be proven to establish a violation of a money-mandating duty. In any event, as detailed below, the Osage Nations' specific investment claims fit within the scope of the money-mandating duties imposed by the 1906 Act and 25 U.S.C. §§ 161a and 162a because they relate to specific failings of the United States to pay interest or make appropriate investments. Whether viewed under the standards of RCFC 12(b)(1) or 12(b)(6), it is clear that none of the United States' arguments justify dismissal of the Osage Nation's investment claims.

### A. The Court Should Deny the United States' Motion to Dismiss the Osage Nation's Investment Yield Claim

The Osage Nation's investment yield claim is straightforward: The United States, in its capacity as trustee, failed to invest the Osage trust funds as a prudent trustee would have. The statutory bases for this claim are evident. The 1906 Act creates the Osage Trust; requires that oil and gas royalties, as well as other funds, be placed in that trust; names the United States as trustee; and requires that the United States earn interest on funds held in trust. Moreover, 25 U.S.C. §§ 161a and 162a require the United States to earn interest at the *greater of* the 4%

statutory rate set forth in Section 161a *or higher* yields that might be obtained by investing trust funds as provided in Section 162a. *See Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238, 1245 (N.D. Cal. 1973) ("the present statutory scheme entitles the Band to a minimum return of 4 per cent on its trust moneys and authorizes investment in the range of investment alternatives outlined above").

The juxtaposition of these two statutes led the court in *Cheyenne-Arapaho Tribes of Indians v. United States*, 512 F.2d 1390, 1394 (Ct. Cl. 1975), to conclude that "[t]he fiduciary duty which the United States undertook with respect to these funds includes the 'obligation to maximize the trust income by prudent investment,' and the trustee has the burden of proof to justify less than a maximum return." Accordingly, the United States is liable for breach of fiduciary duty when it fails to withdraw Indian tribal trust funds from the Treasury and invest them in higher-yielding investments pursuant to Section 162a. *Manchester Band*, 363 F. Supp. at 1247-48; *Cheyenne-Arapaho*, 512 F.2d at 1396. *See* Legal Bases Br. at 4. Consistent with those authorities, the Court correctly concluded that it had jurisdiction over the Osage Nation's investment yield claim.

Undeterred by either this Court's ruling or clear precedent, the United State advances two arguments in an effort to avoid having to defend its investment decisions on the merits. Neither argument has merit.

**1. The Investment Standard Articulated in *Cheyenne-Arapaho* Governs This Case**

The United States argues that *Mitchell II* and *Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 336 (1986), somehow undermine the Federal Circuit's earlier decision in *Cheyenne-Arapaho*. Def's Reply at 8. First, that argument was explicitly rejected in *Minnesota Chippewa Tribe v. United States*, 14 Cl. Ct. 116 (1987). The court there explained that *Mitchell II* and

*Navajo* do not supplant *Cheyenne-Arapaho* because "[t]he tests referred to in [those cases] . . . are easily distinguishable . . . because they all involve Government actions in areas in which fiduciaries are generally seen as having much greater discretion." 14 Cl Ct. at 129.

Second, the Osage Nation is not arguing, as the United States appears to imply, that the United States must maximize returns by making investments other than those authorized by 25 U.S.C. §§ 161a and 162a. The Osage Nation simply seeks to enforce the United States' obligation "to make their trust funds as productive as legally and practically possible." *Cheyenne-Arapaho*, 512 F.2d at 1394. The United States apparently objects to the *Cheyenne-Arapaho* standard because of the word "maximize." Yet the standard proffered by the United States from the Court of Claims decision in *Mitchell II*, that "defendant must as trustee exercise reasonable management zeal to get for the Indians the best rate," *Mitchell v. United States*, 664 F.2d 265, 274 (Ct. Cl. 1981), *aff'd* 463 U.S. 206 (1983), is functionally identical to the *Cheyenne-Arapaho* standard. Simply stated, there is no meaningful distinction between working zealously to get the best rate under *Mitchell II* and obtaining the maximum prudent return under *Cheyenne-Arapaho*.

