**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | Electronically Filed January 12, 2006 |
| *v.* | ) | Nos. 99-550 L & 00-169 L Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF OSAGE NATION'S**
**MEMORANDUM OF CONTENTIONS OF FACTS AND LAW**

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................

STATEMENTS OF FACTS ....................

I. BACKGROUND .................... 1

A. The Osage Tribe and Its Multiple Forced Relocations .................... 1

B. The 1906 Act .................... 4

C. The Osage Agency .................... 7

II. THE OSAGE LEASES AND REGULATIONS .................... 8

A. The Regulations and Form Leases Issued by the United States .................... 8

B. The Tranche One Leases .................... 9

C. The Osage Regulations .................... 11

D. The Government Must Determine and Verify a Number of Variables Under the Royalty Formula .................... 15

III. THE GOVERNMENT'S GENERAL ADMINISTRATION OF ROYALTY COLLECTION AND VERIFICATION FOR FEDERAL AND INDIAN MINERALS LEASES .................... 16

A. Lack of Auditing .................... 17

B. Lack of Independent Verification of Production Volume .................... 19

C. Inadequate Staffing .................... 20

IV. THE OSAGE AGENCY'S ADMINISTRATION OF ROYALTY COLLECTION AND VERIFICATION .................... 20

A. General Systemic Flaws .................... 20

B. Specific Flaws .................... 22

C. Lack of Sufficient Records to Substantiate Royalty Collections .................... 25

V. THE OSAGE AGENCY'S MANAGEMENT OF FUNDS COLLECTED .................... 27

A. The Process for Depositing Royalty Payments .................... 27

B. Investment of Osage Minerals Trust Funds .................... 28

C. Distribution of Funds to Headright Owners....30

D. The Government's Mishandling of Trust Funds....30

VI. THE GOVERNMENT'S ADMINISTRATION OF THE OSAGE MINERALS ESTATE HAS HARMED THE TRUST AND THE OSAGE NATION....31

A. Harms Caused by the Government's Failure to Collect All Moneys Due Under the Tranche One Leases....32

1. Systemic Losses Due to Failure to Audit and Police....36
2. Penalties....37

B. Harms Caused by the Government's Failure to Invest Trust Funds Efficiently and Prudently....37

STATEMENT OF ISSUES OF FACT AND LAW....

APPLICABLE LEGAL PRINCIPLES....

I. AS TRUSTEE OF THE OSAGE MINERAL ESTATE, THE UNITED STATES OWES THE OSAGE NATION THE HIGHEST FIDUCIARY DUTY....45

A. The United States' General Trust Duties Toward Dependent Indian Nations Impose a Heightened Standard of Care for Specific Statutory Trust Duties....45

B. Any Ambiguities in Statutes or Regulations Meant to Benefit Indian Tribes Must Be Construed in the Indians' Favor....47

C. The United States Must Administer the Osage Trust Without Regard to the United States' Own Interests, Irrespective of the United States' Own Convenience, and at the United States' Own Expense....48

D. In the Absence of a Proper Accounting, the United States as Trustee Bears the Burden of Proving That It Has Properly Discharged Its Duties, and All Doubts Must Be Resolved Against the Trustee....49

II. CLAIM 1: THE UNITED STATES BREACHED ITS DUTY TO COLLECT "ALL MONEYS DUE" UNDER THE TRANCHE ONE LEASES....50

A. The United States Had a Duty to Collect "All Moneys Due" Under The Tranche One Leases....51

1. The United States Was Required to Determine Accurately the Volumes of Oil Subject to Royalty....52
2. The United States Was Required to Calculate Royalties Correctly....53
3. The United States Was Required to Collect Late Fees Owed Under the Tranche One Leases....55

4. The United States Had a Duty to Keep Clear, Detailed, and Accurate Accounts Showing What Moneys Were Due and What Moneys Were Collected ....................55

B. The United States Committed Multiple Breaches of its Duty to Collect "All Moneys Due" Under the Osage Leases....................56

1. The United States Breached Its Duty to Collect All Moneys Due by Failing Accurately to Determine Volumes of Oil Subject to Royalty....................**56**

2. The United States Breached Its Duty to Collect All Moneys Due by Failing to Ensure the Accuracy of Sales Prices Used to Calculate Royalties ....................**57**

3. The United States Breached Its Duty to Collect All Moneys Due by Failing Accurately to Determine Major Purchasers and Their Posted Prices ....................**59**

4. The United States Breached Its Duty to Collect All Moneys Due by Failing to Include in Royalty Calculations the Highest Prices Offered by Major Purchasers ....................**59**

5. The United States Breached Its Duty to Collect All Moneys Due by Improperly Excluding from Consideration Prices Posted, Offered, or Paid in Excess of Price Caps Applicable in Regulated Markets....................**62**

6. The United States Breached Its Duty to Collect All Moneys Due by Applying Gravity Adjustments to Posted Prices When Calculating Royalties ....................**67**

7. The United States Breached Its Duty to Collect All Moneys Due by Failing to Take into Account Higher Prices Paid on the Same Lease....................**68**

8. The United States Breached Its Duty to Collect All Moneys Due by Failing to Identify Underpayments Subject to Late Fees....................**69**

9. The United States Has Breached Its Duty to Account for Trust Moneys....................**69**

III. CLAIM 2: THE UNITED STATES HAS BREACHED ITS DUTY TO INVEST TRUST FUNDS PRUDENTLY ....................69

A. The United States Has a Duty to Manage Trust Funds Prudently ....................69

1. The United States Had a Duty to Deposit Trust Funds Within 24 Hours of Receipt ....................**71**

2. The United States Has a Duty to Obtain a Reasonable Return on Investments ....................**72**

3. The United States Has a Duty to Obtain Interest on Funds Awaiting Disbursement After Checks Are Cut....................**73**

4. The Government Has a Fiduciary Duty to Pay Interest on Funds It Failed to Collect Due to Breach....................**75**

B. The United States Has Committed Multiple Breaches of Its Duty to Invest Prudently....................76

1. The United States Breached Its Duty to Invest Trust Funds Prudently by Taking an Unreasonable Amount of Time to Deposit Trust Funds Into Interest-Bearing Accounts ..... **76**
2. The United States Breached Its Duty to Invest Trust Funds Prudently by Obtaining an Unreasonably Low Yield ..... **77**
3. The United States Breached Its Duty to Invest Trust Funds Prudently by Failing to Earn Any Interest on Trust Funds Awaiting Disbursal ..... **77**

IV. DAMAGES ..... **78**

A. Moneys Due Under the Tranche One Leases That Were Not Collected and Deposited in Trust Accounts ..... 79

1. Royalties Not Collected or Accounted For ..... **79**
2. Late Fees Not Assessed for Underpayment of Royalties ..... **80**

B. Interest that the United States Had a Duty to Earn But Did Not Earn ..... 80

1. Interest Lost Due to Unreasonable Delays in Depositing Trust Funds ..... **80**
2. Interest Lost Due to Mismanagement of Funds on Deposit ..... **81**
3. Interest That Could Have Been Earned on Funds Awaiting Disbursal ..... **81**
4. Interest on Moneys Due Under the Leases That Were Not Collected ..... **81**

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Agurs v. Amoco Prod. Co.*, 480 F. Supp. 737 (W.D. La. 1979)....................................66, 67
*Albuquerque Indian Rights v. Lujan*, 930 F.2d 49 (D.C. Cir. 1991) ............................47, 48
*Amoco Prod. Co. v. United States*, 17 Cl. Ct. 590 (1989)...........................................55, 66
*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) .......................................50, 81
*Blackman v. Hustler Magazine, Inc.*, 800 F.2d 1160 (D.C. Cir. 1986) ..............................50
*Brent v. Natural Gas Pipeline Co.*, 457 F. Supp. 155 (N.D. Tex. 1978), *aff'd* 626 F.2d 1261 (5th Cir. 1980)..........................................................................................64
*California v. Southland Royalty Co.*, 436 U.S. 519 (1978) ..............................................64
*Cheyenne-Arapaho Tribes of Indians v. United States*, 512 F.2d 1390 (Ct. Cl. 1975) .........................................................................................71, 72, 73, 75
*Cheyenne-Arapaho Tribes of Oklahoma v. United States*, 33 Fed. Cl. 464 (1995) ...........71
*Coast Indian Cmty. v. United States*, 213 Ct. Cl. 129 (1977)............................................66
*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ..............................................45, 48, 60
*Confederated Tribes of the Warm Spring Reservation v. United States*, 248 F.3d 1365 (Fed. Cir. 2001)..........................................................................50, 79, 80
*In re Consupak*, 87 B.R. 529 (N.D. Ill. 1988)............................................................74, 75
*County of Oneida v. Oneida Indian Nation*, 470 U.S. 226 (1985)....................................47
*Exxon Corp. & Subs. v. United States*, 88 F.3d 968 (Fed. Cir. 1996) ...............................67
*Fletcher v. United States*, 116 F.3d 1315 (10th Cir. 1997)...............................................3, 4
*HRI, Inc. v. EPA*, 198 F.3d 1224 (10th Cir. 2000)......................................................47, 61
*Hemus & Co. v. Hawkins*, 452 F. Supp. 861 (S.D. Tex. 1978) ..........................................64
*Imperial Colliery Co. v. OXY USA, Inc.*, 912 F.2d 696 (4th Cir. 1990) ............................66
*Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324 (10th Cir. 1982) ...................................48
*Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555 (10th Cir. 1984)..48, 60, 68
*Kingery v. Continental Oil Co.*, 626 F.2d 1261 (5th Cir. 1980).........................................65
*Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238 (N.D. Cal. 1973).......................................................................................................73, 75
*Minnesota Chippewa Tribe v. United States*, 14 Cl. Ct. 116 (1987) ............................46, 71
*Mitchell v. United States*, 664 F.2d 265 (Ct. Cl. 1981), *aff'd* 463 U.S. 206 (1983)...........46
*Mobil Oil Corp. v. FPC*, , 463 F.2d 256 (D.C. Cir. 1972)..................................................63
*Montana v. Blackfeet Tribe*, 471 U.S. 759 (1985)......................................................47, 61
*In re Morgan*, 106 B.R. 573 (Bankr. D. Ark. 1989)..........................................................50
*Okie Crude Co. v. Muskogee Area Director,* 23 IBIA 174 (1993) .........................60, 61 ,62
*Osage Tribe of Indians v. United States*, 68 Fed. Cl. 322 (2005).............................. *passim*
*Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672 (1954) ...............................................63
*Placid Oil Co. v. FPC*, 483 F.2d 880 (5th Cir. 1973).........................................................67
*Pueblo of Laguna v. United States*, 60 Fed. Cl. 133 (2004)...............................................50
*Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F. Supp. 252 (D.D.C. 1972) .........49
*Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) ...................................47
*Red Lake Band v. United States*, 17 Cl. Ct. 362 (1989) .............................................49, 55
*Sac & Fox Tribe of Indians v. United States*, 340 F.2d 368 (Ct. Cl. 1964) ........................71
*Seminole Nation v. United States*, 316 U.S. 286 (1942) ...................................................46

*Shapiro, Bernstein & Co. v. Remington Records, Inc.*, 265 F.2d 263 (2d Cir. 1959).........50
*Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed. Cir. 2004) .................. *passim*
*Sowell v. Natural Gas Pipeline Co.*, 789 F.2d 1151 (5th Cir. 1986) ............................65, 66
*United States ex rel. Willoughby v. Howard*, 302 U.S. 445 (1938) ...................................70
*United States v. Mason*, 412 U.S. 391 (1973) ..................................................4, 45, 46, 52
*United States v. White Mountain Apache*, 537 U.S. 465 (2003) .......................................53
*West v. Oklahoma Tax Comm'n*, 334 U.S. 717 (1948) ...................................................2, 3
*Yankton Sioux Tribe v. United States*, 623 F.2d 159 (Ct. Cl. 1980)........................... *passim*

**STATE CASES**

*In re D'Espinay-Durtal's Will*, 4 A.D.2d 141 (N.Y. App. Div. 1957)................................75
*In re Doyle's Will,* 191 Misc. 860, 79 N.Y.S.2d 695 (1948)..............................................73
*Lightcap v. Mobil Oil Corp.*, 562 P.2d 1 (Kan. 1977).................................................66, 67
*Lynch v. John M. Redfield Found.*, 88 Cal. Rptr. 86 (2d Dist. 1970)................................72
*Maryland Nat'l Bank v. Cummins*, 588 A.2d 1205 (Md. 1991) ..................................75, 81
*Estate of Pelton ex rel. Wells Fargo Bank v. Pelton*, 132 Cal. App. 3d 496 (1982)...........73
*Shell Oil Co. v. Williams, Inc.*, 428 So. 2d 798 (La. 1983) ...............................................65
*Vest. v. Bialson*, 365 Mo. 1103, 293 S.W.2d 369 (1956)..................................................74

**STATUTES AND REGULATIONS**

15 U.S.C. § 751 ..........................................................................................................63
25 U.S.C. §§ 161 ..............................................................................................70, 71, 73
25 U.S.C. § 162.....................................................................................................71, 73
25 U.S.C. § 331 ............................................................................................................3
30 U.S.C. § 1701 ..........................................................................................................19
30 U.S.C. § 1702..........................................................................................................19
Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. § 1711 (2003)
("FOGRMA") ........................................................................................................18, 20
31 U.S.C. § 1321..........................................................................................................70
12 C.F.R. § 9 ...............................................................................................................75
25 C.F.R. § 183 (1975)......................................................................................... *passim*
25 C.F.R. § 226 (1983).................................................................................11, 12, 13, 14
25 C.F.R. § 226 (1991)......................................................................................... *passim*
25 C.F.R. § 226.(2005).......................................................................................9, 11, 12
43 C.F.R. § 3162 ..........................................................................................................57
43 C.F.R. § 4 ...............................................................................................................60
39 Fed. Reg. 22,254, (June 21, 1974) ..................................................................12, 13
46 Fed. Reg. 9909 (Jan. 31, 1981) ...............................................................................63
55 Fed. Reg. 33,112 (Aug. 14, 1990)............................................................................13
Act of June 28, 1906, Chapter 3572, 34 Stat. 539 ............................................... *passim*
Act of March 3, 1921, Chapter 120, 41 Stat. 1249 ...........................................................6
Act of February 27, 1925, Chapter 359, 43 Stat. 1008 ......................................................6
Act of March 2, 1929, Chapter 493, 45 Stat. 1478 ...........................................................6
Act of June 24, 1938, Chapter 645, 52 Stat. 1034 ...........................................................6
Act of July 25, 1947, Chapter 334, 61 Stat. 459 ..............................................................6

Act of June 15, 1950, Chapter 248, 64 Stat. 215 ....................6
Act of October 6, 1964, 78 Stat. 1008 ....................6
Act of October 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660 ....................4, 6
H.R. Rep. No. 92-963 (1972)....................3, 4
S. Rep. No. 97-512 (1982)....................17

**MISCELLANEOUS**

Garrick A. Bailey, *Osage, in* 13 *Handbook of North American Indians* 476...........1, 2, 3, 4
Bureau of Indian Affairs, Osage Agency, *Policies and Procedures Guide* (May 2004) ....................7
*Cohen's Handbook of Federal Indian Law* (1982) ....................49, 64
Coopers & Lybrand, Osage Agency – Minerals Branch Organizational Review Report (Jan. 15, 1992)....................21
Deed from the Cherokee Nation in Trust for the Use and Benefit of the Osage and Kansas Tribe, as reprinted in The Constitution and Laws of the American Indians, Vol. 4 (Nov. 26, 1890); ....................3
*Federal Leasing and Disposal Policies: Hearings Pursuant to S. Res. 45, A National Fuels and Energy Policy Study Before the Senate Comm. on Interior and Insular Affairs,* 92d Cong., 2d Sess., 652 (1972) ....................49
Galvin, "Developing an Oil and Gas Jurisprudence in Michigan," 7 Wayne L. 64Rev. 403, 425 n.99 (1961), cited in 3 *Williams & Meyers Oil and Gas Law* § 644....................64
Report of the Commission on Fiscal Accountability of the Nation's Energy Resources, Preface (1982) .................... *passim*
Report of Royalty Management and Delinquent Account Collection Activities Fiscal Year 2000 (Aug. 23, 2002). ....................19
*Restatement of Trusts*, Second (1957).................... *passim*
*Restatement of Trusts*, Third (1992)....................72, 74
IIA Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts*, (4th Ed. 1987).................... *passim*
U.S. Gen. Accounting Office, Oil and Gas Royalty Collections – Longstanding Problems Costing Millions (Oct. 29, 1981)....................16, 17, 18
Terry P. Wilson, *The Underground Reservation: Osage* 7-9 ....................2, 3, 5

Plaintiff, the Osage Tribe of Indians of Oklahoma ("Osage Nation" or "Tribe"), brings this action to recover damages from Defendant United States of America ("United States" or "Government") for its failure, as trustee, to manage the Osage Mineral Estate properly. The United States has breached its trust duty to the Osage Nation to (1) collect and verify the full amount of royalties and penalties due and (2) invest prudently those funds that it did collect.

The Court has divided Plaintiff's claims into two tranches. Tranche One covers "those of plaintiff's trust fund mismanagement claims falling within the parameters described in *Shoshone Indian Tribe v. United States,* 364 F.3d 1339, 1350-51 (Fed. Cir. 2004), for five oil and gas leases for the following six months: January 1976, May 1979, November 1980, February 1986, July 1989, and October 1990." Order at 1 (Apr. 15, 2005). The five Tranche One Leases are commonly referred to as the North Burbank Lease, the North Avant Lease, the Stanley Stringer Lease, the Osage Hominy Lease, and the East Hardy Lease. All but one of the Tranche One Leases are oil leases only, and Plaintiff's claims with respect to Tranche One relate solely to the Osage Mineral Estate's oil.[1]

## STATEMENT OF FACTS

## I. BACKGROUND

### A. The Osage Tribe and Its Multiple Forced Relocations

When first encountered by French traders in the late 17th century, the Osage Tribe lived along the Osage River in an area that is today southwestern Missouri. Garrick A. Bailey, *Osage, in* 13 *Handbook of North American Indians* 476 (Smithsonian Institution 2001). The Tribe's hunting ranges extended into southeastern Kansas, northeastern Oklahoma, and northwestern

[1] The lease for the Osage Hominy Unit contains a royalty provision requiring royalty on natural gas. The Tribe is not asserting any damages with respect to what appears to have been a *de minimis* amount of gas production during the Tranche One months.

Arkansas. *Id.* at 477. As a result of three treaties in the early 1800s, the Osage ceded substantial territory to the United States. *See* Terry P. Wilson, *The Underground Reservation: Osage* 7-9 (Univ. of Nebr. Press 1985). The treaties left the Osage with a reservation, established in 1825, measuring approximately 50 miles by 125 miles in what is now southern Kansas. Although many Osages initially refused to move onto the reservation, that soon changed. "Short of both food and trade items," off-reservation Osages came under substantial pressure to move because of the influx of white settlers and members of eastern tribes who resettled to the Osage's traditional hunting areas after passage of the Indian Removal Act of 1830. Bailey, *supra,* at 478. "In 1839 the last off-reservation Osage villages were finally forced to move to the reservation in Kansas." *Id.*

It was not long, however, before the Osage were forced to relocate again. The Homestead Act of 1862 launched a wave of settlers into Kansas, and the Government sought Osage land to accommodate them. In 1866, the United States and the Cherokee Nation executed a treaty that, among other things, permitted the Government to settle "friendly" Indians in certain areas of Cherokee territory, including what is now northern Oklahoma. *West v. Oklahoma Tax Comm'n,* 334 U.S. 717, 720 (1948) (citing 14 Stat. 799). In 1870, the Osage leaders "reluctantly accepted legislation stipulating that the Kansas reservation would be sold for $1.25 an acre, and the money deposited for the tribe in the United States Treasury, where it would draw five percent interest." Wilson, *supra,* at 14.

Comforted by the words of spiritual leader Wa-ti-an-ka, who declared that there was something in the ground that would protect their children and elders from starvation, most of the Osages moved in 1871 to a newly established reservation on a portion of the Cherokee territory covered by the 1866 treaty. *See id.* at 15. In 1881, the Osage adopted a constitution creating a

tribal government modeled loosely on the government of the United States. *Fletcher v. United States,* 116 F.3d 1315, 1319 (10th Cir. 1997), (citing H. R. Rep. No. 92-963 at 7 (1972)).

In 1883, proceeds from the sale of the Kansas lands were used to purchase from the Cherokees, at a cost of $.50 an acre, the 1.47 million acre territory that is now the Osage Reservation. The Cherokee conveyed the land to the United States "in trust nevertheless and for the use and benefit of the said Osage and Kansas Indians." *See* Deed from the Cherokee Nation in Trust for the Use and Benefit of the Osage and Kansas Tribe, as reprinted in The Constitution and Laws of the American Indians, Vol. 4 (Nov. 26, 1890); *West v. Oklahoma Tax Comm'n*, 334 U.S. at 720. This conveyance included both the land and the rights to minerals underneath the land. *Id.*

In 1887, in response to pressure to open Indian Territory to white settlers, Congress passed the General Allotment Act, 24 Stat. 388, 25 U.S.C. § 331, which empowered the President to distribute or "allot" reservation lands to individual Indians. The Osage resisted allotment and were excluded from the 1887 Allotment Act. Wilson, *supra,* at 36. Allotment remained a contentious issue among the Osage, with some factions favoring allotment and others opposing it. *See id.* at 38-41.

In 1897, oil was discovered on the new Osage Reservation. In 1900, in frustration over the Osage National Council's refusal to agree to allotment, the Secretary of the Interior, at the urging of the Commissioner of Indian Affairs, abolished the tribal government created by the Osage's 1881 constitution. *See* Bailey, *supra,* at 488; Wilson, *supra,* at 37-42. In 1904 the federal Indian Service created the Osage Business Committee, and, in a subsequent election, a pro-allotment faction won control of the Committee. Bailey, *supra,* at 488.

**B. The 1906 Act**

In 1906, Congress enacted a statute allotting the surface rights to tribal lands to individual members of the Osage Tribe. Act of June 28, 1906, Chapter 3572, 34 Stat. 539 ("1906 Act"). The 1906 Act required the creation of a tribal membership roll. *Id.* Each enrolled tribal member was to be allotted a pro rata share of the tribal lands not reserved for other uses.[2] *Id.* at § 540-41. The final roll was approved on April 11, 1908,[3] and consisted of 2,229 enrolled members of the tribe, each of whom received approximately 658 acres of land. Bailey, *supra,* at 488. Under Section 7 of the 1906 Act, these lands were set aside "for the sole use and benefit of the individual members of the tribe entitled thereto, or to their heirs, as herein provided."[4] 34 Stat. at 545.

Unlike the surface land, title to all minerals, oil, natural gas, sand, and gravel ("Mineral Estate") was not allotted. Bailey, *supra,* at 488. Instead, Section 3 of the 1906 Act reserved these resources to the Osage Tribe for a period of 25 years.[5] 34 Stat. at 543. The Act created "headrights," "which are each tribal member's individual share of the income derived from the minerals located on the land." *United States v. Mason,* 412 U.S. 391, 393 (1973). Each Osage whose name appeared on the 1908 roll received one "headright." *Fletcher,* 116 F.3d at 1319.

---

[2] Town sites, railroad right of ways, agency buildings, three Indian village sites, and Roman Catholic school lands were to be withheld from the allotment. 1906 Act § 2(8)-(11), 34 Stat. at 542.

[3] *See* H.R. Rep. No. 92-923 at 8.

[4] The Government, as trustee, has numerous trust duties with respect to the allotted lands and the Osage Mineral Estate that are outside the scope of Tranche One. Accordingly, we do not address them in this memorandum.

[5] Ultimately, Congress made the trust containing the Osage Mineral Estate permanent. Act of October 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660.

Section 9 of the Act establishes the Osage Tribal Council, comprised of a Principal Chief, an Assistant Principal Chief, and High-council members, to act on behalf of the Tribe. 34 Stat. at 545.

The 1906 Act includes important provisions addressing the responsibilities of the United States to the Tribe and its members. Section 4 of the Act states: "[A]ll funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, *shall* be held in trust by the United States . . . ." 34 Stat. at 544 (emphasis added). Section 4(2) of the Act specifies that "the royalty received from oil, gas, coal, and other mineral leases . . . shall be placed in the Treasury of the United States to the credit of the members of the Osage tribe." *Id.* That section of the Act also provides that money derived from leases of the Tribe's mineral interests "*shall* be distributed to the individual members of said Osage tribe according to the roll provided for herein, in the manner and at the same time that payments are made on interest on other moneys held in trust for the Osages by the United States, except as herein provided." *Id.* (emphasis added).

Under the Act, the remaining proceeds from the sale of the Kansas property also were placed in trust for the Osage, as well as grazing-rights revenues. 34 Stat. at 544; *see also* Wilson, *supra,* at 92-93. Section 4(1) of the Act acknowledges that claims can be made against the Government for recovery of money due the Osage Nation and provides that recoveries for such claims should be placed in trust.

Section 3 of the 1906 Act provides that only the Government, as trustee, can issue a lease for the Osage Minerals Estate. 34 Stat. at 543. Thus, in accordance with this and the other provisions of the 1906 Act described above, the Government, as trustee, exercises complete and

plenary control over every aspect of the management and operation of the Osage Minerals Estate and over the funds derived from that Minerals Estate.

Congress has amended the 1906 Act on several occasions.[6] The amendments reinforce the Government's obligation to administer the Osage Minerals Estate "as may be deemed for the best interest of the Osage Nation." Act of March 2, 1929, Chapter 493, 45 Stat. 1478; Act of June 24, 1938, Chapter 645, 52 Stat. 1034. Moreover, through the amendments Congress exercised further control over the Osage Minerals Estate by mandating that the Government and the Osage Nation must lease no less than 25,000 acres of the Osage Reservation for mining each year. *Id.* None of the amendments to the 1906 Act, however, changed in any material way the Government's trust duties described above, including the duties to collect and hold in trust all payments due or that may become due to the Osage Nation, to invest those funds prudently, and to distribute trust funds in accordance with statutory requirements.

Under the 1906 Act, the Osage Tribe is the beneficiary of the trust containing the Osage Minerals Estate. *Osage Tribe of Indians v. United States,* 68 Fed. Cl. 322, 330 (2005). Some of the funds from the trust are used to cover expenses of the Osage Tribal Council, the governmental authority for the Osage Nation. The Council's expenses include the administrative costs of the tribal government, such as salaries, travel, and supplies, and costs related to administration of the Minerals Estate. The balance of the tribal funds, after payment of Tribal Council expenses, are distributed pro rata to "headright" owners on a quarterly basis.

---

[6] The 1906 Act was amended and modified by: Act of March 3, 1921, Chapter 120, 41 Stat. 1249; Act of February 27, 1925, Chapter 359, 43 Stat. 1008; Act of March 2, 1929, Chapter 493, 45 Stat. 1478; Act of June 24, 1938, Chapter 645, 52 Stat. 1034; Act of July 25, 1947, Chapter 334, 61 Stat. 459; Act of June 15, 1950, Chapter 248, 64 Stat. 215; Act of October 6, 1964, 78 Stat. 1008; and Act of October 21, 1978, 92 Stat. 1660. (Copies of these statutes are included in the Joint Appendix submitted by parties on Sept. 12, 2005.) As used herein, the term "1906 Act" refers to the 1906 Act as amended, unless specified otherwise.

**C. The Osage Agency**

To fulfill its treaty and other responsibilities to the Osage Nation, the Government established the Osage Agency. The Osage Agency is a sub-agency of the Department of the Interior, Bureau of Indian Affairs ("BIA"), located in Pawhuska, Oklahoma, on the Osage Reservation. The Reservation covers roughly 1.47 million acres and thus is larger than Delaware or Rhode Island. More than half of that acreage is covered by oil leases and oil and gas combination leases. According to the 1989 Osage Agency Annual Status Report, there were 1,601 producing oil leases on the Reservation at that time.

In its employee position descriptions, the Osage Agency describes its purpose in the following way:

> The Osage Agency will uphold and strive to accomplish the Bureau of Indian Affairs mission within the boundaries of the Osage Nation Reservation in Oklahoma. Through the Branch of Minerals, we are to serve and promote the daily operations of the Osage Mineral Estate and the welfare of the Osage Tribe.
>
> The Branch of Minerals will prudently uphold the Bureau and Osage Agency mission by managing the Osage Minerals Estate for the Osage Tribe, which includes, but is not limited to, verifying volume and value of royalties of the Minerals Estate. Insuring that all monies are received in compliance with the Code of Federal Regulations and properly recorded in accordance with generally accepted accounting principles and generally accepted auditing standards.

The duties that Osage Agency employees discharge include the collection of revenue from the Osage Minerals Estate for the benefit of the Osage Nation. "As the Osage Agency is the representative royalty collector," it is the responsibility of "the oil and gas accounting sections within the [Agency's] Branch of Minerals" to account for "all royalties due the Osage Tribe." Bureau of Indian Affairs, Osage Agency, *Policies and Procedures Guide* Ch. 1 (May 2004) ("Osage Policy Guide").

The testimony of Osage Agency employees and governmental manuals describing the Osage Agency's duties leave no doubt that the United States exercises plenary control over Osage oil and gas leasing operations, including in particular the calculation and collection of royalties, for the purpose of fulfilling the trust obligations of the United States to the Osage Nation. The Osage Agency may − and sometimes does − consider the Osage Nation's wishes and may consult with the Osage Nation. Nevertheless, the evidence will show that the Osage Agency makes all decisions about Osage oil and gas leases based on the Government's determination of the proper course of action, even if that means disagreeing with the Osage Tribal Council. In fact, the Government understands that it must exercise this independent "high fiduciary responsibility" to discharge its obligations as trustee, even if that means denying the Osage Nation's requests with respect to management of the Minerals Estate. For example, in 1996 the Agency denied an Osage Nation request for a division order, stating:

> We agreed with your line of thinking that a high fiduciary responsibility does exist as defined in the 1906 Osage Allotment Act which offers specific guidance in the management of oil and gas trust resources. We place considerable weight on protecting the interests of the Osage mineral owners or annuitants as provided in the 1906 Act as amended.

Letter from Gordon Jackson, Superintendent, Osage Agency, to Principal Chief Charles O. Tillman, Jr., Osage Tribal Council at 2 (October 18, 1996).

## II. THE OSAGE LEASES AND REGULATIONS

### A. The Regulations and Form Leases Issued by the United States

To implement its trust responsibilities under the 1906 Act, the United States has issued comprehensive regulations ("Osage Regulations") covering all aspects of oil and gas production

from the Osage Minerals Estate.[7] 25 C.F.R. Part 226. Those regulations include form leases that must be used by all lessees. 25 C.F.R. § 226.7. Unless approved by the United States, as trustee for the Osage Nation, no oil and gas lease is valid and binding. 34 Stat. at 543.

Since the first Osage Regulations under the 1906 Act were promulgated in 1912, the form oil and gas leases have incorporated by reference the Osage Regulations in effect at the time as well as all future changes in those regulations. The regulations, however, do not override royalty-rate, rental-rate, or term-of-lease provisions in the leases. 25 C.F.R. § 226.5.

### B. The Tranche One Leases

The Tranche One Leases permit the lessee to explore for and produce crude oil in defined areas of the Osage Reservation in exchange for specified payments to the United States, as trustee. The lessee pays royalties each month crude oil is produced from the leased premises.[8]

Each Tranche One Lease contains various provisions specifying how to compute the monthly royalty payment on crude oil. In basic terms, that computation involves three elements: royalty rate, volume, and value. It can be expressed as a Royalty Formula:

Royalty = Royalty Rate x Royalty Volume x Royalty Value

The Tranche One Leases define all three elements of the Royalty Formula.

The first element – the Royalty Rate the lessee must pay – is a fraction (often 1/8 or 1/6) and is usually expressed as a percentage. The Tranche One royalty rates typically vary depending on the pool of oil (referred to in the lease as "sands" or "reservoirs") or area of the

---

[7] Copies of each version of these regulations are included in the Joint Appendix that the parties jointly submitted to the Court on Sept. 12, 2005.

[8] The Tranche One Leases give the Osage Nation the option, subject to the trustee's approval, of taking the monthly royalty payment "in kind" – that is, taking physical delivery of a fractional share of the monthly crude oil production in lieu of a financial payment. During the Tranche One period, there were no in-kind takings by the Osage Nation from the Tranche One Leases.

lease from which the crude oil was produced. In some cases, the rate varies with the per well production from the relevant portion of the lease. For example, the Stanley Stringer Lease establishes different royalty rates for three different portions of the leased premises:

- For oil produced from the Burbank Sand, the royalty rate is 16 2/3% on the first 850,000 barrels of oil produced and 12 1/2% on any additional oil produced.
- For oil produced from sands other than the Burbank Sand, the royalty rate is 16 2/3% unless oil production from those sands averages 100 or more barrels per well per day, in which case the royalty rate is 20%.
- For oil produced from a specified 520-acre portion of the lease, the royalty rate is 16 2/3% unless oil production from those sands averages 100 or more barrels per well per day, in which case the royalty rate is 20%.

Stanley Stringer Lease at 3-5. The other Tranche One Leases contain similar provisions.

The Royalty Formula's second element – Royalty Volume – is expressed in barrels. The Tranche One Leases require that the royalty payment be based on *all* crude oil produced from the lease minus crude oil used as fuel to operate the lease.

Under the leases, the third element – Royalty Value – is the higher of two prices: (1) the actual sales price of the oil (*see, e.g.*, North Burbank Lease § 2(a)-(b)) or (2) the "highest market posted price" on the "day of sale or removal" for crude oil "in the Mid-Continent Field," which includes Oklahoma, Kansas, Colorado, and parts of Texas.[9] North Burbank Lease § 2(c). The leases require the lessee to pay royalties based on the higher of those two alternative valuations. *Id.* at § 4.

These lease provisions create a methodology for determining Royalty Value that is unique to the Osage. Under most oil and gas leases, Royalty Value is based exclusively on the market

[9] Named for the sheet that was literally posted in a producing field, "posted prices" indicate how much a potential buyer (usually a refiner) might be willing to pay for a crude oil or blend of oils of standardized quality (*e.g.,* Oklahoma Sweet, West Texas Intermediate, Louisiana Light).

value of the crude oil produced from the lease itself, not the market value of other crude oil sold at other, distant locations. By contrast, under the Tranche One Leases, the Royalty Value analysis includes posted prices for all types of crude oil throughout a large, multi-state geographical area. In short, the Royalty Value of crude oil produced from the Osage Mineral Estate is not limited to the market value of that oil at or near the lease. Instead, it may be based on the highest posted price for crude oil produced at locations many miles from the lease.

The federal regulations relating to the Osage Minerals Estate ("Osage Regulations") apply to, and can modify many terms of, the lease, including the determination of Royalty Value. For example, the North Burbank lease provides:

> This lease is subject to the regulations now or hereafter prescribed by the Secretary of the Interior, relative to such leases, all of which are made a part of this lease; PROVIDED, that no regulations made after the approval of this lease shall operate to affect the term of lease, rate of royalty, rental or acreage, unless agreed to by both parties.

North Burbank Unit Lease at ¶ 16. *See also* 25 C.F.R. § 226.5 (making leases subject to the then-current Osage Regulations). As explained below, the Government's 1974 and 1990 regulations modified the methodology for determining Royalty Value during the Tranche One Months.

### C. The Osage Regulations

The Department of the Interior, through the BIA, has promulgated comprehensive regulations governing the leasing of the Osage Mineral Estate.[10] The Osage Regulations cover virtually every aspect of the oil leasing process, from the selection of lessees, to the operation of the wells, to the payment of royalties, to the shutting down and eventual abandonment of wells.

---

[10] For the first three Tranche One Months, until March 30, 1982, those regulations were codified at 25 C.F.R. Part 183. Effective March 30, 1982, the regulations were recodified at 25 C.F.R. Part 226.

Consistent with the Government's collection duties under the 1906 Act, the Osage Regulations require that all royalties and other payments due under the leases be made to the Government as trustee. 25 C.F.R. §§ 226.4, 226.11(a)(1). As the Court has found, the pervasive nature of the Osage Regulations establishes that "the government has taken on not only the principal, but the sole, responsibility for managing lease revenues." *Osage Tribe,* 68 Fed. Cl. at 333.

In 1974, the BIA adopted a new set of regulations, which remained in effect through the first five Tranche One Months (January 1976, May 1979, November 1980, February 1986, and July 1989). 25 C.F.R. § 183; 39 Fed. Reg. 22,254-62 (June 21, 1974). With respect to Royalty Value, the new regulations provided that the two types of prices mentioned in the Tranche One Leases – actual selling prices and posted prices – should continue to be part of the analysis. But the regulations also added two new dimensions to the analysis.

First, the 1974 regulations directed that Royalty Value was to be based on the "highest … offered price by a major purchaser" in the relevant geographic area, if that price was higher than either the actual selling price or the highest major-purchaser posted price in the area.[11] 39 Fed. Reg. at 22,256. Second, the 1974 regulations provided that, if different actual prices were "paid simultaneously for oil from a lease[,] and the highest such price exceed[ed]" the posted and

---

[11] The complete text of the 1974 royalty regulation is:

> Unless the Osage Tribal Council, with the approval of the Secretary, shall elect to take the royalty in kind, payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area, whichever is higher on the day of sale or removal. Where different prices are paid simultaneously for oil from a lease and the highest such price exceeds the higher of the aforementioned prices, then that price shall be the basis of royalty on all oil from said lease.

39 Fed. Reg. 22,254, 22,256 (June 21, 1974) *codified at* 25 C.F.R. § 183.11(a)(2) (1975), *recodified at* 25 C.F.R. § 226.11(a)(2) (1983).

offered prices, then the highest actual selling price "shall be" the Royalty Value "on all oil from" the lease. 25 C.F.R. § 183.11(a)(2) (1975).

The 1974 regulations also reduced the geographic area that the lessee and the Osage Agency must consider in determining Royalty Value. While the leases require consideration of posted prices of major purchasers in the entire Mid-Continent region, the 1974 regulations limited the major purchaser analysis for posted and offered prices to only two states in that region – Kansas and Oklahoma. 25 C.F.R. § 183.1(h) (1975). In 1990, the BIA adopted regulations further narrowing the relevant geographic area to a single county in Oklahoma – Osage County. 55 Fed. Reg. 33,112-114 (Aug. 14, 1990), *codified* at 25 C.F.R. § 226.1(h) (1991). The 1990 regulations, which apply to the sixth Tranche One Month (October 1990), also changed the 1974 definition of "Major Purchasers." While the 1974 regulations defined major purchasers as the "minimum number of purchasers taking 80 percent of the oil in the Kansas-Oklahoma area," 25 C.F.R. § 183.1(h), the 1990 regulations provided that the definition covered the purchasers of 95 percent of the oil in Osage County only. 25 C.F.R. § 226.1(h). In addition, the 1990 regulations deleted the simultaneous actual selling price provision added to the Royalty Value analysis by the 1974 regulations. 55 Fed. Reg. at 33,114.

The Osage Regulations make the lessee responsible for the accurate measurement of all crude oil produced from a lease of the Osage Minerals Estate. 25 C.F.R. § 183.11(a); 25 C.F.R. § 226.11(a). In addition, the lessee must file a monthly report with the Osage Agency providing the total volume of crude oil subject to royalty for each lease. 25 C.F.R. § 183.13(b); 25 C.F.R. § 226.13(b). If the purchaser (as lessee's agent) is responsible for paying the royalty, it must also file a monthly report setting forth relevant royalty and volume information. 25 C.F.R. § 183.14(b); 25 C.F.R. § 226.14(b).

Lessees owe royalties on all crude oil produced from the Tranche One Leases, with the exception of oil used as fuel to develop and operate the lease from which the oil was produced. Thus, a lessee must report and "pay royalty on the value of all oil … used *off the premises* for development and operating purposes." 25 C.F.R. § 183.14(a) (emphasis added); 25 C.F.R. § 226.14(a). In addition, the regulations provide the Osage Agency with broad authority to prevent waste, including the loss of crude oil subject to royalty. 25 C.F.R. § 183.37; 25 C.F.R. § 226.37.

The Osage Regulations specify the timing and manner of royalty payments and the sanctions that apply when timely, correct payments are not made. The regulations direct the lessee to pay the royalty due on oil sold in a given month by the 25th day of the following month.[12] 25 C.F.R. § 183.13; 25 C.F.R. § 226.13. Payment must be made directly to the Osage Agency for the benefit of the Osage Nation. 25 C.F.R. § 183.11(a); 25 C.F.R. § 226.11(h). The regulations in multiple places make clear that tardy royalty payments trigger mandatory late fees of one and one-half percent per month. For example, 25 C.F.R. § 226.13(a) provides: "Failure to make such payments *shall* subject Lessee or purchaser, whoever is responsible for royalty payment, to a late charge at the rate of 1½ percent for each month or fraction thereof until paid." (Emphasis added.) *See also* 25 C.F.R. § 183.13(a) (one and one-half percent late fee); 25 C.F.R. § 183.11(c) ("Payment for any underpayment not made within the time specified *shall* be subject

[12] Both the 1974 and 1990 regulations permit the purchaser of the crude oil to remit the royalty payment on behalf of the lessee. 25 C.F.R. § 183.14(a); 25 C.F.R. § 226.14(a). In that event, however, the lessee remains liable for the royalty payment. During the Tranche One period, both lessees and purchasers made royalty payments. In some cases, the lessee was a vertically integrated oil company that also "purchased" the oil produced from a Tranche One Lease.

to a late charge at the rate of not less than 1½ percent for each month or fraction thereof until paid.") (emphasis added); 25 C.F.R. § 226.11(c) (same).

**D. The Government Must Determine and Verify a Number of Variables Under the Royalty Formula**

As already noted, to compute and collect the full amount of royalties owed the Osage Nation, the Government must calculate the correct Royalty Rate, Royalty Volume, and Royalty Value. The Tranche One Leases, as modified by the Osage Regulations, require that the following items be determined each month in quantifying each of those elements:

Royalty Volume

- The total volume of oil produced and sold from each lease or from each portion of the lease having a separate royalty rate.
- The volume of oil produced from each lease that was used for operation and development of the lease from which it was produced.
- The total volume of oil produced from each lease and used for development and operation of a lease other than the lease from which it was produced.

Royalty Rate

- The rate in the lease for each portion of the leased premises.
- For leases (or portions thereof) with different royalty rates depending on levels of historical production, the cumulative volume of such production.
- For leases (or portions thereof) with different royalty rates based on the rate of production, the average rate of production per well.

Royalty Value

- The identity of each "major purchaser" in the relevant geographic area (Kansas-Oklahoma or Osage County, depending on the Tranche One Month) during the month in which the crude oil was sold or removed from the leased premises. To determine the major purchasers, the Osage Agency must know
    - the total volume of oil purchased in the relevant geographic area during the relevant month;

  - the identity of each purchaser in the relevant geographic area during the relevant month; and
  - the volume bought by each such purchaser.

- Actual prices for all crude oil sales from each lease on a daily basis.
- The amount of each offer to buy oil by each major purchaser for each day of each month.
- The posted price bulletins issued by each major purchaser for each day of each month.
- Whether different prices are paid simultaneously for crude oil from a lease, and, if so, the actual prices paid by each purchaser.

## III. THE GOVERNMENT'S GENERAL ADMINISTRATION OF ROYALTY COLLECTION AND VERIFICATION FOR FEDERAL AND INDIAN MINERALS LEASES

The United States has long managed extensive oil and other mineral resources for its own benefit and as trustee for a number of Indian tribes, including the Osage Nation. Over the past several decades, Congress and other governmental entities have analyzed the Government's managerial effectiveness. Those assessments have been disheartening. For example, the Comptroller General of the General Accounting Office has written:

> Since 1959, numerous GAO and Department of the Interior audit reports have pointed out the need for improved management of the Geological Survey's royalty accounting system. In our April 1979 report, we recommended both short and long range alternatives. Our follow up work shows that the problems discussed in our 1979 report not only persist, but have become worse.

U.S. Gen. Accounting Office, Oil and Gas Royalty Collections – Longstanding Problems Costing Millions 2 (Oct. 29, 1981) ("1981 GAO Report").

In 1981, in recognition of extensive problems with the collection of royalties from federal and Indian oil leases, the United States created the Commission on Fiscal Accountability of the Nation's Energy Resources, referred to as the Linowes Commission after its Chairman, David F. Linowes. The United States asked the Commission to:

- examine the allegations of massive irregularities in royalties on the Nation's energy resources that are owed to the Federal government, Indian tribes, and States;

- investigate the allegations of theft of oil from Federal and Indian lands; and

- make recommendations for improving fiscal accountability of the Nation's energy resources.

Report of the Commission on Fiscal Accountability of the Nation's Energy Resources, Preface (1982) ("Linowes Report").

After months of investigation and work, the Commission concluded:

> Management of royalties for the Nation's energy resources has been a failure for more than 20 years. Because the Federal government has not adequately managed this multibillion dollar enterprise, the oil and gas industry is not paying all the royalties it rightly owes.
>
> The government's royalty recordkeeping for Federal and Indian oil and gas leases is in disarray. For this reason, the exact amount of underpayment is unknown. The results of individual audits, which have often uncovered large underpayments, suggest that hundreds of millions of dollars due the U.S. Treasury, the States, and Indian tribes are going uncollected every year.
>
> In addition, oil thefts are occurring on Federal and Indian leases. The extent of theft and the amount of royalty losses are unknown, but it is well-documented that security at many Federal and Indian lease sites is lax and is an open invitation to theft.

*Id.* at xv.

The GAO, the Linowes Report, and other various governmental studies have identified certain systemic flaws that have prevented the United States from fulfilling its responsibilities, both as owner of federal lands and as the trustee of Indian natural resources, to collect the full amount of royalty due.

**A. Lack of Auditing**

The GAO has acknowledged that auditing oil and gas lease records is a critical component of effective royalty management. "[W]ithout sufficient lease account audits the

Geological Survey must rely on unverified data reported by the oil and gas companies to compute and collect royalties due." 1981 GAO Report at 9. According to the Linowes Report, the "major shortcomings" of the federal royalty management system include the failure to "verify data reported by the oil and gas companies" and to "audit[] or critically review[]" lessee records on a regular basis. Linowes Report at 15; *cf. id.* at 44. The Government has acknowledged that, given the absence of independent verification, the oil industry has been on the "honor system." S. Rep. No. 97-512 at 9 (1982).

The studies have uniformly concluded that the Government's failure regularly to conduct audits and check accounts has cost the federal treasury and Indian tribes hundreds of millions of dollars in uncollected royalties. 1981 GAO Report at 1. Although the lack of adequate records prevents a precise estimate, audits and other independent verification procedures alone can reasonably be expected to reveal significant underpayments ranging from two to ten percent of the amounts due. Linowes Report at 13, 16-18.

The GAO has urged the Department of the Interior to "increase its auditing and monitoring of lease accounts." 1981 GAO Report at 3. The GAO also has recommended that the Department of the Interior adopt a "comprehensive, systematic plan for monitoring, reconciling, and auditing lease account records; inspecting leases; and verifying production and sales data." *Id.* at 5. The Linowes Report similarly recognized that "auditing [of oil royalty payments] should take its place as just another of the controls used by the system." Linowes Report at 74.

In accordance with Congress's directives in the Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. § 1711(c) (2003) ("FOGRMA"), the Department of the Interior's Minerals Management Service ("MMS") has undertaken in recent years, for leases on

federal lands and all Indian lands other than the Osage Minerals Estate, an intensive audit program that relies on sampling techniques similar to those employed by the Internal Revenue Service.[13] MMS's audit procedures require verification of lessee reports and purchaser statements by reference to original source documents. Recent reports of the Minerals Management Services have highlighted the agency's success in finding oil royalty underpayments through the use of inspection and detection programs. According to MMS, such programs have resulted in the collection of nearly $2.6 billion since the early 1980s. Report of Royalty Management and Delinquent Account Collection Activities Fiscal Year 2000 at 33 (Aug. 23, 2002).

### B. Lack of Independent Verification of Production Volume

The Government has repeatedly recognized that, to fulfill its fiduciary obligations, it must verify the volume of oil produced from Indian leases. For example, the Linowes Commission observed:

> The government has a legal responsibility to collect all the royalties due on oil removed from the public and Indian lands. As a trustee of Indian natural resources, it also has a fiduciary responsibility to fulfill. The Federal government can best meet its site security responsibilities by monitoring the industry's lease site security performance.

Linowes Report at 86.

The Linowes Commission determined that, in addition to the "real problem" of oil theft, under-measurement and under-reporting of oil production volumes require remedial action. *Id.* at 55, 85. That means more than simply reviewing the oil companies' paperwork. Rather, Congress has concluded that it is "essential" to provide for "routine inspection" of wells and to engage in other direct, hands-on efforts to verify production volumes. 30 U.S.C. § 1701(a)(3).

---

[13] By its terms, FOGRMA excludes the Osage Nation from its coverage. 30 U.S.C. § 1702(3).

That is why Congress in FOGRMA directed the Department of the Interior to conduct annual inspections of leases that have "significant" production or that have a history of regulatory noncompliance. 30 U.S.C. § 1711(b) (2003).

### C. Inadequate Staffing

The Government has recognized that it needs well-trained, professional staff in sufficient numbers to manage mineral resources effectively. The Linowes Commission strongly urged an expansion of the Department of the Interior's minerals management staff, and described additional staff training in the oil and gas business as "essential." Linowes Report at 78. Such training is especially important to the effective execution of critical functions such as royalty collection and field inspection. *Id.* at 77-78, 148 (royalty management staff), 101-103 (field inspectors). The Linowes Commission urged federal royalty managers to commence comprehensive training of their staffs immediately. *Id.* at 79.

## IV. THE OSAGE AGENCY'S ADMINISTRATION OF ROYALTY COLLECTION AND VERIFICATION

### A. General Systemic Flaws

No Auditing. The evidence at trial will show that, notwithstanding the recognition in numerous governmental studies of the need to conduct regular audits to verify the accuracy of information provided by the royalty payor, the Osage Agency did not audit royalty payments, oil production volume, or any other aspect of the royalty process. The Agency had no system or procedure for doing so. Nor were there regular audits of the Osage Agency itself to test its procedures. In short, other than limited checks by a handful of gaugers, the Osage Agency did not independently verify any of the price, volume, or other data reported by lessees and purchasers. During the Tranche One period, the Osage Agency's royalty-collection process was

organized to run as precisely the kind of "honor system" that Congress found unacceptable for itself and the other Indian Tribes.

Inadequate Site Inspection and Security. It was not until some time in the 1970s that the Osage Agency began to employ tank inspectors, known as "gaugers," to check oil production volumes. The evidence will show that, during the Tranche One period, the Agency's gaugers made sporadic inspections, checking between one and three percent of the crude oil storage tanks on the Osage Reservation each month.

Some of the same governmental studies that have commented generally on the need for volume-verification procedures have specifically noted the absence of adequate inspection efforts on the Osage Reservation. In 1982, the Linowes Commission wrote that "the Osage Tribe's inspectors, made available through the Bureau of Indian Affairs, are only six in number and are charged with inspecting 11,000 wells." Linowes Report at 121. The Commission recommended that the BIA provide for sufficient inspection resources to conduct site-security and production-verification inspections at least once a year. Linowes Report at 126. Similarly, Coopers & Lybrand, conducting a study on behalf of the Osage Nation, determined that the Osage Agency did not have enough gaugers to inspect oil pumps and tanks and recommended that the Agency hire from six to nine more gaugers and field inspectors. Coopers & Lybrand, Osage Agency – Minerals Branch Organizational Review Report 22 (Jan. 15, 1992). The Osage Agency subsequently hired one.

Inadequate Training and Expertise. Most of the Osage Agency personnel who were responsible for verifying oil-royalty payments were not engineers and had no accounting or financial background. Indeed, most of the line staff lacked any formal education beyond high school. In addition, during the Tranche One Months, the Osage Agency had no manuals or

written procedures to guide employees in carrying out their responsibilities to collect the proper amount of royalties due. The Osage Agency did not prepare a written manual for the royalty-collection process until 2004. An MMS oil royalty auditor familiar with the Osage Agency will testify that it did not hire or train personnel who were qualified to perform an audit of royalty payments. Moreover, although the Osage Agency's Minerals Branch had pervasive control over the Osage Minerals Estate, its personnel received no training in trust duties until approximately 2002 or 2003.

**B. Specific Flaws**

Based on the testimony of the Government's RCFC 30(b)(6) deponent, the evidence will show that the royalty determination, collection, and verification process during the Tranche One period essentially worked in the following way. For the first five Tranche One Months, Osage Agency personnel had a spreadsheet identifying those purchasers whom they believed to have collectively purchased 80% of the oil produced in Kansas-Oklahoma. For the sixth Tranche One Month, Osage Agency personnel had a spreadsheet showing those purchasers whom they believed to have collectively purchased 95% of the oil produced in Osage County. The Government's RCFC 30(b)(6) witness could not explain the derivation or basis of the spreadsheets. Nor was she able to produce copies of the worksheets.

Osage Agency personnel looked at the posted price bulletins of the "Major Purchasers" for each month to determine the highest posted prices for each day. Osage Agency personnel then prepared a Highest Posted Price Bulletin and sent it to lessees and known purchasers of oil from the Osage Reservation to inform them of the previous month's daily highest posted price.

The Osage Agency made gravity adjustments to the prices in the Highest Posted Price Bulletins.[14] The Osage Agency sent out its Highest Posted Price Bulletin some time before the 25th of the month following the month in which the oil was sold. The bulletin identified the highest posted prices by "Major Purchasers" for each day period of the month. The bulletin directed that royalty payments be made based on the posted prices in the bulletin unless the lessees' actual selling prices for oil from Osage leases were higher. In that latter case, the Agency directed the parties to compute royalty obligations based on the actual selling price.

Throughout the Tranche One period, lessees and purchasers made royalty payments by check. In later Tranche One Months, electronic transfer became more common. Because many lessees or purchasers paid royalty on a number of leases as a group by a single check or electronic payment, each payment was accompanied by a lessee's report or purchaser's report that purported to show the detail for the payments covered by the check, including the volume of oil bought or sold from each lease, the price paid or received for that oil, and the royalty rate.

The Osage Agency reviewed the payment information it received, calculated the royalty it believed to be due on each lease, and compared that calculation to the amount paid. In making this calculation, Osage Agency personnel relied only on the paperwork provided by the lessee and purchaser and on its own Highest Posted Price Bulletin for that month. The Agency did not look at the companies' sales contracts or otherwise examine their records to determine whether the royalty determination was capturing all of the consideration being paid for the oil. Based on the payment and bulletin information it had, the Osage Agency took the higher of the highest

[14] The "gravity" of crude oil is its specific gravity, *i.e.*, the ratio between the weight of equal volumes of the crude oil and water, where the weight of the water is assigned a value of 1. In the petroleum industry, the specific gravity of crude oil is normally expressed in degrees on a scale developed by the American Petroleum Institute.

posted price or the reported sales price and multiplied that price by (1) the reported volume sold and (2) the royalty rate from the lease. Agency personnel recorded the result of that calculation on form DI-1040, which was prepared for each check received. When the Osage Agency determined that a royalty underpayment existed, it sent a notice to the lessee and/or purchaser.

The evidence will show that the Osage Agency's process for determining and collecting the amount of royalties due violated the Tranche One Lease terms and the applicable Osage Regulations in several ways.

First, the Osage Agency failed to consider certain price postings by major purchasers that were higher than the royalty value applied by the Osage Agency.

Second, the Agency failed to consider offered prices of major purchasers in the relevant geographic region.

Third, during the three Tranche One months (January 1976, May 1979, and November 1980) when federal crude oil price controls were in effect, the Agency failed to base Royalty Value on posted or offered prices of major purchasers in the relevant geographic region that exceeded the regulatory ceilings.

Fourth, the Agency failed to consider selling prices from the same lease that were higher than either the actual sales price of the lessee's production or the posted or offered prices of major producers in the relevant geographic market.

Fifth, the Agency made downward price adjustments based on gravity differentials without any basis for doing so in the terms of the leases or regulations.

Sixth, the Agency failed to collect mandatory penalties on the royalty underpayments that have resulted from its regulatory and lease-term violations and other royalty-collection failures.

The United States is expected to contend that it would have been too difficult for it to have identified offered prices for the entire Kansas and Oklahoma area. There is no evidence, however, that the Osage Agency even attempted to collect data regarding offered prices. Moreover, the purported existence of administrative burdens is no excuse for the United States to ignore trust obligations imposed by its own regulations.

The United States is also likely to take the position that it did not violate the offered price regulation as properly interpreted. That raises legal issues that are addressed in plaintiff's contentions of law below. Similarly, the United States' positions on the other lease and regulatory violations alleged above can be expected to raise legal issues. Plaintiff also addresses them in its contentions of law.

**C. Lack of Sufficient Records to Substantiate Royalty Collections**

Based on the deposition testimony of the Government's RCFC 30(b)(6) witness on the royalty calculation and verification process, the evidence will show that the Government was unable to locate complete records of the Tranche One royalty payments. The records that it did find are insufficient to verify the correctness of the royalty amounts apparently received, even under the Osage Agency's own procedures. Indeed, for many of the Tranche One Leases, the records are not sufficient to determine even how much royalty the Osage Agency collected.

For example, during discovery the United States did not produce the Highest Posted Price Bulletins for the first three Tranche One Months (January 1979, May 1979, and November 1980). Without those bulletins, it is impossible to verify that the Osage Agency applied its own procedures correctly. In determining Royalty Value, the Osage Agency relied exclusively on those bulletins to identify the highest posted price.

The Government has not produced records showing its major purchaser determination methodology. Nor has it produced records showing that the Osage Agency had the information necessary to identify the "major purchasers." Such information would have included

- the total volume of oil purchased in the relevant geographic area (Kansas and Oklahoma from 1974 through July 1990 and Osage County after that);
- the identity of all purchasers of oil in the relevant geographic area; and
- the volume of oil bought by each such purchaser.

The Government's oil royalty expert has testified that the computer program purportedly used by the Osage Agency to make Major Purchaser determinations was inoperable and that he could not glean from the computer disk containing the program any information about how the Osage Agency performed the Major Purchaser analysis. As a result, he was unable to recreate or duplicate the Major Purchaser analysis in his expert report.

Furthermore, the royalty-payment process was subject to inadequate accounting controls. For example, the Osage Agency did not limit the time in which lessees or purchasers could make after-the-fact downward adjustments to prior royalty payments. Nor has there ever been a complete accounting of the Osage trust funds in general, or of the oil royalties collected in particular. The various records of the funds held in the Trust are also inadequate to determine account balances and trust activity.

The United States is expected to argue that all Osage Agency records were sent to the American Indians Records Repository ("AIRR") facility in Lenexa, Kansas, where they remain, and that the missing records could be located with more time and effort. The available evidence, however, indicates the contrary. In an effort to identify Osage Agency records, the parties spent substantial time and resources conducting a joint review of the database of records stored in the AIRR. Literally hundreds of boxes were identified and reviewed, page by page, by a joint

document search team. That effort occupied much of August 2005, and we understand that the United States continued its search after the discovery cut-off date. Despite those efforts, the United States has been unable to locate needed records. Indeed, the inability to locate such records, after the parties' extensive joint search, suggests that the missing items no longer exist.

Moreover, the evidence will show that, on at least two occasions, the Osage Agency destroyed a substantial volume of records. In one incident, documents relating to oil royalty liability and verification were burned. In another incident, the Agency shredded documents, again including a variety of documents relating to the Osage Minerals Estate. The Osage Agency's document-destruction activities support the inference that documents that cannot be located today may no longer exist.

## V. THE OSAGE AGENCY'S MANAGEMENT OF FUNDS COLLECTED

### A. The Process for Depositing Royalty Payments

When the Osage Agency received a royalty check, a collections officer logged it in and sent a copy to the Agency's Minerals Branch for review as described above. After review by the Minerals Branch, the collections officer would complete tracking paperwork and mail all checks ready for deposit to the BIA's office in Muskogee, Oklahoma. When the Muskogee office received the checks, it would complete a deposit slip and deposit the checks in a local federal depository bank, the First National Bank of Muskogee. The BIA's Muskogee office would make no attempt to verify the accuracy or completeness of the royalty payment. It simply deposited checks received from the Osage Agency. The Muskogee office typically deposited checks on the same day received or the next business day.

In January 1990, a bank in Pawhuska was designated as a federal depository. Thereafter, the Osage Agency no longer mailed checks to the BIA's office in Muskogee but deposited them in the bank in Pawhuska.

In approximately 1986, some lessees and purchasers began making royalty payments by wire or electronic transfer directly to the BIA's regional office in Albuquerque, New Mexico. In those cases, the Osage Agency received notice of the payment from the Albuquerque office or from the lessees or purchasers directly. The lessees and purchasers also filed lessee reports and purchaser statements with the Osage Agency.

**B. Investment of Osage Minerals Trust Funds**

After deposit of royalty payments, the BIA placed the funds into a generic account for all tribal trust funds. Within that account each fund allocated to a tribe or trust fund was assigned a particular tracking number – 7386 in the case of the Osage Minerals Trust Fund. The BIA's Albuquerque office made all investment decisions for deposited funds. To make an investment, a BIA official would give instructions to the Department of the Treasury in Washington, D.C.

If not invested in a CD or other long-term instrument, the funds earned interest in the following ways. Until the mid-1980s, such uninvested funds earned simple interest at the statutory rate of four percent. Beginning in the mid-1980s, the BIA had the option of investing such cash balances in overnighter accounts. That procedure, however, was not automatic; the BIA had to direct Treasury to make the overnighter investment.

In general, it appears that the BIA invested some Osage Minerals Trust Funds in various securities and certificates of deposit authorized by 25 U.S.C. § 162a. The BIA also apparently invested some trust funds in overnighter accounts or otherwise paid interest on these funds for periods of time. The trust records, however, are incomplete and preclude a determination of such basic facts as how much money was available for investment at any point in time, how and why the BIA chose particular investments, and what investment yield was obtained. Although some information is available for certain periods of time, it is not enough to permit an accounting to be

performed or a determination to be made of whether the United States invested the funds prudently for each of the Tranche One Months.

On a monthly basis, Treasury would compare its records of account activity with BIA's report and inform the BIA of discrepancies. The BIA was responsible for maintaining the official trust account records and reconciling any discrepancies identified by Treasury. Nevertheless, in a lengthy report, Arthur Andersen documented its unsuccessful effort, at the Government's direction, to reconcile the Osage Minerals Trust Fund accounts for the years 1972-1992. Arthur Andersen made clear that missing records prevented a full accounting. Agreed-Upon Procedures and Findings Report for Osage Nation of Oklahoma, July 1, 1992, Through September 30, 1992 ("Arthur Andersen Report") 1. It also noted other problems with the Osage Minerals Trust accounts, including frequent royalty-deposit delays and numerous periods of inadequate investment returns. *Id.* at Attachments B-1, B1a, B-2, B-3, and B-3a.

Ultimately, Arthur Andersen could not resolve the problems created by the lack of documentation. To complete its report, Arthur Andersen was forced to rely on a series of "agreed-upon procedures." It is undisputed that the Arthur Andersen Report does not represent an accounting, audit, or reconciliation of trust records of the BIA in general or the Osage Nation in particular.

There are other problems. For example, before 1978, the BIA's trust records fail to distinguish between investment and other types of income, making it impossible to determine whether the trust funds were prudently invested. Similarly, numerous existing account records for Osage Trust funds indicate negative balances. The United States' designated witness on trust accounting issues, Margaret Williams, was unable to explain the negative balances and conceded that they should not exist.

### C. Distribution of Funds to Headright Owners

In accordance with the 1906 Act, oil and gas royalties and accrued interest on such royalties and on other account funds were distributed to Osage headright owners four times a year based on the net funds collected for a calendar quarter. As a general rule, the distributions occurred early in the third month following the end of the quarter. The Osage Agency and the BIA provided Treasury with the name and address of each headright owner and the share amount to be distributed. Treasury withdrew the total quarterly distribution from account 7386 and placed it in a special disbursal account. It issued checks against that account to headright owners who did not have individual Indian money trust accounts. For those having such trust accounts, Treasury made payments by electronic transfer. Funds in the disbursal account were not invested and did not earn interest.

Many checks issued to headright owners were not negotiated for several days, and there are documented instances of checks going unnegotiated for many months and even years. Indeed, some checks were never negotiated. The United States ultimately canceled those checks and may have returned some of the funds to BIA's tribal trust account. While these checks were outstanding, no interest was earned or paid on the funds.

### D. The Government's Mishandling of Trust Funds

The Government's processing and handling of royalty collections, as described above, had several failings. First, the Osage Agency's procedures prevented the timely investment of royalty collections. Mailing royalty checks to the BIA's area office in Muskogee delayed, by at least several days, the ability to deposit the checks into an account from which the funds could be invested or otherwise allowed to earn interest. The Government has been unable to explain why it waited until 1990 to designate a federal depository in Pawhuska or a nearby town. Nor is it able to explain why the Osage Agency did not deliver the checks to a federal depository closer

than Muskogee. In addition, the Arthur Andersen Report shows that, from 1972 to 1992, the Osage Agency failed to deposit a number of royalty checks for time periods ranging from a couple of days to more than a month. Arthur Andersen Report, *supra, at* Attachments E, E-1, and E-2.

Second, the United States failed to obtain investment yields for the Osage Minerals Trust Funds equal to the prudent-person rate endorsed by the United States' own expert.

Third, the United States failed to earn interest on funds awaiting disbursal. The evidence will show that, when the United States designated funds for disbursal to headright owners every quarter, it stopped investing or otherwise obtaining interest on those funds. The evidence will further show that checks to headright owners were not negotiated for periods ranging from a few days to many years. During the time the checks were outstanding, the Government took no steps to ensure that interest was paid or earned on those funds.

## VI. THE GOVERNMENT'S ADMINISTRATION OF THE OSAGE MINERALS ESTATE HAS HARMED THE TRUST AND THE OSAGE NATION

As detailed above, the United States breached its trust duties in three ways: (1) by failing to apply the provisions of the Tranche One Leases and the Osage Regulations correctly, (2) by failing to audit and otherwise verify the accuracy of oil production and sales information, and (3) by failing to maintain proper trust accounting. As a direct result of those breaches, the Osage Nation was deprived of money, in the form of lost oil royalties, investment earnings, and interst, that it would have received had the United States not breachd its trust duties.

That the Osage Nation was harmed by the United States' failure properly to collect and manage funds owed to, and already in, the trust for the Osage Mineral Estate is clear. Establishing the amount of the harm becomes somewhat problematic, however, precisely because of the United States' failure to maintain complete and accurate books, records, and

accounts of trust activities. Due to its systemic mismanagement of the Osage Minerals Estate, the Government cannot account or the moneys due the Estate under the Tranche One Leases. The Government's RCFC 30(b)(6) witnesses acknowledged that many documents relevant to the Tranche One claims are missing and extensive effort such as the Arthur Andersen Report have thoroughly documented the inadequacy of the United States' books and records regarding the Osage Mineral Estate.

The United States is expected to seize on the absence of key records to take the position that there is insufficient proof that it has caused any loss to the Osage Mineral Estate under the Tranche One Leases. It will urge the Court to draw the factual inference that the Government acted in good faith and collected a substantial amount of the royalty owed, asking the Court to rule, in effect, that the United States' work was good enough for government work. As detailed in the Contentions of Law below, however, such an inference is flatly prohibited as a matter of law. The Government is held to the highest fiduciary standards in this case. Moreover, the facts simply do not support an inference in favor of the United States because of the extensive evidence that it breached its trust duties.

Accordingly, the Osage Nation has made a good-faith effort to calculate its damages by using reasonable data, assumptions, and analysis as a reasonable proxy for the missing information.

### A. Harms Caused by the Government's Failure to Collect All Moneys Due Under the Tranche One Leases

As detailed above, the United States harmed the Osage Minerals Trust in three ways: (1) by failing to apply the provisions of the Tranche One Leases and the Osage Regulations correctly, (2) by failing to audit and otherwise verify the accuracy of oil production and sales information, and (3) by failing to maintain proper trust accounting.

To estimate the damages incurred by the Osage Nation, it was necessary to find reasonable alternative sources of information to fill in the gaps created by the missing records. The Osage Nation relies on Daniel T. Reineke to provide those alternative sources of data and to calculate the damages the Osage Nation seeks. To fill in the gaps in the records regarding royalty paid, volume sold, and price paid, Reineke relied on data reported to the Oklahoma Tax Commission as well as certain unaudited data compiled on a non-secure computer database maintained by the Osage Agency, known as System 36. Even with that additional data, Reineke was unable to obtain all the data necessary to calculate damages for each breach of each Tranche One Lease for each Tranche One Month.

To calculate the damages from the United States' failure to apply the highest posted price of major purchasers in the relevant geographic area, Reineke attempted to recreate the Osage Agency's major purchaser analysis. To do that, he collected posted price data from companies active in the Oklahoma and Kansas markets and made a determination as to which of those companies would have comprised the "Major Purchasers" for each Tranche One Month under the Osage Regulations. Reineke then averaged those posted prices over the month. Because of the difficulty of determining the actual percentage of oil produced in the relevant geographic area that each company actually purchased, using the average posted price, rather than selecting the highest price posting, provides a conservative measure of the posted prices by major purchasers in the relevant geographic area. Reineke compared that weighted average posted price to the highest posted price as determined by the Osage Agency. In the months when he could not determine the highest posted price used by the Osage Agency, he compared the average highest posted price to the royalty value actually paid by the lessees. Reineke's analysis shows that for three of the six Tranche One Months, the average posted price was higher than the highest posted

price as determined by the Osage Agency. This analysis shows an undercollection of royalties in the amount of $42,175.

To calculate the damages caused by the Osage Agency's failure to consider offered prices, Reineke first determined whether there were offered prices higher than the prices reportedly paid or highest posted prices determined by the Osage Agency. Because there were no records from the Osage Agency memorializing offered prices, Reineke used as a reasonable proxy price records for crude oil on the NYMEX commodities market for oil to be bought in Cushing, Oklahoma. In addition to reflecting an offer to buy oil in Oklahoma within the definition of the Osage Regulations, the so-called Cushing Price is widely recognized as indicating the market price of crude oil. In addition, Reineke was able to obtain records of actual sales of crude oil in Kansas and Oklahoma for oil produced during some of the Tranche One Months. Reineke calculated the royalty that would have been due on the oil sold for each Tranche One Lease and Month using that offered price as the basis for Royalty Value. He then compared that royalty payment to the royalty reportedly paid. Based on that analysis, Reineke determined that the Osage Agency failed to collect $46,709 in royalties for the Tranche One Leases in the Tranche One Months.

To calculate the money lost by the Osage Agency's use of downward gravity adjustments in making its highest posted price determination, Reineke applied the highest posted prices by major purchasers as described above without making any downward gravity adjustments. He then compared the royalty due using that posted price as the Royalty Value to the royalty actually paid and determined that the United States failed to collect $2,187 in royalty payments by improperly applying gravity adjustments.

To determine the harm caused by the Osage Agency's failure to apply the higher sales price of crude oil when oil produced from the lease was sold for two different prices in one month, one must first determine whether there were any such sales. If there were, one must calculate the Royalty Value for all oil sold from that lease in that month as if it had been sold at the higher of the two prices. An examination of the available Lessee's Reports and Purchaser's Reports shows that there were four such sales: East Hardy in January 1976, East Hardy and Osage Hominy in May 1979, and Osage Hominy in November 1980. In each case, however, the royalty was based on the sales price for that individual sale alone; the higher sales price was not applied to all oil produced from each lease in each month. When the higher of the two sales prices in each month is applied to all of the oil sold from each lease in each month, it is apparent that the Osage Agency failed to collect $188,241 in royalties due the Osage Nation.

To determine the harm caused by the failure of the United States to calculate Royalty Value based on the unregulated price of crude oil during Government's failure to include posted prices for unregulated crude oil in the determination of Royalty Value for royalty payments received in the Tranche One Months of January 1976, May 1979, and November 1980, Reineke consulted posted price bulletins from major purchasers and Cushing Price data showing unregulated prices for oil during those months. Reineke then calculated the royalty that would have been due using the unregulated value of oil to determine Royalty Value. He compared that royalty calculation to the royalty that was reportedly paid. That analysis shows that the Osage Agency failed to collect $211,461 in royalties based on the use of regulated prices in the posted price analysis and failed to collect $202,734 in royalties under the offered price analysis.

Even under the United States' theory for calculating royalties, the United States' expert, Ronnie Martin, has demonstrated that the Osage Agency failed to collect the full royalty due

under the Tranche One Leases. Martin determined that the Osage Agency in fact failed to collect $35,583 in royalties, which equals approximately 1.47% of the royalties apparently collected. Although Martin expressed the belief that this underpayment was not the result of breaches by the Osage Agency, he admitted that he could not prove his hypothesis and conceded that the undercollection could have been the result of mistakes by the Osage Agency.

### 1. Systemic Losses Due to Failure to Audit and Police

Under any "Honor System" like the one at issue here, the cost of enforcement and deterrence is forgone at a price. Given long experience of human nature, the only possible inference, in a system where self-interested parties are left to decide for themselves whether to pay honestly for the full amount of a valuable resource taken, is that only some will do so. Some will diligently attempt to do so and fail; some will casually attempt to do so and give themselves an unwarranted "benefit of the doubt"; some will go to no effort whatsoever to determine whether they are being honest; a very few will overpay, inadvertently, once in a blue moon; and some will actively steal. Over time, the same person or entity may do any number of these things. At bottom, it is common experience that an "Honor System" results in systemic losses. As discussed above, Congress has so found with respect to the lack of policing on both federal and Indian mineral leases, including leases of the Osage Mineral Estate. The Government's decision to run its trusteeship as an "Honor System" has caused large losses to the Estate. No other inference can reasonably be drawn.

Moreover, it is in the very nature of such losses that the amount of loss cannot be determined precisely. Studies by a number of governmental agencies as well as other evidence will demonstrate that appropriate auditing and accounting typically results in oil-royalty underpayment determinations in the range of two to ten percent of collected royalties. Using a percentage of seven percent as a reasonable estimate of the underpayments audits of the Tranche

One Leases and Tranche One Months would have revealed, the Osage Nation lost royalties in the amount of $169,856 as a result of the United States' failure to audit and otherwise verify the accuracy of oil production and sales data reported by lessees and purchasers.

#### 2. Penalties

The United States did not collect the full royalty due under the Tranche One Leases by (1) failing to apply its own regulations properly and (2) failing to perform audits that would have uncovered other underpayments. It follows therefore that the United States did not collect any of the late fees that were also due on the unpaid royalties. The failure to collect those late fees also harmed the Osage Nation.

### B. Harms Caused by the Government's Failure to Invest Trust Funds Efficiently and Prudently

Consistent with the findings of the Arthur Andersen report, the Government's RCFC 30(b)(6) witness on trust account issues testified that the Osage trust account records are incomplete and that it is not possible to determine how all trust funds had been invested and how much interest had been earned. To estimate the harm to the Osage Nation caused by the United States' failure to prudently invest Osage Mineral Estate Trust Funds, the Osage Nation's expert, Stephen A. Jay, compared the investment yields the United States apparently obtained, based on the information provided in the Arthur Andersen Report, to the investment yields that the United States contends should have been obtained, based on the "prudent person" yield rate adopted by the United States' expert, Charles Lundelius. Those rates varied for each of the Tranche One years, reflecting varying market conditions, from a low of 5.34% in 1976 to a high of $16.22% in 1981. Jay used data in the Arthur Andersen Report to compute the fund balances available for investment in given time periods. Although the Arthur Anderson data is, by its own terms,

incomplete and not audited, it remains the most reasonable source of account data upon which to base any calculations of this type.

Jay's analysis shows that during four of the six Tranche One years, the apparent yield earned by the United States on the Osage Mineral Estates Trust Funds was *less* than the "prudent person" rate as computed by the United States' expert. The lost investment income in those four years was $824,196. The present value of that lost investment income, based on the benchmark rates computed by the BIA and rates for 7-year treasury bills, is $5,057,547.

To calculate the damages caused by the United States' failure to timely deposit royalty payments, Jay first estimated how many days in took the Osage Agency to deposit royalty payments based on data in the Arthur Andersen Report showing lag times. Although the Arthur Andersen data is presented in ranges (*e.g.*, 1-3 days), Jay used only the mid-point of each range to keep the calculations conservative. Applying those days of deposit lag time, Mr. Jay calculated that the present value of that lost interest was $467.

To calculate the damages caused by the United States failure to pay interest on funds awaiting disbursal, Jay performed two calculations. First, the evidence will show that some checks were issued and eventually negotiated. Jay estimated the time to mail and negotiate those checks and determined that the present value of lost interest on those funds is $143,340. Second, the evidence will show that a number of checks were never negotiated and were eventually cancelled by operation of law in about 1989. It is unclear the proceeds of those checks were ever returned to the Osage Nation. Jay calculated that the present value of the lost interest on checks that were never negotiated, assuming that the proceeds of those checks were never returned to the Osage Nation, is $11,728,793. If, as the United States may contend, the proceeds of those

checks were returned to the Osage Nation in October, 1989, the present value of the lost interest on those funds is $4,521,929.

## STATEMENT OF ISSUES OF FACT AND LAW

The complaint raises two claims for breach of trust: breach of the duty to collect all moneys due the trust, and breach of the duty to invest trust funds prudently. The Court has already held that the United States, as the trustee of the Osage Minerals Estate, is bound by these two trust duties. At trial, the Court will have to analyze these duties more particularly, compare the duties to evidence of the Government's conduct, and then decide whether the duties were breached. But first the Court must decide issues of law applicable to both claims.

## LEGAL ISSUES TO BE DECIDED BEFORE ANALYZING SPECIFIC CLAIMS

The Court must decide whether the United States as trustee of the Osage Minerals Estate is held to the highest fiduciary standard of care.

The Court must decide whether the Department of the Interior is entitled to *Chevron* deference in interpreting its regulations as they apply to the Osage Minerals Estate, or whether, to the contrary, the agency was required to examine all reasonable constructions of its regulations and adopt the reasonable construction most favorable to the trust beneficiary.

Because the Government has never rendered a proper accounting of trust funds, and because many critical trust records requested in discovery were not produced during the discovery period, the Court must decide the burden of proof applicable to trust matters not fully documented in discovery. That is, the Court must decide whether, to the extent that there are insufficient trust records to show that the United States performed its trust duties, the United States is excused from any breaches that it may have committed, or whether, to the contrary, the burden of proof is on the United States as trustee to prove that it satisfied its trust duties.

## CLAIM ONE: BREACH OF THE DUTY TO COLLECT "ALL MONEYS DUE"

With respect to Claim One, the Court has held that "the defendant, as trustee, has a specific duty to verify that 'all moneys due' under the terms of the mineral leases were in fact

paid to the government and deposited to the account of the trust beneficiary." *Osage Tribe*, 68 Fed. Cl. at 328 (footnote omitted). The Court has also noted the general distinction between a "specific duty" the United States has as trustee and "the tasks that may be required to carry out that duty." *Osage Tribe,* 68 Fed. Cl. at 327. The United States breaches its duty if it fails to perform a "task[] . . . required to carry out [a specific] duty." *Id.*

The United States had to perform four tasks as part of the duty to collect all moneys due under the Tranche One Leases. First, the Government was required to determine the volume of oil subject to royalty. Second, the Government had to calculate the correct Royalty Value. Third, the Government had to collect any late fees due under the leases. Fourth, the Government was required to account to the Osage Tribe to show that all moneys due were collected and deposited.

**<u>DETERMINING VOLUMES SUBJECT TO ROYALTY</u>**

There is no dispute that the United States was required to meet some standard of care in determining volumes of oil subject to royalty under the Tranche One Leases, and that any failure to meet that standard of care is a breach of trust. The Court must decide what that standard of care was, what the government did and did not do to determine volumes subject to royalty, and whether the government's actions failed to meet the standard of care.

**<u>CALCULATING THE CORRECT ROYALTY VALUE UNDER THE APPLICABLE REGULATION</u>**

Royalty Value is calculated according to a formula specified in regulations that were incorporated into the Tranche One Leases. There is no dispute that the United States was required to apply the 1974 regulations correctly in the first five Tranche One months and the 1990 regulations correctly in the sixth Tranche One month, and that any failure to do so is a breach of trust. There is also no dispute that to determine Royalty Value, the 1974 and 1990

regulations required the United States to calculate three arithmetic values, which may be referred to for purposes of this statement of issues as “sales price,” “offered price,” and “posted price.”

Further, there is no dispute that to calculate the “sales price,” the United States had to verify the full consideration received by lessees for all oil subject to royalty under the Tranche One Leases. The Court must decide what standard of care the Government was required to meet in verifying the full consideration and whether the United States met that standard.

The Court must resolve three disputes about how to construe the Royalty Value regulations. First, the Court must decide whether the Government’s construction of the term “offered price” is incorrect insofar as it limits that term to prices offered *specifically to the lessee*. Second, the Court must decide whether the Government misconstrued the regulations when it excluded from Royalty Value calculations any “posted” and “offered” prices that were above price-control ceiling prices for regulated sales reported by the lessee for crude oil produced on the Osage Minerals Estate. Third, the Court must decide whether the United States improperly read into the regulations a requirement that it adjust “posted” prices downward based on the gravity (i.e., density) of the royalty oil. After resolving these three disputes about how to construe the royalty-price regulations, the Court must determine whether the United States collected the amounts due under the correct construction of the regulations.

It is undisputed that for the first five Tranche One months, the applicable regulation required the United States to determine whether there had been multiple sales from the same lease on the same day, to compare the actual price per barrel received for each such sale, take the highest of such prices, and put it into the regulation’s formula for calculating the Royalty Value. The Court must determine whether the United States failed to do so.

**COLLECTING LATE FEES DUE UNDER THE LEASES**

The Court must decide what moneys were due under the leases as late fees for underpayment of royalties, and whether the United States failed to collect the full amount due.

**ACCOUNTING FOR ALL MONEYS DUE UNDER THE LEASES**

It is undisputed that the United States has a duty to account for all moneys due under the Tranche One Leases and that the United States has failed to do so. As the Court has previously noted, the United States "does not claim that . . . a 'meaningful accounting' has been provided to the Osage Tribe." *Osage Tribe*, 68 Fed. Cl. at 334 (quoting *Shoshone*, 364 F.3d at 1347).

**CLAIM 2: BREACH OF THE DUTY TO INVEST TRUST FUNDS PRUDENTLY**

There is no dispute that the United States has a duty to invest trust funds prudently. The Court must decide whether it was possible for the United States to deposit trust funds in interest-bearing accounts within 24 hours of receipt, and, if so, whether it was consistent with the applicable standard of care for the United States to take longer than 24 hours to deposit such funds.

The Court must decide what interest rate the applicable standard of care required under the circumstances, and whether it failed to obtain such returns on trust funds.

The Court must also decide whether it was reasonable under the circumstances for the United States to fail to earn interest on funds awaiting disbursement pending clearance of checks.

**DAMAGES**

The Court must make findings on the difference between the moneys that were due the Osage Nation under the leases and the moneys the United States actually collected.

The Court must make findings regarding additional interest the trustee could have obtained had all funds received been deposited in a timely manner under the trustee's standard of care.

In addition, the Court must decide the rate and amount of interest that the United States would have earned by prudently investing all moneys due, both collected and uncollected, between the time those moneys were due and the time they were disbursed (or would have been disbursed had they been collected). From this amount, the Court must subtract the amount of interest that the United States can show was actually earned.

The Court must further decide, for moneys that should have been collected, invested, and disbursed, but instead went uncollected, the time value of money lost in the interval from the time such moneys and their corresponding earnings should have been disbursed to the present.

The Court must determine the rate and amount of interest that moneys awaiting disbursement would have earned had the United States placed such moneys in an appropriate interest-bearing account.

The Court must determine what expenses borne by the Osage Tribe to bring this action would not have been necessary had the United States fulfilled its duty as trustee to keep proper trust accounts.

## APPLICABLE LEGAL PRINCIPLES

Part I describes the United States' trust relationship with the Osage Tribe, identifies the sources of law governing the relationship, and articulates the standard of care applicable to the United States as trustee. Part II identifies the legal principles relevant to the claim that the United States breached its duty to collect moneys due under oil leases. Part III discusses the legal principles relevant to the claim that the United States breached its duty to invest prudently the proceeds of the oil leases. Part IV discusses the legal principles applicable to calculating the damages that flow from the claimed breaches.

### I. AS TRUSTEE OF THE OSAGE MINERAL ESTATE, THE UNITED STATES OWES THE OSAGE NATION THE HIGHEST FIDUCIARY DUTY

The United States' trust duties to the Osage Tribe arise from two primary sources: first, the government-Indian relationship, and second, the 1906 Act and regulations thereunder. Thus, while "the plain language of . . . the 1906 Act establishes fiduciary duties," *Osage Tribe*, 68 Fed. Cl. at 327, it is also true that "[t]he federal government has substantial trust responsibilities toward Native Americans" that "are grounded in the very nature of the government-Indian relationship." *Cobell v. Norton*, 240 F.3d 1081, 1086 (D.C. Cir. 2001) ("*Cobell VI*").

"[T]he scope of the United States' fiduciary duty in administering . . . trust property is a question of federal law." *Mason*, 412 U.S. at 397, n.9.

#### A. The United States' General Trust Duties Toward Dependent Indian Nations Impose a Heightened Standard of Care for Specific Statutory Trust Duties

Although the specific money-mandating duties found by this Court in this case arise from the 1906 Act, the *standard of care* for the performance of those duties must be informed by the more general, far-reaching duties the United States owes to Indian tribes. Unlike a typical beneficiary-trustee relationship, the government-Indian relationship was thrust upon the beneficiaries simultaneously with the confiscation of their real property, the subjugation of their

nations, and many other hardships. "The Indian Tribes, as domestic dependent nations, were subjected to the imposition of the trustee-beneficiary relationship and have become reliant upon their trustee to carry out trustee responsibilities." *Shoshone*, 364 F.3d at 1348 (citing *Mitchell v. United States,* 463 U.S. at 225 (1983) ("*Mitchell II*").

As a result of the manner in which the Osage Tribe was subjected to the trustee-beneficiary relationship, and in light of the United States' complete control over the Osage Minerals Estate, *see supra* at 5, the United States owes the Tribe the very highest standard of care. The federal courts have used a variety of forceful expressions to emphasize the strictness of the applicable standard:

- "There is no doubt that the United States serves in a fiduciary capacity with respect to [the Osage] Indians and that, as such, it is *duty bound to exercise great care* in administering its trust." *Mason*, 412 U.S. at 398 (emphasis added).

- "Because of its treaty and statutory obligations to tribal nations, the United States must be held to *the 'most exacting fiduciary standards'* in its relationship with the Indian beneficiaries." *Shoshone*, 364 F.3d at 1348 (quoting *Coast Indian Cmty. v. United States*, 213 Ct. Cl. 129 (1977)).

- In evaluating the "general trust relationship between the United States and the Indian people" under claims of breach, the Supreme Court has "emphasized '*the distinctive obligation of trust* incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'" *Mitchell I*, (quoting *Seminole Nation v. United States,* 316 U.S. 286, 296 (1942)).

- The "standard of duty for the United States [as trustee] is *not mere 'reasonableness'* but the highest fiduciary standards." *Minnesota Chippewa Tribe v. United States*, 14 Cl. Ct. at 130 (citing *Yankton Sioux Tribe v. United States,* 623 F.2d 159, 163 (Ct. Cl. 1980)).

- The United States as trustee takes on "*the most exacting fiduciary standards*" of responsibility, because it "has charged itself with *moral obligations of the highest responsibility and trust*." *Seminole Nation v. United States,* 316 U.S. 286, 297 (1942).

This "highest" standard is reflected as well in the rules courts apply to claims that are brought by Indians and that are based in whole or in part on the language of federal statutes or regulations enacted for the Indians' benefit.

### B. Any Ambiguities in Statutes or Regulations Meant to Benefit Indian Tribes Must Be Construed in the Indians' Favor

"The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985). "Undertakings with the Indians are to be liberally construed to the benefit of the Indians." *Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F. Supp. 252, 256 (D.D.C. 1972). Accordingly, when a court applies a statute or regulation promulgated for the Indians' benefit, the court must look to canons that reflect the United States' heightened responsibility to Indian tribes.

First, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit . . . ." *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985).

Second, the United States' "trust relationship and its application to all federal agencies that may deal with Indians necessarily requires the application of a similar canon of construction to the interpretation of federal regulations." *HRI Inc. v. EPA*, 198 F.3d 1224, 1245 (10th Cir. 2000). The *Blackfeet Tribe* canon not only governs the interpretation of regulations, it in fact precludes the deference that might otherwise be accorded to an administrative agency's statutory and regulatory interpretations. *See, e.g., Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461-62 (10th Cir. 1997); *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 59 (D.C. Cir. 1991). "This departure from the *Chevron* norm arises from the fact that the rule of liberally construing statutes to the benefit of the Indians arises not

from ordinary exegesis, but 'from principles of equitable obligations and normative rules of behavior,' applicable to the trust relationship between the United States and the Native American people." *Cobell,* 240 F.3d at 1101 (quoting *Albuquerque Indian Rights,* 930 F.2d at 59).

To the extent that the Secretary of Interior has any discretion in Indian trust matters, that discretion must of course be exercised in a manner consistent with the Secretary's trust duties. "When the Secretary [of Interior] is acting in his fiduciary role . . . and is faced with a decision for which there is more than one 'reasonable' choice as that term is used in administrative law, he must choose the alternative that is in the bests interest of the Indian tribe." *Jicarilla Apache Tribe v. Supron Energy Corp*., 728 F.2d 1555, 1567 (10th Cir. 1984) (Seymour, J., concurring in part and dissenting in part), *adopted as majority opinion as modified en banc*, 782 F.2d 855 (10th Cir. 1986). "'If there is any doubt, the interpretation [of regulations] should be made liberally in favor of the Indians for whose protection these provisions were promulgated.'" *Id.* (quoting *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1332 (10th Cir. 1982)).

### C. The United States Must Administer the Osage Trust Without Regard to the United States' Own Interests, Irrespective of the United States' Own Convenience, and at the United States' Own Expense

The United States' duty of loyalty to beneficiary Tribes is paramount. "The most fundamental duty owed by a trustee to the beneficiaries of the trust is the duty of loyalty. . . . It is the duty of the trustee to administer the trust solely in the interest of the beneficiaries." *Scott on Trusts* § 170 at 311 (4th ed. 1987); *accord* Restatement (Third) of Trusts, § 170(1) at 193 (1992) ("The trustee is under a duty to administer the trust solely in the interest of the beneficiaries."). When faced with a choice as to how to administer the trust, the trustee must do what is best for the trust, not what is most convenient for the trustee: "[the trustee's] interest must yield to that of

the beneficiaries." S*cott on Trusts,* § 170.25 at 436 (4th ed. 1987). "In administering the trust the trustee is under a duty to the beneficiaries not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the trust." Restatement (Third) of Trusts, § 170 cmt. q at 201 (1992). Accordingly, "administrative expenses of a United States Indian agency are not proper objects for the expenditure of tribal trust funds." *Yankton Sioux Tribe v. United States,* 224 Ct. Cl. 62, 101 (1980).

In arrogating the Osage Trust to itself, the United States gained total control over a large volume of oil, a critical strategic resource. The United States' self-interest in this matter further requires strict construction of the terms of the trust against the United States. As a matter of law, in the context of mineral leasing, "the principal goal of the Department of the Interior in Indian oil and other mineral resource management is not to further federal energy policies, but rather to assist Indian landowners in deriving maximum economic benefit from their resources consistent with sound conservation practices." *Cohen's Handbook of Federal Indian Law* § 13.H (1982) (*citing Federal Leasing and Disposal Policies: Hearings Pursuant to S. Res. 45, A National Fuels and Energy Policy Study Before the Senate Comm. on Interior and Insular Affairs,* 92d Cong., 2d Sess., 652-53 (1972)).

**D. In the Absence of a Proper Accounting, the United States as Trustee Bears the Burden of Proving That It Has Properly Discharged Its Duties, and All Doubts Must Be Resolved Against the Trustee**

Trustees have a fundamental duty to properly keep records and accounts of the trust. Restatement (Second) of Trusts, § 172 cmt. a (1957) ("The trustee is under a duty to keep accounts showing in detail the nature and amount of the trust property and the administration thereof."). To fulfill this duty, a trustee must keep proper records of "what gains have accrued and what losses have occurred, receipts, expenditures, and allocations between principal and interest." *Red Lake Band v. United States*, 17 Cl. Ct. 362, 374 (Ct. Cl. 1989).

"[W]hen the United States fails to preserve documents in its fiduciary role to a tribe," a finding of bad faith is unnecessary to establish liability when the United States has "inadvertently destroyed or otherwise lost documents critical to the determination of liability or damages." *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 139 n.11 (2004). "The trustee alone is in a position to know all the facts concerning the administration of the trust," and if the trustee fails to keep proper records, "obviously he cannot be permitted to gain any possible advantage" from that failure. *In re Morgan*, 106 B.R. 573, 582 (Bankr. D. Ark. 1989). "If the trustee fails to keep proper accounts, he is liable for any loss or expense resulting from his failure to keep proper accounts." Restatement (Second) of Trusts § 172 cmt. b (1957). Any such losses or expenses incurred because of the failure of the trustee to keep proper accounts "are not chargeable against the trust estate but are chargeable against the trustee personally." *In re Morgan*, 106 B.R. at 582.

Moreover, when a trustee does not keep proper records, "all doubts will be resolved against him and not in his favor." *Confederated Tribes v. United States*, 248 F.3d 1365, 1373 (Fed. Cir. 2001) (citing Scott on Trusts § 172 (4th ed. 1987)). "If the trustee fails in his duty to keep accurate records, 'all the inconvenience of the confusion' should be 'thrown upon the party who produces it.'" *Blackman v. Hustler Magazine, Inc.*, 800 F.2d 1160, 1164 (D.C. Cir. 1986) (quoting *Shapiro, Bernstein & Co. v. Remington Records, Inc.*, 265 F.2d 272-273 (2d Cir. 1959)). This principle is rooted in "[t]he most elementary conceptions of justice and public policy," which require that "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946).

## II. CLAIM 1: THE UNITED STATES BREACHED ITS DUTY TO COLLECT "ALL MONEYS DUE" UNDER THE TRANCHE ONE LEASES

"[T]he statutes and regulations at issue here clearly establish a fiduciary duty to verify that lessees fulfill their contractual obligations to the Tribe by verifying the accuracy of payments

made . . . ." *Osage Tribe*, 68 Fed. Cl. at 333. "[T]he defendant, as trustee, has a specific duty to verify that 'all moneys due' under the terms of the mineral leases were in fact paid to the government and deposited to the account of the trust beneficiary." *Id.* at 328 (footnote omitted).

**A. The United States Had a Duty to Collect "All Moneys Due" Under The Tranche One Leases**

As a matter of law, "[t]he Secretary [of the Interior's] proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following:

(1) Providing adequate systems for accounting for and reporting trust fund balances.

(2) Providing adequate controls over receipts and disbursements.

(3) Providing periodic, timely reconciliations to assure the accuracy of accounts.

(4) Determining accurate cash balances.

(5) Preparing and supplying account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis.

(6) Establishing consistent, written policies and procedures for trust fund management and accounting.

(7) Providing adequate staffing, supervision, and training for trust fund management and accounting.

(8) Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands."

25 U.S.C. § 162a(d) (2000).

Besides being subject to these statutory baselines, the United States was required, as a matter of law from the face of the leases and regulations, to perform four general tasks as part of its trust duty of collecting the correct amounts "contractually due under the terms of the lease." First, it had to determine accurately the volume of oil actually subject to royalty. Second, it had to compute and collect the royalties that lessees were required to pay. *Osage Tribe*, 68 Fed. Cl.

at 328. Third, it had to compute and collect any late fees due for late payments and underpayments. Fourth, it had to document all these steps in a manner sufficient to show that the trust had been administered in a prudent manner. And it had to do all these things "exercis[ing] such care and skill as a man of ordinary prudence would exercise in dealing with his own property." *Mason*, 412 U.S. 391, 398 (1973) (quoting Scott on Trusts, § 1408 (3d ed. 1967)); Restatement (Second) of Trusts, § 174 cmt. a (1957).

### 1. The United States Was Required to Determine Accurately the Volumes of Oil Subject to Royalty

Under regulations and orders implementing the 1906 Act, a percentage royalty is due on all production from an Osage lease except for that portion of production used as fuel on the same lease. The production subject to royalty includes oil sold to a third-party, stored by the lessee, wasted, or removed by the lessee for the lessee's own use off the lease (such as at lessee's refinery).[15] The United States is not expected to argue to the contrary.

[15] On July 3, 1912, the Secretary of Interior adopted and promulgated a regulation setting the royalty rate at "sixteen and two-thirds percent of the gross proceeds of all oil produced." Regulations to Govern the Leasing of Lands in the Osage Reservation, Okla., For Oil and Gas Mining Purposes, Approved July 3, 1912, The Parties' Joint Appendix to the Court at Tab 17. Since that time there have been occasional changes in the phraseology used to describe the volumes subject to royalty, but the meaning has not changed. There is wide variation in lease and regulation language on this point, even in Tranche One. For example, the East Hardy lease alone refers to

> oil "produced and saved from the leased premises after deducting the oil used in operating the lease," § 2,
>
> "the gross proceeds from sales of all crude oil produced," § 2(a),
>
> "the gross proceeds from sales of oil produced and saved," § 2(b), and
>
> "the gross proceeds of all oil produced and saved," § 2(c).

Other Tranche One Leases have similar language to the effect that royalty is due on "gross proceeds of all oil produced and saved." North Avant Lease, § 2; Osage Hominy Lease, § 2; Stanley Stringer Lease, § § 2(a)-(d); North Burbank Lease, § § 2(a)-(c). Both the 1974 and 1990 regulations are a truncation of such language; they refer to "the gross proceeds from sales after deducting the oil used by Lessee for development and operation purposes on the lease."

Therefore, to calculate the correct Royalty Volume, the United States necessarily had to (1) determine the total production from each lease, (2) determine accurately the volume of oil "used by Lessee for development and operation purposes on the lease," and (3) subtract (2) from (1). Step (3) is arithmetic, while steps (1) and (2) require that the United States audit lessees with respect to production volumes and lease usage volumes, audit purchasers, ensure accuracy of volumetric meters, and provide sufficient site security to guard against theft. As part of the duty to preserve the trust property, "a trustee is under a duty to use proper care to prevent theft of the subject matter of the trust . . . ." Scott on Trusts § 176 (4th ed. 1987).

> [E]lementary trust law . . . confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch. "One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets."

*United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475 (2003) (quoting *Central States, Southeast Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 572 (1985)).

**2. The United States Was Required to Calculate Royalties Correctly**

The 1974 regulations require that a lessee must make monthly payments for each month's production on each lease, no later than the 25th of the following month, in an amount calculated according to the following formula:

> [S]ettlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal. Where different prices are paid simultaneously for oil from a lease and the highest such price exceeds the higher of the aforementioned prices, then that price shall be the basis of royalty on all oil from said lease.

25 C.F.R. § 183.11(a)(2)(1975). "Major purchaser" is defined elsewhere in the regulations as "any one of the minimum number of purchasers taking 80 percent of the oil in the Kansas-Oklahoma area." *Id*. at § 183.1(h)

To calculate royalties under this regulation, the United States had to do a number of investigative steps and arithmetical calculations for each sale on each lease. For purposes of analysis, the process that the regulation requires can be broken down into eight steps. Steps 1-6 require investigation, while 7 and 8 are simple arithmetic.

(1) Determine the day of "sale or removal."

(2) Correctly determine the actual selling price of the oil in question.

(3) Identify all other purchases of oil from the lease for that day. For each such purchase, correctly determine the actual selling price.

(4) Correctly determine the major purchasers in the Kansas-Oklahoma area for that day.

(5) Identify all prices posted by major purchasers for that day.

(6) Identify all prices offered (including prices paid in actual transactions) by major purchasers for that day.

(7) For each sale of oil, take the highest of (2), (3), (5), or (6). That is the price basis on which all royalties for oil from that lease for that day are calculated.

(8) Multiply (7) by the royalty volume. This is the amount the United States had a duty to collect.

Similarly, under the 1990 regulation,

> settlement shall be based on the highest of the bona fide selling price, posted or offered price by a major purchaser (as defined in § 226.1(h)) in Osage County, Oklahoma, who purchases production from Osage oil leases.

25 C.F.R. § 226.11(a)(2). Under the 1990 regulation, the process outlined above in eight steps is the same, with two exceptions. First, under step (4), major purchasers are determined by looking at the top 95 percent of oil sales in Osage County, and any major purchaser in Osage County, Oklahoma who does not purchase production from Osage oil leases for that day is excluded. Second, step (3) has been eliminated, so that only (2), (5), and (6) are considered in step (7).

### 3. The United States Was Required to Collect Late Fees Owed Under the Tranche One Leases

Whenever royalties were not paid in full by the 25th day of the month following production, the lessee or purchaser owed a late fee:

> Royalty payments due may be paid by either purchaser or Lessee. Unless otherwise provided by the Osage Tribal Council and approved by the Superintendent, *all payments shall be due by the 25th day of each month* and shall cover the preceding month. *Failure to make such payments* shall subject Lessee or purchaser, whoever is responsible for royalty payment, to a late charge at the rate of not less than *1½ percent for each month or fraction thereof until paid*.

25 C.F.R. § 183.13(a). There is nothing discretionary about such late fees; they "shall" be imposed on the Lessee or purchaser. *Id.* As the D.C. District Court held with respect to a similar late-fee regulation for mineral royalties, "the mandatory nature of the statutory and regulatory language" governing the payment of late fees "speaks for itself." *Amoco Prod. Co. v. Baca*, 300 F. Supp. 2d 1, 17 (D.D.C. 2003) (interpreting an analogous provision under MMS regulations). Because these penalties are "moneys due under the terms of the mineral leases," *Osage Tribe*, 68 Fed. Cl. at 328, the United States had a duty to collect them. Obviously, as part of its duty to collect penalties, the United States was required to identify, through auditing and any other means necessary, any royalties that were due under a lease and that went unpaid as of the 25th of each month.

### 4. The United States Had a Duty to Keep Clear, Detailed, and Accurate Accounts Showing What Moneys Were Due and What Moneys Were Collected

"It is well settled that a trustee such as [the United States] is under a duty to the beneficiary 'to keep and render clear and accurate accounts with respect to administration of the trust.'" *Red Lake Band*, 17 Cl. Ct. at 373-374 (1989) (citing Restatement (Second) § 172 (1959)).

Such accounts must not only "show in detail the nature and amount of the trust property," but also demonstrate "the administration thereof." Restatement (Second), § 172 cmt. a.

To properly keep track of the nature and amount of the trust property, a trustee must keep "clear and accurate accounts" of receipts and expenditures, as well as "what gains have accrued and what losses have resulted." *Shoshone*, 364 F.3d at 1351. To fulfill this duty, the United States was required to keep accurate and consistent records of oil volumes, royalties, and penalties received under each lease.

Additionally, the United States must keep records demonstrating the proper administration of the trust. "[T]he beneficiary is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust." Restatement (Second) of Trusts, § 173 cmt. c. 2. It is not sufficient, then, that the United States merely passively record the receipts, gains and losses. As trustee, the United States must actively seek to ascertain the proper amounts due under the leases, and certify that the amounts owed under the leases were in fact the amounts actually received.

### B. The United States Committed Multiple Breaches of Its Duty to Collect "All Moneys Due" Under the Osage Leases

Under Claim 1, the Osage Tribe seeks "the amount owed from lessees based on the precise calculation required under the terms of the lease and relevant federal regulations." *Osage Tribe*, 68 Fed. Cl. at 334. The United States breached its duty to collect amounts based on such "precise calculation[s]" in nine ways, discussed in turn in the sections that follow.

#### 1. The United States Breached Its Duty to Collect All Moneys Due by Failing Accurately to Determine Volumes of Oil Subject to Royalty

As discussed above, the United States has systematically failed to ensure the accuracy of volumes removed from the leases were subject to royalties. The "honor system" Congress repudiated in enacting FOGRMA continued to exist on Osage leases throughout the Tranche One

period. The Osage Agency did only sporadic and infrequent volume audits to check reported volumes. Moreover, unlike the MMS, *see* 43 CFR 3162.7-5, the Osage Agency had no regulations governing site security at Osage leases during Tranche One, and such security has been woefully inadequate.

In 1994 the MMS admitted that the Osage Agency still could not account for all volumes removed by a major lessee, Phillips, and that "volume discrepancies such as stolen oil would be difficult to identify due to the number of [separate] wells feeding into a [single] tank battery [i.e. storage unit] and the method of measurement used to allocate production to the wells. In addition since it appears written reports are not filed with BIA, their monitoring of loss/spills may be less effective." Audit of Oil and Gas Royalties: Osage Mineral Leases, January 1, 1998 Through December 21, 1992. United States Department of the Interior: Minerals Management Service, Dallas Area Audit Office, February 1994.

By failing to take the most basic steps to monitor, control, and account for the volumes of oil removed from the Tranche One leases, the United States breached its duty as trustee.

**2. The United States Breached Its Duty to Collect All Moneys Due by Failing to Ensure the Accuracy of Sales Prices Used to Calculate Royalties**

To calculate the "actual selling price" (1974) or "bona fide selling price" (1990) for oil from a lease, the United States was required to audit the lessees to determine what the true consideration was and to ascertain generally whether the lessee and purchaser reports were accurate. As part of such auditing, the United States would have to determine such information as whether bonuses were paid, what value was reflected by tax payments on the oil, whether consideration in addition to the stated price for the oil was paid directly or indirectly, and whether lessee and purchaser reports were accurate. The United States specifically empowered itself to make such determination by giving itself "the sole right" and the duty to "enter the

premises and inspect both the premises and the books of lessees." *Osage Tribe*, 68 Fed. Cl. at 333 (citing 25 C.F.R. § 226.30). Yet there are no records of any such audits with respect to any Tranche One months. The United States chose to do its job as trustee by deferring entirely to the very entities it was required to police. The United States' failure to conduct any meaningful audits of lessees or purchasers for Tranche One Months is a breach of trust.

Also, to collect the proper amount of royalties, the United States was required to hire and train sufficient skilled personnel to administer the regulations and leases as written. None of the employees at the Osage Agency were qualified to perform the kind of auditing necessary to fulfill the United States' duty as trustee to determine the "actual selling price" or "bona fide selling price" (1990) owed to the Tribe. Ignorance is no excuse for a trustee: "[t]he trustee's ignorance of the terms of the trust will not protect him from liability. He does not use proper care unless he acquaints himself with the terms of the trust and with the nature and circumstances of the trust property." Restatement (Second) of Trusts, §174 cmt. c; *cf.* 25 U.S.C. § 162a(d) (2000).

Moreover, there is no record of the agency *ever* auditing to determine the actual day of "sale and removal" of oil, which governed price calculations. This allowed lessees vast latitude to manipulate the prices used to calculate royalties.

In 1982, Congress noted such problems throughout the royalty systems for Indian and federal leases:

> The federal royalty accounting system lacks effective accounting procedures and is understaffed. The system does not provide for the verification of data reported by oil and gas lessees, and lease account records are so unreliable that federal royalty managers often do not know which lessees have paid royalties and which lessees have not. Penalties for late payment or underpayment are rarely imposed. Because of these shortcomings, the Linowes

> Commission concluded that "the industry is essentially on an honor system."

S. Rep. 97-512 at 9. Despite actual notice of these systemic failings, the United States never remedied these problems at the Osage Agency during the Tranche One Months and continued to operate on the same discredited "honor system." Such conduct falls far short of the standard of care the United States owes the Osage Tribe.

#### 3. The United States Breached Its Duty to Collect All Moneys Due by Failing Accurately to Determine Major Purchasers and Their Posted Prices

For the United States to fail to accurately determine the major purchasers and their posted prices constitutes a breach of the duty to collect "all moneys due."

#### 4. The United States Breached Its Duty to Collect All Moneys Due by Failing to Include in Royalty Calculations the Highest Prices Offered by Major Purchasers

In calculating Royalty Value, the United States failed to investigate prices "offered" by "major purchaser[s]" in the relevant geographical area, and as a result, undercharged lessees. The regulations plainly provide that when a price offered by a major purchaser is higher than posted or actual selling prices, lessees must pay royalties on the offered price. Thus, the United States consistently breached its duty to calculate and collect royalties corresponding to such offered prices, which were "moneys due" to the Tribe under the Tranche One Leases.

The manifest purpose of the way Royalty Value is defined in the Osage Regulations is to ensure that the Osage Nation gets royalties based on the highest value of *any* oil sold or subject to a purchase offer *anywhere* in the relevant geographic area, period. This purpose and the corresponding language of the regulation are consistent with the high fiduciary standard to which the United States is bound. But the United States simply did not enforce that regulation according to its plain terms, in clear breach of its trust duties.

The Osage Nation expects that the United States will claim that in calculating the royalties owed by a lessee, only those prices "offered" *specifically to that lessee* are taken into account in calculating royalties. That was the interpretation adopted by the Department of the Interior, via its Board of Indian Appeals, in the administrative decision styled *Okie Crude Co. v. Muskogee Area Director*, 23 IBIA 174 (1993).

The IBIA's actions in *Okie Crude* provide the Government no excuse here. The IBIA is merely an arm of the Secretary of the Interior. The Secretary is ultimately personally responsible for all actions of the IBIA, because the Secretary has "[t]he authority to take jurisdiction at any stage of any case before any . . . board . . . and render the final decision in the matter." 43 C.F.R. § 4.5(a)(1) (2005). The Secretary of Interior "cannot escape his role as trustee by donning the mantle of administrator to claim that courts must defer to his expertise and delegated authority." *Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001), citing *Jicarilla*, 728 F.2d at 1567. The Secretary's adoption of the IBIA's administrative decision itself constitutes a breach of trust, for several reasons.

First, by its very terms, the *Okie Crude* decision was decided under the wrong legal standard, because it interprets a purported *ambiguity* in the regulation *against the Tribe* and in favor of lessees. This error is plain on the face of the decision. The Board began by reasoning that the term "offered price" in the regulation is ambiguous: "Because the term[] . . . 'offered price' [is] not defined in [the regulations], the Board must determine [its] meaning." 23 IBIA at 180. The Board then acknowledged that "[r]egulations must be interpreted in accordance with traditional principles of statutory construction." *Id.* (quoting *Solan Garbage Co. v. Cheney*, 779 F. Supp. 477, 487 (E.D. Cal. 1991)). After determining that it had to construe an ambiguous term according to principles of statutory construction, the Board committed plain error by failing to

apply the most important canon of statutory construction in the context of an Indian trust — to construe all ambiguities in favor of the Indians. *See Blackfeet Tribe,* 471 U.S. at 759, 766 (1985) ("S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."). The Board also failed to apply the "similar canon of construction to the interpretation of federal regulations." *HRI Inc. v. EPA*, 198 F.3d 1224, 1245 (10th Cir. 2000). Thus, by its own terms, the Board's decision is a blatant breach of trust inuring to the benefit of the oil producers who petitioned the BIA, depriving the Osage Nation of money it was owed.

Second, the Board's reasoning in *Okie Crude* turns the definition of Royalty Value on its head by tying the term "offered price" to an individual lessee. The Board reasoned that because under contract law, an offer is "personal to the offeree," the term "offered price" must mean the "price offered to the lessee." 23 IBIA 181. This in an appalling non sequitur. Simply because contract law deems offers to be personal to the offeree says nothing about *which* offers to *which* offerees are relevant for purposes of calculating royalties under the Tranche One Leases. The Board's decision is contrary to the plain language of the Regulation because the Regulation does not state that only offers made to certain offerees are relevant; *all* prices "offered . . . by a major purchaser" in a large geographic area are relevant, without limitation. If a major purchaser is offering *anyone* a price higher than the lessee is getting for Osage oil, then the lessee must pay royalties on the higher offered price. One important purpose of including "offered price[s]" in the calculation is to ensure that lessees cannot deprive the Osage Nation of royalties by manipulating their own sales prices or by failing to market the oil diligently. Contrary to this purpose, *Okie Crude* makes the term "offered price" almost entirely superfluous.

Third, the rationale adopted by the Board for interpreting the 1990 regulation does not square with the language of the 1974 regulation, and thus cannot be applicable in any event to the period before the regulation was amended. "Under the Board's analysis, 25 C.F.R. 226.11(a)(2) requires a producer to pay royalty on the highest price *available to it*, whether or not it actually receives that price." 23 IBIA at 185. But the 1974 regulation requires that when a lessee receives a higher price for other oil from the same lease, "then that price shall be the basis of royalty *on all oil from said lease*," irrespective of whether that price was "available" for "all oil from said lease." It is therefore impossible to even apply the *Okie Crude* construction of "offered price" to the pre-1990 version of the Osage Regulations.

In sum, the United States is liable for not correctly enforcing the leases with respect to the term "offered price."

**5. The United States Breached Its Duty to Collect All Moneys Due by Improperly Excluding from Consideration Prices Posted, Offered, or Paid in Excess of Price Caps Applicable in Regulated Markets**

In calculating the Royalty Value, the United States improperly ignored relevant posted prices, offered prices, and same-lease prices if these prices were higher than contemporaneous price ceilings in regulated markets. This is a clear breach of the Osage Regulations because Royalty Value requires application of the "highest" posted, offered or same-lease price. The only limitation is that the price be posted or offered by a "major purchaser." There is no limitation tied to price controls, other regulations or any other factor. By failing to apply the highest applicable Royalty Value, the breached its duty to calculate and collect the correct amount of royalty under the Tranche One Leases.

The United States is expected to argue that Royalty Value was limited by price ceilings and that it was common in the industry to apply price ceiling values to royalty payments. That argument ignores the plain language of the Osage Regulations and substitutes instead an

interpretation of the Regulations that favors lessees over the Osage Nation. That in itself is a breach of trust.

Under the Emergency Petroleum Allocation Act, 15 U.S.C. §§ 751 et seq., price controls on certain sales of crude oil were generally in effect between November 27, 1973 and January 30, 1981.[16] Similar controls on certain natural gas sales at the wellhead were in effect from 1954 to 1993.[17] Although sales prices for oil and gas were subject to regulation, production subject to royalty interest did not constitute a regulated "sale," and therefore oil and gas royalties were not subject to direct regulation by FERC, DOE, or their predecessors. *See Mobil Oil Corp. v. FPC*, 463 F.2d 256 (1972) (royalties under oil and gas leases are not subject to regulation under the Natural Gas Act).

The Solicitor of the Department of the Interior agreed, and explain that "[t]he FEA [later DOE] has no statutory authority to regulate or limit the royalty interest of the United States in attempting to reach its price regulation obligations." Memorandum from the Department of the Interior Office of the Solicitor to the Department of Energy Office of the General Counsel at 10 (Oct. 21, 1977) ("DOI Solicitor's Memo"). Thus, "the 'value' of the production for royalty purpose is a matter apart from the price of the production for purposes of sale." *Id*.

Moreover, whether royalties under a given lease were or were not subject to price controls depends on the language of the lease itself. As early as 1961, some lease forms included provisions capping royalty valuation at regulated prices. For example: "If the price of any substance is regulated by any governmental agency, the value of such substance, for the purpose

[16] S*ee* "Decontrol of Crude Oil and Refined Petroleum Products," 46 Fed. Reg. 9909 (Jan. 30, 1981).

[17] Price regulation for sales of natural gas started in 1954. *See Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672 (1954). In 1974 the Federal Power Commission set a national price ceiling. Gradual elimination of price controls lasted from 1978 to Jan. 1, 1993.

of computing royalty hereunder, shall not be in excess of the price fixed by such regulation." Galvin, "Developing an Oil and Gas Jurisprudence in Michigan," 7 *Wayne L. Rev*. 403, 425 n.99 (1961), cited in 3 *Williams & Meyers Oil and Gas Law* § 644.11 (rev. ed. 2004). The Tranche One Leases and the Osage Regulations contain no such limitation, even though the 1974 regulations were adopted only months after price controls on oil first went into effect. If there had been any intent for the regulations to cap the royalty base price at regulated prices, such a provision would have been written in explicitly.[18] For agency personnel to *read in* an *implicit* limitation that reduced the Tribe's royalties below what the regulations explicitly called for—as the Osage Agency did—was a breach of trust. The Government was not allowed to use its position as trustee to further federal policies. *Cohen's Handbook of Federal Indian Law* § 13.H (1982).

Any doubt that Royalty Value must be calculated using offered or posted prices not subject to price ceilings is dispelled by judicial consideration of how price ceilings affected royalty values in other leases. For example, *gas* leases often based royalty value on the market price of the gas produced, where the production is "dedicated irrevocably to the interstate market" by connection to a interstate pipeline under a FERC certificate of public convenience and necessity.[19] In those circumstances, the market value of such "irrevocably dedicated"

[18] It is far from clear whether, even if the Government had wanted to, it could have complied with its trust duties to the Osage Nation under the 1906 Act while imposing price controls in a way that substantially reduced royalties from the Osage Mineral Estate.

[19] Such dedication is irrevocable due to the physical characteristic of the gas flowing in the pipeline coupled with the requirement that FERC must authorize any abandonment of gas service. *See, e.g., California v. Southland Royalty Co.*, 436 U.S. 519, 524 (1978) ("Gas which flows across state lines for resale is dedicated to interstate commerce," and "once gas [has begun] to flow in interstate commerce from a filed subject to a certificate of unlimited duration, that flow could not be terminated unless the Commission authorized an abandonment of service.").

interstate gas is generally the regulated price. *See Brent v. Natural Gas Pipeline Co.*, 457 F. Supp. 155 (N.D. Tex. 1978), a*ff'd* 626 F.2d 1261 (5th Cir. 1980); *Hemus & Co. v. Hawkins*, 452 F. Supp. 861 (S.D. Tex. 1978); *Shell Oil Co. v. Williams, Inc.,* 428 So. 2d 798 (La. 1983); *Kingery v. Continental Oil Co.*, 626 F.2d 1261 (5th Cir. 1980).

By contrast, other gas leases contain different royalty value language that does *not* tie royalty value to regulated markets or prices. In *Sowell v. Natural Gas Pipeline Co.*, 789 F.2d 1151 (5th Cir. 1986), the royalty value clause provided royalty on gas production of "one-eighth (1/8) of the average market price per thousand cubic feet that is paid for gas in Carson, Hutchinson, Potter, Moore, Graf, and Wheeler Counties, Texas." 789 F.2d at 1154. The district court and the court of appeals both rejected the argument that the maximum price for purposes of royalty was the maximum regulated ceiling price. Like the district court, the court of appeals found the royalty clause "unambiguous" and held that "[t]he mathematical universe for computing the average is gas sales in the six[] counties. *There is absolutely no contractual limiting of that universe to gas that is physically or legally comparable to what is produced on the [lease]*." *Id.* at 1155 (emphasis added). The court of appeals distinguished a long list of cases where the contracts in question required computation of "market value" or "market value at the well" of the gas actually produced. "The critical distinction, the one on which the district court [correctly] relied, is that every market value lease to which we have been referred requires the royalty to be based on the market price or market value of the gas *produced from the lessor's land*. In contrast, the [contract in question] refers to the average market price of gas *in a six-county area*." *Id.* (emphases added).

The definition of Royalty Value in the Osage Regulations is indistinguishable from the royalty value clause in *Sowell*. The royalty clauses in the 1974 and 1990 regulations are neither

market-price clauses nor gross-proceeds clauses. Rather, in both regulations, an arithmetic formula is prescribed in which three (1990) or four (1974) values are compared, two of which have no relationship whatsoever to the value of the actual oil produced. Under the 1974 regulation, the four values are (1) the sales price, (2) the highest price posted by a major purchaser in Kansas or Oklahoma, (3) the highest price offered by a major purchaser in Kansas or Oklahoma, and (4) the highest price paid for oil on the same lease as the royalty oil. 25 C.F.R. § 183.11(a)(2). Nothing in the regulations limits the universe of prices considered under (2) or (3) to oil of any similar quality, gravity, classification, or other distinguishing feature.

Although the clauses at issue here and in *Sowell* are less common than the more typical market value clause, the result of having a royalty value exceed the price the seller could obtain is unremarkable, even under a market value clause. Analyzing whether a market value clause could support royalty value higher than the regulated price, the Solicitor for Department of the Interior answered in the affirmative: "the regulated price does not necessarily equal the royalty value when the latter is to be based upon current 'market price.'" DOI Solicitor's Memo at 16; *see also Amoco Prod. Co. v. United States*, 17 Cl. Ct. 590, 595-96 (1989) (agreeing with the Department of the Interior that royalty valuations for gas can exceed price control ceilings). "[T]he existence of federal regulation fixing the maximum rate a gas producer may receive from its purchaser is absolutely no obstacle to the fixing of a higher rate as the 'market value' of gas for the purpose of computing royalties." *Agurs v. Amoco Prod. Co.*, 480 F. Supp. 737, 738 (W.D. La. 1979). Similar results occur in other areas of law as well. In *Exxon Corp. & Subs. v. United States*, 88 F.3d 968, 975-76, 981 (Fed. Cir. 1996), the Federal Circuit held that the valuation of gas reserves for federal income-tax depletion purposes could exceed the actual gross receipts for the gas.

The Tribe expects that the United States will take a position in sympathy with its past lessees rather than admit its poor treatment of its beneficiary. These lessees were bound by their contracts as written, and if the price controls caused them hardship, then the proper avenue for redress was for the lessees to seek exceptions before the agency imposing the controls. Royalty calculations take precedence over price caps, and not the other way around:

> Mobil contends that the rate it is permitted to charge puts a ceiling on the royalty costs it may incur. . . . [But] the process begins at the other end. The royalties to be paid are first to be determined under state law, based on the terms of the lease. The royalties so determined then become a component cost, to be considered by the FPC in determining the rates it will permit Mobil to charge.

*Lightcap v. Mobil Oil Corp.*, 562 P.2d 1, 8 (Kan. 1977). It was not for the Government to alleviate lessees' contractual burdens by taking money out of the pocket of the Tribe, its beneficiary. "If, as subsequent events develop, the producers are put in a bind by their royalty obligations, they may certainly petition [price regulators] for individualized relief." *Placid Oil Co. v. FPC*, 483 F.2d 880, 911 (5th Cir. 1973).

In this case, in clear disregard of its fiduciary duties to the Osage Nation, the United States effectively provided such "individualized relief" to lessees by adopting a construction of the Osage Regulations contrary to the law, against the plain meaning of the Regulations and, most indefensibly, directly contrary to the interests of the Osage Nation, the beneficiary of the trust the United States was administering. The United States breached its trust duties by limiting posted prices to those found in regulated markets.

#### 6. The United States Breached Its Duty to Collect All Moneys Due by Applying Gravity Adjustments to Posted Prices When Calculating Royalties

As just discussed, the Tranche One Leases and regulations do not limit the determination of Royalty Value to price measures that reflect only the physical or legal characteristics of the oil

produced on the Tranche One Leases. Unlike many other definitions of Royalty Value, the Osage Regulations do not limit Royalty Value to oil of "like kind or quality." There is nothing that limits the prices considered to any particular quality (such as "Oklahoma Sweet") or composition. Instead, the definition of Royalty Value is tied to prices of *any* oil in a defined geographic area.

The Osage Agency ignored the plain meaning of its own regulation by making downward adjustments to the highest posted price based on the gravity of the royalty oil. By adjusting the posted price *downward*, the Osage Agency did not apply the "*highest* posted price." Instead, the Osage Agency adopted a construction of the Osage Regulations that consistently *lowered* the royalty received by the Osage Nation.

Moreover, even if the regulation were ambiguous, the United States' construction of the regulations is impermissible because it is squarely contrary to the interests of the trust's beneficiaries. *See Jicarilla Apache*, 728 F.2d at 1567 ("[W]hen the Secretary [of Interior] is acting in his fiduciary role … and is faced with a decision for which there is more than one 'reasonable' choice as that term is used in administrative law, he must choose the alternative that is in the bests interest of the Indian tribe."). Accordingly, by applying gravity adjustments to posted prices, the United States breached its duty to collect all royalty payments due under the Tranche One Leases.

#### 7. The United States Breached Its Duty to Collect All Moneys Due by Failing to Take into Account Higher Prices Paid on the Same Lease

The plain language of the 1974 regulation requires the Osage Agency to determine if more than one price was paid for crude oil from a single lease and, if so, to pay royalty on all oil from the lease based on the highest such price (unless, of course, there was an even higher posted

price or offered price). When the agency did not do so, the United States breached its duty to collect "all moneys due" under the plain terms of the 1974 regulation.

The Osage Tribe does not expect the United States to take a contrary position.

**8. The United States Breached Its Duty to Collect All Moneys Due by Failing to Identify Underpayments Subject to Late Fees**

The United States' failures in auditing volumes, auditing sales prices, and otherwise ensuring that lessees paid royalties due has resulted in massive unenforced delinquencies in royalties due the Tribe. The United States failed to identify underpayments within a reasonable time and collect the applicable late fee on delinquent amounts: 1.5 percent per month from the time the payment was originally due until the payment would have been made (following a notice of delinquency). The United States' failure as trustee to collect these "moneys due" under the Tranche One Leases is a breach of duty.

**9. The United States Has Breached Its Duty to Account for Trust Moneys**

The United States does not and cannot contest that it has failed to render the trust accounting due to the Osage Tribe.

## III. CLAIM 2: THE UNITED STATES HAS BREACHED ITS DUTY TO INVEST TRUST FUNDS PRUDENTLY

### A. The United States Has a Duty to Manage Trust Funds Prudently

The United States' duties as trustee of the Osage Minerals Estate include the duty to invest prudently the moneys collected. This duty derives from its trust relationship with the Osage and its contours are defined both by statute and by common law.

The 1906 Act provides that "all funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States . . . ." 1906 Act § 4. And "the royalty received from oil, gas, coal, and other mineral leases . . . shall be placed in the Treasury of the

United States to the credit of the members of the Osage tribe." The 1906 Act also provides expressly that funds placed in the Osage Trust shall "draw interest as now authorized by law." *Id.* at § 4(1). Consistent with the 1906 Act, the funds in the Osage mineral estate are among moneys statutorily designated as "trust funds." *See* 31 U.S.C. § 1321(a) ("Indian moneys" are "classified as trust funds."). By law, the United States must invest such funds. "All funds held in trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of Indian tribes shall be invested by the Secretary of the Treasury . . . ." 25 U.S.C. § 161a(a).

"[T]he mere imposition of statutory duties does not remove liability for breach of existing common law duties." *United States ex rel. Willoughby v. Howard*, 302 U.S. 445, 452 (1938). Under the common law, "[i]t is normally the duty of the trustee promptly to invest cash belonging to the trust so that it will produce an appropriate rate of return for the trust estate and its beneficiaries." Restatement (Third) of Trusts § 181 cmt. c at 148 (1992); *see also* Scott on Trusts § 181 at 542 (4th ed. 1987) ("Ordinarily it is the duty of the trustee to invest trust funds so that they will be productive of income.").

> A trustee's duties are described in the Restatement (Second) of Trusts, §§ 169-185 (1959). "The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property. . . ." Id. at § 174. This duty includes the obligation "to use reasonable care and skill to make the trust property productive." Id. at § 181. Applying these standards, when DOI leased mineral rights on plaintiffs' lands, it was obliged to use reasonable skill and care in an effort to maximize the benefits, financial and otherwise, that the Tribes would receive from those mineral leases.

*Cheyenne-Arapaho Tribes of Oklahoma v. United States*, 33 Fed. Cl. 464 (1995). Moreover, the high standard of care applicable to the Government as trustee is "doubly strict when the

[Government], by retaining Indian moneys in the Treasury, in effect borrows those funds." *Cheyenne-Arapaho*, 512 F.2d at 1392.

With respect to a trustee's general duty to invest prudently, the United States is expected to continue to argue that investment decisions under 25 U.S.C. §§ 161a and 162a are discretionary. The United States has argued that *Chevron*-type deference is appropriate in trust cases. But the United States has no answer to the many cases cited above that have held that in Indian trust cases the United States is held to a standard of care a least as high, if not higher, than that applicable to non-governmental trustees. "[T]he Court of Claims has at least twice stated that the 'arbitrary and capricious' standard is not the highest measure of fiduciary accountability." *Minnesota Chippewa*, 14 Cl. Ct. at 130 (citing *Sac & Fox Tribe of Indians v. United States*, 340 F.2d 368, 375 (Ct. Cl. 1964)); *Yankton Sioux Tribe v. United States*, 623 F.2d 159, 163 (Ct. Cl. 1980)).

#### 1. The United States Had a Duty to Deposit Trust Funds Within 24 Hours of Receipt

The United States has a duty to deposit trust assets into interest-bearing accounts promptly and to make trust assets productive. And the Department of Treasury, Financial Management Service *Manual of Procedures and Instructions for Cashiers*, which Osage Agency personnel attempted to follow, provides that "[d]eposits shall to the extent possible, be made within 24 hours or the next workday with an authorized depositary." Department of Treasury, Financial Management Service *Manual of Procedures and Instructions for Cashiers* § 3.9(A) at 2 (July 1985).

Trustees breach their fiduciary duties if funds are left unproductive for an unreasonably long time. Restatement (Third) of Trusts § 181 cmt. c at 148 (1992). A trustee has duty to invest trust funds within a reasonable time after they are received. *Cheyenne-Arapaho Tribes of Indians*

*of Oklahoma v. U.S.,* 206 Ct. Cl. 340, 512 F.2d 1390 (1970). A trustee is liable for a breach of trust if that reasonable time is exceeded. *Id.* at 1394 (citing Restatement of Trusts (Second) Trusts § 231 cmt. b; *id.* § 181 cmt. c (1959)). Reasonableness is a mixed question of fact and law to be determined upon examination of the totality of the circumstances. *Id*. at 1395; *Lynch v. John M. Redfield Foundation,* 88 Cal Rptr. 86 (2d Dist. 1970).

> It is normally the duty of the trustee promptly to invest cash belonging to the trust so the it will produce an appropriate rate of return for the trust estate and its beneficiaries. The trustee is normally liable for failure to do so for a time that is, under all circumstances, unreasonably long. The trustee is not liable, however, if a delay is reasonable *and, when applicable, the trustee has taken reasonable advantage of opportunities to earn interest on the funds while seeking to make what may be more suitable, longer term investments.*

Restatement (Third) of Trusts § 181, cmt. d at 148 (1992) (emphasis added).

The United States has argued that it acted reasonably by mailing royalty checks to the regional office in Muskogee within 24 hours of receipt. The United States' position is undercut by its own guidance requiring that funds be deposited within 24 hours of receipt. *Id.* at 21-22. By mailing royalty checks to Muskogee, the United States delayed deposit by an additional 24-72 hours *after* receipt of the checks.

**2. The United States Has a Duty to Obtain a Reasonable Return on Investments**

Once funds have been secured, the United States' "'obligation [is] to maximize the trust income by prudent investment' and the trustee has the burden of proof to justify less than a maximum return." *Cheyenne-Arapaho*, 512 F.2d at 1394 (quoting *Blankenship v. Boyle*, 329 F. Supp. 1089, 1096 (D.D.C. 1971)).

Together, 25 U.S.C. §§ 161a and 162a require the United States to earn interest at the *greater of* the 4% statutory rate set forth in Section 161a *or higher* yields that might be obtained by investing trust funds as provided in Section 162a. *See Manchester Band of Pomo Indians v.*

*United States*, 363 F. Supp. 1238, 1245 (N.D. Cal. 1973) ("the present statutory scheme entitles the Band to a minimum return of 4 per cent on its trust moneys and authorizes investment in the range of investment alternatives outlined above"). Accordingly, the United States is liable for a breach of fiduciary duty when it fails to withdraw Indian tribal trust funds from the Treasury and invest them in higher-yielding investments pursuant to Section 162a. *Manchester Band*, 363 F. Supp. at 1247-48; *Cheyenne-Arapaho*, 512 F.2d at 1396.

In *Estate of Pelton ex rel. Wells Fargo Bank v. Pelton*, 132 Cal. App. 3d 496, 501-02 (1982), the court explained, "a statute authorizing a particular type of trust fund investment does not supersede the trustee's general duty to maximize the trust assets consistent with safety and other relevant considerations. Depending on the circumstances, a statutorily authorized investment may or may not be the prudent course of conduct for the trustee to pursue." *Id.* (citing and following *In re Doyle's Will* (1948) 191 Misc. 860 [79 N.Y.S.2d 695] ). "[W]here a bank-trustee places trust funds on deposit with itself at a rate of interest which is less than would have been earned by a deposit of a like size over a similar period of time, the bank bears the burden of proving that the circumstances reasonably known to it at the time the investment decision was made justified the lower interest account." *Pelton*, 132 Cal. App. 3d at 502. Similarly, a trustee does not discharge its duty by merely making an authorized investment; the trustee must use due care, skill, and prudence in selecting the particular investment within the range of authorized investments. *Vest. v. Bialson*, 365 Mo. 1103, 293 S.W.2d 369, 63 A.L.R.2d 504 (1956).

### 3. The United States Has a Duty to Obtain Interest on Funds Awaiting Disbursement After Checks Are Cut

"Although a trustee can properly deposit trust funds in a bank for the purpose of making the funds available from time to time for the payment of expenses or pending investment or

distribution, he may incur a liability where he leaves an excessive amount of money on deposit for an unreasonably long time, instead of withdrawing and investing it. In such a case, if the deposit is not at interest and justifiable as an investment, the trustee is liable for interest lost by the failure to invest." Restatement (Second) § 180, cmt. d.

Because today's sophisticated financial system offers many short-term, highly liquid, interest-bearing investment options,

> interest may run from the time of deposit to the time of withdrawal without preliminary notice of withdrawal. Hence it would seem not unreasonable to require the trustee to make the income productive of income …there do not seem to be any practical impediments today to the making of trust funds temporarily productive of income, and retaining their liquidity, whether by deposits in savings accounts or by creating some form of short-term security funds."

*Scott on Trusts* § 181 at 549 (4th ed. 1987). "Simple business prudence dictates that accumulated funds be invested pending distribution." *In re Consupak*, 87 B.R. 529, 543 (N.D. Ill. 1988). Consistent with this principle, the United States itself directs trust departments of banks to deposit funds awaiting distribution in interest bearing accounts: "With respect to a fiduciary account for which a national bank has investment discretion, the bank shall obtain for funds awaiting investment or distribution a rate of return that is consistent with applicable law." 12 C.F.R. § 9.10 (2005).

This duty has been widely recognized and enforced by the courts. A trustee must obtain interest on funds awaiting disbursement whenever interest is available. *Manchester Band*, 363 F. Supp. at 1245-46 (citing *Estate of Whitney*, 248 P. 754, 757 (Cal. App. 1926)). Moreover, "where a delay in [distribution] occurs, a trustee who allows those funds to accumulate without investment breaches his fiduciary duty … such idle funds should instead be placed at interest." *In re Consupak*, 87 B.R. at 540 (citing *Manchester Band*, 363 F. Supp. at 1245-46). A trustee

must seek to obtain interest on funds awaiting disbursement "if they are not required for the payment of claims or expenses and are not necessary for distribution within a reasonably short time." *In re D'Espinay-Durtal's Will*, 4 A.D.2d 141, 142 (N.Y. App. Div. 1957). *Cheyenne-Arapaho* held that the United States was liable for income not earned because funds were not deposited in interest-bearing accounts. 512 F.2d at 1396.

In *Maryland Nat'l Bank v. Cummins*, 588 A .2d 1205 (Md. 1991), a bank was held liable for putting funds awaiting disbursement in a non-interest bearing account and ordered to pay lost interest. Based on examination of available investments, the court held that the bank had to pay the rate of a passbook savings account for the earlier period, and the rate of a money market account from 1976 on. In finding the court liable for breach of trust, the court stated, "[r]easonable persons do not, as a matter of policy, continuously leave uninvested sums up to $999 . . . . Reasonable persons do not, as a matter of policy, leave uninvested for up to nearly three months income cash aggregating hundreds of thousands of dollars." *Id.* at 1210.

The United States is expected to continue to argue that under the common law, trustees have no duty to pay interest on disbursed funds. This position is unjustifiable in light of the authority discussed above. Moreover, there is nothing exculpatory about the fact that funds are awaiting disbursal. A trustee always breaches its trust duties if it leaves "an excessive amount of trust funds on deposit for an unreasonably long time." Restatement (Second of Trusts) § 180 cmt. d.

**4. The Government Has a Fiduciary Duty to Pay Interest on Funds It Failed to Collect Due to Breach**

"[T]he Government . . . has a separate and distinct statutory fiduciary obligation to pay the interest on the funds it failed to collect or otherwise mismanaged." *Shoshone Indian Tribe v.*

*United States*, 364 F.3d 1339, 1351-55 (Fed. Cir. 2004); *accord* III *Scott on Trusts* § 207.1 at 256 (4th Ed. 1987); Restatement (Third) of Trusts § 211(2) at 160-61.

### B. The United States Has Committed Multiple Breaches of Its Duty to Invest Prudently

#### 1. The United States Breached Its Duty to Invest Trust Funds Prudently by Taking an Unreasonable Amount of Time to Deposit Trust Funds Into Interest-Bearing Accounts

The royalty checks are clearly trust assets, as they are the payment of royalties for oil and gas from the Osage mineral estate. 1906 Act at §§ 3, 4. The United States breached its trust duties to the Osage Nation by taking an unreasonable amount of time to process those checks and make those funds available for investment or the accrual of interest. In many cases the United States failed to deposit checks for various periods of time, ranging from a few days to several months, without any apparent justification or explanation. This failure to take control of trust assets and make those trust assets productive in a prompt manner is plainly a breach of the United States' obligations as a trustee.

For most of the Tranche One Months, the United States structured its check intake procedure in a way that effectively guaranteed that checks would not be deposited in an interest bearing account for at least 24 hours longer than necessary only because the United States did not take simple steps that would have allowed the more rapid deposit of checks into an interest bearing account. Specifically, the Osage Agency mailed all checks to the district office in Muskogee to be deposited in a bank in Muskogee instead of making arrangement to deposit checks in a bank in Pawhuska, Bartlesville, or Tulsa, all of which could be reached within an hour. By handling Osage Trust funds in a manner that served its own convenience rather than in a manner that benefited the Osage Nation, the United States breached its trust duties.

Moreover, it is well established that "administrative expenses of a United States Indian agency are not proper objects for the expenditure of tribal trust funds." *Yankton Sioux*, 623 F.2d at 179. By structuring the administration of the Osage Trust in a way that necessarily deprived the Trust of interest income solely for the ease of administration, the United States effectively used Osage Trust funds to defray administrative expenses. This is a breach of the United States' duties as Trustee.

**2. The United States Breached Its Duty to Invest Trust Funds Prudently by Obtaining an Unreasonably Low Yield**

The United States further breached its trust duties to the Osage Nation by failing to invest Osage Minerals Trust Funds in a prudent manner. The United States breached this duty by failing to earn for the Osage Trust investment returns equal even to the *expected* yields that a prudent trustee, would earn, as determined by the United States' own expert. Nothing explains the United States' investment decisions, or even allows one to determine what investments were made. Because the United States failed to obtain investment earnings for the Osage Trust that the Government's own experts found were obtainable by a prudent trustee, the United States breached its duty to the Osage Nation to properly invest tribal trust funds from the Osage Minerals Estate.

**3. The United States Breached Its Duty to Invest Trust Funds Prudently by Failing to Earn Any Interest on Trust Funds Awaiting Disbursal**

The United States placed funds awaiting disbursal in non-interest bearing accounts. Because many disbursal checks were not negotiated for many days, months and even many years, the United States failed to earn *any* interest on a substantial balance of Osage Trust funds. By allowing funds awaiting disbursal to sit idle in non-interest bearing accounts, the United States breached its duty of loyalty to the Osage Nation by placing its own administrative convenience ahead of its obligation to earn interest on Osage Trust funds. Moreover, by

structuring the distribution process in a way that deprived the Osage Trust of interest, simply for the administrative convenience of the United States, the United States violated its trust duties by effectively charging the Osage Trust an administrative fee. *See Yankton Sioux*, 623 F.2d at 179.

There were often periods of several days, weeks, and even years between the time a check was written to a headright owner and the time the check was negotiated and funds actually withdrawn from the Osage Trust account. Indeed, there are many examples of checks *never* being negotiated, allowing funds to remain in the Treasury for years without earning interest. As a result, the United States allowed a substantial amount of money to remain uninvested and in non-interest bearing accounts. No responsible person would treat his or her own money that way, and there is no legal justification for the United States to treat Osage trust funds in such a manner.

## IV. DAMAGES

In the context of a breach of trust,

> a beneficiary is entitled to recover damages for the improper management of the trust's investment assets. In determining the amount of damages for a breach of the trustee's fiduciary duty with regard to investments of the trust property, courts attempt to place the beneficiary in the position in which it would have been absent a breach.

*Confederated Tribes v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001). Moreover, "[t]here is no threshold minimum of loss that [must be proven] before being entitled to an award. Even if the damages are minimal, the [plaintiffs are] entitled to recover whatever damages they can prove. *Id.* at 1373.

In this case, because of the number of missing documents critical to documenting the full extent of the United States' breaches and the damages caused thereby, the Osage Nation is entitled to a presumption in favor of a damages award, and all doubts regarding the amount of

damages must be resolved in favor of the Osage Nation and against the United States. "[I]t is a principle of long standing in trust law that once the beneficiary has shown the breach of the trustee's duty and a resulting loss, the risk of uncertainty as to the amount of the loss falls on the trustee." *Id.* at 1371. *See also Id.* at 1373-74 ("Under trust law principles, if a trustee fails to keep proper accounts, "all doubts will be resolved against him and not in his favor." William F. Fratcher, Scott on Trusts, § 172 (4th ed. 1987); *see* also *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 90 L. Ed. 652, 66 S. Ct. 574 (1946) ("the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

## A. Moneys Due Under the Tranche One Leases That Were Not Collected and Deposited in Trust Accounts

### 1. Royalties Not Collected or Accounted For

To the extent that the Osage Nation can determine, based on existing trust records, what royalty amounts should have been collected under the mineral leases and what amounts actually were collected, the difference between those amounts is the proper measure of damages. However, to the extent that the absence of records prevents the Tribe from calculating the difference between those amounts, the Tribe is entitled to damages based on a reasonable estimate of that difference. *See* Restatement (Second) of Trusts § 172 cmt. b (1957) ("[a trustee] is liable for any loss or expense resulting from his failure to keep proper accounts.").

In addition, expenses borne by the Osage Nation to bring this action would not have been necessary had the United States fulfilled its duty as trustee to keep proper trust accounts. The United States is therefore also liable to the Tribe in damages for these expenses.

### 2. Late Fees Not Assessed for Underpayment of Royalties

If the United States had properly fulfilled its duties as trustee to the Tribe, it would have periodically audited the lessees of the Osage Nation's mineral estate, discovered any late payments or underpayments, and assessed the appropriate and mandatory late fees. Since the United States failed to fulfill this trust duty, the Osage Nation is entitled to be placed "in the position in which it would have been absent a breach", *Confederated Tribes*, 248 F.3d at 1371, by receiving in damages whatever late fee the United States would have assessed lessees had it audited them properly.

## B. Interest that the United States Had a Duty to Earn But Did Not Earn

### 1. Interest Lost Due to Unreasonable Delays in Depositing Trust Funds

By mailing royalty checks to Muskogee, the United States delayed deposit by an additional 24-72 hours *after* receipt of the checks, and further unreasonably delayed depositing checks by other means. If the United States had properly and promptly deposited those checks as required by its duties as trustee, the Osage Nation would have consistently received at least an additional 24-72 hours of interest, and in some cases much more. The Osage Nation is therefore entitled to the amount of interest it would have received in the absence of those periods of unreasonable delay, at the rates of return that the trust funds should have received had they been prudently invested.

**2. Interest Lost Due to Mismanagement of Funds on Deposit**

The United States was required, as trustee, to invest Osage Nation trust funds prudently so as to maximize the return on those funds. However, the United States frequently failed to earn the maximum available rate of return, and often failed even to earn the required bare minimum. The Osage Nation is entitled to the difference between the interest actually earned on trust funds and the maximum obtainable rate of return.

**3. Interest That Could Have Been Earned on Funds Awaiting Disbursal**

The Osage Nation is entitled to an award of damages equal to the amount of interest that the United States could have earned on funds awaiting disbursal. *Maryland Nat'l Bank v. Cummins*, 588 A .2d 1205 (Md. 1991)

**4. Interest on Moneys Due Under the Leases That Were Not Collected**

"[W]hen the government has a clear statutory fiduciary duty to collect or manage funds and further undertakes the duty to earn interest on those funds, the failure of the Government to collect or manage such funds in accordance with its obligations will result in an award of damages for that failure and an award of interest on the amount mismanaged or not collected." *Shoshone*, 364 F.3d at 1353-54 (citing *Peoria Tribe of Indians v. United States*, 390 U.S. 468 (1968)). As in *Shoshone*, such interest is particularly appropriate in this case because the 1906 Act expressly requires that the Osage Trust "draw interest." 1906 Act at § 4(1). Accordingly, as part of the Osage Nation's damages, it is entitled to recover interest that would have been earned on (1) oil royalties and late fees the United States failed to collect, and (2) interest and investment earnings the Osage Trust would have received had the United States properly managed the Osage Trust.

Under *Shoshone*, the Osage Nation is entitled to lost investment income that it would have earned had the United States not breached its trust duties. The United States is expected to

continue to argue that the Osage Nation is entitled only to the amount of interest that would have been earned on moneys due during the three months prior to disbursement. While the Osage Nation is due that amount of interest, at the rates that the United States would have earned had it prudently invested the funds according to statute, that amount is not the sole measure of the Osage Nation's damages. The Osage Nation is also entitled to interest for the time period between the theoretical quarterly disbursements and the present. Had the United States properly collected the moneys due, the trust beneficiaries would have been able to invest them in other interest-bearing vehicles after the quarterly disbursement. The United States' position denies the Osage Nation the time value of the moneys that it failed to collect – a significant amount considering the number of years involved. Therefore, the Osage Nation is also entitled to interest for the periods from the quarterly disbursement to the present, at a different rate of interest than that applicable to that which the funds should have earned while held in trust.

## CONCLUSION

For the foregoing reasons, the evidence will show that the United States breached its trust duties to the Osage Nation and that the Osage Nation is entitled to an award of damages against the United States.

January 12, 2006

Respectfully submitted,

*s/Wilson K. Pipestem*
WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation