**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | Electronically Filed: January 26, 2006 |
| v. | ) | No. 99-550L (into which has been consolidated No. 00-169L) |
| THE UNITED STATES OF AMERICA, | ) | Judge Emily C. Hewitt |
| Defendant. | ) | |

**DEFENDANT'S PRETRIAL**
**MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

BRETT BURTON
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section

MARTIN LALONDE
KEVIN WEBB
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
601 D Street, N.W., 3rd Floor
Washington, DC 20004
TEL: (202) 305-0247 / 0479
FAX: (202) 353-2021

# TABLE OF CONTENTS

ISSUES OF FACT AND LAW

I. ISSUES OF FACT TO BE DECIDED BY THE COURT . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Plaintiff's Royalty Claims - Duty to Collect All Monies Due . . . . . . . . . . . . . . . . 1

B. Plaintiff's Investment Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

C. Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. ISSUES OF LAW TO BE DECIDED BY THE COURT . . . . . . . . . . . . . . . . . . . . . . . . 2

A. Issues Applicable to Both Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. Plaintiff's Royalty Claims - Duty to Collect All Monies Due . . . . . . . . . . . . . . . . 3

C. Plaintiff's Investment Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. DEFENDANT'S CONTENTIONS OF FACT AND RESPONSES TO PLAINTIFF'S CONTENTIONS OF FACT - ROYALTY CLAIMS . . . . . . . . . . . . . . . . 4

A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1. Sources of the Government's Duties Related to Plaintiff's Royalty Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

a. 1906 Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

b. Applicable regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2. Methodology for payment of royalties under 1974 and 1990 regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

a. Determination of major purchasers and highest posted or offered price . . . . . . . . . . . . . . . . . . . . . . . . 8

b. Payment of royalties and submission of lessee and purchaser reports . . . . . . . . . . . . . . . . . . . . . . . . . 11

c. Agency Calculation and Verification

of Oil Royalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

d. Agency Monitoring of Lease Production . . . . . . . . . . . . . . . . . . . 15

B. Royalty payments and Agency verification related to Tranche One leases and months . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1. The Tranche One Months and Leases . . . . . . . . . . . . . . . . . . . . . . . . . 16

2. Verification of proper royalty payments on Tranche One Leases in Tranche One months . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

3. Issue of multiple prices on same lease . . . . . . . . . . . . . . . . . . . . . . . . . 19

C. Interior Board of Indian Appeals Interpretation of Osage regulations . . . . . . . . 19

D. Tribe's Involvement and Knowledge of Osage Agency's Application of Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1. Historic involvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2. Tribe's active participation in formulation of regulatory policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

3. Tribe's monitoring of royalty calculation and collection practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

4. Tribe's contract staffing of Minerals Branch . . . . . . . . . . . . . . . . . . . . . . 24

E. The Osage Nation and the Federal Oil and Gas Royalties Management Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

II. DEFENDANT'S CONTENTIONS OF FACT AND RESPONSES TO PLAINTIFFS' CONTENTIONS OF FACT - INVESTMENT CLAIMS . . . . . . . . . . . . 25

A. THE DEPOSIT OF ROYALTY RECEIPTS . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1. The BIA's Deposit Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2. BIA's Efforts to Expedite Receipt and Deposit of Royalty Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

3. Timing of Deposits of Royalty Receipts for the Tranche One Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B. INVESTMENT OF OSAGE TRIBAL FUNDS . . . . . . . . . . . . . . . . . . . . . . . . . 28

1. Interior's investment practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

2. Investment of Tranche One royalty receipts . . . . . . . . . . . . . . . . . . . . . . 31

C. DISBURSEMENT OF OSAGE FUNDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

D. TRIBE'S INVOLVEMENT IN AND KNOWLEDGE OF INTERIOR'S FUND MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

APPLICABLE LEGAL PRINCIPLES AND CONTENTIONS OF LAW . . . . . . . 35

I. BURDENS OF PROOF AND STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . 35

A. Plaintiff bears the burden of showing the existence of a money-mandating duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B. Plaintiff bears the burden of showing the Government breached a money-mandating duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1. Plaintiff bears the burden of proof of showing a breach of fiduciary duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

2. Plaintiff retains the burden of proof as to damages, even in this fiduciary context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

3. The absence of an accounting does not shift the burden of proof to the Government to show the proper discharge of its duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A. Standards of Review for Weighing Plaintiff's Case Against the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1. Deferential standard to be applied to the Government's interpretation of its statutory and regulatory duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2. Standard of review to apply to Agency's discharge of its statutory and regulatory duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

3. The Court should decline to adopt Plaintiff's inappropriate "highest standard of care" . . . . . . . . . . . . . . . . . . . . . . . . 44

II. LEGAL CONTENTIONS RELATED TO ROYALTY CLAIMS . . . . . . . . . . . . . . . . . 45

A. Duty to Verify Accuracy of Payments Made . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

B. The contours of the Government's duty to verify payments . . . . . . . . . . . . . . . . 45

1. Requirements of regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

2. The Court should uphold the Osage Agency's interpretation of the pricing regulations . . . . . . . . . . . . . . . . . . . . . . . . . 46

A. The IBIA decision in *Okie Crude* provides the definitive interpretation of the pricing provision of the Osage regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

i. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

ii. Board's Discussion and Conclusions . . . . . . . . . . . . . . . . 48

iii. The Agency's interpretation was correct . . . . . . . . . . . . . 51

a) Actual selling price / bona fide selling price . . . . . . . . . . . . . . . . . . . . . 52

b) Offered price . . . . . . . . . . . . . . . . . . . . . . . . . . 54

b. The ordinary meaning of "posted price" supports the Agency's application of gravity adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

c. The United States did not breach its duty to collect all royalties due to Plaintiff because it was subject to the price controls imposed under federal laws and regulations . . . . . . . . . . . . . . . . . . . . . . . 58

i. The Price Control Statutes Cannot be Properly Construed to Exempt the Department of Interior from Federal Price Controls . . . . . . . . . . . . . . . . . 58

ii. Plaintiff inappropriately misconstrue the 1977 Solicitor's Office memo and illogically rely upon judicial interpretations regarding a completely different statute to support its

proposed application of the EPAA . . . . . . . . . . . . . . . . . 62

iii. Plaintiff's Proposed Application of the EPAA Would Undermine the Very Purpose of the EPAA and Therefore, Must be Rejected . . . . . . . . . . . . . 64

d. Plaintiff's construction of the pricing regulation is unreasonable and should be rejected . . . . . . . . . . . . . . . . . . . . . . 65

3. The Court should uphold Interior's verification procedures established in the Osage regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

4. The Tribe's claims related to the interpretation and implementation of the regulations for determining royalty value are barred by laches or estoppel . . . . . . . . . . . . . . . . . . . . . . . . . 70

a. The Tribe's Claims related to the Interpretation and Implementation of the Regulations for determining royalty value are barred by the equitable doctrine of Laches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

b. Principles of Equity Demand that the Tribe be Estopped from bringing claims related to the Interpretation and Implementation of the Regulations for determining royalty value. . . . . . . . . . . . . . . . . . . . . . . . . . . 74

4. The Agency properly applied the regulations . . . . . . . . . . . . . . . . . . . . . 75

a. Determination of highest posted price . . . . . . . . . . . . . . . . . . . . . 76

b. Verification of volumes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

c. Verification of royalties paid . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

B. Plaintiff is not entitled to late-payment penalties against the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

III. INVESTMENT CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

A. Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

1. Determining the Appropriate Standard of Review . . . . . . . . . . . . . . . . . 78

2. Application of the abuse of discretion standard . . . . . . . . . . . . . . . . . . . 80

3. The Court should reject Plaintiff's proposed maximization standard . . . . . 81

B. The Tribe Cannot Demonstrate That it Sustained Compensable Damages Because of Alleged Delays in Crediting Deposits to Tribal Accounts . . . . . 84

1. Defendant followed reasonable practices for depositing receipts . . . . . 85

a. Standard for determining whether deposits are timely . . . . . 85

i. Treasury guidelines for deposit . . . . . 85

ii. Interior guidelines for deposits . . . . . 88

b. Availability of a local depositary . . . . . 89

c. All but two of the royalty payments were deposited within two days of receipt . . . . . 89

2. Timeliness of investment of funds . . . . . 90

C. Investment Yield . . . . . 91

1. The Government properly exercised its discretion under 161a and 162a . . . . . 91

2. Interior discharged its discretionary duty through investing in allowed instruments with appropriate maturities . . . . . 93

3. Interior discharged its discretionary duty through investing in a manner that comported with the prudent investor standard . . . . . 93

D. Disbursements . . . . . 94

1. Long-standing disbursement practice . . . . . 94

2. Implementing a system that would have allowed the Government to calculate interest on disbursed funds prior to checks clearing would have been unreasonable and unduly burdensome . . . . . 98

3. Plaintiff would not be entitled to interest earned on uncleared

checks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

4. Congress has accepted the federal agencies' practice of ceasing interest payments at the time of disbursement . . . . . . . . . . . . . . . 99

5. The authorities on which Plaintiff relies do not support its disbursement lag time claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) . . . . -71-

*Aeropres Corp. v. Dep't of Energy*, 461 F. Supp. 1215 (D.La. 1978) . . . . . . . . . . . . . . . . . . . -59-

*Air Transport Ass'n of America v. Federal Energy Office*,
382 F. Supp. 437 (D.D.C. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -59--61-, -63-

*Alabama Power Co. v. Gorsuch*, 672 F.2d 1 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -63-

*American Express Co. v. United States*, 262 F.3d 1376 (Fed.Cir. 2001) . . . . . . . . . . . . . . . . -51-

*American Fed'n of Gov't Employees, AFL-CIO v. Glickman*,
215 F.3d 7, 10 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -51-

*Amoco Prod. Co. v. Watson*, 410 F.3d 722 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . -73-

*Andrus v. Glover Construction Co.*, 446 U.S. 608 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . -40-

*Armstrong v. United States*, 171 F. Supp. 835 (E.D. Pa. 1959) . . . . . . . . . . . . . . . . . . . -97-, -101-

*Bailey v. United States*, 59 Fed. Cl. 743 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -51-

*Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . -60-

*Blankenship v. Boyle*, 329 F.Supp. 1089 (D.D.C. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . -82-

*Bowers v. Baystate Technologies*, 302 F.3d 1334 (Fed.Cir. 2002) . . . . . . . . . . . . . . . . . . . . . -57-

*Brown v. United States*, 42 Fed. Cl. 538 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -81-

*Brown v. United States*, 86 F.3d 1554 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -84-

*Brundage v. United States*, 205 Ct. Cl. 502 (Ct. Cl. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . -70-

*Burlington Resources Oil & Gas Co. v. Department of Interior*,
21 F.Supp.2d 1 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

*Cammarano v. United States*, 358 U.S. 498 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -55-

*Cathedral Candle Co. v. United States Int'l Trade Comm'n*,

400 F.3d 1352 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -65-

*Cavanagh v. United States*, 12 Cl. Ct. 715 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -105-

*Chapman Law Firm v. United States*, 63 Fed. Cl. 519 (2005) . . . . . . . . . . . . . . . . . . . . . . . . -42-

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) . . . . -96-

*Cheyenne-Arapaho Tribes of Oklahoma v. United States,* 966 F.2d 583 (10th Cir.1992) . . . -81-

*Cheyenne-Arapaho Tribes of Oklahoma v. United States,* 33 Fed. Cl. 464 (1995) . . . . . . . . . -81-

*Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States,*
512 F.2d 1390 (Ct. Cl. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -82-

*Chugach Alaska Corp. v. Lujan*, 915 F.2d 454 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . -40-

*Cities Service Co. v. Federal Energy Administration,*
529 F.2d 1016 (Temp. Emer. Ct. App. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -58-

*Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . -40-, -81-, -98-

*Colorado Department of Labor & Employment v. Department of Labor*,
875 F.2d 791, 797 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -49-

*Confederated Tribes of The Warm Springs Reservation v. United States*,
177 Ct.Cl. 184 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -80-

*Confederated Tribes of Warm Springs Reservation v. United States*,
248 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-, -37-

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102 (1980) . . . . . . . -38-, -39-,
-58-, -60-

*Cornetta v. United States*, 851 F.2d 1372 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . -70-, -71-

*D.O. Haynes & Co. v. Druggists' Circular*, 32 F.2d 215 (2nd Cir. 1929) . . . . . . . . . . . . . . . -70-

*Deering v. United States*, 620 F.2d 242, 245 (Ct. Cl. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . -71-

*Diaz v. United States Immigration & Naturalization Service,*
648 F. Supp. 638 (E.D. Cal. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -48-

*Erickson v. United States*, 1 Cl. Ct. 163 (Cl.Ct. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . -70-

*Estate of Berg v. United States*, 687 F.2d 377231 Ct. Cl. 466 (1982) . . . . . . . . . . . . . . . . . . . -105-

*Foster v. United States*, 3 Cl. Ct. 440 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -70-

*Frey v. Amoco Production Co.*, 943 F.2d 578 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . -57-

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770 (Fed. Cir. 1995) . . . . . . . . . -70-

*Haynes v. United States*, 891 F.2d 235 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-

*Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573 (Fed. Cir. 1988) . . . . . . . . -37-

*HRI Inc. v. EPA*, 198 F.3d 1224 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

*In re Beaty*, 306 F.3d 914 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -71-

*In re Consupak, Inc.*, 87 B.R. 529 (Bankr. N.D.Ill. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . -103-

*In re Jones*, 141 F. Supp. 2d 577 (W.D. N.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . -74-, -75-

*In re Unisys Savings Plan Litig.*, 74 F.3d 420 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . -93-

*In re: Guterl Special Steel Corp.*, 316 B.R. 843 (Bankr. W.D. Pa. 2004) . . . . . . . . . . . . . . . . -74-

*Independent Petroleum Ass'n v. Babbitt*, 92 F.3d 1248 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . -41-

*J.H. Rutter Rex. Mfg. Co. v. United States*,
706 F.2d 702 (5th Cir.), cert. denied, 464 U.S. 1008 (1983) . . . . . . . . . . . . . . . . . . . . -96-

*Jicarilla Apache Tribe v. Supron Energy Corp.*,
728 F.2d 1555 (10th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

*Kansas City Southern Ry Co. v. Guardian Trust Co.*, 240 U.S. 166 (1916) . . . . . . . . . . . . . -74-

*Kinnett Dairies, Inc. v. J.C. Farrow*, 580 F.2d 1260 (5th Cir.1978) . . . . . . . . . . . . . . . . . . . . -96-

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -81-

*LaForge & Budd Constr. Co. v. United States*, 48 Fed. Cl. 566 (Fed. Cl. 2001) . . -70-, -71-,-73-

*Laketon Asphalt and Refining, Inc. v. Dep't of Interior*,
476 F. Supp. 668 (N.D. Ind. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -65-

*Library of Congress v. Shaw*, 478 U.S. 310 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -105-

*Louisiana Public Service Commission v. F.C.C.*, 476 U.S. 355 (1986) . . . . . . . . . . . . . . . . . -57-

*Menominee Tribe of Indians v. United States*, 97 Ct. Cl. 158 (1942) . . . . . . . . . . . . . . . . . . . -79-

*Mitchell v. United States*, 229 Ct.Cl. 1 (1981), aff'd, 463 U.S. 206 (1983) . . . . . . . . . . . . . . . -81-

*Mitchell v. United States*, 664 F.2d 265 (Ct. Cl. 1981) . . . . . . . . . . . . . . . . . . . . . . -43-,-83-, -84-

*Mobil Oil Corp v. Federal Energy Admin.*, 566 F.2d 87 (Temp. Emer. Ct. App. 1977) . . . . . -61-

*Mohawk Petroleum Corp., Inc. v. Dep't of the Navy*,
395 F. Supp. 933 (C.D. Cal. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -60-

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . -39-

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . . . . . . . -80-

*Mountain Fuel Supply Co. v. United States Department of Energy*,
656 F.2d 690 (Temp. Emer. Ct. of Appls. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -55-

*Navajo Tribe of Indians v. United States*, 624 F.2d 981 (Ct. Cl. 1980) . . . . . . . . . . . . . . . . . -43-

*North Central Airlines, Inc. v. Continental Oil Company*,
574 F.2d 582 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -57-

*Northern Paiute Nation v. United States*, 9 Cl. Ct. 639 (1986) . . . . . . . . . . . . . . . . . . . . . . . -105-

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) . . . . . . . . . . . . . . . . -40-, -98-

*NVT Technologies, Inc. v. United States*, 370 F.3d 1153 (Fed. Cir. 2004) . . . . . . . . . . . -42-, -78-

*Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707 (8th Cir. 1979) . . . . . . . . . . . . . . . . . -41-

*Oregon Dept. of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753 (1985) . . . . . . . . . . -39-

*Osage Nation v. United States*, 57 Fed.Cl. 392 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -99-

*Oxy USA, Inc. v. Babbitt*, 268 F.3d 1001 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . -73-

*Pawnee v. United States*, 830 F.2d 187 (Fed. Cir. 1987) . . . . . . -35-, -42-, -43-, -45-, -84-, -104-

*Pepper v. United States*, 8 Cl. Ct. 666 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -70-, -71-

*Perrin v. United States*, 444 U.S. 37 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -51-

*Qwest Communications International, Inc. v. FCC*, 398 F.3d 1222 (10th Cir. 2005) . . . . . -100-

*Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) . . . . . . . . . . . . . . . . . -39-, -40-

*Red Lake Band v. United States*, 17 Cl. Ct. 362 (Ct. Cl. 1989) . . . . . . . . . . . . . . . . . . . . . . . -38-

*Rice v. Rehner*, 463 U.S. 713 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

*Robbins v. United States*, 86 Ct.Cl. 39 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -74-, -75-

*Roth v. Sawyer-Cleator Lumber Company*, 16 F.3d 915 (8th Cir. 1994) . . . . . . . -36-, -65-, -92-

*Secretary of the Treasury*, 1956 WL 3036 (Feb. 20, 1956) . . . . . . . . . . . . . . . . . . . . . . . . . -97-

*Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d 1335 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . -40-

*Seminole Nation v. United States*, 316 U.S. 286 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-

*Short v. United States*, 25 Cl. Ct. 722 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -79-

*Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed. Cir. 2004) . . . . . . . . . . . -69-, -104-

*Shoshone Tribe of the Wind River Reservation v. United States*,
56 Fed. Cl. 639 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -81-

*Silva v. Senders*, 600 F. Supp. 1008 (D. D.C. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -101-

*Skelly Oil Co. v. Federal Energy Admin.*, 448 F. Supp. 16 (N.D. OK 1977) . . . . . . . . . -58-, -61-

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -57-

*Solano Garbage Co. v. Cheney*, 779 F. Supp. 477 (E.D. Cal. 1991) . . . . . . . . . . . . . . . . . . . . -48-

*South Carolina v. Catawba Indian Tribe*, 106 S.Ct. 2039 (1986) . . . . . . . . . . . . . . . . . . . . . -39-

*Stinnett et al. v. Colorado Interstate Gas Co. et al.*, 227 F.3d 247 (5th Cir. 2000) . . . . . . . . -75-

*Syms v. Chrysler Corp. Loan Guarantee Bd.*, 670 F.2d 238 (D.C. Cir. 1981) . . . . . . . . . . . . -60-

*Thompson v. Cherokee Nation*, 334 F.3d 1075 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . -39-, -52-

*Torch Operating Co. v. Babbitt*, 172 F. Supp. 2d 113 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . -57-

*Udall v. Tallman*, 380 U.S. 1 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

*United States Department of Energy v. Osborn,*
760 F.2d 282 (Temp. Emerg. Ct. App. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -49-

*United States v. Booker,* 543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-

*United States v. King,* 395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-

*United States v. Mason,* 412 U.S. 391 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . -77-, -83-, -84-

*United States v. Mitchell,* 463 U.S. 206, 219 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

*United States v. Navajo Nation,* 537 U.S. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . -35-, -82-

*United States v. Ron Pair Enters.,* 489 U.S. 235 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

*United States v. Sherwood,* 312 U.S. 584 (1941 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-

*United States v. Unitank Terminal Service,* 724 F. Supp. 1158 (E.D. Pa. 1989) . . . . . . . . . . -49-

*United States v. White Mountain Apache Tribe,* 537 U.S. 465 (2003) . . . . . . . . . . . . . . . . . . -43-

*Warner-Lambert Co. v. Apotex Corp.,* 316 F.3d 1348 (Fed.Cir.2003) . . . . . . . . . . . . . . . . . . -53-

*Wells v. United States Steel & Carnegie Pension Fund, Inc.,*
950 F.2d 1244 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -71-

*Wesreco, Inc. v. Dep't of Interior*, 618 F. Supp. 562 (D. Utah 1985) . . . . . . . . . . . . . . . . . . . -61-

*Williams v. Babbitt*, 115 F.3d 657 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-

*Wilson & Co. v. United States,* 82 Ct. Cl. 261 (Ct. Cl. 1936) . . . . . . . . . . . . . . . . . . . . . . . . -75-

*Work v. United States ex rel Lynn*, 266 U.S. 161 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

*Wyoming Refining Co. v. Dep't of Interior*, 547 F. Supp. 297 (D. Wyo. 1982) . . . . . . . . . . . -61-

**STATE CASES**

*Hartmann et al. v. Bertelmann et. al*, 39 Haw. 619 (Haw. 1952) . . . . . . . . . . . . . . . . . . . . . -75-

*In re D'Espinary-Durtal's Will*, 4 A.D.2d 141 (N.Y.App.Div. 1957) . . . . . . . . . . . . . . . . . -103-

*Kamp v. Bank of America Nat'l Trust & Savings Ass'n*, 204 Cal. App. 3d 819 (1988) -101--103-

*Maryland National Bank v. Cummins*, 588 A.2d 1205, 1206-07 (Md. 1991) . . . . . . . . . . . . -104-

**FEDERAL STATUTES**

15 U.S.C. § 751(b) (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-, -59-

15 U.S.C. § 753(a) (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-, -60-

15 U.S.C. § 753(e) (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -60-

15 U.S.C. § 760(h) (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-, -15-

15 USC § 753(b)(1)(G) (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -64-

25 U.S.C. 162a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ibid

25 U.S.C. § 161a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ibid

25 U.S.C. § 4011(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

28 U.S.C. § 149 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-

28 U.S.C. 2516(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -105-

29 Stat. 179 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -86-

30 U.S.C. § 1702(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

30 U.S.C. § 1701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

30 U.S.C. § 1757 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

31 U.S.C. 321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -85-

31 U.S.C. 3302(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -85-

31 U.S.C. 3334(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -100-

31 U.S.C. 3334(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -100-

31 U.S.C. § 3302(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -85-

41 Stat. 1249 . . . . . . . . . . -93-

41 Stat. 1250 . . . . . . . . . . -29-, -80-

43 Stat. 1008-1009 . . . . . . . . . . -29-, -80-

43 Stat. 13 . . . . . . . . . . -44-

64 Stat. 215 (1950) . . . . . . . . . . -7-

64 Stat. 832 . . . . . . . . . . -95-

64 Stat. 835 . . . . . . . . . . -96-

64 Stat. 836 . . . . . . . . . . -96-

87 Stat. 627 (1973) . . . . . . . . . . -3-, -58-

87 Stat. 628 (1973) . . . . . . . . . . -10-

89 Stat. 871 . . . . . . . . . . -10-, -60-

90 Stat. 1125 (1976) . . . . . . . . . . -10-

92 Stat. 1660 . . . . . . . . . . -4-

98 Stat. 1729 . . . . . . . . . . -79-

98 Stat. 494 . . . . . . . . . . -86-

101 Stat. 552 . . . . . . . . . . -34-, -99-

107 Stat 1379 . . . . . . . . . . -100-

118 Stat. 2809 . . . . . . . . . . -38-

Act of June 28, 1906, 34 Stat. 539 (“1906 Act”)Act of June 28, 1906, 34 Stat. 539 . . . . . . . ibid

Act of October 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660 . . . . . . . . . . -4-

Pub L. 98-369 . . . . . . . . . . -86-

Pub. L. No. 100-86 . . . . . . . . . . -34-

Pub. L. No. 101-644 . . . . . . . . . . -79-

Pub. L. No. 108-447 . . . . . . . . . . -38-

Pub. L. No. 548 . . . . . . . . . . -7-

Pub. L. No. 66-360 . . . . . . . . . . -93-

Pub. L. No. 93-159 . . . . . . . . . . -3-, -58-

Pub. L. No. 94-163 . . . . . . . . . . -10-, -60-

Pub. L. No. 95-496 . . . . . . . . . . -4-

Pub. L. No. 98-146 . . . . . . . . . . -79-

Pub. L. No. 98-451 . . . . . . . . . . -79-

Pub.L. No. 103-138 . . . . . . . . . . -100-

Pub.L. No.100-86 . . . . . . . . . . -99-

**FEDERAL REGULATIONS**

10 C.F.R. 212.54(a) . . . . . . . . . . -66-

25 C.F.R. Part 183 . . . . . . . . . . -5-

25 C.F.R. Part 226 . . . . . . . . . . ibid

25 C.F.R. § 115.809 (2005) . . . . . . . . . . -81-, -92-

30 C.F.R. § 206.103 . . . . . . . . . . -81-

31 C.F.R. 206.5(a)(1) . . . . . . . . . . -87-

31 C.F.R. Part 206 . . . . . . . . . . -87-

On January 12, 2006, Plaintiff Osage Tribe ("Osage" or "the Tribe") submitted its pretrial memorandum of contentions of fact and law and filed a corrected version of its pretrial memorandum of contentions of fact and law on January 13, 2006. Pursuant to RCFC, Appendix A, ¶ 14(b), Defendant hereby submits its responsive pretrial memorandum of contentions of fact and law.

## ISSUES OF FACT AND LAW

## I. ISSUES OF FACT TO BE DECIDED BY THE COURT

The Court should resolve the following issues of fact as they relate to Plaintiff's royalty and investment claims based on the Tranche One leases for the Tranche One months.

### A. Plaintiff's Royalty Claims - Duty to Collect All Monies Due

1) Whether the Osage Agency correctly calculated the highest posted prices.

2) Whether the Osage Agency's practices related to the verification of oil volumes complied with its regulatory and statutory duties, properly construed.

3) Whether the Osage Agency collected royalty payments based on the correct oil volume.

4) Whether the Osage Agency appropriately applied the regulations, properly construed, to verify that royalty payments were based on the correct price.

5) Whether the Osage Agency collected royalty payments based on the correct price.

6) Whether the United States collected the late fees that were due.

7) Whether the Osage Nation was extensively involved in the promulgation, amendment, and implementation of the Osage regulations.

### B. Plaintiff's Investment Claims

1) Whether the Osage Agency deposited Osage royalty receipts in a timely fashion.

2) Whether Interior invested the Osage royalty receipts in a timely fashion.

3) Whether Interior abused its discretion in the investment of the royalty receipts.

4) Whether Interior abused its discretion in following the Government practice of ceasing to earn interest or other investment returns on Osage funds after they were disbursed to headright owners.

**C. Damages**

1) The appropriate manner in which to calculate interest as a component of any damages found.

2) The appropriate interest rate to apply in calculating any such damages.

## II. ISSUES OF LAW TO BE DECIDED BY THE COURT

The Court should resolve the following issues of law as they relate to Plaintiff's royalty and investment claims based on the Tranche One leases for the Tranche One months.

**A. Issues Applicable to Both Claims**

1) Whether Plaintiff bears the burden of proving its claims that the Government breached identified money-mandating duties.

2) Whether the Government should be granted deference in its interpretation of the statutes and regulations that form the basis of its duties to the Osage Tribe.[1/]

3) Whether a reasonableness standard applies to Interior's discharge of its duties related

---

[1/] As explained in Defendant's Motion in Limine to Preclude Plaintiff from Challenging Interior's Interpretation of Osage Regulations In *Okie Crude Co. V. Muskogee Area Director*, being filed herewith, the Court should accept as established Interior's interpretation of the pricing regulations set forth in *Okie Crude v. Muskogee Area Director*, 23 IBIA 174 (1993).

to the calculation of the appropriate Osage royalties and to the deposit of Osage royalty receipts, and whether the abuse of discretion standard applies to Plaintiff's investment claims.

**B. Plaintiff's Royalty Claims - Duty to Collect All Monies Due**

1) Whether, in *Okie Crude v. Muskogee Area Director, Bureau of Indian Affairs*, 23 IBIA 174 (1993) the Interior Board of Indian Appeals correctly construed the meaning of the terms "actual selling price," "bona fide selling price," "highest posted price," and "offered price" in the Osage regulations. The legal interpretation of these terms informs the scope of the Government's duties to collect the royalty payments based on the appropriate price of the oil, or royalty value.

2) Whether the term "posted price" in the Osage regulations is properly interpreted to require or allow the Government's practice of allowing gravity adjustments in determining the appropriate price of the oil, or royalty value.

3) Whether the Government's volume verification procedures set forth in the Osage regulations should be upheld.

4) Whether the Emergency Petroleum Allocation Act, Pub. L. No. 93-159, 87 Stat. 627 (1973) (codified at 15 U.S.C. § 751 *et seq.* (1976 and Supp. 1985)), was applicable to the royalty values established for Osage royalty payments.

5) Whether the penalty provision for late payments applies to the United States.

6) Whether the Osage Nation's extensive involvement in the promulgation, amendment, and/or implementation of the Osage regulations forms a sufficient basis to bar its claims, in whole or in part, under the doctrines of laches or quasi-estoppel.

**C. Plaintiff's Investment Claims**

1) Whether Government-wide standards for receipt and deposit of funds apply to Osage

royalty payments.

2) Whether Interior's exercise of discretion in investing Osage royalty receipts is informed by the parameters set forth in 25 U.S.C. §§ 161a and 162a, and the prudent investor standard.

3) Whether Government-wide practices for disbursement of funds apply to Osage headright payments.

## STATEMENT OF FACTS

## I. DEFENDANT'S CONTENTIONS OF FACT AND RESPONSES TO PLAINTIFF'S CONTENTIONS OF FACT - ROYALTY CLAIMS

### A. Background

#### 1. Sources of the Government's Duties Related to Plaintiff's Royalty Claims

##### a. 1906 Act

The Osage Tribe, at the turn of the last century, occupied a reservation which now constitutes Osage County, Oklahoma. By virtue of the 1906 Act, the surface interests were allotted to individual tribal members. Section 3 of the 1906 Act reserved "the oil, gas, coal, and other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage Tribe for a period of twenty-five years from and after the eighth day of April, nineteen hundred and six . . . ." The ownership of the minerals by the Osage Tribe has been extended from time to time and was last extended in perpetuity by the Act of October 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660. The 1906 Act provides that leases are to be made by the Osage Tribal Council and approved by the Bureau of Indian Affairs ("BIA"). The Act also created a trust fund consisting of proceeds from the sale of Osage lands in Kansas and income from the Osage mineral estate. *See* H.R. Rep. No. 92-963.

The history of the 1906 Act shows that the Tribe sought this legislation and was closely involved in its formulation. By 1906, the Osage Tribe of Indians had, for several years, "been considering the question of asking the Government to divide its lands and moneys among the members of the tribe." House Committee on Indian Affairs, Division of Lands and Funds of Osage Indians, Oklahoma, H.R. Rep. No. 59-3219. In 1906, the Tribe had agreed on a plan to divide its lands and moneys. *Id.* The final bill enacted by Congress "was submitted to the Osages at [a] general election held by them, and it was adopted by all factions of the tribe. It was brought to Washington by delegates representing those factions, submitted to the Secretary of the Interior for his consideration, and the committee has given the measure very careful consideration and recommends its passage . . . ." *Id.*

**b. Applicable regulations**

During the first five Tranche One months, regulations promulgated in 1974 defined the responsibilities of the lessee, the purchaser, the Osage Tribe, and the Osage Agency ("Agency") of the Bureau of Indian Affairs ("BIA"). 25 C.F.R. Part 183, later redesignated as 25 C.F.R. Part 226 ("1974 regulations"). For the 1990 Tranche One month, amended regulations at 25 C.F.R. Part 226 defined the responsibilities of these parties ("1990 regulations").

The regulations are explicitly applicable to, and incorporated into leases, for oil recovered from the Osage mineral estate ("Osage oil"). Each of the Tranche One leases provides that (1) they are subject to the Osage regulations existing at the time the leases were entered; and (2) that any subsequent amendments to the regulations that are not agreed to by the parties to the lease do not affect the term of the lease, rate of royalty, rental or acreage. *See, e.g.,* Stanley Stringer Lease at 19-20; May 23 Tr. at 37-39; 25 C.F.R. § 226.5.

The regulations provide the following:

> (a) *Royalty on oil* – (1) Lessee shall pay or cause to be paid to the Superintendent, as royalty, the sum of not less than 16 ⅔ percent of the gross proceeds from sales after deducting the oil used by Lessee for development and operation purposes on the lease . . . The Osage Tribal Council may, upon presentation of justifiable economic evidence by Lessee, agree to a revised royalty rate subject to approval by the Superintendent, applicable to additional oil produced from a lease or leases by enhanced recovery methods, which rate shall not be less than 12 ½ percent of the gross proceeds from sale of oil produced by enhanced recovery processes, . . .
>
> (2) Unless the Osage Tribal Council, with approval of the Secretary, shall elect to take the royalty in kind, payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of the sale or removal.

25 C.F.R. § 226.11.[2] "Major Purchaser" is defined as "any one of the minimum number of purchasers taking 80 percent of the oil in the Kansas-Oklahoma area." 25 C.F.R. § 226.1(h).

In August 1990, subsection 226.11(a)(2) was amended to provide as follows:

> Unless the Osage Tribal Council, with approval of the Secretary, shall elect to take the royalty in kind, payment is owing at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the highest of the bona fide selling price, posted or offered price by a major purchaser (as defined in s 226.1(h)) in Osage County, Oklahoma, who purchases production from Osage oil leases.

25 C.F.R. 226.11(2) (1991). "Major Purchaser" was defined as "any one of the minimum number of purchasers taking 95 percent of the oil in Osage County, Oklahoma." *Id.* at § 226.1(h).

Section 226.13 of the regulations provides that:

> (a) Royalty payments due may be paid by either purchaser or Lessee. Unless otherwise provided by the Osage Tribal Council and approved by the Superintendent, all payments shall be due by the 25th day of each month and shall cover the preceding month. Failure to make such payments shall subject Lessee or purchaser, whoever is responsible for royalty payment, to a late charge at the rate of not less than 1 ½

[2] Herein, the Government will cite to Part 226.

percent for each month or fraction thereof until paid.

(b) Lessee shall furnish certified monthly reports by the 25th of each following month covering all operations, whether there has been production or not, indicating therein the total amount of oil, natural gas, casinghead gas, and other products subject to royalty payment.

(c) Failure to remit payments or reports shall subject Lessee to further penalties as provided in §§ 226.42 and 226.43 . . . .

Section 226.13(a) was amended in August 1990 with the following additional language: "The Osage Tribal Council, subject to the approval of the Superintendent, may waive the late charges." 25 C.F.R. § 226.13(a). The regulations further provide that the lessee shall require the purchaser of oil from his lease or leases to furnish the Superintendent, no later than the 25th day of each month, a statement reporting the gross barrels of oil purchased during the preceding month. The Superintendent may authorize an extension of time, not to exceed 10 days, for furnishing this statement. 25 C.F.R.§ 226.14(b).[3/]

**2. Methodology for payment of royalties under 1974 and 1990 regulations**

The regulations require the lessee to pay royalties, which are calculated using the following formula: Royalty = Royalty Rate x Royalty Volume x Royalty Value (price).

The royalty rate is determined by either the United States or, after 1950, Pub. L. No. 548, 64 Stat. 215 (1950), by the Tribe. The rate is either 1/8 (12 ½ percent) or 1/6 (16 2/3 percent) of the value of production, as defined in each lease. Royalty rates may vary for a particular lease depending on volumes produced, the oil pool from which the oil is produced, or the area from which the oil is

---

[3/] Prior to the August 1990 amendment, the regulations required that the lessee shall require the purchaser of oil from his lease or leases to furnish the Superintendent, no later than the 15th day of each month, a statement reporting the gross barrels of oil sold during the preceding month. 25 C.F.R. § 226.14(b)(1990).

produced.

The royalty volume is based on the volume of oil produced and sold from each lease or each portion of the lease having a separate royalty rate after deducting the volume of oil used by lessee for development and operational purposes on the lease. *See* 25 C.F.R. 226.11(a).

The royalty value is based on the lessee's gross proceeds from its sales. Specifically, this value is based on the higher of the price that the lessee actually received (actual selling price or bona fide selling price) for the production, or on the highest posted or offered price of a major producer. These prices are to be calculated on the day of the sale or removal of the oil.

The following explains the manner in which the Agency applied the regulations to assist the lessees and purchasers in paying the correct royalty and then in verifying the accuracy of the payments.

**a. Determination of major purchasers and highest posted or offered price**

Under the 1974 regulations, for each month, the Osage Agency obtained a listing of crude oil purchasers from state authorities in Kansas and Oklahoma, which indicated the amount of oil each purchaser bought in that State for the most recent month for which data was available. . The lists would be used to rank each purchaser in descending order according to the total amount of oil they purchased in both states during the subject month, both as an absolute volume, and as a percentage of the volume purchased in the Kansas and Oklahoma area. The Agency also calculated the cumulative total percent of volume purchased in order to determine the major (top 80%) purchasers.

The same methodology was used after September 1990, except the Agency determined the major purchasers by only considering the top 95% of purchasers in Osage County. Moreover, the Agency did not need to obtain production information from the States. Instead, the Agency identified

the major purchasers from the Agency's own monthly production summaries.

Under both the 1974 and the 1990 regulations, the Agency simultaneously obtained crude oil posted prices from companies that published crude oil price bulletins (postings) for the subject month. These postings delineated different prices for different qualities and types of crude oil . The postings typically provided a price for 40 degree API crude oil and a gravity[4/] schedule showing how much the company would reduce the price for oil that was lower than 40 degree API. Based on this data, the Agency calculated the highest posted price paid by major purchasers at all degrees of API gravity oil for each day or periods of days during the production month.

The Agency completed the highest posted price analysis by issuing a pricing letter and an attached pricing schedule by gravity to all lessees and purchasers early in the month following the month of production so that payment could be based on the higher of the posted or actual sales prices. The letters set forth the highest posted price for each day or range of days for the production month for crude oil purchased in the Kansas and Oklahoma area (and for Osage County after September 1990). It required that oil royalty due must be based on the higher of the posted price for the appropriate gravity of oil or the actual selling price and, if the API gravity was different than 40 degree API oil, then the Agency referred purchasers and lessees to an attached pricing schedule that set out the highest posted price for lower-gravity oil. It also required that royalty payments were due by the 25th of the month following the month of sale. For particular time periods, the Tribal Council and the Superintendent granted lessees an extension of ten days from the 25th of the month following sales to pay any additional royalty.

During the first three Tranche One months (January 1976, May 1979, and November 1980),

---

[4/] Generally, the higher the API gravity, the greater the value of the oil.

prices for oil were subject to price and allocation controls, promulgated under the Emergency Petroleum Allocation Act ("EPAA") and subsequent amendments. EPAA, Pub. L. No. 93-159, 87 Stat. 628 (1973) (codified as amended at 15 U.S.C. § 751 et seq. (1976 and Supp. 1985)). In response to the Middle Eastern oil embargo, Congress, through the EPAA, sought to minimize any adverse impacts that shortages of crude oil, residual fuel oil and refined petroleum products might have on the domestic economy. *Id.* at § 2(b) (15 U.S.C. § 751(b) (1982)). Specifically, Congress directed the President to establish controls over the pricing and allocation of all crude oil, residual fuel oil and refined petroleum produced in or imported into the United States. *Id.* at § 4(a)(1973) (15 U.S.C. § 753(a) (1982)). The EPAA was extended by the Energy Policy and Conservation Act of 1975 ("EPCA of 1975") which, among other things, called for the expiration of the EPAA on September 30, 1981. EPCA of 1975, Pub. L. No. 94-163, Title IV, § 461, 89 Stat. 871, 955 (15 U.S.C. § 760(h) (1976)).[5]

Pursuant to EPAA, the President issued several versions of price regulations that set out mandatory price controls. The regulations established maximum lawful prices for different categories of oil, depending on certain factors, such as when the production had commenced and the volume of oil produced. Initially, the regulations established price ceilings for two categories of oil, "old oil" and "new oil." In 1976, the two categories were changed to "lower-tier oil" and "upper-tier oil." Unregulated, or "exempt" oil was not subject to price controls. One category of unregulated oil, for certain time periods, was "stripper oil," which was produced from a well with an average daily

[5] Congress passed other statutes that also affected the price and allocation of petroleum and crude oil between 1973 and 1981 such as the Energy Conservation and Production Act ("ECPA"), 90 Stat. 1125 (1976) (codified at 42 U.S.C. § 6801 *et seq.* (1976)). EPCA modified the crude pricing formula under EPAA and exempted crude oil from "stripper" wells (those producing ten barrels per day or less) from regulatory controls. *Id.* at §§ 121, 122.

production of less than 10 barrels. Finally, after 1978, oil from "marginal property" was subject to pricing based on a percentage of both unregulated and upper-tier pricing. *See* Ronnie Martin Supplemental Expert Report, January 12, 2006, at 6-7 (Def.'s Ex. 2340).

During this price control era, the Agency would list the highest posted prices on exempt oil for particular time periods, including information such as effective dates and the price being paid for 40 degree oil. The Agency would also list the posted prices for categories of regulated oil (upper and lower tier) that matched the maximum price that could be legally obtained for each corresponding category of oil.

In the mid-1970s, the Agency followed a practice of informing purchasers of instances where a major purchaser had offered a bonus above the highest posted price for unregulated oil (such bonuses could not be offered for regulated categories of oil). The Agency requested other purchasers to match the higher offers.

**b. Payment of royalties and submission of lessee and purchaser reports**

The regulations required the lessee or purchaser to pay royalties by the 25th of the month following the month of sale. The highest posted price letter reminded purchasers and lessees of this obligation. For particular time periods, however, the Tribal Council and the Superintendent granted lessees an extension of ten days from the 25th of the month following sales (production) to pay the additional royalty. Additional royalty was owed when royalty based on the highest posted price exceeded royalty based on the actual sales price; either the lessee or the purchaser (whoever was responsible for royalty payments) had to pay this additional royalty. Sometimes purchasers or lessees paid this additional royalty by the 25th of the month as part of their overall royalty payment and sometimes they submitted the additional royalty separately to the Agency.

The lessees or purchasers were required to pay royalties based on the higher of the actual selling prices the lessees received (*e.g.*, the actual price paid by the purchaser) or the highest posted or offered price of a major purchaser for the gravity of oil produced. During the price control era (1973-1981), the Department of the Interior ("Interior") based royalty value on the regulated prices for particular categories of oil, which practice was followed by the Agency for Osage royalty payments. Thus, the lessee or purchaser based its royalty on the maximum price the lessee could receive (or the purchaser could pay) for its category of regulated oil.

Generally, by the 25th of the month following production by the lessee (or following sales to a purchaser), lessees submitted Lessee's Reports to the Agency.[6] The Lessee's Reports were prepared on the Agency's standard forms (Oil Lessee's Monthly Report), and included information such as purchasing company, barrels of oil sold, royalty amount (on some forms), and barrels of oil produced. The Lessee's Report was based on a purchaser's statement. The lessee, or a producer on its behalf, would verify the volumes in the purchaser statement with daily volumes set out in the lessee's or producer's gauge books.

Some Lessee's Reports also included prior month adjustments and noted the regulated category of oil. The Lessee reports contained a certification line on which an officer of the company would place his or her signature attesting to the truth and accuracy of the report.

Purchasers of oil from the Osage mineral estate were also required to file monthly purchaser's statements (sometimes referred to as purchase reports or run statements) with the Superintendent by the 15th of each month, reporting all purchases from the previous month. The 1990 revision of the

---

[6] Often, a lessee would engage another company to operate its wells. In this case, the operator, or producer, would provide the lessee report.

regulations changed this reporting deadline to the 25th day of the month following the month of sales. The Superintendent was also empowered to authorize up to a 10-day extension of time for furnishing this statement. This was a unique reporting requirement for leases on the Osage mineral estate. The MMS did not require a monthly purchaser's statement from purchasers setting out the information below for Indian and Federal leases.

The purchaser's statements were not prepared on a standard Agency form, but rather were prepared and submitted on forms or statements prepared by the purchasing companies. Some purchasers provided a separate report for the royalty amount, but most purchasers listed the royalty amounts on the purchaser's statement. Purchaser's statements varied by the company, but typically contained information such as property description and name, production operator, purchaser, net barrels, API gravity, price per barrel, gross value, and net value. Some statements also contained the royalty rate and royalty amount. Further, the Osage Agency and lessees received a copy of the purchaser's statement.

The information in a purchaser statement was either derived from a gauge ticket (also referred to as a run ticket) or a lease automatic custody transfer ("LACT") unit. A gauge ticket provides the volume and "quality"[7/] of oil purchased from a tank. A gauger would measure the level of oil in a tank before and after a withdrawal. The difference between the two measurements indicated the volume of oil sold. From these measurements, the purchaser's agent determined the volume of API quality barrels of oil in any given tank. The measurements were subsequently entered on a gauge ticket, typically indicating information such as the date and time of the sale, the name of the lessee,

---

7/ The gauger determined the API gravity or density, the temperature, and basic sediment and water (BS&W) content of the oil.

the number and location of the lease, and the number and size of the oil tank. A copy of the gauge ticket was distributed to both the lessee and to the Agency

The volume of crude oil sold from some of the Tranche One leases was measured by a LACT unit. A LACT unit is used to measure volume (through a meter) and quality of oil (through sampling). LACT units are typically calibrated for accuracy by an independent third party on a periodic basis.

**c. Agency Calculation and Verification of Oil Royalties**

After receipt of the lessee's reports and purchaser's statements, the Agency compared the volumes and values reflected in them. If the volume and value data did not match, the Agency contacted either the Lessee or Purchaser to reconcile the difference, file corrected reports, and adjust payment if necessary.

The Agency also verified the accuracy of royalty rates, volumes sold, and royalty value and determined whether it had received the correct royalty payment. If not, the Agency calculated the additional royalty due and sought an additional payment and any late fee. Royalty payment data was maintained on IBM computer systems and included information such as legal description, lease contract number, type of lease, gross volume, and royalty. On the computer system, the highest posted prices were compared to the prices reported by the purchasers for each crude oil transaction made on any given day. If the purchaser reported a sales price less than the "highest posted price," the computer calculated and reported the additional royalty due. As part of the verification process, the Agency spot-checked purchaser reports (run statements) against gauge (or run) tickets to verify sales volume. In addition, the Agency reviewed each purchaser's statement to verify the actual price paid.

In 1993, the Minerals Management Service ("MMS") conducted an audit of royalty payments made by Phillips Petroleum Company on Osage mineral leases from January 1, 1988, through December 31, 1992, yielding a royalty value of $6,897,515. Minerals Management Service, Dallas Area Office, Audit of Oil and Gas Royalties - Osage Mineral Leases Paid by Phillips Petroleum Company January 1, 1988 through December 31, 1992, February 1994 ("MMS Audit"). Def.'s Ex. 1468. The MMS Audit examined three of Phillips' leased oil properties, including North Burbank (one of the Tranche One leases). In comparing the calculated royalty figures with those actually paid for three test months, the Audit revealed only two underpayments totaling $252.12. MMS considered the two underpayments "isolated instances and not evidence of a systematic weakness." *Id.* at 7.

**d. Agency Monitoring of Lease Production**

The Agency monitored oil leases for both compliance with the regulations and accuracy of reported sales. Random unscheduled visits were made by Field Engineering Technicians ("FET") to check for, among other things, basic compliance, environmental problems, and landowner complaints. Production was monitored by FETs and Agency Gaugers through random on-site inspections of purchaser gauging, independent gauging of oil production, and review and comparison of reported volume data against data in the possession of the Agency. Agency gaugers verified the measurements taken by the purchaser or his agent on the date of purchase and then reported the information on a separate Agency gauge (or run) ticket.

**B. Royalty payments and Agency verification related to Tranche One leases and months**

**1. The Tranche One Months and Leases**

In its April 15, 2005 Order, this Court adopted Plaintiff's definition of Tranche One as encompassing Plaintiff's trust fund mismanagement claims for five oil and gas lease for six sample months consisting of January 1976, May 1979, November 1980, February 1986, July 1986, and October 1990. Plaintiff subsequently identified the Tranche One leases as follows: North Burbank Unit (I68 IND 25667), North Avant Unit (168 IND 7883), Stanley Stringer Unit (14-20-201-2679), Osage Hominy Unit (168 IND 3618) and East Hardy Unit (14-20-G06-664).

The Tranche One leases were historically large production leases executed between 1920 and 1965. Four of the leases are "blanket" oil leases; the remaining lease is a combination blanket oil and gas lease. Each of the blanket oil leases replaced a number of terminated individual oil and gas leases. All of the Tranche One leases are waterflood leases. Waterflood is a method of recovering oil in depleted reservoirs by injecting water through injection wells. Because waterflooding was a costly venture, it was not uncommon for firms to request that the Osage Agency and Osage Tribe cancel existing leases and establish a blanket lease incorporating lower royalty rates.

**2. Verification of proper royalty payments on Tranche One Leases in Tranche One months**

Testimony and documents will show that the Agency followed the foregoing procedures in the Tranche One period. The regularity of the procedures will be demonstrated and should be presumed for the Tranche One leases and months, in the absence of specific facts to the contrary. For the Tranche One leases and months, Defendant obtained the relevant documentation that it or the Plaintiff identified during numerous inspections at various locations. For certain leases and months,

all apparently relevant material was obtained.

The parties were unable to locate all purchaser or lessee statements for other leases and months. Nevertheless, with some exceptions, in these instances Defendant's oil and gas expert, Ronnie Martin, was able to reconstruct the royalty calculations with other information to verify their accuracy. *See* Expert Report of Ronnie A. Martin ("Martin Expert Report") (Nov. 3, 2005) (Def.'s Ex. 1672); Supplemental Expert Report of Ronnie A. Martin ("Martin Supp. Expert Report") (Jan. 12, 2006) (Def.'s Ex. 2340). Mr. Martin concluded that there were no material differences between the amounts of oil royalty received by the Osage Agency for the production of crude oil during the Tranche One months for the Tranche One leases, and the amounts that were properly due and owing. Most, if not all of the differences he identified, were likely the result of incomplete information. Nevertheless, sufficient documentary evidence exists to enable Mr. Martin to opine that the Agency's internal procedures that were in place to match volumes and values from lessee and purchaser reports were reasonable and effective to ensure that the proper oil royalties were paid.

Mr. Martin's assumptions, methodology, analysis, and conclusions are contained in his Expert Report and his Supplemental Expert Report. For purposes of his analysis, Mr. Martin assumed that lessors, including the United States, who receive royalty payments were subject to crude oil price controls. In other words, if particular crude oil was subject to a regulated price under applicable price control statues and regulations (for example, if the oil was classified as "old" or "lower tier oil"), Mr. Martin used the regulated price as the oil value for the purpose of determining the oil royalty owed during the Tranche One months of January 1976, May 1979, and November 1980. Mr. Martin also assumed that "offered price" only applies to lessees that were actually offered that price based on the Interior Board of Indian Appeals ("IBIA") decision in *Okie Crude Co. v. Muskogge Area Director*,

*Bureau of Indian Affairs*, 23 IBIA 174 (1993) (Def.'s Ex. AR001.00).

To determine whether there was a discrepancy between the amounts of royalty received by the Osage Agency for crude oil produced during the Tranche One months for the Tranche One leases, and the amounts that were due and owing, Mr. Martin reviewed numerous sources of data, including original source documents (such as Lessee Reports and purchaser statements), computer data (System 36 data), and Oklahoma Tax Commission data. Martin Expert Report, Exs. F-2, F-3, F–4. Based on this information, Mr. Martin calculated the royalty due and compared it to the royalty paid.. *Id.* at Exs. F-3 and F-2. He calculated the royalty price (or value) by making the appropriate gravity adjustments and selecting the higher of the highest posted price or price paid. Mr. Martin, when feasible, obtained volume information from original source documents, such as Lessee's Reports, and also used System 36 data. He also validated production volumes between paper reports and the System 36 data, which were generally consistent. Finally, Mr. Martin calculated the difference between the royalty due and the royalty paid for the Tranche One months and leases, which equaled $35,583. *Id.* at Ex. F-1. Mr. Martin noted that the difference was not likely due to the Agency's failure to collect the correct royalty payments; rather, it was due to unavailable information needed, for instance, to determine major purchasers and, as to one lease, to determine the correct category of regulated oil.

Mr. Martin subsequently produced a supplemental expert report based on additional documents related to the Agency's determination of major purchasers and, as to the one lease, to the category of regulated oil. Using the same methodology as in his November 3, 2005 expert report, Mr. Martin recalculated the difference between the royalty due and the royalty paid as $8,128, and, once again, concluded that the remaining difference was likely due to missing documents. Martin

Supp. Expert Report at 8, Ex. E-1.

**3. Issue of multiple prices on same lease**

Plaintiff claims that the Agency failed to apply the higher sales price of crude oil when oil produced from a single Tranche One lease was sold for two different prices in a month. Plaintiff refers to four specific sales for particular Tranche One leases during the following Tranche One months: January 1976, May 1979, and November 1980. Plf.'s Mem. Of Contentions of Fact and Law ("Plf.'s Mem.") at 35. Defendant does not dispute that crude oil produced from these Tranche One leases during the listed Tranche One months was sold for two different prices. However, these two different prices resulted from the application of price control statutes and regulations. In other words, portions of oil produced from a Tranche One lease in a single month were classified as different categories of oil. Oil for royalty purposes must be based on the maximum lawful price under the applicable price control statutes and regulations.

**C. Interior Board of Indian Appeals Interpretation of Osage regulations**

On February 5, 1993, the Interior Board of Indian Appeals ("IBIA" or "the Board"), issued a decision on an appeal of a pricing order issued by the Muskogee Area Director. *Okie Crude Co. v. Muskogee Area Director*, 23 IBIA 174 (1993). Therein, the Board defined the terms "actual selling price," "bona fide selling price," "highest posted price," and "offered price." The Board's decision was based on an administrative record that has been provided to Plaintiff. For the Tranche One months, the BIA's implementation of the regulations was consistent with the interpretations that the Board adopted. A full explanation of the background, conclusions, and rationale related to this decision is set forth below in Defendant's contentions of law.

**D. Tribe's Involvement and Knowledge of Osage Agency's Application of Regulations**

Notwithstanding the Plaintiff's attempts to convince this Court that it historically functioned as a "passive" beneficiary, the evidence will demonstrate the extensive, active Tribal involvement in the affairs of the Mineral Branch as those activities pertained to the Osage mineral estate.

**1. Historic involvement**

From early on, it is clear that the Tribe participated in the administration and management of the Osage mineral estate at a detailed and sophisticated level. The Tribe paid particular attention to economic factors which might have detrimental effects on the productivity of oil leases. In 1931, for instance, in response to a period of depressed oil prices, the Tribe moved to enact Resolution number 30 reducing royalty minimum payments to afford relief to oil operators. In 1948, when faced with the prospect of declining production in depleted wells, the Tribal Council approved, after extensive deliberation with the United States Geological Survey and several oil purchasing companies, the extraction approach known as "waterflooding." This approach was approved after determination was made that market oil prices for Osage oil having gravity readings of between 38 and 40 degrees A.P.I. could bring an additional $7.7 million in royalty income to the Tribe. Tribal Resolutions throughout the 20th Century tell a similar story of a beneficiary very much interested and actively involved in the administration of its property.

**2. Tribe's active participation in formulation of regulatory policy**

The Plaintiff would have this Court believe that it is merely the victim of an ever-changing regulatory scheme which placed it at a perpetual economic disadvantage. The evidence at trial however will tell a different story. It will show that the Tribe recognized and supported the construction and implementation of the regulations such that lessees were not obligated to pay

royalties based on prices they could not receive.

For instance, Tribal Resolution Number 22-154, dated February 19, 1970, is a prime example of active Tribal involvement in the Osage regulatory scheme. The Resolution recognized the outmoded nature of the then-existing regulations, and requested assistance from the Commissioner of Indian Affairs to detail staff from the Division of Real Property Management in Washington, D.C. to "aid in the drafting of revisions to the regulations governing the leasing of the Osage Reservation lands for oil and gas mining purposes, Osage oil and gas leases, royalties, and bonuses . . ." The revisions requested by the Tribe were completed by November, 1970. Tribal Resolution number 23-36, dated November 18, 1970 approved, adopted and requested submission of the proposed revisions as written. The Resolution stated that the revisions were "carefully reviewed and revised by the Osage Tribal Council." Def.'s Ex. 2260.

Moreover, the Tribe did not hesitate to request deviations from the regulatory scheme when economic needs arose. In correspondence dated January 30, 1985, the Tribal Council recognized the financial pressure that the then-existing global oil surplus was placing on lessees who were getting less than highest posted price for sales of oil. Fearing strains on oil production, the Council requested a deviation from regulations requiring royalty payment based upon the higher of the"actual selling price, or the highest posted or offered price" then required by the regulations. Def.'s Ex. 2381. Instead, the Council requested that Osage lessees be permitted to pay royalties based upon the "actual price of oil." *Id.*

Tribal participation in the drafting and approval of regulations was a pattern that extended into the 1980's and 1990's. In 1985, the Tribe requested that the requirement in 25 CFR § 226 regarding payment of royalties based upon the offered or posted price of major purchasers in the *Kansas-*

*Oklahoma area*, be geographically restricted to *Osage County*. The Osage Tribal Council noted that the Tribe had "participated in the reviewing of the current regulations and the drafting of the proposed amendments to the regulations." Tribal Resolution No. 26-631 (Sept. 5, 1985) (Def.'s Ex. 867). The suggested amendment was devised in concert with "numerous conferences held with the Oklahoma Independent Petroleum Association." *Id.* In its Resolution requesting that Interior publish the proposed amendment, the Osage Tribal Counsel stated that the revision "would be in the best interest of the Osage Tribe of Indians and the Osage oil lessees. . . ." Tribal Resolution No. 26-754. In the preamble to the proposed regulation, Interior noted

> [i]t is the consensus of the BIA and the Osage Tribal Council that the proposed rule which amends 25 CFR 226 will best strengthen the management of the Osage Mineral Estate and will alleviate the necessity for many of the oil lessees to pay the Osage Tribe more for its royalty oil than paid by crude oil purchasers. This may reduce the tribal income; however, such action may curtail the plugging of marginal wells. The proposed rule would be cost effective.

52 Fed. Reg. 38608 (Oct. 16, 1987). In responding to comments in the preamble to the revised rule to this change, Interior found:

> Under the current regulations, if the "major purchaser" setting the highest posted price does business in the Kansas-Oklahoma area but does not purchase oil in Osage County, Oklahoma, . . . lessees would be required to pay royalty based on a price higher than the highest price the lessees could possibly receive. The revision to this section can prevent this from happening. This could have a beneficial effect on the exploration and development of oil leases.

55 Fed. Reg. 33112, 22,133 (June 18, 1990).

When concerns arose in the early 1990's about losses to the mineral estate due to oil purchasers' inability to pay premiums and or bonuses to producers without "effecting [sic] the highest paid price provision in 25 CFR § 226.11," the Tribe once again "participated in drafting" the proposed amendment to the regulations. *See* Tribal Resolution No. 28-393 (Dec. 18, 1991) (Def.'s

Exh. 1098). The Tribe recommended official approval of the proposed amendment by the Secretary of the Interior on August 19, 1992. *See* Tribal Resolution No. 28-522. In a draft preamble to the proposed regulations, Interior noted

> [a]s an evident result of the Bureau's assessment of royalties based on bonus prices paid to some (but not all) oil producers, there has been a cessation in the county of the practice of purchasers paying bonuses or premiums for certain oil. This has had the dual result of limiting the income available to oil producers and the royalty income which would be paid to the Tribe. The Osage Tribal Council is on record as wanting the regulation changed.

Def.'s Ex. 1150.

**3. Tribe's monitoring of royalty calculation and collection practices**

Consistent with its role as a conscientious beneficiary, the Tribe played an active role in monitoring the status of the Agency's royalty calculation and collection practices. The Tribe engaged the services of expert personnel to assist in its monitoring and auditing of the government's management of the mineral estate. In some instances, Tribal officials worked along side the experts in monitoring the Agency's practices.

Tribal auditors actively observed and audited the Osage Agency's royalty valuation calculations and, in the mid-1980s, one auditor was assigned to the Agency's Branch of Minerals where he helped with the backlog of additional royalty calculations. The auditors submitted to the Tribe numerous memoranda detailing alleged inadequacies with the maintenance of the mineral estate and the investment of funds derived therefrom. Finally, Tribal auditors and experts regularly received and reviewed monthly lessee and purchaser reports containing information used by the Minerals Branch to verify the accuracy of royalty calculations.

**4. Tribe's contract staffing of Minerals Branch**

Tribal involvement and participation with the government in the administration of affairs at

the Osage Mineral Branch went beyond the audits/inspections conducted by hired experts. The Osage Tribe, as an official contractor, recruited and hired employees to staff many skilled positions at the Mineral Branch. The Tribe hired Engineering Field Technicians to monitor leases in the field, clerk typists to compile field data into written reports, and accounting staff members to assist the Minerals Branch with royalty computation and verification. The Tribe also recruited administrative and clerical support personnel, and played an active role in the training and development of both BIA and tribal employees.[8]

Tribal participation was designed to, among other things, "provide para-professional support staff and services to the Bureau of Indian Affairs professional staff...in the administering and carrying out of the Fiduciary Trust Responsibilities of the United States Government for the Osage Tribe of Indians." Def.'s Ex. 805. Moreover, the Tribe desired to "explore to the greatest extent possible realization of the maximum benefit to the Osage Mineral Estate shareholders concerning the tribe's ownership in its natural resources and the development thereof." *Id.*

As the Court can see, there is substantial evidence that the Plaintiff partnered with the government when it came its participation in the operation and management of the mineral estate. Inherent in its position as a "partner," the Osage Tribe was a beneficiary with full knowledge of the manner by which the royalty valuation regulations were being interpreted and applied.

---

[8] In particular, the Tribe took an active part in the production of training films aimed at educating tribal and BIA employees regarding "functions and duties of Trust Management and Responsibilities of the Osage Mineral Estate for its respective shareholders." Def.'s Ex. 805.

### E. The Osage Nation and the Federal Oil and Gas Royalties Management Act

In its pretrial brief, Plaintiff explains that, in the early 1980s, Congress and governmental entities, including a Commission chaired by David F. Linowes, examined and criticized the United States' management of federal and Indian oil and mineral resources. Plf.'s Mem. at 16-20. To address the serious deficiencies in the federal royalty management system identified in these studies, Congress enacted the Federal Oil and Gas Royalties Management Act, 30 U.S.C. §§ 1701-1757 ("FOGRMA"), which authorized the Secretary of the Interior to develop a comprehensive system of royalty management.

In hearings conducted on the FOGRMA, Chairman Linowes testified that the Osage Agency, in cooperation with the Osage Tribe, had implemented excellent methods for tracking production that went beyond those used by the United States Geological Survey, which was responsible for managing other Indian oil. In addition, the Acting Principal Chief to the Osage Tribe explained to the Select Committee on Indian Affairs of the United States Senate that "overall, the Bureau of Indian Affairs mineral operations in Osage County has been determined to be operated in an efficient manner." Def.'s Ex. 2377. Notably, Congress ultimately exempted the Osage Tribe from the operation of FOGRMA. 30 U.S.C. § 1702(3).

## II. DEFENDANT'S CONTENTIONS OF FACT AND RESPONSES TO PLAINTIFFS' CONTENTIONS OF FACT - INVESTMENT CLAIMS

### A. THE DEPOSIT OF ROYALTY RECEIPTS

#### 1. The BIA's Deposit Process

During the early Tranche One months, purchasers and lessees sent the majority of their royalty payments to the Osage Agency by check via U.S. Mail. By 1980, purchasers and lessees had begun sending some royalty payments via Electronic Funds Transfer ("EFT"). Shortly thereafter,

purchasers and lessees began sending the majority of their payments via EFT. The royalties owed for the Tranche One leases were paid by EFT during the 1986, 1989, and 1990 Tranche One months.

When a royalty check was received in the mail at the Osage Agency, BIA personnel would log the payment; complete a Bill of Collections for each payee; determine the type of payments received (e.g., oil royalty, gas royalty, etc.); generate a Schedule of Collections listing all of the checks that were to be deposited that day; complete a Certificate of Deposit reflecting the total amount to be deposited that day; and record on an Encoding Sheet the account to which the money was to be credited. Agency personnel sent the checks, the Schedule of Collections, the Certificate of Deposit, and the Encoding Sheet via certified U.S. Mail to the Muskogee Area Office for deposit. The Agency had a daily cutoff time by which to mail deposits to Muskogee on the same day that the payments were received. Generally, the U.S. Postal Service delivered mail from Pawhuska to Muskogee within one day. As a result, payments were typically delivered to Muskogee within one day of their receipt by the Osage Agency.

Upon receipt of these materials, Muskogee Area Office personnel would review them to determine that the accounting information provided was complete and accurate; would enter the necessary data related to the receipt transaction into the BIA's accounting system (centrally located in Albuquerque, New Mexico); and would deposit the funds at a designated Federal depositary, the First National Bank in Muskogee. The deposits were usually made on the same day that the materials were received. The bank would stamp (*i.e.,* confirm) the Certificate of Deposit, give one copy of the Certificate of Deposit to the Muskogee Area Office, and send the original of the Certificate of Deposit to the Federal Reserve Bank. The Muskogee Area Office would then send a copy of the Certificate of Deposit and a copy of the Schedule of Collections back to the Osage Agency.

During the Tranche One period, Treasury made deposited funds available to Interior for investment or disbursement as of the date of the confirmed Certificate of Deposit.

**2. BIA's Efforts to Expedite Receipt and Deposit of Royalty Income**

In order to expedite the deposit of royalty payments, the BIA encouraged purchasers and lessees to make their royalty payments via EFT. In 1979, the Osage Agency Superintendent requested that payments over a certain amount be made by EFT rather than by check.

In another effort in the mid-1980's to improve cash management, the BIA sought to contract with a third-party to provide trust services, including the expedited deposit of receipts. Under the proposed plan, purchasers or lessees making royalty payments would make them directly to the trust services provider, which also would manage the investment of the funds.

In or about 1989, the Osage Agency sought to further expedite the deposit process by requesting the designation of a local Federal depositary in Pawhuska. In January 1990, Treasury designated a Federal depositary in Pawhuska. Thereafter, the Agency could make deposits at that facility instead of mailing them to Muskogee. Generally, the Agency used the same-day cutoff process described above to ensure that checks were deposited on the same day that they were received. By this time, however all of the payments on the Tranche One leases were being made via EFT.

**3. Timing of Deposits of Royalty Receipts for the Tranche One Leases**

Tranche One royalty revenues were credited to one account of the Osage Tribe, account 7386. On only two occasions related to the payment of royalties for the Tranche One Leases for the Tranche One oil production did the time between receipt of payment and deposit at the Federal depositary extend beyond one day. On both occasions, the lag time included a federal holiday.

## B. INVESTMENT OF OSAGE TRIBAL FUNDS

### 1. Interior's investment practices

The Muskogee Area Office and Osage Agency staff shared the responsibility of consulting with the Tribe about investment of its trust funds and of communicating the Tribe's investment instructions to BIA "central office west" officials in Albuquerque, who actually carried out the investment transactions.

When the Muskogee Area Office made a deposit of Osage Nation funds in excess of $25,000, it would notify the Albuquerque-based Chief of BIA's Branch of Investments or one of BIA's investment officers. During the first three Tranche One months, the Branch of Investments would invest amounts that exceeded $25,000. For amounts less than $25,000, the transaction costs to the Government were perceived to exceed the interest income that might be generated by such an investment. Thus, these small amounts were either combined to form sufficiently sizeable investments or allowed to earn four percent interest pursuant to 25 U.S.C. § 161a. After the amendment to section 161a, any amounts that were not otherwise invested were placed on a daily basis in a one-day Treasury nonmarketable certificate that became known as the "Overnighter."

In deciding when and how to invest, pursuant to the discretion granted to the Secretary of the Department of the Interior under 25 U.S.C. § 162a, the Branch of Investments considered the cash needs of the specific Tribe in determining the appropriate maturities of investments. The appropriate maturities for investments of Osage funds were dictated by the 1906 Act requirement to make a quarterly headright payment. Under the 1906 Osage Allotment Act, as amended, the United States is required to disburse to each headright owner his or her share of the mineral estate royalties every three months. To meet this quarterly annuity disbursement requirement, the Branch of Investments

considered securities with maturities of three months or shorter in duration to be appropriate investments of Osage royalty funds.

In addition, the Branch of Investments was limited as to the types of securities that could be purchased with Osage trust funds. According to the Department of the Interior's Bureau of Indian Affairs Manual ("BIAM"), investments were limited by statute to:

> … (1) public debt obligations of the United States; (2) bonds, notes, or other obligations which are unconditionally guaranteed as to both principal and interest by the United States; (3) commercial banks in custodial savings accounts; (4) commercial bank time deposit certificates. The latter two investments must be secured by acceptable collateral security therefore in the form of any public debt obligations of the United States and in any bonds, notes, or other obligations which are unconditionally guaranteed as to both principal and interest by the United States as provided for by Act of June 24, 1938 (25 U.S.C. 162a).

BIAM Supp. 3, Sec. 3.11. par A. Rel 3 6/5/72 (Def.'s Ex. 381).[9] The BIAM also listed obligations of Federal Home Loan Banks and participation certificates of the Federal National Mortgage Association ("Fannie Mae") as other acceptable investments. 42 BIAM Supp 3, Sec 3.11. Due to the relatively short period that the Government held these Osage royalties, however, investments were effectively limited to short-term instruments such as Treasury bills and bank certificates of deposit ("CDs"). Obligations such as Fannie Mae participation certificates had much longer maturity terms. Thus, the primary investment vehicles used by the Branch of Investments for the Osage royalty account during the Tranche One period were U.S. Treasury bills and CDs.

During the Tranche One period, investments in Treasury bills were made daily by telephoning

---

[9] The BIAM provided, further, that "Osage funds are authorized to be invested in other securities by the Act of March 3, 1921 (41 Stat. 1250) and the Act of February 27, 1925 (43 Stat. 1008-1009)." As explained by those statutes, however, those other investments pertained only to funds allocated to, but not paid out, as headright payments to headright owners lacking certificates of competency. *See also Work v. United States ex rel Lynn,* 266 U.S. 161, 168-69 (1924).

the Department of the Treasury by 9:00 am Albuquerque time. Because uninvested receipts already were on deposit with the U.S. Treasury, these investment transactions could be requested by telephone. Written confirmations of requests for purchases and redemptions were prepared by the Branch of Investments and sent to Treasury after the transaction had been executed.

Investments in CDs were made on Tuesdays and Thursdays. The investment cycle for placing money in CDs began approximately two weeks in advance of placing the money. The Branch of Investments first determined the amount of funds that would be available for investment, by maturity, for each Tribe. It then solicited bids from banks that had indicated they wished to accept Indian trust fund deposits. Banks responded with bids a day or two before the Branch of Investments intended to place funds. The bids were evaluated to identify the bidders offering the highest effective yields for the maturities that would meet tribal requirements. Bids were selected based on factors such as the interest rate offered and the availability of sufficient insurance or collateral to secure the principal and anticipated interest payments.[10/]

After making investments, the Branch of Investments sent a form letter to each affected Tribe indicating the actions that had been taken. The letter advised the Tribe of new investments that had been made on its behalf and listed the appropriation (account) number, amount, date of purchase, date of maturity, and interest rate of each such investment.

Prior to 1985, funds that were not otherwise invested (known as "cash balances") earned four percent simple interest per annum. 25 U.S.C. § 161a. Interior would calculate the interest every six months and would place the interest earnings in an interest account associated with the principal

[10/] Because, in the absence of additional collateral, no one Tribe could have deposits at a given financial institution in excess of FDIC/FSLIC insurance limits, the Branch of Investments also had to consider whether a bidder already had any of that Tribe's funds on deposit.

account. The Osage royalties were deposited in account number 7386. The interest account number was 7886.

Beginning in January 1985, cash balances were invested in the Overnighter. At the end of each day, Interior would calculate the amount of otherwise uninvested funds it held in various trust funds. Interior personnel would inform Treasury of that amount, and request that it be invested in the Overnighter. On a daily basis, Interior would record the earnings from the Overnighter in the appropriate trust accounts.

**2. Investment of Tranche One royalty receipts**

Prior to 1985, as soon as deposits of royalty receipts from the Tranche One leases became available to Interior for investment, they would be included in Interior's biannual calculation of four percent interest until they were invested in longer-term securities. After 1985, such funds were placed in the Overnighter on a daily basis until they were otherwise invested.

Soon after receipt, the Branch of Investments sought to place Osage royalty payments in longer-term investments that would mature at or near the date of the annuity payment by which these funds would be disbursed.[11/] In certain instances, when these initial investments matured prior to the date of the relevant annuity payments, Interior reinvested the funds in instruments maturing at or near the annuity payment date.[12/] The funds were invested in either Treasury bills or bank CDs. Due to the short-term nature of the investments that Interior needed to make to ensure availability of the funds for the quarterly disbursements, other available investments such as Fannie Maes were

---

11/ In one instance in 1990, Interior placed funds in an instrument that matured after the annuity payment by which those receipts were expected to be disbursed.

12/ In addition, in some instances, the funds continued to earn four percent, or stayed in the Overnighter.

considered inappropriate for account 7386 and thus were not used.

The Government's expert, Charles Lundelius, evaluated Interior's performance in investing the receipts from the Tranche One leases for the Tranche One months. Mr. Lundelius decided to evaluate the performance of the United States as trustee of the Osage funds under the prudent investor standard. *See* Expert Report of Charles R. Lundelius, Jr. ("Lundelius Report") at 5-7 (Def.'s Ex. 1668). As Mr. Lundelius explains it, the prudent investor must exercise a reasonable degree of care in selecting investments; a reasonable degree of skill in making those selections; and a reasonable degree of caution to ensure the preservation of the funds invested. *Id.* Mr. Lundelius examined the investment practices that Interior followed generally and in investing the Osage funds. He examined the performance of Interior from the date of receipt of the funds from the Tranche One leases to the date that those funds were disbursed as part of a quarterly annuity payment.

Mr. Lundelius determined that the United States fulfilled the duties of care and caution in investing Tranche One funds by following an investment practice that limited investment horizons to match the disbursements for quarterly annuities, limited investment selection to short-term Treasury bills and bank CDs, required that some funds be readily available for the payment of taxes and Tribal Council expenses, and held funds in short-term Treasury securities including the Overnighter until CDs of appropriate maturity became available. To evaluate whether the United States satisfied the duty of skill, Mr. Lundelius evaluated returns achieved on Tranche One funds against a range of expected rates that a prudent investor could have achieved during this time period under the constraints imposed by the duties of care and caution noted above. Mr. Lundelius concluded that the United States met or outperformed the expected rate in five of the six Tranche One periods of investment and, for the sixth, determined that the returns fell just shy of the expected rate.

### C. DISBURSEMENT OF OSAGE FUNDS

Under the 1906 Act, Interior is required to make disbursements to headright owners on a quarterly basis. In the early Tranche One periods, Osage Agency personnel would calculate the annuity payment by adding together the cash balance, the investments and their returns that were to mature at or before the date of the annuity payment, and interest. The Agency would then subtract certain expenses, including the gross proceeds tax on oil to be paid to Oklahoma and the Tribe's quarterly budget expenses, to derive the net amount to be divided among the headright owners. In the latter Tranche One periods, the Tribe's auditor prepared this calculation and then submitted it to Agency personnel for verification.

At the time of the annuity payment, the BIA would 1) prepare internal forms to transfer annuity payments directly into Individual Indian Money ("IIM") accounts for those headright owners who maintained such accounts and 2) send a certified voucher to Treasury's Regional Disbursing Office ("RDO") in Denver, requesting the issuance of checks for annuity payments to those headright owners who did not have IIM accounts. The RDO in Denver would issue the requested Treasury checks, which were drawn against the United States' Federal Reserve Bank account in New York. The issuance of the checks would create a liability of the United States recorded as a credit to the Disbursing Officers Checks Outstanding account in Treasury's central accounting system.

Upon making the internal transfer and sending the voucher to the Denver RDO, the BIA would debit account number 7386. At that point, the funds covering those transactions no longer were available for investment under sections 161a (post 1984) or 162a, and would not accumulate interest under section 161a (pre-1985). This procedure followed longstanding Government accounting practices, whereby funds are debited from the relevant account as soon as a check is

issued, regardless of when the check is negotiated by the payee.

As mandated by the Competitive Equality Banking Act of 1987, Pub. L. No. 100-86, 101 Stat. 552 ("CEBA"), effective October 1989, Treasury cancelled all Federal Government checks that had been outstanding for more than one year and began thereafter to cancel checks outstanding for more than a year on a going-forward basis. The United States' accounting expert, Greg Chavarria, analyzed the Tranche One headright disbursements to determine the percentage of checks that had been cancelled under this so-called "mass cancellation" and whether the proceeds of those checks were refunded to Interior for return to the Osage royalties account. Mr. Chavarria has determined that the percentage of Tranche One headright owner checks that were cancelled was approximately .01% and that the proceeds of three Tranche One checks totaling $4,510.54 were not returned to Interior for return to the Osage royalty account.

### D. TRIBE'S INVOLVEMENT IN AND KNOWLEDGE OF INTERIOR'S FUND MANAGEMENT

Since approximately the late 1970's, the Tribe has engaged auditors who closely monitor the deposits and investments of Osage funds. The auditors have had full access to Interior's financial documents related to the Tribe. They frequently reviewed those documents, and, where discrepancies or problems were identified, sought corrective action. Moreover, the Tribe was aware that its funds stopped earning any interest or investment income once funds were withdrawn from account 7386 in order to make a headright payment.

## APPLICABLE LEGAL PRINCIPLES AND CONTENTIONS OF LAW

## I. BURDENS OF PROOF AND STANDARDS OF REVIEW

The fact that the United States has a fiduciary relationship with the Osage Tribe does not, of itself, give rise to a valid claim of breach of trust, compensable by money damages. *Pawnee v. United States*, 830 F.2d 187, 191 (Fed. Cir. 1987). In this case, this Court has been called upon to determine whether: 1) the particular duties set forth in the statutes and regulations that constitute the basis of the Osage Tribe's claims against the United States are "money-mandating duties" under *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) and *United States v. Mitchell*, 463 U.S. 206, 219 (1983) ("*Mitchell II*"); 2) whether the United States breached those duties; and 3) whether the Osage Tribe has suffered compensable damages as a result of any such breach.[13]

### A. Plaintiff bears the burden of showing the existence of a money-mandating duty

Although the Court has identified money-mandating duties that apply to the United States related to the claims that Plaintiff had articulated as of the time the parties briefing concluded on July 25, 2005, Plaintiff has since articulated more specific claims that fall outside the scope of those money-mandating duties. These claims, as explained in Defendant's Motion to Dismiss, in Part, filed on December 2, 2005, should be dismissed for lack of jurisdiction because Plaintiff has demonstrated no money-mandating duty supporting the claims.

### B. Plaintiff bears the burden of showing the Government breached a money-mandating duty

Plaintiff bears the burden of establishing that the Government breached a money-mandating

[13] The Osage Tribe argues that the oil and gas leases themselves impose fiduciary obligations on the Government. But the leases explicitly incorporate the regulations, which set forth the duties that form the basis of Plaintiff's royalty claims.

duty. The Government does not, as Plaintiff suggests, bear the burden of showing that it discharged its duties.

**1. Plaintiff bears the burden of proof of showing a breach of fiduciary duty**

In *Confederated Tribes of Warm Springs Reservation v. United States*, 248 F.3d 1365 (Fed. Cir. 2001), the Court examined the burdens associated with establishing damages in a breach of trust case. The Court's opinion demonstrates that, prior to considering damages, Plaintiff must first establish a breach of a money-mandating duty. *See, e.g., id.* at 1371 ("once the beneficiary has shown a breach of the trustee's duty"); *id.* at 1373-74 ("'once the beneficiaries have established their *prima facie* case by demonstrating the trustee's breach of fiduciary duty . . . .'") (citation omitted); *see also Roth v. Sawyer-Cleator Lumber Company*, 16 F.3d 915, 917 (8th Cir. 1994) ("ERISA plaintiffs bear the burden of proving a breach of fiduciary duty. . . .") (cited in 248 F.3d at 1371). Unless Plaintiff demonstrates a breach, the Court need not consider its damages claims.

**2. Plaintiff retains the burden of proof as to damages, even in this fiduciary context**

In addition to establishing a breach of money-mandating duty, Plaintiff must establish a prima facie case that losses were incurred due to the breach. *Warm Springs*, 248 F.3d at 1371-74. Traditionally, when establishing damages, a plaintiff must show with some particularity the losses incurred from the breach. *Id.* A plaintiff may be relieved of the burden to show the precise measure of damages, although not of the burden to show the incurrence of some damages, in the context of a beneficiary-trustee relationship. As the Court in *Warm Springs* noted, "[i]t is a principle of long standing in trust law that once the beneficiary has shown a breach of the trustee's duty and a resulting

loss, the risk of uncertainty as to the amount of the loss falls on the trustee." 248 F.3d at 1371.[14] At a minimum, to support an award of damages, the Court must find that damages traceable to a breach are "within a reasonable degree of approximation." *Id.* at 1372.

**3. The absence of an accounting does not shift the burden of proof to the Government to show the proper discharge of its duties**

Plaintiff asserts that "in the absence of a proper accounting, the United States as Trustee bears the burden of proving that it has properly discharged its duties. . . ." Plf.'s Mem. at 49. Plaintiff is mistaken. The existence or absence of an accounting does not excuse Plaintiff from bearing its burden of proving breaches of duties in this suit for money damages. Rather, the limited accounting that a Court of Federal Claims can oblige the Government to provide would be one that is incidental to establishing damages.

The Trust Reform Act of 1994 requires the "Secretary [to] account for the daily and annual balance of all funds held in trust . . . invested pursuant to" 25 U.S.C. § 162a, and to provide periodic statements of performance with respect to funds deposited pursuant to section 162a, which statements are to identify "(1) the source, type, and status of the funds; (2) the beginning balance; (3) the gains and losses; (4) receipts and disbursements; and (5) the ending balance." 25 U.S.C. § 4011(1), (b). This legislation does not require Interior to show how it has discharged its duties, as Plaintiff suggests an accounting would demonstrate. Further, the Appropriations Act for Interior stops the statute of limitations from commencing on any claim "concerning losses to or mismanagement of trust funds

---

[14] Defendant notes that the Court in *Warm Springs* relied on cases addressing this matter in the context of private fiduciaries, which context does not necessarily extend to the Government acting in a fiduciary context. The extent to which the Government should bear the risk of uncertainty as to damages should be tempered by the fact that this case arises in the context of a waiver of sovereign immunity. Such waivers should be strictly construed. *See Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988).

. . . until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine *whether there has been a loss*."[15] Consolidated Appropriations Act of 2005, Pub. L. No. 108-447, 118 Stat. 2809, 3060-61 (emphasis added). The Appropriations Act does not state that the accounting that must be provided must allow the affected Tribe to determine whether there has been a breach of a fiduciary duty.

In short, although an accounting can assist in showing whether there was a loss, the lack of an accounting is not in itself sufficient to establish that the Government's conduct constituted a breach of a money-mandating duty. In any event, Plaintiff cannot dispute that it has been provided statements of account, access to purchaser and lessee statements, and detailed information related to its investments. Although the issue of whether this information is sufficient to discharge Defendant's accounting duties is not presently before the Court, the existence of the information further undermines Plaintiff's suggestion, due to insufficient information to prosecute its claims, the burden is on Defendant to show it discharged its duties.

## A. Standards of Review for Weighing Plaintiff's Case Against the United States

### 1. Deferential standard to be applied to the Government's interpretation of its statutory and regulatory duties

Statutory interpretation starts with the language of the statute itself. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). When there is no "clearly expressed

[15] Plaintiff also states that, to fulfill its duty to account, the trustee must keep records of "what gains have accrued and what losses have occurred, receipts, expenditures, and allocations between principal and interest." Plf.'s Mem. at 49, *citing Red Lake Band v. United States*, 17 Cl. Ct. 362, 374 (Ct. Cl. 1989). As Defendant will show, the records sufficient to trace the receipts, accrued gains, and disbursements of Tranche One royalties exist and thus, the available evidence related to Plaintiff's claims provides a sufficient basis upon which the Court may determine whether Defendant has breached any of its money-mandating duties.

legislative intention to the contrary," the language of the statute "must ordinarily be regarded as conclusive." *Id.* Where the statutory language is plain and unambiguous, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989).

In appropriate circumstances, the Court may apply the "Indian canon of construction" to interpret statutory terms. Under this canon, statutes are to be construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit. *See, e.g., Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997); *see also HRI Inc. v. EPA*, 198 F.3d 1224, 1245 (10th Cir. 2000) (expanding this rule to encompass interpretation of federal regulations).

The Federal Circuit has noted, however, that, unless statutory language is ambiguous, it need not apply the Indian canon of construction. *Thompson v. Cherokee Nation*, 334 F.3d 1075, 1090 n. 15 (Fed. Cir. 2003). On the same point, the Supreme Court has noted that "even though 'legal ambiguities are resolved to the benefit of the Indians,'courts cannot ignore plain language that, viewed in historical context and given a 'fair appraisal,' clearly runs counter to a tribe's later claims." *Oregon Dept. of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 774 (1985) (quoting *DeCoteau v. District County Court*, 420 U.S. 425, 447 (1975); *Washington v. Washington Commercial Passenger Fishing Vessel Ass'n.*, 443 U.S. 658, 673, (1979)); *see South Carolina v. Catawba Indian Tribe*, 106 S.Ct. 2039, 2044 (1986) ("The canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress."); *Rice v. Rehner*, 463 U.S. 713, 732 (1983) (canon of construction regarding certain Indian claims should not

be applied "when application would be tantamount to a formalistic disregard of congressional intent"); *Andrus v. Glover Construction Co.*, 446 U.S. 608, 618-19 (1980); *DeCoteau v. District County Court*, 420 U.S. at 447 ("A canon of construction is not a license to disregard clear expressions of tribal and congressional intent").

In addition, courts have concluded that the Indian canon should not apply when an agency's interpretation deserves *Chevron* deference. *Williams v. Babbitt*, 115 F.3d 657, 663 n. 5 (9th Cir. 1997) (holding that the Indian canon "liberal construction rule must give way to agency interpretations that deserve *Chevron* deference because *Chevron* is a substantive rule of law."); *see also Haynes v. United States*, 891 F.2d 235, 239 (9th Cir. 1989) (declining to apply Indian canon of construction "in light of competing deference given to an agency charged with the statute's administration"); *Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d 1335 (9th Cir. 1990) (same); *Chugach Alaska Corp. v. Lujan*, 915 F.2d 454, 457 n. 4 (9th Cir. 1990) (finding that the Indian canon of construction does not apply when the agency charged with administering the statute is owed deference); *but see Ramah Navajo*, 112 F.3d at 1462. Recently, in *Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir. 2005) the D.C. Circuit Court granted *Chevron* deference to the Department of the Interior in the context of determining the character of the accounting owed to individual Indians. In reversing the district court injunction, it stated that the district court had "erroneously displaced Interior as the actor with primary responsibility for 'work[ing] out compliance with the broad statutory mandate.'" *Id.* at 1076 (citing *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004)).

In reviewing an agency's construction of a regulation that it implements, the Court has even less basis to apply the Indian canon of construction. Federal agencies, including Interior, are granted a higher degree of deference to their interpretation of their own regulations than they are to their

construction of statutes. *See, e.g., Udall v. Tallman*, 380 U.S. 1, 16 (1965); *Independent Petroleum Ass'n v. Babbitt*, 92 F.3d 1248, 1257 (D.C. Cir. 1996) (while courts generally "defer to an agency's reasonable interpretation of a statute it is entrusted to administer so long as it is not inconsistent with the unambiguously expressed congressional intent, . . . '[d]eference is even more clearly in order when an agency interprets its own administrative regulations.'"); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 718 (8th Cir. 1979) (the Court should uphold Interior's interpretation unless it is "inconsistent with the statute under which the regulations were promulgated, is plainly inconsistent with the wording of the regulation, or otherwise deprives affected parties of fair notice of the agency's intentions."); *Burlington Resources Oil & Gas Co. v. Department of Interior*, 21 F.Supp.2d 1, 5 (D.D.C. 1998) (the Court is obliged "to give 'substantial deference' to an agency's interpretation of its own regulations, and so long as the agency's interpretation of its own regulations is 'within the range of reasonable meanings,' the Court must uphold the agency's interpretation.").

In light of this heightened deference to an Agency's interpretation of its own regulations, the Indian canon should not automatically prevail over this deferential standard, even in the face of regulatory ambiguity. *But see Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1567, 1569 (10th Cir. 1984) (concluding that, when the Secretary of the Department of the Interior has more than one reasonable interpretation of a regulation implicating the government's trust responsibilities to tribes, the Department's trust responsibilities to tribes require that it apply the interpretation that best serves the tribes' interests). Moreover, as in statutory construction, the Indian canon of construction should not be used when the regulatory language is unambiguous, as is generally the case with the Osage regulations.

**2. Standard of review to apply to Agency's discharge of its statutory and regulatory duties**

After delineating the precise contours of the Government's money-mandating duties through application of the above standards, the Court must then ascertain the standards to apply to its determination of whether the Government breached those statutory and regulatory duties.

The starting point for the Court's determination of the applicable standard of review to apply to the issue of whether the Government breached a fiduciary duty is the statutory or regulatory language that forms the basis of Plaintiff's claim. "[T]he scope and extent of the fiduciary relationship . . . is established by the regulation and leases. Appellants cannot create a viable fiduciary claim purely by insisting that [the court] establish different or higher standards."[16/] *Pawnee*, 830 F.2d at 191; *see, e.g.*, *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (finding standard of review in bid protest case in 28 U.S.C. § 1491(b)(4)); *Chapman Law Firm v. United States*, 63 Fed. Cl. 519, 522 (CFC 2005) (same).

When a statute does not explicitly reference a standard of review, the Court should look to the language and structure of the statute to determine if it implicitly suggests an appropriate standard. *See United States v. Booker*, 543 U.S. 220 (2005) (citing *Pierce v. Underwood*, 487 U.S. 552, 558-60 (1988); *Koon v. United States*, 518 U.S. 81, 99 (1996)). If, for example, the language in the statute describes the duties it imposes as discretionary, the abuse of discretion standard should be the appropriate standard of review.

In the absence of an explicit or implicit statutory standard of review to apply to the

---

[16/] In the case before this Court, the scope of the fiduciary duties on Plaintiff's royalty claims are established primarily (with the exception of the royalty rates) by the regulations incorporated into the leases.

consideration of Plaintiff's breach of fiduciary duty claims, the Court of Claims *en banc* held, the "controlling standards for determining breaches of fiduciary obligations," *Mitchell v. United States*, 664 F.2d 265, 274 n. 17, 229 Ct. Cl. at 16 n. 17 (Ct. Cl. 1981), are as follows:

> . . . [T]he standard by which Interior's actions are to be judicially tested is, not the court's or plaintiffs' own view of the preferable conduct, but *the normal standard for government fiduciaries-were their actions in good faith and within the realm of their acceptable discretion, or were they arbitrary, capricious, in abuse of discretion, or contrary to law?* We repeat, too, the caution that all the rules governing the relationship between private fiduciaries and their beneficiaries do not necessarily apply in full vigor to Indian claims against the United States. "In each situation, the precise scope of the fiduciary obligation of the United States and any liability for breach of that obligation must be determined in light of the relationships between the Government" and the Indians.

*Mitchell*, 229 Ct. Cl. at 14 (emphasis added), *quoting Navajo Tribe of Indians v. United States,* 624 F.2d 981, 988 (Ct. Cl. 1980); *see also Pawnee*, 830 F.2d at 191 n.6 (finding that plaintiff had not alleged an abuse of discretion or arbitrary and capricious action).

Alternatively, in examining a claim that the United States breached a fiduciary duty in the absence of statutory guidance as to the standard, courts have also held the Government to a reasonableness standard. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475 (2003) (stating that standard of responsibility is "such care and skill as a man of ordinary prudence would exercise in dealing with his own property") (citations omitted). Defendant will demonstrate that the Government's discharge of its duties met either standard. Accordingly, for purposes of this trial, and without conceding that an arbitrary and capricious standard is not the appropriate standard, the United States will assume that the standard of reasonableness applies where statutory guidance is lacking. In applying that standard, the Court should decline to adopt its or plaintiff's own view of the preferable conduct, so long as the conduct was reasonable. *Mitchell*, 664 F.2d at 274, 229 Ct. Cl. at 14.

### 3. The Court should decline to adopt Plaintiff's inappropriate "highest standard of care"

The Court should decline to adopt Plaintiff's position that the United States owes to the Tribe "the very highest standard of care." Plf.'s Mem. at 46. Initially, the standard is problematic because it lacks particularity, while an arbitrary and capricious or reasonableness standard have well-established pedigrees and are well-understood. More importantly, however, the cases that Plaintiff cites in support of its standard involved different statutory schemes entailing broad equitable jurisdiction, not, as here, a waiver of sovereign immunity in the context of money damages.

For example, the primary case on which Plaintiff relies, and upon which other cases cited by Plaintiff relied, is *Seminole Nation v. United States*, 316 U.S. 286 (1942). Therein, the Supreme Court stated that the United States has a "distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people." *Id.* at 296. In *Seminole*, the Court addressed claims arising under 43 Stat. 133, which conferred "jurisdiction on the Court of Claims to adjudicate 'all legal and equitable claims,' arising under treaty or statute, which the Seminole Nation may have against the United States. . . ." 316 U.S. at 295. The Court addressed the Tribe's claim grounded in treaty obligations and treated the claim as one based on equity. *Id.* at 296, 298. It was in the context of considering the equitable claim that the Court required compliance with "the most exacting fiduciary standards." It was therefore appropriate for the Court to apply heightened standards in this context. But, decisions adopting this standard in other contexts not involving equitable jurisdiction are suspect and should not be followed.

The context of the case before this Court is different than that addressed in *Seminole*. This case is based on the jurisdiction granted by the waiver of sovereign immunity in the Tucker Act and Indian Tucker Act. 28 U.S.C. §§ 1491, 1505. Neither of these acts provides the Court with equitable

jurisdiction. Moreover, in the context of a waiver of sovereign immunity, the Court should strictly construe not only whether Plaintiff has a claim but also the standards on which the claim should be judged. *See United States v. King*, 395 U.S. 1, 4 (1969); *United States v. Sherwood*, 312 U.S. 584, 586 (1941). In short, the Court should not accede to Plaintiff's insistence that the court "establish different or higher standards." *Pawnee*, 830 F.2d at 191.

## II. LEGAL CONTENTIONS RELATED TO ROYALTY CLAIMS

### A. Duty to Verify Accuracy of Payments Made

In its October 27, 2005, decision this Court explained that the United States has a "fiduciary duty to verify that lessees fulfill their contractual obligations to the Tribe by verifying the accuracy of payments made. . . ." 68 Fed. Cl. 322, 333. Because the 1906 Act, which created the forgoing money-mandating duty, is silent as to the appropriate standard of review, the Court should apply an arbitrary and capricious standard to determine whether the Government breached its duty. As explained above, Defendant will assume, for purposes of this trial, that a reasonableness standard applies instead. Under either standard, Defendant has discharged its duties to verify accurate payments. In determining whether the Agency properly determined the contours of this duty through its definitive interpretations of the Osage pricing regulations, the Court should grant due deference to the Agency's construction.

### B. The contours of the Government's duty to verify payments

#### 1. Requirements of regulations

As explained *supra*, the regulations require a lessee to value its oil for royalty purposes at the highest of its actual selling price, posted price of a major purchaser, or offered price of a major purchaser in the relevant geographic area. 25 C.F.R. § 226.11. Plaintiff asserts that, consistent with

the Government's trust duty, the manifest purpose of this regulation is to obtain royalties based on the highest value of any oil sold or subject to an offer in the geographic area. Plf.'s Mem. at 59. Plaintiff offers a misguided construction of the purpose of the regulations, which would not be in the best interest of the Osage Nation.

A more reasonable construction of the regulations, one which the Government as well as the Tribe recognized as being in the best interest of the Osage contemporaneously with the Agency's implementation of the regulations as opposed to the post-hoc reasoning Plaintiff offers now, provides for ensuring that the lessees paid royalties on the price of oil that, through the exercise of appropriate diligence, they could have received. As will be shown below, requiring lessees to pay royalties on a price that was higher than they could possibly receive would have created disincentives that could have reduced production of Osage oil and could have, in turn, resulted in a decrease in the total revenues the Osage would have earned for this resource.

**2. The Court should uphold the Osage Agency's interpretation of the pricing regulations**

**a. The IBIA decision in *Okie Crude* provides the definitive interpretation of the pricing provision of the Osage regulations**

**i. Background**

In 1990, one of the major purchasers of oil in Osage County, Farmland Industries, Inc. ("Farmland"), initiated a program to offer certain lessees a guaranteed price for oil in specified months, known as a "forward purchase floor price." *Okie Crude*, 23 IBIA at 176-77, 179 (Def.'s Ex. AR001.00). Through this program, Farmland sought to ensure that two of its refineries would receive a known monthly quantity of oil from wells conveniently located to Farmland's truck and pipeline gathering system. Farmland contracted with certain well operators to purchase in 1000 barrel lots

their oil for certain specified future months at the higher of a minimum price[17/] or Farmland's weighted average posted price for the month. Notably, given Farmland's requirements for its contracts that the wells be conveniently located and produce a minimum volume, Farmland did not offer this arrangement to all lessees in Osage County. *See* 23 IBIA at 176-77.

In the ensuing months, due to the Iraq invasion of Kuwait, oil prices fluctuated and, in some months, Farmland's minimum price exceeded the highest posted prices in Osage County. The lessees paid royalty based on the actual selling price it received from Farmland because it was higher than the highest posted price. May 31, 1991 letter.

In early 1991, the Osage Agency became aware of the Farmland contracts and evaluated whether it necessitated under the Osage regulations the recalculation of other lessee's royalty payments. Brf. of Appellee at 4. The Osage Agency provided notice to all Osage County oil lessees regarding the BIA's consideration of whether to recalculate royalties owed, attended a meeting with the Mineral Committee of the Osage Tribal Council and other interested parties including purchasers and lessees, and solicited and considered position papers related to the matter from interested parties. *Id.* at 5-7; 23 IBIA at 178. Based on these deliberations, the Agency decided to collect from lessees additional royalties. The royalties were recalculated based on the actual selling prices of the program (those offered by and paid to Farmland)[18/] to the extent such prices were higher than the actual sales price or highest posted prices on which lessees had based their royalty payment. Brf. of Appellee at 7-8 (Def.'s Ex. AR004.00; 23 IBIA at 178. On October 21, 1991, the Muskogee Area Director sent

---

17/ The minimum price mirrored the price at which like production was being traded on the New York Mercantile Exchange (a futures market) for the months specified in the contract. May 31, 1991 letter; Affidavit of Michael F. O'Brien.

18/ as well as Koch Oil and Sun Oil

its decision with attached billing information to each lessee. The decision provided, in part:

> This additional royalty is due because certain "major purchasers" made agreements with some of their sellers over a three year period (1988 through 1991) whereby the purchaser offered and paid more for certain oil than the price commonly called the "highest posted price." Each time such a transaction occurred, it had the effect of establishing that price as the royalty price for all oil in the Osage Mineral Estate. Therefore, each day one of these purchases took place, the royalty price was increased to the higher amount per barrel. If two such transactions occurred, the royalty price is considered to be the higher of the two.

Def.'s Ex. AR144.01.01; 23 IBIA at 178. Thereafter, most of the lessees duly filed appeals to the IBIA, which subsequently established a joint briefing schedule and consolidated the cases for purposes of its decision. 23 IBIA at 179. Three individual or groups of lessees submitted briefs and the IBIA issued its decision reversing the Area Director on February 5, 1993.

**ii. Board's Discussion and Conclusions**

The IBIA defined the issue on appeal as whether, under 25 C.F.R. § 226.11 (both the version amended in 1990 and its predecessor), "Farmland's forward purchase floor price could be used as the basis for royalty determinations for any person other than a person participating in Farmland's program." 23 IBIA at 179. To resolve this issue, the Board construed the meaning of the key regulatory terms in section 226.11, namely "bona find selling price" in the 1990 regulations or "actual selling price" in the 1974 regulations, "posted price," and "offered price." The Board stated that, in defining these terms' meaning,

> "[r]egulations are interpreted in accordance with traditional principles of statutory construction." *Solano Garbage Co. v. Cheney*, 779 F. Supp. 477, 487 (E.D. Cal. 1991). In particular, "[t]he words used in the regulation are to be given their plain and ordinary meaning." *Diaz v. United States Immigration & Naturalization Service*, 648 F. Supp. 638, 644 (E.D. Cal. 1986). *See also Colorado Department of Labor & Employment v. United States Department of Labor*, 875 F.2d 791, 797 (10th Cir. 1989); *United States v. Unitank Terminal Service*, 724 F. Supp. 1158 (E.D. Pa. 1989). Words which are technical terms or terms of art are given their technical meaning. *Tohono O'odham Nation v. Acting Phoenix Director*, 22 IBIA 220, 231 (1992);

*Melsheimer v. Assistant Secretary of Indian Affairs*, 11 IBIA 155, 160 (1983).

23 IBIA at 180.

Referring to general contract law, the Board defined "bona fide selling price" as applied to 25 C.F.R. Part 226, as "the price, reached as a result of an honest, or 'arms-length,' transaction, at which a willing oil producer will sell a given quantity and quality of crude to a willing buyer." 23 IBIA at 180.

In defining "posted price," the Board noted that it was a term of art in the oil and gas industry and should be given its technical meaning, which the Board found in the leading treatise in oil and gas law. 23 IBIA at 180-81, *citing* 8 Williams and Meyers, *Oil and Gas Law*, 930 (1992) (quoting Temp. Treas. Reg. § 150.4989-1(c)(8)(B); *also citing United States Department of Energy v. Osborn*, 760 F.2d 282, 284 (Temp. Emerg. Ct. App. 1984). *See also* Appellant Acott's Brf. at 27-31 (Def.'s Ex. AR005.00). The Board defined "posted price" as "a written offer which was publicly circulated to all producers in the area or field." 23 IBIA at 182.

The Board defined "offered price" by reference to general contract law, including as defined by *Black's Law Dictionary* and the Restatement (Second) of Contracts, § 24 (1981). The Board concluded, for purposes of 25 C.F.R. Part 226, that "'offered price' is the price presented to a producer by a willing buyer for a given quantity and quality of oil." 23 IBIA at 181. The Board further noted that "an 'offered price' need not be made in writing and to all producers" and therefore is different from a "posted price." The Board's construction gave the two types of prices different meanings, which avoided rendering them "meaningless and superfluous, a situation which the Board attempts to avoid in construing a regulation." *Id.* (citation omitted).

In applying these definitions to the issue of whether Farmland's forward purchase floor price

should form the basis for determining royalty for all lessees, the Board addressed each of the three prices set forth in 25 C.F.R. § 226.11. The Board first noted that the purchase floor price was not a posted price because it was not a publicly circulated written offer to all producers in the area or field. 23 IBIA at 182.

Next, the Board determined that the floor price was a "bona fide selling price" for those purchasers that participated in Farmland's program. But, the Board concluded, that selling price could be used for determining the royalty owed from the lessee who actually received the selling price, but not for a lessee that did not receive that price. 23 IBIA at 182-83.

Finally, the Board held, as to "offered price," that the regulations do not alter the general rules of contract law, which "provides that an offer is controlled by the offerer, is personal to the offeree, and can be accepted only by the person to whom it is made." *Id.* at 183. The Board concluded that "a price that is not offered to a producer is not an 'offered price' as to that producer within the meaning and intent of 25 C.F.R. § 226.11(a)(2)." *Id.* This construction distinguished between "posted" and "offered" price to prevent the language of the regulation from being superfluous.[19/]

[19/] In addition, the Board concluded that the Farmland offers were not made on the date of sale or removal of the oil because they were futures prices that had been offered and accepted in advance of the actual day of sale or removal. 23 IBIA 183-84.

**iii. The Agency's interpretation was correct**[20]

In examining the Agency's interpretation of its regulation, the starting point is the language of the regulation itself. *See Bailey v. United States*, 59 Fed. Cl. 743, 747-48 (2004). As the IBIA appropriately found, the terms of the Osage regulations were not, as Plaintiff asserts, ambiguous. Merely because the regulation did not explicitly define these terms does not make them ambiguous. *American Fed'n of Gov't Employees, AFL-CIO v. Glickman*, 215 F.3d 7, 10 (D.C. Cir. 2000) (holding that "the lack of a statutory definition does not render a term ambiguous. . . . It simply leads us to give the term its ordinary, common meaning."). In determining the plain meaning of the regulatory terms, the Court should apply the "fundamental canon of statutory construction [providing] that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). The Board appropriately followed this method of determining the *plain* meaning of the regulation.

The Board also did not err in referencing dictionaries and technical manuals (Williams and Meyers, *Oil and Gas Law*), among other materials, to determine the ordinary meaning of the regulation's terms. *See American Express Co. v. United States*, 262 F.3d 1376, 1381 n. 5 (Fed.Cir. 2001) (noting that "[i]t is appropriate to consult dictionaries to discern the ordinary meaning of a term not explicitly defined by statute or regulation"). The Board did not need to apply the Indian Canon of construction because the pertinent regulatory terms, as ordinarily understood, admitted to a plain

[20] As set forth in Defendant's Motion in Limine to Preclude Plaintiff from Challenging Interior's Interpretation of Osage Regulations In *Okie Crude Co. V. Muskogee Area Director*, the Court should consider Interior's interpretation of the term "offered price," as well as the other regulatory terms defined in *Okie Crude*, as established for purposes of this trial.

meaning. *See Thompson v. Cherokee Nation*, 334 F.3d 1075, 1090 n. 15 (Fed. Cir. 2003).[21]

**a) Actual selling price / bona fide selling price**

The Court should uphold the Board's construction of the plain meaning of the term "bona fide selling price" as applied to 25 C.F.R. Part 226, which definition equally applies to the term "actual selling price" in the 1974 regulations. The Board defined the term as "the price, reached as a result of an honest, or 'arms-length,' transaction, at which a willing oil producer will sell a given quantity and quality of crude to a willing buyer." 23 IBIA at 180.

The Court should also defer to the Board's conclusion that the selling price could be used for determining the royalty owed from the lessee who actually received the selling price, but not for a lessee that did not receive that price. *Id.* at 182-83. The plain language of the regulation requires this result. In pertinent part, the value of the oil for royalty purposes is to be based on the highest of "the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area." 25 C.F.R. § 226.11. It is plain from this language that it does not mean the actual selling price, highest posted price, or offered price of a major purchaser. Such a construction would read out of the regulation the "or" following the "selling price." Moreover, if "major purchaser" was intended to modify the price actually received, the regulation would have stated that the value is to be determined on the "actual price paid" from the purchaser, rather than the "actual selling price," which is the price received by the lessee. In short, it is plain that the "actual selling price" is unrelated to the major purchasers.

There are two additional reasons to decline to follow Plaintiff's suggestion that a lessee

[21] Because the definition of "posted prices" did not play a significant role in the Board's decision, that aspect of its decision is not discussed herein.

should base its royalty on the actual price paid to other lessees. To do so would require interpreting the regulatory language as requiring settlement to be based on "*any* actual selling price," as opposed to "*the* actual selling price." "The" is "[a]n article that particularizes the subject spoken of." *Black's Law Dictionary* 1324 (5th ed. 1981); *see also Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed.Cir.2003) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" (internal quotation omitted)). In short, the regulation's plain language does not support Plaintiff's interpretation. Furthermore, although the language in the 1990 regulations modifies this phrase to state "settlement shall be based on the highest of the bona fide selling price, posted or offered price by a major purchaser. . . ," 25 C.F.R. § 226.11, there is no evidence that the Agency intended to modify the understanding that the selling price applied only to the lessee who actually received the selling price.

Finally, implementing an interpretation whereby a lessee was responsible for payment of royalties based on the actual selling price (or bona fide selling price) of any lessee would be extremely impractical to implement. The regulations provide that "payment shall be made at the time of sale or removal of the oil. . ." 25 C.F.R. § 226.11. In addition, the regulations provide that "all payments shall be due by the 25th day of each month and shall cover the preceding month." 25 C.F.R. § 226.13(a). It would be extremely difficult, if not impossible, for a purchaser or lessee to know at the time of sale or removal of the oil or by the 25th day of the month following production the actual selling price that all lessees had received. This was particularly true under the 1974 regulations, which would have required the lessee to obtain the actual selling prices for the Kansas-Oklahoma area, an impossibility. Even under the 1990 regulations, which restricted the area to Osage

County, it would not have been until some future date, after the Agency had accumulated and analyzed all actual sales data, that a lessee would find out whether another lessee's actual selling price exceeded the price on which it paid royalties. At that future date, the lessee would owe not only the additional royalties but also a late fee, 25 C.F.R. § 226.13(a), despite the fact that the lessee would not have had the information to pay timely based on the higher actual selling price. In contrast, under the proper construction of the regulation, a lessee would know the highest posted prices, its own actual selling price, and any offer that it had received such that it could pay the correct royalty on the due date.

**b) Offered price**

The Court should uphold the Board's construction of the plain meaning of the term "offered price" as applied to 25 C.F.R. Part 226. The interpretation that "a price that is not offered to a producer is not an 'offered price' as to that producer" comports with the ordinary definition of the term offer in contract law. *Black's Law Dictionary* 975 (5th ed. 1981); Restatement (Second) of Contracts, § 24 (1981). An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts, § 24. "An offer can be accepted only by a person whom it invites to furnish the consideration." *Id.* § 52. Further, "[t]he offeror is the master of his offer; just as the making of any offer at all can be avoided by appropriate language or other conduct, so the power of acceptance can be narrowly limited." *Id.* § 29, cmt. A. As the IBIA correctly determined from these definitions, "an 'offered price' is subject to the control of the offeror and personal to the offeree." 23 IBIA at 181.

Implicit in the Board's holding is that a lessee should not be responsible for paying royalties

on a price that it could not obtain. This does not mean that the regulations were not designed to ensure that lessees had the incentive to obtain an appropriate market price for the oil it sold.[22/] Lessees had to pay on, at least, the highest posted prices, which were based on "bona fide public offers of general applicability to crude oil producers in the field" 23 IBIA at 181 (quoting 8 Williams and Meyers, *Oil and Gas Law*, 930 (1992)), and were thus available to all producers in the market served by purchaser's price postings.

Interpreting "offered price" as an offer extending to all Osage oil producers would also have made the term "posted price" in the regulations surplusage. *See Cammarano v. United States*, 358 U.S. 498, 505 (1959) (rejecting construction of regulation that would render a phrase "pure surplusage")."Posted prices" are, by definition, offers of general applicability. To avoid giving "offered price" the same superfluous definition as "posted price," the Board correctly decided to give the term its ordinary meaning under contract law, which provides that an offer is between the offeror and offeree only.[23/]

Finally, implementing an interpretation whereby a lessee was responsible for payment of royalties based on any private offer that any lessee received would be as impractical to implement as making a lessee responsible for payment of royalties based on the actual selling price of any lessee. It would, again, be extremely difficult, if not impossible, for a purchaser or lessee to know at the time of sale or removal of the oil or by the 25th day of the month following production when payment is

---

[22/] Of course, at least in arms-length transactions, the incentive of a lessee would be to maximize the price at which it sold its oil.

[23/] For another distinction between an offered and posted price see *Mountain Fuel Supply Co. v. United States Department of Energy*, 656 F.2d 690, 692 (Temp. Emer. Ct. of Appls. 1981) (explaining that a posted price does not include premiums above posted prices) (*citing* 38 Fed. Reg. 33,578 (Dec. 6, 1973).

owed of the private offers all lessees may have received. Moreover, the Agency would not be able to identify all potential private offers either in the Oklahoma-Kansas (1974 regulations) or in Osage County (1990 regulations). Given this difficulty, to interpret the regulations in a manner to avoid absurdities requires a construction of the regulations such that an individual producer/lessee must take into account only the offers it actually received.

In summary, the Court should uphold Interior's interpretation of the Osage pricing regulations as set forth in the Board's decision in *Okie Crude*. That interpretation should guide the Court's determination of whether Interior breached a duty related to its collection and verification of the royalty payments on the Tranche One leases for the Tranche One months.

**b. The ordinary meaning of "posted price" supports the Agency's application of gravity adjustments**

Plaintiff asserts that the United States breached its duty by applying gravity [24/] adjustments to posted prices when calculating royalties. Plaintiff notes that neither the Tranche One leases nor the regulations limit the determination of royalty value to the price of oil of the same physical or legal characteristics as the oil produced on the Tranche One leases. It asserts that, by adjusting prices downward to reflect the gravity of the oil from Tranche One leases, the Osage Agency did not apply the "highest posted price" from the regulations. Plf.'s Mem. At 67-68. Plaintiff's position is ill-founded, as it ignores the plain meaning of the term "posted price."

From the time that it applied the 1915 regulations to present, Interior has consistently implemented its regulations in a manner that recognizes gravity adjustments. Interior's long-standing

---

[24/] The gravity of oil reflects its quality. Highest posted prices were tied to the oil's particular gravity and purchasers or lessees paid the price associated with the particular oil gravity.

and consistent practice of recognizing gravity adjustments established a definitive interpretation of the pricing regulations that deserves deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944); *Torch Operating Co. v. Babbitt*, 172 F. Supp. 2d 113, 125 (D.D.C. 2001) (finding that a consistent practice established a definitive agency interpretation of its regulations). Moreover, Interior's interpretation was reasonable.

"Highest posted price" is a technical term of art that should be construed with reference to the understanding of the term in the oil industry. *See Louisiana Public Service Commission v. F.C.C.*, 476 U.S. 355, 372 (1986) (applying "the rule of construction that technical terms of art should be interpreted by reference to the trade or industry to which they apply") (citation omitted); *Bowers v. Baystate Technologies*, 302 F.3d 1334, 1345-46 (Fed.Cir. 2002) ("language carries the ordinary meaning of the words in their normal usage in the field of invention") (citation omitted); *Frey v. Amoco Production Co.*, 943 F.2d 578, 583 (5th Cir. 1991), *opinion reinstated in part*, 976 F.2d 242 (1992), *on remand*, 1994 WL 202330 (1994) (interpreting terms of art used in royalty clause of oil and gas lease according to their meaning in the oil and gas industry).

As understood in the oil industry at the time the 1974 regulations were promulgated, a "posted price" is a purchaser's offered price to all producers in the same field producing the same quality, or gravity, of oil.

> Posted prices are not new to the oil industry. . . . "Posting" has long been a practice in the oil industry. Early on, it involved the physical placement at a public location of a written statement, or "price bulletin," which listed the current price at which an oil company would purchase a barrel of a *specific grade of crude oil*. Producers would read the postings and would base their decision on to whom they would sell upon the prices "offered" by the purchaser. Now, price bulletins are published and circulated to interested parties, such as sellers of crude oil. . . .

*North Central Airlines, Inc. v. Continental Oil Company*, 574 F.2d 582, 588 (D.C. Cir. 1978)

(emphasis added); *see also* 42 Fed. Reg. 3,628, 3,635 (1977) (preamble to Federal Energy Administration ("FEA") regulations defining "posted price": "[t]he general practice among principle purchasers has been periodically to issue price bulletins, which are widely circulated to the public, announcing the price that a particular purchaser would pay for a particular grade of crude oil in a particular location."). Accordingly, the Court should find that the use of the term "highest posted price" incorporated the understanding in the industry that price postings are tied to the quality, or grade, of oil reflected by the gravity of the oil. Further, this construction of the term "highest posted price" is reasonable as it requires the lessees to pay based on the price that they could obtain for the oil it sold.

**c. The United States did not breach its duty to collect all royalties due to Plaintiff because it was subject to the price controls imposed under federal laws and regulations**

**i. The Price Control Statutes Cannot be Properly Construed to Exempt the Department of Interior from Federal Price Controls**

The plain language, legislative history and judicial interpretation of the Emergency Petroleum Allocation Act ("EPAA") unequivocally establish that the Act is applicable to the United States. EPAA, Pub. L. No. 93-159, 87 Stat. 627 (1973) (codified at 15 U.S.C. § 751 *et seq.* (1976 and Supp. 1985)).

"[T]he starting point for interpreting a statute is the language of the statute . . . ." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). In interpreting the authority of a statute, the authorizing provisions and the objectives of the statute must be considered together. *Cities Service Co. v. Federal Energy Administration*, 529 F.2d 1016, 1021 (Temp. Emer. Ct. App. 1975) (to properly interpret the EPAA, the authority provisions must be read with the

objectives); *Skelly Oil Co. v. Federal Energy Admin.*, 448 F. Supp. 16, 18 (N.D. OK 1977).

The purpose of the EPAA was broadly defined to include the minimizing of any adverse impacts that shortages in the domestic supply of crude oil, residual oil, and refined petroleum products would have on the American people and the domestic economy. EPAA § 2(b), 15 U.S.C. § 751(b) (1976); *see also Air Transport Ass'n of America v. Federal Energy Office*, 382 F. Supp. 437, 441 (D.D.C. 1974). The statute's breadth was further evidenced by the comprehensive nature of the objectives enumerated in the Act.[25/] EPAA § 4(b)(1)(A) - (b)(1)(I), 15 U.S.C. § 753(b)(1)(A) - (b)(1)(I) (1976); *see also Aeropres Corp. v. Dep't of Energy*, 461 F. Supp. 1215, 1220 (D.Louis. 1978) (Congress manifested its intent to regulate supply so that all parts of the country would have an adequate amount to continue vital activities). For example, one of the nine objectives provided in the Price Control Regulations were to provide for the "equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices *among all regions and areas of the United States and sectors of the petroleum industry*, including independent refiners, small refiners, nonbranded independent marketers, and all users." EPAA § 4(b)(1)(F), 15 U.S.C. § 753(b)(1)(F) (1976) (emphasis added).

---

[25/]The nine objectives outlined in the EPAA included the (1) protection of public health, safety and welfare, and the national defense; (2) maintenance of all public services; (3) maintenance of agricultural operations; (4) preservations of an economically sound and competitive petroleum industry; (5) allocation of suitable types, grades and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity; (6) equitable distribution of crude oil, residual fuel oil and refined petroleum products at equitable prices throughout the United States and among all sectors of the petroleum industry; (7) allocation of residual fuel and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of, exploration for, and production or extraction of fuels and minerals essential to the United States and for the related transportation; (8) economic efficiency; (9) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms. EPAA § 4(b)(1)(A) - (b)(1)(I), 15 U.S.C. § 753(b)(1)(A) - (b)(1)(I) (1976).

Because the objectives of the EPAA were so broad, the President was provided equally broad latitude to promulgate regulations that would achieve the objectives, to the "maximum extent practicable." *Air Transport*, 382 F.Supp. at 445-47 (discussing the legislative intent of the enumerated objectives). Specifically, the EPAA explicitly authorized and directed the President to promulgate allocation and price control regulations that would be applied to "*all* crude oil, residual fuel oil and refined petroleum products produced in or imported into the United States."[26] EPAA § 4(a), 15 U.S.C. § 753(a) (1976) (emphasis added).

It is incontrovertible that the language of the EPAA provides for expansive regulation of pricing and allocation, in terms of the areas, products and entities. As such, absent an explicit exemption provision in the EPAA, any attempt to exempt an entity, such as the United States, from the price control regulations would be wholly inconsistent with the plain language of the Act. *See Mohawk Petroleum Corp., Inc. v. Dep't of the Navy*, 395 F. Supp. 933, 936 (C.D. Cal. 1975), *aff'd*, 521 F.2d 1394, 1395 (Temp. Ct. Emer. App. 1975). Because the EPAA did *not* contain a specific exclusion for the United States, the petroleum price regulations must be applied to Interior in order to give effect to the plain language of the statute and the intent of Congress. *Id.*

Any inquiry into the intent of a statute ceases if the language of the statute is unambiguous. *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002). Absent clear legislative intent to the

[26] Initially, this provision identified two limitations that are not directly relevant to this case. These limitations provided that the Price Control Regulations were not applicable to (1) the first sale of crude oil from any lease whose average daily production of crude oil for the preceding calendar year did not exceed ten barrels per well or (1) transactions at the producer-level which, upon a finding by the President, need not be subject to allocation requirements to attain the objectives of the Act. EPAA § 4(e), 15 U.S.C. § 753(e) (1976). Soon after the passage of the EPAA, these limitations were removed by the Energy Policy and Conservation Act of 1975 (EPCA of 1975"). EPCA of 1975, Pub. L. No. 94-163, 89 Stat. 871, § 402 (1975) (codified in relevant part at 15 U.S.C. § 753(a)).

contrary, the language of the statute must be regarded as conclusive. *GTE*, 447 U.S. at 108; *Syms v. Chrysler Corp. Loan Guarantee Bd.*, 670 F.2d 238, 242 (D.C. Cir. 1981).

Notably, although the plain language of the EPAA renders an examination of the legislative history unnecessary, the legislative history of the Act provides further evidence that the EPAA intended to provide extensive authority to the President to regulate price and allocation in a broad array of areas, products and markets. Indeed, Congress' intent to provide extensive administrative flexibility was repeatedly expressed in the legislative history. See H.R. Rep. No. 93-531, U.S. Code Cong. and Admin. News, 93d Cong. 1st Sess., pp. 2589 (1973); H.R. Conf. Rep. No. 93-682, U.S. Code Cong. and Admin. News, 93d Cong. 1st Sess., pp. 2702-2703 (1973) (hereinafter "Conf. Rep."); *see also Air Transport*, 382 F. Supp. at 446 ("legislative history of the EPAA indicates that Congress set forth nine broad and equally ranked goals to be accomplished. . . ."). Moreover, the legislative history reveals that Congress recognized and sought comprehensive coverage with respect to the products covered by the EPAA. Conf. Rep. at 2697; *see also Mobil Oil Corp v. Federal Energy Admin.*, 566 F.2d 87, 95 (Temp. Emer. Ct. App. 1977); *Skelly Oil*, 448 F. Supp. at 19-20. The legislative history is consistent with the language of the EPAA, and therefore, the petroleum price regulations must be applied to Interior in order to give effect to the intent of Congress.

Judicial interpretations have also definitively established that the EPAA is applicable to the United States. Federal agencies are subject to the price control regulations promulgated pursuant to the EPAA. *Mohawk Petroleum Corp. v. Dep't of the Navy*, 521 F.2d 1394 (Temp. Emer. Ct. App.1975); *Wesreco, Inc. v. Dep't of Interior*, 618 F. Supp. 562, 572 (D. Utah 1985); *see, e.g., Wyoming Refining Co. v. Dep't of Interior*, 547 F. Supp. 297, 300 (D. Wyo. 1982) (U.S. was subject to claim under the EPAA because "to exempt one of the largest sellers of crude oil from the pricing

mechanisms . . . would be incongruent with that regulatory scheme."); *Tipperary Refining Co. v. Dep't of Interior*, No. MO-84-CA-05 (W.D.Tex. Jan. 16, 1985); *Glenrock Refinery, Inc. v. Dep't of Interior*, No. C84-264B (D.Wyo. Dec. 5, 1984); *see also* Dep't of Energy, Interp. No. 75-15, CCH Compliance Manual para. 52,256 at 56,281 (Mar. 20, 1975).

In light of the foregoing, there is no question that the EPAA applied to Interior. As such, the Plaintiff's contention that the United States improperly applied the federal price control regulations for the purposes of calculating royalties is ill-conceived.

**ii. Plaintiff inappropriately misconstrue the 1977 Solicitor's Office memo and illogically rely upon judicial interpretations regarding a completely different statute to support its proposed application of the EPAA**

Plaintiffs construction of the price control regulations is unreasonable. In fact, Plaintiff incorrectly contends that the EPAA is not applicable to the determination of value with respect to royalties. In an attempt to support this contention, the Plaintiff selectively quotes from a 1977 Memorandum from an attorney of Interior's Solicitor Office[27/] and relies upon judicial interpretations related to a completely different statute. The flaws in Plaintiff's argument undermines the support for its assertion, and therefore, Plaintiff's proposed construction of the price control regulations must be rejected.

Without further breaching the confidences of the privileged Solicitor Office's memo,

---

[27/] Defendant notes that Plaintiff's quotation from this memorandum may violate the Protective Order under which Defendant produced this privileged document. Should the Court wish to explore the contents of this memorandum further, Defendant will file a memorandum under seal.

Defendant notes that the context the memorandum addressed is wholly inapplicable to this case.[28] The case involved a disagreement between FEA and Interior related to the price that Interior could charge for oil that it had taken in kind in lieu of a royalty payment. The lessee that provided the oil in kind had received an exception to the FEA price controls such that it could charge a higher price for its oil. Interior was prohibited, however, from selling the oil it received in kind at the higher price without also obtaining an exception from FEA. Interior sought to receive no less than the lessee would receive when selling the same oil. Plaintiff's reliance upon the Memo does not provide the foundation necessary to support its proposed construction of the price control regulations.[29]

Similarly, Plaintiff has inappropriately relied upon judicial interpretations related to regulations that were promulgated by the Federal Power Commission ("FPC") pursuant to the Natural Gas Act ("NGA"). A comparison of statutory obligations may be appropriately rejected if basic differences exist between the underlying statutory mandates of the statutes. *See, e.g., Air Transport*, 382 F. Supp. At 448. In other words, "[w]hat is appropriate under one statute is not necessarily appropriate under another." *Alabama Power Co. v. Gorsuch*, 672 F.2d 1, 28 (1982).

In this case, any analogy between the EPAA and the NGA is unfounded "because of the basic differences between the two underlying legislative mandates . . . ." *Air Transport*, 382 F. Supp. at 448. As a result, Plaintiff's reliance solely upon opinions involving a statute of an entirely different act is both jurisprudentially questionable and wholly unpersuasive.

---

[28] The Solicitor Office attorney's opinion regarding the authority of the FEA under the EPAA, a statute under which Interior is not the implementing agency, does not represent a definitive interpretation that binds the Government.

[29] It is interesting to note that the memorandum noted that Interior collected royalties based on the prices that it could legally receive. In contrast, Plaintiff contends that royalties should be based upon a value that a lessee was statutorily precluded from obtaining.

**iii. Plaintiff's Proposed Application of the EPAA Would Undermine the Very Purpose of the EPAA and Therefore, Must be Rejected**

Plaintiff's contend that application of the EPAA to Interior's determination of value for royalty purposes, would violate the Osage Act. Contrary to Plaintiff's assertion, the EPAA Act applies to the determination of value with respect to royalties collected by Interior. Any other interpretation would undermine the intent of the EPAA, cause the Osage Act to conflict with the EPAA, and ultimately, would lead to an absurd conclusion, as discussed below.

Specifically, Plaintiff argues that value for the purposes of royalties is not limited by the price constraints imposed upon a lessee by the price control regulations. The effect of this argument would be to require a lessee to pay royalties based upon a purchase price that it was precluded from charging. In other words, Plaintiff asserts that lessees were required to pay a greater percentage of its proceeds in royalties. This would inevitably reduce or remove any incentive for the lessee to continue its production operations. Such an interpretation is hardly plausible as it would undermine the very purpose of the EPAA.

As discussed in Section C.1 above, the EPAA provided for a regulatory scheme to control price and allocation in an expansive manner (*i.e.*, coverage of areas, products and entities) in order to minimize any adverse impacts that shortages in the domestic supply of crude oil, residual oil, and refined petroleum products would have on the American people and the domestic economy. Among the broad objectives of the EPAA was that of providing production incentives. EPAA § 4(b)(1)(G), 15 USC § 753(b)(1)(G) (1976). Plaintiff's interpretation of the Osage Act, which precludes the application of the price control regulations and thus reduces or removes production incentives, would undermine the very purpose of the EPAA.

In light of the foregoing, Plaintiff's interpretation of the Osage Act would cause the Osage Act to conflict with the EPAA. It is commonly accepted that in construing two statutes that deal with the same subject, the rule is to give effect to both if possible. *Cathedral Candle Co. v. United States Int'l Trade Comm'n*, 400 F.3d 1352, 1368 (Fed. Cir. 2005) (two statutes must be construed in a way that best resolves any possible conflict between them) (citation omitted); *Laketon Asphalt and Refining, Inc. v. Dep't of Interior*, 476 F. Supp. 668, 672-73 (N.D. Ind. 1979). Indeed, it is possible to give effect to both the EPAA and the Osage Act. If the Plaintiff's royalties were based upon no more than the prices that lessees could have received, the Osage Act would not have served as a disincentive to the maintenance of their production operations.

Plaintiff's assertion is inherently flawed because, not only would it undermine the very purpose of the EPAA, but it would needlessly cause the two statutes to conflict.

**d. Plaintiff's construction of the pricing regulation is unreasonable and should be rejected**

Plaintiff suggests now, many years after the contemporaneous construction of the regulations as implemented by the Osage Agency, that the Tribe would be better served by its construction, which would provide to the Tribe's royalties based on prices that purchasers would not have paid and, thus, that lessees could not have received. The appropriate time to consider whether Interior's interpretation of the regulations was reasonable, however, is at the time the regulations were implemented. *See, e.g., Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994). Plaintiff's construction of the pricing regulations contemporaneously with the collection of royalties would have been unreasonable, and in some cases absurd, for it would have acted as a disincentive against the development of the mineral estate and could have, in fact, led to decreased returns on the Tribe's mineral resources.

For example, Plaintiff suggests that Interior in the first three Tranche One periods should have determined that the Osage regulations required that regulated prices would not apply to the determination of royalties even though they applied to set a maximum lawful price for the oil. In other words, Plaintiff contends that a lessee should have been required to pay royalties based on unregulated prices of oil even though the lessee legally could be paid only the regulated price. Such a reading would have led to absurd results. For example, if a lessee in May 1979 produced oil categorized as lower tier, it could sell its oil at the maximum lawful price of $6.07 per barrel. At the same time, unregulated oil (also known as "exempt" or "stripper oil", 10 C.F.R. 212.54(a)), fetched a price of $19.35 per barrel. If the lessee was obligated to pay 1/6 royalty on the unregulated price, it would have to pay $3.23 per barrel, which would have been the equivalent of having to pay a royalty rate on the regulated price of over fifty percent. The application of the regulation in this manner wold have created an absurdity, thus Interior acted reasonably in not interpreting the regulation's requirements in this manner.

Further, if the Agency had interpreted the regulations to require lessees to base royalty payments on prices that exceeded – and potentially far exceeded as in the example above – those that the lessees could obtain, it is likely that lessees would have ceased production and sales from, at least, marginal wells rather than incurring a loss on the production. Thus, such an interpretation as Plaintiff offers could have, in fact, resulted in less revenue to the Tribe. Notably, the Osage Agency and the Osage Nation recognized on numerous occasions that it was not in the Tribe's best interest to try to gouge the lessees by requiring royalty to be paid on prices that exceeded the amount the lessees could obtain.

This recognition was demonstrated, for example, in the rationale offered for the amendment

to the Osage regulations in 1990 and in 1993. The Tribe participated in the drafting of both regulations and requested their promulgation. Further, the Tribe concluded that the amendments would be in the Tribe's best interest. For the 1990 amendments, the Tribe recognized that the amendments were in the Osage Nation's best interest because, without the revision, oil lessees were obligated to pay royalties based on prices they could not receive. For the 1992 amendments, the Tribe recognized that the regulations it sought to revise acted as a disincentive to producers to pay higher prices for certain oil when that price would be used as a basis for royalty calculations for all oil.

In the 1970's, the Osage Nation and the BIA had not faced this same issue in the context of requiring lessees to pay royalty for regulated oil based on unregulated prices. The issue did not arise because the BIA required lessees to pay royalties based on the regulated prices that they could lawfully receive, not on unregulated prices that were unavailable to them. But there is no reason to presume that the same rationale – requiring royalty payments on prices that could be obtained to encourage production – would not have applied if the issue had been confronted. Indeed, it is patently reasonable for the BIA to have required payment of royalties based on the regulated prices that lessees could presumably receive.[30/]

In summary, the reasonable construction of the pricing regulations provides that lessees were not obligated to pay royalties based on prices they could not receive. Thus, Interior's interpretation not only comported with the plain language of the regulations, but also was reasonable, and in the best interest of the Osage Nation.

---

[30/] The same rationale also applies to the BIA's practice of allowing gravity adjustments for purposes of valuing oil for royalty payments.

### 3. The Court should uphold Interior's verification procedures established in the Osage regulations

Plaintiff asserts that the Government has breached its duties in collecting the correct royalties on production of Osage oil because it has not implemented appropriate auditing procedures. The 1906 Act does not provide guidance as to auditing or verification of royalty payments. Instead, the Osage regulations, promulgated and amended by Interior with the Tribe's active participation and approval, establish efficient and reasonable practices for verifying proper payments, including ensuring that purchasers or lessees paid royalties based on the correct volumes and prices.

Under the regulations, lessees are obligated to provide a report to the Osage Agency that establishes the volume of oil subject to royalty payment, or, in other words, the amount of oil sold. 25 C.F.R. § 226.13(b). On the other side of the buyer-seller relationship, the regulations require purchasers to provide a report of the oil purchased. Naturally, in arms-length transactions, the lessee would have no incentive to underreport the amount of oil on which it would be paid, and the purchaser would have no incentive to overreport the amount of oil on which it had to pay. This verification system took advantage of countervailing market interests to check that payments were based on correct volumes. It was not, as Plaintiff claims, an honor system. The regulations thus provided an efficient and effective method to ensure the accuracy of the volumes on which the Osage Nation would receive royalty payments. In addition, although not required by the regulations, the Osage Agency also conducted random checks of purchaser reports (run statements) against gauge tickets to verify sales volume.

The Osage regulations also established an efficient process for verifying appropriate payment. Requiring payment to be based on, at least, the highest posted price for the geographic area ensured that the Osage were receiving royalties on, at least, the going market rate for its resource. In the price

control era covering the first three Tranche One months, that going rate for certain categories of oil was not only the minimum price but also the maximum price that could be paid. In addition, although not required by the regulations, the Agency sampled sales invoices from purchasers to verify the actual price paid.

A second check on prices was inherent in the lessee-purchaser relationship. The prices that the purchaser paid for oil were listed in the statements provided to the Osage Agency. These same statements were provided to the lessees as the basis for which they were paid. The lessee, of course, had an incentive to ensure that the purchaser was paying the agreed price, so it may be presumed that the price reported by the purchaser was accurate.

As recognized by the Tribe during testimony to Congress related to FOGRMA, the verification procedures entailed by the Osage regulations were efficient. They were also effective, as evidenced below in the discussion regarding application of the regulations to the Tranche One leases and months. That they were effective is further supported by the conclusions of the MMS audit conducted in 1993 which found no evidence of a systematic weakness in the Osage Agency's management of the Osage mineral estate.[31/]

---

[31/] As Plaintiff explains, the MMS report also addressed the detection of theft of oil. Further, Plaintiff asserts that, to fulfill its duty related to calculation of volumes, the United States was required to provide sufficient site security to guard against theft. Plf.'s Mem. at 53. Claims related to oil theft, however, are associated with the Osage Agency's management of the Osage Nation's assets. Claims related to asset management are barred by the statute of limitations and need not be addressed by the Court. *Shoshone Tribe of Indians v. Norton*, 364 F.3d 1339 (Fed. Cir. 2004).

**4. The Tribe's claims related to the interpretation and implementation of the regulations for determining royalty value are barred by laches or estoppel**

**a. The Tribe's Claims related to the Interpretation and Implementation of the Regulations for determining royalty value are barred by the equitable doctrine of Laches**

Laches is an equitable doctrine premised on the Latin maxim *vigilantibus non dormientibus aequitas subvenit*, equity aids the vigilant, not those who slumber on their rights. *LaForge & Budd Constr. Co. v. United States,* 48 Fed. Cl. 566, 570 (Fed. Cl. 2001) (citing *Cornetta v. United States*, 851 F.2d 1372, 1375 (Fed. Cir. 1988)). This defensive doctrine safeguards a public policy of fairness by barring stale claims arising from a plaintiff's dilatory conduct. *LaForge*, 48 Fed. Cl. at 570.

Laches, as an affirmative defense, operates to bar a plaintiff's claims where the court is satisfied by a preponderance of the evidence that the plaintiff (1) engaged in unreasonable and inexcusable delay in bringing a claim about which he knew, or should have known; and (2) such delay results in prejudice to the defendant. *See Id.; see also Cornetta v. United State*s, 851 F.2d 1372 (Fed. Cir. 1998); *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770 (Fed. Cir. 1995); *Pepper v. United States,* 8 Cl. Ct. 666 (Cl. Ct. 1985); *Foster v. United States,* 3 Cl. Ct. 440 (Cl. Ct. 1983); *Erickson v. United States,* 1 Cl. Ct. 163 (Cl.Ct. 1983); *Brundage v. United States,* 205 Ct. Cl. 502 (Ct. Cl. 1974); *D.O. Haynes & Co. v. Druggists' Circular*, 32 F.2d 215 (2nd Cir. 1929). No fixed boundaries define the length of time deemed unreasonable, and the duration should be viewed in light of the surrounding circumstances. *See LaForge*, 48 Fed. Cl. at 570. Courts have often reasoned however, that "the longer the delay by a plaintiff in filing suit, the less need there is to search for specific prejudice and the greater the burden on the plaintiff to go forward with the evidence to demonstrate lack of prejudice." *Pepper,* 8 Cl. Ct. at 676.

A defendant can allege two types of prejudice: economic and evidentiary. *See Id*. at 572. Economic prejudice focuses on the financial consequences to the defendant, and possibly others, which could have been prevented by an earlier filing, should the plaintiff be successful in its claim. *Id.; see also, A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992). Evidentiary prejudice is the hardship encountered in mounting a defense due to a plaintiff's delay and may include unavailable witnesses, the loss or destruction of evidence, or faded memories. *See LaForge*, 48 Fed. Cl. at 572; *see also, Cornetta*, 851 F.2d at 1378. "Evidentiary prejudice may not only handicap the defendant's ability to make its case, but it also 'undermines the court's ability to judge the facts.'" *LaForge*, 48 Fed. Cl. at 572.

The Plaintiff may argue at trial that the Appropriations Acts delaying the accrual of the statute of limitations on claims concerning mismanagement of trust funds should operate to defeat any laches defense. Laches must be applied apart from and irrespective of any applicable statute of limitations. *Cornetta v. United States*, 851 F.2d at 1378 (plaintiff's post-discharge service in the Coast Guard stopped running of the statute of limitations, but did not affect the period to be considered in determining the existence of laches defense); *see also, In re Beaty*, 306 F.3d 914, 925 (9th Cir. 2002) (creditor with infinite time remaining on statutory clock does not affect the limitation of cause of action by laches); *Wells v. United States Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244, 1250 (6th Cir. 1991) (noting that laches may ripen within a time that is short of the applicable period of limitations); *Deering v. United States*, 620 F.2d 242, 245 (Ct. Cl. 1980) (the Soldiers' and Sailors' Civil Relief Act (50 U.S.C. App. § 525), tolling of the limitations period irrelevant to the determination of the existence of laches)

The Plaintiff's pattern of active participation with the government in the implementation of

the royalty valuation regulations is conspicuous. The Plaintiff, having a pecuniary interest in the maximization of royalty proceeds, played an active role with the government in its interpretation and implementation of the regulations governing oil lessees and purchasers. In fact, the Plaintiff was instrumental in bringing about several amendments to the regulatory scheme impacting royalty valuation. In connection with becoming a well-informed beneficiary, the Plaintiff also retained the services of auditors and other experts whose duties included the regular review of annual statements, purchaser, lessee, and other reports utilized by the government in the determination of royalty value. The Plaintiff communicated its experts' findings to the government, in some instances to obtain additional royalty revenues that the government allegedly failed to collect. Moreover, during all times relevant to the Tranche One lease periods and beyond, the government utilized a system which made valuation adjustments to royalties according to gravity. This practice is deep-rooted within the oil industry as well as the government's regulation of its oil royalty programs on other Federal and non-Osage Indian leases. Finally, the Government, with the Tribe's knowledge, accepted royalty payments based on prices regulated under the EPAA. Despite the Plaintiff's current protestations to the contrary, the legislation limiting petroleum prices applied with equal force to the Osage Mineral Estate. Notably, at the time BIA recognized the price ceilings for Osage royalties, the Tribe did not protest.

In the event that the Defendant breached its duties to the Plaintiff with respect to its determination of royalties owed, the Plaintiff's acquiescence and active participation imputes knowledge of this hypothetical breach. The Plaintiff's involvement and familiarity with these issues certainly placed them on notice of any potential breach of duty. In fact, Plaintiff's notice of some of these issues dates as far back as 1915. Equity cannot reward those who sit idly on their rights.

*LaForge*, 48 Fed. Cl. at 570.

The Defendant may suffer substantial prejudice as the result of the Plaintiff's dilatory conduct. Should the Plaintiff be permitted to pursue its claims, the Defendant will be faced with the prospect of having to recoup additional royalties from lessees in the face of a potential statute of limitations bar. *See Oxy USA, Inc. v. Babbitt*, 268 F.3d 1001 (10th Cir. 2001) (six year statute of limitation bars administrative as well as judicial claims for unpaid royalties); *but see Amoco Prod. Co. v. Watson*, 410 F.3d 722 (D.C. Cir. 2005) (administrative order assessing additional royalties was not an action for money damages subject to statutory bar), *cert. pending*. Moreover, some of the parties with potential responsibility for payment of additional royalties that could be ordered may not even be in existence in 2006. Given the potential statutory bar or unavailability of lessees, the United States could be left holding the proverbial "bag" for an exorbitant sum of money. This is particularly inequitable in light of the fact that the United States is an "intermediary" with respect to oil royalties. The true responsibility for payment belongs to the individual lessees and purchasers, and but for the Plaintiff's excessive delay, the obligation, if any, to pay additional royalties would lie with them.

In addition to economic prejudice, which is substantial, the Plaintiff's delay will cause evidentiary prejudice as well. With the more than 30 years that have elapsed since the origination of the first Tranche One oil lease, the Defendant's ability to mount its defense will be hindered by the unavailability of witnesses and other evidence and the fading memories of witnesses. *See LaForge*, 48 Fed. Cl. at 572. It is for these compelling reasons, that the Plaintiff's potential claims should be equitably barred.

**b. Principles of Equity Demand that the Tribe be Estopped from bringing claims related to the Interpretation and Implementation of the Regulations for determining royalty value.**

The Defendant will prove at trial that the government's reasonable and appropriate interpretation of the Regulations for determining royalty value was accomplished in active partnership with the Plaintiffs. The Plaintiff will demonstrate how this regulatory scheme evolved over the decades, and that the Tribe's involvement in this evolution went beyond mere acquiescence, but rather to full-blown participation. It is completely appropriate for this Court to apply the legal principle that "no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong." *Robbins v. United States*, 86 Ct.Cl. 39, 47 (1937) (citation omitted). As such, the evidence will demonstrate that the Plaintiff must be equitably or *quasi-estopped* from bringing claims representing a drastic change in positions previously held by it as to the royalty valuation Regulations.

In common parlance, quasi-estoppel translates into the maxim that "one cannot blow both hot and cold." *In re: Guterl Special Steel Corp.*, 316 B.R. 843, 856 (Bankr. W.D. Pa. 2004) (citation omitted). Put another way, equity dictates that "one cannot eat his cake and have it too." *Id.* (citation omitted). As an equitable doctrine, quasi-estoppel applies where it would be unconscionable to permit a person to maintain a position inconsistent with one in which he acquiesced or where he accepted a benefit. *See* id.; *see also* Kansas *City Southern Ry Co. v. Guardian Trust Co.*, 240 U.S. 166, 172, 60 L.Ed. 579, 587 (1916) (Trust Company bound by plan of reorganization with which it actively participated and benefitted); *see also In re Guterl*, 316 B.R. at 856 (U.S. Economic Development Administration estopped from opposing payment of bankruptcy estate assets to professionals for services which it participated in and benefitted from); *In re Jones*, 141 F. Supp. 2d

577, 579-80 (W.D. N.C. 2001) (creditor estopped from challenging obligations under agreement from which it accepted benefits); *Stinnett et al. v. Colorado Interstate Gas Co. et al.*, 227 F.3d 247, 258 (5th Cir. 2000) (oil lessors estopped in royalty underpayment action from altering agreement with lessees to which lessors previously benefitted); *Hartmann et al. v. Bertelmann et. al*, 39 Haw. 619, 628 (Haw. 1952) (beneficiaries estopped from damages award in breach of trust action against trustee on basis that beneficiaries participated and acquiesced in the breach); *Robbins*, 86 Ct. Cl. at 47 (taxpayer estopped on refund claim where statute of limitations had run against IRS's ability to assess additional lawful tax); *Wilson & Co. v. United States*, 82 Ct. Cl. 261, 291 (Ct. Cl. 1936) (taxpayer estopped from repudiating previously acknowledged tax liability when statute of limitations on correct tax assessment had run).

Although the Defendant will present ample evidence, as set forth above, that it has suffered substantial prejudice as the result of the Plaintiff's inconsistent positions, such a showing is not necessary to obtain the benefit of quasi-estoppel. *In re Jones*, 141 F. Supp. 2d at 579; *see also Stinnett*, 227 F.3d at 258; *Hartmann*, 39 Haw. at 628. Nevertheless, the Defendant will present persuasive evidence that the Plaintiff acquiesced and participated in the Defendant's reasonable implementation and interpretation of the royalty valuation regulations. The benefit bestowed upon the Plaintiffs and corresponding prejudice suffered by the Defendant require this Court to estop the Plaintiff from its inequitable attempt to shift positions at this late juncture.

**4. The Agency properly applied the regulations**

The Osage Agencies practices for verifying that companies paid the appropriate royalty on oil were reasonable and complied with the Government's duties set forth in the 1906 Act and its implementing regulations. The scope of those duties are explained above. They entail the following:

1) Determining the major purchasers and calculating the highest posted price;

2) Verifying that the purchaser or lessee paid for the correct volume of oil sold; and

3) Verifying that the purchaser or lessee based its royalty payment on the correct price.

The evidence will show that the Osage Agency fulfilled each of these duties.

**a. Determination of highest posted price**

For the last three Tranche One months, the evidence will show that the Agency obtained the best information available to allow it to determine the major purchasers, obtained price postings from the major purchasers, calculated the highest posted price based on this information, and informed the purchasers and lessees of the highest posted prices applicable to each day of the production month on the appropriate gravities of oil. Plainly, the Agency fulfilled its duties.

For the first three Tranche One months, the evidence will show that the posted prices for each category of crude oil in a particular field – whether it was old oil or lower-tier (the lowest controlled price), upper-tier (the higher regulated price) or new, stripper, or market-level (an unregulated price) – were the same, regardless of which company published the posted price. Therefore, there was no need to determine major purchasers for the regulated period.

**b. Verification of volumes**

For certain of the Tranche One leases and months, lessee and purchaser reports or data contained in the Agency's computer system will show that payment was based on the correct oil volumes. For some Tranche One leases and months, this data was no longer available. In these

instances, volume data from other sources was obtained. That data shows that payment was based on the correct volume. Accordingly, the Government fulfilled its duty to verify volumes.

**c. Verification of royalties paid**

In reconstructing the royalty calculations that would have been made pursuant to Interior's interpretation of the Osage regulations, Defendant's oil and gas expert confirmed, with minor discrepancies, that the royalty payments on oil of like gravity and controlled price classification, if applicable, were based on the higher of the actual selling price reported on the purchaser statement or the highest posted price.

The analysis conducted by Defendant's expert confirms to over a 99.5 percent degree of accuracy that the royalty payments made on the Tranche One leases for the Tranche One months were for the amounts that were due. This degree of accuracy demonstrates that the Agency collected the appropriate payments. The immaterial discrepancies that were identified should not form the basis of a finding that the Agency failed to perform its duties, for a trustee should not be held to a standard of perfection. "[I]t has long been recognized that a trustee is not an insurer of trust property," and is not subject to a surcharge for losses to trust property unless he failed to exercise the requisite skill and care. *United States v. Mason*, 412 U.S. 391, 398 (1973), citing 2 A. SCOTT, TRUSTS 1408, 1419 (3d ed. 1967). Here, it will be clear that the Government exercised the requisite skill and care in collecting the appropriate payments.

**B. Plaintiff is not entitled to late-payment penalties against the Government**

The Osage regulations provide that the party responsible for payment, either the lessee or purchaser, shall be subject to a monthly late charge of not less than 1 ½ percent for failure to timely pay royalties. 25 C.F.R.§ 226.13(a). The purpose of this regulation is obvious. It is intended to

encourage timely payment by purchasers or lessees, it is not designed as a means of earning income on the Osage mineral resources. Assessing late fees against the United States on damages, if any, owed by the Government would not advance this purpose.

## III. INVESTMENT CLAIMS

### A. Standard of review

#### 1. Determining the Appropriate Standard of Review

The starting point for the Court's determination of the applicable standard of review to apply to Plaintiff's claims that the Government breached its investment duties is the statutory language that forms the basis of Plaintiff's claim. *See, e.g., NVT Technologies Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The Tribe's investment claims are based on the 1906 Act as well as 25 U.S.C. § 161a, and 25 U.S.C. § 162a.

The 1906 Act, which establishes the duty to deposit funds in the Treasury where they are to be held in trust, does not set forth a standard of review. Accordingly, the Court should apply an arbitrary and capricious standard to determine whether the Government breached its duty. As explained above, Defendant will assume, however, that a reasonableness standard applies instead. Under either standard, Defendant has discharged its duties related to depositing Osage royalty receipts.

The statutes that Plaintiff has cited that articulate the Government's obligations to invest Plaintiff's funds are 25 U.S.C. §§ 161a and 162a. Since 1984, section 161a(a) has authorized Interior to invest tribal trust funds in public debt securities taking into consideration the maturity needs of the fund. The statute provides that:

> . . . [A]ll funds held in trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of Indian tribes shall be invested

> by the Secretary of the Treasury, *at the request of the Secretary of the Interior*, in public debt securities with maturities suitable to the needs of the fund involved, *as determined by the Secretary of the Interior*, and bearing interest at rates determined by the Secretary of the Treasury, taking into consideration current market yields on outstanding marketable obligations of the United States of comparable maturities.

Pub. L. No. 98-451, 98 Stat. 1729, codified at 25 U.S.C. § 161a (1990) (emphasis added). Prior to 1984, Section 161a guaranteed at least a four percent simple interest rate of return on tribal trust funds. *See Short v. United States*, 25 Cl. Ct. 722, 726-77 (1992); *Menominee Tribe of Indians v. United States*, 97 Ct. Cl. 158, 163-65 (1942). That changed with the 1984 amendment quoted above, which expressly gives Interior the discretion to seek payment of varying interest rates on tribal trust funds.[32/]

Section 162a authorizes Interior to withdraw tribal trust funds from Treasury and deposit the funds in banks; it provides that:

> The Secretary of the Interior is hereby *authorized in his discretion*, and under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and to deposit in banks *to be selected by him* the common or community funds of any Indian tribe which are, or may hereafter be, held in trust by the United States and on which the United States is not obligated by law to pay interest at higher rates than can be procured from the banks . . .

25 U.S.C. § 162a(a) (1990) (emphasis added). Language at the end of this provision modifies the scope of allowable investments under this provision for Osage tribal funds: "the foregoing shall apply to the funds of the Osage Tribe of Indians, and the individual members thereof, only with

---

[32/] During the Tranche One time period, there were no implementing regulations for either statute. This brief analyzes the statutes in effect from 1976 through 1990, the period covered by the Tranche One leases. Aside from editing changes and other modifications not relevant to the issues addressed here, there were no other material changes to Sections 161a and 162a in the Tranche One period. *See* Pub. L. No. 101-644; Pub. L. No. 98-146; Pub. L. No. 98-146.

respect to the deposit of such funds in banks."[33] *Id.*

Sections 161a and 162a are discretionary on their face. Section 161a provides the Secretary of the Interior with the discretionary authority to decide if and when to request the Secretary of the Treasury to invest tribal trust funds in public debt securities, which are considered suitable as "*determined*" by the Secretary of the Interior.[34] Likewise, section 162a authorizes the Secretary of the Interior, "*in his discretion*," to withdraw tribal Osage trust funds from Treasury to be deposited in banks "*selected by him.*" Thus, both sections 161a and 162a expressly vest the Secretary of the Interior with broad discretion in the investment of tribal trust funds. Accordingly, to review the Secretary's actions under the statutes, the Court should determine whether the Secretary abused his discretion.

**2. Application of the abuse of discretion standard**

Under the abuse of discretion standard of review, the Court must determine whether the United States considered the relevant factors, whether it had a rational basis for its actions, and whether it acted in the scope of its statutory authority. *See, e.g., Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *Confederated Tribes of The Warm Springs Reservation of Oregon v. United States,* 177 Ct.Cl. 184, 192 (1966). If the Court determines that there was a rational basis for the agency's actions, it should find that the agency has not abused its discretion. *Confederated Tribes*, 177 Ct.Cl. at 192.

---

[33] Interior has determined that it is authorized to invest Osage funds in the same range of securities authorized in section 162a(a), by virtue of other Osage-specific legislation – the Act of March 3, 1921 (41 Stat. 1250) and the Act of February 27, 1925 (43 Stat. 1008-1009). 42 Bureau of Indian Affairs Manual Supplement No. 3, 3.11 (attached as Exhibit 1).

[34] Congress added this discretionary language to section 161a in 1984. Prior to 1984, section 161a provided that tribal trust funds shall bear simple interest of 4% per annum.

Further, the Government's decision is entitled to a presumption of validity and the Court should not substitute its own views for that of the Government. *See, e.g., Cobell*, 428 F.3d at 1076; *Mitchell v. United States*, 229 Ct.Cl. 1, 14 (1981), *aff'd,* 463 U.S. 206 (1983); *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). In applying this standard, as this Court has previously recognized, the first parameters for evaluating the exercise of the Secretary's discretion come from the statutes forming the basis of Plaintiff's claims. *See Shoshone Tribe of the Wind River Reservation v. United States*, 56 Fed. Cl. 639, 649 (2003) (finding that regulation, 30 C.F.R. § 206.103, "provides the Secretary with guidelines within which to exercise her discretion, and provides the court with guidelines within which to evaluate the Secretary's action.").

In addition to considering the parameters provided in the statutes, the Court should review "the Secretary's exercise of discretion to determine whether it conforms to fiduciary standards." *Brown v. United States*, 42 Fed. Cl. 538, 562 (1998). "[T]he Secretary's discretion [is] governed by fiduciary standards and limited by fiduciary duties." *Id., quoting Cheyenne-Arapaho Tribes of Oklahoma v. United States*, 966 F.2d 583, 589 (10th Cir.1992); *see also Cheyenne-Arapaho Tribes of Oklahoma v. United States*, 33 Fed. Cl. 464, 468 (1995). The appropriate fiduciary standard to apply to examine the Secretary's exercise of discretion in this context is the prudent investor standard. 25 C.F.R. § 115.809 (2005).[35/]

**3. The Court should reject Plaintiff's proposed maximization standard**

The Court should reject Plaintiff's assertion that the United States must "maximize the trust

---

[35/] Although the current regulations related to investing and managing tribal trust funds (25 C.F.R. Part 115) did not exist during the Tranche One period, Interior's explicit endorsement of prudent investment practices in promulgating these regulations in 2002 supports a determination that such standards should apply to Interior's conduct in this earlier period.

income by prudent investment." Plf.'s Mem. at 72. There is simply no basis in the language or legislative history of any statute Plaintiff identifies to impose any investment maximization duty on the Government. Nor, with the exception of the required four percent simple interest under the pre-1984 language of section 161a, is there a basis for a claim that the United States had a duty to earn a specific rate of return. Only if the statute reasonably supports such a duty can it be inferred. *See Navajo*, 537 U.S. at 507 (Indian Mineral Leasing Act does not impose a duty to maximize coal leasing revenues); *Shoshone Indian Tribe*, 364 F.3d. at 1349 (United States does not have a fiduciary or statutory duty under the Indian Mineral Leasing Act to maximize revenue for sand and gravel leases). To support its proposed standard, Plaintiff relies on *Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States*, 512 F.2d 1390, 1394 (Ct. Cl. 1975). One can no longer read the holding of *Cheyenne-Arapaho* so broadly, given the statutorily-driven analysis now required by *Mitchell II* and *Navajo*. In *Cheyenne-Arapaho*, the Court of Claims offered the observation that the United States has an "`obligation to maximize the trust income by prudent investment,'" and bears the burden of justifying "less than a maximum return." *Id., citing Blankenship v. Boyle*, 329 F.Supp. 1089, 1096 (D.D.C. 1971) and *Restatement (Second) of Trusts* § 181 (1959). That statement was not based on Section 161a, Section 162a or any other statutory authority cited by that Court.[36/] *Id.* The statutorily-driven analysis mandated by *Mitchell II* and *Navajo* makes it impossible to identify any

[36/] Moreover, any analysis of the import of the maximization language found in *Cheyenne-Arapaho* must factor in that Court's own unease and concern about making "pronouncements" of law in a case where the record was not sufficiently developed by either side to allow the court to consider the motions before it. *Cheyenne-Arapaho*, 512 F.2d at 1394; *see also id.* at 1397 (Nichols, J., concurring).

duty to maximize under the statutes governing Interior's management of Osage trust funds.[37]

Indeed, even before the Supreme Court's decisions in *Mitchell* and *Navajo,* the Court of Claims *en banc* read the holding in *Cheyenne-Arapaho* far more narrowly, not as mandating maximum returns. In its decision in *Mitchell,* the Court of Claims *en banc* stressed that the "holding of Cheyenne-Arapaho is that defendant must as trustee exercise *reasonable management zeal* to get for the Indians the best rate," an entirely different proposition than holding it to a duty to guarantee maximum returns. 664 F.2d at 274 (emphasis added).[38]

Moreover, no such duty to maximize or to earn specified returns can be found in any of the common law relied on by Plaintiff. The general common law rule related to the investment of trust funds "is that the trustee is under a duty to make such investments as a prudent person would make of his own property having primarily in view the preservation of the estate and the amount and regularity of the income to be derived." William F. Fratcher, Scott on Trusts, vol. III, p. 431 (4th ed. 1988); *see also* Restatement (Third) of Trusts § 227 ("The trustee is under a duty to the beneficiaries

[37] Even private trustees are not held to a "maximization" standard, but rather are most commonly held to the standard that a reasonable, prudent person would follow. *See generally Restatement (Second) of Trusts,* § 176 (1959); *Restatement (Third) of Trusts,* § 227 (1992).

[38] Because statutory authority requiring maximization of returns is wholly lacking, imposing such a duty would essentially eviscerate the governing statutes, and place the United States in the role of an insurer or guarantor of the highest possible rate of returns given the advantage of "20/20 hindsight." Any time that investments made did not earn the highest possible yield, regardless of the care taken in making investment decisions or the soundness of its decisions, the Untied States would presumably be liable for the difference. That is not a duty that Congress imposed in Sections 161a and 162a, and it also conflicts with long-standing precedent. "It has long been recognized that a trustee is not an insurer of trust property," and is not subject to a surcharge for losses to trust property unless he failed to exercise the requisite skill and care. *United States v. Mason,* 412 U.S. 391, 398 (1973), *citing* 2 A. SCOTT, TRUSTS 1408 (3d ed. 1967). If Congress had intended such marked departure from established, generally accepted trust responsibilities, it would surely have spelled that out with clarity and specificity in these statutes so there could be no mistaking that intention.

to invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust." ); Restatement (Second) of Trusts § 227. The common law of trusts does not impose a duty to maximize investment returns nor, in fact, to guarantee any specific return: "The trustee is not a guarantor of the trust's investment performance." *Id.* at cmt. b. Rather, under the common law, the trustee is to exercise reasonable care, skill, and caution in making investments and "should incorporate risk and return objectives reasonably suitable to the trust." Restatement (Third) of Trusts § 227(a).[39/] *See also United States v. Mason*, 412 U.S. 391, 398 (recognizing that "a trustee is not an insurer of trust property.").

Plaintiff's maximization standard, therefore, has no basis in law. Under the proper standards of review, Defendant will demonstrate that the Government acted reasonably in expeditiously ensuring the deposit of Osage funds into trust and properly exercising its discretion to invest the deposited funds.

### B. The Tribe Cannot Demonstrate That it Sustained Compensable Damages Because of Alleged Delays in Crediting Deposits to Tribal Accounts

Plaintiff asserts that the United States had a duty to deposit trust funds within 24 hours of receipt. In its "deposit lag time" claim, Plaintiff conflates two different functions: depositing receipts in a timely manner and investing those receipts. Each is addressed in turn.

---

[39/] The Court need not and should not rely on the common law of trusts to define the duties of the Government related to investments. As counseled by the Supreme Court in *Navajo* and the Federal Circuit in, for example, *Pawnee v. United States*, 830 F.2d 187, 191-92 (Fed. Cir. 1987) and *Brown v. United States*, 86 F.3d 1554, 1563 (Fed. Cir. 1996), the Court instead must examine the language of the investment statutes to identify the duties. Even if the Court were to examine the common law, however, it would end up at the same place. "Trustees have a general fiduciary duty to comply with the terms of their trusts. . . . The nature and extent of a trustee's duties and powers are primarily determined by the terms of the trust." Restatement (Third) of Trusts § 227, cmt. b (citing §§ 228, 164).

### 1. Defendant followed reasonable practices for depositing receipts

#### a. Standard for determining whether deposits are timely

There is no statutory requirement imposing on Interior a minimal time for the processing, posting or crediting of receipts, or for depositing tribal monies in Treasury or other interest-bearing accounts. Absent a statutory duty, the Court should determine whether the time between receipt and deposit of royalty payments was unreasonable, taking into account the circumstances existing at the time of the receipts.

##### i. Treasury guidelines for deposit

Although there are no directly applicable statutory or regulatory prescriptions related to the timing of deposits of Osage royalty receipts, Interior followed Government-wide as well as its own guidelines, all of which establish a presumption of reasonableness.

Over the years, Treasury has issued guidelines applicable to government receipts generally. This guidance arises out of the Treasury Department's statutory authority to "prepare plans for improving and managing receipts of the United States Government," 31 U.S.C. 321, and the Miscellaneous Receipts Act, 31 U.S.C. 3302(c). Based on these authorities, Treasury has published instructions to federal departments and agencies for depositing agency receipts into Treasury, such instructions taking the form, successively, of a Treasury Department Circular, the Treasury Fiscal Requirements Manual, ("TFRM"), the Treasury Financial Manual ("TFM"), and, beginning in 1985, Treasury Department regulations.

One of the bases for the instructions, discussed in further detail below, is the Miscellaneous Receipts Act, 31 U.S.C. § 3302(c). Originally enacted in 1857, the Miscellaneous Receipts Act did not include language governing the timing of the deposit of public money until 1896. In 1896,

Congress modified the statute to require the deposit of moneys of the United States "without delay, and in all cases within thirty days of their receipt." Act of May 28, 1896, ch. 252 § 5, 29 Stat. 179. The instruction to federal agencies that the Treasury Department subsequently issued in 1919 to govern the deposit of public moneys did not specify a time frame for the deposit of cash receipts, but required that any checks "shall be forwarded for deposit each day. . . ." Treasury Department Circular 176, "Regulations Governing Deposit of Public Moneys and Payment of Government Warrants and Checks," December 31, 1919. This requirement remained in the Treasury Department circular until it was revised in 1945. The 1945 revision contained no language concerning the timing of deposits.

For the January 1976 Tranche One month, the TFRM provided that "[t]he deposit of all funds received for credit to the Treasurer of the United States should be made without undue delay." 1 TFRM 5-4015 (Def.'s Exh. 759). The concept of depositing funds without delay or "without undue delay" continues to this day.

In March 1978, Part 6 of the TFRM, addressing cash management, was adopted. That section provided more specific instructions, calling for receipts of $1,000 or more to be deposited on a daily basis and allowing receipts of lesser amounts, "at the discretion of the agency," to be accumulated and deposited when the receipts total $1,000, but requiring the deposit of those receipts on at least a weekly basis, regardless of the amount accumulated. 1 TFRM 6-8030.30. The guideline also provided, when no local repository was available, that deposits should be mailed to a Federal Reserve Bank "no later than the morning of the business day following receipt or accumulation of $1,000 or more." *Id.* at § 8030.40.

In 1984, the Miscellaneous Receipts Act was amended by the Deficit Reduction Act of 1984

("1984 Act"), Pub L. 98-369, Title VI, July 18, 1984, 98 Stat. 494, to change the outside time limit for deposits of moneys of the United States from thirty days to three days. The 1984 Act also authorized Treasury to issue regulations shortening or lengthening the three-day outside limit for making deposits. Pursuant to the 1984 Act, Treasury promulgated 31 C.F.R. Part 206, 50 Fed. Reg. 35547 (Sept. 3, 1985), shortening the deposit time for monies collected by government agencies. 31 C.F.R. 206.5(a)(1) provides for the same day deposit of monies collected by government agencies unless same day deposit would not be cost effective or practical, in which case, the money must be deposited the following day.

Concurrently, in 1985, Treasury also changed 6-8030 of the TFM to provide that "Agencies will deposit receipts of $1000 or more on the same day received prior to depositary cutoff time. Where same day deposit is not cost-effective, next day deposit of moneys must be achieved." Collections of less than $1000 were allowed, as before, to be accumulated, but were required to be deposited by the "Friday of each week, regardless of the amount accumulated." At the same time, Treasury also changed a section of the TFM pertaining to cash held outside Treasury to provide that: "Wherever possible, all custodial funds, whether identified as public funds or otherwise, will be deposited for credit to Treasury as prescribed in 1 TFM 6-8030.30." 1 TFM 6-8060.20 (Def.'s Exh. 755). That section was again changed in 1991 to provide that "[a]ll public funds must be deposited to the Treasury's General Account as prescribed in paragraph 8030.30 unless there is specific statutory authority to do otherwise." 1 TFM 6-8060.20.

The principal focus of these provisions is each government agency's responsibility to place funds collected in Treasury within a reasonable time frame. Even if not directly applicable, these provisions provide guidance as to what should be considered reasonable deposit practices. And,

under that guidance, the deposit of the Osage funds within two days of receipt followed the guidelines and thus occurred within a reasonable period of time.[40]

### ii. Interior guidelines for deposits

The Bureau of Indian Affairs Manual that was in place between 1963 and 1989, provided that:

> Deposits should be made daily, insofar as practicable. A "cutoff" time should be established daily for collections to be deposited *or forwarded for deposit* as a part of that day's business, and collections received after that hour should be included in the deposit or transmission made the next business day.

42 IAM 6.3.2.A(3) (Def.'s Ex. 382). The guidelines thus recognize that, when a local Government depositary is unavailable, the receipts may be mailed to where they can be deposited. Instantaneous or even same day deposit in a Federal Reserve Bank or Government depositary was not always feasible, and particularly if the receiving BIA employee was in a location in a city that did not have such a bank. In such cases, BIA had to mail the deposit and allowances had to be made for the time that process would necessarily take. That was the case at the Osage Agency until early 1990 when a federal depositary was designated in Pawhuska. When a deposit was made prior to that time, the BIA Osage Agency staff had to mail it to the BIA Area Office in Muskogee, which would, in turn deposit the receipts.

In July, 1989, the BIAM was amended to provide that "[d]eposits shall, to the greatest extent possible, be made within 24 hours of the receipt of public funds, or the next work day, in a designated Federal depository." 42 BIAM Supplement 3 § 3.9B(4)(b)(ii) (Def.'s Ex. 923). This amendment also recognized practicalities, which would have included the unavailability of a local Federal depository.

[40] In those instances where receipts were deposited in more than two days, the deposit may still be considered timely depending on the circumstances. For example, there may have been insufficient information provided with a payment to the Agency to enable it to know which account should receive the deposit.

**b. Availability of a local depositary**

Plaintiff asserts that the Osage Agency failed to make timely deposit receipts by mailing the receipts to the Muskogee Area Office for deposit. It claims that the Agency breached its duty to make funds productive by failing to designate a local bank as a federal depositary during most of the Tranche One period. The Court should evaluate this claim only after taking into account the totality of the circumstances and the efforts that the BIA in fact undertook to expedite the deposit of receipts. For example, BIA, starting in 1979, encouraged purchasers and lessees to make royalty payments through the use of electronic funds transfer. Through the Tranche One periods, payments increasingly were received in this manner, thus eliminating the time between receipt and deposit. In addition, during the mid-1980s, the BIA sought to engage the services of third-party banks or trust service providers for fund management services. One of the expected benefits of such an arrangement was improved cash management, including the more expeditious deposit of receipts. Finally, in early 1990, a depositary was designated in Pawhuska, ending the need for further mailings to Muskogee.

Because the BIA was plainly taking a variety of steps to speed the processing of royalty receipts, the totality of the circumstances demonstrates that it acted in a reasonable manner.

**c. All but two of the royalty payments were deposited within two days of receipt**

On only two occasions related to the payment of royalties for the Tranche One Leases for the Tranche One oil production did the time between receipt of payment and deposit extend beyond one day. One receipt took three days to deposit, but one of the days counted was a federal holiday. The second receipt took four days to deposit, but once again one of the days counted was a federal holiday. Thus, on only one occasion did the Tranche One deposits take more than two business days,

and on that occasion the deposit took just one more business day. By any standard, it is plain from the evidence that the Agency consistently deposited the royalty receipts related to the Tranche One leases in an extremely expeditious manner. The Court thus should conclude that the Government's deposit practices were reasonable and the Agency's observance of these practices properly discharged its duties related to the timely deposits of royalty receipts.

**2. Timeliness of investment of funds**

In an effort to particularize the duty to timely invest funds, Plaintiff quotes from the Restatement (Third) of Trusts, which provides that:

> [i]t is normally the duty of the trustee promptly to invest cash . . .The trustee is normally liable for failure to do so for a time that is, *under all the circumstances*, unreasonably long. The trustee is not liable, however, if a delay is reasonable and, when applicable, the trustee has taken reasonable advantage of opportunities to earn interest on the funds while seeking to make what may be more suitable, longer term investments.

Restatement (Third) of Trusts § 181, cmt. d (1992) (emphasis added). Defendant does not quarrel with this standard, which the Government has met.

After the funds related to the first three Tranche One months became available to Interior,[41] they started earning four percent simple interest under Section 161a until they were placed in longer term investments. In addition, for certain periods, Interior invested the funds in shorter-term Treasury bonds until higher-yield bank certificates of deposit ("CD") became available. After the funds related to the later three Tranche One months became available, Interior invested the funds in the Overnighter until they could be placed in higher-yield bank CDs or Treasury bills. Interior's practice, as applied to the Tranche One Osage funds, was reasonable.

---

[41] During the Tranche One period, Treasury made deposited funds available to Interior for investment or disbursement as of the date of the confirmed Certificate of Deposit.

## C. Investment Yield

### 1. The Government properly exercised its discretion under 161a and 162a

In enacting sections 161a and 162a, Congress expressly vested in Interior the discretion to select among the investment options and vehicles authorized. Congress provided certain parameters to guide the exercise of this discretion.

First, Congress set forth the permissible investments in which Osage's tribal trust funds may be placed. Under Section 161a(a), as amended in 1984, Congress gave Interior the option of investing trust funds placed in Treasury in "public debt securities." 25 U.S.C. § 161a(a). Under Section 162a(a), Congress gave Interior the option of placing trust funds in adequately-collateralized banks, public-debt obligations of the United States, or in "bonds, notes, or other obligations . . . unconditionally guaranteed" by the United States. 25 U.S.C. § 162a.

Second, Congress provided that investments should be made for appropriate maturities. Section 161a expressly provides that Interior, when it exercises its discretion to direct that the Secretary of Treasury invest trust funds, is to determine the "maturities suitable to the needs of the fund involved." 25 U.S.C. § 161a(a). Section 162a thus comes into play if, in the exercise of Interior's discretion, Osage funds are withdrawn from Treasury and deposited in banks under section 162a(a). In exercising its discretion under section 162a, a key relevant factor for Interior to consider, as in exercising its counterpart discretion under section 161a, is the suitability of the maturities of given investments given the specific needs of the Tribe. The Government properly exercised its discretion by investing in instruments with maturities appropriate to the specific Osage Trust fund account at issue in this case.

Finally, Congress provided certain security requirements for certain investments. If Interior

elects to deposit trust funds in a bank, it must choose a bank that meets the collateral requirements of Section 162a. 25 U.S.C. § 162a(a); *see also id.* § 162a(c)(1)(A)-(D). Also, if Interior chooses to invest in bonds, notes, or other obligations other than public-debt obligations, they must be unconditionally guaranteed by the United States. 25 U.S.C. § 162a(a).

In addition to these parameters, Interior's exercise of discretion should also be measured against a prudent investor standard. *See* 25 C.F.R. § 115.809. As also explained in a leading treatise on trusts,

> [i]n determining whether a trustee used the care and ability of a prudent investor, the courts will consider many factors, for example, the extent of the investigation made by the trustee before investing, ratings and opinions of experts, the adaptability of the investment to the needs of the particular trust, diversification, [and] protection against inflation. . . .

George T. Bogert, Trusts 385 (6th ed. 1987). In investing trust funds, the trustee should exercise the care, skill, and caution that a prudent person would exercise under the circumstances. William F. Fratcher, Scott on Trusts § 227 (4th ed. 1988). Under the requirement of care, the trustee should make a reasonable investigation into the investments available for the trust funds. *Id.* Under the requirement of skill, the trustee must exercise the reasonable degree of skill of a prudent person. *Id.* § 227.2. Finally, under the requirement of caution, the trustee should recognize that his primary purpose "should be to preserve the trust estate, while receiving a reasonable amount of income." *Id.* § 227.3.

Whether the trustee's conduct meets these requirements is judged at the time it was made and not at a later time. *Id.* "[T]he prudent person standard is not concerned with results; rather, it is a test of how the fiduciary acted viewed from 'the perspective of the time of the [challenged] decision' rather than from the 'vantage point of hindsight.'" *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915,

918 (8th Cir. 1994) (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)); *see also In re Unisys Savings Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996) (holding that the prudent investor standard requires "focusing on a fiducirary's conduct in arriving at an investment decision, not on its results. . . .").

**2. Interior discharged its discretionary duty through investing in allowed instruments with appropriate maturities**

Tranche One involves one account of the Osage Tribe, account 7386, to which royalty receipts are credited. The Government disburses the royalties, net of taxes and Tribal Council expenses, on a quarterly basis to the Tribal members. 1906 Act § 4; Act of March 3, 1921, Pub. L. No. 66-360, Chap. 120, 41 Stat. 1249 (Parties' Joint Appendix, Sources of Law, Tab 2). Accordingly, maturities suitable to the fund necessarily are limited by the required quarterly payment to Tribal members. In addition, the securities that were available and appropriate for investment due to these Osage-specific maturity needs were limited to the Overnighter, short-term Treasury securities, and short-term bank CDs. Interior invested in instruments permitted under the statutes with maturities appropriate to meet the Osage quarterly payments; thus, it properly exercised its discretion within the parameters of the investment statutes.

**3. Interior discharged its discretionary duty through investing in a manner that comported with the prudent investor standard**

In investing the proceeds from the Tranche One leases for the Tranche One months, Interior also satisfied the prudent investor standard. Interior properly investigated the available investments for Osage funds during the Tranche One months through a system whereby banks made bids for varying amounts of trust funds to be placed in CDs of varying maturities while Interior also considered other available investment options, such as continued placement in the Treasury at four

percent interest (pre-1985), placement in the Overnighter (post-1984), or investment in Treasury securities. Interior's investments for the Osage all were timed to mature at or before the appropriate headright payment dates; thus, it adapted its investment strategy for this Tribe to the payment requirements of the specific Osage trust fund. In addition, Interior ensured that a reasonable amount of funds was readily available for the payment of taxes and Tribal Council expenses. Defendant's investment expert examined this entire pattern of Investor conduct and opined that it met the prudent investor standard.

Interior also earned a reasonable return on the Osage funds. Although Interior was not obligated by statute (post-1984) to earn any particular return on such investments, and despite the fact that the Court's examination should focus on the trustee's conduct rather than the trust's performance, the return on the Osage funds is still a factor to be considered in evaluating compliance with the prudent investor standard. Interior earned a return that for five of the six Tranche One periods exceeded (and for the sixth, was near) the average rate of return for securities of comparable and appropriate maturities; thus, it made a reasonable return on the Osage funds. This is compelling evidence to justify a finding that Interior acted as a prudent trustee.

**D. Disbursements**

**1. Long-standing disbursement practice**

Since long before the Tranche One period, the Government has followed the practice whereby an agency debits its account at the time a disbursement is made – e.g., a check is issued or an EFT is effectuated. When the agency debits its account, the amount of the disbursement is no longer available for investment. This practice applies to tribal trust funds managed by Interior and accords with long-standing accounting standards that apply to federal agencies. In 1950, Congress enacted

the Budget and Accounting Procedures Act, 64 Stat. 832, which set forth Government responsibilities for budgeting, accounting, auditing, and financial reporting. Pursuant to this and other acts, in 1965, the Comptroller General of the United States issued Accounting Principles and Standards for Federal Agencies ("Principles and Standards"), which provided guidelines for agencies to implement improvements to their financial and accounting systems. (Def.'s Ex. 2324). [42/]

The Principles and Standards were designed to ensure management control over agency appropriations and funds. *See* Principles and Standards at 2-8. In part, control over obligations was necessary to ensure that they were "within limits of congressional appropriations and other authorizations and restrictions." *Id.* Further, the Principles and Standards provided that "financial transactions shall not be recorded in agency accounts in a manner that will produce materially inaccurate or false or misleading information. All financial transactions must be accounted for as realistically as possible and in accordance with the time and manner the events occurred that are being recorded." *Id.* at 2-16 - 2-17. To fulfill these requirements, the Comptroller explained that disbursements "shall be recorded promptly on the basis of paid vouchers"[43/] or, when "disbursing is performed by another agency, the disbursements may be recorded on an approved voucher basis. . . ." *Id.* at 2-27.

The 1972 edition of BIA's Accounting Principles and Standards, complied with the Budget and Accounting Procedures Act of 1950 and conformed with the Comptroller General's Principles and Standards. 42 BIAM 1.1 (Def.'s Ex. 2325). Interior explained that BIA's accounting system would record disbursements"when made." 42 BIAM 1.6.A (Def.'s Ex. 2325). Further, Interior

---

[42/] The Principles and Standards explicitly applied to trust fund accounts. *Id.* at 2-24 - 2-25.

[43/] Vouchers are considered paid when a check is issued or EFT is effectuated.

provided that "[d]isbursements shall be recorded on an approved voucher basis or, when the Bureau performs its own disbursing, on a paid voucher basis."[44]

The Court should not second guess the accounting principles and standards that the Comptroller General set forth and that Interior followed. Congress explicitly directed the Comptroller General of the United States to "prescribe the principles, standards, and related requirements for accounting to be observed by each executive agency." 64 Stat. 835. The principles and standards set forth by the Comptroller General thus deserve deference from the courts. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, (1984).[26] In addition, Congress required that "each executive agency shall establish and maintain systems of accounting and internal control designed to provide . . . effective control over and accountability for all funds . . . for which the agency is responsible. . . ." 64 Stat. 836. Because Interior fulfilled this duty and appropriately followed the Comptroller General's prescriptions, the Court should also defer to the accounting practices implemented for BIA.

Under these accounting practices, BIA recorded disbursements to Osage headright owners as of the date the checks had been issued and EFTs effectuated for the quarterly headright payment. Once recorded as a debit, the funds associated with those payments were no longer available for

---

[44] Subsequently, Interior decided to record disbursements made by Treasury on the date the requested checks were issued – *i.e.*, on a paid-voucher basis.

[26] Even pre-*Chevron* decisions suggest that "[w]hen actions of procurement officials have been expressly validated by considered decision of the GAO [General Accounting Office] or are in compliance with a reasonably consistent pattern of GAO determinations, the court should be extremely reluctant to overturn such actions." *Kinnett Dairies, Inc. v. J.C. Farrow*, 580 F.2d 1260, 1272 (5th Cir.1978). *See also J.H. Rutter Rex. Mfg. Co. v. United States*, 706 F.2d 702, 711 (5th Cir.), cert. denied, 464 U.S. 1008 (1983) ( "[D]ecisions of the Comptroller General are entitled to special deference given the complexities and intricacies of government purchasing decisions.").

investment. Accordingly, BIA acted reasonably and in compliance with law in following this practice.

Moreover, as of the time of disbursement, the nature of the funds changed. The funds were no longer in the Osage trust fund, and no longer held by Interior, available for productive use. Rather, at the time the Treasury Regional Disbursing Office issued the checks for headright payments, a government liability was created in a Treasury account called "Disbursing Officers' Checks Outstanding." The checks were outstanding, and they remained a government liability, payable on demand, until the check was presented to a bank by the payee. The Government thus properly ceased to calculate interest on these monies once they represented a liability of the United States rather than an asset of the Osage trust fund. Long ago, the Comptroller General approved this practice, whereby the funds carried in "expenditure" accounts of Treasury for disbursement to Indians did not have to earn interest under 25 U.S.C. § 161a. Memorandum of the Comptroller General to the Secretary of the Treasury, 1956 WL 3036 (Feb. 20, 1956). The Court should also approve this practice. *See J.H. J.H. Rutter Rex Mfg Co.*, 706 F.2d at 711.

The nature of the Treasury checks further supports this conclusion. The payee of a check drawn on the United States Treasury is entitled to the funds no later than the day after that check is presented for payment. Thus, unlike the procedures more typically associated with checks drawn on private accounts, there is no allowance for the period of time it may take a check to clear through banking channels and be presented back to the payor bank. Treasury checks are payable on demand because they are issued and backed by the federal government. As such, they are considered cash equivalents and the payee is entitled to obtain the funds from the check without waiting for it to clear the banking system. *See Armstrong v. United States*, 171 F. Supp. 835, 838 (E.D. Pa. 1959)

(Treasury check has same effect as bank's check and is the equivalent of the receipt of cash), *remanded on other grounds*, 283 F.2d 122 (3d Cir. 1960). Thus, the United States acted in a reasonable manner when it selected the date a check is issued as the point when the underlying funds stopped earning interest. That cutoff point was entirely consistent with and driven by the way in which Treasury checks are handled within the banking system.

**2. Implementing a system that would have allowed the Government to calculate interest on disbursed funds prior to checks clearing would have been unreasonable and unduly burdensome**

To calculate interest on issued-but-uncleared checks under the pre-1985 version of 25 U.S.C. § 161a would have entailed the implementation of a system to track the dates on each individual check cleared. The Government's central accounting system was designed to provide for "consolidating the accounting results of all agencies under a unified system of central accounting and financial reporting for the Government." I TFRM 2-1020. It is not designed or maintained in a manner that makes implementing a system to track check clearance dates easy or economically attainable. Moreover, the additional investment returns would have been minuscule. In short, such an undertaking would not have been cost-effective. Accordingly, the Government was acting reasonably when it did not implement a new system to enable it to track the dates on which each check cleared for purposes of calculating and paying interest on each such check amount between when they are issued and when they clear. This is consistent with the deference to agency practice and interpretations as recently affirmed in *Cobell v. Norton.* 428 F.3d at 1075-76 (finding that, because neither congressional language nor common law trust principles established a definitive cost / benefit balance regarding the performance of an accounting, the Court would defer to Interior's expertise and judgment in allocating scarce resources); *see also Norton v. Southern Utah Wilderness*

*Alliance*, 542 U.S. 55 (2004).

**3. Plaintiff would not be entitled to interest earned on uncleared checks**

Even if the Government was able to implement a system to allow it to calculate interest or invest funds associated with uncleared checks, Plaintiff would not be entitled to the earnings. At the point when Interior disburses checks for headright payments, the payments belong to the individual headright owners. Thus, the headright owners receiving the payments, not the Osage tribal trust fund from which the payments were made, would arguably be entitled to any additional interest. Although this Court found that the Osage Nation has an interest, and therefore standing, in the funds that are within the tribal trust account, it also suggested that the Tribe had no further interest or claim to the funds once distributed to headright owners. *Osage Nation v. United States*, 57 Fed.Cl. 392, 395 (2003). Similarly, the Tribe certainly has no claim to any alleged unpaid interest on uncleared checks, as such interest would belong to the headright owners, if anyone at all.

**4. Congress has accepted the federal agencies' practice of ceasing interest payments at the time of disbursement**

In the Competitive Equality Banking Act of 1987, Pub.L. No.100-86, 101 Stat. 552 ("CEBA"), Congress directed how outstanding Treasury checks are to be handled. The language that Congress chose in describing those procedures acknowledges and impliedly endorses the Government's practice of debiting an account when a Treasury check is issued from those funds. Congress addressed how such checks are to be handled prospectively and retrospectively. CEBA provided that existing checks that had been outstanding for more than one year were to be cancelled, and provided for the future cancellation, on a rolling basis, of checks issued in the future that remained outstanding for more than one year. Significantly, the proceeds of the checks existing and cancelled when CEBA was initially implemented were, pursuant to the terms of that statute, to be

used to offset certain Government costs, while the proceeds of future checks cancelled under CEBA "shall be returned to the agency concerned and credited to the appropriation or fund account *initially charged for the payment*." 31 U.S.C. 3334(a)(2) (emphasis added).

In connection with the future cancellation of any Treasury checks outstanding for more than a year, Congress drafted CEBA to provide for the recrediting of principal only, and not interest, to the debited agency's account. That provision supports a fair inference that Congress did not contemplate that the monies debited from the agency's account to cover a Treasury check issued from that account would earn interest while the check was outstanding. Had Congress intended for interest to accrue and be credited as well, it could have specifically stated that requirement.[27/]

Congress's intention, reflected in CEBA, supports the conclusion that Congress accepted the existing Government practice to be that, when funds were disbursed by Treasury check, the funds did not continue to earn interest beyond the time the check was issued.

---

[27/] Congress subsequently provided appropriated funds to reimburse tribal trust funds for the proceeds of existing cancelled checks that had been issued from trust funds, but, even then, it did not include any provision for the payment of interest on those proceeds. *Compare*, Department of the Interior & Related Agencies Appropriations Act, 1994, Pub.L. No. 103-138, 107 Stat 1379, 1393 (1993), clause (1) ("$3,000,000 shall be available to (1) liquidate obligations owed tribal and individual Indian payees of any checks canceled pursuant to section 1003 of the Competitive Equality Banking Act of 1987 (Public Law 10086 (101 Stat. 659)), 31 U.S.C. 3334(b)" *with id.* at clause 2 ("and (2) to restore to Individual Indian Monies trust funds amounts invested in credit unions or defaulted savings and loan associations and which were not Federally insured, *including any interest on these amounts that may have been earned, but was not because of the default.*") (emphasis added). When Congress expressly provides for an entitlement or right (here, interest) in one provision, and is silent in another provision in the same Act, the implication is that Congress did not intend the entitlement or right in the second provision. *Qwest Communications International, Inc. v. FCC*, 398 F.3d 1222, 1232 (10th Cir. 2005)

### 5. The authorities on which Plaintiff relies do not support its disbursement lag time claim

Plaintiff asserts that the Government breached its trust duties when it did not pay interest or invest the money covering checks that had been issued but not cashed or cancelled, because this practice left "an excessive amount of trust funds on deposit for an unreasonably long time" without investing it. Plf.'s Mem. at 73-75, *citing* Restatement (Second) of Trusts § 180, cmt. d. In addition to the factual inaccuracies of the contention, Plaintiff's sources do not support its position.

First, most of the authorities for Plaintiff's proposition address private trusts. Plaintiff's attempt to use standards applicable to private trustees for the Government should be rejected. As noted above, checks drawn on the United States Treasury are processed and handled in ways that differ from checks drawn on private banks, and procedures and considerations that may apply to one do not necessarily apply to the other. Treasury checks are not analogous to checks written on an individual or corporate checking account. As explained above, Treasury checks, like cashier's or bank checks, are the equivalent of cash, and the payee is entitled to obtain the funds from the check without waiting for it to clear the banking system. *See Armstrong v. United States*, 171 F. Supp. at 838; *DaSilva v. Senders*, 600 F. Supp. 1008 (D. D.C. 1984) (summarizing reasons why cashier's checks are viewed as cash). If the Court were to consider standards applicable to private trustees, it would still find that it is essential that such checks be funded upon issuance rather than waiting until the check is presented for clearance. *See Van de Kamp v. Bank of America Nat'l Trust & Savings Ass'n*, 204 Cal. App. 3d 819, 852 (1988) (quoting trial court finding that "[t]he trust check is virtually the same as a cashier's check since [defendant], by issuing the check, has already accepted it for payment. As is true of a cashier's check, a trust check is almost a form of money and may be cashed immediately. Hence, [defendant] must ensure that it has funds available for payment at the time it

is issued.”).

Further, the common law, properly construed, does not support Plaintiff’s claims. The general common law rule related to the investment of trust funds “is that the trustee is under a duty to make such investments as a prudent person would make of his own property having primarily in view the preservation of the estate and the amount and regularity of the income to be derived.” William F. Fratcher, Scott on Trusts, vol. III, p. 431 (4th ed. 1988); *see also* Restatement (Third) of Trusts § 227 ("The trustee is under a duty to the beneficiaries to invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust." ); Restatement (Second) of Trusts § 227. The common law of trusts does not impose a duty to pay interest beyond the date when the funds are disbursed or to use any particular method for calculating the date of disbursement. Rather, under the common law, the trustee is to exercise reasonable care, skill, and caution in making investments and “should incorporate risk and return objectives reasonably suitable to the trust.” *Id.* § 227(a).

In addition, trust law permits a trustee to deposit with itself trust funds that are being held pending distribution/disbursement. For example, in a situation where a trustee holds funds pending distribution to an investment, it need not earn interest for the beneficiary while the funds are so held. “Where a trust company is permitted to deposit trust funds awaiting investment in its own commercial department, the funds so deposited cease to be trust funds and become the individual property of the trust company, and it is not accountable for any profit it makes in its commercial department through the use of the funds.” Scott on Trusts § 203. Further, the Restatement (Second) Trusts provides that “A trustee may deposit trust funds in a bank for the purpose of making the funds available from time to time for the payment of expenses or pending investment or distribution.” *Id.*

at § 180, cmt. a. The bank account in which the funds are deposited does not have to be interest-bearing. *Id.* at cmt. a and b. *See also id.* at §181, cmt. d (discussing duty to make trust property productive – "The trustee may also hold reasonable amounts in a checking account, even if the only 'return' is to compensate for banking services on a suitable basis."); *Van de Kamp*, 204 Cal. App. 3d at 852-53 (finding no obligation to provide to beneficiary "disbursing float").

Plaintiff's cases are not to the contrary. In the bankruptcy case, *In re Consupak, Inc.*, 87 B.R. 529, 542 (Bankr. N.D.Ill. 1988), the Court noted a duty to invest funds "beyond the amount needed to meet estate claims and administrative expenses."[28/] Here, Interior did not cease investing or earning interest on Osage funds until the date on which headright disbursements were made. At the time of disbursement, Interior ensured that it had sufficient available funds – funds that were no longer invested – to cover its disbursement. Funds beyond those needed for the disbursement that remained in the Osage trust account continued to earn interest or investment income.[29/]

In *In re D'Espinary-Durtal's Will*, 4 A.D.2d 141, 142 (N.Y.App.Div. 1957), the Court stated that "[f]iduciaries may not permit funds in their possession to lie fallow, if they are *not required for the payment of claims* or expenses *and are not necessary for distribution* within a reasonably short time." (Citations omitted) (emphasis added). The BIA did not allow the Osage funds earmarked for headright payments to lie fallow because these funds were required for payment of claims and were

---

28/ The Restatement provides that the trustee may be liable if "an *excessive* amount of money" is left on deposit without earning interest. Restatement (Second) of Trusts § 180, cmt. d (emphasis added). The Restatement does not define what constitutes excessive funds, but guidance can be found in cases cited by Plaintiff.

29/ To the extent there was any delay in negotiating checks, it was caused by beneficiaries who did not cash their checks in a timely manner. Their delay cannot be imputed to the Government, much less establish that the trustee breached its duty.

necessary for distribution, which occurred at the time the headright payment was made (e.g., at the time checks were issued or EFTs effectuated for the payment).

Finally, *Maryland National Bank v. Cummins* addressed a situation where a trustee failed to invest certain funds between the time of receipt, when the funds were placed in a non-interest bearing demand deposit account, and distribution to beneficiaries. 588 A.2d 1205, 1206-07 (Md. 1991). The case did not involve the failure to earn interest or investment income once disbursements to beneficiaries were made. *Id.* at 1209. The Court concluded that the trustee should have invested the funds after it received them and before it distributed them. The Court recognized, however, that, to cover income distributions, the trustee could transfer cash out of investments to a disbursement account. This is, of course, what Interior, in effect, did. When it made a disbursement for headright payments, it disinvested the appropriate amount of funds to cover the quarterly disbursements.

**DAMAGES**

In determining any damages to be awarded to the Tribe, this Court is constrained by the contours of the statutes and regulations on which the Tribe's claims of breach are based: the Tribe may not recover as damages amounts which require this Court to go beyond the letter of the pertinent statutes, regulations and leases themselves. *See Pawnee*, 830 F.2d at 191. In other words, the Tribe may not use its claimed damages as an alternative means of "maximizing" its claims of breach.

Further, any interest to which the Tribe may be entitled under *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1351-55 (Fed. Cir. 2004), should be limited to that which should have been earned by the Government between the date, for example, of any underpayment of royalties, failure to collect royalties, or failure to timely deposit receipts, and the date of the next annuity disbursement that would have included that income had it been timely collected or deposited. Since

the Government, by law, would have been required to disburse those receipts or earnings as part of its quarterly annuity payment to the headright owners, 1906 Act § 6, the Tribe is not entitled to interest beyond the period that the Government would have held those receipts or earnings.[30]

This construction is supported by the presumption that prejudgment interest is unavailable as an element of relief against the United States. That presumption rests both on general principles of sovereign immunity and, in part, on 28 U.S.C. 2516(a), which states that "[i]nterest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof." The Supreme Court has made clear that Section 2516(a) imposes a substantial burden on a party seeking an award of interest against the United States:

> [T]here can be no consent by implication or by use of ambiguous language. Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice where the intent is not translated into affirmative statutory or contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed.

*Library of Congress v. Shaw*, 478 U.S. 310, 318 (1986) (citations and internal quotation marks omitted). Similarly, in *United States v. Thayer-West Point Hotel Co.*, the Court stated that

> [i]t is not enough that the term [in a contract] might be construed to include the payment of interest. . . . That provision must be affirmative, clear-cut [and] unambiguous . . . . Likewise, where a statute is relied upon to overcome the force of [the predecessor of 28 U.S.C. 2516], the intention of Congress to permit the recovery of interest must be expressly set forth in the statute.

329 U.S. 585, 590 (1947).

---

[30] Damages must be measured as of the time of breach. *See, e.g., Estate of Berg v. United States*, 687 F.2d 377, 380, 231 Ct. Cl. 466, 469 (1982); *Northern Paiute Nation v. United States*, 9 Cl. Ct. 639, 643 (1986); *Cavanagh v. United States*, 12 Cl. Ct. 715, 717 (1987). Any breach would have ended by the time the lost income would have been disbursed as part of a quarterly annuity payment.

In addition, finding that Plaintiff is entitled only to the interest between the date that the damages were incurred and the date of the next annuity payment is consistent with *Shoshone*. In *Shoshone*, the Court concluded that 25 U.S.C. §§ 161a, 161b, and 162a, in conjunction with a fiduciary duty of the Government to collect revenue, create an obligation for the Government to pay interest on amounts that the Government failed to collect. 364 F.3d at 1353. The interest payment would not be considered an award on damages, but '"as part of the damages award itself.'" *Id.* (citation omitted). The damages that the Osage Tribe would have incurred due to, for example, a royalty underpayment, would have included the amount of the underpayment and the lost investment returns or interest that would have been earned on that royalty revenue. In turn, the investment returns or interest that would have been earned on that royalty revenue would have accrued only up until the point of the next quarterly annuity payment. Plaintiff has not demonstrated that it is entitled to interest up to today's date. Indeed, Plaintiff itself seeks only the "interest and investment earnings the Osage Trust would have received. . . ." Depositary Brief at 14. Paying interest to present would provide the Tribe with more earnings than it would have received and would amount to an award of interest on damages, for which there is no authorization in the relevant statutes.

To the extent that the Court does determine that the Tribe is entitled to the interest beyond the annuity payment dates, the appropriate rate to use to equate dollars paid today for damages incurred during the Tranche One period would be the inflation rate.

Respectfully submitted this 26th day of January, 2006,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Division

*s/ Brett D. Burton*
BRETT D. BURTON
United Sates Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0212

Counsel of Record for Defendant

*s/ Martin J. LaLonde*
MARTIN J. LALONDE
KEVIN WEBB
United States Department of Justice
Environment and Natural Resources Division
P. O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0247
Fax: (202) 353-2021

Attorneys for Defendant

OF COUNSEL:

Elisabeth Brandon
Brenda Riel
Attorneys
Office of the Solicitor
Division of Indian Affairs
U.S. Department of the Interior
MS 6456

Washington, D. C. 20240
Telephone: (202) 208-4218
Fax: (202) 208-3490

Teresa E. Dawson
Senior Counsel
Office of Chief Counsel

Financial Management Services
U.S. Department of the Treasury
401 14th Street, S.W.
Room 552A
Washington, D.C. 20227
Telephone: (202) 874-6877
Fax: (202) 874-6627