# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA, | ) |
| PLAINTIFF, | ) |
| V. | ) Case No. 99-550L (into which has been consolidated No. 00-169L) |
| THE UNITED STATES OF AMERICA, | ) |
| DEFENDANT. | ) Judge Emily C. Hewitt |

*******************************************

ORAL/VIDEOTAPED DEPOSITION OF
LUCIAN L. MORRISON
FEBRUARY 13, 2006

*******************************************

ORAL/VIDEOTAPED DEPOSITION OF LUCIAN L. MORRISON, produced as a witness at the instance of DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on MONDAY, FEBRUARY 13, 2006, from 9:31 a.m. to 2:40 p.m., before Pam Gwin Coder, CSR in and for the State of Texas, recorded by machine shorthand, at the offices of Akin Gump Strauss Hauer & Feld, LLP, 1111 Louisiana, 44th Floor, Conference Room J, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any notary public.

JOB NO. 1-51225

don't understand a question that I ask, please feel free to ask me to restate the question. And if your answer is a guess or an estimate, please let me know. And just to make sure we have a common understanding of a couple terms, if in response to a question that I ask you you say you don't know, to me that means that you never knew. Whereas, if you say, "I don't remember," that means at one time you may have known, but you just can't recall at this time.

A Fair enough.

Q Also, please tell me if you need to change or supplement your answer at any time. For the record, Mr. Morrison, do you feel fine physically today?

A I do indeed.

Q We'll probably be taking breaks approximately, you know, every hour, but if for any reason you need to take a break, please let me know.

A I will.

Q Mr. Morrison, have you heard of the term "Tranche One leases"?

A No, I don't know that -- I don't know what that phrase means -- that word means.

Q Do you know what the term "Tranche One months," what that term means?

A No.

A I have not.
Q Do you have any personal notes relating to the subject matter of this case?
A I do not.
Q Please turn the page. Mr. Morrison, do you have any letter of understanding for fees and expenses in this action?
A No. This relationship came up so quickly that I have not. We have a verbal agreement relating to fees and expenses.
Q So I assume No. 7 is not applicable at this time either? You don't have any invoices or billings?
A I do not.
Q What is your verbal understanding of your fees and expenses for this action?
A That with the exception of the time I am actually testifying at trial, I will -- I will receive my standard hourly fee of $460 an hour and reimbursement of all reasonable expenses.
Q But is it your understanding that you will not be paid for the time that you testify at trial?
A That is -- that is correct.
Q What about your time today at the deposition?
A It's my understanding that I will be paid for that, but if that is not appropriate, of course, I will

any -- anything about that oil and gas accounting course?
A No.
Q Did you take any other courses that would relate to oil royalty payments?
A You talking about in undergraduate school, sir?
Q Yes. And in -- yeah. For now we're just focusing on the undergraduate, your time at University of Texas at Austin.
A In the -- in the School of Business Administration because, obviously, I took an oil and gas course in law school. Well, more than one.
Q For now I'm just focusing in on your time in undergraduate.
A I wanted to be sure -- I wanted to be sure I understood your question.
Q No. That's -- that's good. Make sure we're -- make sure it's clear.
A And the answer to the question is none, other than the one oil and gas accounting course.
Q Did you take any courses while you were in college that related to how to measure oil volume?
A No.
Q Mr. Morrison, I'd like to direct your

attention now to your time at the University of Texas at Austin, School of Law, from 1958 to 1960. Did you take any courses in law school relating to mineral trusts?

A Yes. Mineral -- to minerals or mineral trusts?

Q Mineral trusts.

A Well, I took trust courses and I took oil and gas courses. And, of course, they overlapped some. And so the answer is yes to both of those, but there was no such thing as a course specifically for mineral trusts.

Q If you could briefly describe the trust courses that you recall taking in law school.

A Well, I took two -- two trust classes, a standard law school trust course which basically is all sorts of fiduciary -- relating to all sorts of fiduciary matters, primarily trusts, and the other one was a seminar in which -- in which we did planning, including estate planning around the use of trusts. And that was the trust courses. And the oil and gas course, it's basically the basic course in oil and gas law.

Q Do you recall some of the -- and I'm asking you at a fairly high level -- but some of the type of

know.
Q Do you recall if any of those articles related to mineral trusts?
A Well, since I can't recall what the articles were about, I -- I can't say whether they related to mineral trusts. My guess would be probably not.
Q Have you ever lectured on the topic of mineral trusts?
A Not that I recall.
Q Have you ever lectured of the topic of trusts?
A Yes.
Q Do you recall approximately what -- what forum that was and when that occurred?
A Well, over the years at meetings of the Texas Bankers Association, Trust Division, and in -- in any number of CLE events, if I can call them that, relating to trust estates, probate, and those sorts of matters. I've -- I've done it probably six or seven times.
Q And I believe you testified that you don't recall any of those lectures relating to the topic of mineral trusts?
A Not that I recall.
Q Do you recall any of those lectures relating to the topic of oil royalty payments?
A Not that I recall.

Q Mr. Morrison, have you testified as an expert witness before?
A Yes.
MR. ROTHROCK: Counsel, just to correct the record, I don't believe that he's testified that he's testifying today as an expert, and I wasn't sure if that's what you meant by the question or not.
Q (By Mr. Burton) No. At this point I'm just asking general background questions, not about your role today.
A Very well.
Q Do you recall approximately how many times you've testified as an expert witness?
A Well, that would be the same approximate number of times that I've had my deposition taken. So my guess would be that it's in the 40s.
Q Do you recall approximately what time period that covers that you've been testifying as an expert witness?
A I started testifying as an expert witness in the middle 1980s.
Q Do you recall the last time that you testified as an expert witness?
A Oh, yeah. It was last year.
Q And just to make sure we're both clear about

testifying on behalf of the plaintiff and how often you were testifying on behalf of the defense?

A Yes. It is my belief that the -- that the defense work is about 60 percent and the plaintiff's work is about 40.

Q And, once again, at a fairly high level, what is the defense work? What are the types of issues you're dealing with in defense work versus the plaintiff's work? What are the --

A Well, virtually all of the cases relate to breaches of fiduciary duty. Actually, all of the cases relate in one way or another to alleged breaches of fiduciary duty. And I've -- as I say, I have worked on all sorts of those things, both as plaintiff's expert and as defendant's.

Q So just for the record, when you're -- when you're testifying on behalf of the plaintiff, what -- who do the plaintiffs typically consist of?

A Well, depends on the nature of the case. Let me give you some examples. If it is -- if they are private trusts, they have a tendency to be suits by beneficiaries against trustees. If they are ERISA plans, they have a tendency to be suits, usually class actions, against some fiduciary of the plan by the participants in the plan. On the defense side I help

comptroller of the currency for national banks. They set the standard for not only legalities but also best practices.

Q So, one, you've discussed the trustee's duties may be set out in a document or will be set out in a document. Secondly, you discussed statutory regulations. And when you said jurisdiction, I assume you're talking about state's -- different state jurisdictions?

A Well, to my knowledge there is not a codified Federal trust law except in specific areas that I don't know much about. And so I am saying that -- that state -- that in state actions there are -- there are codes of some sort, trust codes of some sort for, I think, every state. I don't know of a state that strictly depends on the common law.

Q And these various sources of the trustee's duty -- documents, statutory regulations, common-law trust cases -- and I -- what was the fourth one again that you stated?

A The fourth one is the regulatory agencies that regulate professional trustees.

Q In discussing these four sources of a trustee's duty, you were talking about a private trustee as opposed to the United States government

acting as a trustee?
A I -- I don't -- don't claim expertise in the United States government acting as a trustee. So I don't know the answer to that.
Q So these different sources for the duties of a trustee would pertain to -- is there any way you can generally describe these trustees in some instances a person, in other instances a company? I'm just trying to understand if you're talking about a trustee that's a private entity versus a trustee that's a, you know, a government entity like United States?
A Well, as I said, my experience relates to private entities. My -- I -- I have never testified in any kind of a case either for or against the government of the United States relating to a trust circumstance. I testified in some tax matters, but not in -- not in anything equivalent to this sort of thing.
Q So when the United States government is acting as a trustee, do you not know how their -- how their duties would be defined, what sources?
A It is my belief that all trustees including the United States government are subject to the basic rules of -- of trust management responsibility, but for statutory shades and phases that I am not aware of.
Q So just to understand the statutory phases, so

where the United States government is acting as a trustee in general, is it accurate to say that you don't have experience when the Department of Interior, specifically the Bureau of Indian Affairs, is acting as a trustee?

A That is correct.

Q And you don't have any experience dealing with the -- relating to the Osage Agency, which is part of the Bureau of Indian Affairs, when it's acting as a trustee?

A That is correct.

Q And is it a fair characterization that your experience in the trustee context is -- has been dealing with private trustees as opposed to government trustees?

A I -- that is correct.

Q Mr. Morrison, what's your understanding of this -- the Osage Nation litigation? Let me strike that. What's your understanding of the -- this litigation you've been called to testify?

A Well, as I told you, I have examined nothing. And so what I get, I get secondhand from the lawyers. When I asked what the nature of the litigation was, I was told -- and this is all very general -- I was told that it related to the method by which the United

States government as trustee for the benefit of the Osage Nation had managed the oil and gas properties and particularly managed the -- the oil productions from the Osage Nation wells. I was further told that the issues relate not only to the price that was paid in accordance with the applicable either document or statute, and I -- that didn't sink in as to which it was. And, secondly, relating to the -- the management diligence of the -- of the trustees towards protecting the -- the volumes of product produced. And then I was asked to provide an opinion not about whether the government failed in any fiduciary duty, but rather the -- my opinion as to what a prudent fiduciary to my -- prudent professional fiduciary year would do in my experience relating to the management of both the pricing and the volumes. And as a -- in other words, what -- what I have done, not -- not -- I'm not trying to be an expert here -- what I have done in my capacity as a trust manager or what I have controlled in situations where there were -- where I had organizations to do the work as to what fiduciary duty was -- was -- what my fiduciary duties consisted of -- and in the management and -- and control and accounting of the production. That's way too long an answer, and I apologize.

Q So it's -- it's not your understanding that you'll be providing an opinion regarding whether or not the Osage Agency properly managed the Osage Nation's mineral estate, correct?

A I have no idea how the Osage Agency managed. I'm being proffered as a fact witness on what a professional fiduciary -- what I, as a professional fiduciary, have done in the past and are doing currently relating to these issues.

Q But it is your understanding that you are -- that you were being requested to provide an opinion regarding what a prudent fiduciary year would do relating to pricing and volumes based on your -- on your experience?

A No. I don't think so. I think it is more narrowly defined than that. I'm being asked to provide testimony as to what I have -- am doing and have done relating to those issues. I as a -- as a professional fiduciary with -- Lord how many years -- 35 years of -- 37 years of professional fiduciary experience much of it relating to oil and gas.

Q I believe you did -- you did previously testify that -- I believe you used the word "prudent" -- a prudent professional fiduciary would do. But you're limiting that now to, I guess, a more narrow

context, what a professional --
A Yeah, I -- I consider myself a prudent professional fiduciary. And what I need to be able to say is: This is what I have done in what I believe to be the exercise of my duties as a professional fiduciary in a prudent manner. I think that's a little different than trying to talk about what a prudent professional fiduciary would do. Do you see the difference?
Q I'm not sure if I do. But I can -- but I think you've clarified your position for the record.
A Thank you.
Q We have gone over some of this before, so I'll do this fairly quickly. But you don't have any personal knowledge of the Tranche One leases and the Tranche One months in this case, correct?
A Nothing at all.
Q And you don't have any knowledge of, personal knowledge, of the Osage mineral estate and trust, correct?
A Is that a defined term? I --
Q Well, let me ask you what is your understanding of the Osage mineral estate?
A Well, it's my understanding that it is managed under some -- under some basis, whether it's statutory

or by written agreement by the Bureau of Indian Affairs.
Q But your -- you don't know the specific --
A No.
Q -- basis of --
A I know nothing about it.
Q Do you know the size of the Osage mineral estate?
A No. Well, I've been around the oil business since I was -- my family has been in the oil business for -- since even before I graduated from college and so you know that the Osage Indian estate, mineral estate, has been a very, very significant number just -- just from common knowledge. But I -- I have no specific knowledge.
Q Did you have any preexisting knowledge of the issue in this litigation prior to meeting with Mr. Rothrock and other --
A No.
Q No?
A I didn't even know there was litigation going on. So . . .
Q And I believe you testified that you don't have any knowledge of the Osage Agency's administration of the Osage mineral estate trust?

it for? And we sold the producing properties for $30 million and we sold the pipeline for 15. And those are round numbers.
Q And none of the leases were Indian leases, correct?
A No.
Q And they weren't Federal leases?
A There may have been a Federal lease or two in the process, but they were irrelevant to the total.
Q Do you recall approximately the number of lessees that you would have to deal with on a monthly basis?
A Oh, there were a lot. I'm sorry. That --
Q Can you say, for instance, more than a certain number or, like, more than 20 or more than 30?
A Well, since all of that accounting was done in the corporation's offices, I can only guess as to what a -- because -- because that was done -- that accounting was done by the corporation, but I would say 40 or 50 lessees, 40 or 50 payors. And that's -- that's a pretty wild guess, Counsel.
Q Do you recall the oil production from this mineral estate on a -- just an average oil production on an annual basis?
A In dollars?

in the negotiation of the -- of the new leases. It's been probably fully a quarter by that time. But the rest of the time when things are running along pretty smoothly, you know, my staff spends time on it, but I don't spend much.

Q And what sort of a support staff do you have?

A For these purposes?

Q Yes, in this matter.

A Internally? Of course, I can go externally for all kinds of services, but I have a petroleum engineer, a CPA, and an accountant that are directly involved in oil and gas activities on my staff.

Q And you employed -- you employed their services for managing this mineral estate?

A And others that I have, including my own. I have substantial oil and gas activity of my own.

Q And, once again, these -- the oil assets from this mineral estate -- let me strike that and rephrase it. The oil from this mineral estate is not in any way derived from the Osage mineral estate, correct?

A Oh, no.

Q And it's --

A No, it's in South Texas.

Q And none of these leases were Indian leases, correct?