**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Electronically Filed: February 22, 2006<br><br>No. 99-550L (into which has been consolidated No. 00-169 L)<br>Judge Emily C. Hewitt |

**DEFENDANT'S BRIEF PURSUANT TO FEBRUARY 17, 2006 ORDER**

In its February 14, 2006 Order and attached pretrial agenda, the Court raised a number of issues related to the standard of care that should apply to the Government's actions in collecting and depositing moneys due the Osage Tribe as royalty payments and in investing Osage trust funds. Pursuant to the Court's February 17, 2006 Order accepting additional briefing on any relevant issue, Defendant herein respectfully files this brief addressing the issue of the appropriate standards of review that the Court should apply at trial to evaluate Plaintiff's claims that the Government violated certain identified duties.

To determine whether the United States discharged the trust duties elaborated in its October 27, 2005 decision, the Court has suggested that it may apply the standard whereby it evaluates whether the Government acted as a reasonably prudent person or investor under the circumstances existing at the time of the alleged breach or acted in its customary agency role. While Defendant reserves its argument that an arbitrary and capricious standard is appropriate, for purposes of trial and this brief, it assumes that a standard of reasonableness under the circumstances will apply and discusses this standard in detail below.

A number of overarching circumstances, or factors, should guide the Court's application of this standard. First, in discharging its duties under the 1906 Osage Act, its implementing regulations, and the investment statutes codified at 25 U.S.C. §§ 161a and 162a, the Bureau of Indian Affairs ("BIA") has not merely donned the mantle of administrator, nor has it acted solely as a trustee. Elements of both roles were present. On the one hand, the BIA's actions were constrained by various statutory requirements, including the Administrative Procedures Act's requirements related to agency adjudications and the interpretation and implementation of regulations. They were also constrained by the appropriations Congress provided to it, for, unlike private trusts, the administration costs of the BIA are not paid from the trust funds, but are funded at taxpayers' expense. *See Cobell v. Norton*, 428 F.3d 1070, 1075 (D.C. Cir. 2005); *Cobell v. Norton*, 392 F.3d 461, 473 (D.C. Cir. 2004). On the other hand, as this Court held in its October 27, 2005 Opinion, the 1906 Act imposes certain trust duties on the Government, which must be fulfilled in light of the aforementioned constraints confronting federal agencies.

In short, the scope of the Government's duties as both agency and trustee are set forth in statutes and regulations. The first inquiry for the Court, therefore, is to determine whether the Government acted in accordance with the plain dictates of the governing statutes and regulations. *See Shoshone Indian Tribe of the Wind River Reservation v. United States*, 56 Fed.Cl. 639, 649 (2003).

Next, in those instances where the statutes or regulations are silent – where they do not plainly require the agency to follow a particular course of action in fulfilling its duties – the Court must determine (1) whether the agency has offered an interpretation of the sources of law and (2) the level of deference it should grant to the agency construction. If the agency has construed its

statutory obligations in the face of statutory ambiguity or silence through notice and comment rulemakings or adjudications, the construction is entitled to *Chevron* deference. *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984); *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Williams v. Babbit*, 115 F.3d 657, 660 n.3 (9th Cir. 1997). If the agency construed its statutory obligations in policy statements or agency manuals, the construction is entitled to persuasive weight. *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (finding that Courts may treat "interpretations [similar to those] contained in policy statements, agency manuals, and enforcement guidelines," as persuasive)*; Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) (the weight accorded to an administrative judgment "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."). If the agency's statutory interpretation contained in a manual or guideline is longstanding, that interpretation is entitled to deference. *Morton v. Ruiz*, 415 U.S. 238, 236-37 (1974).

If the agency has formally construed its regulatory obligations through, for instance, adjudications, the Court should grant the construction a "high level of deference." *See, e.g., Star Lake Railroad Company v. Lujan*, 737 F.Supp. 103, 107 (D.D.C. 1990), *aff'd*, 925 F.2d 490 (D.C.Cir. 1991). Finally, if the agency's interpretation of its regulatory duties is set forth by virtue of long-standing and consistent practice, that interpretation should be considered definitive and entitled to deference. *See Torch Operating Co. v. Babbitt*, 172 F. Supp. 2d 113, 125 (D.D.C. 2001) (finding that a consistent practice established a definitive agency interpretation of its regulations).

Deference to the Government's interpretation of its regulations means that the Court should not substitute its or the Plaintiff's preferred interpretation so long as the Government's

interpretation, be it established through an adjudication or long-standing implementation of the regulation, was "within the range of reasonable meanings." *See Burlington Resources Oil & Gas Co. v. Department of Interior*, 21 F.Supp.2d 1, 5 (D.D.C. 1998). The traditional test for reasonableness is whether (1) the agency's interpretation or action is consistent with the statute under which the regulations were promulgated and with the wording of the regulation, (2) the agency took into account relevant factors and (3) there was a rationale connection between those factors and its interpretation or action.

Thus, for example, in *Okie Crude v. Muskogee Area Director*, the Interior Board of Indian Appeals concluded, in construing "offered price" in the Osage regulations, that "a price that is not offered to a producer is not an 'offered price' as to that producer within the meaning and intent of 25 C.F.R. § 226.11(a)(2)." 23 IBIA at 183. In determining whether to uphold and apply the Board's construction, the Court should find that the Board's conclusion is rationally related to, or supported by, the relevant ordinary meaning of the term "offered price."

Similarly, in deciding whether to uphold Interior's determination, provided through long-standing and consistent implementation of the pricing regulations, that the value of oil for royalty purposes should be based on oil of like kind or quality, the Court should conclude that this determination was rationally connected to standard industry practice. According to that practice, lessees and purchasers priced oil based on its quality, through making gravity adjustments to prices, and, in the price control era, based on the regulated category of the oil. Further, the Court should find that this construction of the pricing regulations was rationally connected to the relevant premise that lessees should not be responsible for paying royalties on a price that they could not obtain for their oil. Further, this construction is consistent with the 1906 Act and its amendments, which

obligated the BIA and the Osage Tribal Council to make the mineral estate productive through leasing. *See, e.g.,* Pub.L.No. 75-711, 52 Stat. 1034, 1035 (1938) § 3. This obligation would have been undermined if lessees were prohibited from making their operations profitable because they had to pay royalties on prices they could not have hoped to obtain.[1]

An additional important relevant factor that the BIA considered in its construction and implementation of the Osage regulations was the interests of the Osage Tribe, including its sovereignty and self-determination interests. Tribal sovereignty and self-determination is a fundamental and long-standing concept that guides federal tribal policy, including policy involving the Osage Tribe.[2] The federal interest in promoting tribal sovereignty and self-determination does not permit Interior to waive, modify, or diminish its responsibilities to the Tribe: Defendant is still held to account for its continuing fiduciary duties. Nevertheless, due to this interest, the Tribe's involvement and input is an important factor to consider in determining whether Interior reasonably implemented its governing regulations and discharged its duties.

---

[1] This standard of review applies to other issues before the Court, such as the propriety of Interior's practice of charging the Osage tribal trust account at the time of disbursement, rather than at the time checks cleared, which practice was rationally connected to, among other factors, the need to control funds.

[2] In 1934, Congress, in the Indian Reorganization Act of 1934, emphasized self-determination by providing for the creation of new tribal governments in a form that would facilitate government-to-government interaction with the federal government and states. 25 U.S.C. § 476. In 1975, Congress enacted the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450 *et seq.*, as "the centerpiece of an effort to move from the federal domination of programs and services for Indians to one in which Indian Tribes control 'the planning, conduct, and administration of those programs and services.'" COHEN'S HANDBOOK OF FEDERAL INDIAN LAW at 412 (2005 ed.). Recently, the Supreme Court noted that the Indian Minerals Leasing Act, "aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties." *U.S. v. Navajo Nation*, 537 U.S. 488, 509 (2003)

Thus, for example, when considering whether the Osage Agency properly interpreted and implemented the Osage pricing regulations, the Court should examine the BIA's reasonable understanding of the Tribe's position related to those regulations at the time of their implementation. At that time, the BIA understood that the Tribal Council knew of and accepted that the regulations related to royalty value took into account the price that a lessee could receive for different qualities or kinds of oil.

Also, on more than one occasion, the Tribal Council indicated that it was not in the Tribe's best interest to require the payment of royalties on values that exceeded that which the lessee could obtain. It recognized that fostering a fair pricing regime and a favorable relationship with its lessees could improve the overall productivity of its mineral estate. For example, in the mid-1980s, when the Tribe determined that the regulation, by basing royalty value on the posted prices in the Oklahoma/Kansas area, led to lessees having to pay royalty on prices they could not obtain, it recognized that the regulations could serve as a disincentive to production of Osage oil. Accordingly, the Tribal Council sought amendment of the regulations to change the relevant area to Osage County. Similarly, in 1991, when it became apparent that the Osage Agency's interpretation of "offered price"[3] for periods including the 1989 Tranche One month was going to serve as a disincentive to production of Osage oil and to purchaser's offering bonuses, it again sought to amend the regulations. This recognized concern, expressed in the context of the Tribe's seeking amendments to the regulations, should also inform a consideration of the reasonableness of the Agency's interpretation and implementation of the regulations. If the Agency had interpreted "offered price," gravity adjustments, and, in the price control era, regulated prices as Plaintiff now

---

[3] It was this interpretation that the IBIA overturned in *Okie Crude*.

suggests it should have, the interpretations would likely have acted as disincentives to production or maximization of prices and would therefore be unreasonable. Instead, by interpreting these terms so that royalty payments would be based on prices that could reasonably be obtained by lessees, the agency's interpretation was consistent with the best interests of the Tribe, as expressed at or near the relevant time-frame by the Tribal Council itself.

Accordingly, should the Court substitute its view of the appropriate interpretation of the regulations for that of the agency, it not only would run counter to the agency's receiving appropriate deference but also would intrude on the sovereignty of the Tribe. The Court should decline to substitute its or Plaintiff's recent view of what is in the best interest of the Tribe for a determination made in the first instance by the BIA and the tribal government itself at the relevant time. *Cf. DeCoteau v. District County Court*, 420 U.S. at 447 (declining to apply the Indian canon because it "is not a license to disregard clear expressions of tribal and congressional intent").

Respectfully submitted this 22nd day of February, 2006,

*s/ Brett D. Burton*
BRETT D. BURTON
Counsel of Record for Defendant

*s/ Martin J. LaLonde*
MARTIN J. LALONDE
KEVIN WEBB
United States Department of Justice - ENRD
Washington, D.C. 20044-0663
Telephone: (202) 305-0212
Attorneys for Defendant

OF COUNSEL:
Elisabeth Brandon
Brenda Riel
Teresa E. Dawson