# EXHIBIT A

# ACTUARIAL NOTE

**Number 142**
**January 1999**

**SOCIAL SECURITY ADMINISTRATION**
**Office of the Chief Actuary**

## SOCIAL SECURITY TRUST FUND INVESTMENT POLICIES AND PRACTICES

*by Jeffrey L. Kunkel*

### Introduction

With trust fund assets growing from just under $46 billion at the end of September 1986 to over $730 billion at the end of September 1998, interest earnings from the investment of trust fund assets have been an increasing percentage of trust fund income. (See the table below.) As the trust funds continue to grow over the next several years, this trend will continue. Without changes to present law, future expenditures are expected to first exceed future tax income in 2013 or thereabouts. Interest earnings will then play an even more important role in financing the Social Security program.

**Table 1.—Interest Income as a Percent of Total Trust Fund Income, Fiscal Years 1987-98**
*(Amounts in millions)*

| Fiscal year[1] | Interest income | Total income | Interest as a percent of total income |
|---|---|---|---|
| 1987 | $4,638 | $226,893 | 2.0 |
| 1988 | 6,500 | 258,090 | 2.5 |
| 1989 | 10,310 | 284,936 | 3.6 |
| 1990 | 14,909 | 306,822 | 4.9 |
| 1991 | 19,759 | 322,611 | 6.1 |
| 1992 | 23,637 | 338,270 | 7.0 |
| 1993 | 26,788 | 351,354 | 7.6 |
| 1994 | 29,203 | 376,307 | 7.8 |
| 1995 | 33,304 | 396,276 | 8.4 |
| 1996 | 36,508 | 416,064 | 8.8 |
| 1997 | 41,215 | 446,553 | 9.2 |
| 1998 | 46,632 | 478,608 | 9.7 |

[1] The government's fiscal year is the 12-month period ending September 30.
Note: Interest income includes minor interest adjustments on certain interfund transfers and reimbursements.

Each year the Board of Trustees for the Social Security Trust Funds issues a report on the financial adequacy of these trust funds, the Old-Age and Survivors Insurance (OASI) and Disability Insurance (DI) Trust Funds. The last several annual reports by the Board have predicted the exhaustion of the combined funds by about 2030. This solvency issue has led many people to focus on investment policy to see if the funds might receive a greater rate of return if a different investment policy were substituted. This note[1] lays out the current investment policies and practices to provide background information needed for a rational debate on the merits of change.

Table A1 in the appendix to this note shows the invested assets of the trust funds as of September 30, 1998. The Social Security Administration's Internet site has links to this table and to data on the fiscal operations of the trust funds. The address for such financial data is http://www.ssa.gov/OACT/ProgData/funds.html. The financial data are updated monthly.

Information concerning the performance of invested assets held by the trust funds can be found in Actuarial Note 138, "Effective Annual Interest Rates Earned by the OASI and DI Trust Funds, 1940-96." The effective annual interest rates earned by the trust funds are updated annually on the Internet at http://www.ssa.gov/OACT/ProgData/intRates.html.

### Current Investment Policies and Practices

With but one exception, the current policies governing investment of trust fund assets were adopted in 1960 or earlier. Many of these policies actually date back to the original Social Security Act of 1935.

The framework and many of the details of trust fund investment policy are established in law. Policies enacted in 1935 and still in effect today provide that:

- *The Managing Trustee is responsible for the investment of all available trust fund assets.* The Secretary of the Treasury is the Managing Trustee and, as such, is solely responsible for the investment of trust fund assets. The Managing

[1] This note is indebted to work done by Ronald Davis, who first compiled the investment policies and practices in 1986 while working for the Social Security Administration as its liaison to the public members of the Board of Trustees. Since then, there has been little change in investment policies.

Trustee must invest that portion of the assets of the trust funds that is not, in his judgment, required to meet current withdrawals.

- *Trust fund assets may be invested only in obligations issued or guaranteed by the U.S. government.* The assets of the trust funds must be invested in obligations of the United States government or in obligations guaranteed as to principal and interest by the United States. These obligations may be acquired (1) on original issue at the issue price, or (2) by purchase of outstanding obligations at the market price.

- *"Special obligations" of the U.S. government are available to the trust funds for investment.* The Treasury is authorized to issue "special obligations" for purchase exclusively by the trust funds on original issue. In practice, these may be either short-term "certificates of indebtedness" or longer-term special issues in the form of notes or bonds.

- *Special obligations may be redeemed prior to maturity without risk of loss to the trust funds.* Unlike other Treasury obligations, special obligations may be redeemed at any time before maturity at their face value (i.e., their original purchase price) plus accrued interest, if needed to cover program expenditures. Therefore, their early redemption cannot result in gains or losses of trust fund capital. On the other hand, if marketable obligations are sold prior to maturity, the prevailing market price is paid.

Three other statutory policies also govern trust fund investment. These varied in the early years of the Social Security program, but have been unchanged since 1960 or before. They provide that:

- *Special obligations are the preferred investment vehicle.* Prior to 1960, the law had generally given preference to the purchase of marketable obligations. Actual practice, however, was to invest largely in special obligations, because purchase of marketable obligations was viewed as potentially disruptive to capital markets. Since 1960, the law has provided that special obligations are to be purchased unless the Managing Trustee determines that the purchase of marketable obligations would be in the public interest. Purchase of marketable obligations has been quite limited, and has not occurred since 1980.

- *The rate of interest on special obligations is the average market yield on long-term U.S. obligations.* The law originally established a fixed interest rate for special obligations. This was superseded by several formulas for computing the interest rate based on the coupon rates of outstanding U.S. obligations. The current market-yield formula was adopted in 1960. It essentially provides that the interest rate on new special obligations will be the average market yield, as of the last business day of a month, on all of the outstanding, marketable U.S. obligations that are due or callable more than 4 years in the future.[1] The rate so calculated is then rounded to the nearest one-eighth of one percent and applies to new issues in the following month. The rate of interest determined for a special obligation security is payable throughout the term of the security and does not vary.

- *Special obligations have maturities fixed with due regard for the needs of the trust funds.* This provision was enacted in 1956. Previously the law was silent as to maturities. The administrative policy followed since 1959 (with rare exceptions) has been to spread the maturity dates of each trust fund's portfolio of special obligations as evenly as possible over the next 1 to 15 years, with the month and day of maturity always being June 30. (At the time the policy was set, June 30 was the end of the government's fiscal year.) The policy calls for immediately investing income received by the trust funds in short-term special obligations, called certificates of indebtedness, that mature on the next June 30. On June 30, the certificates of indebtedness and any other special issues that mature on that date are reinvested ("rolled over") as special issue notes or bonds with maturity dates designed to achieve an even 1-to-15 year spread.

Finally, several essential elements of investment policy are addressed by the law in ways that require administrative interpretation, or are not addressed at all. Primary examples of the former have already

[1] The Department of the Treasury announced on December 21, 1998, that it had made a programming error in computing the average market yield. The error, affecting interest rates in recent years only, caused calculation of yields on callable securities to always be on a "yield to maturity" basis. Yields on those callable securities trading above par, however, should have been calculated on a "yield to call" basis. As a result, the Social Security Trust Funds currently hold certain securities that earn a slightly higher interest rate (1/8 of one percent) than they should had the interest rate calculation been based on prevalent industry practice. The error was corrected with the rate effective for January 1999.

been mentioned above. These are the statutory policies and administrative interpretations governing the purchase of special versus marketable obligations, and the selection of maturity dates for special obligations. In addition, the law is silent on the policy to be followed in redeeming obligations. Two administrative policies have been adopted to fill this void.

- *Obligations held by the trust fund may be redeemed prior to maturity only when their redemption is required to pay program costs.* Obligations will not be prematurely redeemed and reinvested in order to obtain higher (or lower) interest rates, or redeemed for any purpose unrelated to the payment of program costs.
- *Redemption of special obligations prior to maturity will follow a specified, hierarchical procedure.* Because all trust fund income is invested immediately upon receipt, certificates of indebtedness and/or other special issues must be redeemed when cash is needed during the month to pay benefits and other program expenses. When required to pay program costs, special obligations will normally be redeemed in maturity-date order, beginning with the earliest maturity date. Special obligations with the same maturity date will be redeemed in interest-rate order, beginning with the lowest interest rate. Special obligations with both the same maturity date and the same interest rate will be redeemed on a First-In-First-Out basis. Marketable obligations will not be redeemed prior to maturity unless there are no special obligations available for redemption. On rare occasions, the order of redemption has been temporarily modified to deal with unusual circumstances.

While stipulating how interest rates on special-issue obligations should be determined, the law is silent on how frequently interest should be credited to the trust funds. In keeping with the above administrative policy on maturities, interest on special-issue obligations is paid at the end of June. It has been Treasury's policy to pay interest semiannually on marketable notes and bonds, and that policy has continued with special-issue obligations. Thus, interest on these obligations is also paid at the end of December. In addition, when securities are redeemed to pay expenses, interest accrued to the redemption date is paid. (The amount of securities redeemed is generally such that this amount plus the accrued interest is just sufficient to cover the expense.)

The certificates of indebtedness and all other Treasury special obligations issued to the funds thus have three important properties. They (1) are redeemable at par at any time, (2) carry an interest rate determined for the month of issuance in accordance with the statutory average market yield formula, and (3) pay interest semiannually on June 30 and December 31, or upon redemption.

The Department of the Treasury, acting on the instructions of the Managing Trustee (the Secretary of the Treasury), currently uses the following investment procedures for Social Security's OASI and DI Trust Funds.

As individual income taxes and Social Security payroll taxes are received daily throughout a month, the general fund of the Treasury transfers to the trust funds an estimated proportion of these taxes until the total of the daily transfers equals a predetermined estimate. If the total of the daily transfers fails to meet this estimate by the end of the month, additional funds are transferred on the last business day to exactly meet the estimate.[1] The estimated tax transfers are allocated between the two funds in proportion to the statutory OASI and DI tax rates. The transferred funds are immediately invested in certificates of indebtedness, the special obligations that mature on the following June 30. Other trust fund income during the month is also invested in certificates of indebtedness immediately upon receipt.

All trust fund investment in special obligations is, however, subject to the statutory limit on total public debt outstanding. The gross Federal debt includes amounts owed to Federal trust funds, including the Social Security trust funds. New Treasury obligations cannot be issued to the trust funds if doing so would cause the debt limit to be exceeded.

If trust fund income consistently equaled or exceeded outgo over a long period, then on June 30 the nonmature investments of the trust funds would have maturities more or less evenly spread over the next 1 to 14 years. The certificates of indebtedness and other special issues that have just matured would then first be reinvested with 15-year maturities to fill the gap in the portfolio, with any excess being spread evenly over each of the 15 years of maturity in the investment period. This in fact is now the case with the OASI Trust Fund. In the early 1980s, however, a funding crisis required that all of the securities of the

[1] The estimated tax transfers are subsequently adjusted when actual data on taxable wages become available.

OASI Trust Fund be redeemed to pay benefits. Subsequent reinvestment over the next few years was broadly spread over the entire 15-year maturity period in order to restore the OASI portfolio. The situation for the DI Trust Fund is similar, but the funding crisis occurred more recently and was resolved in 1994 before the fund became exhausted.

The following table contrasts the reinvestment of maturing securities, or roll over, for the OASI Trust Fund on June 30, 1984, with that for June 30, 1998. Note that for 1984 about 31 percent of the total available for roll over was put into a one-year bond. This was done because bonds would need to be redeemed before a sufficient amount of certificates of indebtedness had accumulated to pay expenses and no other bonds matured in the short term. In 1998, on the other hand, about 33 percent of the total available for roll over was put into a 15-year bond.

**Table 2.—"Roll Over" of Maturing Securities Into Special-Issue Bonds Old-Age and Survivors Insurance Trust Fund, June 30 of 1984 and 1998**

*(In millions)*

| Maturity year | June 30, 1984 | | | Maturity year | June 30, 1998 | | |
|---|---|---|---|---|---|---|---|
| | Before | Roll over | After | | Before | Roll over | After |
| 1985 | — | $5,262 | $5,262 | 1999 | $37,090 | $6,169 | $43,259 |
| 1986 | — | 1,492 | 1,492 | 2000 | 37,090 | 6,169 | 43,259 |
| 1987 | — | 1,492 | 1,492 | 2001 | 37,090 | 6,169 | 43,259 |
| 1988 | — | 1,492 | 1,492 | 2002 | 37,090 | 6,169 | 43,259 |
| 1989 | $155 | 1,337 | 1,492 | 2003 | 37,090 | 6,169 | 43,259 |
| 1990 | 1,022 | 470 | 1,492 | 2004 | 37,090 | 6,169 | 43,259 |
| 1991 | 1,022 | 470 | 1,492 | 2005 | 37,090 | 6,169 | 43,259 |
| 1992 | 1,022 | 470 | 1,492 | 2006 | 37,090 | 6,169 | 43,259 |
| 1993 | 1,022 | 470 | 1,492 | 2007 | 37,090 | 6,169 | 43,259 |
| 1994 | 1,022 | 470 | 1,492 | 2008 | 37,090 | 6,169 | 43,259 |
| 1995 | 1,022 | 470 | 1,492 | 2009 | 37,090 | 6,169 | 43,259 |
| 1996 | 1,022 | 470 | 1,492 | 2010 | 37,090 | 6,169 | 43,259 |
| 1997 | 1,022 | 470 | 1,492 | 2011 | 37,090 | 6,169 | 43,259 |
| 1998 | 1,022 | 470 | 1,492 | 2012 | 37,090 | 6,169 | 43,259 |
| 1999 | 0 | 1,492 | 1,492 | 2013 | 0 | 43,259 | 43,259 |
| Total | 9,355 | 16,794 | 26,149 | Total | 519,254 | 129,629 | 648,884 |

Note: Totals may not equal the sum of rounded components.

The funding crisis in the early 1980s led Congress to change the mechanism of transferring estimated tax receipts to the trust funds by having the entire estimated monthly receipts deposited on the first day of the month. Such "advance tax transfers" ensured that more funds would be available for paying benefits early in the month and minimized the redemption of bonds. The legislation that brought about the advance tax transfers was part of the Social Security Amendments of 1983. The legislation also provided that the trust funds would pay interest semiannually to the general fund of the Treasury on what amounted to monthly short-term loans. Congress amended the advance tax transfer provisions in November 1990 so that such transfers would only be made to a fund if its assets were otherwise insufficient to pay benefits.

When benefits are paid, securities must be redeemed. The timing of the redemptions, however, depends on the extent to which payments are made by paper check versus direct electronic fund transfers to banks or other financial institutions. In the case of beneficiaries paid by direct deposit, redemption of securities occurs on the payment date. Payment of checks is made by charging the Treasury's general account as checks clear. Redemption of obligations held by the trust funds to reimburse the general account is made on a schedule that takes into account the average of the dates the checks are actually negotiated. This effectively gives the trust funds the benefit of the "float" between the date checks are written by Treasury and the dates they are negotiated. As an increasingly higher percentage of benefits are paid by direct deposit, however, the value of the float has steadily diminished.

If trust fund outgo exceeds income by substantial amounts or for a number of months, funds available from the redemption of short-term obligations may be insufficient to cover costs. In this case, it becomes necessary to redeem longer-term securities as well.

A more complex and less obvious set of circumstances occasionally occurred in the 1980s, when the advance tax transfer could not be invested in certificates of indebtedness because the limit on Federal debt had been reached and the Treasury was prevented from issuing new debt. Longer-term obligations then had to be redeemed in order to pay benefits. When the Treasury's cash balances became extremely low, these obligations were redeemed prior to the payment of benefits in order to create borrowing authority and use it to borrow from the public the cash needed to make the benefit payments. This practice also enabled the Federal government to continue other, non-Social-Security financial transactions for a longer period than otherwise could have occurred. As a result, the Treasury action was viewed by some as an inappropriate use of Social Security funds and was the source of considerable controversy. In retrospect, however, it was agreed by most knowledgeable observers that Treasury had few options and had taken the best course of action during a very difficult period.

## Trust Fund Investment Principles

The principles that have heretofore guided trust fund investment are not explicitly set forth in the law. The legislative history of the Social Security Act provides only a partial guide to their nature and intent. As often as not, the principles and their rationale must be inferred from the specific legal and administrative policies adopted to govern investment of the funds during the past 60 years.

The legal and administrative policies that have governed the investment of trust fund assets appear to be premised on four interrelated principles. These principles are: (1) non-intervention in the private economy; (2) investment only in financially secure instruments; (3) maintenance of general neutrality in the financial dealings between the trust funds and the general fund of the Treasury; and (4) minimal, or non-active, management and investment decision-making by the Managing Trustee.

### Principle 1: Non-intervention in the private economy

Trust fund investment policy, both statutory and administrative, has always been non-interventionist with respect to the private economy and private (or non-Federal) capital markets. This principle underlies the legal requirement that trust fund assets be invested only in U.S. obligations. It was explicitly addressed by the 1959 Advisory Council on Social Security, whose report stated:

> The Council recommends that investment of the trust funds should, as in the past, be restricted to obligations of the United States Government. Departure from this principle would put trust fund operations into direct involvement in the operation of the private economy or the affairs of State and local governments. Investment in private business corporations could have unfortunate consequences for the social security system—both financial and political—and would constitute an unnecessary interference with our free enterprise economy. Similarly, investment in the securities of State and local governments would unnecessarily involve the trust funds in affairs which are entirely apart from the social security system.

The principle of non-intervention is also reflected in the creation and use of non-marketable, special obligations as the primary investment vehicle for the funds. Although statutory policy has always permitted investment in marketable U.S. obligations and, in fact, favored it in some of the earlier years of the program, the consistent administrative policy has been to invest trust fund assets almost exclusively in special obligations. This practice was adopted, at least in part, to avoid the market disruptions that might result from the purchase or sale by the trust funds of large blocks of marketable U.S. obligations in the open market and the appearance of U.S. government interference in open market operations of the Federal Reserve.

### Principle 2: Security

Since the beginning of the program, the law has required that trust fund assets be invested only in "interest-bearing obligations of the United States or in obligations guaranteed as to both principal and interest by the United States." This provides the investments of the funds with the greatest possible protection against the risk of loss of principal or interest due to default.

To the degree that the trust funds purchase marketable U.S. obligations some risk of loss (and, conversely, prospect of gain) due to market fluctuations would be entailed if they were not held until maturity. Practice for many years has been to hold all marketable obligations until maturity unless their sale was required to make benefit payments.

Much more important, however, is the historic practice of investing the vast majority of trust fund assets in special obligations. These securities are purchased at par and can be redeemed at any time at par plus accrued interest. Thus, they are wholly risk free.

In summary, the law since the beginning of the Social Security program has provided that the trust funds be invested in the most secure obligations available, those of the U.S. government. Administrative policy has been to further ensure against risk due to market fluctuations by investing primarily in special obligations.

## Principle 3: Neutrality

Trust fund investment policies have, for the most part, followed a principle of neutrality, in the sense that they have generally been intended neither to advantage or disadvantage the trust funds (the lenders) with respect to other Federal accounts (the borrowers). The underlying concept is that when the trust funds invest assets by lending to the general fund of the Treasury, these transactions should produce investment results similar to those that might be obtained by a prudent, private sector investor in Federal securities. If the general fund could not borrow from the trust funds, it would have to meet its borrowing needs by selling additional securities to just such private investors.

Investment neutrality has the following major elements:

**Interest rate**—The first and most important element of a neutral policy is the statutory interest rate paid on special obligations. Purchases (and subsequent redemptions) of special obligations are transactions conducted wholly within the Federal government. As such, there are no market forces that automatically establish an "equitable" rate of return. Legislative policy makers are therefore free, at least in theory, to set the interest rate at almost any level.

Initially, the interest rate for special obligations was a fixed rate. It clearly favored the Social Security program, because it was higher than the rate paid to private investors in similar, marketable Federal obligations. The law was changed in 1939 to base the rate on the average coupon rates paid on almost all U.S. obligations, and in 1956 to base it on coupon rates for longer-term U.S. obligations. In times of low inflation and relatively constant interest rates, the coupon rates (combined with a policy of one-year maturities on special obligations, adopted in 1944) were reasonable approximations of market yields. Because by the 1950s the trust fund investments were recognized as essentially long term in nature, the elimination of short-term coupon rates from the calculation was seen by the Congress as being more equitable, or neutral, than the previous formula.

In response to upward trends in interest rates, legislation to convert to a market-yield formula was adopted in 1960. The market-yield formula prevented the trust funds from being disadvantaged by coupon rates that were lower than current market values. The Congress intended this change, in the words of the Report of the House Ways and Means Committee on the 1960 legislation, "...to make interest earnings on the Government obligations held by the trust funds more nearly equivalent to the rate of return being received by people who buy Government securities in the open market."

The Congress also recognized in the 1960 legislation that trust fund investments, as foreseen at that time, were primarily long term, but that they had a short-term component. After consideration of a different, short-term interest rate for that "minor portion of the funds" needed to meet "current and near future benefit obligations," they concluded that equitable treatment could be achieved using only one rate. Whether or not the adjustment was technically accurate, the short-term component was acknowledged in the decision of the Congress to shorten the minimum maturity dates of marketable obligations used in the interest-rate calculation from 5 years to 4.

As OASDI asset levels declined and a financing crisis resulted early in the 1980s, it could be argued that observance of a neutrality principle should have required changing the interest-rate formula to one based on shorter term obligations. This would have made the rates on trust fund investments similar to the rates on short-term obligations that would be purchased by a private investor faced with the need for liquidity. Such a change was, in fact, suggested—but for very different reasons. Short-term rates were at that time higher than long-term rates, and some proposed that the trust funds be allowed to take advantage of this inversion of the normal rate and maturity

relationship. In the end, the crisis passed without any alteration in the formula.

The chart below shows the interest rate on new issues for 1940 through 1998. Note the upward jump in 1960 when the current average market yield formula first took effect. The monthly interest rates underlying this chart may be found in appendix table A2.

**Interest Rates on New, Special-Issue Obligations, 1940-98**




**Maturity structure**—The administrative policies governing the maturity structure of special obligations in the trust fund portfolio are another element of neutrality. The administrative decision in the 1940s to assign short-term (1 year) maturities to special obligations was made in order to bring the coupon-rate interest formula then in use more closely into line with the market yields available to private investors. The change to a 1-to-15 year even spread of maturities, coupled with the adoption of the market yield interest formula in 1960, was viewed as the appropriate, neutral response to a changed situation. Trust fund assets could now be invested with long maturities at long-term market rates and, because trust fund balances were quite large, with only limited need for early redemption.

Adjustments in the policy for setting the maturities of special obligations have generally not been made since 1960, despite the changing circumstances of the trust funds. Maturities are less significant for the trust funds, however, than for the private investor. This is because special obligations bear long-term rates but, due to their redemption at par feature, have short-term (in fact, instant) liquidity with no risk of principal loss—an advantage not available to private investors. The administrative policy governing early redemption of special obligations, in combination with the policy of spreading maturities, is designed to compensate at least partially for, or neutralize, the advantage of no-risk liquidity.

**Redemption policy**—Obligations are never redeemed before maturity unless needed to meet current withdrawals. Major redemptions of special obligations with longer-term maturities are usually necessary only when a trust fund is running serious deficits. Even when the income of a fund generally exceeds its outgo, however, some of the obligations which mature on the next June 30 must be redeemed monthly to pay benefits. Under the current policy of spreading maturities over 15 years, an obligation maturing on the next June 30 may bear a rate of interest based on average yields that existed anywhere from a few months (in the case of certificates of indebtedness) to almost 15 years earlier. Over time, as market yields vary and as trust fund reserves fluctuate, the actual ages and interest rates of obligations maturing on a particular date are likely to vary in a complex manner that may not be entirely predictable well in advance.

In turn, the redemption policy based on earliest maturity date produces a more or less random selection of special obligations to be redeemed. Their interest rates may be above or below current market yields. In comparison to obligations sold on the open market, redemption of special obligations at par using this procedure may produce an increase in the overall portfolio interest rate (when their rates are below current market yields), a decrease (when above current yields), or mixed results. This automatic, mechanistic approach to redemption, by producing somewhat random investment outcomes, tends to offset any advantage or disadvantage to the trust funds that might be created by redemption at par and, over time, confers a kind of rough neutrality to the process.

**Neutrality not precise**—It can be argued that the use of one average long-term interest rate is inappropriate for special obligations that have maturities ranging from a few months to 15 years, or at times when major disinvestment is predicted to be required in order to pay benefits. Similarly, the redemption at par feature of special obligations is important to the principle of security but, in and of itself, may produce non-neutral advantages or disadvantages for the trust funds. When the long-term trend of interest rates is upward, as was the case before 1982, the trust funds are potentially advantaged. On the other hand, the current maturity-setting policy can be dis-

advantageous under such conditions because securities with relatively lower interest rates will often be held for long time periods.

The principle of neutrality, as applied to trust fund investment, is therefore not scrupulously precise. Nor is a policy enacted as being neutral under one set of economic or trust fund conditions necessarily neutral under significantly changed conditions. Nonetheless, legislative and administrative policy makers have historically worked to create and maintain a generally neutral system of investment.

### Principle 4: Minimal management of investment

Through a combination of legislative and administrative policies, management of trust fund investments is conducted using set procedures and formulas that largely eliminate discretionary decision-making. Active, day-to-day management of investments in response to changing economic conditions or needs, in the manner practiced by large private investors, is deliberately avoided.

Many of the key parameters of trust fund investment policy are set by law. The Managing Trustee, for example, does not have discretion to invest in other than Federal obligations or discretion as to what rates of interest to pay on special obligations. Nor can he choose not to invest the available assets of the funds (unless, arguably, he is constrained from doing so by other provisions of law).

The Managing Trustee does have the discretionary authority to invest in marketable Federal obligations if he determines that such investments would be in the public interest. He also exercises discretionary authority in determining the maturities of the obligations in which the trust funds invest, subject to the constraint that the maturities must be chosen with due regard for the needs of the funds. In addition, he has rather complete discretion as to the order of redemption of obligations held by the funds, provided that assets not needed to pay program costs remain invested.

In dealing with these discretionary authorities, Managing Trustees have consistently adopted highly mechanistic policies that avoid any active, day-to-day decision-making in managing trust fund investments. The de facto policy since the earliest days of the program has been largely to eschew investment in marketable obligations, even when the purchase of marketable obligations was legally preferred and might have resulted in higher returns on investment. Standardized, non-discretionary administrative policies for selecting the maturities of special obligations have been adopted and followed year after year. Further, Managing Trustees have determined that obligations may not be redeemed in advance of maturity unless redemption is necessary to pay program costs, and that the obligations that are redeemed will be selected following a non-discretionary procedure that ignores market conditions and other economic factors.

Administrative policy, in sum, has been designed to eliminate those elements of discretion that are granted by the law with respect to the daily management of trust fund investment. On those infrequent occasions when administrative policies have been changed in order to respond to changes in general economic conditions or in the law, a new set of non-discretionary procedures has simply been substituted for the old.

There are two fundamental reasons for this principle of minimal management. First, active management would almost certainly require actions that would be contrary to the principles of security and neutrality. The rationale for active management, to maximize the potential gain to the trust funds from investment, is a violation of the principle of neutrality. It could also entail the acceptance of some risk (e.g., through the purchase of marketable securities). Managing special obligations so as to maximize the return on trust fund investment—an objective that could be easily accomplished, for example, by redeeming low interest-rate special obligations at par and reinvesting at higher rates—would automatically disadvantage the general fund.

The second reason for minimal management is also rooted in the principle of neutrality. The Secretary of the Treasury is the Managing Trustee. For the Secretary to actively manage the investment of trust fund assets to the detriment of the general fund or, for that matter, to do the opposite, would involve a clear and unacceptable conflict of interest. Minimal management, employing policies designed to produce neutrality, avoids this dilemma.

# Appendix

**Table A1.—Investments Held at the End of September 1998 by the Old-Age, Survivors, and Disability Insurance Trust Funds**

| Type of investment | Interest rate (percent) | Maturity years | Amount (in millions) |
|---|---|---|---|
| Special issues: | | | |
| Certificates of indebtedness: | 5.375 | 1999 | $18,872 |
| | 5.750 | 1999 | 6,104 |
| Bonds: | 5.875 | 2000-2013 | 140,733 |
| | 6.250 | 2000-2008 | 48,558 |
| | 6.500 | 1999-2010 | 75,360 |
| | 6.875 | 1999-2012 | 101,047 |
| | 7.000 | 1999-2011 | 86,995 |
| | 7.250 | 1999-2009 | 66,927 |
| | 7.375 | 1999-2007 | 49,862 |
| | 8.125 | 1999-2006 | 43,072 |
| | 8.375 | 1999-2001 | 2,997 |
| | 8.625 | 1999-2002 | 7,577 |
| | 8.750 | 1999-2005 | 63,135 |
| | 9.250 | 1999-2003 | 14,874 |
| | 10.375 | 1999-2000 | 2,622 |
| | 13.750 | 1999 | 1,492 |
| Public issues: | | | |
| Treasury bonds: | 3.500 | 1998 | 5 |
| | 7.625 | 2007 | 10 |
| | 8.250 | 2005 | 4 |
| | 11.750 | 2010 | 30 |
| Total amount | | | 730,277 |

## Table A2.—Interest Rates (in Percent) on New Special-Issue Obligations, 1940-98

| | 1940 | 1941 | 1942 | 1943 | 1944 | 1945 | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|---|---|---|---|---|---|
| January | 2.500 | 2.500 | 2.375 | 2.000 | 1.875 | 1.875 | 1.875 | 2.000 | 2.125 | 2.125 |
| February | 2.500 | 2.500 | 2.375 | 2.000 | 1.875 | 1.875 | 1.875 | 2.000 | 2.125 | 2.125 |
| March | 2.500 | 2.500 | 2.375 | 2.000 | 1.875 | 1.875 | 1.875 | 2.000 | 2.125 | 2.125 |
| April | 2.500 | 2.500 | 2.375 | 2.000 | 1.875 | 1.875 | 1.875 | 2.000 | 2.125 | 2.125 |
| May | 2.500 | 2.500 | 2.250 | 1.875 | 1.875 | 1.875 | 1.875 | 2.000 | 2.125 | 2.125 |
| June | 2.500 | 2.500 | 2.250 | 1.875 | 1.875 | 1.875 | 1.875 | 2.000 | 2.125 | 2.125 |
| July | 2.500 | 2.500 | 2.250 | 1.875 | 1.875 | 1.875 | 1.875 | 2.000 | 2.125 | 2.125 |
| August | 2.500 | 2.500 | 2.125 | 1.875 | 1.875 | 1.875 | 2.000 | 2.000 | 2.125 | 2.125 |
| September | 2.500 | 2.375 | 2.125 | 1.875 | 1.875 | 1.875 | 2.000 | 2.000 | 2.125 | 2.125 |
| October | 2.500 | 2.375 | 2.125 | 1.875 | 1.875 | 1.875 | 2.000 | 2.125 | 2.125 | 2.125 |
| November | 2.500 | 2.375 | 2.125 | 1.875 | 1.875 | 1.875 | 2.000 | 2.125 | 2.125 | 2.125 |
| December | 2.500 | 2.375 | 2.000 | 1.875 | 1.875 | 1.875 | 2.000 | 2.125 | 2.125 | 2.125 |
| | **1950** | **1951** | **1952** | **1953** | **1954** | **1955** | **1956** | **1957** | **1958** | **1959** |
| January | 2.125 | 2.125 | 2.250 | 2.250 | 2.375 | 2.250 | 2.375 | 2.500 | 2.500 | 2.625 |
| February | 2.125 | 2.125 | 2.250 | 2.250 | 2.375 | 2.250 | 2.375 | 2.500 | 2.500 | 2.625 |
| March | 2.125 | 2.125 | 2.250 | 2.375 | 2.375 | 2.250 | 2.375 | 2.500 | 2.500 | 2.625 |
| April | 2.125 | 2.125 | 2.250 | 2.375 | 2.375 | 2.250 | 2.500 | 2.500 | 2.500 | 2.625 |
| May | 2.125 | 2.125 | 2.250 | 2.375 | 2.375 | 2.250 | 2.500 | 2.500 | 2.500 | 2.625 |
| June | 2.125 | 2.125 | 2.250 | 2.375 | 2.250 | 2.250 | 2.500 | 2.500 | 2.500 | 2.625 |
| July | 2.125 | 2.250 | 2.250 | 2.375 | 2.250 | 2.250 | 2.500 | 2.500 | 2.625 | 2.625 |
| August | 2.125 | 2.250 | 2.250 | 2.375 | 2.250 | 2.250 | 2.500 | 2.500 | 2.625 | 2.625 |
| September | 2.125 | 2.250 | 2.250 | 2.375 | 2.250 | 2.375 | 2.500 | 2.500 | 2.625 | 2.625 |
| October | 2.125 | 2.250 | 2.250 | 2.375 | 2.250 | 2.375 | 2.500 | 2.500 | 2.625 | 2.625 |
| November | 2.125 | 2.250 | 2.250 | 2.375 | 2.250 | 2.375 | 2.500 | 2.500 | 2.625 | 2.625 |
| December | 2.125 | 2.250 | 2.250 | 2.375 | 2.250 | 2.375 | 2.500 | 2.500 | 2.625 | 2.625 |
| | **1960** | **1961** | **1962** | **1963** | **1964** | **1965** | **1966** | **1967** | **1968** | **1969** |
| January | 2.625 | 3.750 | 4.000 | 3.750 | 4.125 | 4.125 | 4.625 | 4.625 | 5.625 | 6.000 |
| February | 2.625 | 3.750 | 4.000 | 3.750 | 4.125 | 4.125 | 4.750 | 4.500 | 5.375 | 6.125 |
| March | 2.625 | 3.625 | 3.875 | 3.875 | 4.125 | 4.125 | 5.000 | 4.750 | 5.375 | 6.250 |
| April | 2.625 | 3.750 | 3.750 | 3.875 | 4.250 | 4.125 | 4.750 | 4.375 | 5.625 | 6.250 |
| May | 2.625 | 3.625 | 3.750 | 3.875 | 4.125 | 4.125 | 4.750 | 4.750 | 5.625 | 6.125 |
| June | 2.625 | 3.750 | 3.750 | 3.875 | 4.125 | 4.125 | 4.875 | 4.750 | 5.625 | 6.500 |
| July | 2.625 | 3.875 | 3.875 | 3.875 | 4.125 | 4.125 | 5.000 | 5.125 | 5.500 | 6.625 |
| August | 2.625 | 3.875 | 4.000 | 3.875 | 4.125 | 4.125 | 5.125 | 5.000 | 5.250 | 6.625 |
| September | 2.625 | 4.000 | 3.875 | 4.000 | 4.125 | 4.250 | 5.375 | 5.125 | 5.375 | 6.750 |
| October | 3.625 | 3.875 | 3.875 | 4.000 | 4.125 | 4.375 | 5.125 | 5.250 | 5.375 | 7.625 |
| November | 3.750 | 3.875 | 3.750 | 4.125 | 4.125 | 4.375 | 5.000 | 5.625 | 5.500 | 7.000 |
| December | 4.000 | 4.000 | 3.750 | 4.000 | 4.125 | 4.375 | 5.000 | 5.625 | 5.625 | 7.250 |
| | **1970** | **1971** | **1972** | **1973** | **1974** | **1975** | **1976** | **1977** | **1978** | **1979** |
| January | 7.750 | 6.125 | 5.625 | 6.125 | 6.750 | 7.125 | 7.250 | 6.375 | 7.625 | 9.000 |
| February | 7.875 | 5.875 | 5.875 | 6.375 | 6.750 | 7.125 | 7.250 | 7.125 | 7.750 | 8.750 |
| March | 7.000 | 5.625 | 5.750 | 6.500 | 6.875 | 6.875 | 7.250 | 7.125 | 7.875 | 9.000 |
| April | 7.000 | 5.250 | 6.000 | 6.625 | 7.375 | 7.250 | 7.125 | 7.125 | 8.000 | 8.875 |
| May | 7.625 | 6.000 | 5.875 | 6.500 | 7.750 | 7.625 | 7.125 | 7.125 | 8.000 | 9.000 |
| June | 7.625 | 6.125 | 5.750 | 6.625 | 7.625 | 7.375 | 7.500 | 7.125 | 8.250 | 8.750 |
| July | 7.500 | 6.625 | 6.000 | 6.750 | 7.875 | 7.375 | 7.375 | 7.000 | 8.375 | 8.500 |
| August | 7.375 | 6.750 | 5.875 | 7.500 | 8.000 | 7.500 | 7.250 | 7.125 | 8.375 | 8.750 |
| September | 7.250 | 6.000 | 6.125 | 7.000 | 8.125 | 7.625 | 7.125 | 7.000 | 8.250 | 9.000 |
| October | 7.000 | 5.875 | 6.125 | 6.500 | 7.750 | 7.875 | 7.125 | 7.125 | 8.375 | 9.250 |
| November | 7.000 | 5.625 | 6.125 | 6.625 | 7.625 | 7.375 | 6.875 | 7.375 | 8.875 | 10.500 |
| December | 6.125 | 5.875 | 6.000 | 6.625 | 7.375 | 7.625 | 6.500 | 7.375 | 8.625 | 10.000 |

**Table A2.—Interest Rates (in Percent) on New Special-Issue Obligations, 1940-98 (Cont.)**

| | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|---|---|---|---|---|
| January | 10.000 | 11.875 | 13.500 | 10.500 | 11.750 | 11.500 | 9.125 | 7.500 | 8.875 | 9.250 |
| February | 10.750 | 12.125 | 13.750 | 10.875 | 11.500 | 11.125 | 9.250 | 7.375 | 8.250 | 9.000 |
| March | 12.375 | 12.875 | 13.625 | 10.375 | 11.875 | 11.875 | 8.375 | 7.375 | 8.125 | 9.375 |
| April | 12.250 | 12.500 | 13.625 | 10.625 | 12.375 | 11.625 | 7.625 | 7.625 | 8.625 | 9.375 |
| May | 10.375 | 13.500 | 13.250 | 10.250 | 12.625 | 11.375 | 7.625 | 8.375 | 8.875 | 9.125 |
| June | 9.750 | 13.000 | 13.250 | 10.750 | 13.750 | 10.375 | 8.375 | 8.625 | 9.250 | 8.750 |
| July | 9.625 | 13.250 | 13.875 | 10.875 | 13.750 | 10.250 | 7.750 | 8.500 | 8.875 | 8.250 |
| August | 10.125 | 14.000 | 13.250 | 11.750 | 12.875 | 10.625 | 7.750 | 8.750 | 9.125 | 7.875 |
| September | 11.125 | 14.875 | 12.250 | 11.875 | 12.750 | 10.375 | 7.250 | 9.000 | 9.250 | 8.375 |
| October | 11.500 | 15.250 | 11.625 | 11.375 | 12.375 | 10.375 | 7.750 | 9.625 | 8.875 | 8.500 |
| November | 12.000 | 14.250 | 10.625 | 11.625 | 11.625 | 10.125 | 7.625 | 9.000 | 8.625 | 8.000 |
| December | 12.125 | 12.500 | 10.750 | 11.500 | 11.500 | 9.750 | 7.375 | 9.000 | 9.125 | 8.000 |

| | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|---|---|---|---|
| January | 8.125 | 8.125 | 6.875 | 6.875 | 6.000 | 8.000 | 5.875 | 6.625 | 6.000 |
| February | 8.500 | 8.125 | 7.250 | 6.500 | 5.750 | 7.750 | 5.875 | 6.625 | 5.750 |
| March | 8.625 | 8.125 | 7.375 | 6.250 | 6.250 | 7.375 | 6.375 | 6.750 | 5.875 |
| April | 8.750 | 8.125 | 7.625 | 6.250 | 6.875 | 7.375 | 6.625 | 7.125 | 6.000 |
| May | 9.125 | 8.125 | 7.625 | 6.125 | 7.125 | 7.250 | 6.875 | 6.875 | 6.000 |
| June | 8.750 | 8.125 | 7.375 | 6.250 | 7.250 | 6.500 | 7.000 | 6.875 | 5.875 |
| July | 8.500 | 8.250 | 7.125 | 5.875 | 7.375 | 6.500 | 6.875 | 6.750 | 5.750 |
| August | 8.375 | 8.250 | 6.750 | 5.875 | 7.125 | 6.625 | 6.875 | 6.250 | 5.750 |
| September | 8.875 | 7.875 | 6.625 | 5.625 | 7.250 | 6.500 | 7.125 | 6.625 | 5.375 |
| October | 8.875 | 7.500 | 6.500 | 5.625 | 7.750 | 6.375 | 6.875 | 6.375 | 4.875 |
| November | 8.625 | 7.500 | 6.875 | 5.625 | 7.875 | 6.250 | 6.500 | 6.125 | 5.125 |
| December | 8.375 | 7.375 | 7.000 | 5.875 | 8.000 | 6.000 | 6.250 | 6.125 | 5.125 |