# EXHIBIT B

33811
128706
Edmondson
BGM

COMPTROLLER GENERAL OF THE UNITED STATES
WASHINGTON D.C. 20548

B-221127

128706

December 13, 1985

RESTRICTED — Not to be released outside GAO without approval by the Office of Congressional Relations.

RELEASED

The Honorable James J. Florio
Chairman, Subcommittee on Commerce, Transportation, and Tourism
Committee on Energy and Commerce
House of Representatives

The Honorable James R. Jones
Chairman, Subcommittee on Social Security
Committee on Ways and Means
House of Representatives

Subject: Redemption of Railroad Retirement Account Investments (GAO/HRD-86-53)

In November 1985, you asked us to investigate Treasury's unilateral sale of securities from the Railroad Retirement Account. Specifically you asked us to

--analyze the legality of Treasury's sale of securities without Railroad Retirement Board approval and of the sale of securities in an amount in excess of what was required to make benefit payments;

--determine the amount of interest lost by the Railroad Retirement Account as a result of this action; and

--determine how Treasury's action would be characterized under fiduciary standards generally applicable to pension plan managers.

We found that on November 1 and 4, 1985, Treasury redeemed almost $445 million of Railroad Retirement Account securities without Board approval and in excess of what was needed to make benefit payments. It is our view that these actions were not authorized under applicable law. After the Board notified them that these actions were of questionable legality, Treasury officials quickly corrected the errors, pointing out that the national debt ceiling crisis placed unusual demands on Treasury staff and the errors were not intentional violations of the Board's investment authority. The corrections restored all principal and interest legally due the Railroad Retirement Account for these redemptions.

(105225)

534005

In addition on November 1 and 4, 1985, Treasury unilaterally accelerated the redemption of $99.5 million of Railroad Retirement Account securities. The Board had requested this amount be redeemed as of November 7 and 8 to cover benefit checks previously issued. This would have permitted the Account to earn interest on checks outstanding but not cashed (the "float"). Treasury's acceleration of the float period resulted in a loss of an estimated $160,000 interest. We conclude that these actions, which were based on the November debt ceiling crisis, rather than on Treasury's estimate of check processing time, were also unauthorized.

Regarding the Secretary's fiduciary responsibilities in his handling of the Railroad Retirement Account, it is our view that the Secretary's statutory duties are those of an agent and not a trustee. Consequently, we have analyzed his actions in terms of those statutory responsibilities rather than under normal fiduciary requirements.

Enclosure I contains our legal analysis of the questions you raised. Enclosure II describes Treasury actions involving the Railroad Retirement Account and these actions' effect on interest income.

We discussed the information in enclosure II with Board and Treasury officials, who concurred with our observations. Because of time constraints, we did not request written agency comments, nor did we solicit Treasury's views on our legal analysis in enclosure I. Our work was performed in accordance with generally accepted government auditing standards, with one exception: we did not verify all the accounting data supplied by Treasury.

Unless you publicly announce the contents of this report earlier, we will withhold further distribution for 5 days, after which copies will be made available to other interested congressional committees and members; the Secretary of the Treasury; the Chairman, Railroad Retirement Board; the Director, Office of Management and Budget; and other interested parties.

Milton J. Socolar

Acting Comptroller General
of the United States

# GAO LEGAL VIEWS CONCERNING NOVEMBER 1985 REDEMPTIONS OF RAILROAD RETIREMENT ACCOUNT SECURITIES

This enclosure addresses the legality of the Department of the Treasury's redemption of Railroad Retirement Account (RRA) securities without Railroad Retirement Board approval in November 1985 in an amount in excess of that required to make payments. We have also provided our views as to the legality of Treasury's early redemption of RRA securities during the same period.

For the reasons indicated below, we conclude that: (1) the Department in fact redeemed almost $445 million more of RRA securities than it was permitted to redeem under applicable statutory authority, although these unauthorized redemptions were later corrected with no loss of either principal or interest to the RRA, and (2) the Treasury's early redemption of $99.5 million of RRA securities was also not authorized under applicable statutory authority.

With regard to the separate question raised concerning the Secretary of the Treasury's fiduciary duties, it is our view that his statutory responsibilities with regard to the RRA are those of an agent and not of a trustee. We have thus analyzed his actions in terms of those statutory duties, rather than under "normal" fiduciary requirements.

## BACKGROUND

The Secretary of the Treasury administers a number of benefit accounts used to pay pension, unemployment, and other entitlements to railroad workers, retirees, and their survivors. Among these benefit accounts is the RRA, used to pay industry pension benefits. The RRA is financed through taxes paid by railroad employees and employers. The RRA is composed of Treasury securities.

Under ordinary procedures, RRA benefits are paid on the first business day of each month, both by direct deposit and by checks sent to beneficiaries. Because checks take some time to clear, actual fund transfers on the first of each month are limited to the amount of direct deposits. These direct deposit fund transfers are generally paid from RRA investments maturing at the end of each month. The balance

of matured investments is immediately reinvested. In contrast to direct deposits, fund transfers for checks sent to beneficiaries are usually made on the fourth and fifth business days of each month from additional redemptions; the latter procedure permits the various accounts to earn additional interest during the average period for which benefit checks are outstanding but not cashed (the so-called "float").

As detailed in enclosure II, the procedures followed by the Treasury Department during the period November 1-12 deviated sharply from established practice. During October, the Railroad Retirement Board requested the Treasury Department's Financial Management Service to redeem RRA securities (or not to reinvest maturing RRA securities) in an amount sufficient to cover $78.6 million in direct deposit payments for RRA recipients on November 1. The Board also requested Treasury to redeem an additional amount sufficient to cover $99.5 million in check payments on November 7 and 8 (60 percent of that amount to be redeemed on November 7, and 40 percent on November 8, in accordance with Treasury's agreement to allow the RRA the benefit of the "float" on check payments).[1] Consistent with the first part of the Board's request, Treasury in fact redeemed (or, rather, did not reinvest) $78.6 million in maturing RRA securities on November 1. After doing so, however, the Department took the following extraordinary actions: it (1) redeemed an additional $444.8 million in RRA securities ($321 million on November 1 and $123.8 million on November 4) and (2) accelerated redemptions of RRA securities (i.e., denied full use of the "float") for the $99.5 million required for benefit check payments on November 7 and 8 (redeeming $87.8 million on November 1 and $11.7 million on November 4).[2] The first of these actions, according to the Treasury Department, was the result of a clerical error made in the "abnormal situation" caused by the debt-ceiling crisis. The second of these two actions was reportedly taken as part of a broader plan to accelerate November redemptions for several categories of federal trust funds (civil service retirement, railroad retirement, and social security). This plan was reportedly

---

[1]Based on a previous agreement with Treasury, the Board's redemption request was made by telephone, with a confirming letter sent on November 4.

[2]This summary describes the net effect of Treasury's actions. For a complete description of those actions, see enclosure II.

**designed to free up additional borrowing authority to ensure that payments under these various programs could continue to be made despite the limits of the debt ceiling.**

**As stated earlier, the first action (overredemption of RRA securities) was corrected retroactively by Treasury on November 7 and 12 (as of the dates on which the overredemptions were made), with no resultant loss to the RRA of principal or interest. The second action (accelerated redemption of amounts required to cover check payments) resulted in a net loss to the RRA of approximately $160,000 in interest.**

DISCUSSION

Before October 16, 1974, it was the responsibility of the Secretary of the Treasury to determine the manner in which the RRA should be invested. The Secretary was both Account Trustee and Chief Fiscal Officer of the United States, two roles which the RRA's congressional oversight committees considered to present a potential conflict of interest. See, e.g. H.R. Rep. No. 1345, 93d Cong., 2d Sess. 15 (1974). In response to this concern, the Railroad Retirement Act of 1974 specifically delineated the Railroad Retirement Board as the body principally responsible for making investment decisions with regard to the Account, within certain parameters specified in the Act. The Secretary of the Treasury's role as specified in section 15(e) is essentially that of an agent of the Board, with a statutory "duty" to make investments required by the Board. Thus, section 15(e) of the 1974 Act states, in pertinent part:

> "At the request and direction of the Board, it shall be the duty of the Secretary of the Treasury (hereinafter referred to as the "Secretary") to invest such portion of the amounts credited to the Railroad Retirement Account, the Dual Benefits Payments Account and the Railroad Retirement Supplemental Account as, in the judgment of the Board, is not immediately required for the payment of annuities, supplemental annuities, and death benefits. Such investments may be made only in interest-bearing obligations of the United States or in obligations guaranteed as to both principal and interest by the United States. * * *. The Board shall from time to time request the Secretary to redeem such special obligations issued exclusively to the accounts as the Board designates and upon such

> request the Secretary shall redeem such obligations at par plus accrued interest. All requests of the Board to the Secretary, provided for in this subsection, shall be mandatory upon the Secretary.* * *." 45 U.S.C. § 231n(e) (emphasis added).

The unambiguous language of this provision makes it clear that the Treasury Secretary's role with regard to the RRA is essentially ministerial. He has no authority to invest--or to disinvest--RRA funds except in accordance with the instructions provided to him by the Board (limited, of course, to those categories of investments authorized in section 15(e)). In the case of the RRA, it is the Board that is responsible for exercising the discretion required to make investment decisions; the Secretary's responsibilities are limited to carrying out the Board's decisions.

The legislative history of the Railroad Retirement Act of 1974 supports this restrictive view of the Secretary's authority in this area. The relevant committees specifically stated that the reduced role of the Secretary was intended to ensure that RRA investments would be

> "* * * made solely on the basis of the best return to the trust fund, and other considerations (such as the efficient management of the public debt) not being taken into account as they are today. And the Committee feels that this action should not be considered as a precedent for similar changes with respect to other trust funds, because of the unique character of the Railroad Retirement Account." H.R. Rep. No. 1345 93d Cong., 2d Sess. 17 (1974); S. Rep. No. 1163, 93d Cong., 2d Sess. 17 (1974) (emphasis added).

Although this language appears to be directed at the type of investments that make up the RRA accounts, it seems to us to be equally applicable to the manner in which investments are made or redeemed. Thus, the Secretary, in our view, may neither invest nor disinvest funds for any reason other than because he has been directed to do so by the Board.

In light of the foregoing, our review of the Secretary's actions must be based on his compliance with his limited statutory role, rather than on his exercise of discretion as a fiduciary. In the present case, the Treasury Department took two actions without the Board's concurrence. First, the

Department disinvested almost $445 million more than requested by the Board (although this action was later rescinded). Second, the Department accelerated disinvestments needed to meet check payments due on November 7 and 8 (i.e., denied the full amount of the "float" on such checks). As discussed below, it is our view that neither of these two actions was authorized under section 15(e) of the Railroad Retirement Act.

We will first dispose of the relatively straightforward question of the $445 million overredemption of RRA securities. Overredemption was taken in direct contravention of the Railroad Retirement Board's determination that the Account should be fully invested in November except as immediately necessary to meet $78.6 million in direct deposit payments and $99.5 million in check payments. As stated by the Board itself, in a November 7, 1985, letter to Secretary Baker:

> "* * * pursuant to Section 15(e) of the Railroad Retirement Act (45 U.S.C. § 231n(e)), securities held by the Railroad Retirement Account may be redeemed or otherwise disposed of only upon the request of the Board. In the instant case, of course, the Board has not requested that any holdings of the Account be redeemed in excess of the amounts needed to pay Railroad Retirement benefits. Thus, if the information we have received is correct, it appears that someone has attempted to take a disinvestment action which was not authorized by law and which was, therefore, ineffective."

We agree with the Board's conclusion that the Treasury Department's actions were unauthorized under section 15(e).

It should, of course, be noted that the Treasury Department took corrective action as soon as the Board notified it of the unauthorized transactions. In addition, the Department's retroactive correction of the RRA's account appears to reflect agreement with the Board's position that the overredemptions, because they were without authority, were legally ineffective.

The early redemption of RRA securities (i.e., Treasury's denial of the full benefit of the "float") presents a much closer question. The Treasury Department's position, expressed by Acting Fiscal Assistant Secretary Gerald Murphy in testimony on November 14, 1985, before the Subcommittee on Commerce, Transportation, and Tourism, House Committee on

Energy and Commerce, is that the benefit of the "float" is granted to the Board unilaterally by the Department, and that the RRA is not legally entitled to such a benefit. We do not agree with this characterization.[3]

As the previous discussion made clear, the Treasury Department's authority to manage the RRA is limited to those actions considered necessary by the Board to ensure that all RRA funds "not immediately required" for payment are invested. See 45 U.S.C. § 231n(e). In accordance with this authority, the Chairman of the Board, on June 25, 1980, requested that the Treasury Department provide the RRA with a float on the monthly benefit drawdown. In effect, he asked Treasury to determine how much time would normally ensue for "processing" the checks before the funds would have to be on hand for making the payments. The intention was to leave the funds invested and earning interest as long as possible, in accordance with the requirements of section 15(e).

The Treasury Department responded that it would provide a float "consistent with" the float given to the Social Security Trust Funds. See letter dated July 16, 1980, from Fiscal Assistant Secretary Taylor to Board Chairman Adams. At that time, the period was 2 days. We understand that the float period has been unilaterally changed by the Treasury Department at least once over the past several years, based upon revised estimates of check processing time. Treasury's current estimate for the average float period for the time in question is 4.4 days (an average of 60 percent of outstanding checks would be paid in 4 days and an average of 40 percent in 5 days).

Neither GAO nor the Board is disputing the Secretary's exclusive authority to have determined the proper float period in accordance with his estimate of the usual delay in processing benefit checks. Having made that determination and informing the Board that funds would not be needed for 4 and 5 days, the Secretary could not unilaterally accelerate redemption of securities to generate funds for reasons unrelated to the timing of his check processing requirements.

---

[3]During the same hearings, the Board did not take issue with Treasury's view that the float was a matter within the discretion of the Treasury Department. We have been informed by the Board's General Counsel, however, that the Board has not taken a formal position on the matter.

The Secretary does not contend that the acceleration was attributable to new check processing requirements. During November, he determined that the float--on a variety of benefit accounts--should be accelerated in order to ensure that there would be sufficient cash reserves on hand to meet future benefit payments, as well as other United States obligations in view of the debt-ceiling crisis and the danger of a general default. As noted earlier, however, the Secretary's authority in setting the period of a "float" to be provided to the RRA is limited to determining how long the RRA's funds could remain invested before processing was complete and the funds would be "immediately required for payment." In our earlier discussion of the legislative history of the Railroad Retirement Act of 1974, we pointed out that the Congress had created a largely ministerial role for the Secretary, in contrast to the Board, in order to be sure that RRA securities would be managed "solely on the basis of the best return to the trust fund, and <u>other considerations (such as the efficient management of the public debt) [would] not [be] taken into account</u> as they are today." (Emphasis added.)

In the present case, the Department's actions were based on the debt-ceiling crisis, rather than on any change in check processing requirements. Consequently, it is our view that the Department's acceleration of RRA redemptions for payment of check benefits was unauthorized.

CONCLUSION

Based on the above discussion, it is our conclusion that, in November 1985, the Treasury Department disinvested some $445 million of RRA securities in excess of amounts authorized under section 15(e) of the Railroad Retirement Act, although that unauthorized action was subsequently corrected with no resultant loss of principal or interest to the Account. Treasury's acceleration of disinvestments otherwise requested by the Board to make check payments later in the month, which resulted in a loss of some $160,000 to the RRA, was also unauthorized.

# FACTUAL INFORMATION CONCERNING THE NOVEMBER 1985 REDEMPTION OF RAILROAD RETIREMENT ACCOUNT INVESTMENTS

## BACKGROUND

The Railroad Retirement Board administers retirement benefit payments of about $6 billion annually--$500 million a month. The Board directs the Department of the Treasury to pay benefits which are similar to a private pension from the Railroad Retirement Account and the Railroad Retirement Supplemental Account and benefits similar to social security from the Social Security Equivalent Benefit Account.

Taxes and other revenues flow into the accounts continually. In 1974, the Board was granted authority and responsibility to invest these revenues in a manner that would provide the best return of interest and to determine when and which investments are to be redeemed to pay benefits or reinvested. This authority was intended to prevent other considerations, such as Treasury's management of the public debt, from affecting investment decisions. By agreement with Treasury, Board revenues are invested upon receipt in government securities called Par Value Specials, which mature at the end of each month. Matured securities are routinely reinvested in new short-term securities.

Benefits to rail retirees are due and payable on the first of each month. Cash needed to pay benefits is obtained from the maturing Par Value Specials. Benefits are paid by direct deposit to beneficiary accounts and financial institutions or by checks sent to beneficiaries. Direct deposits require that cash be available as of the payment date--that is, on the first business day of the month. Because checks take time to clear the federal reserve system, cash to cover checks mailed to beneficiaries is not needed immediately. For these payments, the Board has requested (and Treasury has agreed) that the accounts earn interest on the "check float"--the average period (4 to 5 business days) between the payment date and the date check payments are redeemed.

## SCOPE AND METHODOLOGY

In developing the information in this enclosure, we reviewed Board and Treasury documents for RRA transactions for November 1-12, 1985. During this period Treasury made unusual

investment redemptions. We examined Board and Treasury procedures and agreements for investing revenues and paying benefits, and we reviewed recent testimony concerning the November 1985 transactions. We discussed the transactions and procedures with Treasury and Board officials. We also considered other events, such as the national debt-ceiling crisis, which precipitated Treasury's actions during November 1985.

## NOVEMBER 1985 ACTIONS INVOLVING THE RAILROAD RETIREMENT ACCOUNT

In November 1985, Treasury lacked sufficient cash to pay government obligations because the statutory debt ceiling had been reached. To reduce debt below the statutory ceiling, thereby providing borrowing authority to generate needed cash, Treasury redeemed securities from several trust funds, including the RRA.

The Board advised Treasury that it would need the cash amounts shown in table II.1 to meet November railroad retirement benefit payments.

Table II.1: RRB's Cash Requirements for November Benefits

| Dates cash needed to pay benefits | RRA | Social Security Equivalent Benefit Account | Railroad Retirement Supplemental Account | Combined cash needs |
|---|---|---|---|---|
| | (000 omitted) | | | |
| 11/1 | $ 78,564 | $148,184 | $4,382 | $231,130 |
| 11/7 | 59,699 | 92,788 | 3,371 | 155,858 |
| 11/8 | 39,800 | 61,858 | 2,247 | 103,905 |
| Total | $178,063 | $302,830 | $10,000 | $490,893 |

### Chronology of Railroad Retirement Account transactions

--November 1

Treasury reinvested maturing RRA short-term securities. The reinvestment was reduced by (a) the $78.6 million the Board estimated the RRA needed for direct deposit benefit payments and (b) a $155.8 million loan to the Social Security Equivalent Benefit Account that was requested by the Board.

**Later on the same day, Treasury redeemed an additional $408.8 million of RRA short-term securities.**

**--November 4**

**Treasury redeemed $135.4 million of RRA short-term securities. These securities earned interest of $109,000 from November 1 to 4, 1985.**

--November 7

Treasury reinvested $321 million in RRA short-term securities to correct previous errors. This transaction was made effective as of November 1.

--November 8

Treasury reinvested $123.8 million in RRA short-term securities to correct previous errors.

--November 12

Because the November 8 entry was not made retroactive to the redemption error date (November 4), Treasury made two correcting entries.

Table II.2 provides a summary of RRA transactions during November 1985. The table also illustrates how Treasury's redemption actions generated uninvested fund balances in excess of cash requirements for benefit payments.

**Table II.2: RRA Financial Transactions**

| Date | Redemptions | Investments | Uninvested fund balance | Cash requirements |
|---|---|---|---|---|
| | ----------------------(000 omitted)------------------- | | | |
| 11/1 | $2,905,744 | $2,671,333 | $234,411 | $78,564 |
| 11/1 | | 155,847[a] | 78,564 | 78,564 |
| 11/1 | 408,815 | | 487,379 | 78,564 |
| 11/4 | 135,413 | | 544,228 | 0 |
| 11/4 | 109[b] | | 544,337 | 0 |
| 11/7 | | 321,000[c] | 223,337 | 59,699 |
| 11/8 | | 123,837 | 39,800 | 39,800 |
| 11/12 | 123,837[d] | 123,837[e] | | |

[a]At the Board's request, this amount was loaned to the Social Security Equivalent Benefit Account and immediately reinvested in short-term securities.

[b]Interest earned from November 1 to 4.

[c]This correcting entry was made effective as of November 1.

[d]This correcting entry was made effective as of November 8, thereby offsetting the previous November 8 entry.

[e]This correcting entry was made effective as of November 4.

## GAO'S EVALUATION OF TREASURY'S NOVEMBER INVESTMENT ACTIONS

The Board authorized Treasury to redeem $234.4 million as of November 1 for RRA and Social Security Equivalent Benefit Account payments. With the exception of $99.5 million needed for payments on November 7 and 8, other November redemptions for the RRA were not authorized by the Board and exceeded the Board's benefit payment needs. Also, Treasury made several computation errors in determining redemption amounts. Corrections made by Treasury from November 7 to 12, placed the RRA in the same financial condition it would have occupied had the mistakes not occurred. Although the Board authorized the redemption of the $99.5 million, Treasury unilaterally accelerated the redemption time frame. This resulted in the RRA not

receiving about $160,000 it would have earned had normal practices been observed and interest on the check float been allowed.

## How Treasury errors occurred

Treasury redeemed $408.8 million on November 1. Treasury officials said that the intended redemption amount was $87.8 million, and that they erred in including an additional $321 million in the redemption. The $87.8 million was the amount Treasury officials arrived at for early redemption because they intended to disallow the float. The officials could not explain the $321 million amount except to say they believed it was supplied by Board staff. (Note that as shown in table II.1, the November 1 combined cash needs for the Board's three accounts were $231 million.) Board staff, however, said they did not know how Treasury arrived at the $321 million figure.

The Board requested that $59.7 million and $39.8 million (a total of $99.5 million) be available for RRA benefit payments on November 7 and 8. Because Treasury disinvested $87.8 million of this amount on November 1, an additional $11.7 million was needed. On November 4, Treasury decided to disallow the float on the remaining $11.7 million and redeemed this amount as part of a $135.5 million redemption action. Treasury staff said the redemption of the additional $123.8 million (the difference between the $135.5 million and $11.7 million) was an error.

The Finance and Funding Branch in Treasury's Accounting Control Division handles trust fund investments. This branch was instructed by Treasury's Office of the Fiscal Assistant Secretary to redeem from the trust funds of three agencies[1] approximately $11.5 billion on November 1, 1985, and $4.5 billion on November 4, 1985. Treasury officials stated these amounts were needed to pay benefits that otherwise would not be paid because of the debt-ceiling crisis. Based on the Office of the Fiscal Assistant Secretary's guidance, the Finance and Funding Branch allocated 3 percent of the needed redemptions to the RRA. The 3 percent was the ratio of the Board's combined

---

[1]Social Security's Old-Age and Survivors' Insurance Trust Fund and Disability Insurance Trust Fund; the Civil Service Retirement Trust Fund; and the Board's Railroad Retirement Account, Social Security Equivalent Benefit Account, and Railroad Retirement Supplemental Account.

cash needs for November 7 and 8 (see table II.1) to the total requests from all the trust funds involved.[2] Using this ratio Treasury determined that $408.8 million and $135.4 million of Board investments should be redeemed on November 1 and 4. Although Treasury used the Board's three accounts to compute the 3-percent figure, all redemptions were made from the RRA.

On November 7, 1985, the Board advised Treasury that Treasury had redeemed securities that exceeded benefit payment needs. The Board said it had not requested these redemptions and that it appeared they were illegal because the Board, not Treasury, has authority over redemption decisions. Treasury recognized it had made mistakes and quickly took corrective action. The Acting Fiscal Assistant Secretary of the Treasury explained that the $321 million (November 1) and $123.8 million (November 4) redemptions were mistakes that occurred "in an office where six people are investing over 130 accounts involving over $300 billion in an abnormal situation with directions mainly given over the telephone."

Interest loss due to early redemption

Treasury usually permits the RRA to earn interest on the check float. Under this practice, cash to cover checks sent directly to beneficiaries is not redeemed from RRA securities until 4 and 5 business days after the payment date--for November 1985 this would have been on November 7 and 8.

Because, on November 1 and 4, Treasury redeemed $99.5 million of securities to cover checks sent directly to beneficiaries, the RRA did not earn an estimated $160,000 that it would have earned under normal operating practices. Neither Board nor Treasury officials are aware of a legal entitlement to check float interest. However, the Board's chief legal counsel stated that the statutes intend that the Board maximize interest earnings, which could be interpreted as providing check float interest. Enclosure I contains our legal opinion on this issue.

---

[2]Social Security's Old-Age and Survivors' Insurance Trust Fund was allocated 84 percent; Social Security's Disability Insurance Trust Fund, 8.7 percent; and the Civil Service Retirement Trust Fund, 4.3 percent.