# EXHIBIT C

133173

United States General Accounting Office

GAO

Report to the Chairman, Committee on Post Office and Civil Service, House of Representatives

May 1987

# CIVIL SERVICE FUND

# Improved Controls Needed Over Investments

133173

RESTRICTED — Not to be released outside the General Accounting Office except on the basis of specific approval by the Office of Congressional Relations.

RELEASED

538804

GAO/AFMD-87-17

GAO

**United States**
**General Accounting Office**
**Washington, D.C. 20548**

**Accounting and Financial**
**Management Division**

B-221680

May 7, 1987

The Honorable William D. Ford
Chairman, Committee on Post Office
and Civil Service
House of Representatives

Dear Mr. Chairman:

As you requested, this report describes the results of our review to determine the amount of interest that the Civil Service Disability and Retirement Trust Fund lost because Treasury did not follow its normal investment and redemption policies during the 1984 and 1985 debt ceiling crises.

Our review showed that the fund sustained losses of about $160 million and that, although Treasury has repaid most of this loss, future losses will occur. Even though legislation was passed giving Treasury authority to restore losses, certain provisions of the law, such as those specifying the dates that should be used in computing losses, restrict its ability to fully reimburse the fund. These future losses could amount to more than $13 million. The fund also sustained at least $400,000 in additional losses as a result of internal control weaknesses and errors by Treasury, as well as by the Office of Personnel Management.

As agreed with your office, unless you publicly announce the contents of this report earlier, we will not distribute it until 30 days from the date it is issued. At that time, we will send copies to the Director, Office of Management and Budget; the Director, Office of Personnel Management; interested congressional committees; the Secretary of the Treasury; and other interested parties. Copies will also be made available to others on request.

Sincerely yours,

Frederick D. Wolf
Director

# Executive Summary

## Purpose

The Department of the Treasury manages the Civil Service Retirement and Disability Fund, which covers 2.8 million active employees and 2 million retirees and their survivors. During fiscal year 1985, the fund received about $13.2 billion in interest income from its portfolio of securities either issued or guaranteed by Treasury. As of October 31, 1986, the fund's portfolio totaled over $158 billion. On October 18, 1985, the Chairman, House Committee on Post Office and Civil Service, requested that GAO review allegations about possible irregularities in Civil Service Retirement and Disability Fund investments and make a comprehensive study of the investment policies and practices of the fund. However, because of an ongoing GAO review of Treasury's investment accounting system, the scope of this review was narrowed. It was agreed that GAO's primary objective would be to determine the amount of interest that the trust fund lost because Treasury did not follow its normal investment and redemption policies during periods in 1984 and 1985.

## Background

The fund was established in 1920 and is used to fund a retirement plan that covers employees of the executive, judicial, and legislative branches of the U.S. government and the District of Columbia, unless excluded by law or regulation. During fiscal year 1985, the fund, in addition to its $13.2 billion in interest income, received an additional $27 billion through employer and employee contributions while paying out $23 billion to plan participants.

Although the Office of Personnel Management (OPM) is responsible for handling many of the activities affecting the fund, Treasury is legally responsible for fund investments. In fulfilling this responsibility, Treasury's Financial Management Service handles all aspects of the fund's investments. In addition to borrowing from the fund,Treasury also borrows from the public and other trust funds under its care to finance government operations. Treasury's borrowing is constrained by a legal limit (debt ceiling) which restricts the debt that may be outstanding at any one time.

## Results in Brief

During 1984 and 1985, Treasury departed from its normal fund management procedures because the government's outstanding debt was at or near the legal limit (referred to as a debt ceiling crisis). These departures from normal procedures resulted in the fund losing about $160 million in interest earnings. The fund also sustained at least $400,000 in additional losses as a result of internal control weaknesses and errors by

Treasury as well as by OPM. While Treasury has restored $160 million in lost interest earnings, GAO estimates that the fund will sustain future losses that could amount to $13.6 million. These future losses will occur even though legislation was passed giving Treasury authority to restore losses resulting from the debt ceiling crises. This is because certain provisions of the laws, such as those specifying the dates that should be used in computing losses, restrict Treasury's ability to fully reimburse the fund.

## Principal Findings

### Departure From Normal Procedures

Treasury departed from its normal fund management procedures by delaying investment of fund receipts, prematurely redeeming fund securities, and/or taking other actions in its attempts to manage the government's finances in 1984 and 1985. During those times, the outstanding federal debt was at or near the legal limit, and Treasury took these unusual actions to obtain the cash to pay fund expenses. However, the unintentional consequences of Treasury's actions cost the fund about $160 million in lost interest earnings. As a result, the Congress enacted legislation to permit Treasury to reimburse the fund. Although the Congress' intent was to fully restore the losses, the legislative language was somewhat restrictive, and the fund's future earnings have been and will be adversely affected. Although it is difficult to estimate the exact amount of the unrestored loss, it could be as much as $13.6 million unless further legislative action is taken. (See chapter 2.)

### Internal Control Weaknesses

GAO also found that the fund incurred losses as a result of internal control weaknesses that allowed errors to occur during the fund's routine operations. These losses were not related to the problems caused by the debt ceiling crises. For example,

- adjustments to the fund's accounting records were generally not documented and did not ensure the accuracy of fund interest earnings, and
- OPM underreported to Treasury amounts to be invested on behalf of the fund.

Treasury cannot restore all losses resulting from such weaknesses, primarily because it is limited by law from making all the necessary adjustments to the fund's records in order to ensure accurate interest earnings. (See chapter 3.)

## System Evaluation Lacking

Treasury has not evaluated the system used to account for fund investments for conformance with applicable accounting principles and standards. However, Treasury's procedures for complying with the Federal Managers' Financial Integrity Act call for such an evaluation. This law requires agency heads to annually report to the President and to the Congress the status of their accounting systems' conformance. Had the system been properly evaluated, some of the problems GAO found could have been identified and corrective action initiated. Treasury does not believe that the system is an accounting system, which would make it subject to the Treasury requirements. GAO does not agree with Treasury's position because, among other things, this system is the basis for the trust fund entries made in the Bureau of Public Debt's accounting system. (See chapter 3.)

## Recommendations

GAO recommends that the Secretary of the Treasury direct the Financial Management Service to

- determine the amount of unrestored losses resulting from the 1984 and 1985 debt ceiling crises and seek the necessary authority to restore these losses as well as those resulting from the fund's routine operations,
- establish controls to ensure that the stated redemption policies are followed,
- properly document adjustments to the accounting records, and
- evaluate the fund's accounting system for conformance with applicable accounting principles and standards.

## Agency Comments

Treasury generally agrees with GAO's recommendations concerning the need to properly document adjustments and to seek broad legislative authority over investment accounting. The Department did not agree, however, that improved internal controls were needed. GAO believes the Department needs to improve its controls over operations and discusses this issue in chapter 3. OPM also provided comments on the report and agreed that Treasury is the fund manager for investment purposes and that the fund should be made whole for any losses incurred.

# Contents


| | | |
|---|---|---|
| Executive Summary | | 2 |
| Chapter 1 Introduction | | 8 |
| | Investment and Redemption Policies | 8 |
| | Disruptions in Investments Caused by Debt Ceiling Crisis | 9 |
| | Objective, Scope, and Methodology | 10 |
| Chapter 2 Treasury's Departure From Normal Procedures Resulted in Losses to the Fund | | 12 |
| | Equity Between the General Fund and the Trust Funds | 12 |
| | Actions Relating to 1984 | 12 |
| | Actions Relating to 1985 | 13 |
| | Other Unusual Actions Taken During Debt Ceiling Crisis | 14 |
| | Further Losses Will Occur | 15 |
| | Conclusions | 17 |
| | Recommendations | 17 |
| | Agency Comments and Our Evaluation | 17 |
| Chapter 3 Legal Restrictions and Internal Control Weaknesses Impact Fund Earnings | | 18 |
| | Redemption Policies and Procedures | 18 |
| | Improved Controls Needed Over Error Corrections | 19 |
| | Accounting System's Conformance Has Not Been Assessed | 22 |
| | Treasury's Interest Computation Method Was Changed To Ensure Accurate Earnings | 23 |
| | Authority for Restoring Losses Is Limited | 24 |
| | Conclusions | 26 |
| | Recommendations | 27 |
| | Agency Comments and Our Evaluation | 27 |
| Appendixes | Appendix I: Comments From the Department of the Treasury | 30 |
| | Appendix II: Comments From the Office of Personnel Management | 34 |
| Tables | Table 2.1: Procedure Used To Raise Cash | 13 |
| | Table 2.2: Future Fund Losses | 16 |
| | Table 3.1: Comparison of Interest Computation Methods | 24 |

## Abbreviations

| | |
|---|---|
| FFB | Federal Financing Bank |
| FMS | Financial Management Service |
| GAO | General Accounting Office |
| IG | Inspector General |
| OPM | Office of Personnel Management |

# Introduction

The Civil Service Retirement and Disability Fund was established by Public Law 66-215, signed May 22, 1920, and has been amended by many subsequent acts of the Congress. It is used to fund a defined-benefit,[1] single employer retirement plan which covers the employees of the executive, judicial, and legislative branches of the U.S. government and the District of Columbia, except those excluded by law or regulation. On September 30, 1985, the plan covered about 2.8 million active employees and 2 million retired employees and survivor annuitants.[2] Although responsibilities for the fund are shared between the Office of Personnel Management (OPM) and the Department of the Treasury, Treasury is legally responsible for fund investments. Treasury's Financial Management Service handles all aspects of the fund's investments.

## Investment and Redemption Policies

According to Treasury and OPM officials, no formal agreement on fund investment and redemption policies exists between the two agencies. However, over the years, an informal policy has evolved which outlines how investments and redemptions will be handled. Treasury is required by law to immediately invest in interest bearing government securities those fund receipts not needed to pay fund expenses. During fiscal year 1985, the plan received about $13.2 billion in interest income with an additional $27 billion received through employee and employer contributions. The plan paid about $23 billion to plan participants during the same period. The fund balance on October 31, 1986, was over $158 billion and consisted entirely of securities either issued or guaranteed by Treasury.

### Investment Policies

Fund receipts are invested in nonmarketable Treasury securities commonly referred to as par value specials and can be redeemed any time at their face value, or "par." The interest rate for these securities is based on the average rate for comparable marketable securities as defined by Treasury, with 4 or more years to maturity. This rate is established on a monthly basis, and all investments for a given month must bear the same rate. Under normal conditions, OPM notifies Treasury of the

[1] A defined-benefit plan specifies how the benefits will be determined for employees upon retirement. For example, years of service, salary history, and/or age are used to determine a retiree's benefits.

[2] The retirement plan offers retirees an option to designate their spouses as the plan beneficiary. If an employee elects this option and dies before the spouse, then the spouse receives the retirement payment at a greatly reduced rate (55 percent or less). Such individuals are referred to as survivor annuitants.

amount to invest and Treasury then makes the investment. Such investments are normally made in short-term, nonmarketable Treasury securities maturing on June 30, which is considered the end of the fund's investment year. On June 30, the surpluses are converted into long-term par value specials with maturities of 1 to 15 years.

## Redemption Policies

At the beginning of each month, OPM provides Treasury with an estimate of the funds it will need to pay that month's expenses. Treasury then redeems fund securities based on this information. At the end of each month, OPM provides Treasury with a report on the amount of cash it actually used, and Treasury adjusts its records accordingly. Those securities maturing within the investment year, along with additional investments made during the year, and any accrued interest, are the source of funds used to pay fund expenses.

Under normal procedures, fund benefits are paid by direct deposit to an individual's bank account or by check on the first business day of each month. Because checks take some time to clear, OPM and Treasury have agreed to only redeem securities equal to the amount of benefits paid by direct deposit on the first business day of each month. The securities necessary to pay the benefit checks are usually redeemed on the fourth and fifth business day of the month. This sequencing is designed to allow the fund to earn interest during the average period that benefit checks are outstanding but not cashed (the so-called "float period").

## Disruptions in Investments Caused by Debt Ceiling Crisis

Our nation has historically carried debt. In 1789, the federal government began with a debt of about $78 million. At the end of April 1987, the debt ceiling was $2.3 trillion. The Congress attempts to control the size of the federal debt by imposing ceilings on the amount of obligations the government can issue.

The securities issued to the Civil Service and other trust funds are normally considered part of the debt subject to the ceiling. However, occasionally, fund receipts have been invested in securities issued through the Federal Financing Bank (FFB).[3] FFB securities are not subject to the debt ceiling.

[3]The FFB was created in 1973 to help ensure that federal and federally assisted borrowings are coordinated. We have determined that FFB's debt is not considered part of the statutory debt ceiling.

On various occasions over the years, normal governmental financing has been disrupted because Treasury had borrowed up to or near the debt ceiling, and legislation to increase the ceiling had not been enacted in a timely manner. We refer to these events as debt ceiling crises because of the prospect of government operations being halted as a result of a lack of financing. The crises also present problems for the various trust funds, since Treasury's inability to borrow funds from the public equates to an inability to invest trust fund receipts. Two debt ceiling crises that affected the fund occurred in 1984 and 1985. The 1984 crisis lasted from September 30, 1984, until October 16, 1984. The 1985 crisis lasted from September 3, 1985, until December 12, 1985. Although fund receipts were available for investment, Treasury did not invest them because it was at or near the debt ceiling. Until legislation was passed which raised the ceiling, Treasury was prevented from legally incurring additional debt.

## Objective, Scope, and Methodology

On October 18, 1985, the Chairman, House Committee on Post Office and Civil Service, requested that we review allegations about possible irregularities in Civil Service Retirement and Disability Fund investments and make a comprehensive study of the investment policies and practices of the fund. As agreed with the Chairman's office, we did not perform a comprehensive review of Treasury's investment policies and practices for the fund since this is included in an ongoing GAO review of Treasury's investment accounting system. Therefore, we agreed with the Chairman's office that our primary objective would be to determine the amount of interest that the trust fund lost because Treasury did not follow its normal investment and redemption policies during the 1984 and 1985 debt ceiling crises. On January 23, 1986, we provided the Chairman with an interim letter which supplied our preliminary estimates of interest losses to the fund resulting from Treasury's investment practices and disclosed several issues relating to fund management which we needed to further analyze.

Our review was conducted between October 1985 and September 1986 and was made in accordance with generally accepted government auditing standards. We performed our work in Washington, D.C., at the Department of the Treasury and the Office of Personnel Management. We interviewed agency officials and reviewed the documents necessary to accomplish our objective (for example, Treasury's accounting ledgers and investment and redemption instructions from OPM). We limited our review to the transactions occurring between July 1, 1984, and June 30,

1986. This period was selected because it represented the fund's investment years during which the 1984 and 1985 debt ceiling crises occurred. The specific periods and methodology used for major segments of our work are discussed below.

## Estimating Fund Losses

To determine whether the fund incurred any losses as a result of Treasury's actions, we reviewed fund investment and redemption activities and compared them to Treasury's stated procedures. Where it appeared that Treasury did not follow its normal procedures, we compared the fund's actual interest earnings with those that would have accrued had the normal procedures been followed. Treasury officials agreed with our methodology and our estimates of the losses that resulted.

## Accuracy of Treasury's Investment and Redemption Data

In order to assess the accuracy of Treasury's investment and redemption information, we validated the information shown in Treasury's records by comparing them to OPM's requests for investments and redemptions. We selected the period of July 1, 1985, through December 31, 1985, because (1) it covered the period of the latest debt ceiling crisis referred to in the Chairman's letter and (2) the information was readily available. We did not attempt to validate the information OPM provided to Treasury since that was outside the scope of our review. We did, however, rely on a GAO financial audit of the fund for the year ending September 30, 1984.[4] This audit disclosed no reason to question the amount of fund receipts reported by OPM to Treasury except for OPM's calculation of the year-end special payment. (See chapter 3.)

[4] Financial Audit: Civil Service Retirement System's Financial Statements for 1984 (GAO/AFMD-86-12, April 2, 1986).

# Treasury's Departure From Normal Procedures Resulted in Losses to the Fund

We found that during 1984 and 1985, in its attempts to manage the government's finances during the debt ceiling crises, Treasury did not follow its established policies and procedures for investing fund receipts and redeeming the fund's securities. Treasury also took unusual actions during these periods by purchasing Federal Financing Bank (FFB) securities. Three laws were later passed to mitigate the effect of these actions, and Treasury reimbursed the fund about $160 million for the lost interest earnings. In our view, Treasury has fully complied with these laws. However, because of (1) the methods prescribed in the legislation for restoring the lost interest and (2) the long-term nature of some of the fund investments, additional losses will result in future years. Although the Congress' intent was to fully reimburse the fund for the losses sustained, Treasury does not have the authority to do so.

## Equity Between the General Fund and the Trust Funds

Treasury officials have stated that a basic trust fund management policy is to ensure equity between the various trust funds and the general fund—the fund used to pay most government obligations. Assuring that none of the funds unduly benefit from Treasury's management of the funds is sometimes difficult because Treasury is responsible for ensuring that

- the general fund has sufficient cash to finance government operations,
- fund investments and benefit payments to beneficiaries are made on time, and
- the statutory debt limit is not exceeded.

Although there is no inherent conflict among these statutory responsibilities, Treasury has sometimes had difficulty fully meeting them during debt ceiling crises. This was the case at various points in 1984 and 1985, when Treasury was prevented from raising additional cash through borrowing because the amount of debt outstanding was near the statutory debt ceiling and Treasury's operating cash was declining.

## Actions Relating to 1984

At the end of September 1984, OPM notified Treasury that it should invest about $16.3 billion. The majority of this amount was associated with the special year-end fund deposits required by Public Laws 91-93, 93-349, and 98-168.[5] Treasury did not immediately invest about $11.8 billion of these receipts because it was nearing the statutory debt ceiling.

[5]These laws specify that year-end payments are to be made to the fund to cover certain specified liabilities.

Treasury gradually invested the $11.8 billion in Treasury securities, and by October 16, 1984, the entire amount was invested. Because the $11.8 billion had not been invested on September 30, the fund lost interest. As discussed later in this chapter, the exact amount of the loss cannot be determined until the securities are redeemed or reach their maturity. However, the fund lost $65.4 million through December 31, 1985, an amount which Treasury has restored in accordance with a specific provision in Public Law 99-272—the Consolidated Omnibus Budget Reconciliation Act of 1985.

## Actions Relating to 1985

On September 30, 1985, OPM notified Treasury that it should invest about $17.4 billion. As in 1984, the majority of these funds were associated with the special year-end fund deposits. Because of debt ceiling constraints, Treasury only invested about $4 billion. The remaining funds were gradually invested in Treasury and FFB securities, and by November 14, 1985, all funds were invested. In November 1985, Treasury redeemed fund securities earlier than normal to reduce the government's outstanding debt. This allowed Treasury to borrow from the public and obtain the operating cash Treasury officials determined to be needed to pay fund benefits.

In late October 1985, Treasury's available cash for government operations was continuing to decrease. Because of the debt ceiling crisis, Treasury anticipated sufficient cash would not be available on November 1 to meet the government's obligations. Treasury officials stated that in order to borrow sufficient cash from the public to meet the fund's benefit payments, they decided to redeem $1.5 billion in fund securities. On November 4, Treasury redeemed an additional $198 million in fund securities to cover the benefit payments. Table 2.1 shows an example of the advantage of using this procedure during a debt ceiling crisis.

**Table 2.1: Procedure Used to Raise Cash**

| Date | Action | Effect on Treasury's cash | Effect on outstanding debt |
|---|---|---|---|
| 11-1-85 | Treasury redeems $1.5 billion of trust fund securities for benefit payments which were issued on November 1, 1985. | None | Reduces debt by $1.5 billion |
| 11-1-85 | Treasury issues $1.5 billion of securities to public for cash. | Increases cash by $1.5 billion | Increases outstanding debt by $1.5 billion |

As Table 2.1 shows, although the total amount of the outstanding debt remained unchanged, Treasury was able to obtain $1.5 billion in cash. This cash was then available to pay fund benefits. Had normal procedures been followed, Treasury would have redeemed only $1.4 billion on November 1 since this was the amount of the benefit payments made by direct deposit. Treasury stated that the additional $100 million was needed to ensure that Treasury had enough cash to cover checks actually presented on November 1, as well as electronic funds transfers. The remainder would normally have been redeemed on November 7 and 8 as requested by OPM. (See redemption policies in chapter 1.) Public Law 99-155, which was enacted to temporarily increase the debt ceiling until December 6, authorized Treasury to partially compensate the fund for the losses caused by Treasury's actions.

In early December 1985, Treasury again encountered debt ceiling constraints and did not follow its normal procedures. Instead, Treasury redeemed securities that would not otherwise have been redeemed and did not immediately invest some of the daily fund receipts. As it did earlier, the Congress enacted legislation to increase the debt ceiling as well as to compensate the fund for the losses resulting from Treasury's actions (Public Law 99-177). In accordance with both laws, Treasury has reimbursed the fund about $95 million. This is in addition to the $65.4 million reimbursed under the authority of Public Law 99-272. (See page 13.)

## Other Unusual Actions Taken During Debt Ceiling Crisis

In 1985, Treasury for the first time invested Civil Service funds in FFB securities by redeeming Treasury securities and then purchasing similar FFB securities. Because FFB securities are not subject to the statutory debt ceiling, this action allowed Treasury to borrow more cash from the public. The interest rates and maturities were the same so the fund would not lose interest because of the transfer. At the time the transfer was made, Treasury computed the interest earnings on the Treasury securities redeemed. Treasury allowed OPM to use this interest to cover fund payments. However, the accrued interest on the redeemed Treasury securities exceeded the amount of cash needed for payments and this excess was not immediately invested as required by statute. We estimate that the fund lost about $2.1 million because Treasury did not immediately invest the interest associated with FFB transactions.

Treasury officials initially explained to us that to have immediately invested the excess interest at that time would have been contrary to Treasury's policy of paying interest to the fund semiannually (that is,

December 31 and June 30). Crediting the fund with interest when the FFB transactions were made would have been contrary to Treasury's policy since interest would have been credited to the fund on days other than the semiannual payment dates. Therefore, the fund would have been allowed to compound its interest more frequently than semiannually. However, Treasury is specifically required by statute to immediately invest funds not needed to pay fund expenses. Upon further discussion with us, the officials agreed and the fund was reimbursed for this loss.

## Further Losses Will Occur

As mentioned earlier, special legislation was enacted with the intent of fully restoring the fund's losses resulting from Treasury's actions during the debt ceiling crises. However, further losses related to those actions will occur in the future. The primary reason for this appears to be the difficulty in developing the precise language that would consider each case's complexity and projecting the long-term effect of Treasury's actions. To ensure that the fund suffered no losses, it would have been necessary to retroactively adjust the records to reflect how the investment portfolio would have looked had normal procedures been followed. However, two of the three laws authorizing restoration only allowed Treasury to compute the interest loss through specific dates. The interest rates on the securities purchased with the funds that were not immediately invested were substantially lower than the rates that were available when the funds should have been invested had the normal procedures been followed. Therefore, the fund's earnings will be less than they otherwise would have been. Although the exact amount of the future loss is difficult to estimate, it could be as much as $13.6 million, depending on future interest rates. Treasury officials have agreed with our analysis and our estimates of the corresponding losses.

### Additional Losses From 1984

The law requiring restoration of fund losses from the 1984 debt ceiling crisis was enacted in April 1986. It specified that Treasury should compute the interest loss through December 31, 1985. Although Treasury complied, the fund's long-term earnings will still be adversely affected because of the lower-rate securities available at the time of the restoration.

On June 30 of each year, Treasury converts the fund surplus into long-term securities bearing June's rate and with maturities of 1 to 15 years. Had Treasury not delayed investments in September 1984, at least some of the lost interest would have been invested in June 1985 in long-term

securities. These securities would have carried June's rate of 10.375 percent. Because of declining interest rates and the timing of the restoration, the restored interest earnings could only be invested in long-term securities bearing the June 1986 rate of 8.375 percent. Table 2.2 shows the potential loss assuming fairly constant interest rates. The exact amount of the loss cannot be determined until the securities are redeemed or reach their maturity date.

**Table 2.2: Future Fund Losses**

Dollars in millions

| Period | Interest assuming normal investment | Expected interest because of adjustment | Potential loss |
|---|---|---|---|
| 9-30-1984 through 6-30-1986 | $68.8 | $68.6 | $0.2 |
| 7-1-1986 through 6-30-2000 | 68.5 | 55.3 | 13.2 |
| **Total** | **$137.3** | **$123.9** | **$13.4** |

We broke this loss down into two periods. The first period ending June 30, 1986, was selected because Treasury restored the interest loss as of December 31, 1985, and because June 30, 1986, was the first time the loss could be invested into long-term securities. In addition, Treasury's interest loss computation included interest earned during this period. The last period was selected because, had the normal procedures been followed, all the securities would have reached their maturity date by June 30, 2000. However, if Treasury had been able to issue securities bearing a 10.375-percent rate and been able to compute the loss through June 30, 1986, then no future losses would have occurred.

## Additional Losses From 1985

As mentioned previously, two separate pieces of legislation were enacted to mitigate the fund's losses resulting from Treasury's actions in 1985. Because neither law authorized Treasury to take the necessary actions to fully restore the loss, additional losses will occur. We estimate that these losses will total about $220,000 in addition to the $13.4 million because Treasury could not restore the loss as if normal procedures had been followed.

In December 1985, Treasury departed from its normal procedures by redeeming higher interest bearing Treasury securities when lower interest-bearing securities were available.[6] Public Law 99-177 only

[6]See chapter 3 for a discussion of normal redemption procedures.

allowed Treasury to restore the interest loss associated with this transaction through December 12, 1985. However, it did not allow Treasury to either (1) compute the interest loss through June 30, 1986, the normal maturity date, or (2) restore the higher rate securities which were improperly redeemed. Therefore, interest losses from December 12, 1985, through June 30, 1986, cannot be restored to the fund without further legislation.

## Conclusions

The unusual actions Treasury took to manage the government's finances during the 1984 and 1985 debt ceiling crises resulted in the fund losing interest earnings. We do not believe, however, that this was the intent of those actions. Although special legislation was required to restore the losses, the legislation, enacted with the intent of fully restoring the losses, fell short of this goal. Because the legislation was developed before the losses were fully determined, it was difficult for the Congress to anticipate the proper adjustments that would have been necessary to cover the long-term effect of Treasury's actions. Had the loss been first determined and then legislation written to compensate for it, the trust fund should not have incurred additional losses. However, the necessary information is now available to determine what is needed to fully compensate the fund.

## Recommendations

We recommend that the Secretary of the Treasury direct the Financial Management Service to

- determine the amount of unrestored losses resulting from the 1984 and 1985 debt ceiling crises and
- seek the necessary legislative authority to fully restore those losses to the fund.

## Agency Comments and Our Evaluation

Treasury agreed with our recommendations and stated that it will seek the necessary legislation and restore any losses to the fund. In a subsequent discussion, Treasury clarified its position and said that, although it has not yet identified the specific organization within Treasury that should be responsible for drafting the legislation, the legislation will be developed. OPM did not address these issues but rather deferred to Treasury, which is the fund manager, and stated that the fund should receive compensation for the unrestored losses. Treasury's and OPM's comments can be found in appendixes I and II, respectively.