# EXHIBIT A

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| *v.* | ) | Nos. 99-550 L & 00-169 L<br>Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**REVISED EXPERT REPORT**

**OF**

**STEPHEN A. JAY**

**IN SUPPORT OF THE TRANCHE ONE INVESTMENT CLAIMS OF PLAINTIFF OSAGE NATION**

March 13, 2006

## INTRODUCTION

1. Plaintiff Osage Nation has retained me to provide expert testimony concerning whether the United States, as trustee, prudently invested the Osage tribal funds that it collected during five specific months under four specific oil and gas leases that it issued for the benefit of the Osage Nation. I filed my Expert Report on September 30, 2005. As discussed in that report, I concluded that the United States failed to prudently invest Osage tribal trust funds in various ways.

2. On November 23, 2004, I filed my Rebuttal Expert Report. In that report, I responded to the opinions in the Expert Report of Gregory J. Chavarria ("Chavarria Expert Report"), dated November 3, 2005, and the Expert Report of Charles L. Lundelius ("Lundelius Expert Report"), also dated November 3, 2005. In my Rebuttal Expert Report, I also clarified certain aspects of my Opinions and calculations in my Expert Report.

3. As a result of the Court's February 17 and February 22, 2006 Orders and information acquired since my initial and rebuttal expert reports, I have prepared this Revised Expert Report. Pursuant to the Court's Orders, I have removed the Stanley Stringer Lease and the month of October 1990 from my analysis. This report supersedes my Expert Report and my Rebuttal Expert Report and modifies and updates my deposition testimony given on December 7 and 8, 2005.

4. I am being compensated for my services in this case, including time spent testifying, at the rate of $250.00 per hour plus expenses. That rate is the same rate I charge for all my consulting services.

## QUALIFICATIONS AND PRIOR TESTIMONY

5. In 1967, I received a Bachelor of Science degree from Oklahoma State University, where I majored in accounting. In addition, I received a Masters of Science degree in accounting

in 1969 from Oklahoma State University. In 1969, I was licensed by the State of Oklahoma as a Certified Public Accountant.

6. From 1971 through 1976, I practiced as a CPA with the firm of Arthur Young & Company in Tulsa, Oklahoma. In 1976, I co-founded Lohrey & Jay, CPAs. In 1988 I founded the firm of Jay & Associates, P.C., where I am the managing shareholder. Jay & Associates, P.C. provides financial audit, tax, and consulting services to privately owned businesses and individuals.

7. I have had extensive experience in the oil and gas industry during the past thirty-four years I have practiced as a Certified Public Accountant. My experience includes the audits of multi-national oil and gas corporations, audits of small independent oil and gas producers, audits of companies with extensive investments in oil and gas royalties, and audits of companies in the oil and gas service industry.

8. I have served as a trustee in three separate matters. I am currently the Trustee of an Unsecured Creditors Trust in regard to a large bankruptcy matter. As trustee, my responsibilities include the collection of funds from various creditors of the trust. I am also responsible for the investment of the funds collected. In addition, I am responsible for the distribution of all collected funds and investment earnings to approximately 3,000 beneficiaries. I and the committee to which I report are further responsible for determining the dates of these distributions. Trust funds that are distributed by check remain invested and continue to earn interest up to the time the checks clear the depository institution on which the checks are drawn.

9. In addition, I am currently the trustee of the 401K plan for the company of which I am a principal. My responsibilities include the administration of the 401K plan and transfer of the contributions by the participants and the company to appropriate accounts for investment by the

participant. Previously, I served as the Trustee of a liquidating trust which received payments from a company in bankruptcy and distributed the funds to beneficiaries.

10. A more detailed summary of my qualifications is attached as Exhibit 1. That summary includes a list of all cases in which I have offered expert testimony, whether by trial or deposition, in the past four years. I have not published any articles in the last ten years.

**THE OSAGE NATION**

11. It is my understanding that the Osage Nation is a federally recognized Indian Tribe. I also understand that the Osage Reservation is contiguous with the boundaries of Osage County, Oklahoma.

12. I further understand that, under a statute enacted in 1906, the United States holds the mineral estate underlying the Osage Reservation (the "Osage Mineral Estate") in trust for the benefit of the Osage Nation.

13. It is my understanding that, as trustee, the United States has issued numerous oil and gas leases covering portions of the Osage Mineral Estate. As trustee, the United States collects all payments due under those leases and deposits them in the United States Treasury. As trustee, the United States also invests those funds until they are distributed to various persons known as "headright owners."

14. I further understand that, under the 1906 Statute, the original headright owners were the persons on an official roll of the Osage Nation that was compiled by the United States. Over time, persons other than members of the Osage Nation have become headright owners.

15. It is my understanding that the United States, as trustee, distributes tribal trust funds to the headright owners four times a year. In general, the amount of a given distribution is based

on the amount of tribal trust funds that the United States collects during a calendar quarter. The United States generally makes these distributions on or about the following dates:

| Calendar Quarter | Distribution Date |
|---|---|
| January – March | June 15 |
| April – June | September 15 |
| July – September | December 15 |
| October – December | March 15 |

I further understand that distributions to headright owners are generally made by checks issued or electronic deposits made by the United States Department of the Treasury.

## DEFINITION OF TRANCHE ONE LEASES AND MONTHS

16. It is my understanding that, in Orders dated April 15, 2005 and February 22, 2006, the Court has defined "tranche one" of this case to include four specific oil and gas leases and five specific months. The four tranche one leases are commonly referred to as the North Burbank Lease, the North Avant Lease , the Osage Hominy Lease, and the East Hardy Lease (collectively, the "Tranche One Leases"). The five tranche one months are January 1976, May 1979, November 1980, February 1986, and July 1989 (collectively, the "Tranche One Months").

## DATA AND INFORMATION CONSIDERED IN FORMING OPINIONS

17. In forming the opinions in this report, I have reviewed various documents and deposition transcripts applicable to the actions of the United States, as trustee, in investing funds it holds in trust for various Indian Tribes, including the Osage Nation. I have primarily relied upon the following data and information:

a. Agreed Upon Procedure Report dated December 31, 1995 issued by Arthur Andersen LLP ("Arthur Andersen Report");

b. Transcripts of the deposition testimony of Greg Chavarria taken on August 15, August 17, September 1, November 9, and December 19, 2005;

c. Documents produced by Greg Chavarria during his deposition;

d. The Expert Report of Greg Chavarria dated November 3, 2005;

e. Transcripts of the deposition testimony of Charles Lundelius taken on November 10, 2005;

f. Documents produced by Charles Lundelius during his deposition;

g. The Expert Report of Charles Lundelius dated November 3, 2005;

h. Transcripts of the deposition testimony of John Vale taken on February 9 and 28, 2005;

i. Documents produced by John Vale during his deposition;

j. Letter dated August 16, 1982 from Charles A. Bowsher, Comptroller General, to James G. Watt, Secretary of the Interior;

k. "Major Improvements Needed in the Bureau of Indian Affairs' Accounting System;" General Accounting Office, September 8, 1982;

l. Letter dated December 13, 1985 from Acting Comptroller General of the United States to The Honorable James J. Florio and Honorable James R. Jones;

m. "Civil Service Fund, Improved Controls Needed Over Investments," General Accounting Office, May 7, 1987; and

n. "Social Security Trust Fund Investment Policies and Practices," Actuarial Note Number 142, Office of the Chief Actuary, Social Security Administration, January 1999.[1]

**OPINION 1:**

**THE UNITED STATES' RECORDS OF THE OSAGE TRIBAL TRUST DO NOT ENABLE ONE TO DETERMINE THAT THE UNITED STATES, AS TRUSTEE, PRUDENTLY INVESTED THE TRUST FUNDS IT COLLECTED FOR THE OSAGE NATION DURING THE TRANCHE ONE MONTHS**

18. In my opinion, the available records of the United States do not permit anyone to determine that the United States, as trustee, prudently invested the trust funds it collected for the

[1] The documents described in items l, m, and n are available at http://www.ssa.gov/OACT/NOTES/pdf_notes/note142.pdf; http://archive.gao.gov/d12t3/128706.pdf; and http://archive.gao.gov/d28t5/133173.pdf

Osage Nation during the Tranche One Months. My opinion is based on the reasons set forth below.

19. In order to determine that the United States, as trustee, prudently invested tribal trust funds of the Osage Nation, one would need trust records establishing the amount of trust funds that were available to be invested. In addition, one would need trust records indicating the available investment choices as well as the investment decisions that were made. One would also need trust records demonstrating the yields from the investments that were made.

20. However, the BIA's finance and accounting system does not contain accurate records of that type for the Tranche One Months. For many years, the General Accounting Office ("GAO") has performed numerous studies of the accounting system that BIA uses for tribal trust funds, including those of the Osage Nation. GAO's studies have uniformly concluded that the information in BIA's finance and accounting system is inaccurate and unreliable.

21. For example, on September 8, 1982, GAO issued a report titled "Major Improvements Needed In the Bureau of Indian Affairs' Accounting System." In that report, GAO found that the information produced by BIA's accounting system was unreliable, that trust accounts had not been reconciled with the general ledger to insure correct balances, that controls over cash receipts and disbursements were inadequate, and that BIA improperly failed to use accrual accounting. GAO also concluded that the information in BIA's accounting system was so unreliable that it was not used even by BIA's managers, who instead maintained their own accounting systems to make decisions. GAO further found that the systems maintained by BIA's managers also contained inaccurate and unreliable information. In addition, GAO found that this lack of accurate financial information resulted in an overall loss of accountability and, among other things, precluded BIA from accurately determining the amount of Indian trust funds that were available for investment.

22. The findings in GAO's September 8, 1982 Report have been confirmed by many subsequent audits performed by the GAO. In addition, numerous audits performed by the Interior Department's Inspector General and the public accounting firm hired by BIA have continued to find serious accounting problems and weak internal controls throughout BIA's accounting system for Indian trust funds. For example, in its report covering its audits of fiscal year 1988 and 1989, Arthur Andersen & Co. issued a qualified opinion on BIA's trust fund financial statements due to an inability to confirm cash balances, major inadequacies in accounting records and related systems, and accounting errors. The report also highlighted 16 material accounting system and internal control weaknesses. For example, Arthur Andersen found that a lack of written policies and procedures and inconsistent accounting practices bureauwide caused numerous accounting errors. In addition, it reported that BIA's financial systems did not provide accurate and timely reports to Indian and tribal account holders. These problems were similar to those discussed in GAO's September 8, 1982 report discussed above.

23. By 1982, the deficiencies with BIA's accounting and finance system became so serious that GAO revoked its approval of BIA's accounting system. It is my understanding that GAO took this action under the Accounting Procedures Act of 1950, which requires agencies to submit the design of their accounting systems to GAO for approval and which requires agency accounting systems to conform to the accounting principles and standards prescribed by GAO. According to its letter dated August 16, 1982 to Secretary of the Interior James G. Watt, GAO took this action because BIA materially modified its accounting and finance system without obtaining GAO's approval and because GAO's review disclosed serious design and operating problems with BIA's system.

24. In view of the above problems with BIA's trust records, I have prepared portions of this revised report using data in the Arthur Andersen Report concerning the "Reconciliation

Project". It is my understanding that BIA contracted with Arthur Andersen to perform the Reconciliation Project so that BIA could fulfill a Congressional mandate that required BIA to provide an accounting to each Tribe for each of their trust accounts for the period July 1, 1972 through September 30, 1992. The primary purpose of this "Reconciliation Project," as stated in the contract between BIA and Arthur Andersen, was to reconstruct historical transactions, to the extent practical, for all years for which records are available for all tribal trust accounts managed by the BIA. Arthur Andersen Report at 1. The Arthur Andersen Report summarizes the work done by Arthur Andersen for the tribal trust accounts of the Osage Nation.

25. However, even when it is supplemented with the data in the Arthur Andersen Report, the available records of the United States still do not permit anyone to determine that the United States, as trustee, prudently invested the funds it collected for the Osage Nation during the Tranche One Months. As noted above, the purpose of the "Reconciliation Project" was only to reconstruct historical transactions involving tribal trust funds to the extent practical for only those years for which records available. As the Arthur Andersen Report makes clear, Phase I of the Reconciliation Project "substantiated that not all records would be available for a full accounting" to each Tribe of its trust accounts. Arthur Andersen Report at 1. As that report also makes clear, prior to 1978, BIA's records did not distinguish between investment income and other types of income, thereby precluding an analysis of whether the United States, as trustee, prudently invested tribal trust funds prior to 1978. *Id.* at Attachment B-1, p. 1.

26. Moreover, the Arthur Andersen Report is based upon "agreed procedures" that were established by the BIA rather than an audit of BIA's trust records. Arthur Andersen Report at 1. Under that type of engagement, Arthur Andersen's only duty was to perform the "agreed procedures" that were established by BIA. By contrast, in an audit, Arthur Andersen would have the responsibility of deciding which procedures and tests should be performed and then, on the

basis of those procedures and tests, issuing a formal opinion concerning BIA's financial statements.

27. Finally, I note that the Fill-the-Gap study that Arthur Andersen performed as part of the "Reconciliation Project" does not establish that the United States prudently invested Osage tribal trust funds. As described by Arthur Andersen, the Fill-the-Gap study was an attempt to trace oil and gas revenues that the United States, as trustee, collected for the Osage Nation to supporting documents that were selected by BIA. Arthur Andersen Report at Attachments F and F-1. Thus, the Fill-the-Gap study did not even attempt to determine whether or not the United States had prudently invested Osage tribal trust funds for any time period.

**OPINION 2:**

**THE UNITED STATES, AS TRUSTEE, FAILED TO PRUDENTLY INVEST THE FUNDS COLLECTED FOR THE OSAGE NATION DURING THE TRANCHE ONE MONTHS**

28. **Lost Income On Osage Tribal Trust Funds Due To Deposit Lag Time**. In my opinion, the United States, as trustee, acted imprudently by failing to deposit Osage tribal trust funds within one business day after they were collected. In my view, a prudent trustee should deposit trust funds on the same day they are received in an interest-bearing account, if possible, and within one business day in any event. It is my understanding that BIA adopted a similar requirement in its operating manual.

29. In my view, the Osage Agency could have easily complied with BIA's requirement that funds be deposited within one business day after receipt. It is my understanding that during the Tranche One Months, the Osage Agency deposited funds by mailing the checks it received at its office in Pawhuska, Oklahoma, to the BIA's regional office in Muskogee, Oklahoma. BIA personnel in Muskogee then deposited the checks in a federal depository in that city. However,

Muskogee is only about a two and one-half hour drive from Pawhuska, Oklahoma. Thus, it was certainly possible for the Osage Agency to deposit Osage trust funds within one business day of receipt as required by BIA's own operating manual.

30. In my opinion, the United States' failure to deposit Osage tribal trust funds in a timely manner has resulted in lost income to the Osage Nation. I computed that lost income based on data in the Arthur Andersen Report concerning deposit lag times at the Osage Agency during the period July 1, 1972 through September 30, 1992. Arthur Andersen Report at Attachment E-2. In its study of that problem, Arthur Andersen computed the number of "lag days" for certain deposits during that period, and then added up the dollar amount of deposits for which it found lag time of 0 days, 1 to 3 days, 4 to 6 days, 7 to 10 days, 11 to 30 days, and over 30 days. *Id.* However, Arthur Andersen assumed a transaction had zero lag days whenever it could not determine the number of lag days for that transaction.

31. Using only those transactions for which Arthur Andersen was able to determine the number of lag days, I computed the interest income that the Osage Nation lost during each fiscal year of the period July 1, 1972 through September 30, 1992 due to the United States' failure to deposit funds in an interest-bearing account within one business day after those funds were received. In making this calculation, I used the average lag days for each category of transactions used by Arthur Andersen. I also used an interest rate of 4 percent, which is the minimum rate of interest that the Osage would have earned on these funds.

32. I have also computed the present value of these lost interest amounts to September 30, 2005 for each fiscal year. For the period 1973 through 1995, I used an interest rate equal to the Benchmark Rates used in the Arthur Andersen report, which are the annual rates of return that BIA realized on its investment of tribal trust funds. For the period 1995 through September 30, 2005, I used an interest rate equal to the yield on a 7-year Treasury security as

reported by the Federal Reserve Bank of New York. As shown by Schedule A, as of September 30, 2005, the present value of the lost interest for Tranche One Months due to deposit lag times is $467.30.

33. In his expert report, Mr. Chavarria asserts that my calculation of the interest that the Osage Nation lost because of deposit lag time is overstated because I did not use actual data for the Tranche One transactions and because I used an inappropriate interest rate in calculating the present value of that lost interest. Mr. Chavarria also claims that he has recomputed the present value of that lost interest using actual data for Tranche One transactions and an appropriate interest rate.

34. Mr. Chavarria, however, did not use actual data concerning the Tranche One transaction to compute lost interest resulting from deposit lag time. In order to compute lost interest in that manner, Mr. Chavarria would have to determine for each Tranche One Lease and each Tranche One Month: (1) the date the United States collected a royalty payment; (2) the date the United States deposited that royalty payment in an interest-bearing account; and (3) the amount of each royalty payment that United States collected. According to his Report, Mr. Chavarria determined these actual dates and amounts from the data compiled by Arthur Andersen during the Reconciliation Project. Specifically, in Exhibit B. 1 of his Report, Mr. Chavarria identifies certain Bills of Collections, Schedules of Collection, and deposit slips that allegedly contain this data for all Tranche One transactions.

35. However, even assuming they are accurate, the trust records that Mr. Chavarria identified in his Exhibit B.1 do not specify the actual royalty amounts and dates for each Tranche One transaction. Rather than indicating the date of each such collection, these records generally contain only the date the BIA prepared a Bill of Collection for that collection. Rather than indicating the date each such collection was deposited in an interest-bearing account for the benefit

of the Osage Nation, these records only contain the date the BIA prepared a deposit ticket that included that collection. Because the BIA office in Pawhuska mailed those deposit slips to the BIA regional office in Muskogee for review and eventual deposit, the date a deposit slip was prepared does not necessarily indicate the date the deposit was actually made. Rather than indicating the amount of a royalty collection for a Tranche One transaction, these records only contain the total amount of royalty payments collected from a company that may be paying royalties for more than one lease.

36. During his deposition on November 9, 2005, Mr. Chavarria confirmed that, in computing interest lost because of deposit lag time, he did not use actual receipt dates for Tranche One transactions but instead used the receipts date as determined by Arthur Andersen. However, as Arthur Andersen itself acknowledged in its final report for that project, those dates of receipt "do not necessarily represent the dates funds were actually received" but in some cases are estimated receipt dates determined by using "agreed procedures" that were determined by BIA. Arthur Andersen Report at p. 54.

37. During his depositions, Mr. Chavarria also confirmed that, in computing interest lost due to deposit lag time, he did not use the actual date that a royalty collection for a Tranche One Lease was deposited into an interest-bearing account for the benefit of the Osage Nation but instead used the date that collection was posted to BIA's account for the Osage Nation. However, even assuming they are accurate, those posting dates are not necessarily the dates on which the royalty collections were actually deposited in such an account or the dates on which the deposits began earning interest. For all the above reasons, Mr. Chavarria's calculation of interest lost due to deposit lag time is not based on actual data concerning the Tranche One transactions as he claims.

38. Under these circumstances, I reasonably relied on the data that Arthur Andersen used in its study of deposit lag time for the fiscal years that include the Tranche One Months. Admittedly, this data is not perfect for the reasons described above. However, because it covers a longer time period and a larger number of transactions, this data is more representative of the actions of the United States as trustee than the data used by Mr. Chavarria, and, in any event, provides a good proxy for the Tranche One transactions.

39. Neither interest rate proposed by Mr. Chavarria for computing the present value of the interest lost because of deposit lag time is appropriate. First, the Inflationary Index Rates should not be used to compute the present value of interest lost due to deposit lag time (or anything else) because those rates do not measure the time value of money. Rather, those rates merely track changes in the purchasing power of a dollar from 1981 to 2005 based on the changes in the rate of inflation.

40. Second, Mr. Chavarria's rationale for using the three-month Treasury bill rate in his alternate calculation of the present value of the interest lost due to deposit lag time is also faulty. According to his Report (at page 4, paragraph 11), Mr. Chavarria believes that these rates are appropriate because the lost income would have been distributed to the Osage Tribe in "head right payments and would not have remained in the accounts." However, that lost income was not deposited in the Osage tribal trust account at the time it was lost or any time since and, as a result, has not been paid to Osage Nation for many years, not just 90 days. Thus, there is simply no relationship between the rates for three-month Treasury bills and the time value of the money that the Osage Nation lost when the United States, as trustee, failed to prevent deposit lag time.

41. The interest rates I used in my calculation of the present value of the interest lost due to deposit lag time are reasonable. As stated in my Report, I used the Benchmark rate for all time periods it was available (through fiscal year 1994) and the rates for 7-year Treasury securities

thereafter. The Benchmark rates are an appropriate measure of the time value of the interest lost due to deposit lag time because they generally track the expected rates of return that, according to Mr. Lundelius's Expert Report, a prudent trustee would have earned for funds collected for the Tranche One Months. In addition, the Benchmark rates are appropriate because they were computed by BIA, represent an average rate of return for many tribes, and bear a closer relationship to the time period during which the lost funds have been withheld from the Osage Nation than the rates used by Mr. Chavarria.

42. The 7-year Treasury rates are an appropriate measure of the time value of the interest the Osage Nation lost due to deposit lag time because they also generally track the expected rates of return that, according to Mr. Lundelius's Expert Report, a prudent investor would have realized on funds collected for the Tranche One Months. In addition, during the period subsequent to fiscal year 1994, these rates generally track the Benchmark rates and, as a result, are good proxies for the Benchmark rates in the period after fiscal 1994 when the Benchmark rates are not available.

43. In addition to the above errors, Mr. Chavarria's calculation of interest lost due to deposit lag time is based on several other errors and unwarranted assumptions. First, Mr. Chavarria grants the United States a grace period of three days in which to deposit any trust funds it collects for the Osage Nation. According to his Report (at page 3, paragraph 7), this grace period is necessary because the United States had to collect these trust funds at a "remote" location that did not have a federal depository and then transport or send the funds to a location that had a federal depository. However, as I described above, Pawhuska, Oklahoma, is not a "remote" location and, in fact, is located within easy driving distance of Muskogee, Oklahoma, which had a federal depository during the Tranche One Months. Thus, the United States could have easily

deposited any trust funds it collected for the Osage Nation in a federal depository on the same day the funds were collected or, at the very latest, the following business day.

44. Second, it is my understanding that, as a result of efforts by the Osage Agency, a federal depository was eventually established in Pawhuska sometime early in the early 1990s so that the BIA could more promptly deposit the trust funds it collected for the Osage Nation. Mr. Chavarria's Report does not offer any reason why a federal depository could not have been established in Pawhuska at a much earlier time.

45. Third, in an apparent attempt to buttress the results of his own calculation of interest lost due to deposit lag time, Mr. Chavarria relies (at page 3, paragraph 8) on the Arthur Andersen Report to conclude that, during the period 1972 through 1992, the United States deposited approximately 96 percent of the funds it collected for the Osage Nation within an average of 2 days. However, the data on which Mr. Chavarria relies is flawed in several respects. First, as discussed above, this data is based on "apparent" receipt dates, determined under criteria established by BIA, rather than actual receipt dates. In addition, this data is based on "posted dates" rather than the actual date a collection was deposited in an interest-bearing account for the benefit of the Osage Nation. This data also improperly treats transactions for which Arthur Andersen could not determine deposit lag days as having zero lag days, an assumption that has no basis in fact and that artificially lowers Arthur Andersen's computation of average lag time. Finally, this data incorrectly assumes that all EFTs have zero days of lag time.

46. For the above reasons, I also believe that the method used by Mr. Chavarria in his Expert Report is not a reasonable way to estimate either lost interest or the present value of that lost interest. I note, however, that if this Court were to accept Mr. Chavarria's calculations, the Osage Nation would nonetheless be entitled to late payment fees for any receipt dates that fall after

the due date for royalties. Similarly, if the Court were to accept the receipt dates in the Lundelius Expert Report, the Osage Nation would be entitled to additional late payment fees.

47. I have computed the late payment fees that are due the Osage Nation if the receipt dates used by Mr. Chavarria and Mr. Lundelius are accepted as correct. As shown by Schedule B, these late payment charges amount to $ 10,598.54.

48. I have also computed the present value of the late payment charges that are due the Osage Nation if Mr. Chavarria's receipt dates are accepted as correct, using the Benchmark rates and the 7-year Treasury rates. As shown in Schedule B, as of September 30, 2005, the present value of those late payment charges is $86,371.04.

49. **Lost Income On Osage Tribal Trust Funds Due To Disbursement Lag Time.** In my opinion, the United States, as trustee, acted imprudently by failing to credit the Osage Nation with interest on tribal trust funds between the date a check was issued to a headright owner and the date that check was cashed. In my experience over the last 34 years, it is quite common for businesses, individuals, and organizations to play the float on checks, i.e., to continue to earn interest after a check is written until the check is presented for payment to the financial institution on which it is drawn. As I noted in paragraph 8 above, as the trustee for the Unsecured Creditors Trust in a large bankruptcy, I distributed funds by check to over 3,000 beneficiaries. In every case, the trust continued to earn interest on the funds represented by those checks until the checks were presented for payment to the financial institution on which they were drawn.

50. In addition, I am aware of several instances where the United States holds funds in a trust and receives interests on checks drawn on those trust funds until the checks are presented to the United States Treasury for payment. For example, with Social Security trust funds, "[r]edemption of obligations held by the trust funds to reimburse the general account is made on a schedule that takes into account the average of the dates the checks are actually negotiated. This

effectively gives the trust funds the benefit of the 'float' between the date checks are written by Treasury and the dates they are negotiated." Social Security Administration Actuarial Note Number 142, "Social Security Trust Fund Investment Policies and Practices," January 1999, Page 5. These same procedures are used by the Department of Treasury with respect to both the Railroad Retirement Account Fund and the Civil Service Retirement and Disability Fund. *See* December 13, 1985 Letter from Acting Comptroller General to Honorable James J. Florio and Honorable James R. Jones, Enclosure I, Page 2; General Account Office Report to Chairman, House Committee on Post Office and Civil Service, "Civil Service Fund: Improved Controls Needed Over Investments," May 1987, Page 9.

51. In my opinion, the failure of the United States as trustee to prevent "disbursement lag time" has resulted in lost income to the Osage Nation. I computed that lost interest by using the account statements for Osage tribal trust funds that Arthur Andersen prepared as part of the reconciliation project. Copies of those statements were produced by Mr. Chavarria during his deposition in this case. Those account statements contain the total amount of headright payments that were made for a calendar quarter containing a Tranche One Month. Those statements also contain the amount of payments that were made by checks mailed directly to the headright owners for which the United States maintained an individual trust account, sometimes referred to as an Individual Indian Money account or IIM. It also contains the amount of checks that were mailed to headright owners for which the United States does not maintain an IIM.

52. For checks that were mailed directly to individuals for which the United States did not maintain an IIM, I estimated disbursement lag time of 5 to 6 days based on the date checks were mailed, the day of the week checks were mailed, and the city from which checks were mailed. For headright owners for whom the United States maintained an IIM trust account during the tranche one years 1976, 1979 and 1980, the United States mailed a check to BIA officials in

Muskogee, Oklahoma, who then sent the check to either Tulsa or Pawhuska, Oklahoma, for deposit. For these checks, I estimated 7 days before ultimate credit to the headright owner based on the factors noted above. For headright owners for whom the United States maintained an individual trust account during the tranche one years of 1986, 1989 and 1991, it is my understanding that an electronic deposit was made rather than the issuance of a check. For these years, I estimated 1 day of disbursement lag time before ultimate credit to the headright owner.

53. I determined the lost interest for disbursement lag days using an interest rate equal to the Benchmark Rates in the Arthur Andersen Report. I then determined the present value of that lost interest by using those same rates for years subsequent to the year of the initial loss of interest through September 30, 1994. For the period from October 1, 1994 through September 30, 2005, I used an interest rate equal to the yield on a 7-year Treasury security as reported by the Federal Reserve Bank of New York rate.

54. Schedule C summarizes the present value of the interest income lost for disbursement lag time for Tranche One Months for those checks that were cashed. As shown in that schedule, as of September 30, 2005, the present value of the interest the Osage Nation lost due to disbursement lag time for checks that were cashed for Tranche One Months is $136,274.60.

55. In his Report, Mr. Chavarria also asserts that my calculation of interest lost because of disbursement lag time for checks that were cashed is overstated because I included EFTs in my calculation. He also claims that my calculation of the present value of that lost interest is overstated because I used interest rates based on the Benchmark rates and the 7-year Treasury security rates. In his Report, Mr. Chavarria recalculated the interest lost due to disbursement lag time for checks that were cashed correcting the above claimed errors.

56. On November 10, 2005, Mr. Chavarria amended his Report by providing revised calculations for the present value of the interest lost due to disbursement lag time for checks that

were cashed. In his revised calculations, Mr. Chavarria changed the interest rate he used to calculate the amount of lost interest for lag days after January 1, 1985 from 4 percent to the overnighter rate.

57. In my view, I properly included EFTs in my calculation because, in my experience, such transactions do not always have zero lag days. For the reasons given above, I believe that Mr. Chavarria improperly used Inflationary Index Rates and 3-month Treasury bill rates to compute the present value of the interest lost due to disbursement lag time for checks that were cashed and that I reasonably used Benchmark rates and 7-year Treasury security rates in making those calculations.

58. **Lost Investment Income On Osage Tribal Trust Funds That The United States Invested**. In his Expert Report, Mr. Lundelius opines that, based on the "available records," the United States, as trustee, acted prudently in investing the funds that the United States collected for the Tranche One Leases for the Tranche One Months. Mr. Lundelius claims that he determined the actual rate of return that the United States earned on these funds. Using what he terms the Prudent Person Rule, Mr. Lundelius then asserts that he determined the expected rate of return that the United States should have earned on these funds if it had acted as a prudent trustee. Mr. Lundelius then concludes that the United States was a prudent trustee because he believes the "actual" rate of return that the United States realized on these funds was higher than the expected rate of return that a prudent trustee would have realized on the funds.

59. Mr. Lundelius's opinion, however, has several flaws that decrease the expected rate of return that he computes for a prudent trustee. The basic premise of Mr. Lundelius's analysis is that "due to the relatively short period that the trustee held the oil and gas royalties, investments were effectively limited to short-term investments such as Treasury bills and certificates of deposits." Lundelius Report at page 4, paragraph 9. In other words, Mr. Lundelius assumes that

the trust fund account had to be depleted every three months, thereby limiting the trustee's ability to make prudent investments for a period longer than about three months.

60. In his analysis, Mr. Lundelius fails to see the "forest for the trees." First, although the trust funds the United States held for Osage Nation had to be disbursed quarterly, by no means did this requirement limit the investment of trust funds by the United States to a short-term horizon. Mr. Lundelius describes an investment limitation for the trustee utilizing the assumption that funds were deposited in the trust account of the Osage Nation and then all funds were withdrawn from the account and distributed on a quarterly basis. The reality as to the operation of the Osage trust account is that funds are received continuously from oil and gas leases and, as a result, the quarterly distribution does not deplete all the funds in the account. In Schedule D, I have prepared an analysis of the account balances by month for the Osage trust account 7386, utilizing the account reconciliation of the Tranche One Months included in the Deposition Witness Binder for the Chavarria Deposition. The analysis summarizes the balance in account 7386 for each Fiscal Year and separates the balance at the end of each month in the fiscal year as to invested funds balance and cash balance. In addition, an analysis was made for each day of each month as to the lowest fund balance. The lowest fund balance in the fiscal year 1976 was $3,381,569.54; in fiscal year 1978, $4,420,364.19; in fiscal year 1981, $11,404,543.20; in fiscal year 1986, $1,631,472.68; in fiscal year 1989, $1,367,625.77; and in fiscal year 1991, $2,040,790.85. This analysis clearly demonstrates that a "prudent investor" did not have to take a completely short-term horizon in making investment decisions. A prudent investor utilizing a very simple common sense analysis would be able to invest funds on a rollover basis for a longer period of time and still retain the liquidity needed for quarterly distributions.

61. Second, Mr. Lundelius did not use actual data to determine the actual rate of return on the Tranche One transactions as he claims. In order to determine the amount of royalties that

were collected from the Tranche One Leases and the dates of those collections, Mr. Lundelius apparently relied on the same documents that Mr. Chavarria used to determine lost interest due to deposit lag time. As discussed above, those documents do not contain enough information to determine the actual dates on which the United States collected royalty payments or deposited them in an interest-bearing account for the Osage Nation.

62. Third, Mr. Lundelius's attempt to determine the rate of return on the Tranche One transactions is flawed for the independent reason that one cannot separate how Tranche One funds are invested as opposed to all other trust funds. At the time investments were made, the claimed proceeds from the Tranche One transactions were not the only funds that the United States, as trustee, had available to invest. Mr. Lundelius's report offers no basis for his method of allocating the claimed proceeds for the Tranche One transactions to specific investments in Treasury bills or CDs. For example, in his analysis of the funds collected for production during January 1976, Mr. Lundelius assumes that on March 11, 1976, about $133,000 of the funds collected from Bigheart were invested in a CD earning 5.74 percent. One could just as reasonably assume that this $133,000 was kept with the remainder of the funds collected from Bigheart and instead invested in a Treasury bill on March 22, 1976 earning only 4.76 percent and then put in a CD on April 1, 1976 earning only 5.22 percent. However, the latter assumptions would significantly reduce the "actual" rate of return that Mr. Lundelius computed for Tranche One transactions for January 1976.

63. Fourth, Mr. Lundelius's method of allocating the claimed proceeds from the Tranche One transactions to specific investments does not make common sense in several respects. For example, in Exhibit D-1 to his expert report, Mr. Lundelius asserts that a deposit in the amount of $234,574 that included royalties for a Tranche One lease was made on February 25, 1976 and invested in a Treasury bill with a 4.62 % yield the next day. Mr. Lundelius also claims that on the

same day, other Tranche One funds were placed in a CD with a much higher interest rate of 5.33%. Mr. Lundelius further claims that the Treasury bill purchased on February 25, 1976 matured on March 4, 1976, after which roughly one-half of the original amount was moved to a CD on March 11, 1976, while the rest was left uninvested for a period of 18 days, and then invested in another Treasury bill on March 22, 1976 that earned 4.76%.

64. Mr. Lundelius's report offers no valid reason why the United States invested Osage Trust funds at two different rates on February 26, 1976. In addition, he provides no valid reason why a portion of the funds from the Treasury bill that matured on March 4, 1976 should have been left uninvested or placed in low-yield Treasury bill when a CD with a higher interest rate of return was available for purchase on March 11, 1976, especially when one considers the Mr. Lundelius claims that some funds from the original deposit were placed in that CD.

65. Fifth, Mr. Lundelius's own analysis demonstrates the United States was not prudent in investing the vast majority of trust funds it collected for the Osage Nation during the fiscal years that include the Tranche One Months. Using the account statements that were prepared by Arthur Andersen as part of the Reconciliation Project and produced by Mr. Chavarria at his deposition, I have compared the investment income that United States realized on those Osage tribal trust funds that it did invest with the investment income the United States would have realized on those funds if it had earned the expected rate of return that, according to Mr. Lundelius, a prudent trustee would have realized. As shown by Schedule D, the investment income that the United States for three Tranche One Months is far short of the investment income that, according to Mr. Lundelius, a prudent trustee would have earned. As also shown by Schedule D, as of September 30, 2005, the present value of that lost income is $420,967.36.

66. In his Report, Mr. Lundelius also opines that my opinion that the United States did not prudently invest the Osage tribal trust funds is flawed in its methodology and unreliable in its

findings. In essence, Mr. Lundelius criticizes my opinion because, in his view, I did not calculate the rate of return on the actual Tranche One transactions. Mr. Lundelius also asserts that, in computing the present value of lost investment income, I improperly relied on the Benchmark rates and the 7-year Treasury security rates rather than Inflationary Index Rate or 3-month Treasury bill rates. Mr. Lundelius also asserts that my calculation of lost investment income improperly included a large number of Osage accounts that are not related to oil and gas royalties.

67. As discussed above, contrary to his claim, Mr. Lundelius did not use actual data to compute the rate of return the United States realized for the Tranche One transactions. For the same reasons, there is no basis for Mr. Lundelius's assertion that I ignored available data or that I should have used actual data to analyze whether or not the United States, as trustee, prudently invested the trust funds it collected for the Osage Nation.

68. As also discussed above, the Inflationary Index Rates and the three-month Treasury bill rates do not constitute appropriate interest rates to determine the present value of the investment income the United States lost by failing to prudently invest the trust funds it collected for the Osage Nation. As I also explained above, the Benchmark rates and the 7-year Treasury security rates are reasonable rates to use in that present-value calculation.

69. **Lost Investment Income On Osage Tribal Trust Funds The United States Did Not Invest**. As discussed, my calculation of lost investment income in Schedule D was limited to those Osage tribal funds that the United States, as trustee, chose to invest. My analysis did not include lost income of those funds that the United States failed to invest and that, as a result, received only the statutory rate of interest provided by 25 U.S.C. § 162a. In general, for the Tranche One Months, that statutory rate of interest is lower than the expected rate of return that, according to Mr. Lundelius, a prudent trustee should earn.

70. In Schedule E, I have computed the additional investment income the United States would have earned for the Osage Nation if the United States had invested all cash funds and obtained the expected rate of return that, according to Mr. Lundelius, a prudent trustee should have earned. As shown by that schedule, the amount of that lost income is $29,790.39. As also shown by that schedule, as of September 30, 2005, the present value of that lost income is $159,226.11.

**SUMMARY**

71. A summary of all income lost by the Osage Nation due to the failure of the United States, as trustee, to prudently invest tribal trust funds for the Tranche One Months is set forth in Schedule F. As shown in that schedule, as of September 30, 2005, the present value of this lost income is $803,306.40. In my view, this is a conservative estimate of the income that the Osage Nation has lost due to the failure of the United States, as trustee, to prudently invest the trust funds it collected for the Osage Nation.

Stephen A. Jay, CPA/ABV