# EXHIBIT B

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| *v*. | ) | Nos. 99-550 L & 00-169 L<br>Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**EXPERT REPORT**

**OF**

**STEPHEN A. JAY**

**IN SUPPORT OF THE TRANCHE ONE INVESTMENT CLAIMS OF PLAINTIFF OSAGE NATION**

September 30, 2005

## INTRODUCTION

1. I have been retained by the Plaintiff Osage Nation to provide expert testimony concerning whether the United States, as trustee, prudently invested the funds that it collected during six specific months under oil and gas leases that it issued for the benefit of the Osage Nation. As discussed in detail below, I have concluded that the United States failed to prudently invest those funds.

2. I am being compensated for my services in this case, including time spent testifying, at the rate of $250.00 per hour plus expenses. That rate is the same rate I charge for all my consulting services.

## QUALIFICATIONS AND PRIOR TESTIMONY

3. In 1967, I received a Bachelor of Science degree from Oklahoma State University, where I majored in accounting. In addition, I received a Masters of Science degree in accounting in 1969 from Oklahoma State University. In 1969, I was licensed by the State of Oklahoma as a Certified Public Accountant.

4. During the years of 1971 through 1976, I practiced as a CPA with the firm of Arthur Young & Company in Tulsa, Oklahoma. In 1976, I co-founded Lohrey & Jay, CPAs. In 1988 I founded the firm of Jay & Associates, P.C., where I am the managing shareholder. Jay & Associates, P.C. provides financial audit, tax and consulting services to privately owned businesses and individuals.

5. A more detailed summary of my qualifications is attached as Exhibit 1. That summary includes a list of all cases in which I have offered expert testimony, whether by trial or deposition, in the past four years. I have not published any articles in the last ten years.

## THE OSAGE NATION

6. It is my understanding that the Osage Nation is a federally recognized Indian Tribe. I also understand that the Osage Reservation is contiguous with the boundaries of Osage County, Oklahoma.

7. I further understand that, under a statute enacted in 1906, the United States holds the mineral estate underlying the Osage Reservation (the "Osage Mineral Estate") in trust for the benefit of the Osage Nation.

8. It is my understanding that, as trustee, the United States has issued numerous oil and gas leases covering portions of the Osage Mineral Estate. As trustee, the United States collects all payments due under those leases and deposits them in the United States Treasury. As trustee, the United States also invests those funds until they are distributed to various persons known as "headright owners."

9. I further understand that, under the 1906 Statute, the original headright owners were the persons on an official roll of the Osage Nation that was compiled by the United States. Over time, persons other than members of the Osage Nation have become headright owners.

10. It is my understanding that the United States, as trustee, generally distributes tribal trust funds to the headright owners four times a year. In general, the amount of a given distribution is based on the amount of tribal trust funds the United States collects during a calendar quarter. The United States generally makes these distributions on or about the following dates:

| Calendar Quarter | Distribution Date |
|---|---|
| January – March | June 15 |
| April – June | September 15 |
| July - September | December 15 |
| October-December | March 15 |

I further understand that distributions to headright owners are generally made by checks issued or electronic deposits made by the United States Department of the Treasury.

## DEFINITION OF TRANCHE ONE MONTHS

11. It is my understanding that, in an Order dated April 15, 2005, the Court has defined "tranche one" of this case to include five specific oil and gas leases and six specific months. Those six months are January 1976, May 1979, November 1980, February 1986, July 1989, and October 1990 (collectively, the "Tranche One Months").

## DATA AND INFORMATION CONSIDERED IN FORMING OPINIONS

12. In forming the opinions in this report, I have reviewed various documents and deposition transcripts applicable to the actions of the United States, as trustee, in investing funds it holds in trust for various Indian Tribes, including the Osage Nation. I have primarily relied upon the following data and information:

a. Agreed Upon Procedure Report dated December 31, 1995 issued by Arthur Andersen LLP ("Arthur Andersen Report");

b. Transcripts of the deposition testimony of Greg Chavarria; and

c. Documents produced by Greg Chavarria during his deposition.

## OPINION 1:

## BASED ON THE AVAILABLE RECORDS OF THE UNITED STATES, NO ONE CAN DETERMINE WHETHER THE UNITED STATES, AS TRUSTEE, PRUDENTLY INVESTED THE TRUST FUNDS IT COLLECTED FOR THE OSAGE NATION DURING THE TRANCHE ONE MONTHS

13. In my opinion, the available records of the United States do not permit anyone to determine whether the United States, as trustee, prudently invested the funds it collected for the

Osage Nation during the Tranche One Months. My opinion is based on the reasons set forth below.

14. In order to determine whether the United States, as trustee, prudently invested tribal trust funds of the Osage Nation, one would need trust records establishing the amount of trust funds that were available to be invested. In addition, one would need trust records indicating the available investment choices as well as the investment decisions that were made. One would also need trust records demonstrating the yields from the investments that were made. However, the documents that have been provided to me do not contain those kind of trust records.

15. In the absence of the above trust records, I have used data in the Arthur Andersen Report. According to that report, the Bureau of Indian Affairs ("BIA") of the United States Department of the Interior ("DOI") contracted with Arthur Andersen to perform agreed-upon procedures with respect to the tribal trust accounts of the Osage Nation for the period July 1, 1972 through September 30, 1992. It is my understanding that BIA entered into this contract in order to fulfill a Congressional mandate that required BIA to provide an accounting to each Tribe for each of their trust accounts. The primary purpose of this "Reconciliation Project," as stated in the contract between BIA and Arthur Andersen, was to reconstruct historical transactions, to the extent practical, for all years for which records are available for all tribal trust accounts managed by the BIA. Arthur Andersen Report at 1. The Arthur Andersen Report summarizes the work done by Arthur Andersen for the tribal trust accounts of the Osage Nation.

16. However, even when it is supplemented with the data in the Arthur Andersen Report, the available records of the United States still do not permit anyone to determine whether the United States, as trustee, prudently invested the funds it collected for the Osage Nation during the Tranche One Months. As the Arthur Andersen Report makes clear, Phase I of the Reconciliation Project "substantiated that not all records would be available for a full accounting"

to each Tribe of its trust accounts. Arthur Andersen Report at 1. As that report also makes clear, in some cases, BIA's trust records do not contain the needed information even when they could be found. For example, prior to 1978, BIA's records did not distinguish between investment income and other types of income. *Id.* at Attachment B-1, p. 1. As a result, nobody can analyze whether the United States, as trustee, prudently invested tribal trust funds prior to 1978.

17. Due to the absence of trust records, the Arthur Andersen Report is based upon "agreed procedures" that were established by the BIA rather than an audit of those trust records. Arthur Andersen Report at 1. In performing those agreed procedures, Arthur Andersen was limited to tracing amounts reported in the Trust Accounts for the Osage Tribe to a supporting document "to the extent source documentation was provided" by BIA.. *Id.* at Attachment A, p. 1. In short, the agreed procedures performed by Arthur Andersen were limited to only that information that BIA could produce. Thus, Arthur Andersen did not perform reconciliation procedures beyond the scope established by the BIA in the test of the BIA's records. The process is described in the Andersen Report as "verified (i.e., traced and agreed…) to the extent that source documentation was provided". *Id.* at 2.

18. In addition, during the Reconciliation Project, BIA "discontinued" the agreed procedures that it had originally requested Arthur Andersen to perform to test the accuracy of investment income and replaced them with a test described as "alternative procedures". Arthur Andersen Report at Attachment A, page 2. Those alternative procedures in effect attempted to test the investment yields that the United States had realized for the Osage Tribe and measure them against the average yield the United States realized for all Tribes, *i.e.*, the so-called "Annual Tribe Funds Bench Mark Rates." Those Bench Mark Rates, however, were computed by BIA, were not subjected to test as originally designed, and were not reviewed or verified by Arthur Andersen. *Id.* at Attachment B-1, p. 5. As a result, Arthur Andersen's use of the Bench Mark Rates to test the

investment yields the United States realized on Osage tribal trust funds in effect uses an untested yardstick as selected by the BIA to test other untested yardsticks.

19. In recognition of the numerous deficiencies in BIA's trust records, Arthur Andersen performed a "Fill-the-Gap" study that was designed to trace oil and gas revenues that the United States, as trustee, collected for the Osage Nation to supporting documents as selected by BIA. Arthur Andersen Report at Attachments F and F-1. However, in order to determine whether the United States collected all payments due under the oil and gas that it issued for the benefit of the Osage Nation, one would need trust records establishing the payments that were due under those leases. At a minimum, these trust records would include documents showing how the government determined the amount of the payments that were due as well as the amounts collected by the government. As noted above, Arthur Andersen did not have such records when it performed the Reconciliation Project. In sum, the "Fill the Gap" procedures used by Arthur Andersen were not adequate to test the accuracy of oil and gas revenues collected by the United States on behalf of the Osage Nation.

**OPINION 2:**

**BASED ON THE LIMITED TRUST DOCUMENTS AND OTHER AVAILABLE INFORMATION, THE UNITED STATES, AS TRUSTEE, FAILED TO PRUDENTLY INVEST THE FUNDS COLLECTED FOR THE OSAGE NATION DURING THE TRANCHE ONE MONTHS**

20. **Deposit Lag Time**. In its report, Arthur Andersen attempted to examine deposit lag time for the Osage Nation for the period 1973 through 1992. Arthur Andersen Report at Attachment E-2. In its study of that problem, Arthur Andersen computed the number of "lag days" for certain deposits during that period, i.e., the number of days between the date the United States, as trustee, collected a check for the Osage Nation and the date the United States deposited that check in a financial institution. The Arthur Andersen Report lists the dollar amounts of collections

for which it found lag time of 0 days, 1 to 3 days, 4 to 6 days, 7 to 10, 11 to 30 and over 30 days. *Id.* However, Arthur Andersen did not attempt to compute the interest income that the Osage Nation lost due to the United States' failure to promptly deposit the Osage Nation's trust funds in an interest bearing account. *Id.*

21. Using the lag days computed by Arthur Andersen for only those transactions for which data was available, I have computed the interest income that the Osage Nation lost during the period 1973 through 1992 due to the United States' failure to deposit funds in an interest bearing account in a prudent and prompt manner. This computation is shown on the first two pages of the spreadsheet attached as Schedule A and titled "Calculation of Lost Interest Based on Arthur Andersen Deposit Time Lag Data." In page 2, row 3, I have shown the average lag days for each category of transactions used by Arthur Andersen. Lost interest for these lag days was computed using an interest rate of 4 percent. The total amount of lost interest for each year is shown in columns 8 through 12 of Page 2.

22. I have also computed the present value of these lost interest amounts to September 30, 2005. For the period 1973 through 1995, I used an interest rate equal to the Bench Mark Rates used in the Arthur Andersen report. For the period 1995 through September 30, 2005, I used an interest rate equal to the yield on a 7 year Treasury security as reported by the Federal Reserve Bank of New York. Present value calculations are presented at columns 13 through 17 of Schedule A, page 2. Lost interest for each tranche one month was computed at Schedule A, page 1 by dividing column 3 by 12. Those monthly amounts are shown in column 4, Schedule A, page 1.

23. As shown by Schedule A, as of September 30, 2005, the present value of the lost interest for Tranche One Months due to deposit lag times is $467.79. As also shown by that schedule, as of September 30, 1995, the present value of lost interest for the period fiscal year 1973 through fiscal year 1992 is $163,634.64.

24. **Lost Investment Income**. In its report, Arthur Andersen attempted to determine whether the interest earned during the period 1978 through 1992 on trust funds the United States invested for the Osage Nation earned the same rate of return as trust funds the United States invested for other Indian tribes. Arthur Andersen Report at Attachment B-1. Specifically, Arthur Andersen compared the rate of return on the trust funds that the United States invested for all Osage Nation with the Bench Mark Rates, that, as noted above, represents the BIA's internal computation of the average rate of return on the trust funds the United States invested for other Tribes. *Id.* In those cases where the rate of return the United States earned for the Osage trust funds was less than the applicable Bench Mark Rate, Arthur Andersen computed the amount of interest that the Osage Nation lost because the United States did not earn a rate of return equal to the Bench Mark Rate. *Id.* In those cases where the rate of return the United States realized for the Osage trust funds was greater than the applicable Bench Mark Rate, Arthur Andersen computed the amount by which the interest actually earned on those funds exceeded the amount that would have been earned at the Bench Mark Rate. *Id.* However, Arthur Andersen did not compute the present value of these interest amounts. *Id.* In addition, Arthur Andersen was not able to perform this analysis for years prior to 1978 because BIA's records for that period do not distinguish investment income from other types of income. *Id.*

25. As part of my study, I computed the present value of the lost interest amounts reported by Arthur Andersen for the years 1978 through 1992 for Osage trust funds. For the period 1979 through 1994, I used an interest rate equal to the applicable Bench Mark Rate set forth in the Arthur Andersen Report. For the period 1995 through 2005, I used an interest rate equal to the yield on a 7 year Treasury security as reported by the Federal Reserve Bank of New York.

26. The results of my analysis of Lost Investment Income are provided in Schedule B, titled "Calculation of Present Value of Lost Investment Income on Cash Funds Based on Arthur

Andersen Data." As shown by that schedule, as of September 30, 2005, the present value of the interest income the Osage Nation lost due to the failure of the United States, as trustee, to realize a rate of return of Osage Tribal funds equal to the Bench Mark Rates equals $18,454.32.

27. **Disbursement Lag Time**. In my study, I also computed the interest lost by the Osage Nation due to disbursement lag time. It is my understanding that the United States did not credit the Osage Nation with interest on tribal trust funds between the date a check was issued to a headright owner and the date that check was cashed. In that regard, it is my understanding that some checks were never cashed and were ultimately cancelled by the Department of the Treasury on or before April 1, 1991.

28. For checks that were cashed, I computed this lost interest by first determining the estimated number of days between the mailing of checks to recipients and their ultimate deposit. It is my understanding that checks were mailed directly to headright owners for which the United Stated did not maintain an individual trust account, sometimes referred to as an IIM. For these checks, I estimated disbursement lag time of 5 to 6 days based on the date checks were mailed, the day of the week checks were mailed, and the city from which checks were mailed.

29. For headright owners for whom the United States maintained an IIM trust account during the tranche one years 1976, 1979 and 1980, the United States mailed a check to BIA officials in Muskogee, Oklahoma, who then sent the check to either Tulsa or Pawhuska, Oklahoma for deposit. For these checks, I estimated 7 days before ultimate credit to the headright owner based on the factors noted above. For headright owners for whom the United States maintained an individual trust account during the tranche one years of 1986, 1989 and 1991, it is my understanding that an electronic deposit was made rather than the issuance of a check. For these years, I estimated 1 day of disbursement lag time before ultimate credit to the headright owner.

30. I determined the lost interest for disbursement lag days using an interest rate equal to the Bench Mark Rates in the Arthur Andersen Report. I then determined the present value of that lost interest by using those same rates for years subsequent to the year of the initial loss of interest through 1994. For the period 1995 through September 30, 2005, I used an interest rate equal to the yield on a 7 year Treasury security as reported by the Federal Reserve Bank of New York rate.

31. Based on the available data, I have estimated that the amount of the checks that were not cashed for a given fiscal year containing a tranche one month to be 1 percent of the total disbursements for Osage trust account 7386 for that fiscal year as set forth in the "reconciled" financial statements prepared by Arthur Andersen. I have computed the lost interest on that amount for a given fiscal year by assuming that the checks that were not cashed that year were issued on July 1 of that year and by using the Bench Mark Rates in the Arthur Andersen Report. I then determined the present value of that lost interest by using those same rates for years subsequent to the year of the initial loss of interest through 1994. For periods after 1994, I used an interest rate equal to the yield on a 7 year Treasury security as reported by the Federal Reserve Bank of New York rate.

32. Schedule C, column 10, summarizes the present value of the interest income lost for disbursement lag time for tranche one months for those checks that were cashed. As shown in that schedule, as of September 30, 2005, the present value of the interest the Osage Nation lost due to disbursement lag time for checks that were cashed for tranche one months is $145,939.45.

33. Schedule D summarizes the present value of the interest lost due to disbursement lag time for checks that were not cashed based on the assumption that the funds for those checks were not restored to the Osage trust account. As shown in that schedule, the principal of those cancelled checks is $2,216,392 and, as of September 30, 2005, present value of that lost interest on

those checks is $11,728,792.99. Assuming the funds for these checks were restored to the Osage trust account on April 1, 1991, the present value of that lost interest as of April 1, 1991 is $4,720,441.

34. **Lost Investment Income On Cash Funds**. In its report, Arthur Andersen compared income earned for the period 1978 through 1992 on cash accounts in trust accounts the United States maintained for the Osage Tribe to yields which could have been earned if the money had been invested at the Bench Mark Rates, *i.e.*, BIA's determination of the average rate of return the United States earned on funds it held in trust for all Indian Tribes. Arthur Andersen Report at Attachment B-2. Arthur Andersen, however, did not compute the present value of those amounts. Nor did Arthur Andersen perform this analysis for years prior to 1978 because BIA's trust records for that period do not distinguish between investment income and other types of income. *Id.* at Attachment B-2, p. 1.

35. As part of my study, I computed the present value of the lost interest amounts computed by Arthur Andersen for the years 1978 through 1992. For the period 1979 through 1994, I used an interest rate equal to the benchmark rates set forth in Arthur Andersen's report. For the period 1995 through 2005, I used an interest rate equal to the yield on a 7 year Treasury security as reported by the Federal Reserve Bank of New York. The results of my analysis of Lost Investment Income on Cash Funds are provided on Schedule E. As shown on that schedule, as of September 30, 2005, the present value of the lost investment income on the cash trust funds of the Osage Nation is $311,749.79. As also shown on that schedule, as of September 30, 2005, the present value of the lost investment income on cash trust funds of the Osage Nation for fiscal years 1973 through 1992 is $1,464,163.57.

36. In sum, the United States failed to prudently invest the tribal trust funds it collected for the Osage Nation during the Tranche One Months. Based on the available trust records and

other available information, the United States failed to deposit collected funds in a prudent manner, failed to obtain prudent yields on funds that were invested, and failed to earn any investment income on disbursed funds between the time checks were issued and the time those checks were cashed. In addition, the United States may have failed to restore the funds for cancelled checks to the Osage Nation's trust account.

**SUMMARY**

37. A summary of all income lost by the Osage Nation due to the failure of the United States, as trustee, to prudently invest tribal trust funds is set forth in Schedule F of my report. As shown by Schedule F, as of September 30, 2005, the present value of this lost income is $12,204,952.98. In addition, the United States may have failed to restore to the Osage Nation trust account $2,216,392 in funds attributable to cancelled checks. In view of the absence of available trust records as discussed above, this is a conservative estimate of the income that the Osage Nation has lost due to the failure of the United States, as trustee, to prudently invest the trust funds it collected for the Osage Nation.

______________________________
Stephen A. Jay, CPA/ABV