# EXHIBIT C

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| | ) | Nos. 99-550 L & 00-169 L |
| *v*. | ) | Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**REBUTTAL EXPERT REPORT**

**OF**

**STEPHEN A. JAY**

**IN SUPPORT OF THE TRANCHE ONE INVESTMENT CLAIMS OF PLAINTIFF OSAGE NATION**

November 23, 2005

## INTRODUCTION

1. I have been retained by the Plaintiff Osage Nation to provide expert testimony concerning whether the United States, as trustee, prudently invested the funds it collected during six specific months ("Tranche One Months") under five specific oil and gas leases ("Tranche One Leases") that the United States issued for the benefit of the Osage Nation. On September 30, 2005, I submitted my Expert Report in this case.

2. I have read the Expert Report of Gregory J. Chavarria ("Chavarria Expert Report"), dated November 3, 2005, and reviewed the transcript of his deposition taken on November 9, 2005 and attached exhibits. In his Expert Report, Mr. Chavarria sets forth his calculations of lost interest resulting from deposit lag time, disbursement lag time, and cancelled checks and, in addition, raises several issues with respect to my Expert Report. This Rebuttal Expert Report responds to the calculations in Mr. Chavarria's Expert Report and clarifies certain aspects of my own calculations.

3. I have also read the Expert Report of Charles R. Lundelius ("Lundelius Expert Report"), dated November 3, 2005, and reviewed the transcript of his deposition taken on November 10, 2005 and attached exhibits. In his Expert Report, Mr. Lundelius sets forth his opinions concerning whether the United States, as trustee, prudently invested the funds it collected for the Osage Nation under the Tranche One Leases for the Tranche One Months. This Rebuttal Expert Report also responds to the opinions in Mr. Lundelius' Expert Report and clarifies certain aspects of my Opinions in this matter.

## RESPONSE TO MR. CHAVARRIA'S CALCULATIONS CONCERNING LOST INTEREST DUE TO DEPOSIT LAG TIME, DISBURSEMENT LAG TIME, AND CANCELLED CHECKS

4. **Lost Interest Due to Deposit Lag Time.** In his expert report, Mr. Chavarria asserts that my calculation of the interest that the Osage Nation lost because of deposit lag time is

overstated because I did not use actual data for the Tranche One transactions and because I used an inappropriate interest rate in calculating the present value of that lost interest. Mr. Chavarria also claims that he has recomputed the present value of that lost interest using actual data for Tranche One transactions and an appropriate interest rate.

5. Mr. Chavarria, however, did not use actual data concerning the Tranche One transaction to compute lost interest resulting from deposit lag time. In order to compute lost interest in that manner, Mr. Chavarria would have to determine for each Tranche One transaction: (1) the date the United States collected a royalty payment; (2) the date the United States deposited that interest payment in an interest bearing account; and (3) the amount of each royalty payment the United States collected for a Tranche One Lease. According to his Report, Mr. Chavarria determined these actual dates and amounts from the data compiled by Arthur Andersen during the Reconciliation Project. Specifically, in Exhibit B. 1 of his Report, Mr. Chavarria identifies certain Bills of Collections, Schedules of Collection, and deposit slips that allegedly contain the actual data for the Tranche One transactions.

6. However, the specific trust records that Mr. Chavarria identified in his Exhibit B.1 do not contain the actual royalty amounts and dates for the Tranche One transaction. Rather than containing the date of each such collection, these records generally contain only the date the BIA prepared a Bill of Collection for a collection. Rather than containing the date each such collection was deposited in an interest bearing account for the benefit of the Osage Nation, these records only contain the date the BIA prepared a deposit ticket that included that collection. Because the BIA office in Pawhuska Oklahoma mailed those deposit slips to the Regional Office in another city for review and eventual deposit, the date a deposit slip was prepared does not necessarily indicate the deposit was actually made. Rather than containing the amount of a royalty collection for a

Tranche One transactions, these records only contain the total amount of royalty payments collected from a company that may be paying royalties for more than one lease.

7. During his deposition on November 9, 2005, Mr. Chavarria confirmed that, in computing interest lost because of deposit lag time, he did not use actual receipt dates for Tranche One transactions but instead used the "apparent" receipt date as determined by Arthur Andersen. However, as Arthur Andersen itself acknowledged in its final report for that project, those "apparent" dates of receipt "do not necessarily represent the dates funds were actually received" but instead are estimated receipt dates determined by using "agreed procedures" that were determined by BIA. Arthur Andersen Report at p. 54.

8. During his depositions on November 9, 2005, Mr. Chavarria also confirmed that, in computing interest lost due to deposit lag time, he did not use the actual date a royalty collection for a Tranche One Lease was deposited to an interest bearing account for the benefit of the Osage Nation but instead used the date that collection was posted to BIA's account for the Osage Nation. However, those posting dates are not necessarily the date that royalty collection was actually deposited in such an account or the date that deposit began earning interest. For all the above reasons, Mr. Chavarria's calculation of interest lost due to deposit lag time is not based on actual data concerning the Tranche One transactions as he claims.

9. Under these circumstances, I reasonably relied on the data that Arthur Andersen used in its study of deposit lag time for the fiscal years that include the Tranche One Months. Admittedly, this data is not perfect for the reasons described above and in my Report. However, because it covers a longer time period and a larger number of transactions, this data is more representative of the actions of the United States as trustee than the data used by Mr. Chavarria, and, in any event, provides a good proxy for the Tranche One transactions.

10. Neither interest rate proposed by Mr. Chavarria for computing the present value of the interest lost because of deposit lag time is appropriate. First, the Inflationary Index Rates should not be used to compute the present value of interest lost due to deposit lag time (or anything else) because those rates do not measure the time value of money. Rather, those rates merely track changes in the purchasing power of a dollar from 1981 to 2005 based on the changes in the rate of inflation.

11. Second, Mr. Chavarria's rationale for using the three month Treasury bill rate in his alternate calculation of the present value of the interest lost due to deposit lag time is also faulty. According to his Report (at page 4, paragraph 11), Mr. Chavarria believes that these rates are appropriate because the lost income would have be distributed to the Osage Tribe in "head right payments and would not have remained in the accounts." However, that lost income was not deposited in the Osage tribal trust account at the time it was lost or any time since and, as a result, has not been paid to Osage Nation for many years, not just ninety days. Thus, there is simply no relationship between the rates for three month Treasury bills and the time value of the money that the Osage Nation lost when the United States, as trustee, failed to prevent deposit lag time.

12. The interest rates I used in my calculation of the present value of the interest lost due to deposit lag time are reasonable. As stated in my Report, I used the Benchmark rate for all time periods it was available (through fiscal year 1994) and the rates for 7-year Treasury securities thereafter. The Benchmark rates are an appropriate measure of the time value of the interest the United States lost due to deposit lag time because, as shown by Schedule A, they generally track the expected rates of return that, according to Mr. Lundelius' Expert Report, a prudent trustee would have earned for funds collected for the Tranche One Months. In addition, the Benchmark rates are appropriate because they were computed by BIA, represent an average rate of return for

many tribes, and bear a closer relationship to the time period during which the lost funds have been withheld from the Osage Nation than the rates used by Mr. Chavarria.

13. The 7-year Treasury rates are an appropriate measure of the time value of the interest the Osage Nation lost due to deposit lag time because, as shown by Schedule A, they also generally track the expected rates of return that, according to Mr. Lundelius' Expert Report, a prudent investor would have realized on funds collected for the Tranche One Months. In addition, during the period subsequent to fiscal year 1994, these rates generally track the Benchmark rates and, as a result, are good proxies for the Benchmark rates in the period after fiscal 1994 when the Benchmark rates are not available.

14. In addition to the above errors, Mr. Chavarria's calculation of interest lost due to deposit lag time is based on several other errors and unwarranted assumptions. First, Mr. Chavarria grants the United States a grace period of three days in which to deposit any trust funds it collects for the Osage Nation. According to his Report (at page 3, paragraph 7), this grace period is necessary because the United States had to collect these trust funds at a "remote" location that did not have a federal depository and then transport or send the funds to a location that had a federal depository. However, Pawhuska Oklahoma is not a "remote" location and, in fact, is located within easy driving distance of several cities with federal depositories. Thus, the United States could have easily deposited any trust funds it collected for the Osage Nation in a federal depository on the same day the funds were collected or, at the very latest, the following business day.

15. Second, it is my understanding that a federal depository was eventually established in Pawhuska sometime early in the early 1990s so that the BIA could more promptly deposit the trust funds it collected for the Osage Nation. Mr. Chavarria's Report does not offer any reason why a federal depository could not have been established in Pawhuska at a much earlier time.

16. Third, in an apparent attempt to buttress the results of his own calculation of interest lost due to deposit lag time, Mr. Chavarria relies (at page 3, paragraph 8) on the Arthur Andersen Report to conclude that, during the period 1972 through 1992, the United States deposited approximately 96 percent of the funds it collected for the Osage Nation within an average of 2 days. However, the data on which Mr. Chavarria relies is flawed in several respects. First, as discussed above, this data is based on "apparent" receipt dates, determined under criteria established by BIA, rather than actual receipt dates. In addition, this data is based on "posted dates" rather than the actual date a collection was deposited in an interest bearing account for the benefit of the Osage Nation. This data also improperly treats transactions for which Arthur Andersen could not determine deposit lag days as having zero lag days, an assumption which has no basis in fact and that artificially lowers Arthur Andersen's computation of average lag time. Finally, this data incorrectly assumes that all EFTs have zero days of lag time.

17. For the above reasons, I also believe that the method used by Mr. Chavarria in his Expert Report is not a reasonable way to estimate either lost interest or the present value of that lost interest. I note, however, that if this Court were to accept Mr. Chavarria's calculations, the Osage Nation would nonetheless be entitled to late payment charges based on the receipt dates that Mr. Chavarria used in his calculations because, in some cases, Mr. Chavarria receipt dates are after the date royalties were due. In Schedule B, I have computed that present value of the amount of those late payment charges.

18. **Lost Interest Due To Disbursement Lag Time For Checks That Were Cashed.** In his Report, Mr. Chavarria also asserts that my calculation of interest lost because of disbursement lag time for checks that were cashed is overstated because I improperly included an investment purchase transaction of $1,656,297.66 posted on June 12, 1986 as a disbursement and because I included EFTs in my calculation. He also claims that my calculation of the present value

of that lost interest is overstated because I used interest rates based on the Benchmark rates and the 7-year Treasury security rates. In his Report, Mr. Chavarria recalculated the interest lost due to disbursement lag time for checks that were cashed correcting the above claimed errors.

19. On November 10, 2005, Mr. Chavarria amended his Report by providing revised calculations for the present value of the interest lost due to disbursement lag time for checks that were cashed. In his revised calculations, Mr. Chavarria changed the interest rate he used to calculate the amount of lost interest for lag days after January 1, 1985 from 4 percent to the overnighter rate.

20. I agree that my calculation inadvertently included an investment purchase of $1,656,297.66 as a disbursement. However, I properly included EFTs in my calculation because, in my experience, such transactions do not always have zero lag days. For the reasons given above, I reasonably relied on the Benchmark rates to compute the last interest on disbursement lag time. For the same reasons, I believe that Mr. Chavarria improperly used Inflationary Index Rates and 3 month Treasury bill rates to compute the present value of the interest lost due to disbursement lag time for checks that were cashed and that I reasonably used Benchmark rates and 7-year Treasury security rates in making those calculations. In Schedule C, I have recalculated the present value of interest lost due to disbursement lag time for checks that were cashed without the $1,656,297.66 investment purchase.

21. **Lost Interest Due To Disbursement Lag Time For Checks That Were Cancelled.** In his Report, Mr. Chavarria claims that my calculation of interest lost due to disbursement lag time for checks that were cancelled is based on improper speculation about the amount of cancelled checks. Mr. Chavarria also claims that he recomputed this lost interest for the first four Tranche One Months using actual data for checks that were cancelled during the period July 30, 1987 through September 29, 1989. He also claims that he recomputed this lost interest for

the last two Tranche One Months using actual data for all cancelled checks during those months. In addition, Mr. Chavarria repeats his assertion that I erred in using Benchmark Rates and 7-year Treasury security rates to determine the present value of this lost interest

22. Mr. Chavarria's November 10, 2005 amendment to his Report also changed his calculation of interest lost due to disbursement lag time for checks that were cancelled. In his revised calculations, Mr. Chavarria changed the interest rate used to compute lost interest for lag days after January 1, 1985 from 4 percent to the overnighter rate.

23. In my opinion, Mr. Chavarria improperly relied on data for the period July 1987 through September 1989 to determine the amount of cancelled checks for the first four Tranche One Months. That data is attached to Mr. Chavarria's report as an unmarked exhibit between his Exhibit B.2 and Exhibit C. I have been informed by counsel for the Osage Nation that this material may not have been produced in discovery prior to the September 30, 2005 deadline for my Expert Report. Thus, I may not have had the opportunity to discuss the data in this unmarked exhibit in my Report.

24. Assuming it was proper for Mr. Chavarria to rely on his unmarked exhibit and without waiving any objection the Osage Nation may have to the government's use of that data in this case, I have nonetheless reviewed that data and determined that it does not provide a proper basis for estimating the amount of cancelled checks during the first four Tranche One Months. First, Mr. Chavarria's Report offers no explanation for why he believes that cancelled check data for the period July 30, 1987 through September 29, 1989 is representative of data for the first four Tranche One Months. As he acknowledged during his deposition, the only reason Mr. Chavarria used data for that period as a proxy for data for the first four Tranche One months was because no other data was available. Second, on its face, the data on which Mr. Chavarria relied is not even complete data for the period July 30, 1987 through September 29, 1989, further undercutting the

reasonableness of Mr. Chavarria's decision to extrapolate that data to other unrelated time periods. Third, the source of this data, according to Mr. Chavarria, is the Arthur Andersen Reconciliation Project, which means this data has never been audited or reconciled.

25. The data on which Mr. Chavarria relies for his calculations of lost interest for the last two Tranche One Months is equally flawed. The source of this data, like the data for the first four months, is the Arthur Andersen Reconciliation Project. As I pointed out in my Report, Arthur Andersen was unable to audit or reconcile the BIA's trust records for the Osage Nation (or any other tribe) for the simple reason that BIA was unable to locate all the trust records that were needed to perform an audit or a reconciliation. In short, there is simply no factual basis for Mr. Chavarria's claim that he determined all cancelled checks for the last two Tranche One Months from the available trust records.

26. Mr. Chavarria's calculation of the present value of the interest lost due to cancelled check is also flawed. As noted above, that calculation is based on the incorrect amount of cancelled checks. In addition, for the reasons discussed above, Mr. Chavarria improperly used interest rates based on the Inflationary Index Rates and the 3 month Treasure bill rates.

**RESPONSE TO MR. LUNDELIUS' OPINIONS CONCERNING LOST INVESTMENT INCOME**

27. **Prudent Investment Of Osage Trust Funds By The United States.** In his Expert Report, Mr. Lundelius opines that based on the "available records", the United States, as trustee, acted prudently in investing the funds that it collected for the Tranche One Leases for the Tranche One Months. Using the Prudent Person Rule, Mr. Lundelius asserts that he determined the expected rate of return that the United States should have earned on these funds if it had acted as a prudent trustee. He then claims that he determined the "actual" rate of return on these funds. Mr.

Lundelius then concludes that the United States was prudent trustee because he believes it earned a higher rate of return on these collections than it would have earned at the expected rate of return.

28. Mr. Lundelius' opinion, however, has several flaws. The basic premise of Mr. Lundelius' analysis is that " due to the relatively short period that the trustee held the oil and gas royalties, investments were effectively limited to short-term investments such as Treasury bills and certificates of deposits." Lundelius Report at page 4, paragraph 9. In other words, Mr. Lundelius assumes that the trust fund account had to be depleted every three months, thereby limiting the trustee's ability to make prudent investments for a period longer than about three months.

29. In his analysis, Mr. Lundelius fails to see the "forest for the trees". First, although the trust funds the United States held for Osage Nation had to be disbursed quarterly, by no means did this requirement limit the investment of trust funds by the United States to a short term horizon. Mr. Lundelius describes an investment limitation for the trustee utilizing the assumption that funds were deposited in the trust account of the Osage Nation and then all funds were withdrawn from the account and distributed on a quarterly basis. The reality as to the operation of the Osage trust account is that funds are received continuously from oil and gas leases and, as a result, the quarterly distribution does not deplete all the funds in the account. In Schedule D, I have prepared an analysis of the account balances by month for the Osage trust account 7386, utilizing the account reconciliation of the Tranche One months included in the Deposition Witness Binder for the Chavarria Deposition. The analysis summarizes the balance in account 7386 for each Fiscal Year and separates the balance at the end of each month in the fiscal year as to invested funds balance and cash balance. In addition, an analysis was made for each day of each month as to the lowest fund balance. The lowest fund balance in the fiscal year 1976 was $3,381,569.54; in fiscal year 1978, $4,420,364.19; in fiscal year 1981 $11,404,543.20; in fiscal year 1986 $1,631,472.68; in fiscal year 1989 $1,367,625.77; and in fiscal year 1991 $2,040,790.85. This

analysis clearly demonstrates that a "prudent investor" did not have to take a completely short term horizon in making investment decisions. A prudent investor utilizing a very simple common sense analysis would be able to invest funds on a rollover basis for a longer period of time and still retain the liquidity needed for quarterly distributions.

30. Second, Mr. Lundelius did not use actual data to determine the actual rate of return on the Tranche One transactions as he claims. In order to determine the amount of royalties that were collected from the Tranche One Leases and the dates of those collections, Mr. Lundelius apparently relied on the same documents that Mr. Chavarria used to determine lost interest due to deposit lag time. As discussed above, those documents do not contain enough information to determine the actual dates that the United States collected royalty payments or deposited them in an interest bearing account for the Osage Nation.

31. Third, Mr. Lundelius' attempt to determine the rate of return on the Tranche One transactions is flawed for the independent reason that one cannot separate how Tranche One funds are invested as opposed to all other trust funds. At the time investments were made, the claimed proceeds from the Tranche One transactions were not the only funds that the United States, as trustee, had available to invest. Mr. Lundelius' report offers no basis for his method of allocating the claimed proceeds for the Tranche One transactions to specific investments in Treasury bills or CDs. For example, in his analysis of the funds collected for production during January 1976, Mr. Lundelius assumes that on March 11, 1976, about $133,000 of the funds collected from Bigheart were invested in a CD earning 5.74 percent. One could just as reasonably assume that this $133,000 was kept with the remainder of the funds collected from Bigheart and instead invested in a Treasury bill on March 22, 1976 earning only 4.76 percent and then put in a CD on April 1, 1976 earning only 5.22 percent. However, the latter assumptions would significantly reduce the

"actual" rate of return that Mr. Lundelius computed for Tranche One transactions for January 1976.

32. Fourth, Mr. Lundelius' method of allocating the claimed proceeds from the Tranche One transactions to specific investments does not make common sense in several respects. For example, in Exhibit D-1, Mr. Lundelius' asserts that a deposit in the amount of $234,574 that included royalties for a Tranche One lease was made on February 25, 1976 and invested in a Treasury bill with a 4.62 % yield the next day. Mr. Lundelius' also claims that on the same day, other Tranche One funds were placed in a CD with a much higher interest rate of 5.33%. Mr. Lundelius' further claims that the Treasury bill purchased on February 25, 1976 matured on March 4, 1976, after which roughly one-half of the original amount was moved to a CD on March 11, 1976, while the rest was left uninvested for a period of 18 days, and then invested in another Treasury bill on March 22, 1976 that earned 4.76%.

33. Mr. Lundelius' offers no valid reason why the United States invested Osage Trust funds at two different rates on February 26, 1976. In addition, he provides no valid reason why a portion of the funds from the Treasury bill that matured on March 4, 1976 should have been left uninvested or placed in low-yield Treasury bill when a CD with a higher interest rate of return was available for purchase on March 11, 1976, especially when one considers the Mr. Lundelius claims that some funds from the original deposit were place in that CD.

34. Fifth, Mr. Lundelius' own analysis demonstrates the United States was not prudent in investing the vast majority of trust funds it collected for the Osage Nation during the fiscal years that include the Tranche One Months. In Schedule E, I have provided a summary of the investment results for each of the fiscal years containing the Tranche One months as obtained from the Deposition Witness Binder for the Chavarria Deposition. Using an average balance in the cash and investment accounts for each fiscal year, Schedule E also compares the rate of return actually

received on funds in the Osage Account 7386 to the rate of expected rate return computed by Mr. Lundelius for short term investments. Except for fiscal year 1989, the actual rate of return is far short of Mr. Lundelius expected rate for a prudently managed portfolio.

35. To further demonstrate the deficiencies of Mr. Lundelius' analysis, I have summarized in Schedule F the average balance in the cash and investment accounts for each fiscal year and computed an expected dollar amount of investment income using the statutory rate of 4% for cash balances and Mr. Lundelius most conservative expected rate of returns for invested balances to determine an estimate as to the total amount of dollars the funds should earned for each fiscal year. As Schedule F demonstrates, the trustee under performs in 4 out of 6 years, resulting in lost investment income to the Osage Nation of $887,195.95. As also shown in Schedule F, the present value as of September 30, 2005 of that lost investment income is $5,057,546.98.

36. **Criticisms of my Report**. In his Report, Mr. Lundelius also opines that my opinion that the United States did not prudently invest the Osage tribal trust funds is flawed in its methodology and unreliable in its findings. In essence, Mr. Lundelius criticizes my opinion because, in his view, I did not calculate the rate of return on the actual Tranche One transaction. Mr. Lundelius also asserts that, in computing the present value of lost investment income I improperly relied on the Benchmark rates and the 7-year Treasury security rates rather than Inflationary Index Rate or 3 month Treasury bill rates. Mr. Lundelius also asserts that my calculation of lost investment income improperly included a large number of Osage account that are not related to oil and gas royalties. Mr. Lundelius further asserts that, in Schedule B of my Report, I used Osage trust accounts that were not related to oil and gas revenues and that, in my Schedules B and E of my Report, I used the wrong fiscal year for the Tranche One month of November 1980

37. As discussed above, contrary to his claim, Mr. Lundelius did not use actual data to compute the rate of return the United States realized for the Tranche One transactions. For the same reasons, there is no basis for Mr. Lundelius' assertion that I ignored available data or that I should have used actual data to analyze whether or not the United States, as trustee, prudently invested the trust funds it collected for the Osage Nation.

38. As also discussed above, the Inflationary Index Rates and the three month Treasury bill rates do not constitute appropriate interest rates to determine the present value of the investment income the United States by failing to invest the trust funds it collected for the Osage Nation in a prudent manner. As I also explained above, the Benchmark rates and the 7-year Treasury security rates are reasonable rates to use in that present value calculation.

39. In Schedule F to this Rebuttal Report, I have recomputed the lost investment income that resulted from the failure of the United States, as trustee, to prudently invest the trust funds it collected for the Osage Nation. As a result, the issues that Mr. Ludelius has raised with respect to Exhibits B and E of my original Report are essentially moot.

Stephen A. Jay