# EXHIBIT D

# Transcript of the Testimony of **Stephen A. Jay**

**Date:** December 7, 2005
**Volume:** 1

**Case:** The Osage Nation v. The United States of America

Printed On: December 13, 2005

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -x
THE OSAGE NATION AND/OR TRIBE: Nos. 99-550L &
OF INDIANS OF OKLAHOMA, : 00-169L
Plaintiff, :
V. :
THE UNITED STATES OF AMERICA,: Judge Emily C.
Defendant. : Hewitt
- - - - - - - - - - - - - - - -x

DEPOSITION OF STEPHEN A. JAY

Washington, DC
Wednesday, December 7, 2005

REPORTED BY:
VICTORIA L. WILSON

Deposition of STEPHEN A. JAY, called for examination pursuant to notice of deposition, on Wednesday, December 7, 2005, in Washington, DC, at the offices of Akin, Gump, Strauss, Hauer & Feld, 1333 New Hampshire Avenue NW at 9:05 a.m., before VICTORIA L. WILSON, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

JERRY E. ROTHROCK ESQ.
Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue, N.W.
Washington, DC
Email: Jrothrock@akingump.com
On behalf of Plaintiff

-- continued --



APPEARANCES (Continued):

KEVIN S. WEBB, ESQ.
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street, N.W.
Washington, DC 20004
Email: Kevin.webb@usdoj.gov
(202) 305-0267
On behalf of the United States of America

ELISABETH C. BRANDON, ESQ.
U.S. Department of the Interior
1849 C Street, N.W., Room 6038
Washington, DC
(202) 208-4218
On behalf of the Department of the Interior

VIDEO OPERATOR: T.J. O'Toole
ALSO PRESENT: Greg J. Chavarria and Charles R. Lundelius, Jr.



P R O C E E D I N G S

(Jay Deposition Exhibits 1 through 10 marked.)

VIDEO OPERATOR: On the record with tape number one of the videotaped deposition of Stephen Jay taken on behalf of the defendant in the matter of The Osage Nation And/Or Tribe of Indians of Oklahoma versus the United States of America, Cases Number 99-550L and 00-169L, in the United States Court of Federal Claims. This deposition is being taken at the law offices of Akin, Gump, Strauss, Hauer and Feld, located at 1333 New Hampshire Avenue, Northwest In Washington, D.C. on December 7th, 2005, at approximately 9:05 a.m. My name is T.J. O'Toole representing Ace-Federal Reporters, 1120 G Street, N.W., Washington, D.C. I am the certified legal video specialist. The court reporter is Victoria Wilson, also representing Ace-Federal Reporters.

Will counsel please identify themselves and indicate which parties they represent.

MR. ROTHROCK: Jerry Rothrock representing the Osage Nation.



MR. WEBB: Kevin Webb, Department of Justice, on behalf of the United States.

MS. BRANDON: Elisabeth Brandon, Office of the Solicitor, Department of Interior.

MR. WEBB: I will state for the record that present, as well, are Greg Chavarria from Chavarria, Dunne & Lamey and Charles Lundelius from FTI Consulting.

VIDEO OPERATOR: Thank you. Will the court reporter please swear in the witness.

Whereupon,

STEPHEN A. JAY

was called as a witness and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. WEBB:

Q Good morning.
A Good morning.
Q How you doing?
A Good.
Q Good. Could you please state your name for the record?

A Stephen Allen Jay.
Q And could you please state your business address?
A 4312 East 51st Street, Tulsa, Oklahoma 74135.
Q Great. And we have met before; right?
A We have.
Q And you know I'm an attorney for the United States in this case?
A I understand that.
Q Okay. And you are an expert witness on behalf of The Osage Nation?
A I am.
Q And your attorney, I assume, has explained depositions, the process of depositions to you?
A He has.
Q Okay. And you understand that you are under oath?
A I do.
Q And that your testimony today is the equivalent to trial testimony?
A I understand that.



Q Okay. And please feel free to take breaks as needed. There is water -- Akin Gump has been very kind enough to supply their own brand of water -- and coffee, and please let me know if you want to take any breaks at any time for water, restroom, what have you. Also, I'm going to do my best to make my questions clear. If I have -- you feel any other questions are unclear, please let me know and that I will restate them. If you answer a question, I will assume that you have understood it. Is that acceptable procedure?
A That's fine.
Q Also, if you have any changes that you want to make to any of your prior answers that you have given at any time, please don't hesitate to say, you know, "Hold on. Can I go back and the answer I gave before, I would like to, you know, restate it or make a correction." Please don't hesitate to do that. Also, if you think of any documents that would be helpful, responsive, would move things along or be informative to the questions posed, please don't hesitate to identify those.



Now, as you probably see here, the court reporter is taking down all the questions and answers and all the conversations between counsel but, unfortunately, at least not yet, she can't record nonverbal responses, so we need to verbalize, both of us, in terms of questions and answers. Do you understand that?
A I do.
Q Okay. And everything is being transcribed, as we just mentioned, and we will assume that everything is going to be on the record unless all of us agree that it is off the record. And you will have an opportunity to review and correct the transcript and thereafter sign it. And that if the changes that you put forth are substantial, I have the right to comment. Do you understand that, that process --
A I do.
Q -- that process? How are you feeling today?
A I feel fine.
Q Flight was okay?



A It was long.
Q Yeah, I bet. Let me ask you this: Are you on any medication or drugs that would make it difficult for you to understand questions and provide answers?
A No, I'm not.
Q And have you consumed any alcohol or anything else that would make it difficult for you to understand questions and provide answers?
A No, I haven't.
Q Are you sick at all, under a doctor's care or anything that would make it difficult for you to understand questions and provide answers?
A No, I'm not.
Q And another thing, I will apologize, if I start going real fast, please don't hesitate to tell me to slow down.
A Okay.
Q I just trying -- I'm going to try and keep us on pace so we get you out of here tonight.
A That's no problem.
Q Is there anything that would prevent you

from testifying accurately and truthfully today?
A Not that I know of.
Q Okay. Let's start off with the notice of deposition here, which we have pre-marked as Exhibit 1. Let me give you a copy. Let me just grab my copy here.
All right. Can you identify this document, please?
A This appears to be the notice I got of the deposition.
Q Okay. And when did you first see this?
A I don't remember the exact date. I received an e-mail copy from Mr. Rothrock and then I received the original later on but I don't remember the exact date.
Q Okay. Did you review it with Mr. Rothrock or any of the other attorneys for The Osage Nation?
A Not very much, no.
Q Okay. Do you understand what its requirements were?
A I do.
Q And what were those requirements as you



understood them?
A Those requirements are that I was to be here on December 7th for a deposition and that I was to provide you with a substantial -- with the documents that I had used in preparing for my deposition and for preparing my expert report.
Q Okay. And those documents -- if you could flip back to page 6 of the text, and just to be clear, there is a heading there says, "Documents"; do you see that?
A I do.
Q And it is, I guess, paragraphs 1 through 7.
A Okay.
Q And are those the -- the requests for documents that you mentioned before --
A It is.
Q -- in terms of the requests that the United States has made for you to produce?
A Right.
Q And you have produced documents in response?



A I believe I have.
Q Great. You can put this aside. Put it right here. And let's take a look at those documents. We will move on to pre-marked Exhibit Jay 2.
MR. WEBB: Copy here and copy to Jerry.
BY MR. WEBB:
Q And could you identify this stack of documents marked as Exhibit 2?
A I can only identify it from what you told me it is. It is what I produced but I haven't had a chance to go through it all yet.
Q Okay. And I will give you that opportunity in a second. Let me just -- on the front here there is what appears to be a letter. Can you identify that letter for me, please?
A This is a letter from yourself to -- or, excuse me -- from Jerry to yourself that was saying these are the documents in response to the subpoena.
Q Okay. And the date of that document?
A December 5th.
Q Okay. Great. Then after it, you will see



a collection -- I'm not certain, about the size of a phone book -- a collection of documents. Do you want to take just a quick look through those and see if those are the documents that you provided to Mr. Rothrock in response to the subpoena?
(Witness reviewed the document.)
(Jay Deposition Exhibit 11 identified.)
THE WITNESS: I didn't remember providing these two documents that have to do with the Akin and Gump Pro West System but it is probable I did but I don't remember providing them. They were probably part of the e-mails that I provided. Aside from a question on those two, the rest of them appear to be my documents.
BY MR. WEBB:
Q That were produced in response to the subpoena?
A Yes.
Q Good deal. And I'm under the understanding from your attorney this morning that you also have some documents that you are producing to supplement the documents we just looked at; is that correct?

A I have.
MR. WEBB: And, Jerry, did you want to speak to those?
MR. ROTHROCK: Yes. I just want to state that, for the record, that prior to the start of the deposition, I handed Mr. Webb a letter dated December 7th, 19 -- 2005, which provided him with copies of a few more documents that were inadvertently omitted from the production.
BY MR. WEBB:
Q Okay. And let me just hand this to you just to verify. Whoops.
A That didn't work good, did it?
Q And the documents here we have I have marked as Jay Exhibit 11 and those are the -- that's the packet that I received from Mr. Rothrock this morning. I just want you to take a look through it and just confirm that those are documents as Mr. Rothrock stated.
A They are.
Q Those are documents produced responsive to the subpoena and supplemented to your prior



production?
A That's correct.
Q We can go ahead and let's get these back here. We will get into those after I have gotten a chance to take a look at them.
A Sure.
Q Put them on the bottom of the pile. Let's go now to -- I will also make the statement, because I'm certain you did not produce these documents with pretty little tabs on them which are on them now. What I have done to sort of save us some time, the documents I would like to discuss I have tabbed here and yours are in yellow, so what I would like to do is to go through Exhibit 2, and that's the documents you produced responsive to the subpoena, your initial production, and just talk about some of these documents and we will just go through them in the order they were produced and as I have tabbed them so hopefully it will guide us along. We are going to start with the first tab and what I have here is a printout, looks like from the Internet site of -- well, let me ask you, what am I looking at here?



A What you are looking at is a copy of a production that I made on the seven-year yield on an annual basis at the end of each of the calendar years for the U.S. government securities that came off the Federal Reserve Internet site.
Q Okay. And were these the numbers that you used in your calculations for your report?
A I can't remember if I used these numbers or not, to be honest with you, or if I just downloaded them to see what they looked like.
Q Okay.
A I would have to look back at each report and see what I used for the yield.
Q Okay. So these may have been used but you are not certain?
A It is possible. I'm just not sure.
Q Okay. Okay. And the web site -- I apologize.
A We have given you the web site before but it is the Federal Reserve statistical web site.
Q Okay. That's FederalReserve.gov with a whole bunch of language underneath it at the bottom



of the page?
A That's right. Exactly. Right.
Q Let's take a look at the next tabbed document and this -- can you identify this document, please?
A This is a copy of the engagement letter that I have with the Wilson Pipestem law firm in regard to this litigation.
Q And it appears to be three pages; is that correct?
A That's correct.
Q And can you tell me the signatures on the last page?
A Signatures on the last page, one is mine and the other one I understand to be Wilson Pipestem's.
Q Okay. And referring back to the first page, in the second paragraph, the first sentence, it states, "We require a retainer of $10,000 in regard to our engagement to be applied to our final invoice." Could you describe for me what that is, what that represents?

A It represents a $10,000 retainer to be applied to our final invoice.
Q And was that paid to you by --
A Yes, it was.
Q And that was by Pipestem law firm?
A Yes, it was.
Q And let me flip to the second page now and, let's see, it is the one, two, three, fourth paragraph, the one that starts, "The scope of."
A Yes.
Q Do you see that? The second sentence there, it states, "Moreover, because our engagement is limited in nature and scope, it cannot be relied upon to discover all documents and other information or provide all analyses which may have importance to this matter." Did I read that correctly?
A You did.
Q Can you explain to me what that means?
A What it is -- what it means is that it is impossible for us to have found every document that could have related to this matter and it is just making a scope limitation to that effect.



Q Is a part of your duties under this agreement to search for documents relative to the matter or which may have importance to this matter?
A Well, it is my duty to take the documents that I have and try to determine the relevance -- relevance they have to this matter. I didn't go back to the government's records and try to look for every document that I could possibly find.
Q Did you go to the government's records?
A No, I did not. I went to transactions at various times but I didn't go -- I haven't visited the United States Government and gone through their files.
Q What about the files that were produced to The Osage Nation as part of this litigation, did you review those files?
A When you say, "the documents that have been produced to The Osage Nation," the documents that Mr. Rothrock had in his possession, I have reviewed many of those.
Q And were those -- did you request documents -- strike that and rephrase it.



Were those documents provided to you by Mr. Rothrock?
A Yes, they were.
Q Were they provided at your request?
A I can't recall if I requested any particular document. It is possible that I may have. I may have asked to see a certain thing. He may have told me he had something. I said, "Send me a copy of it." We have had many, many conversations and I can't recall every one of those.
Q Okay. Let me ask you about the next sentence in this paragraph, and that's the last sentence in this fourth paragraph here on the page, I guess, it is 2. It states, "This engagement does not anticipate the compilation, review, or audit of financial records or financial statements." Can you explain to me what that sentence means?
A It is just a scope limitation. It is stating that we are not doing a compilation, review or audit of the financial statements.
Q Of the financial statements, in general, or --



A It could be considered to be the financial statements of the Osage Tribe. It is just a scope limitation; it is just stating we are not doing an audit.
Q Okay. But --
A You want me to further explain?
Q Yes, if you could.
A Would that help you?
Q Yes.
A These are all boilerplate type scope limitations that go on every engagement letter we have. They are not engagement specific to this engagement.
Q And why do you make this stipulation?
A Because there are people -- you know, it is amazing, and I find this particularly -- you know, if I step on anybody's toes, I'm sorry, but lawyers, in particular, if you do any type of work at all, they call it an "audit" and so you have to be very careful with being able to limit them to the fact that you are not performing an audit every time you look at a document. So, you know, everybody thinks that if an

Page 22

accountant looks at a document, they have audited it and that's not true.
Q What is your definition of the term "audit"?
A Well, in my definition, the term "audit" has to do with an attestation type engagement and that is where I go in to perform an audit for the purpose of certifying financial statements.
Q And if you could help me out with that, as to what you meant by the "attestation."
A Where you attest, you attest to the financial records.
Q Okay.
A You say, "In my opinion, these financial statements represent" -- and that's called an audit or an attestation --
Q And are there --
A -- engagement.
Q I'm sorry. I didn't mean to interrupt you.
A Go ahead. That's all right.
Q Are there any certain procedures or steps

Page 23

you have to follow that qualify that work as an audit?
A Certainly, yes, there is Generally Accepted Auditing Standards that the American Institute of CPAs has provided publications on.
Q Okay. And so that's the standard that's established. And do they establish standards for reviews other than audits? I assume that there are other types of reviews; is that correct?
A There is three types of -- three types of financial statement engagements that CPAs get involved in, generally. One is called a compilation and, primarily, a compilation is a situation where you take a set of financial statements that a client provides you and you put them in form -- in a format that is acceptable to the third party so that they can understand them, because a lot of times they don't have the proper disclosures or all the adequate information. Second time is called -- second type is called a review statement and in a review, what you do is you perform analytical procedures in order to be able to determine whether or not you can provide,

Page 24

in effect, negative assurance in regard to those financial statements. And a third stage is a financial audit, in which you actually go in and test underlying data and arrive at an opinion that you certify to.
Q Okay. And of those three for your work in regard to the Osage, which does your work qualify into one of those three?
A No, it does not and that's what the scope limitation says is that it does not qualify for any of those.
Q So how would you qualify the work that you have done on behalf of the Osage for this case?
A The work I have done for the Osage in this case is to analyze data and to reach conclusions for the -- for preparing an opinion for the purpose of the court.
Q Okay. And that doesn't -- that didn't involve compilation, review or audit of financial records or financial statements?
A No, it does not.
Q Now, of the -- now I see -- now I

Page 25

understand better that you have all three mentioned here in this last sentence.
A Right.
Q Of the audit, review and compilation, which of these three is the most rigorous?
A The audit is.
Q The audit. Okay. And is there a hierarchy? Does it go compilation is the least rigorous; then review is more and then audit is the most rigorous?
A That's correct.
Q Slowly getting it. My accounting classes were a long, long time ago.
A That's all right. That's all right.
Q So, please, I apologize for --
A It is no problem.
Q -- my slowness. Let me flip now to the next tab and I apologize for -- this tab sort of falls in the middle of a document and if we flip back, it goes about two pages before the tab and there is a document -- the document has a title, "Jay & Associates, P.C."; do you see that?

A I do.
Q Could you identify this document for me, please?
A This is a copy of a billing that I sent to Wilson Pipestem for the work that I performed.
Q And it is about a six-page document; is that correct?
A Yes, it is.
Q Okay. And -- all right. And the date of the document?
A The date of the document is September 30th, 2005.
Q And so this is work -- this is your bill for work associated with this case; correct?
A That's correct.
Q And as I flip to page 3 here, and that's the tab, at the bottom of page 3, on the date of September 19th, 2005 -- do you see that entry?
A I do.
Q The last one.
A Uh-huh.
Q And it says here in the second item,



"telephone calls with Jerry Rothrock, Jim Parris regarding disbursement calculations." Do you see that?
A I do.
Q And did I read that accurately?
A You did.
Q And can you identify who Jim Parris is?
A Jim Parris is an individual that used to work for the Osage Tribe and was actually, I think, in their office in Pawhuska. I think he grew up in Pawhuska, even. And then I think later on he worked for the United States Government in regard to work performed on the various tribes.
Q And did you have conversations with him regarding your expert opinions in this case?
A I had conversations with him regarding some of the documents in the case, not regarding my expert opinion.
Q Did he help -- did he provide you with information?
A He -- basically, what Mr. Parris did was he provided me with an understanding of some of the



documents that I would be looking at in regard to disbursement transactions for head rights payments.
Q Let's skip -- we can skip the next tab, then -- I will caution you about that -- and go to the last one, which is on page 5, the last page of the document -- I apologize; it is the second-to-last one -- actually, no, the last one. I'm throwing us all off here and I apologize. I just want to look at the -- this is page 6, looking at the current amount due, and that's $26,783.25; is that correct?
A That's correct.
Q And that represents work from the time period of about the end of August to end of -- pretty much August; is that accurate?
A Yeah, from the date that I was hired until September 30th.
Q Okay. And what date were you hired?
A I would have to go back to that engagement letter again.
Q Okay.
A Well, the engagement letter is dated August



24th. Discussions with Mr. Rothrock may have come a day or two earlier than that but that's a pretty good indication.
Q Okay. Well, that appears from your -- the billing document that you have a bill for preparing the draft engagement letter so that makes sense.
A Right.
Q Okay. And it also states here at the bottom of page 6, "Retainer: Received $10,000 to be applied to final invoice"; is that accurate?
A That's accurate.
Q And did that occur?
A Yes, it did.
Q Let's flip now to the next document, and I apologize again that I tabbed one page at the end of a document. You can get the front page; we have got to back up a few. I tabbed what appears to be page 4 of the document and if you could flip back -- I think you have got it there. Can you identify this document for me?
A This is a copy of my invoice at -- excuse me -- this is not a copy of the invoice. This is a

copy of all the time that I have incurred up to the date that I was responsive to the subpoena.
Q Okay.
A And it is -- you can see, it doesn't have an invoice number on it and the reason being is because it hasn't been finalized and sent out yet.
Q It says it's a draft?
A It is a draft.
Q And this is from the period of, looks, mid October to the end of November?
A That's correct.
Q Is that a fair -- and it appears that the current amount due on page 4 is 14,945.06; is that accurate?
A That's correct.
Q Okay. Now, the document we looked at first was August through September and so the only thing missing, really, did you submit a bill for the beginning of October?
A Well, this -- if you look at the work in process right here, it starts on October 19th --
Q Right.



A That's when I began picking up again on October 19 after the September 30th date.
Q So was this a break?
A There was a break in time where I didn't do any work on it.
Q Okay. I appreciate breaks. I like them very much, when I can get them. Okay. We can go on to the next tab. And the next tab is, I believe, is -- let me ask you this: Do you know the origin of these pages here? There seem to be a collection of pages, handwritten notes.
A These are notes that I have taken at various times throughout this case.
Q Okay. And kept in a note pad or notebook of some sort?
A I had them just in my stack of documents.
Q Okay. The tabbed page I have here, which the header, for the record, which I should be noting, is, "Books," I believe?
A Yes.
Q And it is in the middle of the page, there is a paragraph here -- I apologize, just I was unable



to read some of this.
A There is a lot of people that have trouble with my writing.
Q Likewise. There is a paragraph in the middle of this page and if you could read it for me, because I just -- I couldn't read it, to be honest. Looks like it says, "Asked" --
A Sure. It says, "Asked to provide witness," I think that's -- that I'm being asked to provide witness, I think, "who we," I think, something, "knowledgeable interest for five to six months and asked them to explain correct or not." I think this is -- oh, okay. I think I can tell you. I think this was a note that I had taken in the original deposition of Mr. Chavarria, and that was a question that was asked of Mr. Chavarria, I think, but I don't recall exactly what the context was.
Q So you had -- you attended the deposition of Mr. Chavarria?
A I attended the deposition of Mr. Chavarria toward -- it would be back in my billings, that I think was done, oh, gosh, sometime late August.



Q Okay. Was that -- I'm sorry. I didn't mean to interrupt.
A And I attended the beginning of the deposition that was taken sometime in October.
Q So would that be both his fact deposition and his 30(b)(6) deposition in this case?
A I believe six.
Q You believe six?
A I believe it was, yes.
Q Good deal. The next page, which starts with what looks like a two and a circle, and there is a statement there, it is about, I guess, five lines down; it says, looks like, "AA," something, "on only available," something. Do you see?
A Yes. Basically, what that says is, "Arthur Andersen numbers are only available except for," and I trail off. I don't know -- again, I don't know when that was done and what I was trying to say for it at that time. Probably just taking a note at some time.
Q That's fine. Let's flip to the next tab, and this looks to be a fax cover sheet.

A A what?
Q Fax cover page, the next tab -- not the next page but the next page that has a colored tab on it.
A Okay. You are going to have to direct me. I have gotten lost.
Q I'm sorry. Just the next tab.
A The next tab I have got is --
Q Yes.
A -- there.
Q There we go. Could you identify this page for me, this document?
A This is a copy of a fax that I sent to Mr. Rothrock that would provide him a background from AICPA professional standards as to what Agreed-Upon Procedures, requirements were and what they accomplished.
Q And you -- this is the organization you mentioned earlier?
A The organization, you are talking about the American Institute of CPAs.
Q Yes. Thank you for saying -- thank you for



remembering it because I couldn't.
A That's all right.
Q Is this an organization that you belong to?
A This is the organization that controls all the operations of certified public accountants in the United States of America.
Q So this is the licensing organization; is that accurate?
A The license is actually granted through states.
Q Okay.
A I'm licensed through the State of Oklahoma but I belong to the American Institute of CPAs and the American Institute of CPAs is the body that provides research and makes decisions as to what should be included in Generally Accepted Accounting Principles, Generally Accepted Auditing Standards and various and sundry other auditing programs.
Q And here you talk about, at the bottom of the page, the -- "Attached are the AICPA Professional Standards relating to Agreed-Upon Procedures." What are "Agreed-Upon Procedures"?



A Well, Agreed-Upon Procedures is a form of what's considered to be a special report and what Agreed-Upon Procedure, basically, sets out is that an entity will hire a CPA to perform certain procedures that they sit down with the CPA and say, "Here's what we want you to do and give us the results of what these procedures are," and the certified public accountant firm will perform those procedures that they have agreed on with their client and provide a report as to the results of those procedures.
Q Okay. And that's what's in the documents attached here, is that -- that's what that addresses?
A Yes, it just talks about the standards that are associated with Agreed-Upon Procedures work.
Q And you mention here in the second sentence on this fax cover sheet, "Refer to the requirements applicable to the 'specified party(s),'" and then you list a whole -- you know, a certain section, 2602.03, .04, .06, .07, .11, and.15. What do those -- what does that refer to?
A Well, what I was trying to show Mr. Rothrock was that in regard to Agreed-Upon



Procedures work, that "specified party," which is either the client or it could possibly be a third party that specifies the procedures, have a significant responsibility to make sure that those specified procedures or those procedures that they specify are the ones that are going to satisfy whatever the needs of the users are.
Q Okay. And the document that's attached here, which looks to be a -- I'll just call it a multipage document, looks like about 15 pages --
A Something to that effect.
Q Something to that effect. And that's -- where does this come from?
A These come from the American Institute, Publications for Auditing Standards. This, in effect, is a -- it is a book that they use to condense all the different rules that have to do with Agreed-Upon Procedures work or any other type of audit work.
Q And what does this -- how is this to be used by CPAs?
A Well, if I am performing an Agreed-Upon

Procedure engagement, this is where I start, because I want to make sure that when I establish my Agreed-Upon Procedure engagement, I don't leave out any steps that are important. I make sure that the understandings that -- that are included in the requirements are done, documentation; these are kind of my guidelines or -- "these are my kind of my guidelines," they are my guidelines.
Q Are these the guidelines you used in preparing your expert report in this case?
A No, they are not.
Q Why did you consider these guidelines as part of your preparation for this case?
A Well, these guidelines -- the Agreed-Upon Procedures was the report that was prepared by Arthur Andersen that was referred to numerous times in this case and so what I was trying to do was to give Mr. Rothrock the capability of understanding what Arthur Andersen had done, what their role was and what the role of the Bureau of Indian Affairs was in this regard.
Q Okay. So this is -- these procedures that



Andersen followed in terms of their analysis of the Osage accounts?
A I have no idea if they followed them.
Q Okay.
A They say they did.
Q They say they did. Okay. Were you able to determine whether they followed them or not?
A No, I wasn't. I would have to review their audit work papers to do that.
Q Okay. Did you review their audit work papers?
A No, I did not.
Q Okay. Let's flip to the next tabbed document and it appears to be a chart. I think it is the next page or a couple pages back.
A Okay.
Q And can you explain to me what this document represents? And I'll say just for the record the document is entitled, "In The United States Court of Federal Claims, The Osage Nation And/Or Tribe of Indians of Oklahoma, Plaintiff, v. The United States of America, Defendant, Experts



Rebuttal Report Exhibit D," as in dog -- or delta, I guess I should say. Can you explain what this document represents?
A I'm not sure if this was a draft of one of my Exhibit Ds for the rebuttal report or the final. It is probably the final but I'm not certain of that. But it is a draft of my Exhibit D that was utilized in my rebuttal report.
Q And did you prepare this?
A I did.
Q Let me direct -- I'll put that aside. We will come back to that one later. Why don't we go ahead and flip to the next tab. And, once again, I tabbed something in the middle of a document and I'll apologize once again. Can I have a continuing apology?
MR. ROTHROCK: Absolutely.
MR. WEBB: Thank you.
BY MR. WEBB:
Q And this appears to be in the middle of a document that's entitled, "Rebuttal Expert Report of Stephen A. Jay In Support of the Tranche One



Investment Claims of Plaintiff Osage Nation," and it is noted in the upper right-hand corner as "Draft, 11/23/05, East#7505575v1," dated November 23rd, 2005 and --
MR. ROTHROCK: Kevin, we need to go off the record for just one second.
MR. WEBB: Sure.
VIDEO OPERATOR: The time is 9:45:31. Off the record.
(Discussion off the record.)
VIDEO OPERATOR: On the record. The time is 9:45:53.
BY MR. WEBB:
Q Okay. Could you please identify this record -- this document for the record, please?
A This was one of the drafts of the rebuttal report that I prepared in regard to this case.
Q Okay. And is this draft as of November 23rd?
A I believe so.
Q Believe so. Okay. And flip to the -- now we can flip to the tabbed page. And look at what's

numbered here, I guess it is page 2, and it is numbered as paragraph 6, and the second sentence in 6 is what I would like to ask you about. It says here, "According to Exhibit B of his Report, Mr. Chavarria relied on the same data on which I relied in order to compute interest lost due to deposit lag time, i.e., the data used by Arthur Andersen in its Reconciliated Project." Is that an accurate reading of -- pardon my stumbling through it but is that accurate?
A I believe so.
Q And can you tell me -- tell me what this -- what you meant by this sentence?
A I think that what I was trying to say was that Mr. Chavarria relied on some of the same data that I did.
Q Okay. And when you mentioned the -- and we have done this already and I should probably clarify this. The Arthur Andersen -- you call it here the reconciliated project. Is that the -- are you referring to the Arthur Andersen Agreed-Upon Procedures report?
A I am.



Q And we will get to that in a second. I just want to make sure that we are being consistent with our terminology. I typically refer to it offhand as the Andersen report or the Arthur Andersen report just for shorthand, if that's okay.
A That's fine.
Q If you flip to the next page, and it is page 3, paragraph 9, and the first sentence there, it states, "During his deposition, Mr. Chavarria confirmed that, in computing interest lost due to deposit lag time, he used the data captured by Arthur Andersen in its study of deposit lag time as the 'receipt date' for a royalty payment from a Tranche One Lease." Did I read that accurately?
A You did.
Q And what do you mean by that sentence?
A Exactly what it says, in that -- that Mr. Chavarria confirmed the fact that in computing deposit lag time, he used the Arthur Andersen data.
Q Okay. Let's flip to the next tab, page 4 -- page 6, paragraph 17, and the second sentence there says, "In my experience, funds for an



electronic transfer sometimes have to be withdrawn" --
A Excuse me. I'm lost.
Q I apologize. Did I --
A What page was it again?
Q Page 6 --
A 17, okay.
Q -- paragraph 17.
A I'm there. Thank you.
Q Second sentence, it says -- do you see, "In my experience"? It starts at the end of that first line.
A Yes, I do. Okay.
Q "In my experience, funds for an electronic transfer sometimes have to be withdrawn from an account one day prior to the electronic transfer of those funds to a different account." Could you explain to me what you mean with that -- by that sentence? Actually, let me ask you first, did I read that accurately?
A You read it accurately.
Q Okay. Can you explain to me what you meant



by that sentence?
A My experience is in two regard, in regard to electronic funds transfers. One is that -- and I will just take a personal case. I have a -- I have a bank account for my company and I have my personal bank account with the same bank and my payroll transaction, I don't get paid by a paper check anymore, it just transfers from one account to the other. The interesting thing about it is it comes out of my bank account on the one day and it doesn't show up in my other bank account until the next day. They pull it out one day in advance and it doesn't show up until the second day. Same thing has to do with the transfers in regard to EFT for payroll deposits. If you are going to make a payroll deposit to the United States Government to pay your withholding federal income taxes, it comes -- you have to make it the day before. You can't make it the day of. So it goes out the day before and it hits on the next day. So in my opinion there is a one-day lag.
Q And do you have any other experience with

Page 46

electronic fund transfers?
A Oh, wire -- if you call wire transfers, you know, that, yes, I do. Various times, I have had clients that have had to make wire transfers or particularly accounts that I have been custodian for for one reason or another and I have made those transfers.
Q And are wire -- are wire transfers considered electronic fund transfers?
A I don't think so. I think they are separate.
Q They are separate. How are they distinct from one another?
A There is an EFT system that you have to be established on.
Q Okay.
A And a wire transfer doesn't require you to do that. It just requires you to have ABA numbers that will be able to transfer from one bank to the other.
Q So do you have any other, I guess, EFT or electronic funds transfer experience other than these

Page 47

two instances you mentioned?
A Just payroll records and the experience that I have had in my bank.
Q Are you familiar with the EFT's as they work within the federal government?
A When you say, "the federal government," if you are talking about payroll transfers, I'm knowledgeable of the fact they come out one day prior to the time they hit the government.
Q That was a vague question. I apologize.
A I don't work in the federal government system, if that's what you are wondering.
Q And I apologize. That was a vague question. How about electronic funds transfers as they deal with the depositing of royalties with the federal government?
A I have never been involved in that, no.
Q What about electronic funds transfers as they deal with disbursements from trust funds held by the federal government to individuals?
A I have never been involved in that either.
Q And that applies, I assume, for the Osage?

Page 48

A That's correct.
Q Have you looked to see whether the electronic funds transfer process for The Osage Nation and its trust fund lines up with your experience?
A It is impossible to tell. I have looked at some documents that show transactions that have to do with electronic funds transfers. They are primarily the ones that Mr. Chavarria relied on for the Tranche One months. You can't tell from those documents when the transfer was actually made and when it hit the books so I don't -- I can't tell from those documents what -- what the lag was.
Q Are there documents that you could look at that would enable you to tell the lag?
A I would -- I would imagine there probably are somewhere. I haven't seen them.
Q Okay. Have you requested those documents?
A No, I have not.
Q So have you looked at any actual data regarding electronic -- have you looked at any actual data regarding electronic funds transfers as they

Page 49

relate to the management of the Osage fund?
A I have. It is those documents I just referred to that Mr. Chavarria utilized for his documentation.
Q Okay. And from those documents, were you able to determine that they have to be -- those electronic transfers sometimes have to be withdrawn from an account one day prior to the transfer of those funds to a different account?
A No. As I stated before, you can't tell that from the data.
Q Okay. Let me flip to the next tab. And that's page 11, paragraph 32. It is the third sentence -- let me see how many lines -- one, two, three, four, five, six lines down. The line says, "quarterly basis," is the beginning of the line.
A Okay. Just a second. Paragraph 32, sixth line down?
Q Yes. It starts, "quarterly basis." The sentence starts, "The reality."
A Okay. "The reality as to the operation"?
Q Yes.

A Okay. Go ahead.
Q Let me -- it is, "The reality as to the operation of the Osage trust account is that funds are received continuously from oil and gas leases and added to an existing account balance with a quarterly distribution of a portion of the funds in the account." Did I read that accurately?
A You certainly did.
Q Could you explain to me what you meant when you said, "quarterly distribution of a portion of the funds"? Primarily, the "portion" is what I am interested in.
A Here's -- here's what I was trying to express. And the best way I can do this is maybe try to provide you some kind of a picturesque description, and that is if you had a bucket and you set the bucket below a spigot and you had water continuously coming into the bucket and then you also had a -- some type of a drain plug at the bottom of the bucket and, occasionally, in this case quarterly, you went and pulled that drain plug, there would be water coming out the bottom at the same time while



water is coming in the top. So what you have got is a process where quarterly money comes out but while money is coming out, money is also coming in at the same time. So it is just a continuous filling and depletion process.
Q Okay. And as to the depletion, how much is being depleted?
A Generally, what's depleted is the amount that's accumulated over the -- let's just take, for example, a Tranche One month or a Tranche One quarter. Okay? What came in during the period that contains -- that contains -- that was received in that quarter is generally what's depleted back out.
Q That's your understanding that -- that royalties are received -- let ask you this: Is it your understanding that the royalties received for a quarter minus expenses of the tribal counsel and taxes are to be distributed to the right owners on a quarterly basis?
A That's correct.
Q And so -- so when you mention your portion, that's a pretty considerable portion?



A Well, what I am talking about as far as portion is the total amount that's in the fund, okay, which there is money that's in the fund that is not just what came in the last quarter.
Q Okay.
A And so what I am saying is a portion of the total amount of money that's in the fund, which usually is similar to what came in that quarter, is distributed out at the end of the quarter.
Q And that goes back to your bucket analogy, the water coming in?
A Exactly. Exactly.
Q Does that analogy -- does that rely on that you always have water coming in?
A Yes.
Q Okay. And what happens -- and that you always have water coming in at a pretty consistent level?
A You know, if you want to try to describe it in terms of what was actually happening with the Osage, it changes. It is not always at a consistent level. You can see trends. During a certain period



of time, it will go up. For example, during the early eighties, that amount of money went up, then it started trailing back off during the latter part of the eighties when the oil boom went off. Now it is starting to probably trend back up again. So it is not a continuous exact replacement dollar for dollar, it is a flow.
Q So, with that fluctuation, and to go back to your analogy, how much water do you know to let out of the bottom of the bucket, given the -- you are not certain how much is coming in?
A You want to know how I would do it if it was -- you want to know how I would do it if it was me?
Q Yes. Please.
A It is pretty -- it is pretty simple, you know, and I have done this in one of my documents. I have loaded in what the balances were as far as cash and invested funds over a period of time and you can see a pretty good trend, and knowing -- you know, oil and gas prices don't just change overnight. It is not like today you wake up and oil is back to three-

dollars-and-a-quarter like it was in 1971. It has a tendency to rise slowly; it has a tendency, generally, to fall slowly. It is pretty easy to -- a person with just a little bit of common sense to be able to forecast what's going to happen as far as the ebb and the flow of that oil and gas money.
Q But is there a possibility that you could have a significant drop or, for that matter, a significant rise?
A Well, if you say, "possible," you know, anything is possible.
Q Right.
A Is it probable? Probably not.
Q Okay. What about in terms of the water stopping; you don't have water coming in?
A The Osage has been pumping oil out of that ground up there since early 1900's, and so far it hasn't dried up.
Q What if you did have a significant drop in, say, the water that was coming in? And I may be harping too much on the analogy but I love analogies. If you have too much -- if you have a



significant drop in the water coming in and you have already let out a lot of water at the bottom and you are left with a little bit, some drips, at the bottom of the bucket and you have to disburse a hell of a lot more and you just don't have the water to compensate for that coming in the top, what do you do? In other words, what happens if you have a shortfall?
A If you have got a shortfall, you can't disburse, but that's the way it should be. If you don't have money coming in, you can't send it back out.
Q But wouldn't your inability to disburse be predicated on your -- on the fact that you have tied up that money in long-term investments?
A Oh, you are making a -- you are throwing in a new assumption on me now. All right. Now, if you are -- if you are saying that, in effect, you did have money in there but you have tied it up in long-term investments, well, then you would have to somewhat go in and liquidate those long-term investments in order to make a distribution, if a



distribution is due. If they are not receiving money on a quarterly basis, there is no distribution due.
Q Right. But here in the Osage, money is received on a quarterly basis; correct?
A And so the bucket -- and so the bucket doesn't have any kind of a problem filling up.
Q Assuming that the bucket -- the water is always coming in at a relatively consistent or easily forecasted level.
A Well, you know, I think -- let's make it clear. If they don't get any oil and gas revenues, they don't pay any money out.
Q Granted. But if you are talking about trying to -- I think we are getting too deep in the analogy and getting away from what's actually happening. But if we are dealing here with the needs to distribute royalties on a quarterly basis and some of those royalties may be tied up in long-term investments and you don't have the funds to cover those royalties that are tied up in long-term investments that should be disbursed, you mentioned that you would have to liquidate those long-term



disbursements to cover it, to make the disbursement; is that accurate?
A Well, I think -- I think we are getting tangled up in an argument that really is not that complicated. A prudent investor, what they would do is they would see to it that they had enough liquidity to pay out those quarterly investments -- or quarterly distributions. Excuse me. If they had money that was in there on a long-term basis, they would consider the possibility of investing that money on a long-term basis because it is not prudent to treat it as if it is going to paid out if it wasn't going to be paid out.
Q Okay. And to go to the liquidation, if you were to be required to liquidate long-term investments to make a distribution payment, would you suffer any lost revenue to do that in terms of having to cut the long-term investment short?
A I don't know if you would suffer any lost revenue. You wouldn't receive any revenue due to the fact that you had to pay the money out. That's not lost revenue.

Q But if you were in a situation where, say, interest rates increased over the duration of a long-term investment and now you have to sell it at a lower price, wouldn't you be losing income?
A If you had a situation where interest rates decreased, then the possibility is that if you were holding a long-term investment that you couldn't hang onto until the time that you waited for that to mature, you possibly could have a decrease in value. Now, whether or not that's lost income or not, I don't think I would characterize it that way.
Q I'm probably way over my head now in terms of my understanding of finances and what not but let me see if I can eke out one other question before my head explodes. Have you undertaken the type of financial forecasting that you described? Have you done that as part of your business, as part of your consulting for companies?
A I have served as a trustee and in that trustee responsibilityship, I had to determine what I thought the cash flows would be and make investments appropriately.



Q But did you have a situation here where you had money coming in on a regular basis and the quarterly distribution and investing some of that money on a long-term basis and using the money that's coming in in the interim to cover disbursements as you described?
A In effect, yes.
Q You have?
A It wasn't -- it wasn't exactly like the Osage account.
Q Okay. Could you explain to me what -- how -- maybe I will understand it better if you could explain to me how it worked, the situation you have experience with.
A What it was is I was a trustee of a company that had been in bankruptcy and, in that regard, we had a certain amount of money that was to be utilized for all the expenses of the process of trying to pay out to -- basically, it was an unsecured creditors' trust -- pay out to the unsecured creditors the moneys that were, in effect, due to them under their claims. The bankruptcy had been going on for



approximately five years and in that five-year period of time, we would forecast what our cash flow needs were, make investments when we considered it appropriate, some of which were fairly long term, in excess of -- and I'll call long term in excess of a year -- and money would come into the bucket as we would settle litigation with various parties; we would turn around and make distributions out to the unsecured creditors on that and, in effect, did somewhat of a forecasting system similar to this.
Q That may be one I don't understand at all. One is my lack of knowledge of the area. Let me ask you this: Have you ever been the trustee of a pension plan?
A No, I haven't. I have been -- I have a client that has a very significant pension plan. I am the accountant for that pension plan and I am at every meeting of the trustees and involved in it. I'm submersed in it.
Q But you are not the trustee?
A I'm not the trustee.
Q Let me ask you -- let me --



A Wait a minute. I need to change that answer.
Q Okay.
A Effective last week, I am the trustee of a pension plan.
Q Okay. You just became --
A I just became one.
Q The one you were just discussing?
A No.
Q A different one?
A It is the one for my firm.
Q Okay. Very good.
A I hadn't thought about that until just a minute --
Q Let me go to the next tab now and let me just get one more question and we can take a break. The next tab is on page 14 and I have tabbed page 14 here and I'm looking at -- do you have 14? Yes. It is paragraph 42.
A Uh-huh.
Q Do you see that --
A I do.

Q -- on the page?
A Right.
Q It says in brackets here, "Discussion of claimed clerical error," close bracket. Can you explain to me what that reference is?
A It is just a footnote to explain the discussion that had been -- or the fact that it had been pointed out to me that I had used fiscal year 1980 rather than fiscal year 1981 by Mr. Lundelius in computation of one of my damage calculations in Schedule, I think, E, I believe.
Q Was that -- was that the only schedule wherein that clerical error appeared?
A That's the only one, I believe, that clerical error appeared, yes.
Q We'll take a look at that -- at those in a little bit. And that was a clerical error?
A Yes, it was. I just got confused on my fiscal years.
Q So 19 -- I guess you said --
A It was November 1980. I put that into fiscal year '80 rather than '81. I forgot to switch



my thought process from calendar year to fiscal year.
Q So it should have been '81, as opposed --
A That's correct.
Q Okay. Why don't we go ahead and take a break with that because I think we have been going for just about an hour now. Is that fine with you?
A That's fine.
MR. WEBB: Why don't we take about a five-minute break.
MR. ROTHROCK: Five minutes?
MR. WEBB: Sound good.
VIDEO OPERATOR: The time is 10:07:11. Off the record.
(Recess.)
VIDEO OPERATOR: On the record. The time is 10:21:28.
BY MR. WEBB:
Q Okay. If we can step back, actually, we were just talking about -- it is a little chilly in here -- page 14 of this draft report, paragraph 42 where you mention a discussion of the clerical error.



A Yes.
Q And let me ask you this: Do you recall that this was a clerical error for one of your schedules? Is it possible it appeared in two?
A Well, there is two clerical errors in the schedule.
Q Okay.
A All right -- or excuse me. There is two clerical errors in the exhibits to the report.
Okay. One of them had to do with the one that I'm talking about in 42, and that was the one I explained about the fiscal year difference. The other one had to do with on a schedule that had to do with disbursement of funds, disbursement lag, where I had accidentally gotten an investment amount included in my computation of disbursements.
Q And that was a clerical error?
A That was a clerical error, also. To further help you understand that it was a clerical error, that error was not carried forward into the following schedule where I computed the amount of percentage of the disbursement compared to the total



disbursement for that Tranche One month.
Q And other than those clerical errors, was the methodology being used, was that correct?
A In my opinion, it was, yes.
Q Okay. And let me take a look -- why don't we -- I apologize for mixing up exhibits and throwing them in here but why don't we just go ahead and take a look at Jay Exhibit 3. If we can take a look at that.
MR. WEBB: And, Jerry, did you have a copy? Let me get you one.
BY MR. WEBB:
Q While I'm searching for this for Mr. Rothrock, could you identify that document, please?
A This appears to be a copy of my original expert's report.
Q Okay. And could you refer to the last page or, I should say, the signature page of the document?
A Okay.
Q And is that your signature?
A No, it is not. It is a printed signature.

Page 66

Q Okay. But you did sign this document at one point, I assume?
A I did.
Q Okay. And if I -- I remember correctly, counsel correct me if I am wrong, but you did forward me a signed version of the signature page?
MR. ROTHROCK: Yes, we did.
MR. WEBB: Okay.
BY MR. WEBB:
Q And can you take a look at the document just to make sure it's got all the appropriate exhibits -- I believe you refer to them as schedules -- just to ensure that we are looking at the same thing? Mine has got 12 pages of the text and then a -- let's see -- it's got what appears to be your CV and then, let's see, a Schedule A, which is two pages, Schedule B, Schedule C, which is two pages, and Schedule D, Schedule E, and Schedule F.
A Okay.
Q Is that accurate? That has everything it's supposed to?
A Looks to me like it does.

Page 67

Q Good deal. Let's take a look at the errors you were just referencing, the clerical errors.
A Okay.
Q And I think you said it was -- was it Schedule B that had --
A E, Schedule E.
Q Okay. And so Schedule B here where -- under Tranche One fiscal year, where it has, "1980," that should be, "1981"?
A Look real quick.
Q I'm sorry. I should have let you get there.
A Yes, that's correct.
Q And I think you said, also, E?
A No, actually, it was Schedule C that had the other --
Q Oh, C was the --
A Disbursement error.
Q -- disbursement. And where is that?
A If you look under the February 28th, 1986 time frame --
Q This is page 2 of Schedule C; correct?

Page 68

A That's correct. There is three amounts: 6-million-604, 2-million-116 --
Q Right.
A The 1-million-656 is an error. That was an investment transaction.
Q So that shouldn't have been included?
A That's exactly right.
Q And let me draw your attention to Schedule E, as well. Flip back to that. And taking a look here, and the calculations you did on the far right where you started totaling out the dollars, appears that you referenced fiscal year 1980 here, as well.
A I was consistent in that error, yes.
Q Okay. So that should be 1981?
A Right.
Q So we have the Schedule B and the '80 should be '81 and then the investment not disbursement for the Schedule C?
A That's exactly right.
Q And otherwise -- other than those clerical errors, the methodology approach that you used is accurate and correct?

Page 69

A I believe so.
Q Okay. We can go ahead and put that aside for now. I just wanted to do that since we were talking about it.
A Sure.
Q Okay. And let me step back for a second to some of the testimony you have given already today, and you mentioned the three financial analyses, and I may be using the wrong terms and please correct me if I am. You described compilation, review and audit.
A Yes.
Q Are there other types of engagements?
A There are special reports.
Q And what's a special report?
A Special report is similar to the Agreed-Upon Procedures engagement that Arthur Andersen performed.
Q So Agreed-Upon Procedures is another --
A It is a special report is what it is.
Q A special. Okay. And then, also, when you mentioned audits and what audits were and you helped me understand, you said that -- you mentioned

certified financial statements. What did you mean by that?
A Well, what the -- a CPA does is provide his opinion that states whether or not he believes that those financial statements have been prepared in accordance with Generally Accepted Accounting Principles in the United States of America.
Q Okay. And so that's --
A That's called a certification.
Q And, also, I believe you said that you would need to review -- this goes to the Agreed-Upon Procedures.
A Okay.
Q And, actually, in -- those Agreed-Upon Procedures -- I'm sorry to make you flip back.
A That's okay.
Q But flip back to the Agreed-Upon Procedures, which, I think, was one of our first tabs. In reflection, I probably should have organized this a little better; shouldn't I? Let me find that fax cover sheet. Let's see.
MR. ROTHROCK: 10, tab 10.



MR. WEBB: That's the right way to do it. Thank you, Jerry.
BY MR. WEBB:
Q The Agreed-Upon Procedures here that you included from the AICPA Professional Standards, do you know the date -- actually, it says on the first page. Can you read me the date that these were effective?
A That they were effective?
Q Well, that they -- I assume that there is a date when these were established.
A These have been established for years.
Q Okay. But this states here on this page that's 2601, it states, "Effective when the subject matter or assertion is as of or for a period ending on or after June 2, 2001, unless otherwise indicated." Is that accurate?
A What it is talking about is those two SSAEs that it references above, it is saying that -- let me think about how to explain this -- that there -- that everything that's here is effective on that date unless otherwise indicated. In other words, there is



some changes that come into play, okay, and whenever they have a change that comes into play, they indicate the effective date on that.
Q Okay. Were these Agreed-Upon Procedures in effect in the mid nineties?
A The vast majority of them probably were. They haven't changed significantly for years.
Q Have you looked to see whether or not they have changed?
A No, I haven't.
Q Why don't we go ahead back to where -- I don't know if you saved your place. Actually, let me ask you, while we are talking about Agreed-Upon Procedures, did you -- in terms of the Andersen work, you say that you need to review Andersen's audit work papers to determine if Andersen followed these procedures; is that accurate?
A I think that's accurate.
Q Okay. Could you define what you meant by "audit work papers"?
A For a person -- for a firm that prepares financial statement audits or audits for special



reports, whatever, they generally prepare work papers and those work papers show a lot of the work that they did, explanations, discussions, that type thing, and I would probably like to see those if I knew that they followed everything that they were supposed to follow.
Q And then -- I apologize for jumping around on you.
A That's okay.
Q But on the discussion of electronic funds transfers, EFT's --
A Right.
Q -- so I don't have to trip over the words again -- you said in terms of your analysis of the Osage fund and EFT's, you were unable to determine lag time; is that accurate?
A No, that's not accurate.
Q I apologize. What did you say?
A What I said was that I estimated the lag time to be one day based upon my experience.
Q Oh, right. Right. But in terms of looking at the actual documents or the Andersen data --

A When you look at the -- when you look at the examples that Mr. Chavarria included in his report, you can't determine what the date the funds were wired from -- let's say, for example, Phillips Petroleum. You can't tell the date they actually wired it. You can see on the report the date that they indicate that they either received it or recorded it or whatever they did with it but it doesn't show the exact date that Phillips wired the money, for example.
Q Does it indicate that they are -- I assume that you have -- strike that.
You have determined that certain transfers were electronic fund transfers?
A No, I have not. I have seen documents that appear to be electronic transfers. I haven't gone in and analyzed them to see if they were.
Q And how did they appear to be electric funds transfers?
A They were on a document that I think had EFT somewhere on there, if I remember right.
Q And what would you need to do in order to



determine whether they truly were electronic funds transfers?
A Probably have to go back to who transferred the document and see if they used the EFT system.
Q You mean speak with the individual?
A Yes, Phillips Petroleum, I used them as an example, have to go back to the Phillips people and be able to determine whether or not they made it or I don't know if there is some kind of a system within the process that would be able to show whether or not it was or not.
Q Okay. Did you request documents that help you determine whether these were EFT's or not?
A No, I did not.
Q Let's go back to our tabs and -- good for you. You saved your spot. Let's go to the next tab that I have here, and it is -- looks like a draft letter dated August 24th, 2005.
A Okay.
Q And it appears this is a draft engagement letter similar to the one -- the final one that we saw before; is that accurate?



A That's correct.
Q And here on the second paragraph on the first page, the first sentence, it says, "We require a retainer of $5,000 in regard to our engagement to be applied to our final invoice." I just -- I take it that that figure changed?
A It did.
Q And what -- what brought about that change?
A Probably during that period of time, I got a little bit better grasp of the hours involved and I bumped it up.
Q And bumped it up to 10,000?
A Yes.
Q And how much time have you spent on the case?
A It is in those two documents that I gave you.
Q Okay.
A That shows you up through approximately November 30th but the hours are there; you can see them.
Q Okay. You are going to test my math?



A I don't know exactly how many hours it is.
Q Okay. And has anyone else in your office worked on this?
A I have had several of the people in the office work from time to time. Probable 90 percent of the work is mine.
Q Okay. The other -- who were the other individuals who have worked on it?
A My son is a certified public accountant; his name is Stephen Neil Jay, Stephen N. Jay. He worked on it. My daughter does clerical work for the firm and at times I may have her do some clerical tasks. I don't think there was probably anybody else but those time records, if you go back and look at them, you will see the names of everybody that performed work.
Q Okay. Was there anyone outside of your office who you worked with in preparing your report?
A No.
Q Other than your attorney, the attorneys for the Osage?
A No. The only person outside of my office

besides Mr. Rothrock that I worked with was the discussion I had with Mr. Parris that I have talked to you earlier.
Q How many discussions have you had with Mr. Parris?
A I think I have talked to him twice on the phone and once in person.
Q Let's go to the next tab and it appears to be a chart here that says United -- The Osage Nation v. United States -- versus United States of America, Attachment to Exhibit -- Expert's Report, Summary of Calculation of Interest Damages." It is entitled, "Interest Loss (Gain) Present Value." Can you explain to me what this -- I'm sorry. Do you have the same document I do?
A I do.
Q And can you explain for me what this chart represents?
A It was one of my early drafts of the calculation of present value of loss due to deposit lag and disbursement lag.
Q And do these numbers change between this



draft and the final?
A It is possible. I would have to go back and look and see.
Q Okay. And what -- well, skip that. Let's go on to the next tab and I'll let you jump there before I jump aside. And if we could flip back, actually -- I apologize -- one page because that will give us an idea as to what we are looking at here, and this appears that -- it appears I have tabbed a page or a few pages within one document and that document -- the title page appears before my first tab and, as I see it, it says, "Expert Report of Stephen A. Jay In Support of the Tranche One Investment Claims of Plaintiff Osage Nation," and it says in the upper left-hand corner, "4th Draft, 9/30/05, East#7475961v4." Is that accurate?
A As far as I know, yes.
Q And it is dated September 30th, 2005. Is that accurate?
A That's correct.
Q Okay. Now, is this -- can you explain to me what this is?



A This is one of the drafts of my report.
Q Okay. And it appears to be a red line or black line or CompareRite or however you want to describe the document that it appears to be one document draft compared to another. Go ahead and take a look, if you need to.
A That's all right.
Q Let me know if that's accurate.
A That's -- it, basically, shows changes that were made.
Q Okay. Any idea whether this is -- this appears to be, I guess, a change from the fourth -- from the third draft to the fourth draft; is that accurate?
A That would probably be reasonable to assume.
Q Since we have a "Deleted: 3rd" up at the top and 4th is new?
A That's probably right.
Q And the changes to this fourth draft, were these your changes?
A They were -- they were probably my changes,



they were probably some of them were Mr. Rothrock's changes. We would e-mail this back and forth and deal with it.
Q Okay. But in terms of the actual language that was written, did you write that?
A I wrote a great deal of it. I don't know -- I didn't write every word.
Q Did Mr. Rothrock write any of it?
A He assisted me, yes.
Q In terms of actual writing a word or sentences, did Mr. Rothrock write any words or sentences that appear in this report?
A I'm sure he did.
Q Okay. But you are not certain?
A Oh, no. I said I'm sure he did. "Sure" means certain to me.
Q Okay. If we flip to the next page, it is one that's tabbed, and the first paragraph here, it is the introduction page.
A Okay.
Q Yes, right there. In paragraph one, the second line, there is a change here from the -- I

guess the third draft to the fourth draft where it appears -- and you see the second line where the word "prudently" appears in the text and it is underlined and off to the right you have a little box and it says, "Deleted: properly." And as I look through the document, it appears throughout the document, at least a few times. Can you explain to me this change from the term "properly" to the term "prudently"?
A Just believe that "prudently" was a better term to use.
Q And how were you using that term?
A Do you want me to define "prudent" to you?
Q Prudent -- that would be good and, also, as you have used in the this document.
A Basically, the idea of prudence is that they invested money in a manner that would be consistent with what they would do with their own money. That's kind of the best laymen's term that I can provide you. If I am prudent in using my own money, I should be prudent in the use of other people's money.
Q And where did you obtain that standard?



A I didn't go to any standards to obtain that.
Q That was something you just created; it was a common term?
A Just common -- just common sense.
Q Okay. Did you create that standard or did Mr. Rothrock provide that to you?
A I have no idea.
Q Don't recall? What about the -- the standard of "properly"? That was deleted. Do you know why that was deleted and that "prudently" was put in its place?
A I think what I discussed before was felt like "prudently" was a better term.
Q And why was it better?
A More descriptive of what the investment process should have been.
Q Okay. Why don't we go to the next tab and this -- it is on page 9 of the document and it addresses your -- it is -- I'm looking at here is the last sentence of -- I believe it is your paragraph 26, which starts actually on page 8, and paragraph 26



deals with analysis of lost investment income provided in Schedule B, and if we look at the last -- do you have it there?
A I do.
Q If we look at the last -- actually, the last term in that paragraph, it is 18,454.32. Do you see that?
A I do.
Q And it appears that that figure is changed. It was 26,895.81. Do you recall why that number changed?
A No, I don't.
Q Let's go ahead and take a look at the next tab here and that goes to -- whoops, looks like we are in a new document so let's identify that. The next tab I have appears on page 3 of the document and flipping back a couple pages, I'm looking at the title page of the document or what appears to be the title page, and it states, "Expert Report of Stephen A. Jay in Support of Tranche One Investment Claims of Plaintiff Osage Nation," and it, in the upper left-hand corner, says, "Third draft, 9/29/05." It



is the same East number except it is a version 3, and it appears that this is the third draft coming from the second. Is that accurate?
A I would agree.
Q Okay. And this also appears to be a -- please correct me as to the proper term because I can never get it straight, whether it is red line, black line or comparison or some form where this document has been compared to the prior draft. It that accurate? It appears in the columns. And it is undated; just says, "September 2005"; is that accurate?
A That's correct.
Q Let's flip to the first tab here and this appears on page 3 of the document and it appears to be -- what I would like to ask you about is a statement in the deleted section from the comparison. For paragraph 12, and the comment, I guess, goes to the last line where you are listing out the documents you have relied upon, primarily, and it states, "Deleted: Other documents and deposition transcripts applicable to the United

States' investment of trust funds of the Osage Nation." Do you see that? I'm sorry. Did I jump ahead too fast?
A That's all right. I went to one of your other tabs.
Q Okay.
A Okay.
Q The box, I guess the only -- well, the big box on the page. Can you explain to me what -- what you're referencing there?
A I think the -- the fact that I had been -- I had reviewed a lot of other documents and deposition transcripts. For example, let me just give you an example: Margaret Williams. I had read through her deposition. I had read through various others. I had put in kind of a generalized statement there that ultimately I decided was not appropriate because I really didn't rely on that to prepare my report, so I just, in effect, tried to eliminate anything that would mislead you in thinking that you had to go through all those documents to determine what I relied on.



Q Okay. And I note here you say, "primarily relied on." Are there others that you relied on but did not identify?
A I think -- you know, let's kind of tell you what happens in the process of being an expert witness. You see a whole lot of documents. All right? And I can't tell you that something in one of those documents didn't stick in my mind somewhere but primarily this is what I relied on were these documents right here. Now, I may have read something in somebody's deposition that stuck in my mind and it may show up as a word in here, but I don't recall what it was.
Q Okay. So to the best of your knowledge, your expert opinions are supported by the -- the three documents you have identified here: The Andersen report, the transcript of the deposition and testimony of Greg Chavarria and the documents produced by Greg Chavarria during his deposition; is that accurate?
A That's a good summary.
Q Okay. Let's go to the next tab. And it is



on page 8, paragraph 28. Looks like -- I'm looking at the box here, the deleted box, something that appeared, I guess, in the second draft which has now been deleted to the third and it looks like it used to appear in paragraph 28 but it is uncertain. It says here, "Deleted: Based on the records I have reviewed, I do not have enough information to compute lost interest on checks to headright owners that were never cashed"; is that accurate?
A That's correct.
Q Can you explain to me what that means?
A That was -- what that was an explanation as to how I went about computing the estimate of lost checks and I was saying that, in effect, that I didn't have that information where I could go back and say specifically here's exactly how to do it, that I had to make some type of an estimate in order to do it. We just eliminated that language.
Q Okay. So were you at one point -- did you have enough information to compute the lost interest on checks to headright owners that were never cashed?
A Not on an actual basis, no.



Q Okay. So you had -- you were required to make an estimate?
A That's right.
Q Okay. Let's go ahead to the next tab and this appears to be a new document. We are making some headway through this stack here. And this document, it has the case caption that was titled, "Report of Expert Testimony," and appears in sort of an outline form. Is that -- can you identify this document?
A Yes, I can.
Q What does it represent or what is it?
A This was my initial first draft of what I thought was going to be put into my report and it was, basically, like you stated, just an outline of what I was going to do and that was -- that was the first kind of, you know, outline that I prepared.
Q And here, I guess, I notice on this first page, you note your area of expertise and -- do you see that?
A I do.
Q And it says, "Business and Accounting"?

Page 90

A Right.
Q And what is -- what are your areas of expertise in business and accounting? What does that mean?
A I deal with business transactions all the time. I think that makes me an expert in understanding basic business fundamentals. I think being a CPA and an APV qualifies me as an expert in accounting.
Q And what about in terms of the business transactions, could you be more specific as to what you mean in terms of your area? That's sort of a broad term, at least for me. Could you be more specific as to what types of transactions you have expertise in?
A Well, I deal as a consultant to clients in regard to how they operate their business. I deal as a consultant to clients, for example, on the pension and profit-sharing plan that we discussed earlier that you had asked me if I had ever been a trustee of where I provide them consultation as far as what's -- I hate to use this term but what's a prudent thing to

Page 91

do in certain instances. I provide consultation in all kinds of business matters. People can -- people come to me with problems in regard to how to deal with their children. It is amazing but they do.
Q Sort of put you here as therapist, as well?
A You could put me down as a therapist.
Q (Laughter.) Why don't we go down to the next tab and that's -- let's see. It falls on a page 4 and it looks like it is a -- we skip back a few pages. Looks like it is page 4 of a -- a draft, a rebuttal expert report of Stephen A. Jay in Support of the Tranche One Investment Claims of Plaintiff Osage Nation dated November 23rd, 2005, although the "Draft" up in the upper right-hand corner is dated 11/19/05, with the -- I assume it is the document number East#7504402v1.
MR. ROTHROCK: Mr. Webb, pardon me for interrupting. I'm under the distinct impression the air-conditioning is on and I'm about to freeze. If we can go off the record for 30 seconds, I will see if I can correct that.
MR. WEBB: I will happily agree to that.

Page 92

VIDEO OPERATOR: The time is 10:49:38. Off the record.
(Recess.)
VIDEO OPERATOR: On the record. The time is 10:51:36.
BY MR. WEBB:
Q Okay. I believe before Jerry stated we were freezing, we were talking about this draft rebuttal report dated 11/19/2005. Is that -- is that accurate? Is that what this is?
A I believe it is.
Q Okay. And let's see. It is about six -- no -- eight pages; is that correct?
A Could be.
Q I guess we will find out as we go through it. Let's take a look. This is a report that you drafted; correct?
A That's correct.
Q And in terms of before we were talking about the expert report, in terms of the rebuttal report, did you draft all the language that appears in your rebuttal report?

Page 93

A Not every word.
Q Okay. Did your attorneys draft any of the language that appears in your rebuttal report?
A There are parts that they made suggestions on, yes.
Q Did they draft any language that appears in the report?
A I don't know of any that they, in effect, drafted. I don't know what the term is but they had recommendations to me as to what to put in here.
Q Okay. Let's take a look at page 4 here, and looking at the paragraph that starts -- it's already started, actually, on page 3 and we are looking at the end of it. It is the top paragraph. About four lines down from the top of the page, the sentence that starts, "Pawhuska is not in a remote location, but within a 1 hour drive to Bartlesville, within a 1-1/2 hour drive to Tulsa and within a 2-1/2 hour drive to Muskogee. Each of these locations have banks with Federal Depositories." Is that accurate?
A Is that what that says?
Q Yes.

Page 94

A Yes, that's what it says.
Q Is that accurate as to --
A You know, I'm not sure because I decided to drop that specific wording and instead just went to the fact that it was within a -- it wasn't a remote location and that it was within range of the Federal Depository.
Q And do you know what the -- during the Tranche One period, do you know what the closest Federal Depository was to Pawhuska?
A No, but when I wrote that, which was my first draft in that regard, my assumption was that there was probably one in Bartlesville because Phillips Petroleum is located there. I didn't ever follow up to see whether or not there was or not and that's why I dropped that particular language.
Q And does that apply also to Tulsa and Muskogee?
A I have a hard time imagining Tulsa didn't have a Federal Depository. It appears Muskogee did because that's where they deposited their money.
Q Did you ever confirm that Tulsa has a

Page 95

Federal Depository?
A No, I did not but I think they do.
Q Do as of -- how long do you believe they had?
A I believe they have probably had one for a long, long time.
Q But you don't know when they first had one?
A No, I don't.
Q Then that next paragraph, I think we have already gone through this, but the paragraph starts, "Second, Mr. Chavarria incorrectly." The next sentence says, "A one day period is required for processing of EFT's." Is that tied to the explanation we talked about before in terms of your experience with EFT's?
A It is.
Q Okay. Just checking. We can flip to the next tab on this. It is page 7, paragraph that starts, "Chavarria's Opinion Concerning Possible Lost Interest Due to Cancelled Checks," and the next sentence, which is third line on that paragraph, says, "The computation I made in my report clearly

Page 96

was based on an estimate of an amount of checks which may not have been cashed." Can you explain to me what you meant by that sentence in terms of what computation you are referring to and what it was based on?
A It was the computation that had to do with distribution checks. It was clearly based on a 1 percent estimate, checks which may not have been cashed.
Q Okay. Okay. Let's go to the next tab and I'm -- this is another document here, this tab appears on page 6. If we kick back a few pages -- let's see. We have got, as I see it, document entitled, "Rebuttal Report of Stephen A. Jay in Support of Tranche One Investment Claims of the Plaintiff Osage Nation." The document is dated November 23rd, 2005. The draft is actually in the upper right-hand corner, just says, "Draft, November 23rd, 2005," along with the document number version one. Could you identify this document, please?
A I think it is a draft of the rebuttal report.

Page 97

Q Okay. Is it a draft that you prepared?
A Yes, it is.
Q Let's take a look at the tabbed page in here and the paragraph 16, it is page 6, paragraph 16, and this here, it states, "In my experience, funds for an electronic transfer sometimes have to be withdrawn from an account one day prior to electronic transfer of those funds to a different account." Do you see that sentence?
A Yes, I do.
Q And that's -- that sentence and actually the whole paragraph looks like it's been X'd out; is that accurate?
A That's correct.
Q Do you know why that paragraph was X'd out?
A It was -- in the process, I was reading through it, trying to decide whether or not I was going to make a change there or not and I think I was going to make a change on that paragraph.
Q And what change did you make to that paragraph?
A I would have to go back and look at my

original to see.
Q Okay. Your original or the next draft?
A The final.
Q The final. Okay. We will take a look at that in a second. So let's go on to the next tab, which appears to fall -- it is in the middle of a document again, and kick back, I guess, three pages. The document doesn't have a title to it but it does start off by saying, "Mr. Lundelius was asked to determine whether certain Osage" -- do you see that? If you kick back a couple pages, I think it is three pages back, we will find the first page of the document or appears to be the first page of the document.
A Okay.
Q And do you have the same page, "Mr. Lundelius was asked to determine"? I don't have any other way of identifying it.
A That's fine.
Q But was this -- can you identify -- and this appears to be a several page document. Could you identify this document?



A These were some of my original notes in regard to rebuttal.
Q Okay. And rebuttal as it pertains to Mr. Lundelius?
A Yes, it is.
MR. ROTHROCK: Could we go off the record for just a second, please?
VIDEO OPERATOR: The time is 10:58:33. Off the record.
(Discussion off the record.)
VIDEO OPERATOR: On the record. The time is 10:59:36.
BY MR. WEBB:
Q Okay. And I think we are all on the same page now, literally, the "Mr. Lundelius was asked to determine" document, which appears to be a draft of your rebuttal report; correct?
A It is my original thoughts.
Q Okay. And if we flip to the page that's tabbed, which appears to be the -- let's see -- the fourth page of the document, and we look at the -- do you have it?



A Yes, I do.
Q Okay. If you look at the last paragraph, which appears to be the last paragraph in the document, and let me just read that and -- let's see, "Mr. Lundelius was also critical of my use of estimating lost income from Tranche One months by dividing annual data provided in the Arthur Andersen report by 12. This method provides a reasonable approach to estimate tranche one losses from annual data. Methodology of this type is commonly used in auditing techniques employed by Certified Public Accountants to test the reasonableness of annualized data." Did I read that accurately?
A You did.
Q Can you explain to me what you -- what message you are conveying with this paragraph?
A The message I was conveying was that the utilization -- the division by 12 to try to determine what the tranche one months should be is a reasonable estimate as to determining the losses from a tranche one months by utilizing annual data.
Q And how is it that it is reasonable -- how



do you define the term "reasonable"?
A I think it is a good approximation.
Q Is there -- you note here that this methodology is commonly used in auditing techniques employed by CPA's to test the reasonableness of annualized data; is that correct?
A That's correct.
Q And have you used this methodology to -- in your auditing of testing reasonableness of clients' annualized data?
A Absolutely.
Q And can you cite to any section in the Generally Accepted Auditing Standards that relate to the calculation of damages?
A Thankfully, the Generally Accepted Auditing Standards do not try to detail what you are supposed to do in calculation of damages.
Q Are there any documents, standards that address how to calculate damages?
A No.
Q So there is nothing in -- is there anything in the Generally Accepted Auditing Standards that

address dividing annual numbers by 12?
A No, they don't. They don't detail individual procedures like that.
Q Okay. Okay. Let's go on to the next tab and that appears to be an e-mail. I don't know if you have it. Do you have the one I'm looking at?
A Page 1 of 2, November -- where it talks about saving the date, November 7th, 8th at the top?
Q Actually, I have got September. I think you are looking at a different document.
A That's my next one.
Q Mine here says September 30th. Maybe they skipped a -- skipped one on you.
MR. ROTHROCK: That's my next one, too, for what it is worth.
BY MR. WEBB:
Q I don't think you even have a tab there, do you?
A Right there, second page.
Q Oh. Okay. There we go.
A I see.
Q Okay. Now we are on the same page.



A Okay. September 30th.
Q Okay. Good deal. So this appears to be an e-mail from Jerry Rothrock to you, Jim Parris and Neil Jay on Friday, September 30th, 2005, at 5:49 p.m. with a cc to Wilson Pipestem and Eric Pilsk regarding -- subject line reads, "Treasury's mass cancelation project." Is that accurate?
A That's correct.
Q Okay. And I would like to ask you, the document here, this e-mail appears to forward a prior e-mail; is that accurate?
A I believe it did, yes. The original one looks like it is from Jim Parris to Jerry Rothrock and this is where Jerry is copying me on his discussions with Jim.
Q Okay. And it appears that the document the e-mail is forwarding is from Jim Parris to Jerry Rothrock, I'm guessing Steve Jay and Neil Jay and cc to Wilson Pipestem and Eric Pilsk, on Thursday, September 29th, 2005, 11:48 p.m., regarding the Treasury's mass cancelation project; is that accurate?



A I think that's accurate.
Q What I want to ask you about is the -- I guess it is the second sentence, sort of third line down in the body of that forwarded e-mail from Jim Parris, and what I have here reads, "All" -- I'll read the whole sentence: "In a Treasury Financial Manual announcement dated May 26, 1988, (notice A-88-02), it stated, 'All checks issued prior to October 1, 1989, which have not been negotiated to a financial institution will be canceled by Treasury by April 1, 1991, and the moneys will be applied by Treasury as required in Public Law 100-86," close quote. Is that accurate? Did I read that accurately?
A I believe you did.
Q What did you take that sentence to mean?
A I took it to mean that they had set up a procedure to try to cancel those checks.
Q Effective as of what date?
A Looks like October 1st, 1989.
Q And what role does April 1st, 1991 play? What is the importance of that date?



A That's date that it says -- says, "which have not been negotiated to a financial institution will be canceled by Treasury by April 1, 1991." That's the date that they were going to cancel them.
Q Okay. And what does it mean where it says, "The moneys will be applied by Treasury as required in Public Law 100-86"?
A You know, all I can tell you is that that's what they were -- whatever the public law said they were going to do, that's what they were going to do. I can't tell you.
Q Did you ever look to see what Public Law 100-86 is?
A I did not. No.
Q Are you familiar with the -- I see a reference here a few lines down to mass cancelation, the term. What does "mass cancelation" mean to you?
A They were going to try to do a mass cancelation of those checks that had been outstanding for years.
Q Do you know if there is any part of this -- as -- Jim Parris describes a mass cancelation

project. Do you know if any part of that project involved the restoration of those funds to the accounts upon which the checks were drawn?
A No, I don't.
Q Okay. Did you ever look to see whether --
A That's what we were trying to find out from Jim Parris, whether or not he knew that it had been done.
Q And did Jim Parris -- was he able to help you with that?
A He was able to tell us that it was -- that it should have been done. Whether or not it had been done or what the effects of it were, I don't think we were able to get an answer on that.
Q Okay. If we look to the -- I guess the original e-mail that started this link, it starts at the bottom of the page; it is from Jerry Rothrock to Steve Jay, Neil Jay, cc to Wilson Pipestem, Eric Pilsk, Jim Parris, Subject: Treasury's mass cancelation project, dated Thursday, September 29th, 2005 -- quick math -- 3:30 p.m., and it states -- it says, "Steve and Neil, According" -- and I'll skip



the grammar. It will make it go a little faster. "According to Jim Parris, the effective date of Treasury's mass cancellation was October 1st, 1989. That means that on that date, all Treasury checks that had been issued for one year or longer were deemed cancelled as of that date. Jim believes that agencies had a specified period of time in which to return these funds to the accounts from which they were withdrawn, perhaps six months or a year. He is checking on that time period and will get back to us shortly." Did Jim ever -- did you ever receive information regarding the return of these funds to the accounts which they were drawn?
A No, I did not.
Q So is this the extent of your knowledge about as to whether the funds were ever withdrawn -- returned to the funds upon which they were withdrawn?
A Yes. Excuse me. It is.
Q Did you ever inquire as to additional information regarding the return of these funds to the accounts from which they were withdrawn?
A No, I did not.



Q Okay. When did you first -- when were you first asked to address -- I'll give you a second to drink some water.
A Thank you.
Q No problem. When were you first asked to address the mass cancelation or the cancelation of checks as part of your expert analysis for this case? Do you recall?
A We started discussing the mass cancelation somewhere in the first two or three weeks I started working on the transaction.
Q Sometime beginning of -- end of August, beginning of September?
A September, somewhere around in there.
Q Okay. Let's go on to the next tab. And this appears to be an e-mail from Jerry Rothrock to Steve Jay and Neil Jay, copy Wilson Pipestem and Eric Pilsk, titled, "Update on draft expert report for Steve Jay as of 9:30 a.m. on September 30th, 2005." Is that accurate as to what this represents --
A I believe it is.
Q -- or what document this is. And in



paragraph 2 of this e-mail from Jerry Rothrock to the group, it states, "Yesterday, we also e-mailed/faxed you a copy of the draft expert report with suggested changes." Do you see that in number 2?
A I have gotten lost somewhere.
Q Okay. Let's see where we are here. Do you have this document?
A No. I have got one dated September 21st.
Q You may have jumped ahead. Yes, I think it might be back one.
A Back one?
MR. ROTHROCK: There you go.
THE WITNESS: Okay.
BY MR. WEBB:
Q Okay. The number 2 there, let's take a look at that and that says -- let me ask you, is this -- do you recall how I described the document, whether I described it accurately? This is an e-mail from Jerry to you and others dated on September 30th --
A Right.
Q -- regarding the update of your draft

report.
A Right.
Q And it appears here, it says, "Steve and Neil, here's where we are: Number 2, Yesterday, we also e-mailed/faxed you a copy of the draft expert report with suggested changes."
MR. WEBB: I probably went too fast for you.
BY MR. WEBB:
Q "Yesterday, we also e-mailed/faxed you a copy of the draft expert report with suggested changes." Do you see that in number 2?
A I do.
Q Then if we drop down to number 3, the second sentence there, it says, "If you do that, please let us know so we can make corresponding changes in the references in the text." Do you see that?
A I do.
Q And then if you drop to number 4, the second sentence there, starts on the end of the first line, "I can either hold these until we see your next



draft or go ahead and send you a new draft with the new suggestions as tracked changes." Do you see that?
A I do.
Q Were your attorneys drafting your report and forwarding it to you?
A No, we were -- this was a process that we were trying to finalize it and I would make changes, Jerry would make changes and we would draft them back and forth and coordinate it.
Q So both you and your attorneys were making edits to the report?
A Certainly.
Q Okay. And suggesting -- okay. That's fine. All right. Let's flip to the next tab, which is an e-mail. Almost done with this, this stack, at least. It is an e-mail from Jerry Rothrock to you on Wednesday, September 21st, 2005, 11:37 a.m.; it says, "Forwarding 5 AA CDs." And if we drop down to the, I guess, two links back -- I don't know if that's proper parlance for e-mails, but the -- it says it is an e-mail that's being forwarded from Jerry Rothrock



to Alvarado, Rosamaria Alvarado, cc-ing Andrew Paolone, I believe, Sofia Mendoza, Jim Parris, Steve Jay, subject being 5 AA CDs, Tuesday, September 28th, 2005. And in the first sentence there -- second sentence, I should say, it says, "Please overnight the second set of the 5 CDs to Steve Jay in Tulsa." Is that accurate --
A That's accurate.
Q -- the way I described the document and what it says?
Can you explain to me what we are talking about or what Jerry is talking about when he references these 5 CDs?
A These were 5 AA CDs that had some detailed documentation on them.
Q What was that detailed documentation?
A Copies of documents.
Q What kind of documents?
A The once I recall, in fact, the only ones that I think I used out of there at that time when I was doing this particular piece of work with Jim Parris was copies of disbursements on headright



payments.
Q And what was the source of these documents?
A These 5 CDs.
Q Do you know where the 5 CDs came from?
A I think they came from the government.
Q Okay. And do you know, the documents you speak of, are they -- were they documents related to the -- were the government documents related to management of the funds and disbursements, is that --
A I think they were documents that Arthur Andersen produced. That's why they call them the 5 AA CDs.
Q Okay.
A And the government had then produced them to us.
Q Okay. So were they documents related to the Andersen report?
A I think so.
Q Okay. Let's look at the next one and I'll promise you a break as soon as we get through. We only have, I think, four more tabs in this stack.
The next document I have is an e-mail from

Jim Parris to Jerry Rothrock cc-ing Steve Jay, Wilson Pipestem, Eric Pilsk and S. Keith at AkinGump.com on Monday, September 19th, 2005, at 11:14 p.m., subject being re: Forward mass cancelation file. And this just references, I guess -- the last paragraph here at the bottom says, "I will look forward to meeting with Steve tomorrow." And just to confirm, you did meet with Jim Parris?
A I did.
Q And to discuss the mass cancelation file?
A No, primarily we discussed the disbursement transactions for headright payments.
Q And what did you discuss in that regard?
A Jim helped me understand the codings on the documents as to what dates meant, what -- which documents were disbursement transactions so I wouldn't get confused and pull an investment transaction rather than a disbursement.
Q Did Mr. Parris relate to you any factual information regarding his experience in working with the tribe or with the Osage Agency?
A Factual information. I don't think so.



Q Okay. Let's flip to the last -- it is actually a collection of documents. Four documents are grouped together here, each has a tab, and if you can just -- do you have those?
A I do.
Q Great. If you could just identify those documents for me.
A These are copies of the documents I just got finished talking to you about that I discussed with Jim Parris.
Q Okay.
A And the notes that I made on here were notes that helped me understand what this document, in effect, was telling me in terms of data.
Q And these documents deal with the disbursement of funds from the Osage account?
A They do.
Q Did you look at documents other than these four documents?
A With him?
Q Yes.
A I believe this was probably it.



Q Okay. Did you look at any other documents in terms of your preparation of your expert report relating to the disbursement of money from the Osage account?
A I did.
Q Okay. Were those documents identified in your expert report?
A They were documents that had been included in Mr. Chavarria's deposition and so they are identified through that.
Q Okay. Great. And that's the -- all the questions I have regarding the -- your initial response to the subpoena. And we have been going for almost exactly an hour. We can take a break. And it also appears the tape is running out so it is well-timed. Is it okay with --
MR. ROTHROCK: Is that your last page?
MR. WEBB: Yes, sir. Can we go off the record?
VIDEO OPERATOR: This ends tape number one of the Jay deposition. The time is 11:17:11. Off the record.



(Recess.)
VIDEO OPERATOR: On the record with tape number two of the testimony of Stephen A. Jay in the matter of Osage Nation versus U.S.A. The date is December 7th, 2005. The time is 11:29:22.
BY MR. WEBB:
Q Okay. Let me ask you, Mr. Jay, during the break, did you have any discussion with your attorney regarding the substance of the testimony you have given or you intend to give during this deposition?
A Not anything significant, no.
Q Okay. What do you --
A You want me to tell you what I asked?
Q Yes, please.
A Why are we going through all this detailed minutia.
Q Welcome to the world of depositions.
A You know --
(Laughter.)
Q That's fine. I take that -- let's go down to how you prepared for this deposition. What have you done to prepare for this deposition?

A I have reread the Arthur Andersen report; I have reread my initial report, my rebuttal report; I reread Mr. Chavarria's report; I reread Mr. Lundelius's report; I have gone through Mr. Lundelius's Exhibits D-1 through D-7 in detail; I have also gone back through examples of Mr. Chavarria's documents that he utilized for some of the moneys that were used for Tranche One months in his report. That's pretty much it.
Q Okay. Did you meet with your attorney, that being Mr. Rothrock?
A Mr. Rothrock and I met yesterday afternoon and for approximately maybe a couple of hours.
Q Okay. Did you meet with anyone else?
A His assistant, Kelly -- I can't remember her last name.
MR. ROTHROCK: Dunn, D-u-n-n.
THE WITNESS: -- was with us.
BY MR. WEBB:
Q And did you have discussions with anyone --
A No.
Q -- during your preparation? Did you review



any documents other than the ones you have identified?
A Not that I can remember.
Q Okay. Did you prepare any notes?
A Yeah, I did. Basically, they are not -- when I say, "notes," what I did was I just underscored on some of those documents, again, matters that I thought were important.
Q Okay. Have you produced those notes or those documents?
A I haven't. I have got them with me today if you would like to see them.
Q Yes, if that's possible and I can discuss that with your attorney off the record.
A Sure.
MR. WEBB: If you would prefer.
MR. ROTHROCK: Sure. Whatever.
BY MR. WEBB:
Q And you attended -- in preparation for this deposition, you attended depositions; is that accurate?
A I did.



Q And that being the depositions of Mr. Chavarria?
A That's correct.
Q And how much time have you spent preparing for this deposition?
A Had about eight hours on the airplane and in airplane -- airports yesterday that I spent reviewing it and I probably spent about six hours the day before reviewing documents and I spent about an hour-and-a-half this morning.
Q Okay. And you already, I believe, stated that you were retained for this case the end of August, I think it was August 24th; is that accurate?
A Somewhere in that vicinity.
Q Somewhere. And when you were retained in the case, what were you told about the case?
A The initial conversation was that the case involved a lawsuit by the Osage Indians against the United States Government for the handling of the trust funds by the United States Government that came in from payments from oil and gas leases in Osage County.



Q And what were you asked to do?
A I was asked to be prepared to be an expert witness and, in that regard, I would prepare a report to the court.
Q On what subjects were you asked to testify to as an expert?
A Primarily damages, that I don't know if it was just limited to that.
Q Damages in general or were there specific issues that were addressed?
A I can't remember over the period of time that we started addressing significant issues.
Q Okay. Were you asked to make any assumptions by the attorneys for the case?
A No, not -- not in particular.
Q Okay. Let me ask you about your prior testimony and, if you would like, I think we have already identified your expert report here as Exhibit 3.
A Sure.
Q If you want to refer to that --
A Glad to.

Q -- please do so. I want to ask you about your prior testimony. How many times have you testified -- and some of this for me was a little unclear from your report so if you could help me clarify. How many times have you testified in a deposition?
A In deposition?
Q Yes.
A I would have to count them.
Q Okay. According to -- from my look, it appeared that it could be around 34 times?
A Hang on a second. I counted the deposition only just then. Same. Sure. I would say somewhere in that neighborhood is probably a reasonable estimate.
Q Okay. And what period of time does that cover?
A This goes all the way back into the early eighties.
Q Okay. And how about at trial or hearing, how many times have you testified at a trial or -- how about at a trial?



A I think it was somewhere around 30-some-odd.
Q 30-some. And then there is arbitration, I believe you also --
A I have.
Q And that covers what time period? Same?
A Same time period.
Q Okay. Were there instances where you provided an expert report but did not testify? I believe that's identified in your --
A I think there were.
Q Do you know how many times that was? I only counted two.
A Couple of times, I think.
Q And that's for the same time period?
A Yes, it is.
Q Do you know why you didn't testify?
A They were -- the cases were settled.
Q Okay. In both instances?
A You know, actually, some of them I don't know what the -- the final --
Q Okay. Now, I think you also noted times



where you served as a consultant but did not provide an expert report or testify and I counted that as around 11. Is that accurate?
A You have to let me look here for a minute.
Q Yes, certainly.
A I don't know exactly where you are pulling that number from.
Q Okay. Let me see. Well, as I look at it now, I'm not certain either. Let's see. Why don't we go ahead and skip that question because I can't find the basis for it either. Further cases, though, that are identified in your expert report as part of your CV, could you identify the cases that dealt with the collection deposit of trust funds?
A Let me look real quick but I don't think any of those involved trust funds. I'll just look to be sure. I take that back. There are some of the Chapter 11 cases that dealt with trust funds. See if I can figure out which ones they were. The Republic Financial Corporation Chapter 11 bankruptcy, chapter -- Republic Financial Corporation was a trust.



Q Did that -- did it deal with the collection deposit of trust funds --
A Yes, it did.
Q -- as part of that work?
A Was it exactly like this? No, but it was -- it dealt with that issue. Let me look and see what else I have got here. Tulsa Industrial Facilities, that, in fact, was a trust in Chapter 11. It was a trust that was formed out of Chapter 11 and I dealt with that account. In the next-last page, at the bottom of the page it starts talking about court appointed trustee. That deals with moneys coming in and out of a trust fund.
Q Okay.
A That's the trust for the American Creditors Trust. On the next page is the trustee work I have done on Commercial Financial Services and I have dealt with moneys coming in and out of the trust fund.
Q Any others?
A That's it.
Q Okay. Can you identify the cases that

dealt with the lag time associated with the collection of the deposit of trust funds?
A None.
Q Okay. How about those cases involving investment of trust funds?
A Are you saying was that an issue in those cases?
Q Yes.
A I would say the Fitzgerald DeArman -- actually, not the Fitzgerald DeArman, the Republic Financial Corporation had to do with moneys coming in and out of the trust fund investment.
Q Any others?
A No.
Q Okay. How about the disbursement of trust funds, did any of those cases deal with that issue?
A Republic Financial Corporation did.
Q Okay. How about the lag time associated with the disbursement of trust funds?
A It didn't involve that.
Q Are there any cases that dealt with the lag time associated with the disbursement of trust funds?



A No.
Q How about interest earned on disbursed funds, in terms of the float, interest earned after the funds are disbursed?
A I don't think any of those cases involved that.
Q How about oil and gas royalties, any cases having to do with oil and gas royalties?
A Have to go back and think my way through that.
(Pause.)
I don't believe any of them specifically dealt with oil and gas royalties.
Q How about tribal trusts, any cases that deal with tribal trusts?
A No.
Q And how about the Federal Government, Department of Interior, Department of Treasury, any of your cases deal with --
A The Federal Government?
Q Yes.
A Testified for the Federal Government in a



criminal matter and let's see if I can find it here. It was United States versus Copeland Manufacturing. I testified on behalf of the government.
Q Have you ever failed to qualify as an expert?
A No.
Q Have you ever had your expert testimony stricken or excluded?
A No.
Q Have you ever worked with the Osage or its members before this case?
A No.
Q Have you ever worked with Mr. Pipestem, Mr. Rothrock or Mr. Pilsk before?
A No.
Q What is the hourly rate that you are charging for your work on this case?
A $250 an hour.
Q Is that the same, more or less, than you have charged for your other legal work?
A It is what I charge for any work that I perform.



Q Okay. Does that include the expenses that you incur, as well, associated expenses?
A No.
Q Travel?
A No. That's outside.
Q Okay. And we have seen the bills that you have provided. Do you know what your income was in 2004 from your work for -- in litigation?
A In all litigation?
Q Yes.
A When you say my income, okay, I have -- I have a Subchapter S corporation.
Q Okay.
A Are you wanting to know what the Subchapter S corporation earned from litigation or are you wanting to know what portion of that I was able to take home?
Q Why don't we step back and, actually, let me ask when you receive payment for your work on cases, where does that payment go?
A It goes to the Subchapter S corporation.
Q Let's talk about the Subchapter S

corporation and its income that it recognizes from your work in litigation.
A Right.
Q Do you know how much that was in 2004?
A I -- I would have to make an estimate. If I had to estimate, it would be somewhere around $100,000.
Q And what about in 2005, do you have a guess as to what it will be?
A Similar amount.
Q Okay. And -- and test my financial memory, my finance class was a long time ago, but in terms of the Subchapter S corporation, are you a shareholder of the corporation? Is that what you are?
A Yes.
Q Are there other shareholders?
A There is one.
Q Who is that?
A It is a friend of mine in Denver, Colorado by the name of Harley Rhubottom. Harley Rhubottom.
MR. WEBB: As long as you got that.
BY MR. WEBB:



Q And what -- what is your share of this Subchapter S?
A 99.999.
Q And who is the gentleman whose name there is no way I can pronounce, what is his involvement in the Subchapter S?
A He really is just a friend and he owns one share.
Q Okay. And what is the percentage of income that this Subchapter S corporation receives for litigation relative to other income it receives?
A Would you please state that again?
Q Sure. I know it was a poorly worded question. Let me ask this: What is the -- does the Subchapter S corporation have a name?
A Yes, it does.
Q And what is that name?
A Jay & Associates, P.C.
Q Is that different than the -- your firm, Jay & Associates, or is it one and the same?
A It is all the same.
Q And what percentage of litigation income



does Jay & Associates, P.C., receive relative to other income, what percentage?
A Approximately about an eighth.
Q So an eighth of your income is from litigation-related work and 92 percent is from your other consulting or accounting work?
A Well, I didn't say percent, I said an eighth.
Q Oh, an eighth.
A One-eighth. I'm not sure if -- whether it would be 12 percent, roughly.
Q So 12 percent. And was that the same in 2004, 2005, roughly?
A They were similar amounts.
Q Okay. And what about timewise, the time you spend on litigation related matters? Do you have a percentage of your time?
A Probably we need to define what litigation is and this is not a Bill Clinton type question.
Q I understand. I understand. Let me be clear.
A Here, let me tell you why I say that. As



trustee of the consol -- of the CFS Unsecured Creditors Trust, I'm including that in litigation; okay? And that has been in process for about the last five years and it is -- it requires quite a bit of time and it also provides additional revenues. Now, if you consider that to be litigation, being the trustee, then that's where some of those numbers are derived. If you don't consider being a trustee litigation, then those numbers would go down significantly, also would my time involvement.
Q Okay. That's fair. What about in terms -- let's see. You have identified the individuals who have assisted you with your preparation for this case and that being your son, I believe, your daughter; is that correct?
A Yes, I have a son and a daughter that both work in my firm.
Q Do you have other employees of the firm?
A Yes, I do.
Q And how many employees do you have?
A At the current time, I think I have got seven.

Q Okay. So that's the -- and -- all right. And are all those seven involved in the pension plan that you are managing now?
A No. Primarily it is just myself and my son.
Q Okay. In terms of management or in terms of --
A I think you misstated that when you said that I was managing the pension plan.
Q Okay.
A I don't manage a pension plan; I'm an accountant for it.
Q You are the accountant of the pension plan for your own -- for Jay & Associates?
A Oh, for Jay & Associates, there is three trustees.
Q Okay.
A One is myself, one is my son, and one is one of my associates whose name is Eric Winden.
Q And who are the individuals who participate in the pension plan?
A Everybody.



Q Who?
A Everybody in the firm.
Q And how many people are in the firm?
A Seven, I think, is total.
Q Oh, seven. Okay. And we are approaching 11:50. If you would give me an extra few minutes, we can get past some of this -- some of this stuff.
A That's fine.
Q Okay. Let me ask you about your professional experience, and I believe it is listed, if we turn to your expert report and your CV. Yes, there it is. On page 1 of your CV, in your expert report, you list out the employment. Can you -- you list here as your work for Jay & Associates from '88 to present; Lohrey & Jay, if I'm pronouncing that correctly --
A That's close enough.
Q -- from August of '76 to April '88; Arthur Young from June '71 to July '76, Army from '69, May of '69 to April of '71; Haskins & Sells from January '69 to May of '69; and I believe that's it. I apologize for going in reverse order, which makes it



a little bit harder to follow.
A That's fine.
Q Can you tell me how -- how this work relates to the opinions that you have provided in this case?
A Well, a lot of the opinions I am providing in this case now -- I have been a CPA for 36 years. A lot of the opinions I apply in this case have been based on the experience that I have gained for 36 years. You develop a lot of knowledge in that period of time and I think a lot of that was applied.
Q Okay. Were you ever terminated from any of those positions?
A No, I was not.
Q And what is your current position with Jay & Associates, P.C.?
A I'm the owner and managing partner.
Q And you list here, I believe, under -- I have got it somewhere -- you identify, I believe it is your client base, as financial audit tax and consulting services to privately owned businesses and individuals. Is that accurate?



A That's accurate.
Q And do you do any work for publicly held corporations?
A I have in the past but I don't right now.
Q Okay. And what about the government, other than the -- the one testifying?
A Other than the testifying I did for that one case, I don't think I have ever worked for the government.
Q Okay. And I believe here on your CV it also, the first year, educational background, and is it Master's of Science in Accounting, '69, from Oklahoma State and a BS in Accounting in '67 from Oklahoma State?
A That's correct.
Q That means you bleed orange; is that how --
A You will find one of my e-mails in there to Wilson Pipestem today that says I bleed orange.
Q I saw that. Have you taken any continuing education courses?
A I take at least 40 hours a year.
Q 4-0?

A 4-0, uh-huh.
Q And what are those subjects?
A They vary. They are all over the map. They -- I usually try to attend every year the ABV national program and I go to -- I have been to various and sundry national conferences. I try to attend at least one to two national conferences a year. They will be on taxation; they will be on auditing. They cover a wide spectrum.
Q And do those courses or your courses you took in college or for your Master's, how do they relate to the opinions that you are providing in this case?
A They are background information. I took courses in finance; I took courses in economics. They all provide a background for being able to understand financial terms and computations and that type thing.
Q Have you taught any courses?
A I have.
Q And what courses have you taught?
A I taught -- when I was in Vietnam in 1969,



I taught Accounting for the University of Maryland for two semesters. Prior to that, when I was at Fort Hood, Texas, I taught at the Central Texas Community College, Accounting. I have also taught for the Tulsa Junior College, taught Principles of Accounting at Tulsa Junior College. I think that's the academic work I have done.
Q And have you taught any classes in terms of investments or financial planning?
A No, I have not.
Q It's been mostly accounting?
A Mostly accounting.
Q And what professional licenses do you hold? I think -- I believe you say here -- I see you are certified in Oklahoma, Accredited in Business Valuation, that's the ABV you mentioned before?
A It is.
Q And you also say the Oklahoma Society of CPAs and the American Institute of CPAs, the AICPA?
A Right.
Q And can you tell me how your certifications or your licenses relate to the opinions you are



providing in this case?
A Well, they -- the only thing I can tell you that they relate to this case is they provide certification that I am knowledgeable --
Q Okay.
A -- in the things that they test on the exams.
Q Those entities, organizations or what have you, they have certain standards and codes and rules that they establish for the members -- its members; correct?
A They do.
Q And you abide by those?
A I do.
Q Have you ever been censured or otherwise disciplined by any of those bodies?
A No, I have not.
Q Okay. Are there other societies or organizations that you belong to in a professional sense?
A No.
Q Have you --



A Excuse me. I belong to the Tulsa Chapter of CPAs, also, but, you know, it is -- I noticed Mr. Lundelius was a Beta Alpha Si member. I was president of my chapter of Beta Alpha Si in college, so if you want to consider that to be a credential.
Q Okay. That works. Let me -- have you -- have you written or published any articles, books or dissertations?
A No. I was a speaker at the bankruptcy -- the Bar Association bankruptcy conference last year in Oklahoma City.
Q I apologize. I interrupted you and I'm sorry.
A Sure. That's okay.
Q You say the Bar; is that the American Bar Association?
A American Bar Association -- no, it was the Oklahoma Bar. I'm sorry.
Q Oklahoma Bar. And that was on bankruptcy?
A Yes, it was. I did not speak on bankruptcy. What I spoke on was accounting.
Q Okay. Have you -- so you have not

Page 142

published articles, books or dissertations?
A No, I have not.
Q Okay. And the speeches in terms -- I know you said you were a speaker but were there other speeches or presentations that you gave related to your professional --
A Oh, from time to time, I will be asked to speak at a rotary club or I will be asked to, you know, provide some kind of speech but --
Q Are they primarily dealing with accounting areas?
A Accounting and taxation.
Q Almost to the break. Give me five more minutes.
A That's all right.
Q Is that okay?
A Sure.
Q Have you ever managed a trust fund?
A I guess the answer would be yes because I'm managing this unsecured trust right now.
Q The -- the pension fund for Jay & Associates?

Page 143

A No. No.
Q Oh, the other that you mentioned?
A The unsecured trust for the bankrupt corporation. I managed two of those and I managed the trust fund for the American Bureau of Creditors Trust, also. I was the trustee so I guess you would call me the manager.
Q Have you ever managed an entity's investment portfolio?
A Aside from my own?
Q Yeah.
A No.
Q Okay. Have you ever held any role in the administration of trust funds, that being the collection, investment or disbursement of trust funds?
A Other than being trustee, no.
Q And what is your background in securities and investment banking?
A When you say my "background," the background you would go all the way back to college. I had classes in finance in college; I had classes in

Page 144

economics; I have been involved in the investment of the pension and profit-sharing plans that I told you about that I served as the accountant for and consultant; I have been involved in the investment of the trust funds that I have under my responsibility. I have never been what you would call an investment banker, as such.
Q Were you making actual investment decisions in those roles or were you soliciting the advice of investment analysts and financial planners?
A Some of them I was making decisions where I was the trustee. Sometimes I would -- and sometimes I would solicit opinions of others in regard to that. Sometimes I was merely an adviser.
Q What about actually your role in the -- your new role with the pension funds for Jay & Associates, is that -- what are your duties with that?
A Well, the duties are primarily that of a trustee but, you know, it really involves administrative type things that have to do with making sure that everybody gets their proper amount

Page 145

of contribution and seeing to it that the people that are involved in investing the money, you know, do so and that if anybody in the firm has a problem, they are probably going to come to me and want to know what the problem is.
Q Yeah. Yeah. In terms of the pension funds that you served as an accountant, did you ever make investment -- select investments for the pension plans, those pension plans that you consulted?
A No.
Q What is your experience with in financial forecasting?
A We do financial forecasting continuously.
Q And what about with financial planning?
A I get involved lightly in financial planning. I have a CFP on my staff and a lot of clients will come in to me to discuss financial planning. I will work with the CFP and between the two of us, we will work out financial plans.
Q And who is that CFP?
A His name is Eric Winden.
Q And did he have any involvement in your

Page 146

preparation of your expert report or your testimony in this case?
A No, he did not.
Q Have you ever served as a chief financial officer of an organization?
A If that includes churches where I was the treasurer or various and sundry organizations that I have been treasurer, I guess so but other than that, I'm the chief financial officer of Jay & Associates and that's it.
Q Okay. And on what subjects do you consider yourself an expert?
A I consider myself an expert in regard to analyzing financial statements, preparation of financial statements, consulting corporations and individuals as far as their financial status, being able to analyze performance, investment performance. That's part of what I do with the pension and profit-sharing plan that I work with. I have to analyze investment performance for them, help them analyze investment managers, whether or not they are doing a good job or a bad job. We have about eight

Page 147

that we work with. It runs the gamut.
Q Okay. That -- are there any other areas of expertise that -- I have analyze financial statements, prepare financial statements, consulting, analyze investment performance and analyze investment managers. Are there --
A In the process of doing my accounting work, we will at various times do work similar to what I have done here and that is analyze yields and we will analyze reasonableness of whether or not yields were reasonable against benchmark rates. You know, my practice is very general. I also have a bank as a client. Sometimes I get involved in problems they have in the banking industry.
Q Okay. All right. And it is noon or one after noon and I've taken you 11 minutes over your desired time but if you want to take a break now for lunch, we will do that and go off the record.
VIDEO OPERATOR: The time is 12:01:45. Off the record.
(Whereupon, at 12:01 p.m., the deposition was recessed, to be reconvened at 1:00 p.m. this same

Page 148

day.)

Page 149

AFTERNOON SESSION (1:05 p.m.)
Whereupon,
STEPHEN A. JAY
resumed the stand and, having been previously duly sworn, was examined and testified further as follows:
VIDEO OPERATOR: On the record. The time is 13:05:18.
EXAMINATION (Resumed)
BY MR. WEBB:
Q Okay. I want to step back for one second to questions you answered regarding your investment duties as a bankruptcy trustee and I just wanted to see if I can get a better understanding of the investment duties you have as a bankruptcy trustee for the -- in cases that you mentioned.
A Okay.
Q Can you explain to me what your duties are in that capacity?
A Basically, there is a pool of money and the money ebbs and flows. Money comes in from litigation, money goes out in terms of distributions. The distributions are determined when

Page 150

we think we have got enough money to make the distribution worthwhile and I'm in charge of that money and I make investment of that money.
Q And how do you make investments of that money?
A Primarily through -- it is held in a trust account at a bank and I instruct the bank to buy investments for me and I keep certain amount of money in a fund that draws interest that's guaranteed by Treasury type securities.
Q And what types of investments are you making?
A Primarily Treasury Bills.
Q Okay. Of what duration?
A Some of them go out year, year-and-a-half; some of them are short-term.
Q Okay. Now, jumping forward, just back just a little from where we ended up, we were talking about your -- subjects you consider yourself an expert and I have, and correct me if I am wrong --
A Sure.
Q -- as I also try to attempt to read my

Page 151

chicken scratch -- you consider yourself an expert in analyzing financial statements, preparing financial statements, consulting, analyzing investment performance, analyzing investment managers, analyzing yields and analyzing the reasonableness of yields against a benchmark; is that accurate?
A I believe that's accurate.
Q Are there any other areas that you consider yourself an expert?
A Not that I can think of right offhand.
Q And what -- in terms of these areas of expertise, what is the basis for your expertise in these areas?
A Knowledge of investment transactions, economics, finance, accounting, 36 years of experience.
Q And what percentage of your time is spent in these areas?
A Oh, it is hard to say. I have no idea. Never tried to break it down.
Q And can you give me examples of your work in these areas?

Page 152

A Primarily in the pension and profit-sharing plan that I meet with on a quarterly basis and deal with every day of the month. We -- we analyze what the investment experience has been in those accounts the end of the year; I show each participant in the account what his accounts yielded, show -- we show them data all the time as far as the percentage of return on their investments, that type of thing, you know, provide -- basically, provide input to the participants as to what's happened to their account.
Q And what professional periodicals do you review in these areas?
A I don't review any professional periodicals.
Q What about continuing education classes, are there any that you attend in these areas?
A No. It is all based on the knowledge I have gained over 36 years.
Q Okay. Are there any leading texts or articles in these areas?
A Oh, there probably are articles about investment managers, you know, for example, you are

Page 153

going to try to compare them to what's done on the S&P, you might compare them to what's done on the Russell Indexes, you might look at those type of documents, you know, read the Wall Street Journal and I used to take Baron's; I dropped it, just got bored with it. I watch the financial markets daily.
Q Do you consider yourself an expert in forensic accounting?
A Yes, I do, from the standpoint that I have done a lot of forensic accounting, I would.
Q And how do you define the term "forensic accounting"?
A It is a person that does investigative type work with regard to accounting issues.
Q And how much experience do you have digging through source documents?
A Hours and hours.
Q For the -- for the cases that you have testified on or --
A Just my whole -- my whole professional career. That's what my professional career has consisted a whole lot of.

Q Have you ever been qualified as an expert in investments?
A No, I have not.
Q Now, on the pension plans --
A I'm going to take that back. In the -- in the divorce case of Tuttle versus Tuttle, I did provide expert testimony in regard to whether or not Ms. Tuttle's rate of return would be on the money that was provided her in her separation agreement and whether or not I thought that was adequate for her to be able to continue her lifestyle.
Q Okay. But other than that case?
A I don't recall. It is possible there is something else but I don't recall exactly what it was.
Q And was that state court, federal court?
A State court, divorce court.
Q Okay. And going back on the pension plan that you deal with every day, what exactly do you do every day for the plan?
A Primarily, I keep track of changes in their plan on a daily basis and that doesn't necessarily



mean investment changes, it can mean contributions to the plan, it can mean -- they have transactions, for example, like loans to participants and those have transactions with the plan. On a monthly basis, I accumulate all the data on that, analyze it. On a quarterly basis, I print out reports to each of the participants, meet with the trustees, go through the performance of all the investment advisors, we even meet with the investment advisors on occasion.
Q Let me turn now to your reports and we have already talked about -- introduced your first report. That's your primary report in this case that we marked as Exhibit 3. Let me now introduce what's been marked as Exhibit 4, Jay 4. If you could identify that for the record.
A This is a copy of the rebuttal report that I issued on the 23rd of November.
Q Okay. And does it contain all the schedules, exhibits that you have filed when you filed the report?
A It does.
Q Okay. And does it contain your signature



or in this case maybe a signature line?
A It contains, I'm sure, the signature line.
Q Line?
A Yes. It doesn't contain my signature.
Q But it is the report that you had filed?
A It is.
Q And, again, I believe Mr. Rothrock did forward me a copy of the signature page, which I need to substitute. Note to myself.
Let me ask you this: The reports, do these reports contain -- the rebuttal expert report marked as Exhibit 4 and your expert report marked as Jay 3, do those contain all of your opinions in this case?
A Yes, they do.
Q Okay. So in the expert report, just to go over it again, the expert report addresses your opinions on insufficient documentation upon which you judge the prudence of investments, then that the investments are not prudent based on deposit lag time, investment -- lost investment income, disbursement lag time and lost investment income on cash flow. Is that accurate as a general



proposition, as a general statement?
A As a general proposition, yes.
Q But there are some other subopinions to that.
A Sure.
Q And then the rebuttal report, that is organized that you have a response to Mr. Chavarria's report addressing deposit lag time, disbursement lag time for cashed checks, disbursement lag time for canceled checks and then you have a response to Mr. Lundelius's report on prudence of investments and then criticisms of your report. Is that generally how it is organized in your opinions? I'll let you flip.
A That's a pretty good summary.
Q But there are some subopinions there, as well.
A Certainly.
Q Did -- did you have any other opinions on this matter that you did not include in your expert report or your rebuttal report?
A No.

Q In the process of drafting your reports, were you asked to change or remove any of your opinions?
A There were changes that I -- that were made in the wording. As far as changing or removing my opinion, no.
Q Okay. Let me take a look here at -- actually, I have got it here -- a document we have identified here as Jay Exhibit 5 and let me hand that to you, if you could identify that. Take a look at it and identify that for the record and with any of those documents, please take your time taking a look at them. Don't let me rush you at all.
A This looks like it is a document forwarding supporting documents to my original expert's report.
Q Okay. And what's the date on that?
A October 21st.
Q And that's a letter from whom to whom?
A It is a letter to Brett Burton from Eric Pilsk.
Q And signed by Eric Pilsk?
A Uh-huh.



Q And you understand it to be the contents of the work papers that you used in drafting your initial expert report?
A What it is, it is the -- I have Excel files and if I had run you copies of the Excel files, you would have never gotten to the meat of my report, so I sent you the meat of my report. These were the supporting files that supported those calculations and once you asked for them, we printed them off for you.
Q Okay. Let me ask you, in terms of the documents that you reference in the reports, the documents that you have produced subsequent to the reports, these work papers here, Exhibit 5, and documents you produced in response to the subpoena, are there any other documents that you have relied on for your expert opinions in this case?
A No, I don't believe so.
Q Are there any other documents that you have considered as part of this case?
A I have read a lot of documents, you know. As to which button they kicked off in my head to be



considered, I don't know.
Q Are there any documents that you have considered that you have not produced?
A No.
Q Okay. Let's look at your exhibit report, Exhibit 3, and let's take a look at paragraph 11, which appears on page 4, I believe. Is that right?
A Yes, it is. Page 3.
Q Of your -- you may be right. I may be wrong. Okay. I have it on page 4 of your initial -- no, I've got it wrong. I'm on your rebuttal report. Too many reports. I'm getting confused. Thank you for straightening me out here. Okay. Page 3, paragraph 11. Here you have the definition of the Tranche One months; is that correct?
A That's correct.
Q You don't define the Tranche One leases in this report, do you?
A No.
Q Why did you not?
A Didn't believe it was necessary.
Q Why did you think it was not necessary to



define the Tranche One leases?
A I think everybody in the case knows what the Tranche One leases are.
Q Did the Tranche One leases play any role in your analysis of the Osage -- the government's management of the Osage fund?
A Certainly they played a role. From the standpoint of knowing that they were out there and that they were the producers of the oil and gas revenues that were subject to this litigation, also played a role in understanding what Mr. Chavarria and what Mr. Lundelius had done.
Q Did you consider the Tranche One leases in your analysis?
A Considered them, yes.
Q To what extent did you consider them?
A Considered them from the standpoint that I knew that they were part of the definition of the litigation. I considered them from the standpoint as to whether or not the data was out there could represent what those Tranche One leases had done.
Q Did you rely on any documentation specific

to the Tranche One leases?
A The word "rely," I'm not sure. Did I analyze it and did I consider it in taking into account the errors that exist in those Tranche One lease documents? Yes, I did.
Q The -- how do you define Tranche One lease documents?
A A good example is the Tranche One lease documents that Greg Chavarria provided us in regard to the oil and gas revenues on the Tranche One leases.
Q So you considered the Tranche One lease -- leases in relation to or at least in regard to their documents included in Greg Chavarria's exhibits?
A Yes. Also, it affected Mr. Lundelius's report, also.
Q Did you search for any documentation specific to the Tranche One leases?
A No, I did not.
Q Do any of your calculations focus solely on the Tranche One leases?
A No, they do not.



Q Do your calculations include moneys for leases other than the Tranche One leases?
A They include moneys for leases other than the Tranche One leases?
Q Yes.
A They include the same moneys that Mr. Lundelius and Mr. Chavarria included in their computations, which are Mr. Lundelius in his footnote 24 and in his testimony on page 183 of his deposition indicated that the Tranche One leases were not separated out, so, evidently, he couldn't separate it out of those documents and so it includes those items.
Q Okay. Let me restate the question. Did you -- your calculations, I'm not talking about Mr. Lundelius or Mr. Chavarria, I'm talking about your calculations, did they include moneys for leases other than the Tranche One leases?
A Yes, they included the same data that Mr. Chavarria and Mr. Lundelius used.
Q So that's yes?
A Yes.



Q Did you consider the most -- did you ever consider the most common purchasers in the Tranche One leases in your analysis?
A You are talking about Phillips Petroleum, Big Heart, Sun Oil Company, that type?
Q Correct.
A Did I ever consider them?
Q Yes.
A I knew they were out there. I knew they were the people that were set up as being the purchasers of Tranche One leases.
Q Did -- and to what extent did you -- is that the extent of your consideration of their role?
A Well, I -- again, same -- I used them the same way that Mr. Lundelius and Mr. Chavarria used them.
Q So that's -- that was the extent of your consideration, what you just testified to?
A That's correct.
Q Okay. Let's take a -- in terms of paragraph 12, when you look upon -- you state here, "I have primarily relied upon the following data and



information." We talked about this section in, I believe, one of your draft reports; is that correct?
A That's correct.
Q For the last item, documents produced by Greg Chavarria during his deposition, what documents are you speaking to?
A He had a lot of exhibits to his depositions and they were in various and sundry binders and I can't tell you exactly which ones they were but there were a whole bunch of them.
Q Let me talk -- let's turn now -- we don't have to turn because we are right on this page -- your Opinion 1 states that, "Based on the available records of the United States, no one can determine whether the United States, as trustee, prudently invested the trust funds it collected for The Osage Nation during the Tranche One months." Did I read that correctly?
A Okay. Let's make sure we are on the right --
Q Page 3.
A Page 3 of the first report.

Page 166

Q Yeah. Right at the bottom of the page there it says, "Opinion 1."
A Right.
Q Was that an accurate recitation of what's written there?
A My opinion, yes.
Q What did you do first in coming to that opinion?
A The biggest document I read that led me to that conclusion was the Arthur Andersen report.
Q And why did you look at the Arthur Andersen report?
A Because the Arthur Andersen had, for a fee of about $23 million, attempted to try to analyze the accounts of the Osage Tribe and other Indian Tribes.
Q And what do you mean by "attempt to analyze"?
A Well, they -- it indicates in the report that they started out, for example, trying to do various types of reconciliations and analysis, like, of investments accounts, and due to the fact the records were incomplete or unavailable, that they

Page 167

drew back and changed their procedures midstream and did some alternative procedures.
Q And are those classified as -- or characterized as the Agreed-Upon Procedures --
A I believe so.
Q -- that we talked about earlier? And what information did the Arthur Andersen report provide in relation to your Opinion 1?
A Could we pull out a copy of that and I will be glad to go through it and show you.
Q Oh, certainly. I believe it is marked here and, actually, it is the next one.
A Good.
Q Marked as Exhibit 6, I will hand it to you and see if you could identify that for the record.
A It appears to be a copy of the Arthur Andersen report.
Q Okay. It is titled the, "U.S. Department of the Interior, Bureau of Indian Affairs, Tribal Trust Funds Reconciliation Project, Agreed-Upon Procedures and Findings Report for Osage Nation of Oklahoma, July 1, 1972 through September 30th, 1992,"

Page 168

with, it says, "Arthur Andersen LLP," at the top of the page. Is that accurate?
A That's correct.
Q And how did the Arthur Andersen report help you get to your Opinion 1?
A Okay. Let's start with the opinion page of Arthur Andersen where it is after the --
Q Let me give you a break one second so I can get Jerry a copy here so he doesn't have to look over your shoulder.
MR. WEBB: Here you go.
MR. ROTHROCK: Thanks.
BY MR. WEBB:
Q Okay. I'm sorry.
A It's okay.
Q What page are we on?
A Start with the opinion paragraph that has Arthur Andersen LLP at the top.
Q Okay. That's about three pages in?
A Yes, about the third page. Okay. I'm going to just kind of scan through here and tell you paragraphs that say that there is inaccuracies. It

Page 169

says in the middle -- in the second paragraph or, actually, that's the third paragraph, where it starts out, "The Congressional mandate," if you drop down to the middle of that paragraph, it says -- it says the primary objective of the Reconciliation Project, as stated in the Contract, is to reconstruct historical transactions, to the extent practicable, for which all records are available for all Tribal Trust accounts managed by the Bureau. Phase I of the project substantiated that not all records would be available for full accounting of such funds. Due to the unavailability of some of the records, the scope of the Reconciliation Project is designed to provide reasonable assurance as to the accuracy of the trust balance. Okay?
Q Uh-huh.
A Let's see. If you go down two paragraphs after that, it is talking about source documents and it says the Bureau has advised us not all the source documents for the reconciliation could be located. That indicates to you that the records are incomplete.

Q I'm sorry. Where is that again? I apologize.
A Go right above number 1 to Account Statements.
Q Okay.
A Start with the second sentence, "The Bureau has advised us that not all source documents" --
Q Okay. Thank you.
A Okay. If you go to the next page, page 2, let's see, starting out with the receipts, We verified, traced and agreed, non-investment receipts posted to each account -- Tribe's account, to the extent source document was provided -- so, essentially, they couldn't find all the source documents -- as to date -- as to amount, date, account number, et cetera, et cetera, et cetera.
Q So it is safe to say you are referring to statements within the Andersen report regarding the unavailability of documents?
A Unavailability of documents and errors.
Q And that's what you are using --
A Yeah.



Q -- the report for?
A And errors that they had in there, yes.
Q And you mention that the -- the report was conducted for a fee of $23 million. Where did you get that number?
A Oh, I think Mr. Rothrock told me that.
Q Okay. And you also mentioned that there are some procedures that were going to be undertaken but they were pulled back. Do you know -- what did you mean by "pulled back"?
A It was in that -- they were changed.
Q Okay. Do you know why they were changed?
A Because they couldn't find adequate documentation, I believe.
Q And what's your basis for that?
A Let me see if I can find that for you. It may be back in the other section. Basically, it has to do with analysis of schedule -- I think it was Schedule B or E where they stated that they started out trying to analyze investment interest and couldn't do it and went back and applied the rates for the Indian tribes on an overall basis but I will



see if I can find that for you to be specific.
Q Okay.
A Here goes. Page 2, item C.
Q Uh-huh.
A It says, "Investments Transactions." It says we also performed procedures similar to 2a, 2b above for investment transactions in Fiscal Years '86 through '91. However, these procedures were discontinued and these transactions were tested through alternative procedures such as Investment Yield Analysis and Treasury Interest Recalculation.
Q Uh-huh.
A So they changed their procedures right there.
Q But you don't know why?
A Let's see if it discloses. It doesn't disclose what their reason was.
Q Do you know if the report indicates that the records that were provided were inaccurate?
A It is chocked through the whole report. It talks about inaccuracies, assumptions that had to be made in regard to these documents and it talks about



errors that were made.
Q Okay. Do you feel that the report is -- presents an inaccurate depiction?
A Let's talk about two different things. Are you saying am I -- you are saying that I'm saying the report is inaccurate or are you saying that the trust records are inaccurate?
Q I first asked you what the report said and now I'm asking for your opinion.
A Yeah. As to whether or not the report is accurate or not, I would have to -- need to go back again, like I told you before, and look at all the work papers and try to determine the accuracy of the procedures they performed, so I can't answer that question.
Q Did you go back and look at the work papers to see if the --
A I don't have access to their work papers.
Q Okay. You -- you have not reviewed any work papers that were used to generate the Andersen report that we are looking at?
A I have seen copies of ledger analysis that

they prepared. I don't consider those to be their work papers. There is work papers consistent with a whole bunch of documents.
Q Did you request those documents?
A No, I did not.
Q Why not?
A I didn't feel like that I was here to drive another nail into the coffin of Arthur Andersen.
Q And what did you mean by that?
A Well, they are not even in existence anymore.
Q So are you saying that -- is your criticism of the Andersen report or the records?
A My criticism is of the trust records.
Q Okay. And are you claiming that those trust records are -- those contain inadequate -- I apologize -- are you claiming that those trust records contain inaccuracies?
A I think Andersen claims that.
Q Can you show me where?
A I did. I just got finished showing them to you where they are missing records, where they had to



assume --
Q You indicated missing but you didn't indicate that they were inaccurate.
A Let me show you an error report that they have got. There is a place in here where they say that they -- let me take you to the Osage page, number 5 --
Q Okay.
A -- Attachment A. It says past adjustments, exceptions identified in the reconciliation process that were not approved for adjustment by the Bureau. Although no requested additional supporting document could be provided, the Bureau concluded that subject collection -- correction was made to the account or the exception is no longer valid. Those were inaccuracies that Arthur Andersen found and turned over to the Bureau and the Bureau is saying don't worry about them; we will take care of them.
Q So it is a -- you are -- when you say, "inaccuracies," you are talking about --
A Errors.
Q -- errors that were made to the account but



ones where a subsequent correction was made?
A Well, subsequent -- when the Bureau came back to them and said that -- what Andersen did is what they call passing on the adjustment. In other words, they didn't make the adjustment because they went back to the Bureau and the Bureau, in effect, told them don't worry about it, even though they couldn't provide additional documentation; it says although no additional -- although no requested additional supporting documentation could be provided, the Bureau concluded that subsequent correction was made at the account or the exception is no longer valid.
Q Do you know if any of those past adjustments occurred during the Tranche One period or periods?
A I'm not for sure. I would have to go back and think my way through that.
Q Have you made any determination to that effect?
A The only one that I can really think of right off the top of my head is the one that



Mr. Chavarria provided us additional documentation on the lag time that existed on the receipt of funds at December 29th, 2000 -- or 1980 that was deposited, I think, five days late. That would be an example of an inaccuracy that would relate to a Tranche One month for the -- for the period November 1980.
Q How do you define the term "inaccuracy"?
A You can determine a whole lot of ways. You can say, okay, that they didn't record a transaction in the right account. You could say they recorded the transaction for the wrong amount. You could say they weren't timely in their deposit of funds and, therefore, The Osage Nation didn't get the amount of income they should have. You could say that there were errors that were made in any kind of record timekeeping transaction.
Q So you are using the term "inaccuracy" not necessarily that the record itself was inaccurate but it could be that the transaction was done in error or done inappropriately in terms of time or process --
A Well, what Andersen --
Q -- is that accurate?

A What Andersen says in their documentation is that you couldn't determine the accuracy of the records. If you went back on a transaction by transaction basis, Andersen made some assumptions, and based on those assumptions, they would determine, for example, that the receipt of documents was based on the posting date. They couldn't verify, according to the -- to this report, whether or not that was true or not but they made those assumptions. Now, whether or not those items were received, whether or not they were deposited that particular time, you can't tell from the documentation that Mr. Chavarria gives us.
Q Okay. Does the Andersen report -- are there any other instances of inaccuracy?
A You know, if you want to sit here and I'll go through it page by page.
Q Not necessarily. Let me ask you this: Does the Andersen report come out and say that the records are inaccurate, using that language?
A If I were a lay person reading it, I don't know if I would come to that conclusion. As an



accountant, as a person that's knowledgeable, I think they do, yes.
Q Did the records that were reviewed or referenced support the identification of these errors and inaccuracies?
A Say it to me again.
Q Do the records that were reviewed as part of this process support the identification of these errors? In other words, these errors were supported by documentation; correct?
A Well, let me give you the one that I can call to again, and that's the one Mr. Chavarria used in his report and that was that the deposit had been -- had failed to be deposited on a timely basis. Yeah, it was reflected in the documentation.
Q Okay. What other information did you look at in coming to Opinion 1 regarding the insufficiency of documentation other than the Andersen report?
A I think that was probably the basic thing. Let me just look back again what I quote you as being my -- I'm trying to think of any of the documents in Mr. Chavarria's deposition or his -- I have already



told you about some of the documents that Greg provided as being a problem but I think that's, basically, what my source was.
Q Okay. In coming to your opinion, was it necessary to make any assumptions?
A In coming to which opinion?
Q The opinion, your Opinion 1 regarding insufficiency of documentation.
A No, I don't think so.
Q And in terms of the errors you have identified or inaccuracies, whatever term you want to use, you have identified this one, is it deposit lag?
A Right.
Q Four-day?
A Right. I think it was a five-day lag.
Q Four or five days, a lag of some period?
A Right.
Q Are there any other errors that come to mind that you notice?
A You are talking specifically about Tranche One months.
Q Yes. Yes, well, the case is about Tranche



One, so certainly.
A Yes, I can, I can think of some of other errors that came into mind. If you look at Mr. Lundelius's report where he goes through the D-1 schedule, it shows in D-1 that there is a deposit that was made and I want to say it was from Sun in the amount of about $535,000 that was received on March the 2nd. Those -- those type funds should have been received by the 25th of the prior month. To me, that looks like -- I have looked at that source document and March the 2nd is the date that's been put on that source document. It is -- so I have no reason to think at this point that it was actually received in any time later than that but it doesn't appear that it was received by the 25th and, if so, it is subject to penalties for late fees.
Q Are there any other instances of errors?
A Those are the only two I remember right now relating to Tranche One.
Q Okay. And as the Arthur Andersen document addresses missing documents, do you know whether any of those missing documents referenced by the Arthur

Andersen report related to Tranche One?
A No, I don't.
Q Did you ever verify as to whether they relate to Tranche One?
A No, I did not.
Q Why did you not?
A I didn't consider it to be necessary. Arthur Andersen said the records were in poor condition and I assumed that they were speaking appropriately.
Q You accepted their assumptions?
A I did.
Q Have you at any point in time held a different opinion regarding this issue, that being the sufficiency of documentation?
A No.
Q And what standard did you use to evaluate whether there was sufficient relevant data to reach a conclusion?
A The Arthur Andersen report.
Q Well, did you have a standard as to what was sufficient or you just accepted what Andersen was



saying?
A Here's, basically, what Andersen says. They say in regard to these source documentation, and I'm just going to take receipts, for example, that they have adapted -- I can't remember if it is assumed, whatever -- a date as far as the receipt of funds based on the date that it was posted, if I remember correctly. Basically, what they are saying is they can't go back and determine the actual date that the funds were received, so they have made an assumption for purposes of preparing this Agreed-Upon Procedure report. The BIA agreed with them that that's fine with them and they issued their report on that basis, but as to whether or not that was the actual date of receipt or the actual date of deposit, whether or not all the Tranche One lease data was there is correct or not, there is no indication. They just indicate they traced it to a document and assume that the date was correct.
Q So is it correct to say that you -- or you are accepting the procedures as adopted by the Arthur Andersen and Agreed-Upon Procedures --



A No.
Q -- study?
A No, I'm not.
Q Then I guess my question is did you establish a standard upon which you are going to evaluate whether sufficient documentation as to how -- what types or numbers of documents were sufficient upon which you can base it -- an opinion of the prudence of investments?
A I think you're really at the crux of the matter, Kevin, and that is that these documents indicate or don't indicate what date they were actually received, what date they were actually deposited and so they can't be relied on to know for sure exactly what those exact dates were. They don't show exactly which leases that they were paid on. If you look at the documents Mr. Chavarria produced regarding the leases for Phillips Petroleum, for example, it is just one lump sum. It doesn't go down there and say, okay, we produced this from the Osage Hominy, we produced this one from the East Hardy, we produced this one from the North Avant or we produced



this one from the North Burbank. I think the other one was the Stanley Stringer. It doesn't have that type of documentation. It is just one number.
Q But did you ever establish a standard? It appears -- correct me if I am wrong but you looked at the Andersen report, read what it had to say and based your conclusion on what that report had said as opposed to establishing a standard wherein you set forth I need this type of document, that type of document, this type of document or, say, five documents related to each transaction as a standard upon which you would evaluate whether there was sufficient documentation upon which to evaluate the prudence of investments; is that accurate?
A Well, what we had to do -- what we did was we saw the problems on an individual transaction basis, so in analyzing the prudence of investments, what we did was we took an overall approach and we looked to see what the prudence was in regard to the trust as a whole and we used the Arthur Andersen data to compare to that prudence determination.
Q Okay. That's fine. Let me turn to

Page 186

paragraph 14 in your expert report and you state here in this paragraph, and if I can summarize, that to determine the prudence of investments, you need records that establish the amount of trust funds available to be invested, the available investment choices and decisions made, and documents -- demonstrative -- demonstrating yields from investments made. Is that an accurate summary of what it says?
A That's accurate.
Q If you had these records, could you evaluate the prudence of investments?
A I think so.
Q Okay. Could you give me examples of these records?
A Well, first, trust records are trust records. I mean those are trust records that accurately portray when the date a check, for example, was received, when it was deposited in the account, when it began first earning income. If you go back to 1976, the first Tranche One year, there is no records available to even show the difference

Page 187

between investment income and -- and other transactions. You would have to have those detailed records to show you whether or not when that money came in that they prudently saw to it that that money was invested in a transaction that would provide an appropriate yield on that money.
Q Now, you all -- you end the paragraph by saying that the documents provided to you do not contain these kind of records. What documents are you referring to?
A I'm talking about the documents that I have seen that are really Arthur Andersen documents that summarize the various listings of transactions that were in the accounts. It is kind of a summary of accounts. Starts out the beginning of the year and summarized to the end of the year.
Q And did you ask for additional documents, for example, documents establishing the amount of the trust funds available to be invested, indicating the available investment choices and the investment decisions or demonstrating the yields of the investments were made?

Page 188

A No, I did not.
Q And why not?
A I didn't think they existed and I'm going to -- here's where one of those little buttons in the back of my head pops off and that is that when I read Mr. Lundelius's report, he talked about Mr. Vale and Mr. Vale is somebody that I read, I think, back in Margaret Williams' deposition sometime ago and -- and Mr. Vale, in effect, according to Mr. Lundelius, had said that there were no trusts, written trust, investment procedures that mainly list what he did mentally, as far as determination of when they should invest money, and I think I remember that same type thing in Mrs. Williams' deposition that I read.
Q So are you indicating that there -- you understand there are no documents which establish the amount of the trust funds are available to be invested or investment choices, investment decisions and the yields?
A Well, there are documents that show the amount of money that Arthur Andersen put together, okay, and I relied on those.

Page 189

Q Are you saying there are no documents at all other than what appears in the Andersen --
A Those are the only documents I have available to me, okay?
Q Right. But did you ask for -- my question was did you ask for additional documents of this nature?
A No, I did not.
Q And -- are you familiar with the Department of Interior's money max reports for the Osage?
A I have read about them briefly.
Q But you have not reviewed them?
A No, I have not.
Q Have you seen any information regarding the finance system of the Department of Interior?
A I have read about it briefly. I think --
Q You haven't reviewed any of the material?
A No, I have not.
Q Does the trust fund that you consult for maintain a record of available investments that were never invested in?
A That's kind of a squirrelly question.

Q Can you answer it?
A No.
Q Do you maintain records of choices that options that you did not make?
A No.
Q You don't maintain a record?
A No.
Q Are you saying that the Arthur Andersen documents do not show the amount available?
A No, I'm saying that Arthur Andersen do say -- show the amount available. Whether or not the dates are accurate, we don't know.
Q When did you first receive the Andersen report?
A When did I first receive the Andersen report. I think I received it almost immediately upon discussion with Mr. Rothrock of the case.
Q Back in the end of August?
A Way back at the very beginning.
Q Okay. And what did you receive? The document we have here?
A Yes.



Q Was that the -- did you have receive any of the other additional documents, the underlying documents?
A No, not at that time.
Q Have you received those?
A I have Mr. Chavarria's deposition binders.
Q Okay. And that contained the underlying documents for the Andersen report?
A Well, what it contained was it contained a lot of summaries by Tranche One month, for example, of analysis of the account, summarizing from the beginning balance to the ending balance at the end of that year.
Q And was some of the documents you are talking about summaries, you are including in that the account statements for the Osage?
A That's what I think they're titled, if I remember right.
Q That was included in the Chavarria binders?
A I believe so, yes.
Q And did you review those account statements?



A I did.
Q Okay. Let me turn now to paragraph 16 of your report at the bottom of page 4 and it states -- let me just find the actual quote here -- it is actually on the top of page 5. The latter half of the paragraph states that essentially the pre1978 information regarding investment income was not available. Is that accurate?
A According to Arthur Andersen, it is.
Q Okay. Could you turn to the Andersen report? You cited here, I believe, Attachment B-1, page 1, for that proposition.
A Uh-huh.
Q Could you turn to that section of the Andersen report for me?
A Sure. Be glad to.
Q And could you identify where that quote comes from where it says investment income is not available?
A Let me look here for a minute. Talks about they only did '78 through '92. It says at the top of page 11, under procedures, the following procedures



were applied to fiscal years 1978 through 1992. General ledger income cost codes needed to determine whether a transaction is interest related were not available for years prior to fiscal year 1978 and, therefore, interest receipts could not be identified for comparison.
Q Okay. But, so, here, I guess, it is the certain cost codes were not available; correct?
A It says interest. Interest and cost codes.
Q Where does it say interest?
A It says general ledger income.
Q Cost codes. Are you saying that's --
A Interest is income. Oil revenues are income.
Q But it is -- is it the codes that are missing or is it the income that is missing?
A It just said that they didn't analyze it for those years because that information was missing.
Q But we are talking about the codes; correct?
A Well --
Q General ledger income cost codes.

Page 194

A You might have to ask Mr. Chavarria about that. He prepared this report. And get him to specify for you what that said because I didn't prepare it but what I gather from reading this is there is incomplete data for years prior to 1978 and, therefore, they didn't do it.
Q Okay. And did you ever review any information that would enable you to identify the pre19 -- the pre-'78 investment transactions and related earnings?
A No.
Q Why not?
A Didn't have that information.
Q Did you request it?
A No.
Q Did the Andersen report say this could not be done?
A They did right here.
Q And where does it say that again?
A Following procedures were applied to fiscal years 1978 through '92. General ledger income cost codes needed -- needed to determine whether

Page 195

transaction is interest related were not available for years prior to fiscal year 1997 -- or 1978 and, therefore, interest rates receipts could not be identified for comparison.
Q Let me look to paragraph 17, first sentence in that paragraph, your expert report, where you say that, essentially, that the Andersen report was not an audit. Is that accurate?
A No, it wasn't an audit; it was an Agreed-Upon Procedures special report.
Q And do you have any auditing background?
A Do I? That's what I have done my whole life.
Q And in terms of the Andersen report and the language appearing in the Andersen report, based on your comment earlier, do you consider Mr. Chavarria to be the best source for understanding of the procedures used by Andersen in the compilation of the report?
A I would certainly hope so.
Q Is there a different -- is there a difference between the audit and the audit and the

Page 196

procedures followed as part of the Andersen report?
A Yes, there is.
Q And what are those -- what's those differences?
A It is just right off the top. The procedures that are performed in an audit are determined by the auditor and the procedures determined in the Agreed-Upon Procedures report are determined by the client.
Q And which of these two approaches, audit or Agreed-Upon Procedures, is more appropriate in this situation?
A What they did was they performed an Agreed-Upon Procedures audit.
Q So it is a type of audit?
A It is a type of audit.
Q And in your opinion, is that the appropriate methodology to use in analyzing this information?
A It depends on who the user is and that's what -- if you go back to those documents that we went through earlier from the American Institute of

Page 197

CPAs, what they say is that the -- the person that specifies the procedures, that they have a responsibility to see to it that those procedures are adequate to provide the users of the information with adequate information that -- as to what was done and whether or not it was appropriate. In other words, it is their responsibility, in this case BIA, to design -- design these Agreed-Upon Procedures in a manner that's going to satisfy people like the Osage Tribe and the other tribes who might be involved.
Q And how would you analyze the Osage account? What approach would you use?
A You know, to answer that question, I would have to be in the position where I had access to all the records and given the responsibility to do that.
Q And were you placed in that position, what approach would you use?
A I would -- it would depend on what my purpose was. If my purpose was to provide an audited reconciliation, I would start with a plan. I would plan out the audit. I would set up a -- an audit team. I would make sure that we did a walk-through

of the internal controls and did testing of the internal controls of the government system. Based on that, I would design tests of the system and reviews of the documentation to determine whether or not the system was working accurately. If I determined that the system was not working accurately, then I would design tests to determine what the errors were in it.
Q Let's turn now to paragraph 18 of your report on page 5 and it is the last full sentence of paragraph 18, page 5, starts with, "Those benchmark rates." Do you see that?
A Yes, I do.
Q In there, you state benchmark rates were not subjected to test as originally designed. Do you see that?
A I do.
Q What does that mean?
A Well, basically, what they have used is an untested benchmark rate to compare to the interest earnings of the tribes. In other words, the -- originally, what Arthur Andersen did was they set out to determine what the interest earnings were by the



tribes. They determined subsequently that they couldn't or didn't want to, I don't know what exactly the reason was, to perform that analysis, so they turned around and used these untested benchmark rates to then turn around and test to see whether or not the tribes had received adequate amount of funds.
Q And is this -- this statement is cited to Attachment B-1, page 5. Could you turn to that, please?
A Sure.
Q It is B-1, page 5, of the Andersen report.
A That's correct.
There is a bunch of blank pages in here, Kevin.
Q Sorry about that. We need a new copier.
A Yes.
Q Could you point to me where on Attachment B-1, page 5, you cited -- you are cited to for your statement that the benchmark rates were computed by BIA were not subjected to test as originally designed, were not reviewed or verified by Andersen?
A It is the same paragraph that we discussed



earlier in regard to where they changed their procedures. It is not on page 15.
Q Page 5?
A Well, page 5 at the top, page 15 at the bottom.
Q Okay.
A It is not on this page.
Q So it is --
A It is that same paragraph I read you a little while ago.
Q So your citation on here is incorrect?
A Well, no, it is page-- the citation is correct, it is page 5 of Attachment B-1.
Q Right.
A I'm just telling you it is not on that page, okay, where I'm citing. That's the citation for the benchmark rates.
Q Okay. So you are citing the bottom of the page as opposed to the --
A No. Let's drop back. Okay? The benchmark rates are Attachment B-1, page 5.
Q Correct.



A Okay. That's the benchmark rates and that's what we are talking about here is the benchmark rates.
Q Right. So that's your citation.
A But your question is not where are the benchmark rates, your question is where did you determine that the benchmark rates had not been tested.
Q Exactly.
A Okay.
Q Yes.
A That is found back where I read you a little while ago where they changed their procedures and they determined that they couldn't audit the interest as they originally designed and so they changed it and went back and used those untested benchmark rates to contest everything else.
Q And could you just tell me where on -- I guess it is B-1, page 1 of 6, that appears?
A Yeah. Hang on. I'll go back through here and find it again.
Okay. Go to page 2 of the Arthur Andersen

report. Go to investment -- to investment transactions, item C.
MR. ROTHROCK: Could you just clarify page 2 is the page number at the bottom?
THE WITNESS: Number at the bottom of the page, yes.
MR. ROTHROCK: Thank you.
THE WITNESS: It says we also performed procedures similar to 2a and 2a above for the certain investment transactions in Fiscal Years 1986 through 1991. However, these procedures were discontinued and these transactions were tested through alternative procedures. So what they are saying is they didn't test the individual transactions. Okay? So the rates that they are using for benchmark rates have never been subject to these detailed tests that they originally planned to do. And so then they are turned around and using those benchmark rates to compare to what the tribes actually got and seeing whether or not that's a way of measuring it. Let me give you an example. Okay? If you -- if you said to me I want you to measure me and tell me how tall I



am -- how tall I am but you said I want you to use an accurate yardstick when you measure me, so I want you to go certify the length of that yardstick and then come in here and measure me. And I went out and got a yardstick to measure you with but I decided that I didn't have anything to certify it with, so, therefore, I came in and measured you with that uncertified yardstick. You may or not be -- it may not be that height because that yardstick had never been subject to test.
Q And how would you test the benchmark? I assume that's what you are referring to.
A The way they started that test, going back through all the investment calculations and seeing what the interest earnings should have been and then computing what the benchmark rates would be.
Q And what was the role of the benchmark in the Andersen report?
A It was to try -- to compare the yield on funds that was received on investments from the tribe compared to the overall investment yield of the tribe.



Q For what purpose?
A To see -- to find a reasonableness indication or to see if there were -- and I'm going to kind of -- I'm quoting Andersen's report based on my memory -- to see whether or not there were any possible errors that could exist just based on the fact that they fell out of parameters.
Q Okay. But is there any language as to reasonableness of investments, the use of the benchmark?
A Well, I would have to -- I'm trying to quote you Andersen.
Q Right.
A Okay? Let me read you what Andersen said.
Q Well, I'm familiar with what Andersen said and I'm not familiar with any statement as to reasonableness, so that's why I am asking it.
A Well, before I give you exactly what that statement said, can I go back and look at it?
Q Sure.
A Okay. Let's look and see what Andersen said regarding these benchmark rates. I'm going to



flip back to the Osage Tribe, I think is where it is.
(Witness reviewed the document.)
A Okay. Page 30. We are going to talk specifically about the Osage in this regard. Page 30 at the bottom.
Q Okay.
A Says the following summary compares the pro forma calculated interest to Bureau postings for -- of interest for actual earnings on cash balances. The calculation and comparison is for informational purposes only, provided at the request of the Bureau. It is a theoretical estimation of what might have been earned had the funds been invested at the rate. No investigation was made to explain variations or resolve timing differences of cash basis postings. Variances do not represent exceptions -- or represent exceptions resulting in proposed adjustments.
Q Okay.
A And then they have got a series of -- maybe I'm thinking about the wrong investment transaction.

They have got a series of explanations in terms of footnotes as to what each of the various errors they found when they compared those benchmark rates and why they were able to justify that those errors were reasonable. I may have gotten off on the wrong one. Let's see. Yes, I think benchmark was actually starting on page 28 or 27. I wish I could find your -- okay, here it is. Here's where it talks about it. Okay. I'm going to need a break after this. I'm getting tired of doing this. It says -- it says the calculated -- it is talking about using these rates. It says the calculated amounts for each account and each year were compared to the total actual overnighter interest posting as identified as those transactions with a document description containing a "BB" with a "Z" or an "AW" and an element component with the one exception of TT05Z0002, which is determined to have been used to post an overnighter rate. So they had a series of error codes that they would compare against those benchmark rates to decide whether or not they felt like the benchmark rates fell out of the necessary



parameters or not.

Q Right. But was there any mention of a reasonableness standard that's being applied?

A I -- what they did was the reasonableness standard was applied because they would go in and select out the exceptions and then determine whether or not they thought those exceptions were not a problem due to the fact, for example, that the income had slipped from one period to the next, those type things.

Q But in the -- I don't mean to cut you off. I'm sorry.

A It's okay.

Q In this report, there is no language saying that the benchmark is being used to evaluate the reasonableness of investments of the Osage, is there?

A I don't know. I would have to sit down and look at that. But what it was used --

Q Well, at this point in time, can you point to a section where it shows --

A Let me finish what I was going to say. Let me finish what I was going to say. What it was used



for was to try to determine unreasonable problems. Okay? In other words --

Q How do you define a reasonableness --

A Let me finish what I was going to say.

Q Okay.

A They tried to determine whether or not they were unreasonable problems. Okay? So they -- they go in and they compare it to the overnighter rate and when they -- when they see some kind of a fluctuation fall out of that that they considered to be unreasonable, they tried to go back and explain as to why that fluctuation was reasonable. So it may not use the word "reasonable" there but that, in effect was the purpose of their work.

Q That's your interpretation?

A That's my interpretation.

Q Okay. That's fine. We can take a break now if you want.

A Sure.

MR. ROTHROCK: Can we try to keep it to five minutes?

MR. WEBB: Sounds good.



VIDEO OPERATOR: The time is 14:08:56. Off the record.

(Recess.)

VIDEO OPERATOR: On the record. The time is 14:18:48.

BY MR. WEBB:

Q Okay. I would like to turn to paragraph 19 of your expert report.

A Kevin, can I interject for a minute?

Q Sure.

A As I told you during the break, I did find the word "reasonable." It is on page 12. Right in the middle of the sentence, it talks about the objectives that were used in the summary of investment yield analysis, and the last objective says to ensure interest earnings on investment funds are properly posted to tribal accounts, interest reasonable, other.

Q And what do you interpret the "interest reasonable" means?

A That what they were trying to do is see whether or not the interest was a reasonable amount

based on those benchmark rates.
Q Even though the primary part of that sentence deals just with the posting?
A Well, it says to ensure interest earnings on investment funds.
Q Are properly posted to tribal accounts.
A Right. Well, that's another way of saying interest earnings.
Q Okay.
A What they are saying is what's been posted is their earnings.
Q Okay. Let's turn to paragraph 19 of your expert report and it is on page 6 and I'll give you a second to get to that.
A Okay.
Q At the last sentence of that paragraph states Andersen's "fill-the-gap" procedures were inadequate to test the accuracy of oil and gas royalty collections, essentially. Is that accurate as to what is being explained there?
A Yes, it is.
Q And what does that mean?



A Well, what they did in the fill-the-gap procedures was they went back in the statistical sample of oil revenues from the leases and they did a judgmental sample on gas revenues to try to reach conclusions about whether or not that they had done that. I think that, in particular, the judgmental sample is inappropriate because it doesn't allow you to reach any kind of statistical conclusions and so I think that causes the whole process to be inadequate.
Q And what's your basis for saying it is inadequate?
A The exact answer I just gave you and that was because they used the judgmental sample in regard to the gas.
Q And what does -- what does this have to do with the prudent investment of trust funds?
A This has to do with the accuracy of the records and the accuracy of the records results in prudent investments.
Q You are talking about the accuracy of records in terms of oil and gas royalty collections?
A That's correct.



Q And what would have been adequate procedures?
A Well, the -- you know, if you say in a best world, if you have got a set of documents that -- or a set of records that don't appear to be accurately maintained, is that you would go all the way back to the source documents even to the effect of going to the Tranche One purchasers. In this case there was just five of them, and that would Phillips Petroleum -- do I need to list them all for you?
Q No, you don't. Do you consider yourself an expert on collections?
A What kind of collections?
Q The collections you are addressing here?
A Oil and gas collections?
Q Yes.
A I cut my teeth on oil and gas.
Q All right. What's your experience with oil and gas collections?
A When you say, "collections," you are talking about remitting them like Phillips did?
Q No, about the accuracy of maintaining



records regarding oil and gas revenues.
A Well, the accuracy should be that when -- do you want -- so, basically, you are asking what would I have done had I been --
Q No, actually, I'm asking what's your -- are you an expert on the accuracy of oil and gas revenue collections because you are providing an expert opinion here on the accuracy of United States' oil and gas revenue collections and I'm wondering whether you are now holding yourself out as an expert on the subject.
A Well, let me, first of all, tell you that I spent the first two years of my audit life working on Phillips Petroleum. I spent the next two years working on -- and various other oil and gas clients, Foster Petroleum, Bartlesville, Oklahoma, was another one that I worked on. I spent the next two years of my life working on clients such as Cotton Petroleum. I spent -- that was after I left Arthur Young & Company. Then I spent working on small producers. I have dealt with oil and gas collections or payments by producers and those payments by producers, if you

know much about the oil and gas industry, what happens is they have an operator of a lease and that operator of that lease generates all the data that has to do with the sales of oil or gas off that lease, and then what they do is they have partners in those leases, also, and, for example, Phillips may have been -- they may have been the operator of this lease, they have been a partner. Let's say, for example, let's use it from a collection standpoint, which is where you want to go. Their operating partner would have remitted to them their share of those oil and gas revenues. Okay? I have seen those kind of transactions. I have seen the same thing as far as oil royalties. Foster Petroleum was a pretty interesting story, if you want me to go into it, but they were way back in the Osage back in the early thirties as far as releasing mineral rights and oil royalties, that type of thing, and I have seen all the remittances that have come in and tested those remittances, and what you'd be able to do is you try to go back as far as you can into the producer's or the operator's information to determine whether or



not you have got your fair share of the data.
Q So on the basis of that work experience, you feel that you are an expert on the accuracy of oil and gas revenues, revenue collections?
A I think I have had probably more experience than most people.
Q But do you consider yourself an expert?
A I don't know. What's an expert? What's the definition of an expert? Is it a person that's worked in it for 10 plus years or is it a person that -- you know --
Q So are you -- would it be fair to say you are uncertain as to whether you are an expert but you feel you have a sufficient amount of experience?
A I think I have sufficient amount of experience to be able to tell you whether or not they have gone back to adequate source documents.
Q Okay.
A What I read on fill-the-gap procedures, I don't think they have.
Q Okay. Have you reviewed the -- I think you have mentioned that you reviewed the records provided



as part of Mr. Chavarria's earlier depositions in this case as a fact witness and possibly also as a 30(b)(6) witness; is that accurate?
A Now say that to me again.
Q The documents associated with Mr. Chavarria's testimony as a fact witness and 30(b)(6) witness in this case, you have reviewed those?
A I have reviewed some, yes.
Q Some of them. Okay. Have you reviewed the records produced -- strike that.
Have you reviewed the expert reports of Mr. Chavarria and Mr. Lundelius in this case?
A Yes, I have.
Q And why don't we go ahead and introduce those. The Chavarria expert report is marked as Jay 7 and Lundelius expert report is marked as Jay 8. If you want to take a second just to --
A See if that's what they are.
Q I'll represent to you -- I'll represent to you that those are the --
A I think they are.



MR. ROTHROCK: While he is doing that, do you have extra copies of those exhibits?
MR. WEBB: Of course, Jerry. I don't want to leave you sitting there without anything to look at.
MR. ROTHROCK: Well, I had memorized them but, you know, this is getting late in the week and my memory sort of degrades a little as we get towards Friday.
MR. WEBB: There you go.
MR. ROTHROCK: All right. Thanks.
MR. WEBB: Okay.
BY MR. WEBB:
Q Have you reviewed the records cited in these expert disclosures?
A Which records are you talking about?
Q The records recited in -- I believe -- they are, let's see, attachments here. Let me find the ones for which Mr. Lundelius --
A Is it B.1?
Q Thank you. Have you reviewed those records?

A Yes, I have, at least some of them. I haven't reviewed them all.
Q Okay. Let me just take a look here. Did you review the records cited by Mister -- what about the documents that are attached to Mr. Chavarria's expert report, have you reviewed those?
A You are talking about the ones for canceled checks?
Q Yes.
A I have reviewed his report with those attachments. I haven't reviewed -- gone back to those specific documents the look at them.
Q And then there is, also, I guess, exhibit list of B-2, list of documents, have you reviewed those? I think it is in between the two documents -- yes, there you are. Have you reviewed those documents?
A I don't remember seeing any of those, no.
Q Okay. All right. How would you characterize the documents that appear in Mr. Chavarria's disclosure?
A Which set of documents?



Q That are referenced.
A Which section?
Q B-1 and B-2 and the documents that are attached.
A The documents in B-1 that I have looked at, they characterize the Arthur Andersen report. In other words, they are very similar to the Andersen report. You can't tell the date of collection, the date of deposit, the date when interest started earning from those documents.
Q Do you know if these documents were produced to the plaintiffs in this case?
A Do I know if they were produced?
Q Yes.
A I know certain of them were because I looked at them.
Q Would those documents have been helpful in your analysis?
A They were helpful, yes.
Q In your analysis for your expert report?
A No, in my rebuttal. I didn't -- these only came out after my expert report.



Q Correct. But I'm asking did you --
A Did I review them prior to that?
Q Yes.
A Not that I can tell you for sure.
Q Have you ever evaluated the prudence of the sufficiency of documentation to evaluate the prudence of investments before in terms of other situations with clients or trials or what have you?
A The sufficiency of documents to determine the prudence of investment performance. In other words, did they have a large enough number of documents to be able to prove that they had been prudent?
Q Not necessarily the number but maybe the quality. As I understand it, your opinion, your Opinion 1, is that there were insufficient documents upon which you can evaluate the prudence of investments and I'm just wondering whether you have undertaken that analysis in other situations.
A Well, what my insufficiency talks to is about the maintaining of the trust accounting records. Okay? It is not talking about the



sufficiency of their actual investment documents. That's part of the whole thing. It is really talking about the whole accounting system.
Q But have you done that in any other situations?
A Let me think about that. The answer is probably. Okay? Let me tell you why. Any time you do a financial audit that includes a company that has investment records, and I have had one client, for example, that had -- that everything it had almost was investments. I have gone through and tested those records to determine whether or not they were sufficient for me to be able to issue a certified audit on those documents. So I guess the answer is yes.
Q And what cases were -- were those?
A They weren't cases, they were certified audits. The one that I'm thinking about right now is Foster Petroleum.
Q And what situation did you find there in terms of the sufficiency of documents?
A They were excellent. They had the best

records I have ever seen.
Q And they have documentation similar to what you said is required in this case?
A Well, if you mean that you could go through and you could tell what the date was they had received something, what the date was that they put it into an investment process, yes. Uh-huh.
Q And so if I was to read your deliverable on that situation, I would see that you had all the documentation that you maintain is needed in this case?
A No, you would not. You don't put that in certified audit.
Q Is there any written record of that finding?
A You could read through the lines on that because if I didn't find that adequate document, then I would make some kind of a qualification in my report that would be probably a scope limitation similar to what Arthur Andersen did when they limited their scope to the Agreed-Upon Procedures.
Q But there is no written formal conclusion



as to that -- as to that?
A Sure there is. You don't talk about sufficiency of supporting documents, you talk about whether or not the financial statements are fair in their presentation and that leads down to the sufficiency of whether or not the documents are there.
Q Do you have any opinions regarding the sufficiency of the documentation available to determine the prudence of the Osage investments that you have not fully addressed today?
A Other than what I have already commented on?
Q Yes.
A No.
Q And the basis for those opinions would it be fair to say is the Andersen report?
A I would say it would be the Andersen report, plus the documents that are listed on this page that I have had an opportunity to take a chance to look at.
Q And that's exhibit -- the documents listed



on Exhibit B?
A It is not all of the documents but some of the documents.
Q Some of the documents listed on Exhibit B-1 from the Chavarria expert report?
A That's correct.
Q Just for the record. Just to clarify. Turn to exhibit -- your Opinion 2, now, and as I have it, and I think it is verbatim -- well, it is because I am reading the report, "Based on the limited trust documents" --
A Can I catch up with you now?
Q Sure.
A I'm sorry. I was in the Chavarria report.
Q That's okay. I apologize. I should wait for you.
A Okay. Go ahead.
Q "Based on the limited trust documents and other available information, the United States, as trustee, failed to prudently invest the funds collected for The Osage Nation during the Tranche One months." Is that accurate?



A That's accurate.
Q What standard did you use to evaluate the investment practices of the government as related to the Osage?
A I didn't say that I was saying that I examined their investment practices. What I said was that when you look at the results in their statements, that you can see that they didn't prudently invest it.
Q I guess should I say what standard you used to evaluate the investments of the government as they were made on behalf of the Osage? Is that more accurate?
A Yes. One of the standards that I used was the use of the comparison -- actually, it wasn't mine, it was the comparison that Arthur Andersen made of the bunchmark rates with the funds that were returned to the Osage Tribe and then a calculation of the present value of any deficiencies.
Q So it is primarily the Andersen?
A Primarily the Andersen data.
Q Okay. You looked to the Andersen data.

Let me take a look at -- let's take a look at the expert report and let's flip back, actually, to paragraph 16 on page 4 and the first sentence in paragraph 16 on page 4.
MR. WEBB: Jerry, are you there?
MR. ROTHROCK: I'm there.
MR. WEBB: One more. There you go.
BY MR. WEBB:
Q It states in the first sentence, however, even when supplemented with the data in the Andersen report, the available records of the United States don't permit anyone to determine whether the United States, as trustee, prudently invested funds it collected for the Osage during Tranche One. Did I read that accurately?
A You did.
Q Doesn't that opinion directly conflict with your Opinion 2?
A What you have got is a situation like this, Kevin: You have got inaccuracies in the trust records. Okay? And Andersen points out those inaccuracies. But Andersen does not correct those



inaccuracies. All right? What Andersen does is just point them out. So when you supplement the trust records with the fact that Andersen points out that there are inaccuracies, plus what they point out the fact that what they did was controlled by the BIA, you are still not able to say that they prudently invested those funds because what an independent person would determine if they performed audit procedures that they themselves designed might turn out something different than what's in the Agreed-Upon Procedures report.
Q Well, I'm just having a hard time reconciling where in 16 you say that you can't evaluate the prudence of the investments because of the insufficiency of documentation, and then you say, well, looking at it with the documents that are out there, I have established that it is not prudent. I'm trying to say are you getting it both ways here?
A Well, in effect, because what I am saying is that I don't have anything better than the Arthur Andersen data to look at to determine whether or not it is prudent and if you apply these rates from the



Arthur Andersen data, it looks to me as if they have not been prudent in their investment policy.
Q But does your opinion in 16 detract from the --
MR. WEBB: Thank you.
BY MR. WEBB:
Q -- detract from the credibility or the validity of your statement in Opinion 2 because of the lack of documentation?
A You know, I don't know. It is the best I had to work with and that's what I used.
Q Which opinion do you stand by?
A I stand by both of them.
Q You stand by both. So -- let's take a look and see where we are going into deposit lag time here and we need to change tapes. Why don't we just take a break to change the tape and we will come right back.
VIDEO OPERATOR: This ends tape number two of the Jay deposition. The time is 14:38:15. Off the record.
(Recess.)



VIDEO OPERATOR: On the record with tape number three of the testimony of Stephen Jay in the matter of Osage Nation versus United States. The date is December 7th, 2005. The time is 14:42:16.
BY MR. WEBB:
Q Okay. And, Mr. Jay, during the break, did you have any substantive conversations with your attorney regarding the substance of your testimony that you have given or plan to give in this case?
A No, we just talked about the last thing you were talking about, the difference between those two paragraphs.
Q Okay. And what was the substance of that conversation?
A Jerry just said that he understood where you were coming from.
Q Okay. And your response?
A No response.
Q Let's talk about deposit lag time. What is your specific opinion regarding deposit lag time in this case?
A My opinion is that there were deposit lags

that could be documented by Arthur Andersen.
Q And how do you define "deposit lag"?
A It is the difference between the date an item was received and the date it was deposited.
Q Now, when you talk about -- when you talk about depositing, we are not talking just about depositing, we are talking about the crediting of the account and the amount of the funds deposited; is that accurate?
A That's correct.
Q Is it your understanding that with the government's deposit of royalty collections, that deposit and account credit are one and the same; there is immediate credit?
A Immediate credit to a cash fund.
Q The account.
A Well, yeah, I'm sure there is. Any time you take money to the bank and you hand it to them and you say deposit this in my account, yes, it is immediately put into the account. You know, it generally doesn't show up until the next business day but it generally is taken in at that time.



Q Do you know whether that one-day delay occurs with the Osage trust fund account?
A I don't know for sure.
Q Okay. Have you looked into that at all?
A No, and I didn't use it as a basis for my computations.
Q Okay. What is the basis for your opinion regarding deposit lag, generally speaking?
A The Arthur Andersen report.
Q Did you rely on any other documentation or discussions with others for your opinion regarding deposit lag time?
A Mr. Chavarria's report substantiated in one transaction for a Tranche One month of November 1980 that there had been a deposit lag.
Q And what did you do first in coming to your opinion?
A In coming to my opinion as to whether or not there had been a deposit lag.
Q In general -- your general opinion regarding deposit lag time.
A What I did first was I read the Arthur



Andersen report, sought -- saw the volume of transactions that had deposited lag.
Q And in coming to your opinion, did you make any assumptions?
A The assumptions that I utilized was that that money could be reinvested at the overnight rate -- or not -- excuse me -- not the overnight rate, the benchmark rates.
Q And when you say, "that money" --
A The money, the lag time money.
Q Have you at any point in time held a different opinion regarding this issue?
A Not that I know of.
Q Let me turn your expert report to, actually, Schedule A of your expert report. Do you have that?
A I do.
MR. WEBB: Jerry, do you have a copy?
MR. ROTHROCK: I do.
MR. WEBB: Okay.
BY MR. WEBB:
Q Schedule A, it has 1900 -- the year column?



A Right.
Q And it says 1973 to 1992; is that correct?
A That's correct.
Q And why did you include -- why 1973 to 1992? How did you pick that date range?
A I think that was the range off the Arthur Andersen report.
Q Does that include information outside the Tranche One months?
A Probably. I think Andersen picked up the deposit lag on all funds of the Osage Tribe.
Q And why did you include information outside of the Tranche One months?
A It was the best information I had.
Q Best information as it pertained to what?
A As it pertained to the funds of the Osage.
Q And related to Tranche One?
A Well, it relates to Tranche One from the standpoint that those years contain the Tranche One months.
Q What about the years that do not contain the Tranche One months?

Page 234

A I just listed them all there. Excuse me. I listed them all there so that they could be analyzed.
Q Full disclosure?
A Just curiosity.
Q You list here as your source the Arthur Andersen Schedule E-2; is that correct?
A That's correct.
Q Did you draw information or data from any other source than the Arthur Andersen report for this chart?
A I don't believe so.
Q Okay. And did you segregate out only those deposits that relate to Tranche One leases?
A No, I think I -- I would have to go back and look for sure. Do you want me to look at E-2 and see what I pulled?
Q Sure.
(Witness reviewed the document.)
A What I used was the data that was included on the Arthur Andersen Schedule E-2, page 1 of 1, for The Osage Nation.

Page 235

Q Okay. Okay. And on -- here we go. All right. Let's go back to your -- right there to your Schedule A. If we can turn to page 2 of Schedule A.
A Okay. Certainly.
Q That's calculation of lost interest based on the Arthur Andersen deposit lag time data.
A Okay.
Q And you have here at the top of the page, underneath where it says, "Source," Arthur Andersen Schedule E-2, a list of assumption, 4 percent interest on lag funds for initial year and interest at tribal benchmark rates for years after initial year. Is that accurate?
A That's correct.
Q Now, as I look at your expert report, and sorry to balance all these documents here, but if you can take a look at your report, I don't know if you can separate -- you might want to separate out the schedule for the report.
A Okay. Tell me what page. Tell me what page.
Q Page 7 of your expert report, actually, not

Page 236

the Andersen report. Page 7, paragraphs 21 and 22, as I see it, you -- and let me know if this is accurate -- the bottom of paragraph 21, you indicate that the lost interest for lag days was computed using an interest rate of 4 percent.
A That's correct.
Q And -- but you don't say anything about interest at tribal benchmark rates after the initial year, as is mentioned on Schedule A.
A Read paragraph 22.
Q Well, that talks about present value.
A That's what I did.
Q Okay.
A I computed the present value of that amount of interest that was calculated at 4 percent, all right, at a present value rate using the benchmark rates, the 1990 through 2005.
Q Well, you used --
A I used a combination of benchmark rates --
Q I'm sorry. I apologize. You said combination of the benchmark and seven-year. I'm sorry. I apologize. I didn't hear that. So on your

Page 237

Schedule A where it says interest at tribal benchmark rates for years after initial year, there should probably be an addition to that referencing the seven-year?
A Right.
Q That was my confusion.
A I think we adequately disclosed that to you that that's what it was.
Q Okay. Why did you use 4 percent?
A That was an overnighter rate that was probably not -- excuse me -- it wasn't an overnighter rate, it was a legal rate of interest, I believe, that was required prior to about -- oh, I'm trying to remember -- 19 -- or 1985 or 1986, at which time the overnighter rates kicked in. We just used that for ease of computations to try to get an estimate.
Q And what was your required on?
A It was required rate of interest that was -- that the funds were required to earn, I believe.
Q And what funds were you speaking of?
A Funds of the Osage.

Page 238

Q Oh.
A Cash balances.
Q And were there any alternative assumptions you decided not to make in terms of what interest to put or to use?
A Oh, you know, all the interest -- all the interest rates that were being kicked around could have been utilized, the overnighter rate, the Treasury Bill rate, you know, there was various things. I just decided the interest rate at 4 percent was a conservative number that would get us to an answer to start making calculations from.
Q Did you examine the impact of the alternative assumptions?
A No, I did not.
Q Okay. And then there is the benchmark. What is the benchmark? We have been talking about it for a little bit. We really haven't defined what it is.
A The benchmark is listed on the Arthur Andersen report, page B-1-1 -- or B-1, page 5 of 6, bottom of the page, numbered 15, and it says the

Page 239

table below represents benchmark rates provided by the Bureau. These are what the Bureau gave Arthur Andersen to say that the overall tribes had earned on their investment funds.
Q And what's your understanding of how these rates were generated?
A I get the idea that they were generated by the Bureau, given to Arthur Andersen, and that they were based on the yield the Bureau thought that they had earned on those funds during those years.
Q And when you say, "those funds," what funds are you referring to?
A Funds of the Indian tribes.
Q What tribes?
A I think all of them.
Q And the -- are these monthly? Daily? Annual?
A These appear to be annual.
Q Annual?
A How they calculated them on a daily basis or monthly, I don't know.
Q Do you know where the information came from

Page 240

other than --
A It says right here it came from the Bureau.
Q Do you know where the Bureau got their information?
A No, I don't.
Q What type of funds are reflected in the benchmark?
A I would think probably all the funds that they have.
Q Are they of differing sizes?
A Sure.
Q Different durations?
A Sure.
Q What commonality is there between the funds; do you know?
A The commonality is they were funds in accounts invested for by the Indians.
Q Are there any other common aspects that you are aware of?
A I haven't analyzed them to where I can answer that question.
Q Okay. Do you know if there are fixed

Page 241

income investments, equity investments? Don't know?
A Can't tell you.
Q Did you try to find out?
A No.
Q Okay. Why not?
A I felt like that if they were adequate for Arthur Andersen to use to analyze the fluctuations in investments to determine whether or not they were reasonable or not, that they were adequate for us to be able to utilize to compute deposit lag time with.
Q Do you think it is a reliable measure?
A The answer to that is that -- it is kind of interesting. When you go through Mr. Lundelius's report as to what he considers to be a reasonable yield, the benchmark, for the most part, comes in lower than what Mr. Lundelius considers to be a reasonable yield for those Tranche One years. Sometimes they get a little bit above it but for the most part they are below it and I have added a schedule to my rebuttal report that shows that.
Q Okay. And let me ask you this while we are talking about that: Would a -- in your opinion,

could a prudent investor underperform the benchmark?
A I wouldn't think a prudent investor in this environment would normally underperform the benchmark.
Q And why is that?
A Because it seems to me that the benchmark is an overall rate that's spread across a lot of different moneys for a lot of different tribes somewhat would be indicative of what their performance was, and that the person investing the money -- you know, again, it gets back to measuring the yardstick against the yardstick. In other words, what you are measuring here is the performance of the person that did the investing and saying whether or not he was prudent against his own results. Does that make sense? In other words, the benchmark is -- if you consider the person investing the money for the government to be prudent, his numbers would match exactly up to the benchmark.
Q Okay. So if a prudent investor did everything right in terms of their coordination of the collections, investments, disbursements, kept all



the documentation appropriately, kept track of it all, followed the appropriate procedures and terms of investments but for one reason or another did not -- their investment returns did not match the benchmark, are you saying that investor would be deemed not prudent?
A I don't know. I would have to put more analysis into it than that. I would have to find out why they didn't match up.
Q Is the benchmark an average?
A I think it is.
Q Okay. Well, then, wouldn't some be lower than the benchmark and some be higher, the funds that make up the benchmark?
A You are talking about the funds that make up the benchmark?
Q Yes.
A Would some of them be lower and higher? No, they would be exactly the same. The benchmark is calculated from all the tribes.
Q Right.
A Okay. And so what the overall tribes did



is the benchmark.
Q But with an average, you will oftentimes have numbers above the average and numbers below.
A You are saying within the benchmark.
Q Yes. Yes. Yes. Yes.
A Sure.
Q But, like, the tribes here.
A Yes. Sure.
Q So you will find some of the tribes' returns will be higher than what appears in the benchmark and some will be lower?
A Yes. Certainly.
Q What publications are you aware of or statutes that support using the benchmark to determine if a trustee is prudent?
A Only the Arthur Andersen report.
Q Okay. Do you know if the benchmark reflects viable investment opportunities for the Osage funds? Let me strike because that was a little vague, wasn't it?
A Sure was.
Q Do you know if the funds that make up the



benchmark reflect viable investment opportunities for Osage trust funds?
A No, I don't.
Q Okay. Are you familiar with the quarterly disbursement requirements of the Osage?
A I am.
Q Do you feel that quarterly -- well, I'll ask anyways. Do you feel that quarterly disbursement requirements conflicts with investments greater than a quarter, longer in duration than a quarter?
A Sometimes, not all the time.
Q And when would it conflict?
A Well, I have attached a page to my expert's report and it shows that what I did was I analyzed the least amount of cash for a period of -- for the six Tranche years that the Osage account had in it on a daily basis and those amounts that were less than that least amount of cash appear to me that they could have been invested for a longer period of time than a quarter.
Q Okay. Let me ask you what the benchmark -- you use the benchmark up to '95. Why did you stop in

'95?
A Because there was no benchmark after '95. If you look at the page, the Andersen report, it only goes through that period of time.
Q I have it in front of me, also.
A Have you -- look at the date.
Q It is on page 15 and the date I have here is 9/30/94.
A Right. That's where they quit.
Q Okay. So it didn't -- so, actually, you used the benchmark up to '95 or '94?
A Up to that date at that point in time.
Q So this should be, actually, '94?
A I don't think I would include that. I'm talking about the Treasury rate for years after '94.
Q Right. But in your expert report, you said you use the benchmark --
A Let's see what it says.
Q -- for '73 through '95; they use an interest rate equal to the benchmark rates. That's in paragraph 22, second sentence.
A That may be a typo because -- in fact, it



was up to September 30th of '94.
Q Okay. So that should be '94, then, or September 30th of '94?
A Yeah. I would agree.
Q Were there any alternative assumptions that you looked at in terms of what rates to use for this period in terms of your present value calculations?
A No. I felt like that was an appropriate rate to use.
Q And why did you believe it was appropriate?
A It was the one that reflected what the overall Indian tribes had been doing.
Q And why do you believe that's an appropriate rate upon which to judge the interest rates or evaluate the interest rates the Osage should have received?
A Let me explain something here. We are still talking about this report?
Q Yes.
A Okay. At this time, that was the best rate I got. Later, Mr. Lundelius provided me with better rates and so then I used Mr. Lundelius's rates.



Q Okay. So Mr. Lundelius -- the rates provided by Mr. Lundelius in his expert report are a better source for present value calculations than the benchmark?
A You know, according to Mr. Lundelius, that's what a prudent investor should be expecting and I utilized those rates instead of the benchmark for later calculations as far as deposit lag and any calculations of present value.
Q But it is your opinion that they are a better source of present value?
A I thought they were -- I thought they were a good bar. You know, it was a good number to hit and so I decided to use them.
Q Are they better than the benchmark?
A I think so.
Q Okay. And how about the seven-year Treasury security yield, are they better than the seven-year Treasury security yield?
A In most instances, yes.
Q In some instances not?
A Possibly. I don't know. I would have to



bo back and analyze it year by year to see whether or not I thought they were.
Q But generally?
A Generally, I think they are.
Q Why did you use the seven-year Treasury -- going back to our present value calculations here, deposit lag time, why did you use the seven-year Treasury security yield?
A What I did was -- you know, the statistical data, if you have been to the web site on the Federal Reserve, it's got all kinds of yields. It shows you CD yields, it shows you, you know, various and sundry interest rate yields. What I did was I tried to go back -- I took the benchmark rates that existed from 1973 through 1994 and I compared those to the various interest rates that fluctuated across there and what I have tried to do is find a pattern where that -- that I could either find a similarity between the yield that existed in the Federal Reserve with the benchmark rate, and in most instances, what I -- the seven-year yield actually was a little bit lower than the benchmark rates for those years and so I figured

Page 250

that was a conservative number to use and it would fairly reflect something similar to the benchmark rates and that's what I used.
Q And for what period of time were you tracking the two?
A From 1990 -- after subsequent to September 30th, 1994 through 2005. Oh, that I tracked them?
Q Yes.
A '73 through '94.
Q Okay. And those rates -- have you identified those rates?
A I know we provided you copies of them.
Q Copies in the work papers or are they --
A In that supplemental data that we sent you after you -- on October -- I think it was the 17th or 21st, from Eric Pilsk.
Q Okay. That's -- yes, we have already identified that as an exhibit. It is in that stack over there. I'm familiar with what you are talking about. Were there alternative assumptions that you considered to the seven-year Treasury yield?
A No, I -- when I went in and matched it up,

Page 251

I thought it matched up fairly well and I felt like it was something that would be a similar computation of the benchmark rate and I used it.
Q Let's take a look at paragraph 22 of your expert report on page 7 and what we are talking about here, how do you get from the information that you derived from the physical -- fiscal years containing a Tranche One month to the Tranche One month calculation, what -- your data that you provide for what moneys are -- should be accounted for the Tranche One months?
A I think I divided it by 12 once I got the present value, if I remember right.
Q Were there alternative methods you contemplated?
A No.
Q Okay. And why did you do it this way?
A I felt like it was indicative of what the earnings should have been for the Tranche One month, what -- the activity that happened for the year would be fairly indicative for that one month.
Q Is it fair to say that the calculation you

Page 252

did comes out with an average, a monthly average for the fiscal year?
A I would say it is reasonably close.
Q But it is not an actual month figure?
A No.
Q Okay. Now, is this -- I think we have addressed this before but is this your standard approach, a CPA approach at calculating amounts that are present, owed or due for a specific month?
A That are present, owed or due?
Q Yes.
A No, it is a typical approach when you are trying to analyze reasonableness of a number, to do a 12-month calculation.
Q To divide by 12 from an annual --
A Andersen did the same thing in their report. They went through and they divided their information by 12 to get to some monthly rates, used some daily averages. They used averages in their report, too.
Q Do you know off the top of your head where those are?

Page 253

A I would have to go back and look but I remember reading it.
Q Let me ask you this.
A Okay.
Q The numbers that you have, as we mentioned, they are a monthly average; correct?
A That's correct.
Q So there is a possibility they could be wrong as they apply to the actual Tranche One month?
A There is a possibility.
Q And, in fact, the actual deposit lag time for a Tranche One month could be zero, couldn't it?
A It is possible if they didn't have any deposit lag in that month.
Q But on the other hand, there could be an actual deposit lag time for the Tranche One month?
A There are some lags.
Q Well, but they are -- through your methodology of dividing by 12, that -- you came up with an estimated average; correct?
A That's correct.
Q But that figure did not take into account

the actual number of -- the actual deposit lag during a Tranche One month; correct?
A What it does -- the answer is that there is no actual data. Okay? Let me give you an example. When you go back to the detail that supports the transactions for Tranche One month, it doesn't show the exact date the money was collected. What Arthur Andersen did, they made assumptions in regard to what data was collected based on the posting date, so as far as when you use the word "actual," you have got to know the actual date it was received, you have got to know the actual date it was deposited and the other thing you have got to know that none of the experts so far have been able to express an opinion on is that the actual amount that existed for those five leases that are considered to be Tranche One leases.
Q Okay. But in terms of your calculations, your calculations did not focus on the actual deposit lag during a Tranche One month?
A No, let me drop back. I don't think you can find the actual Tranche One lag. Okay?



Q And I understand your point.
A So mine is an estimate.
Q Yours is an estimate. Also, yours didn't take into account the Tranche One leases either, did they?
A Nobody can figure out what the Tranche One leases is so far in the expert reports that I have read.
Q And what do you mean by that?
A Well, Mr. Chavarria and Mr. Lundelius, Mister -- and Mr. Lundelius's report, footnote 24, deposition page 183 says he wasn't able to pick out the Tranche One leases in his calculations.
Q But you didn't take into account the Tranche One leases in your calculations; correct?
A No, I -- I had the same problem they did.
Q All right. Let me go back to this divided by 12 where you said the Andersen report took that approach. Could you actually grab the report and identify for me the --
A I think it had to do with a daily average. Let's see if I can find it here.



Q Okay.
(Witness reviewed the document.)
A Okay. If you look at Attachment B-1, page 1 of 6, page 11 on the Andersen report.
Q Whatever I did with it. Oh. Here it is. B-1. I'm sorry. Page which?
Page 11 at the bottom, B-1, 1 of 6 at the top.
A Uh-huh.
Q In the third paragraph, it says below is a summary of detailed procedures applied to investment yield analysis.
A Uh-huh.
It says we calculated interest yield for each appropriate -- for each appropriation for each fiscal year based on total interest postings to the general ledger divided by the average daily balances. So they used an averaging technique to do that type thing.
Q Okay. Do you have any other examples?
A If I went through the whole report -- do you want me to take that kind of time?



Q Not really.
A I'm glad you said no.
Q But to your knowledge right now, this is -- this is the one that you can point to?
A Well, that's the first one I found. You know, there may be more. I don't know.
Q But you are not certain?
A I can't remember but I actually remember recalling that they had used some averages.
Q Okay. Let's take a look at -- in terms of your Schedule A of your -- in your report, I think we already addressed the -- well, yeah, well, we addressed the source of your information, that being the Arthur Andersen report; correct?
A That's correct.
Q And so you relied on the Andersen data for your calculations and conclusions results?
A No, I didn't rely upon the calculations for my conclusions results, I relied on them for the amount of investment lag that had occurred.
Q But in order to do that, you needed to rely on -- you used their data?

A That's what I said, I relied on it for their investment lag.
Q And you are confident in your conclusions results based on that data?
A I think they are a good estimation.
Q Let me ask you this: What do you consider to be a reasonable deposit lag time?
A One day.
Q Okay. And what's your basis for that?
A I don't see any reason why they couldn't make a deposit within one day.
Q In your calculations in Schedule A, you calculate lost interest for any deposits beyond a zero day lag time; isn't that correct?
A I do.
Q Why is it that you do not provide some credit for what you consider to be a reasonable lag of one day?
A I provide more than one day. What I do is I do an average. What Andersen report did was broke it down to 1 to 3 days. I used two days for an average on that. That gives them credit for 1 day.



On the 4 to 6, I gave them 5 days. On 7 to 10, I gave them 8.5 days. That's a day-and-a-half to take care of that. On 11 to 30, I used 20. They, in effect, got the benefit of around 9 to 10 days, as far as lag time.
Q So you feel your -- strike that.
Were there any alternative considerations that you decided in terms of what you feel is a reasonable lag time?
A No.
Q Okay. Are you aware of any of the deposit requirements at the BIA?
A Are you talking about their --
Q Procedures.
A -- internal procedures?
Q Uh-huh.
A No, I'm not.
Q Did you look into that?
A You know, Jim Parris and I talked about it just briefly but I can't remember what the results were. We just talked about where the money went to, not so much as what the procedures were as to how



they got it there.
Q And why didn't you look into that?
A I didn't see any reason it was necessary. Arthur Andersen considered this to be a lag and they had spent a great deal of time working in the BIA's records so I assumed that they knew what they were talking about, that there was a lag here.
Q And do you have any other opinions regarding deposit lag time that you haven't fully addressed today in your testimony?
A No.
Q Okay. All right. Let me ask you about your opinion regarding lost investment income. Could you provide me with a -- what's your specific opinion regarding lost investment income in this case?
A Well, let me -- if you want to spend time going over this, Kevin, you can. We are considering Schedules B and Schedule E in my original report not to have any significance anymore because we have replaced them with the schedule that's used to calculate interest lost on investment income utilizing Mr. Lundelius's rates. So if you want to



talk to them, we can, but they really, in my opinion, don't apply to this case anymore.
Q So you no longer stand by the opinions expressed?
A Well, I stand by the calculations I made, okay, but what I am trying to say is we have got better numbers now. Mr. Lundelius has given us a better bar to look at.
Q Why don't we do this: Why don't we take a brief break and I will take a look and see what, if anything, that -- given that --
A Sure.
Q -- that I want to get into. Is that fine?
A Sure.
MR. WEBB: Take a break.
VIDEO OPERATOR: The time is 15:14:48. Off the record.
(Recess.)
VIDEO OPERATOR: On the record. The time is 15:35:39.
BY MR. WEBB:
Q Before we get back into our discussion or

start our discussion of lost investment income, let me step back subjectwise for a second and ask you about -- you talked before about passed on adjustments as that item is referred to in the Andersen report. Do you recall that?
A I do.
Q Have you ever had any clients who have passed on adjustments?
A Certainly.
Q And, if so, does that indicate their records are inaccurate?
A Yes, in some -- the word "accurate" meaning perfect. Perfect, yes.
Q In the same context you used it to describe the Andersen report.
A It does mean they are inaccurate, sure.
Q Okay. Wait for Jerry to get back.
MR. ROTHROCK: Go ahead. I'm sorry.
BY MR. WEBB:
Q And before we went off the record, we were talking about the lost investment income which is tied to your Schedule B and you had indicated that --



I believe you had indicated that that schedule for all intents and purposes has been put aside based on new schedules developed as part of your rebuttal report; is that accurate?
A That's correct.
Q Does that apply, as well, in terms of the statements in your report, being paragraphs 24 through 26, as they address lost investment income, are those now put aside, as well? Do the statements made in your rebuttal report replace those?
A Well, in effect, the -- the statements that regard -- that are in my original report that relate directly to Schedules B and E, the computations and how they are computed, what my source data was for that type thing, those -- those are definitely replaced now. There may be other statements in there that relate to the condition of the records or, you know, some kind of other situation that I won't retract at this point but if I say I used an interest rate of 4 percent to calculate the amount of lost income for a deposit lag or, you know, for example, on schedule whichever it was, Schedule B, then that's



no longer applicable because I'm not trying to realize that type of thing.
Q And to bounce around quite a bit on you and I apologize for that.
A That's okay.
Q Going back to our passed on adjustment questions, were you able to issue an audit opinion when clients pass on adjustment?
A Certainly.
Q I'm jumping back to or forward or however it goes to lost investment income. Let me ask you this: In terms of -- I understand your response and I appreciate that, in terms of the text of your report as pertains to Schedule B in lost investment income. Let me just ask you one thing. In terms of your paragraph 24 of your expert report, if you could turn to that, it is page 8.
A Okay.
Q And in line 10, sort of in the middle of paragraph 24, it is the line starts with "Interest." Do you see that?
A No, I don't.



Q Okay. It is -- can I point to your document? Do you mind?
A No, I don't mind at all.
Q It is right there.
A I thought you meant the sentence started with --
Q Oh, no. I apologize. I should have been clear. In fact, why don't we just read that sentence. It say in the -- and this is a sentence in the middle of paragraph 24 on page 8. "In those cases where the rate of return the United States earned for the Osage trust funds was less than the applicable Bench Mark Rate, Arthur Andersen computed the amount of interest that The Osage Nation lost because the United States did not earn a rate of return equal to the Bench Mark Rate." Is that accurate?
A That, in fact, is what they did.
Q Did the Andersen report refer to this calculation as a calculation of lost interest?
A No, I think that's my characterization.
Q Okay. In terms of your Schedule B, which

we have talked about a little bit -- let me turn to that for just a second -- Schedule B, I think we talked about how the -- there is a clerical error, I believe, as you characterize it, for -- instead of being in 1980 fiscal year, it should be 1981?
A That's correct.
Q And then you mentioned that this chart has essentially been replaced by a chart in your rebuttal report?
A Exactly.
Q One question here, though, in terms of the accounts, is 70 -- to your understanding, is 7386 -- 7386 the only relevant account for the matters involved in this case?
A That's the -- the accounts the Tranche One money came into.
Q And those would be the -- that's the oil and gas royalties account --
A That's correct.
Q -- is that accurate? And as we have discussed, the clerical error, as you term it, for the 1980, 1981, if the calculation was done with



1981, did you perform that calculation with 1981 as opposed to 1980 fiscal year?
A I don't recall if I did or not.
Q Okay. I believe -- let's take a look at exhibit -- I should have written the number down but it is Mr. Lundelius's expert report and -- maybe Exhibit Number 8. That's what it is. Do you have that?
A I think I do, if I can just lay my hand on it.
Q Okay. And let me see if I can get a good copy of it. Okay. If we can turn to -- let's see -- Exhibit F and what do you understand this chart to represent?
A I think this is where Mr. Lundelius went back and tried to determine what he thought I should have done.
Q Okay. And what do you mean by what he should have done?
A Gotten the proper year in there instead of 1980, 1981.
Q And his calculation, using 1981, comes up



with a total loss of $3.86; is that accurate?
A Is it accurate? I don't know. I haven't tested it.
Q But what I just said, is that accurate in terms of his chart?
A You read his page correctly.
Q Okay. And do you have any reason to believe that that's inaccurate?
A I don't know. I haven't tested it.
Q Okay. Do you plan on testing it?
A No.
Q In that -- were you able to verify whether in that chart he used the correct number for 1980 -- fiscal year 1981?
A Kevin, I knew that I was going to do a different calculation after I saw what Mr. Lundelius's rate of return -- expected rate of return was going to be and I totally disregarded that particular page and I totally disregarded the Schedules B and E from that point forward.
Q So you didn't determine whether he used the correct number for 1981?



A I did not.
Q Okay. Okay. Let's move on to disbursement lag time and we will get back to lost investment income when we get to your rebuttal report, which hopefully will be shortly. Well, as I like to do, jumping back, in terms of Mr. Lundelius's Exhibit F, that being what he proposes of the recalculation of your Exhibit B, assuming he applied the same methodology that you used for Schedule B, would you agree with his result?
A I have no idea what methodology he applied.
Q But if it was the same that you applied?
A I don't have any opinion in that regard.
Q You have no opinion?
A It requires me to try to guess what Mr. Lundelius did.
Q I'm not asking you to guess, I'm saying assume that Mr. Lundelius applied the same methodology that you applied.
A I don't think it matters. We are not using that schedule anymore.
Q Well, that's -- that's fine but I mean

regardless of that, if you -- could you assume for me that Mr. Lundelius applied the same methodology for his Schedule F as you applied for your -- his Exhibit F as you applied for your Exhibit B, do you have any reason to --
A I have -- I would have to speculate.
Q Please, go ahead and speculate.
A Speculation would be if he did exactly like I did it, it may or may not have the same answer.
Q All right. Disbursement lag time. Can you provide me with your specific opinion regarding disbursement lag time in this case?
A My opinion in regard to disbursement lag time was that there had been a lag in the time that checks were issued in regard to disbursements to headright owners of the Osage Tribe that, in effect, they had lost interest on that money during that period of time.
Q Okay. And what did you do first in coming to that opinion?
A It was really just a common sense determination that I made when I discussed with



Mr. Parris the procedures involved in disbursing money. What Mr. Parris did, if you remember that document that you looked at with me, showed me how to read one of the disbursement documents and it showed where it was issued from, what the dates on it were and what I did was I said, you know, if that -- if those were the dates that it was issued and they were sent by check, in effect, there was a period of time that probably existed between the time the checks were dropped in the mail and the money was removed from the Osage accounts and, therefore, the money was received by the headright owners and deposited in their accounts.
Q Okay. What other work did you do in coming to this opinion?
A I analyzed the disbursement records for each of the Tranche One months to see how many Tranche One dollars were disbursed -- excuse me -- or Tranche One dollars were disbursed for the quarter containing the Tranche One months, excuse me, and then I looked to see what the revenues were for the Tranche One months in that quarter, and I determined



a percentage that the Tranche One revenues were of the total disbursement for the quarter that contained them. I then applied that percentage to a calculation of what I thought the lost interest was on that money for the period of days that it was outstanding, utilizing the benchmark rates, and computing a present value on that money through September 30th, 2005.
Q Okay. Let me ask you this off the bat: Have you held -- at any point held a different opinion regarding this issue than the one presented in your expert report?
A No -- well, let me qualify that. There is an error in there that Mr. Chavarria pointed out and where I put in six days of interest for $1,600, and I corrected that in my rebuttal report and it changed the total calculation by about $2,000.
Q And was that 1,600 or 1.6 million?
A 1.6 million. I'm sorry.
Q That's all right. All right. Let's take a look at your expert report, paragraphs 28 to 29.
A Okay.



Q And these paragraphs, best I can tell, address your estimations of disbursement lag time based on the disbursement of payments from the Osage account; is that accurate?
A That's exactly right.
Q Now, here we are addressing the number -- and we are addressing the number of disbursement lag days. We are only addressing the timing associated with the government's distribution plan for these checks or transfers; is that correct?
A Say that to me again.
Q Well, what I am -- we are only addressing the timing associated with the government's distribution plan for these checks or transfers, essentially how they are being distributed, we are not addressing or you are not addressing the timing associated with, say, the recipient's failure to deposit it or cash checks immediately upon receipt; is that accurate?
A No. No. What I did was I gave them a reasonable period of time that, you know, they would receive the money and deposit it and I think that

Page 274

reasonable period of time was one day.
Q And would you agree that it is out of the government's control, the recipient's failure to deposit checks or cash checks immediately upon receipt?
A Certainly it is out of the government's control.
Q And let's take a look at the travel times you estimate for the disbursements to the Osage. If we can go down -- what you have here -- checks that were mailed directly, I'm looking at paragraph 28, checks mailed directly to headright owners with the United States did not maintain an individual trust account, you estimated disbursement lag time of five to six days based on the date the checks were mailed, the day of the week checks were mailed and the city in which checks were mailed; is that correct?
A That's correct.
Q What was the basis for this estimate?
A What I did was I went back for each of those years and I looked to see what day of the week that the checks were mailed on and, in certain

Page 275

instances, those checks were mailed on a day that, let's say, for example, a Thursday, and I would have to go back and look to see which exact ones were a Thursday. If they were mailed on a Thursday, the probability is that they didn't get those checks until sometime maybe Tuesday and so they would have a little bit longer deposit lag. If they were mailed, for example, like, on a Wednesday, then they possibly would have a shortened deposit lag because they -- they might get there before the weekend. I can't remember exactly how I dropped those days in but it was, basically, on whether or not there was a weekend involved.
Q So were you looking at the actual disbursements and then estimating based on where those disbursements were going, what the time -- disbursement lag time might be?
A I didn't try to figure out whether or not it took longer to go from San Francisco to Oklahoma than it took to go from Oklahoma to New York City --
Q Right.
A -- or anything like that. I just used what

Page 276

I thought was a reasonable period of time.
Q But based on the actual disbursements?
A Based on the dollar amount that was disbursed.
Q Okay. And did you account for -- the example you used was Thursday to Tuesday or I forget what it was but it included a weekend.
A Right.
Q Now, do you give any credit in terms of lag for weekends or holidays?
A Oh, certainly. If they didn't -- if they were over a weekend, well, then, that was a lag day.
Q Okay. So that still would account against -- okay. You would still include weekends and holidays in terms of calculating loss of interest?
A Certainly.
Q How did you determine when the checks were mailed?
A Mr. Parris and I got on the phone and got a person in Mr. Rothrock's office that's a computer guru and he was able to crack the code on the five

Page 277

disk -- five Arthur Andersen disks and go in and sort out the disbursement checks and send us copies of them -- or disbursement documents.
Q Okay.
A I can't remember the exact name for the form.
Q And it is from those documents you were able to determine --
A What day of the week.
Q So is it a document -- a disbursement document and that document would have a certain date on it as to when it was mailed or distributed?
A Well, we don't know exactly what the date was it was mailed. We used the date of the document.
Q Okay.
A And that's another problem that you have got in this disbursement lag is they may have dated the document, let's say, like, on the 2nd. I don't know the checks went out that date. They may have gone out the 3rd, you know.
Q Okay. But you use the date -- the date of the document?

Page 278

A Date of the document.
Q Was there a title to the document?
A I -- we looked at one just a little while ago, if you want to pull it out. It is the one that I have written all over that I showed you as being one.
Q Okay.
A You remember that one?
Q Yes, I do.
A That's a good example of one if you want to go back and look at it.
Q Why don't we. That was included in --
A In my initial production.
Q -- your initial production of documents.
A Exactly.
Q So that would be Exhibit 2?
A I have no idea.
Q Yes, it is in the end. I remember it now. There were four documents towards the end.
A I believe it is right towards the end.
Q Whoops, not that, that's an e-mail. Here we go?

Page 279

A Yes, that's a good example. Do you want me to look at that?
Q Sure.
A It says it is a document -- let me find a form number on here. I don't see a form number. It just says voucher and schedule of payments and it talks about the distribution of funds.
Q And there is -- where is the date that you are referencing?
A The date that we utilized was September 15th, 1975.
Q Okay. That's a stamp?
A Right.
Q It says, "Paid by," and there is a stamp, "Treasury Department, Division of Disbursements, September 15, 1975, Denver, Colorado"?
A Right.
Q Okay.
A It's got Osage quarterly annuity. We pulled all of these for each of the distributions for those Tranche One years.
Q Is it possible that the --

Page 280

A Excuse me. Tranche One months. I'm sorry.
Q Okay. Is it possible that the distributions predated the documents, the actual distribution?
A You know, I -- I guess I have to answer that I don't know.
Q Okay.
A I don't know whether it would.
Q Okay. Let's go to the next one. For headright owners for whom the United States maintained an IM trust account during Tranche One years, '76, '79 and '80, the United States mailed a check to BIA officials from Muskogee, Oklahoma, who then sent the check to either Tulsa or Pawhuska for deposit. What's the basis for that understanding?
A That's my understanding from talking to Mr. Parris as to what the procedures were.
Q Okay. Did you do any verification of that?
A No, I did not.
Q Okay. "For these checks," the next sentence, I'm sorry, says for these checks, I estimated seven days before ultimate credit to the

Page 281

headright owner based on the factors noted above. Can you explain that to me, please?
A Well, it is the song and dance they had to go through and they sent them to Muskogee; Muskogee then had to get them back to Pawhuska; Pawhuska then would go through and do their work as far as crediting to the accounts and it appeared to us in my discussions with Mr. Parris, and he had worked in the Pawhuska office, that we thought that that resulted in an actually longer lag time than probably mailing out the checks did.
Q Okay. But did you have any actual information in terms of when checks were -- these types of checks were disbursed and when they were received?
A Same type of documents were prepared on the IMs and we looked at those dates and then, like it says right here, I estimated seven days.
Q Right. So I guess for -- for all these calculations, did you ever verify from the recipients as to when they received their checks --
A No.

Q -- based on the date of disbursement?
A No.
Q Okay. For the next one, it says, "For headright owners for whom the United States maintained an individual trust account during the Tranche One years of '86, '89 and '91, it is my understanding that electronic deposit was made rather than the issuance of a check." Did I read that accurately?
A That's an accurate reading.
Q And you say for these years -- actually, let me back up. What was your basis for understanding of that?
A Discussion with Mr. Parris as far as when the EFT system kicked in and actually looking at the documents that were done by EFT transfer.
Q So you saw documents, actual documents, EFT documents or disbursements for '86, '89, '91?
A I believe I did, yes.
Q Do you know whether those documents were -- pertained to the Tranche One months?
A Yes, they all pertained to the Tranche One



months.
Q Okay. I just -- strike that.
Then you say, the following sentence, "For these years, I estimated one day of disbursement lag time before ultimate credit to the headright owner." Is that based on the conversation we had earlier in terms of your personal experience with the EFT's and how long they take?
A Yes.
Q You didn't confirm that in terms of what actually happened in terms of the disbursements with the Osage, did you?
A No, I did not.
Q Okay. Were there any alternative assumptions that you decided not to make regarding these days?
A No.
Q Okay. And, obviously, these are, as you have said, these are estimates, they are not the actual dates?
A That's exactly right.
Q So there is the possibility it could be



wrong?
A It is possible.
Q Okay. And you have indicated you did not independently verify these estimated dates other than your conversations with Mr. Parris; is that accurate?
A Well, Mr. Parris didn't tell me these exact dates. They are the ones that through discussion with him as far as the procedures involved, that I thought were reasonable, so they weren't determined by him, they were determined by me based on discussions that I had with him.
Q Okay. Did you search for any actual -- I mean documentation for the actual lag time?
A No.
Q And why not?
A I don't know if any exists. You know, I guess to do it, you would have to go back and get copies of all the checks that the individual headright owners had cashed and look and see what date they were deposited and that would be a humongous task.
Q One that you did not do?



A No, I did not do.
Q Okay. Just to be clear. Now, you mentioned, I think, earlier but I'm not certain I caught it, what do you consider to be a reasonable disbursement lag time?
A I would say -- you know, I guess my reaction is the only preparation of that schedule is that we considered the fact that the government should have given the Osage credit for what they knew would be a reasonable lag time and that it would be somewhere in that range of five to six days. I guess what I am saying is they should have played the float just like a lot of businesses played the float and we couldn't see any reason why with the experience of 75 to 100 years of disbursements they couldn't have done that.
Q So to sum up, your -- you have one number for all of the different types of disbursements or in terms of what you think is reasonable or --
A I used a different number depending on the day of the week.
Q Okay. And that's based on your estimate?

A Just strictly my estimate.
Q Do you have any other basis beyond --
A No.
Q In your Schedule C calculations, what lag time did you assume as being reasonable?
A Well, for some disbursements, I assumed five days. For some I assumed six, depending on what day of the week it was. Here's the days of the week that are set out.
MR. WEBB: Let me take a brief break, if you don't mind, just for one second --
THE WITNESS: Sure.
MR. WEBB: -- while I try to locate my --
VIDEO OPERATOR: The time is 16:01:55. Off the record.
(Off the record.)
VIDEO OPERATOR: On the record. Time is 16:02:43.
BY MR. WEBB:
Q Apologize for the break. I had to locate my copy of the schedule. I have got it now. As we look -- as I look at Schedule C, page 2, and I look



at the calculations, it appears, and correct me if I am wrong, that you have calculated interest on any disbursement lags over zero days; is that accurate?
A That's correct.
Q Does that not, though, give credit for lags that you consider to be reasonable, lag time?
A Are you saying that would it have been more appropriate to say that every one of those should have been reduced by one day, for example?
Q Either that or the ones that are one day were not included or both?
A Yeah.
Q I guess that would be --
A I guess my reaction is that what I did was I tried to figure out what I thought was a reasonable lag time and that's what I used. And it seems to me if I -- if I could come up with a number that's a reasonable lag time with all the records the Bureau had, they should have been able to come up with a reasonable lag time, too, probably even get more scientific than that.
Q But the days that we have here where you



have estimated days in transit, that doesn't give credit for what you consider to be a sort of the end of -- end number of a reasonable lag time of the day, does it? Does that make sense or is that --
A Well, you asked me how many days I thought it should take for them to deposit and I said I thought they should have one day for deposit.
Q Right. Right. But these numbers here where you say you have five days in transit --
A Right.
Q -- that doesn't include the one day that you are giving as sort of a, lack of a better word, grace period?
A No. Once I thought that the -- that the person that received the check had received the check, then I thought they ought to be down there the next morning to make a deposit. I didn't say that they would have to immediately once that -- that they would have to go out and meet the mailbox every day, pick that up, immediately drive downtown and deposit it. I would say they probably deposited it the next morning.



Q Would you think it would be reasonable to make a reduction in your estimated days of transit, as far as your calculations go, of one day, for that one-day grace period that you consider reasonable?
A I think I have taken it into account. I made what I think was a reasonable estimated lag time.
Q But you had indicated that you felt that one day was reasonable; correct?
A I did and it is not included. Let's say -- let's get specific. Okay?
Q Yes.
A That five days does not include that one day.
Q Okay. And then the one days down in February, July and October of '86, '89, '90, where it says one day here, that's actually -- you had estimated actually two days of transit and you gave credit for one day?
A No. Those one days have to do with EFT transfers.
Q Okay.

Page 290

A That's the one day of EFT transfer.
Q But haven't you deemed that to be a reasonable lag?
A Sure, but that's --
Q Should that not be excluded from the chart?
A That doesn't require them to go down and deposit.
Q So your standard of reasonableness only applies to non-EFTs?
A Right.
Q Okay. So if it is a non-EFT, then you made a one-day reduction in the estimated days of transit for that grace period; is that what you are saying?
A The assumption was they can get on a day and the next morning they would deposit it. That's a one-day -- that's the one-day lag.
Q Okay. And is that -- is that mentioned in your expert report?
A I think it is. You mean talking about what I think they would do, the -- the receiver of the funds?
Q No, but as I understand, and please, you

Page 291

know, clarify it for me if I have got it wrong, but you are saying -- you are giving non-EFT fund transfers a one-day grace period.
A Right.
Q And you have told me that your estimated days in transit as it appears to your Schedule C, you essentially deducted that one day for that?
A No, that's not what I am saying.
Q Okay.
A The word "in transit" means in transit.
Q Okay.
A Okay. In my opinion, it was in transit for that period of time.
Q Okay.
A So I don't have to give them a day grace for the in transit time.
Q So you are essentially -- you are calculating interest on disbursement lag from zero days lag time?
A From the day that -- from the day that they got it -- excuse me -- from the day they disbursed it until -- through all the time that it was in transit

Page 292

and whenever it was received by the holder, okay, then that day they should have deposited it the next day.
Q So despite the fact that you have stated that one-day lag is reasonable, you have not accounted for that reasonable grace period of one day?
A We aren't going to get agreement on this.
MR. ROTHROCK: Excuse me. I think you are mischaracterizing his testimony or you are misunderstanding it or he is not explaining himself clear enough because you are just on two different points here, Kevin.
THE WITNESS: Right. What I am talking about is in transit days, days -- in transit, let me define "in transit" for you. The day the check was put in the mail, okay, or it even can be worse than that, the day the document was produced but it wasn't put in the mail, maybe it was put in the mail the next day or the day after that, through the day that it was received in the mailbox of the holder. Okay? That's what I am calling "in transit."

Page 293

BY MR. WEBB:
Q Right.
A Doesn't have anything to do with giving them time to run to the bank.
Q Okay. Let me ask you on Schedule C where you list disbursements. How did you determine what disbursements to include?
A I went through the Arthur Andersen data that was attached to Mr. Chavarria's report that showed all the different disbursements for the Tranche One leases and with Mr. Parris's help in the document -- in understanding what the documents looked like, it represented disbursements that we looked at a few minutes ago, I went through and figured out which ones those were and that's the ones that I listed.
Q And how did you determine that these disbursements were distributed in ways that you have assumed based on your estimated dates?
A Because when you -- remember the document we looked at a minute ago? That's a document that shows they were mailed. Okay? The documents that

shows that they were EFT transfers are different. The documents that shows that they were transfers to the IM accounts are different.

Q Okay. And were you able to ascertain whether these disbursement amounts related to the Tranche One leases?

A Well, they were disbursed for a Tranche One lease disbursement period. Okay? To me, that's for a Tranche One lease.

Q Could that have included moneys in addition to the Tranche One leases?

A Sure.

Q And then we have noted here the third amount in -- for February 20th, 1986, the one -- $1,666 -- 656,296.66, that amount is not actually disbursed but it is an investment?

A It was an investment transaction. And I used it on this page to calculate the interest amount but I did not use it on the subsequent page to calculate the percentage of the distribution to the total revenues, so it was just an oversight.

Q Okay. For this -- you state that you --



this calculation of disbursement lag time is based on Arthur Andersen data. What data did you rely on?

A Well, let me say when I say, "Arthur Andersen data," the source of it was the data that Arthur Andersen had accumulated in putting together their analysis. Okay? The actual data was a document that was initiated by the BIA, so it was a BIA source document that was accumulated by Arthur Andersen.

Q Okay. Let's look now at your paragraph 27 of your expert report and in that paragraph, you refer to the term "lost interest." And I want to ask you what is your basis for assuming that funds should earn interest between the time a check is issued and the date that it is cashed or canceled?

A It seems pertinent to me that the government would play the lag time just as much as anybody else plays the float.

Q And what is your basis for -- basis for saying the prudent -- what the prudent course of action would be?

A Well, their purposes, I would think, were



to try to earn as much money for the Osage Tribe as they could and a prudent way to do that would be to calculate the period of time of float that they have got, take advantage of it.

Q And then you mention what anyone would do. What do you mean by "anyone"?

A A prudent investor.

Q A prudent investor. And where did you develop -- where did you pull that standard from? Did you have any resource for that standard?

A Just makes sense. People do it every day.

Q What do you mean by "people do it every day"?

A Well, people invest large amount of moneys, if you have ever been around large corporations, especially back in the seventies and eighties, they knew exactly what their float was and they knew exactly how to make it pay and they utilized those floats to make more money.

Q Is that your understanding of how trust funds are maintained?

A You know, I can't say that -- well, let me



put it to you this way, all right? The trust funds that I utilize, I play the float on it as much as I possibly can.

Q And when you say, "play the float," what do you mean?

A Well, if I -- I know that when I issue my distribution checks, I send out distribution checks to probably, I would guess, 3,000 people and probably 500 of those corporations, 2,500 of them are individuals. I only move the amount of money at the time that I think it takes to cover it before those checks start getting cashed and I keep it invested until that time and then when I see that that amount of money -- then when I know that that amount of money is going to start hitting the bank, I move a portion of it over there to where I think that it will cover the checks that are going to hit during the two- or three-day period. Once that time period passes, I know that I'm going to have another group of checks that are going to start to hit and I will move more money over there. So I try to keep my money invested as long as I possibly can.

Page 298

Q Is that standard industry practice to your knowledge?
A I don't know. It seems like it ought to be. I think -- I think you will see corporations use it a whole lot.
Q But you are -- you don't know whether it is standard industry practice?
A No, I can't say that.
Q Do you know whether it is -- what the practices are of the federal government in its management of trust funds?
A No, I don't.
Q Let's take a look at paragraph 30, which is on page 10. How did you calculate lost interest as part of this lost -- disbursement lag time analysis?
A You go back to Schedule C, Schedule C will tell you is that I estimated the number of days that it was out -- that the float was in effect. I multiplied the benchmark rate times the total dollar amount that was outstanding and then multiplied that times the number of days in transit over 365 to get an interest rate that was effective to those number

Page 299

of days. Then when I got that in transit number of interest amount for those in transit days, I then, from that date forward to 2005, I computed the present value of that utilizing the benchmark rates or utilizing the Treasury yield rates for years after 1994.
Q In terms of the interest, the lost interest, why didn't you use 4 percent like you did with the deposit lag time?
A Well, you know, this is a question that speaks to a lot of different criticisms of my use of the benchmark rate or the Treasury yield. You know, the assumption I used was that the period of time that that money was -- if they had been done it properly and played the float, they probably would have used that money as a benchmark rate because the benchmark rate was where they had their money invested. Okay? Now, after that point in time, that money was never paid out to the Osage and it still hasn't been paid out to the Osage. As a result, it still should be sitting there and accumulating money at the benchmark rate.

Page 300

Q Well, and I believe I understand what you are saying but in terms of going back to the 4 percent, if this was money -- as you mentioned with the trust fund that you are involved with, you will hold onto funds until they are cashed -- you believe they are going to be cashed.
A Right.
Q Wouldn't that require a fairly short-term investment rate --
A What I have got --
Q -- or investment?
A I have got my money in two different things. Okay? I have got -- the portion that I consider to be a long-term, I will put in long-term type investments. The portion that I don't consider to be long term, I will put in a short-term government money market account. And the moneys that I then put into the checking account also draws interest. So what I will do is I will have enough money in the short-term government account to cover my disbursement for that period of time. I'll transfer it over, as needed, to the checking

Page 301

account. If there is any lag in the checking account, then I will pick up the interest in the checking account in addition to playing the float on the initial transfer.
Q Okay. To your -- to your knowledge -- I think you have mentioned this before, that prior to, I believe, it was '85, there is a 4 percent interest that could be gained on the cash funds.
A That's correct.
Q And that post '85, the overnighter rate was available for cash funds; is that the way --
A I believe that's correct.
Q I believe you addressed present value here already as to how you came up with that and that being the application of the benchmark rate until '94 and then the seven-year T bill from '95 to 2005; is that accurate?
A That's correct.
Q And that's a similar calculation to what you did for Schedule A?
A Very, very similar.
Q Okay. Let's take look at paragraph 27.

Page 302

Step back just a little. I'm trying to keep our disbursement lag time regarding cash checks separate from our discussion of disbursement lag time regarding canceled checks. In 27, you refer to -- the last paragraph you refer to checks that were never cashed and ultimately cancelled; is that correct?
A In paragraph 27?
Q Yes, the last sentence.
A Let's see. Yes. Uh-huh.
Q And then you reference April 1st, '91.
A Right.
Q And does that go back to -- I believe it was that e-mail that we saw before from Jim Parris which referenced April 1st, 1991.
A That's correct.
Q Is that where that comes from?
A Right.
Q One -- and I think -- strike that.
Can you do me a favor? Go into your Schedule C, page 2.
A Okay.

Page 303

Q And I know you have -- you have addressed this but, unfortunately, it is probably something that's over my head so I was wondering if you wouldn't help me again in terms of understanding how you came up with the number percent for Tranche One month.
A What I did was I took the -- really you need to go to Schedule -- page 1.
Q Schedule C?
A Schedule C.
Q Okay.
A What I did was I took the Tranche One revenues for the Tranche One month of January 31st, 1976, for example.
Q Uh-huh.
A Okay? And that was taken from the Arthur Andersen report. Then I took the total distribution that was made at June 15th, 1976, which, by procedures, would have been the distribution that took into account the Tranche One month. And I said, in effect, that a million-five divided by 5.2 million was a percentage of 30.08 and so then I applied that

Page 304

30.08 to the present value of the Tranche One dollars and said -- or excuse me -- to the disbursement for the Tranche One period and said that's the amount of those Tranche One dollars that were in lag for the Tranche One month.
Q Okay. Did you contemplate any alternative approaches?
A Not at this time.
Q Okay. And why did you do it this way?
A Made sense.
Q Okay. No other basis than it just made sense?
A No.
Q Okay. Let's go to paragraph 31 and the first sentence here, you state -- it is page 10 of the expert report -- "Based on the available data, I have estimated that the amount of the checks that were not cashed for a given fiscal year containing a tranche one month to be 1 percent of the total disbursements for Osage trust account 7386 for that first fiscal -- for that fiscal year as set forth in the reconciled financial statements prepared by

Page 305

Arthur Andersen." Did I read that correctly?
A That's correct.
Q Now, why did you make this assumption?
A You have seen the e-mail going back and forth. We were trying to figure out what was happening on the canceled checks. We were not able to find any definitive data on what happened on the canceled checks, so as a result of that, we wrestled with a way to be able to demonstrate what the problem could be and utilized 1 percent as an estimate.
Q And how did you come -- how did you -- what's the basis for the assumption of 1 percent?
A It was just a number that I thought, if any other number was a multiple of it, it would be easy to calculate. If we found a number that was more appropriate, for example, if somebody said the number actually should be 2.3 percent, it would be very easy to go in and redo my calculation by multiplying it times 2.3. It was just a handy number. It was a rough estimate based on the best I could come up with.
Q Is there any other basis for it?

A No. You know, if I used, for example, uncashed checks in my trust that I work with, it would be -- it would be a lot higher than that. We would be talking about a 15, 20, 25 percent rate. I felt like it was very conservative.
Q But in terms of as it relates to the actual percentage of canceled checks for the Osage trust account, there is -- you made no inquiry into the actual percent of total disbursements for the Osage trust account that were canceled, did you?
A We did make inquiry. We tried to find it. You know, we tried to find if there was data out there that would show us what it was. We couldn't find it. I don't think Mr. Chavarria has been able to find it.
Q So you weren't also -- also, you weren't able to verify, then, this 1 percent as being accurate?
A No. No, I wasn't.
Q So it is a possibility it could be wrong?
A It is possible.
Q Now, you also make the assumption here



where you say applies to -- well, you say in the first part of the sentence, "Based on the available data." What is the data you are referring to?
A The -- the data that showed us what the disbursements were. That was the Arthur Andersen report and their -- what you call their summary.
Q Did that give you any indication as to what the percent of canceled checks would be?
A No.
Q Okay. And the assumption, as you state here, applies to the given fiscal year containing a Tranche One month; is that correct?
A That's correct.
Q Now, why did you develop an assumption specifically addressed the Tranche One months instead of the entire year in which they occurred?
A Well, I did, in effect. Okay? What I did was I took the 1 percent rate -- do you want to go back to the schedule and look at it?
Q Yes. Yes.
A Let's do that. That would probably be the easiest way to demonstrate it for you.



Q We are talking about Schedule D; is that correct?
A Yeah. I think it is -- yeah. What I did was I said for Tranche One month January 31st, 1976, and I took the fiscal year disbursements of 20,723, estimated amount of cancelations of 207,233 --
Q Right.
A -- and then I calculated the amount of benchmark interest --
Q Right.
A -- and then computed the present value.
Q Okay. I guess my question is instead of taking the disbursements for the entire fiscal year, why didn't you look at the disbursements for the Tranche One month?
A Well, that's -- let me look at something right here, I think, to answer your question. There was a summary report, I think, took that into account. Now, I would have to go back and look. I was thinking I divided by 12 to get the Tranche One month but I may have left it at an annual amount. I can't remember exactly how I did that.



Q How you did what? I'm sorry.
A Well, what I was going to tell you is that I thought that I divided the amount of interest for the Tranche One year by 12 --
Q Uh-huh.
A -- to come up with the amount of in transit interest.
Q Right.
A But I can't prove that to you by looking at these sheets right here and I thought maybe I might have done it on the summary schedule but I don't see it over there either.
Q So --
A But I think that's what I did.
Q What you did -- on this sheet, there is a missing calculation --
A Right.
Q -- that leads to the end result and that's the -- the divide by 12?
A I think so.
Q Are you able to take a look at maybe one line and determine --

Page 310

A No, because where it is buried, it is buried in that present value calculation. In other words, if you look at the estimated amount of collections of 207, which is -- let's take January 31st, 1976, take 1 percent of that -- of 20 million, you come up with $207,000.
Q Right. Right.
A You multiply it times the interest benchmark rate and you say the interest on the in transit days, in effect, was $214,000 for the Tranche One year.
Q Right.
A Okay? And then you do a present value calculation on that. I think in there I did a one-twelfth calculation before I present valued it.
Q Okay. So what's missing is a column here after the column that says interest on in transit days which would essentially be divided by 12?
A 12.
Q And then from that number you calculate the present value?
A Calculate the present value. I believe

Page 311

that's the way I did it. I can't swear to you from looking at this schedule right now.
Q Again, you feel that would be an accurate estimate as to the canceled checks for a Tranche One month?
A It is an estimate. That's what it is.
Q So it -- as an estimate, it could be wrong?
A It could be, yeah.
Q One thing, let me ask you about the columns here on Schedule D. Where you have the column that says interest on in transit days --
A Right.
Q -- is that actually principal plus interest on in transit days?
A Yes, it is.
Q Okay.
And your present value calculations were conducted on that principal plus in transit days?
A That's correct.
Q Okay. Look in your expert report, paragraph 31. You -- and I guess it is the second sentence, about one, two, three, four, five, six

Page 312

lines in, you mentioned July 1st, that you assumed that checks were not cashed for issued on July 1st of a given year.
A Okay.
Q Do you know why -- can you explain to me why you made that assumption?
A Well, I think in 1976 is where I got started using that because I think that was the year they were still on the old fiscal year basis and so I just used that as a date from that year forward.
Q And I'm sorry, I don't follow you.
A Well, the government was on a fiscal year that ended June 30th at one time.
Q Okay.
A In 1976, they switched out of it the last quarter of 1976, so I started using that July 1st date for 1976 and I continued to use it for the remaining years.
Q Okay. Okay. But that -- did the fiscal year change --
A Yes.
Q -- over the last --

Page 313

A After 1976.
Q Okay. And how did you calculate lost interest? You did it at the benchmark rate?
A Yes, the benchmark rate for the number of days in transit.
Q And did you ever consider using the 4 percent rate as you --
A No, I did not.
Q Why not?
A I stopped -- benchmark rate was a more representative number.
Q Representative of what?
A The amount of money that they could have earned if they had invested the money.
Q And this Schedule D, it is -- the title is "Calculation of Interest on Canceled -- Cancelation of Disbursements based on Arthur Andersen Data"; is that accurate?
A That's correct.
Q Do you know what Andersen data you relied on for this?
A I think it was from the data in the Arthur

Page 314

Andersen supporting documents that were in Mr. Chavarria's deposition attachments, if I remember right.
Q Okay. And we talked about the present value calculation and here that was done with the benchmark and then seven-year T bill, similar to what you did with the -- with Schedule A and Schedule C; correct?
A That's correct.
THE WITNESS: Is this a good time for a break?
MR. WEBB: Yes, certainly.
VIDEO OPERATOR: The time is 16:33:27. Off the record.
(Recess.)
VIDEO OPERATOR: On the record. The time is 16:56:02.
BY MR. WEBB:
Q Let's take a look, expert report, paragraph 33, which addresses Schedule D, and in the first sentence, you note, "Schedule D summarizes the present value of the interest lost due to

Page 315

disbursement lag time for checks that were not cashed based on the assumption that the funds for those checks were not, underscored, restored to the Osage trust account." Is that an accurate reading of what appears in the report?
A I believe that's correct, uh-huh.
Q And why did you assume that the funds for canceled checks were not restored to the Osage account?
A Because I couldn't -- nobody could tell me that they were restored.
Q So you weren't able -- were you able to verify whether or not the funds for canceled checks had been restored?
A No, I wasn't.
Q Are you aware of the -- is it possible -- so that's an assumption on your part and that assumption could be wrong?
A Could be.
Q And if it were wrong, if the canceled checks were restored, would that change your analysis?

Page 316

A It would.
Q And is that noted in your report?
A It says, as shown on that schedule, the principal of those canceled checks is $2,216,293.
Q So that would be what would be taken out of the account?
A The amount that would have been restored if it hadn't been, if it was restored fully.
Q And I see here on the last sentence of 33, assuming the funds were restored, the present value of the lost interest is $4,720,441?
A That's correct. Actually, that's correct as of April 1, 1991. It was 11-million-728 as of September 30th.
Q Okay.
A There is two different dates there. One is cut off as of 1991, the other one is cut off as of September of '05.
Q And why did you do that, actually?
A Because -- because of the e-mail that we had received from Mister -- Mr. Parris that indicated that they may have been restored after that date.

Page 317

Q Going to Schedule D, the column which is interest on in transit days, I think we noted, we already talked about the fact that it includes principal, as well.
A That's correct.
Q How did you calculate the interest on in transit days?
A Let's see. You know, the exact computation, if I remember right, was based on the number of days that it took to go to the end of the fiscal year, in other words, from January 31st of '76 through the end of the fiscal year divided by 365 to get the initial in transit interest.
Q And why did you take that approach?
A The -- I'm going to back up. I can tell you that it was an allocation of days times the interest rate but I would have to go back and look and see exactly how I did that. I can't remember exactly what the procedure was. But I took an allocation for a portion of the year based on the time the disbursements were made and they would be outstanding to the end of the year. That's probably

about the best explanation I can give you at this time. In other words, I just didn't say, okay, on that January 31st, they were outstanding for a full 12 months until the next January 31st. I took them to the end of that fiscal year and then did a present value calculation on them from the end of that fiscal year.
Q Okay. In your expert report, you note -- I think we have already gone over it -- in paragraph 33, April 1st, 1991 is the date?
A Right.
Q But on your chart here --
A It is.
Q -- Schedule D, it is April 1st, 1990.
A It is a typo. I think we talked about that a little while ago.
Q I apologize if I'm reasking it. It is getting late in the day, as we all know.
A I understand.
Q Okay. Do you have any other opinions regarding disbursement lag time that you have not fully addressed in your testimony today?



A No, I don't.
Q We will leave disbursement lag time now. I want to ask you about your next opinion. That involves lost investment income on cash funds. And I know you made a statement as to referencing Schedule B on a lost investment income and the language in the report as it addresses lost investment income. I'll give you the opportunity now, if you want, to address the relevance of Schedule E, as in eagle, and the language regarding it in your report.
A Yes. Schedule E, you know, as far as the calculation that we have used in Schedule E, it's been replaced by what we have included in the rebuttal report. B and E both were replaced by that. As far as any basic comments, I don't think I have any change in the basic comments, it is just the schedule has been replaced.
Q Okay. And -- and I apologize for going over this again but just to be clear, on Schedule E, there is a, as you term, a clerical error --
A Right.
Q -- in that 1980 fiscal year was used



instead of 1981, which is the appropriate fiscal year for the Tranche One months.
A That's correct.
Q Is that accurate?
A Uh-huh.
Q Okay. And did you recalculate your Tranche One gain or loss on income with using the correct fiscal year of 1981?
A I don't believe I did.
Q And let's take a look at Mr. Lundelius's report, which I believe is exhibit -- I believe it is exhibit -- I don't remember but you probably have it right there. It is Number 8.
A Yes.
Q Take a look at Exhibit -- Exhibit F. No, not Exhibit F. Exhibit F-2. Do you have that?
A I do.
Q Okay. And looks like the first one, two, three, four, five, six columns are identical to columns and information that appears in your Schedule E; is that correct?
A I'll have to look here and see.



Q Okay.
A No, they don't appear to be the same.
Q Okay. Can you tell me what the difference is?
A Well, his calculated interest at benchmark rates is different. First column, not the year column but the first calculated column.
Q I do see that. Okay.
A I think that's straight out of the Arthur Andersen report but I'm not positive.
Q Let me take you to one, two, three, four, five, six -- the sixth column over, which is the Tranche One gain, loss and income as computed by Jay on this Schedule E. Do you see that?
A I do.
Q Does that column -- is that column identical to the column that you have in your Schedule E?
A The Tranche One? It is except for the '80-81 period. I don't know how he did that with his first numbers being wrong.
Q Well, putting the numbers aside, that --

that second-to-last column, I think, it is the one two, three, four, five -- the sixth column is identical to yours; is that correct?
A Yeah, he evidently took my numbers and jotted them down.
Q Okay. Have you done a recalculation -- I apologize if I have asked this. Again, it is getting late. Have you done a recalculation based on the 1981 fiscal year based on this chart?
A No, I haven't.
Q Do you know whether a recalculation of that number using the correct fiscal year results in a positive or a negative number?
A No, I don't.
Q Okay. In paragraph 36 on page 11 of your expert report --
A Okay.
Q -- the last -- actually, the last few words on that page, where it says, "based on available trust records and other available information," on the second page --
A Okay.



Q -- what did you mean by "trust records"? What documents are you referring to?
A The information that Arthur Andersen had put together in their report.
Q Let's take a look at Schedule F now of your expert report. Is this -- are you still relying on this expert report -- on this schedule in your expert report, given the changes or the withdrawal or however -- I'm not certain what term -- I'll let you use the term -- how you are treating Schedule B and Schedule E?
A Yes, we treated Schedule B and E in my rebuttal report, I think the term we used was that they were "moot."
Q So is this still a -- should we still be referring to this Schedule F in your expert report, given that Schedule B and E --
A Schedule A I don't think is changed. Schedule C has changed with the correction that Mr. Chavarria pointed out to me. Schedule D I don't think has changed. Schedule E is no longer appropriate, not is Schedule B.



Q Okay. And the Schedule D cancelation of disbursements, that assumes the canceled checks were not credited back to the account; is that accurate?
A I believe that is the number that includes that. Let me look and see.
Q Okay.
A That's correct.
Q Okay. And this number -- granted that this number is changed, that your total number -- your total for Tranche One year interest loss, gain, present value, as we look at the total horizontally and total vertically in the bottom right corner is $12,205,404.76, I assume since you have replaced -- you have replaced Schedule B and Schedule E with schedules from your rebuttal report, that figure is now changed; is that accurate?
A It is, uh-huh.
Q Of the figure that's currently represented here, the $12 million figure, would it be accurate to say that about 95, 96 percent of that figure is represented by the cancelation of disbursements number?



A I don't know what the exact percentage is but it is probably somewhere --
Q In that ballpark?
A Uh-huh.
Q And the -- the $2,216,000 figure that you use for cancelled checks, as I think we have already discussed, that was -- that's moot if the funds were part of the account; correct? I'm referring -- it is on -- I apologize -- page 10, paragraph 33 of your expert report.
A If those funds had been returned, obviously they are not owed to us.
Q Okay. Are you familiar with other experts in -- in the field dealing with subjects such as this who have analyzed these types of issues?
A No, I'm not.
Q Okay. Let me ask you, you have, I believe, testified that you have reviewed the expert reports of Mr. Chavarria and Mr. Lundelius and you were present at -- or you were present at the deposition of Mr. Chavarria; is that correct?
A I was.

Page 326

Q And you reviewed the transcripts of their depositions in this case?
A I have.
Q Okay. What is your opinion of Mr. Chavarria's credentials?
A He is a CPA. I respect that credential.
Q Is he better qualified than you to address the Arthur Andersen report?
A Does he know more about the detail behind it? Probably so. Uh-huh. I would hope so.
Q Is he better qualified than you to address deposit lag time and disbursement lag time?
A I don't know.
Q Do you think he is more knowledgeable than you with regard to deposit lag time and disbursement lag time?
A I don't have any idea.
Q Okay.
A You are asking me to read his mind.
Q I'm just asking for your opinion. What about Mr. Lundelius; do you believe that he is better qualified than you to address the prudence of an

Page 327

entity's investment practices?
A I don't know.
Q Do you know if he is more knowledgeable than you regarding the prudence of an entity's investment practices?
A I don't know.
Q Do you know if he is better qualified than you to address lost investment income?
A I don't know.
Q And what about addressing lost investment income on cash flows?
A I don't know.
Q Same response? Okay. Okay. We are in the home stretch. We have already introduced Exhibit 4, your rebuttal report, and that was filed in response to the expert reports of Mr. Chavarria and Mr. Lundelius; is that correct?
A That's correct.
Q And in your rebuttal report on paragraph 1, you define the Tranche One leases; is that correct?
A I do.
Q That information was not defined in your

Page 328

initial expert report; correct?
A Are you saying the fact that I didn't say there are five specific leases?
Q We can strike that. Strike that.
MR. ROTHROCK: Kevin, do you have an extra copy of that? I didn't ask for one at the time but maybe now it will speed things up.
MR. WEBB: I'm sure I do. Lots of copies here. There you go.
MR. ROTHROCK: Thank you.
BY MR. WEBB:
Q If we take a look at the rebuttal report, paragraph 5, which appears on page 2, you state that Mr. Chavarria -- in the first sentence, Mr. Chavarria did not -- however, did not use actual data concerning the Tranche One transactions. How do you define "actual data"?
A Well, what Mr. Chavarria used in determining deposit lag time was an estimated date of receipt of funds that was utilized in the Arthur Andersen report and an estimated date that those -- those funds were deposited. There hasn't been any

Page 329

substantiation provided as to what the actual date of receipt and the actual date of deposit were.
Q And how do you define the Tranche One transaction?
A Tranche One transactions were the transactions from the five leases that existed for the Tranche One months and that's a further problem with Mr. Chavarria's data because it is hard to break down -- probably can't be done -- break down the Tranche One leases out of that amount of income that was received from a payor that included a Tranche One month. He and Mr. Lundelius both just assumed that if Phillips was making a check payment, that it included all the Tranche One month money plus any other money and didn't try to separate the two.
Q And I apologize; I didn't -- I should have prefaced it, this section deals with lost interest due to deposit lag time.
A Right.
Q I know we are aware of it but just for the record. I apologize for stepping back like that. Let me ask you, how do you know that Mr. Chavarria

did not use actual data concerning the Tranche One transactions?
A Well, first of all, I reviewed the same information that Mr. Chavarria used and I looked at those documents. There is nothing to support the actual date that shows when that money was received or the date that it was actually deposited.
Q So you reviewed all the documents that Mr. Chavarria has disclosed as part of this case?
A As far as collections for the Tranche One months.
Q And does that include the transaction documents used by Mr. Chavarria identified as Exhibit B-1?
A It includes some of those documents on B -- Exhibit B-1. You are talking about B-1 of his original report.
Q Yes. Yes.
A Includes some of those documents. They are included in that list.
Q You don't consider those to be actual?
A Well, like I explained, they are not actual



from the standpoint of knowing exactly when the checks were received, not knowing exactly when the checks were deposited, not knowing exactly when those checks -- when the moneys that were deposited started earning interest or not knowing exactly if they included just Tranche One leases or if they included other leases or if they didn't include some of the Tranche One leases.
Q Okay. Do you have an understanding of when the Tranche One month royalties were collected?
A When they were collected?
Q Uh-huh?
A Generally, they were collected the 25th of the month following the Tranche One month.
Q Do you make an assumption in your calculations regarding which months were relevant for collections?
A I don't understand that question.
Q Well, I don't either. So I'll trying it --
A At least we are on the same page.
Q Did the -- the collection months that you considered, were those the same months that were used



by Mr. Chavarria?
A Well, if you are talking about in my rebuttal report as far as computation of some of these items, I utilized a full year in certain circumstances. In some circumstances, I think I may have used a Tranche One month. It depended on which item we are looking at.
Q Okay. That's fair. Were you able to identify the relevant trust account used for the collection of Tranche One royalties?
A Are you talking about account 7386?
Q Yes.
A Sure.
Q Did Mr. Chavarria use collections for the relevant collection months into this -- into this account?
A It looks like he did, yes.
Q Okay. In the second sentence of paragraph 5, you start off by saying, "In order to compute lost interest in that manner, Mr. Chavarria would have to determine for each Tranche One transaction," three things. What did you mean when you stated, "in order



to compute lost interest in that manner"?
A Well, we are talking about deposit lag time and the concept is that the money came in and didn't get deposited on a timely basis. And in order to know whether or not it got deposited on a timely basis, you would have to know the exact date that the United States collected the payment. You would have to know the exact date that the United States deposited the payment. You would have to know the amount of each royalty payment for the Tranche One leases. And none of that data is apparent from the documents that Mr. Chavarria had and they did use what's called an apparent posting date to determine all that.
Q Who is "they"?
A Arthur Andersen.
Q Okay. We are talking here about Mr. Chavarria.
A Well, he, in fact, used the same date. He used the apparent posting date.
Q Okay. We will get to that in a second. Can -- are you saying can actual -- can lost interest

be computed without these three items: The date the U.S. collected royalty, the date it deposited it and the amount of each payment?
A Well, I think if you are going to calculate accurately, you have to know those dates.
Q Okay. And -- and going back to your expert report, your initial expert report, Schedule A, can you pull that up for a second? Do you still have that?
A Sure. Okay.
Q And here you calculated -- calculation of lost interest based on the Arthur Andersen deposit lag time data; is that correct?
A That's correct.
Q For this calculation, did you determine the dates of collection?
A No.
Q Did you determine the dates of deposit?
A No.
Q Did you determine the amount collected for the Tranche One leases?
A No.



Q And why not?
A Because I used the Arthur Andersen data and they didn't determine those items and they said they couldn't determine them.
Q Did you search for that information?
A No, I did not. I -- well, yes, I did. I searched through Mr. Chavarria's supporting documents for it and it wasn't there.
Q Did you look for any additional documents?
A No, I did not.
Q Why not?
A I didn't have any additional documents that would help me with that.
Q I'm sorry. You say they didn't or --
A I did not have any additional documents.
Q Did you inquire of your attorneys to search for additional documents that would provide you information regarding the dates of collection, dates of deposits or the amount collected for the Tranche One leases?
A No, I did not.
Q Ad why not?



A I didn't consider it probably to be available. Arthur Andersen said they couldn't find it.
Q Okay. Let's go back to the rebuttal report and paragraph 6 and, actually, now I remember, I just got a note saying five minutes left on the tape, so why don't we take a real brief break and let the videographer change the tape.
VIDEO OPERATOR: This ends tape number three of the Jay deposition. The time is 17:22:33. Off the record.
(Off the record.)
VIDEO OPERATOR: On the record with tape number four of the testimony of Stephen Jay in the matter of Osage Nation versus United States. The date is December 7th, 2005. The time is 17:24:16.
BY MR. WEBB:
Q Take a look at paragraph 6 of your expert report -- I'm sorry -- your rebuttal report. And I'm looking at the first sentence here. You state, "Trust records do not contain actual royalty amounts and dates." What is your basis for that statement?



A My review of the documents of Mr. Chavarria that we previously discussed that he attached as exhibits to his report.
Q And did you verify that statement as accurate as it pertains to the Tranche One months and leases?
A I did.
Q I'm sorry.
A I did.
Q By looking at actual data?
A I looked at Mr. Chavarria's supporting documents.
Q And in the second sentence, you state the records generally contain only the date that BIA prepared a bill of collection and not the date of the actual collection. Is that accurate?
A I think that's accurate.
Q I may have paraphrased and I apologize. Can you define the term -- what you mean by "generally"?
A I don't know if it is that way in every case because toward the latter part of the -- for

Page 338

example, the latter period of time, they started being received through EFT transfers and probably in those cases, you know, that was the date of -- of collection. It probably was a one-day lag but that was probably very close to the date of collection.

Q What's your basis, though, to say, "generally"?

A Because of the fact that it includes the EFT transactions, too. I could have gone through, I guess, and specified that it would be through a period until EFT transactions took place, which I think was about 1986 or so.

Q How many records did you review?

A I reviewed every one of the documents that Mr. Chavarria and Mr. Lundelius relied on to support their receipt of funds for Tranche One months.

Q And how did you verify that the date that BIA prepared the bill of collection was not the same as the date of the actual collection?

A Well, first of all, there is nothing in there to show what the actual date of collection was. That's number one. Second thing is that Arthur

Page 339

Andersen said that they used the apparent date, which is the date of -- that they were posted to the accounts. Second thing is if you go through there and you inspect those documents rather closely, there is a lot of indication that some of those checks were for periods of time prior to the date that bill of collection was made up.

Q And you -- did you verify the statement was accurate as pertains to the Tranche One months and leases?

A Yes. That's what I am making the comment about.

Q What is your understanding of when a bill of collection is prepared?

A I guess my understanding is that the bill of collection is prepared sometime at the time the money is received, somewhere in that vicinity. I don't know if it is the exact date -- holds -- stays in somebody's drawer for two or three days or whether or not it is done immediately upon the time that it hits the door.

Q In your calculations for your reports, what

Page 340

documents did you use to establish the date of the actual collections?

A I used the same dates that Mr. Chavarria used and that's the date that it was on the bill of collection.

MR. WEBB: Could we take a break?

MR. ROTHROCK: Oh, sure.

MR. WEBB: Just real briefly.

VIDEO OPERATOR: The time is 17:27:58. Off the record.

(Recess.)

VIDEO OPERATOR: On the record. The time is 11:31 -- I'm sorry -- 17:31:46.

BY MR. WEBB:

Q Okay. We are going to shift gears here and talk about investment income, your opinions regarding lost investment income and the prudence of investments. Looking here at paragraph 29, page 10 of your report, where you state that, "In his analysis, Mr. Lundelius fails to see the 'forest for the trees.'" Would you please explain to me what you mean by "forest for the trees"?

Page 341

A Well, what Mr. Lundelius did is he went in and worked out a bunch of CDs and Treasury bills to reach a rate of return that he thought was approach, but he failed to see the fact that for those Tranche One years, that very rarely were those rates appropriate to what The Osage Nation received on those funds.

Q And in terms of your statement -- let me find out where it is here. Let's see. One, two, three, four, five, six -- the sixth line down in paragraph 29, the sentence starts a little off to the right where it says, "The reality as to the operation of the Osage trust account is that funds are received continuously from oil and gas leases and, as a result, the quarterly distribution does not deplete all the funds in the account." Did I read that accurately?

A You did.

Q What is your basis for that statement?

A I performed an analysis of the accounts for the Tranche One years and looked to see whether or not those funds, in effect, were completely depleted

Page 342

at the lowest point of any day in that year.
Q Okay. What percentage of the funds are disbursed from the account, do you know?
A Can we go back to my schedule so I can -- that's a lot of numbers and I can't memorize all those.
Q Sure.
A If you go back to Schedule D, there is three pages, I believe, of this schedule. The lowest fund balance for fiscal year that runs from 7/1/75, and that's the unusual fiscal year again, to 6/30/76, the lowest balance in that year was 3.381569154 and that happened at 6/15 of '76. That, compared to the total fund balance, the highest fund balance was, looks like, $8,623,000 on 5/27, so if you compared the lowest to the highest, approximately 40 percent of the account was never disbursed through.
Q Let me ask you, on the Schedule D, can you define -- the fiscal year, I think, you identified earlier that you were using the -- is it June to July -- July to June?
A That's the government's fiscal year for

Page 343

that year.
Q Okay. But you made the correction or you made the change here for the latter years.
A Right. I used the actual fiscal year that contained each of those Tranche One months.
Q For the fiscal year 1981 that's on page -- I guess, page 2 of your Schedule D, it has the first account balance date is September 30th, 1980 and the last is September 30th, 1981.
A Right.
Q Is September 30th or the month of September appropriate to be included in the fiscal year for 1981?
A No. What that was was that's the last date on the runs for Arthur Andersen that was given that began the fiscal year of 1981. Technically, 10/1 is the first date but what I am saying is that's what they said the balance was on 9/30. Some of these accounts had squirrelly little numbers in between -- in front of them. This may have been one of them. And they would have an account in there that start off with a beginning balance that started off, like,

Page 344

February 2nd of 1980 for two or three lines and then they would jump to these 9/30 numbers, and so that's why I used that 9/30 date. I tried to duplicate what was in the records.
Q On the -- the account balance date, you use the month end or beginning dates were selected; correct?
A Correct, generally speaking.
Q Why did you not use a daily balance as opposed to monthly balance?
A I could have; it just would have taken a lot more time to calculate and I felt like this was a reasonable approximation.
Q Would a daily balance have given you a more accurate depiction?
A Possibly; possibly not.
Q But you didn't verify that?
A No, I haven't.
Q And quarterly disbursements are made on or about the 15th of the month; is that accurate?
A Generally, yes, that's accurate, until you get into some of the latter years. You get into, for

Page 345

example, after 1996, they were done around the 11th of the month, I believe.
Q And so the month end balance wouldn't capture the really low point in the account, would it?
A No, but my lowest day balance does.
Q Right. Right. But I guess right now I'm just talking about the account balance date.
A The account balance date doesn't get necessarily the highest at the end of the month or the lowest.
Q Since royalties are due by the end of the month, wouldn't it be the largest the account probably is since that's when the money is coming in?
A No, not necessarily, because, for example, there is a distribution made on -- I think it is 12/15, so that brings that balance down quite a bit, so from 12/15 to 12/31, it doesn't have a chance to build up very high.
Q But don't all the royalties -- or shouldn't the royalties be coming in around the 25th?
A They come in around the 25th but I'm saying

it only includes that month's royalties so I mean it's had a full quarter distribution, so you took three months out, added one month in, that's an over-weighting of the out money, not the in money. So it -- on the whole, I think, it calculates fairly reasonable.
Q On the far right column where you look at the lowest fund balance for each month, would it be more appropriate to look at the cash balance, the lowest cash balance at that point to see the money that's available in terms of sort of the -- your safety zone between what you claim you could invest on a longer term basis and what you could not?
A Why, I don't think cash is just your safety zone, it is the total amount of funds you have got available to you. I think a non -- I think a prudent investor would not just use the cash balance.
Q But the cash balance shows what's not invested; correct?
A It shows what's not invested in invested funds. It doesn't necessarily mean that it couldn't be.



Q Right.
MR. ROTHROCK: 30 second break, please.
VIDEO OPERATOR: The time is 17:40:05. Off the record.
(Off the record.)
VIDEO OPERATOR: On the record.
BY MR. WEBB:
Q Paragraph -- going back to paragraph 29 of your expert report, page 11, essentially starts on 10 but that is just the word "this," it states, "This analysis clearly demonstrates that a 'prudent investor'" --
MR. WEBB: Could we go off the record for a second?
VIDEO OPERATOR: The time is 17:40:44. Off the record.
(Off the record.)
VIDEO OPERATOR: On the record. The time is 17:41:37.
BY MR. WEBB:
Q In that sentence on the top of page 11 where you state, "analysis clearly demonstrates that



a 'prudent investor' did not have to take a completely short term horizon in making investment decisions," how do you define a "prudent investor"?
A I think Mr. Lundelius's definition of a prudent investor is a good one.
Q Okay. And you also reference "completely short term horizon." What do you mean by that?
A Mr. Lundelius in his analysis takes the stance that the money came in and was dumped out in one quarter. That's a very short term horizon attitude in my opinion. I don't think that you have to that approach and I think I have proved it by the fact of -- fact they had a lot of money in these accounts that stayed in there and the theory that I have already gone through with the bucket being filled up while it was being drained.
Q And then the next sentence, you say, "A prudent investor utilizing a very simple common sense analysis would be able to invest funds on a rollover basis for a longer period of time and still retain the liquidity needed for quarterly distributions"; is that accurate?



A Yes, it is.
Q What do you mean by "very simple common sense analysis"?
A It is not a -- it is not a very detailed computation. You look at the trend of what's being received in terms of cash, look at the trend of what's going out, you are able to see that, you know, if they had gone back through and done any analysis of the history of the account, they can see that they have got a dollar amount of cash that's there for a long period of time and they would be able to invest that prudently without taking any substantial risk and possibly get a better yield off of it.
Q And what do you mean by "rollover basis"?
A Well, it is the bucket theory that I was talking about before. You have got money coming in; you have got money coming out. In effect, it all looks like money and it -- you have got that money to invest while it is in the account.
Q And then you also say, "a longer period of time." What do you mean by that?
A Well, let's just go to the chart.

Page 350

Q Okay.
A Let's look back where we were just a minute ago. If you look at 1976, the lowest fund balance for that year was 3 million 303 -- $3,381,000. If you had started that year, 7/1/75, done your homework, you probably could have invested that $3 million for almost the whole year. You could have. Or if you said I don't want to be that risky, you could have invested $2.5 million for that whole year in a longer term investment. If you didn't want to take that big a risk, you could have jumped back to 1.5 or 1 but you didn't have to take the attitude that the money -- the money was coming in and dumping out on a one-quarter basis because that didn't happen.
Q Well, if you take a look at fiscal year 1981 and you see -- the next page -- and you see the lowest fund balance being in the teens or the twenties, and then you see the next year -- not the next year but it is still 1986, you see the fund being in the ones, what happens if there is a shortfall?

Page 351

A Well, let's talk about those years. I lived through those years in the oil and gas business and in about 1982, '83, there was a bust in the oil and gas industry and the prices started coming down. You would take that into consideration. You wouldn't stretch yourself out too far; you know, you have to -- have to use the common sense that a prudent investor is required to do.
Q So what happens if there is a -- if there is a drastic cut, if there is a shortfall?
A You wouldn't stretch yourself out so far that you would extend yourself in a position that you couldn't cover.
Q So how -- how much would you invest during these periods?
A Well, if you are talking about in a retrospect, for example, fiscal year 1981, I would say that if you invested anything below $10 million, you were probably pretty safe because you had the lowest balance was $11.4 million. That leaves you a million-four, 10 percent of it for an error right.
Q But how do you project that? It is easy to

Page 352

do in hindsight but how do you project?
A You can do it based on what's happening at the time. You look at the past and see what's happened over time in the past. You look to see if economic forces are changing that would significantly affect that. You have got -- for example, let's say that the oil bust happened on January 1st; okay? That's not going to affect you at all for the month of January because the collections are still happening for the month of December. So you have got a 30-day lag right there. You have got a period of time of two-and-a-half more months before you have to pay the money out in the quarterly distribution so you have got time to react.
Q So does it require some knowledge of your future cash flows?
A I think it requires some knowledge -- I think it just requires some common sense, just a little bit of brains and a little bit of effort.
Q But knowing what money is coming in helps, knowing that that money is consistently coming in?
A Sure, but, you know, it is not hard to

Page 353

forecast these things. These people ought to know what's happening.
Q Is that something that you have done in your business?
A Try to forecast cash flows?
Q Yes.
A Yes, I have.
Q Now, let me ask you in terms of the investments, how long would you be investing this money? You have mentioned investing for longer periods of time. Would those be three-month investments?
A They could be -- three months is what Mr. Lundelius used. I think that's too short.
Q Six months?
A I think you can go out six months with no trouble.
Q What about a year?
A You might, depending on -- it would depend on what the economic situation was.
Q What about, say, seven years?
A I doubt if I would go out seven years on

those investments.
Q So maybe a year, but maybe a little less?
A Right.
Q Do you have any sort of common sense number you would throw out in terms of the duration of the investment?
A You know, I don't think I would want to go too much out further than a year on something like that.
Q Okay. Okay. Let's see what we have got here. Let's look at paragraph 30.
A Okay.
Q That's on page 11. And in that, you state that -- let me see -- there it is. You say in the first sentence that Mr. Lundelius did not use actual data. Can you define "actual data"?
A Same problem I had with Mr. Chavarria's data. His data and Mr. Chavarria's data are the same data; okay? And that is the source of it was these deposits that came in from these collections; all right? We didn't know the date, the actual collection date. We didn't know the actual deposit



date. We didn't know the actual leases that were out there. So, you know, it is -- it is the same problem. We also didn't know what the actual investment alternatives were out there for investing that money in.
Q What does the collection date and deposit date have to do with Mr. Lundelius's analysis of investments?
A Well, it has to do as to when the money is available to invest.
Q The deposit date -- or the collection date does?
A Sure. Between the collection date and the disbursement -- and the deposit date indicates when he had the money available to invest.
Q But it doesn't impact what investments were undertaken once the investments were made; correct?
A Well, it could. If it wasn't deposited on a timely basis, it could undertake which investments were utilized.
Q And how does that work?
A Well, if you got money in on the first of



the month, you might have an investment alternative available to you that you didn't on the 10th of the month. Somebody had sat on the money, you might have missed the opportunity to invest it at a higher rate. You might have had an opportunity to invest it at a higher rate.
Q Let's take a look at paragraph 31 and in that paragraph 31, you state that Mr. Lundelius's attempt to determine the rate of return on Tranche One transactions is flawed because it can't separate out Tranche One funds from invested. I'm paraphrasing.
A That's true.
Q Is that accurate?
A Yes, it is.
Q Can you explain what you meant by that?
A It is -- again, it is indicated in his report, in footnote 24, again, in his deposition at page 183, that he didn't separate the Tranche One leases from the money that came in. He just took them by producer.
Q And were you -- were you able to track the



money?
A No, I was not.
Q And why not?
A I had -- I was using the same data Mr. Lundelius was and the information is not there.
Q And you were able to confirm that Mr. Lundelius was available to track the money by matching the amounts and the timing of the investments?
A I believe what he said in his report, that he wasn't able to track it.
Q And do you understand his report to say -- what?
A That he couldn't track the leases.
Q And you are referring to this footnote?
A 24, page 183 of his deposition, he repeated it.
Q Let's look at paragraph 32, and paragraph 32, you -- first sentence, you state, "Mr. Lundelius' method of allocating the claimed proceeds from the Tranche One transactions to specific investments does not make common sense." Can you define what you mean

by "common sense"?
A Well, if you pull out those D-1 documents, D-1 through D-7, when you go through there and track what he said he did in order to get to those different investment alternatives, it just doesn't make sense, doesn't look logical.
Q Do you have any -- is there any standards for common sense or is it just sort of your belief is what's sensible?
A I guess the standard for common sense is that common sense is something that's not too common. You know, apparently there is a lot of people that don't have it and, you know, it is what a prudent person would do. They would -- if they had an opportunity to invest money on a direct basis rather than splitting it up and moving it around, they probably wouldn't do it.
Q Why doesn't Mr. Lundelius's investment flow analysis make common sense?
A Would you like to pull out Schedule D-1 and I will show you?
Q Sure.



A Okay.
Q Schedule D-1 of your report?
A No, Schedule D-1 of Mr. Lundelius's report.
Q Sure. You should have it. I believe it is Exhibit 8.
A Okay.
Q Okay.
A Well, this one doesn't have the little scratches on it with the numbers that he had on the ones that I saw. Do you care if I pull out one that I have got in my bag?
Q No. That's fine.
A In this copy of the D-1 schedules, I think this was taken straight from Mr. Lundelius's documents that he said he provided before his deposition.
Q Okay.
A He has actually gotten numbers written in there and it makes my opinion that his -- his method of investing doesn't make common sense much more clear.
Q Can you explain what you mean by that?



A Okay. Let's take, for example, he says that Big Heart on 2/25/76, paid 200 -- was paid $234,574 to the Osage Tribe. Now, we don't know if that's for Tranche One leases or Tranche One leases plus other data. He says that that money, approximately 235,000 that he has got written down here, or I think his partner, Mr. Woo or somebody like that wrote it down, was put into a Treasury bill from 2/26/76 to 3/4/76. Then what he says is that he broke that Treasury bill when it came due into two parts. He ran 133,000 of that $323,000 down to a CD that was invested in on 3/11/76. He ran the difference in that amount of money over to the -- a Treasury bill that was invested on 3/22/76. And the Treasury bill that he indicates they invested in was $335,000, which was the same amount of money that he originally had in the Treasury bill that came due on 3/4/76. So why would you split up that investment into two parts when you are running the same dollar amount over to the Treasury bill on three -- 3/22/76? Items such as that, and I can go through the rest of these and show you something similar, it



doesn't make any sense to me as to why you would split up those moneys when you have the same amount of money going over to Treasury bill on the same day. Now, in addition to that, there is -- there is lags in there of deposit -- or investment time. That Treasury bill on that Big Heart expired on 3/4/76. Evidently, they just let that sit in a cash account until 3/22/76 and so they lost, in effect, 18 days of interest that they could be earning additional interest on, rather than letting that money just sit there. So he just, you know, doesn't make sense to me.
Q Do you have any information that contradicts his investment flow?
A No, I don't.
Q Okay. Have you searched for information that would -- you believe would clarify the investment flow?
A No, I haven't.
Q Do you believe that diversification is an important tool in investing funds?
A If you are talking about the Osage Tribe or

Page 362

if you are talking about personal investments --
Q Generally speaking?
A Yeah, personal investments, obviously, it is very important. In the Osage Tribe, I don't know if they had all that much opportunity to diversify. They were pretty much locked into CDs and Treasury bills and items of that nature.
Q But how about diversification between Treasury bills and CDs?
A You know, I guess my reaction would be where do you get the best rate of return and if CDs are the best at that point, there is nothing -- and as long as they are fully secured, there is nothing wrong with investing 100 percent in CDs if they are the best return.
Q Are you familiar with the CD investment bidding process?
A No, I'm not.
Q Are you familiar with any limitations on the acquisition of CDs?
A I imagine the -- I'm going to tell you what I think. I'm not speaking from this other than a

Page 363

little bit of knowledge of banking and that is that the banks that are able to provide CDs have to have securities that they support those CDs on file with the federal government.
Q Did you inquire of Mr. Parris or anyone else as to the process used to purchase or invest CDs on -- with the Osage funds?
A No, I did not.
Q And why not?
A I didn't feel like it was necessary.
Q Wouldn't that have been helpful in terms of determining investment flow, the proper investments were being made?
A Well, the example that I am giving you right here wouldn't have affected it at all, I don't think.
Q During the -- invested -- uninvested funds earned 4 percent interest pre-1985; isn't that correct?
A I think that's the number.
Q And they earned the overnighter rate post '85?

Page 364

A I believe that's correct.
Q Looking at your Schedule E in your report, could you identify for me what the rows mean starting with -- starting with the title? Let me let you get to it before I start asking you questions.
A Okay.
Q Are you there?
A Uh-huh.
Q Can you tell me what the rows mean starting with the annual income from Tranche One year statement of account, Chavarria deposition, what it means?
A Certainly. These were -- these rows were taken directly from the records that were provided us from the Arthur Andersen report that's attached to Mr. Chavarria's deposition and these were the descriptions of the sources of income that were included in the account 7386 for the Tranche One years.
Q Okay. And I notice here you use the Tranche One years you just mentioned. Why did you use the Tranche One years as opposed to the Tranche

Page 365

One months?
A What I was -- what I was curious to see is whether or not Mr. Lundelius's expected rate of return would hold up for the entire year, and so what I did was -- this is where I am saying he is missing some of the forest for the trees. If you look at the entire year, the average rate of return on the Tranche One years very rarely exceeded Mr. Lundelius's expected short-term rate on -- based on those short-term CDs and Treasury bills.
Q So you are saying that the annual -- this is dropping down a little on the chart -- but the annual rate of return on the average invested funds and cash, you are saying exceeded Mr. Lundelius's expected rate of return for the Tranche One months and for that -- in that short-term investment, the three-month investment of 80 percent CDs and 20 percent Treasury bills?
A No, what I am saying is that the actual rate of return for the Tranche One years --
Q Right?
A -- was below Mr. Lundelius's expected rate

of return.
Q Okay. And -- and that's -- but here, actually, you are comparing annual rates of return to a three-month rate of return; correct?
A Well, that's what he indicated, I think, for -- or let's look at his report.
Q Okay.
A You are right. It is what he indicated his expected rate of return for those months under his most conservative method.
Q Are we comparing apples to oranges here in terms of comparing annual rates of return to three-month rate of return --
A Well --
Q -- and evaluating the difference?
A What you are evaluating is whether or not Mr. Lundelius's rate of return occurred for the entire year and the answer is it didn't.
Q I don't understand what you mean by that. Could you explain?
A Well, Mister -- the rate of return for 1976, for example, the average rate of return on the



invested funds was 4.2493. Mr. Lundelius said for that one-quarter that he was dealing with that, his worst case expected rate of return is 5.34.
Q What did you mean by "worst case"?
A He gave three cases. One was 80 percent CD, 20 percent Treasury; one was 90 percent CD, 10 percent Treasury; 100 percent CD. And in that case, he indicated that the expected rate of return in his -- in his opinion was 5.34 percent, which was the lowest of those three possibilities.
Q And by the worst, when you reference worst, you meant lowest?
A Lowest.
Q And that's for one quarter of 1976?
A That's correct.
Q And you are comparing that to the rate that you have calculated for the full year of 1976?
A That's correct. That's called a reasonableness test.
Q A reasonable --
A Reasonableness test.
Q Can you define that for me?



A Sure. It is not reasonable.
Q What, the comparison of an annual rate to a quarter rate is not reasonable? I agree with you on that but --
A The fact -- the fact that he didn't get a return for the entire year similar to what his quarter rate return was.
Q So you are saying he should have had a rate -- I'm sorry. You have lost me here.
A Here's what I am saying. Here's what I'm saying: That for you to determine whether or not Mr. Lundelius's rate of 5.3 percent -- 3.4 percent is reasonable, compared to what they actually got, and they didn't -- they missed that by a long ways. 1 percent, that's a big difference. And so what I am saying is that what I did was a reasonableness test on Mr. Lundelius's one-quarter picture and it doesn't look reasonable.
Q Now, in terms of -- are there certain years where a quarter -- one-quarter out of the year will be better than the other three?
A There might be.



Q Could that happen in this instance?
A I don't know.
Q Okay. Did you look to see whether that happened in this instance?
A No, I didn't, but generally it doesn't happen to the tune of 1 percent.
Q And how did you get the 1 percent difference? How did you calculate that?
A It is the difference between 4.2493 and 5.34.
Q It is just a subtraction?
A Subtraction.
Q And let me ask you, going back up because I kind of want to get through this a little bit, when you have here the average invested funds and cash, exhibit blank --
A Right.
Q -- is that supposed to be Exhibit D?
A Yes, that's from Exhibit D.
Q Okay. And that figure there that's $6,632,401.43, that appears on your Schedule D of the average monthly?

A It does.
Q Yes. And, now, does that figure include interest and principal?
A Does it include interest and principal. It includes -- it includes the funds invested and the cash balances.
Q But would it also include the interest income for the year?
A Well, cash is cash and once it's income, that eventually turns into cash, so it is just a cash balance.
Q So -- I'm sorry. I'm not following you.
A Here's what happens. If you get income in --
Q Right.
A -- here's an accounting term: Debit cash.
Q Right.
A Credit income.
Q Right.
A They happen simultaneously.
Q Okay. Well, maybe if I can just ask it this way: Is that $281,829.77 of total interest



income for the year, is that included in -- would I find that interest income in this $6,632,401.43 if I was to break that number down?
A It is included in there.
Q Then shouldn't that number be deducted from this -- shouldn't 281,000 and what not be deducted from the 6.6 million before you start looking at generating percentages of rates of return?
A No, because it is part of the cash they had available to invest. In other words, they should have been making money off that. That's the compounding of interest.
Q So the inclusion of the interest -- and I always forget what's on top and what's on the bottom as far as numerator and denominator.
A Right.
Q Which one --
A Numerator is on top.
Q Numerator is on top. We will call it the numerator on top and the denominator on the bottom.
A Let's just say top or bottom.
Q Top or bottom. So the bottom number should



include the principal and the interest and the top number would be the interest?
A Yes.
Q And that's how you got your --
A That's how I got my number.
Q -- that's how you got your --
A You take 281,829 divided by 6,632,401.
Q And it is included on the bottom because -- because of the compounding issue?
A Right.
Q Okay. In terms of the -- going back up -- sorry. Kind of going all over the chart without --
A Sure.
Q Up here you have the interest, interest on the overnighter?
A Okay.
Q And this comes from the Andersen data?
A Comes straight from the Andersen data.
Q And you picked that up starting at '86; correct?
A That's correct.
Q What about -- we have talked before about



the 4 percent interest, the statutory interest, and that was in effect up until about '85 or so?
A Uh-huh.
Q But did you not account for that here?
A Well, I -- it wasn't my accounting, it was the accounting of Arthur Andersen and it is not in there.
Q Should it be included if you are going to calculate total interest income?
A If their reconciliations are accurate, it is included. If there are reconciliations that are inaccurate, it isn't included.
Q And where would it be included?
A It would be included in their reconciliation of the account. That's --
Q I'm sorry. I meant on your chart because you have interest on overnighters, CDs and government securities. Where would I find the 4 percent?
A Here what I did. I took the beginning balance at the -- they have a summary statement that's called an income sheet or something or in a balance sheet or something like that, and it shows

the total amount of money in the fund at the beginning of the year, the total amount of money at the end of the year; okay? It shows how those funds came in and went out and it shows these two items as being the income that came in; all right? And they -- by doing that, they reach a balance, and if they failed to give us income, then the reconciliation is wrong. If they plugged that income, whether or not it was from the 4 percent funds or whatever, into these CDs or government securities, then it is just misleading as far as where they put their money. But they are saying this is the total amount of income they received for that year.
Q So -- so you are not certain where the 4 percent appears, if it appears?
A It better be in there or the Osage have another claim.
Q Do you think it is under government securities or CDs or you just don't know?
A I have no idea.
Q Is it possible that it was just -- it was



earned but not included?
A Let's drop back, Kevin. You remember we talked about 1970 -- from '78 back, that the Arthur Andersen report said that they couldn't determine interest income in the accounts? Well, I guess this is part of their problem. They didn't -- they didn't know where it was.
Q Well, so, wouldn't we agree that the 4 percent does not appear to be accounted for?
A But it -- well, I don't think -- I think it was accounted for this these numbers but we are uncertain where.
Q Okay. But we are uncertain where it is being accounted for. If it was being accounted for -- if it was accounted for in these numbers, it is unclear where?
A It is buried in there somewhere, yes. That's my -- that's my guess.
Q And for 1991, there is no government security number. Do you know why that is?
A No, I don't. Again, that's the technique that -- that's information Arthur Andersen provided.



Q Is it possible that the income was classified as something else that's not on your chart?
A If it did, they have misled everybody as to where the money is -- money came from.
Q Did Andersen say that it was part of their Agreed-Upon Procedures to classify this correctly?
A I think that their procedures would have been appropriate that they would have pointed out to everybody that it was -- that it was classified improperly.
Q Did they do that?
A I don't know.
Q What do you consider to be a significant difference in interest rates when you compare interest rates like you have done here on Schedule E?
A I think 1976, '79 '81, '89 and '91 are significant. Anything over a percentage.
Q So a percentage, 1 percent?
A I think that's --
Q Anything over 1 percent is significant?
A Actually, anything from a half percent to 1



percent is pretty significant but anything over a percentage is very significant.
Q Is very significant?
A Yes.
Q And I guess in your expert report, you use the term "far short." Is that sort of shorthand for significant?
A That's shorthand for significant.
Q Okay. Let's take a look at Schedule F and, I guess, also paragraph 35 in your report, which I believe describes Schedule F. And in paragraph 35, the first sentence is the deficiencies of Mr. Lundelius' analysis.
A Yes.
Q Can you describe for me what you mean by "deficiencies of analysis"?
A I think his analysis is deficient because I think it fails -- I think you can't support the rate of return that he indicates for the Tranche One months based on what happened in the entire Tranche One year.
Q All right. Could we go down the chart

here --
A Sure.
Q -- and see if we can do it this time, going straight down, and just identify what each row represents in terms of the items.
A Okay.
Q We will start -- the title I think we already talked about. You mentioned the Chavarria deposition. Is that the source of this information?
A Yes, it is.
Q At least not the deposition itself but the documents --
A Documents.
Q -- associated with it.
A Right.
Q Let's start off with cash. If you can just tell me what it represents and where -- all this information came from the Andersen report; correct?
A That's exactly right.
Q So if you can just tell me what the different terms represent.
A The cash represents cash balance; the



average cash balance; the investment funds represent the average investment funds balance. Okay?
Q Okay.
A So what I did was I applied if statutory 4 percent rate to the cash balances. I applied Mr. Lundelius's conservative rate to the invested fund balances and said, okay, if we had invested those funds at 4 percent on the cash balances and Lundelius's rate on the invested funds, we would have earned $351,870.47 for 1976. Then I took the same information that I had that we looked at a few minutes ago and that's what actually showed up on the statements prepared by Arthur Andersen reconciling the activity for the year and I said they actually showed they earned $281,000; therefore, there is a $70,000 underperformance on that money. And then what I did was I computed a present value based on that underperformance.
Q Okay. And, again, why did you use the fiscal years that include Tranche One months and not the actual investments from Tranche One months?
A First of all, the argument is the actual --



what the actual investments were from the Tranche One months. I'm not convinced I know what the actual investments were. In those years -- in those Tranche One months that Mr. Lundelius used, how do we -- when money is put in the account, it all looks alike. It all looks like dollar bills. Okay? How do you know, for example, that he is investing the exact same dollars that the Tranche One month had or how do you know he isn't investing money that he had left over from an investment from a previous time? They got a bunch of money in there. Now, when you start getting into the latter years and you start getting into 1986, '89, 1991 and you go through this D-1 through D-7 analysis, you can start seeing some of those Tranche One dollars coming in on the EFT and they look like they are somewhat matching it up. It is much cleaner. You don't have these little arrows going everywhere mixing and matching and so they look much more reasonable and your rates start looking more reasonable.
Q When you talk about in your list here invested funds, where -- that includes the principal



and the interest, the total fund balance?
A It is the total amount of cash and investment funds.
Q Okay.
A I remember my rule from math: Numerator on top and denominator on bottom.
MR. ROTHROCK: Do you know four out of three people don't understand fractions and you are one of them.
THE WITNESS: No, I understand fractions but I can't memorize those things.
BY MR. WEBB:
Q Let me ask you this: I'm just looking back and forth between -- well, never mind. It is getting late. My eyes are starting to play tricks on me. So the -- the investment we will skip on.
Now, these are, also, the investment funds are based on the monthly average, not daily; correct?
A Right.
Q And I think you mentioned before that you are not aware of what the -- if it was based on daily average, what that would result -- what results that

would derive?
A I think it would be similar.
Q But you don't know. Why did you -- let me ask you this: You provided for that 4 percent statutory rate on cash for the years '86 through -- '86, '89 and '91, when that statutory rate was no longer in effect and the overnighter was in effect.
A Right.
Q Why did you use the 4 percent?
A I just used the simplest use, used it straight across the board. I'm just trying to illustrate a point.
Q Do you know if the overnighter was higher than 4 percent during those years?
A It could have been. I can't remember.
Q Did you ever verify that?
A I have seen it in Mister -- well, I'm trying to remember if it was in Mr. Chavarria's -- I think Mr. Chavarria's report had the overnighter rate for '89 and '90, if I remember right -- or '91, if I remember right.
Q Do you recall whether it was higher or



lower?
A I don't recall right offhand.
Q In here, the comparison you are doing is a comparison based on -- you have Lundelius's expected rate on 80 percent, 20 percent Treasury, 80 percent CD, 20 percent Treasury, and that's for his one-quarter analysis, essentially, for each -- for each year, the relevant Tranche One months?
A That's correct.
Q And you are comparing that to the -- the annual returns, the annual income --
A That's correct.
Q -- as you have calculated it for the whole year?
A Well, it is not the annual income that I calculate, it is the annual income that Arthur Andersen reported in their report.
Q And that you have included in your chart as being compared --
A Right.
Q -- to the quarterly return that is calculated by Mr. Lundelius?



A Well, that wasn't calculated by Mr. Lundelius, it was calculated by me. I just used his rates.
Q I apologize. I'm using the proper description but I didn't -- I think we are clear on what we are talking about.
A Right.
Q How did you calculate the present value of the underperformance?
A Oh, I took the amount of the under- performance and did a present value calculation similar to the way I did the other damage calculations and utilized the -- no. No. No. Let me see if I described it in my report.
Q Yes, I didn't see it in the report.
A We have got so many of these calculations. I think I used Mr. Lundelius's rate. I'm trying to remember. I can't remember if I used Mr. Lundelius's rate or if I used the benchmark rate and that seven-year real -- I would have to go back and see if I can get you that. I can't remember. I'm getting tired.



Q No, I understand. Let me ask you this: You note here the present value of the under- performance but you didn't calculate the present value of the overperformance. Why didn't you do that?
A Well, it is all included in that total present value performance.
Q So this is present value of --
A Of all those numbers.
Q So it is not -- I guess, yeah, the way you describe it is present value of underperformance. I wasn't clear as to whether you just took the under- performance numbers or whether you took all the numbers.
A Probably would have been better if I had said the present value of net underperformance.
Q Okay.
MR. WEBB: And why don't we take a break to change tapes.
VIDEO OPERATOR: The time is 18:21:33. Off the record.
(Recess.)

Page 386

VIDEO OPERATOR: On the record. The time is 18:37:23.
BY MR. WEBB:
Q Okay. I only have a couple more questions regarding Exhibit F, one being looking at Exhibit F of the rebuttal report, which is here somewhere, the total figure that you have of percent -- present value of underperformance of $5,057,546.98, does that amount -- are you taking that amount and plugging that into your exhibit -- Exhibit F or your total damages calculation where you have taken out B and E? This supplants B and E?
A That's exactly right.
Q And is this number -- now, should this number be divided by 12 to get the --
A If you want to estimate a Tranche One month, that would be fine.
Q Okay. And would it be that number, though, would be added in as the total damage?
A For a Tranche One month.
Q For Tranche One -- for a Tranche --
A For the total of all the Tranche One

Page 387

months, in effect.
Q Okay. So the total number would be $5,057,546 divided by 12?
A If you want to reduce it to a one-month calculation.
Q One month. Okay. If I wanted to reduce it to the calculation that you would use for your analysis of the Tranche One months in loss of investment income, how would I do that? Divide by 12 and multiply by 6 or divide by 2 or --
A If you take that $5 million and divide it by 12 --
Q Yes?
A -- you are going to be there. You don't have to multiply by 6.
Q So that's my number, 5 million divided by 12.
A Yes.
Q And let me ask you about one document that I saw in the documents you produced responsive to your subpoena and I can just -- you can look for it, I can hand it to you.

Page 388

A Sure.
Q Doesn't matter either way. I will represent that I did pull it out. And this is a document -- let me just read it. It is -- it is titled as the title of the case and then it says, "Expert's Rebuttal Report, Exhibit D," and then has the information, and if you could just take a look at it and see if it looks familiar to you.
A Yes, it is familiar to me.
Q And does this -- was this a draft version of Exhibit F?
A This was a -- an alternative I considered.
Q Okay.
A Okay? And that was I splitted the investment -- "splitted," that's not very good English. What's the good way? I split the investment funds into two parts, okay, short term and long term. The long term are based on that lowest cash balance less a factor of 10 percent, and said that they could have been invested for a longer period of time. The number I used to calculate the interest on the long-term money was the 7 percent

Page 389

Treasury yield.
Q Okay. And -- and the numbers that you used for seven-year -- actually, going up a little, the long-term number, you said that -- and how did you calculate that number?
A It is -- it is the $3 million.
Q Right.
A And using my 7 percent Treasury.
Q I apologize. I should have been clearer. Underneath investment funds, you have both short term and long term. For the long term you have, where did the 3 million come from?
A I split that 6-million-632 that's on all of my other schedules.
Q And just use them even?
A Well, the $3 million, if you go back to Schedule F --
Q Yes.
A -- that is for 1976 less than the minimum amount of balance that you had in the account for the entire year; okay?
Q Okay.

A So what I said was if I were a prudent investor and I was trying to analyze this and say how much money could I keep, and I said, all right, in this year, I had $3.3 million as my lowest fund balance, I want to be careful to the tune of about 10 percent, so I'll only invest 3 million of that for a longer term.
Q Okay.
A And that's -- and then all I did was subtract that $3 million from the 6-million-622 and that gave you the short-term amount.
Q And then you calculated the seven-year Treasury yield on that amount?
A That's right.
Q And you have, let's see, 3 million for '76, 4 million for '79, 10 million for '81, and I'm talking long-term investment funds --
A Right.
Q -- 1.5 million for '86, 1.2 million for '89 and then 1.8 for '91; is that accurate?
A That's accurate.
Q And then down at the bottom you listed the



yearly, as well, that you used --
A Right.
Q -- is that correct?
A Right.
Q Correct. I just wanted to clarify that. Let's take a step back and we are rounding the bend, as it were.
A Kevin, you remember those yield numbers for the seven-year for the year that right at the very beginning you asked me what was that sheet for?
Q Uh-huh. Yeah.
A That's what it was for. That was the seven-year yield on an annual basis.
Q Yes. Okay. And so that's where those numbers --
A That's the source.
Q They come from that?
A That's exactly right. That's the source of those numbers.
Q Okay.
A I -- it kind of all fell together for me right now.



Q Okay. Now, we are going to step back and talk about deposit lag time for a very brief period and so I'm just going to step back and talk to you, going back to page 2 --
A Of the rebuttal report?
Q -- of the rebuttal report.
A Okay.
Q And I believe one of the last questions I asked you was what is your understanding of when the bill of collection is prepared.
A Right.
Q And could you -- I apologize if I am reasking but this is my best guess as to where I stopped.
A Right.
Q Could you provide me with your understanding of when a bill of collection is prepared?
A I have thought about that question, too, and I really shouldn't even be able to answer that because I don't have any idea when the bill of collection is prepared -- no idea with justification,



let me put it that way.
Q What's your understanding of when a collection officer signs and dates a bill for collection, do you know?
A I don't know.
Q In your calculations for your reports, what documents did you use to establish the date of the actual collections?
A The documents that were provided in the Arthur Andersen report and Mr. Chavarria's report.
Q Okay. Going to the third sentence in this paragraph 6 where it states -- I may be paraphrasing -- records only contain the date the BIA prepared a deposit ticket and not the actual deposit date. What's your basis for that statement?
A I'm having a hard time finding --
Q I'm sorry. I kind of jumped in there, didn't I? It is one, two, three, four, five lines down, sort of started in the middle of the sentence. It is the sentence starting, "Rather than."
A Okay. So it says, "Rather than containing the date of such collection, these records generally

Page 394

contain only the date the BIA prepared the bill for collection."
Q Right.
A I think that's the date that the Arthur Andersen report indicated that they utilized as the collection date.
Q And did you verify this statement's accuracy as it pertains to the Tranche One months by looking at the actual data?
A No, I did not.
Q So is it possible that that statement is inaccurate?
A For the Tranche One months?
Q Yes.
A I would have to go back and look and see each of those Tranche One month's data and compare them.
Q But since you haven't looked at that, it is possible that it is inaccurate; correct?
A It is possible.
Q What is your understanding of how the deposit ticket date was used by Mr. Chavarria?

Page 395

A Deposit ticket date, I don't know how Mr. Chavarria used it but the deposit ticket date does not show the date that the bank deposited the -- that the money was indicated as being received by the bank except in one circumstance.
Q And what circumstance?
A There is one document in there that has both the copy of the deposit slip that was filled out by the Osage or the BIA and the copy that the bank had, but only one.
Q In your calculations for your reports, what documents did you use to establish the actual deposit dates?
MR. ROTHROCK: I'm going to object because it mischaracterizes his testimony. He testified he did not determine the actual deposit date.
MR. WEBB: Okay.
BY MR. WEBB:
Q You may answer the question.
A I agree. I didn't.
Q What deposit dates did you use for your calculations?

Page 396

A Deposit dates that were shown in the Andersen report and Mr. Chavarria's calculations.
Q Let's look at the next sentence where you state -- let's see -- because the BIA mailed deposits slips to the regional office, the deposit slip date is not necessarily the deposit date, and I'm paraphrasing to an extent but is that, in essence, what you are saying?
A That could -- that's the situation, it could be, yes; we don't know.
Q That's what your statement --
A My statement, basically, is that there is no deposit slip that shows when it was actually received by the bank.
Q And what -- does this deal with all deposits?
A Dealt with all the ones for the Tranche One months that I looked at except for one and except for the EFT transfers.
Q And -- okay. And did you verify that the statement is accurate as pertains to the Tranche One months and leases by looking at actual data?

Page 397

A I looked at the data that Mr. Chavarria had and, you know, it indicated that the date that the EFT was -- the date of the EFT is the date they used as the deposit date.
Q But did you look at actual data?
A The actual data that Mr. Chavarria had.
Q You also state that the -- also, I think, in that sentence, you -- well, as part of that sentence you state the date -- the date the deposit ticket is prepared does not necessarily indicate the deposit is actually made; is that accurate?
A That's accurate.
Q What do you mean by "not necessarily"?
A If you don't have a document there that, for example, that shows when the bank says we accepted this deposit, then you don't know the exact date they received the deposit.
Q Could you put a percentage as to the percentage likelihood that indicates a deposit was actually made? Because you say, "not necessarily."
A It is not a known factor. I don't know.
Q So it is not certain but it -- but it is

possible that it did indicate --
A Let me give you an example. When I go deposit my money for my company in the bank, I fill out a deposit slip. When I take it down to the bank, they give me a little receipt back that shows the date that they received it. If for some reason I had written a deposit slip five days before with a date on it and hadn't taken it to the bank for five days, you could go to that receipt and you could see whether or not I deposited it or not or how many days I had sat on it. We don't have that data.
Q But it is possible that the date the deposit ticket was prepared was the date that the deposit was actually made?
A It is possible but if they were dropped in the mail, it is not likely.
Q Did you verify this statement -- that that statement is accurate as it pertains to Tranche One months and leases by looking at actual data?
A No, I didn't.
Q Okay. Did Mr. Chavarria use the date the deposit ticket was prepared?



A I think he did or the date was posted; I can't remember which.
Q How did you determine that?
A It was based on the Arthur Andersen data. I think he used the same data the Arthur Andersen data had.
Q Does interest start accruing when the funds are deposited?
A Depends if they have got it in an interest-bearing account or not.
Q If -- what if they do have an interest-bearing account?
A Let's put it this way: Interest should start accruing. Whether or not it has or not, I don't know.
Q Did you look to see what happened with the Osage fund as to whether interest started accruing?
A You can't. You can't trace it.
Q What deposit dates do you use for your calculations?
A The same dates I believe that Mr. Chavarria did.



Q Okay. The next sentence, you speak to -- at the top of page 3, you state, "The records only contain royalty payment amounts from a company that may be paying on more than one lease." And, actually, before we get to that, let me step back for a second and I apologize for doing this. But when you -- in the statement where you say that the date deposit ticket is prepared does not necessarily indicate deposit actually made -- is that correct?
A That's correct.
Q Okay. Do you mean whether the deposit was actually made at all or made on the date of the deposit ticket?
A On the date of the deposit ticket.
Q Okay. I'm sorry. I just wanted to be clear on that.
A That's no problem.
Q Going back to where we talked about in the fifth sentence the records contained -- you say, "Records only contain the total amount of royalty payments collected from a company that may be paying royalty for more than one lease." What do you mean



by "may be"?
A Well, you don't know for sure whether or not they are just the Tranche One leases or whether or not they contain leases for -- for, you know, other payments; for example, Phillips Petroleum, maybe they are paying for a Tranche One lease only, maybe they are paying for Tranche One leases and other leases. It is the same qualification that Mr. Lundelius used in his report and in his deposition.
Q Did you verify this statement as accurate as pertains to the Tranche One months and leases by looking at actual data?
A I did, I looked to see whether or not they broke it down by lease for most of those payments and then it didn't indicate to me that they did.
Q Did it -- it indicated that it did not break it down?
A Phillips was the one that I really -- remember real well and they would just -- they would say, "$550,000 from Phillips," period, end of statement. They didn't say for which leases.

Phillips may have provided them at some point another -- a listing of the leases they provided but it wasn't indicated in that documentation that Mr. Chavarria had.
Q The records, though, would still include payments on Tranche One leases; correct?
A They would be embedded in there.
Q Okay.
A Probably -- let me back up.
Q I'm sorry.
A They may be embedded in there.
Q Okay.
A We don't know that.
Q I guess the issue would be that it would be -- it is potentially overinclusive, that it may include payments on other leases, as well?
A It may be overinclusive, may be under-inclusive.
Q And what deposit amounts did you use for your calculations?
A I used the deposit amounts that Mr. Chavarria had in his report.



Q Looking at paragraph 7, the first sentence, where you state to the effect that Mr. Chavarria didn't use actual receipts but used apparent receipts?
A Right.
Q Do you see that?
A I do.
Q Could you define what you mean by "apparent receipt"?
A It is the definition that Arthur Andersen used in its --
Q I don't want -- sorry to interrupt but I asked the question improperly. I should have asked apparent receipt date because that's what you use in the document and I didn't say that so I'm sorry. Could you define --
A In the Arthur Andersen report, they define "apparent receipt" as being, I think, the posted date.
Q Could we take a look at that?
A Let's try.
Q I believe it is on page 54. And as I look



at page 54 of the Andersen report, I'm looking under the -- where it says, "Supplemental information," and there is a paragraph there in the middle of the page and the last sentence in that paragraph says, "The criteria for selecting the receipt date in order of priority are as follows." Do you see that?
A I do.
Q It says, number one, "The receipt date on the collection voucher is clearly indicated; number two, the date on the collection voucher is the most recent date subsequent to the check date if a check date is indicated. This apparent date of receipt could be represented by a stamp date indicating when the collection voucher was processed, the date the collection voucher was prepared, the date the collection voucher was signed as approved," and there is a third criteria; it puts, "The bank accomplished date of the deposit ticket." Did I read that accurately?
A You did.
Q So is the apparent receipt date that you are referring to, are you referring to this item



criteria two where it uses the term "apparent receipt date"?
A My personal opinion, I think that the apparent receipt date applies to all three of those criteria.
Q So the term "apparent receipt date" is more of your term of art as opposed to the term that's being used by Andersen in this passage I just read?
A It is both by Andersen and by me. You know, they specifically apply it to that item two. That's the only place they do it but it is pretty obvious from reading this that they have decided that they are going to go with the receipt date based on one of these possibilities. The fact that they have got three possibilities indicates to me that they are unsettled as to what the actual date of receipt is. If not, if I were doing this work and I can figure out what a date of receipt was, that's the one I would hang my hat on. I wouldn't say let's choose among one of these three depending what the circumstances are.
Q In -- you state here that Mr. Chavarria

confirmed that he used the apparent receipt date as determined by Arthur Andersen, and I'm paraphrasing.
A That's correct. That's correct.
Q Now, in your draft expert report, you phrase it, if I remember correctly, that Mr. Chavarria used the receipt dates captured by Arthur Andersen. Do you recall that?
A I -- I don't recall it exactly but that's probably true.
Q Do you know which it is, whether Mr. Chavarria used the receipt date captured by Arthur Andersen or whether he used these apparent receipt dates?
A I think it is semantics. I think we are saying the same thing.
Q Do you have an understanding with Mr. Chavarria as to what you meant by the use of the term "apparent receipt date"?
A I think he probably meant something similar to what I am saying right here is one of those options.
Q I'm sorry. I apologize.



A That's okay.
Q Do you know whether he used the term "apparent receipt date"?
A I would have to go back through and sort through it but it seems like he did but I'm not sure.
Q Why don't we take a look, actually, at the Chavarria deposition. This is going to be Exhibit 12.
(Jay Deposition Exhibit 12 identified.)
BY MR. WEBB:
Q And let's take a look at page 41 is where, I believe, the conversation occurred.
A You are talking about page 41 of the four pages?
Q Yes. Yes. Yeah. And it is, as I see it, it is line 15 to 16 is the question posed by Mr. Rothrock and where he says, "Could you give us the definition of the receipt date in column 5," and that pertains to --
A Excuse me a minute.
Q Okay. I'm sorry.
A There is four sections that have a line 14



and 15 on it. Which one?
Q It is on page 41.
A Well, page 41, that's why I was asking, because --
Q It is this -- I apologize. It is page, actually, 11, pages 38 to 41. I thought when you said bottom right you were talking about --
A Okay. So I'm supposed to go to the --
Q Yes.
A -- quad 41.
Q Exactly. I'm sorry. My fault.
A Okay. Go ahead.
Q And as I see it, the question's asked -- the relevant question's asked on page 41, line 15 to 16, the response is line 17 and 18, where Mr. Rothrock asked, "Could you give us the definition of the receipt date in column 5," as it pertains to one of Mr. Chavarria's exhibits. And Mr. Chavarria responds, "This is the date captured by Andersen as the date the funds were received." And Mr. Rothrock states, "Mr. Chavarria, when you say, 'Andersen,' I think you're referring to the Arthur Andersen



reconciliation study; is that correct?" And Chavarria responds, "That is correct." And the next is, "And that's something we talked about in your last deposition, and we understand each other what we mean by that?" And Mr. Chavarria's response, "I hope so." And I won't take up time and I also won't make you sit through and go through his deposition right now for a reference of "apparent receipt dates" but I would draw your attention to the index, to the -- well, if we had a copy of it. We don't have a copy of it. I would represent to you that the index indicates that "apparent" -- the word "apparent" does not appear in the deposition transcript but we don't have the index in this exhibit so we will pass on that question.
Did you verify that Mr. Chavarria used apparent receipt dates in his calculations for his expert report in this case?
A You know, I can't tell you, Kevin, for sure if I -- what I looked at exactly at this point. I'm getting tired.
Q Okay. I understand. And we don't have

much longer, I promise you.
A Right. Detailed question like that, I -- I'm burned out on that.
Q Okay. On the second sentence, you state that apparent receipt dates are not necessarily when the funds received, they are just estimates. Actually, I may have put, "they are just estimates." Let me look at that. Yes, that's mine. My editorial comment.
A I think that's a good comment.
Q Okay. Thank you. You use the term "not necessarily." Again, that's because it is uncertain?
A That's correct.
Q So it is possible that the receipt dates were when the funds were received?
A It is very possible.
Q Possible. Okay. Did you verify the statement's accurate as pertained to the Tranche One months or leases by looking at the actual data?
A I looked at the same data Mr. Chavarria applied.
Q And what receipt dates did you rely on for



your calculations?
A I think the same receipt dates that were in that detail but I can't remember exactly.
Q Paragraph 8, you -- in the second-to-last sentence in paragraph 8, the one that starts, "however," see it about five line down, says, "However, those posing dates"?
A Uh-huh.
Q Essentially, you say, however, those posing dates are not necessarily the actual -- the date the royalty collection was actually deposited in such accounts or the date that the deposit began earning interest; is that accurate?
A Yes, that is.
Q What do you define as a posing rate -- posting date? I'm sorry.
A The posing dates, I think, were the references to the Arthur Andersen report where they used the apparent receipt dates, and I'm saying that they may not be the actual date they were deposited in the account or the date they began earning interest.



Q And, also, you use the term "not necessarily." Is that, again -- it is uncertain?
A It is uncertain.
Q So it is possible that the posting dates were the date the royalty collection was actually deposited or the date the deposit began earning interest?
A It is possible.
Q Did you verify the statement's accuracy to Tranche One months or leases by looking at actual data?
A The question can't be answered by looking at the actual data. I looked at the actual data but it doesn't answer the question because you can't tell from the actual -- from the -- you know, the term "actual data" is really not even an appropriate term because you don't know whether or not the information on those bills of collection is true or not.
Q Do you know -- what is your understanding of the relevance of the posting date and the calculation of interest?
A The posting date was, I think, the apparent



date that Arthur Andersen utilized in some instances.
Q I want to take a quick break and I can see if we can cut some of this down and get out of here sooner rather than later.
VIDEO OPERATOR: The time is 19:03:31. Off the record.
(Recess.)
VIDEO OPERATOR: On the record. This ends tape number four and concludes volume one of the testimony of Stephen Jay in the matter of The Osage Nation versus the U.S. The date is December 7th, 2005. The time is 19:19:35. Off the record.
(Whereupon, at 7:19 p.m., the deposition was concluded.)

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

X

Subscribed and sworn to before me this day of , 20 .

X
Notary Public

My commission expires: .



CONTENTS


| WITNESS | PAGE |
|---|---|
| Stephen A. Jay | |
| by Mr. Webb | 4 |


EXHIBITS


| JAY DEPOSITION EXHIBIT NUMBER | IDENTIFIED |
|---|---|
| 1 - Subpoena | 4 |
| 2 - Documents responsive to subpoena | 4 |
| 3 - Expert report | 4 |
| 4 - Rebuttal expert report | 4 |
| 5 - 10/21/05 letter from Pilsk to Burton with attachments | 4 |
| 6 - Arthur Andersen report | 4 |
| 7 - Chavarria expert report | 4 |
| 8 - Lundelius expert report | 4 |
| 9 - Rate sheet | 4 |
| 10- BIA summarized statement of Account No. 7386, Fiscal Year 1986 | 4 |
| 11- 12/7/05 letter from Rothrock to Webb with attached additional documents from Jay | 13 |
| 12- 11/9/05 Chavarria deposition transcript | 407 |

# Transcript of the Testimony of **Stephen A. Jay**

**Date:** December 8, 2005
**Volume:** 2

**Case:** The Osage Nation v. The United States of America

Printed On: December 13, 2005

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -x
THE OSAGE NATION AND/OR TRIBE: Nos. 99-550L &
OF INDIANS OF OKLAHOMA, : 00-169L
Plaintiff, :
V. :
THE UNITED STATES OF AMERICA,: Judge Emily C.
Defendant. : Hewitt
- - - - - - - - - - - - - - - -x

DEPOSITION OF STEPHEN A. JAY
(Volume 2)

Washington, DC
Thursday, December 8, 2005

REPORTED BY:
VICTORIA L. WILSON

Deposition of STEPHEN A. JAY, called for further examination pursuant to notice of deposition, on Thursday, December 8, 2005, in Washington, DC, at the offices of Akin, Gump, Strauss, Hauer & Feld, 1333 New Hampshire Avenue NW at 12:02 p.m., before VICTORIA L. WILSON, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

JERRY E. ROTHROCK ESQ.
Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue, N.W.
Washington, DC
Email: Jrothrock@akingump.com
On behalf of Plaintiff

-- continued --



APPEARANCES (Continued):

KEVIN S. WEBB, ESQ.
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street, N.W.
Washington, DC 20004
Email: Kevin.webb@usdoj.gov
(202) 305-0267
On behalf of the United States of America

ELISABETH C. BRANDON, ESQ.
U.S. Department of the Interior
1849 C Street, N.W., Room 6038
Washington, DC
(202) 208-4218
On behalf of the Department of the Interior

VIDEO OPERATOR: Larry Flowers



P R O C E E D I N G S

VIDEO OPERATOR: This is the continued deposition of Mr. Stephen A. Jay. The date is December 8th, 2005. We are on the record.

Whereupon,

STEPHEN A. JAY

resumed the stand, having previously been duly sworn, was examined and testified further as follows:

EXAMINATION (Resumed)

BY MR. WEBB:

Q Mr. Jay, good morning.
A Good morning.
Q Hope you are reinvigorated from yesterday and I assume you understand you are still under oath.
A I do.
Q And let me ask you, did you have any conversations with your attorney regarding the substance of your testimony you have given already or that you plan to give as part of this deposition?
A I did.
Q Okay. Can you tell me what the substance



was of that conversation?
A Basically, the substance was that Mr. Rothrock thought that at certain times I failed to remind you that the data that Mr. Chavarria looked at in regard to particularly deposits that I also looked at, it referred to his actual data, and in our opinion, that is not actual data. Those are documents but they don't show the actual date the money was received. They don't show the actual date the money was deposited. They don't show the actual Tranche One leases. So any time you use actual data in regard to those documents, you know, I just want the Court to be sure and know that I don't agree with that term as it being actual data.
Q Okay. I think that's -- I think that's clear?
A Sure.
Q Thank you. Let me ask you, before we jump back into deposit lag time --
A Okay.
Q -- and our discussion of the report, rebuttal report, as it addresses that subject, to

look at the different charts that you have presented, the schedules, as part of your primarily expert report and your rebuttal expert report and if -- essentially, I am trying to get to your big figure, the total figure you have.
A Okay.
Q If I was to take from your initial report, it would be Schedule A and then Schedule D --
A That's correct.
Q -- from your -- and also -- and that -- it was with the assumption that I think you presented on Schedule D that that number is divided by 12 as part of the calculation. And then take that and add that -- those -- the numbers from -- the number from Schedule A, the number from Schedule D to the number on Schedule B in your rebuttal report, that being the late payment --
A Okay.
Q -- the number on Schedule C in the rebuttal, which is the recalculated --
A Recalculation.
Q -- and then the number on Schedule F that



you had in your rebuttal and with the provision that that number would be divided by 12 as it pertains to the Tranche One months.
A I think that sounds right but let me take a look at that rebuttal report.
Q Yes, take a look. I'm just trying to keep all this straight in my mind.
A Yes, that's fine. Let's just check that to be sure. I agree with you. Schedule A from my original report, not Schedule B --
Q Right.
A -- Schedule D from my original report, not Schedule E. Schedule F used to be the summary.
Q And not Schedule C either, correct, the original?
A No. I'm going to replace that with a new Schedule C.
Q All right.
A And then, let's see, schedule in my new report, Schedule C is the correct amount. Schedule B is the penalties that we are saying are appropriate.
Q Right.



A And Schedule F is the summary of the present value of the underperformance. That would be it.
Q Okay. Good deal. Let's get back into our good friend deposit lag time.
A Okay.
Q And let me ask you some questions, and primarily we are going to focus on some of the language in your rebuttal report. Do you have that?
A I do.
Q It is -- you know the number better than I do probably by now. It is 8?
A 4.
Q Shows you know it much better than I do. I'm looking here at paragraph 9 of your rebuttal report and that's on page 3, and in paragraph 9, the second sentence -- well, actually, let me read the first sentence. "Under these circumstances, I reasonably relied on the data that Arthur Andersen used in its study of deposit lag time for the fiscal years that include the Tranche One months. Admittedly, this data is not perfect for the reasons



described above and in my report." Can you define for me what you meant by "not perfect"?
A Well, Arthur Andersen had the same problems that I just finished describing to you about Mr. Chavarria and that is they didn't know the actual deposit date. They didn't know the actual date that the money was, of course, collected.
THE WITNESS: That's me. Excuse me.
(Telephone ringing.)
THE WITNESS: I can fix that. Excuse me just a second.
Okay. They had the same problems that Mr. Chavarria did. They didn't have the exact date of the money being collected, the exact date of deposit, they don't show the exact leases either. So that's what I am trying to describe in that situation.
BY MR. WEBB:
Q Okay. And the last sentence in that paragraph states, "However, because it," and I assume you are referring to your report there; is that correct?

A Let me get this in context.
Q Okay.
A Okay.
Q Okay. In that third sentence in paragraph 9 on page 3 where it says, "However, because it," and the "it" refers to your report; is that correct?
A No. What it refers to is the fact that -- well, it does refer to my report and the fact that I used a longer period of time to do my analysis.
Q Right. I don't mean -- I was actually going to read the full sentence so I will let you get to that. I just wanted to cover the "it" part. "However, because it covers" -- and I'm reading the sentence now, for the record -- "However, because it covers a longer time period and a larger number of transactions, this data is more representative of the actions of the United States as trustee than the data used by Mr. Chavarria and, in any event, provides a good proxy for the Tranche One transactions." Did I read that correctly?
A You did.
Q Can you tell me what you meant by "covers a



longer period of time"?
A Well, basically, what it does, it covers a fiscal year, the period of time that I used for that analysis.
Q How about "larger number of transactions," what does that mean?
A Well, there is -- there were -- Mr. Chavarria came up with one transaction that was in excess of five days in regard to lag time. There was another one that was three days of lag time that he doesn't consider appropriate. My transactions cover all the transactions that had to do with lag during that fiscal year.
Q During the year as opposed to the month?
A That's correct.
Q And then you state -- you say -- you use the term here "this data." I assume you are referring to the data that you use for your report?
A That's correct.
Q Okay. You say, "This data is more representative of actions of the United States as trustee." Can you tell me what you meant by that?



A I think that -- that it is more representative. In other words, it demonstrates a better idea of what was happening at the trust level by the United States trustee than the specific data that Mr. Chavarria picked out.
Q Okay. And then you say, "and, in any event, provides a good proxy for the Tranche One transactions." Can you tell me what you meant by "good proxy"?
A It is a good estimation.
Q Okay. And are you, in essence, saying here that a longer period of time and a larger number of transactions provide a better sample than Tranche One? Is that what you meant by --
A I'm saying it is a good -- it is a good estimate as to what the Tranche One transactions would be.
Q I guess my confusion is whether by saying more representative of the actions of the United States as trustee, are you referring to the United States' actions as a trustee in general over an extended period of time or are you referring to more



representative of the actions of the United States as trustee during Tranche One?
A Well, it had to do with Tranche One the way we divided it down.
Q Okay. So that's how it is focussed. I just wanted to --
A Sure.
Q Okay. And what is your basis for those statements?
A My personal opinion.
Q Simply your personal opinion?
A Yes. The data that we have to work with from Arthur Andersen report is the same data, in effect, that Greg used. It is subject to the same problems as far as those dates and actual records that are not there that Greg had. Because of that, it takes into account a wider span and I think would be more representative of the Tranche One period.
Q Okay. Let's take a look at paragraph 10 and here -- let me find the proper language. Well, essentially, let me see if I can -- here it is. You say, "The inflationary index rates should not be used

to compute the present value of interest lost due to deposit lag time or anything else because those rates do not measure the time value of money." Do you see that?
A I do.
Q And did I read that correctly?
A You did.
Q And let me ask you this: What's -- what's wrong with measuring the time value of money?
A I did not say that I was -- I did not say there was anything wrong with it.
Q Okay. Well, what's the issue with -- that you have with -- I'm sorry. I mis -- misunderstood your statement. I apologize. It is a poor question because I should have read the following sentence, which says, "Rather, those rates merely track changes in the purchasing power of a dollar from 1981 to 2005 based on the changes in the rate of inflation." Did I read that correctly?
A Exactly right.
Q And what I should have asked was what problem do you have with tracking the changes in the



purchasing power of the dollar in this -- in this instance?
A It doesn't provide compounding. In other words, it doesn't provide a return on the money that was not paid out.
Q Okay. And have you ever used inflationary rates for a calculation for your clients?
A Not in a transaction similar to this.
Q How have you used inflationary index rates?
A I don't think I have ever had to use the inflationary index. I have used the inflationary rate, you know, the CPI and that type of thing before to do various things but not to calculate a damage calculation.
Q Can you give me examples of what you have used before?
A I would have to go back and -- I would have to search back but I know I have used it because I have had to look it up before.
Q But nothing comes to mind right now as far as a specific example?
A No.



Q Okay. Did you ever consider using the inflationary rates for your calculations for this, your expert opinions?
A Absolutely not.
Q Okay. Let's look at paragraph 12, now, at the bottom of page 4 and here you state that the benchmark rates -- and you see it, I think it is the third sentence in paragraph 12, about four lines down -- it says, "The benchmark rates are an appropriate measure of the time value of the interest the United States lost due to deposit lag time because, as shown by Schedule A, they generally track the expected rates of return that, according to Mr. Lundelius's expert report, a prudent trustee would have earned for funds collected for the Tranche One months." Did I read that correctly?
A That's correct.
Q What do you mean by "generally track"?
A They run similar to what Mr. Lundelius had as far as the expected rates of return. They are actually, in most cases, I think, a little bit less than Mr. Lundelius's expected rate of return.



Q And when you say, "similar," do you mean that they are similar in number or similar in fluctuation or --
A Similar in number and similar in fluctuation. They -- if I remember right, they will run anywhere from 1 to 2 percent less than Mr. Lundelius's expected rate of return, so, therefore, if anything, they are conservative.
Q Did you look at any other numbers in terms of tracking the benchmark?
A Well, I compared them, as I explained to you yesterday, I compared them to the seven-year yield and they generally tracked the seven-year yield somewhat similar to the way they do Mr. Lundelius.
Q What is the importance or significance of general tracking?
A Well, I guess, in this instance, it is used as an example that the -- the benchmark rates are not that far out of line.
Q Okay. Let's take a look at Schedule A --
A Sure.
Q -- from your rebuttal report and do you

have it there?
A I do.
MR. WEBB: Jerry, do you have a copy?
MR. ROTHROCK: I don't at the moment. If you have an extra copy, that would be great.
MR. WEBB: Would you like a copy. I may have one in the box. Let me see if I can grab one. Hold on for one second.
I think this is a complete copy.
MR. ROTHROCK: That's fine. Thanks, Kevin, very much.
MR. WEBB: Sure. No problem. We are on Schedule A. I'm not certain what page that appears on but --
BY MR. WEBB:
Q Let's see. Could you describe for me your Schedule A, how it is structured?
A Sure. What -- it is set up in two parts. What it compares, in the first line, Mr. Lundelius's rate with the BIA rate, benchmark rate, and it shows Mr. Lundelius's rate for 1976, '79, '81, '86, '89, '91 for his Tranche One quarters and it compares



that to the BIA rate and it shows the differences in the rate. In '76, the BIA was higher by 1.3 percent. In '79, it was higher by .003 percent. '81, it was lower; it was lower than Mr. Benchmark -- Mr. Lundelius's rate by 1.48 percent. In '86, it was higher than his rate by 1.67 percent. '89, it was lower -- or higher than Mr. Lundelius's rate by one-half of 1 percent. And in 1991, six-tenths of 1 percent it was higher.
Q And here we are looking at the Tranche One years; correct?
A That's correct.
Q And your comparison of the BIA benchmark rate to the -- Mr. Lundelius's -- I forget how we described it yesterday but sort of a quarterly rate?
A His expected --
Q Is that right?
A What he would expect from a prudent investor for a quarter.
Q For a quarter. Okay. And what do you think -- what is the threshold percentage difference between interest rates you consider to be



significant?
A I think we talked about that last night and I would say anything over 1 would be significant.
Q Okay. I just wanted to confirm that. If I wanted to calculate the percentage difference between what you have here as the Lundelius expected rate and the BIA benchmark rate, how would I do that?
A You would sub -- the difference between the two is just a subtraction process.
Q Okay. What about if I wanted to find the percentage difference?
A You would have to divide the percentage difference by the original rate. In other words, if you took -- for 1976, if you took 1.30 and divided by 5.34, it would give you the percentage of change.
Q And did you do that calculation?
A No, I didn't.
Q Would you be surprised if I told you that it was a 20 percent difference?
A That's -- eyeballing it, that's about exactly right.
Q Okay. And with my remedial math, I was



able to figure this out, I think, and I think you can find I did it correctly.
A Right.
Q But in 1981, I found about a 10 percent difference?
A 1981, I would think -- that would be about -- no, I would think it would be higher than that.
Q Okay. And in '86, you found about a 20 percent difference?
A Could be, uh-huh.
Q And you consider those to be fairly significant differences; right?
A I would, uh-huh.
Q Do you still feel that these numbers generally track one other?
A I think that they are representative of what was going on. If you say that, therefore, they are inappropriate, you know, it is a judgment call.
Q Okay. Give me one sec here. Go back to -- let's go back to your report, paragraph 12, and it is the last sentence that starts on page 4. It is the,

Page 477

"In addition, the benchmark"; do you see that?
A Right.
Q It is in the second-to-last line. It says, "In addition, the benchmark rates are appropriate because they were computed by BIA, represent an average rate of return for many tribes and bear a close relationship to the time period during which the lost funds have been withheld from the Osage Nation than the rates used by Mr. Chavarria." Did I read that correctly?
A That's correct.
Q Can you tell me what you meant by "computed by BIA"?
A Well, my understanding is they were computed by BIA. If you go back to the Andersen report, it tells you the BIA gave them the rates.
Q And do you consider computations -- do you generally consider computations by BIA to be appropriate?
A You know, it is hard to say. You don't know how accurate they are. Like we talked about yesterday, it is an unmeasured computation. You

Page 478

know, Arthur Andersen set out to measure that computation. They eventually decided they couldn't measure it, pulled off and did an alternative calculation that used the computation they couldn't make, so it is -- it is an indication as to what we have got there.
Q Okay. Given that, why do you use it as a basis for your opinion that the benchmark rates are appropriate?
A Well, the BIA says that's what they earned and so I say that's what the Osage Nation should earn according to BIA's own statement.
Q Okay. Then you say that they -- well, I think we already talked about representing an average rate of return for many tribes.
A Right.
Q And what makes up the benchmark, I think we talked about that already.
A Right.
Q But I'm a little unclear as to what you meant by "bear a close relationship to the time period." Can you tell me what you meant by that?

Page 479

A What Mr. Chavarria is utilizing is he is utilizing, first of all, an inflationary index rate, which has only to do with -- with the amount of change in the value of a dollar during a period of time, so I don't think it has anything -- any kind of relationship to interest rates. The other thing is he uses a quarterly interest rate and I don't think that -- that quarterly interest rates reflects what's happened over the period of a year, like the benchmark rate does.
Q Let's take a look at paragraph 13 here which -- and correct me if I am wrong but you are making some of the same statements about the seven-year treasury rate in 13 that you are making about the benchmark in 12. Is that close?
A That's correct.
Q Okay. And you use the term here, I believe, "generally track," in that last sentence.
A Okay.
Q You are using the term here in the same manner that you are using it in paragraph 12?
A I am.

Page 480

Q Okay. And let's take a look at your Schedule A again. I think when we talked about it last time, you just addressed the top portion.
A Right.
Q Would you want to go ahead and address the bottom portion?
A And the process is the same thing for the bottom portion, the only difference is instead of the benchmark rate, I used the annual seven-year Treasury yield and compute the difference between the two and show whether or not one is higher or lower than the other.
Q And that seven-year Treasury yield, the annual -- well, I guess the -- the seven-year Treasury yield is being compared to Mr. Lundelius's rates for a quarter, the Tranche One quarter, as I think we addressed?
A That's correct.
Q And, again, going through some of the math in terms of the percentage difference, and let me know if these seem appropriate to you or right to you.

A Okay.
Q It is -- in 1976, I had about 28 percent difference between the two numbers?
A Yes, but, you know, of course, we didn't use the seven-year Treasury for anything in 1976.
Q Okay.
A Do you agree with that?
Q So you are just using that just showing the general tracking?
A I'm just showing you the tracking.
Q Okay. But then we also have a difference in '79 of around 10 percent and '81, about 15 percent or so?
A Right. And for any of those years, we didn't use the seven-year Treasury yield.
Q But you use this comparison as a basis for the use of the seven-year Treasury yield because you thought it generally tracked; correct?
A Yeah. Okay. First of all, for the years '76, '79, '81, '86, '89 and '91, we didn't use the Treasury yield for any of those.
Q Right.



A Okay? There are no computations that are based on the Treasury yield for that. They are all based on the benchmark rate. What I am doing here is I'm just trying to show you how these rates track.
Q Okay.
A And sometimes one is up, sometimes the other one is down.
Q Okay. That's fine. Let's take a look at -- let's see. Okay. It is the last sentence in paragraph 13. I was wondering if you would help me. I was having a little difficulty understanding. In -- you state, "In addition, during the period subsequent to fiscal year 1994, these rates generally track the benchmark rates and, as a result, are good proxies for the benchmark rates in the period after fiscal 1994 when the benchmarks rates are not available." Did I read that accurately?
A You read it accurately but I'm sitting here reading it; that's a poorly worded statement.
Q Yes. I didn't understand it.
A Because the benchmark rates, we don't have anything after 1994. What I was trying to say is



that the seven-year Treasuries track the benchmark rates prior to 1994.
Q Okay. That's what I thought you meant but I wanted to make certain.
A You are right.
Q Are you aware of any government policy that the government invested its funds under a hold-to-maturity policy?
A No, I'm not.
Q If you -- if there was such a policy, would that change your opinion regarding the investment of Osage funds in long-term investments?
A It might. It depends.
Q Depends on what?
A Depends on, you know, like we talked about last night, what's considered a long term, what you foresee out there as the future. If you see the procedure is -- as not ever having to dig into those minimum funds that I was indicating, and I think I indicated to you last night that I thought one year or so would be how far I would be willing to go out, I don't think there would be a problem with that



policy if they had a hold-to-maturity policy.
Q Okay. Have you determined a percentage difference between -- actually, strike that.
Let's move on.
MR. ROTHROCK: Kevin, can we go off the record for just a second here?
MR. WEBB: Sure.
VIDEO OPERATOR: We are off the record. The time is approximately 12:27 p.m.
(Recess.)
VIDEO OPERATOR: We are back on the record. The time is approximately 12:30 p.m.
BY MR. WEBB:
Q Okay. I'm just looking through a few things here, which I'm hoping that I can skip over.
A Okay.
Q Try to get you out of here sooner rather than later. There is one thing, if we can take a look at paragraph 16 on page 6, and I apologize for repeating some information. If we are, please feel free to alert me to that.
A Okay.

Q But I just want to talk to you here as you talk about Mr. Chavarria -- a statement in Mr. Chavarria's report. The statements you made here in paragraph 16 regarding his use of apparent receipt dates, posted dates and treating EFTs with zero lag and then the Andersen's treatment of deposit -- deposits for which they could not determine deposit lag days or zero lag, that's similar to the positions you have taken earlier in this deposition. I believe we have covered a number of these subjects; is that correct?
A That's correct.
Q And although one, actually, now that I say it, it comes to mind, I don't know if we have addressed this one statement here where you say that this data also improperly treats transactions for which Arthur Andersen cannot determine deposit lag days as having zero lag days.
A Right.
Q Can you tell me why you consider that approach that you understand Arthur Andersen to have taken as being improper?



A Well, my understanding is that if Andersen could not determine what the deposit lag days were, they treated it as a zero lag, and who knows whether or not that's proper treatment or not. If they couldn't figure it out and treat it as a zero lag, it could have an error rate in there that we don't know about.
Q And do you know within the Tranche One months whether there were deposits for which Arthur Andersen could not determine deposit lag days and provide a zero lag day?
A No, I don't.
Q I guess just to wrap it up, do you know whether during the Tranche One months, whether apparent receipt dates were used rather than the actual receipt dates?
A I think they were, yes.
Q Okay. And that data was posted -- that posted dates were used rather than the actual dates of collection in the Tranche One months?
A That's my understanding.
Q Okay. I just wanted to -- and do you



know -- and one more wrap-up.
A Sure.
Q That -- that in the Tranche One months, EFTs were incorrectly assumed to have zero days lag time?
A Right.
Q Okay. Thank you for indulging me with possibly repetitive questioning. I apologize if I did that.
A That's all right.
Q My wife tells me I do it all the time so --
A That's okay.
Q -- it's not surprising that I do it here.
Let's look at paragraph 17 now and this deals with the late payment charge part of your report, and if I read here -- let's see -- if I pick up the second sentence, third line down, paragraph 17, I think you have it --
A Okay.
Q -- it is, "I note, however, that if the Court were to accept Mr. Chavarria's calculations, the Osage Nation would, nonetheless, be entitled to



late payment charges based on the receipt dates that Mr. Chavarria used in his calculations, because in some cases, Mr. Chavarria -- I guess Mr. Chavarria's receipt dates are after the royalty -- the dates the royalties were due." Did I somewhat read that correctly -- did I read that correctly?
A Yes, you did.
Q Okay. Could you -- now, are you -- do you consider yourself -- I think we addressed it before -- an expert on collections?
A An expert on collections. Are you talking about government collections? Are you talking about oil and gas collections?
Q Why don't we strike that because, actually, you know, I think we have addressed this already and, again, I want to not have you go over testimony that you have already done before.
A I appreciate it.
Q Have you reviewed the history of Osage collections?
A The ones that are included in the Arthur Andersen report and the ones that Mr. Chavarria has

included, yes.
Q Okay. Have you done any research on the collection practices of the -- the Osage Agency in terms of their receipt of -- of royalty payments?
A No, I have not.
Q Okay. In your -- the sentence I read, you use the term "in some cases." Can you define what you mean by that?
A Well, in the -- Mr. Chavarria listed several items in his report that he says that he looked at documents on and if I could find Chavarria's report, I could tell you where to go to look at that.
Q I'm guessing it is Exhibit 7, hazarding a guess at that.
A Right. I think it was Schedule G support, if I remember right. My memory may be -- no, Schedule C support. If you look at page 1 of Schedule C support, you will see there listed that this is a -- what he calls a lag day on a Tranche One month that he shows that the transactions, apparently -- we don't agree with whether or not they



were actually received, but apparently received on 12/29/1980. That's, from my understanding, four days subsequent to when they were supposed to be received by, which was by December 25th.
Q And what's the basis for that understanding?
A It is my understanding of what the requirements were for the Osage in talking to Mr. Rothrock.
Q And that's how you determined that the late payment fee was owed, based on that?
A That's -- that's correct.
Q And you determined the date of collection from that?
A I determined the date of receipt based on what Mr. Chavarria said it was. Now, whether or not it was actually that or not, I don't think Mr. Chavarria knows, nor do we know because no one knows what the actual date of receipt was.
Q Are you familiar with the -- trying to think of the proper term here -- but I guess it would be are you familiar with the relationship between the



agency and the -- the individuals paying the royalties as it -- they pertain to late payment fees?
A The relationship.
Q Relationship or a contract or agreement between --
A I have never read them, no.
Q Okay. Do you know who would pay a late penalty if one were to be assessed?
A The oil and gas company.
Q Do you know whether or not there was an attempt to collect a late fee associated with this late payment that you have identified?
A No. No, I do not.
Q And do you know whether there -- whether or not a late fee was ever collected for this late payment you have identified?
A No, I do not.
Q Okay. Let's take a look at the schedule that you prepared which corresponds to this section of the report. I believe that's Schedule B of your rebuttal.
A Okay.



Q And could you explain what Schedule B represents?
A It represents the total dollar amount that was taken from Mr. Chavarria's Schedule C support, page 1 of 2, of $253,000, shows the days of late remittance, computes the penalty amount on the $253,000 and then computes present value of what that money would be at September 30th, 2005.
Q Okay. And --
A And I see an error right there just jumped out at me. Receipt date is not 12/29/2005, it is 12/29/1980.
Q I was going to ask you how you were able to see into the future.
A Yeah, I was clairvoyant.
Q And wondering why if you were able to do that -- just strike that.
The document description, was there a Bates number in addition to the document description that appears, do you know, for the document that --
A No. I think there is a Bates number in Mr. Chavarria's schedule back here. I think it is a

B.1, if I remember right. He lists all the different data that he looked at. B.1, page 1 of 1. That document was one of these CT documents down here. Which one, I can't remember.
Q You have it listed here, the CT, so that's easy enough.
A Here it is, CT5G5679.
Q Okay. Thank you. And then the days of late remittance, that came from your subtraction of the date that appears in that chart from the 25th?
A Right.
Q And then how did you determine the penalty rate for the late remittance?
A I think it was 1.5 percent per day, if I remember right.
Q And what's the basis for that?
A That was the basis of my understanding with Mister -- Mr. Rothrock.
Q Okay. And how did you calculate the present value?
A I think I used the -- the same rates that I have used for all my other present value calculations



and I don't remember that for certain but I think it was based on the benchmark rates through 1994, the seven-year Treasury yields for the rates after 1994.
Q Were you able to identify any other late payments besides this one late payment?
A I was and it -- it's been subsequent to the preparation of the schedule, but in Mr. Lundelius's report, he shows a payment received on 3/2 of -- I think it was the -- let's see -- February month was 1979, if I remember right -- no. Trying to remember what -- can I look at Mr. Lundelius's report real quick?
Q Yes, that's fine.
A Tell you when it was. But there is a payment received from Sun subsequent to the date they should have received it. No, it was in the '76 year. I'm sorry. 3/2/76, Sun Oil Company, $539,000, some small ones from Phillips and some other people. It looks to me now after I have had a chance to think about this a little bit more, probably should be computed for late payments, also.
Q And based -- and why should it be computed



for late payments?
A Again, it was received after the 25th of February.
Q And do you know whether or not there is an attempt to collect this late fee?
A No, I don't.
Q And do you know whether there was -- a late fee was ever collected?
A No, I don't.
Q And what is your familiarity with the contract or agreement between the agency and -- I forget the name of the producers. You identified Sun. -- regarding late payments; are you aware of that?
A Again, I'm not familiar with that.
Q Okay. Let's take a look now at paragraph 24 and we jump into the subject of disbursement lag time and, as it is identified in your report, the -- and correct me if I am wrong but I believe it says, "lost interest due to disbursement lag time for checks that were canceled."
A Okay.



Q And looking at paragraph 24, and I have -- as I read this, and I'm summarizing -- let men if this is an accurate summary -- you are saying that Mr. Chavarria did not have a proper -- did not provide a proper basis for estimating the amount of canceled checks because he offered no explanation, he did not use complete data and the source of his data was the Arthur Andersen report which is not audited or reconciled. And -- yeah, would that be accurate?
A This is for paragraph 24?
Q Yes.
A I think what this -- you know, let me read through this real quick.
Q Okay. Please take a second if you want to look at it.
A Deals with canceled checks.
(Witness reviewed the document.)
A Let me tell you in my words what I am saying here.
Q Okay.
A Okay? Mr. Chavarria had found some type of a document that pertained to the time period July

30th, 1987 through September 29th, 1989, and he takes those amounts of canceled checks for that period of time, the percentages, and he applies those to data for other years, primarily years from '76, '79, '81, '86, all right, prior to that period of time, and he says because this is what I found for this period of time, that's probably what went on the other time. I have a problem with that, number one, and that's what I explain, that I don't think that data is representative for the four prior Tranche One months. The second thing he does is that he says that -- that, in effect, he made it sound like in his report that that was complete information, that it included every canceled check that had taken in effect during that period of time. In the hearing or in the deposition that I attended where Mr. Rothrock, you know, pressed him on that question, he admitted that his documentation was incomplete, that he doesn't know whether or not it included every canceled check, but it -- this is the number of canceled checks that he was just able to come up with. And so what we are saying is that he -- he



applied this incorrect nonrepresentative rate for prior years, the rate is not what he says it is, and that is a complete canceled check list, and that this data, because it was the source of it, was the Arthur Andersen reconciliation report, has never been audited or reconciled. So we questioned the authenticity of it, the completeness of it, the accuracy of it, et cetera.

Q Okay. Let me ask you, what explanation did you provide in your expert report for your 1 percent assumption?

A I explained that it was an estimate. I didn't provide any explanation other than that.

Q And what data did you use to come up with your 1 percent assumption?

A It is just a number that I thought would give us an indication as to what could be the problem.

Q And what -- what was the source of your data for your calculation of lost interest due to disbursement lag time?

A The source of my data for disbursement --



loss --

Q The lost interest on disbursement lag time for your calculation.

A For canceled checks, now, are we talking about canceled checks?

Q For canceled checks.

A The source of the data was the amount of checks that had been issued during the year.

Q Okay. And where did that information come from?

A It came from the Arthur Andersen data.

Q And you said -- you criticized Mister -- I believe you criticized Mr. Chavarria's use of the Andersen -- Arthur Andersen report because it, for one reason, you said, has never been audited or reconciled; is that accurate?

A That's correct.

Q Does a document such as this need to be audited and reconciled to be reliable?

A I think it would be helpful, yes.

Q Helpful or does it need to be, though?

A I think it was -- I think it should be.



Q If it does not -- if it was not audited or reconciled, is it thereby unreliable?

A Arthur Andersen's job was to perform a reconciliation and if they performed that reconciliation, this canceled checked listing would be something that should be audited because that's part of the reconciliation process.

Q Okay. But I don't know if that answered my question. I think -- I'm just asking whether a document needs to be audited or reconciled to be reliable.

A In this set of circumstances, I think it does.

Q Okay. And how do you define "audit" and "reconciled"? Take them either together or separate, however.

A Well, to audit a batch of canceled checks, you would have to have a listing of what somebody considered to be the checks that had been canceled, you would have to go back and see whether or not those checks were still outstanding as of the date that they were canceled, what the dollar amounts

were, what particular account group they were associated with, what happened to the money once that amount of money was supposedly canceled, did it go back into the account, where did it go, and, basically, you would track that information to the appropriate supporting documents.
Q Did Andersen say that its report was not reliable?
A No, they said they couldn't perform a lot of steps because they didn't have adequate documentation.
Q If they -- if they had determined that it was not reliable, would that be something that they would state in their -- in the document itself?
A Well, Andersen was in a unique situation. Andersen was doing an Agreed-Upon Procedures report, so, basically, all they had to do was report what they had done according to the instructions the BIA had given them. So they, in effect, were -- it was -- the only way they could be held responsible for making a mistake was if they failed to perform those agreed upon procedures the way the BIA told



them to do so. So they had a pretty safe position.
Q I guess one question I also have is as one of your points of questioning the propriety of -- of Mr. Chavarria's analysis, you note his reliance on the source of his data, as you put it, is the Arthur Andersen project but in the beginning of this paragraph 24, you talk about his unmarked exhibit and I'm wondering whether -- I'm just a little confused because I thought you were addressing his reliance on the unmarked exhibit and your criticism of that for his analysis, but then at the end of paragraph, you focus on the Arthur Andersen report and I'm wondering, is there --
A No, what I am saying is where we are still talking about that exhibit, we are talking about the fact that the source of it, according to Mr. Chavarria, is the Arthur Andersen reconciliation product.
Q Of the unmarked exhibit?
A That's my understanding.
Q Okay. And what data do you think would be necessary to determine the amount of canceled checks?



A I think I have already told you that. That's what I went through a long detailed answer about a minute ago.
Q Well, I apologize if I didn't catch that.
A Right.
Q It happens sometimes.
A That's okay.
Q Do you know what -- do you know what the correct amount of canceled checks is?
A No, I don't.
Q Beyond your rebuttal report, are there any other points in which you disagree with Mr. Chavarria -- Mr. Chavarria's testimony or his expert report?
A I think it sets forth pretty straightforward what I disagree what.
Q Are there -- beyond the rebuttal report and your primary report, are there any other points on which you agree with Mr. Chavarria?
A I think my rebuttal report stands on its own.
Q Okay. And as to Mr. Lundelius, are there



any other points to which you disagree with Mr. Lundelius that are not referenced in your rebuttal report or your primary report?
A I think my rebuttal report stand on its own.
Q And are there any other points beyond your rebuttal report or your primary expert report on which you agree with Mr. Lundelius?
A Same answer.
Q Okay. Are there any other -- beyond your rebuttal report and your expert report, are there any other errors in Mr. Chavarria's methodology results, conclusions or opinions that you have determined that are not referenced in the --
A I don't believe so.
Q Okay. And as pertains to Mr. Lundelius's -- Mr. Lundelius, are there any other errors in his methodology, results, conclusions or opinions that have not been referenced in your rebuttal report or your primary report?
A You know, the only thing that I found kind of interesting was the F-2 data that he put -- that

you called my attention to last night that really I hadn't paid much attention to and it looks like he got his source numbers wrong.

Q Can you refresh my recollection?

A Oh, last night we were looking at comparison of his F-2, which was a reconstruction of my Schedule E.

Q Right. Okay.

A And I think his numbers are all out of whack.

Q I remember your identifying the difference between, I think, your chart and his chart.

A Right. And I didn't make a big deal out of it last night because that schedule that he is -- he was messing with, anyway, we're not utilizing any more, but that's the only thing I think that's not explained in my rebuttal report.

Q Okay. Have you completed all your work on this project?

A You know, I guess the answer is I don't know. As far as I -- as far as I know right now, I am.



Q Do you have any outstanding tasks that you are -- you are working on?

A Not that I know.

Q Are there any tasks that you have planned for down the line?

A Not at this point.

Q Not at this point. Okay. Is there anything further you would like to address?

A No.

MR. WEBB: Okay. I don't have any further questions, Jerry, other than just to say we assert that the deposition be continuing, as I believe is the understanding with almost all the depositions that have been part of this case, but with that, we have no further questions.

MR. ROTHROCK: I just have one quick comment for the record. I have continued a number of depositions but they haven't been for specific reasons, such as privilege claims, and I don't know if this schedule permits a general continuation or not but I also don't think we need to resolve that right now.



Also, I wanted to repeat -- make a qualification that perhaps I should have made at the very outset. I just wanted to note for the record that in his report, Mr. Jay addressed all the data that he could in Greg Chavarria's report, Charles Lundelius's report, without regard to whether it was proper for the government to rely on some of that data. That's something for the lawyers to work out. I just thought it was more efficient to let him go ahead and address it and he said he would do that without -- well, we claim without waiving any right to object to some of that data but that's a matter the lawyers can take up later.

MR. WEBB: Okay. I believe that's all.

VIDEO OPERATOR: We are off the record. The time is approximately 12:55 p.m. This concludes today's testimony of Mr. Stephen A. Jay.

(Whereupon, at 12:55 p.m., the deposition was concluded.)



I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

X

Subscribed and sworn to before me this day of , 20 .

X
Notary Public

My commission expires: .

Page 509

CONTENTS

| WITNESS | PAGE |
|---|---|
| Stephen A. Jay (Volume 2) | |
| by Mr. Webb (Resumed) | 459 |

EXHIBITS

(None marked this volume.)