United States General Accounting Office

GAO

January 2001

# FEDERAL TRUST AND OTHER EARMARKED FUNDS

## Answers to Frequently Asked Questions

G A O
Accountability * Integrity * Reliability

GAO-01-199SP

# Contents

Preface 5

Section 1: What Are Federal Trust and Other Earmarked Funds? 7

1.1 What Are Federal Trust Funds? 7
1.2 How Are Federal Trust Funds Different From Private Trust Funds? 7
1.3 How Do Federal Trust Funds Fit Within the Unified Budget Concept 8
1.4 What Fund Types Within the Federal Budget Are Earmarked? 9
1.5 What Are the Differences Between Earmarked Fund Types? 10
1.6 How Many Earmarked Funds Are There? 12
1.7 Why Are Earmarked Funds Established? 14
1.8 When Were Earmarked Funds Established? 15
1.9 By Design, Earmarked Funds May Accumulate Balances. What Do Balances Really Mean? 16
1.10 What Receipt Sources Contribute to Fund Balances? 17
1.11 What Do Funds Do With Their Balances? 17
1.12 What Do the Treasury Securities Represent? 18
1.13 To What Extent Do Earmarked Funds Earn Interest? 19

Section 2: What Is the Composition of Earmarked Funds? 20

2.1 What Are the Sources of Income for Earmarked Funds? 20
2.2 What Purposes and Activities Do Earmarked Funds Finance? 23
2.3 What Is the Relationship Between the Sources and Uses of Earmarked Funds? 23
2.4 What Earmarked Funds Serve Long-Term Commitments? What Is the Rationale for Earmarking Receipts for These Long-Term Commitments? 24
2.5 What Were the Revenues, Gross Outlays, and Balances of Earmarked Accounts in Fiscal Year 1999? What Portions of These Amounts Represent Long-Term Commitments? 25
2.6 How Do Accumulated Balances of Earmarked Funds Affect the Government's Ability to Meet Its Long-Term Commitments? 26

Section 3: How Are Earmarked Funds Controlled in the Federal Budget Process? 28

3.1 Are Earmarked Funds Treated Differently in the Budget Process? 28
3.2 Are Earmarked Funds Discretionary or Mandatory? 28
3.3 What Does "Off-Budget" Mean? Are "Off-Budget" Funds Governed by Different Rules? 29
3.4 What Kinds of Special Treatment Have Been Given to Some Earmarked Funds? What Arguments Have Been Used for Such Treatment? 30

## Section 4: How Do Earmarked Funds Affect Federal Fiscal Position? 31

4.1 How Has the Composition of Earmarked Versus Unearmarked Federal Receipts Changed Over Time? 31
4.2 What Is the Effect of Earmarked Funds in Measuring Unified Budget Deficits or Surpluses? 32
4.3 What Are the Implications of Investing Balances in Treasury Securities? 33
4.4 What Issues Are Raised by Proposals to Permit Earmarked Revenues in the Private Sector? 34
4.5 What Does It Mean When People Say the Fund Balances Are Used for Other Than Intended Purposes? 36

## Section 5: Policy and Design Issues Related to Earmarked Funds 38

Transparency Issues 38
Signaling Issues 40

## Appendixes

Appendix I: Scope and Methodology 43
Appendix II: Description of Selected Earmarked Funds 45
Appendix III: List of Funds' Revenues, Gross Outlays, and Balances for Fiscal Year 1999 75
Appendix IV: Glossary 88
Appendix V: GAO Staff Acknowledgments 92

## Tables

Table 2.1: Breakout of Fiscal Year 1999 Revenues, Gross Outlays, and Balance, by Fund Type 26
Table III.1: Earmarked Funds Revenues, Gross Outlays, and Balances for Fiscal Year 1999 75
Table III.2: Top 10 Funds in Each Earmarked Fund Type, by Total Revenues 87

## Figures

Figure 1.1: Fund Types in the Federal Budget 9
Figure 1.2: Comparison of the Number of Earmarked Funds to Funds' Total Revenues 14
Figure 2.1: Concentration of Revenues Among Earmarked Funds 20
Figure 2.2: Sources and Uses of Nonrevolving Trust Fund Receipts 22
Figure 2.3: Sources and Uses of Special Fund Receipts 22
Figure 4.1: Trust Funds' Share of Total Receipts and GDP Over Time 31
Figure 4.2: Effect of Trust Fund Surpluses/Deficits on Unified Budget Totals Over Time 33

## Text Boxes

| | |
|---|---|
| Reclassification of Indian Tribal Funds From Federal Trust Funds to Nonbudgetary Deposit Funds | 8 |
| Application of Trust Fund Criteria | 11 |
| Recording Earmarked Funds | 13 |
| Setting Aside Annual Surpluses of Funds Earmarked for Long-Term Commitments to Reduce Debt | 37 |

**Abbreviations**

| | |
|---|---|
| AIR-21 | Aviation Investment and Reform Act for the 21st Century |
| CCC | Commodity Credit Corporation |
| CSRD | Civil Service Retirement and Disability |
| CSRS | Civil Service Retirement System |
| DCA | Deficit Control Act |
| DI | Disability Insurance |
| ESRD | End Stage Renal Disease |
| FCC | Federal Communications Commission |
| FEGLI | Federal Employees Government Life Insurance |
| FEHB | Federal Employees Health Benefits |
| FEHBP | Federal Employees Health Benefits Program |
| FERS | Federal Employees Retirement System |
| FICA | Federal Insurance Contributions Act |
| FUTA | Federal Unemployment Tax Act |
| GDP | Gross Domestic Product |
| HI | Hospital Insurance |
| LTC | Long-Term Care |
| LWCF | Land and Water Conservation Fund |
| OASI | Old-Age and Survivors Insurance |
| OMB | Office of Management and Budget |
| OPM | Office of Personnel Management |
| PAYGO | Pay-as-you-go |
| REHB | Retired Employees Health Benefits |
| SMI | Supplemental Medical Insurance |
| TEA-21 | Transportation Equity Act for the 21st Century |
| TVA | Tennessee Valley Authority |
| UC | Unemployment Compensation |
| USDA | United States Department of Agriculture |

# Preface

In fiscal year 1999, trust fund receipts represented nearly half of all federal budget receipts. Despite their importance in the budget, the relationship between federal trust funds—such as the Social Security or Medicare trust funds—and other earmarked funds—such as the Nuclear Waste Fund or the Postal Service Fund—and the rest of the federal budget can be confusing to both policymakers and the public. There is confusion about the distinction between federal trust funds and private trust funds, about how trust funds compare to other fund types, about how earmarked funds are controlled in the federal budget, and about the relationship between fund accounting and the government's overall financial condition.

Prior to 1969, three concepts were variously used as federal budgets: (1) administrative, (2) consolidated cash, and (3) federal sector in the national income accounts. The most commonly used of these, the administrative budget, excluded the operations of all trust funds, which were shown in the consolidated cash and national income accounts budgets. Trust fund transactions did not receive much attention in appropriations debates and action. The administrative budget was viewed as an increasingly incomplete and unreliable measure of government activities.

Acting on a recommendation from the 1967 *Report of the President's Commission on Budget Concepts*, the federal government adopted a unified budget for fiscal year 1969—including the transactions of both federal and trust funds in calculating a single budget surplus or deficit. Separate accounts were maintained for the individual trust funds, and tabulations were made of the trust fund and federal fund groups in total. Although the decision to include trust fund transactions in the 1969 budget produced a single statement of the United States government's use of funds, it did not definitively resolve concerns about the budget treatment of trust funds. Rather, it opened a new debate on trust fund budget treatment and status. For example, some observers raised concerns that inadequate attention was being paid to whether trust fund surpluses were being used to finance and mask increasing federal funds deficits.

We developed this report to provide answers to some basic questions that often arise about trust funds and other earmarked funds. In addition, appendix II contains a more specific discussion about some of the larger earmarked funds, and appendix IV contains a glossary of relevant budget terms.

This document was prepared under the direction of Paul L. Posner and Susan J. Irving, who may be reached at (202) 512-9573 if there are any questions.

Paul L. Posner Susan J. Irving

Paul L. Posner
Managing Director
Federal Budget Issues
Strategic Issues

Susan J. Irving
Director
Federal Budget Issues
Strategic Issues

# What Are Federal Trust and Other Earmarked Funds?

## Q1.1 What Are Federal Trust Funds

**A1.1** Federal trust funds represent one accounting mechanism used to link earmarked receipts[1] with the expenditures of those receipts. The Office of Management and Budget (OMB) and the Department of the Treasury determine budgetary designation as a trust fund when a law both earmarks receipts to a program and identifies the account as a "trust fund" account.

## Q1.2 How Are Federal Trust Funds Different From Private Trust Funds?

**A1.2** In the federal budget the meaning of the term "trust" differs significantly from its private sector usage. In the private sector, a person creates a private trust fund using his or her own assets to benefit a stated individual(s). The creator of the trust names a trustee who has a fiduciary responsibility to manage the designated assets in accordance with the stipulations of the trust. In the federal sector, the Congress creates a federal trust fund in law and designates a funding source to benefit stated groups or individuals.[2] However, in contrast to a private trust fund, the federal government does not have a fiduciary responsibility to the trust beneficiaries, and it can raise or lower future trust fund collections and payments or change the purposes for which the collections are used by changing existing laws. Moreover, the federal government has custody and control of the funds as well as the earnings of most federal trust funds.

There are cases—such as the federal employees' Thrift Savings Fund[3]—in which the federal government holds nonfederal monies in trust as a custodian on behalf of some entity outside the government. Since the government makes no decisions about the amount of these deposits or how they are spent, they are not considered to be federal trust funds. Rather, they are considered to be nonbudgetary and are excluded from the federal budget. Accordingly, these funds are not included within the scope of this report. The following text box discusses the example of Indian Tribal Funds, which the government recently reclassified from trust to nonbudgetary deposit funds.

[1]In this report, the term "earmarked receipts" refers to collections that, by law, have been dedicated to a specific fund for a specific purpose or program.

[2]In some cases, such as gift funds, the federal government is the beneficiary of the trust.

[3]The Thrift Savings Fund is composed of individual accounts maintained by the Federal Retirement Thrift Investment Board on behalf of individual federal employee participants in the fund. These participants may select how their contributions are distributed among three investment funds.

**Reclassification of Indian Tribal Funds From Federal Trust Funds to Nonbudgetary Deposit Funds**

Beginning in fiscal year 2000, the federal budget no longer includes funds that are owned by Indian tribes but are held and managed in a fiduciary capacity by the government on behalf of the tribes. These Indian tribal funds were included in the budget totals beginning with the adoption of the unified budget in 1969 through fiscal year 1999 under the generic title "tribal trust funds." However, they are trusts in the private sector meaning of the term. For example, the funds include (1) Indian-owned assets derived from tribal-owned natural resources, (2) judgments against the United States, and (3) monies derived from legislative acts and for government obligations. Appropriate application of current federal budget concepts dictates that most of the Indian tribal funds should not have been included in the budget or been subject to budgetary constraints, and accordingly they have been reclassified as nonbudgetary deposit funds. This reclassification affects only budget coverage, not the operation of the funds or ownership of the funds' assets. The funds will continue to be managed by the federal government according to present law, with the same rights and responsibilities that existed prior to the reclassification.

## Q1.3 How Do Federal Trust Funds Fit Within the Unified Budget Concept?

**A1.3** The unified budget, as conceived by the 1967 *Report of the President's Commission on Budget Concepts*, includes the full range of federal activities, regardless of their fund type or whether they are on- or off-budget.[4] The unified budget can be divided into two fund groups: (1) federal funds and (2) trust funds. Section 4.2 of this report discusses the effect of both groups of funds on the unified budget totals.

As shown in figure 1.1, within these two fund groups there are six fund types: (1) the general fund, (2) special funds, (3) public enterprise funds, (4) intragovernmental funds, (5) nonrevolving trust funds, and (6) revolving trust funds. All of these, except the two types of trust funds, are considered to be "federal funds."

[4]On-budget refers to transactions included in the budget. Off-budget refers to transactions required by law to be excluded from the budget even though they are part of total government transactions. The budget combines the on- and off-budget totals to derive unified or consolidated totals for federal activity. Nonbudgetary refers to transactions of the government that do not belong in the budget because they do not represent a cost to the government.

Figure 1.1: Fund Types in the Federal Budget




## Q1.4 What Fund Types Within The Federal Budget Are Earmarked?

**A1.4** Trust funds are created to account for monies that are earmarked; that is, dedicated for a specific purpose. While earmarked monies are heavily concentrated in trust funds, trust funds are not the only way earmarked monies can be accounted for in the federal budget. For example, special and public enterprise funds also are used for programs primarily financed by earmarked collections. Trust, special, and public enterprise funds are used to account for the receipt and expenditure of monies earmarked by the government for carrying out specific purposes and programs in accordance with legislation.[5] Revolving trust funds are similar to public enterprise funds: they carry out a cycle of business-type operations and their earmarked receipts are basically revenues generated by their business activities. Nonrevolving trust funds, such as Social Security, are similar to special funds, such as Funds for Strengthening

[5]Some general fund accounts also receive earmarked receipts in the form of offsetting collections—either from the public or from federal sources—that are credited directly to the account and are available for use, often without further legislative action. These have been discussed in *Budget Issues: Earmarking in the Federal Government* (GAO/AIMD-95-216FS, Aug. 1, 1995) and *Federal User Fees: Budgetary Treatment, Status, and Emerging Management Issues* (GAO/AIMD-98-11, Dec. 19, 1997).

Markets, Income, and Supply: they are used to account for earmarked receipts and spending that primarily are not the result of business-type activities.

Among authorizing statutes for similar kinds of programs there is no consistency in whether they are funded by earmarked receipts or general fund appropriations. For example, both the Coast Guard Military Retirement System and the general Military Retirement System are noncontributory pension plans. However, the Coast Guard's system is financed through the general fund while the Military Retirement System is financed through a trust fund. Another example of the inconsistency is the Multinational Species Conservation Fund and the Cooperative Endangered Species Conservation Fund. Both funds support efforts to protect endangered species and their habitats, yet the former is financed through a general fund while the latter is a special fund.

## Q1.5 What Are the Differences Between Earmarked Fund Types?

**A1.5** The major difference between the four types of earmarked funds is whether the activities they finance are business- or non-business-type activities—not whether the funds are labeled "trust funds." Both revolving trust funds and public enterprise funds primarily are used for business-type activities, whereas both nonrevolving trust funds and special funds primarily are used for non-business-type activities.

There are no substantive differences between a revolving trust fund and a public enterprise fund. Both are credited with offsetting collections to finance the costs of their business-type activities. For example, the Veterans Special Life Insurance revolving trust fund and the Veterans Reopened Insurance public enterprise fund both finance payments on Veterans' life insurance claims.

Similarly, there is no substantive distinction between a nonrevolving trust fund and a special fund. Both are used to track receipts and spending for programs that have specific taxes or other revenues earmarked for their use. By definition, the only difference between them is whether the word "trust" is included in the legislation establishing the account. For example, the Environmental Protection Agency's Hazardous Substance Superfund—a fund with receipts earmarked for environmental cleanup—was designated by law as a trust fund, while the Department of Energy's Nuclear Waste Fund—also having earmarked receipts and similar purposes—was established in legislation as a separate fund and is shown by Treasury and OMB as a special fund. Notwithstanding the definition and examples like this, our analysis found that in practice there is a

notable difference between the use of nonrevolving trust and special funds:

- Trust fund monies predominantly fund long-term commitments, whereas no special fund monies currently fund long-term commitments. (See section 2.4 for a discussion of what funds serve long-term commitments.)
- Trust fund accounts are more likely to fund large dollar programs than special fund accounts.

The text box below discusses how OMB determines whether an account is a trust fund.

**Application of Trust Fund Criteria**

OMB's policy is to identify receipts as belonging to a trust fund if the receipts have the following two attributes: (1) they are dedicated by law to a particular program or set of programs and (2) they are dedicated to accounts designated in law as "trust accounts." It is possible, however, for an account to be labeled a trust fund in legislation but, because it does not have funding that meets the above criteria for dedication to a trust fund, OMB and Treasury would not consider it to be a trust fund. For example, the Violent Crime Reduction Trust Fund was established pursuant to the Violent Crime Control and Law Enforcement Act of 1994. Notwithstanding its name, because the fund is substantively a means of accounting for general fund appropriations and does not consist of dedicated receipts, it is classified by OMB and Treasury as a federal fund rather than a trust fund.

## Q1.6 How Many Earmarked Funds Are There?

**A1.6** In fiscal year 1999, Treasury identified 224 federal trust funds and 247 special funds. However, in doing our analysis, which was based on OMB budget data, we identified 130 federal trust funds.[6] This included 120 nonrevolving trust funds and 10 revolving trust funds. Using OMB budget data, we also identified 149 special funds and 113 public enterprise funds. A complete list of these funds, including their fiscal year 1999 incomes, gross expenditures, and end-of-year balances is shown in appendix III.[7] The text box below discusses how earmarked funds are recorded in the federal budget and in federal financial statements.

[6]OMB and Treasury report funds differently. While Treasury records earmarked funds in separate accounts, OMB does not always report them separately in annual budget documents. Because the federal budget rounds amounts to millions of dollars, it does not show funds with amounts less than $500,000. Accordingly, OMB instructs agencies to consolidate small trust fund accounts with larger general fund accounts. In addition, OMB will sometimes report trust fund groups rather than individual trust funds. Groups may include two or more trust funds with similar purposes. For example, it groups the five trust funds related to "foreign service national separation liability" associated with five different agencies under one group trust fund name. However, Treasury tracks monies for each discrete trust fund account down to the penny in order to fulfill its governmentwide accounting and cash management responsibilities. Thus, Treasury's count of funds represents the actual number of separate entities designated as earmarked funds.

Because this report was written primarily from a budgetary perspective, we used OMB budget data to analyze earmarked funds. Accordingly, our analysis does not separately identify funds with amounts less than $500,000. Although, to the extent possible, we individually counted trust funds that OMB grouped together, we could not always separately identify expenditures that had been merged or consolidated with other accounts. As a result, the number of earmarked funds we identify is more than the number of funds tracked by OMB but fewer than the actual number tracked by Treasury. According to OMB, there were 112 trust funds and trust fund groupings in fiscal year 1999. Alternatively, Treasury tracked 224 trust funds in fiscal year 1999.

[7]In some cases, we could not separately identify expenditures and fund balances because these budget data had been merged or consolidated with other accounts. In these cases, we listed fund groups in our appendix.

## Recording Earmarked Funds

As part of its governmentwide accounting responsibility, the Treasury establishes numbered accounts for each agency of the government. Receipts are recorded in "receipt accounts" and expenditures in "expenditure accounts." Nonrevolving trust and special funds are recorded differently from revolving trust and public enterprise funds.

Nonrevolving trust and special funds are comprised of both receipt accounts and expenditure accounts. Receipt accounts are grouped by unique 4-digit receipt account numbers. Each of these numbers correlates to one nonrevolving trust or special fund, which may have one or more receipt accounts. Typically, these funds will have a single expenditure account. However, some funds have multiple expenditure accounts, each with a separate expenditure account number. For example, the Oil Spill Liability Trust Fund's receipt account symbol is 8185. It obtains receipts from five different sources such as excise taxes, earnings on investments, and fines and penalties, with each in a separate receipt account—8185.10, 8185.20, 8185.30, 8185.40, and 8185.50. Coincidentally, the fund also includes six expenditure accounts for purposes such as oil spill response, oil spill research, and pipeline safety.

In some cases, matching receipt accounts with their related expenditure accounts is difficult because the expenditures for accounts with relatively small dollar amounts and similar purposes have been consolidated into a different account altogether—sometimes not even a special or trust fund account. For example, the receipts for "Fees, Operation and Maintenance of Recreation Facilities, Forest Service" are credited to a special fund receipt account (12-5072.00). However, the corresponding expenditures from these receipts are reported in the general fund account, "National Forest System" (12-1106).

Revolving trust funds and public enterprise funds are relatively easier to identify because each has a unique expenditure account number. In addition, these funds do not use receipt accounts; they primarily collect monies from their business-type or market-oriented activities that are credited to expenditure accounts. These collections are then used to offset expenses.

Federal accounting standards classify revenue to the government as part of either an exchange or a nonexchange transaction.[8] Exchange revenue is revenue resulting from the government's business-type activities; hence it includes most user charges. The standards require that financial statements recognize exchange revenue at the time that a government entity provides goods or services, measured at the price likely to be received. Thus, financial statements for public enterprise and revolving trust funds—the budget accounts used for business-type activities—would recognize revenue when it is earned rather than when it is paid. In the *Financial Report of the United States Government,* intragovernmental exchange revenue would be deducted from the totals.

Nonexchange revenue includes inflows of resources arising from the government's sovereign power to tax, as well as voluntary donations. These revenues are recognized when the collection is probable (i.e., a reporting entity has established a specifically identifiable, legally enforceable claim to cash or assets) and the amount can reasonably be estimated. Nonrevolving trust and special funds generally would have nonexchange revenue.

[8] According to the Statement of Federal Financial Accounting Standards (SFFAS) No. 7, *Accounting for Revenue and Other Financing Sources and Concepts for Reconciling Budgetary and Financial Accounting,* exchange revenues, also known as earned revenues, arise when a government entity provides goods and services to the public or to another government entity for a price. Nonexchange revenues arise primarily from exercise of the government's power to demand payments from the public (e.g., taxes, duties, fines, and penalties) but also include donations. The term "revenue" does not encompass all financing sources of government reporting entities; for example, most of the appropriations they receive are not included.

Almost 100 percent of trust fund revenues are concentrated in 20 funds, nearly 90 percent of special fund revenues are concentrated in 20 funds, and about 90 percent of public enterprise fund revenues are concentrated in 16 funds. Figure 1.2 below compares the number of funds in each fund type to the total revenues of each fund type.

**Figure 1.2: Comparison of the Number of Earmarked Funds to Funds' Total Revenues**




## Q1.7 Why Are Earmarked Funds Established?

**A1.7** Earmarked funds are established as a way to link receipts to a specific purpose or activity. This concept of dedicated receipts can be very appealing to a public interested in supporting that purpose or activity. Although for trust, special, and public enterprise funds, the earmarking of receipts by law indicates the government's intent to restrict the use of those funds to the specified purpose, the government can always change this restriction by changing the law. As discussed in section 5, designation as a trust fund does not in and of itself impose a greater commitment on the government to carry out that activity than it has to carry out other government activities. However, the confusion of the federal use of the term "trust fund" with the private sector use of the term may lead the public to expect a similar commitment and hence may provide some degree of political protection. This "protection" may affect the allocation

of resources within the budget. Constituencies may create pressure to spend earmarked revenues because the revenues are there, regardless of the need for the spending at the moment or the priority that would otherwise be given such spending. Ironically, earmarked funds may also constrain program spending when the spending threatens to outstrip accumulated balances. This is because the fund balance determines whether Treasury has the legal authority to issue checks for a program.[9]

In practice, as discussed in section 2.3, the strength of the link between the source and use of earmarked receipts can vary considerably. While the link is clear in many cases, such as with the payroll tax portion of social insurance programs, in some cases the source and use of monies appear unrelated. For example, the Elk Hills School Lands (special) fund was established to dispense a percentage of the sale proceeds from the Elk Hills Naval Petroleum Reserve for payment to the State of California for its Teachers' Retirement Fund. Although the sources are very different from those for social insurance funds, the sources and uses of funds are linked for gifts and bequests and for business-type funds. For business-type funds—public enterprise and revolving trusts—the earmarking of receipts received as payment for goods or services permits an ongoing cycle of business activity.

## Q1.8 When Were Earmarked Funds Established?

**A1.8** One of the earliest of the largest trust funds established was the Civil Service Retirement and Disability fund, set up in 1920. Since then, trust funds have often been created in response to the public policy concerns of the time. For example, during the bleak economic times of the 1930s, the Unemployment and the Federal Old-Age & Survivors Insurance trust funds were created. During the more prosperous 1950s, Federal Disability Insurance was added and, in the 1960s, two medical trust funds: Federal Hospital Insurance and Federal Supplementary Medical Insurance. In the 1980s, the Leaking Underground Storage Tank Trust Fund was created. This trust fund provides funds for responding to releases from leaking underground petroleum tanks.

The oldest of the largest special funds is the Reclamation Fund, established in 1902. The largest special fund (in terms of receipts) is Funds for Strengthening Markets, Income, and Supply (Section 32) which was established in 1935. Later, the Land and Water Conservation Fund was

[9]The Antideficiency Act prohibits incurring obligations or making expenditures in excess of amounts available in appropriation or fund accounts, unless specifically authorized by law.

established by the Land and Water Conservation Act of 1964. The Nuclear Waste Fund was established in 1983 by the Nuclear Waste Policy Act to finance the disposal of spent fuel from nuclear powered electrical generators. Special funds are established from time to time to meet specific needs for funds to finance specified activities. For example, the Elk Hills School Lands (special) Fund was established as a result of the Fiscal Year 1996 National Defense Authorization Act to finance payment to the State of California for its Teachers' Retirement Fund.

The largest public enterprise fund by far is the Postal Service Fund. It was established by the 1970 Postal Reorganization Act. Other large public enterprise funds include the Commodity Credit Corporation Fund, a predecessor of which was established in 1933, and the Tennessee Valley Authority Fund (TVA).[10] TVA was established during the depression and created by the Act of May 18, 1933. More recently established public enterprise funds are the Bank Insurance Fund, the Federal Savings and Loan Insurance Corporation Resolution Fund, and the Savings Association Insurance Fund. These funds were established by the Financial Institutions Reform Recovery and Enforcement Act of 1989.[11]

## Q1.9 By Design, Earmarked Funds May Accumulate Balances. What Do Balances Really Mean?

**A1.9** The vast majority of earmarked funds take in more than their current needs.[12] On an annual basis, this is often described as having a "surplus." The accumulated surpluses result in these funds having a "balance." The balances of earmarked funds are assets of the funds in that they provide a claim on the general fund of the Treasury for future spending. However, the balances are not cash. As with all other money collected by the government, the general fund of the Treasury receives the actual earmarked taxes and fees paid by the public. Treasury then credits these collections as assets (often in the form of Treasury securities) to the appropriate fund accounts. From the general fund's perspective, these fund assets are a liability. From the standpoint of the government as a whole, the earmarked funds' assets and the general fund's liabilities offset each other so that neither an asset nor a liability is shown for the federal

[10]The Postal Service Fund accounts for over half of all public enterprise fund outlays, while the Commodity Credit Corporation Fund and the Tennessee Valley Authority Fund account for about 8 percent and 6 percent of all public enterprise fund outlays, respectively.

[11]The Bank Insurance Fund and the Savings Association Insurance Fund are both successors of previous funds.

[12]In fiscal year 1999, only 53 of 392 earmarked funds had balances of less than $500,000.

government as a whole in the consolidated *Financial Report of the United States Government.*

The relationship between earmarked fund balances and the claim on future resources depends on whether the program financed by the fund was structured so that earmarked receipts would cover the future program claims. Not all funds are structured to be actuarially sound. Depending on the financing structure, the balance may or may not equal the future claim. For example, the current and expected earmarked receipts from Social Security are not structured to cover the expectations for future payments stemming from the program's defined benefit structure. Conversely, the Highway Trust Fund has no defined benefit structure other than that based on receipts to the fund. Although payments from both funds are limited to the fund balance, the difference in benefit structure leads to a different expectation for future payments beyond its balance. The relationship between fund balances and the government's ability to meet future commitments is discussed further in section 2.6.

## Q1.10 What Receipt Sources Contribute to Fund Balances?

**A1.10** Fund balances stem from a combination of earmarked receipts (e.g., taxes and collections from market-oriented activities) and appropriated contributions from the general fund. These contributions include such things as interest payments, the employer share of federal employee pension costs, and in some cases, such as Medicare's Supplemental Medical Insurance (SMI) trust fund, what might be viewed as a subsidy from the general fund. Excluding interest payments and the federal employer's share of compensation-related payments (pensions, etc.), 39 out of 269 nonrevolving trust and special funds received general fund contributions totaling about $72 billion during fiscal year 1999. Of this amount, about $70 billion was related to Medicare.

## Q1.11 What Do Funds Do With Their Balances?

**A1.11** Whether and how funds invest their balances is based on specific legal authorizations by the Congress. Trust funds generally are required by 31 U.S.C. 9702 to be invested in government obligations at an annual interest rate of at least 5 percent. Most of the balances of earmarked funds are invested in special, nonmarketable U.S. Treasury securities; Treasury credits the appropriate fund with the securities. If the fund reaches a point where outgoing payments exceed current receipts, the fund may redeem these securities to make the required payments. A few funds do not invest in Treasury securities and simply hold credit balances. Finally, some earmarked funds are specifically authorized by the Congress to invest outside Treasury securities. For example, the Civil Service Retirement and Disability trust fund also carries but does not routinely invest in federal

agency securities while TVA invests in a portfolio of securities designed to earn interest in line with overall equity market performance.

## Q1.12 What Do the Treasury Securities Represent?

**A1.12** When an earmarked fund invests in U.S. Treasury securities, it has "lent" money to the general fund of the Treasury. The value of the securities held is recorded as "debt held by government accounts" and represents debt owed by one part of the government to another.[13] In many ways, the special U.S. Treasury securities held by government accounts are indistinguishable from the marketable government debt sold to the public. A maturity date is set, interest is accrued at established market rates, and the securities count as part of the overall federal debt. These securities, however, are not traded in the financial markets. They can only be redeemed by the Treasury Department. The interest they earn is simply credited to the fund accounts in the form of additional Treasury securities.

Debt held by government accounts represents over a third of gross federal debt and like publicly held debt is guaranteed for principal and interest by the full faith and credit of the United States government. At the end of fiscal year 2000, debt held by government accounts was about $2.2 trillion. This debt does not appear on the government's consolidated financial statements because it represents internal debt—amounts that one part of the government owes to another part of the government. However, it does constitute a liability for the Treasury since the Treasury must pay back the debt held by government accounts when these accounts need to redeem their securities to be able to make their expenditures. When this happens, Treasury would have to obtain cash to finance the government's spending either through increased taxes, spending cuts, increased borrowing from the public, retiring less debt (if the unified budget is in surplus), or some combination thereof.

[13]Debt held by government accounts plus debt held by the public are the two components of gross federal debt, which totaled about $5.7 trillion at the end of fiscal year 2000. A key difference between the two components of debt is their effect on credit markets. Changes in debt held by the public approximates the federal government's competition for credit with the private sector in the credit markets and affects current interest rates and private capital accumulation. In contrast, changes in debt held by government accounts does not compete with the private sector for available funds in the credit market. However, when the government accounts redeem their securities to obtain cash to make expenditures, Treasury competes with the private sector for cash by borrowing more from the public (or redeeming less debt held by the public if in a unified surplus position). For additional information on federal debt, see *Federal Debt: Answers to Frequently Asked Questions—An Update* (GAO/OCG-99-27, May 28, 1999).

## Q1.13 To What Extent Do Earmarked Funds Earn Interest?

**A1.13** Generally, earmarked funds earn interest on balances. The extent to which funds may earn interest and the rate at which interest is earned is determined by specific legal authorization from the Congress. As discussed in section 1.11, most of the balances of earmarked funds are invested in special, nonmarketable U.S. Treasury securities. In some cases, laws may permit that the interest earned by one fund's investment be used for a different purpose. For example, the interest earned by the Abandoned Mine Reclamation Fund (a special fund) is transferred to the United Mine Workers' Combined Benefits Fund.

Some funds with relatively small balances, such as the Radiation Exposure Compensation Trust Fund, do not invest their balances but receive interest as if they had invested. Because of provisions contained in the Transportation Equity Act for the 21st Century, as amended, the Highway Trust Fund is unusual in that securities held after September 30, 1998, are noninterest bearing.

# What Is the Composition of Earmarked Funds?

## Q2.1 What Are the Sources of Income for Earmarked Funds?

**A2.1** Nonrevolving trust and special funds obtain revenues primarily through earmarked receipts, such as Social Security payroll taxes, and, to a far lesser extent, offsetting collections.[1] In contrast, revolving trust and public enterprise funds operate primarily through offsetting collections resulting from their business-type activities. Although there were 392 trust, special, and public enterprise funds in the budget during fiscal year 1999, a few large funds received most of the revenues. In fact, about 78 percent of all earmarked revenues were associated with just six funds in fiscal year 1999, with the remaining 22 percent earmarked to all other 386 funds. These six large funds included the two Social Security trust funds, the two Medicare trust funds, the Civil Service Retirement and Disability trust fund, and the Postal Service public enterprise fund. Figure 2.1 illustrates this concentration of revenues.

**Figure 2.1: Concentration of Revenues Among Earmarked Funds**




[1]Offsetting collections are monies credited directly to expenditure accounts rather than receipt accounts.

The concentration of earmarked revenues in a few funds can also be seen in the sources and uses of fund receipts. Specific sources and uses of funds in fiscal year 1999 are described below.

- Nonrevolving trust funds received almost two-thirds of their receipts from taxes and contributions related to social insurance (largely Social Security and Medicare). About 12 percent of receipts stemmed from interest earnings on balances and another 16 percent from other federal fund transfers, such as the federal government's contribution to its employees' pension funds.

- Special funds received over half of their receipts from customs duties, permits, and regulatory fees. Nearly a third was derived from business or market-oriented activities with the public such as income from housing loans, rents and royalties, and fees for other services such as nuclear waste disposal and recreational programs.

- About 95 percent of revolving trust fund collections came from federal employee health benefit contributions (81.4 percent) and federal employees' life insurance premiums (13.3 percent).

- Over half of public enterprise fund collections came from postal revenues with the remainder collected from multiple sources such as the Commodity Credit Corporation and the Tennessee Valley Authority.

Figure 2.2 shows the types of sources and uses, by budget function, of receipts for nonrevolving trust funds and figure 2.3 shows the sources and uses of receipts for special funds.

## Figure 2.2: Sources and Uses of Nonrevolving Trust Fund Receipts




Notes:

[a]Includes receipts such as federal contributions to Medicare and Social Security, and employing agency contributions to retirement programs.

[b]Includes receipts such as excise taxes, fees, and sale of government property.

[c]Includes outlays such as those for federal pension programs, for example the Civil Service Retirement and Disability Trust Fund.

[d]Includes budget functions such as Transportation, Natural Resources and Environment, and Veterans Benefits.

## Figure 2.3: Sources and Uses of Special Fund Receipts




Notes:

[a]Includes receipts for such things as royalties and rents, fees, sale of products, and interest on investments.

[b]Includes other budget functions such as Energy, Income Security, and General Government.

## Q2.2 What Purposes and Activities Do Earmarked Funds Finance?

**A2.2** Every budget function included some activities financed by earmarked funds in fiscal year 1999. However, as was the case for revenues, the distribution was not even. Gross outlays financed by earmarked revenues were also concentrated in a few specific areas.

- Over 75 percent of nonrevolving trust fund dollars supported social insurance programs, including Social Security (50.9 percent) and Medicare (27.5 percent). Income security, which primarily includes pension programs, ran third, consuming about 11 percent of total gross outlays.
- Although special funds served a broader variety of functions than trust funds, they were heaviest in commerce and housing credit (35.8 percent), administration of justice (21 percent), and natural resources and environment (13.7 percent).
- Revolving trust fund spending was highly concentrated in the health budget function (86.8 percent), which is completely driven by federal employees' health benefits.
- Public enterprise fund monies were dominated by the Postal Service fund and thus were concentrated in the commerce and housing credit function (58.7 percent). A large portion (28.4 percent) of public enterprise fund monies served multiple functions.

## Q2.3 What Is the Relationship Between the Sources and Uses of Earmarked Funds?

**A2.3** Because revolving trust and public enterprise funds carry out a cycle of business-type operations, the sources and uses of monies for these funds are directly related.[2] In addition, for the majority of nonrevolving trust and special fund revenues, the relationship between the sources and uses of the revenues is relatively direct. For example, Old-Age Survivors and Disability Insurance Trust Funds receive most of their monies from Federal Insurance Contributions Act (FICA) taxes paid by employees and their employers, and they use the monies to finance Social Security payments to individuals and to invest in Treasury securities. The sources and uses of monies for Medicare taxes and premiums[3] and pension

[2]Because revolving trust and public enterprise funds receive monies through offsetting collections deposited in expenditure accounts and do not have receipt accounts, detailed data on the explicit sources of monies were not always readily available. However, the collections would be payments from the public or another federal entity for goods or services provided by the fund's business activity.

[3]Nearly three-fourths of the SMI portion of Medicare is financed from general fund contributions.

programs are also directly related. However, in some cases the relationship is less direct. For example, the largest special fund, Funds for Strengthening Markets, Income, and Supply (Section 32) is financed by 30 percent of customs duties collected and automatically appropriated for expanding outlets for nonbasic agricultural commodities. Most of these earmarked customs duties are used primarily to support child nutrition programs.[4]

## Q2.4 What Earmarked Funds Serve Long-Term Commitments? What Is the Rationale for Earmarking Receipts for These Long-Term Commitments?

**A2.4** Funds that provide social insurance,[5] federal insurance, federal pensions, and certain education benefits represent what we classify as long-term commitments of the federal government.[6] About 93 percent of all nonrevolving trust fund outlays were associated with funds representing long-term commitments. Some examples of earmarked funds that do not represent long-term commitments include gift funds, such as the Library of Congress gift fund; funds that transfer collected revenues to state or local governments for local use, such as the special fund for Mineral Leasing on Public Lands; and transportation funds, such as the Highway Trust Fund. Although only 38 of the 392 earmarked funds were dedicated to long-term commitments in fiscal year 1999, these funds represented the vast proportion of dollars collected. Most long-term commitments were associated with nonrevolving trust funds rather than revolving trust or public enterprise funds; none were associated with special funds. The payments for long-term commitments that were made by these funds tended to be cash payments to or on behalf of individuals rather than services to the general public. Overall, projected fund balances may not equal the future claims the federal government could be responsible for under current law. For example, Social Security's trust funds are projected to have balances sufficient to fund benefits through 2037, leaving an unfunded claim at that date of about 28 percent of benefits owed.[7]

---

[4]See appendix II for more detailed discussion of this fund.

[5]For social insurance funds, we included the funds listed in the Federal Accounting Standards Advisory Board's Statement of Federal Financial Accounting Standards (SFFAS) No. 17, *Accounting for Social Insurance*, August 1999.

[6]Long-term commitments are not an established budget concept; individuals may differ on what they perceive should be included in this category.

[7]*Status of the Social Security and Medicare Programs.* A Summary of the 2000 Annual Reports (Revised April 2000), Social Security and Medicare Boards of Trustees.

One rationale for earmarking revenues to finance long-term commitments is that the benefits are financed by the contributions made by the beneficiaries. However, the current projections for the earmarked revenues for the largest long-term commitment programs would be insufficient to fully finance expected benefits: that is, the earmarked financing of the program is not structured to fully cover future benefits. For example, only about a quarter of the revenues paid into Medicare's Supplemental Medical Insurance trust fund stem from enrollees' monthly premiums; the bulk of the program's financing comes from federal general revenues. In theory, monitoring the funding status of long-term commitments may trigger policy action if a fund becomes too far out of balance. For example, in the past, the threat of trust fund depletion led to changes in the Social Security program and its financing. Recently, concerns over the long-term viability of the Social Security trust funds have led to myriad proposals for reform. Other measures that indicate fund solvency are discussed in more detail in section 5.

Although long-term commitments are in many cases financed by earmarked revenues, this is not always the case. For example, long-term commitments related to some pensions and some environmental cleanup are financed through general fund revenues instead of earmarked funds. The lifecycle costs of capital[8] also typically are financed by general funds.

## Q2.5 What Were The Revenues, Gross Outlays, and Balances of Earmarked Accounts in Fiscal Year 1999? What Portions of These Amounts Represent Long-Term Commitments?

**A2.5** Nonrevolving trust funds receive and use the bulk of earmarked revenues, even though there are more special funds and almost as many public enterprise funds. Moreover, nonrevolving trust funds are overwhelmingly used for financing programs that make long-term commitments. Table 2.1 below shows the earmarked revenues, outlays, and balances by fund type for fiscal year 1999, separately identifying amounts earmarked for long-term commitments.

[8]Life-cycle costs of capital include initial costs plus costs of operation and maintenance, and any costs of decommissioning or disposal. Capital assets are tangible assets (such as buildings, equipment, and information technology) that are owned by the federal government and primarily used to deliver federal services.

**Table 2.1: Breakout of Fiscal Year 1999 Revenues, Gross Outlays, and Balance, by Fund Type**

Dollars in billions

| | | Revenues | | Gross outlays | | Fund balances | |
|---|---|---|---|---|---|---|---|
| Fund type | Number of funds | Total | Long-term commitments | Total | Long-term commitments | Total | Long-term commitments |
| Nonrevolving trust | 120 | $ 983 | $ 916 | $ 771 | $ 718 | $ 1,847 | $ 1,786 |
| Special | 149 | 27 | 0 | 14[a] | 0 | 40[a] | 0 |
| Revolving trust | 10 | 22 | 3 | 21 | 2 | 29 | 22 |
| Public enterprise | 113 | 120 | 9 | 127 | 8 | 163 | 55 |
| Totals | 392 | $ 1,152 | $ 928 | $ 933[a] | $ 728 | $ 2,079[a] | $ 1,863 |

[a]This amount is understated because some special fund appropriations have been consolidated into general fund accounts. Thus, an unknown portion of special fund outlays are included in general fund outlays and some special fund balances is included in general fund balances.

## Q2.6 How Do Accumulated Balances of Earmarked Funds Affect the Government's Ability to Meet Its Long-Term Commitments?

**A2.6** Annual surpluses can accumulate into large trust fund balances. However, because these balances are really bookkeeping credits to the fund with the actual cash commingled with other collections, the accumulation of large balances does not by itself affect the government's ability to meet long-term commitments or make a program more sustainable in the future. In other words, accumulated balances do not increase the government's ability to acquire future resources to meet long-term commitments. Nor do they necessarily represent the full future cost of existing commitments. From a macro perspective, the critical question is not how much a trust fund has in assets but whether the government as a whole has the economic capacity to finance the claims on the trust funds for benefits now and in the future and at the cost of other competing claims for scarce resources. The President's Budget includes a useful discussion on the relationship of balances to the economy.

> "Increases in trust fund balances do strengthen the ability to pay future benefits if the surplus in the trust fund is matched by an improvement in the Government's net financial position. It is in this sense that future benefits can be prefunded. If a trust fund surplus is matched by a corresponding reduction in publicly held debt, then the Government's financial position will be improved. This makes it easier to finance future benefits in two respects. The first, direct effect, is that this debt reduction reduces future interest payments and frees up general receipts to finance the future benefits. The second is that debt reduction increases the

> resources available for investment in the economy as a whole. Greater investment now increases future incomes and wealth, which will provide more real economic resources to support the benefits, and may prolong the solvency of the trust funds."[9]

From a micro perspective, projected trust fund balances can provide a vital signaling function for policymakers about underlying fiscal imbalances in covered programs. However, balances do not provide meaningful information about program sustainability,[10] notwithstanding that financial condition is often gauged by the solvency of the fund. Extending a trust fund's solvency without reforms to make the underlying program more sustainable over the long-term can obscure the warning signals that trust fund balances provide, thereby creating a false sense of security and delaying needed reform.

[9] *Analytical Perspectives, Budget of the United States Government*, Fiscal Year 2001, p. 346.

[10] By program sustainability, we are referring to the Nation's ability to finance promised benefits over the long run.

# How Are Earmarked Funds Controlled in the Federal Budget Process?

## Q3.1 Are Earmarked Funds Treated Differently in the Budget Process?

**A3.1** Fund type does not determine how fund spending is controlled. The budget distinguishes between federal funds and trust funds; however, this designation does not control federal spending. Although some have advocated the creation of earmarked funds with an eye toward giving these monies special treatment, these are not the labels that matter for budgetary control. The Deficit Control Act (DCA)[1] divides the budget into "discretionary" and "mandatory" categories—and it is these categories that determine how a fund is controlled. What matters for budget control is whether an earmarked fund is classified as discretionary or mandatory and whether it has any special rules accompanying it.

All spending classified as discretionary (whether from earmarked or general funds) is subject to annual adjustable dollar limits (spending caps) and is controlled through the regular appropriations process. Mandatory spending is subject to pay-as-you-go (PAYGO) rules, regardless of whether its financing source is earmarked or general fund. These rules require that the aggregate effect of new legislation that either increases mandatory spending or decreases receipts be deficit neutral (that is not increase the deficit or decrease the surplus). The two Social Security trust funds are exempt from these general budget enforcement procedures but are subject to special rules of each chamber of the Congress barring legislation that would erode trust fund balances. The legal authority to issue checks for programs financed by earmarked funds is limited to their fund balances, except where there is authority to borrow.

## Q3.2 Are Earmarked Funds Discretionary or Mandatory?

**A3.2** DCA classification is relatively consistent across fund types. The majority of each earmarked fund type is mandatory. A large number (59) of nonrevolving trust funds and special funds have both mandatory and discretionary authority. The public enterprise group has more individual funds (24) with strictly discretionary spending than do the other earmarked fund types.

Of the 392 funds we analyzed for fiscal year 1999, we were able to determine DCA classification for 367.[2] The revenues and outlays for 268 of

[1]The actual title of this act is the Balanced Budget and Emergency Deficit Control Act of 1985, as amended. However, for simplicity, we refer to it as DCA. It is often referred to as the Budget Enforcement Act (BEA) because that act added the current sequestration process and designated accounts as either mandatory or discretionary.

[2]DCA classification data were not readily available for 25 of the 392 funds because they had no receipts or expenditures during fiscal year 1999.

these 367 funds were completely mandatory. Spending from these funds was governed by the legislation that established the program, that is, eligibility criteria and benefit formulas. Another 31 funds were completely discretionary. Spending from these funds was controlled by the appropriations process and was subject to the spending caps, thus limiting the amounts that could be spent from the funds. Finally, 68 funds had a mixture of mandatory and discretionary revenues and outlays. The Hazardous Substance Superfund (trust fund) is an example of such a case. The outlays of this fund are all discretionary while revenues have both mandatory and discretionary components. The mandatory revenues stem from taxes, fines, recoveries and interest while the discretionary revenues stem from additional appropriations from the general fund.

## Q3.3 What Does "Off-Budget" Mean? Are "Off-Budget" Funds Governed by Different Rules?

**A3.3** Every year since 1971 at least one federal entity has been "off-budget." Off-budget federal entities are federally owned and controlled, but their transactions are excluded from the budget totals by law. The off-budget federal entities currently consist of the two Social Security trust funds and the Postal Service public enterprise fund. "Off-budget" is a display distinction not a control distinction.

As discussed in section 1.3, the federal government uses the unified budget concept as the foundation for its budgetary analysis and presentation. It is a comprehensive display of the full range of federal activities, regardless of fund type or on- and off-budget status. Thus, whether a fund is "on-budget" or "off-budget" affects the way totals are displayed in various summary budget tables. However, it has no effect on the collection or expenditure of funds or on the way the funds are controlled. As discussed in section 3.1, it is the DCA mandatory and discretionary categories and Social Security's special rules that determine how a fund is controlled. Taking a fund off-budget does not by itself exempt it from DCA controls. Whether a fund is exempt from DCA depends on the existence of a law specifying exclusion, such as the specific exclusion of Social Security contained in DCA.

## Q3.4 What Kinds of Special Treatment Have Been Given to Some Earmarked Funds? What Arguments Have Been Used for Such Treatment?

**A3.4** Since 1974, the Postal Service—a public enterprise fund—has been moved on- and off-budget. Currently, it is off-budget, financed by business transactions with the public, and excluded from DCA controls. Social Security was taken off-budget in response to concern about its financial condition, fear that use of its surpluses to offset other spending would hurt the program, and criticism that surplus Social Security taxes were hiding the size of budget deficits. It is excluded from DCA controls and subject to its own set of congressional rules designed to prohibit legislation that would erode its surpluses.

During the 106th Congress, proposals were made to move a number of additional funds off-budget: the Airport and Airway Trust Fund, the Civil Service Retirement and Disability (trust) Fund, the Nuclear Waste (special) Fund, the Inland Waterways and Harbor Maintenance Trust Funds, and the Land and Water Conservation (special) Fund. All these proposals would also have excluded these funds from DCA controls. Proponents argue that the combination of off-budget and DCA exclusion is a stronger way to set aside earmarked monies and assure that they are used in the near term for their dedicated purpose rather than for general government activities. Opponents of off-budget designations argue that changing its label or category does not make an activity less federal, does not change total federal revenues or spending, and contributes to a more confusing picture of the federal government's total taxes and spending. Opponents of DCA exemptions argue that removing a fund's transactions from the existing budgetary Congressional controls reduces the ability of the President and the Congress to make trade-offs across government priorities.

Special budgetary treatment has been provided to the transportation trust funds without moving them off-budget or excluding them from DCA. The Transportation Equity Act for the 21st Century (TEA-21), enacted in 1998, guaranteed specific levels of funding for many highway and mass transit programs based on the user tax receipts credited to the Highway Account of the Highway Trust Fund. More recently, a similar treatment of the Airport and Airway trust fund was provided in the Aviation Investment and Reform Act for the 21st Century (AIR-21), enacted April 5, 2000. Since these funds are technically under the discretionary caps, their guaranteed funding levels in effect reduced the ability of policymakers to make trade-offs among discretionary spending programs.

# How Do Earmarked Funds Affect Federal Fiscal Position?

## Q4.1 How Has the Composition of Earmarked Versus Unearmarked Federal Receipts Changed Over Time?

**A4.1** Historical budget data on earmarked receipts are only readily available for those earmarked to trust funds. It is the trust fund historical trends that are most important, however, because they hold about 90 percent of all earmarked balances. Over the last 50 years, trust fund receipts have grown both as a share of total federal receipts and as a share of Gross Domestic Product (GDP). Today, annual trust fund receipts make up about half of all federal receipts and about 10 percent of GDP. In fiscal year 1950, trust fund receipts made up only about one-seventh of total receipts and about 2 percent of GDP. Even in 1970, after the enactment of Medicare, trust fund receipts made up less than a third of all federal receipts. The big jump in the mid 1980s in large part reflects the effect of the Social Security Amendments of 1983 when payroll taxes were set higher than needed to cover current expenditures, causing the trust fund balances to grow. Figure 4.1 illustrates this growth.

**Figure 4.1: Trust Funds' Share of Total Receipts and GDP Over Time**




Source: *Historical Tables, Budget of the United States Government, Fiscal Year 2001*, tables 1.2 and 1.4

## Q4.2 What Is the Effect of Earmarked Funds in Measuring Unified Budget Deficits or Surpluses?

**A4.2** Again, historical budget data do not readily separate special and public enterprise funds from other federal funds. There are rich historical data, however, on federal versus trust fund surpluses and deficits. The sum of trust fund and federal fund surpluses/deficits comprise the annual unified budget total. Accordingly, any trust fund surpluses add to the unified budget totals (increasing a surplus or reducing a deficit), and any trust fund deficits subtract from them. Since 1963, in the aggregate, trust funds have been running surpluses, thus reducing the federal government's need to borrow from the public. As discussed earlier, these surpluses generally are invested in special U.S. Treasury securities. For fiscal year 2000, the unified budget had a surplus of $237.0 billion—the cumulative result of a trust funds surplus of $228.7 billion (including interest received from federal funds) and a federal funds surplus of $8.3 billion (including interest paid to trust funds). As discussed in section 1.10, trust funds receive contributions from the general fund for such things as interest payments, the employer share of federal employee pension costs, and, in some cases, such as Medicare, what might be viewed as a subsidy from the general fund. Interest payments make up a significant portion of these contributions. For example, if the $128.9 billion in interest paid to trust funds were excluded from surplus calculations, the fiscal year 2000 federal funds surplus of $8.3 billion would increase to a surplus of $137.2 billion. Similarly, the trust funds surplus of $228.7 billion would be reduced to a surplus of only $99.8 billion.

Figure 4.2 illustrates the extent to which trust fund surpluses/deficits have affected the unified budget deficit or surplus over time.[1]

[1]For additional information on deficits/surpluses and their relationship to federal debt, see Federal Debt: Answers to Frequently Asked Questions—An Update (GAO/OCG-99-27, May 28, 1999).

**Figure 4.2: Effect of Trust Fund Surpluses/Deficits on Unified Budget Totals Over Time**




Note: Data exclude the extra quarter in fiscal year 1976, which resulted from the shift in fiscal years from July 1st to October 1st.

Source: *Historical Tables, Budget of the United States Government, Fiscal Year 2001*, table 1.4, pages 25 and 26, and the Final Monthly Treasury Statement of Receipts and *Outlays of the United States Government, For Fiscal Year 2000 through September 30, 2000, and Other Periods.*

## Q4.3 What Are the Implications of Investing Balances in Treasury Securities?

**A4.3** When earmarked funds hold balances as Treasury securities, the securities represent a future claim on the Treasury. While the security is an asset to the earmarked fund, it is a liability to the general fund of the Treasury.[2] If earmarked surpluses are used to finance other governmental activities, the government's need for additional cash to finance these activities is less than what it otherwise would have been. Using earmarked surpluses to redeem debt held by the public does not reduce gross federal

[2]The same would be true whether the balances are invested in Treasury securities or simply maintained as uninvested balances.