debt because debt held by government accounts increases by the same amount that debt held by the public decreases. However, as discussed in section 2.6, using these surpluses to reduce publicly-held debt not only improves the government's net financial position but, because it frees up private funds for other investments, also promotes future economic growth. As a result, the government's ability to pay the future claims for which the surpluses were earmarked would be enhanced. Therefore, if the trust fund surpluses were used to strengthen the government's fiscal position by causing unified surpluses to be higher or deficits lower than they otherwise would have been, then the government's ability to pay future benefits could be improved. Currently, there is bipartisan consensus to use the surpluses of the largest long-term commitment—Social Security—to redeem publicly-held debt.

When an earmarked fund's annual outlays for benefits and expenses exceed annual earmarked receipts, it redeems some of its Treasury securities. The Treasury would need to obtain cash to redeem these securities. Cash could be obtained either through increased taxes, spending cuts, increased borrowing from the public, retiring less debt (if the unified budget is in surplus), or some combination thereof.

## Q4.4 What Issues Are Raised by Proposals to Permit the Investment of Earmarked Revenues in the Private Sector?

**A4.4** Allowing earmarked revenues to be invested in the stock market, as has recently been proposed for some trust funds, would have consequences for the programs financed by those revenues, the U.S. economy, and federal budget policy.[3] Historically, the rates of return on stocks have exceeded interest rates on Treasury securities, although stock returns are more variable. While the prospect of higher stock market returns might allow the funds to pay benefits longer without other program changes, the government would also face greater risk and other implementation issues. For example, if stock investing were implemented in isolation of other program reforms, the trust funds would inevitably need to liquidate their stock portfolios to pay promised benefits and would be vulnerable to losses in the event of a general downturn in the market.

Proposals for government stock investing typically suggest investing passively in a broad-based stock index to reduce both the costs and the fear that the government, through its stock ownership, would influence

[3]For additional information on this topic, see *Social Security Financing: Implications of Government Stock Investing for the Trust Fund, the Federal Budget, and the Economy* (GAO/AIMD/HEHS-98-74, April 22, 1998).

individual companies. Although index investing would help achieve these goals, it would not completely eliminate the possibility of political influence over stock selections. Nor would it answer the question of what to do about voting rights. Even choosing not to vote would affect corporate decision-making by enhancing the voting power of other shareholders or investment managers.

In contrast to the current situation in which earmarked funds hold their balances in Treasury securities, stock investing would have the immediate effect of decreasing the unified surplus (or increasing any unified deficit) because, under current budget scoring rules, stock purchases would be treated as outlays. This is because monies would actually be expended outside the government and any money used to purchase stocks would no longer be invested in Treasury securities, thus reducing Treasury's available cash. To the extent that this resulted in unified budget deficits, the Treasury would need to borrow from the public to replace cash used to buy stocks, unless offsetting spending or revenue actions were taken. This would have no effect on gross federal debt. However, if stock purchases were scored under different rules than other types of federal spending, they could be excluded from government outlays.

Without compensating changes in fiscal policy, stock investing would not significantly alter the effect of federal finances on national saving and the economy. To cover a deficit, the government would increase borrowing from the public, but it would offset this action by purchasing stocks from other investors. This asset shuffle could lead to higher stock prices and higher interest rates, undercutting somewhat the potential gain from stock investing and increasing the government's cost of borrowing. Even with such price effects, higher returns might result in the government still coming out ahead by investing in stocks. However, any higher returns earned by the government would otherwise have accrued to other investors. In short, by itself, government stock investing should have no appreciable effect on future national income.

Although the immediate budgetary effect of investing in stocks would lead to decreased unified budget surpluses or possible deficits, stock investing might also indirectly lead to changes in federal fiscal policy that could increase national saving. By making earmarked fund surpluses unavailable to the Treasury, stock investing could focus more attention on any budgetary imbalances that may exist when such surpluses are excluded. Increased attention could prompt policymakers to address an imbalance either by cutting spending or raising revenue. Such fiscal actions could boost national saving and long-term economic growth.

## Q4.5 What Does It Mean When People Say the Fund Balances Are Used for Other Than Intended Purposes?

**A4.5** Concerns have been raised that, because the actual earmarked cash borrowed from the funds is commingled in the Treasury with other receipts and used to pay whatever bills the government currently has on hand, the federal government has inappropriately diverted funds for purposes other than what was intended. Treasury accounts for earmarked monies by crediting these collections to the appropriate funds. Any surpluses resulting from these collections are then lent to the general fund of the Treasury and the funds in most cases are given special, nonmarketable Treasury securities in return.[4] These special securities are claims on the Treasury (i.e., IOUs) that can be redeemed in the future to obtain the cash needed to pay the intended benefits. However, if sufficient surpluses are not available to redeem the securities, the government would either need to increase borrowing from the public, raise future taxes, reduce future spending, retire less debt (if the unified budget is in surplus), or some combination thereof. This future need for cash to redeem Treasury securities emphasizes the importance of using earmarked surpluses to reduce debt held by the public, thereby increasing economic growth and making it easier for the government to pay these future commitments.

Although the special Treasury securities are nonmarketable, like other Treasury securities they are backed by the full faith and credit of the United States government. History provides no evidence to suggest that the U.S. would not honor these obligations as it does its other obligations. In fact, some trust funds support programs with long-term commitments in which current expenditures on benefits and administration have already exceeded dedicated annual tax revenues (that is, the funds have run a cash deficit). These trust funds have redeemed some of their Treasury securities to make current benefit payments. For example, from 1992 through 1998, the Medicare Hospital Insurance (Part A) Trust Fund had a cash deficit and, as needed, redeemed a portion of its accumulated securities each year to pay current claims. The combined Social Security trust funds also redeemed some of their Treasury securities to cover their cash deficits starting in the mid-1970s through the early 1980s, when payroll taxes were increased. The combined Social Security trust funds are projected to reach the point at which current expenditures exceed annual cash receipts by 2015.

[4] Even if the surpluses were not invested in Treasury securities, they would be used for other purposes.

The following text box discusses the implications of using earmarked fund surpluses of long-term commitments for debt reduction.

**Setting Aside Annual Surpluses of Funds Earmarked for Long-Term Commitments to Reduce Debt**

In fiscal year 1999, about $125 billion of the $201 billion in annual surplus earmarked funds collected for long-term commitments was related to Social Security, leaving about $76 billion related to other long-term commitments, such as pensions, insurance, and other social insurance programs. There was bipartisan consensus to use the surpluses associated with Social Security to reduce debt held by the public—a concept sometimes referred to as a "lockbox." Because the government spent the remaining surpluses related to other long-term commitments, if these surpluses had instead been used to reduce debt held by the public, spending would have had to be cut and/or taxes raised.

# Policy and Design Issues Related to Earmarked Funds

The federal budget is an instrument of national policymaking. It seeks to facilitate the Nation's economic stabilization and growth as well as the allocation of resources among competing claims. Accordingly, it is essential that the budget be transparent, that is, understandable, to as much of the public and as many of their elected representatives as possible. Transparency permits the public to participate intelligently in the important decisions that the budget brings to bear. In addition, the budget should provide decisionmakers with sufficient information to signal when and what forms of corrective actions are needed.

Federal budget concepts are based on the recommendations set forth by the 1967 budget commission almost 35 years ago. Although they apply broadly in the budget process, not all recommendations were implemented and they do not address certain issues that are plaguing lawmakers and budget scorekeepers. For example, issues such as long-term commitments, Social Security reforms, biennial budgeting, and accrual of long-term costs raise concern among budget scorekeepers. Accordingly, there have been proposals for a new budget concepts commission. Should such a commission convene, it could consider a number of the issues raised in the following sections.

## Transparency Issues

Certain aspects of earmarked funds can reduce budget transparency. First, the term "trust fund" in the federal budget does not mean what it does in the private sector. Unlike a private trust fund, the federal government can unilaterally change the terms of a trust fund financed program; it can raise or lower future trust fund collections and payments and change the purposes for which the collections can be used. Also, some believe that the government has a greater commitment to carry out an activity financed by a trust fund than its commitment to other government activities. This is not true. For example, the U.S. Constitution provides that the government is responsible for the common defense of the nation—an activity that is not financed through a trust fund. The lack of a trust fund financing arrangement is certainly not an indication that the government has some lesser commitment to a strong national defense than it does to trust fund activities. Contrary to what many citizens may believe, the absence or presence of a trust fund does not necessarily represent the strength of the government's commitment to a particular activity.

While earmarking does not confer any permanent, unchangeable benefit to a program, it may influence debates about program creation or changes if the program is financed in whole or in part by its beneficiaries. Given these political benefits, earmarking as a means of specifying the financing for a program is unlikely to disappear. However, transparency could be

increased by recognizing the similarity between nonrevolving trust funds and special funds and between revolving trust funds and public enterprise funds. Do we need four fund types when two might suffice?

Consideration should be given to whether budget transparency could be improved by eliminating the use of the term "trust fund" in the federal budget. Use of a term that is not identical to a private sector term with a different meaning could clear up some of the public's confusion. For example, using the term "special fund" instead of trust fund could eliminate the confusion. Also, it might increase consistency within the budget given the lack of distinction between fund types. Alternatively, an entirely new term could be developed to encompass current trust, special, and public enterprise fund labels.

Finally, it may be confusing that gross federal debt can increase during a time when budget surpluses are being used to pay down the debt. This occurs because gross federal debt includes both debt held by government accounts (that is, the balances in earmarked funds) and debt held by the public. Trust funds are generally required by law to be invested in government obligations. When such earmarked funds have annual surpluses—as in the current case of Social Security trust funds—debt held by government accounts increases. Using the earmarked surpluses to reduce debt held by the public merely exchanges publicly held debt for debt held by government accounts; gross federal debt remains unchanged. If the surpluses in earmarked funds are not all used to reduce debt held by the public, total debt would increase even when the budget is in surplus. Moreover, reforms to Social Security and Medicare can increase balances and hence could increase gross federal debt if they increase any near-term surpluses in these funds.

Some reconsideration of how debt is defined might help clarify the situation. For example, the term "debt held by government accounts"—essentially a bookkeeping entry of what has been earmarked to particular purposes in excess of spending—could be reconsidered. This debt might be excluded from gross federal debt so that gross federal debt reflects only borrowing from the public which is a better concept for analyzing the effect of the budget on the economy.[1] Debt held by government accounts

[1]Debt held by the public is a useful measure because it represents the cumulative burden of past federal borrowing on today's economy and the federal budget. Because debt held by government accounts is neither equal to future benefit payments nor a measure of the commitments of the current system, it cannot be seen as a measure of this future burden.

could also be excluded from the amount that is subject to the federal debt limit. The balances of debt held by government accounts could be tracked and interest paid, but it would not be called "debt." This single clarification could make public discourse on debt more transparent.

## Signaling Issues

The federal budget is intended to facilitate the allocation of resources among competing claims as well as the Nation's economic stabilization and growth. As a general principle, decision-making is enhanced if the government recognizes the costs of its commitments at the time it makes them. For most programs, cash-based budgeting accomplishes this. However, for some programs, such as credit, pension, and insurance, cash-based measurement is incomplete and potentially misleading. For such programs and others established to account for long-term commitments like Social Security, the budget in some cases attempts to accumulate earmarked balances in anticipation of future claims.

Because an earmarked fund's accumulated balance does not necessarily reflect the full future cost of existing government commitments, it is not an adequate measure of a fund's solvency or sustainability. As discussed in section 2.3, the relationship between projected future fund balances and the claim on future resources depends on whether the program financed by the fund was structured such that earmarked receipts would cover the future program claims stemming from its benefit structure. However, when programs are not designed to be fully self-financed, their projected accumulated balances can provide a vital signaling function about underlying fiscal imbalances. For example, under current law, the long-term projected balances in the Social Security trust funds will not cover the cost of Social Security benefits projected for the same long-term period. In that case and others, the information on accumulated fund balances provides an indication of the solvency of the fund but does not fully inform policymakers about either the size of the benefit promised or the sustainability of the programs financed by earmarked funds. Tracking the estimated future balances in earmarked funds does make it possible, however, to estimate how much more funding is needed to pay for the commitments that have been promised. A shortfall between the long-term projected fund balance and projected costs can signal that the fund, either by design or because of changes in circumstances, is collecting insufficient monies to finance future payments. This signaling device can eventually prompt policymakers to action.

The difficulty of developing meaningful measures of fund sustainability is exacerbated by the length of time covered by long-term commitments. The longer the span of time between the collection and the expenditure of

funds, the greater the uncertainty involved in forecasting future needs. Social insurance, pensions, and other programs that create long-term commitments will frequently grapple with these timing issues. Having several measures may in fact be the most informative. For example, Social Security uses three alternative sets of economic and demographic assumptions to estimate a range of possible future experiences.[2]

In that balances do not fully inform policymakers and the public about the long-term sustainability of the programs financed by earmarked funds, consideration is warranted of other ways to make long-term commitments more apparent when making budget decisions. For example, similar to credit programs, one might look at the net present value of estimated costs and receipts for specific programs. Alternatively, constructing meaningful measures that would trigger some action, such as expected program growth beyond a specified share of GDP, might offer another means to focus policymaker attention on certain long-term commitments. For example, we have suggested that Medicare reforms could include a trigger that would require the President to propose how to deal with the growth and the Congress to vote on the proposal, either accepting it or developing an alternative.[3] Whether ways to make long-term commitments more apparent should represent changes in how the budget is measured or simply changes in budget display would need to be considered based on what is appropriate for each type of program. As we have said before, the future sustainability of programs is the key issue policymakers should address—i.e., the capacity of the economy and budget to afford the

[2]The three sets of estimates include low-, high-, and intermediate-cost assumptions that are used to prepare 10-year and 75-year estimates. The low-cost alternative is more optimistic for trust fund financing, the high-cost alternative is more pessimistic, and the intermediate-cost alternative reflects the "best estimate" of future experience.

[3]*Medicare Reform: Issues Associated With General Revenue Financing* (GAO/T-AIMD-00-126, Mar. 27, 2000).

commitment. Fund solvency can help, but only if promoting solvency improves the future sustainability of the program.

# Scope and Methodology

OMB and Treasury report funds differently. For example, because amounts in the federal budget are rounded to millions of dollars, OMB instructs agencies to consolidate small accounts with larger general fund accounts.[1] However, Treasury tracks monies for each discrete trust fund account down to the penny in order to fulfill its governmentwide accounting and cash management responsibilities. Thus, Treasury's count of funds represents the actual number of separate entities designated as earmarked funds.

Because this report was written primarily from a budgetary perspective, we used OMB budget data to analyze earmarked funds. Accordingly, our analysis does not separately identify funds with amounts less than $500,000. Although, to the extent possible, we individually counted trust funds that OMB grouped together, we could not always separately identify expenditures that had been merged or consolidated with other accounts. As a result, the number of earmarked funds we identify is more than the number of funds tracked by OMB but fewer than the actual number tracked by Treasury.

The budget data we used were extracted from automated information collected and maintained by OMB. We obtained this data for the fiscal year 2001 budget, which included data for fiscal year 1999. We extracted account data on receipts (including source information), offsetting collections, gross outlays, and balances (including unappropriated, unobligated, and obligated balance data). We also extracted data on budget function and Deficit Control Act classification as mandatory or discretionary. We excluded (1) financing accounts, since they are nonbudgetary; (2) funds established after 1999; and (3) legislative proposals included in the 2001 budget. Although we did not independently verify the extracted data for every earmarked fund, we reconciled account data for a judgmentally selected set of funds to the published *Budget of the United States Government, Fiscal Year 2001—Appendix* and, in many cases to the Department of Treasury's receipt data published in the *United States Government Annual Report—Appendix.*

We defined earmarked funds that carry some degree of long-term commitment as those that finance federal insurance programs, social

[1]OMB also will sometimes report trust fund groups rather than individual trust funds. Groups may include two or more trust funds with similar purposes. For example, it groups the five trust funds related to "foreign service national separation liability" associated with five different agencies under one group trust fund name

insurance programs, and federal pensions. We recognize that there is no universal agreement on which programs constitute federal insurance[2] and social insurance. We determined our list based on the programs previously identified by OMB and the Federal Accounting Standards Advisory Board. We also included earmarked pension funds that had filed under P.L 95-595 as well as others we identified. In addition, we included two railroad funds related to Social Security and Unemployment Insurance and two Department of Defense education funds that represent exchange transactions.

To develop historical perspective on earmarked funds, we reviewed relevant literature. In addition, we met with budget specialists from OMB, CRS, and CBO and held telephone conversations with specialists from the Department of Treasury. We obtained comments on this report and incorporated them as appropriate.

Our work was performed in Washington, D.C., and was done in accordance with generally accepted auditing standards.

[2]See *Budget Issues: Budgeting for Federal Insurance Programs* (GAO/AIMD-97-16, Sept. 30, 1997).

# Description of Selected Earmarked Funds

Earmarked funds serve a multitude of purposes and can vary considerably in their makeup. To provide a sense of this variety, this appendix briefly describes the background and purpose of some of the bigger funds and each fund's Deficit Control Act category, fiscal year 1999 fund data, investment information, and current issues. We include funds from each of the four types of earmarked funds and have ordered them alphabetically.

- Airport and Airway Trust Fund *(Nonrevolving Trust Fund)*
- Civil Service Retirement and Disability Fund *(Nonrevolving Trust Fund)*
- Commodity Credit Corporation Fund *(Public Enterprise Fund)*
- Federal Employees and Retired Employees Health Benefits Funds *(Revolving Trust Fund)*
- Employees Life Insurance Fund *(Revolving Trust Fund)*
- Highway Trust Fund *(Nonrevolving Trust Fund)*
- Land and Water Conservation *(Special Fund)*
- Medicare (Hospital Insurance and Supplemental Medical Insurance) *(Nonrevolving Trust Funds)*
- Military Retirement Fund *(Nonrevolving Trust Fund)*
- Nuclear Waste Fund *(Special Fund)*
- Postal Service Fund *(Public Enterprise Fund)*
- Strengthening Markets, Income, and Supply (Section 32) *(Special Fund)*
- Social Security (Old-Age and Survivors Insurance Fund and Disability Insurance Fund) *(Nonrevolving Trust Funds)*
- Tennessee Valley Authority Fund *(Public Enterprise Fund)*
- Unemployment Insurance Fund *(Nonrevolving Trust Fund)*
- Universal Service Fund *(Special Fund)*

## Airport and Airway Trust Fund (20-8103-0-7-402)

**Fund type, authorization, background, and purpose:**

The Airport and Airway Trust Fund is a *nonrevolving trust fund* established by Title II of the Airport and Airway Revenue Act of 1970 (section 208 of P.L. 91-258). The "Aviation Trust Fund," as it is also known, was established to provide funding for capital improvements and operations for the nation's airport and airway system. The most recent reauthorization of aviation programs occurred with passage of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (P.L. 106-181).

The aviation trust fund receives the vast majority of its funding from a percentage tax on domestic airline tickets and a flight segment tax. Additional funding is obtained from taxes on aviation fuels, cargo waybills, and international departures and arrivals.

**Deficit Control Act category:** Mandatory receipts and discretionary outlays

**Budget subfunction:** Air transportation (402)

**Fiscal year 1999 fund data:**

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$11,121** |
| Source of funds: | | | |
| Taxes (governmental receipts) | | $10,391 | |
| Offsetting collections | | 32 | |
| Proprietary receipts | | 0 | |
| General fund transfers: | | 698 | |
| Interest | $698 | | |
| Appropriations | 0 | | |
| Other | 0 | | |
| **Outlays** | | | **$ 8,089** |
| **Balance at end of year** | | | **$12,446** |

**Investments:** The fund is invested in nonmarketable federal securities.

**Current issues:** In April 2000, the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21) was enacted. This law

changes the budgetary treatment of the Airport and Airway Trust Fund so that it is similar to that of the Highway Trust Fund (i.e., establishes annual guaranteed minimum funding levels that are tied to receipts.) Providing guaranteed funding levels to any one activity in the budget protects that activity from competition with other areas for finite resources. GAO has previously testified on guaranteed funding levels and trust fund control in the budget.[1]

## Civil Service Retirement and Disability Fund (24-8135-0-7-602)

**Fund type, authorization, background, and purpose:**

Civil Service Retirement and Disability (CSRD) is a *nonrevolving trust fund* covering the defined benefit components of the two major federal civilian retirement systems: the Civil Service Retirement System (CSRS) and the Federal Employees' Retirement System (FERS). According to the Office of Personnel Management's annual report, the CSRS and FERS retirement plans cover about 90 percent of the federal civilian workforce.

From 1920 to 1984, CSRS was the retirement plan covering most civilian federal employees. In 1935, the Congress enacted the Social Security system for private sector workers. The Congress extended Social Security coverage to state and local government workers in the early 1950s and, in 1983, the Congress enacted P.L. 98-21, which mandated that workers hired into permanent federal positions on or after January 1, 1984, be covered by Social Security.

In June 1986, the Congress passed the Federal Employees' Retirement System Act of 1986 (P.L. 99-335) creating FERS. Unlike CSRS, which is a defined benefit plan,[2] FERS has three components: (1) Social Security defined benefit, (2) a FERS defined benefit pension, and (3) the Federal Thrift Savings Plan defined contribution plan. CSRS was closed to new entrants after December 31, 1983.

**Deficit Control Act category:** Primarily mandatory; some discretionary outlays

[1] *Budget Issues: Trust Funds in the Budget* (GAO/T-AIMD/RCED-99-110, March 8, 1999) and *Budget Issues: Cap Structure and Guaranteed Funding* (GAO/T-99-210, July 21, 1999).

[2] Federal workers covered by CSRS also may participate in the thrift savings plan, but their total contribution is limited to 5 percent of pay and they receive no matching contributions from their employing agency.

**Budget subfunction:** Federal employee retirement and disability (602)

**Fiscal year 1999 fund data:**

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$ 74,522** |
| Source of funds: | | | |
| Governmental receipts: employee contributions | | $ 4,421 | |
| Proprietary receipts | | 0 | |
| Offsetting collections | | 0 | |
| General fund transfers: | | 70,101 | |
| Interest | $33,579 | | |
| Appropriations | 21,427 | | |
| Other (employer contributions) | 15,095 | | |
| **Outlays** | | | **$ 43,932** |
| **Balance at end of year** | | | **$481,273** |

**Investments:** The fund is invested in interest-bearing securities of the U.S. government. It also carries, but does not routinely invest in certain federal agency securities.

**Current issues:** At present, there is no looming financial crisis facing either CSRS or FERS. According to the actuaries of the Office of Personnel Management, both programs will have sufficient resources to meet their obligations for the indefinite future. Periodically, proposals have been made to take the CSRD trust fund off-budget, as has been done with the Social Security trust funds. For example, since 1993, at least three bills have been introduced to move the CSRD trust fund off-budget. However, none of these bills was enacted.

Congressional interest in the civil service retirement programs in the past has tended to focus on the "under-funding" of retirement annuities in CSRS. While FERS was set up to be fully funded, CSRS has always been

funded on a pay-as-you-go basis.[3] In other words, payments into the CSRD trust fund were used to pay benefits to already retired workers rather than to prefund the pension benefits of current workers. Proposals to prefund CSRS in the same manner as FERS have tended to founder on the issue of whether they would be given additional budget authority or make higher contributions from their existing budget authority. While recording additional budget authority in agency budgets would properly reflect the costs of CSRS employees, the accumulation of large surplus balances in the trust fund does not by itself affect the government's ability to meet commitments or make a program more sustainable in the future.

## Commodity Credit Corporation Fund (12-4336-0-3-999)

**Fund type, authorization, background, and purpose:**

The Commodity Credit Corporation (CCC) fund is a *public enterprise fund.*

CCC was established in 1933 as one of the first pieces of New Deal legislation proposed by President Roosevelt. CCC was originally incorporated under a Delaware charter and was reincorporated in 1948 as a federal corporation within the U.S. Department of Agriculture (USDA) by the Commodity Credit Corporation Charter Act (P.L. 80-806). CCC was established to stabilize, support, and protect farm incomes and prices and to assist in maintaining balanced and adequate supplies of agricultural commodities and in facilitating their orderly distribution. CCC carries out this mission by financing a variety of income and commodity support programs through direct payments and loans. These programs assist in the production and marketing of agricultural commodities such as feed grains, wheat, rice, and cotton. CCC's mission was expanded in recent years to include the financing of a range of commodity export, resource conservation, and disaster assistance programs. Among other things, these programs are intended to enhance price competitiveness of U.S. commodities in foreign markets, assist producers in implementing conservation practices on their farms, and indemnify producers for the extraordinary losses of crops or livestock resulting from weather-related

[3]Because the full costs of CSRS are not met by the combined total of employee contributions, agency contributions, and the supplemental payments from Treasury, some future CSRS benefits will of necessity be paid from contributions that were made to the fund on behalf of employees who are covered by FERS. This would have created an unfunded liability for FERS. However, funding for this liability is provided through a series of 30-year amortization payments from the general fund of the Treasury to the CSRD trust fund.

disasters and pest infestations. CCC uses offsetting collections from the sale of commodities, loan repayments, interest income, dairy assessments, and various other program fees. CCC has no employees; its operations are carried out principally through the personnel and facilities of USDA's Farm Service Agency, Foreign Agricultural Service, and Natural Resources and Conservation Service.

**Deficit Control Act category:** Mandatory

**Budget subfunction:** Multiple functions (999)

**Fiscal year 1999 fund data:**

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$ 9,882** |
| Source of funds: | | | |
| Taxes (governmental receipts): | | $ 0 | |
| Proprietary receipts | | 0 | |
| General fund transfers | | 0 | |
| Offsetting collections: | | 9,882 | |
| Interest | $ 0 | | |
| Federal sources | 1,621 | | |
| Nonfederal sources | 8,261 | | |
| **Gross outlays** | | | **$29,182** |
| **Balance at end of year** | | | **$ 1,402** |

## Federal Employees and Retired Employees Health Benefits Funds (24-9981-0-8-551)

**Fund type, authorization, background, and purpose:**

This account is a *revolving trust fund* and combines the Federal Employees Health Benefits fund (FEHB) and the Retired Employees Health Benefits fund (REHB). Authorized by the Federal Employees Health Benefits Act of 1959 (P.L. 86-382), the FEHB program began operations on July 1, 1960. The basic structure of FEHB has undergone

relatively few changes since the program began operation.[4] The REHB program was created by the Retired Federal Employees Health Benefits Act (P.L. 86-724). Together, these two funds comprise the FEHB trust fund.

FEHBP is the nation's largest voluntary employer-sponsored health insurance program and is administered by the Office of Personnel Management (OPM). Employees and retirees share the costs of health coverage with the federal government, which pays 72 percent of premium costs, on average.[5] FEHBP serves as an insurance purchaser contracting with several hundred private health plans to offer health benefits to federal employees, retirees, and their dependents. OPM negotiates premiums and benefits with participating health plans but it does not directly reimburse claims or directly provide health care services. Participation in FEHBP is voluntary and enrollees may change from one plan to another during annual "open seasons." At the time of retirement, eligible enrollees must make a one-time election to continue to participate in FEHBP as retirees. Participating retirees pay the same premiums as active employees.

**Deficit Control Act category:** Primarily mandatory

**Budget subfunction:** Health care services (551)

[4]Since 1991, OPM has required participant plans to implement cost containment procedures and policies such as hospital precertification, case management, and development of preferred provider networks.

[5]The Balanced Budget Act of 1997 (P.L. 105-33) established a new formula that permanently sets the government's share of premiums at 72 percent of the average total premium cost of all plans in the FEHBP, weighted by the number of participants in each plan. The government share cannot exceed 75 percent of the premium of any particular plan.

**Fiscal year 1999 fund data:**

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$18,039** |
| Source of funds: | | | |
| Taxes (governmental receipts): employee contributions | | $ 0 | |
| Proprietary receipts | | 0 | |
| General fund transfers | | 0 | |
| Offsetting collections: | | 18,039 | |
| Interest | $ 360 | | |
| Employer/government contributions | 12,759 | | |
| Employee/annuitant contributions | 4,920 | | |
| **Outlays** | | | **$18,463** |
| | | | |
| **Balance at end of year** | | | **$ 5,813** |

**Investments:** The fund is invested in nonmarketable, market-based government debt securities, which have a yield that equals the average of all marketable government debt securities with 4 or more years to maturity.

**Current issues:** As of October 1, 2000, OPM began allowing employees of the executive branch agencies to pay their share of FEHB insurance costs with pretax dollars, thus increasing employees after-tax income. Only current employees will be able to pay their premiums in this manner. We have estimated that the tax loss associated with this method of payment will be over $700 million annually.

S. 2218 and H.R. 4040 have been introduced to establish a long-term care (LTC) insurance program for federal employees and annuitants, current and retired members of the uniformed services, and their qualified relatives. Under these proposals, OPM would contract with private insurance carriers or a consortium of insurers to provide LTC benefits. Insured individuals would be responsible for 100 percent of premiums.

## Employees Life Insurance Fund (24-8424-0-8-602)

**Fund type, authorization, background, and purpose:**

This *revolving trust fund* finances payment to a private insurance company for federal employees' group life insurance (FEGLI) and expenses incurred by OPM to administer the program. The life insurance program

was created by the Federal Employees Group Life Insurance Act of 1954 (P.L. 83-598) and covers about 90 percent of eligible employees, annuitants, and many of their family members.

The FEGLI program provides basic coverage and three types of optional coverage, including standard, additional, and family optional coverage. FEGLI is administered through a contract with Metropolitan Life Insurance Company. Basic insurance is determined by the amount of an employee's annual rate of basic pay, rounded to the next highest thousand, plus $2,000. All federal employees are automatically covered by basic insurance unless they decline. Starting in 1995, living benefits were added to the FEGLI program. Living benefits allow eligible terminally ill enrollees to receive their basic insurance benefits during the last stage of their lives.

**Deficit Control Act category:** Primarily mandatory

**Budget subfunction:** Federal employee retirement and disability (602)

**Fiscal year 1999 fund data:**

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$ 2,945** |
| Source of funds: | | | |
| Taxes (governmental receipts) | | $ 0 | |
| Proprietary receipts | | 0 | |
| General fund transfers | | 0 | |
| Offsetting collections: | | 2,945 | |
| Interest | $1,311 | | |
| Nonfederal sources | 1,240 | | |
| Other (Agency contributions) | 394 | | |
| **Outlays** | | | **$ 1,561** |
| **Balance at end of year** | | | **$20,486** |

**Investments:** The fund is invested in nonmarketable, market-based government debt securities, which have a yield that equals the average of all marketable government debt securities with 4 or more years to maturity.

## Highway Trust Fund (20-8102-0-7-401)

**Fund type, authorization, background, and purpose:**

The Highway Trust Fund is a *nonrevolving trust fund* comprised of two accounts: highways and mass transit. The Highway Trust Fund was created by Title II of P.L. 84-627, the Highway Revenue Act of 1956. This 1956 act provided funding for construction of the interstate highway system and for some other federal highway programs. The Highway Trust Fund was established as a way to provide funding for capital construction and this remains its principal focus.

The mass transit account, created by the Surface Transportation Assistance Act of 1982 (P.L. 97-424), represented the culmination of a long congressional debate about the position of transit in the national transportation system. The transit account provided a consistent federal funding source for capital spending on new and rehabilitated mass transit infrastructure and for other purposes.

**Deficit Control Act category:** Mandatory receipts; predominantly discretionary outlays

**Budget subfunction:** Ground transportation (401)

**Fiscal year 1999 fund data:**

(Dollars in millions)

| | | |
|---|---|---|
| **Income** | | **$39,427** |
| Source of funds: | | |
| Taxes (governmental receipts) | $39,299 | |
| Offsetting collections | 126 | |
| Proprietary receipts: interest | 2 | |
| **Outlays** | | **$29,036** |
| | | |
| **Balance at end of year** | | **$28,979** |

**Investments:** The fund is invested in nonmarketable Treasury securities which are noninterest bearing.

**Current issues:** Over the last 40 years, the Highway Trust Fund and the federal program it supports have been changed numerous times. In almost every instance, the Congress has chosen to expand the scope of the federal highway program. At various times over the same period, the

Congress has also chosen to increase the revenue stream into the trust fund by raising federal excise taxes on motor fuels. Over the last several years, a number of bills have proposed to both move the Highway Trust Fund off-budget and exempt it from DCA controls in order to ensure that highway spending is not held down in order to lower the federal deficit.

Instead of moving the fund off-budget, legislation in May 1998 established minimum guaranteed spending levels. The Transportation Equity Act for the 21st Century (P.L. 105-178), referred to as TEA-21,[6] established two new categories within the discretionary spending caps set forth in the DCA: the highway category and the mass transit category, each with its own outlay caps through fiscal year 2003. TEA-21 also established minimum obligation limitations or spending levels for the highway and mass transit categories for fiscal years 1999 through 2003. For the highway category, these minimum spending levels are tied to receipts (from the previous year) of the highway category. TEA-21 provides a mechanism for adjusting these spending levels upward or downward each year based on actual receipts from 2 years prior to the fiscal year, as reported by Treasury, plus revised Treasury receipt projections for the fiscal year in question. For example, for fiscal year 2000, TEA-21 requires that this adjustment be calculated by comparing (1) actual highway account receipts for fiscal year 1998 with the TEA-21 projection of these receipts and (2) revised projections of the highway account receipts for fiscal year 2000 with the TEA-21 projection of these receipts. The sum of these differences becomes the adjusted funding level. GAO has previously testified on guaranteed funding levels and trust fund control in the budget.[7]

## Land and Water Conservation Fund (14-5005-0-2-303)

**Fund type, authorization, background and purpose:**

The Land and Water Conservation Fund (LWCF) is a *special fund* administered by the Department of the Interior. The fund was created by the Land and Water Conservation Fund Act of 1965 (Pub.L. 88-578). The fund was originally authorized through fiscal year 1989 but was

[6]A technical corrections bill provided additional clarification of funding formulas, highway safety regulations related to drunk driving, and certain budget offsets. The technical corrections for TEA-21 were ultimately incorporated into Title IX of the Internal Revenue Service Restructuring and Reform Act of 1988 (P.L. 105-206), which was enacted on July 22, 1998.

[7]*Budget Issues: Trust Funds in the Budget* (GAO/T-AIMD/RCED-99-110, March 9, 1999) and *Budget Issues: Cap Structure and Guaranteed Funding* (GAO/T-99-210, July 21, 1999).

reauthorized through fiscal year 2015 by the Omnibus Budget Reconciliation Act of 1987.

Revenues to the fund are comprised of federal recreation fees, proceeds from the sale of surplus federal real property, part of the motorboat fuel tax, and part of the receipts from oil and gas leases on the Outer Continental Shelf. The latter item constitutes the bulk of the revenues to the fund.

LWCF funds are available to support federal land acquisition and state recreation programs only upon appropriation by the Congress. Appropriations are made for the Forest Service in the Department of Agriculture and to three Department of the Interior agencies (National Park Service, Fish and Wildlife Service, and Bureau of Land Management).

**Deficit Control Act category:** Mandatory receipts and discretionary outlays

**Budget subfunction:** Recreational resources (303)

**Fiscal year 1999 fund data:**

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$ 908** |
| Source of funds: | | | |
| Taxes (governmental receipts) [motorboat fuels tax] | | $ 1 | |
| General fund transfers (intragovernmental transfers) | | | |
| Interest | | | |
| Appropriations | | | |
| Other | | | |
| Proprietary receipts: | | 907 | |
| Outer Continental Shelf lands rent | $899 | | |
| Surplus property sales | 8 | | |
| Offsetting collections | | 385 | |
| **Outlays** | | | **$ 1,087** |
| **Balance at end of year** | | | **$12,936** |

**Investments:** The Land and Water Conservation Fund is not authorized to invest surplus funds in Treasury securities.

**Current issues:** Concerns have been raised that, over the years, spending from the LWCF has been held down to help reduce the federal budget deficit. A substantial balance of unappropriated funds has accumulated, and even if funds were appropriated at the authorized level, the fund would be unlikely to spend down the balance in the near future. Some advocates see the current budget surpluses as an opportunity to spend more money on these activities.

Bills to greatly expand federal financial support for land and resource acquisition and for protection and recreation have been introduced during the 106th Congress. Some proposals would replace annual appropriations with a permanent appropriation. Other proposals would take the LWCF off-budget and exempt it from any general budget limitation. The House passed H.R 701 on May 11, 2000. This bill would increase funding for LWCF by transferring up to $900 million annually from a newly established Conservation and Reinvestment Act Fund. Funding for federal land acquisition would remain subject to appropriations acts while a portion of the funds would not be subject to appropriations.

## Medicare Trust Funds (20-8004-0-7-571 and 20-8005-0-7-571)

**Fund type, authorization, background, and purpose:**

Medicare, financed through two *nonrevolving trust funds*, is a federal health insurance program enacted in 1965. Initially, eligible Americans age 65 or older were covered. Coverage was later extended to certain disabled persons by the Social Security Amendments of 1972. Medicare is the nation's largest health insurance program. It is administered by the Health Care Financing Administration, which contracts with insurance companies for claims processing services.

Medicare has two parts, A and B, and two trust funds, HI and SMI, each of which is financed differently.

*Part A: Federal Hospital Insurance (HI) Component*: Medicare Part A is financed through the HI trust fund, which covers inpatient hospital, skilled nursing facility, home health, and hospice services. It is financed by a 1.45 percent payroll tax on employers and employees. It also receives a portion of federal income taxes paid on Social Security benefits. All citizens 65 years of age or older with credit for at least 40 quarters of employment are fully covered for life under Social Security. They are entitled to Part A at no cost. Senior citizens without sufficient quarters of coverage can purchase Part A for premiums based on the actuarial value of benefits. Persons who have received Social Security disability benefits for 24

months and most people with kidney disease—End Stage Renal Disease (ESRD)—are also entitled to Part A without additional premiums.

*Part B: Federal Supplementary Medical Insurance (SMI) Component:* Medicare Part B is financed through the SMI trust fund. It is a voluntary program under which anyone age 65 or older, disabled persons, or ESRD patients entitled to Part A can purchase coverage for a wide range of outpatient services ranging from physicians' services to clinical laboratory tests. Enrollees pay a monthly premium that covers about 25 percent of program costs; federal general revenues pay the remainder. Beneficiaries are responsible for a $100 annual deductible payment. For most covered services, beneficiaries are also responsible for 20 percent coinsurance. If a Medicare beneficiary qualifies for Medicaid (an income-tested program), the Medicaid program will pay his or her Medicare Part B premiums.

**Deficit Control Act category:** Benefit payments, comprising about 98 percent of gross outlays, are mandatory; administrative expenses, comprising about 2 percent of outlays, are discretionary.

**Budget subfunction:** Medicare (571)

**Fiscal year 1999 fund data:**

Federal Hospital Insurance

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$153,018** |
| Source of funds: | | | |
| Taxes (governmental receipts) | | $132,337 | |
| Offsetting collections | | 3 | |
| Proprietary receipts: | | 1,403 | |
| Interest | $ 2 | | |
| Premiums | 1,401 | | |
| General fund transfers: | | 19,275 | |
| Interest | 9,286 | | |
| Appropriations | 7,413 | | |
| Other (federal employer contributions) | 2,576 | | |
| **Outlays** | | | **$131,503** |
| | | | |
| **Balance at end of year** | | | **$138,421** |

Federal Supplementary Medical Insurance

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$85,457** |
| Source of funds: | | | |
| Taxes (governmental receipts) | | $ 0 | |
| Offsetting collections | | 179 | |
| Proprietary receipts | | 20,167 | |
| Interest | $ 7 | | |
| Premiums | 20,160 | | |
| General fund transfers: | | 65,111 | |
| Interest | 2,926 | | |
| Appropriations | 62,185 | | |
| **Outlays** | | | **$80,697** |
| | | | |
| **Balance at end of year** | | | **$45,649** |

**Investments:** The Social Security Act requires that funds not necessary to meet current expenditures be invested in interest-bearing obligations of the United States or in obligations guaranteed as to both principal and interest by the United States. These investments are carried at face value as determined by Treasury.

**Current issues:** Absent changes, the long-term financial outlook for the Medicare program is bleak. Under the Trustees' 1999 intermediate projections, HI and SMI expenditures taken together are expected to increase dramatically, rising from about 12 percent of all federal revenues in 1999 to about 25 percent by mid-century, even without any additions to the benefit package. Over the same time frame, Medicare's expenditures are expected to double as a share of the economy, from 2.5 percent to 5.3 percent.

Medicare trust fund reports show that the HI component had a cash deficit from 1992 through 1998 but is now running a surplus that is projected to continue until 2025. Nevertheless, the Medicare program is fiscally unsustainable in its present form as the disparity between program expenditures and program revenues is expected to reopen and widen dramatically after 2025. Moreover, the program has not adopted modern, market-based management tools and its benefit package contains gaps in desired coverage compared to private employer coverage. Compounding

the difficulties of responding to these competing concerns is the sheer size of the Medicare program—even modest program changes send ripples across the program's 39-million beneficiary population and the approximately 1 million health care providers that bill the program.

A number of legislative proposals dealing with Medicare benefits and financing have been made. Options to reform Medicare must balance the needs of all parties and require hard choices based on affordability, equity, adequacy, feasibility, and acceptance.

## Military Retirement Fund (97-8097-0-7-602)

**Fund type, authorization, background, and purpose:**

The Military Retirement Fund is a *nonrevolving trust fund.* It was established by the Department of Defense Authorization Act of 1984.

The military retirement system provides benefits for retirement after a military career, disability retirement, and survivor benefits for eligible survivors of deceased retirees. Benefits are paid after 20 years of active service, regardless of age, and are intended more to retain qualified personnel through a full 20-year career than to provide adequate retirement income. The system seeks to minimize turnover and the government's training costs for skilled personnel and to encourage the retirement of service members who have become too old to meet the physical and mental demands of military service. The military retirement system is a noncontributory (i.e., no employee contributions) defined benefit plan.

**Deficit Control Act category:** Mandatory

**Budget subfunction:** Federal employee retirement and disability (602)

## Fiscal year 1999 fund data:

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$ 38,227** |
| Source of funds: | | | |
| Taxes (governmental receipts): employee contributions | | $ 0 | |
| Proprietary receipts | | 0 | |
| Offsetting collections | | 0 | |
| General fund transfers: | | 38,227 | |
| Interest | $12,560 | | |
| Appropriations | 15,250 | | |
| Other (employer contributions) | 10,417 | | |
| **Outlays** | | | **$ 31,889** |
| **Balance at end of year** | | | **$151,853** |

**Investment:** The fund is invested in nonmarketable, special-issue Treasury securities.

**Current issues:** A variety of major changes in military retirement were enacted in the fiscal year 2000 National Defense Authorization Act (P.L. 106-65). Some of the changes included (1) allowing military personnel the option of retiring under the "Redux" system with a cash bonus of $30,000 or under a more generous pre-Redux formula without the bonus payment;[8] (2) allowing military personnel to enroll in the federal civil service's Thrift Savings Plan; (3) repealing dual compensation laws that required military retirees in the federal civil service to forfeit some or all of their retired pay; and (4) authorizing a special payment to some people who receive both military nondisability retired pay and Department of Veterans Affairs disability compensation.

[8]Redux refers to cuts incorporated in military retirement pay for persons who would first be retiring in mid-2006. Redux was established in the Military Retirement Reform Act of 1986 (P.L. 99-348) based on allegations that military retirement cost too much, had overly generous benefits, and contributed to inefficient military personnel management.

## Nuclear Waste Fund (89-5227-0-2-271)

**Fund type, authorization, background, and purpose:**

The Nuclear Waste Fund is a *special fund* under the jurisdiction of the Department of Energy. It was established by the Nuclear Waste Policy Act of 1982, Public Law 97-425, enacted January 7, 1983. It finances the activities of the nuclear waste disposal program, which consists of the development, acquisition, and operation of facilities for the disposal of nuclear waste.

The act requires that reactor operators pay (1) fees for electricity generated by a civilian nuclear power reactor and (2) a one-time fee for spent nuclear fuel for power generated prior to the act. These fees are credited to the fund. The act said that, in return for these fees, the Secretary of Energy, beginning not later than January 31, 1998, would provide for the disposal of the high-level radioactive waste or spent nuclear fuel accumulated at nuclear power plants. The Secretary was authorized to make expenditures from the fund for purposes of authorized radioactive waste disposal activities, subject to appropriations that would remain available until expended. Balances in the fund may be invested in Treasury securities.

**Deficit Control Act category:** Discretionary

**Budget subfunction:** Energy Supply (271)

**Fiscal year 1999 fund data:**

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$ 768** |
| Source of funds: | | | |
| Taxes (governmental receipts) | | | |
| Proprietary receipts : | | $662 | |
| Fees for Services | $662 | | |
| General fund transfers (intragovernmental transfers) | | 106 | |
| Interest | 106 | | |
| Appropriations | | | |
| Other | | | |
| Offsetting collections | | | |
| **Outlays** | | | **$ 188** |
| | | | |
| **Balance at end of year** | | | **$7,927** |

**Investments:** The fund is invested in U.S. Treasury securities, which are classified as "available-for-sale" and are reported at market value.

**Current issues:** The goal of accepting radioactive waste into a repository at Yucca Mountain, Nevada, in 1998 was not achieved. The goal now is to open the facility in 2010 at the earliest. The lack of a disposal site has been a contentious issue over the years. Nuclear utilities, which have paid for the waste disposal program for years through the fee on nuclear power, have become concerned over the delays and the need to store spent nuclear fuel. Some delays have been blamed on poor program management, while the Department of Energy contends that tight funding has been a major barrier. Congressional approval is required to spend the fees collected, and only about half of the fees collected have been appropriated to the program. Some surplus in the fund may be needed to pay future costs after nuclear plants have ceased operation.

In the 106th Congress, bills to modify the civilian waste program were considered in both houses. The House Commerce Committee approved H.R. 45, which would have moved the Nuclear Waste Fund off-budget and exempted it from DCA controls. Although appropriations would still be required for all expenditures from the fund, the appropriations would not be subject to budget caps. This proposal raised considerable concern from the House Budget Committee. The Senate bill (S. 1287) would leave the current funding mechanism in place but would authorize waste shipments to the repository site if it receives a Nuclear Regulatory Commission construction permit. S. 1287 passed both houses of Congress but the President vetoed the legislation on April 25, 2000. A Senate override attempt on May 2, 2000, was unsuccessful.

## Postal Service Fund (18-4020-0-3-372)

**Fund type, authorization, background, and purpose:**

The U.S. Postal Service is financed through a public enterprise fund. The Service's roots date back to 1775 when the Continental Congress appointed Benjamin Franklin as Postmaster General. Throughout the years, the mode and price of mail delivery changed. In 1970, President Nixon signed into law the Postal Reorganization Act (P.L. 91-375), the most comprehensive postal legislation in nearly two centuries. The 1970 act removed the Post Office Department from the President's cabinet, retained the postal mail monopoly, ended the authority of the Congress to set employee wages and postage rates, and granted the new independent establishment substantial fiscal autonomy over its operations. Its primary mission is to provide universal postal service at reasonable rates. It must also remain self-supporting from postal revenues.

Currently, the Postal Service is one of two off-budget federal entities; the other is Social Security. By law, the government must exclude the transactions of off-budget programs from the totals of the President's budget and the Congress' budget resolutions, even though they are part of total government transactions.

**Deficit Control Act category:** Excluded

**Budget subfunction:** Postal Service (372)

**Fiscal year 1999 fund data:**

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$62,943** |
| Source of funds: | | | |
| Taxes (governmental receipts) | | $ 0 | |
| Proprietary receipts | | 0 | |
| General fund transfers | | 0 | |
| Offsetting collections: | | 62,943 | |
| Interest | $ 29 | | |
| Federal sources | 957 | | |
| Nonfederal sources | 61,957 | | |
| **Gross outlays** | | | **$63,964** |
| **Balance at end of year** | | | **$22,107** |

**Investments:** The Postal Service invests in nonmarketable U.S. Treasury securities.

**Current issues:** Direct and indirect competition to the Postal Service is growing. Advances in communications technology, privatized and deregulated foreign postal services, and consumer demand fueled by dramatic growth in Internet commerce make it imperative to raise the quality and ease of use of products and services. In particular, the Postal Service has been hampered by long-standing challenges in labor-management relations that, if continued, may hinder efforts to achieve desired improvements. Continued success will depend heavily on the Postal Service's ability to control operating costs, improve productivity, strengthen internal controls, and ensure the integrity of its services.

## Funds for Strengthening Markets, Income, and Supply (Section 32) (12-5209-0-2-605)

**Fund type, authorization, background, and purpose:**

Funds for Strengthening Markets, Income, and Supply (Section 32) is a *special fund* administered by the Agricultural Marketing Service of the Department of Agriculture. Section 32 of the Act of August 24, 1935, Chap. 641 (7 USC 612c) authorized a permanent appropriation equal to 30 percent of the gross receipts from duties collected under the customs laws to be maintained in a separate fund. The money was first made available during the depression to assist farmers suffering from price-depressing surpluses.

Funds must be used for (1) encouraging the export of farm products through producer payments or other means, (2) encouraging the domestic consumption of farm products by diverting them from normal channels and expanding use by low-income groups, and (3) reestablishing farmers' purchasing power. The Secretary of Agriculture has wide discretion in deciding how to achieve these objectives since the legislation provided that the sums shall be expended for one or more of the specified purposes and at such times, in such manner, and in such amounts as the Secretary determines. However, no more than 25 percent may be spent on any one commodity or product.

Most of the money credited to this special fund is transferred to the Food and Nutrition Service and is used to purchase commodities under section 6 of the National School Lunch Act and other authorities specified in the child nutrition appropriation. In fiscal year 1999 just over $5 billion was transferred to Child Nutrition Programs. An amount equal to 30 percent of receipts collected on fishery products ($66 million in 1999) was transferred to the Department of Commerce for fisheries research. The remaining funds are available for administrative expenses for direct commodity purchases and to serve as a contingency reserve.

**Deficit Control Act category:** Mandatory

**Budget subfunction:** Food and nutrition assistance (605)

**Fiscal year 1999 fund data:**

(Dollars in millions)

| | | |
|---|---|---|
| **Income** | | **$5,681** |
| Source of funds: | | |
| Taxes (governmental receipts): customs duties | $5,680 | |
| Proprietary receipts | | |
| General fund transfers | | |
| Offsetting collections: Nonfederal sources | 1 | |
| **Outlays** | | **833** |
| **Transfers to other accounts** | | **$5,114** |
| | | |
| **Balance at end of year** | | **$ 486** |

**Investments:** This fund has no investments in Treasury Securities.

**Current issues:** Among the issues identified by the Congressional Research Service is the issue of whether 30 percent of customs receipts is still an appropriate source and level of funding. The Congress designated this level in 1935 on the premise that 30 percent of the population then lived on farms. Thus, the amount theoretically represented the farmers' "fair share" of customs revenues. Today only about 2 percent of the population live on farms. Those who take exception to that argument contend that the food and fiber system accounts for about 13 percent of GDP and provides 23 million jobs. Only about 3 percent of the customs receipts are spent on the direct purchase of agricultural products. The bulk of the fund receipts are transferred to the Food and Nutrition Service and are being used to reimburse schools and other institutions for meals served to children. If this level were reduced, discretionary appropriations would have to be increased to maintain the same level of child nutrition programs.

## Social Security Trust Funds (20-8006-0-7-651 and 20-8007-0-7-651)

**Fund type, authorization, background, and purpose:**

In 1935, the Social Security Act was enacted, establishing a program to provide monthly retirement benefits to workers. Program benefits are generally based on average lifetime taxable earnings. Over the years, the benefit amount, taxable income base, and tax rates have substantially increased. Participation in the program has become mandatory for most workers. In addition to changes in benefits and taxation, the law has also

been amended to add survivor's coverage and to provide benefits for the disabled. As a result, Title II of the Social Security Act now provides for two programs that are financed by two *nonrevolving trust funds*: the Federal Old-Age and Survivors Insurance Trust Fund (OASI) and the Federal Disability Insurance Trust Fund (DI).

Each of these programs is financed by Federal Insurance Contribution Act and Self-Employment Contributions Act payroll tax contributions from employees and employers that are placed in separate nonrevolving trust funds from which benefits are paid. Both programs are federally administered by the Social Security Administration.

*Old Age and Survivors Insurance Component:* Under the OASI program, workers may retire at age 65 and receive full benefits.[9] Retirees man opt to retire as early as age 62 and receive reduced benefits.

*Disability Insurance Component:* The DI program is administered by both the federal government and state entities (Disability Determination Services). The DI program pays benefits to individuals who are unable to work for long periods because of medical conditions that prevent substantial gainful activity.

Over time, there have been several proposals to remove Social Security from the federal budget. Measures were enacted in 1983 and 1985 specifying that Social Security should not be included in the budget. In 1990, Social Security's off-budget status was reaffirmed and was also removed from calculations in the sequestration process . Although the program is part of the unified budget, budget totals are shown both on a unified basis (including Social Security) and excluding Social Security.

**Deficit Control Act category:** Benefit payments, comprising over 99 percent of gross outlays, are mandatory; administrative expenses, comprising less than 1 percent of outlays, are discretionary. Both trust funds are excluded from DCA controls but are subject to special enforcement provisions.

**Budget subfunction:** Federal employee retirement and disability (602)

[9]The normal retirement age, when a person may first become entitled to unreduced retirement benefits, is currently 65 years and 2 months. However, under current law, it is scheduled to gradually increase to 67 for persons reaching that age in 2027 or later.

## Fiscal year 1999 fund data:

### Old-Age and Survivors Insurance

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$449,489** |
| Source of funds | | | |
| Taxes (governmental receipts): employee/employer contributions | | $383,559 | |
| General fund transfers (intragovernmental transfers) | | 63,409 | |
| Interest | $46,847 | | |
| Appropriations | 10,188 | | |
| Other (employer contributions) | 6,374 | | |
| Proprietary receipts | | 9 | |
| Offsetting collections | | 2,512 | |
| **Outlays** | | | **$340,427** |
| **Balance at end of year** | | | **$762,374** |

### Disability Insurance

(Dollars in millions)

| | | | |
|---|---|---|---|
| **Income** | | | **$67,791** |
| Source of funds | | | |
| Taxes (governmental receipts): employee/employer contributions | | $60,909 | |
| General fund transfers (intragovernmental transfers) | | 6,870 | |
| Interest | $5,223 | | |
| Appropriations | 636 | | |
| Other (employer contributions) | 1,011 | | |
| Proprietary receipts | | 12 | |
| Offsetting collections | | 0 | |
| **Outlays** | | | **$52,142** |
| **Balance at end of year** | | | **$92,628** |