0001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 00-169 L
Judge Emily C. Hewitt

THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA,
Plaintiff,
vs.
THE UNITED STATES OF AMERICA,
Defendant.

VIDEOTAPED DEPOSITION OF MARGARET WILLIAMS
August 16, 2005
8:30 AM
4400 Masthead, Northeast
Albuquerque, New Mexico

VOLUME 1

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. JERRY ROTHROCK
ATTORNEY FOR PLAINTIFF

REPORTED BY: CATHERINE LEON, CCR No. 71
Kathy Townsend Court Reporters
110 Twelfth Street, Northwest
Albuquerque, New Mexico 87102





A P P E A R A N C E S

For the Plaintiff:
AKIN, GUMP, STRAUSS, HAUER & FELD
Attorneys at Law
1333 New Hampshire Avenue, Northwest
Robert S. Strauss Building
Washington, D.C. 20036-1564
By: MR. JERRY ROTHROCK
MS. STACEY M. KEITH

For the Defendant:
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
601 D Street, Northwest
Washington, D.C. 20004
By: MR. MARTIN J. LaLONDE
MR. BRETT D. BURTON
MR. KEVIN WEBB

DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
DIVISION OF INDIAN AFFAIRS
1849 C Street, Northwest MS 6456
Washington, D.C. 20240
By: MS. ELISABETH C. BRANDON
MR. STEPHEN SIMPSON (BY TELEPHONE)
MS. KAREN LINDQUIST (BY TELEPHONE)

VIDEOGRAPHER: Legal Action Video
Fran Hindsley, CLVS
7008 Conestoga, Northwest
Albuquerque, New Mexico 87120

I N D E X


| | PAGE |
|---|---|
| MARGARET WILLIAMS | |
| Direct Examination by Mr. Rothrock | 5 |
| CERTIFICATE OF COMPLETION OF DEPOSITION | 148 |
| DEPONENT SIGNATURE/CORRECTION PAGE | 151 |







| E X H I B I T S | PAGE |
|---|---|
| 1. Notice of Deposition 30(B)(6) | 11 |
| 2. Notice of Deposition | 13 |
| 3. Witness' List of Guidelines, etc. | 18 |
| 4. Interagency Procedures Handbook | 19 |
| 5. Position Descriptions | 20 |
| 6. Binder Volume 1, Pleadings/Depositions | 21 |
| 7. Binder Volume 2, Statements/Overnighter Rates | 21 |
| 8. Binder Volume 3 | 22 |
| 9. Policy Manual | 103 |


EXHIBITS 6-8 RETAINED BY COUNSEL





VIDEOGRAPHER: This is the videotaped deposition of Margaret Williams in the matter of the Osage Nation and/or Tribe of the -- of Indians of Oklahoma, plaintiff, versus the United States of America, defendant, case number 00-169 L in the United States Court of Federal Claims. We are recording at the Office of Special Trustee for American Indians, 4400 Masthead, Northeast, Albuquerque, New Mexico. Court reporter is Catherine Leon from Townsend Court Reporting. Court videographer Fran Hindsley from Legal Action Video.

For the purposes of the video record, will the attorneys present and by phone identify themselves?

MR. ROTHROCK: Jerry Rothrock representing the Osage Nation.

MS. KEITH: Stacey Keith, the Osage Nation.

MR. LALONDE: Martin LaLonde, Department of Justice.

MR. BURTON: Brett Burton, Department of Justice.

MR. WEBB: Kevin Webb, Department of Justice.

MS. BRANDON: Elisabeth Brandon, Office of the Solicitor, Department of the Interior.

MR. SIMPSON: Stephen Simpson, Office of the Solicitor, Department of Interior.

MS. LINDQUIST: Karen Lindquist, Department of Interior, Office of Solicitor.

VIDEOGRAPHER: The date is August 16th, 2005, the time 8:34 a.m. Mountain time. We are now on the record. Could the court reporter please swear in the witness?

MARGARET WILLIAMS

after having been first duly sworn under oath, was questioned and testified as follows:

DIRECT EXAMINATION

BY MR. ROTHROCK:

Q. Good morning. My name is Jerry Rothrock. I am an attorney that represents the Osage Nation. Would you please state your name for the record?

A. Margaret Williams.

Q. Ms. Williams, could you also give us your business address?

A. 4400 Masthead, Albuquerque, New Mexico, 87109.

Q. And where are you employed at the present time?

A. Department of the Interior, Office of the Special Trustee for American Indians.

Q. And what is your job title with them?

A. Deputy special trustee for trust services.

Q. Ms. Williams, any time you'd like to take a





break today, would you just speak up? We will be glad to accommodate you. Second, during the deposition, is it okay if I refer to you as Ms. Williams, or would you prefer I use a different form of address?

A. Ms. Williams is fine.

Q. Third, I understand from talking with your counsel that you have some time constraints on you today, and we have agreed to make it possible for you to meet your other time constraints.

Could you just tell us again though when you need to depart this room so you can meet your other obligation?

A. I need to leave this room at 3:00.

Q. We will plan the deposition with that in mind.

A. Thank you.

Q. Ms. Williams, you have told us your current title. Could you tell us how long you have worked in that position?

A. I have worked in the position -- oh, in this position?

Q. Yes, the one you are in right now.

A. Since April of 2003.

Q. And have you had the same title the whole time?

A. Yes.





Q. And tell us again what that title is?

A. Deputy special trustee for trust services.

Q. Who do you report to in your current position?

A. Donna Erwin.

Q. What is her position?

A. Principal deputy special trustee.

Q. Do you know how Ms. Erwin spells her name?

A. E-R-W-I-N.

Q. Who does Ms. Erwin report to?

A. Ross Swimmer, the special trustee.

Q. Could you spell Mr. Swimmer's name, please, if you know?

A. Last name?

Q. Yes.

A. S-W-I-M-M-E-R.

Q. Ms. Williams, where were you employed prior to your current position?

A. Prior to the current position of deputy special trustee?

Q. Yes.

A. Here at the office of the special trustee for American Indians. I was the deputy director for the office of trust funds management.

Q. And is that office sometimes referred to as OTFM?





A. Yes.

Q. How long did you have that position?

A. I had that position for approximately a year.

Q. Did you have a job before that?

A. Yes. I was the division chief for the division of trust funds accounting within the office of trust funds management.

Q. How long did you hold that position?

A. I held that position -- I am going to go years now if that is okay.

Q. Approximation is just fine.

A. I had that since 1995, so 1995 till then.

Q. Approximately 2002, if I did the math right?

A. Uh-huh, yes.

Q. Were you employed prior to 1995 as division chief?

A. Yes. I was the branch chief for the branch of investment accounting, which was within the division of trust funds accounting.

Q. And approximately how many years did you hold that position?

A. About a year.

Q. What did you do prior to that position?

A. I was a staff accountant within the branch of reporting.

Q. And is that branch of reporting part of what?
A. I believe it was in a different division in the office of trust funds management. I don't think it was in trust funds accounting, and I don't recall the name of the division.
Q. Sure. What did you do before that position?
A. I was a staff accountant in the branch of investment accounting, and that was within the division of trust funds accounting.
Q. That is also in the office of trust funds?
A. Yes.
Q. If you recall, approximately how long did you hold the last two positions you described for us here?
A. Approximately three years.
Q. Now is that together, the two positions you held?
A. Right. Correct.
Q. What did you do prior to that?
A. I was in the private sector auditing for a public accounting firm.
Q. Can you tell us the name of the public contracting firm?
A. Arthur Andersen and Company.
Q. Do you recall the years you worked for Arthur Andersen, approximately?





A. '90 to '92.
Q. What was your job title when you started work at Arthur Andersen?
A. I believe it would have been called just a staff accountant.
Q. Did you have any other positions at AA, Arthur Andersen?
A. No.
Q. Could you tell us if you were employed prior to working at Arthur Andersen?
A. Employment before -- before Arthur Andersen was college, and before that was restaurants, you know, stuff like that.
Q. We are going to save those for your autobiography.
A. I was going to say, oh, my God.
Q. I am sure it is coming out soon.
A. That is going to be tough if we are running through.
Q. Could you tell us where you attended college?
A. I attended two universities, finished at the University of New Mexico.
Q. When did you graduate from University of New Mexico?
A. In 1990.





Q. What was your degree in?
A. I finished with a degree -- it was called a -- well, a degree in -- a bachelor's in business administration with a concentration in finance and accounting is the way it was termed.
Q. And what was the name of the other university you attended?
A. Harvard.
Q. Ms. Williams, I am going to hand you a document which has been marked by the reporter for identification as Plaintiff's Exhibit 1. I want you to take a moment and look at that document.
My question is, do you recognize this document?
(Exhibit 1 marked.)
A. Yes.
Q. Could you tell us what this document is?
A. This is the notice of deposition and the subpoena.
Q. Ms. Williams, do you recall approximately when you first saw this document?
A. I believe it was a couple weeks ago.
Q. Ms. Williams, if you will flip over a few pages, you will come to the subpoena you mentioned, and then after that, there is an Exhibit A, which has some





definitions in it, and after the definitions, there is a section labeled, topics to be covered. The bottom of that page says 4, has the number 4 on it.
Have you found that?
A. I believe so.
Q. That section lists topics to be covered at the deposition today. Are you appearing here today to discuss one or more of the topics in this section?
A. Yes.
Q. The topics in this section have been numbered. Could you please tell us the numbers of the topics you are going to be discussing here today?
A. 1d, and 1g.
Q. There are no other topics you are going to discuss here today under this?
A. No.
MR. BURTON: If I could just make a point of clarification as well.
MR. ROTHROCK: Sure.
MR. LALONDE: Under 1d, Ms. Williams focuses on the -- there is a whole list of items -- is the investment and accounting of all payments.
MR. ROTHROCK: I'm sorry, Martin, would you just say that again?
MR. LALONDE: Under 1d, there is a list of

receipt, collection, handling, deposit, investment, distribution and accounting of all payments from the leases. Ms. Williams is designated specifically for investment and accounting of all payments.

MR. ROTHROCK: And not for the other topics in B?

MR. LALONDE: Correct. That is correct.

Q. (BY MR. ROTHROCK) Ms. Williams, I am handing you a document that the reporter has marked as Plaintiff's Exhibit 2 for identification. I want you to take a moment and look at that document and tell me if you can identify it.

(Exhibit 2 marked.)

A. Yes.

Q. Can you tell us what that is?

A. It is a payment. I have seen a -- I have seen copy of it.

Q. I'm sorry, Ms. Williams, I didn't hear your answer.

A. I'm sorry. It is a payment. I have seen a copy of it. I mean -- I'm sorry. It is a payment. I remember hearing people talk about it. I don't remember seeing this. I just remember people referring to -- that it would be coming around.

Q. Ms. Williams, when you were referring to this,





you were holding up what I believe is the last page of Plaintiff's Exhibit 2?

A. Yeah, the last page of it. I'm sorry.

Q. Just so I understand your testimony, are you saying you have never seen that page before?

A. No, not this page. I don't recall seeing this page before.

Q. What about the other pages of this Plaintiff's Exhibit 2 that appear ahead of that, have you seen those before?

A. If I have seen these pages before specifically, they looked like the other pages to me, and I didn't pick them out as different from, you know, the other notices.

Q. But you do recall seeing, except for the last page which you have mentioned, you do recall seeing --

A. Right. I do recall seeing --

Q. -- the rest of Plaintiff's Exhibit 2?

A. I am not saying this right. I recall seeing notices.

Q. Right.

A. If this notice is different than the other notices, I don't know that.

Q. Right.

A. I just recall seeing notices.





Q. Right.

A. I also recall being told that a payment would come through. I don't recall seeing a payment or a copy of a payment come through.

MR. ROTHROCK: Let's go off the record for a moment.

VIDEOGRAPHER: We are temporarily going off the record at 8:49 a.m.

(Discussion held off the record.)

VIDEOGRAPHER: We are back on the record at 8:52.

Q. (BY MR. ROTHROCK) Ms. Williams, during the off-the-record break, you were given an opportunity to look at what's been marked for identification as Plaintiff's Exhibit 2. Having had a chance to review the document, can you tell me whether you have seen Plaintiff's Exhibit 2 before or not?

A. Yes, I have.

Q. Do you recall approximately when you first saw Plaintiff's Exhibit 2?

A. I have seen it over the -- it came in approximately sometime over the last two weeks through the materials that I have been going through.

Q. Can you identify Plaintiff's 2 for us? What is this, if you know?





A. It is the notice of deposition for the fact deposition.

Q. Ms. Williams, referring you back now to Plaintiff's Exhibit 1, have you brought any documents with you today to the deposition in response to the subpoena attached to Plaintiff's 1?

A. Yes, yes, I have.

Q. Could you tell us briefly what those documents are?

A. I brought with me a list of the guidelines and manuals that I use in my performance of duties. I brought with me an excerpt from the interagency procedures handbook between the Bureau of Indian Affairs and the Office of the Special Trustee for American Indians. The excerpt is the section of the handbook that pertains to tribal accounts, which would be the part that pertains to the Osage Nation.

I brought with me a copy of my PDs for the positions that I have held, and I brought with me the materials that I have been going over over the last couple weeks to prepare for the deposition, three volumes. One is down here on the floor.

MR. LALONDE: I'd like to just clarify, and this is an important point as we, I guess, progress today as well that we want to make sure that the fact

deposition component of what we are doing is distinct from the 30(B)(6) component of what we are doing. Obviously, on the 30(B)(6), Ms. Williams is speaking on behalf of the Interior. The fact portion, she is speaking from her own personal knowledge and experience, and the reason I am bringing it up now is I think that Ms. Williams just explained documents that we have had her bring for the fact deposition, which were the first items that she explained, and items that she has been using that she was provided with to prepare for the 30(B)(6). I just wanted to make sure that we keep these two things as distinct as possible, so if we could clarify.

MR. ROTHROCK: I will be glad to do that. When we mark the exhibits, we can let her testify as to why she brought it.

MR. LALONDE: Right.

Q. (BY MR. ROTHROCK) Ms. Williams, referring you now to Plaintiff's Exhibit 2, my question is, have you brought with you today to the deposition any documents in response to the subpoena attached to Plaintiff's 2?

A. Yes. I have brought -- I have brought this list of documents and manuals that I use on a day-to-day basis, the excerpt from the interagency procedures handbook that pertains to tribal funds and my PDs.





Q. Those are the same documents you described a little earlier, right?

A. Right.

MR. ROTHROCK: So let's go off the record for just a moment.

VIDEOGRAPHER: We are temporarily going off the record at 8 -- I'm sorry, 8:57.

(Discussion held off the record.)

VIDEOGRAPHER: We are back on the record at 9:18 a.m.

Q. (BY MR. ROTHROCK) Ms. Williams, you previously described some documents that you brought with you in response to the subpoenas. During the off-the-record break, we have marked some of those documents, and it would be helpful if you could just briefly identify which is which.

I am handing you now what's been marked as Plaintiff's Exhibit 3. Could you identify which of the documents Plaintiff's Exhibit 3 is?

(Exhibit 3 marked.)

A. This is a list of documents or procedures manuals or, for instance, in the case of the number 1 item, the United States Code, that I use to do my job, my -- perform my duties on a day-to-day basis.

The subpoenas listed in a very broad way the





guidelines, manuals, anything that I use to do my job that may impact the Osage Nation, or at least that is the way I interpreted the notice of deposition and subpoena. So I listed on this page anything that I thought might be responsive.

Q. Ms. Williams, I am asking you now to look at what the reporter has marked as Plaintiff's Exhibit 4, and please tell us which of the documents you previously discussed this one is.

(Exhibit 4 marked.)

A. This is an excerpt from the Interagency Procedures Handbook. This is a handbook that the Bureau of Indian Affairs and the Office of the Special Trustee uses to do our jobs. It is a guide book as to responsibilities in terms of duties with regard to the trust funds. Most of the book pertains to individual Indian money, so I just copied out of the book the chapter, the section that pertained to tribal funds, and that is what this is.

Q. Thank you, and I am handing you now what the reporter has marked as Plaintiff's Exhibit 5. Please tell us which of the documents you previously discussed this one is.

(Exhibit 5 marked.)

A. The notice -- the notices of deposition. The





subpoenas asked for documents that would describe previous jobs held, current jobs held, the duties, and what these are are the position descriptions for all the positions that I have held with the Department of the Interior, including my current position.

Q. Ms. Williams, I believe you have also testified that you brought three notebooks of documents with you in response to the subpoenas, is that correct?

A. Correct.

MR. ROTHROCK: We are going to go off the record for just a moment to give the reporter an opportunity to mark those.

MR. LALONDE: Should I use Margaret's copy? I have an extra copy for the court reporter.

MR. ROTHROCK: Whatever is easiest.

VIDEOGRAPHER: We are temporarily going off the record at 9:21 a.m.

(Discussion held off the record.)

VIDEOGRAPHER: We are back on the record at 9:24.

Q. (BY MR. ROTHROCK) Ms. Williams, would you please look at what the reporter has marked for identification as Plaintiff's Exhibit 6 and tell us if you can identify that document -- that notebook?

(Exhibit 6 marked.)

A. Yes. This is one of the notebooks that I have been reviewing.
Q. And this has a table of contents, is that correct?
A. Yes.
Q. It lists five items in the table of contents under pleadings and two under depositions?
A. Yes.
Q. Would you please look at what the reporter has marked for identification as Plaintiff's 7 and tell us if you can identify that?
(Exhibit 7 marked.)
A. Yes. It is another -- thank you. It is another binder that I have been reviewing.
Q. And does that binder also have a table of contents?
A. Yes.
Q. I don't believe those -- there is numbers in the table of contents, but it looks like there is 1, 2, 3, 4, 5, 6 statements, and then something called overnighter rates, is that correct?
A. Correct. Correct.
Q. Then in the front cover of that notebook, I believe your counsel has added a couple documents that aren't on the index. Do you find that material?





A. Yes.
Q. Could you just tell us how many documents are there?
A. Two additional documents.
Q. And could you just briefly describe each of those documents?
A. They are two additional documents reflecting historical rates.
Q. And I believe one of them is titled, Yield Table?
A. Yes. One is titled Historical Yield Curve, and one is titled Yield Table.
Q. And the one titled Yield Table, that appears to be three pages?
A. Yes.
Q. And the other document isn't numbered consecutively, but it appears to have about 11 pages in it, is that correct, or 12?
A. 12 pages.
Q. Ms. Williams, would you please look at what the reporter has marked for identification as Plaintiff's Exhibit 8 and tell us if you can identify that?
(Exhibit 8 marked.)
A. Yes. This is volume 3 of the binders that I





have been reviewing.
Q. And that also has a table of contents?
A. Yes.
Q. It looks like there are 41 items listed in that table of contents?
A. Yes.
Q. And I believe your counsel has added some material to the front of that notebook also that is not on the table of contents, is that correct?
A. Correct.
Q. It looks like there is three documents there. Could you just briefly read the title of each document so we can know what these were?
A. There is a three-page document titled, Tribal Overnight Investment. There is a memorandum dated December 16th, 1991, that is three pages, the subject of which is tribal overnight interest from the period July 1st, 1986, to December 31st, 1986, and then there is a third document. It is an eight-page document titled, Office of Trust Funds Management, Investment of Indian Trust Funds, Fiscal Year, 1990.
MR. ROTHROCK: Thank you very much. Can we go off the record for a moment again?
VIDEOGRAPHER: We are temporarily going off the record at 9:29 a.m.





(Discussion held off the record.)
VIDEOGRAPHER: We are back on the record at 9:30 a.m.
MR. LALONDE: The point of clarification, then I am going to describe some additional document issue. The three binders, Exhibits 6, 7 and 8, specifically relate to the 30(B)(6) deposition. They were compiled to prepare the witness to address two topics that she is addressing as part of the 30(B)(6) deposition. It is not related to her fact deposition.
Now, with respect to documents produced with -- for the fact deposition, defendants produced either one or two CDs, and I believe it was early last week, but certainly within the last two weeks, of items that had been imaged here at the OST within the past couple months. Unfortunately, I am not going to be able to give you in-depth exactly what those CDs contain either, but they contained documents from -- what is Doug Lord's operation.
THE WITNESS: Field operations.
MR. LALONDE: The field operations specifically related to the Osage Tribe. They would be relatively current documents involving investments of Osage Tribe funds, communications with the tribe and other materials, and we also produced separately under a

different volume, I believe, documents that came from the main OST offices, and they would include such items as desk operating procedures, which I believe is one of the items that is listed in Exhibit -- what was that -- 3.

Our proposal just on Exhibit 3 as well is that you can review these documents. We had Ms. Williams list them rather than bringing her two shelves, you know, two book shelves full of the documents here. We can either arrange an inspection of those records, or we can label or note which ones you'd like a copy of. We can see if we'd already provided you images on the CDs I have just described, and if not, we will be happy to provide you images of that.

They are all single-page TIF images that we provided with basic coding date and the like.

MR. ROTHROCK: Martin, thanks for the clarification. My only question is, are the data on the disks being produced in response to the fact notice of deposition or the 30(B)(6) or both?

MR. LALONDE: They are being produced for the fact deposition, and the items that I mentioned from the field offices is not specifically related to Ms. Williams, but they were items from Office of Special Trustee. It is more -- the volume that would have





included desk operating procedures and the like are more specific to Ms. Williams' fact deposition.

MR. ROTHROCK: Thank you very much.

Q. (BY MR. ROTHROCK) Ms. Williams, at the request of your counsel, I am going to ask you some questions first today about what we have been referring to as the fact notice of deposition, and then later, the second, 30(B)(6) notice of deposition. As I explained in an e-mail to your counsel, the line between those two is not always as bright as some people might wish it to be, but that is the goal here. We are going to talk to you first about one area and then a second area. So let me start now with some questions about the first area.

Are you familiar with the term tranche one months? Is that phrase --

A. Yes.

Q. Are you aware that those are six months that have been designated in an order by the court for the first part of the resolution of the claims in this case?

A. Yes.

Q. Ms. Williams, if you need to refresh your recollection as to what those six months are, we will be glad to do that, but I believe they start in January of 1976 and come forward through a month in 1991.

My question is, were you involved in the





investment of any of the funds that were received from the tranche one leases for the tranche one months in terms of an investment or accounting activity?

A. No.

Q. Do you know anybody at the Department of Interior that would have personal knowledge of how those funds were invested?

A. That is currently employed?

Q. Correct, let's start with that.

A. No.

Q. Do you know of any prior employees of the Department of Interior that might have knowledge about that?

A. Yes.

Q. Could you give us the names of those employees, or more correctly, former employees?

A. It is my understanding that John Vale, Fred Kellerup would have knowledge of how funds were invested.

Q. During the tranche one months?

A. During the later tranche one months. I don't know about the earlier tranche one months.

Q. Just to refresh your recollection, the tranche one months are January, 1976, May, 1979, November, 1980, February, 1986, July, 1989 and October, 1990. I believe





you mentioned the name John Vale?

A. Uh-huh.

Q. Which of those six months do you think he might have knowledge about?

A. The 1980 dates.

Q. So that would be like November, 1980, February, '86?

A. Uh-huh.

Q. July, '89?

A. Uh-huh.

Q. Those three months?

A. Yes.

Q. Could you spell John Vale's last name, if you know, please?

A. V-A-L-E.

Q. Do you know where Mr. Vale is currently living?

A. No.

Q. Are you personally acquainted with John Vale?

A. I used to be.

Q. When is the last time you talked with Mr. Vale?

A. I really don't remember. It's been years, years since I last talked to him.

Q. Ms. Williams, could you spell the name of the

other person you mentioned as a prior employee who might have knowledge?

A. Fred Kellerup, K-E-L-L-E-R-U-P.

Q. Which of the six tranche one months might he have knowledge of?

A. I only know of -- he was on board when I came on board, so the only months that I could even be fairly sure of would be the 1990 time period.

Q. So that --

A. Late '80, 1990 time period.

Q. So that would be October, 1990, for sure?

A. Right. That is the only time that I would be comfortable in saying.

Q. Are you personally acquainted with Fred Kellerup?

A. Yes.

Q. When is the last time you talked to him?

A. Couple months ago.

Q. That was before you got the notices of subpoena that you have identified as Exhibits 1 and 2?

A. Correct.

Q. Do you know where he is living at this time?

A. No, other than -- I know he lives in Albuquerque, but not specifically where in Albuquerque.

Q. Or at least he was when you last talked to





him?

A. Right. He might have fled by now.

Q. Ms. Williams, are you involved in the process of investing the Osage tribal trust funds at this time?

A. Yes.

Q. Could you tell us what your involvement in that process is?

A. I am in charge of the office that is responsible for investing the funds. I am also in charge of -- well, that is it. I am in charge of the office that is responsible for investing the funds.

Q. I may be making you repeat yourself, but could you tell us the name of that office again, please?

A. The Office of Trust Funds Management.

Q. Could you briefly describe what your day-to-day duties are in terms of investing those funds?

A. My day-to-day duties involve meeting with the director of the Office of Trust Funds Management and meeting with the division chief for the Division of Trust Funds Investments just in terms of the activities that are going on within the shop.

Q. And the Division of Trust Funds Investment is part of the Office of Trust Funds Management?

A. Yes.

Q. When you say you are in charge of the office





responsible for investing funds, do you mean by that that you have some supervisory responsibility over them?

A. Correct. Correct. They report to me.

Q. Do both these people you just named, the director of Office of Trust Funds Management and the director of the Division of Trust Funds Investment report to you?

A. The division chief of the division reports to the director of OTFM.

Q. Right.

A. Then that director reports to me.

Q. Are you involved in making decisions on how to invest tribal trust funds?

A. No.

Q. Who has that responsibility?

A. The investment manager that is assigned the specific account, the specific tribal account would make that decision.

Q. Ms. Williams, is it your testimony that within the Office of Trust Funds Management, there is an investment manager for each specific tribal account that makes the investment decisions?

A. Correct, and could you step back and ask that question again, because I don't think that I completely answered it, who is in charge of making the investment





decisions on the account.

Q. Sure.

A. It is a collaborative effort between the investment manager, the fiduciary trust officer and the tribe itself, and the tribe will give us -- they will assign to us -- they will let us know who is in charge, who's been delegated by the tribe, the responsibility to let us know who the investment, the cash flows and, you know, the needs of the tribe.

So it is a collaborative effort between those three entities, and then based on the information that comes out of that collaborative effort, that investment manager will make an investment decision. Sorry about that. I was kind of thinking about the answer as you went on to the next question.

Q. That is fine. Any time you want to add some testimony to an answer, you are free do that. You don't need my permission. I want you to answer whatever you feel the appropriate answer is to a question, either too much or too little. I will let you decide that.

MR. ROTHROCK: We are going to go off the record to answer the knock on the door.

VIDEOGRAPHER: We are temporarily going off the record at 9:43 a.m.

(Discussion held off the record.)

VIDEOGRAPHER: We are back on the record at 9:53 a.m.

Q. (BY MR. ROTHROCK) Ms. Williams, before the break, you were describing the investment process for tribal trust funds, and I take it your description applies to the Osage tribal trust funds?

A. Yes.

Q. Who is the investment manager for the Osage tribal trust account at this time, if you know?

A. I believe it is Sonny Holladay.

Q. Could you spell that name for us, please?

A. H-O-L-L-A-D-A-Y.

MR. ROTHROCK: We can go on the record.

VIDEOGRAPHER: I didn't even have time to go off, so we are there.

Q. Could you spell the first name also, please?

A. Sonny, S-O-N-N-Y, and it is probably not his legal name, but that is how I know it.

Q. Okay. And how long has he had that position?

A. I don't know.

Q. And do you know the name of the liaison person that the Osage Nation has delegated to discuss these kinds of investments?

A. I don't know.

Q. Do you know if those discussions take place





orally, over the phone?

A. I know they have taken place over -- orally over the phone.

Q. Do you know if any of those conversations are written down?

A. I don't know.

Q. Do you know how the Office of Trust Funds Management determines how much money the Osage Nation has available to invest on any given day?

A. Currently, we look into our trust funds accounting system.

Q. And when you say our, you are talking about the Office of Trust Funds Management?

A. Yes.

Q. And does that system have a name that you use to refer to it?

A. We refer to it as the trust funds accounting system, which is the government acronym that has been applied to it. Are you looking for something more than that?

Q. No. That is exactly what I was looking for. The acronym is sometimes TFAS, T-F-A-S?

A. Correct. Correct.

Q. How long has that system been in place, if you know?





A. We have had it in place -- the Department of Interior has had it in place since 1998.

Q. One part of that system gives you the total amount of funds, tribal trust funds that are being held that are owned by the Osage Nation?

A. Correct.

Q. And that would be the maximum amount of funds that you could invest at any one time for the Osage Nation?

A. Correct.

Q. Prior to the TFAS system, did you have a different accounting system in place that gave you that same information?

A. Yes, we did.

Q. What was its name?

A. The Omni system.

Q. Ms. Williams, let me jump back to TFAS for just a moment. When you say that is our system, that is the system that is maintained by the office of trust funds accounting?

A. When you mean maintain, do you mean -- what do you mean exactly?

Q. Let me ask you a clearer question. Does the office of trust fund accounting use the services of a third party to run the TFAS system?





A. Yes, we do.

Q. Who is the third party that does that?

A. SEI Investments.

Q. And what role did SEI Investments have in the process?

A. What role?

Q. Right. Do they maintain the software?

A. They maintain the software. They run it in what is called a service bureau environment. They make sure that the software is running. They keep -- they do enhancements to the system.

Q. Do they provide any investment advice?

A. They do not provide investment advice. They provide investment accounting. They will do our settlements, but they do not provide advice.

Q. Does SEI Investments have any other role in the process with TFAS?

A. They provide custodial services as well for the investments.

Q. And could you tell us what it means to provide custodial services for investments?

A. They safekeep the investments when we buy them, and they insure that when coupon payments pay, when maturities -- when securities mature, that the funds are delivered on time to us. We don't have to

worry about that. We also don't have to worry about safekeeping and securities. They provide that service for us.

Q. Are there any other services that SEI Investments provides with respect to TFAS?

A. They also provide computer output to laser disk storage for our reports.

Q. Ms. Williams, could you briefly describe the reports you are referring to in your last response, and are they monthly reports? Weekly reports? Daily reports?

A. All of the above. We generate not only system-generated reports from the trust system, but any type of report that we generate, we used an SEI product to put the reports out and make them available for our field staff as well as BIA staff so that we don't have to run them off of printers or mail them or anything like that, and it is called a computer output to laser disk type of product.

Q. Ms. Williams, I am reasonably sure you weren't brought here today to tell us your expertise in computers, but could you just give us a little more detail on computer output to laser diskg? I mean how would somebody in the field access a report, typically, if you know?





A. If they wanted to get to a report, they would just get on to their computer. There would be an icon on their screen. They'd click on that icon, then they'd look up the report they would want.

Q. Right.

A. They would have the ability to just look at it on the screen. They could append notes to it, either notes that they could see themselves or notes that they could put out there for the general population to see, and they could print it if they wanted it for their file.

Q. So anybody who has access to this computer system can get access?

A. Right. And it would be driven by their user ID with what they would be able to see.

Q. Besides the government employees who are involved in this process and their supervisors, does anybody else have access to that computer system?

A. Could you repeat the question?

Q. Sure. I will try to ask you a simpler question. Who has access to this system?

A. To the accounting system?

Q. Right.

A. The people who have access to the accounting system are people who have been provided user IDs. The





people who have been provided user IDs are cleared through a security screening process in our security office.

Q. Are these people employees of the federal government, or do they include also non-employees of the federal government?

A. They would include employees of the federal government. They could include contractors, federal government contractors, and they could include tribal employees doing work for the federal government through self determination compacts.

Q. But in every case, before the person was granted a user ID that would give them access, they have to go through this security screening process?

A. Screening process.

Q. That security screening process is conducted by the Department of Interior itself?

A. The details of the security screening process, I don't feel comfortable talking about, because I am not in charge of that process.

Q. All I am trying to find out is not the details, but whether it is done in-house or whether that is contracted out to some third party, if you know.

A. I don't know the answer to that.

Q. That is fine. You can speculate if you want.





I don't want to cut you off or deprive you saying what you want to say.

A. It used to be done in-house, and I knew there was talk of possibly contracting it out. I don't know where it is at right now is the problem. I mean, I just don't know. I am not involved in it.

Q. As a government employee for some time, would you say it is a common occurrence for things to be contracted out, then not to be contracted out and possibly contracted out?

A. Correct. All I know is they show up with a badge when they ask the questions.

Q. That is something that could change with the time period, is the point?

A. Correct.

Q. As for today, your answer is you are not sure?

A. I am not sure.

Q. Ms. Williams, do you know if anyone at the Osage Nation is currently authorized to access the system?

A. I don't know.

Q. Do you know if anyone from the Osage Nation has been authorized to access this system at any time in the past that you have been here?

A. I don't know.

Q. I mean other than asking people at the Osage Nation that question, is there an easy way to determine that from the government records?
A. I am sure that is something that could be determined.
Q. Maybe there is somewhere that has the name of everybody who is authorized to access the system?
A. Right. The security process on the trust funds accounting system, the one that we operate on currently, has a history of who has ever been granted access to it. That could be determined.
Q. So it is not just currently authorized users, it would be those that were authorized in the past at any time?
A. Correct.
Q. Ms. Williams, again, we are focusing on current time frames and how things are being done right now.
A. Okay.
Q. Do you know what investments are available to Mr. Holladay when he decides that some fund should be invested?
A. Currently, we are limited to investments that would be available under 25 USC 162(A). We also have a solicitor's opinion that has listed some agency





securities that we are allowed to invest in in addition to Treasury securities.
In addition to that, we have an investment policy that has determined that there are -- within that environment, there are certain maturities that we feel are not appropriate for the trust funds in terms of length, and there are certain types of agencies in terms of derivatives that we feel are not appropriate for the trust funds. Within those parameters, Sonny invests.
Q. If I really wanted to torture you, I'd ask you to define derivative at this point.
A. I appreciate it.
MR. LALONDE: That might torture us more than it would torture her.
Q. Ms. Williams, let's start with 162(A). Is it your testimony that the allowable investments under that statutory provision are basically Treasury securities?
A. Government securities, Treasury securities and government securities backed by the full faith and credit of the United States.
Q. I take it there's never been a dispute within your agency as to what those securities are?
A. No.
Q. You'd say there is pretty general agreement as to what falls in that category?





A. The full faith and credit, correct.
Q. You don't recall having any arguments with any tribes as to whether or not a particular investment was backed by the full faith and credit of the United States or not?
A. I don't recall arguments, no.
Q. You also mentioned you had a solicitor's opinion that had approved as investment vehicles certain agency securities. By agency securities, are you referring to agencies of the United States or of states?
A. Of agencies, I mean of the United States, and I mean such as Ginnie Mae, Fannie Mae, Freddie Mac. And what the solicitor's opinion allowed was, you know, agency by agency, can you invest this, this or can you not.
Q. Right. But those investments would also be subject to your investment policy?
A. Yes. Yes. They would be subject to the investment policy as well as, that is correct.
Q. The solicitor wasn't trying to give any advice on that?
A. No.
Q. Just whether or not these were available in general?
A. The agency as a whole, if they issued





something, could you invest in it.
Q. Did you include the solicitor's opinion in the materials you have produced today?
A. Yes. I believe I saw it in the binders. It is also in the desk operating procedures.
MR. LALONDE: Which is in one of the disks, and I know that this particular opinion has already been produced to you as well separately. We initially withheld it as privileged, and it is one of the documents that, upon further review, we provided to you. So you should have multiple copies of it.
MR. ROTHROCK: Your optimism is very much appreciated.
MR. LALONDE: Whether you can find any of the multiple copies, I won't comment about.
MR. ROTHROCK: Thank you. That is appreciated, too, probably even more appreciated.
Q. (BY MR. ROTHROCK) Ms. Williams, do you recall approximately when the solicitor's opinion was issued?
A. I want to say 1960 something.
Q. Goes back awhile?
A. Yes.
MR. LALONDE: If I could put a point of clarification.
MR. ROTHROCK: Sure.

MR. LALONDE: The one that I know we have produced is from a later era.
MR. ROTHROCK: What?
MR. LALONDE: From a later era, sometime in the late '80s.
THE WITNESS: Then I could be wrong. I take that back.
MR. ROTHROCK: Or there could be two.
Q. (BY MR. ROTHROCK) Just from memory now, again, this is not a memory test, but if you recall this, you mentioned Ginnie Mae and Fannie Mae. Do you recall any other federal agencies that were approved as investment vehicles by this solicitor's opinion or opinions, whatever it is?
A. The only one that is jumping into my memory off that list was Tennessee Valley Authority.
Q. Sometimes referred to as TVA?
A. Correct. It was quite a list though, and I just don't recall the other ones on the list.
Q. Right. Whatever it is, it is in the opinion?
A. Right.
Q. You also mentioned in your answer an investment policy. If you know, what is the earliest time that such an investment policy was established by the Department of Interior for investment of tribal





trust funds?
A. I don't know.
Q. Has there been an investment policy for the entire time you have been employed with the Department of Interior working within this area?
A. I don't know the answer to that.
Q. You don't recall a time when there wasn't an investment policy?
A. I don't know that -- I don't know the answer to that. I mean it wasn't -- I wasn't in a place where I would have known whether there was an investment policy or not.
Q. Sure. Sure. If you know, who is responsible for formulating the investment policy?
A. Right now?
Q. Yes.
A. I am responsible for formulating the investment policy. That is one of my duties listed in the departmental manual is policy and procedure.
Q. How often as a general matter do you revise that investment policy?
A. Throughout the year actually, we review it. And as a matter of fact, we just revised it about a year ago. We don't generally revise it a lot.
Q. What was the change in the policy that was





made approximately a year ago?
A. The biggest change was more to allow -- it was the makeup of a portfolio review committee. We were looking at doing some expansion. We were doing some clean-up of the policy. Every time we added a broker, we had to revise the policy, and we didn't want to have to do that, so it was more of a reorganization of how the policy was built.
Q. Any other changes in this at that time?
A. I believe we changed the bond rating. I believe we changed it from BAA to AAA. It wasn't a real significant change in terms of we didn't have to make any asset allocation changes or any changes to the assets. It was a change that we just wanted to make in the policy. I think it is because we have it covered up with this thing.
MR. LALONDE: Every once in awhile, somebody has to get up and stretch. That is your job, Stacey.
Q. (BY MR. ROTHROCK) If I understand your answer, Ms. Williams, under the old policy, you could invest in bonds rated BAA, and under the new policy, they had to be rated at least AAA before you could invest, is that correct?
A. Something like that. We increased the rating of the bond. Don't hold me to exactly the rating,





but --
Q. Was there some specific reason why you made the change at that time?
A. Not that I can recall. Not that I can recall. Nothing stands out.
Q. In the time you have been responsible for the investment policy, have there been other revisions other than one you mentioned about one year ago?
A. Not that I recall, no.
Q. Is the current version of the bond policy, investment policy written down?
A. Yes.
Q. Is that included in the materials you have provided here today?
A. It is on the list in the investment DOP, yes.
Q. Approximately how long is that document that sets forth the investment policy, if you know?
A. Six to ten pages long.
Q. You have testified that you are responsible for the investment policy. Do you do that on your own, or do you consult with people?
A. I consult with people.
Q. Who would you consult with?
A. I would consult with my director of OTFM. I would consult with the division chief for trust funds

investments. I would consult with the principal deputy special trustee. I would consult with or take it to the special trustee, and this last investment policy change, the entire investment policy was taken to and approved by the special trustee's advisory board.
Q. Well, when you say special trustee's advisory board that almost defines itself, but I am going to ask you anyway. What is your understanding of what the special trustee's advisory board is?
A. Under the Trust Fund's Management Reform Act of 1994, the special trustee has an advisory board of people with various talents. They might -- they meet periodically, and during one of their meetings, this investment policy was reviewed and approved, the current version of the investment policy.
Q. Was there some reason that you are aware of that they -- this advisory board approved and -- reviewed and approved this version of the policy and investment policy and didn't review and approve prior versions?
A. I don't know that they didn't approve prior versions.
Q. Ms. Williams, what is the document that you'd use to find out how much -- how much money the Osage Nation had available to invest on any given day? I





understand you said it is in the TFAS system, but is there a specific document or some part of that system that you go to to find that information?
A. I am going to ask you to clarify that question. If I were wanting to know like on a go-forward basis, like today, if I were operating, and I was coming in to do my job today and saying I want to know how much today, I would go in on line and look at a particular screen. Do you want to know the name of the screen?
Q. Yeah.
A. Versus trying to go back in time and look at what they had on a particular day. That is a different screen.
Q. Let's start with the question that is responsive to what you just suggested. If you today wanted to find out how much -- how many funds in the Osage tribal trust account were actually there and available for investment, you would look that number up in the TFAS system?
A. Yes, and let me also say that there are 1,000 different ways to do it, so each person probably has their favorite little way to go in and do it.
Q. What is your favorite way? I assume you choose the easiest way?





A. Yeah, I am sure. The most efficient way is the way I do it.
Q. Right.
A. Admin.
Q. What would that be?
A. I would go in the system, and I would go admin, BA, that is cash, what do you have in cash.
Q. Now, does that show the cash that is available for investment, meaning it doesn't show you the cash that's already been invested?
A. It doesn't show the cash that has already been invested in either a long-term security or the short-term fund. It would show literal cash, you know, sitting there available to go into the short-term fund or long-term securities, longer-term securities.
Q. Would you go to a different screen to find out today -- you go into the system, how much -- how many tribal trust funds for a particular tribe had already been invested?
A. Yes.
Q. Can you find that on a single screen, or do you have to go to several screens, like one for the short-term fund?
A. You can find it on a single screen.
Q. How would you do that?





A. I would go log into TFAS and go to admin HO, which is the holding screen.
Q. I presume there are other screens where you can get breakdowns of what those investments are?
A. Yes. Yes.
Q. Would those two screens give you the total amount that -- of tribal trust funds that the particular tribe owned on that particular day at that particular time?
A. Uh-huh.
Q. They are either in the cash, or they are in the investment?
A. Uh-huh.
Q. The sum of the two is what they are owed?
A. Uh-huh, and there is a screen that you can go to to get them both. The reason that I went to the admin holding screen is it gives you the detail of the holdings too, if you want, but if you just wanted a grand total of them all and didn't care about the detail, there is another screen you can go to for that.
Q. Suppose you go to the admin HO screen, which has the investment and the detail that you mentioned, can you also determine from that screen the amount of investment income that the funds are going to earn from that particular investment?

A. It will have the coupon rate. I don't remember if it shows an actual dollar projection of what it is going to pay.

Q. Right.

A. It will definitely show the coupon rate. It will have all the terms of the security. I don't know -- I can't remember if it actually shows a dollar amount of the projection.

Q. Is there another screen you can go to that would give you the dollar amount of the projected?

A. I am sure there is. It is not a screen that I go to all the time. I'd have to fool around to hunt for it, so I don't know it off the top of my head.

Q. I assume all those screens are available to Mr. Holladay when he gets ready to make a --

A. Oh, yeah.

Q. -- new investment?

A. Oh, yeah. Uh-huh.

Q. Ms. Williams, are there regular reports generated about the tribal trust funds for the Osage Tribe that are distributed daily, monthly, weekly to everybody who is interested in them or anybody who is interested in them?

A. Yes.

Q. Can you tell us what those reports are?





A. Off the top of my head, no, but I would guess there are cash reports, holding reports, and I would ask you to clarify, too. Are you asking me managementwise in my daily duties, or from an account rep standpoint? From an investment standpoint? I mean it is a real kind of broad question, and there is a whole bunch of reports generated, depending on your job.

Q. Let me narrow it down. So let me just start with you since you are here today, and we don't expect you to know what -- precisely what everybody else in the agency is doing.

What reports do you consult daily, weekly, monthly in performing your duties?

A. I tend to run -- the kind of reports that I do and that my shop runs daily are tribal trust funds as a whole reports, and Osage Nation accounts will be part of them. You know, we run anomaly reports, basically, did everything balance last night? Did everything roll up the way it should have? Did everything interface right the way it should have?

And then we run cash reconciliation reports with Treasury. Did everything that hit Treasury last night book into the system? And those are the kind of reports that my shop will run on a daily, monthly, weekly basis. Did we balance with the custodian? And





within those global reports is the Osage Nation, along with everybody else, and we distribute that among our shop, you know, to the appropriate people, depending on what the reports are revealing.

Q. Ms. Williams, I realize the answer to this next question may vary report by report, but I am going to ask it anyway and see if you can respond.

When you say you tend to get a report for tribal trust funds as a whole, would that report simply have aggregate numbers for all the tribal trust funds as a whole, or would it also have a breakdown as to which tribes owned those tribal trust funds?

A. It will have a breakdown. What I mean by as a whole is all my processes are looking at it as a whole, but if it finds -- and I am looking for anomalies, so if it finds an anomaly, it will report the anomaly specific. So if it found an anomaly for the Osage Nation, it will say Osage Nation account number whatever has an anomaly. Go find it, but it is not going to come out and say everything is fine for Osage. Here is a report on Osage saying everything is fine. It is, you know, running as a whole is what I am trying to get at.

Q. Right.

A. It is balancing everything as a whole, but yes, it has specifics. If you were ever to go look into





my database or go look into my giant unprinted reports, they are stored in cold, yes, there are specifics. You can get to it.

Q. The funds as a whole data is basically built up from --

A. The detail.

Q. -- individual tribal trust accounts?

A. Exactly.

Q. Whether or not you display the detail just depends on the formatting of the report?

A. Exactly.

Q. But the data would be somewhere in the system if you need to access it?

A. Exactly.

Q. Ms. Williams, let's talk a little bit about some of the things you described in your last answer. I am going to start with the last one. One of the reports you apparently run is a cash reconciliation report, is that correct?

A. Correct.

Q. Is that something you do daily?

A. Yes.

Q. You describe that as a process where, if I understood your answer, DOI is reconciling its records with the Department of Treasury records?

A. Correct.

Q. And I think you said you wanted to make sure that everything that hit Treasury hit your records?

A. Uh-huh.

Q. Is that right?

A. Correct.

Q. Now does that mean that if someone deposits something in the United States Treasury for the benefit of a specific tribal trust fund, you want to make sure that that same collection gets shown on your books?

A. Correct.

Q. Is there anything that is reconciled with Treasury other than the cash, as you have described it?

A. With Treasury, we reconcile if we have bought a security with Treasury, and it is being held with Treasury, then we will reconcile our holdings with Treasury monthly. We also, in addition to reconciling the cash activity with Treasury daily, reconcile the cash balances with Treasury monthly.

Q. Ms. Williams, I want to follow up briefly on those last couple descriptions you gave us. In addition to the daily reconciliation of cash with Treasury, you mentioned two other things, one was the holding of Treasury securities. So let me start with that.

Some of the investments you have testified can





be Treasury securities?

A. Uh-huh.

Q. So I take it the reconciliation process here is there is some record with the Treasury that shows how many Treasury securities your office has bought with tribal trust funds?

A. That we have bought with -- directly from Treasury that are being safekept at Treasury.

Q. Right.

A. We could also buy Treasury securities directly in the secondary market that is being safekept at SEI.

Q. Sure. So this is a subset of your investments. It is Treasury securities that are bought from Treasury and held for safekeeping?

A. Safekept at Treasury.

Q. At Treasury, so somewhere Treasury has a record of that?

A. Uh-huh.

Q. Somewhere you have a record of that?

A. Uh-huh.

Q. You want to make sure your records agree with Treasury's records?

A. Uh-huh.

Q. That is done monthly?

A. Correct.





Q. By anomaly, do you mean a situation where the two records don't agree in some respect?

A. Correct.

Q. Then I take it it is the job of someone in your facility to find out what the difference is and to bring the two into agreement?

A. Correct.

Q. And that is done monthly?

A. Correct.

Q. The second thing you mentioned was the reconciliation. The second new thing you mentioned was the reconciliation of cash balances, and you said that was done monthly?

A. Correct.

Q. With Treasury. So I take it the process here is you have a cash balance for a tribal trust fund on your record --

A. Uh-huh.

Q. -- records, Treasury has a balance of that same tribal trust fund?

A. Uh-huh.

Q. And again, the reconciliation is to find out if they agree or disagree?

A. Uh-huh.

Q. And if they disagree to try and bring them





into agreement?

A. Uh-huh.

Q. What does that cash balance reflect other than the collections that are being made to add to that particular tribal trust fund account?

A. The cash balance would reflect the collections and then would be reduced by any disbursements that had been made to the fund.

Q. So the balance is basically just you have a starting balance?

A. Uh-huh.

Q. Then you have additions and subtractions?

A. And subtractions and an ending balance.

Q. And you get an ending balance?

A. Uh-huh.

Q. So at the end of every month, you reconcile the ending balances for that month?

A. Correct.

Q. Then the process starts over the next month?

A. Correct.

Q. Disbursements are in the cash balances, and those are the things that are reconciled monthly. Is there some reason disbursements aren't reconciled daily like the cash?

A. Disbursements -- we reconcile activity daily,

and that is all we can see is the activity, and disbursements, receipts, everything are reconciled daily to the activity. We have a system that we can see that Treasury has. What we do monthly is just verify it against the balances that Treasury reports, so it is kind of a verification of our daily activity reconciliations. So in a way, we have done it daily.
Q. Right.
A. It is just when those reports finally come from Treasury monthly, that is the first time that we have gotten something back from Treasury to check against the balances. So we have done checks and receipts daily.
Q. Ms. Williams, you have used the phrase activity?
A. Correct.
Q. As opposed to the information you get back from Treasury at the end of the month?
A. Correct.
Q. Which we call the closing monthly balance?
A. Right.
Q. What is the activity that you are able to monitor?
A. The activity that we are able to monitor is Treasury has a system called cash link, and every day,





for instance today, August 16th, Treasury is showing me on cash link the receipts and disbursements that I have posted for yesterday and the day before. Now sometimes Treasury doesn't show me my disbursements very timely. They might have a one or two-day lag on them, but they are pretty good about showing me my receipts for the day before, but they are only showing me my receipts and my disbursements, just my activity.
So that is what I am reconciling to is, okay, today I am looking in TFAS and going, did I book all those receipts, and did I book all those disbursements like Treasury is showing on the system. It is not until month end that Treasury actually hands me a report saying: Here is your balance, and that is when I get to double-check and hope that all that activity reconciling that I have done has paid off and there is no differences when I get to the balance side.
Q. The activity, if I understood your answer, is actually a dollar amount of a receipt?
A. Of a receipt.
Q. Or a disbursement?
A. Or a disbursement.
Q. But it is just shown as a separate item?
A. Uh-huh.
Q. Not as an addition or subtraction to a prior





balance of some kind?
A. Correct.
Q. Is that correct?
A. It is just showed as a here is a dollar receipt, here is a dollar disbursement, here is a dollar receipt, here is a dollar disbursement.
Q. So the activity, or basically the debits and credits, that are going to be used to change the beginning balance of the month to the ending balance of the month?
A. Correct.
Q. So hopefully, if you have reconciled on a daily basis, the cash coming in and the cash going out, and the math is done right, you'd expect the reconciliation at the end of the month to be correct?
A. Correct.
Q. How can it ever be not correct?
A. Exactly.
Q. How does that ever happen? Does that ever happen?
A. Not that I know of.
Q. You reconcile things daily, then you get to the end of the month, and you get a closing balance that is different than what you expected?
A. Actually, the way it can happen -- yes, it





does happen, and the way it can happen is other agencies can be depositing and reporting into my balances, and if they haven't told me that they have done that during the month, the first time I will see it is in that balance at the end of the month.
Then I go back and try and set up a relationship and say: If you are going to continue to deposit and report into my balance, then you need to tell me during the month that you are doing it. Tends not to happen on the tribal trust side. There are some other activities that I am in charge of where that tends to happen.
Q. Is there any other -- is there any other type of reconciliation that you do at the current time with the Treasury records?
A. Just related to tribal trust?
Q. Yes, tribal trust. I'm sorry. I wanted to limit it that way.
A. No, that is it.
Q. When you have an anomaly, what is the process for resolving it, in general, if you can describe one? You have got a number; treasury's got a number; they don't agree.
A. Then we pull the source documents for the transaction that generated the transaction. That is

generally the first step to see, okay, who is right, based on the source documents.

Q. So when you say who is right, you mean to say it could be that either one of you were right?

A. Right. It could be, you know, who's got an encoding error. Is it a timing difference, a principle payment paid down. It could be any number of things.

Q. A timing difference would be when activity is recorded in different months by Treasury and you?

A. Uh-huh.

Q. So it shows up in a closing balance for one month for you and a different month closing balance for them?

A. Exactly. It could be any number of things just like that.

Q. Can you think of any other common reasons for anomalies?

A. Not off the top of my head. It is usually a timing difference. It is usually not big things.

Q. Ms. Williams, I may not have written down this perfectly, I am not trying to quote you here, but in addition to talking about cash reconciliation reports, you mentioned that you wanted everything to balance. You wanted things to roll up. You wanted to interface. I am just giving you some words that I thought I copied





down.

Could you tell me what it means to get everything to balance, as you were using that term?

A. We have -- for instance, when interfaces come in, there are certain type of interfaces that are supposed to be just transfers, so the net effect on the system is supposed to be zero. We need to make sure that's really happened.

We have certain types of disbursements that are supposed to happen in the system at night. If they don't happen, we get reports that tell us they haven't happened.

We have -- there is all kinds of processes that run within TFAS where coupon payments are being released within the -- what is called night run into the tribal accounts, for example, and those need to post out of suspense accounts, and then the custodian will come in and pay those accounts. Those need to balance. If they don't balance, they generate reports that tell us that we got paid more or less than we were expecting.

All those things are releasing at night, and the system is geared for us to only deal with things that don't zero out. So all those reports are coming out in the morning and showing up on various people's machines, depending on -- I mean desks, depending on





what their jobs are. I could go on for days, but you don't want me to.

Q. Well, we haven't decided that yet, but we are only going to go to 3:00 today, so we will probably jump around a little bit.

What does the term interface mean, as you were using it?

A. When one system talks to another, or when one part of a system, one module of a system talks to another module of a system with data. Data is transferring from one system to another. That is what I mean it to mean, I should say. I should qualify that.

Q. Could you provide just a little more detail when you were discussing that the release of a coupon payment during the night, it has to come out of a suspense fund. What suspense fund are we talking about here?

A. This is real technical interworkings of a trust system between a custodian. Is this really what you want to hear?

Q. If I start screaming, stop answering.

A. Okay.

Q. Try to simplify if you can.

A. This is the way the securities and the trust system work.





Q. Sure.

A. Between the custodian.

Q. Okay.

A. It happens at night. Your custodian is holding your security, and they have got it sitting at like a depository trust company, which is who holds the securities for everybody, and they are collecting your income. I am holding the securities on the trust system, and since we are talking about Osage, we will pretend Osage is expecting a payment, okay, along with a bunch of other tribes.

The way the trust system is working is it is projecting that payment coming in, and it is holding the payment in what is called a MAP, a multiple account distribution process, and it is in a suspension account. It's got all the money sitting in a suspense account, and I know I am not supposed to do this because you can't, but I use my arms, and it is holding it in a MAP, and it is showing Osage, Sioux Nation, Crow, whoever, who are participating in that security and how much they own, okay, and it is holding it in a suspense account.

At night, two things happen in the night work on the day it is due. The suspense account will release those coupon payments down into the tribal account, down into the Osage account, and the custodian, through an

interface between the custodian's system and the trust system, will pay that suspense account the money that they have received from Ginnie Mae, Fannie Mae, Freddie Mac, Treasury, whoever is paying for that security. They will pay that suspense account.

Then the report I get in the morning is did it zero out, or is there an over or underage, and that is what I mean about that suspense account and the way it is working at night. Then I get the report in the morning, and I just deal with did we get shorted? Did we get over? What is going on?

But I have a contract that I deal with the custodian on any shortages or overages. We pay contract to the tribal accounts. They don't have to deal with shortages or overages. They get paid based on what the contract is.

Q. So the essence of this is that the custodian holding the security is the one that actually collects the investment payment?

A. Uh-huh.

Q. And that person has to physically transfer that payment to Office of Trust Funds Management?

A. Right. Right. This is happening on all of our tribal accounts, plus you have the activity of Sonny, looking at Osage, plus everybody else.





Q. Right.

A. They are buying or selling or doing whatever they do, plus I have got all my other securities doing that thing they did at night.

Q. Right.

A. At noon each day, I settle up with my custodian. Do I owe you money, or do you owe me money for all the activity that's happened, so they either wire me funds or I wire them funds.

Q. Before we get to the wiring of the funds part, this custodian is collecting an investment and paying it to the Office of Trust Funds Management, is that correct?

A. Well, go -- well, I am a very literal person. They are transmitting funds, yes.

Q. Okay. Transmitting funds into the trust accounts?

A. Yes.

Q. You are saying that happens overnight?

A. Yes. That is happening in the night work.

Q. Independent of that, Office of Trust Funds Management is transferring funds to whatever tribe or tribal accounts share in that investment?

A. Uh-huh.

Q. And you are paying them at the contract rate?





A. Right, whatever the security was bought for.

Q. Which might or might not be the same amount of money that is transferred to you by the custodian?

A. Uh-huh.

Q. So the process you have to go through is find out if those two numbers are the same or different?

A. Uh-huh.

Q. And even if they are different, it doesn't affect the transfer you have made to the tribal trust funds --

A. Right.

Q. -- that shared in that account?

A. Right.

Q. That is a matter that you set up with the custodian?

A. Between OTFM and the custodian.

Q. And you have got to do that with every custodian that holds securities for the tribal trust funds?

A. I have one. I have one.

Q. Who is that?

A. Well, I have one in addition to Treasury.

Q. Okay, so you have Treasury. Who is the other one?

A. SEI Investments.





Q. You have to do the same thing with Treasury, right?

A. Correct. Treasuries that we hold directly with them.

Q. And that one zeros out in the sense that it is certainly possible that you could owe them money, or they could owe you money?

A. Uh-huh.

Q. That is all governed by a contract between you and SEI Investments when they are the custodian? Is that what I heard you say?

A. Yes, yes, for the securities that they hold.

Q. That contract explains how the settlements will take place?

A. Yes, yes.

Q. Do you have a similar contract or agreement with Treasury with respect to the Treasury securities that it holds for you, or does this same issue arise with respect to securities held by Treasury?

A. If we have a contract with them, I am not aware of it. My understanding is that we participate with them through the Treasury direct program. I don't -- if there is a contract, I am not aware of it, and I am not aware that we have ever had trouble getting Treasury to pay us. That's never been brought to my

attention.
Q. So you normally don't have an over or under with the Treasury investments that Treasury holds itself for you?
A. No. I don't expect a problem, and never has it been brought to my attention that we have had one.
MR. ROTHROCK: Why don't we take a little break here since we have been going for a little bit.
THE WITNESS: I thought we were on a roll.
MR. ROTHROCK: Plus you are killing us. We need a break.
THE WITNESS: I'm sorry. This is exciting stuff.
MR. ROTHROCK: Somehow I have managed to contain myself.
VIDEOGRAPHER: Tape one will end as we go off the record at 10:49 a.m.
(Recess taken and reconvened.)
VIDEOGRAPHER: This is tape two in the continuing deposition of Margaret Williams. We are back on the record at 11:17 a.m.
Q. (BY MR. ROTHROCK) Ms. Williams, before we went off the record, we actually had been discussing for some time your day-to-day job duties and your current position.





Have you exhausted that topic at this point? Have you pretty much told us what you do day-to-day?
A. In terms of the investments, yes.
Q. You have described various reports that can be accessed internally by people that have access to your system. Are there also reports that you provide to the tribes concerning the activities you perform?
A. Yes.
Q. Could you briefly describe what those reports are?
A. I provide the tribes a monthly statement of performance or statement of account. I also provide the tribes -- if the tribes have trading activities in their accounts, securities that are bought, sold, called or matured, then the tribe would be receiving trade -- what are called trade advices.
Q. Anything else that you can think of that you provide the tribes routinely with respect to your job functions?
A. I believe that my investment shop also distributes to the tribe monthly investment newsletters about the investment activity as a whole in the investment shop.
Q. Ms. Williams, is there a copy of a typical monthly statement of account for the Osage Nation in any





of the materials you brought today?
A. No, not a current one.
Q. Would it be possible to get a typical example of one, say, over lunch so we can look at it maybe and discuss it?
A. Yes.
Q. I take it that is not a rolling feed document?
A. No.
Q. We will talk more about that after lunch when we have it, but I take it that monthly statement does what, shows all funds owned by the Osage Nation and held in trust whether they are invested or uninvested?
A. Yes, and it is by account.
Q. These are the accounts, the different trust accounts that Treasury keeps for these funds? Or are they your designated accounts?
A. We have -- Treasury keeps an umbrella account, if you will, for tribal trust funds, two or three umbrella accounts, depending on the type of designation of the fund. We keep the detail here. So he -- for example, there will be several different types or different tribal accounts on the TFAS system that roll up into one umbrella account at Treasury.
Q. Does this --
A. So -- I'm sorry.





Q. Go ahead.
A. Go ahead.
Q. You said you keep the detail here. You mean at OTFM, right?
A. Uh-huh.
Q. Once we get the statement, it will probably be easier to go through it and identify the accounts. What I would be interested in is you are just identifying which ones are your detail and which ones might be a Treasury account that you just take as a Treasury account, if any.
A. I am confused by what you are saying. What I am going to bring in here is a statement for an Osage account.
Q. Right.
A. That is not going to show you a Treasury account.
Q. Okay. Well, I think part of the confusion is it is hard to talk about it in the abstract.
A. Okay.
Q. It will be easier to do it, but you say monthly statement for one account. Does the Osage get more than one monthly statement, one for each account?
A. They would get one for each account if they had more than one account.

Q. How many monthly accounts are -- monthly statements are the Osage Tribe getting at the present time, if you know?
A. I don't know off the top of my head. I would have to look up in the system to answer that question.
Q. If it is a small number of accounts, like three or four, it would be helpful if you could bring a typical statement for each one.
A. For each account?
Q. If we are talking about hundreds, which I doubt if we are --
A. I don't think we are talking about hundreds.
Q. I am trying to keep the paper down to a reasonable level here.
A. Okay. Okay.
Q. Then we will talk about that. The trade advices, those are just notices that a certain investment has either been made or matured or been called, is that correct?
A. That is correct.
Q. It basically just says the funds have been invested or the investments been completed in some way?
A. Right, and it has the details of the security on it.
Q. Would it have the investment income, gain or





loss, whatever it was, also?
A. I don't know. It's been awhile since I have looked at the detail of the trade advice itself.
Q. If that detail wasn't in the trade advice, would it be available to the Osage Nation in a different form?
A. In the statement of account.
Q. This is the monthly statement you were talking about?
A. Correct.
Q. Then the monthly investment newsletter, I take it that is -- that is advice or commentary about investment activity in general? It doesn't really relate to any specific investments that have been made with Osage trust funds?
A. Correct.
Q. So if you were trying to understand how much money they had or how much money the Osage Tribe had gained or lost, you wouldn't need to consult that document?
A. No.
Q. Are there any other monthly statements you can think of that the Osage Nation is provided besides these -- I shouldn't say monthly because you said trade advices weren't monthly?





A. Right.
Q. Are there any other reports or documents that are provided to the Osage Nation as a matter of course or when certain events happen?
A. I believe that the Osage Nation also receives an annual statement.
Q. Would the annual statement simply be the sum of the monthly statements?
A. Correct.
Q. Ms. Williams, you talked about how from time to time there are anomalies, and you have to resolve those. I take it it takes a finite amount of time to resolve an anomaly.
How are anomalies shown on these monthly statements of account, if there is anomalies, let's say, as unresolved at the close of a month?
A. If an anomaly required some type of an adjustment to the tribal account, it would be shown on the statement of an account -- of the account, if it required an adjustment.
Q. And if it was unclear at this point, at the time the account was rendered whether or not an adjustment was occurred, how is that shown?
A. It wouldn't be reflected on the statement if it was unclear if an adjustment had not been made.





Q. It is only after the anomaly is resolved?
A. Right.
Q. That you then know whether or not an adjustment is needed?
A. Right.
Q. If so, that shows up on the next monthly statement?
A. Correct.
Q. It includes the resolution? I take it those are reflected, too, in the annual statement?
A. Correct.
Q. Since they are just the sum of the monthly statements?
A. Correct.
Q. Any other reports or documents that you think you provide the Osage Nation at regular intervals or at the occurrence of certain events concerning the investment activity that is done on their behalf?
A. Not that I recall right now.
Q. Ms. Williams, at the outset of this deposition, you gave us the time line of your different positions. You have been in your current position I believe since about April of 2003?
A. Uh-huh.
Q. The reporting activity that we just talked

about, has that description been accurate for the entire period since April, 2003?
A. Yes.
Q. How far back does that system of reporting go beyond April, 2003?
A. System of reporting the statement of accounts, that should have been in place since the tribal accounts were converted to TFAS, which I believe was February of '99, I would have to verify, to date.
Q. You can do that at a later time and let us know.
A. Okay.
Q. We don't have to do it right now. How about the reconciliation process that you described with Treasury, how long has that been in effect the way you have described it in your recent responses?
A. At least since 1994.
Q. Was there some change of systems in 1994 that resulted in the start of this reconciliation progress or -- you said at least since 1994, so --
A. It wasn't so much a change in systems. It was more of a change in processes.
Q. You had mentioned earlier that the Omni system was in effect immediately prior to TFAS. Did the Omni system go back to 1994?





A. The Omni system goes back to April of 1995.
Q. What was the system in place before Omni, if you know?
A. The system in place before Omni is the -- what was referred to as the old finance system. I think you will also hear it referred to as TFMS.
Q. Do you know what that acronym stands for?
A. Trust funds management system.
Q. Ms. Williams, you said the reconciliation process went back to -- at least since 1994. Do you have any records that you can consult that would give us a more definitive answer to that?
A. I have records that I can consult, yes. I am sitting here thinking of the various phases of the different approaches that we took, and I can consult and get us a solid answer.
Q. That would be helpful if you could.
A. Okay. Is that a during lunch thing, too?
Q. It depends on how easy that is.
A. Okay.
Q. You should take as much time as you need for lunch. We have already said we are going to end this at 3:00. I don't want to send you on wild goose chase, but isn't it correct that if you go back far enough, there was a time when BIA was not reconciling its records with





the Treasury department?
A. That is my understanding.
Q. Do you know approximately how far back you have to go before that is a true statement?
A. I think that if you get back into 1992 and 1991.
Q. Perhaps in that era somewhere?
A. Right, you will start hitting maybe that era.
Q. Now you have talked about the investment manager for Osage?
A. Yes.
Q. Suppose for whatever reason, right or wrong, the investment manager decides not to invest funds today for the Osage. So these are funds in the Treasury department, somewhere in the U.S. Treasury. Decision has been made not to invest them.
Do you know if those funds earn interest while they are sitting in the Treasury?
A. Can I clarify that question for myself?
Q. Sure. I will restate it, too.
A. When you say to me if the investment manager decides not to invest funds today --
Q. Right or wrong.
A. -- that means to me that he decided not to go into longer-term securities other than my short-term





investment fund. So my answer to you is, yes, they are going to earn interest because my system is going to sweep them into the short-term investment fund.
Q. That happens automatically whether the investment manager --
A. Whether my investment manager does anything or not.
Q. -- decided that was the best way for those funds to be handled or not. Basically, in the absence of a decision to invest elsewhere, they get swept into some system?
A. Yes. Let me clarify. The default is the short-term investment fund. My system will sweep any available cash on a daily basis at noon that has not been swept into a longer-term fund. So when you say to me the investment manager decides not to invest, that means he decided not to go into longer than my short-term, my daily fund.
Q. I was trying to eliminate the investment manager altogether from the question, and you have answered the question.
A. And you did.
Q. We are trying not to cast blame here, but just suppose the decision wasn't made, and there was no intention one way or the other to make or not make a

decision. The fact is the funds will be swept?
A. Right. My funds will get swept, and they will earn interest at Treasury. They will earn interest.
Q. At what rate of interest, say, if they got swept in today?
A. It is a daily rate that is provided to me by the public -- the Office of Public Debt that is basically tied to the fed funds rate. There is a much longer explanation for it that I would have to go get from my investment group, but it is loosely tied to the fed funds rate.
Q. You are just having way too much fun answering these questions, so we are not going to let you do that right now. We will probably let you do it later.
Is that rate called the overnighter rate?
A. Yes. You will hear it termed the overnighter rate.
Q. Correct me if I am wrong, because I am not a finance person like you, but doesn't overnighter really mean invested for one day?
A. It is an overnight rate. It could be invested for one day. It is a money market rate. In the private sector, you will hear it money market.
Q. Well, I am revealing my ignorance here, but your testimony is it can be invested for less than a





day?
A. No, not with Treasury. Once I make the call at noon, they are not going to give me my money back until tomorrow.
Q. So basically, the overnighter is really a 24-hour investment?
A. Correct.
Q. So every day, there is a new sweep at noon?
A. Uh-huh.
Q. Whatever is swept into that fund goes into that overnighter, and there is a new rate every day?
A. Right.
Q. Might be the same as yesterday's rate, but it is a new rate for that day?
A. Right.
Q. How long has that system of automatic sweeping been in effect?
A. I have been automatically sweeping all available funds since the Omni system, which is since 1995. Prior to that time, there was a mechanism to get funds invested with the overnighter, but it wasn't exactly what we have in place now.
Q. Would you say it was a somewhat more complicated system prior to Omni in 1995?
A. I think that is fair.





Q. In any event, it wasn't an automatic system?
A. Correct.
Q. You talked earlier about a short-term fund -- I believe you said long-term fund, is that correct?
A. Longer term investments.
Q. Longer term investments. By short-term fund, were you referring to just the overnighter?
A. Correct.
Q. Maybe I missed something here, and I am sure you will tell me if I did, but what if there is an anomaly at 12:00 noon that hasn't been resolved, what is the amount of money that gets swept into the system, Treasury's number or OTFM's number?
A. Treasury doesn't have a number. Treasury never has a number during the day, because Treasury, remember, doesn't give me a balance except once a month. So during the day, we are using my number, because Treasury only reports to me a balance once a month.
Q. Okay. Let me try and ask it this way, because it is a hard question to ask, and I am not sure I got it right.
A. Okay.
Q. Let's suppose your office or Office of Trust Funds Management decides that the Osage Nation has one dollar in available cash to invest, and doesn't Treasury





check to see if it agrees that there really is a dollar to invest?
A. No.
Q. They are going to pay you interest on that dollar in the overnight rate?
A. Yes.
Q. What happens if Treasury later decides after it does its closing, its monthly statement, that you didn't have that dollar to invest?
A. They have never called and told me that, so I don't know the answer to that question.
Q. What did you mean by longer-term investments?
A. Longer than one day. Longer than one day, my overnighter fund. In other words, I am going to take it out of the overnight fund, and I am going to buy a 30-day, 90-day, 2-year, 3-year, 5-year government security.
Q. Basically, longer-term investment is any investment other than --
A. Government overnighter.
Q. -- government overnighter? Okay. You had given us the menu of that somewhat earlier.
How long has that menu been in effect? I assume the menu you gave us is what the menu is today?
A. Correct.
Q. How long has that particular menu been in

effect that you recall?
A. As long as I have been aware of it, it has been in effect, and through my review, it has been in effect at least since the solicitor's opinion was issued, which I need to check the date on.
Q. It could go back as long as the '60s?
A. Correct, as long as the solicitor's opinions have been out there allowing the expansion out of treasuries.
Q. Does the menu -- if you know, does the menu include the ability for Interior to buy -- take the funds out of the Treasury and buy, say, a certificate of deposit at a commercial bank?
A. The statute I believe covered that, 25 USC, I believe it is 161. So the solicitor's opinion didn't have to expand on allowing the money to be withdrawn to go into bank CDs. The statute covered that.
Q. In other words, to the extent that could be done, that was already set forth?
A. In the statutes.
Q. In the statute?
A. Right.
Q. You are not aware of any solicitor opinions about what that statute means?
A. Not that I recall. The solicitor's opinions I





reviewed were centered on agency securities, which ones were allowed or not allowed.
Q. So one of the investment opportunities available that Mr. Holladay can think about is CDs at commercial banks?
A. It could be. It could if we chose to do that.
Q. Does the investment policy cover when you might make that choice and when you might not make that choice?
A. The investment policy does cover, if I recall, whether we would go into CDs or not. However, it hasn't been a practice that we have been in for awhile now. So the bulk of the investment policy centers on government securities.
Q. When is the last time, say, the last year you can recall there was a significant amount of activity of investing in CDs of commercial banks?
A. I don't recall the last year that there was significant activity. I just recall that the last time we had CDs in the inventory was this 1998, I believe.
Q. What was the reason that you discontinued having those in your inventory?
A. We were having -- there was issues about tracking the collateral and getting the FDIC coverage with the tribes, because it was becoming more and more





difficult to be able to track what funds the tribes themselves had in banks versus the funds that we had in the banks for the tribe, and if a bank went under, well, you know, the bank was only going to cover so much for the tribe.
So there was a risk there, a risk that you didn't have with the government securities.
Q. The policy decision was that if you can get the same rates from securities that don't have this issue, why do you need this issue?
A. Yeah, and you can get the same flexibility, and why try to build some way to track this, and then also, you wouldn't have to be delving into the finances of the tribes.
Q. Does Mr. Holladay spend full-time looking at the investments for the Osage Nation, or does he do this for more than one tribe?
A. He does this for more than one tribe.
Q. Is there a rule of thumb about how many tribes a given investment manager will handle?
A. I am sure there is. I don't know what it is. The division chief is responsible for allocating the accounts out to the various managers.
Q. I'm sorry to jump around on you a little bit, but I wanted to go back to overnighter for just a





moment.
You talked about how there was a somewhat different system in place prior to Omni. Do you know how far back the overnighter investment vehicle goes?
A. From the review of some of the information here in these binders, and from a review of -- am I allowed to look at the rate table that we inserted in here?
Q. It is fine with me.
A. Because that would tell me.
MR. LALONDE: Again, these are materials that were reviewed for the purpose of the 30(B)(6).
THE WITNESS: 30(B)(6), right, but that would tell me how far back.
MR. LALONDE: I think it is at the end.
THE WITNESS: Looks like we go back to the mid-'80s, 1985, and that seems to coincide with some of the materials I was reading in the binders that looked like we started around the mid-'80s with the current overnighter program.
Q. (BY MR. ROTHROCK) Prior to the overnighter program, did cash that was uninvested in a long-term -- what we call these longer-term investments, did it earn any interest?
A. Again, in the 30(B)(6) preparation that I did,

my understanding from the materials is that it would -- it was subject to the 4 percent rate at Treasury.
Q. What is the origin, if you know, of that 4 percent rate at Treasury?
A. My understanding is that is the statutes as well, predecessor statutes to the 162, 161, or the current 162.
Q. Ms. Williams, we talked earlier about how today, you could go into your TFAS system and find out certain information, such as cash that was available for investment, funds that had been invested, the detail of those investments.
How far back on that TFAS system can you go to determine that information for any given point in time?
A. There are approximately 15 1/2 months of transactions on the system. So I should be able to go back approximately 15 1/2 months to get cash balances from the system. Now -- that is on the system.
Q. Right. By your answer, I take it there is some way to get the same data for earlier time periods?
A. Correct. You can get it from the reports, off the cold product.
Q. I'm sorry the reports off the --
A. Off the computer output to laser disk product. The daily reports. In addition to the system we are





storing reports every day as well, so on any given day, you can go look at the reports for the system. Those are stored indefinitely right now.
Q. When did you start storing those reports, if you know?
A. Since -- well, for the tribal accounts?
Q. Yes.
A. That would be since February of '99. Verifying that date, of course, if that is conversion of the tribal accounts.
Q. So roughly, let's just say roughly February, 1999.
A. Okay.
Q. What about reports for earlier than whatever that precise date is, are they stored in any other form than on this computerized system you mentioned?
A. I believe hard copy reports are being stored for the Omni system time frame as well as the TFMS system time frame.
Q. I believe you said Omni goes back into the neighborhood of 1994?
A. April, '95.
Q. '95?
A. Uh-huh.
Q. What system was in place prior to the Omni





system?
A. The old finance system.
Q. I'm sorry, I asked you that before, and you gave us the acronym for that, too.
A. TFMS.
Q. How far back does that system go? I don't believe I asked you that.
A. I thought it went back to 1972, but I have heard earlier dates than that, like the late '60s.
Q. Have you ever heard a name for the system that was in place prior to the old finance system?
A. I have not.
Q. Ms. Williams, I believe you said when you got your degree, you had some concentration in business and accounting?
A. I had a bachelor's degree in business administration with a concentration in finance and accounting.
Q. Do you consider yourself an accountant?
A. I am a certified public accountant.
Q. So you passed the CPA exam, right?
A. Yes, I have.
Q. That is what you were doing when you were working for Arthur Andersen?
A. Yes.





Q. As a CPA, I assume you are familiar with what an audited financial statement is?
A. Yes.
Q. These reports that you give to the Osage Nation, we talked about a monthly report, is that an audited financial statement?
A. No.
Q. What would have to be done in order for that to be an audited financial statement, in brief, general terms?
A. You'd have to apply generally accepted auditing standards and procedures to the transactions or to the statement itself.
Q. And please keep in mind that I am not an accountant, and so if I say something silly here, you will just have to correct me, but my understanding of an audited financial statement is it is basically the opinion of some professional who's been qualified as a CPA, say, that he examined the statements and that it is that person's opinion that they have been prepared in accordance with certain accounting principles, which he may specify, and that they accurately reflect the activity that the accounting has been done for in that person's opinion?
A. Uh-huh.

Q. So basically, somebody would have to review the statements and then decide whether they could or could not make such an opinion?
A. Right.
Q. With respect to the statements, and I guess there is sort of an in between case where they make some kind of opinion, but they might put certain restrictions, limitations, qualifications, whatever adjective you want to pick there, on it?
A. Uh-huh.
Q. To your knowledge, have the -- we were talking just about the monthly financial statements that you had described are being done now, okay.
I now want to ask you, are the accounts or records, whatever you want to say, financial system that OTFM or its predecessors maintained for recording this tribal trust investment activity, have those records been audited by anybody at any time, to your knowledge?
A. Yes.
Q. When were they audited, if you know?
A. I am going to start current, rolling back.
Q. Okay.
A. We are currently audited annually. It is a requirement under the American Indian Trust Fund Reform Act. So we are currently in our fifth year under the





KPMG audit. So this is the fifth year, which is, what, 2005. So we have a 2005, 2004, 2003, 2002, 2001 under KPMG, and then Dan Griffin and Associates audited the 2000, the 1999, the 1998, the 1997, the 1996 and the 1995 is when Dan Griffin and Associates started, and that was a balance sheet only audit.
Then Arthur Andersen and Company audited -- I don't know if this matters, but this is when I flip over to the 30(B)(6) when I studied, because this is out of my current knowledge.
MR. LALONDE: Sure.
THE WITNESS: Arthur Andersen audited 1990, 1989 and 1988, and those were financial statement audits, full audits, and as part of that audit, the system itself undergoes a SAS 70 audit, which is an audit of the TFAS system.
Q. When you say those audits in the last sentence, you were referring to the time period the TFAS has been in existence?
A. Yes, the current, the TFAS on the KPMG audits that I have worked on have required SAS 70 audit on the TFAS system itself, and those have been conducted as well, and I believe those were conducted by Price, Waterhouse, Coopers.
Q. Let's talk first about the Arthur Andersen





audits for 1990, 1989 and 1988. You described those as a financial statement full audit?
A. Financial statement audits.
Q. I take it when you say 1990, 1989 and 1988, you are talking about fiscal years for this agency?
A. Yes. Yes.
Q. During this time period, the fiscal year started when, October 1st?
A. October 1st through 9/30.
Q. So the fiscal year 1990 is October 1st, '89, through September 30?
A. 1990.
Q. 1990, if I got that right?
A. Uh-huh.
Q. The same with respect to Dan Griffin and KPMG, you are giving fiscal year information, right?
A. Correct.
Q. Then you stated when Dan Griffin started in 1995, that was a balance sheet only audit?
A. Correct.
Q. What is the difference between that and a financial statement audit?
A. Under the yellow book requirements, a financial statement audit requires the balance sheet, the statement of changes in financial position, a review





of your internal controls and a report and a review of compliance with laws and regulations.
And in that year, I don't recall the reasons, but a balance sheet -- I mean a statement of changes in financial position was not done, just a balance sheet was done, and I believe the compliance in the internal controls were done, too. I would have to look, but we did not do a statement of changes in financial position that year.
Q. Ms. Williams, I am going to have to make you repeat part of your answer because I -- you can talk just a little bit faster than I can write sometimes, and that is not a criticism, believe me. I wanted to make sure I got it done.
First of all, you mentioned under the yellow book requirement. Which yellow book are you referring to?
A. The government yellow book. That is the government Bible on what is required in government audits.
Q. So an audit under that required an audit of the balance sheet, an audit --
A. The income statement, to shorten it up for you.
Q. Statement of changes in financial position?

A. Right.
Q. Or income statement, the internal controls and then?
A. Compliance with laws and regulations.
Q. That is what you mean by financial statement audit?
A. Uh-huh.
Q. And the one done in 1995 by Dan Griffin included some of those steps but not all, and you'd have to check?
A. Right. I'd have to check. I know it didn't have the income statement.
Q. May or may not have had the review of internal controls?
A. Right.
Q. And compliance with the laws and regulations. For Dan Griffin in fiscals '96, '97, '98, '99, 2000, were those financial statement audits?
A. Yes.
Q. Same with KPMG for the five fiscal years they have been involved?
A. Yes.
Q. Do you have copies of all those financial statements or easy access to them, or do you know somebody who does?





A. We can get copies. I'd be surprised if we hadn't already given them to you, but we can definitely get copies.
Q. Do you recall if Arthur Andersen qualified its opinion for fiscal '88 in any way?
A. It was a qualified opinion. I don't remember the details of the qualification.
Q. This is not a memory test, although I bet you'd do very good at that. I promised not to bother you too much, so I am not going to do that.
We may want to ask some CPA type questions to you after we get a chance to review the statements.
A. Okay.
MR. ROTHROCK: Let's go off the record for a second.
VIDEOGRAPHER: We are temporarily going off the record at 11:59 a.m.
(Recess taken and reconvened.)
VIDEOGRAPHER: We are back on the record at 1:19 p.m.
Q. (BY MR. ROTHROCK) Ms. Williams, during the lunch break, you were kind enough to run down a copy of the policy manual, so I am going to hand you what the reporter has marked for identification as Plaintiff's Exhibit 9 and ask you if you can identify that.





(Exhibit 9 marked.)
A. This is the Office of the Special Trustee for American Indians investment policy from the investment DOP.
Q. I'm sorry, I missed the last phrase. Investment DOP meaning desk operating procedures?
A. Procedure, uh-huh.
Q. This was the investment policy you were referring to earlier in your testimony today?
A. Yes.
Q. And I noted this is -- I note this is dated effective date 04/01/2005, is that correct?
A. Correct.
Q. This was the last revision of the policy, to your knowledge?
A. Yes.
Q. I may have asked you this before, but just to be certain, when was the last prior revision prior to this one that is effective 04/01/2005, if you remember?
A. I don't remember when the -- when the last revision prior to that was.
Q. Okay. Can I ask you to direct your attention to the bottom of page 1?
A. Uh-huh.
Q. You will see two lines there at the bottom.





The first one reads 04/01/05 transmittal number 34?
A. Uh-huh.
Q. Does that mean anything to you?
A. It means that this was transmitted. The top line means that -- the way our directives work is they are transmitted on a transmittal. So it is saying it went out on transmittal number 34, dated 4/1/05.
Q. That does not mean this is the 34th revision of the policy?
A. No. That means this is the 34th transmittal.
Q. Then what about the second line that says replaces transmittal dated 06/01/00, number sign, looks like P as in Peter, OL00-001?
A. Right. What this is saying is that this policy replaces a policy that was transmitted dated 6/1/00, and it was a numbered policy, numbered policy 00-001.
Q. Ms. Williams, having looked at those two lines at the bottom of that first page, does that refresh your recollection any as to when the last version of this policy investment policy was issued?
A. No.
Q. Ms. Williams, are you currently considering any revisions to this policy that is effective 01/-- I'm sorry, 04/01/2005?

A. Am I currently considering any revisions?
Q. Right.
A. No.
Q. Ms. Williams, is this policy -- is this investment policy that you have identified as Plaintiff's Exhibit 9, is that made available to the tribes that you hold tribal trust funds for, your agency does?
A. We don't -- we don't hand it out as a matter of -- as part of the packages that we hand out when we go and visit the tribe. However, if a tribe asked us for a copy of our investment policy, I am not aware of anything that would prohibit us from handing it to them, should they ask.
Q. Do you know if a copy of this policy has ever been given to the Osage Nation?
A. I don't know.
Q. And I take it you don't know if they have ever asked for a copy of that policy either?
A. I don't know.
Q. Ms. Williams, if I could direct your attention to page 6 of Plaintiff's Exhibit 9, there is a Roman numeral IV near the bottom of the page: What are the provisions for exceptions, and there are two numbered paragraphs under that, paragraph 1, paragraph 2. The





paragraph labeled paragraph 2 makes reference to a committee.
Could I give you an opportunity read that, which is just one sentence or two at most, and then my question is, what committee does that refer to?
A. Currently, we have an investment committee where the investments in the various tribal portfolios are reviewed by this investment committee on a periodic basis.
Q. And you say -- did I understand you to say: We have an investment committee?
A. Uh-huh.
Q. You are referring to the Office of Special Trustee?
A. Yes.
Q. Do you know who appoints the members of those committee -- that committee?
A. Let's see, the special trustee.
Q. Do you know who is on the committee at this time? Again, this is not a memory test, so I am not suggesting you should know this kind of stuff.
A. The makeup of the committee has been around for quite awhile, and I don't know exactly the makeup of the committee from memory, but there are -- generally, there are members from the different offices and





divisions within the Office of the Special Trustee for American Indians.
Q. Ms. Williams, if I could direct your attention to Appendix A to this Plaintiff's Exhibit 9, do you recognize that Appendix A?
A. Yes.
Q. Can you tell us what that is?
A. This is the solicitor's opinion that I referred to earlier in my testimony that we rely on in terms of what government obligations we can invest in other than Treasury securities.
Q. Ms. Williams, if I could ask you to go back to page 6, which I believe is the last page of the investment policy memo itself, there is a Roman numeral near the top that says: What are unacceptable portfolio investments and practices? Have you located that point?
A. Yes.
Q. And I believe that Roman numeral III paragraph has seven different types of investments that are considered unacceptable, is that correct?
A. Yes.
Q. Could you just look at the first one, which I believe is corporate stock of any corporation or debt instruments issued by any corporation with the exception of agency corporations approved in section II of the





policy statement.
What is the reason why that particular type of portfolio investment is unacceptable for the investment of tribal trust funds, if you know?
A. Because it is not acceptable under the statute, a corporate stock of any corporation or debt instruments that are issued by the corporation are not acceptable under the statute, because they are not Treasury securities. They are not backed by the full faith and credit of the United States.
Q. Ms. Williams, would that also be your response with respect to item 2, which is commercial mutual funds?
A. Number 2 is a little more complicated. As you can see, it says: Are not acceptable at this time. If you look at 25 USC 162, and this is a memory test because I don't have it in front of me, I think it is C, there is a potential for mutual funds in the statute, but there are steps that have to be taken before you can get into mutual funds.
That is why this says: At this time. There are other hoops that would have to be jumped through before we would get into mutual funds. We don't get into them at this time.
Q. I take it, however, that under the exception

provisions in paragraph 4, some Indian tribe could ask that an exception be made with respect to a particular investment in a mutual fund?

A. The potential is out there. The statute doesn't rule it out.

Q. Do you know if any exceptions of that type have been made by any Indian tribe?

A. Not that I know of.

Q. Unacceptable portfolio investment number 3 are specific categories of CMOs. Are CMOs collateralized mortgage obligations? Is that what that stands for?

A. Yes.

Q. Why are those specific categories of CMOs excluded -- excluded as investments?

A. These would be what I had termed earlier in my testimony as derivatives. They are a little riskier. They are hard to account for, and by risk, they don't always do what you think they are going to do. So within the confines of 162(A), they are actually acceptable, but within our world, we have deemed them unacceptable because of some of the attributes that they carry with them.

Q. By 162(A), you are referring to the statutory provision?

A. Right. The statutory then the expansion





through the solicitor's opinion. They are not ruled out because they might be a Ginnie Mae, or they might be a TVA or something like that, but because of the attributes that they carry, we have ruled them out because of some of the idiosyncrasies they might carry in terms of their accounting or way they pay their income or, you know, some other attribute that we have chosen not to have in our portfolios.

Q. Ms. Williams, unacceptable portfolio investment number 4 is any zero coupon (accrual) bond or other type of strip. Why are those particular investments excluded?

A. Well, it is not that a zero coupon or a strip is excluded. It is that a zero coupon or a strip with a term more than 10 years is excluded.

Q. Thank you.

A. We have zero coupons and strips in our portfolio. We just stay away from the 10 years. They tend to go out a little longer than we want to go out in our portfolios. We have shrunk back the duration in our portfolios, and we are trying to keep them around 10 years.

Q. Is it your testimony that this is -- is it your testimony that this particular type of zero coupon or strip for more than 10 years is not excluded by the





statutory provisions in 162?

A. Correct. It is not excluded. Again, it is just like 3. They are within the agency's or the treasury's -- Treasury makes zero coupons that go out. We just have decided through various types of research that we don't want them longer than 10 years in our portfolios.

Q. Ms. Williams, unacceptable portfolio investment number 5 is any form of hedge, options, futures contracts or covered calls.

Why are those forms of investment excluded?

A. Any kind of hedging or betting, you know, more of a risk, these are more risk betting type of trading practices that we don't allow.

Q. Is it your testimony that these are being excluded as a matter of policy rather than a matter of statutory provision?

A. Correct.

Q. Ms. Williams, unacceptable portfolio investment number 6 describes a category of types of investments, and rather than reading that, could I have you just look at the category of investments in item 6 and ask you if you can tell us briefly what those types of investments are?

A. There is quite a variety of investments in





here. Some of them aren't investments. Some of them are bad practices. Like overtrading, that means that you have traded more than you have got. You have adjusted trades after you have traded. Some of these are just practices that bond traders have been known to do that we don't allow with our bond traders.

Bond swapping. You trade a bond, then you swap it out after you have traded it. We don't allow them to do that. Repositioning. Repositioning is another way of bond swapping. We don't allow that to happen. Securities lending, that is an acceptable practice in the industry. It is another way to make money on securities.

Repurchase agreements is another way to invest your funds and make money. Dollar repurchases is another way to make money, as are the rest of these, pair-off transactions, speculating in the market.

These are -- number 6 is a combination of practices that we don't allow and additional ways to make money.

Q. That you don't allow?

A. I need -- what do you call it, attorney-client -- a break. We need to talk.

MR. LALONDE: Let's take a break. Is that okay if we go off the record?

MR. ROTHROCK: Oh, sure.

VIDEOGRAPHER: We are temporarily going off the record at 1:36 p.m.

(Recess taken and reconvened.)

VIDEOGRAPHER: We are back on the record at 1:45 p.m.

MR. LALONDE: Before we proceed on this, Jerry, we are going to lodge an objection based on the attorney/client privilege with respect to a couple of these items that Ms. Williams would be discussing under paragraph 6, Roman numeral set.

I am just going to ask, for purposes of the court's ruling on the fiduciary exception, I am going to ask Ms. Williams a couple of questions, and then depending on her answer to the question, we will either instruct her not to answer, or we will instruct her to answer and ask that we treat the answer as subject to the protective order of July 18th as privileged information. But if I may proceed with that.

MR. ROTHROCK: That is acceptable. I will just state for the record for Ms. Williams' benefit that once we go through this, we will have the reporter read back the question that you were asked so you can focus on that again.

THE WITNESS: Again.





MR. ROTHROCK: We will give your attorney a chance to make his objection or to do whatever he needs to do.

MR. LALONDE: Do you want to read that back first?

MR. ROTHROCK: No. Well, if she wants to hear it, fine.

MR. LALONDE: The first question is with respect to the additional items under this paragraph 6 that we just spoke about. Do any of those or do any of your discussions with the solicitor's office with respect to those items relate solely and specifically to any other tribe besides Osage?

THE WITNESS: No.

MR. LALONDE: And do they -- any of the discussions you may have had regarding these items with the solicitor's office involve exclusively litigation?

THE WITNESS: No.

MR. LALONDE: So based on your answers with those two items, we are not going to instruct you to not answer. We are going to ask you to answer the question, but to the extent that Ms. Williams and her answers for the question on this subject area involve the attorney-client advice or her seeking the attorney-client advice, we would ask that that be





subject to the July 18th, 2005, protective order.

MR. ROTHROCK: That is agreeable to us, Martin. I just want to make sure that the record clearly reflects what part of her answer, if any, is going to be protected so that everybody will treat it accordingly.

MR. LALONDE: Okay, and --

MR. ROTHROCK: You may have to go on the record again and indicate that.

MR. LALONDE: Sure.

MR. ROTHROCK: For the sake of clarity.

MR. LALONDE: Absolutely.

MR. ROTHROCK: Now we are at the point we are going to read the question back, I believe. Except I need to consult with my counsel for just one second.

(Discussion held off the record.)

MR. ROTHROCK: Would the reporter please read back the question that was on the floor before we took the little break?

(Last question read back.)

Q. (BY MR. ROTHROCK) I am not sure that is a complete question, so why don't you let me rephrase that question before we took the break, and let me come at it this way. And again, your counsel may need to object here, so you might wait a second before you make an





answer.

I take it some of the practices listed in this paragraph 6 are permitted by the statute, but which, under your policy, are not permitted, is that correct?

MR. LALONDE: I am going to just object to the extent that her answer is going to -- and I don't know whether it is -- is going to include any advice that she sought or received from the solicitor's office, but on the subject matter, the subject matter is fairly broad, and we are going to treat that as being subject to the protective order. I am not going to instruct her to not answer. You can go ahead and answer that question.

A. As I stated before, part of this -- part of this section 6 is practices that just aren't allowed, but part of this are investments. They are investment vehicles, ways to invest. They are not so much types of investments that would be covered by 162(A). They are ways to invest, and they are things that we have been in discussion with the solicitor's office about.

Q. Ms. Williams, what I'd like you to do is just, without going into the discussions you had with the solicitor's office, indicate which ones of these practices in paragraph 6 are ways of investing, to use your phrase, just starting with the first one, overtrading, and just going down the list.

If it is easier to just identify the ones that aren't, do it that way.
A. The ones that --
Q. Aren't ways of investing.
A. Are not ways of -- well, the ones that are are securities lending, repurchase agreement, dollar repurchases -- these are the ares -- security trading, pair-off transactions. Those are the ares. Based on my understanding, those are the ares.
Q. The ones that are left are not ways of investing, as you have used that phrase?
A. Not acceptable, as I understand them. They are not -- they are more like practices of --
Q. Would that include short sales?
A. Right, and over.
Q. Extended settlements?
A. Uh-huh.
Q. Overtrading?
A. Uh-huh.
Q. Adjusted trades or bond swapping and repositioning?
A. Correct.
Q. In this latter category, it is your testimony that the things that are described in the latter category aren't permitted under any circumstances?





A. They aren't anything that would be discussed or anything that you would cover under 161 or, you know, statutory.
Q. Right.
A. They are just practices that aren't allowed.
Q. And the other -- the other category contains ways of investing, and my question is, are any of those ways of investing permitted by the statutes that you have been referring to?
MR. LALONDE: I am going to object that that calls for a legal conclusion as well, but you can go ahead and answer.
A. I don't know.
Q. Could you tell us -- again, we are talking about this category that we have used the phrase ways of investing.
A. Uh-huh.
Q. Can you tell me why those ways of investing in that category are excluded as investments under this memo? What was the policy rationale for that?
A. Because there is some question as to whether they are allowable under the statute.
Q. And with respect to the other category, the practices, I believe you referred to them as bad practices, is that correct?





A. Right, but I still think the two categories -- I mean the two boxes that they are sitting in, that second box, there is only two of those practices that we have ever questioned with the solicitors. I mean it is not like I am discussing all of those things in that second category.
Q. Right, I understand.
A. Okay.
Q. But the practices that aren't permitted by this policy, what is the basis for that decision? I mean you referred to them as bad practices, and I understand.
A. Known per industry practices that are viewed as not acceptable.
Q. In other words, the policy determination was made that these shouldn't be permitted by anybody who is investing?
A. Anybody in the industry.
Q. Whether they are holding funds in trust or investing their own money or whatever?
A. Right, a private sector investment corporation or company or here. No matter where you are, they are practices that wouldn't be deemed acceptable.
Q. And that is why they are excluded by this memo as investment practices?





A. Correct.
Q. Now let's go back to the other category, and as I understand it, some of those you may have discussed with your solicitor, some of them you may not have.
A. Yes.
Q. What is the reason that you might have discussed this with the solicitor? And let me try and make that question easier. My guess would be somebody asked to invest in those kinds of investments, and somebody needed to decide if you were going to do that or not.
Is that the kind of thing that led to those discussions?
A. No.
Q. You were simply trying to clarify your investment policy?
A. We were exploring different ways that we could take the investment program, or just different options for the investment program, and so one of the options that we were potentially going to explore involved possibly utilizing a couple of these particular ways of investing.
Q. When you say we in your last answer, were you referring to the agency you are working at, the Office of Special Trustee?

A. Right.

Q. This was an internal discussion?

A. Right.

Q. At the Office of Special Trustee?

A. Right, correct.

Q. This was not something that resulted from some questions that came to you from any of the tribes?

A. No.

Q. Was there any other reason, policy reason why these practices in the second category we have been discussing are excluded investments other than what you have mentioned so far?

A. Not that I know of.

Q. Let's look at number 7. It says: Unacceptable portfolio investment 7. Purchases of a specific security for an account are unacceptable unless it is in marketable block size.

First of all, explain what that means, and then tell us why that particular policy has been adopted.

A. When you go out and sell a security in the market, it needs to be in a block, if you will, that is marketable. For instance, you want to sell it in a par value block of $1,000. You can't go out and find a block or sell a block of $800, $850.95. That doesn't





exist.

So what this is saying is you cannot drop into an account a block of $850.95 because you will not be able to sell a block of $850.95 because it is not marketable. So this policy is establishing do not do that because it will not be a marketable. Buy and sell in marketable blocks.

Q. Would it be fair to characterize that as a liquidity concern?

A. You could say that. In an institution investor of our size, there would be a way to get liquidity if we needed to for a tribe that had an unmarketable block. It is more of a processing effectiveness, efficiency concern of an institutional investor. So I guess I am disagreeing with you a little bit.

Q. It is not a liquidity concern for OST because it has -- it can, in effect, make its own market in the securities --

A. Right. We have 1,400, 1,500 accounts that we could work with in order to, you know, add up a few and make a marketable block. However, efficiency processing timewise, it is not the way to do business.

Q. Now maybe I am repeating myself again, but I think you testified that the current policy is to limit





investments to ten years or less, is that correct?

A. Correct.

Q. What is the concern there with investments that are longer than ten years?

A. You get into an interest rate risk issue. I mean you get out ten years, you have locked yourself out there. You lose some flexibility when you get out that far, and we just want to make sure that the portfolios have a little more flexibility than being locked in that far out.

Q. Is the flexibility you lose the ability to get in and out of the security if you need to?

A. You can get in and out of the security, but when you are locked in rates that are that far out, you might be getting in and out at prices that you don't particularly care for.

Q. Would it be fair to characterize that as a volatility concern?

A. Price volatility, yes, you could characterize it as such.

Q. So under the current policy, investments of ten years or more are deemed to have too much price volatility risk to be acceptable investments?

A. Let me think about that. I am not sure that that is exactly the right term for it, but you are just





locked in. It is almost like you don't have flexibility. You don't -- that rate is going to sit there at 5 percent no matter what the market is doing, and if the market is going down, you know, your portfolio, great, but if the market is going up, you are stuck right there, and there is nothing you can do.

You have no flexibility except to sell that security because you are locked in there at ten years or above.

Q. Would it be fair to say that price volatility is a factor in the --

A. I will go with that.

Q. -- prohibition? Ms. Williams, could I ask you to once again turn your attention to what's been marked as Plaintiff's Exhibit 3, which is hopefully still in front of you. This was your one-page paper indicating various manuals.

A. Yeah, I have it.

Q. I wanted to go down this list and just get a little bit of detail. You don't have to be exhaustive here. I do want to make sure I understand what each of these items are.

A. Okay.

Q. Particularly since some of them may have been produced to us already, and we may need to find them

under names that don't quite agree with what you have here.

A. Okay.

Q. Title 25 of the United States Code, are there any specific parts of that that are more important than others? I mean title 25 is pretty large.

A. It is pretty large, and I only put it here because the notice said and the subpoena said, what do you use? I tend to grab it on an as-needed basis. Nothing is jumping out at me right now except the one I keep using, 25 USC.

Q. When you grab that, is it usually to look at a much more limited part of it, though, as opposed to the entire part?

A. It is usually 25 USC. It is usually right in there. It has something to do with the investment regulations, investments. That is usually where I am, and the other part that I am usually in, which probably isn't going to pertain to Osage specifically, is I am usually in the judgment fund kind of stuff.

Q. I want to make sure I understood your answer. Were you referring to the statutory provisions in Title 25, which I believe is item 1 on your list, or the regulations?

A. The statutory -- number 2, I actually can cite





a regulations or two of Osage that we go to.

Q. But with respect to the statutory provisions, there is no one or two provisions that you -- statutory provisions that you review more commonly than others?

A. No. Mostly listed it there as an as-needed.

Q. What about number 2, Title 25 of the Code of Federal Regulations, are there parts of that that are more important?

A. Yes. Now 25 Code of Federal Regulations, I pop in there, 117, look into a lot for Osage, and then 115 contains a tribal trust fund portion that I would refer to for Osage.

Q. Now are you talking about part 117 and part 115?

A. Yes. Yes.

Q. What is in part 117, 117, for the Osage that you look at most often?

A. Now that is -- it is not so much on the tribal side, but when I am dealing with the Osage individuals on the annuity payment, that is where I go.

Q. Is the annuity payment sometimes referred to as a head ride payment?

A. Yes, the head ride payment, and it is not on the calculation of it or on the royalties. It is on the maintenance of the distribution of it in terms of the





individuals, the certificates of competency or lack of, or how you pay the individuals, their voluntary holds or not, that kind of stuff. It is very heavily tied to the individuals.

Q. Are there also probate issues involved in that?

A. No. The probate -- oh, good one, I didn't list it. 43 CFR.

Q. Do you often get involved in that, too?

A. Just in terms of interpreting the orders and distributing. Not in the decision part of it, just doing the distributions.

Q. When we talked to Judy Hill at the Osage agency, who I believe works for OSD, and I realize you don't have her testimony in front of you here, but I am going to represent to you that I got the impression that a lot of the probate stuff was done at the Osage agency part of OST rather than here.

Would that be correct?

A. It depends on what she meant by a lot of the probate stuff, and I don't know the time of her deposition, but there's been a transition of some of the probate work from the agency to central office in the last year-and-a-half. So --

Q. So it could be either place, basically?





A. Right.

Q. Depending on what it was?

A. Depending on what it was.

Q. And the time frame?

A. And the time frame.

Q. What about part 115 of 25 CFR, the tribal trust fund, what is the general subject there that you have to consult?

A. The general subject there, it talks about what a tribe has to do to withdraw funds out of their tribal accounts. It talks about how often tribes are consulted on their investments. It talks about how -- how a tribe can direct an investment in a security or not. So it's got a lot of stuff that is germane to my investment branch, so we use that section.

Q. How about number 3, account maintenance desk operating procedures?

A. Now the account maintenance desk operating procedures is going to talk about the kinds of documentation that we get and the kinds of information that is stored on the trust funds accounting system for the tribe's account, the administrative data, the statements, the trade advices, the addresses, the names of the people that this kind of information is going to. That desk operating procedure is going to talk about the

how-tos of getting that information into the trust fund's accounting system.

It is a big volume, and it is going to have both individual and tribal information in it, but it will be divided between the individual and the tribal information.

Q. How about number 4, the receipting desk operating procedures?

A. Basically the same thing except it is going to talk about receipts. It is going to talk about the documentation that is needed and how you get receipt information dollars into the trust fund's accounting system, the accounts that are on it. Again, it is going to be divided between the individual accounts and the tribal accounts.

Q. How about number 6, the investing -- I'm sorry I skipped over 5, didn't I?

A. Five is disbursing. It is going to be the same thing, only it is going to talk about disbursements, what do you need to get a disbursement out of the system. It will focus on the tribal accounts as well, what information -- tribal resolutions, what signatures are needed, et cetera, and how do you get it into the trust fund's accounting system.

Q. How about number 6, the investing desk





operating procedures?

A. Number 6 is going to talk about the investment operation. It is going to focus in on what the division of trust fund's investment is doing in order to invest the funds in something longer than the overnight fund, the short-term investment fund.

Q. Is Plaintiff's Exhibit 9 part of these investing desk operating procedures?

A. Yes. It will be in there. It will be part of that DOP.

Q. How about number 7, OST numbered policies?

A. The OST numbered policies and number 8, OST numbered procedures, were the predecessor policies and procedures to the desk operating procedures. The reason I listed them is if we haven't encompassed them into the account maintenance, receipting, disbursing, investing DOPs, then they are stand-alone policies still, and I still follow them.

The intent is that if a DOP manual has been issued, then it should have superseded all the policies and procedures that pertain to it, but there is still the possibility that some of the policies and procedures are out there and stand alone, which is why I listed them.

Q. Did the desk operating procedures described in





items 4, 5 and 6 all go into effect at the same time?

A. No. Staggered. They went into effect at staggered times as they were completed.

Q. Do you know the dates, just by chance?

A. No, not off the top of my head.

Q. Would it have been fairly recently or within a couple years?

A. 3 through 6 probably all have gone into effect within the last couple years, but the predecessors before them were 7 and 8.

Q. How about item 9, the OST delegations?

A. These are the authority that I had to operate. So again, in response to the notice of deposition, the guidelines, the manuals, the instructions, what I do use to operate, this is the way I get my authority, so I listed them.

Q. Could you please describe item 10, the Federal Manager's Financial Integrity Act of 1982?

A. Although this is an act, and I have listed it, this is an act. It is actually processes that we go through very similar to an audit process, only it is done by the manager, and it is a self-assurance process. It probably is along the lines of manuals, regulations, guidelines, and it is a self audit of my program, and it is fairly detailed, and all my managers go through it.





So I have listed it as a guideline, a publication, something that we go through.

Again, it is not that the Osage accounts would be looked at, but they would be part of the program, part of the database as a whole that is looked at through this process.

Q. Item 12 is -- I'm sorry, 11 is Office of Management and Budget Circulars. Why is that on your list?

A. That is on my list because I am required to follow several Office of Management and Budget circulars. They are particularly germane especially to IT security, as well as internal controls, a couple of the big ones we follow.

Q. Do you recall when the OMB circular on IT security you are referring to went into effect, roughly?

A. Well, they have been in effect all through the years, but there's been revisions, and there's been some fairly hefty revisions in the last couple of years.

Q. Item 12 is the audited financial statement -- I'm sorry, annual financial statement audits and accompanying reports. Are those the audits we talked about earlier?

A. Not all of the audits. The ones I was thinking of are the ones that have been done during my

tenure with the office, because there are reports that are issued action item reports that I have followed and have made management decisions and adjustments based on them through the years.

Q. Whose responsibility is it to decide if there is an action item need on the basis of one of these annual financial statement audits and accompanying reports?

A. Well, it is -- it is more of a -- it is management. It is me. It is the special trustee, and it is the principal deputy special trustee, and it is the auditors. Basically, before an action item is put into the report, you get together with your auditor and you decide, yeah, that is a comment, and yeah, it is valid, and yes, you are going to -- it is going in, and you are going to do something about it.

Q. The action items you are referring to are all in these annual financial statement audits and accompanying reports?

A. Right.

Q. Item 13, American Indian Trust Fund Management Reform Act of 1994, why is that on your list?

A. Because there are steps within there. There are responsibilities within there that I have to adhere to. There is a list of responsibilities, as well as





time frames within it that I have to meet in terms of the statement of accounts, in terms of the annual audit, and then notifications of the annual audit and, very importantly, it outlines the responsibilities that I am trying to meet as well.

Q. Ms. Williams, you are not an attorney, right?

A. No.

Q. And you understand I am not asking you for legal opinions, because I recognize you are not an attorney, but I want to understand how you use this particular act that you described in 13.

And my question is, just in the way you perform your duties day-to-day, is it your understanding that this act mentioned in item 13 changed in any way, the menu of investments that you can make for tribal trust funds?

A. I don't believe that the act changed the menu of investments, no.

Q. That is controlled by other statutes as far as the way you perform your job?

A. Right, in terms of the investing, yes.

Q. Other than the annual audits and the time frames for certain statements of accounts, is there any other major responsibilities that this item 13 imposes on you that come to mind at this time?





A. I have a duty to reconcile daily. I am going from memory now.

Q. Sure.

A. I might jumble up some of the words.

Q. This still is not a memory test.

A. I have a duty to reconcile, I have a duty to provide daily balances, I have a duty to account. It lists duties like that that I am cognizant of and try to make sure that I have the ability to do through my systems.

Q. I think I understood all your answers, but the duty to account, what precisely were you thinking of?

A. I am thinking of my trust funds accounting system. I can put money in, I can disburse it, I can invest it, I can sweep it, all those things, and I have a system that knows what is happening to that dollar as I am doing all of that.

Q. Item 14 lists certain sections from the departmental manual. My question is, the departmental manual is the Department of Interior manual that you are referring to?

A. Correct.

Q. That is a manual that sets forth operating procedures for the Department of Interior?

A. No. Actually, a couple things of what I have





got listed here is -- the reason I listed them is it actually comes up in my day-to-day operations. If somebody asks me to do something, or you do this for me, or who is supposed to be doing this for me, I will on occasion pull up the departmental manual and say, all right, who is supposed to be doing this? Is this my job, or is this so-and-so's job.

This outlines, again, the OST delegations tell me within OST who is supposed to be doing stuff. The departmental manual within the department can help me say who within the department is doing things.

I think it is the 303 DM2, also, I have listed here as the secretary's trust responsibilities or trust principles, sorry, secretary's trust principles, so that is another DM that I tend to pass out to my people and say: Here, be aware of these.

Q. One of the DMs has to do with the secretary's trust principles?

A. Yes, trust principles.

Q. The other one you mentioned, could you just repeat that?

A. It is how -- it is how we are built. It is the makeup of OST and what offices are responsible for what and that kind of thing.

Q. You appear to have listed five separate

sections of the departmental manual?

A. Uh-huh.

Q. I take it that wasn't meant to be an exhaustive list?

A. Oh, no. These are just the ones that I tend to look at and that I tend to use.

Q. More frequently than any others?

A. Right. In fact, I don't crack open the others. I don't have them in my office. These are the ones that I have in my office that I use in performing my duties.

Q. Item 15 is Treasury regulations and manuals. Why is that on your list?

A. That is on my list because I operate within the Treasury environment. My bank account is basically within the Treasury environment, so I have to follow Treasury regulations and follow the Treasury financial manual for moving money around, for doing my wires, for depositing the money, for disbursing the money and for electronic funds transfer.

I also have to do all my reporting within the Treasury environment and issue various statements, not to the account holders, but to various Treasury entities within the Treasury environment, and I have to follow their rules. So there is one of my whole offices, the





Office of Trust Reporting follows those manuals and those regulations.

Q. Ms. Williams, I believe I followed your answer in large part. Your testimony, as I understand it, is that your bank account is essentially within the Treasury environment, so naturally, like any bank, it has rules?

A. Right.

Q. As to when you can deposit money, when you can withdraw money and move money and so forth?

A. Right.

Q. So those rules are set forth in Treasury regulations and manuals, as I understand it?

A. Correct.

Q. You also said that you have to do certain reporting within the Treasury environment, and I think you excluded from that the reports you provide to the account holders, meaning the tribes that you are holding tribal trust funds for?

A. Right.

Q. If we exclude those reports, what reports are you doing within the Treasury environment?

A. In order for Treasury to give back to me my balance reports each month, there is a suite of reports that I have to give to Treasury about the activity that





I have done during the month. I don't know that it would mean anything to you, but the SF 224, the SF 1218.

Q. I don't know anything more frightening, if it meant something to me or if it didn't. You could startle all of us here terrifically.

A. I have to report to them in a certain format by a certain day of the month, so that is what I meant by reports to them.

Q. I think the upshot of your testimony is that in order to get certain reports from Treasury, monthly or at certain fixed intervals, you have to comply with certain requirements?

A. Uh-huh.

Q. Which requires you to make certain reports with Treasury?

A. Right.

Q. But the reports we are talking about here, we have already excluded the accounts, the reports you give to the account holders, meaning the tribes?

A. Right.

Q. And I think you are also excluding -- and this is really a question, the interim reporting that you do within -- within your agency?

A. Right. This would be reporting that I would do on my activity right to Treasury.





Q. To Treasury, and that is a condition to get their reports back to you?

A. Right. Right.

VIDEOGRAPHER: Five minutes remain on the videotape.

MR. ROTHROCK: Why don't we take a break here, real short break. We will try to get you out of here a few minutes early. Why don't you just check to see if anything else has come down that we could mark?

THE WITNESS: Okay.

MR. ROTHROCK: If it is, fine, if not, we will mark it later. And why don't we just take ten minutes, then we will come back and do maybe 10 or 15 more minutes and see if we can get you out of here.

VIDEOGRAPHER: Tape two will end as we go off the record at 2:25 p.m.

(Recess taken and reconvened.)

VIDEOGRAPHER: We are back on the record at 2:42. This is tape three of Margaret Williams.

MR. ROTHROCK: Ms. Williams, as we previously discussed, we are going to terminate this in a few minutes here to accommodate your schedule, and I believe we will continue -- is the suggestion to do it at 11:00 a.m.?

MR. LALONDE: Right, and we want to understand

when we would end, and if we think -- we can move it a little bit earlier if we really must and we think we can get through by starting at 10:00, especially if you have got a flight to catch that day, then we will probably be catching the same flight.

MR. ROTHROCK: I think we have some flexibility there. You had suggested 11:00. I think that works without making any promises and either raising your hopes or lowering your hopes. It is probably a couple more hours.

MR. LALONDE: Okay.

MR. ROTHROCK: The flights are late enough in the day that you can start at 11:00 and do that.

MR. LALONDE: Okay.

MR. SIMPSON: 11:00 on Friday?

MR. ROTHROCK: Yes, but I am going to suggest that as usual, this is all by mutual agreement, and we ought to check in with each other again on Thursday and get an update, or if you need to adjust a little bit one way or the other, fine.

MR. LALONDE: Okay.

MR. ROTHROCK: I think we definitely have to stop by 5:00 p.m. at the absolute latest.

MR. LALONDE: Okay.

MR. ROTHROCK: 4:00 would be more preferable,





so we can work back from that. By the way, that reminds me, he was supposed to check in with you if Mr. Chavarria -- are we starting at 9:00 a.m. tomorrow?

MR. BURTON: I think we should start at 9:00, and I think -- I have to check with him if he changed his flight or not.

MR. ROTHROCK: He said he was going to do it regardless.

MR. BURTON: I think he ended up sticking with his flight, so he'd have to leave at noon, so if you think it is going to be about three hours, we could start at 9:00. If you think earlier, I can call Greg and see if we can start it earlier at 8:00.

MR. ROTHROCK: Let me give you a call on that tonight. I was trying to keep him from moving his flight to like much later. Is there anything like at 2:00 so there is a little wiggle room there?

MR. BURTON: After we are done here, I can call Greg.

Q. (BY MR. ROTHROCK) Ms. Williams, we are back to you now.

A. Okay.

Q. And we were going down your list, and we had done 15. Could you give us a quick description of number 16 on your list, trust funds accounting system





reference guides and operating manuals?

A. The trust funds accounting system reference guide and operating manual is focused very specifically on TFAS and how to maneuver and get around in TFAS.

Q. Basically tells you which screen to go to when you want to find something?

A. Right. Right.

Q. Number 17, Customer StrataStation reference guides and operating manuals?

A. This is the computer output to laser disk product, and this is the reference guide and user manual for how to use it, how to look up reports in it.

Q. Number 18 is comprehensive trust management plan?

A. Couple years ago, we were charged with coming up with a comprehensive trust management plan. It is a very comprehensive document. A lot of what we do is covered with this plan, and that is what this is.

Q. That is a publicly available report, is it not?

A. Yes. Yes.

Q. Number 19 is the fiduciary trust model?

A. Correct, and this is another document that is about trust reform. A lot of what I do on a daily basis is covered by this document and the goals that are set





out in this document.

Q. Is that a publicly available document?

A. I don't know.

Q. Ms. Williams, you have previously identified as Plaintiff's Exhibit 5 your position descriptions, is that correct?

A. Yes.

Q. I believe those are still in front of you, if you want to grab those.

A. Yes.

Q. As I flip through that document, I count six, seven different position descriptions, is that correct?

A. I either miscounted or I have eight. One, two, three, four, five, six, seven, eight. I have eight in here.

Q. Ms. Williams, I am counting seven, but it could be that two of mine are stapled together as one.

A. Okay.

Q. When we go off the record later, we can compare the copy with your original and make sure we have it, but there is either seven or eight there. We will go with eight since you have the original, and I only have the copy.

A. Okay.

Q. My question is, do those position descriptions

correctly describe the positions you have held and currently hold here at the Office of Special Trustee or predecessor agency?

A. Yes.

Q. Ms. Williams, you have given a lot of testimony today about your duties and what you do. This question is about something that I am guessing you don't do. When you invest the funds, is it part of your job to determine whether or not the correct amount of funds have been collected for a particular tribal trust account?

A. I need you to be more specific.

Q. Let me try to ask the question this way, if there is a dollar in the Osage Nation tribal trust fund account, and you are trying to decide how to invest that dollar, whether to leave it in the overnight or purchase some other investment, is it part of that process to determine whether one dollar was the correct amount that should be in that account in terms of the money that was collected on behalf of the Osage Nation?

A. No.

Q. Someone else has that responsibility?

A. Correct.

Q. You simply take the funds that are there?

A. Correct.





Q. Invest them?

A. Correct.

Q. Who, if you know, at the Department of Interior, if anyone, has the responsibility for that collection process?

A. It is my understanding that the Bureau of Indian Affairs has that responsibility.

Q. That is another subagency of the Department of Interior?

A. Correct, with the Department of Interior.

Q. You described in some detail the audited financial statements that have been made of the -- would it be correct to say office of the trust fund records?

A. Yes.

Q. -- on various periods of time. Would those audited financial statements have involved determining whether or not the Department of Interior had collected the right amount of funds for a particular tribal account?

A. No.

Q. That would be outside the scope of those audits, too?

A. Right.

MR. ROTHROCK: Ms. Williams, thank you for your time. By agreement of your counsel and us, we are





continuing this until 11:00 on Friday, August 18th?

MR. LALONDE: 19th.

MR. ROTHROCK: 19th or such other convenient time as your counsel may agree, and I am sure your counsel will be in touch with you if there is a change in time.

THE WITNESS: Okay.

MR. ROTHROCK: Thank you.

VIDEOGRAPHER: Today's deposition adjourned at 2:51 p.m.

(Deposition concluded at 2:51 p.m.)





IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

00-169 L
Judge Emily C. Hewitt

THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA,
Plaintiff,
vs.
THE UNITED STATES OF AMERICA,
Defendant.

CERTIFICATE OF COMPLETION OF DEPOSITION

I, CATHERINE LEON, CCR No. 71, DO HEREBY CERTIFY that on August 16, 2005, the deposition of MARGARET WILLIAMS was taken before me at the request of, and sealed original thereof retained by:

AKIN, GUMP, STRAUSS, HAUER & FELD
1333 New Hampshire Avenue, Northwest
Robert S. Strauss Building
Washington, D.C. 20036-1564
By: MR. JERRY ROTHROCK

I FURTHER CERTIFY that copies of this certificate have been mailed or delivered on , 2005, with changes, if any, by the witness appended, to the following counsel and parties not represented by counsel appearing at the taking of the deposition:

U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
601 D Street, Northwest
Washington, D.C. 20004
By: MR. BRETT BURTON
DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
DIVISION OF INDIAN AFFAIRS
1849 C Street, Northwest MS 6456
Washington, D.C. 20240
By: MS. ELISABETH C. BRANDON

I FURTHER CERTIFY that examination of this transcript and signature of the witness were required by the witness and all parties present. On ,
2005, a letter was mailed or delivered to MR. BURTON regarding obtaining signature of the witness.

I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition, including exhibits, to MR. JERRY ROTHROCK is $ .

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys in this case, and





that I have no interest whatsoever in the final disposition of this case in any court.

CATHERINE LEON
CCR License Number: 71
Expires: 12/31/05





THE OSAGE NATION vs. THE UNITED STATES OF AMERICA

DEPONENT SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below.

PAGE LINE
Change to
Change to
Change to
Change to

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE LINE CORRECTIONS REASON FOR CHANGE

I, MARGARET WILLIAMS, do hereby certify that I have read the foregoing pages of my testimony as transcribed, and that the same is a true and correct transcript of the testimony given by me in this deposition, taken on August 16, 2005, except for the changes made.

MARGARET WILLIAMS

DATE





DATE DELIVERED/MAILED _________RETURN BY: ___________

MR. BRETT BURTON
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
601 D Street, Northwest
Washington, D.C. 20004
RE: THE OSAGE NATION vs. THE UNITED STATES OF AMERICA
Deposition of: MARGARET WILLIAMS
Date Taken: August 16, 2005
DEAR MR. BURTON:

At the time of the above deposition/sworn statement, it was requested that the deponent read and sign the transcript.

____ Enclosed is your copy of the transcript with the original signature page. Please ask the witness to read the transcript and make any corrections on the original signature page and return the original signature page to our office.

____ DUE TO TRIAL IN THIS MATTER BEING SET FOR __________, SIGNATURE MUST BE COMPLETED BY __________.

____ Enclosed is a courtesy copy of the transcript with the original signature page. Please read the transcript and make any and all corrections to your testimony that you feel are necessary and indicate such corrections on the attached page. Please only return the attached original signature page to our office, not the transcript.

____ The deposition transcript is now ready to review in our offices. Please call 505-243-5018 to make arrangements for reading and signing.

____ The transcript is now ready for review. Please remit payment in the amount of $________. Your transcript will be delivered as soon as payment is received. If you choose not to pay, please contact our office at 505-243-5018 to make arrangements for reading and signing.

8/16/2005 Williams, Margaret (Vol 1)

Other:________________________________________
__________________________________________________
__________________________________________________.

In most instances, a witness is provided 30 days from the receipt of this letter to read and sign the transcript. Failure to read and sign within this time will result in the original transcript being filed without the signature page.

Your immediate attention to this matter will be appreciated. If you have any questions, please call us at 505-243-5018.

_____________________________

KATHY TOWNSEND COURT REPORTERS