0154

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 00-169L
Judge Emily C. Hewitt

THE OSAGE NATION AND/OR TRIBE )
OF INDIANS OF OKLAHOMA, )
)
Plaintiff, )
vs. )
)
THE UNITED STATES OF AMERICA, )
)
Defendant. )

VIDEOTAPED DEPOSITION OF MARGARET WILLIAMS
VOLUME 2
August 19, 2005
11:18 AM
4400 Masthead, Northeast
Second Floor
Albuquerque, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. W. ERIC PILSK
ATTORNEY FOR PLAINTIFF

REPORTED BY: SALLY PETERS, RPR, CCR No. 57
Kathy Townsend Court Reporters
110 Twelfth Street, Northwest
Albuquerque, New Mexico 87102





A P P E A R A N C E S

For the Plaintiff:
AKIN, GUMP, STRAUSS, HAUER & FELD, LLP.
Robert S. Strauss Building
1333 New Hampshire Avenue, Northwest
Washington, DC 20036
BY: MR. W. ERIC PILSK

For the Defendant:
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
General Litigation Section
601 D Street, Northwest
Washington, DC 20004
BY: MR. MARTIN J. LaLONDE
MR. KEVIN WEBB

DEPARTMENT OF THE INTERIOR
Office of the Solicitor
1849 C Street, Northwest MS 6456
Washington, DC 20240
BY: ELISABETH C. BRANDON
STEPHEN SIMPSON, Attending via telephone





I N D E X


| MARGARET WILLIAMS | PAGE |
|---|---|
| Continued Direct Examination by Mr. Pilsk | 158 |
| CERTIFICATE OF COMPLETION OF DEPOSITION | 303 |
| DEPONENT SIGNATURE/CORRECTION PAGE | 305 |


E X H I B I T S

| | | MARKED |
|---|---|---|
| 10. | Statement of account | 157 |
| 11. | Statement of account | 157 |
| 12. | Statement of account | 157 |
| 13. | Statement of account | 157 |
| 14. | Statement of account | 157 |
| 15. | Statement of account | 157 |
| 7A. | Yield Table | 212 |
| 7B. | Historical Yield Curve | 212 |

(7A & 7B Retained by Counsel)





(Williams Exhibits 10 - 15 marked.)

THE VIDEOGRAPHER: This is Volume 2, Tape 1 in the continuing deposition of Margaret Williams in the matter of the Osage Nation And/Or Tribe of Indians of Oklahoma, Plaintiff, versus the United States of America, Defendant, Case No. 00-169 L in the United States Court of Federal Claims.

We are recording at the Office of the Special Trustee for American Indians, 4400 Masthead, Northeast, Albuquerque, New Mexico. The court reporter is Sally Peters from Townsend Court Reporters. Court videographer, Fran Hindsley from Legal Action Video.

For the purposes of the video record, will the attorneys present and by phone please identify themselves?

MR. PILSK: Eric Pilsk, Akin, Gump, Strauss, Hauer & Feld, for Plaintiff.

MR. LaLONDE: Martin LaLonde, Department of Justice.

MR. WEBB: Kevin Webb, Department of Justice of the United States.

MS. BRANDON: Elisabeth Brandon for the Office of the Solicitor, Department of the Interior.

THE VIDEOGRAPHER: Mr. Simpson, are you with us?

And by phone, Mr. Stephen Simpson will also be with us by phone.

The date is August 19, 2005. The time is 11:18 AM. We are now on the record.

MARGARET WILLIAMS

after having been previously duly sworn under oath, was questioned and testified further as follows:

DIRECT EXAMINATION (Continued)

BY MR. PILSK:

Q. Mrs. Williams, my name is Eric Pilsk. You were deposed earlier in the week, is that correct?

A. Correct.

Q. Just remind you that you are still under oath.

A. Uh-huh.

Q. And the same general rules of depositions apply. Your deposition on Tuesday -- was it Tuesday or Wednesday? I'm sorry.

A. Tuesday.

Q. It was with Mr. Rothrock from my office, and because of your travel and his schedule, the parties have agreed that I'm going to continue the deposition today. So just to let you know who I am and why I am here.

I understand that you had a late flight last night, and that you get migraines from time to time. If





you need a break at any time for any reason, please let me know. We'll take a break. If you feel you are unable to continue, please let us know and we'll stop the deposition. If we can adjust the shades or do anything else to make you more comfortable, just let us know.

A. Thank you.

Q. If you need a break for any other reason, also let us know. We tend to -- I tend to take a break every hour to hour and a half almost no matter what, but, you know, let me know if you need something sooner.

A. Okay.

Q. Just the same rules of a general deposition, I'm going to ask you a series of questions. I am entitled to your best answer based on your knowledge and recollection. I'll hand you exhibits from time to time. If you need to refer to a document to answer a question, let me know and we'll do our best to make that available.

MR. LaLONDE: Eric, if I may just interject one item that we explained to Jerry and had agreement with Jerry, and just want to make sure that it was passed on to you as well. We are trying to make sure that we have a clear demarcation between the fact deposition that we're doing, which is going to be based





on Mrs. Williams' personal knowledge, and then the 30(b)(6), which is going to be based on the work that she has done with these binders and getting herself up to speed on an historical period that predates her time here so.

MR. PILSK: I understood that, and I'm going to start with a few questions to finish up the fact part of it before transitioning into the 30(b)(6) part of it.

Q. (BY MR. PILSK) I understand, and correct me if I'm wrong, that you worked for Arthur Andersen in the early 1990s?

A. Yes.

Q. What was your period of employment with Arthur Andersen?

A. 1990 to 1992.

Q. Okay. And where were you based?

A. Here in Albuquerque.

Q. Okay. And generally what did you do at Arthur Andersen?

A. I was a staff accountant.

Q. Okay. Were you involved in any of the Arthur Andersen work related to tribal auditing?

A. Yes, I was.

Q. Okay. What project or projects did you work on?





A. I worked on the 1990 audit, and then very little at the beginning of the 1972 reconciliation project.

Q. Okay. Which -- the 1990 audit, which audit is that?

A. The financial audit --

Q. Of?

A. -- of the trust funds.

Q. Of the trust funds, okay.

A. Yes.

Q. And approximately what timeframe did you work on that trust fund audit?

A. I worked -- well, I worked for Arthur Andersen from approximately May 1990, May, June 1990 to around July or August 1992. So it had to be -- I mean, it was a very short timeframe, so it had to be right in there. The audit work transitioned right into the reconciliation work, so it had to be right in that timeframe.

Q. Were you working with the same team of people throughout your time at Arthur Andersen?

A. No, because I didn't work only on that job. I worked on other jobs at Arthur Andersen.

Q. Okay. With respect to the tribal work, both the 1990 audit and the reconciliation project, did you

work with the same team on both of those projects?
A. I believe it was primarily the same team.
Q. Okay. What were your -- what did you do in connection with the 1990 audit?
A. The details of what I did, you know, that was over 12 years ago. I don't actually recall. It was staff accounting work, so it would be checking work papers that came in from the client, you know, re-adding things that came in --
Q. Okay.
A. -- verifying things, that the type of work that a staff accountant would have done.
Q. Okay. I'm not an accountant.
A. I'm sorry.
Q. No, that's all right.
A. Just the details of that so many years ago, exactly the work that I did.
Q. No, I understand, and what I meant was that I don't know what a staff accountant would do. So --
A. Oh, okay. So I could be more general than --
Q. Yes, that would be helpful.
A. Okay. Well, they would check. You know, they would re-add work papers or -- when you ask the client to give you schedules, they are called prepared by client schedules. And a staff accountant would





generally re-add them -- do they add? They would verify the date on it, you know. So that would be the type of work that I would have done.
Q. Okay. Do you recall if you did any work in connection with any Osage Nation accounts?
A. I don't recall if I did that.
Q. Do you recall if you did any work in connection with any specific tribal account?
A. I don't recall that.
Q. Who did you report to at Arthur Andersen, in connection with the tribal work?
A. One of the people that I reported to in connection with the tribal work was Greg Chavarria.
Q. How much contact did you have with him on a weekly basis?
A. I would say 50 percent of my time I would have contact with him, because he wasn't my only supervisor.
Q. Let me rephrase it and make sure I understand you. How many -- did you meet with him daily?
A. No.
Q. Did you talk to him daily?
A. No.
Q. Okay. So when you said a moment ago, contact, you mean even the work that you were doing was for him?
A. Not necessarily. He wouldn't be the only





person that would have reviewed my work.
Q. Okay. All right. And who else, do you recall who else you either reported to or reviewed your work in connection with the 1990 audit?
A. Jim Thompson was a person that I remember reviewing work.
Q. Okay.
A. There were other managers, but their names are escaping me right now.
Q. Okay.
A. There were lots of people that reviewed my work.
Q. Do you recall how many people Arthur Andersen had working on the 1990 audit?
A. I would say there were probably eight or nine people working on that audit at any given time.
Q. Okay. When, do you recall, did your work transition from the 1990 audit into the reconciliation project?
A. I'm not exactly sure, but I would say approximately January of 1992.
Q. Okay. And actually one -- go back for one more housekeeping note. I understand that you're going to need to take a break to get some food --
A. Uh-huh.





Q. -- for your medication?
A. Uh-huh.
Q. When do you think you'll need to do that? I just want to --
A. Maybe about 12:30.
Q. Okay, that's fine. How did you -- strike that. What were you told about the 1972 reconciliation project when you first began working on it?
A. By who?
Q. Well, who did you -- how did you learn about the project?
A. I don't know. I mean, that was so many years ago, and, I mean, to say -- you would have to be more specific. I mean, who did I learn it from first?
Q. Yes. Well, let me tell you what I'm trying to lay a foundation for but lead up to.
A. Okay.
Q. And that is, when you first began working on that, what you call the 1972 reconciliation project --
A. Uh-huh.
Q. -- what was your understanding of the task, of what the purpose of the '72 reconciliation project was?
A. Actually, as you sit here and ask the question right now, the memory that pops into my head is being briefed on the reconciliation project by the then

chairman of the Intertribal Monitoring Association, who was Eloise Cobell, and she gave us a very rousing speech about how important it was, and that it was a reconciliation project that would help the tribes understand what had happened with their money. And because it's happened so many years ago, when you asked me the question just now, that's the memory that popped into my head.

Q. Do you recall where she gave this talk?

A. Yeah, it was downtown in the Western Bank building.

Q. And who -- is that Arthur Andersen's offices or was it?

A. No, it wasn't Arthur Andersen's office at the time. It was the Office of Trust Funds Management's offices at the time, and it was a speech that was given to the reconciliation team, which was Arthur Andersen. I was still working with Arthur Andersen at the time, but she was giving the speech to the team.

Q. And were there representatives from the Bureau or the -- I apologize. I cannot keep straight. Which entity?

A. It was the Bureau at the time.

Q. The Bureau, okay. Were the representatives of the Bureau also present at this meeting?





A. Yes.

Q. Did you learn anything, as you worked on the project, did anyone at Arthur Andersen tell you or did you come to the conclusion that the purpose of the reconciliation project was different than what Ms. Cobell had explained at that meeting?

A. Not that I recall.

Q. Okay. Did anyone at Arthur Andersen, as you sit here and begin to think, remember and think about it, did anyone at Arthur Andersen give a briefing to the members of the reconciliation team at Arthur Andersen about what the project was, what you were doing?

A. I don't recall one separate from this briefing.

Q. Okay. What did you do in connection with the reconciliation project?

A. I reconciled documents. I would literally sit there and check off, you know, documents, reconcile.

Q. So you had two documents in front of you, and you were comparing them?

A. I had a document in front of me, and I would see that it was posted to the system correctly.

Q. Okay. What did you -- do you recall what documents you looked at?

A. I don't recall whether they were receipt or





disbursement documents, but I recall sitting there with documents and comparing them to what posted in the finance system, and if it was correct, checking it off.

Q. Okay. So, presumably you had some kind of record that reflected that, for example, a deposit had been made in a given account?

A. Correct.

Q. And then you had some other record that reflected the account activity, is that correct?

A. Correct.

Q. And you would look on the record of the deposit and say on a certain date a deposit in a certain amount was made, and then look on the account record and verify whether or not the account record reflects that deposit being made on that day?

A. Right. I just don't remember if I was looking at a deposit or a disbursement. But, yes, I was looking at a record and then account activity and comparing them.

Q. Okay. I'm sure this was on the record previously, and I apologize if I repeat a few questions, but you are a CPA, is that correct?

A. Yes.

Q. And were you at the time you worked --

A. No, I wasn't.





Q. Okay. Had you -- what was your background in accounting at the time you worked for Arthur Andersen?

A. At the time I worked for Arthur Andersen, I had a bachelor's in business administration, and I had with a concentration in accounting and finance.

Q. Okay.

A. But I had not taken the CPA exam at the time. It was not a requirement that you had taken it --

Q. But when did you --

A. -- until you had reached a certain level, and I resigned from Arthur Andersen before I had hit that requirement.

Q. When did you take your CPA exam? Let me rephrase it. When did you pass your CPA?

A. Oh, it was after I worked here at the Office of Trust Funds Management. It's been awhile. I don't know the exact year.

Q. Okay. But you're sure you passed it?

A. Oh, yes, I'm sure I passed it. I remember celebrating at the mailbox when I got the scores.

Q. We all did the same thing, I'm sure, when we passed the bar.

When you -- again, I am not an accountant, when you say reconcile, what does that mean?

A. Comparing something to something else.

Q. And making sure that they match up or noting if they don't match up?
A. Correct.
Q. Do you recall whether you did any reconciliation work regarding any Osage Nation accounts?
A. In the '72 --
Q. Yes.
A. -- reconciliation?
Q. Yes.
A. I don't recall if I did.
Q. Do you recall whether -- any specific tribal account you might have looked at?
A. I don't recall.
Q. As you reconcile an account, would you have been able to tell what account it was?
A. I don't recall whether they were sorted by accounts at that time, you know, when we -- when they were given to the staff accountant to reconcile. I don't recall if they were sorted that way.
Q. Okay. Other than the 1990 audit and the 1972 reconciliation project, did you do any other work at Arthur Andersen related to tribal matters?
A. Yes.
Q. And what else did you do?
A. I reconciled the MoneyMax system to the





finance system.
Q. Okay. And was there a name for that project?
A. Just that.
Q. Okay. And when did you work on that?
A. It would have been during that time period that I worked at Arthur Andersen. I don't remember specifically, other than it would have been within that time period.
Q. Okay. Just to make sure that we're all -- we understand each other, what is the MoneyMax system and what is the finance system?
A. The finance system is the official system of record that the tribal trust funds operated on prior to the Omni system, and it's the system that was used for the '72 reconciliation, during that time period. And the MoneyMax system is an investment management system that was used to record the detail investment information for a sub-time period. It doesn't cover that entire '72 to '92 time period, but a sub period of that time period.
Q. Was this MoneyMax to finance system reconciliation a part of the '72 reconciliation, or was it a separate project?
A. I believe it was a separate project. It was my understanding it was separate.





Q. Do you know whether the MoneyMax to finance system reconciliation was ever incorporated into the '72 reconciliation?
A. I don't know.
Q. Okay. Now, the MoneyMax system, is that a Bureau system?
A. Yes. It was.
Q. Was. And the finance system was a Bureau system, is that correct?
A. Yes.
Q. Okay. As part of this reconciliation, the MoneyMax to finance system, did you look at or review Department of Treasury documents?
A. No.
Q. There was no reconciliation between either the MoneyMax and/or the finance systems and any Department of Treasury systems?
A. No.
Q. And who did you work for or report to in connection with the MoneyMax to finance system reconciliation?
A. I don't remember on that.
Q. Was it also Greg Chavarria?
A. It could have been, but I don't recall if it was.





Q. Was there a tribal accounting group or team at Arthur Andersen? Was it organized in that kind of a way?
A. I don't know if they were called a tribal accounting group. I mean, it was more jobs. If I recall, Arthur Andersen was organized by jobs. You worked different jobs.
Q. What are some examples?
A. Well, I don't know if I can say.
Q. What was your job?
A. I mean --
Q. You can't -- is there -- you can't remember or you cannot tell me for some other reason?
A. I don't know. I mean, can I start listing off the jobs that I worked on at Arthur Andersen? Is that allowed?
Q. Here's my question, when you said jobs, are you referring to clients?
A. Yes, clients.
Q. Okay. Not job description?
A. No, clients.
Q. Okay, okay. So, you were organized around client teams?
A. Right, clients, client teams.
Q. And in this case your clients was the Bureau

of Indian Affairs?
A. Right.
Q. Okay.
A. Right.
Q. Going back to the '72 reconciliation for a moment, the -- when you looked at the documents you were reconciling --
A. Uh-huh.
Q. -- can you recall generically what the documents were or would have been?
A. They would have been, since I was dealing with receipt and disbursement documents, they would have been SF104s, SF1166s, and that's the extent of what I remember they would have been.
Q. Okay. And do you recall finding instances where you could not reconcile something, where you found a transaction on one document that wasn't reflected in the other?
A. I don't recall finding that.
Q. Do you recall what you were supposed to do when you found -- when you were unable to reconcile a given transaction?
A. No, I don't recall that.
Q. Okay. Did you -- was it part of your job to look behind the documents that you were given for any





further support or explanation for the transactions that were reflected on the documents that you were looking at?
A. Can I go back to a previous question?
Q. Sure.
A. Which reconciliation were you talking about?
Q. I'm sorry. The 1972 reconciliation project.
A. When you say do you recall what you were supposed to do if you couldn't reconcile?
Q. Yes.
A. Then I don't recall.
Q. Okay. You want to answer? What did you do on the MoneyMax to finance system?
A. Proposed an adjustment for a correction.
Q. Okay. And how would you know what to propose?
A. Because one was a subsidiary system to the other system. The MoneyMax was a subsidiary to the finance system, so either one or the other would need a correction. So I would propose an adjustment to the finance system or propose an adjustment to MoneyMax.
Q. Okay. I guess when you say subsidiary system, what does that mean?
A. It means that it's holding the detail to a summary transaction. Finance, for example, finance would hold a $50,000 hit, and MoneyMax would be holding





10,000, 10,000, you know, whatever.
Q. A group of transactions that add up to the 50?
A. A group of transactions that add up to the 50,000. And so if that was wrong, you know, added up to 60,000, then I would propose the transaction that would fix it. If finance needed to add up to 60,000, MoneyMax was actually right, the 60,000 was right and the 50,000 was wrong, then I would propose a transaction that would fix the 50,000.
Q. How would you know which was right?
A. By the source documentation from the security transaction.
Q. Okay.
A. Because what MoneyMax was, was holding subsidiary -- what MoneyMax and finance system were reconciling was security investment transactions. So how I would know what was right was the source documentation on the investment.
Q. Okay. So on that reconciliation project, the MoneyMax to finance system, you would have additional documents, source documents, to verify?
A. Right.
Q. And you would refer to those?
A. From the broker, from the custodian. This is actually what happened, this is actually what's right.





So I would fix whichever system was off based on the actual source document.
Q. Okay. Now turning back to the '72 reconciliation, were there any source documents behind the accounts that you were looking at?
A. Yeah, there were. I just don't recall. See, I don't remember hitting one that was wrong, so I don't remember what I did --
Q. Okay.
A. -- on that. And I just didn't work on it very long, so I don't have a memory of what was done.
Q. Okay. Were there any other Bureau matters that you worked on while at Arthur Andersen?
A. Not that I recall.
Q. Okay. Did you do any work for any tribal -- were there any tribal clients -- not the Bureau, but a specific tribe, while at Arthur Andersen?
A. Well, I'm not sure that I could have told you, but no.
Q. Well, without naming a tribe, but the answer is no?
A. But no.
Q. Okay. Did you do any other work related to tribal funds for any other, any client other than the Bureau while at Arthur Andersen?

A. I'm sorry.
Q. Well, we know you worked on Bureau matters.
A. Right.
Q. In the three matters that we talked about.
A. Right.
Q. And then you testified that you did not do any work for any tribe as a client?
A. Right.
Q. And my question is just a catch-all. Did you do any work for any other client that related to tribal funds?
A. Oh, no.
Q. Okay. Without naming any client, did you do work for any other client besides the Bureau while you were at Arthur Andersen?
A. Yes.
Q. Okay. Were these private companies or individuals?
A. Yes.
Q. Okay.
MR. PILSK: And if we could go off the record for just a minute.
THE VIDEOGRAPHER: We are temporarily going off the record at 11:45.
(Recess held from 11:45 to 11:45 AM.)





THE VIDEOGRAPHER: We are back on the record at 11:45.
Q. (BY MR. PILSK) Okay. Let me hand you what we've marked as Exhibit 10, and these are -- the next few exhibits are going to be these accounts.
MR. LaLONDE: Which one are we starting on?
MR. PILSK: This is 7469.
Q. (BY MR. PILSK) I believe you provided to Mr. Rothrock on Tuesday statements of accounts for, I believe six different accounts?
A. Uh-huh.
Q. Is this one of those account -- statements of account?
A. Yes.
Q. Okay. Again, I don't want to -- I don't mean to make us go over old ground, but why did you provide these accounts?
A. Because he asked me to.
Q. That's a good reason. Thank you. Can you identify this Exhibit 10?
A. It's a statement of account for PL7469700.
Q. Okay. What is that account number? What kind of -- what is that an account for?
A. It's a proceeds of labor account for "Restored





Funds, Osage Tribe Holding Account," according to the title.
Q. Okay. And did you prepare this statement of account?
A. It -- yes.
Q. Okay. What does restored funds mean?
A. I don't know. It's the title on the account.
Q. Okay. Do you know what kind of funds are in the account?
A. What I know just from the account title is that it's a proceeds of labor account, which means that the account is completely controlled by the tribe, which means they get to withdraw the funds whenever they want to, and they basically direct how long the funds are invested, and they also could direct the title of the funds.
Now, because we're talking about Osage Nation, though, some of these account numbers are held over from a very, very, very long time ago, and could be governed by public laws. But I personally haven't researched this account, so I couldn't tell you.
Q. When I asked you a moment ago whether you prepared this statement of account, you said yes. What does that mean?
A. That means that my organization, the Trust





Services, is responsible for issuing a statement of account from the trust funds accounting system.
Q. Okay. Do you, yourself have any direct involvement with this account, with managing this account?
A. I manage the investments. My office, my division of trust investments invests the funds on this account. I have an investment officer that will work directly with the tribe.
Q. Okay. Look on the second page. Can you just walk me through, and for a non-accountant, explain to me what this shows?
A. Okay. This is an asset summary, and what it is showing you is the holdings, the asset holdings on the account. The first column is the asset category, and it's showing you that this is a principal only account. So it's showing you the principal portfolio. The first category is the US Treasury overnighter, which is our short-term investment fund. It's showing you that at cost, which is at dollar value, there is $3,667.68 in the overnighter as of -- if you go up to the top -- 7/31/05.
Q. Okay. Is that $3,667.68 figure the principal?
A. Yes. This is a principal only account, so --
Q. Okay. So that is the amount -- is that the

amount invested in US Treasury overnighters as of July --

A. 7/31/05.

Q. Okay.

A. Yes. The next column is going to tell you the market rate as of that date, the percent of account at the market. So it's at a 2.98 percent. That's what the market rate of the overnighter is.

Q. 2.98 percent, does that mean -- looking at the next row -- at the government entity issues? What does that stand for, US government --

A. That is the summarized value of the US sponsored government entity issues that it's invested in, and let's finish with this page, and then we'll go to the next page which will show you the detail of what's in that category.

Q. I guess what I'm confused about is what this percent of account at market means.

A. I'm sorry. I just misread the column. You're right. It's telling you how much of the total amount of the account is in --

Q. Each of those --

A. -- that category. Yes.

Q. Because I was going to invest in those entity issues --





A. I'm sorry. You're right. I misread.

Q. Okay.

A. It's telling you how much of the account is in that.

Q. In each one?

A. Yes. The next column is the market value, and since the government overnighter is dollar for dollar, it's going to be the same.

Q. Okay. And then the other column is a lesser value because it's for a given term?

A. Right.

Q. Is that correct?

A. Yeah. It's not dollar for dollar, and we'll know what's going on a little bit more on the next page when it breaks out the detail.

Q. Okay.

A. Unrealized gain/loss, cost to market, dollar for dollar there in the first line. This is telling you you have an unrealized loss of 284.40 in the next category, but we'll get the detail on the next page if there's multiple securities involved. Estimated annual income, on this particular category, this is a summarized category, is $117 for the overnighter and then 31.50 for that other category. Again it's estimated.





Q. Again, is that just projecting out from this amount of capital of investment?

A. Right, and it's projecting out a year forward from that date, and it's only estimated, we always say. Income yield at cost, again it's exactly that. It's the income yield at the cost, and it's a projection.

Q. And then how does, on the total assets line, on the income yield at cost number is 2.65, how is that number derived?

A. It's a number that's derived as what you're yielding, what your income yield is going to be at based on cost.

Q. Okay. So it's, I guess what I would call, a weighted average? You are taking the two, your two investments in the overnighters and the Treasuries --

A. Right.

Q. -- or the other ones, and adding them together. In a sense you're combining them to see what your average yield is?

A. Right. And it's only a snapshot, so it's going to change. And your overnighter changes by day, so it's even a bigger snapshot that you're taking at the end of the month.

Q. Okay.

A. And now you have your list of your assets, so





it looks like the US Government sponsored entities is just one security for this particular account, and this is where you get your detail listed.

Q. Okay. So, these are the same figures but broken out, if there were more than one --

A. If there were multiple securities, it would have been broken out by security.

Q. Okay. Page three?

A. And page three is your bond maturity schedule.

Q. Okay.

A. If you had multiple securities here, it would have listed it out for you.

Q. And page four?

A. Is your transactions, and one of these statements that you get to -- this would be very exciting -- there's going to be the big account, the 7386, has a lot of transactions here.

Q. Right. So this -- I'm just going through, okay. So it reflects that on --

A. 7/1 the government overnighter paid interest. Has your beginning balance.

Q. Okay. Where does it reflect -- I see the overnighter, but where does it reflect the other securities?

A. This is just your -- I'm sorry.

Q. So those were already purchased? Is that what this is showing?
A. Yes. What do you mean where is your other securities? Your cost is built in here. See your beginning cost there, 123,457.59.
Q. Right. I guess what I'm confused about is the 123 --
A. And then, see how you have your ending balance here, 123,464.88, which matches your holding on your assets summary.
Q. I see, you only bought 7.29?
A. Right, because that's your interest.
Q. Okay.
A. Which swept into the overnighter.
Q. Right, okay.
A. Okay.
Q. Let me take a step back before we go through these other ones, and I don't think we need to go through them all in so much detail.
A. Okay, yeah. They all work alike.
Q. Are these all the Osage accounts that your office deals with?
A. Currently.
Q. Currently.
A. Uh-huh.





Q. Okay. Have there been other accounts that your office has managed over time?
A. I would have to research that.
Q. Okay. In the 1972 reconciliation project -- and I'll use that term, even though I know it's not the official name --
A. Right.
Q. -- but as a shorthand, there were -- we have various of the work -- of the results of that reconciliation, that project, have been produced to us and were testified to at Mr. Chavarria's deposition earlier this week. There were a number of other account numbers, and which aren't reflected here. I am wondering if you would have any idea of what happened, why those account numbers aren't here, why you haven't produced them?
A. I would have to research that.
Q. I mean, for example, there was an account number, and it was ended with 7171. Does that?
A. I would have to research. I mean, there's any number of reasons why that account might not be here now.
Q. Okay. Why don't we just -- I just at least want to ask you to identify each one. So let me hand you what's been marked as Exhibit 11.





A. Okay.
Q. This is 9701 account, the commencement money and other damages.
A. Uh-huh. This is account number PL 7549-70-1 "Commencement Money and Other Damages to Tribal Trust Land as the Result of Drilling Operations, 25 CFR 19."
Q. Okay. And is this an account that your office manages?
A. Yes.
Q. And generally, what is -- do you know what is in -- what kind of funds are in this account? What does commencement money and other damages mean?
A. I would have to research that.
Q. Okay. As investment manager, you don't -- do you ever have occasion to really research what exactly -- what kinds of funds are in the account?
A. I'm not the immediate investment manager. I have -- I'm the deputy special trustee for trust services, so I am basically four levels above the immediate investment manager of the account.
Q. Okay.
A. Which is why you're getting the, "I don't know."
Q. Okay. All right. Why don't we take a look at Exhibit 12, and ask you to identify that document?





A. This is account number PL73850 -- I'm sorry -- 708, Osage Fund.
Q. Do you know what the Osage Fund is?
A. No.
Q. Okay. But your office is responsible for managing this account?
A. Correct.
Q. Okay. And you prepared or asked someone to prepare this particular statement of account?
A. Correct. I have an office that is responsible for preparing the statement for this account.
Q. Okay. Let me hand you Exhibit 13. That's the 7387.
A. Account number PL7387704, "Osage Tribe proceeds from non-oil and gas, Osage Reservation."
Q. Okay. Is this an account that your office manages?
A. Yes.
Q. And did you ask that this statement, Exhibit 13, be prepared?
A. My office is -- I have -- I manage an office that's responsible for generating a statement for these accounts.
Q. And your office generated this Exhibit 13?
A. Yes.

Q. And do you know what the proceeds from non-oil and gas, Osage reservation, what those funds are, where they came from?
A. I would -- no, not without researching.
Q. Okay. Okay. And let me hand you Exhibit 14, and ask you to identify this document.
A. Account Number JA 9271121, "Award of Indian Claims Commission, Osage Nation, Dockets 105 and 106 and 107 and 108 - 9271."
Q. Okay. And does your office manage this account?
A. Yes.
Q. And do you know what kinds of funds are put into this particular account?
A. Not beyond what's in the title.
Q. Okay. And did your office prepare this specific exhibit, Williams Exhibit 11?
A. Yes.
Q. Okay. And finally, let me show you Exhibit 15.
A. Account Number PL7386706, "Osage Tribe Proceeds of Oil and Gas Lease Royalties, et cetera, or etc., Osage Reservation - 7386."
Q. Okay. And is your office responsible for managing this account?





A. Yes.
Q. Okay. And did your office prepare this specific statement of account identified as Exhibit 15?
A. Yes.
Q. Okay. Are you familiar with what kind of money is placed into this account?
A. Yes.
Q. And what is that? What is your understanding?
A. Oil and gas royalties.
Q. Okay. Why do you have -- know more about this account than you did about the other accounts?
A. Because the quarterly annuity is paid out of this account, and I'm familiar with the calculation and payment of the quarterly annuity.
Q. And how did you become familiar with that?
A. It's a big deal in my office every quarter.
Q. Okay.
A. So it's an ongoing, daily operation every quarter for us.
Q. Okay. I want to come back and ask you a few specific questions about Exhibit 15 --
A. Okay.
Q. -- but I want to ask you a question about all of these accounts kind of collectively for a moment.
A. Okay.





Q. First, are you -- are these all of the Osage accounts that your office currently manages?
A. To the best of my knowledge right now.
Q. Okay. Is there someone else in your office who would be -- who would have more knowledge about the Osage account that your office manages?
A. Not that I know of.
Q. Do specific individuals in your office have responsibility for specific tribes, or is it broken up in a different way?
A. They have specific knowledge for -- they are responsible for specific tribes, and I want to clarify that my office is only responsible for the management of the investments. There is another office that is responsible for a trust administrator type function for other types of information and interaction with the tribe.
Q. And who is the person in your office who has the responsibility for the Osage investments?
A. Sonny Holiday.
Q. And is Sonny, is that a male or female?
A. Male.
Q. Okay. Are these statement of accounts that we have marked as Exhibits 10 through 15, provided to the Osage Nation?





A. Yes.
Q. And how often?
A. Monthly and then annually.
Q. Okay. Are they sent from your office directly to the tribe?
A. Yes.
Q. Okay. Do you know for how long, either statements for these accounts or their predecessor accounts, were sent to the tribe?
A. I would have to research that.
Q. Okay.
A. I don't know.
Q. Have they been sent to the tribe since you assumed your current position?
A. Yes.
Q. Okay. I don't want to go over your whole work history again, but prior -- how long -- excuse me -- how long have you been in your current position?
A. Since April of '03.
Q. And prior to that, did you work in the same office?
A. In the Office of the Special Trustee, yes.
Q. Okay. Okay. Do you ever recall a time when statements of account were not sent to tribes directly?
A. No.

Q. Okay. If you turn to Exhibit 15, which is the proceeds of oil and gas 7387 account, and if you look on page six, for example, on the upper right hand corner --
A. Uh-huh.
Q. -- there is an entry on 7/5/05, cash receipt income as-of-investment overnight interest earned, 6/29/05. Do you know if overnight interest, is it posted daily or on some other basis?
A. Overnight interest generally is posted monthly, on the first business day of the month.
Q. Okay. And why is that? Why is it not posted daily?
A. Why is it not posted daily?
Q. Yes.
A. Because it's just standard industry practice to post it monthly. It's compounded daily in the calculation, but we only distribute it monthly.
Q. Okay. So on Monday -- just to make sure I understand -- on Monday if there's -- just use a round number -- if there's $100,000 in the account and then you invest that --
A. Uh-huh.
Q. -- all that $100,000 into an overnighter, and it's going to earn some amount of interest, a dollar?
A. Uh-huh.





Q. Then on Tuesday, you take that $100,000 plus that $1.00 and invest that in an overnighter?
A. Uh-huh, uh-huh.
Q. Okay.
A. And it's reflected in the rate.
Q. Okay. Is there an account or ledger sheet or some other place where the daily investments are tracked?
A. Yes.
Q. Okay. But per industry practice, they are just simply not posted to this account until the first of every month?
A. The interest?
Q. Yes.
A. Yes.
Q. Okay. And similarly, even though this shows transactions, the daily transaction of investment and payout is not reflected as a daily transaction, is that correct?
A. The daily?
Q. The investments. Every day you're investing money in the overnighters and then getting it back the next day, is that right?
A. Yes.
Q. But that's not, it's just not reflected as a





daily transaction on the transaction activity?
A. If the tribe has money coming in and has invested it, it's reflected. You can see it here. For instance, let's see. See --
Q. What page are you looking at?
A. Cash receipt, cash receipt, cash receipt. Hold on, I'm looking for it here. Cash receipt, cash receipt, and cash receipt. Let me find it. Let's see. Well, if there was, if the overnighter was buying here, there would be a transaction reflected. So the transaction would be here. Now, the whole overnighter activity that's happening at the Treasury level is not reflected here in the account, but is reflected in an overnight, a different account within the TFAS system. So that's what I was trying to get at.
Q. Well, I guess what I'm not understanding is that your reference to the tribe. If the tribe directs -- is it -- does the tribe direct certain funds to be invested in an overnighter?
A. The default investment is the overnighter.
Q. But if the tribe makes another investment?
A. Then it would go into something other than the overnighter.
Q. And that would be reflected --
A. Yes.





Q. On Exhibit 15 --
A. Yes.
Q. -- or a similar statement of account?
A. Yes.
Q. Okay. And the rates on the overnight, are those the rates that they're paid reflected on Exhibit 15 anywhere, or would that be reflected on the other statement?
A. Let's see.
MR. LaLONDE: Objection, vague.
Q. (BY MR. PILSK) For example, if you look on page 25.
A. Page 25.
Q. Okay. At the bottom of the page, the last three entries appear to reflect interest earned. Well, the last two say cash receipt of interest earned on government overnighter, and then there is some detail.
A. This does not appear to have the rate posted.
Q. Okay. And, then, what is the entry above that, that says cash receipt income on as-of-investment, overnight interest earned. Do you know what that means?
A. Yes. If a -- if a cash receipt comes in late and misses the overnight investment cutoff, we have the ability to invest it the next day with Treasury as if we had received it, and get as-of interest, and it's,

because we can prove with Treasury that we couldn't see it. It was in the Treasury system.
Q. I see.
A. But we couldn't see it.
Q. So Treasury had the money?
A. Treasury had the money.
Q. And they actually invested it?
A. No, they didn't invest it.
Q. Oh, okay.
A. Treasury had the money in their system. It's just that we couldn't see it to invest it, and as long as we can prove that with Treasury, they let us invest it as of the day before. It's called an as-of investment, and that's what that's reflecting.
Q. And so the tribe is credited with the interest that they should have earned?
A. As if it was -- yeah. As if it's, yeah, that's exactly it.
Q. Do you know how long that as-of investment practice has been going on?
A. I believe since 1999.
Q. Do you know what the practice was prior to that?
A. No.
Q. Okay. Was there a specific -- was there some





kind of decision or regulatory action of some sort, by either the Treasury or the Bureau, that put that as-of investment practice in place?
A. It was Cobell.
Q. The court decision?
A. Uh-huh.
Q. Okay. There's a couple more questions on the fact side, and then I think it would be a good time to break for lunch coming up on your time. Are you okay?
A. Yes.
Q. In Tuesday's deposition with Mr. Rothrock, I believe he asked you if there were any audited financials for the Osage?
A. Yes.
Q. And I think he asked you to see if you could find them. Were you able to?
A. I didn't actually look. Audited financials of the Osage, no, he didn't ask me that.
Q. What did he ask you?
A. He asked me if there were -- well, he might have asked me that, and the answer to that is no. I do not know of any audited financials of the Osage. There might have been another question called, are there any audited financials of the trust fund as a whole.
Q. Yes.





A. The answer to that is yes.
Q. Okay.
A. And he might have asked me to get that, but that question should be directed to the attorneys.
MR. LaLONDE: We can look to see if we have one around, if you want. I mean, I will look at that this afternoon to see what we have, and we'll get it produced to you.
MR. PILSK: Okay. Thank you.
Q. (BY MR. PILSK) Just a couple questions about that. Do you know when the audit of the trust funds was?
A. It's a list.
Q. Are they done regularly?
A. Yes.
Q. What's -- how regularly?
A. They've been done regularly since 1995.
Q. Okay.
A. And then prior to that time, the Arthur Andersen, 1988, '89, '90.
Q. Okay. And by regularly, what, how regularly?
A. Annually.
Q. So annually since '95, and then the three Arthur Andersens in '88, '89, and '90, and are you aware of any others?





A. Not that I know of.
Q. Okay. Who currently does the auditing of the trust funds?
A. KPMG.
Q. With your office or the Bureau as the client?
A. I believe the IG is the client. It's an IG audit. It's actually an IG audit with KPMG doing it under contract with the IG, and they do Interior as well as us.
Q. Okay.
MR. PILSK: Okay. Why don't we stop there, and end the fact part of the and --
THE WITNESS: Okay.
MR. PILSK: -- break for lunch?
THE WITNESS: Thank you.
MR. PILSK: How long -- we can go off the record now.
THE VIDEOGRAPHER: We are temporarily going off the record at 12:16 PM.
(Recess held from 12:16 to 1:18 PM.)
(Mr. Simpson was not present by telephone.)
THE VIDEOGRAPHER: We are back on the record at 1:18 PM.
Q. (BY MR. PILSK) Okay. Ms. Williams, we're now going to shift focus areas now, and away from your

direct job duties and direct job responsibilities into what we're calling the 30(b)(6) portion of the deposition. Do you understand what I mean by the 30(b)(6)?

A. Yes.

Q. Let me hand you -- do we have the -- well, let me hand you what we have previously marked as Exhibit 1. That's actually my copy, but it's the 30(b)(6) deposition notice. And I flagged, the green flag indicates where the description of the subjects we asked for testimony regarding. Can you identify what subjects --

MS. BRANDON: Hello.

MR. SIMPSON: Hello.

MS. BRANDON: Hi, Steve.

MR. SIMPSON: Yeah.

MS. BRANDON: We're starting the deposition again.

MR. SIMPSON: Okay.

MR. LaLONDE: Apologize.

MR. SIMPSON: That's all right.

Q. (BY MR. PILSK) Can you either look at that and identify it for me, or tell me what subject areas you have been designated to testify about?

A. I have been designated to testify for 1.d, the





investment distribution and accounting part of 1.d, and then 1.g, the rates of return obtained section.

Q. Okay. Thank you. Prior to any work you did in connection with this -- preparing for this deposition today, did you have any firsthand knowledge of investments, distributions, or accounting of Osage tribal trust funds during any of Tranche One period?

A. It's possible that I could have reconciled Osage investment transactions that covered the Tranche One later periods, the '80 periods, during my work with Arthur Andersen.

Q. Okay. But that would have been, you would have looked at account statements and some other statement to reconcile?

A. The MoneyMax to reconciliation or even the '72 stuff. It's possible that I covered that.

Q. Okay. But other than that, would you have any --

A. No.

Q. -- firsthand knowledge? Okay. What do you understand the subject means to talk about the investment distribution and accounting -- and I'm reading from 1.d -- "Of all payments owed to the Osage Nation and made and/or received by the United States for royalties on crude oil and natural gas, including





liquids extracted therefrom, produced during the relevant months."

What's your understanding of what that subject matter means?

A. My understanding of what that subject matter means is what happened to the oil and gas royalties for those subject months in terms of the investment and then the disbursement of and the accounting of, at least of the investment and disbursement of.

Q. Okay. And similarly with respect to the other subject topic, 1.g, which is, "The rates of return obtained on investments of payments owed to the Osage Nation and made and/or received by the United States for any and all royalties on crude oil and natural gas, including liquids extracted therefrom, produced during the relevant months, including but not limited to, discussions, analysis, considerations, comments, deliberations, alternatives, and/or conclusions relating to such investments."

Prior to preparing for this deposition, did you have any firsthand knowledge of that topic?

A. Again, the only firsthand knowledge would be whatever I had reviewed for the reconciling of the funds.

Q. And you previously testified that, even if --





although you may have seen documents relating to Osage trust, you have no independent recollection of actually having seen --

A. Right.

Q. -- any of those documents relating to the Osage Tribe, is that correct?

A. Right, right.

Q. Okay. And if you could tell me in your words what you understand 1.g, which I just read, to mean?

A. What I understand 1.g to mean is the rates of return is what rates of return were obtained on the funds back in those periods for the royalties that came in on the those tranches which are those relevant months.

Q. Okay. Given that you had no firsthand knowledge, other than the possibility of having looked at some of the documents during your time at Arthur Andersen, what did you do to educate yourself about these two topics, just generally? We will get into details with each one in a minute. But generally, how did you go about educating yourself?

A. I educated myself by reviewing the information that was provided to me in binders that was gathered for the periods of the relative -- excuse me -- relevant months.

Q. Okay. Are these the three binders that were previously marked as Exhibits 6, 7, and 8?
A. Yes.
Q. I can show them to you, but I think we're all talking about --
A. Right. I recognize them as Volumes 1, 2, and 3.
Q. Okay. Other than reviewing the material in those binders, did you review -- did you look at any other documents to prepare for today's deposition?
A. No, not that I recall.
Q. Other than -- other than the government attorneys in this case, did you talk to anyone to prepare to educate yourself about the 30(b)(6) topics?
A. I talked to my staff.
Q. Okay. Who did you talk to in your staff?
A. I talked to Charlene Toledo and Brandon Fryar.
Q. What is Charlene Toledo's position?
A. She's the division chief for trust funds accounting.
Q. And how long has she been at the Bureau?
A. Oh, I don't know how long she has been at the Bureau.
Q. Okay. Why did you talk to her?
A. I just wanted to get a run-down, a verbal





run-down of the annuity calculation, the current annuity calculation.
Q. Did you talk to her about historical annuity calculations?
A. No.
Q. Okay. And what about Brandon Fryar? How do you spell Fryar, by the way?
A. F-R-Y-A-R, and I asked him the same question.
Q. Okay. And again, just about current?
A. Yeah, current.
Q. Not about historical?
A. No. Current annuity calculation.
Q. Did you talk to anyone who was involved in any way with the actual investment activity of the Osage trust accounts during any of the Tranche One periods?
A. Yes.
Q. Who did you talk to?
A. I talked to Sarah Yepa.
Q. And how do you spell that last name?
A. Y-E-P-A.
Q. Okay. And who's she?
A. She currently works -- I don't know her current title, but she currently works in field operations, here in OST.
Q. Okay. And what does field operations mean?





A. They take care of our field operations, all of our staff that work in the field.
Q. Okay. Is she based here in Albuquerque?
A. Yes.
Q. Okay. And why did you talk to her?
A. I wanted -- excuse me -- to gain an understanding of how the overnighter calculation worked prior to the current overnighter calculation.
Q. And what was her, not familiarity or knowledge of that?
A. I'm sorry?
Q. What did she tell you?
A. She told me mostly that she couldn't remember, but that she thought that the detail was held in a general ledger account. I was asking where the detail of the transactions were held.
Q. Uh-huh.
A. I wanted to know how the system knew how much overnight interest to post.
Q. Okay. And why would she have known that or why did you think that she would have known that?
A. Because she worked in the tribal trust branch during the time period that the overnighter calculation was running.
Q. Okay. Do you know what time period?





A. I don't know the exact time period. I just knew that she was the predecessor branch chief.
Q. Okay. And I don't know if I cut you off. But she didn't recall?
A. She didn't recall mostly anything. She just said that she thought that the detail was in a general ledger account.
Q. Okay. Did you find any documents relating to that general ledger account?
A. No.
Q. Did you look for them?
A. No.
Q. Did you ask anyone to look for them?
A. No.
Q. Would you expect that kind of document to still exist?
A. Yes.
Q. Would that be generally an electronic form or hand form or perhaps both, depending on how long it existed?
A. I don't know.
Q. Okay. Where would you expect that kind of document to be?
A. That I don't know.
Q. Is that the kind -- I don't know your

procedures -- is that kept somewhere in the office's immediate files, or would it be sent to a repository of some sort?

A. I would assume it would be in a repository since it would be a very old record.

Q. Okay. Other than the three individuals you just identified, and again excluding attorneys, did you talk to anyone else to help prepare for the deposition?

A. Not that I recall.

Q. Okay. Did you talk with the attorneys about -- in preparation for today's deposition?

A. Yes.

Q. Okay. I want to be very careful here. Did they provide you additional factual information, other than what's in the notebooks, to help you prepare for today's deposition?

A. I guess I don't understand what that means exactly.

Q. Well, what I mean, with witnesses before deposition, I will give them --

A. Uh-huh.

Q. -- advice and counsel on what's going to happen at the deposition and generally how to conduct yourself as a witness.

A. Uh-huh.





Q. I'm not asking about that.

A. Okay.

Q. They may have given you background about the lawsuit --

A. Uh-huh.

Q. -- and some of their strategic thinking about the lawsuit. I'm not asking about that.

A. Okay.

Q. They may also, however, have given you factual information that was learned through discovery in this case, about whether this happened or that happened and how things were done or not done at a certain point in time, and I am asking, simply yes or no, whether they gave you factual information to help you prepare for today's deposition?

A. Not that I recall. I believe that it's in the binders.

Q. Okay.

MR. LaLONDE: And let me just, if I can add on this, the tabs that are in the one binder, I did put those tabs in there.

MR. PILSK: This is Volume 2 of 3?

MR. LaLONDE: Volume 2 of 3 to try to identify, or at least the green and red ones, to try to identify the month of receipt for the relevant





production months, and the red one to identify what I understood the annuity payout date. So that would be a fact that I did essentially provide.

MR. PILSK: Okay, thank you.

Q. (BY MR. PILSK) One other just sort of to lay the foundation in the background. Each of these notebooks, Exhibits 6, 7 and 8, contain a table of contents. I understand that in the beginning of Exhibit 7, which is the Volume 2, that there were two documents that were added, inserted into the notebook immediately prior to the deposition on Tuesday. Let me hand them to you. Why don't we just, to make it simple, mark these as 7A and B?

(Williams Exhibit 7A and 7B marked.)

MR. LaLONDE: And just for your information, in case Jerry did not explain it to you, there were a couple of additions that would not appear in the table of contents, and something that was removed as well that I went over with Jerry.

MR. PILSK: On the record?

MR. LaLONDE: It was off the record. I can tell you what it is again whenever you want me to.

MR. PILSK: That's fine.

MR. LaLONDE: I didn't have that information.

MR. PILSK: I did want to clear up these two





documents just to identify them.

MR. LaLONDE: Right.

Q. (BY MR. PILSK) So let me hand you Exhibit 7 and Exhibits 7A and 7B, okay. And ask you to just identify Exhibit 7A?

A. Exhibit 7A is a yield table for the generic three-month bill, three-month T-bill.

Q. Is that a document that you referred to in preparation for today's deposition?

A. Yes.

Q. Okay. And was it provided to you by counsel in this case?

A. No. It was provided to me by me, my people.

Q. Okay. For which topic did you prepare that document -- the 1.d or the 1.g?

A. Oh, the 1.g, I believe. Is that the rates of return?

Q. Yes. Okay. And if you could just identify 7B?

A. 7B is a historical yield curve.

Q. And did you prepare that document?

A. Yes, my people did.

Q. And for what topic was that prepared?

A. The 1.g, the rates of return.

Q. Okay. Okay. Why don't we turn first to the

1.d topic, the investment -- I forget it myself -- investment, distribution, and accounting, is that right?
A. Right.
Q. Investment, distribution of the payments.
A. Uh-huh.
Q. Let me back up and ask you another general question. Did you read everything in the three, in Exhibits 6, 7, and 8?
A. Pretty much. I either read it or scanned it.
Q. Okay. With respect to the 1.d topic -- investment, distribution, and accounting of payments -- do you recall, were there any documents in particular that you relied on to inform your knowledge?
A. Not in particular.
Q. Okay.
A. I mean, I just scanned everything in there.
Q. Okay. Okay. Sorry. Bear with me just one second. Keeping on 1.d for awhile, can you walk me through the process, the investment process? That's a general -- that's what I'm going to ask you about. And ask you first, how often was money deposited into the trust account, do you know, during the Tranche one? All these questions are during the Tranche one period.
A. And I have to ask you to be a little bit more specific than that, because from what I researched





through the binders, the process changed through the Tranche One periods.
Q. Okay. Why don't we -- I was going to ask about that. So why don't we start with the first Tranche One period.
A. Okay.
Q. Or I'll ask you to group it.
A. I need to refresh my memory on that.
Q. Okay --
A. Let's -- we're going to need to be really specific.
Q. Absolutely. Which notebook do you need?
A. I think maybe this one.
Q. Which is exhibit -- that's Exhibit 7?
A. This is the one with the statements in it, correct.
Q. Okay, Volume 2, Exhibit 7.
A. Right. So let's go a tranche period at a time.
Q. Okay.
A. So what's the first one? 1976?
Q. Okay. First, why don't you -- wait a minute.
A. Do you need this back?
Q. Oh, I see you have the first page. Okay. So we have opened up Exhibit 6 -- excuse me -- Exhibit 7?





A. Exhibit 7.
Q. And we are now looking at the tab that says fiscal year 1976, and you could turn to the --
A. Yes.
Q. -- first page of that exhibit or that behind fiscal year '76, and just tell me, identify for me the document or collection of documents that is behind the tab, "Fiscal Year 1976."
A. What is behind this tab, "Fiscal Year 1976," is a Bureau of Indian Affairs summarized statement of account. Osage Nation, Account number 7386, fiscal year 1976. And what I understand this to be is an Arthur Andersen agreed upon procedures findings report. This is not an actual statement from the system. This is the Agreed Upon Procedures Statement.
Q. Okay. And just to keep things straight, the Agreed Upon Procedures Report, is that what the final title was of what we referred to earlier as the 1972 reconciliation project?
A. That's my understanding --
Q. Okay.
A. -- from these binders.
Q. Did you look at any account statements or accounting information about the Osage account, this account number 7386, that were contemporaneous with the





Tranche One period, that is, any documents actually from 1976 or '77?
A. Let me look in here. No.
Q. Okay. So, your analysis of the investment activity and Tranche One period is based on the Agreed Upon Procedures Report that's here in Exhibit 7?
A. Right, what's in here.
Q. Did you look -- the Agreed Upon Procedures Report is quite large. Did you look at any other parts of the Agreed Upon Procedures Report or simply what is here in Exhibit 7?
A. Here, what's in Exhibit 7.
Q. Okay. Okay. I interrupted you to get those foundational questions out, and you were going to explain to me, I think the question was how often was money deposited into the trust account?
A. During the Tranche One period?
Q. During the Tranche One period, during the 1976 period.
A. The Tranche One period, I need to refresh my memory, what month is it?
Q. I was afraid you were going to ask that.
MR. LaLONDE: If I can, through discussions with Jerry Rothrock, I mean, the actual period of time is, I believe it's January 1976. But that's the

production period, so what we've been looking at is the month following the production, to look at the receipts that were coming in for the previous production month. So it would be February 1976.

THE WITNESS: Okay.

MR. PILSK: Right. Thank you. And that is how we have been doing it, and in fact, in some cases we trail a couple months after the month of production to catch --

MR. LaLONDE: Right, that's what we have been trying to do as well.

THE WITNESS: Okay. For some reason this copy has this end of the page cut off.

MR. LaLONDE: It should be green tabbed, which we were able to do at least.

THE WITNESS: There we go, February 1976.

Q. (BY MR. PILSK) What page? Is there a page reference in the bottom?

A. Page 27. Now, the trouble I'm going to have is the page is cut off, so I don't know when February starts and ends.

Q. Well, my copy doesn't seem to have that. Well, mine does have that problem.

A. So because your question is how many in that tranche month, and to count all the receipts, I would





need to know when the February starts and ends.

Q. My question wasn't how many, but how often were deposits made -- daily, weekly, monthly?

A. I would have to look here, though. I would have to look here and say, okay, it appears that they were made.

Q. As I look at my version of Exhibit 7 on page 27, my 27 is clear. I can see the month, day, and year reference in the far left hand corner.

A. For the whole month?

Q. Well, no. Let me finish, because what I'm saying is that it appears that the way this is divided up is that each row of dotted lines across the page separates a day.

A. Oh, I'm misunderstanding your question. So, your question is if the deposit came in daily, you would make it daily?

Q. Right.

A. You wouldn't hold it and make it once a month or once a week or --

Q. My question was very general. As a first instance, were deposits made daily when they were received, or were they held for a period of time or how did it work?

A. From what I can see here, they were made





daily. They were made when they came in.

Q. Okay. And who -- do you know where -- well, let me, I want to work back as I understand what you know about through the chain of payment. These are oil and gas royalties in this account, is that correct?

A. Correct.

Q. And that's what we're interested in mainly. So an oil producer or purchaser, for example, will buy oil and send a royalty check in to the Osage Agency, is that correct? Is that your understanding?

A. A royalty check or a wire. You can see wires in these binders, too.

Q. Okay. So the purchaser or the lessee will make a royalty payment --

A. Correct.

Q. -- by some means to the Osage Agency. Do you know what the Osage Agency did with that payment?

MR. LaLONDE: Let me interject an objection here, in that, this particular question, which seems to be more on the deposit side, is outside of the scope of what we have asked Ms. Williams or presented her to be. However, if she has, if she can't testify to that as our designated 30(b)(6). For point of clarification, to the extent she has her own personal, factual knowledge of that, she is allowed to answer it.





MR. PILSK: And I understand, and I understand why you have to make that objection. And my purpose is not to try to -- I want to know where her topic begins and ends in the terms of the chain of payment when the investment function kicks in, so I understand.

Q. (BY MR. PILSK) Did the Osage Agency, do you know, were they the entity who deposited those payments into the trust account?

A. I don't know.

Q. Okay. Do you know whether -- do you know who, which entity deposited payments into the trust account?

A. I don't know.

Q. Okay. Do you have any knowledge of how long it was, if there was any lag between the time a payment was received and the time it was deposited into the trust account?

A. I don't know.

Q. Okay. Your testimony in this case really picks up when the money was deposited in the account, however it got there?

A. Correct.

Q. Is that fair? Okay. We are -- do you know whether -- were oil and gas royalty payments and lease payments segregated in any way within this trust account, or were all funds in this trust account treated

the same?
A. From what I can see from the statements, all funds were treated the same.
Q. Okay. And let me ask you generally, from looking at this statement from fiscal year 1976, what did you learn about the way that oil and gas payments were invested, distributed, and accounted for during this Tranche One month or period?
MR. LaLONDE: I'm going to object to the vagueness and the breadth of that question. It's very broad and calls for a narrative answer.
But you can go ahead and answer that question.
Q. (BY MR. PILSK) Well, let me break it down.
A. Please.
Q. It was a broad question. How was -- how were the proceeds, payments for royalties on oil and natural gas, invested during this first Tranche One month?
A. It appears they were invested in government securities.
Q. Okay. And how can you -- how do you tell that?
A. And CDs. And the way I am telling that is the transaction description, excuse me, during the Tranche One months, says government security and CD maturity.
Q. Okay. Can you point to an example of that





page reference?
A. Page 27, at the very top of the page, if you see 2/15/76, that date, you have some transactions there that say government security and then investment earnings government security.
Q. Okay. Let's take a second, and again, I apologize for not being an accountant, but can you walk through these transactions and just explain to me how to read this document?
A. Okay. The first field is your date, your transaction date. The next field is your document number.
Q. Do you know what that refers to?
A. It refers to the type of document that is being used. For instance, this is an AW. It's an investment receipt.
Q. Okay.
A. Document Bates number, I happen to remember that from my Arthur Andersen days. I think it was some type -- I remember it as a control number that they were using on the documents.
Q. Okay.
A. Receipt code, I don't remember. This isn't something from the finance system. This is something else --





Q. Okay.
A. -- from Arthur Andersen that I don't remember. Exception number, that must be from an Arthur Andersen thing. Transaction amount, that is the amount of the transaction. Transaction description, that would be out of the finance system. That would have been whatever was typed in. Fund balance, now this is now something that Arthur Andersen is calculating, I believe, in their statement. And then amount invested by BIA, this is a calculation from Arthur Andersen, and then they're calculating the cash balance.
Q. Okay.
A. Fund balance would be the entire amount of the balance versus the cash balance. You can see it showing that it's over-invested. The cash is over-invested, but there is an actual amount, a fund balance of the account.
Q. Okay. Now, in this first line, are they -- they're -- this is a purchase of a government security?
A. No, this is a maturity of a government security. This is money coming in.
Q. Okay. So $253,977.25, that has been invested in a government security?
A. Is maturing.
Q. Is maturing, and is now coming into the funds?





A. The fund, with $265 -- I mean $295.16 in interest coming with it, from the appearance of the transaction, since they're together.
Q. Okay. And then, okay. I guess I'm trying to follow. The fund balance is going -- oh, I see. It goes up?
A. It should only go up by the interest, because the security is just coming out of the fund balance and going into cash.
Q. Okay.
A. So it should only go up by the interest. That's the only real increase to the fund.
Q. Okay. And so, for example, on the first line, there's a fund balance of 7,024,977.25?
A. Uh-huh.
Q. And then the next line shows interest of 295.16 coming in?
A. Uh-huh.
Q. And without doing -- I'm just adding up the cents on this. You go from 25 cents plus 16, it takes you to 41 cents. Okay. And then the amount invested column doesn't change, because you've taken the money out, and there's no change by the interest payment.
A. Uh-huh.
Q. And the cash balance, however, does change,

because now you have added in that interest payment, okay.

A. Right. Then you come down, and you've got -- well, I don't know. You can ask me what else you want to know about.

Q. Okay. Could you tell from here what exactly the government security, how exactly the money was invested?

A. I'm sorry. The term, is that what you're saying?

Q. Yes.

A. No, not from this.

Q. Okay. Were you able to determine the term of investments for royalties received relating to the Tranche One, to the first Tranche One month?

A. No, I was not. There were no other reports in here, other than this, that would have listed the detail behind, what was that.

Q. Okay. Earlier today in reference to the current, your current job --

A. Right.

Q. -- you mentioned that there was a ledger, and this was with regard to overnighters, a ledger that was kept showing the overnighter investments. Do you know, back in the Tranche One months, first Tranche One month,





whether there was a separate ledger or accounting that kept track of how the trust fund was invested, whether overnighters or CDs or government securities or other, any investment?

A. In these binders there were references to investment reports, but I can't recall right now whether 1976 Tranche One months was one of the periods.

Q. Okay. Do you recall where those references were?

A. Oh, this is all reports. I need to see those other binders and see if I can thumb through them a little bit. It wouldn't have been this one. It would have been one --

Q. That's Exhibit 8, and let me get you -- Exhibit 6 is also right there.

A. Oh, maybe this one. Hold on a second. This might be the one right here. 1976 investment report. This investment report claims --

Q. Can you tell me what you are looking at?

A. I am looking at, this is PLF Exhibit 8, and it is behind tab four, and it's the Bureau of Indian Affairs Investments, Fiscal Year 1976 Report. Are you there?

Q. Uh-huh.

A. Okay. If you go to page 7, it says reports





furnished tribes.

Q. Uh-huh.

A. It claims that it is giving reports to tribes, concise monthly statements, and then I don't know what's in that. You know, if -- because all I have here is the Arthur Andersen report --

Q. Okay.

A. -- I don't know if there's a report out there that would have showed it.

Q. Okay. So sitting here today, you can't tell me the terms or any of specific details about the investments that were made to the Osage trust funds during the first Tranche One month?

A. Right, but I remember reading here that there might have been a report.

Q. Okay. Do you know what documents Arthur Andersen relied on to generate their report that's attached to Exhibit 7 that we have been looking at?

A. To generate this?

Q. Yes.

A. I don't know.

Q. Okay. Do you know what the rate was, the return on the investments made for the Tranche One months?

A. No. For this Tranche one month?





Q. Yes.

A. No, not for this '76 month.

Q. Okay. Do you know if any documents exist that memorialize what the first -- what the investments -- what the terms of the investments made for the first Tranche One month proceeds?

A. Let me clarify that. This report --

Q. What are you --

A. I'm sorry.

Q. You need to identify what you are pointing to.

A. The report we were just looking at.

Q. Behind tab four?

A. Behind tab four in exhibit --

Q. 8?

A. -- 8 claims an overall tribal rate which Osage would have been part of.

Q. Okay.

A. But not a rate specific to Osage.

Q. Okay.

A. So the only rate of return that I was able to pick up from research for 1976 overall --

Q. Uh-huh.

A. -- which would include the Tranche month is this one.

Q. Okay.

A. Is 6.4 percent.
Q. Okay. And do you know, is that number -- were all tribal funds invested receive 6.4 percent, or is that an average, or do you know?
A. That this would be an average rate. From what I can pick up in this report, from the reading of this report, this is some type of average rate --
Q. Okay.
A. -- of all the trust funds, the tribal trust funds.
Q. Okay. So you're not able to say what specific rates the Osage funds got for any specific period of time?
A. No.
Q. Okay. Do you know of any documents that exist that would indicate the specific rates that the Osage funds got for any specific period of time during the Tranche One period?
A. During the Tranche --
Q. The first Tranche One period.
A. The 1976 Tranche One, no.
Q. Okay. Looking back at the statement of account for fiscal year 1976 -- and we can stay on page 27 if that's convenient.
A. Okay.





Q. First, can you explain why there's negative cash balances?
A. It appears that if you go to the page before --
Q. Page?
A. Page 26, and I can't see the date, the whole date, but that, the day right there that ends on page 26.
Q. Something?
A. The second transaction.
Q. Uh-huh.
A. There's a government security purchase that is for 253,977.25.
Q. Uh-huh.
A. There was only 213 in cash, so it over-drafted the account.
Q. Okay. My -- well, let me ask you this. From an accounting point of view, you shouldn't purchase checks -- purchase securities for which you do not have the money to pay for them, is that correct?
A. That's correct.
Q. And my question was, do you know what caused, why, what caused someone to purchase a security for more money than was available in the account?
A. No.





Q. Do you know, are you aware of any documents that might explain that?
A. No.
Q. Okay. Turning, starting at the bottom of page 28 when the cash balance goes positive again --
A. Uh-huh.
Q. -- and stays positive for a couple of pages, do you know why money remained in cash as opposed to being invested?
A. In general?
Q. Yes.
A. In general, from reading the binders, money would stay in cash as opposed to being invested, because it was about to be used for annuity payment.
Q. Okay. Do you know anything about the process by which the exact amount of cash that should be available was determined?
A. They are the annuity calculation. There was a process to determine how much the annuity calculation would be.
Q. Okay.
A. And, I mean, I can't recite it, but I can find a copy of it in here and go through it.
Q. Okay. It is in these Exhibits 6, 7, and 8?
A. I don't know that it ties to exactly the





Tranche One periods, but there's copies of the annuity -- an annuity calculation in here.
Q. Do you know -- and again this is, for present purposes, all my questions assume that we are in the first Tranche One month.
A. Okay.
Q. Okay. Do you know if the securities purchased or the investments made were calibrated in a way to maintain the maximum amount of funds invested and to adjust the terms to the duration of the investment so that cash would be available in time to make the disbursements? I guess more generally my question is, do you know if there was a policy to attempt to maximize the amount of funds invested at any given time, but in order to make the funds available for disbursement at the time that they were to be disbursed?
A. I need to -- just give me a minute. I need to refresh my memory. I went through several of these statements, and it did appear that that policy was there, but I need to make sure it was for 1976 --
Q. Okay.
A. -- Tranche month.
MR. LaLONDE: And just for a point of clarification, if you recall, the red tab is what we understand, though it's still subject to some

verification, when the annuity is, just for purposes of expediting and getting to that point.

THE WITNESS: Okay.

MR. PILSK: How we doing on tape, by the way?

THE VIDEOGRAPHER: We are 15 minutes away. Actually in ten, I'll change it.

THE WITNESS: I would say it does look like that.

Q. (BY MR. PILSK) Okay. Where are you?

A. I skipped the red tab, because the green tab is February, and these pay out quarterly, and the February receipts we would have paid out in March, and if you look at 31 --

Q. Okay. Just one moment. Okay.

A. -- see how you see all these maturities happening on the same day that the disbursement for the annuity is happening -- well, let me explain, that that's what you're seeing on page 31.

Q. Uh-huh.

A. All these readings are investment CD maturities.

Q. So when I see the funds in the transaction amount when there are numbers that are not in parentheses, those are deposits?

A. Yeah, those are positives. Those are AWs and





those are positives. So on that same day, all these positives are coming in maturing at the same day that the disbursements start happening for the annuity. And that would lead me to believe that somebody in that time, timed them to happen that way.

Q. Okay.

A. Was that your question?

Q. Yes.

A. Okay.

Q. And my next question is, that, though, is -- did you come across a statement of that policy, that that was the policy of investment during the first Tranche One month?

A. I don't know that I came across a statement of that policy. I just think I saw it --

Q. Okay.

A. -- happening.

Q. Okay. Other than inferring --

A. As we're talking, can I thumb through these binders.

Q. Absolutely. Why don't I stop and let you take a look.

A. What's in here that might be germane to what your question is, statements that if we don't have investment instructions from tribes, we're going to





reinvest their funds. We're letting them know that, because it's inefficient for us and we could -- they could possibly lose earnings. If they haven't been timely in giving us their investment instructions, we're going to reinvest them. There are statements in here like that.

Q. Who made those statements?

A. Let's see. There's one here. Let's check this one. 19 --

Q. Which binder are you in?

A. I am in Exhibit 8. So it's Volume 3 of 3. Hold on. That's the wrong one. Hold on. That's not the one I was thinking.

Q. What tab? I will let you see if that's it.

A. Darn it. I can't find the actual letter that's the mailgram. Well, I thought I had read this somewhere. Maybe it's in one of these investment reports. I'm going to have to look for it.

Q. Well --

A. I know I read in here that they had made the decision, that if they didn't get timely investment instructions, they were going to go ahead and roll the funds again just for 30 days.

Q. Okay. Let me back up, and we can come back to this in a minute.





A. Okay.

Q. But can you explain generally -- and again, we're talking about the first Tranche One month to start with -- who decided how to invest the money in the account? And I mean, was the tribe directing specifically invest this amount of money in this kind of instrument, or was someone in the Bureau making that decision?

A. From what I gathered in the documents, it was a combination of the tribe and the BIA, because there's documents throughout these binders of the intent to get a lot of tribal input in the investment of funds. Now, I don't see documents showing that there was a lot of tribal input, just memorandums directing people to get, you know, that it's the policy to get tribal input.

Q. Okay. Do you know who made the actual decision of how and when to invest funds in the account?

A. No, because all I have is this statement --

Q. Okay.

A. -- for that first Tranche One month.

Q. Okay. So for this month, it just tells you that an investment was made?

A. Right.

Q. But you don't know who decided?

A. Who, no. All I have for this month is this

statement.
Q. Do you know if there are any documents that would show who decided to make any specific investment?
A. There should be for that time period, just like there is for current time period, actual source documents that show who authorized transactions.
Q. Okay. Have you seen any of those documents?
A. No.
Q. Do you know whether those documents exist?
A. No.
Q. Do you know if anyone has looked for those documents?
A. I don't know.
Q. Okay. And you did not rely on those documents, obviously, in preparing for this deposition?
A. No.
Q. Okay. Do you know if there was, assuming there was input from a tribe on a given -- or be specific, from the Osage on a given investment, and for whatever reason the appropriate official at the Bureau disagreed with what the tribe was requesting, you know, felt that it was not in the best interests of the tribe, do you know whose decision would prevail, that is, which investment would be made -- the one the tribe was recommending or the one that the Bureau official was





recommending?
A. From these documents, no, I don't know the answer to that.
Q. Okay. Do you know the answer to that from some other way, other than just these documents?
A. No, not for that time period.
Q. Okay. Do you know the answer, for jumping ahead on this, for later time periods?
A. No, not for the Tranche One.
Q. What about after the Tranche periods?
A. You mean for like right now?
Q. Yeah.
A. If you jumped out of 30(b)(6) and back into fact.
Q. Okay. For purposes of this answer.
A. For purposes of this answer and you jump back into fact, it's the government's decision.
Q. Okay. Do you know -- and trying to work backwards?
A. Unless you withdraw the funds under the Reform Act.
Q. Do you know whether that rule, that it's the government's decision ultimately of how to invest trust money, was established at any point in time?
A. I don't know.





Q. Okay. So you don't know how long that rule has been in existence?
A. No.
THE VIDEOGRAPHER: Five minutes remain on the videotape.
MR. PILSK: Okay. Why don't we go off the record?
THE VIDEOGRAPHER: We are temporarily going off the record at 2:14 PM.
(Recess held from 2:14 to 2:33 PM.)
THE VIDEOGRAPHER: This is Volume 2, tape two, in the continuing deposition of Margaret Williams. We are back on the record at 2:33 PM.
MR. PILSK: Okay. Did you want to take a statement, Martin?
MR. LaLONDE: No, I think Ms. Williams during the break found the memo that she was looking for earlier. I just wanted to --
Q. (BY MR. PILSK) Okay. Do you want to identify it by which exhibit and tab number?
A. Exhibit 8, tab number -- well, it's in the miscellaneous correspondence section.
Q. Uh-huh.
A. Tab number 15. And it's a memo dated October 2nd, 1974, and it's stating that "Absent timely





notification of what to do with the maturing investments from late arriving investment instructions, then it would automatically be reinvested for 30 days."
Q. Okay.
A. That's the memo I was talking about.
Q. Okay. Do you know whether there were any other memos or directives, if that investment, 30-day investment, might make funds unavailable for distribution, for a quarterly distribution?
A. I'm sorry.
Q. My question is, we talked earlier about the fact that you at least would like to, and it appears at times it was the case, that investments were timed to mature immediately prior to the time to make a quarterly distribution?
A. Uh-huh.
Q. And was there any -- did you find any refinement of the policy you mentioned, the 1974 policy, that called for reinvestment for 30 days?
A. Not that I can recall.
Q. Okay. Did you make any attempt, for this first Tranche One month, this 1976 period, to determine the duration of the different investments?
A. Could you say that one more time?
Q. Did you make any attempt to determine the

duration of the different investments during this first Tranche One month?
A. No. There were no reports that I could find here that would have allowed me to do that.
Q. Okay. Just looking at the face of this document, the statement of account for that 1976, is there information in here that would allow you to determine the duration or term of any particular investment?
A. No.
Q. Okay. And what about the rate of any particular investment?
A. No.
Q. Okay. During this first Tranche One month, were overnighters used?
A. No.
Q. Okay. Could you tell for how long money was kept uninvested before it was invested?
A. I can't tell how long it was kept uninvested, because -- well, I might need you to clarify that term, because my understanding for the time period before the overnighter investment was available, is if funds were uninvested, there was a four percent interest rate that could be charged to Treasury for that time period.
Q. Okay.





A. So --
Q. So, let me walk through a sample payment and make sure that I understand.
A. Okay.
Q. Let's say a payment or collection of payments that total $100,000 come in on a Monday?
A. Uh-huh.
Q. And deposited into the account on a Monday?
A. Uh-huh.
Q. And my first question was, do you know, were there any policies or guidelines that specified how soon after a given deposit hit the account, that those funds needed to be invested?
A. I didn't see any policies or guidelines in here that said how soon it needed to be invested.
Q. Okay.
A. I could just, you know, review from here and see what happened.
Q. Okay. And did you do that kind of analysis? Did you attempt to determine how long funds were remained uninvested once they hit the account?
A. Not extensively other than looking at, you know, just reviewing transactions and seeing that funds would be receipted and then purchased into government securities and CDs.





Q. Okay. Did you draw any conclusions about what seemed, based on your sampling anyway, the length of time between deposit and investment?
A. Actually my conclusions were that they seemed to invest in the government overnighter fairly quickly.
Q. In the --
A. I mean, not government overnighter, government securities or CDs. Sorry.
Q. What do you mean by fairly quickly? Within days or a week or --
A. Yeah, sometimes within a day. Sometimes on the same day.
Q. Okay. Now, then the next question was, in the case of funds that, for whatever reason aren't invested right away --
A. Uh-huh.
Q. -- you testified that they received, that those funds still received a four percent rate?
A. It's my understanding from the reading that they would have been subject to a four percent rate at Treasury.
Q. Okay. And do you recall where in your reading you found that?
A. I just saw it again when I was looking for that memo. Let me look again. Whoops. You better take





these exhibits from me. I almost just ripped that one.
Q. These are yours.
A. There's a memo here that refers to -- Exhibit 8, miscellaneous correspondence, tab 9. I mean, it's not specifically addressing that, but it refers to the four percent rate.
Q. Okay. And from this document behind tab 9 in Exhibit 8, you drew your understanding that uninvested funds still earned four percent?
A. Uh-huh.
Q. Okay. Do you know, could you tell what the process was during the first Tranche One month for deciding which investment, which investment or security to purchase?
A. No. I couldn't tell what the process was to decide which. I could just see that there were purchases into both CDs and governments.
Q. Okay. Do you know whether there was any guidance or system of any sort for Bureau employees to determine which investment, how to invest the funds at any point in time?
A. Could you repeat the question one more time?
Q. Yes. Again, we're still focusing on the first Tranche One month.
A. Right.

Q. And the question was, was there any guidance or policy or system of any sort to guide Bureau employees in deciding how to invest the Osage trust funds?

A. I did not see anything in my research.

Q. Okay. Are you aware of any guidance that would apply for this first Tranche One month?

A. No.

Q. Okay. Do you know of any documents that might explain that?

A. Let me check one more thing here before I answer that. Let me check one more thing. The B -- let me reanswer that. There is a BIAM here, again in Exhibit 8. It's the very first. It's tab 1. The guidance that was available during Tranche One is under tab 1 and tab 2, and it's dated 1971 and 1972, but it's very, again, it's very limited.

Q. Okay. I mean, it's --

A. Well, it's just very limited.

Q. Okay. I mean, the documents obviously will say whatever they say. Do you recall whether they provided guidance on how to select?

A. Not how to select. It was more, this is what's available. You can get into Treasuries, bonds, notes, bills. Here's some other obligations. Here's





some farm bonds, federal home loans, debentures, but if you were looking for -- and here's all the -- please, bear with me.

Q. That's okay.

A. I just need to refresh my memory as to what was in these documents. It instructed them on how to buy them --

Q. Okay.

A. -- you know, but not -- are you looking for specifics on how to select one type of security from another?

Q. Yes.

A. Like how you would pick a T-bill from a --

Q. Well, it's several things.

A. -- from a farm loan or something like that?

Q. Right. Or were employees restricted to a certain menu of options or not, and was there any guidance given on what you guide them into choosing one investment over another?

A. No, no. The BIAM didn't get that specific.

Q. And BIAM is Bureau of Indians Affairs Manual?

A. Yes, that's my understanding.

Q. Okay. We touched on this earlier, but I want to make sure we get it on the table explicitly. And again, we're focusing on the first Tranche One month for





now. We know, given an investment matured, what happened next? The moneys obviously that we've seen, the money and the interest -- the principal and the interest were returned or put back into the account?

A. Uh-huh.

Q. And then what was supposed to happen next to that money?

A. Well, in the case of Osage, in the Tranche One month what I'm seeing happen a lot -- and let me -- again, bear with me. Let me look at it. But what you tend to see here is the money get used for the annuity, for the payout on the annuity in this specific case.

Q. Okay. And again, you're looking in Exhibit 7 behind the tab for fiscal year 1976 --

A. Yes.

Q. The statement of account?

A. Yes. Because what I saw in the Tranche One, first Tranche One month, was in the sampling that I did -- again, I didn't look at every transaction -- but in the sampling that I did, it looked like things were timed for the annuity, so that the balance tended to go up on the day of the annuity, and then go way down. So let me see if I can find an example of that.

Q. And by annuity, what are you referring to?

A. The annuity payment to the headright holders.





Q. And how often were those made?

A. Quarterly.

Q. You still refer to it as an annuity?

A. Yes.

Q. Okay.

A. I still do.

Q. As long as we know what we're talking about.

A. I think even the calculation says annuity headright payment.

Q. Okay.

A. Well, in this case we seem to have overdrafted the account but --

Q. Okay.

MR. LaLONDE: Which page are you on?

THE WITNESS: So I kind of overstated my point, but -- 27.

Q. (BY MR. PILSK) Okay. Let me -- still staying with the Tranche One, first Tranche One month, or let's rephrase it and take a point that Martin made earlier.

When I refer to Tranche One month, I'm really, as Martin suggested, referring to Tranche One period. It's the proceeds that were derived from oil and gas production in that specific month, but those proceeds may not have been received into the account until the subsequent month?

A. Correct.
Q. And may have remained in the account uninvested through the next quarterly distribution or annuity distribution time. Is that your understanding as well?
A. Correct.
Q. So, I may interchangeably refer to Tranche One month or Tranche One period, but I'm referring broadly to the period of time when the proceeds from oil and gas production during the Tranche One month were received and in the Osage account. Have you been using the terms in that way as well?
A. Right. As long as we just keep talking about the 1976 month.
Q. Yes, the first Tranche One month is really referring to that January month and the following period of time --
A. Right.
Q. -- when the proceeds from that month are remaining in the account.
A. Okay.
Q. Okay.
MR. PILSK: Have I confused that sufficiently?
MR. LaLONDE: No, that made sense to me.
THE WITNESS: No, if you switch to next month,





just let me know.
Q. (BY MR. PILSK) I will. Still staying within that first Tranche One period, I want to switch topics slightly to another one of the subtopics in 1.g, and that's accounting?
A. Okay.
Q. We have been talking about investment and how the investments are managed, and now I want to talk about accounting. Can you tell me, can you describe for me the process of how the payments are, the payments as they come into the account are accounted for and how the investments are accounted for?
A. From what I can see here, the way they were accounted for is through the old trust fund management system or what you might here refer to as the old finance system.
Q. Okay.
A. And that, in that they were posted into the finance system, the receipt was posted, and then the monies were made available. The security was bought, and then you see the transaction posted again, the purchase, and then when the security matured, you see the maturity posted and the interest posted. And then when the annuity or headright payment was paid out, you see that posted again. And then for the funds that were





transferred for the individuals into the IIM system, you see the transfer posted. And that's the extent of the accounting that I can see here.
Q. Okay.
A. There's narratives, as I pointed out earlier in my testimony, of reports that were sent to the tribes, which in my mind would have been further accountings, but I have not reviewed them.
Q. Okay. Do you know if those reports exist?
A. I do not know that they exist. I have not seen them.
Q. Okay. Did you ask for them as part of your preparation?
A. No. I have not asked for them. Well, I asked for them in terms of, I asked for whatever was available, and this -- I was given what was found in the time before the deposition.
Q. Okay. Are you familiar with the system of manual accounting, manual cards?
A. No.
Q. Okay. Are you aware, was there any other bookkeeping or accounting system parallel to the finance system that you just referred to? Are you aware of any such system?
A. Parallel to the finance system?





Q. Yeah. Another set of books, as it were, that kept track of the account balances.
A. Not the account -- other than the MoneyMax system, Treasury systems.
Q. Okay.
A. There should have been Treasury systems that were tracking cash balances and to some extent some investment balances.
Q. Okay. The MoneyMax system, do you know when that began?
A. I almost hate to say this, but I think there's a memo in here that says when the first fund was put on MoneyMax.
Q. Let me make it a little bit simpler. Do you recall whether it was before or after the first Tranche One month?
A. After the first Tranche month.
Q. So the first Tranche One month period, MoneyMax, that system wouldn't be around?
A. No, no.
Q. Did you look at any --
A. And it wasn't the tribe. It wasn't Osage that was the first tribe that was put on either, if I remember the memo correctly.
Q. Okay. Do you recall when Osage was put on the

MoneyMax?
A. No, that's not in here.
Q. Okay. Jumping ahead, did you look at the MoneyMax statements as part of your preparation?
A. Yes, for some of the -- it's in here for some of Tranche.
Q. Okay, so we'll get to those. Did you look at any Treasury accounts?
A. No.
Q. Did you look at any Treasury accounts for any of the Tranche One periods?
A. No.
Q. Okay. And if there was -- and we've heard testimony from other witnesses --
A. Okay.
Q. -- about a manual card system, you have not seen that system?
A. No.
Q. Or any cards relating to any of the Tranche One months?
A. No.
Q. Okay. Are you familiar with the accounting practices -- and I'll explain that in a minute -- during the Tranche One month, the first Tranche One month? Do you know how account balances were verified? Was there





a system for reconciling accounts or verifying balances?
A. To what?
Q. Well, to the actual balances. I mean, for example, we have seen overdrafts. Do you know whether there was any system to either determine whether there was an actual overdraft, or if that's just an error in the books?
A. Are you asking me if there was any type of reconciliation process in place?
Q. Yes.
A. I don't know.
Q. Have you seen any evidence of such a reconciliation system?
A. No.
Q. Do you know whether there was any attempt during the Tranche One period or generally in the 1976 timeframe to reconcile Bureau accounts with Treasury accounts?
A. I don't know.
Q. Have you seen any evidence --
A. No, I haven't.
Q. -- of such a reconciliation?
A. No, I haven't.
Q. Okay. This is sort of a catch-all question, but was there anything else that you learned about the





investment accounting from the Osage trust account, this account 7386, during the first Tranche One month?
A. No.
Q. Okay. We haven't talked about distribution, but generally, what did you consider when you examined the distribution from the trust account?
A. For the Tranche One?
Q. Yes, for the first Tranche One month.
A. Only the statement.
Q. Okay.
A. So I only reviewed the disbursements here as reflected on the statement.
Q. Okay. And I'm looking at -- just happen to have it open to page 31.
A. Okay.
Q. And there's a number of disbursements at the bottom of the page and a wide range of amounts. Do you know what those disbursements were for?
A. I am surmising that they are for the annuity, given that they are disbursing in March of '76 and given the size of them.
Q. Okay. My date is cut off.
A. I know. So is mine.
Q. Okay.
A. But I'm still getting it's March, because it's





right after February on my statement. Does anybody have a copy where the date's not cut off?
MR. LaLONDE: Yes. Page 31 is March 15, 1976.
MR. PILSK: Okay.
MR. LaLONDE: And just for your information as well, unfortunately these are cut off, but these are available in the Greg Chavarria binders, I believe without the cut off dates. I apologize for that. I didn't realize the copy job had ended up with that.
MR. PILSK: Okay.
Q. (BY MR. PILSK) So this appears to be March, but you're surmising that, based on the date --
A. Uh-huh.
Q. -- and I think you said the amount --
A. Uh-huh.
Q. What about the amounts of the disbursements leads you to believe that these would be annuity disbursements?
A. Only because they are large and they're in March, and they're right after all the securities matured, and it just fits the trend, it fits the trend of the annuity.
Q. You say they are large, but I see three there for $42?
A. These are just transfers over to the other

system. BB documents signify transfers, and they're small. I don't know what those would be.

Q. Okay.

A. There's another small disbursement for $95. Those could be individual payouts of some kind. I don't know.

Q. You said BB, is that a BIA code or --

A. It's a BIA document code that signals a transfer.

Q. Okay. And what is VD in the next sentence?

A. I'm assuming that VD must be a predecessor to a VT, which is a disbursement through Treasury.

Q. Okay. And the AW on the entries above the BB ones?

A. It's an investment maturity.

Q. Okay. Okay. And other than looking at these statements and noting that disbursements were made -- well, did you -- well, what did you do to educate yourself about the disbursements from the Osage account during the first Tranche One month?

MR. LaLONDE: And I'm going to object here. Actually we hadn't, we hadn't named her for disbursements. It was investments and accounting.

THE WITNESS: I might have said distributions. That's my mistake.





MR. PILSK: Distributions. I've been using disbursements. I meant distributions, but that's what I --

THE WITNESS: Was it my mistake?

MR. PILSK: I think that's what you said on the phone the other day, as a matter of fact.

THE WITNESS: I thought you had.

MR. LaLONDE: Yeah, I probably did. I apologize if there's a confusion on that. Go ahead. I'm sorry. You can answer the question.

Q. (BY MR. PILSK) Do distribution --

A. This is exciting stuff, I know.

Q. Do distribution and disbursement mean the same thing?

A. To me it does. I mean, distribution could be a transfer or just, you know, payment right out of the system, interchangeable for me.

Q. Okay. When you were going through this, did you not consider anything listed as a disbursement because it was not a distribution?

A. No.

Q. Okay. And tell me, what did you do to -- let me reask the question.

A. Okay.

Q. What did you do to educate yourself about the





distributions from the Osage account during the first Tranche One month?

A. Just review the information in the binders to see if the disbursements were materially different than they are right now.

Q. Okay. And what else did you look at besides the statement of account for 1976?

A. I need to review these other binders. Basically, the only thing that I looked at was the annuity calculation to see if it was materially different than it is right now.

Q. And is it?

A. No, it really isn't.

Q. Okay.

A. Do you want me to find it?

Q. No, that's okay.

MR. LaLONDE: Let me just object. I just need to clarify this again. I do believe we said only that she was designated for investments and accounting. Did I -- I wish I could go way back to the beginning of this deposition. I thought that's what -- and I apologize for the confusion.

MR. PILSK: Well, I can tell you my notes from our conference the other day when we talked about the coming week indicated investment, accounting, and





distribution. That was my understanding going in.

MR. LaLONDE: Okay.

MR. PILSK: But let me ask you this, is there another designee who is going to talk more specifically about the annuity?

MR. LaLONDE: That's why I'm a little confused. The only reason I raised this is that I had this binder put together, and if Ms. Williams was going to be testifying to disbursements, I would have printed off the documents or had printed out the documents that are listed here as Bates numbers. And she wasn't provided, which is telling me that we were never thinking she was going to be --

MR. PILSK: Is there another witness?

MR. LaLONDE: That I don't know. But you can go ahead. I mean, she obviously has done some work on this. I'm just saying there was a document that we would have prepared.

MR. PILSK: Okay.

THE WITNESS: I am limited. All I did was review the annuity calculation to see if it was different than it is right now.

Q. (BY MR. PILSK) And by that you mean you actually reviewed the methodology?

A. Right.

Q. You didn't double-check the actual calculations?
A. In each one of these, no. I reviewed -- there was a couple, maybe -- there's at least one, possibly two documents in here that showed the methodology or actually show an actual calculation. I don't recall whether they tie to a particular time period or if they are just a calculation somewhere along the way. I reviewed them to see if they are materially different than what we do right now. They are not. That's the extent --
Q. And you didn't -- did you attempt to test the accuracy of any specific disbursement?
A. No, no, not on any of the Tranche months. I did not pull any documents or test any of them.
Q. Okay. So if there were an error in the calculation -- in the annuity distributions or any other disbursement reflected in the statement of account, you wouldn't know that?
A. No, no.
Q. Okay. Did you -- could you tell, is the four percent interest that Treasury pays on otherwise uninvested funds reflected anywhere in the statement of account?
A. In this one?





Q. Yes, for the first Tranche One month, the 1976 statement of account.
A. No. No.
Q. Okay. Is there any way of knowing whether the four percent was paid to the tribe for that month, for this first Tranche One period?
A. I ran across a document in here -- well, no, that's not -- that's different. That's a different time period. I don't recall. I'm getting the time periods mixed up here now.
I actually have to search through here, but the four percent would have been paid semi-annually, if I remember correctly. And I don't remember reading a document that told me when, you know, if they had an actual schedule of when they paid it -- I mean when they billed it and then when they got it. So we would actually have to look through here and see if we could find a four percent.
Q. Would you -- is there a particular description or a code that would indicate that it was the four percent Treasury interest payment as opposed to some other?
A. It would, it would have to be different. It would have to come in with a different code.
Q. Okay. Well, let me ask you --





A. It would have been semi-annual, so, you know, it would be something we wouldn't see on a monthly basis.
Q. All right. Now, let me ask you this, if, assuming such payments were made during the Tranche One month, would you expect them to be reflected in the statement attached here to Exhibit 7?
A. They would have to be. I mean, I would expect them to be reflected. If they had affected the balance, I would expect them to be in the statement.
Q. Okay.
A. As you're talking, I'm going to just keep kind of cruising through it and see if I can find one.
Q. Okay. And Martin maybe or both -- is this, this statement that's attached to Exhibit 7, is not for the entire -- is it for the entire year?
A. It should be. It said fiscal year on the front of it.
Q. Yeah, I guess it does, by the end of September.
A. I mean, it says fiscal year 1976, so it should.
Q. Yeah, okay. All right. Now after -- if you look after page 45 --
A. Uh-huh.





Q. -- there's a page that's printed normal, vertically instead of landscape mode or horizontally.
A. Okay.
Q. Can you tell me what this page is?
A. It says Bureau of Indian Affairs, summarized statement of account, fiscal year 1976, transition quarter.
Q. Do you know what that means?
A. I don't know what that means.
Q. Do you know what this page is showing?
A. You know, I don't. The bottom says the accompanying Agreed Upon Procedures dated December 31st, 1995 should be read in conjunction with this statement --
Q. Right.
A. -- dated December 31st, 1995.
Q. That refers to some internal documents in the Arthur Andersen Agreed Upon Procedures Findings Report.
A. Okay.
Q. Okay. Okay. Is there anything else that you learned about the investment and accounting distribution of Osage proceeds for oil and gas payments during the first Tranche One month that we haven't talked about?
A. No.
Q. Okay. In the course of reading through all

the material, is there anything else that you learned about the first Tranche One month relating to the subjects that you were asked to testify about, that you can think of?
A. No.
Q. Okay. Why don't we turn now to the next Tranche One period, which is the 1979 year. And first, behind the 1979 tab, there's some additional documentation, and if you could walk me through, there's one, two, three tabs or sets of documents for this Tranche period, the second Tranche period.
A. Okay.
Q. If you just walk me through each set of documents and identify what they are.
A. Okay. So the first tab you have got your Arthur Andersen statement, like we had for the 1976.
Q. Okay. And is this the same format and information --
A. Yes.
Q. -- as in the --
A. Yes.
Q. Okay.
A. But then for this year, 1979, for the -- and what is the Tranche month again?
MR. LaLONDE: It's May of 1979.





MR. PILSK: It's May.
THE WITNESS: So shouldn't we be looking for June, for the production month, I mean, for the receipts? If we really want to be -- well, might be jumping ahead. Let me just tell you what you have got here. That's what you asked me, okay. You've got your statement, and then what you are seeing next are the summary and detail of trust fund reports. Those are actual statements with the actual statements that were issued from the old finance system.
Q. (BY MR. PILSK) Okay.
A. Okay.
Q. Now, as I'm flipping through, it looks like behind, there's green slips of paper in mine.
A. Okay.
Q. I think in yours, as well.
A. Okay.
Q. That separate months.
A. These are just the different months. This is a cumulative report for the year. So if you have a May 1979 report and then a July 1979 report, July is going to have your main data.
Q. Okay. Now, there's no report for June?
A. But your June will be in your July.
Q. Okay.





A. You just won't have your June balances. I mean, the only thing you're going to be missing is your as-of June balance --
Q. Right.
A. -- with your July report.
Q. Okay. Is there any -- I mean, as I flip through the page, it looks like there's a lot of line-by-line detail of amounts of payments.
A. Uh-huh. This is transactional activity.
Q. Will the July report include the daily transactional activity for June?
A. Yes.
Q. Okay. So it is truly cumulative?
A. Yes.
Q. Okay. I see.
A. So if you keep on flipping -- I'm sitting in May, but if you keep flipping, you should start hitting your June transactions. Okay. There they are.
Q. Okay.
A. What's behind this next one. August is in there, too.
Q. Let me just stop you for a second and go back to these same three -- May, July, and August funds. Can you tell from looking at these documents when they were actually prepared, when these papers were actually





printed?
A. No.
Q. Okay.
A. No. No.
Q. But you understand this data to be from the finance system?
A. Yes.
Q. It's contemporaneous. This was the real data as of the time, as of the first page, May 31, 1979?
A. Right. And this was the actual statement that would have gone to the tribe.
Q. Okay. Now, I'm sorry. I cut you off. You went to the next tab, which is investment reports, May 1979.
A. Right. And what this is is -- these are investment reports which show detail investment information. Well, this would be the detail to support what's in the summary in detail of trust funds.
Q. Okay. I apologize. I just realized there was a question that we got side-tracked on, and I forgot to ask you about the first Tranche One month.
MR. LaLONDE: There's no going back. Once you get past your --
MR. PILSK: Well, I'm asking the same question about the second one.

Q. (BY MR. PILSK) And it relates to -- we got side-tracked because we were talking about the four percent interest and how you can tell whether those payments were credited to the account. And my question is, there has been testimony about an issue that goes by several names, but disbursal lag time is one of them, that at some point a check is cut or that a payment, a disbursal out is posted on the account. But there may be a period of time before the cash is actually withdrawn, before the check is deposited and cleared into the account, and the question of what happens to the interest on the money that's still in the account during that interim period.

Are you familiar with this issue at all?

A. I read about it in here, and I'm not -- I think I -- you mean, the money's not still in the account, though? You mean the money hasn't cleared Treasury yet.

Q. Well, that's part of what I'm trying to understand.

A. Okay.

Q. That's the issue.

A. Okay. Yes, I'm familiar with the issue.

Q. Okay. And I'm trying to understand how it might have happened.





A. Okay.

Q. And so let me first ask you that, as part of your review of the investment and accounting and distribution practices --

A. This would be on the distribution side?

Q. Right. Did you look into that issue at all? Did you consider that as part of your analysis?

A. I don't consider it an issue, so I didn't -- I mean, I saw that people thought it was an issue.

Q. Why don't you consider it an issue?

A. Because we're following standard industry practice, and I think I might be mixing up my fact with my 30(b)(6) too. What we do right now -- jumping into my fact -- the way we treat the accounts right now and the way we post disbursements is basically standard industry practice, so I don't consider it an issue.

Q. Okay. Let me -- go ahead.

A. But I understand, from reading prior depositions in even other cases, that it's come up as an issue.

Q. Okay.

A. And I read somewhere in here, I think, that it was an issue.

Q. Okay. When you say standard industry practice, do you mean GAAP?





A. No. Just standard industry trust practice of, you know, you've disbursed funds out of an account so you post the disbursement.

Q. Okay. And is there -- how do you know it's standard industry practice, is there a trust guidance that's out there, that either FASB or some other accounting board publishes or is there a similar organization for trust accounting?

A. We've checked with them, our trust system provider, to see if other trust organizations try to time the clearing of the checks through the banks with the D investment. Also our management comes from private sector trust and has said, no, we've never tried to do that. And then we have also thought about, well, you know, since it seems to be an issue or in the past it had seemed to be an issue with the tribe, we thought about the logistics of, well, would we try to do something different than what the industry would do -- not GAAP but the trust industry -- how would we go about trying to do it? And so we've thought about the logistics of that, too, and just decided that there probably wasn't a way to do it, because the trust systems wouldn't handle it, wouldn't be able to handle the talking back and forth with Treasury of trying to time when checks were clearing.





Q. Okay. Do you know whether that -- and I'll just continue to use the term the lag time issue or the, just disbursal accounting -- was done in accordance with industry standards during the first Tranche One month?

A. I don't know.

Q. Okay. Did you see any documents that would tell you one way or the other?

A. No, I didn't see anything in here that would tell me one way or another.

Q. And do you know, if in fact interest was earned on funds that have been -- where disbursal had been posted to the tribal account, but the funds had not been withdrawn from Treasury, do you know what happened to any interest that accrued on those funds?

A. No. I don't know that interest accrued on those funds, and I don't know -- I mean, I don't know that interest accrued, so I don't know what would have happened to it had it accrued.

Q. Okay. Were you able to tell that, assuming that there was money like that and assuming -- well, whether the four percent was applied to those funds, the Treasury four percent?

MR. LaLONDE: Objection, vague question.

MR. PILSK: You can answer if you understood.

THE WITNESS: I just -- I need you to ask it

again. I'm sorry. It got --
Q. (BY MR. PILSK) Sure, absolutely. Assuming that there were funds, money still in the Treasury account?
A. It hadn't cleared Treasury. It had posted out of the tribal trust account, so it was no longer invested by the Bureau.
Q. Right.
A. Okay.
Q. But --
A. But it hadn't cleared Treasury.
Q. Hadn't cleared Treasury, do you know whether Treasury was still paying the four percent?
A. I don't know.
Q. Do you know of any records that would indicate one way or the other?
A. I don't know.
Q. Okay. That was what I wanted to know about going back to Tranche One. Now we can move back to Tranche Two.
A. Okay.
Q. I think you were going to explain what's behind the investment reports tab.
A. Okay. The investment reports tab are the detailed investment reports that were available in that





time period.
Q. Okay. Are these reports, as you understand, are these contemporaneous, that is, these were issued during that --
A. Yes.
Q. Do you think from what system they were printed?
A. That I don't know. I could not tell from the documents here.
Q. Do you know who in 1979, during the second Tranche period, what Bureau or division branch section kept track of trust fund investments?
A. Hold on. Let me see. I might be able to tell from one of these investment annual reports. Okay. In Exhibit 8 behind tab 5 is an annual report for 1979, and the pages aren't numbered -- oh, wait, there's a --
Q. After the Bates number on the lower right?
A. Yeah. If you go by that number --
Q. Uh-huh.
A. -- page three, the very first paragraph is what I went with.
Q. Okay. So Bureau of Indian Affairs Investment Program, Branch of Investments, okay, and they are authorized to invest travel funds. So it's your understanding that that office --





A. Uh-huh.
Q. -- the Branch of Investments, would actually manage the investments?
A. Uh-huh.
Q. Okay. I want to try to simplify it as we move forward through the months.
A. Thank you.
Q. I said try. I may not get there. But can you tell me what changed, what you saw was different about the investment, the distribution, and the accounting with the trust, between the trust, the first Tranche One period and now the second Tranche One period?
MR. LaLONDE: Objection. If you could break that down. It's a fairly broad and multi-part question.
MR. PILSK: Well, let me ask the witness, is that something that you can answer or is it too broad?
THE WITNESS: It's -- I don't really know what changed other than, I can tell you what changed in terms of the reports I have seen here.
Q. (BY MR. PILSK) Okay. Well, why don't we start there.
A. Can we start there?
Q. Yes.
A. Okay. What changed and what I have seen here is that, I can see from the summary in detail of trust





funds reports and I can see from the detail -- I have detail reports, so I can talk a little bit more. I might be able to answer some of your questions that you asked. I mean --
Q. Regarding the specific investments, their terms, their rates of returns, those kinds of question?
A. Well, I don't know about the rates. In looking at these reports, I don't see rates. Oh, wait, I do see rates. Well, maybe I don't. Interest rates, yeah. There are interest rates.
Q. Well, I tell you what. I thought that might be a shortcut, but let me take it step by step. Turning back to the statement of account --
A. Uh-huh.
Q. -- first of all, this is the same, I think you testified, this is the same format, the same basic report that we had for the first Tranche period?
A. Uh-huh.
Q. Okay. Were you able to learn any more information from looking just at this report than you had gathered from before?
A. No.
Q. Okay. So this part remained the same?
A. Right.
Q. And whatever you were able to explain before,

and you were not and you're still not?

A. Uh-huh.

Q. Now, we turn to the summary in detail of trust.

A. Right.

Q. Okay. Let's just look at the May, the summary of trust funds as of May 31, 1979.

A. May 31, okay.

Q. The first one, on the first page. And just walk me down the page and explain to me how to read this document.

A. Okay. The first page is a summary, of course, and it's just going to show you balance at the beginning. Your total increase, which is going to be your receipts, and then your expenditures, and then your total cash and investments at the end. The bottom section is going to try and show you where they're at, you know, what, where -- well, exactly what it says -- where are the funds that are owned. Your allotted funds, and I'm not quite -- I'm not as familiar as to what allotted meant. I know unallotted was the old acronym for overnighter, so that should have been cash. And since we are back in 1979, that should have been the amount that was subject to the four percent.

Q. Uh-huh.





A. And then investments would have been your CDs and your government securities, and then total cash and investments. I'm not familiar what allotted, it says US Treasuries so --

Q. Okay. And what about the line right below that that says, "Obligations not disbursed, type of net for a non-add"?

A. I'm not as familiar with that, either, as to what that would have meant. I noticed that back in these earlier days, it looked like some of these funds -- there's just some things I just wasn't as familiar with. It looked like some of the old appropriated kind of government acronyms were still running through them, and I just wasn't as familiar with it.

Q. Okay. And I just want to make sure, because I have gotten confused about the questions I asked you about, only due to the first Tranche One period, not really generally. But with respect to all the Tranche periods, your analysis was limited to once the money hit these accounts?

A. Right.

Q. You didn't look at when the money was received and how long it took to get to the account?

A. No.





Q. Okay. And similarly, on the back side, you simply, when you saw that something was posted as disbursed, you didn't consider what might have happened to that money after that?

A. No.

Q. Either where the money was sent to, how it was accounted for there?

A. No.

Q. Or as we just were discussing about what might have happened to the cash between the time of posting and time the cash was actually taken out from the Treasury account?

A. No.

Q. You didn't look at that?

A. No.

Q. For none of the periods?

A. No.

Q. Okay. Turning now to the second page of the May, of the detailed trust funds as of May 31, and this begins -- well, why don't you tell me. The following pages are a list of what look like daily entries?

A. Right. The following pages is the detail of trust funds, and I don't know why these don't have dates, but these are interest transactions that are coming in. These 9705 are basically interest





transactions.

Q. And how do you know that?

A. Because somewhere in this is a manual that tells you what these various interest -- like what 9705 means. I think that means interest on government securities.

Q. Oh, I see the account number.

A. Yeah, the accounting code. I think 9705 is interest on -- it might be interest on CDs actually. I lost the little -- where is -- let me look and see if it's in this one. Hold on a second. I thought I lost track of it, but somewhere in here.

Q. Okay. But?

A. Whoops. It might have been right in here. I think I'm getting warmer. Here we go. Treasury securities.

Q. Where are you looking, what tab number?

A. I am in Exhibit 6. I am behind -- I'm in the Judy Hill deposition, tab 10. I'm in a tribal trust fund manual.

Q. Uh-huh.

A. And I'm on page 4.1.

Q. Okay.

A. And if you look on that left hand page up there, it's going to match those codes.

Q. Okay.
A. Do you see that?
Q. Yep. Now, why don't we just, without going through line by line obviously --
A. Right.
Q. -- but this first, number one, section one, cash investments owned, No. 1, and then it's sort of a restatement of what we saw on the previous page, right? We have got the balance beginning of the year reinvested?
A. Right, and this will be the detail. You had a big summary number. Now this is going to be your detail.
Q. Okay. So now this is telling me, these are total increase in trust balance receipts. So these are payments into the balance?
A. Right. This is going to be new money that actually increases your fund balance.
Q. Okay. And so I can go down, and by tracing the account number and cross referencing it to --
A. This isn't an account number. This is an accounting code of some kind.
Q. Right. Thank you. But by cross referencing the accounting code, I can get a description of the kind of receipt that that is?





A. Right.
Q. And you don't know why this first set of receipts are undated?
A. And now that I think about it, there's a decode on the bottom of the statement, on page -- whatever the last page of the statement is. I was going to say we would have told the tribe how to do this too, and there it is on the last page of the statement.
Q. Well, if you look on the upper right-hand --
A. Oh, yeah, 13.
Q. Oh, okay.
A. I was just sitting here thinking, well, how is the tribe to know this? Well, we would have told them on the last page.
Q. So, you go through the daily summaries, and then there is the total by category of the receipts?
A. Uh-huh.
Q. Okay. And then you've got, the next Arabic numeral 3, you have total reduction and trust balance, and that works the same way? There is a series of accounting codes --
A. Right.
Q. -- that tells you what kind of production that is?
A. Yes.





Q. Okay. And then there is the summary at the end of that?
A. Uh-huh.
Q. Can you explain what the -- on page 16, number four, it says increase or decrease in investments. It says, "Investments not add" and then "reinvested interest." Do you know what those two mean?
A. Increase, decrease, new investments, investments. This should be the investment balance that's being held, and then their total cash and investments. Reinvestment, reinvested interest is just zero at this point.
Q. So as of May 31, this, just over 4.4 million invested?
A. Let me go to the front here and check on that. I don't think so, because the front says investments is 10 million.
Q. Yeah.
A. So let's see if we can figure out what that is. Not add four million. I don't know what that number is signifying there in that statement. That is not the investment balance.
Q. Okay.
A. That's too small to be the investment balance.
Q. There is a, right above after total





expenditures, there's a summary, and the first line says investment.
A. If I -- it almost looks like it's the net change in the investment for that period.
Q. Oh, increase or decrease?
A. Yeah.
Q. Okay. Okay. But you're not sure?
A. I'm not sure.
Q. Okay.
A. But if you were forcing me to come up with an answer, that would be what I would say.
Q. Okay.
A. It would be the change in the investment for that period.
Q. And then we turn the page. What's this page showing?
A. This is an interest account. See how this is 7386 for May 31st, 1979. This is the interest account 7886.
Q. Okay.
A. So one was the principal account and one was the interest account for May 31st, 1979.
Q. Okay. Was --
A. Oh, that would be why we didn't see the interest in that old account, that 1976 account we were

looking in.
Q. Uh-huh.
A. Sorry. I'm slow on the uptake.
Q. Okay. So --
A. We were looking in the interest, the principal account here.
Q. Okay. Have you seen any documentation of the interest account for that first Tranche One month?
A. Sorry.
Q. Are you aware --
A. I should have clued in on that before now.
Q. That's why we're here all day.
A. I've got a migraine, you know. You got to cut me some slack.
Q. Do you really have a migraine?
A. No, I'm fine. It's there in the background, but, no, I'm just kidding. I'm trying to make excuses for not clueing in on this until I hit the interest statement right now.
Q. It's a small demerit. Okay.
A. No, I didn't see the interest statement for the 1976 Tranche --
Q. Okay.
A. -- month.
Q. And without that interest statement, you





really can't tell how much interest was earned?
A. No. Not for the four percent.
Q. What about for other types of interest?
A. That you could see posting here --
Q. Okay.
A. -- for some reason. Even though it wasn't the interest account, we saw interest posted.
Q. Okay. All right. So turning back now to the second Tranche One month -- the second Tranche month --
A. Right.
Q. -- we are now looking at the interest account 7886. And this is, I guess the form is the same? You have got the balance at the beginning?
A. Uh-huh.
Q. The increase?
A. Uh-huh.
Q. And when it says total increase in trust balance receipts, that's on item two --
A. Yes.
Q. -- on the first page.
A. That's an interest posting, but there's no date on it. There's asterisks for the date. 9701 was --
Q. Interest on funds in US Treasury.
A. Yeah, that's got to be it. But there's no





decode on statement for it, unfortunately.
Q. Okay. Could you -- well, I suppose, could you go back and compare this interest payment to the initial capital balance and determine what the percent was? Would that match up? No, it wouldn't.
A. I would have to -- I mean, we would need to know what this was for.
Q. Okay. And you can't tell?
A. Not from this.
Q. And have you seen any documents or other information that would explain that?
A. No.
Q. Okay. Now, number three is "total reduction in trust balance expenditures." What would these two offsetting 630 entries --
A. 0630, I believe, was a CD maturity and purchase. Let me look. Let's go back. Yeah, this is a timed deposit, bank timed certificate of deposit. So that looks like -- without dates, we'll just go in the order -- it looks like 5,000 matured and then was purchased.
Q. What is that?
A. I'm sorry.
Q. What is this bank --
A. It's a CD.





Q. Okay.
A. A CD maturity and then a purchase.
Q. Okay. Why would that be shown on the interest side account?
A. They were investing the interest as well.
Q. Okay. All right. And so now, and then we go down to -- we get the detail of that. I see there's the investment, and then there's the increase or decrease in the total cash and investments. Okay. And now we start the same basic statement, as of July 31 is the next?
A. Yes.
Q. Okay.
A. For 7386, the principal account.
Q. Okay. Now, turning to the investment reports, can you just walk me through how to read these documents?
A. Okay. Very first page.
Q. Uh-huh.
A. Earnings maturity. Maybe we should go to the next page, because it looks like it's got more numbers on it. If you had earnings maturity, it would show you what your earnings would be at maturity.
Q. Okay. Let's just stop to keep the record clear. In the upper right-hand corner is a page number?
A. Yes.

Q. And what page are you looking at?
A. 373.
Q. Okay.
A. Is that your page?
Q. Yes.
A. The first column is going to show you your earnings at maturity.
Q. Okay. So that first interest, that is $1,082.22?
A. Yes.
Q. Okay.
A. Your next column is your appropriation account, and this is -- the first line is showing you where the principal is.
Q. This is the actual account?
A. The actual account.
Q. Not the accounting code?
A. Right, the account. 92712605 is where the principal, the base amount is going to be.
Q. Uh-huh.
A. Okay. And then the interest is going to flow into 97712605. It was purchased 5/22/79, at an interest rate -- I'm going to assume that there is a .99182 there, so a 9.91 percentage rate. I can't see it there. I mean, there's nothing there, but I'm going to





assume --
Q. Why would you assume that to be there?
A. Just because when there's no -- usually when I look at investment reports, if there's no decimal, I assume it's at the front. I don't know why it's just the way --
Q. Would you read this .99182?
A. Yeah.
Q. Or 9.?
A. .99182 is the way I would have read it on the report, which I would interpret it as a 9.91 interest rate if you were to multiply it by 100.
Q. Okay. Oh, I see what you're saying.
A. I'm sorry. I am dazzling you with my brilliance.
Q. My turn to be slow.
A. Okay. Maturity date, 6/7/79. I kind of have splotch on mine, but that's what it looks like to me.
Q. Uh-huh.
A. Now, 0560, I don't know what that is. I am going to take a guess, though, that it might be a bank code for the bank that the CD's maturing at.
Q. Okay. If you look down on the last two entries --
A. Uh-huh.





Q. -- for this page, it actually gives the name of the bank.
A. Right.
Q. These entries don't.
A. I know.
Q. The first one, and I don't know if that -- if you know what that means?
A. I just remember that later in MoneyMax, there used to be three digit codes that went with bank codes. I don't know if it carried forward. I don't even know why I said that, except that now this -- maybe not, because this is a bill. This is a bill, investment-type bill.
Q. Okay.
A. So I just, I don't know what that is. It's just sitting there in the middle, and there really isn't a column to go with it.
Q. Okay.
A. Face amount, that's par value. Reinvested interest.
Q. Can you read down for me, though, you have got the face amount, and the first number, there's 248,000 and more, and then there's a 1,082.22 number.
A. Then there's a $250,000 number.
Q. Right.





A. I think that's the par value, the 250,000, because it's nice and round.
Q. So that's the purchase amount plus the interest, because you have earnings at maturity of 1,082.22 that matches up with the face amount in the second line.
A. Uh-huh. It doesn't add up, though. The way I read this report is they bought it on an interest date, that because purchased interest, there's zero. They didn't buy any interest, so they must have bought it on an interest date.
Q. Well, let me ask you this, was there any -- did you see any additional back-up?
A. No.
Q. So whatever you can decipher from this document is all the information that you have regarding the investments during the second Tranche period?
A. Right. And this is the discount they bought it at. See, this is, the 250 is what it's going to mature at. 248 is what it was paid for.
Q. And the difference is what they're going to earn?
A. Well, no, part of what they're going to earn. Difference is the discount, so they're going to earn the discount plus the coupon.

Q. Oh, okay. And where is that?
A. The interest rate, which is the 9.91.
Q. I see.
A. So it will be a combination of the discount and the coupon.
Q. So they'll get the 1,082.22?
A. Plus the 9.91 on the 250,000 for the --
Q. Between the 5/22 and 6/7 or whatever that is?
A. Yes, yes. That's the way you read that. Then there's the bill, bill, and then you got down CDs. Then you start rolling into CDs.
Q. Now, how would I tie this particular investment back to the detail of trust funds we were just looking at?
A. Okay. Let's go -- well, let's see if we can tie this 5/22/79. It says we bought it on 5/22/79. Is that the only thing we bought on that?
MR. LaLONDE: That is a different account number.
THE WITNESS: Oh, it is? Oh, yeah, it is. There's a 7386.
Q. (BY MR. PILSK) Well, do you know what the account number 9271 is?
A. Let's try and find a purchase on 7386. I don't have a calculator. Anybody have a calculator? We





might have to add up some of this stuff to tie it out, because what you're going to see on the summary of detail of trust funds is a big total amount, and then you're going to come over here and need to add up a bunch of costs to tie out to that big total amount, and I didn't bring a calculator. I can run and get one.
Q. Okay. Well, let me --
A. You see what I'm saying?
Q. Yeah.
A. That's the way this is supposed to work, is that this detail -- this should be the detail for the total amount that's on the summary in detail.
Q. For one day?
A. For one day.
Q. Right. So if they purchased -- I'm looking at this --
A. Are you back on the summary in detail?
Q. No. I'm back on the trust fund investments. It looks like this was the only thing purchased on 5/22?
A. Well, let's see. Let's look at -- well, I just happen to have a tab on one of these days. Let's try one of those days. 9/12/79, let me see if that ties to something else over here on 9/12/79.
MR. LaLONDE: Which page were you looking at?
THE WITNESS: 397. Do I have a September?





MR. LaLONDE: That might be pushing to another --
THE WITNESS: I think I just went into another month.
Q. (BY MR. PILSK) Well, we're still on the same --
A. Wait, no, that's December. I mean, that's maturity. Wait, when did I buy it? 7/5/79, perfect. Let me go look.
MR. LaLONDE: 8/31/79. I think that's where I found the page, number 397.
MR. PILSK: Are you still looking at the same tab?
MR. LaLONDE: No, I'm past the third green slip.
MR. PILSK: Oh, same tab.
MR. LaLONDE: Same tab.
MR. PILSK: 397?
MR. LaLONDE: I think that's what she said.
Q. (BY MR. PILSK) Okay.
A. Okay. All right. I went back to the Arthur Andersen statement. If you go back to page 45 of the Arthur Andersen statement, let's try that first, and then I'll try to walk it into the summary in detail.
Q. Okay.





A. Okay. Are you on page 45?
Q. Uh-huh.
A. Very first transaction, 7579263684836, do you see that? No?
Q. No. I'm sorry. What were you -- I'm not -- I don't catch numbers quickly. What column am I looking at? This is 7579?
A. Uh-huh, 7579, transaction amount.
Q. Oh, okay.
A. 2636848, okay, so that's the summarized transaction, which hopefully we'll be able to find in the summary in detail of trust funds too, but if you go back to that tab that we're holding your finger on.
Q. 397?
A. Yes. See that same line item there?
Q. Gotcha. 7/5, the date it was purchased?
A. Uh-huh.
Q. All right.
A. That will tie to --
Q. 9/12, or we don't have that here?
A. That's the maturity date.
Q. Yes.
A. That's the maturity date. And that's the face amount and the principal cost.
Q. There it is.

A. That adds up. That's a summary of all those CDs on those pages before. Okay?
Q. Uh-huh.
A. So that's the way that works.
Q. Okay. Okay. And then we should be able to tie it back to the summary of trust funds as well?
A. Yeah, let me go to that now. Let's see, July. July 31st. I can find the transaction number, but it's higher. It's this. The one in summary in detail has an additional amount in it, and I could probably reconcile it but --
MR. LaLONDE: Which page?
MR. PILSK: Where are you finding it?
THE WITNESS: Page 19.
MR. LaLONDE: In which --
MR. PILSK: I'm sorry. You got to be --
MR. LaLONDE: Last month? First month?
THE WITNESS: I'm in July 31st, 1979, page 19. They're going to be these undated transactions, because you're dealing with these VT transactions -- these VT investment transactions, and I'm looking at the document number VT 03 T. I mean VT, not 03.
Q. (BY MR. PILSK) On what page?
A. 19.
Q. 19, I'm sorry.





A. VT 07 T 0123.
Q. Okay.
A. See, this one is showing up for 272825388, and it could be that there were two transactions that day that collapsed on the summary in detail into one, even though I can't see them here.
Q. Okay. So we can't, at least this specific --
A. Oh, oh, here it is. See on this next page, the page before on 44?
MR. LaLONDE: Which tab are you in?
THE WITNESS: Okay. Keep up with me now you two. If you go back to the Arthur Andersen report on the page before we looked, there's another $91,000 transaction with the same VT number. Here.
Q. (BY MR. PILSK) No. I got you.
A. You see.
Q. But I'm trying to go back.
A. That's what's mussing me up on the summary in detail of trust funds report. That's what's got us off, why you can't tie it one-to-one, because there's this additional $91,000 transaction.
Q. Collapsed in there?
A. Yeah, that collapsed on the summary in detail. If I had a calculator I would tie it out for you exactly, but you can see it. On the page before there's





another VT that's carrying that same transaction number. Phew, I was sweating there for a minute, but that's the way it works.
Q. Okay. Do you know, moving from the Tranche, first Tranche to the second Tranche period, were there any changes in the four percent, the Treasury four percent interest?
A. Not that I can see.
Q. Okay. And that Treasury four percent, if something -- again, make sure I understand -- that was paid on uninvested cash?
A. Correct.
Q. So --
A. That was not invested in a longer term security.
Q. Right. Were they investing, during the second Tranche -- all my questions now are on the second Tranche One months, unless I say otherwise --
A. Okay.
Q. -- were they doing overnighters at this time?
A. No.
Q. So it was either earning the CD rate or whatever else they invested in or the Treasury at four percent?
A. From what I could see in my research.





Q. Okay. Were you able to see where the Treasury four percent was posted in the information we now have for the second Tranche period?
A. Just from that statement we just looked at.
Q. Okay.
A. That 7886 statement we looked at.
Q. Uh-huh. And --
A. That one interest hit that we saw, and I'm surmising that, that there is a four percent interest posting.
Q. You are surmising. There is no code or description that --
A. That said four percent?
Q. -- that positively tells you that this is the Treasury four percent?
A. No, only that it said 9701 Treasury interest.
Q. Do you know of any other records or documents that would indicate whether or not the four percent was being paid?
A. Not that I know of.
Q. And you haven't seen any of those documents?
A. No, not in my research.
Q. Okay. And do you know, for the second Tranche One period, whether there are any new or different guidelines regarding the amount of time that money could

remain uninvested?

A. No, not that I know of.

Q. Okay.

MR. LaLONDE: Just, we have been going, I think, for about a little over an hour. Whenever just --

MR. PILSK: Yeah. Well, let's go off the record.

THE VIDEOGRAPHER: We are temporarily going off the record at 3:57 PM.

(Recess held from 3:57 to 4:01 PM.)

THE VIDEOGRAPHER: We are back on the record at 4:01 PM.

MR. PILSK: By agreement of counsel and the witness, we're going to stop the deposition for today and continue the deposition to another date to be mutually determined by the parties.

THE VIDEOGRAPHER: Today's deposition is adjourned at 4:01 PM.

(Deposition recessed at 4:01 PM.)





IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Case No. 00-169 L
Judge Emily C. Hewitt

THE OSAGE NATION AND/OR TRIBE )
OF INDIANS OF OKLAHOMA, )
)
Plaintiff, )
vs. )
)
THE UNITED STATES OF AMERICA, )
)
Defendant. )

CERTIFICATE OF COMPLETION OF DEPOSITION

I, SALLY PETERS, RPR, CCR No. 57, DO HEREBY CERTIFY that on August 19, 2005, the deposition of Margaret Williams, Volume 2, was taken before me at the request of, and sealed original thereof retained by:

AKIN, GUMP, STRAUSS, HAUER & FELD, LLP.
Robert S. Strauss Building
1333 New Hampshire Avenue, Northwest
Washington, D.C. 20036
BY: MR. W. ERIC PILSK

I FURTHER CERTIFY that copies of this certificate have been mailed or delivered on , 2005, to the following counsel and parties not represented by counsel appearing at the taking of the deposition:

U.S. DEPARTMENT OF JUSTICE
Department of Natural Resources Division
General Litigation Section
601 D Street, Northwest
Washington, DC 20004
BY: MR. MARTIN J. LaLONDE





I FURTHER CERTIFY that examination of this transcript and signature of the witness was not waived by the witness and all parties present.

On a letter was mailed or a copy of the deposition was delivered to Martin J. LaLonde.

I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition to W. Eric Pilsk is

I FURTHER CERTIFY that the witness was still under oath prior to the taking of this deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, to the best of my ability, and the foregoing is a true and correct transcript of the proceeding.

I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

__________________
SALLY PETERS
CCR License Number: 57
Expires: 12/31/05





OSAGE NATION vs. USA

DEPONENT SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below.

PAGE LINE
Change to
Change to
Change to
Change to

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE LINE CORRECTIONS REASON FOR CHANGE

I, MARGARET WILLIAMS, do hereby certify that I have read the foregoing pages of my testimony as transcribed, and that the same is a true and correct transcript of the testimony given by me in this deposition, taken on DT, 2005, except for the changes made.

MARGARET WILLIAMS

DATE

DATE DELIVERED/MAILED ________________________

MR. MARTIN J. LALONDE
U.S. DEPARTMENT OF JUSTICE
Department of Natural Resources Division
General Litigation Section
601 D Street, Northwest
Washington, DC 20004

RE: OSAGE NATION vs. USA
Deposition of: MARGARET WILLIAMS
Date Taken: August 19, 2005

DEAR MR. LaLONDE:

At the time of the above deposition/sworn statement, it was requested that the deponent read and sign the transcript.

____ Enclosed is your copy of the transcript with the original signature page. Please ask the witness to read the transcript and make any corrections on the original signature page and return the original signature page to our office.

____ DUE TO TRIAL IN THIS MATTER BEING SET FOR ____________, SIGNATURE MUST BE COMPLETED BY ____________.

____ Enclosed is a courtesy copy of the transcript with the original signature page. Please read the transcript and make any and all corrections to your testimony that you feel are necessary and indicate such corrections on the attached page. Please only return the attached original signature page to our office, not the transcript.

____ The deposition transcript is now ready to review in our offices. Please call 505-243-5018 to make arrangements for reading and signing.

____ The transcript is now ready for review. Please remit payment in the amount of $__________. Your transcript will be delivered as soon as payment is received. If you choose not to pay, please contact our office at 505-243-5018 to make arrangements for reading and signing.





____ Other:__________________________________________
________________________________________________
________________________________________________.

In most instances, a witness is provided 30 days from the receipt of this letter to read and sign the transcript. Failure to read and sign within this time will result in the original transcript being filed without the signature page.

Your immediate attention to this matter will be appreciated. If you have any questions, please call us at 505-243-5018.

___________________________
KATHY TOWNSEND COURT REPORTERS