0308

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 00-169L
Judge Emily C. Hewitt

THE OSAGE NATION AND/OR TRIBE
OF INDIANS OF OKLAHOMA,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

VIDEOTAPED DEPOSITION OF MARGARET WILLIAMS
August 26, 2005
10:02 a.m.
4400 Masthead, Northeast
Albuquerque, New Mexico

VOLUME 3

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: W. ERIC PILSK
ATTORNEY FOR PLAINTIFF

REPORTED BY: CHERYL ARREGUIN, RPR, CCR No. 21
Kathy Townsend Court Reporters
110 Twelfth Street, Northwest
Albuquerque, New Mexico 87102





A P P E A R A N C E S

For the Plaintiff:
AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
Attorneys at Law
Robert S. Strauss Building
1333 New Hampshire Avenue, Northwest
Washington, DC 20036
By: W. ERIC PILSK

For the Defendant:
US DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
General Litigation Section
601 D Street, Northwest
Washington, DC 20004
By: BRETT D. BURTON

DEPARTMENT OF THE INTERIOR
Office of the Solicitor
1849 C Street, Northwest MS 6456
Washington, DC 20240
By: ELISABETH C. BRANDON

The Videographer:
FRAN HINDSLEY, CLVS
Legal Action Video
7909 Puritan Court, Northeast
Albuquerque, New Mexico 87109





I N D E X

| | PAGE |
|---|---|
| MARGARET WILLIAMS | |
| Direct Examination (Continued) by Mr. Pilsk | 312 |
| CERTIFICATE OF COMPLETION OF DEPOSITION | 377 |
| DEPONENT SIGNATURE/CORRECTION PAGE | 379 |

E X H I B I T S

NONE





THE VIDEOGRAPHER: This is Volume 3, Tape 1 in the continuing deposition of Margaret Williams.

We are recording at the Office of the Special Trustee for American Indians, 4400 Masthead, Northeast, in Albuquerque.

This is in reference to the Osage Nation and/or Tribe of Indians of Oklahoma, Plaintiff, versus the United States of America, Defendant, Case Number 00-169L, in the United States Court of Federal Claims.

Court reporter is Cheryl Arreguin from Townsend Court Reporting, court videographer Fran Hindsley from Legal Action Video.

For the purposes of the video record, will the attorneys present please identify themselves?

MR. PILSK: Eric Pilsk, Akin, Gump, Strauss, Hauer & Feld, for the plaintiff, Osage Nation.

MR. BURTON: Brett Burton, Department of Justice, for the United States.

MS. BRANDON: Elisabeth Brandon, Office of the Solicitor, Department of the Interior.

THE VIDEOGRAPHER: The date is August 26, 2005, the time 10:04. We are now on the record.

MR. PILSK: Okay.

Ms. Williams, welcome back.

Why don't we go ahead and swear you, since

it's -- it's just been a week since the last phase of the deposition.

MARGARET WILLIAMS

having been previously duly sworn, was examined and testified further as follows:

DIRECT EXAMINATION (Continued)

BY MR. PILSK:

Q. Ms. Williams, today is the third and I'm going to try to promise the last day of this deposition. We'll try to move through it quickly today.

Before we begin, though, I wanted to note for the record a stipulation between the parties, that we've been conducting the past two days of the deposition as well as today's on the stipulation that all objections except for objections to the form of the question are reserved, and that's been our operating stipulation at all the depositions in this case, including the past two days, of Ms. Williams' deposition.

In addition, I think Mr. Burton wanted to make a clarifying statement as to the 30(b)(6) topics for which Ms. Williams has been designated.

MR. BURTON: Thank you.

As Mr. Pilsk stated, I just wanted to clarify the topics for which Ms. Williams has been designated as a 30(b)(6) witness. I'm referring to the topics that





are numbered in the May 4th deposition notice from the Tribe to the Department of Interior.

Ms. Williams has been designated as a 30(b)(6) witness as to topic 1.d as to investments and accounting. She has not been designated as to distribution. That was Ms. Hill.

As previously stated, Ms. Williams is also designated as a 30(b)(6) witness to cover topic 1.g.

And there are two additional topics that Ms. Williams has been designated to cover, topic 5 as to investing and topic 14 as to investing.

MR. PILSK: I would just note that in -- in prior discussions and I -- and, I believe, E-mails between your colleagues, Mr. Burton, and our office, it was our understanding that Ms. Williams had always been designated under 1.d for investment accounting and disbursements.

And so we've asked her some questions on that, to which she's answered, and I'm going to ask her some additional questions on that, although just to clarify, we're focusing on the accounting for disbursals from the trust side of things, not -- not -- she's already testified, I believe, that she wasn't involved in the calculation of the amount of disbursals.

And with respect to topics 5 and 14, today is





the first time that we've been notified that she -- that she's been designated for those topics. I think we've covered them, but we would just note an objection to the late designation for her on those topics and reserve our rights to raise any additional questions if they come up later on, on those two -- 5 and 14, on those two topics.

MR. BURTON: That's fine.

I just wanted to briefly note for the record, and we can discuss this further off the record, that it's my recollection that the E-mails that I have sent out concerning topic 1.d only designated Ms. Williams to cover investment and accounting, and I believe, from my review of the first day of the transcript, Mr. LaLonde mentioned that Ms. Williams would cover topic 1.d as to investing and accounting.

But we can have further discussions about that.

MR. PILSK: Yeah. We're not going to argue this now.

The only thing I would note is that the government has designated -- I'm not sure exactly how many 30(b)(6) witnesses, and it's -- it's a very piecemeal process.

MR. BURTON: Yeah.

MR. PILSK: It's like putting together a





puzzle as to who's covering what. And if I need to ask questions on the fringes of each topic to understand exactly where the pieces meet, and to the extent that disbursements are made from the trust fund, I need to understand at least as much as I can of what Ms. Williams has to say so I can match that up with what Ms. Hill has testified to.

So with that, all objections are reserved, so we'll fight about this if we need to another day.

Q. Ms. Williams, when we left off last week, we were going through the accounting records that exist in Exhibits 6, 7 and 8 for the different tranche periods.

Do you recall that process?

A. Yes.

Q. I want to -- before we turn back to the documents, I want to take a step back and -- and ask some generic procedural questions as to how the trust funds were managed during the Tranche One periods, based on your investigation and what you've been able to learn.

And what I want to do, so I -- to make sure I understand what was happening, is try to follow through a hypothetical -- I don't think it's necessary to turn to a specific transaction -- but a -- a hypothetical oil royalty payment that's deposited into the trust fund,

and -- and just ask a series of questions to follow through how that is handled, from receipt through disbursal out from the trust fund.

And what I'd like to do is start by asking the question with respect to the first Tranche One months, which is the 1976 period, and then explore how that process did or -- has or hasn't changed through the other Tranche One periods.

So we understand from other witnesses that oil producers or lessees will -- will make a payment either by check or -- if we're talking the 1976 time period, typically by check, to the Osage Agency. That was processed through the agency in the area office and ultimately deposited into a bank, into the -- into the trust account.

A. Um-hum.

Q. And my first question is, how would your office -- and by your office I mean the branch or bureau or division of -- of Interior or BIA -- first have become aware that a deposit had been made into the trust fund?

A. They would have looked at reports of the amount of cash that's available to invest.

Q. Okay.

So let's just say on a given day that five





checks totalling $500,000, just to make a simple, round number, were -- were deposited into the Osage trust account. Okay?

A. Um-hum.

Q. Would -- would the Trust Office have received a fax or notice in some way, or would they simply look at the -- check the daily balance and see, "Oh, we received -- $500,000 was deposited into the account"?

A. From what I could see in the research, the -- the only thing I could truly determine was reports. If there was any ahead notification, I don't know about that.

Q. Okay.

And when you say reports, you -- you're talking about the balance and ledger sheets --

A. Right.

Q. -- that are attached in Exhibit --

A. Right.

Q. -- I believe it's 7, Volume 2?

A. Well, Exhibit 7 as well as the miscellaneous correspondence in Exhibit 8 --

Q. Okay.

A. -- that I was reading --

Q. Okay.

A. -- just the various miscellaneous





correspondence --

Q. Okay.

A. -- about the way funds were invested --

Q. Okay.

A. -- and the procedures that were in the binders.

Q. Okay.

And do you know what -- was there a procedure to check the daily balance?

A. There were just procedures that talked about investing available balances.

Q. Okay.

And I guess I'm trying to figure out how did you know you -- your predecessors -- how -- how did they know what the available balance was on a day-to-day basis.

A. The only way they would have been able to know would have been from the system.

Q. So someone would have had to --

A. Default way would have been from the system.

Q. Okay.

A. If there was another way other than that, I don't know from what's in here.

Q. Okay.

And you haven't seen any -- any documents that





indicate notice from regional area office or the agency itself saying "X amount of money was deposited today"? You haven't seen any documents like that?

A. Give me a minute, and let me -- let me look through here.

No.

Q. Okay.

A. Nothing specific to Osage.

Q. Okay.

Now, when funds are deposited into the account -- well, let me ask this first.

Who actually -- where is the account? Is it managed by your office or by the Department -- controlled by the Department of Treasury? Where is the account?

A. The account --

MR. BURTON: Objection, vague.

You may answer the question.

THE WITNESS: The account from the annual reports -- and you're -- you're -- I'm going back to you said you're starting with the first tranche month --

MR. PILSK: Correct.

THE WITNESS: -- rolling forward, and we're still sitting in that first tranche month.

MR. PILSK: Correct.

THE WITNESS: From the annual reports in here, the account was managed out of -- let me check.

The responsibility of investing was carried out centrally in Albuquerque, New Mexico, but communication with the tribes was done out of the area and agency offices.

MR. PILSK: Okay.

Q. And then was the Treasury Department involved in the management of the account at all?

A. No, not from the reading of the report here, the investment report in 1976.

Q. Okay.

Were there any -- are you aware of any communications or advices between any section of the -- of the Bureau and the Department of Treasury about the Osage trust account?

A. When you -- not in terms of the management in terms of advice. Investing, they invested in treasury securities, they invested --

Q. Oh.

A. The 4 percent interest was with Treasury.

Q. Oh, right.

A. But not in terms of management advice do I see any evidence of that in the research --

Q. Okay.





A. -- that I've done.

Q. But by advice, it was a specific term, it wasn't meant advice as in "This is how you should do it," but --

A. Right.

Q. -- notice of balances, notice of -- I'm trying to just understand -- did the Department of Treasury play -- were they involved in how the funds were accounted for so that -- it's my understanding that the -- the account is actually with the Department of Treasury, but it's managed by the Trust Office, and so in order to move money back and forth, my question is, was there communication between the Bureau and the Department of Treasury as to what to do with the money?

A. Yes. There had to be to move money back and forth through Treasury.

Q. Okay.

So if -- if an investment was made, whether it's the 4 percent in Treasuries or in a -- in a CD or some other vehicle, there would have to be some communication between the Bureau and Treasury saying "Take a certain amount of money and put it into this vehicle."

A. Yes.

MR. BURTON: Objection, vague, compound.





You may answer the question.

THE WITNESS: Yes.

MR. PILSK: Okay.

Q. And my question is now, can you describe what those communications would have been and how that worked?

MR. BURTON: Objection, calls for narrative.

You may answer the question.

THE WITNESS: I mean, there could have been multiple types of communication depending on what was happening. If it was a disbursement of funds, what type of disbursement, there would have been a specific type of communication. If there was a receipt of funds, there had to be a communication.

MR. PILSK: Okay.

THE WITNESS: Any movement of funds required a communication of Treasury.

MR. PILSK: Okay.

Q. Now, let's -- good.

Now, to simplify it, have you seen in the -- for the Tranche One period, have you seen any documents evidencing those instructions and communications between the Bureau and Treasury?

MR. BURTON: Objection, vague.

You may answer the question.





THE WITNESS: I have seen documents that evidence that there must be documents that exist.

Q. (BY MR. PILSK) And these are the account statements that we looked at --

A. Right.

Q. -- last week?

A. Right.

Q. So, I mean, they show that money, in fact, moved around, and you infer from that that there were communications, but you haven't seen the documents, if any, of the actual communications; is that correct?

A. Correct.

Q. Okay.

Have you seen those kinds of documents -- documents of those kinds of communications for any of the tranche periods?

MR. BURTON: Objection, vague.

You may answer the question.

THE WITNESS: I need to look at the binders here for a second.

MR. BURTON: May we go off the record briefly?

MR. PILSK: Yeah.

THE VIDEOGRAPHER: We are temporarily going off the record at 10:22.

(Proceedings in recess.)

THE VIDEOGRAPHER: We are back on the record at 10:23.

Q. (BY MR. PILSK) Ms. Williams, while we were off the record, you indicated you had found an example of a communication between Treasury and the Bureau?

A. Oops. Behind tab -- let's see.

Q. What tranche are you --

A. I'm sorry?

Q. What -- what volume are you in?

A. I'm in Vol- -- Exhibit 8, and I'm back behind tab 35. And I'm mistaken. I believe this is an internal communication. But it does have Osage on it. It's about Treasury funds, but I believe it is an internal communication.

Q. Can you tell from this who it's to?

Okay.

A. No.

Q. Okay.

Were there forms or a typical format for -- that the communications between Treasury and the Bureau took? In other words, was there a form to ask, for example, to invest a certain amount of money in a certain kind of vehicle?

A. Yes.

Q. Do you -- generally, can you describe what





that form would have looked like?

A. Generally, it depended on the type of transaction.

Q. Okay.

A. If it was a receipt transaction, there would be a particular form, disbursement transaction, a particular form, and an investment transaction would have a particular form.

Q. Okay.

And would the forms always be going from the Bureau to the Treasury, the Bureau informing Treasury "We received a receipt, we want to make a disbursal, or we want to make an investment," or would they go back and forth?

A. They could go back and forth. Treasury would communicate to the Bureau, too, as well.

Q. Okay.

What -- in what cases would Treasury communicate back to the Bureau?

A. Treasury would communicate to the Bureau on interest that they were paying to the Bureau --

Q. Okay.

A. -- maturing principal to the Bureau.

Q. Okay.

A. They should have also communicated to the





Bureau reports, standard Treasury reports, investments activity.

Q. Account balances?

A. Exactly.

Q. Those type of things? Okay.

And then who informed -- between the Bureau and Treasury, who informed whom about receipts?

A. I don't understand the question.

Q. Well, a receipt came in -- and you mentioned there would have been a form for receipt transactions, and my question is who -- who filled out that form? Was it Treasury or -- or the Bureau?

A. I don't know.

Q. Okay.

A. On the receipt side.

Q. Okay.

But you -- you've -- you think there was a -- there was a receipt form?

A. Right.

Q. Okay.

But you're not -- you don't -- you're not sure how it was used?

A. Right. On the receipting side, I'm -- I'm not the witness -- the 30(b)(6) witness on the receipting.

Q. Okay.





A. So I don't -- I mean, I'm not -- that's not what I researched and studied up on.

Q. Well, let -- this is receipt into the trust account. And you --

A. You mean like collections?

Q. Well, if a payment is made -- deposit is made into the trust account, so the balance goes up by the amount of that deposit.

A. Um-hum.

Q. It goes back to -- I guess this relates to my earlier question of how did the Bureau know what the available balances were.

A. Um-hum.

Q. And earlier you testified that it largely was a matter of checking the balance --

A. Right.

Q. -- on a daily basis. And now you mentioned there's a receipt form, and I'm just trying to understand how that fits in.

A. Oh, that would be done -- the receipt form would be done out in the field somewhere.

Q. Okay.

A. I'm sorry.

Q. Okay.

So that -- that receipt --

A. That wouldn't be something that the investment people would be dealing with.

Q. Okay.

So the investment people would be dealing with forms regarding --

A. They would be dealing with --

Q. -- making an investment?

A. -- system-generated kind of reports.

Q. By that you mean a computer printout?

A. Right.

Q. Okay.

So if on a given day the Bureau decided -- and this is, again, in the first tranche period -- and I use the Bureau generically in this case to cover whichever office was responsible for managing the trust fund -- decided that "We're going to -- there's a cash available balance of $500,000, and we're going to invest that in a CD," of a given term and given rate.

Would they fill out a form instructing Treasury to make that investment?

A. From what I can see in here, yes, that's what they would have to do.

Q. Okay.

You haven't seen the form, but you're inferring from your knowledge of the basic procedures





that there would have been a form?

A. There would have to have been some type of form --

Q. Okay.

A. -- filled out to transmit to Treasury to --

Q. Okay.

A. -- to transact it.

Q. And then have -- and then once that $500,000 investment matured, Treasury would send back a form indicating that the principal was being returned to the account and the interest was being deposited into the account; is that correct?

A. Correct.

Q. Do -- do you know if there were --

A. To -- to indicate that Treasury -- Treasury would have -- I don't believe Treasury would have sent a form. It would have been a transaction through their system, a money transaction through their system, that would be reflected in their system.

Q. Okay.

And so the Bureau would only know about that by looking at the statements or the reports of the account that showed account activity?

A. And by knowing -- by storing the asset and knowing that the asset -- that the money is expected.





Q. Okay.

I mean, they would -- because they would instruct Treasury in the front end to buy a CD of 90-day term, and at the end of 90 days, they would expect that to be --

A. Right.

Q. -- back plus the interest?

A. Because we know it's coming and the bank is paying it and --

Q. Okay.

A. -- Treasury will have the cash flow.

Q. Okay.

Do you know as part of this -- the decision to make an investment, was there -- on each specific investment, was there communication back to the local -- to the Osage Agency?

MR. BURTON: Objection, vague.

You may answer the question.

Q. (BY MR. PILSK) Did the -- did the Bureau -- the Trust Management Office, or whatever it was called then, send a notice back to the Osage Agency saying "We've invested $500,000 in a 90-day CD"?

A. What is reflected in what I researched is that every attempt was made to get investment instructions from the Tribe, and if the Tribe did not give investment





instructions, then the policy was to roll the funds for 30 days. I did not see anything in the binder, you know, indicating that there was a specific notice sent.

Q. Okay.

I'm asking -- that was -- that was actually going to be my second question, because I'm -- there's a distinction between the Tribe and the Osage Agency, which is the local BIA Office at the Tribe.

And my first question really was, was there communication -- was -- was the agency -- was the local BIA Office in Pawhuska notified every time an investment was made of Osage trust funds?

A. I don't know.

Q. Okay.

And then my next question was going to be about the Tribe, and I think you've -- you've answered that.

Now, with respect to disbursals, we've already talked about the fact that -- that your office didn't calculate the amount of the disbursal, that was done at the local level, but my question is, how did you know or Treasury know to make a disbursal in a given amount?

MR. BURTON: Objection, beyond the scope of the 30(b)(6) topic.

You may answer the question.

THE WITNESS: How did Treasury know how much to disburse?

MR. PILSK: Yeah. You're --

THE WITNESS: That's what you're asking?

MR. PILSK: Right.

Q. Well, let me ask you -- let me take a step back and ask you this.

Did -- we know from other depositions --

A. Um-hum.

Q. -- that the local Osage Agency --

A. Um-hum.

Q. -- calculated what the -- the quarterly headright distribution would be.

A. Okay.

Q. And so now that distribution has to be made. And I'm trying just to figure out who communicated with whom to make the disbursal.

And so, for example, did the Agency communicate with the Trust Office to say "We have our quarterly headright payments are due, we need to distribute, you know, $2 million, to do that"? Is that how it worked, or was there some other mechanism, or do you know?

A. I don't know.

Q. Okay.





You haven't seen -- other than the indications in the account statements that reflect the fact that a distribution was made --

A. Correct.

Q. -- you haven't seen any communications about those distributions; is that correct?

MR. BURTON: I just would make a continuing objection, beyond the 30(b)(6) topic.

You may answer the question.

THE WITNESS: The only thing that I've seen in here about disbursements are the disbursements in the statement, and then there is a few -- a couple examples of the calculation of the annuity amount.

MR. PILSK: Okay.

Q. Now, that discussion, we -- we're focusing on the first Tranche One period, and I -- I just generally want to know, did that -- how that process changed, if at all, over the course of the full Tranche One -- all the Tranche One time periods.

MR. BURTON: Objection, vague, calls for narrative. And I would just renew my previous objection about beyond the scope of 30(b)(6) topic.

You may answer the question.

Q. (BY MR. PILSK) Not with respect to disbursals, with respect to the whole process for what





the notice -- how the Bureau learned of deposits, the communications back and forth between Treasury, if any. I'm just trying to get a sense of did things change over time.

MR. BURTON: I just object, vague, calls for narrative.

You may answer the question.

THE WITNESS: I don't know how to answer the question. It's -- I mean, because the time period is so large, it's '76 to '90, that a lot of things -- you mean did -- did what change in -- I just don't know. I'm sorry.

Q. (BY MR. PILSK) Well --

A. I'm not trying to be difficult, I just don't know.

Q. Well, I'm trying to make this less tedious.

A. Okay.

Q. And actually I could ask this, you know -- ask that same series of questions for every tranche period --

A. Okay.

Q. -- and we'd be here for a while, and I'm just trying to see if there's a way to cut through that.

A. Okay.

Q. And maybe the easiest way -- well, strike





that.

You described a process where once funds are deposited into the account --

A. Um-hum.

Q. -- the Bureau would look on the daily balance --

A. Um-hum.

Q. -- and learn how much money was available for investment --

A. Um-hum.

Q. -- and then make investment decisions. If they had input from the Tribe, they would use that; if they didn't, they would, I think you said, make a 30-day investment.

A. Um-hum.

Q. And there were communications of some sort between the Bureau and Treasury about those investments and money coming back.

A. Um-hum.

Q. And at some point, instructions were received to make a distribution, and the distribution was made.

A. Okay.

Q. Okay? Sort of the life cycle --

A. Um-hum.

Q. -- of a deposit in the trust account.

A. Um-hum.
Q. And during that time, information -- interest accrued, and Treasury advised -- or the interest was posted into the account.
A. Um-hum.
Q. And my question is just trying to see -- I mean, answer this question with respect to '76.
A. Okay.
Q. My question is, did that basic process change over the tranche periods? And if so, how?
MR. BURTON: Objection, calls for narrative. And I'll just make that a continuing objection.
You may answer the question.
THE WITNESS: Okay.
No. I don't think it changed significantly over the period. I think, you know, that's basically the way the investment process worked.
MR. PILSK: Okay.
THE WITNESS: Look at the available balance and go from there.
MR. PILSK: Okay.
Q. Having looked at the -- the balance sheets and account statements that are included in the binders -- and I think most of them are in Exhibit 7 -- did the manner in which the trust account was accounted -- the





accounting of the trust account change over time? Could you tell?
MR. BURTON: Objection, vague.
You may answer the question.
THE WITNESS: I'm going to say no. However, it appears from the reports that the accounting systems changed.
MR. PILSK: Okay.
Q. And what do you mean by that? What -- what do you mean by the accounting system?
A. It appears from the reports that the investment systems that were used changed.
Q. Would this be a software package?
A. Correct.
Q. Okay. Okay.
We were -- when we left off last Friday, we were walking through the documents in Exhibit 7, Volume 2 of the three, and I think we were done with the set of reports for the second tranche period, which include -- which was fiscal year 1981.
A. Can I make one more --
Q. Yes.
A. I don't know if this would fall into the manner, or the approach, but also the 4 percent changed to the overnighter over that period.





Q. Okay.
A. And that didn't -- I mean, that's not -- it's more like -- not the manner, but the default if you weren't in a long-term security.
Q. Okay.
A. Your default went from the 4 percent to the overnighter over that time period.
Q. Okay.
Do you know when that change took place?
A. Mid '80s.
Q. Okay.
And -- and -- excuse me.
Just, if you could, describe what is an overnighter.
A. The overnight investment. It went from if the funds were not invested in a long-term security, then the cash was subject to the 4 percent rate at Treasury to they were subject to a market rate, market -- money market rate invested overnight with Treasury.
Q. Okay.
A. And that started in the mid '80s.
Q. Okay.
And we'll -- I guess we'll look through the documents and be able to see what the rate of return was on those overnight investments?





A. Yes. There's a rate table in -- in one of these binders.
Q. Okay.
What I want to do is -- is continue going through the documents for each tranche month --
A. Okay.
Q. -- but we've already had detailed discussion about what the documents are with respect to the first Tranche One period and the second Tranche One period and how they interact with each other.
And what I really want to do as we move through the remaining Tranche One periods is find out what's -- what, if anything, is different in the format of the documents, so we don't have to -- we've already established how they work together for the Tranche One -- for the first and second periods.
So starting with -- I think it's fiscal year 1986 in Exhibit 7.
And it looks like the first document is the -- is the Arthur Andersen report.
A. Correct.
Q. And this is the same format and the same kind of document as we saw with the other two Tranche One periods?
A. Correct.

Q. Okay.

In looking through this report, the Arthur Andersen report, was there any -- did you notice any -- any changes in the -- the practices and procedures for managing the account?

A. No, I did not.

Q. Okay.

And then the next document is the -- or set of documents are the Summary and Detail of Trust Funds, miscellaneous months of 1986.

And are these Summary and Detail reports the same formatted kind of report as we saw for the second Tranche One period?

MR. BURTON: Objection, the documents speak for themselves.

You may answer the question.

THE WITNESS: Correct.

MR. PILSK: Okay.

Q. And in looking through these documents, did you notice any changes in procedures or the way the trust fund was managed?

A. No.

Q. Okay.

The third set of documents for this third Tranche One period is called MoneyMax reports, February





through June, 1986.

And I don't believe we've seen this report for the prior tranche periods.

Can you describe what this is?

MR. BURTON: Objection, calls for narrative.

You may answer the question.

THE WITNESS: This is a report from the investment system that was in place, a software package, basically, that was used to track the investments, the individual investments.

MR. PILSK: Okay.

Q. In the second tranche period, there was a tab with -- it's called Investment Report, November through December, 1980. And that appeared to track individual investments.

It's right before --

A. May through September?

Q. No. It's -- it's 1980 --

A. Oh, November through December, 1980?

Q. 1980.

A. Okay.

My binder just broke. Hold on.

Okay.

Q. And my -- my question is -- is the MoneyMax report a different version or an updated version of this





investment report we saw in the second tranche period?

A. I don't know.

Q. I notice that there's not a document called Investment Report for the third tranche period, and we have this MoneyMax report instead, but you don't know why -- why there's a different kind of reports for these two tranche periods?

A. I don't know.

Q. Okay.

Can you just briefly walk me through the MoneyMax report for the third tranche period and -- and explain what it's showing?

MR. BURTON: Objection, calls for narrative, vague.

You may answer the question.

THE WITNESS: The -- basically what the first page is showing you is summary statistics about the Tribe's investments as a whole. And it is showing you summary statistics for all of the investments for all of the tribal accounts.

MR. PILSK: Okay.

THE WITNESS: As of a certain date, and it shows the period there in the left-hand corner.

MR. PILSK: Okay.

THE WITNESS: The next page is a Time Deposit





General Journal. It's a posting journal for certificates of deposit for that period, February, 1986.

MR. PILSK: Okay.

Q. Would this be CDs only, or does this include overnighters?

A. Overnighter was not in MoneyMax.

Q. Oh.

A. And this -- and this should be CDs only since it was the Time Deposit General Journal.

Q. Okay.

Is MoneyMax -- maybe you could take a minute and explain what MoneyMax is and what it tracked.

A. What it tracked was investments other than the overnighter.

Q. And it -- and if there was any overlap, it wouldn't have included the 4 percent either?

A. No. I -- it did not cover the 4 percent.

Q. Okay. Okay.

A. The next report in it is the Income Summary Report for time deposits. This report reflects when time deposits or CDs are maturing and how much money is going to flow when they mature.

Q. Okay.

So this reflects, is it correct, every CD that was purchased, and its rate, principal, interest, total

return?

A. And when it's going to pay, and it's a snapshot as of that time period.

Q. Okay.

Is this -- I'm sorry. On these reports, does this show the actual earnings or the projected earnings or return on each investment? In other words, is --

A. This -- this report, the Income Summary Report, is an -- is a projection.

Q. Okay.

So these are investments that were made during that period and what their stated rates and terms and returns were?

A. Correct.

Q. Okay.

A. And because this is MoneyMax, this is not the system of record. The system of record is the Summary and Detail of Trust Fund report, so that is the report you would go to to see what actually happened.

Q. Okay.

So this is -- the MoneyMax is a separate investment tracking?

A. (Nods head.)

Q. Okay.

Okay. Just keep explaining what the -- each





different part of this report is.

A. I need a break --

Q. Okay.

A. -- for one quick minute.

MR. PILSK: Okay. Why don't we go off the record.

THE VIDEOGRAPHER: We are temporarily going off the record at 10:48.

(Proceedings in recess.)

THE VIDEOGRAPHER: We are back on the record at 10:52.

MR. PILSK: Okay. While we were off the record, Ms. Williams pointed out that one page in Exhibit 7 appears to relate to another tribe, and we've agreed that the government will remove that page from this exhibit and provide any substitute pages that relate to the Osage that may be appropriate and that we will work together to answer any -- get any questions we have about those additional pages answered after this deposition.

Q. Okay. Ms. Williams, why don't we turn past the next separator sheet, and if you could just tell me what this next set of documents are. It looks like it's the same kind of report, but for a different time period; is that correct?





A. Right.

MR. BURTON: I would just make -- make a continuing objection, calls for narrative.

You may answer the question.

THE WITNESS: It appears to be another Income Summary Report for March, for the March time period.

Q. (BY MR. PILSK) I notice that the period is March 1, '86, to December 31, '99, on the top of --

A. Correct.

Q. -- page -- and I guess I'm not -- and the previous report was for February 1, '86, to 12/31/99, but it --

A. Because that was for the February report.

Q. Okay.

A. And if I can get to the end of the report -- and I'm going to try to answer the question. I believe what that's reflecting is that they have CDs maturing all the way to the -- December of '99.

Q. Is there a column where the maturity date would be reflected?

A. That should be the Income Date.

Q. Income. I'm not seeing a column for that.

Oh, I see. Income Date. Okay.

A. The Income Date's on the left. The other thing is -- what that reflects is how the time period





that the report is running for, how far out the income is going.

Q. Okay.

And so --

A. The period end. What these reports -- if I remember them correctly, you could say how -- "How far do you want the report to run for? I want income from this period to this period."

Q. I see.

A. Or this period to that period.

Q. And there may or may not be actual activity that far out --

A. Exactly, exactly.

Q. -- but you -- you're trying to capture -- okay.

A. You're trying to capture activity for however period you want it.

Q. Okay.

A. You could set the period.

Q. And as I read these columns, the -- make sure we're on the same --

A. I'm not sure I'm on the same page you are anymore.

Q. -- document.

What page are you on?

A. I'm on 188.
Q. And for what period?
Okay. I think I've got it.
A. I'm still back in February.
Q. Okay. Just a second so we can make sure we're on the same -- I've lost 188.
A. I believe I --
Q. Oh, I got it.
A. -- I went back in time.
Q. Okay.
So Income Date reflects the date of a -- is that the date of maturity of a CD?
A. Correct.
Q. Okay.
And Purchase Date is the date it was purchased?
A. Correct.
Q. And then -- do you know what Line Number means?
A. That's a control number within the report.
Q. Okay.
And then the Fund Number and Appropriation Number reflect the account and the -- which fund it is for the Osage?
A. The Fund Number was the number that -- the





Tribe number, if you will, that was assigned within MoneyMax, and then 7386 is the account number.
Q. Okay.
And then we've got the Name, Rate, Principal, Interest, those are self-explanatory.
A. Um-hum.
Q. Okay.
And then just quickly summarize what the other portions of this -- these MoneyMax reports are behind each separator page, these similar reports.
MR. BURTON: Objection, calls for narrative.
You may answer the question.
THE WITNESS: I believe we've gone through a Time Deposit General Journal. It's the actual posting journal.
Q. (BY MR. PILSK) Which one is this now?
A. I'm -- I went behind the next -- I just kept going --
Q. Okay.
Is this --
A. -- into the next report.
Q. It says Portfolio Statistics from 4/1/86 to 4/30/86? Are you -- past that.
Time Deposit General Journal? Is that what you're looking at?





A. Yeah, I was in Time Deposit, but I don't have a Portfolio Statistics page. I don't know -- let me find a green tab and see if --
Q. All right. Let me see if I can count back.
A. -- that ends up --
Q. It's behind the -- mine is the one --
A. Yep. I'm there. I'm where you are.
Q. Okay.
A. 4/1/86 to 4/30/86?
Q. Okay.
And this is -- this appears to be just the monthly --
A. This is the summary page.
Q. Okay.
For that -- for the month of April?
A. For that month, um-hum.
Q. Okay.
A. And this is the Income Summary Report. We've already talked about that.
Q. Okay.
And now we're at the Time Deposit General Journal.
A. Correct. This is the posting journal.
Q. Okay.
Now, this is still MoneyMax, this is still





only tracking investment activity?
A. Right.
Q. Okay.
A. The detailed investment activity.
And then the next report -- this looks like the May Income Summary Report.
Q. Okay. Right.
A. Because the dates on the top of it have changed.
And then we hit the June Portfolio Statistics page.
Q. Okay.
What's the difference between these Time Deposit General Journal summary reports and the Income Summary Reports?
A. An Income Summary Report is a projection report. A Time Deposit General Journal is a posting report. It's intended to reflect what supposedly happened.
Q. Okay.
A. But what you've got to keep in mind is the entire system is a subsidiary tracking system.
Q. Right. I understand.
So MoneyMax, if I look at the -- the Income Summary Reports, this is telling me that a given

instrument CD was bought on a certain date, it's going to mature on a certain date, and on the face of it, it will generate a certain amount of interest on that date?
A. Um-hum.
Q. And then if I look at the -- in the Time Deposit General Journal pages, this is telling me what actually happened --
A. Correct.
Q. -- but, again, within the MoneyMax investment tracking system?
A. Correct.
Q. And these -- these postings in the Time Deposit General Journal should match up to the Summary and Detail of Trust Funds?
A. That is my understanding. Yes.
Q. Okay.
Because the Summary and Detail are the actual postings to the account?
A. Correct.
Q. Is that correct?
A. Correct.
Q. So if everything is working together, if I see a CD maturing in the Time Deposit General Journal for MoneyMax on a given -- on a certain date, I should be able to look at that date in the Summary and Detail and





see that posted?
A. Correct.
Q. Okay.
Okay. And then the final set of documents in the MoneyMax is -- looks like the same report for -- for the June, 1986, period?
A. Correct.
Q. Okay.
Other than the use of the MoneyMax reports, as opposed to what other -- other system they had for tracking investments, in looking through the documents for this third tranche period, did you notice any other changes in the way the trust fund was managed?
A. No.
Q. Okay.
Well, we've been going for about an hour. Does anybody need a break?
MR. BURTON: I could use a brief break.
MR. PILSK: Okay. Why don't we go off the record for a few minutes.
THE VIDEOGRAPHER: We are temporarily going off the record at 11:02.
(Proceedings in recess.)
THE VIDEOGRAPHER: We are back on the record at 11:11.





Q. (BY MR. PILSK) Okay. Ms. Williams, I think we're moving on next to the -- I think we're up to the fifth -- we were just referring -- I might have made a mistake on the record and referred to the last set of documents as the third tranche period when it was really the fourth tranche period. And this was the -- the one covering fiscal year 1986.
So now why don't we turn to the fifth tranche period covering fiscal year 1989.
And, again, just ask to look at the sets of documents we have here. The first set is -- it looks like the Arthur Andersen Summarized Statement of Account for the Osage trust account; is that correct?
A. Correct.
Q. Okay.
And is this the same format and kind of document as we've seen with the other Arthur Andersen reports for the other tranche periods?
MR. BURTON: Objection, the document speaks for itself.
You may answer the question.
THE WITNESS: Yes.
Q. (BY MR. PILSK) And -- and looking at the Arthur Andersen Summarized Statement of Account for the fifth Tranche One period, did you notice any changes in





the way that the fund was managed?
MR. BURTON: Objection, vague.
You may answer the question.
THE WITNESS: No.
MR. PILSK: Okay.
Q. And then behind the next tab, we have the MoneyMax reports for July through October of 1989.
And are these the same format of reports we saw for the previous Tranche One period?
MR. BURTON: Objection, the documents speak for themselves.
You may answer the question.
THE WITNESS: Yes.
MR. PILSK: Okay.
Q. And then reviewing these reports, did you notice any change in the way the trust fund was managed from the previous Tranche One period?
A. No.
Q. Okay.
I notice that for this fifth tranche period we don't -- the Summary and Detail of Trust Funds report is not attached.
Have you seen the Summary and Detail report for this tranche -- the fifth Tranche One period?
A. No.

Q. Do you know why that report would not have been attached?
A. No.
Q. Okay.
I believe you testified that the Summary and Detail report is the -- and correct me if I use the wrong term, but the -- the accounting report of record, that details the actual transactions in the account; is that correct?
MR. BURTON: Objection, vague.
Q. (BY MR. PILSK) I can't remember the exact phrase that you used.
A. I can't remember the exact phrase. The Summary and Detail report at that time would have reflected the transactions from the system of record.
Q. Okay.
And what is the system of record?
A. At that time, it would have been the trust fund's management system or the old finance system.
Q. Okay.
And just so we -- maybe we can walk through, starting with the first tranche period in 1976, what was the system of record at that time?
A. I believe it was the finance system, the old trust fund's management system.





Q. Okay.
It's the finance system, and then it -- it became the trust fund management system?
A. It was the same system --
Q. Or the same system.
A. -- during that time period --
Q. Okay.
A. -- during the tranche time periods.
Q. From '76 to '90.
A. Correct.
Q. Okay.
And then the -- the Summary and Detail report is a report generated from that system?
A. Correct.
Q. Is that correct? Okay.
The -- do you know whether the Arthur -- if the Arthur Andersen report was created using that system?
MR. BURTON: Objection, beyond the scope of the 30(b)(6) topic.
You may answer the question.
THE WITNESS: I don't know.
MR. PILSK: Okay.
Q. So without the summary and detail report, do we have actual information or information of actual





trust fund activity from the system of record, the accounting system of record, for the trust fund?
A. I -- I don't know. The Arthur Andersen report is in here. It is my understanding that it reflects transactions from the old finance system.
Q. But you don't know for sure?
A. I don't know the source of --
Q. Okay.
A. -- the data. I don't know if it came from the report or straight from the system.
Q. Okay.
If you were looking for as definitive answer as possible about a given transaction, would you want to look at the Summary and Detail report?
A. Yes.
Q. In reviewing the Arthur Andersen report and the MoneyMax reports for the fifth Tranche One period, did you notice any changes in the way the trust fund was managed in that fifth tranche period?
MR. BURTON: Objection, vague.
You may answer the question.
THE WITNESS: No.
MR. PILSK: Okay.
Q. And, now, turning to the sixth Tranche One period -- let me just ask you quickly to identify the





two sets of documents that are -- we have for that period.
A. For fiscal year 1991 --
Q. Yes.
A. -- we have the Arthur Andersen report, and then we have the MoneyMax reports.
Q. Okay.
Is the Arthur Andersen report in the same formatted kind of report that we've seen for the other Tranche One periods?
A. Yes.
Q. And are the MoneyMax reports for the sixth Tranche One period the same kind of reports we've seen for the -- other MoneyMax reports we've seen?
A. Yes.
Q. Okay.
Have you seen -- there doesn't appear to be the Summary and Detail report for the sixth Tranche One period.
Have you seen any Summary and Detail reports for the sixth Tranche One period?
A. No.
Q. Do you know why we don't have the Summary and Detail report for the sixth Tranche One period?
A. No.

Q. And the final tab in Exhibit 7 is called Overnighter Rates.
And could you tell me what this information is?
A. This is --
MR. BURTON: Objection, calls for narrative.
You may answer the question.
THE WITNESS: This is the Treasury overnight rate from the inception of the rate through 1999.
MR. PILSK: Okay.
THE WITNESS: That is not the top sheet that's there, but 1999 is down a sheet.
MR. PILSK: Okay.
Q. It looks like these are arranged by fiscal year, so we start with --
A. Right.
Q. -- October 1, '98, for fiscal year '99.
A. Um-hum.
Q. Okay.
Do you know who prepared these documents?
A. The overnight rate documents?
Q. Yes.
A. My staff.
Q. And where do they get the information on the overnight rate?





A. We have a database.
Q. Okay.
And it's store -- they store all the information from the inception of the program?
A. Correct. We store it for calculations.
Q. Okay.
Does the database have a name that you refer to it as?
A. I don't know if it does.
Q. Okay.
Is -- is this a separate system from the -- the accounting system?
A. Yes.
Q. Is this in MoneyMax?
A. No.
Q. There's a separate system to keep track of the overnighter rates?
A. Correct. It's a database.
Q. Okay.
And where do you get the -- the actual rate information from? Who gives that to you to put into the database?
A. The Office of Public Debt.
Q. Is that Department of Treasury?
A. Correct.





Q. Okay.
And do they inform you of the overnight rate daily?
A. Yes.
Q. I'm just curious. Before or after the investment is made? In other words --
A. At the time of the investment.
Q. So is there -- there's a daily sweep?
A. Yes.
Q. And at that time, you're advised --
A. Yes.
Q. -- that the rate for tonight will be --
A. Yes.
Q. Okay.
And at that time, the rate is then recorded into the database?
A. Yes.
Q. Is it automatic, or does someone have to keypunch it in?
A. We have to keypunch it in.
Q. Okay. Okay.
Now, we identified earlier, and I think marked as Exhibits 7A and 7B, these two Yield Tables and Yield Curves that were added to the -- to the notebook, after it was provided to us.





Do you have those in front of you?
A. Yes.
Q. Why don't we look at 7A first.
And ask you to tell me what this document is.
A. This document reflects the three-month Treasury bill yield at various dates.
Q. Okay.
And who prepared this document?
A. My staff.
Q. At your request?
A. Yes.
Q. And why did you ask them to prepare this document?
A. I wanted to know what the Treasury -- the three-month Treasury bill yield was during the tranche months.
Q. And why?
A. I was just curious.
Q. Okay.
When you got this report, did you compare the -- these yield figures to the yields from the trust, the yields that the trust actually obtained?
A. Not to the yields of the trust, but to the rate that -- or the coupon rate that was on a couple of the CDs.

Q. And what did you find?
A. That the CDs had a higher rate than the three-month T-bill.
Q. Was that -- did you -- tell me how many you checked and what was your method.
A. I checked like three, and my method was judgmental.
Q. You opened a page and looked?
A. I opened a page and looked.
Q. Okay.
So for the three or so that you checked, you found the CD rate was higher?
A. Correct.
Q. Okay.
Did you do anything else with Exhibit 7A?
A. No.
Q. Okay.
And then 7B, can you explain what this shows?
MR. BURTON: Objection, calls for narrative.
You may answer the question.
THE WITNESS: 7B shows a three-month, a six-month, a two-year, a three-year, a five-year a 10-year and a 30-year rate at various times -- at various dates of the Treasury -- Treasury securities.
MR. PILSK: Okay.





Q. So you're looking at Treasury securities and projecting yield out over varying periods of time?
A. What the yield was on Treasury securities at various times in the past.
Q. Okay.
And did your staff also prepare this document at your request?
A. Yes.
Q. And why did you want to look at this data?
A. I wanted to know what longer-term securities were yielding --
Q. Okay.
A. -- at various dates.
Q. And did you compare the results of this 7B to actual investment activity in the trust account?
A. Actually, no. What I wanted to know was whether there were government securities available in 30-day -- 30-day and 60-day flavors.
Q. Okay.
A. And the answer was no.
Q. Okay.
And what --
A. So I didn't use this document for anything other than that.
Q. And why did you want to know that, whether





there were 30- and 60-day investment -- government investment vehicles?
A. Because the portfolio was invested in CDs, and I just wanted to know if there were other vehicles other than Treasury bills at that time.
Q. Okay.
And maybe you can just explain to me the first page of 7B, what that -- what that's showing.
A. This is just the yield curve. This is just showing what the yield curve -- the historical yield curve at the time, at 3/1/76 and 2/2/76, at that -- at -- during that time frame, over time. 2/2/76 and 3/1/76, it's just showing the yield curve.
Q. Oh, okay. I see.
A. The next page is the page I was really interested in, which is showing that at the three-month and the six-month, that there was nothing available --
Q. Okay.
-- and was?
A. -- at 2/76 and 3/76.
Q. I see.
And these are for each of the periods?
A. Right.
And then --
Q. So -- so once you saw that there was nothing





available --
A. Right.
Q. -- you put this down?
A. Right. Once I was seeing that the three-month and six-month at '79 and '80 -- that there was zero, nothing available, I basically set it down.
Q. Okay.
A. And that's what I was using it for.
Q. I notice for the -- in the '86 -- for 3/3/86 and 3/31/86, there do appear to be three- and six-month vehicles.
A. Correct.
Q. Did you -- did you see that, too?
A. I did see that, but I did not compare. I did not use it to compare --
Q. What --
A. -- to the '86.
Q. And why not? Any particular reason?
A. No particular reason. I just did not.
Q. Okay.
Did you do anything else with Exhibit 7B?
A. No.
Q. Let me ask -- sort of change topics for a minute and ask you about the specific investment options that were available during the tranche period, all --

throughout, and we'll -- we can do the same thing as we did before, start with the Tranche One period and then discuss changes over the period.

During the first Tranche One period in 1976, what controlled the available -- or how did the Bureau know what to invest in?

MR. BURTON: Objection, vague.

You may answer the question.

THE WITNESS: In the binders, in Exhibit 8, behind tab 2, there's a document called the BIAM -- 42 BIAM Supplement 3 --

MR. PILSK: Okay.

THE WITNESS: -- 3.11, Investments.

If you look at 3.11D.(1), there's a list of obligations, that it appears to say these are available for investment.

MR. PILSK: Okay.

Q. So this is a -- is this a complete menu of -- of the kinds of investments that the trust fund could make?

A. Near as I could tell. And it's dated 1972, so that should have covered the Tranche One period.

Q. Okay.

So any -- at this time, you could only -- the trust could only be invested in the kinds of vehicles





identified in this document that we're looking at?

A. Other than -- I mean, in addition to CDs.

Q. Okay.

A. I know that CDs were allowed. This seemed to be outlining in addition to CDs, here's some Treasury securities and other obligations that you can go into.

Q. Okay.

Do you know where it's stated that CDs were an acceptable form of investment?

A. A couple pages later, 3.11F.(4). G. It's on -- it says G, Bank Deposits.

Q. Okay. Okay. I see.

So as I look through this 42 BIAM Supplement Number 3, this lays out --

A. Um-hum.

Q. -- the available investment vehicles?

A. Um-hum.

Q. And there was no -- if an investment vehicle isn't authorized in here, it couldn't be made; is that correct?

A. That's my understanding.

Q. Okay.

And are there -- and did the menu change over time as we move through the Tranche One periods?

A. It would have changed by a Solicitor's Opinion





that is dated in 1989, I believe, that might have shuffled the government security menu.

Q. What do you mean by shuffled?

A. Maybe added and subtracted from the government obligations that it could go into.

Q. But these would -- but did it change -- as you recall, did it change the CD that -- whether or not CDs were an available vehicle?

A. No.

Q. And did it -- other than the -- the variations in the government securities, did it add any other private or nongovernmental investment vehicles?

A. No.

Q. Okay.

During the Tranche One periods, were investment decisions governed -- or the available investment vehicles defined by the various iterations of the BIAM supplement -- or the BIA -- Bureau of Indian Affairs Manual?

A. Could you repeat that?

Q. Yeah.

I'm just looking -- projecting forward from '76 through the other Tranche One periods.

In each period, if I -- if I'm a trust officer for the Bureau, wanting to know how to invest money,





would I look to the then current version of the BIAM -- Bureau of Indian Affairs Manual to see what the menu was and then make the investment from that menu?

A. That and the Solicitor's Opinion.

Q. Okay.

Within the available menu of investments, how was the decision made to invest in one vehicle or another? Were there procedures for choosing which one was more appropriate or not?

A. I don't know.

Q. Okay.

Are there procedures now for --

A. Yes.

Q. Okay.

Do you know when those procedures -- are they written?

A. Yes.

Q. Do you know when those procedures were first issued?

MR. BURTON: I just wanted to note for the record that any testimony as to how things are occurring now would be as a fact --

THE WITNESS: Fact.

MR. BURTON: -- versus a 30(b)(6).

THE WITNESS: Right.

MR. BURTON: You may answer the question.
THE WITNESS: Okay.
It was sometime during this last fiscal year that procedure -- detailed procedures on how to -- how to document the selection of one security over another were issued.
MR. PILSK: Okay.
Q. Do those guidelines contain criterion to help the -- the individual employees decide which is the more appropriate vehicle?
MR. BURTON: Objection, the term "appropriate" is vague.
You may answer the question.
THE WITNESS: I agree. I -- appropriate as to --
MR. PILSK: Well, let me -- let me rephrase it --
THE WITNESS: Um-hum.
MR. PILSK: -- and maybe put it in specific terms to see if we can get somewhere.
Q. If I'm -- let's just simplify it and say that I'm a -- I'm one of your employees --
A. Um-hum.
Q. -- and I've got $100,000 of --
A. Um-hum.





Q. -- Osage money --
A. Um-hum.
Q. -- that I need to invest.
A. Um-hum.
Q. And let's just say that I'm trying to choose between a -- a Fannie Mae --
A. Um-hum.
Q. -- investment and -- and a bank CD.
A. Okay.
Q. All right?
What -- how do I decide which one to choose? What are the criterion that I would use?
A. Your question has mixed in our world a policy with a procedure. Part of our policy talks about whether we get into CDs or government securities, a choice whether we get into CDs or government securities. And our policy of choosing CDs over government securities has -- and I'm in the fact world right now, completely in the fact world -- has been, I believe, in place since 1994.
Q. Okay.
A. Our procedures -- detailed procedures on whether we choose a Fannie Mae over a Freddie Mac over a Treasury bond and how we go about doing that have been in place, documented in a -- in an official desk





operating procedure since just this fiscal year, I believe.
Q. Okay.
Are you aware of -- of any similar policies or similar procedures that were in place during the Tranche One periods?
A. I -- only policy or -- slash procedures that I'm aware of are in this BIAM or in that Solicitor's Opinion.
Q. Okay.
We may actually be able to finish.
Are the -- and again, we're staying within the Tranche One periods. My general question, though, is whether the -- the Osage trust account or the procedures and the methods for managing that trust account -- strike that. Let me ask another question first.
Did the Trust Office, or whatever the right word is, over the course of the Tranche One periods, that manage the Osage account also manage IMM accounts?
A. I don't know.
Q. Okay.
Did the same office manage any other kind of accounts, for example, MMS type of accounts?
MR. BURTON: Objection, beyond the scope of the 30(b)(6).





You may answer the question.
THE WITNESS: I need you to be more specific, MMS type of accounts --
Q. (BY MR. PILSK) Any -- any other accounts that managed mineral royalties, other than Osage -- other than Indian accounts.
A. I don't know.
MR. PILSK: Why don't we go off the record and take a brief break, but I think I'm done. I just want to go back through everything and make sure I haven't missed something.
THE VIDEOGRAPHER: We are temporarily going off the record at 11:39.
(Proceedings in recess.)
THE VIDEOGRAPHER: We are back on the record at 11:41.
MR. PILSK: Okay. I have no further questions.
MR. BURTON: I'd like a brief off-the-record break.
MR. PILSK: Okay.
THE VIDEOGRAPHER: We are temporarily going off the record at 11:41.
(Proceedings in recess.)
THE VIDEOGRAPHER: We are back on the record

at 11:53.

MR. BURTON: The government does not have any questions.

I just wanted to note for the record that the parties have agreed that the documents and exhibits produced in this case will be handled as confidential until they determine otherwise, based on confidentiality review.

MR. PILSK: Okay.

THE VIDEOGRAPHER: This deposition will conclude at 11:54.

(Proceedings adjourned at 11:54 a.m.)





IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 00-169L
Judge Emily C. Hewitt

THE OSAGE NATION AND/OR TRIBE
OF INDIANS OF OKLAHOMA,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

CERTIFICATE OF COMPLETION OF DEPOSITION

I, CHERYL ARREGUIN, RPR, CCR No. 22, DO HEREBY CERTIFY that on August 26, 2005, the deposition of MARGARET WILLIAMS was taken before me at the request of, and sealed original thereof retained by:

AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, Northwest
Washington, DC 20036
By: W. ERIC PILSK

I FURTHER CERTIFY that copies of this certificate have been mailed or delivered on , 2005, with changes, if any, by the witness appended, to the following counsel and parties not represented by counsel appearing at the taking of the deposition:





US DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
General Litigation Section
601 D Street, Northwest
Washington, DC 20004
By: BRETT D. BURTON

I FURTHER CERTIFY that examination of this transcript and signature of the witness were not waived by the witness and all parties present.

I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition, including exhibits, to W. ERIC PILSK is $ .

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

CHERYL ARREGUIN
CCR License Number: 21
Expires: 12/31/05





OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA vs. USA
DEPONENT SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below.

PAGE LINE
Change to
Change to
Change to
Change to

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE LINE CORRECTIONS REASON FOR CHANGE

I, Margaret Williams, do hereby certify that I have read the foregoing pages of my testimony as transcribed, and that the same is a true and correct transcript of the testimony given by me in this deposition, taken on August 26, 2005, except for the changes made.

MARGARET WILLIAMS

DATE

DATE DELIVERED/MAILED ________________________

MR. BRETT BURTON
US DEPARTMENT OF JUSTICE
General Litigation Section
601 D Street, Northwest
Washington, DC 20004

RE: OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA vs. USA
Deposition of: MARGARET WILLIAMS
Date Taken: August 26, 2005

DEAR MR. BURTON:

At the time of the above deposition/sworn statement, it was requested that the deponent read and sign the transcript.

____ Enclosed is your copy of the transcript with the original signature page. Please ask the witness to read the transcript and make any corrections on the original signature page and return the original signature page to our office.

____ DUE TO TRIAL IN THIS MATTER BEING SET FOR ____________, SIGNATURE MUST BE COMPLETED BY ____________.

____ Enclosed is a courtesy copy of the transcript with the original signature page. Please read the transcript and make any and all corrections to your testimony that you feel are necessary and indicate such corrections on the attached page. Please only return the attached original signature page to our office, not the transcript.

____ The deposition transcript is now ready to review in our offices. Please call 505-243-5018 to make arrangements for reading and signing.

____ The transcript is now ready for review. Please remit payment in the amount of $__________. Your transcript will be delivered as soon as payment is received. If you choose not to pay, please contact our office at 505-243-5018 to make arrangements for reading and signing.





____ Other:__________________________________________
________________________________________________
________________________________________________.

The New Mexico Rules of Civil Procedure provide the witness 30 days, in most instances, from the receipt of this letter to read and sign the transcript. Failure to read and sign within this time will result in the original transcript being filed without the signature page.

Your immediate attention to this matter will be appreciated. If you have any questions, please call us at (505) 243-5018.

_______________________________
KATHY TOWNSEND COURT REPORTERS