**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | Electronically Filed: May 4, 2006 |
| v. | ) | No. 99-550L (into which has been consolidated No. 00-169L) |
| THE UNITED STATES OF AMERICA, | ) | Judge Emily C. Hewitt |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL BRIEF**

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

BRETT BURTON
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section

MARTIN J. LALONDE
KEVIN S. WEBB
KEVIN J. LARSEN
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
601 D Street, N.W., 3rd Floor
Washington, DC 20004
TEL: (202) 305-0212
FAX: (202) 353-2021

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. TRANCHE ONE LEASES, MONTHS, AND PURCHASERS . . . . . . . . . . . . . . . . . . . . 2

II. CALCULATION OF ROYALTIES FOR THE TRANCHE ONE LEASES . . . . . . . . . . 3

III. DEPOSIT AND INVESTMENT OF OSAGE FUNDS . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. PLAINTIFF HAS FAILED TO MEET ITS BURDEN TO PROVE THAT THE UNITED STATES BREACHED ITS TRUST DUTIES RELATED TO THE COLLECTION OF ROYALTIES FROM THE TRANCHE ONE LEASES FOR THE TRANCHE ONE TIME MONTHS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. Interpretation of the Regulations Applicable to Plaintiff's Royalty Calculation and Collection Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1. The Contours of the Government's duties are defined by the pricing terms in the Osage regulations in effect from 1974 to 1990 . . . . . . . . . . . . . . . . 4

a. "Actual selling price" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

b. "Posted Price" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

c. "Offered price" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

2. Plaintiff's proposed interpretation of 25 C.F.R. § 226.11 is contrary to both the plain meaning of the regulation and the best interest of the Osage Tribe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

a. Plaintiff's interpretation of "offered price" is contrary to the language of the regulations and is unworkable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

b. Plaintiff's proposed interpretation of the pricing regulations is not in the Tribe's best interest and is contrary to the 1906 Act . . . . . 12

4. The Ordinary Meaning of "Posted Price" Supports the Agency's Application of Gravity Adjustments . . . . . 13

B. Federal Price Controls Set the Maximum Price for Purposes of Calculating Royalties in the First Three Tranche One Months . . . . . 14

1. Application of MPPR to royalty interest owners . . . . . 14

2. The use of unregulated prices as the basis for the calculation of Osage royalties was consistent with the 1906 Act and its implementing regulations . . . . . 17

C. The Osage Agency Fulfilled its Duty to Verify That Proper Royalties Were Paid on the Tranche One Leases . . . . . 19

1. Procedures Implemented by the Agency to Ensure Payment on the Volumes Produced from Osage Leases . . . . . 19

2. Royalty Rates . . . . . 22

3. Determination of royalty prices . . . . . 22

a. Highest posted price of major purchasers . . . . . 23

b. Offered Prices . . . . . 25

c. The Interior Board of Indian Appeals reversed the Agency's application of actual and offered prices to, among other months, July 1989 . . . . . 26

4. Verification of oil royalties paid . . . . . 27

5. The correct royalties were paid on the Tranche One leases in the Tranche One months . . . . . 31

D. Plaintiff Is Not Entitled to Late-Payment Penalties Against the Government . . . . . 34

III. PLAINTIFF HAS FAILED TO MEET ITS BURDEN IN PROVING THAT THE UNITED STATES BREACHED ITS INVESTMENT TRUST DUTIES TO THE OSAGE NATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

A. Plaintiff Failed to Demonstrate That the Timing Associated with the United States' Deposit of Osage Oil and Gas Royalties was Unreasonable . . . . . . . . . . . . . . . . . . . . . 34

1. Defendant's Tranche One Deposit Practices Were Reasonable . . . . . . . . . . . . 35

a. Standard for determining whether deposits are timely . . . . . . . . . . . . . 35

b. BIA's Deposit Process for Tranche One Royalty Receipts . . . . . . . . . 36

i. Payments by check . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

ii. Payments by EFT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2. Timing of Deposits of Royalty Receipts for the Tranche One Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

B. The Government Properly Exercised its Discretion to Invest Under 25 U.S.C. §§ 161a and 162a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

1. Relevant factors for determining whether the Government properly exercised its discretion in investing Osage funds . . . . . . . . . . . . . . . . . . . . . . . 42

2. The United States Prudently Invested Tranche One Royalties . . . . . . . . . . . . . 43

a. Interior's Tranche One Osage-Specific Investment Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

b. BIA's Investment of Tranche One Royalty Receipts . . . . . . . . . . . . . . 46

C. Plaintiff Failed to Provide Evidence That the United States Breached its Duty to Deposit and Invest Tranche One Oil and Gas Royalties in a Reasonable Manner . . . . 49

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

TABLE OF AUTHORITIES

FEDERAL CASES

*Advanta USA, Inc. v. Chao*, 350 F.3d 726 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Air Transp. Ass'n v. FEA*, 382 F. Supp. 437 (D.D.C. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Demko v. United States*, 44 Fed. Cl. 83 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

*Dept. of Energy v. Osborn*, 760 F.2d 282 (Temp. Emer. Ct. App. 1984) . . . . . . . . . . . . . . . . 6, 7

*Exxon Corp. v. DOE*, 802 F.2d 1400 (Temp. Emer. Ct. App. 1986) . . . . . . . . . . . . . . . . . . . . . 16

*Exxon Corp. v. Jarvis Christian Coll.*, 1991 WL 771247 (E.D. Tex. Feb. 15, 1991) . . . . . . . . 17

*Frey v. Amoco Production Co.*, 943 F.2d 578 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Grigsby v. Dept. of Energy*, 585 F.2d 1069 (Temp. Emer. Ct. App. 1978) . . . . . . . . . . . . . . . . . 6

*In re Unisys Savings Plan Litig.*, 74 F.3d 420 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Linda Newman Construction Co. v. United States*, 48 Fed.Cl. 231 (2000) . . . . . . . . . . . . . . . . . 8

*Marathon Oil Co. v. FEA*, 547 F.2d 1140 (Temp. Emer. Ct. App. 1976) . . . . . . . . . . . . . . . . . 16

*Mountain Fuel Supply Co. v. Dept. of Energy*,
656 F.2d 690 (Temp. Emer. Ct. App. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*North Central Airlines, Inc. v. Continental Oil Co.*,
574 F.2d 582, 588 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 13

*NVT Tech. Inc. v. United States*, 370 F.3d 1153 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 4

*Osage Tribe of Indians v. Ickes*, 45 F. Supp. 179 (D.D.C. 1942) . . . . . . . . . . . . . . . . . . . . . . . 44

*Pawnee v. United States*, 830 F.2d 187 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Perrin v. United States*, 444 U.S. 37 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*R.L. Griffin v. United States*, 537 F.2d 1130 (Temp. Emer. Ct. App. 1976) . . . . . . . . . . . . . . . 17

*Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . 43

*Ruben v. Secretary of DHHS*, 22 Cl. Ct. 264 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Borden*, 308 U.S. 188 (1939) . . . . . . . . . . 18

*United States v. Cuomo*, 525 F.2d 1285 (5th Cir. 1976) . . . . . . . . . . 6

*United States v. Mason*, 412 U.S. 391 (1973) . . . . . . . . . . 34, 40

*Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348 (Fed. Cir. 2003) . . . . . . . . . . 5

*Wesreco v. Dept. of Interior*, 618 F. Supp. 562 (D.Ct. Utah 1985) . . . . . . . . . . 16

*Wilshire Westwood Assocs. v. Atlantic Richfield Corp.*,
881 F.2d 801, 803-4 (9th Cir. 1989) . . . . . . . . . . 7, 9

FEDERAL STATUTES

12 U.S.C. § 1904 . . . . . . . . . . 14

25 U.S.C. § 161a . . . . . . . . . . 3, 42, 43, 44

25 U.S.C. § 162a(a) . . . . . . . . . . 3, 42, 43, 44

25 U.S.C. §§ 161a . . . . . . . . . . 42

28 U.S.C. § 2501 . . . . . . . . . . 14

30 U.S.C. § 226 . . . . . . . . . . -16

34 Stat. 539 . . . . . . . . . . 1, 3

41 Stat. 1249 (1921) . . . . . . . . . . 44, 46, 48

52 Stat. 1034 . . . . . . . . . . 12

64 Stat. 215 (1950) . . . . . . . . . . 22, 24, 26, 28, 29

87 Stat. 628 (1973) . . . . . . . . . . 14

88 Stat. 102 . . . . . . . . . . 15

FEDERAL REGULATIONS

10 C.F.R. Part 205 (1981) . . . . . . . . . . 15

10 C.F.R. Part 212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10 C.F.R. § 205.55 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

10 C.F.R. § 212.73(c) (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10 C.F.R. § 212.74(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

10 C.F.R. §§ 212.72 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

25 C.F.R. 226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *ibid*

25 C.F.R. 226.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *ibid*

25 C.F.R. § 115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

25 C.F.R. § 226.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

26 C.F.R. § 150.4989-1 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

30 C.F.R. Part 221 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

6 C.F.R. Part 150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**APPENDIX TO DEFENDANT'S ATTACHMENTS FOR**

**POSTTRIAL BRIEF**

| Attachment No. | Description |
|---|---|
| 1 | *M.J. Mitchell*, 3 FEA ¶ 83,146, p. 83,553 (case No. FEA-2199, April 2, 1976) |
| 2 | *United States Geological Survey*, 5 FEA ¶ 80,537, at p. 80,675 (Case No. FEA-0850, January 26, 1977) |

## INTRODUCTION

This Court has tried Plaintiff Osage Tribe's claims that Defendant United States breached its duties to the Tribe with respect to the collection and verification of royalties from the Osage mineral estate, and to the investment of those royalties, in the context of four leases for five months between 1976 and 1989. As is clear from the trial, Plaintiff has failed to meet its burden of demonstrating that the United States has breached its duties and that Plaintiff has suffered damages as a result of the United States's actions.

As to Plaintiff's royalty collection and verification claims, Defendant sets forth herein the appropriate interpretation of the sources of law – particularly, the Act of June 28, 1906, ch. 3572, 34 Stat. 539, as amended ("1906 Act") and its implementing regulations, 25 C.F.R. Part 226 (1982) – that provide the contours of the Government's duties. That interpretation requires that the Bureau of Indian Affairs ("BIA"), through the Osage Agency, collect royalties on the higher of either (1) the actual price paid to a particular lessee or (2) the highest posted or offered prices of major purchasers located in the Kansas-Oklahoma area, which posted or offered prices were available to the lessee. It also requires that, during the period when prices of oil were regulated, royalties be based on no more than the regulated prices.

As shown at trial, in implementing these regulations, the Osage Agency followed practices and procedures that ensured that lessees paid royalties based on the correct volume of oil, royalty rate, and price. Through a comparison of the Tranche One royalties that the Osage Agency actually obtained and those that it should have obtained, Defendant demonstrated that the Osage Agency complied with these practices and procedures and with the 1906 Act and its implementing regulations. Further, this comparison showed that the Agency obtained the correct Tranche One royalties.

Also at trial, Defendant identified the purchasers that paid the royalties on the Tranche One leases and traced their royalty payments through the deposit process into the Osage royalty account. From there, Defendant showed how the funds associated with these purchasers were invested until they were disbursed as quarterly "headright" payments. The facts of this case show that the deposits of the royalty payments were timely. Further, the facts plainly show that the BIA followed a reasonable investment process for the Tranche One payments, and properly exercised its discretion in making investments, including complying with the prudent person standard.

Plaintiff has entirely failed to meet its burden of showing otherwise. This Court should issue judgment in favor of Defendant on the Tranche One issues and claims.

## BACKGROUND

### I. TRANCHE ONE LEASES, MONTHS, AND PURCHASERS

Tranche One encompasses Plaintiff's trust fund mismanagement claims for four oil leases for five sample months: January 1976, May 1979, November 1980, February 1986, and July 1989. *See Osage Nation v. U.S.*, No. 00-169L, April 15, 2005 Order (Dkt. No. 194); *Osage Tribe v. U.S.*, No. 99-169, February 22, 2006 Order (Dkt. No. 176). The Tranche One leases are the North Burbank Unit (I68 IND 25667), North Avant Unit (168 IND 7883), Osage Hominy Unit (168 IND 3618), and East Hardy Unit (14-20-G06-664). *Id*. The companies that were purchasers for the Tranche One leases during the Tranche One months are (1) North Burbank - Phillips; (2) East Hardy - Sun Oil;[1] (3) North Avant - Bigheart, for the first four Tranche One months, and Koch, for the last Tranche One month; and (4) Osage Hominy - Sun Oil, for the first two Tranche One

[1] Sun Ray was the purchaser for the first Tranche One month, but Sun Ray and Sun Oil were either the same company or successors in title. RT 991:10-16.

months, and Union Oil, for the last three Tranche One months.[2] Record of Trial ("RT") 988-94, 1533-1534; Joint Exhibit ("JX") 16; JX32-1; Defendant's Exhibit ("DX") 2675-650.

## II. CALCULATION OF ROYALTIES FOR THE TRANCHE ONE LEASES

The 1906 Act and its implementing regulations promulgated in 1974, as well as lease terms, establish in the Department of the Interior ("Interior") the duties to collect royalties on the Tranche One oil and gas leases for the Osage Tribe. Defendant's Pretrial Memorandum of Contentions of Fact and Law ("Def.'s Pretrial Mem.") at 21-24 of 127 (Dkt. No. 136) . The regulations required the lessee or purchaser to pay royalties on its gross proceeds by the 25th day of the month following the month of sale. 25 C.F.R. § 226.13. The royalties were calculated using the following formula: Royalty Due = Royalty Rate x Volume x Royalty Price. RT 1390:9-15.

## III. DEPOSIT AND INVESTMENT OF OSAGE FUNDS

The Tribe's investment claims are based on the 1906 Act, as well as 25 U.S.C. sections 161a and 162a. The 1906 Act establishes the duty to deposit funds in the Treasury, where they are to be held in trust. 1906 Act § 4. During the first three Tranche One months, the funds in Treasury initially earned four-percent simple interest, 25 U.S.C. § 161a 91976), and, in the latter two months, the funds were initially invested in public debt securities with a one-day maturity (the so-called "Overnighter"), 25 U.S.C. § 161a(a) (1985). At the discretion of the Secretary of the Interior, the funds could be withdrawn from the Treasury and deposited in private banks or invested in Treasury securities. 25 U.S.C. § 162a(a). On a quarterly basis, the funds were disbursed to the "headright" owners. 1906 Act § 4.

---

[2] In discussing Osage Hominy, Defendant's expert Ronnie Martin clarified that Union Oil was the entity that paid the royalty (*i.e.*, the payor), while Koch was the purchaser. RT 1533:14-1534:7. Consequently, in Mr. Martin's Exhibit U (DX2675-650), the column "purchaser" should read "purchaser/payor." *Id.*

## ARGUMENT

## I. STANDARD OF REVIEW

The starting point for the Court's determination of the applicable standard of review to apply to Plaintiff's claims that the Government has breached its duties is the statutory and regulatory language that forms the basis of Plaintiff's claim. *See, e.g., NVT Tech. Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *Pawnee v. United States*, 830 F.2d 187, 191 (Fed. Cir. 1987). To the extent the statutory and regulatory language is silent as to the standard of review, the Court should apply a reasonableness standard to determine whether there has been a breach. For a more detailed discussion of the standard of review, see Def.'s Pretrial Mem. at 55-62 of 127 and Def.'s Brf. Pursuant to Feb. 17, 2006 Order (Dkt. No. 178).

## II. PLAINTIFF HAS FAILED TO MEET ITS BURDEN TO PROVE THAT THE UNITED STATES BREACHED ITS TRUST DUTIES RELATED TO THE COLLECTION OF ROYALTIES FROM THE TRANCHE ONE LEASES FOR THE TRANCHE ONE TIME MONTHS

### A. Interpretation of the Regulations Applicable to Plaintiff's Royalty Calculation and Collection Claims

#### 1. The Contours of the Government's duties are defined by the pricing terms in the Osage regulations in effect from 1974 to 1990

The applicable regulation at issue in this case, 25 C.F.R. § 226.11(a)(2), governs the manner in which the United States verified oil royalties paid by lessees to the Osage Tribe. The regulation states: "settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal." 25 C.F.R. 226.11(a)(2).

##### a. "Actual selling price"

The phrase "actual selling price" is not defined in the regulations. Therefore, it must be

given its contemporaneous and common meaning. An actual selling price is the price received by the lessee for the sale of its oil to a purchaser. RT 1220:25-1221:3, 1402:22-23.

The regulations require that the actual selling price be used for determining the royalty owed from the lessee who actually received the selling price, but not for a lessee who did not receive that price. This is clear from the text of the regulation itself. To conclude otherwise, that is, to conclude that a lessee should base its royalty on the actual price paid to other lessees as Plaintiff has posited, would demand an interpretation of the regulatory language as requiring settlement to be based on "*any* actual selling price," as opposed to "*the* actual selling price." "The" is "[a]n article that particularizes the subject spoken of." BLACK'S LAW DICTIONARY 1324 (5th ed. 1981); *see also Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" (internal citation omitted)). Here, from the context of the regulation, it is plain that the word "the" limits "actual selling price" to the particular lessee receiving the actual price. The first sentence of the pricing provision – providing that the "[l]essee shall pay" the royalty – makes clear that the provision setting forth the basis for the royalty value relates to a singular lessee. 25 C.F.R. § 226.11(a)(1).

The phrase "actual selling price" is followed in the regulations by a comma and an "or" and then by two "price offered" terms – "the highest posted or offered price. . . ." 25 C.F.R. § 226.11(a)(2). The use of punctuation and grammar play an important role in statutory and regulatory construction. *See Demko v. United States*, 44 Fed. Cl. 83, 87 (1999). Generally, the term "or" functions grammatically as a coordinating conjunction and joins two separate parts of a sentence. *See id.* at 88; *see also Ruben v. Secretary of DHHS*, 22 Cl. Ct. 264, 266 (1991). As a

disjunctive, the word "or" connects two parts of a sentence, but it also disconnects their meaning, so that the meaning in the second part excludes that in the first. *Demko*, 44 Fed. Cl. at 88-89. The text of 25 C.F.R. Part 226.11(a)(2) thus demonstrates that each lessee's actual sales price is to be considered separate and apart from the major purchaser's "highest posted or offered price" and that "major purchaser in the Kansas-Oklahoma area" does not modify "actual sales price."[3]

**b. "Posted Price"**

Although the phrase "posted price" is undefined in 25 C.F.R. Part 226, it is a term of art that should be interpreted according to its meaning in the oil industry. *See United States v. Cuomo*, 525 F.2d 1285, 1291 (5th Cir. 1976); *see also Frey v. Amoco Production Co.*, 943 F.2d 578, 583 (5th Cir. 1991); Parties' Stip. of Fact ¶ 5 (Dkt. No. 220-1). A posted price has the following characteristics: it is (1) in writing; (2) publicly circulated; and (3) extended, generally, to all producers in a given field. *See Dept. of Energy v. Osborn*, 760 F.2d 282, 284 (Temp. Emer. Ct. App. 1984); *Mountain Fuel Supply Co. v. Dept. of Energy*, 656 F.2d 690, 692 (Temp. Emer. Ct. App. 1981); *Grigsby v. Dept. of Energy*, 585 F.2d 1069, 1078 (Temp. Emer. Ct. App. 1978); *North Central Airlines, Inc. v. Continental Oil Co.*, 574 F.2d 582, 588 (D.C. Cir. 1978); 26 C.F.R. 150.4989-1 (1981) (Temporary Excise Tax Regulation); 38 Fed. Reg. 33,578 (Dec. 6, 1973) (codified at 6 C.F.R. Part 150) (definition adopted by the Federal Energy Administration).

The most formal way in which posted prices are circulated publicly among sellers and buyers within a given field is by way of a monthly pricing bulletin. RT 865:18-861:19, 1370:9-18. Each bulletin announces the prices that the issuer (*i.e.*, the oil company) will pay for particular

---

[3] Moreover, if "major purchaser" was intended to modify the price actually received, the regulation would have stated that the value is to be determined on the "actual price paid" from the purchaser, rather than the "actual selling price" received by the lessee.

grades of crude oil set forth in the bulletin. RT 1430:20-1431:3; *see also North Central Airlines*, 574 F.2d at 588. Pricing bulletins usually come in the form of a chart. Typically, the charts are divided into columns, the left-hand column listing the various gravities,[4] with the several columns along the top representing a type of crude oil, *e.g.*., Oklahoma Sweet, Oklahoma Sour, West Texas Intermediate, North Texas Intermediate. *See* DX423-1-2; *see also North Central Airlines*, 574 F.2d at 588.

**c. "Offered price"**

The regulations do not contain a definition for the term "offered price." An undefined term in a statute or regulation is deemed to have its ordinarily understood meaning. *See Perrin v. United States*, 444 U.S. 37, 42 (1979); *Demko* 44 Fed. Cl. at 87; *see also Wilshire Westwood Assocs. v. Atlantic Richfield Corp.*, 881 F.2d 801, 803-4 (9th Cir. 1989). In the context of 25 CFR Part 226, an "offered price" is the price presented to a producer by a willing buyer for a given quantity and quality of crude oil. *See* BLACK'S LAW DICTIONARY at 746 (6th ed. 1991); Restatement (Second) of Contracts, §§ 24, 52, 29 comment a (1981). It sets the basis for royalty only as to those lessees to whom the offer was extended. *Okie Crude Co. v. Muskogee Area Director, BIA*, 23 IBIA 174 (1993). In contrast to a "posted price," an "offered price" need not be made in writing or to all producers. *See* 26 C.F.R. § 150.4989-1 (1981) ("The requirement that the offer be in writing and publicly circulated eliminates oral offers and offers made only to specified producers."); *Osborn*, 760 F.2d at 284-85; *Mountain Fuel*, 656 F.2d at 693-94. If it were, it would be a "posted price," and the term "offered price" in the regulations would be rendered superfluous, which is a situation

[4] Gravity is normally expressed in degrees on the American Petroleum Institute's ("API") scale and postings will usually include a deduction for oil that is less than 40 degree API. RT 995-96; Stip. Fact ¶ 4.

generally viewed with disfavor. *See Wilshire Westwood Assoc.,* 881 F.2d at 804.

Soon after the Osage regulations were amended in 1974 to include the "offered price" term, the Osage Agency construed the term "offered price" in a manner consistent with the foregoing definitions. For example, in 1976, the Agency notified purchasers of Osage oil that "Sun Oil Company, along with several other major oil purchasers, offered fifteen cents per barrel over their posting for 'stripper oil' making the price being paid for 'stripper oil,' $14.30 per barrel based on 40 degree gravity oil." DX2334-1. These offers were not in writing or broadly circulated, so they were not posted prices but, rather, were "offered prices." *Id.* Oil classified as "stripper" is oil from wells producing less than ten barrels per day; thus, any of the "majority" of oil producers on the Osage mineral estate that produced "stripper oil" could have received this offered price, and would have been required to pay royalty based on that available price if it was higher than the actual price they received. RT 1228:1-1230:11. This interpretation of "offered price," as applying to those lessees who could have taken advantage of the offer, was contemporaneous with the addition of the term "offered price" to the Osage regulations in 1974. As such, it should be granted deference. *See Advanta USA, Inc. v. Chao,* 350 F.3d 726, 728 (8th Cir. 2003); *c.f. Linda Newman Construction Co. v. United States,* 48 Fed.Cl. 231, 235 (2000) ("Contemporaneous statements construing a contract, made before the dispute arose, are entitled to great weight.").

In summary, royalty payments to the Osage Tribe were based on the higher of either (1) the price the lessee actually received for its oil, or (2) the price(s) offered and available to the lessee from major purchasers located in the Kansas-Oklahoma area.

**2. Plaintiff's proposed interpretation of 25 C.F.R. § 226.11 is contrary to both the plain meaning of the regulation and the best interest of the Osage Tribe**

**a. Plaintiff's interpretation of "offered price" is contrary to the language of the regulations and is unworkable**

Plaintiff contends that the Osage pricing regulations require the United States to consider *any price* that a major purchaser offered in the Kansas-Oklahoma area when computing the oil "floor" price for royalty payment purposes. *See* RT 107:13-24. Such a construction would require the phrase "in the Kansas-Oklahoma area" to modify "offered price" rather than the phrase "major purchaser." The construction would thus require that all offers in the Kansas-Oklahoma area by major purchasers be known to the purchasers, lessees, and the Osage Agency in order to apply properly the Osage regulations. The Court should reject such an unworkable construction.[5]

As the evidence has shown, it would have been impossible for the Osage Agency to obtain all of the prices that major purchasers offered in the Kansas-Oklahoma area. Companies simply would not have volunteered information on their offers. RT 1224:2-26. Further, there is no authority under which the Osage Agency could have compelled companies to produce such information.

Plaintiff has identified no other direct source for information about offered prices in the Kansas-Oklahoma area. Instead, it suggests that prices major purchasers actually paid in the Kansas-Oklahoma area could have been used as a "proxy" for offered prices. RT 253, 1412:11-24. Plaintiff's proposal should be rejected as inconsistent with the regulation, which did not require the Osage Agency to use highest "actual prices" of major purchasers for determining royalty value. *See Wilshire Westwood Assoc.*, 881 F.2d at 804.

---

[5] In addition, Plaintiff's proposed "proxy" is contrary to the plain meaning of the term "offered price" referenced above.

In any event, each of Plaintiff's suggested methods for obtaining actual price information in the Kansas-Oklahoma area would have been unworkable. First, contrary to Plaintiff's suggestion (RT 107:13-24), the Osage Agency could not have obtained information regarding prices paid directly from major purchasers. RT 1412:25-1413:3, 108:1-16.[6]

Second, Plaintiff proposes that actual price information might have been obtained from other government agencies, such as the Minerals Management Service ("MMS"). RT 108:24-109. Again, Plaintiff provides this Court with no support for its proposal. Further, Plaintiff admits that, even if such agency information-sharing were possible, the price information would have been incomplete. *See* RT 109:2-3.

Third, Plaintiff suggests that the Osage Agency might have obtained price information from state tax commissions. RT 109:13-16. This suggestion is unworkable. The state tax commission tracked prices on an average monthly, rather than daily, basis (RT 1222:1-6, 1411:18-19), and the Osage regulations require settlement to be based on the price "on the day of sale or removal." 25 C.F.R. 226.11(a)(2). Further, the Agency was entitled to obtain pricing information from state tax commissions only for Osage production, not all production in the Oklahoma-Kansas area. *See* RT 1413:4-13. Finally, the information was not available until several months after the lessees had paid their royalties (RT 1411:3-16), making the use of this data source impractical.

Fourth, Plaintiff asserts that prices paid for the sale of crude oil at Cushing, Oklahoma might also serve as "proxy" for its "offered price" concept. *See* RT 109:21-110:7. Plaintiff's use

---

[6] Aside from conjecture, Plaintiff offers no factual support for its supposition that major purchasers would have provided this type of information to the government, simply because the Government had asked. In response to the Court's question, "Why would they (the major purchasers) tell you?", Plaintiff's expert, Daniel Reineke, stated: "well, maybe they wouldn't tell you, I don't know. They should tell you, if you ask. I mean, they should tell you. But I think that at least an effort to ask would be appropriate." RT 108:1-8.

of "Cushing Prices" is problematic, however, because oil sold at Cushing is from locations other than Osage County, including Texas. RT 1409:12-1410:24. The so-called "Cushing Price" is artificially inflated due to inclusion of transportation and location adjustments, which prevents it from being truly representative of market price. RT 1409:12-1410:24.

Instead of forcing unworkable proxies into the regulatory scheme, this Court should adopt the workable "plain language" interpretation of 25 C.F.R. section 226.11(a). The phrase "in the Kansas-Oklahoma area" should be read to modify the term "major purchaser," not "posted or offered price."[7] Such an interpretation avoids the factual and legal "impossibility" problems that arise if the Osage Agency had to seek all offered and actual prices in the Kansas-Oklahoma area as discussed above.[8]

The applicable regulations do not require that offered or actual pricing data be gathered from the entire Kansas-Oklahoma area. Rather, Osage lessees must pay royalties based on the prices they actually received, or the highest posted or offered price available to them from a major purchaser in the Kansas-Oklahoma area. By definition, the relevant posted prices would have been

---

[7] In its Motion to Dismiss, in Part, Plaintiff's Tranche One Claims filed June 14, 2005, pp. 18-22 (Case No. 00-169, Dkt. No. 209), the United States suggested that the phrase "in the Kansas-Oklahoma area" modified the posted and offered price terms. The United States now revises its position to reflect the additional information developed during the course of trial preparation and trial. The revised and more appropriate interpretation set forth herein resolves the impossibilities inherent in the alternative interpretation of the regulation, and takes into account the plain language and practical application of the price terms.

[8] An interpretation whereby the phrase "in the Kansas-Oklahoma area" modifies "major purchaser," even though lessees are obligated to base royalties on prices paid or offered in Osage County, comports with the understanding that lessees should be obligated to pay royalties only on prices that they themselves could obtain. By looking to major purchasers in the broader area, the regulations ensured that prices on which royalties were to be based were those from purchasers with the resources to acquire the oil available from the Osage County lessees at the offered or posted prices.

available to all the lessees. Also, in certain situations, offered prices that did not constitute posted prices would have been available, as demonstrated in the 1976 letter related to the generally offered price for "stripper oil," discussed in Part II.A.1.c., *supra*. DX2334-1.

**b. Plaintiff's proposed interpretation of the pricing regulations is not in the Tribe's best interest and is contrary to the 1906 Act**

Maintenance of production levels on the Osage mineral estate was an important aspect of the Government's duties. RT 1185:19-1186:6. Amendments to the 1906 Act expressly state that the regulations governing the leasing of Osage Reservation lands for oil and gas mining purposes should be drafted to secure "the highest percentage of ultimate recovery of both oil and gas." Pub. L. No. 75-711, 52 Stat. 1034, 1035 (1938) § 3, at DX2134-61. In fact, Congress requires the Osage Agency to offer not less than twenty-five thousand acres for oil and gas mining purposes during any one year. RT 1257:4-6; DX2134-61.

Identifying the highest actual selling price and calling that price an "offered price," as Plaintiff's interpretation requires, would have resulted in some lessees paying royalty based upon a price that they could not have received themselves.[9] This would have had a chilling effect on the Osage Agency's ability to promote continued production of the mineral estate and could have led to the decline of royalty proceeds. RT 1248:11-20, 1263:7-20, 1271:3-1273:11. Fewer lessees would have opted to remain in business, and, further, they would have suspended drilling and plugged marginally producing wells.[10] RT 1262:18-1263:20, 1271:24-1272:2, 1272:20-1273:6.

---

[9] This situation stands in stark contrast to that involving the offer by major purchasers for "stripper oil" discussed *supra* Argument Part II.A.1.c. There, the offered price for "stripper oil" was made by a major purchaser and available to all producers selling "stripper oil" in Osage County. DX2334-1. Thus, the offer was for a price that Osage producers *could receive.*

[10] A marginally producing well produces less than ten barrels of oil per day. RT 1186:7-13. A majority of the wells in Osage County produced substantially less than ten barrels per day. *Id.*

Additionally, the Agency would have had difficulty attracting new business to Osage County.[11] RT 1251:12-20. For these reasons, Plaintiff's proposed interpretation is contrary to the intent of the 1906 Act and its amendments.

### 4. The Ordinary Meaning of "Posted Price" Supports the Agency's Application of Gravity Adjustments

The use of gravity adjustments is implicit in the ordinary meaning of the term "posted price." By its very nature, a posted price bulletin is an instrument that communicates to producers in a given field the pricing information that an oil company will pay for particular grades of crude oil. *See* RT 1430:20-1431:3; *see also North Central Airlines*, 574 F.2d at 588. The grade or value of oil is directly related to its specific gravity. RT 1303:1-5. Thus, the Agency, in construing "posted price" in the regulations, properly allowed price adjustments to reflect degrees of gravity.[12]

---

[11] The evidence further demonstrated that there was significant concern expressed by the Osage Tribal Council about loss of income that would result if lessees were forced to plug marginal wells because of being required to pay royalty on a price that they could not obtain. RT 1251:12-20, 1267:7-1273:11; DX2381-2, DX858-1. This concern was echoed in 1987 in a proposed amendment to 25 C.F.R. 226 suggesting a change in the regulation from the "Kansas-Oklahoma area" to "Osage County" to "alleviate the necessity for many of the oil lessees to pay the Osage Tribe more for its royalty than paid by crude oil purchasers. . . and curtail the plugging of marginal wells." 52 Fed. Reg. 38608 (October 16, 1987), at DX2134-230.

[12] Moreover, requiring royalty payments to be based on the highest posted price for 40 degree API oil, regardless of the gravity-type of oil sold by the lessee, would have resulted in lessees (with less than 40 degree API oil) paying royalties on higher prices than they could receive from its sale. RT 1312:21-1313:20. As discussed above, requiring lessees to pay royalties based upon unattainable prices would have led to diminished royalty income in the long-term.

**B. Federal Price Controls Set the Maximum Price for Purposes of Calculating Royalties in the First Three Tranche One Months**[13]

During the first three Tranche One months (January 1976, May 1979, and November 1980), prices for oil in the United States were subject to price and allocation controls promulgated under the Emergency Petroleum Allocation Act ("EPAA") and subsequent amendments. EPAA, Pub. L. No. 93-159, 87 Stat. 628 (1973) (codified as amended at 15 U.S.C. § 751 et seq. (1976 and Supp. 1985)); Def.'s Pretrial Mem. at 75-79 of 127. The price control system applied to royalty interest owners, including Plaintiff.

Pursuant to the EPAA, the Federal Energy Administration ("FEA") promulgated the mandatory petroleum price regulations ("MPPR"). 10 C.F.R. Part 212.[14] These regulations provided a price control system for domestic crude oil, whereby sales of "old" oil (later termed "low-tier" oil) and "new" oil (later termed "upper-tier" oil) were subject to established ceiling prices. 10 C.F.R. §§ 212.72, 212.74, 212.76 (1976); 10 C.F.R. §§ 212.72(c)(2), 212.73, 212.74 (1978). Unregulated or "exempt" oil, such as "stripper oil," was not subject to the federal price controls, however, and could be sold at market prices. 10 C.F.R. § 212.73(c) (1976), § 212.54 (1978).

**1. Application of MPPR to royalty interest owners**

While the MPPR did not specifically indicate whether the price controls applied to royalty

---

[13] Rather than reaching the substance of this issue, the Court should conclude that Plaintiff's challenge to the applicability of the price controls of the EPAA and its implementing regulations is barred by the statute of limitations. 28 U.S.C. § 2501. Plaintiff's claim falls outside of the application of the Appropriations Acts because an accounting is not necessary to show whether there had been a loss due to the application of price controls.

[14] The pricing provisions adopted language that had been promulgated by the Cost of Living Council pursuant to the Economic Stabilization Act, 12 U.S.C. § 1904.

interest owners, the agency charged with implementing the regulations applied them to such owners, as demonstrated in its consideration of the availability of exception relief to royalty interest owners. As part of the regulatory scheme under the EPAA, an affected entity could seek an exception from the price controls "as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens." Pub. L. No. 93-275, § 7(i)(1)(D), 88 Stat. 102; *see* 10 C.F.R. Part 205 (1981). Specifically, an affected entity, such as a producer, had to show that: "(i) the firm ha[d] little incentive to continue production if it is required to sell its crude oil at controlled prices, (ii) the nation would be deprived of the crude oil unless the firm continue[d] its recovery operations, and (iii) the wells involved [we]re already part of a continuing extraction operation." *M.J. Mitchell*, 3 FEA ¶ 83,146, p. 83,553 (case No. FEA-2199, April 2, 1976) (citations omitted) (Attachment 1); *see also Osro Cobb*, 11 F.E.R.C. ¶ 62,240, 1980 FERC Lexis 37 (June 24, 1980); 10 C.F.R. § 205.55 (1981).

Decisions and orders of the FEA consistently concluded that exception relief granted to producers did not extend to royalty interest owners. For example, in *M.J. Mitchell*, *supra*, which was the subject of the October 21, 1977 Memorandum of Law of Leo M. Krulitz, then-Solicitor of Interior ("Krulitz Memorandum") (PX682-2), the FEA granted an exception to the producer but did not extend the relief to the royalty interest owner, the United States Geological Survey ("USGS"). In denying the USGS appeal of the decision, the FEA noted that exception relief had not been granted to the royalty interest owner, because the USGS had not established that it was experiencing any hardship or inequity entitling it to such relief and because granting such relief would have reduced the producer's incentive to continue production through decreasing the producer's return. *United States Geological Survey*, 5 FEA ¶ 80,537, at p. 80,675 (Case No. FEA-0850, January 26, 1977) (Attachment 2); *see also Osro Cobb*, *supra*.

The FEA also rejected the USGS's assertion that the FEA's decision allowing only the producer to obtain exception relief prohibited the USGS from collecting royalties on the producer's gross proceeds[15] or value of production, as required by the USGS regulations and the Mineral Leasing Act, 30 U.S.C. § 226, and its implementing regulations, 30 C.F.R. Part 221. 5 FEA at p. 80,676. In fact, the FEA stated that USGS's regulations could be "superseded by an FEA determination that the Federal interest will be furthered by requiring the royalty payment to the USGS to be limited to the pricing provisions of the EPAA, while the working interest share [*i.e.*, producer's interest] is sold at higher price levels." *Id.* at pp. 80,676-77.[16]

The dispute about the availability of exception relief to royalty interest owners was resolved through the addition of new section 212.74(e) to the MPPR. 45 Fed. Reg. 9526, 9534 (February 12, 1980); *see also* S. Rep. No. 97-512, at 56-57 (1982), *cited in Wesreco v. Dept. of Interior*, 618 F. Supp. 562, 573 n.18 (D.Ct. Utah 1985). In the preamble to the final rule, the Department of Energy (the FEA successor) stated that

> [t]he Office of Hearings and Appeals of the Department of Energy has generally

---

[15] Gross proceeds were "the total monies and other consideration accruing to an oil . . . lessee for the disposition of [oil]." 30 C.F.R. 206.151 (1989).

[16] Interior continued to object to the FEA's interpretation of the EPAA and the MPPR to the extent that it prevented the USGS from obtaining royalties based on the gross proceeds, or the value, received by lessees on federal leases. This objection was the subject of the Krulitz Memorandum (PX682). The Court need not resolve this inter-agency dispute. Tranche One does not involve a situation where the application of the FEA price control regulations prevented Interior from realizing royalty on the gross proceeds of the sale of Osage oil. Rather, Plaintiff here seeks to have royalty based on prices that far exceeded a producer's gross proceeds and were unavailable to the producers. Thus, the underlying dispute in *M.J. Mitchell* and the Krulitz Memorandum is inapposite to Tranche One. In any event, the FEA was given broad latitude to establish a regulatory scheme to achieve the objectives of the EPAA. *See Exxon Corp. v. DOE*, 802 F.2d 1400, 1403 (Temp. Emer. Ct. App. 1986); *Marathon Oil Co. v. FEA*, 547 F.2d 1140, 1145 (Temp. Emer. Ct. App. 1976); Air *Transp. Ass'n v. FEA*, 382 F. Supp. 437, 447 (D.D.C. 1974).

> permitted working interest owners to sell a higher percentage of their production at upper tier or market clearing prices than the regulations would otherwise have permitted where such exception relief has been found necessary to keep the property in production. This relief has not been extended to the owners of royalty interests on the basis that they have not incurred increased costs that impair economic incentive to maintain production.

45 Fed. Reg. at 9528. The amendment explicitly permitted non-operating interest owners, including royalty interest owners, to obtain exception relief. 10 C.F.R. § 212.74(e).

The FEA decisions and the subsequent amendment to the MPPR plainly demonstrate that royalty interest owners, including the United States, were subject to price controls of the EPAA and its implementing regulations. *See also Husky Oil Company*, 11 F.E.R.C. ¶ 61,218, 1980 FERC Lexis 33 (May 30, 1980).[17] Moreover, contrary to Plaintiff's assertion (RT 227:4-14), the availability of exception relief under the EPAA does not support Plaintiff's position that royalties on Osage oil were not subject to the ceiling prices set by the EPAA and MPPR.

**2. The use of unregulated prices as the basis for the calculation of Osage royalties was consistent with the 1906 Act and its implementing regulations**

There is no authority in the 1906 Act or the Osage regulations to support Plaintiff's proposition that, as a royalty interest owner, it was not subject to the MPPR. Nothing in the Osage Act permitted Interior to ignore ceiling prices under the EPAA and MPPR for purposes of determining royalties due from Osage lessees. Nor did the Osage Act set forth a minimum value

---

[17] For further support for the proposition that royalty interests were subject to price controls, see also *R.L. Griffin v. United States*, 537 F.2d 1130, 1139-40 (Temp. Emer. Ct. App. 1976) (finding that royalty owners whose oil was subject to ceiling prices have not had their property taken such that they are entitled to compensation from the United States); *Exxon Corp. v. Jarvis Christian Coll.*, No. TY-80-432-CA, 1991 WL 771247 *1 (E.D. Tex. Feb. 15, 1991) (finding that producer that was found liable for overcharges from sale of oil that it improperly classified as "new" rather than "old" oil was entitled to restitution of the overcharges received by royalty interest owners on the misclassified oil); RT 1314:9-1316:20, 1415:12-1418:20; JX1 Dial Depo. at 146-47.

basis for purpose of determining royalties. Thus, requiring royalties to be based on prices set forth in the MPPR would not conflict with the Osage Act.

In fact, ignoring ceiling prices in calculating royalties would have been contrary to the 1906 Act. Allowing royalties for regulated low-tier oil to be based on unregulated "stripper oil" prices, as Plaintiff asserts should have occurred, would have required lessees to pay royalties based upon a purchase price that they were precluded from charging. This would have resulted in Tranche One lessees paying a royalty rate far in excess of the 1/6 or 1/8 rate called for in their leases. For example, using the unregulated price as the basis for royalty payments on oil subject to the low-tier maximum price would have resulted in an effective royalty rate of 88 percent for the production on the Osage Hominy lease in the 1980 Tranche One month. RT 261:18-264:7. Had Interior required lessees to pay such a high percentage of their oil revenue as royalties based on prices they could not receive, the lessees' incentive to continue their production operations or to acquire Osage leases would have been reduced or removed. *See* RT 1262:15-1263:20, 1317:7-1318:13. Accordingly, such a requirement would have conflicted with the amendments to the Osage Act, requiring the Osage Tribe and the BIA to make the mineral estate productive through annual leasing of a certain minimum acreage. *E.g.*, Pub. L. No. 75-711, 52 Stat. at 1035 (1938) § 3, at DX2134-61. In short, to give effect to the purposes of both the Osage Act and the EPAA required royalties to be based on the prices established in the MPPR. *See* Def.'s Pretrial Mem. at 83-85 of 127 (Plaintiff's construction of Osage Act would undermine purposes of the EPAA); *United States v. Borden*, 308 U.S. 188, 198 (1939).

Further support for the applicability of regulated prices to Osage royalty determinations is found in the Osage regulations, which provide that "[l]essee shall pay or cause to be paid to the Superintendent, as royalty, the sum of not less than 16 2/3 percent of the *gross proceeds* from sales

. . . ." 25 C.F.R. § 226.11(a) (emphasis added). Gross proceeds is the total value or consideration that a lessee receives for the sale of its oil. *See* HOWARD WILLIAMS & CHARLES MEYERS, OIL AND GAS TERMS at 263-64 (4th ed. 1976) (defining "gross value."); 30 C.F.R. 206.151 (1989). Requiring royalties to be based on an unregulated price for oil subject to a regulated price (e.g., requiring payment on the basis of prices for "stripper oil" for "old" or "low-tier" oil) would require payment on far more than the gross proceeds received by the lessee. In contrast, basing royalties on the legal prices that the lessees could have charged would be consistent with basing royalty on gross proceeds.

**C. The Osage Agency Fulfilled its Duty to Verify That Proper Royalties Were Paid on the Tranche One Leases**

The evidence demonstrates that the Osage Agency collected the correct royalties for each Tranche One Lease in each Tranche One month. It followed procedures designed to ensure that lessees paid royalties based on the correct volume, at the correct royalty rate, and for the appropriate royalty price. The following explains these procedures for each element of the royalty formula. It next explains the verification procedures that the Agency implemented at the time of royalty payment. Finally, it demonstrates that the Agency collected the correct royalty amounts.

**1. Procedures Implemented by the Agency to Ensure Payment on the Volumes Produced from Osage Leases**

In the first instance, volumes were measured and reported by the purchasers and lessees. When a purchaser picked up oil from storage tanks at the lease, it would measure the volume purchased through a process called gauging. RT 1049:1-21. A run ticket prepared by the purchaser's gauger provided the volume, temperature, and "quality"[18] of oil purchased from a tank.

[18] The gauger determined the API gravity and the basic sediment and water ("BS&W") content of the oil. RT 998:1-18.

RT 997:1-998:18, 1133:22-1134:1. A gauger would measure the level of oil in a tank before and after a withdrawal and the difference between the two measurements indicated the volume of oil sold. RT 997:3-7. From these measurements, the purchaser's gauger determined the volume of API quality barrels of oil in any given tank. The measurements were subsequently entered on a run ticket (also referred to as a gauge ticket), typically indicating information such as the date and time of the sale, the top gauge, the bottom gauge, temperature in the tank, gravity of the oil, the name of the lessee, the number and location of the lease, and the number and size of the oil tank. RT 1135:18-25. A copy of the run ticket was distributed to the purchaser, the lessee, and the Osage Agency. RT 999:11-16.

In other circumstances, the volume of crude oil sold was measured by a Lease Automated Custody Transfer ("LACT") unit. RT 1007:17-1008:6, 1134:19-25.[19] A LACT unit is used to measure volume (flow) through a meter and quality of oil through sampling. RT 1007:19-22, 1134:17. LACT units were typically calibrated for accuracy by an independent third party, such as Meter Check, on a periodic basis. RT 1008:7-15, 1135:1-8.

The Osage Agency actively monitored the volume determination process of the purchasers and lessees. In the 1983-1989 time period, there were generally two gaugers and six field inspectors. RT 999:24-1000:5. Starting in the late 1970's, Agency gaugers conducted random back-gauging (also referred to as "spot-gauging"), *see* RT 1162:4-6, which consisted of measuring the following prior to the sale of oil: height of the oil ("top gauge"), the gravity, the temperature of the oil, and the BS&W,[20] and then measuring the height of the oil after the sale of oil ("bottom

---

[19] LACT units were used at the Osage Hominy and North Burbank units. RT 1008:16-24.

[20] Gaugers took a sample of oil to determine the BS&W, which is the volume of a sample that is not oil. RT 998:1-999:4. If the sample of oil contained more than one percent BS&W, then the

gauge"). RT 1000:16-1001:1, 1005:13-1006:7, 1125:25-1126:22, 1160; DX37-10. On a monthly basis, gaugers typically recorded these measurements for two to three percent of wells on the Osage mineral estate (RT 1156:15-1157:2), and typically did not find discrepancies between the Agency's volume measurements and the purchaser's volume measurements. RT 1157:12-1158:6. The Agency randomly rotated purchasers in connection with its spot-checking efforts, and this process was well-known among all the purchasers. RT 1160:1-24.

Based on their measurements, the Osage Agency gaugers would record the information on an Agency run ticket and compare their results to the oil purchaser's statement (RT 1005:11-1006:7, 1126:6-13), and the oil purchaser's run ticket (RT 1136:14-17). *See also* RT 1147-55; DX982-1-3.[21] In the event of a discrepancy (greater than a barrel), the gaugers would contact the purchasing company to resolve the disagreement. RT 1006:10-1007:10. If the purchasing company could not provide a satisfactory explanation for the discrepancy, then the lessee was obligated to pay royalty on the difference in the amount removed from the lease. RT 1126:14-17; DX37-10.[22]

The random nature of the Osage Agency's spot-checking process encouraged accurate reporting by purchaser's gaugers. Gaugers who failed to meet the Agency's exacting standards would not be permitted to continue conducting business in Osage County. RT 1158:20-1159:7.

---

oil was no longer considered of merchantable quality. *Id.*

[21] Gaugers also checked tanks to ensure that they had proper locking and sealing devices. RT 1126; DX37-10.

[22] The Agency field inspectors also conducted periodic random inspections and checked for, among other things, production, maintenance, and landowner complaints. RT 1001:5-20, 1004:6-7. Although field inspectors could not do full gauging (height, temperature, and BS&W), they could record basic information on the top gauge and they would notify gaugers of full tanks for possible measurement. RT 1003:15-1004:11; DX2393-6.

The efficacy of the procedure is demonstrated by the fact that the Agency found few discrepancies. RT 1157:12-1158:6. In short, the Agency's processes to ensure recording of proper volumes were reasonable.

The Osage Agency also took steps to prevent oil theft. In order to transport crude oil from the Osage mineral estate, the Agency required that the transportation company register with the Agency, use trip tickets, and appropriately mark vehicles with the name of the transporting company. RT 1182; DX2392-5, 0007. If there was any indication of oil theft, the lease was immediately sealed off, and the Federal Bureau of Investigation and the Osage County Sheriff's Office were contacted. RT 1129:21-1130:5, 1349:7-26; DX37-7. Most reports of alleged theft of oil turned out instead to be the result of poor communication between pumpers, truckers, and the Agency. RT 1130:6-10. In short, Plaintiff failed to present any probative evidence that any oil from Tranche One Leases during Tranche One Months was indeed stolen.

**2. Royalty Rates**

The royalty rate, which is in the leases, was determined by either the United States or, after 1950, by the Tribe. 1906 Act § 3; Pub. L. No. 548, 64 Stat. 215 (1950) at DX2134-80. The rate is either 1/8 (12 ½ percent) or 1/6 (16 2/3 percent) of the value of production, as defined in each lease. RT 863:16-864:11. Particular Tranche One leases, such as North Burbank, provide for royalty rate reductions after lessees meet certain production thresholds. RT 983:7-12, 984:14-19. All of the production thresholds for the Tranche One leases were reached prior to the Tranche One period. RT 985:8-14.

**3. Determination of royalty prices**

To determine the prices on which a lessee should pay, the Osage Agency identified the major purchasers in the Kansas-Oklahoma area and the highest posted prices offered by them.

During certain time periods when offers may have exceeded the price postings, the Agency also obtained the highest prices offered to Osage lessees by the major purchasers.

**a. Highest posted price of major purchasers**

During the Tranche One period, the Osage Agency would obtain the most recent available listings of crude oil purchasers from the Kansas and Oklahoma Corporation Commissions, which indicated the amount of oil each purchaser bought in that state (*see* RT 1013:10-15, 1019:16-1020:11, 1027:21-25, 1194:13-19, 1436:18-19, 1459:7-13, 1474:13-17; DX886). The lists would be used to rank each purchaser in descending order according to the total amount of oil they purchased in both states during the subject month, both as an absolute volume and as a percentage of the volume purchased in the Kansas and Oklahoma area. RT 1016:8-1019:3, 1207:24-1208:3, 1456; DX886-1, DX2675-60*.[23] The Agency also calculated the cumulative total percent of volume purchased in order to determine the major (top 80%) purchasers. RT 1016:8-1019:3, *see also* RT 1436:17-1437:7, 1456:3-1457:10; DX 2345-1-2*, DX2675-43-44, DX2675-60*.

The Osage Agency simultaneously obtained crude oil posted prices (also known as pricing bulletins) from companies that published crude oil price bulletins (postings) for the subject month. RT 1436:6-12, 1462-64, 1477-78; DX2675-46, 0063. These postings delineated different prices for different qualities and types of crude oil. RT 865:18-866:10. The postings typically provided a price for 40 degree API crude oil and a gravity schedule showing how much the company would reduce the price for oil that was lower than 40 degree API. *See* RT 865:21-24. Based on this data, the Agency calculated the highest posted price paid by major purchasers at all degrees (or portions

---

[23] Pursuant to the stipulation of the parties regarding duplicate exhibits, filed on May 4, 2006, Defendant has identified with an asterisk any exhibits for which there is a duplicate. The Court should refer to the attachment to the stipulation for a list of the duplicate exhibit numbers.

thereof) of API gravity oil for each day or periods of days during the production month. RT 1204, 1215:24-1216:19, 1439:14-1441:5.

During the first three Tranche One months (January 1976, May 1979, and November 1980), prices for oil were subject to price and allocation controls. *See supra* at Argument Part II.B. During this era, companies would submit to the Osage Agency pricing bulletins, which delineated different posted prices for categories of regulated oil, such as upper and lower tier oil. RT 869:7-7, 871:5-872:2; DX423-1. The Agency would then consider and select the highest posted prices for the categories of oil. RT 868:21-869:1, 871:13-19. In determining the highest posted price, the Agency essentially used the maximum price that could be legally obtained for each category of oil. RT 1316-17.

Further, during the price control period, as the prices did not change during the month, there was a single price for each category of oil (old or lower tier, new or upper tier, stripper). *See* RT 1433:4-1435:4, 1146:17-1447:7. If one company increased its posted prices, the others would follow suit retroactively. RT 1211:13-25. Because all purchasers paid the same price for oil, it was unnecessary to do the major purchaser/highest posted price analysis done by the Osage Agency in the last two Tranche One months.

During the 1986 and 1989 Tranche One periods, the Osage Agency completed the highest posted price analysis by issuing a pricing letter and an attached pricing schedule by gravity to all lessees and purchasers early in the month following the month of production so that payment could be based on the higher of the posted or actual sales prices. RT 1026:15-25, 1032:22-25, 1213:3-18, 1439:25-1440:19. The letters set forth the highest posted price for each day or range of days for the production month. RT 1034:1-8, 1215:24-1216:21; DX2360-1-2*, DX2547-1-2*, DX2675-58*. It required that oil royalty due must be based on the higher of the posted price for the

appropriate gravity of oil or the actual selling price, (DX 2360-2*, DX2547-1*, DX2675-58*). If the API gravity was different than 40 degree API oil, the Agency referred purchasers and lessees to an attached pricing schedule that set out the highest posted price for lower-gravity oil. RT 1034:1-1035:12, 1439:21-1441:5; DX2360-3*, DX2547-1-2*, DX2675-51*.

**b. Offered Prices**

As explained in Part II.A.1.c., *supra*, soon after the promulgation of the 1974 Osage regulations, the Osage Agency determined that offers by major purchasers for "stripper oil" above the highest posted price would be a basis for calculating the royalty payments of lessees who could have taken advantage of the offers. DX2334-1. There is no evidence, however, that offers exceeding posted prices were available to Osage lessees for unregulated oil during the 1976, 1979, and 1980 Tranche One months.[24] Further, until the late 1980s, including the 1989 Tranche One month, offers above price postings were uncommon. *See* RT 1056:24-1057:9, 1057, 1293:22-25, 1294:21-1295:19. When bonuses above price postings were offered during the 1980s, they were small, generally less than a dollar per barrel. RT 1294:12-16. Moreover, the bonuses were not generally offered to all lessees, but only to particular lessees. *See* RT 1056:4-23. A bonus was usually offered to producers only in unique circumstances, such as when they were located near oil refineries or produced particular qualities or quantities of oil advantageous to the purchaser. RT 1056:9-16, 1296:9-22.

Even if one were to accept Plaintiff's proxy of using actual prices for offered prices, its evidence does not provide legitimate higher actual prices that should be used as the basis for calculating royalty for all leases. As to the first three Tranche One months, Plaintiff improperly

---

[24] Regulated oil generally sold at the maximum lawful ceiling price. *See* RT 1433:1-1434:16.

seeks to have royalties based on unregulated prices even for regulated oil. *See* RT 146:9-13. For February 1986, Plaintiff suggests that its calculated price paid on the East Hardy lease, $24.69, should be used as a proxy for highest offered price. RT 210:22-211:12. This price should be rejected as an appropriate basis for royalties, as it was an anomaly exceeding the highest posted price by over $4.00 (RT 211:13-18), during a time when bonuses above postings were generally less than $1.00. *See* RT 1294:12-16. Moreover, it is likely that the $24.69 price is the result of Plaintiff's using a 1/8 royalty rate, instead of the correct 1/6 rate to calculate the price paid on the East Hardy lease. *See* RT 984:17-24.

**c. The Interior Board of Indian Appeals reversed the Agency's application of actual and offered prices to, among other months, July 1989**

For the 1989 Tranche One month, the Osage Agency, in an October 21, 1991 Order to pay, sought additional royalties from lessees, including on Tranche One Leases, based on prices "offered and paid" by major purchasers for Osage Oil that exceeded posted prices. *Okie Crude Co.*, 23 IBIA at 178.[25] To identify the offers exceeding posted prices, the Agency compared actual daily prices paid in Osage County against the price postings, and sought additional royalties based on the higher actual prices. *Id.* In doing so, the Agency required lessees to pay royalties based on actual prices, whether or not the particular lessees could obtain those prices. In issuing the Order, the Muskogee Area Director reviewed both the 1990 and 1974 versions of the Osage regulations, and found that the wording was only "slightly different." *Id.* The BIA's Order was subsequently reversed by the

---

[25] Despite the Government's proffer that the administrative record documents associated with the *Okie Crude* decision addressed the 1989 Tranche One month, the Court declined to admit the documents into evidence at trial. RT 1107:5-1108:15. The evidence would have shown that Tranche One lessees, such as Phillips Petroleum on the North Burbank lease, were subject to the October 21, 1991 Order of the Muskogee Area Office, AR135.00, and that the Agency calculated the differences between actual and highest posted prices for, among other months, the July 1989 Tranche One month, AR AR144.04.01.

Interior Board of Indian Appeals. *Okie Crude Co.*, 23 IBIA at 174. For the reasons previously stated, Def.'s Pretrial Mem. at 63-72 of 127, the Court should defer to the conclusion of the Board, whose opinion provides Interior's definitive interpretation of the price terms as used in both the regulations in effect during Tranche One and the 1990 amendments to those regulations.

**4. Verification of oil royalties paid**

Each month, the Osage Agency received written reports from both lessees *and* purchasers. *See* RT 877:6-878:13, 880:16-881:19, 1138:23-1139:17, 1519:8-15; DX 2525-1-2*; DX799-1*; DX2505-1, DX1095-1*. Reports submitted by the lessees, called Oil Lessee's Reports, contained information regarding each month's production, and to whom it was sold.[26] *See* DX 799-1*; DX2505-1; RT 880:5-881:19. These reports identified in detailed fashion the volume of oil sold to each purchasing company, the locations from which the oil was produced (legal description of the lease), the contract number of the lease, and, in some instances, the royalty amount derived from the sale. *See* DX799-1*, DX2505-1.

Similarly, on a monthly basis, oil purchasing companies reported to the Osage Agency the volume of oil they purchased. RT 1042:14-1043:2, 1139:9-11; DX 2525-1-2*. These reports, referred to as "oil run statements" or "purchaser reports," were created by each purchasing company and identified the lease and location from which the oil was purchased, the specific gravity of the oil, the volume of oil purchased, the price per barrel, and the gross value. DX2525-1-2*; RT 877-78, 898-900, 1042-46, 1177. In many cases, the purchasing company would submit a report summarizing all of its monthly crude oil purchases. *See* DX1095-1*; RT 874:2-875:8. This report tracked the aggregate volume purchased, as well as royalty paid, broken down by

[26] Lessee reports were sent in to the Osage Agency *every* month, even in months where no production was sold. RT 876:17-19.

royalty rate. *See* DX1095-1*. Purchasing companies obtained this data from run tickets or LACT units. RT 1048:21-1049:7; *see also* Part II.C.1, *supra*.

Royalty checks were submitted on behalf of the lessees each month, usually by the purchasing companies. RT 1043:3-20, 873:2-17. The royalty checks accompanied the oil run statements discussed above. Royalty payments were recorded by the Osage Agency on a Bill for Collection (DX489-1*), which was a receipting instrument that was processed by the Agency on the day payments were received. RT 884:17-25, 888:2-16.

The Osage Agency compared the monthly data reported by lessees and purchasers to verify that the Osage Tribe received the appropriate royalty payment for any given month. RT 1163:11-21, 1519:8-1520:14; DX2469-1. This process required comparison of the volume of oil reported as being sold by the lessees with the volume reported as being bought by the purchaser. RT 902, 904, 909-14, 1519:8-1520:14; DX799-1*, DX2505-1, DX2525-1-2*. The Agency also received run tickets from the purchasing companies at the end of each month (RT 916:3), and randomly compared the data on the run tickets with the data reported on run/purchaser statements. RT 917:16-18, 1522:13-18, 1163:11-21; DX2469-1.[27] Once the volumes were verified as accurate, the Agency computed the royalty amount due from the lessee by multiplying the volume of oil sold by the royalty rate assigned to the lease. RT 900:14-17, 1306:9-15. Next, the Agency verified that the price paid by the purchaser was at least as much as the highest posted price for that specific gravity of oil for that specific date purchased. RT 921:23-923:8, 962:8-963:16; DX2469-1. In the event that the data reported by the lessees and purchasers did not agree, the Agency would conduct

---

[27] Although the Government's witness, Ms. Jerri Jean Branstetter, could not recall an instance where the data differed, she testified that any discrepancies would have been promptly reported to her supervisor. RT 917:19-918:19.

follow-up investigations, as necessary to resolve any discrepancies. RT 1519:15-21, 1522:19-23.

The Osage Agency implemented a detailed record-keeping system to track the acquisition of oil by each purchaser, each month. This data was recorded on a document referred to as a posting schedule. *See* DX2527-1*; RT 928-29. Posting schedules recorded each purchaser's monthly purchase of oil (total barrels and total royalties paid) down to the individual lease level. *See id.* At the end of each month, the purchasers' aggregate purchases were totaled up and, once again, compared with the data reported by the purchasing companies in their purchase, or oil run, statements. *See id.* Finally, each purchaser's aggregate data was compiled and summarized by the Agency in its monthly "Production Report." DX97-1*; RT 929, 892:13-893:3.

After monthly data had been computed and verified by the Osage Agency with no errors, it was recorded on an individual data card maintained for each lease. RT 930-31. Until approximately 1979, this data was manually entered from data cards to a posting machine. *See* RT 931:7-9. Later, the Agency automated this practice, posting it to an I.B.M. "System 36" computer system.[28] Despite the automation, the computation/verification process discussed above remained unchanged. *See* RT 931:7-17, 1163:11-1165:4.

This was a reasonable verification process. As Ronnie Martin, Defendant's oil expert,[29] testified, the Osage Agency process of matching volumes and values from lessee and purchaser statements was "reasonable and effective to ensure that the proper royalties were paid." RT 1518:5-11; DX2675-4. According to Mr. Martin, the Agency verification process was unique,

[28] The System 36 was a computer system used by the Osage Agency beginning in the late 1970's to collect and record royalty-related data, including the lease, production year, location of the lease, production month, gross barrels, and royalty amount. RT 1395:17-1396:24.

[29] Mr. Martin was qualified as an expert witness in oil royalty calculations, verification of royalties paid, and oil royalty practices. RT 1383:20-23, 1385:16-23.

because it required submission of purchasers' statements and because it was conducted on a monthly basis. In contrast, federal and state leases did not require the purchaser to submit statements and they were audited on a far less frequent basis – every five or six years – than the monthly verification implemented by the Osage Agency. RT 1520-21; *see also* JX1, Dial Depo. at 148-49 (USGS and MMS did not require purchasers to submit a purchaser's statement).[30]

Moreover, the Agency's verification system capitalized on the lessee's economic interests. In general, the economic interests of lessees/producers were in opposition to those of the oil purchasing companies. RT 1522:2-12. Lessees/producers had an economic incentive to assure that they were paid appropriately for the volume of crude oil sold. RT 1140, 1522. Indeed, the majority of leases on the Osage mineral estate provided the Tribe with either 1/6 or 1/8 royalty and the lessees would receive the remaining interest (5/6 or 7/8). The lessee (or lessees) had an interest as great as (if not a greater than) the Tribe in collecting the correct volume and value. RT 1140. Even if the lessee and the purchaser were related to one another, such as in a subsidiary relationship, the lessee would still have the incentive to obtain the highest price possible for its crude oil. RT 1141.

---

[30] In addition, Mr. David F. Linowes, the former chairman, Commission on Fiscal Accountability of the Nation's Resources (and author of the Linowes' report, PX81), testified before Congress that "the BIA and the Osage have worked out some excellent methods for keeping track of production, quite beyond anything done so far by the USGS, which is responsible for collecting royalties on other Indian leases, as well as on all federal leases." RT 1549:14-24; DX2368-37. Mr. Linowes was not alone in his admiration of Osage Agency procedures, as numerous groups, primarily other Tribes from the United States, Canada, and Australia, came to the Osage Agency during the Tranche One period to receive training in the Agency's field and accounting department, in areas such as gauging operations and accounting operations. RT 1184:9-1185:14.

**5. The correct royalties were paid on the Tranche One leases in the Tranche One months**

Defendant confirmed that the Osage Agency collected the proper royalty payments, with minor discrepancies, on the Tranche One leases for the Tranche One months. Its expert Ronnie Martin concluded "that there were no material differences between the amounts of royalty received by the Osage Agency . . . and the amounts that were properly due and owing." RT 1386:18-24; DX2675-3. He calculated a difference between the amount paid and the amount due of $6,803, which is a mere .35% apparent underpayment for the Tranche One leases and months. RT 1386:24-1387:15; DX2675-3.

For purposes of his analysis, Mr. Martin assumed that lessors, including the United States, who receive royalty payments were subject to crude oil price controls. RT 1414:21; DX2675-10. In other words, if particular crude oil were subject to a regulated price under applicable price control statues and regulations (for example, if the oil was classified as "old" or "lower tier oil"), Mr. Martin used the regulated price as the oil value for the purpose of determining the oil royalty owed during the Tranche One months of January 1976, May 1979, and November 1980. Mr. Martin also assumed that "offered price" only applies to lessees that were actually offered that price. RT 1403:12-19.

In calculating the royalties due, Mr. Martin used the basic royalty formula, Royalty Due = Volume x Royalty Rate x Price, (RT 1390:12-15), and reviewed numerous sources of data, including original source documents when available. RT 1399:19-24; DX2675-104, 0646. He obtained volumes from lessees' reports, purchasers' statements, the System 36, tax records, and other Agency records, (RT 1390:20-1391:3); royalty rates from the lessees' reports, the System 36, and tax records, (RT 1391:4-10); and price information from purchasers' statements, the System

36, Platt's,[31] price bulletins, and tax records (RT 1391:11-17). If he could not locate necessary data from the original source documents, like a lessee's report, then Mr. Martin would use the System 36 data. RT 1397:3-12. Moreover, he would validate royalty and volumes between the source documents and the System 36 data. RT 1397:13-15, 1505:21-1506:4.

In order to calculate the correct price, Mr. Martin undertook his own major purchaser and highest posted price calculation. RT 1442:4-19. Due to the unavailability of some pricing bulletins, he used Platt's pricing data for the first three Tranche One months, and a combination of bulletins and pricing data for the last two Tranche One months. RT 1432:1-5. Mr. Martin used his own database to determine the major purchasers in Oklahoma and Kansas for 1986 and 1989. RT 1442:16-1446:11. Due to the unavailability of records for the first three Tranche One months, he assumed that all companies were major purchasers (RT 1446:12-22), and then calculated the royalty price by making the appropriate gravity adjustments and selecting the higher of the highest posted price or price paid, (RT 1447:11-1448:3).

Using the methodology and data above, Mr. Martin calculated the royalty due for each Tranche One lease during each Tranche One month, and recorded the royalty due in his Exhibit E-3. RT 1491:17-1492:7, 1499:5-1501:10; DX2675-102. Using the data above, Mr. Martin also determined the royalty actually paid to the Agency in his Exhibit E-2 for the Tranche One leases during the Tranche One months. RT 1486:10-18, 1488-91; DX2675-100. Finally, using data from his Exhibits E-2 and E-3, Mr. Martin calculated the difference between the royalty due and the royalty paid for the Tranche One months and leases, which equaled $6,803. RT 1501:11-1503:25;

[31] Platt's is a commercial service that gathers crude oil data such as price bulletins. RT 1392:14-24.

DX2675-98.[32] Mr. Martin noted that the difference was not likely due to the Agency's failure to collect the correct royalty payments; rather, it was due to the unavailability of documents. DX2675-25-26.

In addition to conducting the methodology above for the Tranche One leases and months, Mr. Martin verified that the royalty amounts on the source documents (lessees' reports, purchasers' statements, tax records, System 36) were in fact received by the Agency by tracing the majority of these amounts to other Agency documents, such as oil purchase reports and Bills for Collection. RT 1526:9-1528:8, 1529:3-18; DX2675-650.[33] Mr. Martin identified the purchasers/payors for all of the Tranche One leases and months.[34] RT 1527:24-1528:8; DX2675-650. He was able to determine the purchasers/payors from purchasers' statements and his determination was consistent with other testimony regarding the identity of the purchasers for the Tranche One leases and months. RT 1533:8-1534:18. Mr. Martin then determined the royalty amount and gross barrels from the source documents and traced these amounts to the oil purchase report and then to the oil production report. RT 1529:24-1533:7, 1537:4-1541:14, DX2675-650; DX2675-667*.

The analysis conducted by Mr. Martin confirms by a 99.65 percent degree of accuracy that the royalty payments made on the Tranche One leases for the Tranche One months were correct. This high level of accuracy confirms that the Osage Agency fulfilled its duty to collect the correct royalty payments. The insignificant discrepancies that were identified do not support a finding that

[32] The data sources Mr. Martin consulted are listed in his Exhibit E-4, RT 1504:5-20; DX2675-105, and contained in his Exhibit J, RT 1508:11-20, DX2675-180-260*.

[33] The documents listed in Exhibit U are cross-referenced and attached in Mr. Martin's Exhibit V. DX2675-652-743*.

[34] Either the purchaser or lessee has the ability to pay royalties. Oftentimes the purchaser would pay the royalties. RT 1528.

the Agency failed to perform its duties, for a trustee should not be held to a standard of perfection. "[I]t has long been recognized that a trustee is not an insurer of trust property," and is not subject to a surcharge for losses to trust property unless he failed to exercise the requisite skill and care. *United States v. Mason*, 412 U.S. 391, 398 (1973), *citing* 2 A. SCOTT, TRUSTS 1408, 1419 (3d ed. 1967).

**D. Plaintiff Is Not Entitled to Late-Payment Penalties Against the Government**

The Osage regulations provide that the party responsible for payment, either the lessee or purchaser, shall be subject to a monthly late charge of not less than 1 ½ percent for failure to timely pay royalties. 25 C.F.R.§ 226.13(a). The purpose of this regulation is obvious. It is intended to encourage timely payment by purchasers or lessees rather than as a means of earning income on the Osage mineral resources. *See* RT 1044:2-6. Assessing late fees against the United States would not advance this purpose. RT 874:2-875:8.

**III. PLAINTIFF HAS FAILED TO MEET ITS BURDEN IN PROVING THAT THE UNITED STATES BREACHED ITS INVESTMENT TRUST DUTIES TO THE OSAGE NATION**

In its October 27, 2005 Order, the Court determined that the United States owed a money-mandating trust duty to invest Plaintiff's oil and gas royalties. Plaintiff has failed to establish that the United States breached this trust duty.

**A. Plaintiff Failed to Demonstrate That the Timing Associated with the United States' Deposit of Osage Oil and Gas Royalties was Unreasonable**

Plaintiff failed to prove at trial that the United States' deposit practices related to Osage Tranche One oil and gas royalties were unreasonable.

### 1. Defendant's Tranche One Deposit Practices Were Reasonable

#### a. Standard for determining whether deposits are timely

There is no statutory requirement imposing on Interior a specific time limit for processing, posting or crediting royalty receipts, or for depositing the receipts in Treasury or other interest-bearing accounts. Although there are no directly applicable statutory or regulatory prescriptions related to the timing of deposits of Osage royalty receipts, Interior followed Government-wide guidelines as well as its own, and thus acted reasonably.

Title 42 of the Bureau of Indian Affairs Manual ("BIAM") provided Interior's guidelines for handling collections during the Tranche One months. RT 1629: 2-4. Pursuant to 42 BIAM 3.9I(1), deposits were to be made within 24 hours of receipt, or the next work day, in a designated Federal depositary. RT 1706:25, 1707:15-22; DX923-20. The guidelines recognized that, when there was no local depositary in the town where a BIA Agency was situated, the Agency could mail receipts to a location where they could be deposited. In such cases, BIA had to mail the deposit and allowances had to be made for the time that process would necessarily take. Under 42 BIAM 3.9I(1)(a), field offices, such as the Osage Agency, were required to mail deposits within 24 hours or by the next workday to a Depositing Collections officer, who could deposit the funds in a Federal depositary. RT 1707:23-1708:5; DX923-20. For office locations without a local depositary, 42 BIAM 6.3.2A(3) required the establishment of a daily cutoff time for collections to be forwarded for deposit as a part of that day's business. RT 1751:17-24; JX21-5. Collections received after the cutoff time were to be included in a transmission made the next business day. RT 1751:24-1752:14, 1753:7-10; JX21-5.

Additionally, the Department of the Treasury ("Treasury") provided instructions in its Treasury Fiscal Requirements Manual ("TFRM") to federal departments and agencies for

depositing agency receipts into Treasury. These instructions applied during the Tranche One period. RT 1767:10-20. Under TFRM 5-1030.10 and 5-4010, only General Depositaries and Federal Reserve Banks were authorized to accept deposits for credit to the Treasury. RT 1770:24-1771:14, 1778:2-11; DX2658-569, 581. As to the timing of deposits, TFRM 5-4020 provided that "[t]he deposit of all funds received for credit to the account of the U.S. Treasury should be made without delay." RT 1778:16-25; DX2658-581. This instruction encouraged Federal agencies to make deposits as soon as possible. RT 1779:1-9.

TFRM 6-8030.40 addressed the timing associated with the deposit of funds by Federal agencies that do not have a Federal Reserve Bank or General Depositary located in the same city. It provides that, when no local depository is available, deposits should be mailed "no later than the morning of the business day following receipt or accumulation of $1,000 or more." RT 1782:1-9; DX2658-666.

**b. BIA's Deposit Process for Tranche One Royalty Receipts**

During the first Tranche One month, purchasers paid their royalties by check. RT1639:1-11, 1670:1-6; DX2676-14, and exhibits cited therein. By 1979, purchasers and lessees had begun making royalty payments via Electronic Funds Transfer ("EFT"). RT 1853:18-1854:2; DX2676-14, and exhibits cited therein. Shortly thereafter, purchasers and lessees began sending the majority of their payments via EFT. RT 1717:15-23. Indeed, all of the royalties owed for the Tranche One leases were paid by EFT during the 1980, 1986 and 1989 Tranche One months. RT 1853:18-1854:2; DX2676-14, and exhibits cited therein.

**i. Payments by check**

Pursuant to 42 BIAM, when a royalty check was received in the mail at the Osage Agency, designated Osage Agency employees would undertake the following actions: log the payment on

a mailroom Schedule of Collections; complete a Bill of Collections for each payee; determine the type of payments received (e.g., oil royalty, gas royalty, etc.); generate a collections office Schedule of Collections listing all of the checks that were to be deposited that day; complete a Certificate of Deposit reflecting the total amount to be deposited that day; and record on an Encoding Sheet the account to which the money was to be credited. RT 1629:5-1633:12, 1639:1-1663:11, and exhibits cited therein.

During Tranche One, there was no federal depositary located in Pawhuska, Oklahoma, where the Osage Agency was located. RT 1781:22-25. The First National Bank in Muskogee, Oklahoma, was the federal depositary where funds from the Osage Agency were deposited during that time period. RT 1663:16-20. Pursuant to the requirements of 42 BIAM 3.9I(1)(a), Osage Agency personnel sent checks, collections office Schedule of Collections, Certificates of Deposit, and Encoding Sheets via certified U.S. Mail to the Muskogee Area Office for deposit. RT 1663:12-20, 1706:25-1708:18; DX923-20.

The Osage Agency's front-end role in the deposit process was typically completed in one day. RT 1708:23-1709:2. Pursuant to 42 BIAM 6.3.2A(3), the Agency had a daily cutoff time by which to mail deposits to Muskogee.[35] RT 1751:17-24; JX21-5. Generally, the U.S. Postal Service delivered mail from Pawhuska to Muskogee within one day. RT 1709:3-10. As a result, payments were typically delivered to Muskogee within one day of their receipt at the Osage Agency. RT 1708:23-1709:10.

Upon receipt of these materials, Muskogee Area Office personnel would review them to confirm that the accounting information provided was complete and accurate; deposit the funds at

[35] If payments were received after the cutoff time, the deposit process would typically be completed the next business day. RT 1751:24-1752:14, 1753:7-10; JX21-5.

the First National Bank in Muskogee; and enter the necessary data related to the receipt transaction into the BIA's accounting system (centrally located in Albuquerque, New Mexico) pursuant to 42 BIAM 3.9I(9). RT 1668:2-21; JX1 Beach Depo. at 19:14-20:11; DX923-24.[36] Tranche One royalty revenues were credited to account number 7386 of the Osage Tribe. RT 396:22-397:2. The deposits were usually made on the same day that the Muskogee office received them. RT 1709:11-15, 1710:1-15; JX1 Beach Depo. at 35:7-36:17. The bank would stamp (*i.e.*, confirm) the Certificate of Deposit, give one copy of the Certificate of Deposit to the Muskogee Area Office, and forward the original of the Certificate of Deposit to the Federal Reserve with the deposit. RT 1777:11-1778:1; JX1, Beach Depo. at 19:14-20:14. Following deposit of the funds, the Muskogee Area Office collections officer would sign the Schedule of Collections and send a copy of it back to the Osage Agency. RT 1658:18-1662:3; JX1, Beach Depo. at 19:14-20:11; DX479.

**ii. Payments by EFT**

In 1979, Treasury issued TFRM 5-4500, and BIA published 42 BIAM Supplement 3.14, which provided agencies with guidelines to follow for the processing of royalty and other payments via EFT. RT 1674:17-1675:5, 1783:17-1784:7; DX528-1; DX2658-583. Treasury and the BIA encouraged the use of EFTs to expedite the deposit of payments. RT 408:24-409:8, 1789:11-23.

Pursuant to 42 BIAM 3.14(H), payors were required to provide written notification to BIA agencies of payments made via EFT. RT 1674:17-1676:12; DX528-5. In addition, Treasury notified Interior of the relevant EFT deposits. At the end of each business day, the Federal Reserve Bank sent notification of all of the wire transfers that it received that day to Treasury's Financial Communications System. RT 1785:4-15. That system segregated all of the messages by agency

---

[36] Under 42 BIAM 3.9(I)(9), deposits were to be recorded into the BIA accounting system on the same day that they were deposited. RT 1668:2-14; DX923-24.

location code ("ALC") and then generated a Daily Support Listing and Deposit Ticket for each ALC, which were provided to the government agencies associated with each ALC. RT 1676:24-1678:18, 1785:4-1786:19; DX528-6, 7, 8; DX689-1, 6. Under TFRM 5-4560.20, agencies received notification of EFTs by mail, fax and, beginning in the mid-1980s, via on-line computer access through the Deposit Message Retrieval Subsystem. RT 407:17-408:19, 1786:20-1787:25; DX2658-584. Payments via EFT of royalties for Osage production were available for investment on the same day that a confirmed Deposit Ticket was generated. RT 408:20-23, 1788:1-24.

After obtaining notification of an EFT, BIA personnel in the Albuquerque Office (BIA-ABQ) would enter the relevant payment information into the BIA accounting system. RT 1671:6-1673:1, 1676:24-1678:6; DX528-6. From that system, Osage Agency personnel would download, on a daily basis, Daily Finance Reports, which referenced any deposits to tribal accounts (including EFTs). RT 1671:24-1672:9. This information was also provided on a monthly Summary and Detail of Trust Funds report that was used by Agency personnel to perform a month-end reconciliation of the BIA accounting system. RT 1672:18-1673:1.

After BIA-ABQ entered data into the BIA accounting system, BIA personnel in the Osage Agency Branch of Minerals would verify that the deposits were accurately recorded in the BIA accounting system. RT 1673:22-1674:16, 1676:13-23; DX528-5. Minerals Branch employees verified that the deposits correctly reflected the appropriate payor, amount, and period of time. RT 1674:12-16.

As the record makes clear, BIA personnel strictly adhered to the requirements of the BIAM and exercised the utmost diligence in faithfully receiving, recording, safeguarding, and depositing Osage Tranche One oil and gas royalties. RT 1679:18-1680:16, 1754:1-8; DX923-4. Indeed, if they had not done so, they would have been held personally liable for any deficiencies. RT

1680:17-1681:4; DX923-4.

**2. Timing of Deposits of Royalty Receipts for the Tranche One Leases**

The United States's accounting expert, Greg Chavarria, undertook a "forensic accounting" of Osage Agency records to evaluate the timing associated with the receipt and deposit of Tranche One oil and gas royalties. RT 1828:24-1829:5, 1831:7-19, 1832:2-17. Mr. Chavarria traced the receipts of royalty payments of Tranche One purchasers[37] into the Osage royalty account 7386. RT 1831:7-1835:5; DX2675-650, 651.

As part of his research, Mr. Chavarria referenced BIA and Treasury source documents (Bills for Collection, Deposit Tickets, Schedules of Collection, Daily Support Listings, Fedwire Deposit System Summaries, and Summary and Detail of Trust Funds reports) and transaction summaries (in electronic and hard copy format) generated as part of Arthur Andersen's "Agreed Upon Procedures and Findings Report for Osage Nation of Oklahoma, July 1, 1972 through September 30, 1992" ("AA Reconciliation Report"). RT 1835:6-1876:21, 2028:3-2034:3, and exhibits cited therein; DX2676-14, and exhibits cited therein.

From that source and summary documentation, Mr. Chavarria was able to track the receipt and deposit of oil and gas royalties paid by purchasers on Tranche One Leases for production related to the Tranche One months. *Id.* He tracked deposits made by check from receipt in the mailroom (mailroom Schedule of Collections)[38] to the completion of forms by the collections office

---

[37] Mr. Chavarria relied on the Tranche One Purchasers identified in Exhibit U of the Expert Report of Ronnie Martin. RT 1831:20-25, 1832:21-1834:9; DX2675-650, 651.

[38] In his expert report, Mr. Chavarria followed the same methodology employed by Arthur Andersen in its analysis of deposit lag time in the Tribal trust fund account reconciliation project. RT 1951:23-1952:11; DX2676-14. That methodology used the date of the Bill for Collection as the receipt date. RT 1951:13-22. At trial, Mr. Chavarria was asked to consider using a different source of information for the receipt date, *i.e.*, the date of the mailroom

(Bill for Collection and Deposit Ticket) to the deposit of funds by the area office and return of forms to the collections office (Schedule of Collections). RT 1835:6-1852:22, 1854:19-1855:9, 2028:3-2034:3, and exhibits cited therein; DX2676-14, and exhibits cited therein. He tracked EFT deposits by cross- referencing Deposit Tickets, Schedules of Collection, Daily Support Listings, Fedwire Deposit System Summaries, and Detail of Trust Funds Summaries. RT 1855:10-1875:16, and exhibits cited therein; DX2676-14, and exhibits cited therein.

Through this tracking process, Mr. Chavarria was able to identify sixteen receipts/deposits related to production for the Tranche One Leases for the Tranche One months. RT 2034:19-25; DX2676:14, and exhibits cited therein. He further determined that for thirteen of those transactions, the time between receipt of payment and deposit was less than or equal to one day. RT 1855:10-1875:16, and exhibits cited therein; DX2676-14, and exhibits cited therein. The remaining three transactions did not exceed two days. RT 1835:6-1852:22, 1854:19-1855:9, 2028:3-2034:3, and exhibits cited therein; DX2676:14, and exhibits cited therein.

Based upon these uncontroverted findings, Mr. Chavarria concluded that the Osage Agency expeditiously deposited the Osage Tranche One royalties and that there was no lost interest due to "deposit lag time."[39] RT 1878:2-1879:12; DX2676-4, 5. The Court should conclude that the

---

Schedule of Collections. RT 1875:17-1876:21, 2028:3-2034:3, and exhibits cited therein. Chavarria agreed and adopted the date of the mailroom Schedule of Collections as the appropriate receipt date for his analysis of the timing associated with deposits of Osage Tranche One royalties. *Id.* Doing so did not change his conclusions, however. RT 1854:3-18, 1877:10-22.

[39] In Mr. Chavarria's expert opinion, lost interest due to "deposit lag time" calculations should include a two day grace period to account for the time required to process, mail, and deposit Osage Tranche One royalties. RT 1854:10-18. The time between the Tranche One receipts and deposits did not exceed two days. DX2676-14. Therefore, Mr. Chavarria concluded that there was no lost interest due to "deposit lag time." RT 1877:10-22.

Government's deposit practices were reasonable and that the Agency's observance of these practices properly discharged its duties related to the timely deposit of royalty receipts.

### B. The Government Properly Exercised its Discretion to Invest Under 25 U.S.C. §§ 161a and 162a

#### 1. Relevant factors for determining whether the Government properly exercised its discretion in investing Osage funds

In enacting sections 161a and 162a, Congress expressly vested in Interior the discretion to select among the investment options and vehicles authorized. 25 U.S.C. §§ 161a, 162a. Congress provided certain parameters to guide the exercise of this discretion. First, Congress set forth the permissible investments in which Osage's tribal trust funds may be placed. Second, Congress provided that investments should be made for appropriate maturities. Finally, Congress provided certain security requirements for certain investments. Def.'s Pretrial Mem. at 96-98, 110-12 of 127.

In addition to these parameters, Interior's exercise of discretion also warrants measurement against a prudent investor standard. *See* 25 C.F.R. § 115.809.[40] In investing trust funds, a trustee should exercise the care, skill, and caution that a prudent person would exercise under the circumstances. William F. Fratcher, Scott on Trusts § 227 (4th ed. 1988); *see also* George T. Bogert, Trusts 385 (6th ed. 1987). Under the requirement of care, a trustee should make a reasonable investigation into the investments available for the trust funds. Scott on Trusts § 227. Under the requirement of skill, a trustee must exercise the reasonable degree of skill of a prudent person. *Id.* § 227.2. Finally, under the requirement of caution, a trustee should recognize that his primary purpose "should be to preserve the trust estate, while receiving a reasonable amount of

[40] Although the current regulations related to investing and managing tribal trust funds (25 C.F.R. § 115) did not exist during the Tranche One period, Interior's explicit endorsement of prudent investment practices in promulgating these regulations in 2002 is consistent with what the Government has demonstrated to have been Interior's conduct in the Tranche One period.

income." *Id.* § 227.3.

Whether a trustee's conduct meets these requirements is judged at the time of his actions and not at a later time. *Id.* "[T]he prudent person standard is not concerned with results; rather, it is a test of how the fiduciary acted viewed from 'the perspective of the time of the [challenged] decision' rather than from the 'vantage point of hindsight.'" *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994) (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)); *see also In re Unisys Savings Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996) (holding that the prudent investor standard requires "focusing on a fiduciary's conduct in arriving at an investment decision, not on its results. . . .").[41]

**2. The United States Prudently Invested Tranche One Royalties**

Plaintiff presented no evidence at trial addressing the prudence of BIA's investment practices. In the absence of any testimony on the subject, Plaintiff utterly failed to meet its burden of proof on this issue. The Court's consideration of this issue should end at this point, for, without any proof, Plaintiff cannot prevail on this claim. Notwithstanding Plaintiff's failure to present any evidence in support of its claim, should the Court decide to continue its inquiry into this issue, the United States presented ample evidence that its Tranche One investment practices and related investment of Osage funds were prudent.

**a. Interior's Tranche One Osage-Specific Investment Practices**

In deciding when and how to invest, pursuant to the discretion granted to the Secretary of the Interior under 25 U.S.C. sections 161a and 162a, BIA's Branch of Investments considered the cash needs of the specific Tribe in determining the appropriate maturities of investments for that

---

[41] For additional detail regarding the abuse of discretion standard, see Def.'s Pretrial Mem. at 98-99, 110-12 of 127.

Tribe. RT 417:17-25, 2099:12-2100:11, 2100:24-2101:20, 2105:20-2107:19, 2114:20-2116:14, 2122:11-2123:6; DX1668-134, 148. The appropriate maturities for investment of Osage funds were dictated by the 1906 Act requirement to make a quarterly headright payment. RT 2089:3-9. Under the 1906 Act, as amended, the United States is required to disburse to each headright owner his or her share of the mineral estate royalties every three months.[42] *Id., see also* 1906 Act § 4; Pub. L. No. 66-360, Ch. 120, 41 Stat. 1249 (1921), at DX 2134-23. To meet this quarterly annuity disbursement requirement, the Branch of Investments considered securities with maturities of three months or shorter in duration to be appropriate investments of Osage royalty funds. RT 414:9-418:6, 2088:21-2091:6, 2100:24-2101:20, 2116:15-2118:5; DX823-5; DX1668-134, 162, 163; DX2695-4.

In addition, the Branch of Investments was limited as to the types of securities that could be purchased with Osage trust funds. Due to the relatively short period that the Government held the Osage royalties, investments were effectively limited to short-term instruments such as Treasury bills and bank certificates of deposit ("CDs"). RT 2100:24-2101:20, 2119:23-2122:10; JX20-3.

After the funds related to the first three Tranche One months became available to Interior,[43] they started earning four percent simple interest under Section 161a until they were placed in longer

---

[42] Not all of the funds in the Tribal trust account would be disbursed as headright payments. Money would be retained in the account to pay gross production taxes and Tribal Council expenses. RT 2123:7-2128:18; DX960-1, 2. *See Osage Tribe of Indians v. Ickes*, 45 F. Supp. 179 (D.D.C. 1942) (explaining gross production tax).

[43] During the Tranche One period, Treasury made deposited funds available to Interior for investment or disbursement as of the date of the confirmed Certificate of Deposit. RT 408:20-23, 1782:10-1783:7, 1788:1-24.

term investments.[44] RT 2095:23-2097:19, 2112:9-14, 2113:5-2114:17; DX1668-122, 152. After the funds related to the later two Tranche One months became available, Interior invested the funds in the Treasury Overnighter until they could be placed in higher-yield bank CDs or Treasury bills.[45] RT 2097:20-25, 2112:14-17; JX1 Williams Depo. at 338:13-19. In some circumstances, Interior invested the funds in short-term Treasury bills until higher-yield CDs became available. RT 2098:1-2101:20, 2111:17-2116:14; DX1668-133, 134, 150, 152, 153.

As soon as possible after receipt of payment, the Branch of Investments sought to place Osage royalty payments in longer-term investments that would mature at or near the date of the annuity payment by which these funds would be disbursed. RT 2099:12-2101:20, 2105:20-2107:19, 2114:20-2116:14; DX1668-134, 148. If these initial investments matured prior to the date of the relevant annuity payments, Interior reinvested the funds either in instruments maturing at or near the annuity payment date or in the Overnighter. RT 2133:9-18, 2157:2-5, 2173:3-8; DX2695-57, 58.

During the Tranche One period, investments in Treasury bills were made daily by telephoning the Treasury by 9:00 am, Mountain Time. RT 2113:5-2114:17; DX1668-152. Because uninvested receipts already were on deposit with Treasury, these investment transactions could be

---

[44] Prior to 1985, funds that were not otherwise invested (known as "cash balances") earned four percent simple interest per annum. RT 2095:23-2097:19, 2112:9-14, 2113:5-2114:17; DX1668-122, 152. Interior would calculate the interest every six months and would place the interest earnings in an interest account associated with the principal account. RT 2095:23-2097:19; JX1 Williams Depo. at 263:4-264:3, 285:15-22, 301:1-10. The Osage royalties were deposited in account number 7386. RT 396:22-397:2. The interest account number was 7886. JX1 Williams Depo. at 285:15-22, 301:1-10.

[45] Beginning in January 1985, cash balances were invested in the Overnighter until they were otherwise invested. RT 2097:20-25, 2112:14-17. On a daily basis, Treasury would inform Interior of the Overnighter rates and Interior would record the earnings from the Overnighter in the appropriate trust accounts. JX1 Williams Depo. at 360:1-362:21.

requested by telephone. RT 2100:12-21; DX1668-134. Written confirmations of requests for purchases and redemptions were prepared by the Branch of Investments and sent to Treasury after the transaction had been executed. *Id.*

Investments in CDs were made on Tuesdays and Thursdays. RT 2098:8-2099:5; DX1668-133, 134. The investment cycle for placing money in CDs began approximately two weeks in advance of placing the money. RT 2099:12-21; DX1668-134, 146-153. The Branch of Investments first determined the amount of funds that would be available for investment, by maturity, for each Tribe. RT 2099:12-21. It then solicited bids from banks that had indicated they wished to accept Indian trust fund deposits. RT 2099:22-2100:11; DX1668-134. Banks responded with bids a day or two before the Branch of Investments intended to place funds. RT 2099:22-2100:11; DX1668-134. The bids were evaluated to identify the bidders offering the highest effective yields for the maturities that would meet tribal requirements. RT 2099:22-2100:11; DX1668-134. Bids were selected based on factors such as the interest rate offered and the availability of sufficient insurance or collateral to secure the principal and anticipated interest payments.[46] RT 2099:22-2100:11; DX1668-134.

### b. BIA's Investment of Tranche One Royalty Receipts

Defendant's expert, Charles Lundelius,[47] evaluated Interior's investment practices and

---

[46] Since, in the absence of additional collateral, no one Tribe could have deposits at a given financial institution in excess of FDIC/FSLIC insurance limits, the Branch of Investments also had to consider whether a bidder already had any of that Tribe's funds on deposit. RT 2103:10-2105:18; DX1668-148.

[47] Mr. Lundelius was qualified as an expert on investment evaluation, including the determination of the prudence of investments and investment practices, financial analysis – including, for example, the calculations of rates of return – accounting, auditing, and damages. RT 2083:5-15.

performance in investing the receipts from the Tranche One leases for the Tranche One months. RT 2083:19-2085:4. Mr. Lundelius evaluated the performance of the United States as trustee of the Osage funds under the prudent investor standard. RT 2083:19-2084:9. As Mr. Lundelius testified, the prudent investor must exercise a reasonable degree of care in selecting investments; a reasonable degree of caution to ensure the preservation of the funds invested; and a reasonable degree of skill in making those selections. RT 2118:15-2119:18, 2129:20-2130:11, 2135:21-2136:3. Mr. Lundelius examined the investment practices that Interior followed generally and in investing the Osage Tranche One funds. RT 2083:19-2220:10, 2249:6-2250:9, and exhibits cited therein. He examined the performance of Interior from the date of receipt of funds from the Tranche One leases to the date that those funds were disbursed as part of a quarterly annuity payment. RT 2143:7-2144:8.

Mr. Lundelius determined that the United States fulfilled the duties of care and caution in investing Tranche One funds by following an investment practice that limited investment horizons to match the disbursements for quarterly annuities, limited investment selection to short-term Treasury bills and bank CDs, required that some funds be readily available for the payment of taxes and Tribal Council expenses, and held funds in short-term Treasury securities including the Overnighter until CDs of appropriate maturity became available. RT 2119:11-2135:8, and exhibits cited therein.

To evaluate whether the United States satisfied the duty of skill, Mr. Lundelius evaluated returns realized on Tranche One funds against an expected rate that a prudent investor could have achieved during this time period under the constraints imposed by the duties of care and caution noted above. RT 2135:21-2136:24; 2139:8-2140:6. Mr. Lundelius derived his quarterly expected

rate from a combination of contemporaneous 3-month CD rates (80% ) and 3-month Treasury bill rates (20% ), to reflect the rates of return on investments available to the Osage funds on a quarterly basis during Tranche One.[48] RT 2136:25-2142:20. To determine the returns on Tranche One funds, Mr. Lundelius conducted a "forensic accounting" of the BIA's Osage investment records. RT 2144:9-2220:10, and exhibits cited therein. First, he identified the royalties paid by Tranche One Purchasers [49] for Tranche One Month production. RT 2143:7-2144:8, 2249:6-2250:9. Second, using source documentation (e.g., Production Reports, Certificates of Deposit, Schedules of Collections, Bills for Collections, Trust Fund Investment summaries, Telegraphic Messages, CD Detail summaries, Investment Letters, Vouchers and Schedules of Payments, Daily Support Listings, Confirmation Journal Vouchers, Summary and Detail of Trust Fund reports, Wire Transfer Reports, Transfer and Correction summaries, MoneyMax Reports, and Internal Transfers Between Appropriations/Activities), Mr. Lundelius followed the royalties from the time the checks were deposited into account 7386, through the manner and means by which they were invested, to the point they were disbursed as part of a quarterly annuity. RT 2143:7-2220:10, 2249:6-2250:9, and exhibits cited therein; DX2695-54-58. Third, he calculated the actual return achieved on the investments. *Id.*; *see also* DX2695-16, 59. He then compared the actual return to the expected return to evaluate the United States' performance under the duty of skill. RT 2143:7-2220:10, 2249:6-2250:9, and exhibits cited therein; DX2695-16, 59. From that analysis, Mr. Lundelius concluded that the United States met or outperformed the expected rate in four of the five Tranche

[48] Mr. Lundelius' quarterly expected rate is not an annual rate. RT 2140:7-14.

[49] Mr. Lundelius relied on the Tranche One Purchasers identified in Exhibit U of the Expert Report produced by the United States' oil royalty expert, Ronnie Martin. RT 2143:7-2144:8; DX2675-650-51.

One periods of investment and, for the fifth, determined that the returns fell just shy of the expected rate. RT 2143:7-2222:22, 2249:6-2250:9, and exhibits cited therein; DX2695-16, 59.

Based upon these findings, Mr. Lundelius determined that the United States fulfilled its duty of skill in investing Osage Tranche One royalties.[50] RT 2221:25-2222:22. Mr. Lundelius finally concluded that, having fulfilled its duties of care, caution, and skill, the United States acted as a prudent investor in its investment of Osage Tranche One royalties. RT 2223:16-2224:3. Given the foregoing, the Court should determine that, because Interior invested only in permissible investments, properly considered maturities, and acted as a prudent investor, the United States did not abuse its discretion under the investment statutes.

**C. Plaintiff Failed to Provide Evidence That the United States Breached its Duty to Deposit and Invest Tranche One Oil and Gas Royalties in a Reasonable Manner**

Plaintiff did not present any evidence at trial as to the reasonableness or prudence of BIA's Tranche One deposit practices. Instead, Plaintiff focused its efforts on damage calculations based on non-Tranche One specific annual data derived from the Arthur Andersen-prepared Tribal trust fund account reconciliation report. Since actual data for Tranche One demonstrates that the Government discharged its duties related to the deposit of the Osage royalties, the Court should reject Plaintiff's generalized "deposit lag time" claims and damage calculations.

Plaintiff also did not provide any evidence at trial regarding the prudence of the United States' investment of Osage oil and gas royalties during Tranche One. As with its claims regarding "deposit lag time," Plaintiff opted to present flawed damage calculations, without proving any breach of investment duties.

---

[50] In Mr. Lundelius' expert and uncontroverted opinion, a prudent investor can fulfill the duty of skill even if its investments occasionally underperform the expected rate. RT 2222:23-2223:15.

## CONCLUSION

For the foregoing reasons, the Court should conclude that Plaintiff has failed to meet its burden of proving that the United States breached its duties related to the collection and verification of royalty payments for the Tranche One leases and months and related to the deposit and investment of those payments.

Respectfully submitted this 4th day of May, 2006,

*s/ Brett D. Burton*
BRETT D. BURTON
Counsel of Record for Defendant

*s/ Martin J. LaLonde*
MARTIN J. LALONDE
KEVIN S. WEBB
KEVIN J. LARSEN
United States Department of Justice - ENRD
Washington, D.C. 20044-663
Telephone: (202) 305-0212
Fax: (202) 353-2021
Attorneys for Defendant

OF COUNSEL:
Elisabeth Brandon
Brenda Riel
Teresa E. Dawson