# ATTACHMENT 1

eral Energy Administration. The provisions of 10 CFR, Part 205, Subpart H, set forth the procedures and criteria which govern the filing and determination of any such appeal.

## ¶ 83,146

**M. J. Mitchell, Dallas, Texas (Case No. FEE-2199, Filed 2-3-76, Decided 4-2-76).**

**Crude oil.**—M. J. Mitchell (Mitchell) filed an Application for Exception from the provisions of 10 CFR, Part 212, Subpart D, which, if granted, would permit Mitchell to sell crude oil produced from the Minnelusa Sand Unit at the upper tier ceiling price. In considering Mitchell's exception request, the FEA determined that: (i) the costs of producing crude oil from the Minnelusa Sand Unit have increased significantly since 1972; (ii) as a result of these cost increases, Mitchell's production costs exceed the price which he is permitted to charge for the crude oil which he sells; (iii) consequently, Mitchell does not have an economic incentive to continue to operate the Minnelusa Sand Unit; and (iv) if Mitchell abandons his production activities at the Minnelusa Sand Unit the nation's recoverable supply of crude oil would be reduced by approximately 337,000 barrels. On the basis of previous precedents involving the same type of factual findings, the FEA concluded that the application of the lower tier ceiling price rule in this case resulted in a gross inequity. Accordingly, Mitchell was granted exception relief which permits him to sell at the upper tier ceiling price 76.66 percent of the working interests' share of the crude oil produced from the Minnelusa Sand Unit.

### [Decision and Order]

On February 3, 1976, M. J. Mitchell (Mitchell) filed an Application for Exception from the provisions of 10 CFR, Part 212, Subpart D, with the Office of Exceptions and Appeals of the Federal Energy Administration. The exception request, if granted, would permit Mitchell to sell the crude oil produced at the Minnelusa Sand Unit in the Pickrel Ranch Field, Campbell County, Wyoming, at the upper tier ceiling price.

The Federal Energy Administration, having considered the Application for Exception filed by Mitchell, has concluded that:

(a) Mitchell is the sole operator of a secondary recovery operation producing crude oil at the Minnelusa Sand Unit in the Pickrel Ranch Field in Campbell County, Wyoming. Mitchell began operating the property in October 1971, when he assumed exclusive control of the water flood operation initiated in April 1970 by the Continental Oil Company. The property consists of three producing wells and two active water injection wells. There are also four abandoned wells. Mitchell owns an 84.9338 percent working interest in the Unit. As a result of these operations, Mitchell is a producer of crude oil as that term is defined in 10 CFR 212.31, and is therefore subject to the provisions of 10 CFR, Part 212, Subpart D, which govern the pricing of crude oil. In his exception request, Mitchell contends that the application of the lower tier ceiling price rule results in a serious hardship and a gross inequity to the operations at the Minnelusa Sand Unit.

(b) The provisions of Subpart D were amended on February 1, 1976 in order to effectuate the crude oil pricing

policy specified in Section 401 of the Energy Policy and Conservation Act (EPCA, Pub. L. 94-163). 41 Fed. Reg. 4931 (February 3, 1976). Those amendments establish a two tier pricing mechanism applicable to all first sales of domestic crude oil. Under the two tier pricing system, old crude oil must be sold pursuant to the lower tier ceiling price rule set forth in 10 CFR 212.73, while stripper well lease crude oil and new crude oil may be sold without regard to the lower tier ceiling price rule but pursuant to the upper tier ceiling price rule set forth in 10 CFR 212.74.[1]

(c) Mitchell's crude oil production during 1973 averaged 19,682 barrels per month. However, production has declined steadily since 1973, and the property produced an average of only 5,830.20 barrels per month in 1975. As a result of this decline in production, all crude oil produced and sold from the Unit is subject to the lower tier ceiling price of $5.13 per barrel. Mitchell states that the Unit's operating costs to the working interest have increased from $.8273 per barrel on May 15, 1973 to an average of $7.3442 per barrel during 1975. Consequently, Mitchell claims that there is no incentive to continue producing oil at a cost of $7.3442 per barrel so long as the price which he may charge for the crude oil is limited to $5.13 per barrel. Mitchell contends that unless exception relief is granted the only feasible alternative is to cease operating the Unit, which he states would diminish the nation's available supply of domestic crude oil by approximately 337,000 barrels.

(d) In support of his claims Mitchell has submitted financial, cost, and production data for the Minnelusa Sand Unit. Table A summarizes the operating cost increases which the working interest owners of the Unit have incurred between 1972 and 1975.

*TABLE A*

*Cost Per Barrel of Net Production*[2]

| *Item* | *1972* | *1973* | *1974* | *1975* |
|---|---|---|---|---|
| Production Tax | $ .0011 | $ .0018 | $ .0037 | $ .0024 |
| Labor | .0908 | .0655 | .1223 | .2875 |
| Payroll Taxes and Insurance | .0073 | .0055 | .0111 | .0272 |
| Fuel Oil and Grease | .0949 | .0640 | .1304 | .3314 |
| Electrical Power | .1231 | .1262 | .2420 | .6746 |
| Submersible Pump Repairs | .0455 | .0645 | .7559 | 2.0137 |
| Injection and Other Repairs | .1363 | .0415 | .1444 | .1704 |
| Third Party Well and Lease Services | .3491 | .1735 | .3808 | .9319 |
| Chemicals | .0413 | .0437 | .0538 | .1239 |
| Supplies | .0333 | .0372 | .0264 | .0829 |
| Taxes | | | | |
| Ad Valorem | .0769 | .1115 | .3837 | .9154 |
| State Severance | .0134 | .0199 | .2120 | .7942 |
| Production Plant Cost | .4003 | .2067 | .3272 | .7860 |
| Field Overhead | .1206 | .0177 | .0200 | .0198 |
| Home Office Overhead | .0963 | .0542 | .0854 | .1828 |
| Total | $1.6301 | $1.0335 | $2.8992 | $7.3442 |

(e) Mitchell has also submitted data which indicates that the increasing expenses and the effect of the $5.13 per barrel price ceiling have resulted in a deteriorating financial position for the Minnelusa Sand Unit operations. Table B below shows Mitchell's net operating income for the Unit from 1972 to 1975.

[1] For a full discussion of the provisions of Subpart D and the amendments which were made to those regulations in order to effectuate the policy as set forth in EPCA, see *Pruet & Hughes Co.*, 3 FEA ¶ 83,116 (February 27, 1976); *Great Southern Oil and Gas Co., Inc.*, 3 FEA ¶ 83,111 (February 27, 1976).

[2] Net production is total production minus the 15.0662 percent of production allocated to royalty interests.

*TABLE B*

*Net Operating Income*

| | *1972* | *1973* | *1974* | *1975* |
|---|---|---|---|---|
| Net Revenue to Working Interest[3] | $346,145.95 | $763,141.78 | $1,002,069.09 | $305,041.25 |
| Operating Expenses | 175,088.24 | 207,256.06 | 368,558.16 | 436,402.68 |
| Net Operating Income (Loss) | $171,057.71 | $555,885.72 | $ 633,510.93 | $(131,361.43) |

Table C below shows Mitchell's net operating income per barrel during the same period of time.

*TABLE C*

*Net Operating Income Per Barrel*

| | *1972* | *1973* | *1974* | *1975* |
|---|---|---|---|---|
| Net Production to Working Interest (bbl) | 107,412.20 | 200,533.67 | 127,124.25 | 59,421.72 |
| Net Revenue to Working Interest Per Barrel | $3.2226 | $3.8056 | $7.8826 | $5.1335 |
| Operating Expenses Per Barrel | 1.6301 | 1.0335 | 2.8992 | 7.3442 |
| Net Operating Income (Loss) Per Barrel | $1.5925 | $2.7721 | $4.9834 | $(2.2107) |

(f) The data presented in Tables B and C supports Mitchell's contention that the lower tier ceiling price of $5.13 per barrel offers no incentive to continue the production of oil from the Minnelusa Sand Unit. The prospect of continued operating losses substantiates Mitchell's claim that the only feasible alternative is to abandon production activities at the Minnelusa Sand Unit unless exception relief is granted.

(g) In order to effectuate the national policy objective of encouraging domestic crude oil production, the FEA in previous decisions has granted exception relief where a producer has shown that (i) the firm has little incentive to continue production if it is required to sell its crude oil at controlled prices, (ii) the nation would be deprived of the crude oil unless the firm continues its recovery operations, and (iii) the wells involved are already part of a continuing extraction operation. *See Mar-Low Corp.*, 3 FEA ¶ 83,132 (March 19, 1976); *Great Southern Oil & Gas Company, Inc.*, 3 FEA ¶ 83,124 (March 9, 1976); *Braden-Deem, Inc.*, 3 FEA ¶ 83,072 (January 15, 1976), *modified* in 3 FEA ¶ 80,597 (March 11, 1976); *Energy Development Corp.*, 2 FEA ¶ 83,309 (October 3, 1975); and *Pruet & Hughes Co.*, 2 FEA ¶ 83,098 (March 25, 1975).

(h) The material which Mitchell has submitted satisfies these requirements. Prior to the implementation of the FEA price regulations, Mitchell realized a substantial profit on the Unit's crude oil production. In contrast, Mitchell is now incurring a substantial loss because the FEA regulations do not permit him to increase the price of his crude oil to reflect the increased operating costs he is experiencing at present. Furthermore, the record indicates that in the absence of exception relief, the only prudent economic course of action for Mitchell is to discontinue operations at the Minnelusa Sand Unit, and thereby reduce the nation's recoverable supply of crude oil by approximately 337,000 barrels. On the basis of the precedents cited above and the data submitted by Mitchell, exception

[3] The net revenue to the working interest was obtained by multiplying the total sales revenues by Mitchell's 84.9338 percent working interest share of the total sales revenues.

relief is warranted from the provisions of 10 CFR, Part 212, Subpart D.

(i) However, the magnitude of the relief which Mitchell has requested exceeds the amount necessary to alleviate the serious hardship. If full exception relief were granted, permitting all oil produced from the Unit to be sold at the upper tier ceiling price, Mitchell's net operating income for 1976 would be approximately $204,933.71, or $4.189 per barrel. That return exceeds by 34.4 percent the per barrel average profit which Mitchell achieved in 1972-1974, when the Unit's production levels were significantly higher than present levels. The 1976 income estimate assumes that the Unit would produce an average of 4,800 barrels per month, and that the operating expenses for 1976 would increase by an average of eight percent per item over the 1975 levels.

(j) In accordance with FEA precedents, the exception relief provided should be designed so as to permit the crude oil produced from the Unit to be sold at prices which reflect Mitchell's increased costs of production from the quarter including May 15, 1973 through the most recently completed fiscal quarter minus $1.35 per barrel already permitted to be passed through under the provisions of Section 212.73. *See, e.g., Braden-Deem, Inc.*, 3 FEA ¶ 83,072 (January 15, 1976). As Table D below indicates, on the basis of the financial data which Mitchell has submitted, the FEA has determined that costs of production have increased by $6.7056 per barrel.

*TABLE D*

*Increased Operating Expenses*

| | *April-June 1973* | *October-December 1975* |
|---|---|---|
| Net Production to Working Interest (bbl) | 66,011.03 | 13,950.81 |
| Operating Costs | $54,610.84 | $102,378.70 |
| Costs per Barrel | $.8273 | $7.5329 |
| Increase in Cost Per Barrel | | $6.7056 |
| Price Increase Permitted by 10 CFR 212.73 | | $1.3500 |
| Unrecovered Cost Increase Per Barrel | | $5.3556 |

In order to provide an economic incentive to operate the Minnelusa Sand Unit, Mitchell should be permitted to recover the $5.3556 per barrel net increase in production costs which have been incurred since the second quarter of 1973. In view of the two-tier pricing system which the FEA has established, we have concluded that the recovery of increased operating costs can be accomplished most effectively by permitting Mitchell to sell 76.66 percent[4] of the crude oil produced and sold from the Minnelusa Sand Unit for the benefit of the working interest owners at upper tier ceiling prices. Because production costs can be expected to fluctuate during future months, exception relief should be limited to a period of six months. Mitchell may then request an extension of the relief by submitting data to the FEA which indicates the production levels, costs, sales and revenues which he experiences in operating the Minnelusa Sand Unit during the first two quarters of 1976.

(k) In the *Great Southern* Decision referred to above, the FEA determined that the exception relief approved on the grounds that the working interest owners would not be able to recover their increased operating costs does not appear to apply to royalty owners as well. Pursuant to the pro-

[4] The 76.66 percent figure was derived from the following formula:

$$\frac{\textit{Unrecovered Cost Increases}}{\textit{Upper Tier Ceiling Price} - \textit{Lower Tier Ceiling Price}} \qquad \frac{\$5.3556}{\$12.12 - \$5.1335} = 76.66 \text{ percent}$$

visions of a typical oil and gas lease agreement, operating costs are borne solely by the working interest owners. Consequently, the objective of maintaining an economic incentive to continue production from a property would not appear to be furthered by approving exception relief for the royalty interest owners, who have neither incurred increased costs nor experienced an economic disincentive to maintain production. Therefore, exception relief was not extended to the portion of production sold by, or for the benefit of, the royalty interest owners in the *Great Southern* Decision. The same considerations appear to be present in this case. However, Mitchell will be required to notify the royalty owners in writing of the provisions of this Decision and the royalty owners will be regarded as aggrieved parties who are entitled to file an administrative appeal of this Decision pursuant to the provisions of Subpart H of the FEA procedural regulations.

It Is Therefore Ordered That:

(1) The Application for Exception filed by M. J. Mitchell be and hereby is granted as set forth below.

(2) From the date of this Order until September 30, 1976, Mitchell may sell 76.66 percent of the crude oil produced and sold for the benefit of the working interest owners from the Minnelusa Sand Unit, Pickrel Field, Campbell County, Wyoming, at the upper tier ceiling price as specified in 10 CFR, Part 212, Subpart D.

(3) In the event Mitchell requests an extension of the exception relief granted herein, he shall submit to the Office of Exceptions and Appeals of the Federal Energy Administration on or before August 31, 1976, data setting forth the volume of production and sales attained, the revenues achieved and the operating costs incurred in connection with his operation of the Minnelusa Sand Unit during the fiscal quarters ending March 31, 1976 and June 30, 1976.

(4) Within ten days of actual receipt of this Decision and Order, Mitchell shall notify all royalty owners of the Minnelusa Sand Unit in writing of the issuance of this Decision and Order and of their right to file an Appeal with the Federal Energy Administration pursuant to the provisions of 10 CFR, Part 205, Subpart H. That notice shall state that a copy of the Decision and Order will be made available by Mitchell to any royalty interest owner who so requests. A copy of this notification shall be forwarded to the Office of Exceptions and Appeals of the Federal Energy Administration along with an appropriate certification by Mitchell that the royalty interest owners have been notified in accordance with this paragraph.

(5) This decision is based upon the presumed validity of statements, allegations and documentary material submitted by the applicant. It may be revoked or modified at any time upon a determination that the factual basis underlying the application is incorrect or on the basis of general regulatory provisions which the FEA may adopt. Furthermore, the FEA may, by Order, direct appropriate adjustments or remedial action to the extent that the operating results and financial projections submitted by Mitchell are demonstrated to have been materially inaccurate by Mitchell's actual sales revenue and actual operating experience.

(6) In accordance with the provisions of 10 CFR, Part 205, any aggrieved party may file an appeal from this Decision and Order with the Federal Energy Administration. The provisions of 10 CFR, Part 205, Subpart H, set forth the procedures and criteria which govern the filing and determination of any such appeal.

## ¶ 83,147

**Northwest Propane, Inc., Farmington, Michigan (Case No. FEE-2125, Filed 1-12-76, Decided 4-2-76).**

**Propane.**—Northwest Propane, Inc. (Northwest) filed an Application for Exception from the provisions of 10 CFR, Part 211. The