# ATTACHMENT 2

211.12(e). However, Ruling 1976-5 also expressly provides that firms may receive additional allocations of motor gasoline for redeveloped sales outlets either through purchases of surplus product under the provisions of 10 CFR 211.10(g)(5), or by seeking an exception which would provide an increase in the base period use of the outlet under the provisions of 10 CFR 211.13(e). Tenneco has submitted no evidence which would indicate that it is unable to pursue either of the procedures outlined above with respect to the San Jacinto outlet.

It is Therefore Ordered That:

(1) The Appeal filed by the Tenneco Oil Company from the Order issued to it by the Director of Operations of FEA Region VI on September 14, 1976 be and hereby is denied.

(2) This is a final order of the Federal Energy Administration of which any aggrieved party may seek judicial review.

## ¶ 80,537

**United States Geological Survey, Denver, Colorado (Case No. FEA-0850, Filed 6-15-76, Decided 1-26-77); Henry W. King, Childress, Texas (Case No. FEA-0926, Filed 9-30-76, Decided 1-26-77).**

**Crude Oil.**—The United States Geological Survey (USGS), a division of the Department of the Interior, appealed from a Decision and Order which the FEA issued to M. J. Mitchell on April 2, 1976. *M. J. Mitchell*, 3 FEA ¶ 83,146 (April 2, 1976). Henry W. King filed an Appeal from a similar Decision and Order issued by the FEA to Austral Oil Company, Inc. on July 15, 1976. *Austral Oil Co., Inc.*, 4 FEA ¶ 83,004 (July 15, 1976). In each of the Decisions being appealed, the FEA approved exception relief which permits a portion of the crude oil produced from the particular property to be sold for the benefit of the working interest owner at upper tier ceiling prices. In the Appeals which they filed from those determinations, the appellants contended that they are entitled pursuant to their lease agreements with the working interest owners to share in the additional revenues generated as a result of the exception relief which was provided. The USGS also contended that under applicable Department of Interior regulations, the USGS must share in any revenues accruing to the working interest owner. In considering the Appeals, the FEA held that even if the approval of exception relief exclusively for the working interest owners requires action which contravenes the terms of the applicable lease agreements, the FEA has the authority to take this action provided that it is necessary to effectuate the objectives of the Emergency Petroleum Allocation Act of 1973 and subsequent legislation. The FEA determined that since the royalty interest owners are not responsible for payment of any of the increased costs or investment expenses associated with the production of crude oil, neither King nor the USGS was experiencing an inequity or hardship as a result of the FEA price regulations. Consequently, allowing them to share in the exception relief provided could exceed the FEA's authority contained in the Federal Energy Administration Act of 1974. The FEA also

noted that if the working interest owners were required to remit to the royalty interest owners a portion of the additional income which they receive as a result of the exception relief, the revenues which the working interest owners would obtain would be insufficient to provide them with the economic incentive to continue or increase production. If the working interest owners were then permitted to sell a greater quantity of crude oil at upper tier prices to ensure that they would have an incentive to continue production, that result would adversely affect all other producers of upper tier crude oil, would further no statutory objectives, and would frustrate the FEA's attempts to ensure the equitable pricing of all domestic crude oil. The FEA also determined that to the extent that the Department of the Interior regulations provide for the payment of a royalty based upon the gross proceeds accruing to the working interest owner, these regulations have been superseded by the FEA's determination that the Federal interest will best be furthered by permitting only crude oil produced for the benefit of the working interest owners to be sold at higher price levels. Since the appellants had not demonstrated that the previous Decisions were erroneous in fact or law or arbitrary or capricious, their Appeals were denied

**[Decision and Order]**

On June 15, 1976, the United States Geological Survey (USGS) filed an Appeal of a Decision and Order issued to M. J. Mitchell (Mitchell) on April 2, 1976 by the Federal Energy Administration. *M. J. Mitchell*, 3 FEA ¶ 83,146 (April 2, 1976). In that determination the FEA granted Mitchell exception relief from the provisions of 10 CFR, Part 212, Subpart D and thereby permitted him to sell 76.66 percent of the crude oil produced from the Minnelusa Sand Unit (Minnelusa Unit) in the Pickrel Ranch Field, Campbell County, Wyoming at upper tier prices. The April 2 Decision and Order specified that the additional proceeds generated by the exception relief which was issued were for the benefit only of Mitchell, the working interest owner of the Minnelusa Sand Unit. The USGS Appeal, if granted, would permit it, as the owner of a royalty interest in the Minnelusa Unit, to share in the additional income which results from the exception relief granted in the April 2 Decision and Order.[1]

On September 30, 1976, Henry W. King (King) completed his filing of an Appeal from a Decision and Order which granted a similar form of exception relief from the FEA ceiling price rules for crude oil to the Austral Oil Company, Inc. (Austral). *Austral Oil Company, Inc.*, 4 FEA ¶ 83,004 (July 15, 1976). The exception relief which was approved in the Decision and Order issued to Austral permits the firm to sell a portion of the crude oil produced from the Ackerly Dean Sand Unit (Ackerly Unit) in Dawson and Martin Counties, Texas at upper tier prices. The King Appeal, if granted, would also permit King as an owner of a royalty interest in the Ackerly Unit to share in the benefits of the exception relief granted to Austral, the working interest owner.

Since the issues involved in these Appeals are almost identical, they have been consolidated for resolution in this single proceeding. As the owners of crude oil produced from these units, the working interest owners and the royalty interest owners of the Ackerly and Minnelusa Units are subject to the provisions of the FEA Regulations which establish ceiling prices for domestic

[1] Leases of land owned by the United States which are entered into for the purpose of oil and gas production are issued by the Bureau of Land Management of the United States Department of the Interior and managed by the United States Geological Survey.

crude oil. Those provisions are set forth in Subpart D of Part 212 of these Regulations. In each of the Decisions from which the present Appeals are taken, the FEA found that a gross inequity resulted from the application of the FEA Price Regulations to the working interest owner of the producing property. In *M. J. Mitchell*, the FEA determined that the costs to the working interest owner of each barrel of crude oil produced from the Minnelusa Unit had increased to such an extent that unless exception relief were granted the working interest owner would be led by economic factors to shut the existing wells in order to avoid continuing losses. An analogous situation was found to exist in *Austral Oil Company, Inc.* In that Decision, the FEA determined that the FEA Price Regulations produced a situation in which the working interest owner of the Ackerly Unit had no incentive to undertake an expanded waterflood program which was necessary if the production of crude oil from the Ackerly Unit were to be increased. In each case, the FEA concluded that its regulations were creating an economic disincentive to the continued recovery of a portion of the nation's supply of crude oil, and relief was therefore granted to permit the working interest owner to sell a portion of the crude oil produced and sold from the property for its benefit at upper tier prices. *Cf., Pruet & Hughes Company*, 2 FEA ¶83,270 (August 25, 1975).

In each case, however, the FEA found that the rationale pursuant to which exception relief was granted to the working interest owner did not apply to the royalty interest owners of the producing properties. The FEA determined that the lease agreement in each case specifies that the operating costs are to be borne solely by the working interest owner. Consequently, the FEA concluded that the need to provide an economic incentive to continue or expand production of crude oil would not be enhanced by approving exception relief for the royalty owners, who merely had investments in the real estate represented by the underlying lease, not in the crude oil producing operations. See, e. g., *Great Southern Oil and Gas Company, Inc.*, 3 FEA ¶83,124 (March 9, 1976); and *William H. Player and Associates*, 3 FEA ¶83,161 (April 9, 1976).

In the present Appeals, King and the USGS assert that the FEA has unlawfully impaired the obligations among parties established in their leases by excluding the royalty interest owners from the benefits of the exception relief which was approved for the working interest owner. King and the USGS claim that pursuant to their lease agreements, they are entitled to an undivided percentage of the gross proceeds which accrue to the working interest owner from the sale of crude oil. Thus, the USGS and King contend that the FEA, by prescribing a different price for the crude oil produced for the benefit of the working and royalty interests from each property, impairs their rights under their leases with the working interest owners.

In considering this contention, the FEA has reviewed the terms of these leases as well as the Federal statutes and regulations applicable to the USGS lease. Based upon that review, the FEA has determined that the appellants' contention are not well founded. As a general matter, royalty owners have an actual interest only in the crude oil produced from their properties rather than in the proceeds which accrue to the working interest owner from the sale of the crude oil production. Consequently, most lease agreements assess a royalty based upon a fraction of the total production of crude oil rather than upon the revenue actually accruing to the working interest owner. As a result, no inconsistency generally exists between lease agreements and the Orders issued by the FEA granting exception relief only to the working interest owners of certain crude oil producing properties. In effect, the Orders merely provide that the royalty interest owners will continue to receive the value of their share of the crude oil production as if no exception relief had been provided, which is equivalent to the proceeds which they would receive if they had received their share of the crude oil in kind and had sold that share on their own behalf.

Furthermore, even if the Orders of July 15 and April 2 were found to re-

quire action which violates the terms of the lease agreements, the appellants have failed to demonstrate that those Orders are erroneous in any manner, or arbitrary or capricious. It has been firmly established that the FEA has the authority to preempt the terms of any contract which prevents the effectuation of the policy objectives set forth by the Congress in the Emergency Petroleum Allocation Act of 1973, as amended, (EPAA, Pub. L. 93-159) and subsequent legislation. *Trans World Airlines v. F. E. O.*, Fed. Energy Guidelines ¶ 26,004 (DDC 1974), *aff'd*, Fed. Energy Guidelines ¶ 26,006 (TECA 1975). Even if these leases had in fact been abrogated by the manner in which exception relief was granted in these cases, then the applicable statutes sustain the FEA action. The Congressional policy regarding the pricing of domestic crude oil enunciated in Section 8 of the EPAA, as amended, directs the FEA to establish prices for domestic crude oil in a manner which will achieve a weighted average first sale price of $7.66 per barrel. The EPAA also provides that the FEA Regulations should encourage the optimum production of domestic crude oil. EPAA, Section 8(b)(1)(B). On the other hand, in providing exception relief, the FEA may grant relief to parties only "as may be necessary to prevent special hardship, inequity or unfair distribution of burdens." Federal Energy Administration Act of 1974 (FEAA, Pub. L. 93-275), Section 7(i)(1)(D).

In the prior proceedings in this matter, the working interest owners of the Ackerly and Minnelusa Units convincingly demonstrated that because of the increased operating costs which they were incurring in extracting crude oil from the properties in which they held a working interest, the return which they were permitted to obtain under the FEA Pricing Regulations was not sufficient to induce them to maintain or increase their production activities. In view of the fact that the Congress intended the energy legislation which it promulgated to encourage appropriate domestic crude oil production and certainly never intended a situation to occur in which the FEA regulations retarded present crude oil recovery operations, the FEA concluded in the prior determinations that the working interest owners had established that the application of the FEA regulations to the particular factual situation involved resulted in a gross inequity. Exception relief was therefore approved which permitted Mitchell and Austral to increase the prices at which they sold crude oil so as to obtain the revenues necessary to meet the increased operating costs which they were experiencing and thereby permit them to continue or increase production of crude oil from the properties.

If the working interest owners of the Ackerly and Minnelusa Units were required to remit to the royalty interest owners a portion of the additional income generated as a result of the exception relief provided, as the appellants suggest, the working interest owners would obtain revenues which would be insufficient to provide the economic incentive which the FEA determined was essential in order to induce continuing production activities. Consequently, if the FEA permitted the royalty interest owners to share in the exception relief provided, the agency would fail to grant sufficient relief to the parties which are actually experiencing a gross inequity and would prevent the working interest owners from maximizing the production of crude oil in a manner consistent with Congressional policy objectives. Since the royalty interest owners do not provide any of the funds necessary to meet the operating expenses of the properties, they have not established that they are experiencing any hardship or inequity as a result of the increased costs of production of crude oil from the Units. Accordingly, there was no proper basis under which they should have been permitted to share directly in the exception relief which was provided to the working interest owners. In fact, both the USGS and King have consistently received royalty payments from these properties, and will continue to receive royalty payments as a result of the exception relief granted to the working interest owners.

Moreover, if the FEA were to extend the exception relief which had been provided to the working interest owners to the royalty owners as well, the volume

of crude oil from the properties involved which would then be sold at upper tier prices would have to be increased in order to ensure that the working interest owners would still receive sufficient revenues to make it economically feasible for them to continue to operate the wells or to increase the production of crude oil. The increased volume of crude oil would be sold for the benefit of the royalty interest owners even though they are not responsible for any of the costs associated with production. Exception relief of this kind would further no statutory objectives and would frustrate the FEA's attempts to ensure equitable pricing of all domestic crude oil. *See* EPAA, Section 8. Indeed, Section 8 of the EPAA, as amended, requires that the FEA establish a composite price for all first sales of domestic crude oil sold in a given month. If the royalty owners were to receive the exception relief which they request in the present proceeding, all other producers of domestic upper-tier crude oil would be adversely affected since a reduction in the price at which their crude oil could be sold would eventually be necessary in order to attain the single nationwide average price level to which the Congress referred. Clearly, this result was not intended by the recent amendments of the EPAA. See *Union Oil Co. of California*, 4 FEA ¶ 80,592 (December 15, 1976). In view of the fact that permitting royalty interest owners to share in the exception relief granted to the working interest owners would obstruct the attainment of the objectives specified in Section 8 of the EPAA, even if the FEA action in these cases did result in an impairment of the contractual obligations of the parties with respect to the leases, the FEA determination would nevertheless properly fall within the agency's statutory authority and would not constitute arbitrary or capricious action.

Finally, the USGS asserts that the exception relief granted in the prior Decision contravenes Section 221.47 of the Oil and Gas Operating Regulations (30 CFR, Part 221) promulgated by the Secretary of the Interior under the authority of the Mineral Leasing Act of 1920 (30 U. S. C. 181 et seq.). The USGS contends that the Act entitles the Department of the Interior to an undivided percentage of the value of any crude oil sold from the lease of a property that is owned by the United States and that the Operating Regulations provide that the value of the crude oil produced from a particular property must not be less than the actual proceeds which accrue to the working interest owner. As a basis for this assertion the USGS states that under Section 17 of the Act (30 U. S. C. 226(c)) leases made with regard to lands of the type involved in this proceeding "shall be conditioned upon the payment by the lessee of a royalty of 12½ percentum in amount or value of the production removed or sold from the lease." The USGS contends that the Secretary of the Interior has determined in Section 221.47 of the Oil and Gas Operation Regulations (30 CFR, § 221.47) that the value of production, for the purpose of computing a royalty "shall be the estimated reasonable value of the product as determined by the supervisor, due consideration being given to the highest price paid for . . . production of like quality in the same field, to the price received by the lessee, to posted prices and to other relevant matters. Under no circumstances shall the value of production . . . be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof." Based on this regulation, the USGS contends that it is entitled to be paid a 12½ percent royalty based upon the gross proceeds accruing to Mitchell from the sale of all of the crude oil produced from the Minnelusa Unit.

We are unpersuaded by the USGS's argument. The Mineral Leasing Act itself fails to define the value of production, and, in fact, permits payment in kind by the lessee by allocating 12½ percent of the total amount of production from a particular lease to the USGS. Although the Department of the Interior Regulations concerning royalties owed to the United States, as set forth in 30 CFR, Section 221.47, provide for the payment of not less than 12½ percent of the gross proceeds from a lease as the royalty payment, these regulations can be superseded by an

FEA determination that the Federal interest will be furthered by requiring the royalty payment to the USGS to be limited by the pricing provisions of the EPAA while the working interest share is sold at higher price levels. The FEA has made this determination in the present case. In Section 7(i)(1)(D) of the FEAA, Congress explicitly directed the FEA to grant exception relief from its regulations only to those parties who are experiencing a gross inequity or a serious hardship. As discussed above, if the FEA were to permit the USGS to share in the exception granted to Mitchell, exception relief would in effect be granted to the USGS. Since the USGS has failed to demonstrate that it is incurring any hardship or inequity as a result of the FEA Pricing Regulations, the extension of exception relief for the USGS would be in direct contravention of an express Congressional directive.

Moreover, if the FEA were to provide a sufficient amount of exception relief to Mitchell to accomplish the objectives discussed in the exception decision while at the same time also providing similar exception relief to the USGS, the FEA would be required to permit Mitchell to sell more crude oil at upper tier prices than would be actually necessary in order to provide Mitchell with a sufficient economic incentive to continue crude oil production activities from the Minnelusa Unit. Since the Congress has directed the FEA to maintain a national weighted average first sale price for domestic crude oil which is equal to $7.66 per barrel plus certain increments to reflect a production incentive and to provide for inflation, the extension of exception relief to the USGS would necessarily reduce the price at which other crude oil producers are permitted to sell the crude oil which they recover. EPAA, Section 8(a) and (d)(1), as amended. Since no justification has been presented in this proceeding which would warrant adversely affecting other crude oil producers in that manner, we have concluded that provisions of the EPAA and the FEAA as implemented by the FEA in this case take precedence over any prior Regulations published by the Department of the Interior which may conflict with the determination reached.

It should also be noted that Section 209 of the Mineral Leasing Act (30 U. S. C. 209) provides that the Secretary of the Interior may waive, suspend or reduce the royalty due to the United States upon a finding that the lease cannot be successfully operated under the terms of the lease agreement and that such action is necessary to encourage the continued production of crude oil. The FEA decision that exception relief should be granted to Mitchell was based on the finding that unless the relief were approved Mitchell would abandon production activities at the Minnelusa Unit. The exception relief that was approved was the minimum amount necessary to permit Mitchell to recover his increased operating costs and thereby maintain production. It is of course possible that Mitchell could have achieved that same result by requesting the Secretary of the Interior to permit him to retain all or a part of the royalty payments which he must remit to the USGS. Relief of that nature would have achieved the same ultimate result as the relief approved by the FEA since it would make more revenues available to Mitchell to meet the operating expenses of the well. That form of relief would however significantly reduce the revenues available to the USGS in contrast to the present situation in which the USGS retains the same revenues that it previously received while Mitchell is able to sell crude oil at higher prices in order to obtain the revenues which are necessary to keep the well operational. Under these circumstances it is difficult to perceive precisely how the USGS is even adversely affected by the determination which the FEA reached in this case.

In the Appeal which he filed King generally asserts that the exception relief granted to Austral is insufficient. According to the King submission, Austral has informed him that it has not instituted the expanded waterflood program which was contemplated in its original Application for Exception. Austral has itself raised similar arguments in a separate Appeal which it

filed from the July 15, 1976 Decision (Case No. FEA-0940). However, King has not provided any evidence in his Appeal to support his claim that additional exception relief should have been granted to Austral and this portion of his Appeal should therefore be denied.

Based on the considerations set forth above and the submissions made by Henry W. King and the United States Geological Survey in support of their Appeals, the Federal Energy Administration has concluded that the appellants have failed to demonstrate that the Decisions and Orders issued to M. J. Mitchell on April 2, 1976, and to the Austral Oil Company, Inc. on July 15, 1976, are erroneous in fact or law or are arbitrary or capricious.

It Is Therefore Ordered That:

(1) The Appeal filed by Henry W. King from the Decision and Order issued to Austral Oil Company, Inc. by the Federal Energy Administration on July 15, 1976, be and hereby is denied.

(2) The Appeal filed by the United States Geological Survey from the Decision and Order issued to M. J. Mitchell by the Federal Energy Administration on April 2, 1976, be and hereby is denied.

(3) This is a final Order of the Federal Energy Administration of which any aggrieved party may seek judicial review.

---

## ¶ 80,538

**Caribou Four Corners, Inc., Afton, Wyoming (Case No. FEA-1112, Filed 1-4-77, Decided 2-3-77).**

**Crude oil.**—Caribou Four Corners, Inc. (Caribou) filed an Appeal from its obligation to purchase the entitlements specified in the Entitlement Notice for the month of September 1976 which the FEA issued on November 22, 1976. The Appeal, if granted, would relieve Caribou of the obligation to purchase entitlements valued at $35,529. The entitlement obligation concerned resulted from adjustments to Caribou's crude oil receipts and runs to stills for the months of February and March 1976 which were reflected in an amended entitlements report which Caribou filed on October 14, 1976. In considering the Appeal, the FEA observed that as a result of the adjustments Caribou's entitlement sales obligation for September was reduced to account for a purchase obligation with respect to its receipts of crude oil in Febraury and March 1976. However, during February and March 1976, Caribou had been exempted from any entitlement purchase obligation by Section 403(a) of the Energy Policy and Conservation Act (EPCA) and Section 3 of Special Rule No. 6. The FEA therefore determined that although Caribou may be required to file reports in which it indicates its actual crude oil receipts and to correct those reports when it receives more accurate data, those reports may not be used to require Caribou to purchase entitlements with respect to crude oil which Caribou received during a period when the statutory entitlement purchase exemption was in effect. The FEA concluded that the exemption of Caribou's crude oil receipts in February and March is not effectively removed merely because