**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | Electronically Filed May 4, 2006 |
| | ) | Nos. 99-550 L & 00-169 L |
| *v*. | ) | Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF OSAGE NATION'S POST-TRIAL BRIEF**

**[REDACTED VERSION]**

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................1

A. The Osage Mineral Estate and the 1906 Act ..........................................1

B. The Tranche One Leases and Applicable Regulations ..........................2

ARGUMENT ........................................................................................................3

I. THIS COURT'S CONSIDERATION OF THE OSAGE NATION'S CLAIMS OF BREACH MUST BE GUIDED BY PRINCIPLES OF SUBSTANTIVE FEDERAL LAW ..........................................................................................3

A. The Applicable Statutes and Regulations Must "Be Construed Liberally in Favor of the Indians" ..........................................................................3

B. The Breaches of Duty Alleged Here Must Be Evaluated Under the Strict Fiduciary Standard of Care That the United States Has Taken Upon Itself – Not "Mere Reasonableness" ..................................................................4

C. The Plaintiff Is Entitled to Favorable Factual Inferences Where the Trustee Has Not Maintained Trust Records..........................................................6

II. THE UNITED STATES FAILED TO COLLECT THE FULL ROYALTIES DUE FOR OIL PRODUCED FROM THE TRANCHE ONE LEASES IN THE TRANCHE ONE MONTHS..................................................................7

A. The United States Failed to Collect Royalty Due Based on the Highest Offered Price by a Major Purchaser......................................................8

B. By Limiting Royalty Value to the Regulated Price Level at Which the Oil Was Sold, the United States Failed to Collect the Full Royalty Due During the Tranche One Months of January 1976, May 1979, and November 1980 ........12

1. Federal Law Established a System of Price Ceilings Applicable to Sales of Specified Categories of Crude Oil ..........................................12

2. Federal Crude Oil Price Controls Did Not Supersede the Osage Regulations Governing the Calculation of Royalty Value .......................13

3. The United States' Presentation at Trial Provides No Lawful Basis for Deviating from the Plain Terms of the Osage Royalty-Value Regulation ..........................................................................16

C. The United States Failed to Collect Royalty Based on the Highest Selling Price from a Lease When There Were Simultaneous Sales from the Same Lease ....20

D. The United States Undercollected Royalties by Failing to Determine the "Actual Selling Price" ....22

E. The United States Failed to Determine the Correct Major Purchasers and the Correct Highest Posted Price of a Major Purchaser....23

F. The United States Violated Its Own Regulations by Reducing the Calculated Highest Posted Prices Based on Gravity....26

G. The United States Failed to Collect Royalties for the Full Volume of Oil Subject to Royalty from the Tranche One Leases in the Tranche One Months. ....28

H. The United States Failed to Verify the Proper Royalty Rate ....29

I. The United States Failed to Audit....30

III. THE UNITED STATES BREACHED ITS DUTY TO INVEST PRUDENTLY THE TRANCHE ONE TRUST FUNDS IT COLLECTED ....33

A. The United States Left an Unreasonably Large Proportion of Collected Funds in the Cash Account and Otherwise Underinvested Trust Moneys....33

1. The United States Breached Its Fiduciary Duty to Invest Prudently....33

2. Lundelius Effectively Concedes Breach for May 1979....35

3. If Lundelius's "Actual" Rate Analysis Is Subjected to the Same Liquidity Constraints He Puts on His "Expected" Rates, His Methodology Shows Breach in *Three* Tranche One Months....36

B. The United States Breached Its Fiduciary Duty by Unthinkingly Delaying Deposit of Royalty Payments....40

1. Defendant Unreasonably Delayed Certification of a Federal Depository in Pawhuska, Causing Lost Interest ....40

2. The Osage Agency Had a Pervasive Deposit Lag Problem....41

IV. THE OSAGE NATION IS ENTITLED TO AN AWARD OF DAMAGES TO REMEDY THE UNITED STATES' BREACHES OF TRUST....43

A. General Principles of Damages Applicable Here....43

1. The Osage Nation Is Entitled to be Made Whole ....43

2. The Osage Nation Is Entitled to All Reasonable Inferences in Favor of Its Damages Estimates ....44

B. Categories of Damages to Which the Osage Nation is Entitled ....46

1. Damages for Undercollection of Royalties....46

2. Late Fees for Royalty Payments the United States Failed to Collect ....48

3. Late Fees on Late Payments Identified by Lundelius and Chavarria ....49

4. Interest Lost Due to Mismanagement of Funds on Deposit ....49

5. Interest Lost Due to Unreasonable Delays in Depositing Trust Funds....49

CONCLUSION....50

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Albuquerque Indian Rights v. Lujan*, 930 F.2d 49 (D.C. Cir. 1991) ....................4

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) ....................6

*Blackman v. Hustler Magazine, Inc.*, 800 F.2d 1160 (D.C. Cir. 1986) ....................6, 13

*Confederated Tribes of the Warm Springs Reservation v. United States*, 248 F.3d 1365 (Fed. Cir. 2001) ....................6, 7, 37, 44

*County of Oneida v. Oneida Indian Nation*, 470 U.S. 226 (1985) ....................3

*Fletcher v. United States*, 116 F.3d 1315 (10th Cir. 1997) ....................2

*HRI, Inc. v. EPA*, 198 F.3d 1224 (10th Cir. 2000) ....................3

*Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555 (10th Cir. 1984) ....................4, 28

*Liss v. Smith*, 991 F. Supp. 278 (S.D.N.Y. 1998) ....................49

*Minnesota Chippewa Tribe v. United States*, 14 Cl. Ct. 116 (1987) ....................5

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985) ....................3, 4, 10, 28

*In re Morgan*, 106 B.R. 573 (Bankr. E.D. Ark. 1989) ....................7

*Osage Tribe of Indians v. United States*, 68 Fed. Cl. 322 (2005) .................... *passim*

*Pennzoil Exploration & Prod. Co. v. Lujan*, 928 F.2d 1139 (Temp. Emer. Ct. App. 1991) ....................18

*Placid Oil Co. v. FPC*, 483 F.2d 880 (5th Cir. 1973) ....................20

*Pueblo of Laguna v. United States*, 60 Fed. Cl. 133 (2004) ....................7

*Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) ....................4

*Seminole Nation v. United States*, 316 U.S. 286 (1942) ....................5

*Shapiro, Bernstein & Co. v. Remington Records, Inc.*, 265 F.2d 263 (2d Cir. 1959) ....................6

*Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339 (Fed. Cir. 2004) ....................5, 44, 45, 46

*Sowell v. Natural Gas Pipeline Co.*, 789 F.2d 1151 (5th Cir. 1986) ....................15, 16

*United States v. Mason*, 412 U.S. 391 (1973) ....................2, 4, 5

*United States v. Mitchell*, 463 U.S. 206 (1983) ....................5

### STATE CASE

*Howell v. Texaco, Inc.*, 112 P.3d 1154 (Ok. 2004) ....................23

### STATUTES

30 U.S.C. § 1711(c) (2003) ....................31

42 U.S.C. § 7194(a) ....................19
Act of June 28, 1906, Chapter 3572, 34 Stat. 539 ....................1, 2, 44
Emergency Petroleum Allocation Act, Pub. L. No. 93-159, 87 Stat. 627.................... *passim*
Energy Conservation and Production Act, Pub. L. No. 94-385, 90 Stat. 1125....................13
Energy Policy and Conservation Act, Pub. L. No. 94-163, 89 Stat. 871 ....................13

**REGULATORY MATERIALS**

10 C.F.R. § 205.55(b)(2) (1975) ....................20
10 C.F.R. § 210.32(b) (1975)....................12
10 C.F.R. § 212.54 (1977)....................13
10 C.F.R. § 212.72 (1975)....................12
10 C.F.R. §§ 212.73, 212.74 (1975)....................12
10 C.F.R. § 212.74 (1977)....................13
25 C.F.R. Part 183....................3
25 C.F.R. § 183.11(a) .................... *passim*
25 C.F.R. § 183.11(c) ....................49
25 C.F.R. § 183.13(a)....................8, 49
25 C.F.R. § 183.14(a)....................3
25 C.F.R. § 183.1(h)....................24
39 Fed. Reg. 22,254-62 (1974) ....................3, 15
41 Fed. Reg. 4931, 4940 (1976) ....................13
47 Fed. Reg. 13,326 ....................3
46 Fed. Reg. 9909 (1981) ....................13
*Okie Crude Co. v. Muskogee Area Director*, 23 IBIA 174 (1993)....................10

**OTHER AUTHORITY**

*Cohen's Handbook of Federal Indian Law* § 13.H (1982) ....................6
Galvin, *"Developing an Oil and Gas Jurisprudence in Michigan,"* 7 Wayne L. Rev. 403, 425 n.99 (1961), cited in 3 *Williams & Meyers Oil and Gas Law* § 644....................14
*Restatement (Second) of Trusts* (1959) ....................6
*Restatement (Third) of Trusts*, (1992)....................5, 6, 46
William F. Fletcher, *Scott on Trusts* (4th ed. 1987) ....................5

## INTRODUCTION

In 1906, in connection with its controversial decision to override the objections of the Osage Nation and allot the surface estate of the Osage Reservation, the United States named itself as the trustee of the Osage Mineral Estate, which includes extensive oil and gas resources. As trustee, the United States assumed the duty to collect all royalties due on the production and sale of oil and gas from the Osage Mineral Estate, verify the accuracy and completeness of those collections, and prudently invest the royalties it did receive for the benefit of the Osage Nation. To perform those duties, the United States created a small bureaucracy, replete with its own regulations and a plethora of procedures and forms.

At trial the evidence showed that, despite this bureaucratic structure, the United States breached its trust obligations by failing to follow key provisions of its own regulations, verify the collection of the full royalty due, and prudently manage the funds received. As a result of the United States' breach of its trust duties, the Osage Nation has been damaged and thus seeks to be made whole through a money judgment from this Court.

## BACKGROUND

### A. The Osage Mineral Estate and the 1906 Act

The Osage came to reside on their current reservation in northern Oklahoma as a result of forced migrations. *See Osage Tribe of Indians v. United States*, 68 Fed. Cl. 322, 323 (2005); Tr. 39:18-41:15 (Tallchief). The reservation covers roughly 1.47 million acres, and its boundaries are co-extensive with present-day Osage County. Stipulation of Facts ("Stip.") ¶ 2 (filed Mar. 29, 2006). The Osage Reservation sits on one of the most productive domestic crude oil reservoirs in the nation. Tr. 84:9-21 (Reineke).

In 1906 Congress allotted most of the reservation surface rights to individual Osages, and reserved the underlying mineral estate to the Osage Nation. Act of June 28, 1906, Chapter 3572,

34 Stat. 539.[1] The 1906 Act required the creation of a tribal membership roll and gave each person on it an "individual share" – called a "headright" – "of the income derived from the minerals located on the land." *United States v. Mason*, 412 U.S. 391, 393 (1973); *see Fletcher v. United States*, 116 F.3d 1315, 1319 (10th Cir. 1997). Under the Act, "all funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States . . . ." 1906 Act § 4, 34 Stat. at 544. In essence, the 1906 Act requires that the United States manage the mineral estate and the proceeds derived therefrom as trustee for the benefit the Osage Tribe. *Osage Tribe*, 68 Fed. Cl. at 330; *see also* 1906 Act § 3, 34 Stat. at 543.

The Osage Agency, which administers the Osage Mineral Estate, is part of the Department of the Interior ("Interior"), Bureau of Indian Affairs ("BIA"), and is located in Pawhuska, Oklahoma, on the Osage Reservation. Stip. ¶ 1.

**B. The Tranche One Leases and Applicable Regulations**

Plaintiff's Tranche One claims cover four leases (North Burbank, North Avant, Osage Hominy, and East Hardy) and five months (January 1976, May 1979, November 1980, February 1986, and July 1989). Order at 1 (Apr. 15, 2005) (modified by Order of Feb. 22, 2006). Except for Osage Hominy, the Tranche One Leases are oil leases. Plaintiff's Tranche One claims relate solely to oil royalties.

Each Tranche One Lease specifies how to compute the monthly royalty payment. The computation involves three elements – royalty rate, volume, and value – and can be expressed as a formula: Royalty = Royalty Rate x Royalty Volume x Royalty Value. The Tranche One Leases

[1] Congress has amended the 1906 Act. *See Osage Tribe*, 68 Fed. Cl. at 324 n.2. As used herein, the term "1906 Act" refers to the 1906 Act as amended, unless specified otherwise.

define all three elements of the formula and incorporate subsequently adopted regulations. *E.g.*, PX751-0119 (Osage Hominy Lease); PX751-0049 (North Burbank Lease).

In 1974, Interior adopted the regulations applicable to the Tranche One Months.[2] 39 Fed. Reg. 22,254-62. The regulations made the lessee responsible for the accurate measurement of all crude oil produced from a lease on the Osage Mineral Estate. 25 C.F.R. § 183.11(a). Lessees owed royalties on all crude oil produced from the Tranche One Leases, with the exception of oil used as fuel to develop and operate the lease from which the oil was produced. *See id*. §§ 183.11(a), 183.14(a). In addition, the regulations gave the Osage Agency broad authority to prevent waste, including the loss of crude oil subject to royalty. *Id*. § 183.37.

## ARGUMENT

### I. THIS COURT'S CONSIDERATION OF THE OSAGE NATION'S CLAIMS OF BREACH MUST BE GUIDED BY PRINCIPLES OF SUBSTANTIVE FEDERAL LAW

#### A. The Applicable Statutes and Regulations Must "Be Construed Liberally in Favor of the Indians"

In construing the applicable statutes and regulations, the Court must adhere to "[t]he canons of construction applicable in Indian law," which "are rooted in the unique trust relationship between the United States and the Indians." *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985). "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit . . . ." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). Further, the United States' "trust relationship and its application to all federal agencies that may deal with Indians necessarily requires the application of a similar canon of construction to the interpretation of federal regulations." *HRI, Inc. v. EPA*,

[2] Originally codified at 25 C.F.R. Part 183, the regulations were recodified without substantive change in 1982 at 25 C.F.R. Part 226. 47 Fed. Reg. 13,326**.** To avoid confusion, this brief cites Part 183 only.

198 F.3d 1224, 1245 (10th Cir. 2000). Thus, the *Blackfeet Tribe* canon precludes the deference that might otherwise be accorded to an administrative agency's statutory and regulatory interpretations. *See, e.g., Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461-62 (10th Cir. 1997); *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 59 (D.C. Cir. 1991).

"When the Secretary is acting in his fiduciary role . . . and is faced with a decision for which there is more than one 'reasonable' choice as that term is used in administrative law, he must choose the alternative that is in the best interest of the Indian tribe." *Jicarilla Apache Tribe v. Supron Energy Corp*., 728 F.2d 1555, 1567 (10th Cir. 1984) (Seymour, J., concurring in part and dissenting in part), *adopted as majority opinion as modified en banc*, 782 F.2d 855 (10th Cir. 1986). "'If there is any doubt, the interpretation [of regulations] should be made liberally in favor of the Indians for whose protection these provisions were promulgated.'" *Id.* (quoting *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1332 (10th Cir. 1982)).

**B. The Breaches of Duty Alleged Here Must Be Evaluated Under the Strict Fiduciary Standard of Care That the United States Has Taken Upon Itself – Not "Mere Reasonableness"**

"[T]he plain language of . . . the 1906 Act establishes fiduciary duties." *Osage Tribe*, 68 Fed. Cl. at 327. "There is no doubt that the United States serves in a fiduciary capacity with respect to [the Osage] Indians and that, as such, it is *duty bound to exercise great care* in administering its trust." *Mason*, 412 U.S. at 398 (emphasis added). The "standard of duty for the United States as trustee for Indians is *not mere 'reasonableness'* but the highest fiduciary standards." *Minnesota Chippewa Tribe v. United States*, 14 Cl. Ct. 116, 130 (1987) (citing *Yankton Sioux Tribe v. United States*, 623 F.2d 159, 163 (Ct. Cl. 1980)) (emphasis added). The United States as trustee takes on "the most exacting fiduciary standards" of responsibility because it "has charged itself with moral obligations of the highest responsibility and trust." *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942).

In evaluating claims of breach, the Supreme Court has "emphasized '*the distinctive obligation of trust* incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'" *United States v. Mitchell*, 463 U.S. 206, 226 (1983) (quoting *Seminole Nation*, 316 U.S. at 296) (emphasis added). "The Indian Tribes, as domestic dependent nations, were subjected to the imposition of the trustee-beneficiary relationship and have become reliant upon their trustee to carry out trustee responsibilities." *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1348 (Fed. Cir. 2004) (citing *Mitchell*, 463 U.S. at 225). Because the 1906 Act expressly makes the United States a trustee over the Osage Mineral Estate, sources including *Scott on Trusts*, the *Restatement of Trusts*, and judicial decisions provide appropriate standards against which to evaluate whether the United States has fulfilled its fiduciary duties. *Mason*, 412 U.S. at 398; Tr. 2118:15-2119:5, 2252:9-2254:4 (Lundelius); DX2695-0007 (Lundelius Expert Report).

The United States owes the Osage Tribe a duty of unswerving loyalty in the management of the Mineral Estate. "The most fundamental duty owed by a trustee to the beneficiaries of the trust is the duty of loyalty," requiring it "to administer the trust solely in [their] interest." William F. Fletcher, *Scott on Trusts*, § 170 at 311 (4th ed. 1987); *accord Restatement (Third) of Trusts*, § 170(1) at 193 (1992). A "trustee is under a duty to the beneficiaries not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the trust." *Id.* § 170 cmt. q at 201. The United States must put the Tribe's interests ahead of its own and do what is best for the trust, not what is most convenient for itself. Its "interest must yield to that of the beneficiaries." *Scott on Trusts,* § 170.25 at 436.

As a corollary of the duty of loyalty, the United States may not allow a particular governmental policy to take precedence over its fiduciary duties. Thus, "the principal goal of the

Department of the Interior in Indian oil and other mineral resource management is not to further federal energy policies, but rather to assist Indian landowners in deriving maximum economic benefit from their resources consistent with sound conservation practices." *Cohen's Handbook of Federal Indian Law* § 13.H (1982) (*citing Federal Leasing and Disposal Policies: Hearings Pursuant to S. Res. 45, A National Fuels and Energy Policy Study Before the Senate Comm. on Interior and Insular Affairs*, 92d Cong., 2d Sess., 652-53 (1972)).

### C. The Plaintiff Is Entitled to Favorable Factual Inferences Where the Trustee Has Not Maintained Trust Records

A trustee has a fundamental duty to keep proper records and accounts of the trust. *Restatement (Second) of Trusts*, § 172 cmt. a (1959). When a trustee has failed to do so, "*all* doubts will be resolved against him and not in his favor." *Confederated Tribes of the Warm Springs Reservation v. United States*, 248 F.3d 1365, 1373 (Fed. Cir. 2001) (citing *Scott on Trusts* § 172) (emphasis added). "If the trustee fails in his duty to keep accurate records, '*all* the inconvenience of the confusion' should be 'thrown upon the party who produces it.'" *Blackman v. Hustler Magazine, Inc.*, 800 F.2d 1160, 1164 n.10 (D.C. Cir. 1986) (quoting *Shapiro, Bernstein & Co. v. Remington Records, Inc.*, 265 F.2d 263, 271 (2d Cir. 1959)) (emphasis added). That principle is rooted in "[t]he most elementary conceptions of justice and public policy," which require that "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946).

"[W]hen the United States fails to preserve documents in its fiduciary role to a tribe," a finding of bad faith is unnecessary to establish liability when the United States has "inadvertently destroyed or otherwise lost documents critical to the determination of liability or damages." *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 139 n.11 (2004). If the trustee fails to keep

proper records, "obviously he cannot be permitted to gain any possible advantage" from that failure. *In re Morgan*, 106 B.R. 573, 582 (Bankr. E.D. Ark. 1989).

In the context of a breach of trust,

> a beneficiary is entitled to recover damages for the improper management of the trust's investment assets. In determining the amount of damages for a breach of the trustee's fiduciary duty with regard to investments of the trust property, courts attempt to place the beneficiary in the position in which it would have been absent a breach.

*Confederated Tribes*, 248 F.3d at 1371. "There is no threshold minimum of loss that [must be proven] before being entitled to an award. Even if the damages are minimal, the [plaintiffs are] entitled to recover whatever damages they can prove." *Id.* at 1373.

## II. THE UNITED STATES FAILED TO COLLECT THE FULL ROYALTIES DUE FOR OIL PRODUCED FROM THE TRANCHE ONE LEASES IN THE TRANCHE ONE MONTHS

The evidence at trial showed that the United States breached its duty "to verify that 'all moneys due' under the terms of the mineral leases were in fact paid to the government and deposited to the account of the trust beneficiary." *Osage Tribe*, 68 Fed. Cl. at 328. The specifics of the United States' royalty-calculation and collection duties are set forth in the Osage Regulations:

> Lessee shall pay or cause to be paid to the Superintendent, as royalty, the sum of 16-2/3 percent [or other rate as specified in the lease] of the gross proceeds from sales after deducting the oil used by Lessee for development and operation purposes on the lease.
>
> . . . .
>
> [S]ettlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area, whichever is higher on the day of sale or removal. Where different prices are paid simultaneously for oil from a lease and the highest such price exceeds the higher of the aforementioned prices, then that price shall be the basis of royalty on all oil from said lease.

25 C.F.R. § 183.11(a) & (a)(2) (1975). "Major purchaser" is defined as "any one of the minimum number of purchasers taking 80 percent of the oil in the Kansas-Oklahoma area." *Id*. § 183.1(h). Thus, under the regulations, Royalty Value is not limited to the market value of the oil produced from the lease but rather is based on the highest of a range of values throughout Kansas and Oklahoma. *See* Tr. 100:5-13 (Reineke).[3]

### A. The United States Failed to Collect Royalty Due Based on the Highest Offered Price by a Major Purchaser

The terms of the Osage Regulations are unambiguous: if a "major purchaser in the Kansas-Oklahoma area" has an "offered price" for crude oil "on the day of sale or removal" that is higher than either the "actual selling price" or the "highest posted . . . price by a major purchaser in the Kansas-Oklahoma area," that "offered price" sets the royalty value for all oil sold on the Osage Reservation on that day. *Id.* § 183.11 (a)(2). Moreover, that is how Osage Agency employees, past and current, understood the offered-price provision to operate. Tr. 1059:5-13, 1071:5-25 (Hurlburt); Tr. 1299:14-16 (Barker). They also understood that any contract price by a major purchaser would constitute an offered price, including where that price included a bonus above the posted price. *Id.* The Chief of the Minerals Branch of the Osage Agency during the Tranche One period testified that, even if a bonus were paid for unique reasons (for example, the particular quality or available volume of oil or the oil's proximity to a refinery), the bonus price would set the royalty floor for all Osage Reservation lessees. Tr. 1296:9-1298:15 (Barker).

[3] The regulations direct the lessee to pay the royalty due on oil sold in a given month by the 25th day of the following month. 25 C.F.R. § 183.13(a). Although the purchaser of the crude oil may remit the royalty payment on behalf of the lessee, the lessee remains liable for the royalty payment. *Id.* § 183.14(a)*; see also* Tr. 81:23-82:3 (Reineke).

Notwithstanding the Osage Agency's understanding of the regulation's requirements, it made *no* systematic effort to identify offered prices by major purchasers. The head of the Royalty Accounting Division of the Minerals Branch from 1976 to 1980 confirmed that the Agency did not check for offered prices at all. JX001, Core Dep. at 88:12-89:18. Similarly, the United States' Rule 30(b)(6) witness on royalty collection procedures did not know of any procedures to identify offered prices. JX001, Revard 30(b)(6) Dep. at 45:6-9. The Agency enforced this aspect of the Royalty-Value regulation only when it happened to become aware of bonuses or other "highest" offered prices. *See* DX2334-0001 (after hearing about bonus by one major purchaser, Osage Agency sends letter seeking to collect additional royalties from lessees).

Plaintiff's royalty expert concluded that the Osage Agency's failure to enforce the offered-price provision resulted in royalty underpayments during all of the Tranche One months.[4] Tr. 214:5-217:15, 231:16-233:15 (Reineke); PX751-0642 & 0645 (offered-price underpayments). This determination was based on an examination of prices paid by major purchasers on just the Osage Reservation alone (not the larger two-state area specified in the regulations) and thus undoubtedly understates the underpayments.

Based on the data he found, Reineke determined that, by not actively enforcing the offered-price provision, the United States failed to collect at least $85,053.50 in royalties on the Tranche One Leases during the Tranche One Months. Tr. 207:11-217:15; PX751-0642. The United States did not contest Reineke's calculation. In fact, the United States' royalty expert

[4] Reineke's offered-price analysis for July 1989 used a non-Osage contract with Total Petroleum as the highest offered price for that month. His analysis (PX752-0642, 0645) shows, however, that the highest offered price in July 1989 for any Tranche One Lease was paid by Koch Oil, indisputably a major purchaser (Tr. 204:7-205:24 (Reineke)), on the Osage Hominy.

agreed that Reineke's analysis is consistent with the Osage Agency's definition of offered price. Tr. 1555:3-1556:16 (Martin).

The United States responds to this undisputed evidence by advancing an internally inconsistent position. The United States argues that the offered-price regulation, despite its being "crystal clear," was misunderstood and "misapplied" by the Osage Agency. Tr. 1278:13, 1283:24-1284:2 (Stmt. of U.S. Counsel). The United States apparently believes that, by walking this semantic tightrope, it can reach the destination it seeks – the interpretation of "offered price" in *Okie Crude Co. v. Muskogee Area Director*, 23 IBIA 174 (1993). But the *Okie Crude* decision rests on the premise that the regulations are ambiguous and require interpretation. 23 IBIA at 180. To rely on *Okie Crude*, therefore, the United States must argue ambiguity and contest the regulation's plain meaning. That, however, contradicts its position that the regulation is "crystal clear," clashes with the Osage Agency's consistent understanding of that "clear" meaning, and ultimately is self-defeating under the *Blackfeet Tribe* canon.

In any event, the *Okie Crude* decision is not persuasive. The panel in *Okie Crude* reasoned that, because under contract law an offer is purportedly personal to the offeree, an offered price cannot be used to set royalty value for any lessee other than the one to whom the offer was made. 23 IBIA at 181. But it does not follow from the law of offer and acceptance that an offer to a third party is unable to serve as a measure of market value. Moreover, the *Okie Crude* definition of offered price would render the term "actual selling price" surplusage. Because no rational seller would refuse the highest offered price, actual selling price and highest offered price would merge under the *Okie Crude* approach. *See* Tr. 1413:14-24 (Martin).

At trial, the United States tried to develop two factual defenses on the offered-price issue. First, the United States elicited testimony suggesting that it would have been impossible to have

determined all of the offered prices in Kansas and Oklahoma. *E.g.*, Tr. 1223:18-1225:15 (Barker); Tr. 1407:11-1408:10, 1410:25-1413:13 (Martin). But that excuse rings hollow when the evidence noted above shows that the Osage Agency made *no attempt* to identify offered prices unless such information fell into its lap. In any event, having written the regulation in question, the United States as trustee cannot excuse itself from complying with the regulation's unambiguous requirements, to the detriment of the trust beneficiaries, on the ground that those requirements were simply too difficult to meet.

Second, the United States elicited testimony that applying the offered-price provision according to its plain terms would have chilled production and been unfair to Osage lessees. *E.g.*, Tr. 1290:13-20 (Barker); 1065:2-7 (Hurlburt).[5] To the extent that such concerns existed at the time, they were relevant only to whether the regulations should be changed, not an excuse for unilaterally refusing to enforce them. Moreover, neither BIA nor Interior conducted any contemporaneous written analysis of the economic impact on lessees or production of enforcing the offered-price provision. Tr. 1339:19-1340:14 (Barker). Thus, the testimony elicited by the United States represents nothing more than unsubstantiated, *post hoc* rationalizations that provide no justification for failing to follow the express terms of the regulations.

[5] Osage Agency witnesses Barker and Hulburt repeatedly emphasized the importance of avoiding complaints by and unfairness to the lessees. *E.g.*, Tr. 1065:2-7 (Hurlburt); Tr. 1339:22-1340:1 (Barker). But it is the trust beneficiaries, not the lessees, to whom the Osage Agency owes a duty of loyalty.

### B. By Limiting Royalty Value to the Regulated Price Level at Which the Oil Was Sold, the United States Failed to Collect the Full Royalty Due During the Tranche One Months of January 1976, May 1979, and November 1980

#### 1. Federal Law Established a System of Price Ceilings Applicable to Sales of Specified Categories of Crude Oil

From 1973 through January 1981, crude oil sales prices were subject to a complex federal program of controls. For present purposes, however, only the basics need be understood.[6]

In November 1973, Congress enacted the Emergency Petroleum Allocation Act ("EPAA"), Pub. L. No. 93-159, 87 Stat. 627, directing the President to issue regulations governing the allocation and pricing of crude oil and most petroleum products. In January 1974, the Federal Energy Office (later the Federal Energy Administration and then the Department of Energy) issued regulations establishing a two-tiered pricing structure for sales of crude oil. 10 C.F.R. §§ 212.73, 212.74 (1975). Production from a property that was less than or equal to a specified historical production level was considered "old" oil and had to be sold at the controlled price.[7] During the early part of the program, "new" oil – that is, production in excess of the property's historical level – was exempt from price controls and could be sold at uncontrolled (or free-market) prices. Another category of exempt oil was production from stripper-well leases – which were defined as "any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well." EPAA, §4(e)(2), 87 Stat. at 632; 10 C.F.R. § 210.32(b) (1975). For Osage lessees, the exemption was significant because "probably a majority" of the production from the reservation was "stripper oil." Tr. 1228:21-1229:4 (Barker).

---

[6] The federal crude oil price regulations were discussed at trial. Tr. 225:11-226:9 (Reineke); Tr. 1449:6-1451:12 (Martin). *See also* JX001, Fox Dep. at 51-54.

[7] The regulations defined a "property" as "the right which arises from a lease or from a fee interest to produce domestic crude petroleum." 10 C.F.R. § 212.72 (1975).

In December 1975 Congress enacted the Energy Policy and Conservation Act ("EPCA"), Pub. L. No. 94-163, 89 Stat. 871. Pursuant to the EPCA, the Federal Energy Administration eliminated the exemptions for new oil and stripper-well oil and instead subjected them to an "upper-tier" price limit. 41 Fed. Reg. 4931, 4940 (1976); 10 C.F.R. § 212.74 (1977). In August 1976, however, Congress passed the Energy Conservation and Production Act ("ECPA"), Pub. L. No. 94-385, 90 Stat. 1125, which amended the EPAA to reinstate the stripper-well exemption. *See* ECPA § 121, 90 Stat. 1133; 10 C.F. R. § 212.54 (1977).

In sum, during the federal price-control program, crude oil was generally sold at one of three price levels: lower tier (old oil), upper tier (new oil), and exempt (stripper well and other specified types of oil). Thus, on the same day, oil produced from the same region, county, lease, or even the same well could be sold at different prices depending on its regulatory classification.[8]

**2. Federal Crude Oil Price Controls Did Not Supersede the Osage Regulations Governing the Calculation of Royalty Value**

During the price-control period, the Osage Agency, when calculating Royalty Value, admittedly ignored posted and offered prices of major purchasers in Kansas and Oklahoma and same-lease prices if those prices exceeded the federal ceilings applicable to the particular oil subject to royalty. Tr. 841:18-24 (U.S. Opening); Tr. 1316:16-1317:12 (Barker); Stip. ¶ 13. For price-controlled oil, the Osage Agency limited Royalty Value to the actual (regulated) sales prices reported by the purchasers and lessees. Tr. 1230:19-1231:1 (Barker); Stip. ¶ 13.

That approach was inconsistent with the terms of the Royalty-Value regulation, which directed the Agency to calculate Royalty Value based on the "highest" of actual, posted, offered, or same-lease prices. 25 C.F.R.§ 183.11(a)(2). The regulation's only limitation was that the

[8] On January 28, 1981, President Reagan terminated federal controls on crude oil. *See* "Decontrol of Crude Oil and Refined Petroleum Products," 46 Fed. Reg. 9909 (1981).

posted and offered prices be ones of a "major purchaser." Nothing in the regulation tied the Royalty Value calculation to federal price controls, other regulations, or any other factor.

The EPAA contained no language modifying or superseding the Osage Regulations. The EPAA authorized the issuance of federal regulations governing crude oil selling prices. It said nothing about modifying lease or regulatory terms establishing royalty-calculation methodologies. Moreover, the EPAA contained a specific preemption provision, but it displaced only (a) conflicting provisions of "any program for the allocation of crude oil, residual fuel oil, or any refined petroleum product established by any State or local government" and (b) the antitrust laws in specified situations. EPAA § 6(b), (c)(4), 87 Stat. 633. On the topic of royalties, the EPAA and its implementing regulations were silent.

Because the EPAA itself does not modify the plain terms of the Osage Regulations, there is only one other potential source for limiting Royalty Value to regulated price ceilings – the language of the Osage leases and Regulations themselves. In fact, some non-Osage oil and gas lease forms do expressly provide that, in the event of price controls, royalty value will be capped at regulated levels. For example, as early as 1961, one such lease form provided: "If the price of any substance is regulated by any governmental agency, the value of such substance, for the purpose of computing royalty hereunder, shall not be in excess of the price fixed by such regulation." Galvin, "Developing an Oil and Gas Jurisprudence in Michigan," 7 *Wayne L. Rev*. 403, 425 n.99 (1961), cited in 3 *Williams & Meyers Oil and Gas Law* § 644.11 (rev. ed. 2004). The Osage leases and Regulations, by contrast, contain no such limitation even though the Regulations were adopted in June 1974, after the EPAA's enactment. *See* 39 Fed. Reg. 22,254 (1974). Had the drafters of the Osage Regulations intended to cap Royalty Value at regulated levels, they could have incorporated such a limitation in the regulations. Rather, the drafters

adopted Royalty-Value language comparable to that at issue in *Sowell v. Natural Gas Pipeline Co.*, 789 F.2d 1151 (5th Cir. 1986).

In *Sowell* the lease language based Royalty Value on "the average market price . . . that is paid for gas in Carson, Hutchinson, Potter, Moore, Graf, and Wheeler Counties, Texas." 789 F.2d at 1154. The court rejected application of the maximum regulated price for royalty-calculation purposes. Finding the royalty clause "unambiguous," the court held that "[t]he mathematical universe for computing the average is gas sales in the six[] counties. *There is absolutely no contractual limiting of that universe to gas that is physically or legally comparable to what is produced on the [lease]*." *Id.* at 1155 (emphasis added). The court distinguished numerous cases where the leases in question required computation of "market value" or "market value at the well" of the gas actually produced. "The critical distinction, the one on which the district court [correctly] relied, is that every market value lease to which we have been referred requires the royalty to be based on the market price or market value of the gas *produced from the lessor's land*. In contrast, the [contract in question] refers to the average market price of gas *in a six-county area*." *Id.* (emphases added).

The 1974 Osage Royalty-Value definition is indistinguishable from the corresponding lease language in *Sowell*. That definition prescribed a formula under which four values were to be compared, and two of those values were not keyed to the market value of the oil being sold or the price of comparable oil produced on the Osage Reservation. Rather, they looked to prices for oil, without regard to its physical or legal characteristics or classification, available throughout a

defined geographic area that extended beyond the lease boundaries.[9] Consistent with *Sowell*'s reasoning, it follows that, under the operative language of the Osage Regulations, federally mandated price ceilings do not here limit Royalty Value.

### 3. The United States' Presentation at Trial Provides No Lawful Basis for Deviating from the Plain Terms of the Osage Royalty-Value Regulation

At trial, the United States argued that the Royalty-Value regulation should be construed to avoid encompassing "unregulated prices that the lessees could not obtain." Tr. 841:23-24 (U.S. Opening). That argument is a variation of a theme running throughout the United States' case – namely, that the regulation should never be interpreted to base royalties on prices that were unavailable to the lessees. But that reading of the regulation is incompatible with not only its plain terms but also the consistent understanding of the legal and non-legal staff in the field charged with its implementation. Tr. 1059:5-13, 1071:5-25 (Hurlburt); Tr. 1275:2-22, 1301:6-24, 1323:19-24 (Barker). They understood that the regulation, by its terms, based Royalty Value on prices that were often unavailable to Osage lessees.

For example, the regulations expressly required that the Osage Agency take into account the highest posted and offered prices by major purchasers throughout all of Kansas and Oklahoma. Many of the posted and offered prices in distant parts of Oklahoma and Kansas would have been inaccessible to the Osage Reservation lessees, but that did not mean that such prices could be ignored given the terms of the regulation. Indeed, the former Chief of the Minerals Branch testified about an instance when the Osage Agency used a posted price to set

---

[9] As explained at trial, the Royalty-Value provision of the Osage Regulations is atypical. Unlike the usual oil lease, the regulation here did not tie Royalty Value solely to the actual selling price of oil produced from the lease at issue or to the market value of oil of like kind or quality. Tr. 99:10-100:13 (Reineke).

Royalty Value even though it was not available to Osage lessees. Tr. 1205:2-1206:1 (Barker). Thus, the United States' "unavailable-to-the-lessee" theory is flawed and cannot support the existence of an implicit regulatory limitation capping Royalty Value at the federal price ceilings.

At trial, the United States elicited testimony, that, during the period of controls, "federal law" prohibited the use of "unregulated price to determine the royalty amount owed to the tribe" and that the federal price "regulations stated" "how the agency would have computed royalties." Tr. 1316:16-1317:5, 1317:17-20 (Barker). The witness, however, cited no specific provision of a federal statute or regulation that would support those assertions – and understandably so. As explained above, the federal price-control statutes and regulations addressed selling prices only; they said nothing about royalty calculation.

Moreover, this witness' testimony on the requirements of federal law is unaccompanied by any evidence that, during the relevant time period, a federal agency engaged in a legal analysis of (a) whether price controls modified the terms of the Osage Regulations governing Royalty Value and, if so, (b) whether requiring the Osage Nation to shoulder the economic burden of federal energy policy was consistent with the United States' obligations as trustee.

PRIVILEGED MATERIAL REDACTED

PX682-0013. In *Pennzoil Exploration & Prod. Co. v. Lujan*, 928 F.2d 1139, 1144 (Temp. Emer. Ct. App. 1991), the court also concluded that neither the EPAA, the regulations promulgated thereunder, nor the statute's policies trumped Interior's regulations for calculating royalties on federal oil leases. Accordingly, the testimony elicited by the United States must be rejected as a *post hoc*, and erroneous, justification for the Osage Agency's failure to follow the plain terms of its regulations.

The United States also elicited testimony on this issue from its royalty expert. He defended his assumption that price controls limited Royalty Value by citing (a) a 1977 FEA brochure, (b) "Texaco's practice" during price controls, and (c) conversations with a former Texaco employee (Fox) and a former Minerals Management Service ("MMS") employee (Dial). Tr. 1414:21-1418:14 (Martin); DX2675-0107. None of those items is probative of the unregulated price issue.

The cited FEA brochure was "not intended to provide legal interpretation of applicable regulations" or "expert" advice on their meaning. Tr. 1571:16-1572:7 (Martin); DX2675-0108. Moreover, as the brochure makes clear, the FEA regulations "are applicable to buying and selling" and are silent on the calculation of royalties. DX2675-0110; *accord* Tr. 1572:13-19, 1573:5-8 (Martin). Texaco's "practice" and the recollections of the former Texaco employee show only that the company took a position consistent with its own economic self-interest in minimizing its royalty obligations. No evidence was presented to show that the position was the product of a thorough and objective legal analysis of the relationship of federal price controls to the trust duties mandated by the 1906 Act and the Osage Regulations. *See* Tr. 1574:18-1575:11 (Martin). Similarly, the information received from the former MMS employee reflected his experience with that agency and its predecessor (U.S. Geological Survey), not the Osage Agency,

and he offered no opinion on "what the Osage regulations meant in this context." Tr. 1573:13-1574:11 (Martin). Moreover, the federal leases that MMS administers base royalties on (a) prices paid for sales of *like-quality* oil or (b) the gross proceeds derived from the sale of the oil in question. JX001, Dial Dep. at 100:7-101:7, 104:4-106:7, 115:2-116:2. That approach differs substantially from the Osage Royalty-Value methodology.

Finally, the United States elicited testimony that using unregulated prices to establish Royalty Value would have "wiped out numerous lessees." Tr. 1318:6-7 (Barker). But that assertion was not supported by even a shred of economic analysis – whether created contemporaneously during the Tranche One Months or later through expert testimony. The United States' duty was to enforce the regulations as written or to amend them if such enforcement would not have been in the best interest of the Osage Nation. What the United States could not do was what it did here – fail to enforce the terms of the regulations based on the personal, unsubstantiated views of Osage Agency staff.

Moreover, had the Osage Agency acted as a prudent trustee and analyzed the available alternatives, it would have realized that any concerns about lessees could have been addressed, without depriving the trust beneficiaries of revenues to which they were entitled under the regulations. The EPAA authorized the granting of "adjustments" to the price regulations. EPAA § 4(c)(3), 87 Stat. at 631; *see also* 42 U.S.C. § 7194(a) (DOE authorized to grant "adjustments" to "prevent special hardship, inequity, or unfair distribution of burdens"). Accordingly, FEA adopted rules authorizing the granting of exception relief to individual companies "to alleviate or prevent serious hardship or gross inequity." 10 C.F.R. § 205.55(b)(2) (1975).

PRIVILEGED MATERIAL REDACTED

PRIVILEGED MATERIAL REDACTED

PX682-0011. *See also Placid Oil Co. v. FPC*, 483 F.2d 880, 911 (5th Cir. 1973) ( "If, as subsequent events develop, the producers are put in a bind by their royalty obligations, they may certainly petition [price regulators] for individualized relief."). To the extent that enforcement of the terms of the Osage Regulation may have resulted in hardships or inequities for the lessees, the availability of exception relief eliminated any conflict that might otherwise have existed between the Osage Regulations and the objectives of the EPAA.

Plaintiff's expert, Mr. Reineke, calculated the royalties that would have been due had the highest posted or offered prices been applied without regard to the regulated price level at which the oil was sold. Under this analysis, the royalties due under the highest posted price analysis are $173,596.23 (PX751-0644; Tr. 235:14-23), and the royalties due for the highest offered price are $245,529.75 (PX751-0645; Tr. 233:6-15). The United States did not rebut or otherwise challenge those calculations.

### C. The United States Failed to Collect Royalty Based on the Highest Selling Price from a Lease When There Were Simultaneous Sales from the Same Lease

The Osage Regulations provided that, in the event that different prices were paid in simultaneous sales of oil from the same lease, the highest of those prices was to be used as the Royalty Value if it exceeded the other values set forth in 25 C.F.R. § 183.11(a)(2) (*i.e.,* actual selling price and highest posted or offered price). This provision required the Osage Agency to keep track of the date of sales from each lease and, where simultaneous sales occurred, to compare the selling prices. The Osage Agency, however, had no system for engaging in those activities. Tr. 236:21-24 (Reineke).

Plaintiff's expert identified four instances in which oil from the same lease was sold at two different prices in the same month. Tr. 236:21-237:4 (Reineke); PX751-0029-30. For example, the Osage Hominy May 1979 Oil Run Statement indicates that, from the non-waterflood portion of the lease, 1600.63 barrels of oil were sold at some point in May for $13.555 per barrel; 2175.27 barrels were sold on May 1 for $5.92 per barrel; and 9464.71 barrels were sold on May 2 for $6.00 per barrel. PX751-0226.*[10] That Oil Run Statement indicates that, from the waterflood portion of the lease, 4280.98 barrels of oil were sold on May 1 for $19.25 a barrel and 18626.78 barrels of oil were sold on May 2 for $19.33 per barrel. PX751-0237.* Even though different prices were paid for oil sold from the same lease on the same day, the Agency failed to apply the highest simultaneous sales price to all sales on that day. PX751-0642. Reineke calculated that the total resulting underpayment for the four identified months is $108,244.19. Tr. 237:15-238:1; PX751-0030.

The United States offered no evidence to rebut Reineke's methodology or calculations. Instead, it tried to explain away the simultaneous sales issue by claiming that such prices were solely a product of federal price controls. Tr. 1291:2-1293:18 (Barker). But, as already explained, the federal price-control program did not nullify the requirements of the Osage Regulations, particularly the simultaneous sales provision, which was added to the regulations *after* the EPAA's enactment. Moreover, because the United States made no attempt during any of the Tranche One period to track simultaneous sales, Tr. 236:21-24 (Reineke), the Barker testimony is nothing more than after-the-fact conjecture. It does not establish that differential simultaneous selling prices occurred only during the period of federal controls.

---

[10] Refer to Stipulation of the Parties Regarding Duplicate Exhibits (filed May 4, 2006).

**D. The United States Undercollected Royalties by Failing to Determine the "Actual Selling Price"**

Under the Osage Regulations, the oil's "actual selling price" is one of the items that the Agency must consider in calculating Royalty Value. There is no dispute that the actual selling price can be determined only by examining the underlying sales contract. Tr. 78:17-79:4 (Reineke); Tr. 1332:13-1333:2 (Barker); Tr. 2334:22-2336:4 (Morrison). This step is necessary to verify that the full consideration for the oil is reported as the sale price, because buyers and sellers often agree to enter side arrangements or to characterize portions of the sales price as something other than consideration for the oil itself. Tr. 139:12-140:13 (Reineke). A sales contract found in the Agency's files is illustrative. PX026. In that contract the parties agreed to treat a portion of the sales price as "further consideration" for the right to buy the oil and for other "services rendered" and to pay that additional consideration by separate check. PX026-0003; Tr. 139:12-144:9 (Reineke). Notwithstanding the need to review sales contracts, it is undisputed that the Osage Agency did not do so. Tr. 1170:2-16 (Barker); Tr. 1078:18-21 (Hurlburt).

At trial, the United States royalty expert suggested that review of the underlying sales contracts was unnecessary because the lessees and the purchasers had opposing economic interests, which ensured that the separate reports they filed reflected the full consideration paid. *See* Tr. 1521:21-1522:12, 1606:11-1607:10 (Martin). This testimony was unconvincing. First, the lessee's report and the purchaser's statement may not tell the full story if, as was the case with PX026, the parties have agreed to pay some portion of the consideration by "separate check." Tr. 143:19 (Reineke). Second, the "opposing economic interests" may be absent if the transaction is between corporate affiliates. In that case there is the incentive and opportunity for the affiliates to structure the internal transfer to minimize royalty and severance tax obligations

and increase overall corporate profits. *See* Tr. 67:2-68:5 (Reineke); *see also Howell v. Texaco, Inc.*, 112 P.3d 1154, 1158 (Ok. 2004) ("The royalty owners' check stubs did not show that Texaco was deducting a cost for marketing and a profit allowance from the royalty payments. At no time did Texaco disclose to the plaintiffs that it was calculating royalty payments based on its intra-company contract."). In the case of interaffiliate transactions, the lessee and the purchaser answer to a single parent that seeks to maximize the corporation's profits. Tr. 1607:11-1610:3 (Martin). Third, even where the lessee and the purchaser are unrelated, they can mutually benefit by structuring the transaction to depress royalty and severance tax liability and to share in the savings. *E.g.* PX026; Tr. 142:17-144:9 (Reineke).

The Osage Agency's failure to collect, review, and preserve sales contracts violated its fiduciary duties and deprived the Tribe of its full royalty.

### E. The United States Failed to Determine the Correct Major Purchasers and the Correct Highest Posted Price of a Major Purchaser

The Osage Agency did not correctly identify the major purchasers, a necessary predicate for selecting the highest posted price. The major-purchaser component of the Osage Regulations required the agency to identify the fewest number of oil purchasers that collectively purchased 80% of all oil sold in the Kansas-Oklahoma area during the month of production. 25 C.F.R. § 183.1(h). Thus, the Agency had to identify, for the relevant month, (1) all purchasers of crude oil in Kansas and Oklahoma, (2) the amounts each purchased in the two states, and (3) the total volume of oil purchased in the two states. Tr. 106:22-107:8 (Reineke); PX751-0017 (Reineke Expert Report); Tr. 1436:17-1437:7 (Martin); *see also* DX0878.

For the first three Tranche One Months (January 1976, May 1979, and November 1980), the Osage Agency did not follow the regulatory requirements for identifying major purchasers. Tr. 146:24-152:18 (Reineke). The Chief of the Royalty Accounting Section during that time

testified that the Agency did not collect detailed oil purchase data but merely reviewed posted price bulletins from some large purchasers on the Osage Reservation. JX001, Core Dep. at 41:13-43:2. An employee in the Royalty Accounting Section during that same time frame testified that the Agency "just kind of knew" who the major purchasers were. Tr. 938:3-10 (Branstetter). Moreover, as the United States' oil expert (Martin) confirmed, there are no records of any sort indicating that the Agency conducted a major-purchaser analysis for the first three Tranche One Months.[11] Tr. 1446:12-18.

In the absence of any documentary evidence reflecting a contemporaneous major purchaser analysis, and because the data needed to perform such an analysis is unavailable, both parties' royalty experts developed similar proxies for the analysis, which are based on all the highest daily prices posted in Kansas and Oklahoma. Tr. 1446:19-1447:9 (Martin); Tr. 217:16-219:14 (Reineke). Based on those proxies, the experts agreed that the United States had failed to collect the full royalty due under a highest posted price analysis for the Tranche One Months of May 1979 and November 1980. PX751-0643 (Reineke Expert Report); DX2675-0016, 0098 (Martin Expert Report).

---

[11] The former Chief of the Minerals Branch, which included the Royalty Accounting Section, testified generally that the procedures summarized in DX0886, a document dated April 4, 1986, were followed in earlier years. Tr. 1208:4-22 (Barker). But that generalized testimony does not override the direct and specific testimony of the two individuals (Core and Branstetter) who actually prepared the posted price letters sent to lessees during the earlier time period. Moreover, the former Minerals Branch Chief was unable to identify any specific employee involved in the determination he claimed was performed. Tr. 1333:8-1334:2. In addition, his testimony contradicts the plain language of DX0886, which states that the described procedures "*will* be the policy for selecting the highest posted price." (Emphasis added.) The former Chief's attempted to explain away the document's repeated use of the future tense by insisting that the use of "will be" throughout the document should be understood to mean "will continue to be." Tr. 1337:1-16. But that explanation is simply not credible in light of the Core and Branstetter testimony and the absence of any documentary evidence that any such procedures existed before the late 1980s.

For February 1986 and July 1989, the United States' royalty expert (Martin) relied on certain documents for the proposition that the Osage Agency did conduct an actual major purchaser analysis for those two Tranche One Months. Tr. 1443:14-1446:11 (Martin); PX751-0517-18; DX2345.* But those documents show only that the United States failed to perform the major-purchaser analysis correctly.

As an initial matter, the documents use data from incorrect months. The alleged major-purchaser analysis for February 1986, PX751-0517-18, uses data from December 1985, and the one for July 1989, DX2345, uses Oklahoma data from February 1989 and Kansas data from April 1989. Moreover, the Osage Agency used an incomplete list of purchasers for its February 1986 analysis. Data reported by Petroleum Information, based on records of the Oklahoma Tax Commission, show that the Osage Agency considered only 55 of the 63 oil companies who purchased oil in Oklahoma in December 1985. Tr. 167:11-168:24 (Reineke); PX751-0503-16.

In addition, based on data from Petroleum Information and DOE's Energy Information Administration, Reineke determined that the Osage Agency's analysis for both months failed to account for significant volume in the two-state area. Tr. 154:25-159:12. For February 1986, the volume shortfall was approximately 11%. Tr. 154:7-159:12. For July 1989, it was 9.2% (even after being updated based on July 1989 data). Tr. 161:8-162:24, 164:24-165:16. Reineke explained that, because the major-purchaser analysis was sensitive to even minor volume differentials, such shortfalls could materially skew the results. Tr. 159:13-160:23. Therefore, the Agency's supposed major-purchaser analyses for February 1986 and July 1989 are inaccurate and unreliable. Tr. 160:24-161:7, 163:2-17, 165:17-166:21, 166:24-167:7 (Reineke).

Because the Osage Agency did not collect and preserve the data needed to re-create major-purchaser analyses for February 1986 and July 1989, Reineke used, as a proxy, the same

average highest posted price methodology he used for the earlier months. PX751-0022; Tr. 217:16-219:14. Based on that approach, he determined that the Osage Agency's failure to use the correct highest posted prices had resulted in royalty underpayments of $24,328.90. Tr. 219:16-220:21; PX751-0643.

The United States offered no response to Reineke's critique of the Osage Agency's alleged major purchaser analyses for February 1986 or July 1989. Nor did the United States present testimony from anyone with any first-hand knowledge about how PX751-0517 or DX2345 were prepared, what data were used, or how the data were obtained and verified. No fact witness discussed PX751-0517, the document purportedly showing a February 1986 analysis. The sponsoring witness for the alleged July 1989 major purchaser analysis, DX2345, admitted that he had never seen the document before March 2006. Tr. 1066:21-1067:12 (Hurlburt). Nor had he ever performed a major purchaser analysis himself. Tr. 1066:9-16.

By failing to identify the correct "major purchasers," the United States breached its fiduciary duties and deprived the Osage Nation of its full royalties.

### F. The United States Violated Its Own Regulations by Reducing the Calculated Highest Posted Prices Based on Gravity

The Osage Agency allowed lessees to pay royalties based on posted prices that had been adjusted downward to reflect gravity differentials. *E.g.*, DX2360-0002; Stip. ¶ 11. Nothing in the language of the Osage Regulations requires that Royalty Value be adjusted based on the gravity of the oil. Tr. 1577:6-19 (Martin). Nor is there any dispute that, in the absence of gravity

adjustments, more royalty income would have been collected for the benefit of the Osage Nation. Tr. 1311:23-1312:5 (Barker).[12]

The United States elicited testimony that, because the gravity of oil relates to its quality, it must be taken into account in determining Royalty Value. *See* Tr. 1302:20-1303:12 (Barker). This argument ignores a distinguishing feature of the Osage Regulations. Unlike other royalty schemes, Osage Royalty Value is not tied to the specific quality of the oil being sold from the leases. Tr. 103:17-25 (Reineke) (explaining that MMS regulations tie one measure of royalty value to oil of "like quality"). The absence of limiting language such as "oil of like quality" in the Osage Regulations indicates that Royalty Value is not a function of quality but rather the prices being paid, offered, and posted for all the different types and qualities of oil being produced in Kansas and Oklahoma. *See* Tr. 105:7-23 (Reineke). The United States' invocation of common industry practice to justify gravity adjustments also fails. Tr. 1312:2-5 (Barker); Tr. 1576:20-1577:5 (Martin). Industry practice is not relevant here given the uniqueness of the Osage regulations. Tr. 99:10-100:13 (Reineke).

In short, the United States has impermissibly adopted a construction of the Osage Regulations not mandated by the language of the regulations that favors the lessees at the expense of the Osage Nation. Such action violates the principles of *Blackfeet Tribe* and *Jicarilla Apache*. Reineke calculated that the losses from this breach during the Tranche One Months for the Tranche One Leases was $1,660.48. Tr. 224:7-17; PX751-0030.

[12] Posted prices were never adjusted upward to reflect gravity differentials. The base posted price uses 40°API gravity. If the gravity of the oil being sold varied from that level, whether higher or lower, it resulted in a downward price adjustment. Tr. 223:21-224:4 (Reineke).

### G. The United States Failed to Collect Royalties for the Full Volume of Oil Subject to Royalty from the Tranche One Leases in the Tranche One Months.

This Court has already held that "the statutes and regulations at issue here clearly establish a fiduciary duty to verify that lessees fulfill their contractual obligations to the Tribe by verifying the accuracy of payments made . . . ." *Osage Tribe*, 68 Fed. Cl. at 333. Volume is the cornerstone of the royalty-determination process because royalty is due on each barrel of oil produced. Tr. 170:12-17 (Reineke). As the United States' witnesses recognized, the United States as trustee had a duty to verify the amount of oil produced and sold to ensure that it collected the full royalty due. Tr. 1118:13-22 (Barker).

As a general matter, care must be taken to assure that oil is not lost through leaks or spills. Often leaks go undetected for a variety of reasons, so careful monitoring is essential. Tr. 1132:8-14 (Barker). In addition, gauging a tank involves several steps, each of which creates an opportunity for unscrupulous or careless purchasers to underreport the amount of oil produced and sold, thereby depriving the Osage Nation of oil royalties to which it was entitled. Tr. 170:18-171:24; 173:19-174:10 (Reineke); PX450-0107-108 (discussing theft of oil from the Osage Reservation by Koch). For these reasons, trustees hire independent gaugers to verify production volumes and instruct those gaugers to independently gauge tanks frequently. Tr. 2331:23-2334:7 (Morrison). Testimony was heard from an oil and gas trustee who employs gaugers to visit wells on average three times a year, with some tanks gauged monthly. Tr. 2333:14-25 (Morrison).

The United States failed to meet its duty as trustee in this regard. First, the Osage Agency had no gaugers on staff until the late 1970s or 1980 (Tr. 1161:24-1162:13 (Barker)), when it hired two gaugers (Tr. 999:20-1000:9 (Hurlburt)). Given the size of the Osage Reservation (1.47 million acres and nearly 2,000 leases), it would have been physically impossible to have gauged an adequate number of tanks with only two gaugers. *See* Tr. 1327:9-

16 (Barker). In fact, they gauged only about 1% of sales. Tr. 1068:13-1069:4 (Hurlburt). The Osage Agency considered hiring additional gaugers in response to the Linowes Report. Tr. 1078:22-1079:22 (Hurlburt). The Agency failed not only to hire additional gaugers but even to analyze whether its verification process was effective. Tr. 1078:22-1080:08 (Hurlburt). By any reasonable measure, the Osage Agency's gauging and field monitoring practices were simply inadequate to assure that the full royalty was collected. Indeed, Reineke expressed his professional opinion that gauging only 2-3% of the sales was not sufficient to verify oil volumes. Tr. 177:12-22.

In the absence of independent gauging reports, the Osage Agency relied on the volumes reported by the purchasers. But even there the Osage Agency only spot-checked volumes reported on the purchaser's statement against the volumes reported on the purchaser's run ticket. JX001, Core Dep. at 175:3-25. Out of almost 1,000 purchasers statements received in a month, perhaps six were compared to run tickets. *Id.* Moreover, the run statements did not include all of the raw data used to calculate the volume, such as the top and bottom gauge readings and the temperatures. Tr. 183:10-16 (Reineke). Thus, Osage Agency staff could not independently verify that the volume had been correctly determined, even assuming the physical measurements were correct. Finally, the United States did not produce a single independent gauger's report for any of the Tranche One Leases in any of the Tranche One Months.

The United States' failure to verify the volume of oil produced resulted in an undercollection of royalty. Tr. 185:17-186:13 (Reineke).

### H. The United States Failed to Verify the Proper Royalty Rate

The Royalty Rate under the Tranche One Leases is generally 1/8. Several of the Tranche One Leases, however, provide for higher royalty rates of 1/6 or 1/5, depending on the specific formation (often referred to as a "sand" or "pool") from which the oil was produced, or

depending on the monthly or historical volume of oil that was produced from all or some portion of the lease. *See* Tr. 92:19-96:17 (Reineke). *See also* PX751-0123 (East Hardy Lease); PX751-0050 (North Burbank Lease). Because a higher royalty rate increases royalty revenue for each barrel of oil sold, it is important to assure that the correct rate is applied. Accordingly, the United States had a duty to verify the formation from which oil was produced to ensure that the correct royalty rate was being used. *Cf.* Tr. 320:13-321:13 (Parris) (describing impact of production level on royalty rate).

Historical production and formation information was provided only by the lessees. Tr. 125:6-25 (Reineke). There was no indication that the Agency had any process to verify the pool, sand, or formation from which the oil was produced, or to verify monthly production rates. The United States therefore is unable to establish that it applied the correct royalty rate to sales of oil, or collected the full royalty due under the Osage Regulations. Because the United States never obtained data on the formation from which oil was produced, it has failed to ensure collection of all moneys due the Osage Nation and has breached its trust duties, harming the Osage Nation.

**I. The United States Failed to Audit**

This Court already has held that "the statutes and regulations at issue here clearly establish a fiduciary duty to verify that lessees fulfill their contractual obligations to the Tribe by verifying the accuracy of payments made." *Osage Tribe*, 68 Fed. Cl. at 333. At the heart of this duty is the need to verify the accuracy of reported data. In a series of studies of its past performance as manager of oil resources, both in its capacity as an owner and as trustee for Indian tribes, the United States described its historical practices as inadequate because they relied almost exclusively on data reported to it by oil companies. *E.g.*, PX079-0003-6 (criticizing reliance on data reported by oil companies, lack of verification procedures, and lack of audits); PX081-0009, 0012, 0025, 0026 (criticizing reliance on unverified and unaudited sales data from

oil companies as an "honor system" and finding that system inadequate). In recent times, the United States has rejected the "honor system" approach for its own oil leases and those that it manages in trust for other Indian Tribes and has substituted an audit-based system. 30 U.S.C. § 1711(c) (2003).

Because audits are the most reliable way to validate royalty payments, witnesses explained that in their experience royalty owners audit 100% of all oil sales on some rolling schedule. Tr. 2336:13-2340:4 (Morrison); Tr. 187:23-188:22 (Reineke). Plaintiff's royalty expert also described the effectiveness of post-sales audits. For example, on the Wind River Indian Reservation, post-sales audits led to the recovery of royalty underpayments of up to 10% of the royalty paid. Tr. 194:14-19 (Reineke). Studies by the United States itself have confirmed the effectiveness of audits in preventing and recovering underpayments. They have produced recoveries of many millions of dollars, ranging from 3.5-10% of royalty paid initially. PX081-0027; s*ee also* PX531-0042 (recovery of $2.6 billion since 1981 in unpaid mineral royalties because of auditing and other underpayment detection). It is also undisputed that the Osage Agency did not routinely audit lessees and purchasers of Osage oil. Tr. 1078:14-17 (Hurlburt). Rather, the Agency relied entirely on the comparison of lessee's reports and purchaser's statements to verify the accuracy of royalty payments.

Plaintiff's expert testified that, in his professional opinion, the Agency's failure to audit means that one cannot verify whether the correct amount of royalty was collected. Tr. 199:24-200:15 (Reineke). Based on his professional experience, as well as the reported experience of MMS and other governmental entities, plaintiff's expert testified that it is likely that the failure to audit and perform other verification measures resulted in a royalty undercollection of approximately 10%. Tr. 241:3-242:5 (Reineke).

The United States did not contest the effectiveness of audits or of reviewing oil sales contracts. Nor did the United States offer any analysis or studies, whether during the Tranche One period or after-the-fact, showing that its system was just as effective as a system that relies on independent verification and inspection of source documents. Instead, the United States focused its defense on establishing the bureaucratic regularity of its practices. Thus, the United States elicited lengthy testimony on the processing of paperwork, the cross-checking of forms, the filing of documents, and similar activities. But none of that testimony was able to patch over the fundamental flaw in the system: the reported data were never compared to source documents or otherwise subjected to a reality check.

In an effort to defend its complete reliance on the lessee's reports and purchaser's statements, the United States argued that the practice of comparing those documents distinguished the Osage Agency from the USGS and other agencies described in the Linowes Report and other United States studies. In essence, the United States argued that the Agency's comparison effort was the functional equivalent of an audit or similar verification.

This view is demonstrably incorrect. Certain important information, such as formation of production, appears *only* on the lessee's report (if at all). Thus, a comparison of the lessee's report to the purchaser's statement could not possibly verify the accuracy of the royalty rate. Similarly, with respect to volume, the purchaser's statement and the lessee's report were both based on the purchaser's run ticket. JX001, Core Dep. at 1583:3-160:24. Obviously, because the different documents relied on the same data, comparing them could not possibly have revealed anything more serious than a transcription error; such a process did not constitute a "verification" of the volume of oil produced. Finally, for the reasons explained earlier, simply comparing the prices reported by the lessee and purchaser did not serve to verify the true selling price of the oil.

In sum, by relying only on information that the parties *chose* to report, and by failing to subject that information to any independent verification or confirmation, the United States breached its duty to verify that full royalties were paid based on the correct Royalty Value, Royalty Volume, and Royalty Rate.

## III. THE UNITED STATES BREACHED ITS DUTY TO INVEST PRUDENTLY THE TRANCHE ONE TRUST FUNDS IT COLLECTED

The United States breached in two major respects its duty to invest prudently. First, the United States underinvested trust moneys and kept unreasonably large amounts of cash. Second, the United States failed to designate a depository in Pawhuska until 1990 and otherwise unreasonably delayed the depositing of royalty checks.

### A. The United States Left an Unreasonably Large Proportion of Collected Funds in the Cash Account and Otherwise Underinvested Trust Moneys

Relying on the Andersen Report, plaintiff's investment expert (Jay) concluded that the United States breached its duty of prudent investment for invested funds in January 1976, May 1979, and November 1980. This analysis is set out in section A.1 below. Section A.2 explains that Lundelius's analysis, too, shows breach for May 1979. Section A.3 identifies a crucial defect in Lundelius's calculation of his actual rates. His "actual" rate of return analysis assumes only **6%** investment in T-bills for Tranche One funds, while the standard against which he judges the trustee's performance – his 80/20 Expected Rate – assumes **20%** investment in T-bills. As explained below, *when this inconsistency is corrected, Lundelius's methodology shows breach in the same three months as Jay's analysis.*

#### 1. The United States Breached Its Fiduciary Duty to Invest Prudently

The Andersen Report shows that the United States failed to earn the returns that a prudent trustee would have earned (Lundelius's 80/20 rate). Jay relied on the Andersen Report because the BIA's accounting system for tribal trust funds has been in disarray for many years. Tr.

344:18-347:9 (Parris); Tr. 491:13-498:19 (Jay). Among other longstanding problems, BIA's accounting system contains inaccurate and incomplete data, lacks proper internal controls, and has generally not been audited. Tr. 343:9-345:22 (Parris); Tr. 498:1-500:4 (Jay); PX513-0003. In addition, BIA has failed to reconcile its main accounting system with its various subsystems or with the records of the Department of Treasury, which serves as BIA's bank.[13] Tr. 499:2-500:4 (Jay); PX087-0027. No one knows if the balances in the Osage trust accounts are accurate. Tr. 347:1-9, 375:17-376:23 (Parris); PX277-0005. As a result, the United States' records do not enable one to determine what investment decisions were made. JX113-0004-7; PX750-0006-10; JX001, Williams Dep. at 237:16-238:10. Nor do they permit a reliable analysis of what happened with a specific royalty check from a particular Tranche One purchaser. PX750-0021-23. Thus, deficiencies and gaps endemic to BIA's accounting system prevent the kind of lease-by-lease, deposit-by-deposit analysis that would allow the Osage Nation as beneficiary to hold the United States accountable for the particulars of its investments in Tranche One. Tr. 472:7-17; 474:23-475:4 (Jay); PX750-0006-10; PX750-0021-23.

As a reasonable estimate, in light of the trustee's failure to maintain the necessary detailed information, Jay relied on the data compiled in Arthur Andersen's multi-year, multimillion-dollar trust fund reconciliation project. PX750-0008 at ¶ 24. Congress required BIA to conduct that project in an effort to correct the longstanding problems noted above. PX476-0003. The project began in 1991 when BIA entered into a contract with Arthur

[13] The errors and problems with BIA's accounting system were so pervasive that BIA's own managers did not rely on the information in that system but instead created their own ad hoc data. PX087-0014. In 1981, GAO revoked its approval of BIA's accounting system because, among other things, it contained inaccurate data, did not use accrual accounting, and had been modified without obtaining GAO's approval. Tr. 493:25-496:7 (Jay); PX086-0001. As of the date of Mr. Parris' trial testimony, GAO had not restored its approval of BIA's accounting system. Tr. 387:3-9 (Parris).

Andersen. Tr. 376:24-388:5 (Parris); Tr. 1899:23-1900:9 (Chavarria). It lasted over five years and cost the United States over $21 million. Tr. 386:7-12 (Parris); PX513-0003. At the project's end, Arthur Andersen issued to the Osage Tribe a detailed final report, as well as reconciled statements for each trust account, including account 7386 for oil and gas revenues. PX476.

For each Tranche One month, Jay made two comparisons. First, he compared the income actually earned by invested funds and cash in account 7386 during the fiscal year for that month (as shown in the Arthur Andersen Report) with the amount of investment income those funds would have earned during that year if (1) cash had earned interest at the statutory rate of 4 percent and (2) invested funds had earned Lundelius' 80/20 rate. Tr. 507:1-17. PX750-0023; 0024-25, 0048. Second, Jay computed the additional investment income the cash would have earned had they been invested at Lundelius's 80/20 rate rather than the 4% statutory rate. Tr. 529:11-25; PX750-0048. Based on those comparisons, Jay concluded that, for January 1976, May 1979, and November 1980, the United States fell short of Lundelius's 80/20 rate for invested funds. *See* PX750-0046. Jay's analysis also shows that, in all five years containing Tranche One months, the United States lost a substantial amount of interest income by keeping unreasonably large balances in the cash account. PX750-0023, 0024-25, 0048.[14]

### 2. Lundelius Effectively Concedes Breach for May 1979

By definition, Lundelius's 80/20 expected rate is the rate a prudent person should have achieved. Tr. 2136:4-2141:25 (Lundelius). Lundelius himself calculates that, in investing royalties from Tranche One purchasers of oil for May 1979, the United States fell $1,192 short of

---

[14] Lundelius erroneously claims that, for the first three Tranche One months, Jay failed to include in his analysis the interest income that the Osage Tribe earned on the cash balance of trust account 7386. Arthur Andersen's reconciled account statement shows that the cash in account 7386 was not credited with any interest income for the fiscal years that include those Tranche One months. Tr. 2436:7-25; *see, e.g.*, JX028-0001.

what a prudent person would have earned with an 80/20 allocation. Tr. 2203:2-2205:6 (Lundelius); DX2695-0059. This, by definition, is a breach. "There is no threshold minimum of loss that [must be proven] before being entitled to an award. Even if the damages are minimal, the [plaintiffs are] entitled to recover whatever damages they can prove." *Confederated Tribes*, 248 F.3d at 1373. Lundelius does not and cannot offer any analysis to suggest that this shortfall is within any statistical margin of error.

There is no excuse for failing to earn a target rate comprised, not of stocks and bonds, but of T-bills and CDs. Thus, Lundelius's strained effort to explain away this failure as something worthy of Warren Buffett or Peter Lynch should be entirely discredited. Tr. 2222:23-2223:15 (Lundelius). The five Tranche One months are a very small sample, and Lundelius calculates failure to achieve what a *prudent* person would at least *one-fifth* of the time.

### 3. If Lundelius's "Actual" Rate Analysis Is Subjected to the Same Liquidity Constraints He Puts on His "Expected" Rates, His Methodology Shows Breach in *Three* Tranche One Months

Lundelius makes different assumptions about liquidity needs in calculating his *expected* rate than he does in calculating the *actual* rate of return for Tranche One royalties. Thus, Lundelius assumes away the problem – evident in the Andersen Report – of underinvested cash. What follows is an explanation of this problem and how, if corrected, Lundelius's methodology shows breaches in the same three months as Jay.

In computing his "prudent" rate of return, Lundelius used a mix of 80% three-month CDs and 20% three-month T-bills. Tr. 2140:15-2141:25 (Lundelius); DX2695-0012-13. He included T-bills to address liquidity needs because T-Bills are almost as liquid as cash. Tr. 2139:18-2140:6 (Lundelius). Lundelius identified three cash needs of Osage trust account 7386 to support his conclusion that the trustee should be measured against a standard that builds in 20%

liquidity at all times. The first was "various operating needs," which he estimated at 6.0%.[15] Tr. 2140:22-2141:8 (Lundelius). The second was "funds needed to make disbursements for gross production taxes and tribal council expenses," which he estimated at 6.1% to 7.2%. Tr. 2141:9-16 (Lundelius); DX2695-0013 at ¶ 29. The third was the need to hold on average 6.5% of funds in T-Bills while CDs were being located (referred to here as "bridging" T-Bills). Tr. 2141:17-25 (Lundelius); DX2695-0013-14 at ¶ 30.

Thus, to be consistent in calculating his "actual" rates for Tranche One funds, Lundelius should have assumed with respect to such funds that 7% went to cash for short-term disbursements, 7% toward "various operating needs," 6% toward bridging T-bills, and 80% toward CDs. DX2695-0013-0014 at ¶¶ 28-30. In short, Tranche One royalties should be allocated between CDs and cash just like any other trust income and, as a result, only 86% of the Tranche One collections should have been allocated to the traced investments (bridging T-bills and CDs) and 14% should have been allocated to maintaining available cash. *Id.*

But when Lundelius calculated the actual rate of return for Tranche One money, he inconsistently assumed that 100% of those funds were invested in either bridging T-bills or CDs all the way out to the headright disbursement date. *See* DX2695-0014-0017 at ¶¶ 32-35; DX2695-0054-58 at Exhibits D-1 through D-5. He allocated no Tranche One royalties toward any short-term disbursements (*i.e.*, 7% in his expected rate for T-bills). *See* DX2695-0054-0058. Nor did he put any Tranche One royalties toward liquidity for "various operating needs" (another 6-7% of his expected rate's use of T-bills, *see* Tr. 2140:22-2141:8; DX2695-0013 at ¶ 28).

To correct this internal inconsistency, the "actual" rate of return earned on Tranche One

---

[15] In his report, Lundelius inconsistently characterized this as liquidity needed for headright disbursements and estimated the need as 6.4 to 7.3%, even though such disbursements are made only quarterly. DX2695-0013 at ¶ 28.

royalties (in Lundelius's chart D-6) must be adjusted by allocating only 86% of the collections to that rate (i.e., investments in CDs and bridging Treasury securities) and 14% of the collections to non-bridging liquidity needs (earning only 4% interest):

January 1976: ( 5.5% x 0.86) + (4.0% x 0.14) **= 5.29%**

May 1979: (10.12% x 0.86) + (4.0% x 0.14) **= 9.26%**

November 1980: (16.28% x 0.86) + (4.0% x 0.14) **= 14.56%**

These corrected "actual" rates are all *lower than* Lundelius's 80/20 prudent rates for these months (5.29% is less than 5.34% for January 1976; 9.26% is less than 10.44% for May 1979; 14.56% is less than 16.22% for November 1980). *See* DX2695-0059. Thus, as corrected, Lundelius's methodology proves breach in the same three months as Jay.

There is nothing in the facts of this case or in Lundelius's analysis to justify his inconsistent assumptions. Money is fungible. The United States never kept its accounts on an accrual basis, much less accounting records that purport to identify a particular investment or expense as "flowing" from any particular income (as though particular pieces of currency had been dyed with identifying marks).[16] And the United States' 30(b)(6) witness on investment issues testified that she found no one with personal knowledge of how the United States invested Tranche One funds. JX001, Williams Dep. at 237:16-238:16. The investments that Lundelius assumed were purchased with Tranche One funds could have been purchased with funds that were already in the Osage cash account. And even if money were not fungible, Lundelius's tracing was not literal: he simply made "judgments," "assumptions," and "inferences" that, to him, seemed "reasonable." Tr. 2266:10-2267:2 (Lundelius). Not surprisingly, he did not require

[16] Before 1978, BIA's accounting system did not even distinguish investment income from other types of income. PX476-0004.

the matching of amounts to the dollar or penny (only one specific link would have qualified, *see* Tr. 2212:22-2213:14); most of it was not even within tens of thousands of dollars. Therefore, Lundelius's tracing is by its terms only an artificial, post-hoc analysis that *deems* certain money to have "flowed" through to particular investments. Tr. 2265:13-2267:2 (Lundelius). Lundelius does not and cannot claim that Tranche One royalties *literally* were invested in the instruments he identifies. For example, Lundelius claims that the United States used the proceeds of a T-bill that matured on December 31, 1980, to purchase a CD on December 30, 1980. DX2695-0056. So if tracing, a post-hoc interpretation, is accepted as a theory, Tranche One royalties coming into account 7386 must be allocated between investments and cash needs of the account 7386 *as a whole* – just like any other income. Every reasonable inference here must favor the beneficiary. *See supra*, 3-4, 6-7. Lundelius's analysis violates this principle.

The skew in Lundelius's methodology is underscored by his testimony that it is "unrealistic" to think that the trustee could achieve his 100/0 rate, Tr. 2142:1-20 (Lundelius), which is based on investing 100% of funds in the highest available CD rates, Tr. 2140:15-21. Remarkably, his analysis of actual rates concludes that the trustee achieved or exceeded this unrealistic rate in three of the Tranche One months. DX2695-0059. Logically, achieving rates higher than the highest available rates should be impossible by definition. Either BIA knows something we'd all like to know, or Lundelius's modeling of actual rates is "unrealistic."

Further, it is undisputed that Lundelius's analysis is inconsistent with how John Vale said he did things; neither Lundelius nor any other Government witness attempted to rebut Jay's testimony on this point. Tr. 564:22-565:23 (Jay). On the contrary, within days after Jay testified

to these discrepancies, the United States canceled Vale's scheduled appearance at trial.[17]

Unlike Jay's analysis, Lundelius's tracing methodology treats the problem of cash as irrelevant to Tranche One royalties, and his report never addresses the presence of large cash balances in account 7386. Tr. 2289:18-24 (Lundelius). (Thus, if accepted, Lundelius's tracing analysis would require that the cash balances be addressed in Tranche Two.) When cross-examined about his failure to analyze cash balances in account 7386, Lundelius claimed that large cash balances were justified by the assumptions underlying the 80/20 rate. But the "20" in 80/20 is *Treasury bills*, not statutory-rate cash balances. Tr. 2139:18-2140:6 (Lundelius). Also, Lundelius's ad hoc attempt on cross to address the issue of cash balances contradicted his earlier testimony on direct that whenever the Osage cash account contained at least $25,000, the United States should and would invest that money in a *short-term T-bill*.[18] *Compare* Tr. 2078:13-19 *with* Tr. 2113:5-2114:5 (Lundelius); DX1668-0152.

### B. The United States Breached Its Fiduciary Duty by Unthinkingly Delaying Deposit of Royalty Payments

#### 1. Defendant Unreasonably Delayed Certification of a Federal Depository in Pawhuska, Causing Lost Interest

During Tranche One, the Osage Agency had to mail royalty checks to Muskogee, Oklahoma, for deposit at a federal depository because BIA did not certify a bank in Pawhuska as a depository until 1990. Tr. 1728:6-18 (Hill). Even if the Osage Agency succeeded in mailing these royalty checks on the same day received, a minimum of one day's interest was lost due to the mailing to Muskogee. Tr. 1728:6-10 (Hill). The process "took two or three days minimum"

[17] In preparing his expert reports, Lundelius did not consider Vale's latest deposition. Tr. 2282:15-2282:24.

[18] In addition, these purchases would not create liquidity problems because they were essentially the same as cash. DX2695-0010 at ¶ 21.

for checks to be deposited, and "it was normal for it to be on average four to five days." Tr. 350:2-311:18 (Parris).

Defendant's failure in this regard is inexcusable. The determination whether to certify a local bank as a depository was supposed to be based on a simple cost-benefit analysis:

> If an agency wanted to use a local depositary, they had to come to the Treasury for approval, and they provided information about the deposits that they were going to be making on a monthly basis, and we do an analysis and determine whether it was cost beneficial to set up an account at a local depositary. If it was, we would go ahead and do that and instruct the agency to begin depositing.

Tr. 1772:10-17 (Bratcher). BIA did no such analysis before 1990, and never sought to certify a Pawhuska depository earlier. Tr. 1792:15-18, 1793:2-6 (Bratcher). Judi Hill could give no reason a local depository was not certified before 1990. Tr. 1728:19-25. Setting up local depositories was something Parris "had wanted to do for a long time," but BIA did not give "the green light" to do so until 1990. Tr. 410:13 - 412:7.

Certifying a local depository would have been highly cost-effective. Royalty checks were often in the hundreds of thousands of dollars, and the lost interest would far exceed the few pennies per check it would have cost to use a local depository. *See, e.g.*, PX578-0034* (listing Sun Oil check for $539,746.31); Tr. 1797:19-1798:5 (Bratcher) ("two or three cents per check to process"). Indeed, BIA considered certification of a Pawhuska depository cost-effective in 1990, when ninety percent of deposits were received by electronic funds transfer. Tr. 1717:10-18 (Hill).

**2. The Osage Agency Had a Pervasive Deposit Lag Problem**

Even aside from the Agency's failure to designate a Pawhuska bank as a depository before 1990, Arthur Andersen calculations prove that the United States had a significant problem making prompt deposits of Osage tribal trust funds, in some cases delaying deposits by as much

as 15 or even 30 days. PX476-0056-0058. The Arthur Andersen data covers over eight thousand Osage Agency deposits that span a period of over 20 years. PX476-0058. That data was created at the behest of the United States and in accordance with procedures dictated by BIA. PX476-0003. Arthur Andersen's calculations were not contested.[19]

Chavarria's conclusion exculpating the United States is not credible. DX2676-0005. It is inconsistent with the Andersen report he helped create, which diagnoses a serious deposit lag time problem at the Osage Agency. PX476-0058. Chavarria claimed that, coincidentally, the deposit lag time for each Tranche One collection was one day or less, despite a chronic problem at the Osage Agency in this time period of delays that normally averaged four to five days. Tr. 1871:10-22; DX 2676-0014; Tr. 351:7-18 (Parris).

The only way he could reach such a result was by basing his analysis on impermissible inferences favoring the Government for its failure to keep trust records. No witness had personal knowledge of the collection and deposit practices for January 1976, May 1979, or November 1980 (Hill was employed at the Osage Agency as a collection officer only during the period since 1981). Tr. 1625:15-1626:5 (Hill). Chavarria did not even attempt to determine the actual date the Osage Agency received a Tranche One check but instead simply assumed that a check was received on the same day the Osage Agency prepared a collection voucher, such as a bill for collection, for the check. Tr. 1951:15-21 (Chavarria). Similarly, Chavarria did not determine the actual date a deposit began earning interest but simply assumed that a deposit began earning interest as soon as the deposit was posted to BIA's accounting system. Tr. 2042:1-21 (Chavarria). Chavarria had no evidence showing that deposits were in fact made on BIA's

---

[19] On the contrary, Chavarria believed that his calculations of deposit lag time were consistent with Arthur Andersen's calculations. Tr. 1990:13-1991:5.

posting date or that they began earning interest on that date. Tr. 1972:25-1973:6. Nor did Chavarria take into account the additional one day delay that, according to Hill, occurred when checks were not mailed out within one business day after receipt. Tr. 1747:4-1747:25. As an exclamation point on the counterfactual nature of Chavarria's rosy assumptions, his methodology yielded a deposit lag time for one transaction of -1 days, a logical impossibility. DX2676-0014.

## IV. THE OSAGE NATION IS ENTITLED TO AN AWARD OF DAMAGES TO REMEDY THE UNITED STATES' BREACHES OF TRUST

### A. General Principles of Damages Applicable Here

#### 1. The Osage Nation Is Entitled to be Made Whole

Damages for breach of trust should return the Osage Nation to "the position in which it would have been absent a breach." *Confederated Tribes*, 248 F.3d at 1371. The 1906 Act requires that the Osage Trust "draw interest," 1906 Act § 4(1), 34 Stat. at 544, so a damages award must include "an award of interest on the amount mismanaged or not collected." *Shoshone*, 364 F.3d at 1353-54; *see also Confederated Tribes*, 248 F.3d at 1371.

The Osage Nation is entitled to lost investment income on each amount the United States failed to collect or earn, beginning on the date each amount should have been deposited in trust and ending on the date of judgment here.[20] The United States is wrong to argue that it owes interest for only the 90 days that it would have held such moneys before disbursement, had the moneys been collected *and disbursed*. Incorporating a hypothetical disbursement into the calculation would unfairly credit the United States with the time value of money as though it had disbursed moneys that it not only never disbursed but also never collected. By way of comparison, if the United States had *collected* the moneys but failed to *disburse* them, it would

[20] The Court discussed this issue at the Pretrial Conference, Feb. 16, 2006, Tr. at 283:21-284:23.

be liable for interest for the entire period over which it deprived the beneficiary of the use of the money. It owes like interest for failing to collect those moneys in the first place.

The appropriate rate of interest is what a prudent trustee would have earned for long-term investments – investments geared to the term of non-collection and non-disbursal. *Shoshone*, 364 F.3d at 1348. For reasons similar to those just discussed, the United States owes not merely a 90-day interest rate based on hypothetical disbursements that never happened due to the Government's breach. Again, if the United States had deprived the beneficiary of use of the moneys by collecting the moneys but failing to disburse them, it could have invested them in long-term investments, at least as long as seven-year Treasury bills. It should be required to pay no less than a comparable rate here. Alternatively, had the United States properly collected and disbursed the moneys due, the headright owners would have been able to invest them. The rates of seven-year Treasury securities reasonably reflect the rate of return the headright owners could have earned. JX113-0035 at ¶ 13.

The United States claims that the present value of damages should be based on the rate of inflation, as measured by the Consumer Price Index ("CPI"). DX2695-0019-20 at ¶ 40**;** Tr. 2292:20-2293:11 (Lundelius). Obviously, the rate of inflation is a measure of decreases in purchasing power, not a measure of the time value of lost income. JX113-0034 at ¶ 10; Tr. 2293:12-2294:3 (Lundelius). Under *Shoshone*, using such a measure would be tantamount to adopting a "prudent person" rate barely keeping pace with inflation.

### 2. The Osage Nation Is Entitled to All Reasonable Inferences in Favor of Its Damages Estimates

As described above, the Government cannot fully account for the moneys due under the Tranche One Leases. Tr. 116:22-121:15 (Reineke); JX001, Revard 30(b)(6) Dep. at 27:14-28:1, 68:1-69:10; Tr. 1722:1-15 (Hill); Tr. 199:24-200:15 (Reineke); Tr. 1577:25-1579:21 (Martin).

*See also* PX751-0013-24. The United States has never provided an accounting of the Osage Trust. *Osage Tribe*, 68 Fed. Cl. at 334 (quoting *Shoshone*, 364 F.3d at 1347). And the multi-year, multi-million dollar effort of the BIA and Arthur Andersen to reconcile trust accounts failed. PX513-0003.

Because the trustee has "fail[ed] to keep proper accounts" documenting the full extent of the United States' breaches and the damages caused thereby, "all doubts" about the amount of damages must "be resolved against [the trustee] and not in his favor." *Scott on Trusts*, § 172 at 452 (4th ed. 1987); *see supra*, 3-4; 6-7. The Osage Nation has made a good-faith effort to estimate its damages. Such estimates should be credited whenever the Court agrees that they are reasonable.

The United States challenges this principle despite its *sole* responsibility for the state of the records in this case. As its excuse, the United States broadly contends that the Osage Agency "adequately" maintained tribal trust documents pursuant to policy. Tr. 2425:13-18 (Currey). The United States apparently will ask the Court to infer that any relevant records were sent to the AIRR facility. Tr. 2370:24-2371:19 (Currey). This excuse is unavailing. It is irrelevant whether the documents are somewhere buried among thousands of boxes at a remote location in Kansas, because the trustee did not locate them in time for trial.

And if the documents' existence were relevant at all, the Osage Nation is entitled to an inference that at least some of the relevant documents may have been destroyed. In May 1989, around the time that massive theft of Indian oil by Koch Oil Company gaugers was discovered, run tickets were burned at the Osage Agency. Tr. 732:8-744:2, 755:14-21 (Mattingly); PX681. The destruction of Koch Oil run tickets was directed from "higher up," a reference by the then-Chief of the Minerals Branch to BIA superiors. Tr. 743:1-13 (Mattingly). Agency field

personnel burned "several truckloads" of run tickets upon instruction from their manager. Tr. 705:2-707:18 (Bighorse); PX681. Such destruction was improper. Tr. 2412:23-25 (Currey). Also, in 1994 "a massive shredding operation" destroyed documents that included Osage tribal trust records. Tr. 769:2-22 (Standingbear); PX678, PX665. Forty-five to fifty filing cabinets were emptied as a part of this operation. Tr. 763:4-18 (Standingbear).

Therefore, in accordance with well-established trust law, all inferences from the absence of documents in this case must favor the Osage Nation.

## B. Categories of Damages to Which the Osage Nation is Entitled

### 1. Damages for Undercollection of Royalties

Some of the effects of undercollection of royalties can be quantified with reasonable specificity using available information and appropriate proxies, as described above. Thus, Reineke has calculated specific damages caused by most of the United States' breaches related to Royalty Value: offered prices, regulated prices, simultaneous sales, posted prices, and gravity adjustments. Much necessary information was unobtainable; for example, not all offered and posted prices could be obtained. The missing information would only *increase* the amount of damages because the Royalty Value regulation requires use of the "highest" price. Therefore, Reineke's calculations of damages for Royalty Value are a floor. Tr. 242:21-243:2 (Reineke). The minimum cumulative amount of royalty the United States failed to collect by (1) failing to measure royalty value using the highest offered price of a major purchaser and (2) limiting royalty value to the regulated price level at which the oil was sold (including simultaneous sales

at different prices from the same lease) amounts to $245,529.75.[21] Tr. 238:2-239:24 (Reineke); PX751-0031, 0647-648.

Other breaches proven at trial, those related to "actual selling price," Royalty Volume, and Royalty Rate are of such a nature that the amount of loss inherently cannot be determined except by rougher estimates, because the resulting damages depend on information that is unavailable as a result of the breach and that cannot now be reconstructed. These breaches include the United States' failure to verify production volumes and guard against theft and loss, verify actual selling price, verify royalty rate, and conduct post-sales audits. As an estimate for these hard-to-quantify damages, the Osage Nation presented undisputed evidence that, where the United States has used post-sales audits in similar circumstances, it has discovered royalty underpayments of up to 10% of the royalties initially collected. Tr. 194:14-19 (Reineke); PX081-0027 (3.5-10% recovery rate).

Thus, even if the Court disagrees with some of the claims that yield Reineke's 12%, a 10%-12% damages award is still warranted as a remedy for the totality of the United States' failures on Royalty Rate, Royalty Volume, and Royalty Value (including actual selling price). PX081-0027 (3.5-10% recovery rate); Tr. 240:18-242:5 (Reineke).

Therefore, the Osage Nation asks that the Court award damages for undercollection of

[21] Some lesser amount of damages would still be appropriate if the Court disagrees with some but not all of the Osage Nation's allegations of undercollection. The damages for each individual undercollection claim (and for various combinations of claims) are ascertainable from the itemizations in Mr. Reineke's report. For example, if the Court denies the Osage Nation's claims regarding unregulated prices or simultaneous sales, the amount of undercollection would be $85,053.50 (highest offered price of a major purchaser). PX751-0642. Damages for offered prices and simultaneous sales but not unregulated prices would be $134,949.89, based on the highest simultaneous sales price for Osage Hominy in November 1979 and May 1980 and East Hardy in January 1976 and November 1979 and the highest offered price by a major purchaser for all other leases and months. In addition, for the Osage Nation's claim regarding gravity adjustments, damages should be adjusted upward by $1,660.48. Tr. 224:7-17; PX751-0030.

royalties in an amount equal to the present value of 12% of the royalties actually collected.

**2. Late Fees for Royalty Payments the United States Failed to Collect**

The uncollected royalties for Tranche One leases are still due and owing. Therefore, the United States continues in breach for failing to collect the late fees that are due on those unpaid royalties. Late royalty payments are subject to a mandatory late fee of 1.5% of the unpaid amount for each month the royalty is not paid. 25 C.F.R. § 183.11(c) ("Failure to make [timely royalty payments] *shall* subject [payor] to a late charge of not less than 1.5 percent for each month.") (emphasis added); *see also* 25 C.F.R. § 183.13(a) ("[L]ate payments *shall* be subject to a late charge of not less than 1.5 percent per month.") (emphasis added). Such fees have accrued on uncollected royalties beginning on the 25th of the month following each Tranche One month and ending on the day judgment is paid in this case. For uncollected royalty payments of $245,529.74, late fees equal $1,096,460.27 through December 31, 2005. PX751-0649.[22] Trustees have been held personally liable for uncollected late fees in analogous circumstances. *See, e.g.*, *Liss v. Smith*, 991 F. Supp. 278, 291 (S.D.N.Y. 1998) (finding a breach of fiduciary duty by trustees of an ERISA plan who improperly waived mandatory interest charges on late payments and uncollected contributions).

[22] Alternatively, the Court may measure the present value of the late fees that a prudent trustee would have collected upon identifying underpayments in a timely manner. Damages thus calculated should include 1.5% per month in late fees for the intervals between the date underpayments should have been discovered and the due dates, adjusted to present value. Reineke assumed a nine-month delay in collecting full royalty and calculated 1.5% per month, adjusting to present value using seven-year Treasury Notes. This yields damages of $1,654,260.08. PX751-0032-33, 0650. Nine months is a conservative estimate of the appropriate interval in such a calculation. If the United States had fulfilled its duties, it might still have taken over a year to discover underpayments. Tr. 2339:18-2340:4 (Morrison). Moreover, it would have taken approximately nine months to obtain the final information regarding major purchasers from the Kansas and Oklahoma authorities. PX751-0032.

**3. Late Fees on Late Payments Identified by Lundelius and Chavarria**

Lundelius and Chavarria claim to have identified the precise date the United States received the Tranche One royalty payments. DX2676-0014; DX2695-0054-0058. If that evidence is believed, it shows that those payments were received after the due date, and the Osage Nation is entitled to the present value of late fees due on those late payments: $88,609.79, as of September 30, 2005. Tr. 550:14-21 (Jay); PX750-0048.

**4. Interest Lost Due to Mismanagement of Funds on Deposit**

The Osage Nation is entitled to the present value of the difference between the interest actually earned on trust funds and the obtainable return had the funds been managed prudently. Jay determined that, as of September 30, 2005, the present value of that lost interest was $613,351.59. Tr. 506:22-508:8 (Jay); Tr. 526:24-527:13 (Jay); Tr. 531:5-20 (Jay); Tr. 534:12-535:2 (Jay); PX750-0048, Column 4 and 5.

**5. Interest Lost Due to Unreasonable Delays in Depositing Trust Funds**

For the United States' delay in depositing royalty checks, the Osage Nation is entitled to damages equal to the present value of the amount of additional interest that would have been earned on the funds had they been deposited in a prudent manner. Jay determined that the lost interest due to delays in depositing royalty payments is $803.33, as of September 30, 2005. Tr. 546:11-23 (Jay); PX750-0048.

**CONCLUSION**

The United States has breached its trust duties, and the Osage Nation is entitled to an award of damages for Tranche One of no less than $2,044,754.73.

May 4, 2006

Respectfully submitted,

*s/Wilson K. Pipestem*

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation