**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | Electronically Filed: May 18, 2006 |
| v. | ) | No. 99-550L (into which has been consolidated No. 00-169L) |
| THE UNITED STATES OF AMERICA, | ) | Judge Emily C. Hewitt |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF**

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

BRETT BURTON
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section

MARTIN LALONDE
KEVIN WEBB
KEVIN LARSEN
United States Department of Justice
Environment & Natural Resources Section
Natural Resources Section
601 D Street, N.W., 3rd Floor
Washington, DC 20004
TEL: (202) 305-0212 / 0247
FAX: (202) 353-2021

TABLE OF CONTENTS

I. The Tranche One Trial Evidence Shows That Defendant Fulfilled its Duties Regarding Royalty Verification . . . . . 1

A. Application of "Offered Price" . . . . . 1

B. Price Controls Were Applicable to Osage Royalties . . . . . 3

C. The United States Properly Determined Actual Selling Prices . . . . . 7

D. The United States Properly Determined the Highest Posted Prices of Major Purchasers . . . . . 7

E. Plaintiff Presented No Evidence Showing that the United States Failed to Collect Royalties on the Correct Volumes . . . . . 8

F. The United States Applied the Correct Royalty Rates . . . . . 9

G. The United States Did Not Breach Any Duty to Audit Purchasers . . . . . 9

II. The United States Prudently Deposited and Invested Osage Tranche One Funds . . . . . 11

A. Plaintiff Failed to Provide Evidence That the United States Breached its Duty to Deposit Tranche One Royalties in a Reasonable Manner . . . . . 11

B. Plaintiff Presented No Evidence of BIA Accounting System Deficiencies Relevant to Plaintiff's Investment Claims . . . . . 12

C. Plaintiff Failed to Provide Any Evidence That the United States Abused its Discretion or Failed to Act as a Prudent Person in Investing Tranche One Royalties . . . . . 13

III. Plaintiff Is Not Entitled to Damages . . . . . 16

A. Plaintiff Has Failed to Meet its Burden of Showing Breaches of Duties Entitling it to an Award of Damages . . . . . 16

B. The Osage Nation is Not Entitled to Inferences . . . . . 17

C. Plaintiff is Not Entitled to Late Payment Penalties . . . . . 18

D. Plaintiff's Calculations of "Lost Investment Income" and "Lost

Investment Income on Cash Funds" Due to Alleged Mismanagement of Funds on Deposit Are Flawed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

E. The Appropriate Rate of Interest to Apply to Any Damages Would be the Inflation Rate or the Short-Term Rates that the Monies Would Have Earned Had They Been in the Osage Account . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## FEDERAL CASES


*Air Transp. Ass'n of America v. FEO*, 382 F. Supp. 437 (D.D.C. 1974) . . . . . . . . . . . . . . . . . 4, 5

*Basin, Inc. v. FEA*, 552 F.2d 931 (Temp. Emer. Ct. App. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Bowers v. Phillips Petroleum Co.*, 692 F.2d 1015 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . 4

*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11

*Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Columbia First Bank, FSB v. United States*, 58 Fed.Cl. 54 (2003) . . . . . . . . . . . . . . . . . . . . . . . 17

*Confederated Tribes of Warm Springs Reservation v. United States*, 248 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*DuMarce v. Scarlett*, __ F.3d __, 2006 WL 1170121 (Fed. Cir. May 4, 2006) . . . . . . . . . . . . . . 5

*Marathon Oil Co. v. FEA*, 547 F.2d 1140 (Temp. Emer. Ct. App. 1976) . . . . . . . . . . . . . . . . . . . 5

*Mobil Oil Corp. v. FEA*, 566 F.2d 87 (Temp. Emer. Ct. App. 1977) . . . . . . . . . . . . . . . . . . . 4, 5

*Mobil Oil Corp. v. FPC*, 463 F.2d 256 (D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237 (1985) . . . . . . . . . . . . . . 3

*New Mexico v. United States*, 831 F.2d 265 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Oregon Dept. Of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753 (1985) . . . . . . . . . . . . 3

*Pennzoil Exploration & Prod. Co. v. Lujan*, 928 F.2d 1139 (Temp. Emer. Ct. App. 1991) . . . . . 6

*Peoria Tribe of Indians v. United States*, 390 U.S. 468 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Pitsker v. Office of Personnel Management*, 234 F.3d 1378 (Fed. Cir. 2000) . . . . . . . . . . . . . . . 1

*Placid Oil Co. v. FPC*, 483 F.2d 880 (5th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Puritan Associates v. United States*, 215 Ct. Cl. 976 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . 20

*Sowell v. Natural Gas Pipeline Co.*, 604 F. Supp. 371 (N.D. Tx. 1985) . . . . . . . . . . . . . . . . . . . . 4

*Sowell v. Natural Gas Pipeline Co.*, 789 F.2d 1151 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . 3, 4

*Udall v. Tallman*, 380 U.S. 1, 16 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

FEDERAL STATUTES

15 U.S.C. § 3301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. § 717 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. § 751 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

15 U.S.C. § 753 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25 U.S.C. § 161a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

30 U.S.C. § 1702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

30 U.S.C. § 1711 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

30 U.S.C. §§ 181-287 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

94 Stat. 229 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Pub. .L No. 96-233 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

FEDERAL REGULATIONS

25 C.F.R. 226.14(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## I. The Tranche One Trial Evidence Shows That Defendant Fulfilled its Duties Regarding Royalty Verification

### A. Application of "Offered Price"

In addressing the interpretation of the price terms in the Osage regulations in its post-trial brief, Plaintiff suggests that Defendant seeks to excuse itself from complying with the regulations due to difficulty. The Court should reject this suggestion. The correct reading of the regulations set forth in detail in Defendant's Post-Trial Brief ("Def.'s Br.") does not simply avoid difficulty, it eliminates an absurd result – the impossibility of obtaining prices of major purchasers offered throughout the Kansas-Oklahoma area. Def.'s Br. at 19;[1] *see Pitsker v. Office of Personnel Management*, 234 F.3d 1378, 1383 (Fed. Cir. 2000).

Where appropriate, the Osage Agency applied the offered-price provision in a manner consistent with the correct interpretation of the regulations. For example, in the 1970s, when the Agency initially adopted and applied the "offered price" term, oil was regulated under a tiered pricing structure that included different categories of oil, including "stripper oil," which could be sold for unregulated market prices. During that time, purchasers made offers above price postings for "stripper oil" and the Agency used these offers as the floor price for that category of oil. DX2334-1. There is no evidence that purchasers continued to make general offers above postings for particular categories of oil after 1981, when oil prices were no longer regulated and oil was no longer differentiated by categories. When bonuses became more common in the mid-1980s, they were normally minimal (usually less than $1.00 per barrel) and usually were offered only to particular lessees for specific reasons, not generally to all lessees. RT 1294:12-1295:5, 1296:14-22.

---

[1] Cites to Defendant's and Plaintiff's Post-Trial Briefs are to the page numbering generated by the Court's ECF system (*e.g.*, p. 19 of 58) .

Nevertheless, when offered bonuses led to actual prices that exceeded highest posted prices, the Osage Agency began using the higher actual prices of major purchasers as the floor for royalty calculation. *See* RT 1297:8-18. These facts eviscerate Plaintiff's assertion (Plaintiff's Post-Trial Brief ("Pl.'s Br.") at 15, 17) that the Agency made no effort to identify offered prices.[2]

When the Agency, in the late 1980s, used higher actual prices as the floor for royalty calculation, however, it misconstrued the regulations. *See* Def.'s Brf. at 34-35. Unlike the 1976 offer that formed the floor for royalties, the actual prices were not available to all the lessees who had to pay royalty based on that price. Moreover, the construction read a new term – "highest actual price of a major purchaser" – into the regulations and caused the term "offered price" to become mere surplusage. This Court should reject this approach, as did the Interior Board of Indian Appeals ("IBIA") in *Okie Crude Co. v. Muskogee Area Director, BIA*, 23 IBIA 174 (1993).

The Court should also reject Plaintiff's contention that the *Okie Crude* decision rests on a finding of ambiguity in the regulations. Plaintiff plainly misstates the IBIA's reasoning. Pl.'s Br. at 16. The IBIA did not find ambiguity. Rather, it applied the plain and ordinary meaning to the regulatory terms. 23 IBIA 180. Further, the Board's interpretation comported with the requirements of the 1906 Act, because requiring lessees to pay royalties based on prices that they could not receive would have been contrary to the Osage Agency's obligation under the 1906 Act to make the mineral estate productive and to lease certain minimal acreage. Def.'s Br. at 20-21. Thus, there is no cause to apply the Indian canon of construction requiring courts to resolve legal ambiguities to the benefit of the Indians. The Indian Canon of construction does not allow a court to "ignore plain

[2] As is clear from his deposition transcript, Melvin Core was confused by the line of questioning involving the term "offered price." *See* JX001, Core Dep. at 88:12-89:3. It has been 26 years since Mr. Core worked in the Minerals Branch at the Osage Agency, and he simply could not recall the answers to many of the questions posed to him by the Plaintiff's counsel. *See* JX001, Core Dep. at 52:24-53:8; 169:14-19.

language that, viewed in historical context and given a 'fair appraisal,' clearly runs counter to a tribe's later claims." *Oregon Dept. Of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 774 (1985).[3] In any event, by fostering continued productivity of the minerals estate, the IBIA's construction of the regulations was to the benefit of the Tribe. Def.'s Br. At 20-21.[4]

**B. Price Controls Were Applicable to Osage Royalties**

The Court should reject Plaintiff's assertion that federal price controls did not apply for the purposes of calculating royalties due to Plaintiff. Initially, Plaintiff argues that, if Interior intended to cap royalty value at regulated levels, it could have said so. Pl.'s Br. at 20. This is an untenable assertion. Interior did not have the authority to decide whether or not royalty interests were subject to the price controls imposed under the Emergency Petroleum Allocation Act ("EPAA"). Rather, that authority resided exclusively with the Federal Energy Administration ("FEA") and Department of Energy ("DOE"). Def.'s Pre-Trial Mem. at 77 of 127; *see also United States Geological Survey* ("USGS"), 5 FEA ¶ 80,537, p.80,675 (Attachment 2 to Def.'s Br.) (finding well-established that application of the mandatory petroleum price regulations ("MPPR") could supercede lease terms).

The Court should deem without merit Plaintiff's argument that the Osage regulations were comparable to the terms contained in the lease at issue in *Sowell v. Natural Gas Pipeline Co.*, 789 F.2d 1151 (5th Cir. 1986). Pl.'s Br. at 21. The Court in *Sowell* construed a lease under the completely independent pricing regime under the Natural Gas Policy Act ("NGPA"), 15 U.S.C. §

---

[3] The Supreme Court has made it clear that "very great respect" must be given to the construction of a statute affecting Indians by the agency charged with administering the statute. *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 254 (1985).

[4] Similarly, Plaintiff's assertions related to the applicability of gravity adjustments (Pl.'s Brf. at 32-33) ignored the fact that the ordinary meaning of "posted price" contemplates that price postings are tied to the gravity of oil and thus the applicability of such adjustments need not be addressed under the Indian canon.

3301 *et seq.*[5] *See Air Transp. Ass'n of America v. FEO*, 382 F. Supp. 437, 448 (D.D.C. 1974) (rejecting analogy between EPAA and Natural Gas Act "(NGA")). A predicate for the Court's conclusion in *Sowell* was that the NGA and NGPA did not set price limits for royalty purposes.[6] No similar predicate existed under the price control regime established by the EPAA and MPPR.

The NGA applies "to the sale in interstate commerce of natural gas . . . and to natural-gas companies engaged in such transportation or sale. . ." 15 U.S.C. § 717(b).[7] In contrast, the EPAA provides that its implementing regulations "shall apply to *all* crude oil . . . produced or imported into the United States," 15 U.S.C. § 753(a) (1976) (emphasis added), not solely to certain sales of oil. Further, unlike the NGA's more limited scope, Congress in the EPAA granted broad authority to the President to "deal with shortages of crude oil," 15 U.S.C. § 751(b), and explained that one of the EPAA's objectives was to "foster competition in producing" oil, *id.* § 753(b)(1)(D). Courts consistently conferred on the FEA and DOE "substantial leeway in attempting to attain" the EPAA's objectives. *Basin, Inc. v. FEA*, 552 F.2d 931, 935 (Temp. Emer. Ct. App. 1977); *see also Mobil Oil Corp. v. FEA*, 566 F.2d 87, 97 (Temp. Emer. Ct. App. 1977) (concluding that FEA had "broad powers and administrative flexibility implied by the comprehensive purposes of the" EPAA); *id.* at

---

[5] The Court should decline to consider the lease language that Plaintiff sets forth through its citation to a law review article. Pl.'s Br. at 20. Plaintiff did not seek to introduce such alternative lease language at trial, where Defendant could have probed the relevancy of the language. The Court should reject Plaintiff's improper and inappropriate post-hoc attempt to introduce additional evidence after trial.

[6] Construing the language of the NGA, the predecessor to the NGPA, courts had concluded that the Federal Energy Regulatory Commission ("FERC") and its predecessor, the Federal Power Commission ("FPC"), had no "authority to regulate the amount of royalty paid by the lessee-producer to the lessor, . . ." *Bowers v. Phillips Petroleum Co.*, 692 F.2d 1015, 1017 (5th Cir. 1982), *citing Mobil Oil Corp. v. FPC*, 463 F.2d 256 (D.C. Cir. 1972); *see also Sowell v. Natural Gas Pipeline Co.*, 604 F. Supp. 371, 374 (N.D. Tx. 1985), *aff'd*, 789 F.2d 1151 (5th Cir. 1986).

[7] The Court in *Mobil Oil Corp.* concluded that a royalty owner not "engaged in any 'sale' of gas" did not fall within the provisions of the NGA. 463 F.2d at 260.

93-97; *Air Transport Ass'n*, 382 F. Supp. at 446-47.

The purpose of the EPAA was to address crude oil shortages and foster oil production. As such, the authority granted under the EPAA necessarily extended to the regulation of royalty interests. If such authority did not encompass royalty interest owners, *e.g.*, if royalties could have been based on prices higher than the MPPR's ceiling prices, then the purpose of the EPAA would have been undermined. 15 U.S.C. § 751(b); 5 FEA ¶ 80,537; Def.'s Br. at 25-27.[8]

Plaintiff's reliance on a Solicitor's memorandum (PX682) to support its position that the EPAA and MPPR did not apply to royalties collected by Interior is also misplaced. This memorandum does not provide a definitive interpretation of the EPAA, because the FEA and, subsequently, DOE, not Interior, were the agencies charged by Congress with the responsibility for implementation of this statute. As explained *supra*, Congress provided the FEA and DOE broad discretion in promulgating and implementing a price control regime under the EPAA. Therefore, the Court should defer to the FEA and DOE's interpretation of the EPAA and their implementation of the MPPR. *See, e.g., Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984); *Udall v. Tallman*, 380 U.S. 1, 16 (1965); *Marathon Oil Co. v. FEA*, 547 F.2d 1140, 1145 (Temp. Emer. Ct. App. 1976).[9]

Further, Plaintiff took the Solicitor's memorandum out of context.

**PRIVILEGED MATERIAL REDACTED**

---

[8] That the price controls applied to royalties is further evidenced by Congress's enactment of the Crude Oil Windfall Profit Tax Act, Pub. .L No. 96-233, 94 Stat. 229 (1980). The act, in part, prevented entities from receiving windfall profits from increased royalties due to increased prices of oil on which royalties were due. *See New Mexico v. United States*, 831 F.2d 265, 269 (Fed. Cir. 1987). If price ceilings had not constrained royalties, the removal of those ceilings would not have resulted in royalty interests receiving windfall profits.

[9] Deferring to the FEA's and DOE's implementation of the EPAA does not violate a duty of loyalty by allowing a particular governmental policy to take precedence over Defendant's fiduciary duties, as Plaintiff claims. There was no conflict of interest between the Government's role under the EPAA and as trustee because the Government was enforcing a constitutional statute, the EPAA. *See DuMarce v. Scarlett*, __ F.3d __, 2006 WL 1170121 (Fed. Cir. May 4, 2006).

**PRIVILEGED MATERIAL REDACTED**[10]

Here, Plaintiff attempts to collect royalties far in excess of the permissible value of the oil, irrespective of the gross proceeds obtained by the lessees. Def.'s Br. at 26-27.[11] The Court should reject Plaintiff's attempt.

The Court should also reject Plaintiff's assertion that the availability of exception relief would have cured any negative impacts arising from a requirement that lessees pay royalties, without regard to the MPPR.[12] This argument overlooks the fact that such relief generally was not extended to royalty interest owners. Def.'s Br. at 21-25. Further, whether the relief would have been granted

---

[10] **PRIVIELEGED MATERIAL REDACTED**

[11] *Pennzoil Exploration & Prod. Co. v. Lujan*, 928 F.2d 1139 (Temp. Emer. Ct. App. 1991) does not support Plaintiff's assertions. There, the Court addressed Interior's contention that, contrary to DOE's position, Interior should be permitted to receive royalties based on prices actually received by Pennzoil under an EPAA incentives program. *Id.* at 1140. The Court ruled that the EPAA and its regulations did not preclude Interior's application of its gross proceeds rule and, that, thus, Interior could collect royalties based on the prices received by Pennzoil. *Id.* at 1144. It did not rule, however, that Interior could assess royalties based on prices exceeding those received by Pennzoil under the EPAA incentives program.

[12] Plaintiff's reliance on *Placid Oil Co. v. FPC*, 483 F.2d 880 (5th Cir. 1973), is misplaced because that case also involved the NGA. *See supra*.

is purely speculative and, thus, does not support Plaintiff's position.[13] In short, the Court should conclude that price ceilings under the EPAA and MPPR were applicable to Osage royalties.[14]

### C. The United States Properly Determined Actual Selling Prices

Plaintiff provided no support for its contention that it was deprived of royalty income as the result of the Osage Agency's alleged failure to determine the correct actual selling price of crude oil by obtaining sales contracts. Plaintiff merely offered speculation that all purchasers and sellers, regardless of their relationship to one another, were involved in clandestine agreements to artificially depress the price of oil or to avoid payment of royalty to the Osage Tribe.[15] Pl.'s Br. at 28-29. The Osage Agency's practice of obtaining actual selling price data from monthly run statements was not only appropriate and prudent, but also the only realistic method[16] available to the Osage Agency to determine an actual selling price of crude oil. *See* RT 1350:15-1351:16.[17]

### D. The United States Properly Determined the Highest Posted Prices of Major Purchasers

Plaintiff incorrectly asserted that the evidence showed that the Osage Agency failed to

---

[13] Indeed, if the Osage Agency had sought royalties for regulated oil such as "low-tier" oil based on unregulated "stripper oil" prices, the lessee would likely have challenged the Osage Agency's attempt to obtain the higher royalties before the FEA, which, given its treatment of royalty interests in the context of exception relief, would have likely concluded that royalties could not be based on any price other than the MPPR ceiling prices.

[14] Simultaneous sales on the same lease at different prices occurred only during the price-control era. RT 1291:7-24. To require payment for production of old oil on a single lease based on the price received for stripper oil from that lease, (Pl.'s Br. at 26-27), would have been contrary to the EPAA and the MPPR.

[15] The 1966 option contract cited by Plaintiff is not relevant or persuasive because it involves an agreement to sell oil under unique circumstances during an irrelevant period. Further, Plaintiff's position ignores the testimony elicited at trial pertaining to the competing economic interests of lessees and purchasers. RT 1140:3-1142:4, 1522:2-12.

[16] Division orders did not necessarily contain specific pricing information. *See* RT 1172: 16-1173:10.

[17] Contracts were rarely executed between parties in connection with the sale of crude oil. RT 1170:5-16. Where they were present, the Osage regulations required that they be submitted to the Agency for approval. *Okie Crude*, 23 IBIA at 178-79; 25 C.F.R. 226.14(a).

identify major purchasers during the first three Tranche One months. The former Chief of the Osage Agency Minerals Branch, Mr. Newell Barker, testified that the Agency identified major purchasers during this period. RT 1199:12-1200:24. Further, correspondence from 1976 shows that the Osage Agency tracked price postings and offers of major purchasers. DX2334-1 (explaining that "Sun Oil Company, along with several other major oil purchasers, offered fifteen cents per barrel over their posting for 'stripper oil. . . .'").

As for the 1986 and 1989 Tranche One months, Plaintiff asserted that its expert showed that the Osage Agency did not include all purchasers or oil volume in its major purchaser calculations. In his analysis, however, Plaintiff's expert relied on information that was not contemporaneously available to the Agency. RT 167:11-24; PX751-503-04. The Agency acted reasonably by using the best information that was available to it at the time of its major purchaser determinations. RT 1020:5-11, 1459:7-14. Moreover, Plaintiff's conclusions regarding the effect on the major purchaser determination of the additional purchaser and volume data are mere speculation and thus insufficient to prove the Agency acted unreasonably. RT 266:18-267:7.

**E. Plaintiff Presented No Evidence Showing that the United States Failed to Collect Royalties on the Correct Volumes**

Plaintiff accused Defendant of failing to collect royalties for the full volume of oil sold during the Tranche One months (Pl.'s Br. at 34), but it provided no probative evidentiary support. In rebuttal to evidence of the comprehensive system implemented by Defendant to ensure payment on volumes from Osage Leases (*see* Def's Br. at 27-30, and evidence cited therein), Plaintiff offered only the testimony of a private trustee with no applicable experience.[18] Plaintiff's proof is

[18] Lucian Morrison's experience is inapposite to the case at hand. With no background in Federal/Indian trust issues, his knowledge is limited to the management of properties such as a 55,000 acre ranch with a single lessee, 175 tanks and 100 wells containing almost exclusively natural gas. RT 2342:22-2349:10. In

insufficient. Moreover, Plaintiff focused on the percentage of wells gauged each month. Plaintiff's focus is off-target. The effectiveness of the Osage Agency's practice is not dependent on the number of wells gauged, but on the fact that spot gauging was done on a random basis, it focused on purchaser gaugers rather than wells, and it uncovered very few discrepancies. *See* Def.'s Br. at 28-29, and evidence cited therein.[19] In any event, Plaintiff provided no evidence of any failures to obtain royalties on full volumes for Tranche One leases and months.

**F. The United States Applied the Correct Royalty Rates**

Plaintiff did not meet its burden of proving that Defendant failed properly to apply the royalty rates to the Tranche One production. Plaintiff merely presented evidence that certain leases had different royalty rates for certain production levels and for oil from certain formations. Plaintiff did not provide any evidence that the Osage Agency failed to apply the appropriate rates. Instead, it sought to shift the burden to Defendant to prove that it applied the correct rates. The Court should reject this attempt. The evidence showed that the Agency did check the royalty rates, RT 863:16-864:20; PX751-643 (Agency applied different royalty rates to different production of the East Hardy and North Burbank leases); DX2675-100 (same); *see also* RT 985:8-14 (production thresholds met before Tranche One), and Plaintiff has offered no evidence that the applied rates were incorrect.

**G. The United States Did Not Breach Any Duty to Audit Purchasers**

In support of its allegations that Defendant breached duties to the Osage Tribe by failing to conduct audits, Plaintiff referred to evidence that did not address the Osage Agency's verification

---

contrast, the Osage mineral estate encompasses 1.47 million acres and 2,000 leases. *See* Pl.'s Br. at 34.

[19] The lack of gaugers before the late 1970s is not critical because, in the earlier era, field personnel also conducted random spot gauging. RT 1162:2-6. Mr. Core recalled personally witnessing such spot gauging in the early years. *See* JX001, Core Dep. at 167:21-168:14.

practices.[20] Indeed, those practices, utilizing regular monthly statements of lessees and purchasers with opposing economic incentives, surpassed a regime that relied on periodic audits. *See* RT 1184:9-1185:14, 1549:8-1550:20; *see also* DX 2368-0037. Plaintiff's efforts are thus unavailing.

Moreover, contrary to Plaintiff's claim, the Agency did not rely "entirely on the comparison of lessee's reports and purchaser's statements to verify the accuracy of royalty payments. . ." (Pl.'s Br. at 37), and "reported data [that] were never compared to source documents. . . ." Pl.'s Br. at 38. The evidence demonstrates that independent, regular and random spot checking of data both in the field and at the Osage Agency proved an effective tool in validating the accuracy of royalty payments. *See* Def.'s Br. at 28-29, 36-37, and evidence cited therein. While Plaintiff is critical of the "bureaucratic regularity" by which this process was conducted (Pl.'s Br. at 38), it fails to offer evidence identifying problems with the Agency's unique and effective process, or why auditing should have occurred in its place, particularly for the Tranche One leases and months.[21]

Further, a duty to audit is not within the contours of the Osage Agency's duties, as defined by the Osage Act or its implementing regulations.[22] Thus, the Court should defer to the Agency's determination implicit in the Osage regulations that the 1906 Act did not impose a duty to audit and its determination of how best to use appropriated funds to verify royalty payments. *See Chevron, supra; Cobell v. Norton*, 428 F.3d 1070, 1076 (D.C. Cir. 2005).

---

[20] Reports cited by Plaintiff, PX79 and PX81, pertain specifically to the USGS, not the Osage Agency. *See* RT 267:12-268:25, 1544:23-1545:23.

[21] In one audit that the Minerals Management Service ("MMS") conducted of Osage oil, the MMS discovered only immaterial differences and no systematic weaknesses. DX2675-14.

[22] In contrast, the Federal Oil and Gas Royalties Management Act ("FOGRMA"), cited by Plaintiff, specifically requires audits. *See* 30 U.S.C. § 1711(c)(1). The Osage, however, is excluded from FOGRMA's application altogether. *See* 30 U.S.C. § 1702(3); *see also Oil and Gas Leases on Indian Lands (Part 3): Hearing before the Senate Select Comm. on Indian Affairs*, 97th Cong. 265-266 (1981) (Letter from Ed Red Eagle, Sr., Acting Principal Chief, to William S. Cohen, Chairman, Senate Select Comm. On Indian Affairs).

## II. The United States Prudently Deposited and Invested Osage Tranche One Funds

As set forth in its Post-Trial Brief, Defendant reasonably deposited Tranche One royalty receipts and properly exercised its discretion to invest those funds in a manner consistent with the prudent investor standard. *See* Def.'s Br. at 42-57. Plaintiff's unsupported conclusory allegations set forth in its Post-Trial Brief fail to prove otherwise.[23]

### A. Plaintiff Failed to Provide Evidence That the United States Breached its Duty to Deposit Tranche One Royalties in a Reasonable Manner

Plaintiff asserted that the fact that Defendant did not certify a local depositary until 1990 was unreasonable. As Defendant demonstrated, however, the Government instead sought to expedite the deposit of royalty receipts through the more effective method of encouraging the use of Electronic Funds Transfer ("EFT"). RT 408:24-409:11, 1789:11-23. By 1979, the majority of Tranche One royalty receipts were deposited by EFT, and all such receipts were deposited by EFT for the last three Tranche One periods. Def.'s Br. at 44, 49.[24] Moreover, in the late 1980s, Interior sought to expedite deposits through an effort to contract out the deposit functions of the Bureau of Indian Affairs ("BIA") to third parties. RT 412:8-413:4. When those efforts ceased in 1989-90, the

---

[23] Several statements in Plaintiff's brief are not supported by or misconstrue the cited transcript testimony. *Compare*, JX1, Williams Dep. at 237:16-238:10 *with* Pl.'s Br. at 40; RT 387:3-9 (Parris) *with* Pl.'s Br. at 40 n13.; RT 2142:1-20 (Lundelius) *with* Pl.'s Br. at 45; RT 2078:13-19 *with* Pl.'s Br. at 46; RT 350:2-351[sic]:18 (Parris) *with* Pl.'s Br. at 47; RT 1871:10-22 *with* Pl.'s Br. at 48; JX1, Williams Dep. at 237:16-238:16 *with* Pl.'s Br. at 44. Further, in contravention of the Court's directive, Plaintiff has numerous citations to material "not specifically pointed out" at trial. *See, e.g.*, PX87-14, 27, Pl.'s Br. at 40; JX113-4, 6-7 Pl.'s Br. at 40; PX750-7-9, 21-25, Pl.'s Br. at 40, 41; DX2695-10, 12-15, 17, Pl.'s Br. at 42, 43, 46; PX476-4, Pl.'s Br. at 44; PX578-34*, Pl.'s Br. at 47.

[24] The cost-benefit analysis associated with the establishment of a local depositary focused on the amount of additional interest that could be earned if an agency deposited checks locally instead of mailing them, relative to the costs associated with establishing a local depositary. Pl.'s Br. at 47; RT 1796:5-1799:22. Since the mailing process resulted in an expeditious deposit of funds, the relative gain achieved from the establishment of a local depositary would have been minimal, and the establishment of a local depositary would not have been necessary.

BIA turned its attention to establishing local depositaries in towns where local agency offices were located, including in Pawhuska, Oklahoma. *Id.*

Plaintiff also asserted that the Osage Agency had a pervasive deposit lag problem. Pl.'s Br. at 47. Defendant's evidence related to the Tranche One receipts undermines this assertion. Def.'s Br. at 48-50, and evidence cited therein. Further, Plaintiff's evidence, which relies on the testimony of Jim Parris and the results of the Arthur Andersen Reconciliation Project, did not prove its contention. Mr. Parris's testimony was not based on any working-level, first-hand knowledge[25] and did not relate to deposits in the Tranche One months. RT 350:2-351:5, 15-16. Further, the Reconciliation Project results for the Osage indicated that approximately 96% of all deposits from 1972 to 1992 were deposited within an average of two days from collection, while only 0.2% of collections were not deposited within 6 days of collection. RT 1878:9-23; DX2676-4; PX476-58. Contrary to Plaintiff's characterizations, the evidence as a whole warrants the conclusion that the United States expeditiously deposited Osage Tranche One royalties. RT 1878:24-1879:12.

**B. Plaintiff Presented No Evidence of BIA Accounting System Deficiencies Relevant to Plaintiff's Investment Claims**

Plaintiff claimed that deficiencies and gaps in BIA's accounting system prevented its analysis of Defendant's Tranche One investments. Pl.'s Br. at 40. In support of its claim, Plaintiff cited to reports that make no mention of Osage funds. RT 645:8-646:4; PX86; PX87; PX277; PX474; PX476. In fact, Plaintiff principally relied on a 1982 General Accounting Office report that

---

[25] Mr. Parris's knowledge stemmed from briefly "observing" the work of the "deposit officer," Judi Hill, on an unspecified number of occasions. RT 350:2-351:5. Ms. Hill was responsible for processing the post-1980 Osage Tranche One deposits and knows about the deposit practices during the earlier Tranche One Months because of her forensic research on source documentation conducted as part of her duties at the Osage Agency. RT 1625:15-1626:5, 1636:5-1638:11. Ms. Hill is thus a more creditable witness than Mr. Parris on the deposit practices of the Osage Agency during Tranche One.

focused exclusively on Individual Indian Money accounts and on accounting records unrelated to deposit and investment activities. RT 400:9-401:19; PX87-23, 45. Plaintiff's citations and reliance are unavailing.

Even if the BIA's accounting system suffered "inaccuracies," Plaintiff provided no evidence that those "inaccuracies" impacted the Tranche One deposits and investments.[26] Further, Plaintiff's witness, Mr. Parris, agreed that, if there are doubts regarding the reliability of accounting records, financial analysis should focus on source documentation. RT 402:5-10. Defendant's experts, Greg Chavarria and Charles Lundelius, relied on source documents for their analysis of Defendant's deposit and investment of Osage Tranche One funds. Def.'s Br. at 48-50, 54-57, and evidence cited therein. Plaintiff's expert, Mr. Jay, did not. RT 585:1-12, 587:18-21; 588:6-17, 643:11-22, 646:24-647:2. Further, Plaintiff failed to show any "inaccuracy" in these source documents.

## C. Plaintiff Failed to Provide Any Evidence That the United States Abused its Discretion or Failed to Act as a Prudent Person in Investing Tranche One Royalties

Plaintiff provided no evidence that Defendant abused its discretion under the investment statutes or that it did not act prudently in investing Osage oil and gas royalties during Tranche One. Plaintiff did not qualify its expert witness, Mr. Jay, as an expert on the prudence of investment practices or investments, and the Court indicated that it would disregard any testimony from Mr. Jay on those issues. RT 465:16-19, 568:11-569:5. Accordingly, Plaintiff's references to any proffered conclusions of Mr. Jay on those subjects should be ignored. *See* Pl.'s Br. at 39.

Defendant's expert, Mr. Lundelius, analyzed Defendant's investment practices and

[26] The negative inference related to the management of the Osage accounts that Plaintiff wishes to draw from these general reports should be rejected because Osage accounts were closely monitored. The Osage Tribal Auditor paid close attention to the deposit and investment of Osage royalties as they were processed, and routinely reconciled current and past financial statements to ensure that deposits and investments were processed appropriately. RT 304:14-306:13, 389:23-394:3, 418:17-24, 423:15-20, 1717:24-1720:22.

investment of Osage Tranche One funds using a "forensic accounting" analysis, and concluded that Defendant fulfilled the duties of care, caution, and skill and, thereby, prudently invested those monies. Def.'s Br. at 50-51, 54-57, and evidence cited therein. Mr. Lundelius's conclusions were based on an evaluation of the reasonableness of Defendant's investment procedures and its overall performance on Tranche One investments. *Id.*

As to his comparison between the actual rate of return earned during the Tranche One investment periods and corresponding expected rates, Mr. Lundelius testified that a prudent investor might not always reach an expected rate of return. RT 2222:23-2223:15. Where under-performance is insignificant both in terms of frequency and amount, an investor may still be held to have fulfilled the duty of skill. *Id.* For four of the Tranche One months, the actual rate of return exceeded the expected rate. RT 2220:11-2222:22; DX2695-16, 54, 56-59. For one month, May 1979, the actual rate of return was only 0.32% below the respective quarterly expected rate. RT 2220:11-2222:22; DX2695-16, 55, 59. This shortfall is certainly insignificant when viewed in context of Defendant's overall performance on investments related to the Tranche One Months. RT 2222:23-2223:15.

Further, contrary to Plaintiff's unsupported argument, failure to exceed the expected rate on one occasion does not "by definition" constitute a breach.[27] Pl.'s Br. at 42. *See* Restatement (Second) of Trusts § 227, cmt. b. ("The trustee is not a guarantor of the trust's investment performance."). Rendering an opinion as to the prudence of investment based on this one occasion places undue emphasis on the investment result for one of five months, completely ignores two elements of the prudent investor standard (duties of care and caution), and, thus, is unpersuasive.

[27] With the exception of the required four-percent simple interest under the pre-1984 language of 25 U.S.C. § 161a, there is no statutory basis for a claim that Defendant had a duty to earn a specific rate of return.

In its Post-Trial brief, Plaintiff for the first time offered a different assumption of how the Tranche One royalties should have been allocated between investments in CDs and in cash. Pl.'s Br. at 42–44. Plaintiff should not be permitted to present such new factual assertions now. *See* February 16, 2006 Pre-trial Conference Transcript at 18:20-19:6.[28] Even if the Court were to consider Plaintiff's assumptions, however, Plaintiff still failed to show a breach of investment duties. Its argument narrowly focused on three instances in which Plaintiff's assumed rates of return fall below the Lundelius expected rate, but only by minor amounts. Plaintiff presented no evidence that such minor discrepancies constitute failures to adhere to prudent investor standards.

In contrast, Mr. Lundelius's assumptions were reasonable, well-founded, and confirmed at trial. They were predicated on the procedures for receipt and investment of funds as outlined to him by John Vale, the investment process described in detail by the 1983 Price Waterhouse Report, and the relevant procedural requirements stemming from the 1906 Act and the 42 BIAM. *See* Def.'s Brf. at 43-49 and evidence cited therein; *see also* RT 2088:11-20, 2090:12-21, 2098:1-2101:20, 2114:20-2116:14, 2134:10-2135:8, 2186:16-2187:3, 2188:12-20, 2282:9-2283:4, 2284:15-24; DX1668-108, 133-34, 146-53, 162-63; DX2134-23; JX20-3. Based on those sources of information, Mr. Lundelius assumed that the BIA invested Osage Tranche One royalties as soon as possible after receipt into CDs (or Treasury securities, until CDs became available) that matured on or near the date of disbursement, with non-invested funds earning either the statutory 4% (pre-1985) or

[28] Allowing what amounts to new factual testimony in Plaintiff's post-trial brief would unduly prejudice Defendant, who has no opportunity to develop evidence rebutting Plaintiff's factual assertions. For example, a change in the manner in which one should consider the actual investments of Osage funds (*e.g.*, instead of tracking the funds into investments, assuming that some percentage of the royalty receipts would be held out of the investments to earn 4% interest) would also require reconsideration of what should constitute the "expected rate of return" (*e.g.*, constructing an expected rate that included a certain percentage of funds held in cash earning only 4% interest), against which to measure performance.

overnighter (post-1984) rate during interim periods. RT 2098:1-2101:20, 2114:20-2116:14; DX1668-133-34.[29]

Mr. Lundelius tracked the receipt of royalties from Tranche One Purchasers into investments that correlated, by date and size, with the receipt of those funds. RT 2143:7-2220:10, 2249:6-2250:9, and exhibits cited therein; DX2695-54-58. Mr. Lundelius verified the timing associated with certain investments with Mr. Vale, who confirmed the reasonableness and correctness of Mr. Lundelius's assumptions. RT 2098:1-2101:20, 2114:20-2116:14, 2134:10-2135:8, 2186:16-2187:3, 2188:12-20, 2282:9-2283:4, 2284:15-24.

## III. Plaintiff Is Not Entitled to Damages

### A. Plaintiff Has Failed to Meet its Burden of Showing Breaches of Duties and Losses Entitling it to an Award of Damages

Prior to considering damages, Plaintiff must first establish a breach of a money-mandating duty *and* a prima facie case that it has incurred losses because of the breach. *Confederated Tribes of Warm Springs Reservation v. United States*, 248 F.3d 1365, 1371, 1373-74 (Fed. Cir. 2001). Further, at a minimum, to support an award of damages, the Court must find that damages traceable to a breach are "within a reasonable degree of approximation." *Id.* at 1372. Plaintiff failed to

[29] For each Tranche One investment period, Mr. Lundelius found that funds not otherwise invested for part of the time either earned 4% interest (pre-1985) or were placed in the overnighter (post-1984). RT 2156:15-2157:5, 2172:18-2173:8, 2201:9-17, 2203:12-17, 2295:22-2296:10; DX78-1; DX2695-54-58. Thus, contrary to Plaintiff's unsupported assertion, Mr. Lundelius did not assume that 100% of the funds were invested in T-bills or CDs. Pl.'s Br. at 43. Further, in the three pre-1985 periods, the percentages of funds that Mr. Lundelius concluded were earning 4% interest align with Mr. Jay's figures. Mr. Jay's percentage of funds invested at 4% interest was 2.6%, 2.4%, and 5.6% in 1976, 1979, and 1981, respectively. JX113-50-52 (calculated by dividing average "Cash Balance" for each fiscal year by average "Total Fund Balance"). Mr. Lundelius's percentage of funds invested at 4% interrest was 2.5%, 2.8%, and 5.3%. RT 2189:23-2190:17, 2203:12-2204:13, 2218:19-25; DX2695-54-56 (calculated by dividing aggregate "Statutory Interest on Tranche One Royalties" by "Total Aggregate Interest Earned by Tranche One Royalties" and then multiplying by "Annualized Actual Rate of Return" divided by 4%. For example, January 1976 cash balance is ($313.01/$17,399.28) X (5.50%/4.00%) = 2.5%).

demonstrate a breach of duty and, for certain of its claims, to establish even a prima facie case that losses occurred due to Defendant's alleged breach.

For the reasons discussed above and in Defendant's Post-Trial Brief, Plaintiff's proposal (Pl.'s Br. at 53-54) that it is entitled to an additional 10 percent of the royalties actually collected due to alleged breaches of duties to verify production volumes, actual selling prices, and royalty rates, and to conduct audits should be rejected because Plaintiff failed to establish any such breaches. Further, even if such breaches were established, Plaintiff failed to support an award of any damages. Plaintiff relied solely on the results of post-sales audits, which, it claimed, discovered underpayments of up to 10% of royalties initially collected. Pl.'s Br. at 53. Contrary to Plaintiff's claim, however, these audits did not address similar circumstances and should be rejected as a basis for granting damages. There is no evidence that the audits to which Plaintiff refered related to royalty payments on Osage oil, which were subject to a unique and effective verification procedure. RT 1520:15-1521:20. These audits related to the USGS and MMS royalty collections, RT202:1-23, 268:8-17, 1545:21-23, and they did not follow the same verification procedures as did Osage Agency.

## B. The Osage Nation is Not Entitled to Inferences

Contrary to its claim, Plaintiff has established no entitlement to inferences in its favor as to whether the Government is liable for breaching any duty.[30] Further, it is not entitled to inferences as to damages because it failed to establish a prima facie case that it suffered losses because of any breaches for which it seeks damages or because of the alleged failure of the Government to "keep

---

[30] Plaintiff is not entitled to any inferences due to alleged document destruction, as Plaintiff failed to establish that any allegedly destroyed documents relate to any Tranche One month or lease or that any documents were destroyed in bad faith. RT 714:12:15; 750:1-15; 790:5-7; 794:3-7; *Columbia First Bank, FSB v. United States*, 58 Fed.Cl. 54, 55 (2003).

proper accounts." *Confederated Tribes*, 248 F.3d at 1373; *see Puritan Associates v. United States*, 215 Ct. Cl. 976, 978 (1977) (it is elementary that "the plaintiff as part of its proof of entitlement, must show it was damaged to some extent by defendant's derelictions. . . .").

**C. Plaintiff is Not Entitled to Late Payment Penalties**

Plaintiff presented no evidence at trial that any of the Osage Tranche One royalty payments addressed by Defendant's experts Greg Chavarria and Charles Lundelius constituted late payments requiring the imposition of a penalty. RT 601:19-21, 602:3-10. Further, even if some of the royalty payments noted by Messrs. Chavarria and Lundelius were late, Plaintiff failed to present any evidence at trial that penalties were not imposed on or collected from lessees for these alleged late payments. RT 601:22-602:2.

**D. Plaintiff's Calculations of "Lost Investment Income" and "Lost Investment Income on Cash Funds" Due to Alleged Mismanagement of Funds on Deposit Are Flawed**

In computing investment damages, Plaintiff's expert, Stephen Jay, relied on annual data for his "lost investment income" calculations. RT 627:20-629:7; JX113-54; PX750-46. His methodology ignored the variance in interest rates between months and inappropriately assumed that monthly revenue streams within a fiscal year are identical.[31] Mr. Jay's method of simply dividing annual figures by 12 does not provide a reliable method of evaluating financial performance, especially when he made no attempt to verify the accuracy of estimated figures derived from annual data. RT 587:18-21, 592:5-593:11, 627:14-19, 2226:20-2227:11.

A more serious flaw arises when Mr. Jay calculates both "Lost Investment Income" and "Lost Investment Income on Cash Funds" by relying extensively on the expected rate developed by

[31] Mr. Jay concedes that the activity for a year is not representative of one month in that year. RT 592:1-4.

Defendant's expert, Mr. Lundelius. With regard to "Lost Investment Income," Mr. Jay improperly uses Mr. Lundelius's four- to five-month expected rates to compute annual expected returns without verifying whether those rates were representative of annual rates for the relevant time periods. RT 627:14-19, 2233:16-2235:11, 2238:3-2241:6; JX113-54; PX750-46. As to "Lost Investment Income on Cash Funds," Mr. Jay improperly compared returns on cash to the expected rates for both cash *and* invested funds,[32] resulting in inflated damages. RT 2244:10-2245:6; JX113-53, PX750-47. Therefore, the Court should reject Mr. Jay's findings with regard to investment returns due to his improper use of the Lundelius expected rates.

Mr. Jay's calculation of "lost investment income on cash funds" has other significant shortcomings. Mr. Jay used month-end cash balances, which overstate cash balances because royalty payments are typically paid at the end of the month. RT 636:2-637:10, 2233:16-2238:2. Further, Mr. Jay failed to take into consideration the rate of return on cash funds in 1986 and 1989, when the Overnighter rates were available and were potentially higher than the 4% rate used in his calculations. RT 638:25-639:4.[33] Consequently, his calculations of actual return for those months were understated and are therefore unreliable.[34]

---

[32] The expected rate evaluates overall fund performance, not the performance of just the cash component. RT 2244:10-2245:6.

[33] Indeed, Mr. Jay did not conduct any research into the available Overnighter rates in 1986 and 1989. RT 629:15-17.

[34] Plaintiff's damage calculation for deposit lags was flawed. It included annual receipts/deposits for all Osage accounts and is thus over-inclusive, RT 585:1-588:17; by calculating deposit lag time using average lag periods, it exaggerated lag times for certain deposits, RT 587:14-21; it assumed that zero days are the only reasonable lag time, RT 1977:18-1978:8; JX113-12; it ignored source documents and instead divided annual figures by 12 providing, at best, a monthly estimate of "lost interest" due to deposit lag time, RT 592:1-593:11; and it ignored source documentation to verify the accuracy of its methodology. RT 585:1-588:17.

**E. The Appropriate Rate of Interest to Apply to Any Damages Would be the Short-Term Rates that the Monies Would Have Earned Had They Been in the Osage Account and the Inflation Rate**

If Plaintiff had established its entitlement to damages, it would be entitled only to the investment proceeds that "would have been received" on any uncollected or under-invested funds. *Peoria Tribe of Indians v. United States*, 390 U.S. 468, 473 (1968), *cited in Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1353 (Fed. Cir. 2004). The uncontroverted evidence shows that any such funds would not have been invested in 7-year Treasury bills. RT 2243:8-2244:9. Instead, the Court should apply the short-term rates of return that Osage funds earned.[35]

Respectfully submitted, this 18th day of May, 2006,

*s/ Brett D. Burton*
BRETT D. BURTON
Counsel of Record for Defendant
Martin J. Lalonde
Kevin S. Webb
Kevin J. Larsen
United States Department of Justice - ENRD
Washington, D.C. 20044-663
Telephone: (202) 305-0212
Attorneys for Defendant

Of Counsel:
Elisabeth Brandon
Brenda Riel
Teresa E. Dawson

[35] Those rates should be applied for the period in which the funds were in the Osage account, with an inflation rate to reflect the time-value of money applying thereafter. RT 2243:8-2244:9.