**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 99-550 L (into which has been consolidated No. 00-169 L) Judge Emily C. Hewitt |
| | ) | Electronically Filed May 18, 2006 |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF OSAGE NATION'S**
**RESPONSE TO DEFENDANT'S POST-TRIAL BRIEF**

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation

## TABLE OF CONTENTS

INTRODUCTION ..........1

ARGUMENT ..........1

I. THE UNITED STATES MUST BE HELD TO THE STANDARD OF A FIDUCIARY, NOT MERE REASONABLENESS ..........1

II. THE UNITED STATES' PURPORTED "INTERPRETATION" OF THE TERM "OFFERED PRICE" CONTRADICTS THE REGULATIONS, THE TRIAL RECORD, AND ITS OWN PRIOR POSITIONS IN THIS CASE ..........3

III. THE UNITED STATES' ERRONEOUS "POSTED PRICE" AND GRAVITY-ADJUSTMENT ARGUMENTS WOULD REQUIRE ADDING LANGUAGE TO THE OSAGE REGULATIONS ..........7

IV. THE OSAGE REGULATIONS, NOT FEDERAL PRICE CONTROLS, GOVERN THE DETERMINATION OF ROYALTY VALUE ..........8

A. The Applicability of Federal Price Controls to First Sales of Crude Oil Did Not Override the Calculation of Royalty Value Under the Osage Regulations ..........8

B. The United States Improperly Seeks to Run Away from the Plain Terms of the Osage Regulations ..........11

V. THE UNITED STATES UNDERCOLLECTED ROYALTIES BY FAILING TO VERIFY ROYALTY VOLUMES AND ROYALTY RATES ..........12

VI. JUST AS IT IS LIABLE FOR UNCOLLECTED ROYALTIES OWED BY LESSEES AND PURCHASERS, THE UNITED STATES IS LIABLE FOR UNCOLLECTED LATE FEES OWED BY LESSEES AND PURCHASERS ..........14

VII. THE UNITED STATES' DEFENSES TO UNDERINVESTMENT ARE BELIED BY THE FACTUAL RECORD ..........15

A. Accepting a Concession, Instead of Presenting Duplicative Evidence on an Uncontested Point, Is Not a Failure to Meet the Burden of Proof ..........15

B. The United States' Failure to Earn the Rate of Return a Prudent Investor Would Have Received Shows That It Mismanaged Osage Trust Funds ..........16

C. Lundelius's Conclusion That the United States Satisfied Its Duty of Skill Is Undermined by the Ledgers of Account 7386 and by His Own Contradictory Testimony ..........17

VIII. THE UNITED STATES' EXPERTS ASSUME AWAY THE AGENCY'S DELAYS IN EARNING INTEREST ....................19

CONCLUSION....................20

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Minnesota Chippewa Tribe v. United States*, 14 Cl. Ct. 116 (1987) ....................3

*N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322 (1981)....................2, 3

*Osage Tribe of Indians v. United States*, 68 Fed. Cl. 322 (2005)....................12, 13

*Pennzoil Exploration & Prod. Co. v. Lujan*, 928 F.2d 1139 (Temp. Emer. Ct. App. 1991) ....................10, 11

*Shoshone Indian Tribe of the Wind River Reservation v. United States*, 56 Fed. Cl. 639 (2003)....................11, 12

*Texas American Oil Corp. v. United States Dept. of Energy*, 44 F.3d 1557 (Fed. Cir. 1995)....................11

*United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003)....................3

### STATE CASES

*Summit Fasteners, Inc. v. Harleysville Nat. Bank & Trust Co.*, 599 A.2d 203 (Pa. Super. 1991)....................15, 16

### STATUTES AND LEGISLATIVE HISTORY

Act of June 28, 1906, Chapter 3572, 34 Stat. 539 ....................2

Act of June 24, 1938, Chapter 645, 52 Stat. 1034 ....................7

S. Rep. No. 97-512 (1982)....................10

### REGULATORY MATERIALS

10 C.F.R. § 212.71 (1975) ....................9

10 C.F.R. § 212.72 (1977) ....................9

25 C.F.R. § 183.1(h) ....................5

25 C.F.R. § 183.11(a).................... *passim*

25 C.F.R. § 183.30....................7

41 Fed. Reg. 4931, 4940 (1976) ....................9

*Okie Crude Co. v. Muskogee Area Director*, 23 IBIA 174 (1993)....................3

## OTHER AUTHORITY

29 Am. Jur. 2d § 158 (2005) .......... 16

32A C.J.S. Evidence § 1343 (2005) .......... 16

2A *Sutherland Statutes and Statutory Construction* § 46:6 (6th ed. 2000) .......... 5

9A Wright & Miller, *Federal Practice & Procedure* § 2529 (2005) .......... 16

## INTRODUCTION

In its post-trial brief, the United States minimizes or ignores the evidence of its mismanagement of trust funds. It seeks favorable inferences to fill the gaps created by its failure to account for its stewardship of Osage moneys. And it defines away its problems so as to escape liability. With respect to the collection claim, having failed to conform its *conduct* to its own *regulations*, the United States now seeks to conform the *regulations* to its *conduct*. The United States repeatedly relies on so-called "interpretations" of the regulations that ignore existing regulatory language and add new phrases and concepts to the regulations. Trial showed that these interpretations are merely responses to this litigation. For example, the United States' offered-price argument was rejected by its own witness. And, on the unregulated-price issue, the United States contradicts Interior's consistent historical position that has been upheld in court.

On the investment claim, the United States' attempts to define away problems are less blatant. But, beneath a sheen of plausibility, the United States relies on undeservedly favorable assumptions and inconsistencies that mask serious failures to meet fiduciary standards. For example, the United States' analysis defines away the fact that Interior, through its own failure to keep track of available funds, maintained massive cash balances that earned 4% statutory interest instead of T-bill rates of up to 15%. And the United States gives itself a three-day "grace period" to deposit trust money, effectively defining away its deposit-lag problem. Such ivory-tower efforts to barricade the United States from accountability as trustee should be rejected.

## ARGUMENT

### I. THE UNITED STATES MUST BE HELD TO THE STANDARD OF A FIDUCIARY, NOT MERE REASONABLENESS

Many of the United States' arguments to avoid liability here are based on the premise that Interior must be given broad leeway to disregard (or to retroactively amend, *sub silentio*) its own

regulations. This premise, advanced under the rubrics of "interpretation" and "reasonableness," was succinctly stated at the pretrial conference:

> THE COURT: Is it reasonable for the United States to do anything other than what's in the regulations?
>
> MR. LALONDE: Well, no.
>
> THE COURT: Good, hold that thought.
>
> MR. LALONDE: But the regulations are silent as to certain issues as far as how to implement [them]. I mean, there is some [room] obviously for interpreting what those regulations are and what the reasonable course would be.

Pretrial Conf. Tr. 313:23–314:7 (Feb. 17, 2006). In its post-trial brief, the United States repeats this mantra of "interpretation" and "reasonableness." By urging that in important respects "the statutory and regulatory language is silent as to the standard [for determining liability]," U.S. Br. 4, the United States seeks to offer "reasonable interpretations" that exonerate it.[1]

To the contrary, the regulations at issue here implement trust duties owed to the Osage Nation and should be construed strictly against the United States. Moreover, there is no silence here: Congress explicitly imposed on the United States the full spectrum of traditional fiduciary duties. The 1906 Act requires that "all funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, *shall be held in trust by the United States* . . . ." 1906 Act § 4 (emphasis added). In similar circumstances, interpreting ERISA, the Supreme Court has explained,

> Congress directed that union welfare funds be established as written formal trusts, and that the assets of the funds be "held in trust," and be administered "for the sole and exclusive benefit of the employees . . . and their families and dependents . . . ." 29 U.S.C. § 186(c)(5). Where

---

[1] Rather than cite any cases on this point or offer any argument, the United States refers to two earlier briefs. U.S. Br. 4. All such attempts at incorporation by reference (*see* U.S. Br. 3, 4, 14, 27, 42, 43 n.41) violate RCFC 5.2(b)(3) and must be "disregarded."

> Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms. . . .
>
> . . . [W]e must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary.

*N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 329–30 (1981); *see United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475 (2003) (applying the common law of trusts to statutory Indian trusts). Accordingly, here the "standard of duty for the United States as trustee for Indians is not mere 'reasonableness' but the highest fiduciary standards." *Minnesota Chippewa Tribe v. United States*, 14 Cl. Ct. 116, 130 (1987). This fiduciary standard forecloses the United States' resort to "reasonableness" and extra-textual "interpretation" of its regulations for its own benefit.

## II. THE UNITED STATES' PURPORTED "INTERPRETATION" OF THE TERM "OFFERED PRICE" CONTRADICTS THE REGULATIONS, THE TRIAL RECORD, AND ITS OWN PRIOR POSITIONS IN THIS CASE

The evidence at trial showed that the Osage Agency failed to measure Royalty Value using offered prices by major purchasers. To avoid the consequences of this evidence, the United States resorts to "interpretation." Relying on *Okie Crude Co. v. Muskogee Area Director*, 23 IBIA 174 (1993), the United States asserts that royalties were to be based on "the highest posted or offered prices of major purchasers located in the Kansas-Oklahoma area, *which posted or offered prices were available to the lessee*." U.S. Br. 1, 8 (emphasis added). Thus, the United States is compelled to *add* language to its regulations—shown in italics above—to even state its position.

In an attempt to project into the past its *Okie Crude* interpretation of "offered price," the United States misconstrues a 1976 form letter to purchasers, DX2334-0001 (cited in U.S. Br. 8). But DX2334-0001 does not state, or even hint at, the *Okie Crude* interpretation of "offered

price." To the contrary, DX2334 contains a number of other letters that show that the Osage Agency *rejected* that view. One company wrote to the Osage Agency to object to paying royalty based on Sun's offered price because "such a price is not being generally offered." DX2334-0014. After speaking with Newell Barker at the Osage Agency, however, the company agreed to pay additional royalty nonetheless: "Where we are the lessee of record, we will pay the additional 15 cents because we understand that our lease and government regulations require that we do so." DX2334-0015.

In fact, after a series of leading or nearly leading questions at trial, Barker in a moment of candor volunteered that, even if the price reflected in DX2334-0001 was not available to all lessees selling stripper oil, "we would assess an additional amount" of royalty on all such lessees. Tr. 1230:1–5 (Barker); *see also* Tr. 1059:5–13 (Hurlburt); Tr. 1296:9–1298:15; 1226:17–1231:13 (Barker). In light of Barker's explicit rejection of the United States' litigating position on offered price, the United States' reliance on DX2334-0001 as a "contemporaneous" *Okie Crude*-style interpretation worthy of "deference," U.S. Br. 8, borders on farce. Rather, the fact that the letter was sent only to purchasers of stripper oil simply reflects the Osage Agency's (erroneous) price-control-era practice for setting Royalty Value. During that era, the Agency did not require royalties on regulated oil ("old" oil) to be based on the unregulated prices for stripper oil. *See* Stipulation of Facts (Stip.) ¶ 13 (filed Mar. 29, 2006); Plaintiff's Post-Trial Br. 13.

In conjunction with its *Okie Crude* argument, the United States tenders another, brand-new textual argument that it admits is in conflict with its previous litigating positions. *See* U.S. Br. 11 n.7. It argues that, although "major purchaser[s]" must be drawn from "the Kansas-Oklahoma area," "posted or offered price[s]" need only be drawn from Osage County. U.S. Br. 6, 9. The United States claims that its new position "reflect[s] the additional information

developed during the course of trial preparation and trial." U.S. Br. 11 n.7. But its new position conflicts with its own evidence and with the theory the United States presented to the Court midway through the trial. Tr. 1566:3–9 (Martin); Tr. 1280:6–1284:8 (colloquy).

This position also conflicts with the Osage Regulations. The phrase "in the Kansas-Oklahoma area" appears twice in the regulations, and each use of the phrase serves a distinct purpose. In the definition of "major purchaser," 25 C.F.R. § 183.1(h), the phrase specifies the area in which purchasing activity will be considered for determining the major purchasers. In the body of the royalty value section, 25 C.F.R. § 183.11(a)(2), the phrase serves to define the area in which one must look for the posted and offered prices of major purchasers. The United States' latest theory would violate fundamental rules of construction by creating both a redundancy and a void: it would make *both* uses of the phrase "in the Kansas-Oklahoma area" apply only to the selection of relevant purchasers, while simultaneously rendering the regulation devoid of any geographic limit on where to look for posted or offered prices.[2] *See* 2A *Sutherland Statutes and Statutory Construction* § 46:6 (6th ed. 2000). Not only does the United States read the regulation so as to create a void, but it then fills the void with language of its own creation.

Although the language the United States adds to the regulation is touted as an improvement, it raises questions that the United States has never addressed. What does it mean to be "available to the lessee"? (At times the United States seems to assume that prices paid to a seller in Osage County are "available" to all lessees in Osage County, *see, e.g.*, U.S. Br. 11 n.8, but the United States gives no reason why this should be so.) And just how would the Agency determine such a thing with respect to an individual offer and lessee? The lack of any attention to such questions further demonstrates that the United States is offering a post-hoc litigating

---

[2] As discussed below in part III, this semantic surgery requires the United States to argue for its erroneous new rule with respect to posted prices as well.

position unsupported by the record.

The rest of the United States' arguments boil down to three attacks on the plain meaning of "offered price." First, the United States argues that "each lessee's actual sale price is to be considered separate and apart from the major purchaser's [sic] 'highest posted or offered price.'" U.S. Br. 6. This is uncontroversial; obviously the "actual sales price" of the oil subject to royalty is always to be considered in calculating Royalty Value. That fact says nothing about whether prices offered and paid by major purchasers in Kansas or Oklahoma are prices "offered . . . by a major purchaser." Barker agreed that an offered price would include a price offered and paid. Tr. 1223:2–8.

Second, the United States protests a plain reading of the term "offered price" on the ground that it would have been too difficult to obtain all of the offered prices by all of the major purchasers in the Kansas-Oklahoma area. U.S. Br. 9–11. But the Osage Agency never even tried to gather such data. Tr. 1604:16–1605:7 (Martin). The United States cannot rewrite the regulation based on after-the-fact speculation that *some* pricing data relevant under the regulation *may* ultimately have been unobtainable even if the Agency had sought it. The Osage Agency possessed extensive data about offered prices for sales to Osage lessees but never referred to it in calculating royalties. Tr. 1223:18–1224:1 (Barker). Had the Osage Agency used even that relatively small subset of the relevant offered-price data, it would have prevented most of the undercollections Reineke calculated. Tr. 207:11–217:15 (Reineke); PX751-0642. Further, the Osage Agency did not use its authority to examine the books and records of Osage lessees (*see* 25 C.F.R. § 183.30) to obtain offered price data. Nor did it seek such data by pursuing confidentiality agreements with other oil companies or by conferring with state authorities or federal agencies such as the Minerals Management Service (MMS) or the U.S. Geological

Survey (USGS).

Third, the United States argues, in ironic and speculative hyperbole, that the Agency had to be careful not to collect too much royalty for the Osage. Arguing for its own "interpretation," the United States speculates that enforcing the regulations according to their plain meaning "*could have* led to the decline of royalty proceeds." U.S. Br. 12 (emphasis added). But the regulations define the United States' obligations, not vague sympathy for the lessees, mislabeled as concern for the Osage.[3] The United States also argues that the Osage Nation supported reducing royalties in order to promote production. U.S. Br. 13 n.11. This is another version of the United States' baseless waiver and estoppel theories, as well as a disingenuous attempt to avoid liability by citing proposals it never adopted. Tr. 1287:13–17 (Barker).

## III. THE UNITED STATES' ERRONEOUS "POSTED PRICE" AND GRAVITY-ADJUSTMENT ARGUMENTS WOULD REQUIRE ADDING LANGUAGE TO THE OSAGE REGULATIONS

As with "offered price," the United States ties its argument on "posted price" to the notion that the Osage Regulations contain the unwritten phrase "available to the lessees." *See* U.S. Br. 13 n.12. Yet Barker testified about specific instances where the Agency rejected lessees' complaints when the highest posted price that set their royalty was a distant posted price that was not available to Osage lessees. Tr. 1205:2–1206:1; *see also* Tr. 1214:3–1216:5 (Barker).

In a similar sense, the United States' argument that gravity adjustments are "implicit in the ordinary meaning of the term 'posted price,'" U.S. Br. 13, is sleight-of-hand that in effect

---

[3] On this point, the United States cites two provisions in the 1938 Act, 52 Stat. 1034 (June 24, 1938), which amended the 1906 Act. First, the United States points to the provision that sets the minimum acreage to be offered for oil leases each year. U.S. Br. 12. On its face, this relates only to potential *new* leases, and says nothing about minimizing the cost of doing business for existing lessees. Second, the United States cites the provision authorizing regulations to promote the recovery of mineral resources. *Id.* But this provision underscores the principle that the *regulations* govern; it is not a license to disregard them on a case-by-case basis.

requires the addition of language to the regulations that would exonerate the trustee. Because posting bulletins always have multiple prices listed for various kinds and qualities of oil, "posted price" is a term that begs the question, "*Which* posted price?" The regulation answers this question unequivocally, "the highest posted . . . price." The United States would effectively change this to read, "the highest posted price for oil of like kind and quality," under the guise of making this added language "implicit." *See* U.S. Br. 13 & n.12; 7 n.4. The omission of this "like kind and quality" language from the Osage regulation, when that language appears in analogous MMS regulations, refutes the claim that such a phrase is "implicit." Tr. 102:5–105:23 (Reineke).

## IV. THE OSAGE REGULATIONS, NOT FEDERAL PRICE CONTROLS, GOVERN THE DETERMINATION OF ROYALTY VALUE

### A. The Applicability of Federal Price Controls to First Sales of Crude Oil Did Not Override the Calculation of Royalty Value Under the Osage Regulations

The United States does not dispute that, during the period of federal price controls on crude oil, the Osage Agency did not follow the terms of the Osage Regulations specifying the methodology for determining Royalty Value. Rather than use the highest posted, offered, or simultaneous same-lease price, as required by 25 C.F.R. § 183.11(a)(2), the Agency capped Royalty Value at the federally established ceilings for first sales of crude oil. Stip. ¶ 13. The United States concedes that neither the EPAA nor its implementing regulations "specifically indicate[d]" that federal price controls limited royalties. U.S. Br. 14. Nevertheless, the United States argues that premise by claiming that Federal Energy Administration ("FEA") decisions "routinely" applied price-control regulations to royalty interest owners.[4] U.S. Br. 15–16.

The United States' argument reflects a misunderstanding of the scope of the crude oil

[4] As noted in the Osage Nation's opening post-trial brief (at 12), the EPAA and its implementing regulations were administered by a succession of re-named agencies—the Federal Energy Office, the Federal Energy Administration, and the Department of Energy.

price regulations and their relationship to the royalty interest owner in this case. The mandatory petroleum price regulations for crude oil were set forth in Subpart D of Part 212 of Title 10 of the Code of Federal Regulations. The first section of Subpart D, entitled "Applicability," defined the scope of the rules: "This subpart applies to the first sale of domestic crude petroleum." 10 C.F.R. § 212.71 (1975). All "first sales" were covered—whether they were by a producer or a royalty interest owner. *See* 41 Fed. Reg. 4931, 4934–35, 4940 (1976); 10 C.F.R.§ 212.72 (1977) ("'First sale' means the first transfer for value by the producer or royalty owner.").

By their terms, the mandatory petroleum price regulations did not apply to the royalty owner in the present case—the Osage Nation—because it engaged in no "first sales" of crude oil. Leases are not oil sales contracts. The lessees sold all of the oil produced from the Tranche One leases and made all of the initial transfers for value. First sales occurred when the lessees transferred custody of the oil to the purchasers. As explained at trial, "ownership of the oil change[d] from the lessee to the purchaser" when the oil left the tank on the lease and either went into the purchaser's truck or flowed through a metering device, known as a LACT or "lease automated custody transfer" unit, connected to a pipeline. Tr. 73:3–20 (Reineke); Tr. 1495:16–24 (Martin); Tr. 1134:12–25 (Barker).

Moreover, until now, Interior has *always* insisted that its own regulations were never superseded by price-control regulations. In a supreme display of opportunism, the United States now takes the exact reverse of Interior's consistent position, and relies on FEA administrative decisions proclaiming the FEA's supposed ability to supersede USGS's or Interior's royalty regulations. U.S. Br. 15-16. As noted by the United States, in a 1977 memorandum by its Solicitor, Interior rejected FEA's assertion that it could supersede federal royalty regulations. U.S. Br. 16 & n.16 (discussing Krulitz memorandum, PX682). And, during consideration of

what became FOGRMA, the Secretary of the Interior in 1982 told Congress that Interior "*never* agreed" with FEA's position and, in fact, that "DOE later agreed with [Interior's] interpretation." S. Rep. No. 97-512, at 56-57 (letter dated May 11, 1982, from Secretary of the Interior D. Hodel to M. Wallop, Chairman, U.S. Senate Subcomm. on Public Lands and Reserve Water) (emphasis added) (cited in U.S. Br. 16).[5] In sum, the United States is taking a position that Interior openly challenged as erroneous (when its own royalties were at issue) and that DOE eventually abandoned.

Even more to the point, the Temporary Emergency Court of Appeals (TECA) rejected the United States' current position when it was raised *against* Interior. *Pennzoil Exploration & Prod. Co. v. Lujan*, 928 F. 2d 1139 (Temp. Emer. Ct. App. 1991).[6] In *Pennzoil,* the lessee sought to reduce its royalty burden by arguing that DOE's price-control regulations took "precedence over" Interior's regulations for setting production value for royalty purposes. *Id.* at 1141. As a consequence, the lessee contended, "the royalty due . . . should be based on the regulated ceiling price established by DOE." *Id.* at 1142 n.3. The court of appeals, however, affirmed the district court's ruling that "neither EPAA policy nor any EPAA regulation was sufficiently compelling to overrule the Secretary of Interior's statutory authority to determine the value of production for royalty purposes." *Id.* at 1144.

The United States brushes aside Interior's previous position based on its view of the

---

[5] The United States acknowledges that DOE "resolved" the inter-agency dispute by amending its regulations to recede from the position to which Interior had objected. U.S. Br. 16-17.

[6] TECA was established by the Economic Stabilization Act of 1970, 15 U.S.C. § 1904 (note), and was given exclusive jurisdiction over price-control disputes. Upon the dissolution of TECA in 1993, the Federal Circuit took over TECA's appellate jurisdiction and "adopt[ed] as precedent the body of law represented by the holdings of the Temporary Emergency Court of Appeals." *Texas American Oil Corp. v. United States Dept. of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995) (en banc).

fairness of the royalty provisions at issue. U.S. Br. 16 n.16. But *Pennzoil* sets out a legal principle that does not depend on whether Royalty Values exceed prices available to producers. *Pennzoil* holds, without qualification, that DOE's price regulations do not supersede Interior's royalty regulations or leases.

Because federal price controls did not displace or modify the Osage Regulations, the Osage Agency should have enforced them as written. The failure to do so during the first three Tranche One months breached the United States' duty as trustee to collect all royalties due.

### B. The United States Improperly Seeks to Run Away from the Plain Terms of the Osage Regulations

The United States recites a series of arguments why the use of unregulated prices to determine Royalty Value would have been inconsistent with the 1906 Act. U.S. Br. 17–19. These post-hoc rationalizations are erroneous. The United States posits that basing Royalty *Value* on unregulated prices would impermissibly increase the lessee's Royalty *Rate*. U.S. Br. 18. But Royalty Value and Royalty Rate are two separate elements of the formula for calculating the lessee's royalty liability. Determining Royalty Value under 25 C.F.R. § 183.11(a)(2) does not change the Royalty Rate that is specified in the lease and that is used in the royalty-calculation formula. The United States has stipulated that "Royalty Rate is a fraction (often 1/8 or 1/6) and is usually expressed as a percentage. Royalty Value is expressed in United States dollars and cents per barrel." Stip. ¶ 8. To the same effect, this Court has held in analogous circumstances that "the 'rate of royalty' is the numerical percentage of value to which plaintiffs are entitled. This view is confirmed by the text of the leases in which the rate of royalty is separately stated as a percentage. The components of 'value' are separately addressed in both the leases and the applicable regulations." *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 56 Fed. Cl. 639, 651 (2003) (Hewitt, J.) (citations omitted).

The United States also argues that basing Royalty Value on unregulated prices would have conflicted with amendments to the 1906 Act setting minimum leasing requirements. U.S. Br. 18. The United States has presented no analysis or empirical evidence to back up the existence of this claimed conflict. Moreover, as noted in plaintiff's post-trial brief (at 19-20), if such conflicts had arisen, the Osage Agency would have had alternatives for addressing them. For example, it could have supported lessees' requests for exception relief. Here, however, the United States seeks to be relieved of its trust responsibilities by reading into the Osage Regulations, long after the fact, new limitations having no basis in the regulatory language.

In another, brand-new argument, the United States culls the term "gross proceeds" from § 183.11(a)(1), erroneously interprets this term as synonymous with "actual selling price," and then argues that basing royalties on unregulated prices would improperly require payment on more than the "gross proceeds" received by the lessee. U.S. Br. 19. This argument conflicts with the United States' other arguments in its post-trial brief, because prices "available to the lessee" can, by definition, be higher than the consideration actually received. And, as previously discussed, inherent in the "offered price," "posted price," and "simultaneous sales" components of § 183.11(a)(2) is the use of Royalty Values that are higher than the actual selling price. Moreover, § 183.11(a)(1) is captioned "Royalty Rate" and does not address Royalty Value at all. The rule for determining Royalty Value is in § 183.11(a)(2), not (a)(1). Tr. 98:19–99:8 (Reineke); Tr. 1569:7–23 (Martin); *cf*. Tr. 837:22–838:14 (Defendant's Opening Statement).[7]

## V. THE UNITED STATES UNDERCOLLECTED ROYALTIES BY FAILING TO

[7] In its unregulated price claim, plaintiff seeks "the amount owed from lessees based on the precise calculation required under the terms of the lease and relevant federal regulations." *Osage Tribe of Indians v. United States*, 68 Fed. Cl. 322, 334 (2005). As such, the claim comes within the "ambit" of the Appropriations Act. *Id.* The United States' argument that "an accounting is not necessary to show whether there had been a loss due to the application of price controls," U.S. Br. 14 n.13, is a rehash of arguments that this Court has already rejected. *See id*.

**VERIFY ROYALTY VOLUMES AND ROYALTY RATES**

The United States argues that it collected the full royalty due because its collection procedures were adequate. U.S. Br. 19–34. But it cannot account for the royalties it collected and cannot document full compliance with *any* interpretation of the Royalty Value regulation. Tr. 116:22–121:15 (Reineke); JX001, Revard 30(b)(6) Dep. at 27:14–28:1, 68:1–69:10; Tr. 1722:1–15 (Hill); Tr. 199:24–200:15 (Reineke); Tr. 1577:25–1579:21 (Martin); *see also* PX751-0013–24; PX513-0003. In the absence of a proper accounting, *see Osage Tribe of Indians v. United States*, 68 Fed. Cl. 322, 334 (2005), the United States wants to be let off the hook based on a description of its procedures. No such inference is justified.

In fact, because the Osage Agency's procedures relied almost entirely on unaudited and unverified data supplied by the oil companies, undercollection of royalties was built into the system. Martin only re-created the results of this faulty process, making the United States' trial presentation entirely circular: in the absence of any true verification, the United States' evidence proves only that the Osage Agency performed certain procedures, not that the results of those procedures were accurate. Typical of this circular self-congratulation is the United States' boast that "[t]he efficacy of the [Osage Agency's gauging] procedure is demonstrated by the fact that the Agency found few discrepancies." U.S. Br. 22. (By that logic, the less gauging the Agency did, the more efficacious it was.) The Agency's failure to discover discrepancies is explained by the Agency's woeful 1–3% monthly gauging rate, not the supposed efficacy of its procedures. Moreover, despite Barker's statement that oil theft "couldn't happen in Osage County," theft known to the Osage Agency went unpunished. Tr. 334:15-20, 331:8-333:14 (Parris). A U.S. Senate report found that Interior and other agencies "have knowingly allowed . . . widespread oil theft," including more than $10 million in Oklahoma alone. PX450-0105-06. The report specifically cited fraud in Osage County. PX450-0107-08.

The United States also argues, erroneously, that royalty rates were determined correctly because "[a]ll of the production thresholds for the Tranche One leases were reached prior to the Tranche One period." U.S. Br. 22. Several Tranche One leases have varying rates depending on the *formation* of production, and those rates were applicable during Tranche One months. Tr. 92:12–93:24 (Reineke). The United States cannot verify that the correct royalty rates were applied for all volumes because it never questioned what lessees reported. *See* Tr. 1605:12–16 (Martin). Nor did the trustee keep records sufficient to reconstruct any kind of verification. Tr. 199:24–200:15 (Reineke). The only permissible inference in these circumstances is to hold this failure against the trustee.

## VI. JUST AS IT IS LIABLE FOR UNCOLLECTED ROYALTIES OWED BY LESSEES AND PURCHASERS, THE UNITED STATES IS LIABLE FOR UNCOLLECTED LATE FEES OWED BY LESSEES AND PURCHASERS

The United States argues that it should not be held liable for late fees due on uncollected royalties because late fees are payable by the lessees and purchasers. U.S. Br. 34. But royalties, too, are payable by the lessees and purchasers. The United States failed to collect the full royalties due under the leases and regulations, and it is liable for those amounts. Likewise, it failed to collect late fees due under the leases and regulations for those unpaid royalties, and it is liable for those sums too. As with uncollected royalties, the Osage Nation is entitled to sue the trustee directly for uncollected late fees; it need not sue those who did business with the trustee.

The United States argues that requiring it to recompense the Osage Nation for uncollected late fees would "not advance" the regulation's "purpose" of "encourag[ing] timely payment by purchasers or lessees." U.S. Br. 34. This argument is puzzling. It would be strange and regrettable if imposing liability on the trustee for its failure to collect late fees from purchasers and lessees did not cause it to monitor lessees and purchasers more closely to ensure full payment in a timely manner.

## VII. THE UNITED STATES' DEFENSES TO UNDERINVESTMENT ARE BELIED BY THE FACTUAL RECORD

Many of the key disputes with respect to the collection claim arise from the Osage Nation's direct challenges to the United States' view of what was required of it—what it *should have* done. Not so with the underinvestment claim. Here, the Osage Nation and the Government agree generally with respect to what the United States should have done. But the devil is in the details in determining whether the United States achieved that standard of conduct. On the factual question of what rate the United States actually earned on Osage funds, the United States' arguments mask serious flaws in the analysis. Correcting these flaws requires, at a minimum, revising the numbers used in the analysis and (as a result) rejecting a number of faulty conclusions that would improperly exonerate the trustee.

### A. Accepting a Concession, Instead of Presenting Duplicative Evidence on an Uncontested Point, Is Not a Failure to Meet the Burden of Proof

It was uncontested at trial that Lundelius's 80/20 rate was an appropriate standard against which to measure whether the United States satisfied its fiduciary duty of investing trust funds prudently. Tr. 503:7-504:2 (Jay); *accord* U.S. Br. 47–48. The United States erroneously argues, without a shred of legal authority, that the Osage Nation's acceptance of this concession was a failure to meet the burden of proof. *See* U.S. Br. 43. The burden of proof requires an evaluation of the *whole record* to determine whether the plaintiff's claim is meritorious.

> While it is said that the party with the burden of proof has the burden of "going forward with the evidence," this does not mean that a party must satisfy this burden with that evidence which he himself introduces. A party may be relieved of this burden by the fact that the necessary proof was introduced by his adversary. Evidence is no less effective in support of a party's case merely because it came into the case through an adversary rather than through the party.

*Summit Fasteners, Inc. v. Harleysville Nat'l Bank & Trust Co.*, 599 A.2d 203, 208 (Pa. Super. 1991) (citations omitted); *accord* 29 Am. Jur. 2d *Evidence* § 158 (stating that "a party may be

relieved of its burden of production if the necessary proof is introduced by his adversary"); 32A C.J.S. *Evidence* § 1343 (observing that "the weight and sufficiency of one party's evidence may generally be aided by evidence introduced by the adverse party"); *see also* 9A Wright & Miller, Federal Practice & Procedure § 2529 (on motion for judgment as a matter of law, the court must consider "all of the evidence *favorable to the position of* the party opposing the motion") (emphasis added).

In any event, Lundelius's expected rate and his view that this was the rate a prudent trustee could have earned were introduced into evidence during Jay's testimony (Tr. 502:22–503:24) and in Jay's report (PX750-0046–47), both of which were sponsored by the plaintiff.

**B. The United States' Failure to Earn the Rate of Return a Prudent Investor Would Have Received Shows That It Mismanaged Osage Trust Funds**

The United States agrees that a prudent investor standard is the appropriate measure for evaluating whether it met its statutory trust duty to invest Osage funds. U.S. Br. 42 & n.40. It also agrees that the duty to invest prudently includes a duty of skill measured by "evaluat[ing] returns realized on Tranche One funds against *an expected rate that a prudent investor could have achieved*." U.S. Br. 47 (emphasis added). This achievable rate "reflect[s] the rates of return on investments *available to the Osage funds*." U.S. Br. 47–48 (emphasis added).

Failure to achieve such a rate—a rate "a prudent investor could have achieved" on "available" investments—is especially probative in this case given that the prudent investments were specified by statute and were risk-free. An expected rate consisting of CDs and T-bills is a *very* low threshold of prudence. The United States' failure to meet this threshold (for one Tranche One month according to Lundelius, and for three Tranche One months according to Jay) shows beyond doubt that it was not managing cash properly. Large amounts of cash could have been put in T-bills at higher rates. *See, e.g.*, JX035-0039–60 (cash balances as high as

$2,531,196.92 for June to Sept. 1979, *see* 8/24/1979); JX048-0015–42 (cash balances as high as $18,269,986.53 for Dec. 1980 to Mar. 1981, *see* 12/11/1980).

The cases cited by the United States, *see* U.S. Br. 43, are inapposite because they involve claims that the trustee imprudently chose risky investments that lost value. This case does not involve any hindsighted second-guessing of the trustee's assessment of investment risk.

### C. Lundelius's Conclusion That the United States Satisfied Its Duty of Skill Is Undermined by the Ledgers of Account 7386 and by His Own Contradictory Testimony

At the crux of the United States' defense of its management of the royalties it collected is its claim that "[a]s soon as possible after receipt of payment, the [BIA's] Branch of Investments sought to place Osage royalty payments in longer-term investments." U.S. Br. 45. According to Lundelius, whenever the balance of account 7386 exceeded $25,000, the United States was supposed to invest the excess in T-bills, pending purchase of a CD earning a higher rate. Tr. 2098:11–2099:5; 2099:14–21; 2113:22–25. Yet the United States does not dispute that uninvested funds in the millions of dollars languished in the cash account over long periods.

In an attempt to gloss over this breach, Lundelius insisted at trial that in his assessment of prudence he had indeed analyzed these uninvested cash-account balances exceeding $25,000. He claimed that "the cash balances are taken into account in the expected rate, and the expected rate is the benchmark that we're using to determine the duty of skill. So that's where the cash balances are taken into account." Tr. 2292:10–14. This response, like Lundelius's report, addressed only the liquidity assumptions for the *expected rate* (the 20% in T-bills), *not* the *actual* cash balances over $25,000. Lundelius never analyzed in his report whether any specific actual cash balances were prudent. According to the United States' own standards, they were *not* prudent to the extent they exceeded $25,000. Indeed, Lundelius's report is devoid of any analysis or even acknowledgment of the specific cash balances during Tranche One months. At

trial, for the first time he claimed that a $1.4 million balance on December 19, 1980, was prudent because it was within the 20% for *T-bills* in his expected rate. Tr. 2278:20–25. But this cash balance was, by definition, not invested in any T-bills. Lundelius tried to reconcile the contradiction by saying that idle cash can only be invested in a T-bill "on occasion." Tr. 2281:14. This contradicts his earlier description of the duty to invest any money in the 7386 account exceeding $25,000. *See* 2098:11–2099:5; 2099:14–21; 2113:22–25.

As the United States admits, T-bills "could be requested by telephone." U.S. Br. 45–46 (citing Tr. 2100:12–21 (Lundelius); DX 1668-134). All BIA had to do was know how much was in its account and pick up the phone to its sister agency. But BIA failed to monitor the amount of money available for investment. Tr. 375:17–376:23 (Parris); PX277-005. And for royalties from two of the Tranche One months this meant drastic losses of interest income, because the gap between the 4% statutory rate and available T-bill rates was large—5.52% for May 1979 and 10.67% for November 1980.

Even though Tranche One royalties were paid into account 7386 just the same as all other Osage receipts, Lundelius adopted assumptions that artificially insulate Tranche One funds from the ongoing cash management problems in account 7386. He *assumed* as a *starting point* for his methodology that all expenses came out of the cash account and that not a single dollar of Tranche One royalties was left in the account (earning only the statutory rate) for more than a few days. Thus, Lundelius admitted that, under his tracing, none of the Tranche One collections bore any expenses, and that if he had allocated a pro rata share of expenses to such funds, "we would have had to have adjusted our rates-of-return calculations." Tr. 2290:18–19. Lundelius offered the conjecture that this "probably wouldn't change the analysis in the end anyway." Tr. 2291:4–6. But the Osage Nation's post-trial brief showed that this conjecture is wrong, and that

Lundelius's expected rate, by using only T-bills (not funds in the cash account) as prudent liquidity, implicitly acknowledges this critical error. Plaintiff's post-trial brief at 36-38. When corrected, Lundelius's analysis shows breach in the same three months as Jay's analysis. *Id.*

## VIII. THE UNITED STATES' EXPERTS ASSUME AWAY THE AGENCY'S DELAYS IN EARNING INTEREST

The United States claims that it "acted reasonably" by following its own manuals with respect to deposit procedures. U.S. Br. 35. But compliance with manuals (which are not regulations, *see* Tr. 2412:7–10 (Currey)) does not necessarily satisfy fiduciary duties. Rather, under the 1906 Act, the law of trusts provides the correct legal standard. The duty of prudence required the United States to design a system that ensured that royalty revenues were deposited and began earning interest promptly. That meant designating a depository in Pawhuska. The United States offers no excuse for failing to do so before 1990. *See* Tr. 1728:15–25 (Hill). Chavarria assumed this problem away entirely: he built in a three-day lag-time "grace period" because of Pawhuska's lack of a depository. DX2676-0005 ¶ 11; Tr. 1854:10–18.

In calculating the actual lag time of Tranche One payments, Chavarria similarly favored the trustee in his assumptions. The absence of several mailroom bills of collection meant that he had no documentation of when the Osage Agency first received payment, and thus no way to verify exactly how long it took for a particular check to get from the mailroom at the Osage Agency to the deposit clerk who sent the check to Muskogee. Tr. 1745:3–14 (Hill) (showing that Koch royalty check cannot be traced). Parris testified that the interval between preparation of the mailroom bill of collection and the mailing of the checks to Muskogee was "two or three days minimum." Tr. 350:5–351:18; *compare* Tr. 1708:23–1709:2 (Hill) ("We *could* do it within one business day, *often* the same day") (emphasis added). After acknowledging that he had ignored this problem in his report, Chavarria at trial adopted an assumption that in every case this process

took only one day—an assumption geared toward keeping deposit lags within his three-day "grace period." Tr. 1844:14–1845:1. Such an indulgent and expedient assumption is unwarranted in the face of Mr. Parris's testimony and the serious deposit lag problems during Tranche One evidenced in the Andersen report. *See* Tr. 350:2–351:18 (Parris) (checks took four to five days to deposit); Tr. 486:3–487:5 (Jay); PX476-0056–58.

Moreover, the United States cannot account for when collected funds for Tranche One began earning interest. Tr. 2041:6–2042:21 (Chavarria). Yet Lundelius and Chavarria assumed that funds began earning interest on the posting date. This is yet another impermissible assumption favoring the trustee.

## CONCLUSION

The United States has breached its trust duties, and the Osage Nation is entitled to an award of damages for Tranche One of no less than $2,044,754.73.

May 18, 2006

Respectfully submitted,

*s/Wilson K. Pipestem*

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation