**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 99-550 L (into which has been consolidated No. 00-169 L) Judge Emily C. Hewitt |
| | ) | Filed Electronically November 17, 2006 |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**[CORRECTED]**
**PLAINTIFF OSAGE NATION'S BRIEF**
**IN SUPPORT OF PROPOSED CALCULATION OF TRANCHE ONE DAMAGES, APPROPRIATE RATE OF INTEREST TO APPLY IN DETERMINING THE CURRENT VALUE OF THOSE DAMAGES, AND ENTITLEMENT TO LATE FEES**

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for plaintiff
Osage Nation

# TABLE OF CONTENTS

I. CALCULATION OF ROYALTY-UNDERCOLLECTION DAMAGES ....2

A. Plaintiff's Proposed Damage Calculations ....2

B. Responses to the United States' Objections to Plaintiff's Royalty-Underpayment Calculations ....5

1. Challenges to the Royalty Value for February 1986 ....6

a. Challenge to the Applicability of the February 1986 Sun Oil Price to Other Tranche One Leases ....6

b. Challenge to the Accuracy of the February 1986 Sun Oil Price ....8

2. The United States' Failure to Incorporate Offered Price Data into Its Damage Calculations ....9

a. Challenges to the MMS Data ....10

b. Challenge to the July 1989 Total Petroleum Price ....11

II. CALCULATION OF TRANCHE ONE DAMAGES BASED ON THE COURT'S CASH BALANCE AND INVESTMENT UNDERPERFORMANCE RULINGS ....11

A. Sources of Information ....11

B. Process Overview ....12

C. Process Detail with Explanations (Tracking the Spreadsheet "T1 Month Underperformance," Attached as Exhibit 5) ....12

1. Actual Credits: Using the Arthur Andersen statements of account, determine how much interest the Government actually credited to the trust accounts during the fiscal year on an average monthly basis ....12

2. Expected Earnings: Applying the Court's ruling, determine how much interest should have been earned during the fiscal year on an average monthly basis. ....13

a. Calculate Expected Return for Balances Above $25,000 ....13

b. Add in the Expected Return for the $25,000 Allowed to Be Left in Uninvested Cash ....16

3. Difference: If the average monthly actual interest earnings are less than the expected interest earnings for the Tranche One month, count the difference as damages. ....17

4. Damages Through 2006 ....18

D. Objections to Defendant's Position ....18

1. Impermissible Subtractions from the Amount Available for Investment....18

2. Use of Discount Rates Instead of Investment-Basis Rates....19

3. Unsupported Statutory Interest Credit in FY 1976....20

4. Revised Accounting for Money Allegedly Making Up for Deficiencies in Previous Years' Overnight Interest....21

III. CALCULATION OF DEPOSIT-LAG DAMAGES....21

A. Sources of Information and General Approach....21

B. Deposit Lag Due to Lack of a Depositary in Pawhuska (Exhibit 7)....23

1. Estimated Lag Days....23

2. Dollar Amounts Subject to Mailing Lag....23

3. Applying the Expected Rate....25

C. Further Deposit Lag Documented in Andersen Report (Exhibit 9)....25

D. Current Value of Damage Amounts....27

E. Objections to Defendant's Position....27

1. Tracing....27

2. EFTs....27

IV. THE OSAGE NATION IS ENTITLED TO AN AWARD OF INTEREST AS PART OF ITS DAMAGES, MEASURED BY APPROPRIATE LONG-TERM INVESTMENTS FOR THE 17- TO 30-YEAR PERIODS AT ISSUE HERE....28

A. Damages Are Measured by the United States' Fiduciary Duty to Invest Osage Trust Funds Whether or Not the Funds Have Been Collected....28

B. The Prudent Investor Standard Must Be Applied Consistent with the Length of Time That Uncollected Funds Have Been Held in Trust in This Case, from 17 to 30 Years....32

C. The Government's Unfulfilled Disbursement Obligations Are No Refuge from Liability for Breach of Its § 162a Investment Duties....33

D. The Government Was Required to Earn Compound Interest by Reinvesting Interest Income....37

E. Explanation of Current Value Methodology (Exhibits 11 and 12)....38

V. THE OSAGE NATION IS ENTITLED TO LATE FEES IN ADDITION TO INTEREST, BUT NOT PENALTIES....38

A. BIA Regulations Subject Royalty Payors to Late Fees, but Not Penalties, on the Amount of Any Underpayment....38

B. The United States Has a Trust Duty to Collect Late Fees....................................40
C. Late Fees Do Not Overlap with Lost Investment Interest ....................................40
CONCLUSION.......................................................................................................................**41**

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Chicasaw Nation v. United States*, 534 U.S. 84 (2001) ....................37

*Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States*, 69 Fed. Cl. 639 (2006) ....................32, 33

*Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States*, 2006 WL 2831042 (Sept. 27, 2006) ....................36

*Confederated Tribes of the Warm Springs Reservation v. United States*, 248 F.3d 1365 (Fed. Cir. 2001) ....................7, 10, 33, 38

*McMahon v. McDowell*, 794 F.2d 100 (3d Cir. 1986) ....................40

*Minnesota Chippewa Tribe v. United States*, 11 Cl. Ct. 221 (1986) ....................35

*In re Morgan*, 106 B.R. 573 (Bankr. E.D. Ark. 1989) ....................7

*Pawnee v. United States*, 830 F.2d. 1987 (Fed. Cir. 1987) ....................32

*Peoria Tribe of Indians*, 390 U.S. 468 (1968) ....................28, 31, 34, 37

*Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339 (Fed. Cir. 2004) .................... *passim*

*The Osage Tribe of Indians v. United States*, 68 Fed. Cl. 322 (2005) ....................29

*The Osage Tribe of Indians v. United States*, 72 Fed. Cl. 629 (2006) .................... *passim*

*United States v. Blackfeather*, 155 U.S. 180 (1894) ....................31, 37

*United States v. Mitchell*, 463 U.S. 206 (1983) ....................32

*White Mountain Apache Tribe of Arizona v. United States*, 20 Cl. Ct. 371 (Cl. Ct. 1990) ....................31

## STATUTES AND REGULATIONS

25 U.S.C. § 161a ........................................ 30, 32, 36

25 U.S.C. § 162a ........................................ *passim*

25 U.S.C. § 613 ........................................ 35

28 U.S.C. § 2516(a) ........................................ 31

Act of June 28, 1906, ch. 3572, 34 Stat. 539 ........................................ 29, 30, 34, 37

25 C.F.R. § 183.11(a) ........................................ 39

25 C.F.R. § 183.11(c) ........................................ 39

25 C.F.R. § 183.13(a) ........................................ 38, 39, 40

25 C.F.R. § 183.13(c) ........................................ 39

25 C.F.R. § 183.42 ........................................ 39

25 C.F.R. § 183.43 ........................................ 39

25 C.F.R. § 226.11(2) ........................................ 2

## MISCELLANEOUS AUTHORITIES

4 A. Scott, *Law of Trusts* § 282.1 (3d ed. 1967) ........................................ 40

4 A. Scott, *Law of Trusts* § 177 (4th ed. 1987) ........................................ 40

In its Opinion of September 21, 2006, the Court ruled that the Osage Tribe is entitled to compensation for specified breaches of the United States' fiduciary duties as trustee of the Osage Mineral Estate. *Osage Tribe of Indians v. United States*, 72 Fed. Cl. 629 (2006). The Court directed the parties to prepare a joint submission addressing the calculation of the Tranche One damages to which plaintiff is entitled under the principles established by the Court's Opinion. In response to that directive, the parties are jointly filing a pleading that describes the damage calculation items on which they have been able to agree. Joint Submission on Calculation of Tranche One Damages (filed Nov. 16, 2006).

Because the Court anticipated that there may be aspects of the damage calculations on which the parties are unable to agree, it instructed the parties to present their respective proposed calculations in the disputed areas with "specific and complete statements explaining their respective positions and the bases therefor." *Osage Tribe*, 72 Fed. Cl. at 671. The Court also instructed the parties to "brief the basis for the appropriate rate or rates to apply in determining the current value of the damages for which defendant has been found liable." *Id.* Plaintiff files this brief in response to those instructions.

In Part I, plaintiff explains its damage calculations for royalty underpayments and responds to the positions that it understands the United States intends to take. In Parts II and III, plaintiff similarly addresses the calculation of damages for underinvestment and investment underperformance and for deposit lag. In Part IV, plaintiff briefs the appropriate methodology for determining current value. In Part V, plaintiff explains why it is also entitled to late fees.

# I. CALCULATION OF ROYALTY-UNDERCOLLECTION DAMAGES

## A. Plaintiff's Proposed Damage Calculations

The Court's Opinion contains four rulings that define the measure of damages for the United States' failure to collect the full amount of oil royalties due under the Tranche One leases in the Tranche One months:

- The United States breached its trust duties to the Osage Nation by failing to calculate oil royalties based on the highest offered price of a major purchaser in the Kansas-Oklahoma area. *Osage Tribe,* 72 Fed. Cl. at 649.

- During the first three Tranche One months, the United States incorrectly determined royalty value by reference to federal price controls rather than the applicable Osage regulation, 25 C.F.R. § 226.11(2), which looked to the "actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area." *Id.* at 658-61.

- Plaintiff failed to "demonstrate that the procedures used by the Osage Agency to determine the identity of major purchasers were not reasonably calculated to comply with the 1974 regulations." *Id.* at 653.

- The United States "did not breach its trust duty to collect royalties under the leases by allowing price adjustments to reflect degrees of gravity." *Id.* at 650.

At trial, plaintiff's expert, Dan Reineke, presented royalty calculations that conformed to three of those four rulings. First, he calculated the minimum amount of royalty due based on available records of the highest offered prices of major purchasers in the Kansas-Oklahoma area. Second, for the first three Tranche One months, he based royalty value on available records of the highest unregulated posted or offered prices of major purchasers in the Kansas-Oklahoma area, not on the federal price ceilings that were applicable to crude oil at that time. Tr. 238:2-239:24 (Reineke); PX751-0031, 0645-648. Third, in determining royalty value for the last two Tranche One months (February 1986 and July 1989), Mr. Reineke relied on the Osage Agency's contemporaneous listings of major purchasers. For the other Tranche One months (January 1976, May 1979, and November 1980), there were no such listings, thus necessitating Mr.

Reineke's use of an alternative methodology that relied on the average of posted prices to determine royalty value. The United States' oil valuation expert, Mr. Ronnie Martin, agreed with that alternative methodology. *Compare* PX751-0028 *to* DX2675-0019.

At trial, the United States presented no evidence of highest offered or unregulated prices. Thus, Mr. Reineke's analysis, which showed a Tranche One shortfall in royalty collections of $245,529.75 (PX751-0645), is uncontested in those respects. Mr. Reineke's analysis, however, did not conform to the Court's fourth ruling, which approved adjusting for gravity in determining royalty value. Tr. 224:7-17 (Reineke); PX751-0030. Since the issuance of the Court's decision, Mr. Reineke and Mr. Martin have agreed that gravity adjustments of $6,637.28 should be deducted from Mr. Reineke's calculations of royalty undercollections, reducing that amount to $238,892.42. A chart summarizing this calculation is attached as Exhibit 1. The current value through December 31, 2006, of those undercollections, determined in accordance with the method described in Part IV below, is $1,731,063.11.

With one exception, the records to which Mr. Reineke had access in preparing his analysis for trial were confined to Osage County and thus did not show the prices of major purchasers throughout the entire Kansas-Oklahoma area. The one exception where Mr. Reineke had price data from outside Osage County involved the July 1989 purchase of oil in Oklahoma by Total Petroleum, a major purchaser, for $20.25 per barrel – a price *higher* than was paid by major purchasers inside Osage County. Tr. at 211:19 – 212:1 (Reineke); PX751-0027. At trial the United States did not challenge the authenticity of that transaction or the accuracy of the reported price.

The Court has endorsed the use of Government records "at this juncture" as proxies for actual pricing data to ensure that the royalties due are "calculated, as nearly as may now

reasonably be determined, in accordance with the requirements of the 1974 Regulations that bonus prices offered by major purchasers throughout the Kansas-Oklahoma area are used in determining royalty value." *Osage Tribe*, 72 Fed. Cl. at 654. In response to that ruling, the United States produced data from the Minerals Management Service (MMS) showing electronically reported royalty transactions on federal lands from the mid-1980s, when electronic reporting of such data began to be common, through December 31, 1990. Those data show approximately 2,500 transactions for each of the last two Tranche One months – February 1986 and July 1989. A copy of the MMS data showing the 200 highest per-barrel sales prices for those two months is attached as Exhibits 2 and 3, respectively.[1]

As in the case of the Total Petroleum price discussed above, the MMS data produced by the United States for July 1989 show higher per-barrel prices paid by major purchasers outside Osage County (but within Oklahoma) than were paid inside Osage County. The highest price paid in that month on any of the Tranche One leases (*i.e.*, inside Osage County) was $19.66 (North Burbank). PX751-646. By contrast, the MMS data show that, outside Osage County (but within Oklahoma), Mobil Oil Corporation, a recognized major purchaser (*see* PX751-0519-24), paid $21.00. Ex. 3 at 1. (Mobil is listed in the MMS records by the name of its successor company, Exxon Mobil Corporation.) The Mobil price is also higher than the $20.25 Total Petroleum price that Mr. Reineke used at trial to calculate royalty undercollections for July 1989.

---

[1] With the limited time available for this filing, the parties were unable to obtain comparable data from other government records (e.g., non-electronic MMS records or information from the Oklahoma Tax Commission) that would cover the earlier Tranche One months. As noted in the Joint Submission on Calculation of Tranche One Damages, the parties have agreed to try to develop a process for compiling a common database of prices needed to determine royalty value under the applicable regulations.

For February 1986, the price of $24.69 paid by Sun Oil on the East Hardy lease appears to be the highest price paid by a major purchaser. The MMS data, however, do show that major purchasers in other parts of Oklahoma paid more than the next highest price on a Tranche One lease ($20.74 on Osage Hominy). For example, Mobil Oil Corporation paid $22.38, Kerr-McGee Refining Corp. paid $22.40, Conoco paid $22.10, and Bigheart Pipeline Co. paid $21.03. Ex. 2. Moreover, according to the MMS data, other large (though not "major") purchasers, such as Marathon Oil and Osage Crude Oil Purchasing, paid *more than* $24.69 elsewhere in Oklahoma, indicating that the price paid by Sun Oil, while perhaps at the high end of the market, was not an anomaly.

Based on the MMS data produced by the United States, plaintiff has amended Mr. Reineke's gravity-adjusted royalty undercollection calculations to reflect the higher Mobil price ($21.00) in July 1989. The resulting Tranche One royalty undercollection figure is $246,309.19. A spreadsheet showing that calculation is attached at Exhibit 4. The current value through December 31, 2006, of those undercollections, determined using the method described in Part IV below, is $1,754,069.94.

### B. Responses to the United States' Objections to Plaintiff's Royalty-Underpayment Calculations

In discussions following the Court's decision, the United States has noted various objections to the Osage Nation's royalty undercollection calculations. The objections generally rely on newly proffered and contested evidence, unsupported conjecture, or inferences, drawn from the absence of records, that are favorable to the United States despite controlling precedent to the contrary.

### 1. Challenges to the Royalty Value for February 1986

The United States presents two alternative arguments in support of its attack on using the Sun Oil price of $24.69 per barrel on the East Hardy Unit for determining royalty value in February 1986 for the Tranche One leases. Neither argument is persuasive.

#### a. Challenge to the Applicability of the February 1986 Sun Oil Price to Other Tranche One Leases

The United States argues that one cannot apply the price offered and paid on the East Hardy Unit to the other Tranche One leases because payment on those leases was on an "equal daily quantity" ("EDQ") basis, while payment on East Hardy was on a "date of delivery" ("DOD") basis. There are two problems with this position. First, the United States can point to nothing – other than Mr. Martin's assumption at trial – that East Hardy was paid on a DOD basis. Tr. 1613:2 – 20 (Martin). But that assumption does not withstand scrutiny. As Mr. Martin testified, payment on a DOD basis means that the oil is paid for and delivered on the same day. Tr. 1613:21 – 1614:3 (Martin). The East Hardy records for January 1976 indicate that 8,181 barrels of oil were sold – all on January 1. It is highly improbable that such a quantity of oil was sold and picked up on New Year's Day. It is more likely that the date of January 1 was used as an accounting convenience to reflect all sales made during that month for that lease. 8,181 barrels would require 39 tanks (each with a capacity of 210 barrels) to store and 44 trucks (each with a capacity of 185 barrels) to remove. *See* Tr. 70:12- 71:4 (Reineke). Mr. Martin testified that he did not know whether there were enough tanks to hold that much oil in January 1976 (or at any other time). Tr. at 1613:16 – 1614:12 (Martin). And it is hardly credible that 44 trucks went to the East Hardy Lease on New Year's Day.

The few extant records for the East Hardy unit in the other Tranche One months also support the conclusion that sales from the East Hardy unit were on an EDQ basis, and further

undermine any conjecture to the contrary. For example, those records report average daily production statistics, which would be consistent with an EDQ transaction, while making ***no*** reference to a specific date of sale or delivery. PX751-0219-0220 (May 1979); -0258 (Nov. 1980); -0299-300 (Feb. 1980); -0257 (July 1989).

Second, even if the East Hardy Lease were DOD, the $24.69 price would serve as an appropriate proxy for major purchaser prices for that month. There is no dispute that Sun Oil was a major purchaser, that the sale occurred in Oklahoma, and that the $24.69 price is from Osage Agency records. In light of the United States' failure to identify offered prices by major purchasers, the East Hardy price by Sun Oil constitutes the highest offered price by a major purchaser in the Kansas-Oklahoma area "as nearly as may now reasonably may be determined, in accordance with the requirements of the 1974 Regulations." *Osage Tribe*, 72 Fed. Cl. at 654.

As the Court noted, when proper trust records are missing, "all doubts will be resolved against [the trustee] and not in [its] favor." *Id.* at 670-71 (quoting *Confederated Tribes of the Warm Springs Reservation v. United States*, 248 F.3d 1365, 1373 (Fed. Cir. 2001) (citing *Scott on Trusts* § 172)); *see also In re Morgan*, 106 B.R. 573, 582 (Bankr. E.D. Ark. 1989) (a trustee "obviously [] cannot be permitted to gain any possible advantage" from his failure to keep proper records). Thus, the Court should not adopt the Government's effort to disqualify the Sun Oil price.[2]

[2] As noted earlier, the MMS data produced by the United States shows that major purchaser Kerr McGee paid $22.40 per barrel. If that value is used as the highest offered price for February 1986 instead of the $24.69 Sun Oil price, the amount of royalty the United States failed to collect for the Tranche One leases in the Tranche One months is $208,291.45.

**b. Challenge to the Accuracy of the February 1986 Sun Oil Price**

In the alternative, the United States argues that Sun Oil's $24.69 price for East Hardy in February 1986 is inaccurate because the royalty rate that both parties used at trial to determine the per-barrel price of the oil was erroneous.[3] By way of background, the East Hardy lease provides that the royalty rate is either 12.5% or 16.67%, depending on the formation or method of extraction used. PX751-0133-0135. Thus, in any given month, royalty on some oil from the East Hardy Unit could be calculated using the 12.5% royalty rate while royalty on other oil from that Unit could be calculated using the 16.67% royalty rate. *See* Tr. 92:12 – 94:19 (Reineke). At trial, both Mr. Reineke and Mr. Martin agreed that, for the Tranche One month of February 1986, the royalty rate for the portion of the East Hardy lease that produced the higher volume of oil was 12.5%. PX751-0646; DX2675-0100. Accordingly, both Mr. Reineke and Mr. Martin agreed, based on calculations that relied on the 12.5% royalty rate, that the price paid by Sun Oil on the East Hardy Lease in February 1986 was $24.69 per barrel. *Id.* Because Sun Oil (DX2675-0650) was a major purchaser in February 1986 (*id.* at 0044), and because the price that it paid exceeded the royalty value that the Osage Agency used to calculate the royalty due on the other Tranche One leases in that month, Mr. Reineke used the $24.69 value as the highest offered price by a major purchaser for all Tranche One Leases in February 1986. PX751-0645.

---

[3] The parties also disagree on the royalty rate to be applied to the East Hardy unit in May 1979. As explained at trial, there are no records that indicate what the correct royalty rate was in that month. Tr. 130:4—131:16 (Reineke). Accordingly, Mr. Reineke made one assumption and Mr. Martin made a different assumption as to the correct royalty rate. Because Mr. Reineke's assumption leads to a more consistent royalty rate for the higher volume producing portion of the East Hardy unit over several relatively closely spaced Tranche One months, the Osage Nation submits it is the more reasonable assumption. The United States has not pointed to anything suggesting that Mr. Reineke's assumption is invalid.

The United States now reverses position and attempts to raise new factual arguments to contest the validity of the price to which both parties' experts agreed at trial. The United States now argues that this agreed-upon price must be too high because the royalty rate it accepted as correct at trial was in fact too low. In making this argument, the United States relies entirely on documents not produced during discovery and not introduced at trial. Moreover, the late-proffered evidence is itself inconclusive on its face. None of the documents indicate that the royalty rate for the East Hardy Unit in *February* 1986 should have been 16.67%. The Hurlburt Memorandum is dated in *April* 1986, and does not indicate that there had been an error in February 1986. The memo concludes only that it cannot be determined whether any oil was reported at an erroneous royalty rate. If, as the United States now suggests, it knew in April 1986 that the February 1986 sale was misreported at the 12.5% rate, it should have recouped an underpayment. Yet the memorandum itself indicates that the agency intended to take no remedial action. Thus, the United States' attempt to revisit this issue should be rejected.

**2. The United States' Failure to Incorporate Offered Price Data into Its Damage Calculations**

As noted above, the Court affirmed that the royalty due the Osage Nation must be "calculated, as nearly as may now reasonably be determined, in accordance with the requirements of the 1974 Regulations that bonus prices offered by major purchasers throughout the Kansas-Oklahoma area be used in determining royalty value." *Osage Tribe*, 72 Fed. Cl. at 654. The Court also noted that "government records appear [] to be a satisfactory proxy [for actual sales and offered price data for sales outside Osage County]." *Id.* In response to these holdings, the United States produced MMS records of certain Oklahoma oil sales that it had not previously produced to the Osage Nation. As noted above, the Osage Nation has used prices paid by major purchasers contained in these records to determine royalty value for July 1989.

Rather than apply the MMS data in a straightforward fashion, the United States has come up with a litany of reasons why prices paid by major purchasers should be ignored. The United States also for the first time is opposing Mr. Reineke's use of a Total Petroleum price for July 1989. Moreover, the United States' calculations for February 1986 and July 1989 rely solely on *actual* and *posted* prices within Osage County, and make no use of higher offered prices by major purchasers in the Kansas-Oklahoma area. Thus the United States' damages calculations effectively replicate the Osage Agency's failure to comply with the 1974 regulations.

In short, in a transparent attempt to recreate the posted price-only regime the Court rejected, the United States has come up with a list of technical-sounding, unsubstantiated reasons to *ignore* relevant data. These exclusions fail to withstand scrutiny.

**a. Challenges to the MMS Data**

The United States agrees that MMS data should be used to calculate damages, yet it unjustifiably disregards a number of MMS prices paid by major purchasers. The United States ignores some such prices because it deems the purchase volumes too small to be relevant—yet the Osage Regulations compel the use of the highest price paid by a major purchaser regardless of the volume of the particular sale that generated that price. The United States also ignores certain prices by opining that a sale "appears to be a DOD" sale, or that a price must have been the result of an "incorrect royalty rate." But the United States offers no evidence (even if proffering such evidence were proper post-trial) to support such assertions. Certainly nothing on the face of the MMS data even suggests such a possibility. Moreover, under the circumstances of this case, inferences must be drawn *in favor* of the Osage Nation, not against it. Under no conception of *Warm Springs* can the United States offer unsupported conjecture to attack the plain meaning of its own records, particularly where, as here, those records must serve as a proxy for data the United States improperly failed to collect in the first place.

#### b. Challenge to the July 1989 Total Petroleum Price

Although the United States did not dispute at trial the $20.25 Total Petroleum price that Mr. Reineke used for the royalty value for July 1989, it now improperly challenges that value many months after the trial ended. Even if the Court were inclined to reopen the record to consider this argument, the Total Petroleum value is moot. As noted above, the MMS records produced by the United States show offered prices by major purchasers even higher than $20.25.

In any event, the United States' argument that the Total Petroleum price is a DOD price that cannot be used to set royalty value for the entire month is unpersuasive. The document evidencing that transaction indicates that the $20.25 price was paid for all sales of oil from Ramee 1-10 during the month of July 1989; there is no reference to a specific date of sale or delivery. PX751-0468. Moreover, for the reasons discussed above, even a DOD price is at least a valid proxy for major-purchaser offered prices.

## II. CALCULATION OF TRANCHE ONE DAMAGES BASED ON THE COURT'S CASH BALANCE AND INVESTMENT UNDERPERFORMANCE RULINGS

### A. Sources of Information

Most of the information used to calculate investment damages came from the "Statement of Account" summaries prepared by Arthur Andersen for the fiscal years containing the Tranche One months for Accounts 7386 (JX028, JX035, JX048, JX053, JX064) and 7886 (Appendices A, B, and C to the Parties' Joint Submission on Calculation of Tranche One Damages[4]). For calculating expected rates, *i.e.*, "the expected return of 'a combination of contemporaneous 3-month CD rates (80%) and 3-month T-bill rates (20%),'" plaintiff used information from the Federal Reserve Statistical Release.

---

[4] Account 7886 ceased to exist after FY 1984.

### B. Process Overview

The basic process that plaintiff used to compute damages for underinvestment and investment underperformance has three parts:

1. Actual Credits: calculate the estimated amount actually credited to the trust on an average monthly basis;

2. Expected Earnings: calculate the amount that should have been earned for the Tranche One month; and

3. Difference: calculate the difference between the Actual Credits and Expected Earnings to determine damages.

### C. Process Detail with Explanations (Tracking the Spreadsheet "T1 Month Underperformance," Attached as Exhibit 5)

**1. Actual Credits: Using the Arthur Andersen statements of account, determine how much interest the Government actually credited to the trust accounts during the fiscal year on an average monthly basis.**

The first page of each Statement of Account shows the amounts of interest paid to the account during the fiscal year. Interest is listed under the heading "RECEIPTS" in three components: "TREASURY INTEREST" (or "OVERNIGHTER INTEREST"); INTEREST ON CDs"; and "INTEREST ON GOVERNMENT SECURITIES." For each fiscal year, plaintiff added together these three amounts on the Statement of Account for 7386; and in the years 7886 existed, plaintiff also added these same three amounts for that account.

This summing of interest credits appears on Exhibit 5 in columns **[C]** through **[I].**

| | C | D | E | F |
|---|---|---|---|---|
| 1 | 7386 "Treasury Interest" or "Interest on Overnighter" | 7886 "Treasury Interest" or "Interest on Overnighter" | 7386 "Interest on CDs" | 7886 "Interest on CDs" |
| 2 | $ - | $ - | $ 272,166.73 | $ - |
| 3 | $ - | $ 5,241.25 | $ 725,565.23 | $ - |
| 4 | $ - | $ - | $ 2,904,122.15 | $ - |
| 5 | $ 57,297.81 | N/A | $ 505,819.84 | N/A |
| 6 | $ 181,579.00 | N/A | $ 299,427.28 | N/A |

| | G | H | I |
|---|---|---|---|
| 1 | **7386 "Interest on Government Securities"** | **7886 "Interest on Government Securities"** | **Total Annual Interest** |
| 2 | $ 9,663.04 | $ - | $ 281,829.77 |
| 3 | $ 66,224.58 | $ - | $ 797,031.06 |
| 4 | $ 310,354.82 | $ - | $ 3,214,476.97 |
| 5 | $ 23,739.11 | N/A | $ 586,856.76 |
| 6 | $ 22,958.66 | N/A | $ 503,964.94 |

The annual amount of interest is divided by 12 to obtain the estimated interest credited for the Tranche One month (column **[J]**).

| | I | J |
|---|---|---|
| 1 | **Total Annual Interest** | **Average Monthly Interest (Actual)** |
| 2 | $ 281,829.77 | **$ 23,485.81** |
| 3 | $ 797,031.06 | **$ 66,419.26** |
| 4 | $ 3,214,476.97 | **$ 267,873.08** |
| 5 | $ 586,856.76 | **$ 48,904.73** |
| 6 | $ 503,964.94 | **$ 41,997.08** |

**2. <u>Expected Earnings</u>: Applying the Court's ruling, determine how much interest should have been earned during the fiscal year on an average monthly basis.**

Plaintiff calculated expected earnings for the Tranche One month by first calculating the expected earnings on invested funds (all but the $25,000 permitted to be left in cash) and then adding to that the expected earnings for the $25,000 left in cash.

**a. Calculate Expected Return for Balances Above $25,000**

**(1) Calculate balance available for investment**

Plaintiff began by summing the agreed-upon average daily balances for Accounts 7386 and 7886.

| | K | L | M |
|---|---|---|---|
| 1 | **7386 Average Daily Balance** | **7886 Average Daily Balance** | **Total Average Daily Balance** |
| 2 | $ 6,185,287.81 | $ 6,853.67 | $ 6,192,141.48 |
| 3 | $ 8,327,523.05 | $ 7,176.93 | $ 8,334,699.98 |
| 4 | $ 23,250,215.10 | $ (4,448.75) | $ 23,245,766.35 |
| 5 | $ 7,574,986.90 | N/A | $ 7,574,986.90 |
| 6 | $ 4,257,500.19 | N/A | $ 4,257,500.19 |

Then, from the average daily balance for the trust as a whole, plaintiff subtracted $25,000 to calculate the average daily balance available for investment.

| | M | N |
|---|---|---|
| 1 | **Total Average Daily Balance** | **Average Daily Expected Invested Balance** |
| 2 | $ 6,192,141.48 | $ 6,167,141.48 |
| 3 | $ 8,334,699.98 | $ 8,309,699.98 |
| 4 | $ 23,245,766.35 | $ 23,220,766.35 |
| 5 | $ 7,574,986.90 | $ 7,549,986.90 |
| 6 | $ 4,257,500.19 | $ 4,232,500.19 |

Plaintiff then multiplied the amount available for investment by the appropriate monthly expected rate, "a combination of contemporaneous 3-month CD rates (80%) and 3-month T-bill rates (20%)." *Osage Tribe,* 72 Fed. Cl. at 671. The next section explains how this rate was calculated.

**(2) Calculate expected rate for invested funds**

As noted above, plaintiff used the Federal Reserve Statistical Release, available at http://www.federalreserve.gov/releases/H15/data.htm, to obtain contemporaneous three-month CD rates and three-month T-bill rates on a month-by-month basis. Plaintiff listed the monthly average interest rate for three-month CDs for each Tranche One month in Column **[K]**. Plaintiff

took these numbers from http://www.federalreserve.gov/releases/H15/data/Monthly/H15_CD_M3.txt.

To conform available data from the Federal Reserve to the scope of the trustee's duty here, the T-bills rates required an extra step in the first three Tranche One months. T-bill rates on an "investment basis" are not available in the Statistical Release for years before 1982; such rates are nevertheless available in the Statistical Release on a "discount basis" in an alternative chart. *See* http://www.federalreserve.gov/releases/H15/data/Monthly/H15_TB_M3.txt. The difference between discount rates and investment rates is significant, so plaintiff converted discount rates to investment rates for these three months using a formula agreed upon by the parties. Unlike investment rates, discount rates do not accurately reflect the investment return on the amount of principal invested, and should not be used in calculating investment yield. As the Federal Reserve explains:

> T-bills are purchased by investors at a weekly auction at less than face value and are redeemed at maturity at face value. The difference between the purchase price and the face value of the T-bill is the investor's return.
>
> The investor's return is used in mathematical formulas to determine the yield on T-bills. One formula, the discount yield method, takes into account the return as a percent of the face value of a T-bill, rather than its purchase price. *Since the purchase price is typically less than face value, the discount method tends to understate the yield.* An alternative formula, called the investment yield method, also can be used to calculate the yield. *Unlike the discount yield formula, the investment yield method relates the investor's return to the purchase price of the bill.*

Federal Reserve Bank of New York, "Estimating Yields on Treasury Securities," available at http://www.ny.frb.org/aboutthefed/fedpoint/fed28.html (attached as Exhibit 6) (italics added). The converted rates listed in the first three entries in Column **[Q]** were calculated using the discount rates in Column **[P]** and the conversion formula agreed upon by the parties.

Plaintiff weighted the CD rate at 80% and the three-month T-Bill rate at 20% to obtain the expected rates for the Tranche One months. Columns **[O]** through **[R]** in Exhibit 5 show this calculation:

| | O | P | Q | R |
|---|---|---|---|---|
| 1 | 3-mo. CD rate for T1 month | Discount Basis 3-month T-Bill rate | Investment Basis 3-month T-Bill rate | Expected Rate for T1 mo. |
| 2 | 5.14% | 4.87% | 5.00% | 5.11% |
| 3 | 10.16% | 9.61% | 9.99% | 10.13% |
| 4 | 15.68% | 13.73% | 14.42% | 15.43% |
| 5 | 7.69% | 7.06% | 7.29% | 7.61% |
| 6 | 8.76% | 7.88% | 8.15% | 8.64% |

**(3) Multiply Funds That Should Have Been Invested by Expected Rate and Divide by 12**

The expected rate in Column **[R]** is stated on an annual basis. Dividing this rate by 12 and then multiplying by the amount available for investment in column **[N]** produces the average monthly expected yield on funds available for investment (column **[S]**):

| | N |
|---|---|
| 1 | Average Daily Expected Invested Balance |
| 2 | $ 6,167,141.48 |
| 3 | $ 8,309,699.98 |
| 4 | $ 23,220,766.35 |
| 5 | $ 7,549,986.90 |
| 6 | $ 4,232,500.19 |

| | R | S |
|---|---|---|
| 1 | Expected Rate for T1 mo. | T1 month expected yield on invested funds |
| 2 | 5.11% | **$ 26,271.18** |
| 3 | 10.13% | **$ 70,114.55** |
| 4 | 15.43% | **$ 298,546.31** |
| 5 | 7.61% | **$ 47,877.13** |
| 6 | 8.64% | **$ 30,468.23** |

**b. Add in the Expected Return for the $25,000 Allowed to Be Left in Uninvested Cash**

To calculate the expected return on $25,000 for 1976, 1979, and 1981, plaintiff used 4% as the expected rate. For years 1986 and 1989, plaintiff used the overnighter rate for the Tranche One month, which was provided by the United States. Plaintiff multiplied the expected rate by

$25,000 and divided by 12 to get the average monthly expected return for such funds (column **[V])**:

| | T | | U | V | |
|---|---|---|---|---|---|
| 1 | Allowable Uninvested Funds | | Interest Rate on Uninvested Funds | T1 month expected yield on uninvested funds | |
| 2 | $ | 25,000.00 | 4.00% | **$** | **83.33** |
| 3 | $ | 25,000.00 | 4.00% | **$** | **83.33** |
| 4 | $ | 25,000.00 | 4.00% | **$** | **83.33** |
| 5 | $ | 25,000.00 | 7.12% | **$** | **148.33** |
| 6 | $ | 25,000.00 | 9.01% | **$** | **187.71** |

Plaintiff then added the amount in column **[V]** to the expected return on invested funds (column **[S]**). This sum is the total expected return for the Tranche One month (column **[W]**):

| | S | |
|---|---|---|
| 1 | T1 month expected yield on invested funds | |
| 2 | **$** | **26,271.18** |
| 3 | **$** | **70,114.55** |
| 4 | **$** | **298,546.31** |
| 5 | **$** | **47,877.13** |
| 6 | **$** | **30,468.23** |

| | V | | W | |
|---|---|---|---|---|
| 1 | T1 month expected yield on uninvested funds | | 1-month total expected | |
| 2 | **$** | **83.33** | **$** | **26,354.51** |
| 3 | **$** | **83.33** | **$** | **70,197.89** |
| 4 | **$** | **83.33** | **$** | **298,629.64** |
| 5 | **$** | **148.33** | **$** | **48,025.47** |
| 6 | **$** | **187.71** | **$** | **30,655.94** |

**3. <u>Difference</u>: If the average monthly actual interest earnings are less than the expected interest earnings for the Tranche One month, count the difference as damages.**

In every Tranche One month where the United States' actual credits to the Osage Tribe fell short of the expected earnings, the difference is the base amount of damages caused by the United States' failure to (1) invest cash in excess of $25,000 and (2) obtain the expected rate of return on trust funds. Those damages total $37,403.89:

| | J |
|---|---|
| 1 | **Average Monthly Interest (Actual)** |
| 2 | **$ 23,485.81** |
| 3 | **$ 66,419.26** |
| 4 | **$ 267,873.08** |
| 5 | **$ 48,904.73** |
| 6 | **$ 41,997.08** |
| 7 | |
| 8 | |

| | W | X |
|---|---|---|
| 1 | **1-month total expected** | **DAMAGES** |
| 2 | **$ 26,354.51** | $ 2,868.70 |
| 3 | **$ 70,197.89** | $ 3,778.63 |
| 4 | **$ 298,629.64** | $ 30,756.56 |
| 5 | **$ 48,025.47** | $ - |
| 6 | **$ 30,655.94** | $ - |
| 7 | | |
| 8 | | **$ 37,403.89** |

**4. Damages Through 2006**

Adjusted to present value using the method described in Part IV below, this amount of damages is $336,214.94.

**D. Objections to Defendant's Position**

Plaintiff responds below to arguments expected to be raised by the United States[5] with which plaintiff cannot agree.

**1. Impermissible Subtractions from the Amount Available for Investment**

The Court held that "[t]he United States is liable for any failure to achieve the [80/20] expected return . . . on average daily balances in excess of $25,000." *Osage Tribe*, 72 Fed. Cl. at 671. The United States disregards this holding, proposing that it should not be liable for failure to invest all funds "in excess of $25,000." The United States claims that it can adjust the cash balance upward from $25,000 to account for a 1-day "grace period" for investing funds received. This is a different position from that taken by the United States at trial. As the Court noted in its Opinion, "[t]he analysis by defendant's own expert does not require holding any Osage funds in

[5] The arguments addressed here reflect plaintiff's understanding of the United States' position based on discussions between the parties.

cash balances and instead provides for *all* short-term liquidity needs to be covered by investments in T-bills." *Id.* at 666 (citing Lundelius report) (emphasis added here).[6] In other words, at trial the United States agreed that the 20% T-bills in the 80/20 rate already builds in the liquidity that the United States is now claiming needs to be added in—again.

As the Court summarized Mr. Lundelius's analysis at trial, "the combined short-term liquidity needs for disbursements to beneficiaries, gross production taxes and council costs, *and time needed to locate appropriate higher-yielding CDs* 'together . . . indicate investments in Treasuries could be as high as 20%.'" *Id.* (quoting Lundelius Rev. Exp. Rep., DX2695-0013-0014). Moreover, it was undisputed at trial that because Osage funds on deposit were *already* in the Treasury, Treasury bills could be obtained by simply picking up the telephone. Tr. 2100:12-21 (Lundelius); DX1668-134. In essence, the United States' position would waive the $25,000 maximum cash balance requirement and the 80/20 rate requirement for one day for each payment made. The United States' revised post-trial position should be rejected.

**2. Use of Discount Rates Instead of Investment-Basis Rates**

The United States claims that the interest earned by the trust and reflected in the average daily balance should not be counted as having been available for investment. It accomplishes this by using "discount-basis" rates of return instead of investment-basis rates. As noted above, use of discount rates does not comport with the trustee's duty here to earn a return on the funds invested, as opposed to measuring returns against the face value of T-bills.[7]

---

[6] Plaintiff's assent at trial to use of the 80/20 rate as the standard of care was premised on the United States' position at trial. It therefore would be unfair to allow the United States to change that position now.

[7] Even if the face value at maturity were the proper basis for calculation here, the United States uses discount rates for CDs, which unlike T-bills are not issued at a discount from face value.

Moreover, this argument is yet another change in position from the United States' position at trial. It is plain from the face of Mr. Lundelius's report that he used investment-basis numbers to calculate his expected rates. He claimed as the source of his data the same Federal Reserve website plaintiff has cited above; yet that website nowhere contains any quotes of three-month CD rates on a discount basis (which is to be expected since CDs are not typically issued at a discount from face value).[8]

Finally, the United States' attempt to lower the 80/20 rate in these post-trial proceedings conflicts with the Court's holdings and the logic of the Court's approach to calculating damages using average daily balances. The United States was required to reinvest interest income from the day the interest was earned through the last day it remained in the trust. And the Court's directive to use the average *daily* balance to measure amounts available for investment ensures that interest income is weighted in the average daily amount available for investment in *precisely* the same proportion as the number of days the interest income was in fact available for reinvestment. Thus, the average-daily-balance methodology ensures that the United States is required to pay interest on all funds in the account.[9]

### 3. Unsupported Statutory Interest Credit in FY 1976

The United States claims that in FY 1976 two of the entries to account 7886 labeled "other receipt," one positive and the other negative, are attributable to statutory (4%) interest.

---

[8] Back-calculation from the "100% CD" expected rate in Lundelius Exhibit D-6, DX2695-0059, also makes clear that these rates are on an investment basis; Lundelius calculated them by averaging the investment-basis rates from the Federal Reserve website for the months that the Tranche One funds were held by the Treasury.

[9] The United States first apprised plaintiff of its discount-rate argument by telephone on November 15, 2006, and did not provide any written statement of its position, so plaintiff may seek leave of the Court to supplement the response here once it is clear precisely how the United States has implemented this theory.

There is no evidence in the record supporting such a claim. In fact, the first page of the Statement of Account that the United States cites shows that "Treasury Interest" for the year was "$.00." JX028-001. If the United States had evidence that the "Treasury Interest" entry of zero was incorrect and that certain "other receipts" were statutory interest, it should have produced such evidence at trial, where the proponent of such evidence could have been cross-examined. The argument is out of order here and should be rejected.

#### 4. Revised Accounting for Money Allegedly Making Up for Deficiencies in Previous Years' Overnight Interest

The United States claims that certain amounts of interest credited to account 7386 in fiscal years 1986 and 1989 are attributable to previous years and should be reallocated to those years in the calculation of damages. The United States has not identified for plaintiff any record evidence that would support such a reallocation. Moreover, even if credits in later years were made to compensate for a failure to credit interest in previous years, the Osage Nation would be entitled damages for the United States' delay in crediting the funds to the trust.

## III. CALCULATION OF DEPOSIT-LAG DAMAGES

### A. Sources of Information and General Approach

Because royalties for multiple leases were often paid with a single check, and because the United States' records are incomplete, it is on the whole impossible to attribute royalty payments to specific Tranche One leases. For example, in January 1976, the records show that Bigheart Pipeline Company, which was the purchaser of oil from the North Avant Unit, made a royalty payment of $234,574.08, but the Bill for Collection does not specify for which leases the payment was made and makes no mention of North Avant. PX578-0013. The royalty apparently paid on the North Avant Unit that month was $5,012.03. PX751-646. The records further show that the $234.574.08 payment was aggregated with a number of other royalty payments totaling

$323,716.57 on a Schedule of Collections dated February 25, 1976, PX578-0012, and that a deposit slip in that same amount was completed on February 25, 1976, PX578-0014. But the deposit slip does not indicate *when* the funds were deposited. More important, there is nothing in the record to connect the $234.574.08 payment and $323,716.57 deposit with the $5,012.03 in royalty due on the North Avant lease. Similar gaps in the United States' records prevent tracing a specific royalty payment on a specific lease to a specific deposit on a specific date in almost every other Tranche One lease and month.

Faced with the absence of complete and accurate evidence, plaintiff calculated deposit-lag calculations on an average annual basis. This approach has the benefit of being a simple methodology that can be applied across broad time periods without the need to resolve unnecessary disputes over what is or is not included in Tranche One. Unnecessarily breaking things down to a lease-by-lease level on this issue, in light of the absence of records at that level, would be contrary to the goals of the Tranche system, which is to make the adjudication of this case easier, not harder.

Even at a more general level, deposit-lag calculations must be estimated because of missing trust records. Because of missing mailroom schedules of collection, there is no conclusive evidence showing what day each check was received in Pawhuska. Tr. 1739, 1748 (Hill). Nor are the Statements of Account accurate in this regard; for example, the United States' expert on deposit lag, Mr. Chavarria, deduced from such records that there was a deposit lag of negative one day for one payment. DX2676-0014, Tr. 1872 (Chavarria). Therefore, plaintiff estimated lag days and resulting damages in two parts. First, plaintiff estimated in Part B below the damages resulting from the one-business-day delay for each check mailed in Pawhuska to reach Muskogee and be deposited. Second, plaintiff estimated in Part C damages from the

additional lag days, over and above the mailing time, as show in the Andersen report's summary chart.

**B. Deposit Lag Due to Lack of a Depositary in Pawhuska (Exhibit 7)**

**1. Estimated Lag Days**

Even if payments mailed from Pawhuska arrived at Muskogee the next business day, one fifth of such mailings—any check mailed on a Friday—would be subject to 3 lag days due to the intervening weekend. Using one lag day for every payment mailed from Pawhuska to Muskogee would ignore this fact and would understate deposit lag. To adjust for this, plaintiff calculated an average: if four-fifths of the mailed checks lagged one day, and one-fifth lagged three days, the average lag is 1.4 days (1+1+1+1+3 = 7; 7÷5 = 1.4). On average, then, each payment made by check before 1990 was subject to a deposit lag of at least 1.4 days.[10]

**2. Dollar Amounts Subject to Mailing Lag**

Plaintiff used as the base amount subject to deposit lag the annual total for royalty receipts, taken from the Andersen Statement of Account for the fiscal year. **[B]** The amount of all payments shown to have been made during the fiscal year by Electronic Funds Transfer (EFT) **[C]** is then subtracted to calculate the receipts subject to deposit lag **[D]**.

| | B | C | D |
|---|---|---|---|
| 1 | **Total Royalty Receipts for FY** | **Royalty Payments made by EFT** | **Royalty Receipts Subject to Lag** |
| 2 | $ 20,316,682.44 | $ - | $ 20,316,682.44 |
| 3 | $ 29,014,232.28 | $ 6,443,648.64 | $ 22,570,583.64 |
| 4 | $ 74,914,410.42 | $ 3,608,167.09 | $ 71,306,243.33 |
| 5 | $ 31,934,499.42 | $ 5,722.31 | $ 31,928,777.11 |
| 6 | $ 21,812,646.77 | $ 20,966,819.60 | $ 845,827.17 |

[10] For the sake of simplicity, this assumption ignores Monday holidays when the federal government is closed (an assumption that benefits the Government).

Based on the assumption that the lag time for the deposit of EFTs is zero days, plaintiff subtracted from the total amount of royalties subject to deposit lag any amounts for which plaintiff agreed there was credible documentary evidence in the record showing that the payment was made by EFT. The attached spreadsheet titled "EFT Payments" (Exhibit 8) lists for each of the Tranche One fiscal years the payments that plaintiff currently agrees are EFTs. Plaintiff accepts the United States' representation that, in general, a "Z" in the middle of the "document number" listed in the Statement of Account denotes an EFT deposit. However, the United States has not adequately explained why any payments without such a designation should be considered EFTs. Nevertheless, plaintiff has searched the record and attempted to identify any non-"Z" payments that are EFTs. Of the payments identified as EFTs by the United States, plaintiff agrees with the designation for all but one. Plaintiff could find no documentary evidence in the record that the 3/25/1986 payment of $2,124,094.52 is an EFT.

As noted above, the United States has analyzed only those deposits it claims to have traced to Tranche One leases, and plaintiff disagrees with that approach because there is insufficient evidence for such tracing. If the Court agrees with plaintiff that analysis of deposit lag should be done on an annual average basis using the Statements of Account, the United States should have an opportunity to produce reasonably conclusive documentary evidence that other non-"Z" payments were made by EFT. If such evidence is provided, plaintiff would be willing to stipulate to the EFT nature of other deposits.

### 3. Applying the Expected Rate

An annual damages figure for mailing lag in column **[F]** is obtained by multiplying the royalty receipts subject to lag **[D]** times the prudent rate for the fiscal year **[E]**[11] times the portion of the year the payments lagged (1.4 divided by the number of days in the year).

| | D | E | F |
|---|---|---|---|
| 1 | **Royalty Receipts Subject to Lag** | **Average Annual Prudent Rate for FY** | **Annual Damages** |
| 2 | $ 20,316,682.44 | 5.34% | $ 4,149.93 |
| 3 | $ 22,570,583.64 | 10.44% | $ 9,013.43 |
| 4 | $ 71,306,243.33 | 16.22% | $ 44,241.04 |
| 5 | $ 31,928,777.11 | 8.38% | $ 10,234.66 |
| 6 | $ 845,827.17 | 7.03% | $ 227.45 |

The annual damages figure **[F]** is then divided by 12 to produce a damages figure for the Tranche One month **[G]**.

| | F | G |
|---|---|---|
| 1 | **Annual Damages** | **T1 Month Damages Before Current Value** |
| 2 | $ 4,149.93 | $ 345.83 |
| 3 | $ 9,013.43 | $ 751.12 |
| 4 | $ 44,241.04 | $ 3,686.75 |
| 5 | $ 10,234.66 | $ 852.89 |
| 6 | $ 227.45 | $ 18.95 |
| 7 | | |
| 8 | | $ 5,655.54 |

### C. Further Deposit Lag Documented in Andersen Report (Exhibit 9)

The analysis above shows that, on average, mailing a check to Muskogee during Tranche One delayed deposit by 1.4 days, and then computes damages for that delay. Yet as plaintiff's

[11] These rates were calculated by averaging monthly figures for the months in the fiscal year in question.

expert, Mr. Jay, discussed at trial, some checks deposited during the fiscal years containing the Tranche One months were, days, weeks, or even over a month late. *See* PX476-0058; Tr. 486:3-487:5; 541:1-542:25 (Jay). Exhibit 9, titled "Andersen Deposit Lag," estimates the damages caused by such lateness, *i.e.*, damages over and above those resulting from the 1.4-day mailing lag.

Because the Andersen data includes ranges instead of precise numbers quantifying the number of lag days, plaintiff assumed that all payments within a particular range had a lag equal to the average in the range. Plaintiff then adjusted the lag days in two ways. First, so that damages would not overlap with the above analysis of 1.4 lag days due to mailing to Muskogee, plaintiff subtracted 1.4 lag days from the Andersen number. Second, to take into account the permitted one-day window for depositing checks (which is not factored into the Andersen ranges), plaintiff subtracted one additional lag day. Thus, 5 lag days became 2.6 lag days, 8.5 lag days became 6.1 lag days, and so forth. (No additional damages are claimed for payments listed as "1 to 3 days" lag.)

For each range, plaintiff multiplied the lag days times the amount of money subject to lag, times the average daily expected rate, to obtain an annual damages figure. The annual figures were then totaled and divided by 12 to produce an estimate for the Tranche One month. Damages for the five Tranche One months total $730.65 before adjustment to current value. The deposit lag summary, attached as Exhibit 10, add this amount to the mailing lag for a deposit-lag figure of $6,386.19:

| | C | D | E |
|---|---|---|---|
| 1 | Base Amount of Deposit Lag Damages | | |
| 2 | Mailing Lag | Andersen Lag | Combined |
| 3 | $ 345.83 | $ - | $ 345.83 |
| 4 | $ 751.12 | $ 0.40 | $ 751.52 |
| 5 | $ 3,686.75 | $ 676.76 | $ 4,363.51 |
| 6 | $ 852.89 | $ 26.57 | $ 879.46 |
| 7 | $ 18.95 | $ 26.92 | $ 45.87 |
| 8 | | | |
| 9 | $ 5,655.54 | $ 730.65 | **$ 6,386.19** |

### D. Current Value of Damage Amounts

If deposit lag is calculated on an average annual basis, current value should be computed from the first day of the month following the Tranche One month. For deposit lag caused by mailing checks to Muskogee, the value of damages through the end of 2006 is $45,615.92. For additional deposit lag documented by Arthur Andersen, the value of damages through the end of 2006 is $6,381.11. The total, shown in Exhibit 10, is $51,997.03:

| | G | H | I |
|---|---|---|---|
| 1 | Current Value of Deposit Lag Damages (as of 12/31/2006) | | |
| 2 | Mailing Lag | Andersen Lag | Combined |
| 3 | $ 3,536.31 | $ - | $ 3,536.31 |
| 4 | $ 5,036.49 | $ 2.71 | $ 5,039.20 |
| 5 | $ 33,748.33 | $ 6,195.04 | $ 39,943.37 |
| 6 | $ 3,236.66 | $ 100.82 | $ 3,337.48 |
| 7 | $ 58.13 | $ 82.55 | $ 140.68 |
| 8 | | | |
| 9 | $ 45,615.92 | $ 6,381.11 | **$ 51,997.03** |

### E. Objections to Defendant's Position

#### 1. Tracing

As noted above, plaintiff does not agree that deposit lag can be analyzed accurately on a lease-by-lease basis.

#### 2. EFTs

As noted above, plaintiff is not aware of any adequate record evidence that the 3/25/1986 payment claimed as an EFT by the United States was in fact an EFT.

## IV. THE OSAGE NATION IS ENTITLED TO AN AWARD OF INTEREST AS PART OF ITS DAMAGES, MEASURED BY APPROPRIATE LONG-TERM INVESTMENTS FOR THE 17- TO 30-YEAR PERIODS AT ISSUE HERE

Interest on damages here should be measured as though the amounts awarded as initial damages had been collected or earned at the proper time, then invested by the standards of 25 U.S.C. § 162a until the funds are paid in satisfaction of judgment. Such a measure of interest is part of the damages due to the Osage Nation for the trustee's breaches, because the United States has owed and continues to owe a duty not only to collect or earn the funds but to invest them prudently through the date the funds are actually disbursed. Under the governing statutes and case law, the funds at issue here, while never collected, have still been trust funds for 17 to 30 years. Therefore, damages must be measured by the trustee's fiduciary duty to invest trust funds. The only investments that would comply with the trustee's duty to invest money held that long would be relatively long-term investments such as the 7-year Treasury bills presented by plaintiff's expert, Steve Jay, at trial, and used by plaintiff in its calculations here.

### A. Damages Are Measured by the United States' Fiduciary Duty to Invest Osage Trust Funds Whether or Not the Funds Have Been Collected

The "current value," 72 Fed. Cl. at 691, of the initial damages awarded for the trustee's failure to collect royalties or earn investment revenue must be measured by the trustee's duty to invest the uncollected (or unearned) moneys. That is, initial damages must be treated as though such funds had been in the trust all along, and additional damages must be assessed for the trustee's consequent failure to invest such funds. "[D]amages are . . . due to the Tribes *for the failure to invest* proceeds that 'would have been received had the United States not violated' its fiduciary obligation to collect amounts due under the sand and gravel leases.'" *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1353 (Fed. Cir. 2004) (italics added) (quoting *Peoria Tribe of Indians v. United States*, 390 U.S 468, 473 (1968)).

This concept of treating uncollected and unearned funds as trust funds that the trustee has a duty to invest is stated expressly in the 1906 Act. The 1906 Act provides that "all moneys that . . . may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States." Act of June 28, 1906, ch. 3572, 34 Stat. 539, § 4. The Court has already held that this language makes moneys that are contractually owed but not collected every bit a part of the trust corpus: "[t]he plain language of the statute makes clear that defendant's duty is *to hold in trust the moneys contractually owed*, ("due and ... that may become due"), to the Tribe, 134 Stat. at 544, not merely whatever amount is deposited by the Tribe's lessees." *Osage Tribe of Indians v. United States*, 68 Fed. Cl. 322, 328 (2005) (italics added). "Congress could have provided that 'all deposits shall be held in trust.' It did not. Rather, the express instruction in section 4 of the 1906 Act was that 'all moneys due, and all moneys that may become due, or may hereafter be found to be due' were to be held in trust by the United States." *Id*. Applying this principle here means that on the date that the contractual obligation to pay royalties arose (i.e. the date full payment was due), any funds that went uncollected became trust funds subject to a duty to invest.

This language from the 1906 Act also plainly applies to other categories of damages in this case, not just amounts contractually owed under leases. Damages for the trustee's failure to invest prudently the funds it *did* collect—damages for what the parties in this case have termed the investment claims, and that have now "be[en] found to be due the . . . Osage tribe"—are also trust funds. The 1906 Act not only defines the trust as including "all moneys that . . . may hereafter be found to be due the said Osage tribe of Indians," it also specifically includes "all moneys found to be due to [the] Osage tribe of Indians on claims against the United States,"

which "shall be . . . placed to the credit of" the tribe, "such credit to draw interest as now authorized by law."[12]

As the Federal Circuit held in *Shoshone*, 25 U.S.C. § 161a and § 162a also create an investment obligation with respect to both uncollected royalties and investment underperformance. "[T]he general provisions for tribal trust management and interest accrual found in [Sections] 161a, 161b, and 162a . . . create an obligation for the Government to pay interest on amounts that the Government failed to collect." 364 F.3d at 1353 (quoted in *Osage Tribe*, 68 Fed. Cl. at 336). *Shoshone* makes clear that income the Government owed a duty to earn through investment is also included as part of the trust. "[W]hen the Government has a clear statutory fiduciary duty to collect *or manage* funds and further undertakes the duty to earn interest on those funds, the failure of the Government to collect *or manage* such funds in

---

[12] Section 4 of the 1906 Act obligates the United States as trustee to do the following:

> [A]ll funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States . . . .
>
> [A]ll the funds of the Osage tribe of Indians, and **all the moneys** now due or **that may hereafter be found to be due to the said Osage tribe of Indians**, and all moneys that may be received from the sale of their lands in Kansas under existing laws, and **all moneys found to be due to said Osage tribe of Indians on claims against the United States**, after all proper expenses are paid, **shall be . . . placed to the credit of the individual members of the said Osage tribe** on a basis of a pro rata division among the members of said tribe, as shown by the authorized roll of membership . . . , **said credit to draw interest as now authorized by law** . . . .

Act of June 28, 1906, 34 Stat. 539.

accordance with its obligations will result in an award of damages for that failure and an award of interest on the amount *mismanaged* or not collected." *Shoshone*, 364 F.3d at 1353-54.[13]

This principle in *Shoshone* is derived from *Peoria Tribe*. Here, as in *Peoria Tribe*, the Government's failure to collect or earn funds is irrelevant to the duty to invest those funds. There, the Supreme Court explained, "[t]he United States was not free merely to hold the [uncollected] proceeds without investing them. The issue in this case . . . is whether the obligation of the United States to invest unpaid proceeds applies to proceeds which, by virtue of the United States' violation of the treaty, *were never in fact received*. . . . [W]e hold that *the obligation to invest* . . . 'continues until the money is paid over.'" *Peoria Tribe*, 390 U.S. at 471-72 (italics added); *accord Osage Tribe*, 68 Fed. Cl. at 335-36 (2005). Moreover, both *Shoshone* and *Peoria Tribe* build on and echo the holding of *United States v. Blackfeather*, 155 U.S. 180, 193 (1894), where the Court enforced a duty to pay an annuity on uncollected funds: "If the government had originally accounted for the whole amount for which the court below held it to be liable, it would have paid five per cent upon this amount until the whole fund was paid over. The fund as to this amount being not yet distributed, the obligation to pay the five per cent annuity continues until the money is paid over."

Because the source of the obligation to pay interest as part of damages is the trustee's unfulfilled duty to invest damages that were incurred in the past, damages must be increased in line with what the trustee would have earned had the uncollected or unearned funds been collected and invested according to fiduciary standards from the date the original damages were

[13] *White Mountain Apache Tribe of Arizona v. United States*, 20 Cl. Ct. 371 (Cl. Ct. 1990), held that § 162a did not constitute an express waiver of interest liability under 28 U.S.C. § 2516(a), but *Shoshone* makes that holding irrelevant when interest is awarded as part of a damages award instead of as pre-judgment interest.

incurred through the date of actual disbursement—*i.e.*, the date of payment following judgment. "The statutes that govern the investment of funds held in trust by the government also 'define the contours of the United States' fiduciary responsibilities.'" *Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States*, 69 Fed. Cl. 639, 656 (2006) (Hewitt, J.) (quoting *United States v. Mitchell* (*Mitchell II*), 463 U.S. 206, 224 (1983), and *Pawnee v. United States,* 830 F.2d 187, 192 (Fed. Cir. 1987)). The question here, then, is reduced to the application of investment standards to that timeframe.

As the Court has recognized, "[t]he requirement to invest Indian trust funds in the highest yielding investments available is a legal requirement mandated by the applicable statutes—here, 25 U.S.C. §§ 161a and 162a—and not solely a prudential one." *Osage Tribe*, 72 Fed. Cl. at 668. The following section discusses how § 162a applies in this case with respect to uncollected funds.

**B. The Prudent Investor Standard Must Be Applied Consistent with the Length of Time That Uncollected Funds Have Been Held in Trust in This Case, from 17 to 30 Years**

A statute enacted long before the first Tranche One month—25 U.S.C. § 162a (enacted in 1938)—would have allowed any funds held from 1976, 1979, 1980, 1986, or 1989 to the present to be invested in long-term T-bills or CDs. Since 1938, § 162a(a) has authorized the Secretary of the Interior "to withdraw from the United States Treasury and to deposit in banks to be selected by him the common or community funds of any Indian tribe which are . . . held in trust by the United States . . . ."[14] This statute "permits the Secretary of the Interior to invest [trust] funds, at

[14] "The new statute [§ 162a in 1938] greatly expanded the investment options available for Indian trust funds by including bonds, notes and other obligations offered by public or private institutions, while insuring the security of the funds." *Chippewa Cree*, 69 Fed. Cl. 659. This flexibility is apparently somewhat narrower for Osage funds; under § 162a, investments outside the Treasury are limited to bank deposits ("[T]he foregoing shall apply to the funds of the Osage

market rates, either in obligations of federally insured banks or through direct purchase of U.S. securities." *Chippewa Cree*, 69 Fed. Cl. at 659. In light of the Government's role as trustee, "the placement of [trust] funds in accounts bearing interest rates . . . below those available from other properly secured investments, would be difficult to reconcile with the intent of Congress expressed in the 1938 enactment and subsequent amendments to § 162a . . . ." *Id.* at 660.

Here, the "highest-yielding instruments" are long-term instruments, because the funds at issue have been held in trust for between 17 and 30 years. The beneficiary has been deprived and continues to be deprived of funds that could have been put to use during this decades-long delay. Using rates for long-term instruments to measure damages thus appropriately implements the principle that "in determining the amount of damages for a breach of the trustee's fiduciary duty with regard to investments of the trust property, courts attempt to place the beneficiary in the position in which it would have been absent a breach." *Confederated Tribes of the Warm Springs Reservation v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001). Damages should be awarded on the basis of long-term investments authorized by § 162a, such as the 7-year T-bill rates offered here by plaintiff as a reasonable estimate. *See Warm Springs*, 248 F.3d at 1371.

### C. The Government's Unfulfilled Disbursement Obligations Are No Refuge from Liability for Breach of Its § 162a Investment Duties

The Government seeks to turn the disbursement obligation on its head—to turn an unfulfilled duty into a limit on liability. First, the Government argues with respect to the uncollected trust funds here that, in effect, despite the Government's holding of these uncollected funds in trust for 17 to 30 years, the Government had no duty to invest these funds beyond the date of the quarterly disbursement following the Government's breach of the duty to collect. In

---

Tribe of Indians, and the individual members thereof, only with respect to the deposit of such funds in banks.").

the alternative, the Government argues that, even if it had a duty to invest uncollected trust funds through actual disbursement (i.e., following judgment), it had no duty to obtain anything more than the yield available for 90-day instruments. Both these arguments lack merit.

The first argument is presumably a placeholder for an inevitably futile appeal. *Shoshone* forecloses this argument. *See supra* at 30 (quoting *Shoshone*, 364 F.3d at 1353-54). Following *Shoshone*, the Court has already ruled on this issue and accordingly did not invite the Government to revisit the issue here. 72 Fed. Cl. at 671 ("The parties shall . . . brief *the basis for the appropriate rate or rates* to apply in determining the *current value* of the damages for which defendant has been found liable.") (italics added). Furthermore, the explicit language of the 1906 Act makes even uncollected royalties and unearned investment income—and for that matter all damages in suits against the United States—part of the Osage trust. *See supra* at 29-30 & n.11. By definition, this imposes a duty on the trustee to earn interest on such funds until they are actually disbursed.

It is nonsense for the Government to claim, in effect, that if it *had* collected the funds and invested them, it would have been required to disburse them rather than continue investment—as though the statutes do not *authorize* the Government to invest prudently beyond a disbursement date that was never achieved. The Government gets no credit for a duty it never fulfilled due to its own breaches of trust. *Peoria Tribe* and *Shoshone* make clear that the Government's breach of an antecedent duty (collection) does not excuse the Government's failure to perform other duties that the breach rendered impossible (investment). These cases compel the conclusion that failure to collect or earn funds carries with it liability for the effects of any further duties left

unfulfilled as a consequence of that failure.[15] Moreover, as discussed above, uncollected trust funds are still funds held in trust. The Government cannot hold onto trust funds without disbursing them and then escape liability for failing to manage the funds wisely by pointing out that it *should have* disbursed the funds. Only when funds are actually disbursed to the beneficiary does the Government's duty to invest cease.

By similar logic, the Government's alternative disbursement-related argument, in favor of limiting its duty to 90-day rates, also conflicts with *Shoshone*. It would be perverse to hold the Government to a lower standard for investment merely because it owed a distinct duty (disbursement) that it never performed, as a consequence of its breach of the collection and investment duties. As discussed above, the trust funds at issue here have been in the trust since the damages were incurred. Under *Shoshone*, the trustee's investment duty here must be measured proportionally. Damages for Government breach of trust duties must be measured so as not to "proportionally . . . reward the Government for inaction that violates the Government's fiduciary duties to collect funds and accrue interest." *Shoshone*, 364 F.3d at 1352; *see also Minnesota Chippewa Tribe v. United States*, 11 Cl. Ct. 221, 256 (1986) ("To hold to the contrary would be to reward the government for its failure to comply with the terms of the law and for its breach of the trust it established for the benefit of the Chippewa.").

At root, the Government's advocacy of a 90-day rate depends upon a false premise—that § 162a prohibits the Government from investing in instruments of duration longer than 90 days. The statute contains no such limit. Rather, the statute requires the Government to choose the highest yielding instruments available for the entire duration that the funds are held. 72 Fed. Cl.

[15] The trust at issue in *Shoshone* has a disbursement requirement similar to that here, yet the Federal Circuit held that interest through the date of judgment was part of the plaintiff's damages. *See* 25 U.S.C. § 613.

at 666-67. If the Government had invested funds in 90-day instruments for 17 to 30 years, it would have breached its duty to invest in the highest yielding instruments available. Positing such a breach cannot be the proper standard for measuring damages for breach of trust.

The report and trial testimony of Mr. Lundelius, the Government's expert on expected investment return, prove the point. Mr. Lundelius never identified any statutory limit preventing investments over 90 days. To the contrary, he recognized that the only barrier to investment in long-term investments is the potential for loss if the investment is liquidated on the secondary market before maturity. DX2695-008-009; Tr. 2130:12-2131-17 (Lundelius). This limit makes sense only if the funds are actually disbursed in a quarterly payment to the beneficiary. The United States has admitted that the appropriate horizon for investment of trust funds under § 161a and § 162a depends upon liquidity needs. *Id.* The Government has denied all the way through trial that these funds are trust funds at all, so the Government obviously has never contemplated disbursing them. There can be no retroactive liquidity needs with respect to funds that have been sitting in trust for 17 to 30 years and still have not been disbursed.

In a different context, this Court has held that a statutory disbursement requirement did not change the nature of the Government's trust duty. "The act of distributing funds held in trust by the United States does not dispel the trustee's fiduciary responsibility to the tribe or group for moneys unpaid or losses sustained while the tribe or group's funds were in the government's care." *Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States,* 2006 WL 2831042 (Sept. 27, 2006) (Hewitt, J.) (holding that disbursement did not change a group claim into multiple individual claims) (citing cases). Here, the fact that the United States made quarterly disbursements in the period between the time the damages occurred and the present is irrelevant to the standard of care applicable for funds not collected or disbursed.

Congress never intended the United States' disbursement duty, when unfulfilled due to breach, to inure to the benefit of the United States and the detriment of the Indians. "[T]he pro-Indian canon of construction . . . 'assumes Congress intends its statutes to benefit the tribes.'" *Shoshone*, 364 F.3d at 1352 (quoting *Chicasaw Nation v. United States*, 534 U.S. 84, 93-95 (2001)).

**D. The Government Was Required to Earn Compound Interest by Reinvesting Interest Income**

The Government takes the position that, if the 90-day rates it advocates are used to calculate present value, those rates should be stated as annualized rates (i.e., as the rate of return the funds would earn if invested for a year) and then compounded annually. Plaintiff agrees with the Government that whatever rate the Court chooses should be compounded. Plaintiff offers the following brief explanation for why that position is correct, notwithstanding several important Indian trust cases where only simple interest was awarded. *See Blackfeather* and *Peoria Tribe*.

Here, an obligation to earn compound interest follows from the language of 1906 Act, which states that "all moneys found to be due to said Osage tribe of Indians on claims against the United States . . . shall be . . . placed to the credit of the individual members of the said Osage tribe . . . , said credit to draw interest as now authorized by law." 1906 Act § 4. This language requires compounding because the interest that should have been disbursed to the beneficiary at quarterly intervals—quarterly interest payments that might otherwise represent the last dollar of damages under a simple interest analysis—are "moneys due" and therefore are trust funds subject to investment (or, more accurately, reinvestment). In other words, because "moneys due" are trust funds, once an amount of interest becomes "moneys due," that interest becomes principal and the compounding cycle continues.

### E. Explanation of Current Value Methodology (Exhibits 11 and 12)

As detailed in the attached spreadsheet labeled "Current Value Calculations" (Exhibit 11), plaintiff calculated the value of $1 of initial damages as of December 31, 2006, by simulating consecutive investments in 7-year Treasury bills. Plaintiff began with $1 on the date funds should have been collected or earned and simulated investment through the end of 2006. Every seven years, the annual interest rate changes to simulate a rollover of the invested funds into a new 7-year T-bill.

As shown in the spreadsheet "Investment Basket Example" (Exhibit 12), 7-year T-bill rates are a good choice for simulating long-term investment because those rates approximate the average return on a "basket" of investments of varying maturities. A long-term investor might choose such a "basket" to build in a modest amount of liquidity. The difference in the bottom-line damages in Exhibit 12 and those in the "Damages Summary" (Exhibit 14) based on plaintiff's use of 7-year T-bill rates is minimal.

The Osage Nation could have advocated even higher rates using terms of up to 30 years, because the funds at issue here were by definition not subject to any liquidity demands. The Osage Nation believes that the more modest approach of choosing 7-year rates is entirely fair to the Government and is a reasonable estimate of damages in accordance with *Warm Springs*, 248 F.3d at 1371.

## V. THE OSAGE NATION IS ENTITLED TO LATE FEES IN ADDITION TO INTEREST, BUT NOT PENALTIES

### A. BIA Regulations Subject Royalty Payors to Late Fees, but Not Penalties, on the Amount of Any Underpayment

Under BIA regulations, any partial payment of royalties due renders the payor liable for late fees on the unremitted balance. Section 183.13(a) states:

> all payments shall be due by the 25th day of each month and shall cover the preceding month. Failure to make such payments shall subject Lessee or purchaser, whoever is responsible for royalty payment, to a late charge at the rate of not less than 1½ percent for each month or fraction thereof until paid.

The natural reading of this language is that a lessee or purchaser must pay royalties in full on time or be charged a late fee. The terms "all payments" and "such payments" are plural, while the term "Lessee or purchaser" is singular. Thus, the language of the regulation contemplates that each lessee or purchaser must submit "all payments," not just a portion of the payments it owes. Moreover, the fact that the late fees are scaled to the size of the delinquency, as a percentage, suggests that even partially delinquent payments may be subject to a fee.

The contrast between the late fees provision (§ 183.11(a)) and the penalties provision (§ 183.13(c)) also suggests that partial payments are subject to the 1.5% late fee. In § 183.11(a), the fee is charged upon the payor's "[f]ailure to make such payments"—with "such payments" referencing "all payments," so that "failure to make all payments" subjects the payor to the fee. By contrast, § 183.11(c) imposes a much harsher consequence and applies only when the payor submits no payment whatsoever: "Failure to *remit* payments or reports shall subject Lessee to further penalties as provided in §§ 183.42 and 183.43 and shall subject the division order to cancellation." (Italics added.) In addition to the lease-cancellation option (the "nuclear" option), §§ 183.42 and 183.43 allow the imposition, after 30-day notice and hearing, of flat fines from $10 to $500 per day per violation. If both § 183.11(a) and (c) applied only to a complete failure to remit payments, (a) and (c) would not be phrased so differently and would not impose remedies of such disparate scope.

The uncollected royalties for Tranche One leases are still outstanding. Late fees have accrued on uncollected royalties beginning on the 25th of the month following each Tranche One month.

**B. The United States Has a Trust Duty to Collect Late Fees**

The United States has breached trust duties by failing to collect the late fees that are due on unpaid royalties. A trustee has a general duty to bring an action to enforce payment due to the trust. *See* William F. Fratcher, *Scott on Trusts* § 177 (4th ed. 1987) ("If a debtor fails to pay a debt due to the estate, it is ordinarily the duty of the trustee to bring an action to enforce payment."). A trustee is personally liable for such loss for failing to act. *Id.* ("A trustee is under a duty to the beneficiaries to take reasonable steps to realize on claims he holds in trust. If he fails to take such steps as are reasonable he is subject to a surcharge for such loss as results from his failure to act."). "Under traditional trust law doctrine . . . if a 'trustee holds in trust a contract right against a third person and the trustee improperly refuses to bring an action to enforce the contract, the beneficiaries can maintain a suit . . . against the trustee . . . .'" *McMahon v. McDowell*, 794 F.2d 100, 110 (3d Cir. 1986) (quoting 4 A. Scott, *Law of Trusts* § 282.1 at 2339 (3d ed. 1967)). The United States has failed to collect late fees owed to the trust and has therefore breached its fiduciary duty.

**C. Late Fees Do Not Overlap with Lost Investment Interest**

An award of lost investment interest does not compensate the Osage Nation for the Government's failure to collect late fees and the associated lost deterrence of underpayment. Only an award of late fees here would accomplish that. As the Government has admitted, Section 183.13(a) is intended to deter underpayment by lessees: "[t]he purpose of this regulation is obvious. It is intended to encourage timely payment by purchasers or lessees rather than as a means of earning income on the Osage mineral resources. See RT 1044:2-6." United States Post Trial Br. at 34. Deterrence of underpayment is crucial in a self-reporting system such as that used by Interior during the Tranche One months. Without such deterrence, lessees have little

incentive to seek out and report the correct royalty values. Failure to collect late fees is a failure to deter underpayment that may otherwise be undetectable.

Moreover, as just quoted from the Government's own words, the Government's duty to collect late fees on behalf of the Osage Nation is a duty distinct from the obligation to invest trust funds. So too is the remedy for breach of the late-fees duty distinct from the remedy required for breach of investment duties. Interest awarded in a current value calculation compensates the Tribe only for the Government's failure to invest trust funds. By contrast, the Government's breach of the distinct obligation of enforcing the leases and deterring noncompliance causes a distinct harm commensurate with the amount of late fees outstanding. The Government is not allowed to "dip into" outstanding late fees to pay its liability for failure to invest uncollected funds; yet that would be the effect of a ruling that interest and late fees overlap. No provision of law allows the Government to waive outstanding late fees, even if it pays the Osage Nation damages for breach of the distinct investment obligation. Therefore, the Court should award the Osage Nation late fees in addition to interest. Plaintiff's claim for late fees totaling $1,141,833.70 is detailed in the attached spreadsheet so labeled (Exhibit 13).

## CONCLUSION

For the foregoing reasons, the Court should award damages to the Osage Nation for Tranche One of no less than $3,284,115.61, as detailed in the "Damages Summary" attached as Exhibit 14.

November 17, 2006

Respectfully submitted,

*s/Wilson K. Pipestem*
WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation