**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA, | ) | Electronically Filed: November 17, 2006 |
| Plaintiff, | ) | |
| v. | ) | No. 99-550L (into which has been consolidated No. 00-169L) |
| THE UNITED STATES OF AMERICA, | ) | Judge Emily C. Hewitt |
| Defendant. | ) | |

**DEFENDANT'S CALCULATION AND SUPPORTING BRIEF ABOUT DAMAGES OWED TO PLAINTIFF PURSUANT TO COURT'S SEPTEMBER 21, 2006 OPINION AND ORDER**

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

BRETT D. BURTON
Counsel of Record for Defendant
United States Department of Justice- ENRD

KEVIN S. WEBB
MARTIN J. LALONDE
United States Department of Justice - ENRD
P.O. Box 663
Washington, D.C. 20044-663
Telephone: (202) 305-0212
Fax: (202) 353-2021
Attorneys for Defendant

OF COUNSEL:
Elisabeth Brandon
Brenda Riel
Candace Beck
Teresa E. Dawson

**TABLE OF CONTENTS**

**PAGE**


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

I. DEFENDANT'S CALCULATION OF DAMAGES OWED TO PLAINTIFF UNDER COURT'S RULING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. Oil Royalty Underpayments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1. Oil Royalty Formula . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2. Price Control Era . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3. Post-Price Control Era . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

a. Use of East Hardy lease data for February 1986 . . . . . . . . . . . . . . . 7

b. Use of Total statement data for July 1989 . .. . . . . . . . . . . . . . . . . . 8

c. Use of MMS Data for February 1986 and July 1989 . . . . . . . . . . . 8

4. Defendant's Calculation of Oil Royalty Underpayment to Tribe Under Court's Ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . .10

5. Plaintiff's Calculation of Oil Royalty Underpayment . . . . . . . . . .. . . . . . . . .10

B. Failure to Maintain Appropriate Cash Balances and Failure to Obtain Investment Yields in Accordance with Law . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1. Calculation of Actual Returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

2. Calculation of Average Daily Fund Balance For Purposes of Determining Expected Returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

a. Determination of Average Daily Fund Balance . . . . . . . . . . . . . . . 13

b. Adjustments to Average Daily Balances to Reflect $25,000 Cash Permitted by Court and to Allow for a Reasonable Amount of Time for the Government to Invest Receipts . . . . . . . . . . . . . . . . . . 14

3. Calculation of Expected Returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4. Calculation of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C. Failure to Timely Deposit Royalty Receipts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II. INTEREST ON DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III. PLAINTIFF IS NOT ENTITLED TO LATE FEES AS PART OF DAMAGES . . . . . . . . . 29

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## TABLE OF AUTHORITIES

**FEDERAL CASES** **PAGE**

*Barney v. Saunders*, 57 U.S. 535 (1853) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Cherokee Nation v. United States*, 270 U.S. 476 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14, 21

*Cheyenne-Arapaho Tribes of Indians v. United States,* 512 F.2d 1390 (Ct. Cl. 1975). . . . . . . . 14, 23

*Confederated Salish & Kootenai Tribes v. United States*, 175 Ct. Cl. 451, *cert. denied*, 385 U.S. 921 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Confederated Tribes of Warm Springs Reservation v. United States*, 248 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24, 26, 31

*E. F. Hutton Sw. Props. v. Union Planters Nat'l Bank*, 953 F.2d 963 (5th Cir. 1992) . . . . . . .14

*East River S.S. Corp. v. Transamerica Delavel*, 476 U.S. 858 (1986) . . . . . . . . . . . . . . . . . . .26

*Manchester Band of Pomo Indians, Inc. v. United States*, 363 F.Supp. 1238 (N.D. Cal. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Menominee Tribe of Indians v. United States*, 97 Ct. Cl. 158 (1942) . . . . . . . . . . . . . . . . . . . . 21

*Menominee Tribe of Indians v. United States*, 101 Ct. Cl. 10 (1944) . . . . . . . . . . . . . . . . . . . .23

*Mitchell v. United States,* 664 F.2d 265 (Ct. Cl. 1981)(*en banc*) aff'd 463 U.S. 206 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24, 25, 26, 32

*Northern Paiute Nation v. United States*, 8 Cl. Ct. 470 (1985) . . . . . . . . . . . . . . . . . . . . . .24, 31

*Osage Tribe of Indians v. United States*, 72 Fed. Cl. 629 (2006) . . . . . . . . . . . . . . . . . . . .*passim*

*Peoria Tribe of Indians v. United States*, 390 U.S. 468 (1968) . . . . . . . . . . . . . . . . . . . .21, 23

*Short v. United States* (*Short IV*), 12 Cl. Ct. 36 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Short v. United States* (*Short VI),* 50 F.3d 994 (Fed. Cir. 1995) . . . . . . . . .. . . . . .. . . .21, 22, 23, 27

*Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed. Cir. 2004) . . . . . . . . . . . . . 22, 26

*United States v. Alcea Band of Tillamooks*, 341 U.S. 48 (1951) . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Mescalero Apache Tribe*, 207 Ct. Cl. 369 (1975) . . . . . . . . . . . . . . . . . . . .21

*United States v. Mitchell* (*Mitchell II*), 463 U.S. 206 (1983) . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Nez Perce Tribe of Indians*, 194 Ct. Cl. 490 (1971) . . . . . . . . . . . . . . . . . 21

*United States v. Sherman*, 98 U.S. 565 (1878) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**FEDERAL STATUTES**

25 U.S.C. § 161a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23, 24, 25, 26, 27, 28, 31

25 U.S.C. § 161a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

25 U.S.C. 161a (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 24, 26

25 U.S.C. § 162a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25, 26, 27, 28, 31

25 U.S.C. § 612 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

28 U.S.C. § 2516(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 29, 31

Act of June 28, 1906, § 6, 34 Stat. 539 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 27, 28

**FEDERAL REGULATIONS**

25 C.F.R. § 226.11(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

25 C.F.R. § 226.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

25 C.F.R. § 226.13(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

25 C.F.R. § 226.42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**OTHER**

Black's Law Dictionary (7th ed. 1999). . . . . . .. . . . . .. . . . . .. . . . . .. . . . . .. . . . . .. . . . . .. . . . 26

Cohen's Handbook of Federal Indian Law (2005 ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

Platt's Oil and Price Oilmanac . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

Restatement (Third) Trusts § 181 cmt. d (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

Scott On Trusts (4th ed. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

**APPENDIX TO DEFENDANT'S BRIEF PURSUANT TO COURT'S SEPTEMBER 21, 2006 OPINION AND ORDER**

| **Exhibit** | **Description** | **Pages** |
| --- | --- | --- |
| Defendant's Exhibit No. 1 | Ronnie Martin Declaration of November 17, 2006, with attachments | Declaration: 8<br>Attachments: 18 |
| Defendant's Exhibit No. 2 | Gregory Chavarria Declaration of November 17, 2006, with attachments | Declaration: 12<br>Attachments: 38 |

## INTRODUCTION

On September 21, 2006, this Court issued its Opinion and Order addressing the Tranche One trial. *Osage Tribe of Indians of Oklahoma v. United States,* 72 Fed. Cl. 629 (2006). Among other things, the Court instructed the parties to calculate jointly and present to the Court the amount of damages that would be owed to Plaintiff under the Court's ruling, and, to the extent that the parties were unable to agree on any part of the damages calculations, to present the areas of disagreement along with explanations for the parties' respective positions. *Id.* at 671.

In accordance with the Court's directive, the parties and their experts conducted several meetings, in Washington, D.C., and elsewhere, and they engaged in numerous exchanges of data, documentation, and expert analyses about their proposed damages calculations. While the parties were able to agree on certain issues regarding the damages calculation, they were unable to agree on every issue so that they could submit a complete joint calculation to the Court. Therefore, the parties have made or are making separate filings setting forth their respective calculations for Tranche One, with supporting rationales, regarding the damages to which Plaintiff should be entitled under the Court's ruling.[1/] Further, the parties have filed a joint statement to the Court delineating the issues or areas on which the parties agree, so as to assist the Court in its adjudication.

Defendant provides below its proposed calculation, with supporting explanations, of damages owed to Plaintiff in Tranche One, as a result of the Court's ruling. Additionally, Defendant provides below a summary discussion of the differences between the parties'

[1/] Plaintiff filed its proposed damages calculation on November 16, 2006. Defendant requested and received from the Court a one-day extension to submit its calculation on November 17, 2006.

calculations.[2] As detailed below, the Court reject Plaintiff's proposal and enter judgment in favor of Plaintiff for either $191,697.16[3] or $1,232,146.29[4].

Also in accordance with the Court's September 21, 2006 Opinion and Order, *id.* at 671, Defendant presents below its positions on the appropriate "interest on damages" and the applicability of late fees. As to "interest on damages," Plaintiff is entitled only to the amount of interest or investment returns that the underpaid royalties or underinvested funds would have earned in the Tribe's trust fund account (Account No. 7386), if the royalties had been properly and timely collected and if the funds had been properly and timely invested. Plaintiff is not entitled to the present value or time value of the damages based on rates that are divorced from those that would have been attainable for the investment of funds in Account No. 7386. As to late fees, Plaintiff is not entitled to collect what would amount to a windfall of an 18-percent annual return on the uncollected funds. The purpose of the late fee provision of the Osage regulations is to impose a penalty or sanction to encourage timely oil royalty payments, which purpose would not be fulfilled by imposition of the late fee on the Government. The provision does not impose a duty on the Government to make the Tribe's partially uncollected royalties

---

[2] Defendant respectfully requests leave of the Court to respond to Plaintiff's proposed damages calculation, to the extent that Plaintiff presents issues or arguments in its proposed calculation that are new or additional to those presented by Plaintiff in its discussion with Defendant and that Defendant has not addressed or addressed in sufficient detail herein.

[3] This figure reflects the damages owed to Plaintiff under the Court's ruling, with the forgone interest or unrealized investment returns to the date of the annuity payment which would have included the damages and associated interest or returns

[4] This figure reflects the damages sustained plus the forgone interest or unrealized investment returns calculated to December 31, 2006 (the presumed date of the Court's judgment).

productive. In addition, a damage remedy should only place the beneficiary, Plaintiff, in the same position that it would have been, absent a breach. Here, there is no evidence that even if Defendant had demanded royalty payments (in accordance with the Court's interpretation of the pricing regulations), the lessees or purchasers would have made late payments.

## I. DEFENDANT'S CALCULATION OF DAMAGES OWED TO PLAINTIFF UNDER COURT'S RULING

### A. Oil Royalty Underpayments

The parties and their oil and gas experts conferred and exchanged data and documentation relating to their respective proposed methodologies for calculating oil royalty underpayments. These meetings and exchanges included the use of and discussions about government records as a source for offered prices. While the parties were able to agree on some items, *see* Parties' Joint Submission on Calculation of Tranche One Damages, dated November 16, 2006, at 1-3, they were unable to agree upon a proposed joint calculation and amount of oil royalty underpayment damages to which Plaintiff is entitled under the Court's September 21, 2006, Opinion and Order. Hence, Defendant presents below its own damages calculations for oil royalty underpayments, along with a detailed explanation of its calculations and positions.

As set forth in depth below, Defendant's oil and gas expert, Ronnie Martin, used an appropriately modified version of the same oil royalty formula and methodology that he used at trial. In accordance with this Court's ruling, 72 Fed. Cl. at 647-49, 661, Mr. Martin revised his methodology and calculations by adding the assumptions that, during the Price Control era, regulated prices did not establish the price for purposes of calculating oil royalty, and that Plaintiff is entitled to oil royalties based on any offered price of a major purchaser in the Kansas-Oklahoma

area, regardless of whether it was available to the lessee. Further, for this calculation, as well as the one at trial, Mr. Martin treated the East Hardy price as a date of delivery ("DOD") price, and, for the Tranche One month of July 1989, Mr. Martin treated the price from a Total statement as a DOD price. Finally, for both of these Tranche One months, as directed by the Court and after making certain necessary assumptions, Mr. Martin utilized recently acquired Minerals Management Service ("MMS") electronic oil royalty data as a proxy for offered prices.

### 1. Oil Royalty Formula

Mr. Martin calculated oil royalties due to Plaintiff under the Court's ruling for the Tranche One leases during the Tranche One months by utilizing the following formula:

Royalty Due = volume X royalty rate X price[5]

Trial Transcript ("Tr.") at 1390:12-19. Mr. Martin determined the volume by consulting several reports, such as lessee reports, purchaser statements, System 36 data, tax records, and Osage Agency records, *id.* at 1390:20-1391:3; 1392:25-1393:16, and he determined the royalty rate from documents such as lessee reports, System 36 data, and certain tax records, *id.* at 1391:4-10.

Price is a more complicated component of the royalty formula, which requires consultation of various sources and performance of several calculations. In order to determine the correct price for the royalty formula, Mr. Martin selected the highest of the actual selling price, posted price, or offered price, by a major purchaser in the Kansas-Oklahoma area. Ronnie Martin Declaration ("Martin Decl") ¶ 5 (Attached as Def.'s Ex. 1). He determined the actual selling price for oil on the Tranche One leases during the Tranche One months by consulting purchaser

---

[5] The Court used the term "royalty value," instead of "royalty price," in its Opinion. *Osage Tribe of Indians v. United States*, 72 Fed. Cl. 629, 636 (2006).

statements and System 36 data. Tr. at 1391:11-17. Mr. Martin determined the highest posted price by (a) obtaining prices from Platt's *Oil and Price Oilmanac* and price bulletins;[6] (b) entering production (volume) data from Kansas and Oklahoma in his database to determine the major purchasers, Tr. at 1442:16-1443:12; and (c) selecting the highest posted price, after making gravity adjustments, from a major purchaser for each day during each Tranche One month, Tr. at 1447:10-1448:5.

Mr. Martin's methodology for determining the posted and offered prices for the Price Control era is different from the one for the Post-Price Control era. Defendant explains below the methodologies and their differences.

**2. Price Control Era**

During the first three Tranche One months (January 1976, May 1979, and November 1980), prices for oil were subject to price controls. *Osage Tribe*, 72 Fed. Cl. at 658-59. The price control regulations established three price levels for old oil (lower tier), new oil (upper tier), and exempt oil (stripper and other particular types of oil). *Id.* at 659. Nonetheless, for the first three Tranche One months, Mr. Martin assumed, in accordance with this Court's Opinion, *id.* at 661, that regulated (maximum) prices did not establish the price for purpose of calculating royalty. Martin Decl ¶ 4. Accordingly, in performing his calculations, Mr. Martin selected the highest prices in Oklahoma and Kansas for unregulated and stripper production, from such sources as Platt's *Oil Price Handbook and Oilmanac* and from the highest prices that were actually paid on the Tranche One leases. *Id.* He did not limit himself to oil of similar legal

[6] Mr. Martin used Platt's as the source of his data for 1976, 1979, and 1980, and Platt's and posting bulletins, as the source of his data for 1986 and 1989. Tr. at 1432:1-5.

quality. *Id.* Mr. Martin applied the unregulated price to determine the royalty due on oil from Tranche One leases that had been subject to regulated prices. *Id.*

### 3. Post-Price Control Era

During the last two Tranche One months (February 1986 and July 1989), Mr. Martin not only used the same methodology, but also obtained proxies for offered prices from major purchasers in Kansas-Oklahoma area. Martin Decl. ¶ 5. Specifically, Mr. Martin obtained offered prices from the highest posted or offered price by a Major Purchaser in Kansas or Oklahoma on the day of sale or removal; the highest price that was actually paid on a Tranche One lease**;** and MMS data. *Id.*, ¶¶ 5, 18. Further, in calculating oil royalty due for February 1986, Mr. Martin treated sales on the East Hardy lease as date of delivery (DOD)[7/], and, for July 1989, he treated sales reflected on the Total statement as DOD. *Id.*, ¶¶ 7, 9.

#### a. Use of East Hardy lease data for February 1986

For February 1986, Mr. Martin assumed oil sales for the East Hardy lease as DOD sales, as opposed to equal daily quantity (EDQ)[8/] sales. *Id.*, ¶ 7. Mr. Martin based this assumption on his discussions with Osage Agency supervisory personnel involved in the operations and management of Osage crude oil leases. *Id.* According to the personnel, crude oil for the East Hardy was picked up at the lease by tanker trucks. *Id.* As a result, Mr. Martin treated oil sales from the East Hardy lease as DOD sales and only utilized the price for oil from the East Hardy

---

[7/] DOD refers to sale volumes delivered on a particular day of the month. The price for production sold on DOD transactions is the price that is in effect for that day of sale. Martin Decl. ¶ 7 n. 1.

[8/] EDQ refers to the concept of equal volumes purchased and delivered each day of the month either physically or by agreement of the parties. The EDQ price is a monthly average price. Martin Decl. ¶ 7 n. 2.

lease as a price for particular days of the month. *Id*.

**b. Use of Total statement data for July 1989**

For July 1989, Mr. Martin treated the price of $20.25 as DOD price, which Plaintiff's expert, Dan Reineke, introduced as a price paid by Total Petroleum ("Total") based on oil transactions on a Total statement. *Id.* ¶ *9.* There are several reasons for treating the price of $20.25 as a DOD price.

First, the transaction price from the Total Statement that Plaintiff's expert utilizes, $20.25, is identical to a posted price that occurred during July 1989. *Id.* ¶ 10. Specifically, Total's price of $20.25 is consistent with the postings of several other purchasers in Oklahoma and Kansas for 13 days during the month. *Id.*

Second, the Total statement indicates that Total paid different prices for other transactions in July 1989. *Id.* ¶ 11. Four of the six transactions were conducted at prices that agree with postings in effect on various days during July 1989 and occur in increments of $0.25 (for example, $17.75, $20.25) . *Id.* The increments of $0.25 for these transactions also match the increments used for price bulletins during this period, making it probable that these transactions were DOD transactions. *See id.* If these transactions occurred on an EDQ basis, as Plaintiff's expert asserts, then it would have been highly improbable that transaction prices would have exactly coincided with a $0.25 increment. *Id.*

**c. Use of MMS data for February 1986 and July 1989**

For the Tranche One months of February 1986 and July 1989, Mr. Martin used electronic royalty data from the MMS for federal and Indian leases as an additional source of data for

offered prices,[9] as instructed in the Court's ruling. There are several problems with using this MMS data, however.

The MMS data is not an appropriate source of data for offered prices because it does not comport with the Osage Regulations. The Osage Regulations regarding the calculation of royalty due to the Tribe provide that "settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher *on the day of sale or removal*." 25 C.F.R. § 226.11(a)(2) (emphasis added). The MMS data does not indicate the day of the month on which a sales transaction occurred. Martin Decl. ¶ 17. Nor does the MMS data identify major purchasers or consistently contain information about the quality (gravity) of the oil. *Id.* Further, the MMS data contains errors in calculated royalties and implied unit values.[10] *Id.*

Nevertheless, given the Court's ruling, Mr. Martin made certain necessary assumptions and adjustments to address the fundamental limitations of the raw MMS electronic data so that he could utilize the data as a source of offered prices for the two Tranche One months of February 1986 and July 1989 for calculating damages. Specifically, before utilizing the MMS data, Mr. Martin excluded transactions that contained (a) data anomalies and outliers; (b) a volume of less than one barrel per month; and (c) DOD sales. *Id.* ¶¶ 19, 21, 23-24. Further, Mr. Martin considered only transactions for companies that were major purchasers under the Osage

---

[9] The MMS electronic data generally contains data beginning in 1983 and includes information such as sales month, gross volume, royalty value, type of production, and payor information. Martin Decl. ¶ 15. Defendant provided this data to Plaintiff and its expert.

[10] Mr. Martin calculated an implied unit (barrel) value by dividing the total sales volume into the total sales value. Martin Decl. ¶ 20.

Regulations and assumed that payors were major purchasers if the company name was identical to that of a major purchaser for the applicable month. *Id.* ¶ 22.

### 4. Defendant's Calculation of Oil Royalty Underpayment to Tribe Under Court's Ruling

Using the foregoing methodology, Mr. Martin determined the oil royalty underpayments for the Tranche One leases and months by computing the difference between the oil royalty payment that was due and the oil royalty payment that was actually collected. Using his revised offered price analysis, with the MMS data as an additional source for offered prices, Mr. Martin estimated the damages for oil royalty underpayments to be $178,179. From this figure, Mr. Martin added the computation of the forgone interest or investment returns on the damages up to the date of the annuity payment that would have included those damages and returns. The resulting total damages figure for Tranche One is $178,856.[11/] *Id.* ¶ 30. In the event that the Court deems it appropriate, Mr. Matin also calculated the damages plus the lost interest or investment returns on the damages up to the entry of the Court's judgment. The resulting total damages figure is $1,145,178. *Id.*

### 5. Plaintiff's Calculation of Oil Royalty Underpayment

Plaintiff's oil royalty underpayment calculation, as Defendant understands it, based on discussions with Plaintiff, has several fundamental flaws. First, Plaintiff's expert assumed that oil sales for the East Hardy lease were EDQ sales as opposed to DOD sales. Defendant and its expert are unaware of any documents or other evidence presented at the Tranche One trial that supports this assumption. This improper use of the East Hardy DOD (a price for particular days)

---

[11/] For the reasons stated below in the section of the brief related to interest on damages, this is the appropriate methodology to calculate lost interest or investment earning on damages.

as the price for all days of the month resulted in a significant, and inaccurate, oil royalty underpayment claim for that month.[12] *Id.* ¶ 6.

Second, for July 1989, Mr. Reineke used a price of $20.25 as an average monthly (EDQ) price based on transactions from a Total statement. For all the reasons stated above, $20.25 is a DOD price, which is only applicable to particular days in July 1989. *Id.* ¶ 9. If the transactions on the Total statement occurred on an EDQ basis, it would be highly unlikely that the sales price would have exactly coincided with a $0.25 increment used for price bulletin postings, as explained above. *Id.* ¶ 11. This erroneous methodology results in an inaccurate and inflated offered price on particular days in July 1989. *Id.* ¶ 6.

**B. Failure to Maintain Appropriate Cash Balances and Failure to Obtain Investment Yields in Accordance with Law**

To calculate the damages associated with the Court's findings that Defendant failed to maintain appropriate cash balances and to obtain appropriate investment yields, Defendant conferred with Plaintiff and adopted, with the exceptions noted below, the methodology that Plaintiff proposed for calculating the damages owed to Plaintiff in Tranche One under the Court's ruling. In that ruling, the Court instructed the parties to determine the extent to which Defendant

---

[12] Based on a Tribal resolution located by Defendant, Mr. Martin determined that the royalty rate for East Hardy in February 1986, should have been 1/6 (as opposed to 1/8), effective October 1977. Martin Decl. ¶ 8. Use of this royalty rate eliminates the previously calculated highest royalty price of $24.65. The highest posted or offered price for this month for crude oil sold on an EDQ basis is $20.74. Martin Decl., ¶ 8. Mr. Martin's alternative damages calculation, assuming a 1/6 royalty rate for the East Hardy, is $176,602. *Id.* From this figure, Mr. Martin added the computation of the forgone interest or investment returns on the damages up to the date of the annuity payment that would have included those damages and returns. The resulting total damages figure is $177,249. Mr. Martin also calculated the damages plus the lost interest or investment returns on the damages up to the entry of the Court's judgment. The resulting total damages figure is $1,143,495. *Id.*

failed to "achieve the expected return of 'a combination of contemporaneous 3-month CD rates (80%) and 3-month T-bill rates (20%),' . . . on average daily balances in excess of $25,000." *Osage Tribe*, 72 Fed. Cl. at 671. As set forth in the attached declaration of Defendant's accounting expert, Greg Chavarria, Defendant calculated the difference between the average monthly actual return earned in Accounts No. 7386 (Osage account in which royalty receipts were deposited) and No. 7886 (Osage account to which the statutory interest (4%) rate was posted) and the average monthly expected return. Greg Chavarria Declaration ("Chavarria Decl.") (Attached as Def.'s Ex. 2) ¶¶ 4-21. Defendant describes below the components of the calculations and explains its position on certain issues on which the parties disagree.

**1. Calculation of Actual Returns**

To calculate the average monthly actual returns for the Tranche One months, Mr. Chavarria identified interest postings from investments in CDs and T-bills posted to Account No. 7386.[13/] *Id.* ¶ 6**.** To this amount, he added the income earned on "cash."[14/] *Id.* ¶ 7.

In the first three Tranche One months, the statutory interest of 4% earned on cash under 25 U.S.C. § 161a was posted to Account No. 7886. *Id.* Mr. Chavarria divided the total annual interest earnings by 12 to obtain the average monthly actual interest earnings. *Id.* ¶ 9.

---

[13/] For actual data, Defendant used the account statements and related data from the Agreed-Upon Procedures and Findings Report dated December 31, 1995 ("Andersen Report"), which had been prepared for the Tribe by the Department of Interior through the use of its contractor, Arthur Andersen, LLP.

[14/] It is Defendant's understanding from the parties' discussions that Plaintiff disputes Defendant's Treasury interest on cash posting for 1976. Mr. Chavarria derived the interest on cash figure for 1976 by referring to Andersen Report collection entries for 1976 identified by the revenue type code "9701," which was used to designate Overnighter/statutory interest, and the alpha characters "AW" in the document description field, which identifies the transaction as investment related. Chavarria Decl. ¶ 7.

In the last two Tranche One months, cash earned interest on short-term Treasury investments called the Overnighter, which was posted to Account No. 7386. *See* 25 U.S.C. § 161a (1984). Mr. Chavarria adjusted the postings of Overnighter interest for 1986 and 1989 to account for Interior's posting of Overnighter returns that were associated with cash balances during the years 1985 through 1988 in subsequent years. Chavarria Decl. ¶ 8. Interior posted the 1985 Overnighter interest in 1986 and the 1986 Overnighter interest in subsequent periods, with a large posting of previous years' interest posted in February 1989. *Id.* Thus, using the actual postings in the fiscal years does not accurately reflect the Overnighter interest that was earned in those years.

To compensate for this problem, Mr. Chavarria reviewed the Overnighter postings from 1985 through 1989 and identified those postings associated with interest actually earned in 1986 and 1989. *Id.* The recalculations for these years ended up creating a difference without significance. Both calculations (actual and adjusted) produced a result where the actual earnings exceeded the expected returns, i.e., no damages were calculated for either the 1986 or the 1989 Tranche One months. *Id.*

### 2. Calculation of Average Daily Fund Balance For Purposes of Determining Expected Returns

#### a. Determination of Average Daily Fund Balance

To determine the average daily fund balance, Mr. Chavarria added the average daily fund balances of Accounts No. 7386 and No. 7886. *Id.* ¶ 11. For Account No. 7386, Mr. Chavarria calculated average daily fund balances based on each day's ending balance in the relevant fiscal years. *Id.* ¶ 10. He used schedules provided by Plaintiff for the average daily fund balance for Account No. 7886. *Id.* ¶ 11.

**b. Adjustments to Average Daily Balances to Reflect $25,000 Cash Permitted by Court and to Allow for a Reasonable Amount of Time for the Government to Invest Receipts**

To calculate the average daily balance on which to base the returns that the funds would have earned pursuant to the expected rate, Mr. Chavarria reduced the daily balance by $25,000. *Id.* ¶ 12. In addition, as consistent with the Court's ruling, Mr. Chavarria adjusted the daily cash balance to reflect a reasonable time between the deposit of funds and the investment of those funds. It is Defendant's understanding from the parties' discussions that Plaintiff disputes the appropriateness of this latter adjustment. Defendant's rationale for the adjustment is explained below.

In its ruling, the Court stated that "cash balances – whether invested in the statutory 4% rate or held in overnight accounts – would be *quickly converted* into higher-yielding investments." *Osage Tribe*, 72 Fed. Cl. at 666 (emphasis added). In noting that cash would be quickly converted, the Court presumably recognized that such conversion could not occur immediately. This recognition comports with the principle that a trustee "can properly take a reasonable amount of time in looking out for proper trust investments and is not liable for failure to make the property productive during such time." *E.F. Hutton S.W. Props. v. Union Planters Nat'l Bank*, 953 F.2d 963, 973 (5th Cir. 1992) (quoting SCOTT ON TRUSTS at 542 (4th ed. 1987); *see also Barney v. Saunders*, 57 U.S. 535 (1853). The Court of Claims has held that this principle applies to the Secretary of the Interior: "While the trustee has a reasonable time to make the initial investment or to reinvest, he becomes liable for a breach of trust if that reasonable time is exceeded." *Cheyenne-Arapaho Tribes of Indians v. United States*, 512 F.2d 1390, 1394 (Cl. Ct. 1975); *see also*, DX1668-0101 (Price Waterhouse Report); Restatement (Third) of Trusts § 181,

cmt. d (1992) ("The trustee is not liable, however, if a delay is reasonable and, when applicable, the trustee has taken reasonable advantage of opportunities to earn interest on the funds while seeking to make what may be more suitable, longer term investments.").

The evidence before the Court demonstrates that, in the first three Tranche One months, investment of receipts in either Treasury securities or bank CDs required a reasonable amount of time. Such investment could not have occurred immediately.[15/] At least one day from the date of deposit was needed to invest funds in Treasury securities. As noted by the Price Waterhouse Report (on which the Court relied to establish the $25,000 maximum cash balance), "[i]nvestments in market bills are made daily by telephoning the Department of the Treasury by 9:00 a.m. Albuquerque time." DX1668-0133 (Price Waterhouse Report). Thus, funds deposited after 9:00 a.m. could not have been invested in Treasury securities on the same day as deposit. Rather, the earliest that they could have been invested would have been the morning of the next business day.

Investment in bank CDs required additional time. Such investments were subject to the investment cycle for CDs. DX1668-0133-34 (Price Waterhouse Report). The investment cycle established by Interior began approximately two weeks prior to placing money in such investments. *Id.* Interior would solicit bids from banks and evaluate the bids to determine the highest effective yields for the appropriate maturities. *Id.* CDs would be selected based on the

---

15/ In the last two Tranche One periods, Interior invested cash in the Treasury Overnighter on a daily basis. Chavarria Decl. ¶ 7. The Treasury Overnighter served the same purpose as short-term Treasury Bills did in earlier periods (and likely would have earned an equivalent return as 3-month T-bill rates which were lower than the Overnighter during that time period, *Id.* Attachments 1A and 2)**,** acting as a bridge between receipt of funds and their investment in longer-term securities.

interest offered and the availability of sufficient insurance or collateral to secure the investments. *Id.* Investments in CDs would be accomplished on Tuesdays and Thursdays. *Id.* Thus, assuming that the investment cycle was initiated in advance of receiving anticipated funds, placing the funds in CDs could still take at least three business days (*e.g.*, if the receipts were deposited at the end of the day on a Thursday, they would not be invested in CDs until the following Tuesday, at the earliest).

Accordingly, in calculating the average fund balance for determining damages, Mr. Chavarria adjusted the account balances to reflect a reasonable time (one day) needed for investing in Treasury securities and CDs.[16/] Chavarria Decl. ¶ 12. This one-day period is supported by the evidence before the Court and is consistent with the Court's opinion, which noted that investments would be made "quickly," not immediately.[17/]

### 3. Calculation of Expected Returns

---

[16/] Defendant notes that the Tranche One trial did not address specifically what constitutes a reasonable period of time between deposit and investment of funds. Therefore, Defendant believes that, in Tranche Two of this case, additional evidentiary development may be necessary to determine the amount of time that would constitute an appropriate and reasonable period between deposit and investment for the remaining time periods at issue in the case.

[17/] The Court also recognized in its ruling that a trustee can maintain a cash balance necessary for making disbursements, *Osage Tribe*, 72 Fed. Cl. at 666-67, which would support a further adjustment to the average daily fund balance. Evidence at trial showed, however, that Interior generally timed investments of Osage funds so that they matured on the date of annuity payments so that there were not extended periods in which the account held cash in anticipation of disbursements. *See* JX28, JX35, JX48. In the later Tranche One months, cash was held in the Overnighter for a longer period of time in advance of annuity payments, but the rate of return for the Overnighter was equivalent to the rate that would have been earned on a short-term Treasury Bill, which could have been used to bridge a time-gap between the maturity of a CD and the annuity payment. Chavarria Declaration Attachments 1A and 2. For these reasons, Defendant has not adjusted the average daily fund balance to allow for a higher cash balance for immediate disbursement needs.

As the Court has instructed, the parties are using a blended rate of return composed of 80% 3-month CDs and 20% 3-month T-Bills. Further, the parties agree to the use of the expected rate of return that was available in the Tranche One months for these instruments. *See* Chavarria Decl. ¶ 13. The parties disagree, however, about whether to use a rate of return based on an investment basis or discount basis.

As explained by Mr. Chavarria, the appropriateness of using an investment rate or a discount rate depends on the calculation of the average daily fund balance. An annual investment rate incorporates compound interest. *Id.* ¶ 14. Thus, it reflects a yield that assumes reinvestment of earnings from the date that the rate is available through the remainder of the year. *Id*. To calculate appropriate expected returns on the average daily fund balance using an investment rate, one should reduce the average funds balance by the interest earnings posted to the account during the year so that one is considering only the principal balance of the account. *Id.* When one combines interest earnings with the principal to obtain the funds balance, then one is creating a compounding effect on the balance. If one applies the investment rate to a fund balance that includes both principal and interest, then one is creating a double compounding effect on the expected return, *i.e.*, the compounded interest that is already included in the fund balance would be compounded again. *Id.* ¶¶ 14, 16.

To avoid the double compounding effect, one can calculate the interest earnings by multiplying the average daily fund balance (which includes earnings and principal) by the discount rate (based on future cash flows). *Id.* ¶ 15. Using this methodology, Mr. Chavarria calculated the expected return by applying the discount rate to the average fund balance that included both principal and interest. *Id.* ¶ 17. He identified and used the monthly Federal Reserve published

rates for 3-month CD's and 3-month T-bills for the applicable Tranche One months. *Id.* ¶ 18. Mr. Chavarria used a discount basis for the T-bill rate as obtained from the Federal Reserve published rates and then converted the published 3-month CD rate to a discount basis. *Id.* He also calculated the expected return by applying the investment rate to the average fund balance that excluded interest. *Id.* ¶ 17. The two resulting expected earnings are not exactly the same, because investment earnings are not posted evenly throughout the year. *Id*. For purposes of determining the Tranche One damages, Defendant is proceeding with the discount basis calculations methodology, because it resulted in a higher expected return on invested funds than the investment basis. To this figure, Mr. Chavarria added the total annual expected earnings on cash to derive the total expected earnings on the average fund balance. *Id.* ¶¶ 19-20.

**4. Calculation of Damages**

Mr. Chavarria calculated the damages by determining the difference between the Tranche One month's actual earnings and expected earnings. *Id.* ¶ 21. The total principal figure for Tranche One damages based on the foregoing calculations is $16,723.41. *Id*.

To this principal figure, Mr. Chavarria added the calculation of interest or investment earnings on the damages, based on two scenarios that are fully explained below in Part III of this brief. For the scenario reflecting damages, as well as lost interest or investment returns on damages up to the date of the annuity payment (which would have included those damages and returns), the total damages figure is $16,809.33. *Id*. For the scenario reflecting damages, as well as lost interest or investment returns on damages up to the entry of the Court's judgment in this case (presumed to be December 31, 2006), the total damages figure is $93,957.22. *Id*.

**C. Failure to Timely Deposit Royalty Receipts**

To calculate the damages associated with the Court's ruling that Defendant breached its duty to timely deposit royalty receipts, Mr. Chavarria relied on the source documents produced by both parties at trial.[18] *Id.* ¶ 23. For royalties paid by check, Mr. Chavarria calculated the time period between the receipt of royalty receipts in the Osage Agency mailroom and the posting of those funds to Account No. 7386. *Id.* Mr. Chavarria obtained information for this calculation from the Osage Agency Mailroom Schedule of Collections and the Andersen Report Account Statements. *Id.* For royalties paid by electronic funds transfer ("EFT"), Mr. Chavarria reviewed Fedwire deposit listings, electronically generated deposit tickets, and Andersen Report Account Statements. *Id.*

Additionally, Mr. Chavarria determined whether there were any instances where payments were not deposited in a timely manner (i.e., the deposit was not credited to the Osage account within 24 hours or by the end of the next business day following receipt), as directed by the Court's ruling. *Id.* Mr. Chavarria did this by counting the number of business days between receipt and posting of royalty payments and then subtracting one day. *Id.* For funds that were not posted within 24 hours or by the end of the next business day following receipt, Mr. Chavarria used the blended 80% 3-month CD and 20% 3-month T-Bill expected rate to calculate the lost investment income that could have been earned on those funds. *Id.* ¶ 25.

From his review of the source documents, Mr. Chavarria determined that all royalty

[18] It is Defendant's understanding based on the parties' discussions, that Plaintiff disputes the appropriateness of this approach, and instead has applied an assumed average deposit lag time to total annual receipts for the fiscal years containing a Tranche One month in order to estimate damages associated with the Defendant's breach of its duty to timely deposit royalty receipts for the Tranche One months. Such an approach has no basis in fact and simply inflates Plaintiff's damages calculations. Indeed, Plaintiff's approach controverts the factual evidence presented by both parties at trial pertaining to the lag times associated with specific Tranche One deposits.

payments for production in January 1976 and one payment for production in May 1979 were made by check. *Id.* ¶ 24. All of the remaining payments were made by EFT. *Id*. Relying on the dates appearing in the Osage Agency Mailroom Schedule of Collections and the Andersen Report Account Statements, Mr. Chavarria determined that two of those check deposits exceeded the Court's permissible time for deposit by one day. *Id*. Mr. Chavarria's review of Fedwire deposit listings, electronically generated deposit tickets and Andersen Report Account Statements revealed that all EFT payments were timely deposited in Account No. 7386. *Id*. Mr. Chavarria's calculation of damages resulting from the untimely deposit of those funds is $228.03. *Id.* ¶ 25.

To this amount of $228.03, Mr. Chavarria added the calculation of forgone interest or investment earnings on the damages, based on two scenarios that are fully explained below in Part III of this brief. *Id.* For the scenario reflecting damages as well as lost interest or investment returns on damages, up to the date of the next annuity payment (which would have included those damages and returns), the total damages figure is $230.57. *Id*. For the scenario reflecting damages as well as the lost interest or investment returns on damages, up to the entry of the Court's judgment (presumed to be December 31, 2006), the total damages figure is $1,656.64. *Id*.

## II. INTEREST ON DAMAGES

By statute, Congress has provided that "[i]nterest on a claim against the United States shall be allowed in a judgment of the [CFC] only under a contract or Act of Congress expressly providing for payment thereof." 28 U.S.C. § 2516(a). Consistent with this congressional directive, courts have long held that the "no interest" rule precludes the recovery of interest on claims against the United States, absent an express provision to the contrary in the relevant

statute, contract, or treaty.[19] The strict nature of the "no interest" rule is evidenced by the refusal of courts to allow the recovery of interest on the basis of policy or implied notions of just compensation, *Short v. United* States, 12 Cl. Ct. 36, 42-43 (1987) ("*Short IV*") (citations omitted), or to allow recovery of interest by simply referring to interest as some other form of relief, *United States v. Mescalero Apache Tribe*, 207 Ct. Cl. 369, 389 (1975).

In order to recover interest on its damages awards, Plaintiff bears the burden of identifying a provision in a statute, contract, or treaty expressly providing for the recovery of interest and demonstrating that it would have obtained interest under the particular provision, had the United States not violated the particular statutory or contractual obligation. *See Short IV*, 12 Cl. Ct. at 43. Here, however, Plaintiff has failed to make the necessary showing of an explicit entitlement to pre-judgment interest pursuant to 28 U.S.C. § 2516(a).

As an alternative, Plaintiff can recover interest by showing an entitlement to damages based on the breach of a money-mandating duty to earn interest or investment returns. This showing of entitlement is particularized. As the leading treatise on Indian law has summarized:

> Interest may be recovered as damages if a statute requires payment of interest, or imposes a duty to make a trust fund productive. In such a case, the interest is properly regarded not as impermissible prejudgment interest, but a portion of the proper measure of damages for failure to make the trust fund productive. These damages may take the form of interest owed on interest-bearing funds or the

---

[19] *See, e.g., United States v. Alcea Band of Tillamooks,* 341 U.S. 48, 49 (1951); *Cherokee Nation v. United States*, 270 U.S. 476, 490 (1926); *United States v. Sherman*, 98 U.S. 565 (1878); *Short v. United States*, 12 Cl. Ct. 36, 42-45 (1987) ("*Short IV*"), *aff'd*, 50 F.3d 994 (Fed. Cir. 1995) ("*Short VI*"); *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369 (1975) ("*Mescalero Apache Tribe*"); *United States v. Nez Perce Tribe of Indians*, 194 Ct. Cl. 490 (1971) ("*Nez Perce Tribe*"); *Peoria Tribe of Indians v. United States*, 390 U.S. 468, 470 (1968) ("*Peoria Tribe*"); *Confederated Salish & Kootenai Tribes of Flathead Reservation v. United States*, 175 Ct. Cl. 451, *cert. denied*, 385 U.S. 921 (1966); *Menominee Tribe of Indians v. United States*, 97 Ct. Cl. 158, 162 (1942).

> amount funds would have earned had they been invested in permissible investments, but this interest is part of the damages and not a violation of the no-interest rule.

Cohen's Handbook of Federal Indian Law, pp. 453-54 (2005 ed.) (citations omitted).

The Federal Circuit has also addressed this issue. In *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339 (Fed.Cir. 2004), the Court of Appeals for the Federal Circuit addressed whether the United States was liable for interest on royalties that it did not timely collect. Recognizing the limitation on interest awards imposed by 28 U.S.C. § 2516(a), the court looked to the operative statutes to determine whether they expressly provided for interest. *Id.* at 1351. The court concluded that the Tribe was entitled to interest on revenue from mineral leases that the Government had a duty to collect under the regulations implementing the Indian Minerals Leasing Act, and that the Government was obligated to pay interest on such lease revenues "pursuant to the general trust management statutes of 25 U.S.C. §§ 161a, 161b, and 162a."[20] *Id.* at 1354.

The Federal Circuit has also addressed whether the government was liable for interest on royalties held in trust that had been distributed to improper parties. *Short v. United States* (*Short VI*), 50 F.3d 994, 997-1001 (Fed.Cir. 1995). Acknowledging section 2516(a)'s limitation on the award of pre-judgment interest against the government, the court determined that under 25 U.S.C. §§ 161a and 162a, the government "owe[d] the plaintiffs interest, *not* as interest on their damages, but as part of the damages award itself." *Id.* at 997-999 (citing *Peoria Tribe of Indians v. United States*, 390 U.S. 468, 472, 88 S.Ct. 1137, 1139 (1968); *Cheyenne-Arapaho Tribes of*

---

[20] The Court also determined that 25 U.S.C. § 612, which is not relevant to the Osage Tribe, entitled the Tribe to interest on monies that the government had failed to collect in a timely manner. *Shoshone*, 364 F.3d at 1354.

*Indians v. United States*, 512 F.2d 1390, 1393-94, 1396 (Ct. Cl. 1975)). The court determined that "the amount of interest that, by statute, should have been accumulating on funds wrongfully disbursed by the government is properly viewed as part of the 'damages resulting from a breach of trust.'" *Short VI,* 50 F.3d at 999 (citing *United States v. Mitchell* (*Mitchell II*), 463 U.S. 206, (1983) ). The court reasoned that, but for the government's failure to provide proceeds to plaintiffs, the plaintiffs "would still be accruing interest as provided by statute." *Short VI,* 50 F.3d at 999-1000 (citation omitted). Accordingly, the court concluded that the proper measure of the interest component of its damages award would be the interest that was required under §§ 161a and 162a when these funds were held in trust.[21] *Id.* at 1000 (citing *Manchester Band of Pomo Indians, Inc. v. United States,* 363 F.Supp. 1238, 1244-48 (N.D.Cal. 1973); *Menominee Tribe of Indians v. United States*, 101 Ct. Cl. 10, 18 (1944)).

Pursuant to the holdings in *Shoshone* and *Short VI*, this Court may provide for interest as part of damages in the form of forgone interest (pursuant to 25 U.S.C. § 161a) or unrealized investment income (pursuant to 25 U.S.C. § 162a). In providing for such interest or returns as part of damages, the Court should examine the amount of interest or returns that "should have been accumulating," *Short VI* at 999, as if the funds had been collected properly and deposited in the Osage Tribe's trust fund, where the funds were subject to 25 U.S.C. §§ 161a and 162a. Contrary to what Plaintiff argued at trial, the amount of interest is not the "measure of the time value of the interest the Osage Nation lost." PX750-0015 ¶ 42 (cited in *Osage Tribe*, 72 Fed. Cl. at 671). It is not the present value or time value of the lost interest to which Plaintiff is entitled,

---

[21] The Court determined that the 4% interest on non-invested cash funds provided under Section 161a was the appropriate interest to be applied as part of the plaintiffs' damages. *Short VI*, 50 F.3d at 1000.

but the forgone returns that the uncollected receipts or under-invested funds should have earned, if they had been in Account No. 7386 and earned interest pursuant to the pre-1985 Section 161a or were invested pursuant to the post-1984 Section 161a or Section 162a.

Further, the appropriate measure of damages due to a breach of the Defendant's duty under Sections 161a and 162a is limited to the measure of that which Defendant should have earned for the Tribe, while the Defendant held or should have held the funds in trust. The Federal Circuit has opined that:

> In determining the amount of damages for a breach of the trustee's fiduciary duty with regard to investments of the trust property, courts attempt to place the beneficiary in the position in which it would have been absent a breach.

*Confederated Tribes of Warm Springs Reservation v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001); *see also Northern Paiute Nation v. United States,* 8 Cl. Ct. 470, 489 (1985). The appropriate measure of damages for a breach of trust is "the difference between the actual proceeds and the greatest *appropriate revenue* which should have been obtained." *Warm Springs*, 248 F.3d at 1371, 1373 (emphasis added) (citing *Mitchell v. United States*, 664 F.2d 265, 271 (Ct.Cl. 1981), *aff'd* 463 U.S. 206 (1983)).

To place Plaintiff in the position in which it would have been, absent the breach, the Court should limit the award of forgone interest or investment earnings to the period of time in which the funds, under law, would have been held in the Tribe's trust fund. It is only during this time that the breach of Defendant's duties under Sections 161a and 162a could have been said to have occurred. Under Section 6 of the Act of June 28, 1906, ch. 3572, 34 Stat. 539, as amended, Defendant was required to disburse all receipts and investment earnings as part of its quarterly

annuity payments[22] to the headright owners. Accordingly, Defendant's duty was to make the receipts productive under Sections 161a and 162a up until the date of the annuity payment when those receipts would have been disbursed. Plaintiff is not entitled to interest on royalty underpayments or additional interest on under-invested funds, beyond the period that the Government was responsible for holding those royalty receipts or investment earnings in Plaintiff's tribal trust fund account.

Any lost interest or investment returns post-dating the relevant quarterly annuity payments would have been a loss incurred by Tribal headright owners. There is no statute that permits recovery of such interest or investment returns once the funds are no longer held in the tribal trust fund account. Moreover, any damages from the lost present value of funds that the Tribal headright owners might have incurred would be indirect or consequential damages, for which the United States cannot be held liable. *Mitchell*, 664 F.2d at 271 ("Congress [mandated] a restricted degree of compensation for violations of traditional fiduciary responsibilities in the management of Indian property. These are therefore claims for monetary compensation founded on, and mandated by, Congressional legislation. . . . But there can be no recovery for other, consequential, indirect damages which a private cestui might possibly recover because of his trustee's derelictions.").[23] Assuming that interest would have accumulated in Account No. 7386 beyond

---

[22] The annuity payment excluded amounts that were disbursed to the Tribe for its expenses or to the State of Oklahoma for severance taxes.

[23] The Court determined that Defendant breached its statutory duties to the Tribe under §§161a and 162a and held Defendant liable for damages in the amount that Defendant as trustee should have earned for Plaintiff, but for its breach. Anything else, such as forgone investment income to headright owners for their use of the principal outside of trust, is necessarily consequential damages that are impermissible under *Mitchell*, 664 F.2d at 271. Consequential damages, which are not available to the Tribe, are defined as '[l]osses that do not directly and

the date of the quarterly annuity payments specifically associated with the Tranche One, under-payments of royalties or insufficient returns on investment of funds would extend the damages award beyond the period of the breach and, thus, would amount to providing pre-judgment interest without statutory authorization. *Warm Springs, supra; Shoshone*, 364 F.3d at 1353 (plaintiff is entitled only to interest or returns '"as part of the damages award itself,'" not as an award on damages).

Further, in determining the lost interest or investment returns, the Court should be guided by the requirements of 25 U.S.C. §§ 161a and 162a. Notably, both Sections 161a and 162a expressly vest the Secretary of the Interior with discretion in the investment of tribal trust funds.[24/] Congress provided certain parameters to guide the exercise of this discretion, including the directive that investments should be made for maturities appropriate to the trust fund involved.[25/]

---

immediately flow from an injurious act, but that result indirectly from the act." Black's Law Dictionary (7th ed. 1999). In this case, the "injurious act" was Defendant's failure to timely deposit and prudently invest Osage royalties. Lost profits stemming from any inability to invest those royalties upon distribution is a form of indirect, consequential damages that should not be permitted. *See East River S.S. Corp. v. Transamerica Delavel*, 476 U.S. 858, 874 (1986).

[24] Section 161a provides the Secretary of the Interior with the discretionary authority to decide if and when to request the Secretary of the Treasury to invest tribal trust funds in public debt securities, which are considered suitable as "determined" by the Secretary of the Interior. Congress added this discretionary language to Section 161a in 1984. Prior to 1984, Section 161a provided that tribal trust funds shall bear simple interest of 4% per annum. Likewise, Section 162a authorizes the Secretary of the Interior, "in his discretion," to withdraw tribal Osage trust funds from Treasury to be deposited in banks "selected by him."

[25/] Section 161a expressly provides that Interior, when it exercises its discretion to direct that the Secretary of the Treasury invest trust funds, is to determine the "maturities suitable to the needs of the fund involved." 25 U.S.C. § 161a(a). Section 162a came into play in this case when Interior withdrew Osage funds from Treasury and deposited them in banks or invested them in Treasury bonds. In exercising its discretion under Section 162a, a key relevant factor for Interior to have considered, as in exercising its counterpart discretion under Section 161a, was the suitability of the maturities of given investments given the specific needs of the fund involved.

Thus, the Court should not consider returns that could have been obtained on investment vehicles with maturities that would have been unsuitable to the funds in Account No. 7386, given the purpose of that account.

It is simply a fiction unsupported by law to suggest that, if the funds had been collected, the Secretary would have or could have exercised his discretion by investing any such funds in long-term instruments. Indeed, if the funds had been timely collected and deposited in the trust account, the Secretary would have abused his discretion under Section 162a and would have violated the terms of Section 6 of the 1906 Act if he had invested the funds in instruments with long-term maturities inconsistent with the maturities necessary to meet Interior's regular and recurring duty to disburse the funds, including earned interest or investment returns, as part of the quarterly annuity payments. The amount the trust fund should have earned was limited by the purpose of the fund (a short-term account for purposes of making quarterly annuity payments) and the available investments given that purpose (*i.e.*, short-term instruments).

Even if the Court adopts the view that the damages and the interest that would have been earned on the damages would have remained in the account up until the date of this Court's judgment, the funds still would have been subject to the rates of return earned in Account No. 7386. They would have been "accruing interest as provided by statute," *Short VI,* 50 F.3d at 999-1000 (citation omitted), which would have been limited to interest earned on investment vehicles of appropriate maturities for that account.

Defendant addressed at trial the appropriate rate of return that funds in Account No. 7386 should have earned in order for the Secretary to fulfill his duties under 25 U.S.C. §§ 161a and 162a. Under both Section 162a and the 1906 Act, investments of Osage royalties were limited to

quarterly investments in 3-month T-bills and 3-month CDs. Record of Trial 2101:1-20; 2122:15-2123:6; 2133:22-2134:9. The parties agreed that the "prudent investor rate" proffered by Defendant's investments expert, Charles Lundelius, was the "'appropriate standard upon which to measure whether the United States satisfied its fiduciary duty of investing funds prudently.'" *Osage Tribe*, 72 Fed. Cl. at 668 (quoting Pl.'s Resp. 15). The "prudent investor rate" reflected "the expected rate that a prudent investor could have achieved during the time period under the constraints imposed by the duties of care and caution." *Osage Tribe*, 72 Fed. Cl. at 668 (citing Def's Br. 47). The expected rate consisted of "a combination of contemporaneous 3-month CD rates (80%) and 3-month Treasury bill rates (20%), to reflect the rates of return on investments available to the Osage funds on a quarterly basis during Tranche One." *Osage Tribe*, 72 Fed. Cl. at 668 (quoting Def.'s Br. 47-48).

In establishing a method for determining damages in this matter, the Court adopted the "prudent investor rate" as the rate of return that Defendant should have earned on Osage royalties, if they had been invested pursuant to Sections 161a and 162a, as well as the 1906 Act. *Osage Tribe*, 72 Fed. Cl. at 671. Absent evidence pertaining to the prudent investment vehicles following Tranche One, the Tranche One "prudent investor rate" may provide, in part, a measure for the calculation of "interest on damages" reflecting what the Tribe may have earned if its funds, including any uncollected royalties, had been invested properly in Account No. 7386 (*i.e.*, a combination of contemporaneous 3-month CD rates (80%) and 3-month Treasury bill rates (20%)).[26/] In those circumstances when the funds in Account No. 7386 earned a rate exceeding

---

[26/] As discussed, *supra*, the rate should be based on a discount basis, unless interest postings are excluded from the average daily fund balance. Further, Defendant notes that no evidence was presented at trial as to the "prudent investor rate" for any periods outside Tranche One.

the "prudent investor rate," however, Defendant applied the higher actual rates to its damages calculation.

In summary, the Court should enter judgment in the amount of $191,697.16, reflecting the damages, as well as the lost interest or investment returns on the damages up to the date of the annuity payment (which would have included those damages and returns). If the Court deems that interest or investment earnings should have accrued until the date of judgment (presumed to be December 31, 2006), however the Court should enter judgment in the amount of $1,232,146.29.

## III. PLAINTIFF IS NOT ENTITLED TO LATE FEES AS PART OF DAMAGES

The Court should not award Plaintiff late fees, in lieu of or in addition to interest on and as part of Plaintiff's damages. Such an award would amount to a windfall on the uncollected funds and would not further the purpose of the Osage Regulations, which is to impose a penalty or sanction so as to encourage timely oil royalty payments. In addition, the late fee provision of the Osage Regulations does not constitute the express provision for payment of interest on damages claims required under 28 U.S.C. § 2516(a).

The Osage Regulations provide that the party responsible for payment, either the lessee or purchaser, shall be subject to a "late charge at the rate of not less than 1 ½ percent for each month or fraction thereof until paid." 25 C.F.R. § 226.13(a). The late fee provision of the Osage Regulations is a "heavy sanction[][,]" *Osage Tribe*, 72 Fed. Cl. at 652, or penalty imposed to

---

Additional evidence therefore will be necessary to fully develop the appropriate reasonable "prudent investor rates" for "interest on damages" calculations for Tranche One under this scenario. Such evidence would also be necessary to fully develop the appropriate reasonable "prudent investor rate" for the remaining periods to be addressed in Tranche Two of this case.

encourage timely oil royalty payments, *see* Tr. 1044:2-6. The Court noted that the "incentives for compliance[,]" including the late fee and the threat of cancellation of leases due to noncompliance with the regulations (25 C.F.R. § 226.42), along with the Osage Agency's verification procedures were "reasonably calculated to result in compliance with the 1974 Regulations" to ensure proper payment of the actual price by the lessees or purchasers. *Osage Tribe*, 72 Fed. Cl. at 652. In short, the purpose of the late fee provision was to encourage timely payment from the parties owing royalties, that is, from the lessees or purchasers, not from Defendant. Imposing the late fee on Defendant would not serve the late fee provision's purpose, as it would not serve to encourage prompt payment by the lessees or purchasers of the deficient royalty payments only now that have been ruled to be as due and owing from Defendant.

Moreover, the Court noted that neither 25 C.F.R. § 226.13 nor § 224.42 "expressly requires the imposition of a penalty for partial payment in cases where some or most of the royalty owed is paid." *Id.* at 658. Specifically, the Court did not find that lessees and purchasers failed to pay the royalties that they and the Osage Agency had deemed were owing. Rather, based on the Court's interpretation of the Osage Regulations, it determined that partial payments were made and that additional amounts are owing. *Osage Tribe*, 72 Fed. Cl. at 643-49, 658-661. Thus, according to the Court's own conclusions, the Osage Agency has not failed to collect late fees on the partially underpaid royalties that the Court has now determined are owed.

In addition, it is not part of the purpose of the late fee provision to provide the Tribe with the lost value of the unpaid funds between the date the payment was due and when it was actually paid. This is clear, given the high rate of interest that the late charge imposed. The 1 ½ is charged for each month of tardiness or fraction thereof, which equates to an 18 percent annual

rate. In contrast, when the late fee provision was promulgated in the 1974 regulations, the annual rate of return for Treasury bonds with a three-month maturity was 7.85% and for a seven-year constant maturity was 7.72%.[27] Therefore, as explained above, the 18 percent annual rate was a penalty to encourage timely oil royalty payments, not a vehicle for generating returns on funds for the Tribe.

Given its purpose, the late fee provision does not constitute the express provision for payment of interest on damages claims required under 28 U.S.C. § 2516(a), and the cases construing this statute. *See supra* at 20-21. The late fee provision also does not create a duty for Defendant to make Plaintiff's funds productive. Such duty is found elsewhere – as explained above, Plaintiff is entitled to the proceeds that "would have been received" pursuant to 25 U.S.C. §§ 161a and 162a.

Finally, Plaintiff's damages should be valued at the date of Defendant's breach, *Northern Paiute Nation*, 8 Cl. Ct. at 489 n. 16, and they should "place the beneficiary in the position in which it would have been absent a breach." *Warm Springs*, 248 F.3d at 1371 (citations omitted). At trial, Plaintiff failed to establish a breach of the duty to charge and collect late fees, *Osage Tribe*, 72 Fed. Cl. at 658, and there is no evidence that the Osage Agency would have failed to impose or collect late fees if it had applied the Court's interpretation of the pricing regulations at the time payments were due. There is also no evidence that had the Government sought royalty payments (calculated in accord with the Court's interpretation of the pricing regulations) that lessees or purchasers would have made late payments. Consequently, awarding late fees to

[27] These rates are available at http://www.federalreserve.gov/release/H15/data.htm.

Plaintiff under such circumstances would be essentially basing the award on rank speculation[28] and, without evidence of a breach, such an award would put Plaintiff in a different position than it would have been, absent the breach.[29]

For the foregoing reasons, the Court should not provide the Plaintiff with an impermissible windfall through requiring Defendant to pay the 18 percent annual late fee rate on the damages due to unpaid royalties.

## IV. CONCLUSION

For the foregoing reasons, the Court should enter judgment in favor of Plaintiff for either $191,697.16, which reflects the damages owed to Plaintiff under the Court's ruling, with the forgone interest or unrealized investment returns to the date of the annuity payment (which would have included the damages and associated interest or returns), or $1,232,146.29, which reflects the damages sustained plus the forgone interest or unrealized investment returns calculated to December 31, 2006 (the presumed date of the Court's judgment).

Respectfully submitted this 17th day of November, 2006,

*s/ Brett D. Burton*
BRETT D. BURTON
Counsel of Record for Defendant

*s/ Kevin S. Webb*
KEVIN S. WEBB
MARTIN J. LALONDE
United States Department of Justice - ENRD

---

28/ The Court has noted that the "Osage Tribe is entitled to damages reasonably estimated based on existing information." *Osage Tribe*, 72 Fed. Cl. at 670.

29/ Further, the purported loss of collections of late fees is an indirect loss to which the Tribe is not entitled. *Mitchell*, 664 F.2d at 271.

Washington, D.C. 20044-663
Telephone: (202) 305-0212
Fax: (202) 353-2021
Attorneys for Defendant

OF COUNSEL:
Elisabeth Brandon
Brenda Riel
Candace Beck
Teresa E. Dawson