The misguided nature of the United States' reflexive aversion to the word "maximize" is apparent from the statutory framework itself. Section 162a defines a range of permissible investment options. As the court in *Cheyenne-Arapaho* recognized, the United States' duty is to get the best yield it can prudently obtain within the statutorily prescribed range of permissible investments, i.e., to maximize investment yields in the context of the statutory investment authority.

Paradoxically, despite earnest argument that one must look only to express statutory and regulatory provisions, the United States reverses course and attempts to use the common law as a

shield. Thus, it seeks to support its position by arguing that no duty to "maximize" returns can be found in the common law. Def's Reply at 9. Since under *Cheyenne-Arapaho* the duty to maximize prudent investment returns flows from the statutory framework itself, the United States' argument reduces to the patently erroneous proposition that the silence of the common law on a specific issue overrides express statutory duties.

In any event, the United States misconstrues the common law by continuing its blindered fixation on the word "maximization." It is true that the Restatement of Trusts, Second (1992) ("Restatement 2d") does not use the word "maximize" when describing a trustee's investment duties. It also true, however, that there is no concept of a trustee's common-law duty that would allow a trustee to fail to obtain the best prudently possible return. Whether a trustee has met those standards is, of course, a fact question that can be resolved only at trial. But an allegation that a trustee failed to obtain the best yield that a prudent trustee could have obtained is clearly a valid claim over which this Court may exercise jurisdiction.

The Osage Nation will show – by, among other things, comparing the apparent yield that the United States obtained for the Osage trust funds to the yields the United States was able to obtain for other tribes and to the prudent yield rate endorsed in the report of the United States' expert – that the United States failed to fulfill its obligations as a trustee. Such a claim falls within this Court's jurisdiction and clearly states a claim on which relief may be granted.

### 2. The United States Has No Discretion to Breach Its Trust Duties or to Redefine Its Own Trust Duties

The United States attempts to avoid any scrutiny of its investment decisions by arguing that investment decisions under 25 U.S.C. §§ 161a and 162a are discretionary, implying that the existence of "discretion" provides a legal bar to scrutiny. Def's Reply at 9-10. The United States attempts to support this bold argument by leveraging the unremarkable fact that a trustee enjoys a

degree of discretion in executing his duties into a conclusion that it should here enjoy the deferential notion of discretion applied by the courts when reviewing non-fiduciary governmental actions under the APA. Def's Reply at 11-13. Indeed, the United States argues that the most recent *Cobell* decision adopted a rule that *Chevron*-type deference was appropriate in trust cases. Def's Reply at 6 (citing *Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir. 2005) and *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)).

The *Cobell* court, however, rejected any notion that APA deference applies as a matter of course in trust cases, precisely because the United States' trust duties require a different standard of review. *Cobell*, 428 F.3d at 1074. Moreover, while *Cobell* did give *Chevron*-like deference to a particular decision of the trustee, it did so under the narrow circumstance where "neither congressional language nor common law trust principles . . . establish[ed] a definitive balance between exactitude and cost" and "[t]he choices at issue required both subject-matter expertise and judgment about the allocation of scarce resources, classic reasons for deference to administrators." *Id.*

The facts of this case are readily distinguishable from *Cobell*, negating any basis for applying *Chevron*-like deference here. In making its investment decisions as trustee, the Secretary of the Interior in this case had no need to make "judgment[s] about the allocation of scarce resources." Nor was it necessary to engage in cost-benefit analysis because making one investment does not cost the United States any more than making any other investment. Moreover, because 25 U.S.C. §§ 161a and 162a, *Cheyenne-Arapaho*, and common law principles establish standards to govern the United States' investment decisions, there is no uncertainty in the applicable standard of care and therefore no need for the United States to exercise the kind of discretion that receives deference under *Chevron*.

Moreover, courts have repeatedly rejected the argument that in Indian trust cases the United States enjoys some lesser standard of care than other trustees. To the contrary, the cases suggest, if anything, that the United States is held to a *higher* standard of care. The "standard of duty for the United States [as trustee] is not mere 'reasonableness' but the highest fiduciary standards." *Minnesota Chippewa*, 14 Cl. Ct. at 130 (citing *Yankton Sioux Tribe v. United States*, 623 F.2d 159, 163 (Ct. Cl. 1980)). The United States as trustee takes on "the most exacting fiduciary standards" of responsibility, because it "has charged itself with moral obligations of the highest responsibility and trust." *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942). *See also Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F. Supp. 252, 256 (D.D.C. 1972) ("Undertakings with the Indians are to be liberally construed to the benefit of the Indians.").

Numerous cases have reaffirmed this fundamental principle. *See Seneca Nation of Indians v. United States*, 173 Ct. Cl. 917, 925 (1965) ("When the Federal Government undertakes an 'obligation of trust' toward an Indian tribe or group … the obligation is 'of the highest responsibility and trust'"); *Cheyenne-Arapaho*, 512 F.2d at 1392 ("We have ruled that the United States as trustee has undertaken an obligation of the highest responsibility and trust"); *Coast Indian Cmty. v. United States*, 550 F.2d 639, 652 (Ct. Cl. 1977) ("The United States, when acting as trustee for the property of its Indian wards, is held to the most exacting fiduciary standards"). Indeed, the standard of conduct for the United States is "doubly strict when the defendant, by retaining Indian moneys in the Treasury, in effect borrows those funds." *Cheyenne-Arapaho*, 512 F.2d at 1392. The United States' argument that its investment decisions as trustee are subject to a lesser standard of care than that applicable to an ordinary trustee collapses under the great weight of contrary authority.

The United States also argues that Section 187 of the Restatement 2d somehow insulates the United States as trustee from judicial review. Def's Reply at 11. But this section of the Restatement 2d has no relevance here. It addresses whether an injunction can be obtained to compel the trustee to perform some discretionary act. Obviously it does not address the availability of damages when a trustee has violated his trust duties.

Finally, the Osage Nation's investment yield claim should proceed to trial because the critical issue even under the United States' theory would be whether the Government exercised its discretion properly. To hold otherwise would require a finding that 25 U.S.C. §§ 161a and 162a confer unfettered and unreviewable discretion on the United States' investment decisions. *Cheyenne-Arapaho* and many other cases have implicitly rejected such an argument by exercising jurisdiction over such claims.

### B. The Court Should Deny the United States' Motion to Dismiss the Osage Nation's Disbursement Lag Time Claim

The Osage Nation's disbursement lag time claim is also straightforward: That the United States breached its trust duties by failing to pay interest on funds that were awaiting distribution to headright owners but had not been withdrawn from the Treasury. This claim has a clear statutory basis. Pursuant to the 1906 Act and 25 U.S.C. §§ 161a and 162a, the United States has a duty to pay interest on funds held in trust. Those statutes impose no limit on that obligation and under their plain language require the United States to pay interest on funds for the entire time they are held in trust. Thus, when the United States allows the funds to remain uninvested, in a non-interest bearing account and not earning even the 4% statutory rate, a valid claim for breach of trust has been stated.

Common-law principles underscoring a trustee's obligation to earn a return on funds held in trust reinforce the validity of this statutory claim. As described in the Osage Nation's Legal

Bases Brief, that general duty imposes a particular duty to earn interest on funds as long as practicable. Legal Bases Br. at 8-10. Given the availability of highly liquid interest-earning vehicles, such as money market accounts, over-nighter investments, and interest-bearing checking accounts, a trustee has a duty to earn interest on funds up until the time of actual withdrawal. No reasonable trustee responsible for the amount of money at issue here would keep the money in a non-interest bearing account, forgoing entirely the interest that could be earned pending check clearance. Yet the United States takes the position that, as a matter of law, when it acts as trustee, it may do precisely that, effectively throwing money away.

The evidence will show that there were often periods of several days, weeks, and even years between the time a check was written to a headright owner and the time the check was negotiated and funds actually withdrawn from the Osage Trust account. Indeed, there are many examples of checks *never* being negotiated, allowing funds to remain in the Treasury for years without earning interest. As a result, the United States allowed a substantial amount of money to remain uninvested and in non-interest bearing accounts. No one would treat his or her own money that way, and there is no legal basis for the United States to treat Osage trust funds in such a cavalier manner.

Thus, it is clear that this Court has jurisdiction over the Osage Nation's claim for breach of the duty to pay interest. Moreover, there is no legitimate argument under Rule 12(b)(6) that the plaintiff here is unable to prove any set of facts that could support its claim. To reach such a holding, the Court would have to conclude, as a matter of law, that a trustee has unreviewable discretion to allow funds held in trust to earn no interest. Whether any circumstantial evidence can excuse the United States' decision as trustee not to obtain interest on certain funds for certain periods of time is a fact question that can be resolved only at trial.

In a vain attempt to overcome the inherent defects in its position, the United States makes three arguments for dismissal, none of which has merit.

### 1. The Money-Mandating Statutes Are Sufficiently Precise to Support the Disbursement Lag Time Claim

The United States argues that dismissal is required because "[o]n their faces, these statutes do not establish any duty on the United States to earn interest on funds between the time checks are drawn on the trust and when those checks are either cashed or canceled." Def's Reply at 14.[1] This is simply another iteration of the previously rejected argument that each duty must appear explicitly in a statute or regulation for it to create a money-mandating duty. *See supra* at 4-5. More fundamental, this argument ignores the clear terms of both the 1906 Act and 25 U.S.C. §§ 161a and 162a. Those statutory provisions explicitly require the payment of interest and say nothing about that duty ever stopping, reflecting a Congressional intent that interest should be paid for the entire period the funds remain in the Treasury. Thus, the precision the United States would require in fact exists.[2] It is the United States that seeks to alter its statutory

---

[1] The United States also argues that this claim violates the principle that "absent specific statutory language, claims for interest against the government will not stand." Def's Reply at 14. But the Osage Nation's disbursement lag time claim is not a claim for prejudgment interest; it is a claim for interest that would have been earned had the United States not breached its trust duties. Such lost income is expressly recoverable under *Shoshone*. Once again, the United States' argument is a play on words. The mere fact that the Osage Nation is seeking the interest that the United States was statutorily obligated to pay it does not somehow convert that claim into a request for prejudgment interest.

[2] The United States argument that ceasing interest payments is justified by the nature of Treasury checks, Def's Reply at 15 n. 6, is simply inapposite. The fact that Treasury checks are considered cash equivalents does not mean that funds may not be deposited in interest-earning accounts pending negotiation of the check, or that the United States could not calculate payment of the 4% statutory rate up until that actual date the check is negotiated. By way of example, many commercial checking accounts pay interest up until the moment a check is negotiated, giving the account holder the benefit of the "float." In any event, whether such a practical issue justifies the United States' action raises an issue of fact that should be resolved at trial, not on a motion to dismiss.

duty by implying a cut-off of the duty to pay interest based on the issuance, or decision to issue, a check in the absence of any statutory or regulatory authorization for such an implied limitation on the United States' trust duties under the 1906 Act and 25 U.S.C. §§ 161a and 162a.

### 2. Congressional Action with Respect to Canceled Checks Is Unrelated to Governmental Trust Duties

In a further attempt to undermine the clear language of both the 1906 Act and 25 U.S.C. §§ 161a and 162a, the United States argues that the provisions of the Competitive Equality Banking Act of 1987, 101 Stat. 552 ("CEBA"), which canceled checks that had been outstanding for more than one year, demonstrate that there is no duty to pay interest on the cancelled disbursements. Def's Reply at 15-16. To support this argument, the United States points to the absence in the CEBA itself of any requirement that interest be paid on the proceeds of canceled checks. Def's Reply at 15. But there was no need for any such directive because the 1906 Act and 25 U.S.C. §§ 161a and 162a already required the payment of interest. Accordingly, silence in CEBA in no way abrogates Congress's earlier mandates that interest be paid on all funds held in trust. Likewise, Congress's failure to appropriate funds specifically to remedy the breach of the Osage trust does not indicate that no breach occurred.

At bottom, the United States' argument rests on the notion that CEBA and the interest appropriations implicitly and silently repealed the provisions of the 1906 Act and 25 U.S.C. §§ 161a and 162a requiring the payment of interest on Osage trust funds. It is a basic tenet of statutory construction, however, that there is a strong presumption against repeal by implication. 1A N.J. Singer, *Statutes and Statutory Construction*, § 23:10 (6th Ed. 2002). This rule applies with particular force when it is suggested that a latter enacted appropriation measure has the effect of creating an exception to a more generally applicable law. *Id.* at p. 489.

### 3. The United States Misconstrues Its Common Law Duties as Trustee

The United States argues that, "under the common law, trustees have no duty to pay interest on disbursed funds." Def's Reply at 17. This argument is wrong.

The United States cites the Restatement 2d for the proposition that "[a] trustee may deposit funds in a bank for the purpose of making the funds available from time to time for the payment of expenses or pending investment or distribution" (Restatement 2d, § 180 cmt. a), and asserts that "[t]he bank account in which the funds are deposited does not have to be interest-bearing." Def's Reply at 17-18. Here, the United States simply selects from the Restatement 2d the language it likes, and ignores the language that undermines its position. Under this same section of the Restatement 2d, a trustee breaches his trust duties if it leaves "an excessive amount of trust funds on deposit for an unreasonably long time." Restatement 2d, § 180 cmt. d. That is the essence of the Osage Nation's disbursement lag time claim: That the United States placed funds awaiting withdrawal in non-interest bearing accounts for unreasonably long periods of time. "In such a case, if the deposit is not at interest and justifiable as an investment, the trustee is liable for interest lost by the failure to invest." *Id.*.

Other authorities explain that modern banking practices allow trustees to obtain interest on trust funds awaiting withdrawal, imposing an obligation to obtain such interest. 2A Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts*, § 181 at 549 (4th Ed. 1987) ("Scott on Trusts"). To argue, as the United States does, that as a matter of law that trustees are *never* obligated to obtain interest on funds awaiting disbursal obviously misconstrues the common law.

Also misguided is the United States' reliance on Scott on Trusts, § 203 for the proposition that a trustee may hold trust funds without paying interest. Def's Reply at 17. That section of Scott on Trusts is inapposite because it addresses the special case of a trust company placing trust

funds held in its own commercial bank, which is not the case here. Obviously, the United States is not a trust company and did not deposit Osage trust funds in a commercial bank.

More fundamental, the ability to place trust funds in a trustee's own commercial banking department does not relieve a trustee from earning an appropriate interest rate on the trust funds. Scott on Trusts, § 170.18 (citing *Matter of Pelton*, 183 Cal. Rptr. 188 (Cal. App. 1982) (bank fiduciary was held liable for lost interest when it kept trust funds its own banking department when it could have secured higher return by making deposits in other banks). Indeed, to accept the United States' position would be to conclude that trust funds become, in effect, the property of the trustee, a position clearly antithetical to the very concept of a trustee. *See* Scott on Trusts, § 179.1 (trust funds must be kept separate from trustee's personal property).

**C. The Osage Nation's Lost Investment Income Claim Is Valid as Stated**

The United States acknowledges that, under *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1351-55 (Fed. Cir. 2004), the Osage Nation may recover lost investment income that it would have earned had the United States not breached its trust duties. Def's Reply at 18. The United States attempts to cut off that right of recovery, however, by arguing that the Osage Nation's lost investment income claim should be limited to income that would have been earned between the time of a given breach of trust to the next quarterly distribution to headright owners. Def's Reply at 18-19.

That position is unsustainable because the United States' breaches of trust have deprived the Osage Nation and the headright owners, including the Osage Nation itself which is both a headright owner in its own right and which relies on the trust to meet the operating expenses of the Tribal Council, of the full economic value of funds that would have been received as long as 30 years ago had the United States not breached its trust duties. If adopted, the United States' proposal would achieve precisely what *Shoshone* bars: A result that "would perversely (and

proportionally) reward the Government for inaction that violates the Government's fiduciary duties to collect funds and accrue interest." *Shoshone Indian Tribe,* 364 F.3d at 1352 n.7. Under *Shoshone*, the Osage Nation is entitled to the lost investment income from those funds from the date of the breach to the present.

The apparent thrust of the United States' position is that lost investment claims for earnings after each quarterly distribution are claims of the individual headright owners. But this Court has already held, in denying the United States' first Motion to Dismiss, that the Osage Nation has standing to pursue damages for the whole breach, which necessarily includes the interest that headright owners would have earned after distribution. *Osage Nation v. United States*, 57 Fed. Cl. 392, 395 (2003). As the Court noted, these claims relate to the collection and management of funds in the tribal trust, and are properly brought by the Osage Nation itself, not individual headright owners. Any concern about whether damages would "flow down" to the headright owners is resolved by Section 4(1) of the 1906 Act requiring distribution on a pro rata basis among the headright owners, including specifically the proceeds of claims against the United States.

In this context, where the underlying breaches of trust all occurred while funds were, or should have been, held in the tribal trust, it is appropriate to measure damages from the time of the breach to the present, and then distribute those damages on a pro rata basis to headright owners as provided in the 1906 Act. To rule otherwise would violate the holding and clear intent of *Shoshone* by denying the trust and its beneficiaries of the benefits of funds withheld from the trust by the United States' breaches of trust. Such a ruling would also contravene this Court's July 28, 2003 ruling dismissing the United States' first Motion to Dismiss. Moreover, that approach would have the unfair and inefficient result of forcing each of the several thousand

headright owners to file individual claims against the United States for his or her pro rata share of the lost investment income.

### D. The Standards for Considering the Osage Nation's Deposit Lag Time Claim Cannot Be Determined Before Trial

The United States "does not dispute that it has a duty to deposit funds that it receives for the Osage Tribe into Treasury." Def's Reply at 21. Nor does the United States make a motion to dismiss the Osage Nation's deposit lag time claim. The United States merely argues that the Court should find that the United States acted reasonably by mailing royalty checks to the regional office in Muskogee within 24 hours of receipt. Def's Reply at 22.

The United States position is undercut, however, by its own guidance requiring that funds be deposited within 24 hours of receipt. *Id.* at 21-22. By mailing royalty checks to Muskogee, the United States delayed deposit by an additional 24-72 hours *after* receipt of the checks. The Court cannot conclude as a matter of law that the United States acted reasonably by mailing checks to Muskogee and thereby ensuring that checks would be deposited 24-72 hours later than if they had been deposited in or near Pawhuska. Whether the United States can explain such conduct can only be determined by a factual record that the United States has not yet established. Moreover, the evidence will show that other actions by the United States caused additional delays in making deposits.

## CONCLUSION

For the foregoing reasons, the Court should reaffirm its ruling of October 27, 2005, and deny the United States' Motion to Dismiss the Osage Nation's Investment Claims.

December 30, 2005

Respectfully submitted,

*s/Wilson K. Pipestem*

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation