IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA,<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant | No. 99-550 L (into which has been consolidated 00-169 L)<br>Judge Emily C. Hewitt |

DECLARATION OF RONNIE A. MARTIN

I, Ronnie A. Martin, hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct.

1. During the Tranche One trial I was qualified by the Court as an expert in oil royalty calculations, the verification of oil royalty paid, and oil royalty practices. I am a senior managing director for FTI Consulting (FTI) in Houston, Texas and am the practice leader for FTI's oil and gas service practice. Previously, I worked for Texaco for thirty-three years. My last position there was vice president of Texaco Exploration Producing, Inc. At Texaco and FTI some of my duties are and were to help clients analyze claims relating to oil and gas issues, particularly with respect to royalty and severance tax valuation issues. I graduated from Mississippi State University in 1969 with a Bachelor of Science degree in mechanical engineering and am a member of the National Energy Services Association.

2. I calculated the oil royalty damages to which Plaintiff is entitled in accordance with the Court's September 21, 2006 Opinion. Specifically,

    a) During the price control era, I assumed that regulated prices did not establish the price for the purpose of calculating royalty.
    b) I assumed that Plaintiff is entitled to oil royalties based on the highest of 1) actual selling price; 2) higher of highest posted prices or offered prices by a Major Purchaser in Kansas or Oklahoma; 3) prices paid by a Major Purchaser in Kansas or Oklahoma, and; 4) prices from Minerals Management Service (MMS) Form 2014 royalty data ("MMS 2014 data") which may be used as a proxy for offered prices.

3. The analysis in this declaration updates and supplements my previous expert reports and testimony at the Osage Tranche One trial.

REVISED TRANCHE ONE TRIAL CALCULATIONS

PRICE CONTROL ERA

4. In accordance with the Court's Opinion, I did not restrict the determination of offered prices to only crude oil that was of similar legal quality under the price control regulations which were in effect during the Tranche One months of January 1976, May 1979 and November 1980. Instead, I used the higher prices for unregulated and stripper oil production as offered prices for the lower priced old and new oil production. I obtained the highest posted prices for Oklahoma and Kansas from Platt's *Oil Price Handbook and Oilmanac* publication and the highest prices that were paid on other Tranche One leases for the Tranche One months during the period of crude oil price controls from Osage Agency records. I was unable to confirm that any bonuses were paid during the Tranche One months or the existence of any higher offered prices by a major purchaser in Kansas or Oklahoma.

POST – PRICE CONTROL ERA

5. I revised my trial calculations for the Tranche One months of February 1986 and July 1989 in accordance with the Court's Opinion. In particular, I considered the highest posted or offered price by a Major Purchaser in Kansas and Oklahoma on the day of sale or removal as well as prices paid for all of the Tranche One leases as evidence of offered prices. I utilized the highest of these prices on the day that the royalty volume was sold in my calculations. Each of the prices was gravity adjusted to the actual gravity of the Tranche One lease sales volume. The calculated difference between the crude oil royalty due and the royalty paid is $173,899 and is shown in Attachment 1, "Analysis Summary". Detailed results of the calculation are shown in Attachment 2, "Revised Trial Exhibit E – Calculated Difference".

6. Plaintiff's calculation of additional royalty due contains several improper assumptions and, in general, overstates oil royalty underpayments.

   a) For February 1986, Plaintiff's expert inappropriately applied a price from the East Hardy lease that was applicable only for a particular day of the month to all days of the month for all Tranche One leases. The use of the inappropriate daily price caused Plaintiff's expert to overstate the difference he calculated between the crude oil royalty due and the royalty paid for February 1986.

   b) Also, for February 1986, Plaintiff's expert utilized an incorrect royalty rate for the East Hardy lease in determining the royalty unit value. The use of the incorrect royalty rate caused Plaintiff's expert to understate the East Hardy royalty volume. As a result, he overstated the highest offered price for February 1986 for all leases on the day of delivery for the East Hardy sale, and he understated the difference he calculated between the crude oil royalty due and the royalty paid for East Hardy for February 1986.

   c) For July 1989, Plaintiff's expert incorrectly used a price for a sales transaction that took place outside the Osage reservation for what appears to be a sale on one day of the month as the sales price for each day of the month. The Osage

Regulations require royalty to be paid on the higher of the actual sales price or the higher of the highest posted or offered price on the date of sale or removal. This error resulted in an overstatement of the monthly offered price.

These three areas of disagreement are discussed in more detail below.

7. As shown in my March 2, 2006 expert report, it was my opinion that the sales from East Hardy did not occur equally throughout the month. I indicated in Trial Exhibit E-4, DX 2675-0102, that those sales should be considered date of delivery sales (DOD[1]) for which specific quantities were sold on specific days of the month. I reached this conclusion based on discussions that I had with Osage Agency supervisory personnel involved in the operations and management of the Osage Agency's crude oil leases. During these discussions I inquired as to the delivery method of each of the Tranche One leases. The Agency personnel advised that, during this period, there was no crude oil pipeline connected to the East Hardy lease, and, as a result, that crude oil was picked up at the lease by tanker trucks. Based on this information, I concluded that East Hardy was a DOD lease. The East Hardy DOD unit value was calculated by dividing the royalty volume (gross volume x assumed royalty rate) into the royalty value paid. For the most part crude oil production from the other Tranche One leases was sold ratably during the month in equal daily quantities (EDQ)[2]. At trial Plaintiff's expert did not distinguish between the East Hardy DOD actual sales price and other Tranche One leases EDQ prices[3]. East Hardy's DOD price was a price that was paid for particular days of the month. Plaintiff's expert improperly used the East Hardy DOD actual sales price as an offered price for each day of the month. This misapplication of East Hardy DOD price to the other EDQ leases resulted in a significant underpayment claim for the month.

8. For February 1986, at trial, both Plaintiff's and Defendant's expert used data from the Osage Agency's System 36 records to determine the royalty rate for volumes produced from the East Hardy Field. The System 36 reports data on a monthly basis and does not capture the date of sale. The System 36 data was used even though I assumed that East Hardy volumes were sold on a DOD basis rather than

---

[1] Date of delivery (DOD) refers to sales volumes delivered on a particular day of the month. The price for production sold on DOD transactions is the price that is in effect for that day of sale.

[2] Equal daily quantity (EDQ) refers to the concept of equal volumes purchased and delivered during the month either physically or by agreement of the parties. The monthly average price for EDQ volumes may be determined in two ways. First, it may be determined by valuing each day's volume at that day's price, summing the daily values and then dividing the month's total value by the month's total volume. Second, the monthly average price may be determined by calculating a simple average price for the month by summing all daily prices and dividing the sum by the number of days. Both ways yield the same average price for the month.

[3] It is inappropriate to use DOD prices as the average price for the month. This can be seen in a simple example. In February, 1986, the highest posted price for Kansas and Oklahoma began at $23.75 for the 1st through the 7th of the month and dropped consistently throughout the month until it reached its lowest price of $17.50, which was applicable from the 26th through the end of the month. The average EDQ price for the month was $20.74. Under the Osage regulations, it would be inappropriate to apply the price applicable to the 1st day of the month ($23.75) to a sale on the 27th day of the month (for which the highest posted price was $17.50). Therefore the use of a single day's price must be limited to value that particular day and not to value the entire month.

on an EDQ basis. Although the price that resulted from using the available royalty rate information looked out of line with other prices paid that month, no purchaser reports or other data was available to the experts to preclude the use of the calculated East Hardy royalty rate. The United States has now located and provided to the Plaintiff and to me a document that clearly establishes the royalty rate for all production from the East Hardy lease beginning in October 1977. Attachment 3 is a Tribal Resolution that increases the royalty rate for the East Hardy lease to 1/6 effective October 1977. This new information regarding the royalty rate eliminates the previously calculated highest royalty price of $24.69 for East Hardy which is a DOD lease[4]. The highest posted or offered price for February 1986 for crude oil sold on an EDQ basis is $20.74 and is applicable to the remaining Tranche One leases except for East Hardy, which is a DOD lease. Based on the 1/6 royalty rate the calculated difference between the crude oil royalty due and the royalty paid is $176,602 and is shown in Attachment 4, "Revised Trial Exhibit E – Calculated Difference".

9. For July 1989, I did not use the price of $20.25 as the average monthly price, which Plaintiff's expert introduced as having been paid by Total Petroleum (Total) for a transaction off the reservation, Attachment 5. There is no evidence that this transaction was for anything other than a date of delivery sale. The more reasonable interpretation of Attachment 5 is that it was for a DOD sale. I reached this conclusion for three reasons.

10. First, the transaction price that Plaintiff's expert utilizes is identical to a posted price that occurred during the Tranche One month of July 1989. I have attached Attachment 6, Defendant's Trial Exhibits DX2675-0063 through 0064, which is a worksheet showing the various prices that purchasers posted for each day during the month and Attachment 7, Defendant's Trial Exhibit DX2675-0060, which indicates Major Purchasers as determined by the Osage Agency for the month of July 1989. Total's price of $20.25 is consistent with the postings of several other purchasers in Oklahoma and Kansas for 13 days during the month.

11. Second, the Total purchase statement, Attachment 5, shows that Total paid different prices for the other transactions for July 1989. Four of the six transactions (including the transaction associated with the Ramee 1-10 were conducted at prices that also exactly agree with postings in effect on various days of the month of July 1989. (See also Attachment 6). Note that the prices for these four transactions are in increments of $0.25, which is the increment used for price bulletin postings in this time period. The four transaction prices are: Mason #1 at $17.750, Ramee 1-10 at $20.250, Simunek 1-3 at $18.500 and Work Estate at $20.000. Had these transactions occurred on an EDQ basis, it is highly unlikely that the sales price would have exactly coincided with a $0.25 increment.

12. Third, the volume associated with the Ramee 1-10 as well as the other three transactions whose prices exactly coincide with posted prices for the month of July

[4] System 36 shows a sales volume of 3,196.39 and a royalty value of $9,865.78 for East Hardy for February 1986. Assuming a 1/8 royalty rate, the calculated price paid is $24.69 ($9,865.78 ÷ 3,196.39 ÷ 1/8). Assuming a 1/6 royalty rate, the calculated price paid is $18.52 ($9,865.78 ÷ 3,196.39 ÷ 1/6).

1989 are consistent with volumes associated with DOD purchases and would likely be sold on a single day.

13. For all these reasons, it is my opinion that the Total purchase that Plaintiff's expert uses as an offered price for July 1989 is a DOD purchase rather than an EDQ purchase, and the resulting price of $20.25 should be used only for the day of sale. In my analysis I used $20.25 as the highest price paid for 13 days of the month, since that price was determined by the Osage Agency to be the highest posted price for those days, and I confirmed that price in my trial report. I used the highest posted prices for each of the other days in July 1989 to determine the average price of $19.68.

ALTERNATIVE OFFERED PRICES

14. The Court ruled in its September 21, 2006 Opinion that "government records appear to the court to be a satisfactory proxy at this juncture" for offered prices. The United States was able to obtain an electronic database from the MMS of royalty payments for production from federal and Indian leases in Oklahoma and Kansas. In an effort to comply with the Court's Order, I utilized the MMS 2014 data for Kansas and Oklahoma as a source for offered prices. The MMS 2014 data is discussed in more detail below.

MMS DATA ANALYSIS

15. The United States has obtained an electronic download of MMS 2014 data and provided the data to Plaintiff's experts and to me. The electronic file contained monthly data generally beginning in 1983 and concluding at the end of December 1990 for federal and Indian leases in Kansas and Oklahoma. This data includes not only the information actually reported on each transaction line (and in the header of the page)[5], but also includes certain elements that are calculated from the reported data, including royalty rate and the unit value.

16. MMS began collecting the 2014 royalty data in 1983. Prior to that date the United States Geological Survey (USGS) was responsible for collecting royalty data for federal and Indian leases. The USGS data is not available electronically, so any data appearing in the MMS 2014 data for sales months prior to 1983 are most likely adjustments to original USGS data. Therefore, any isolated data lines for the first three Tranche One months are incomplete and do not represent an accurate depiction of royalties paid or prices received for those months.

17. The MMS 2014 data has limitations that prevent it from being used as an accurate source of prices under the Osage regulations. The Osage regulations require royalty prices to be determined on a daily basis and that royalties be paid on the higher of actual selling price or the highest posted or offered price by a Major Purchaser in the states of Kansas and Oklahoma. The MMS valuation regulations

[5] Relevant data contained on a MMS 2014 line includes the following items: sales month, lease number, gross volume, royalty value, type of production (oil, gas, etc.). Data in the MMS 2014 header contains payor name, payor identification number and a federal or Indian lease indicator.

required that oil royalties be reported and paid on a monthly basis. MMS never collected information that stated what day of the month a sales transaction took place. Oil field practices require the adjustment of crude oil price based on the crude oil's gravity. MMS never consistently collected information concerning the quality of the oil, e.g., gravity, and such gravity determination is not contained in the MMS 2014 data. In addition, the MMS 2014 data sometimes contains errors or incomplete information that can result in an incorrectly calculated royalty rate and unit value.

18. Despite these limitations, in an effort to comply with the Court's Order that government documents may be used as a proxy for offered prices, I utilized MMS 2014 data as a possible source of offered prices with certain necessary assumptions.

19. The assumptions that I made include the following: (1) Data anomalies and outliers were not considered to be valid transactions. For example, I did not consider a price of $2,928 per barrel that apparently was a result of an incorrect adjustment entry. I also did not consider lines for which the reported royalty rate was obviously incorrect, e.g., 0.0125, or 1/80, which was most likely intended to be 0.125 or 1/8. (2) All transactions with volumes less than one barrel per month were not considered, as they were likely to be adjustment payments which would distort the sales price. (3) The payor was considered a Major Purchaser if the company name was identical to either the Major Purchaser determined by the Osage Agency for that month or to a successor-in-interest to the Major Purchaser. (4) The sale was considered to be a date of delivery sale if the total number of barrels for the month was approximately 160 barrels or less, or in a few cases, multiples of 160 barrels[6] when data suggested that there was more than one transaction in the month. (5) MMS data for the Tranche One months of February 1986 and July 1989 cannot be extrapolated to the first three Tranche One months because the crude oil prices can vary significantly from month to month.

20. For each payor's report for each lease in the MMS 2014 data for the Tranche One months of February 1986 and July 1989, I determined the total sales volume and total sales value. I divided volume into value to calculate a unit value and arrayed the unit values from the highest to the lowest. I analyzed the data that included unit values that were greater than the highest posted prices that I used in my trial report.

21. Attachment 8 shows the MMS 2014 data for February 1986 ranked in descending order from the highest calculated unit value each with the appropriate "reason for exclusion" shown. As can be seen from Attachment 8, the first 55 lease-payor transactions of the 1389 total transactions for the month contained reasons for exclusion as described above. Therefore, I used the lease-payor transaction shown on line 56, which yielded a price of $20.43 per barrel. Similarly, Attachment 9 shows the MMS 2014 data for July 1989 ranked in descending order from highest calculated unit value each with the appropriate "reason for exclusion" shown. As can

[6] I understand that most crude oil tanker trucks in use in Oklahoma are approximately 160 barrels. Sales of approximately 160 barrels or less (or sales of small multiples of 160, such as 320 barrels) would normally be taken by tanker truck and would therefore be sold on a single day.

be seen from Attachment 9, the first 73 lease-payor transactions of the 1372 total transactions for the month contained reasons for exclusion as described above. Therefore, I used the lease-payor transaction shown on line 74, which yielded a price of $20.12 per barrel.

22. I attempted to follow the applicable Osage regulations by including only data for companies that were on the Osage Agency Major Purchaser list for each of the two Tranche One months of February 1986 and July 1989. (See Attachment 10, Defendant's Exhibits at trial DX2675-0043 through 0044, and Attachment 7, Defendant's Exhibits at trial DX2675-0060 through 0061). While the MMS 2014 data does not contain data that identifies the purchaser, it is a well-established practice in the State of Oklahoma that the purchaser of the oil and gas typically pays the royalty. The Major Purchasers for the Tranche One months of February 1986 and July 1989 were determined at trial. All of the highest prices found in the MMS 2014 data were prices for sale of oil from federal and Indian leases in Oklahoma, except for one transaction for July 1989 that was from Kansas. I compared the payors of royalty listed in the MMS 2014 data to the Major Purchasers determined at trial and considered only those payors that I could determine were Major Purchasers.

23. I also did not include data that appeared to be DOD sales. The use of prices that are applicable to only particular days of the month for all days of the month leads to inaccurate royalty calculations as prices can vary significantly over the course of a month.

24. Finally, I rejected certain outliers[7] when the reports appeared to have significant errors that lead to incorrect calculations of the net price. For example, in February 1986, the Osage Crude Oil Purchasing Company reported on three leases in the MMS 2014 database values that exceeded $30.00. In each of those reports there were significant errors.

25. When I utilized the MMS 2014 data as an additional source for offered prices, I determined that the calculated difference between the crude oil royalty due and the royalty paid is $178,179. This amount and the associated details are shown in Attachments 1 and 11, "Revised Trial Exhibit E – Calculated Difference, MMS 2014 Data."

CONCLUSION

26. As shown in Attachment 1, by requiring the Osage lessees to pay royalty on the highest posted price, without regard to the limitations on what they were entitled to collect during the three month period of crude oil price controls (January 1976, May 1979 and November 1980), my calculated royalty difference amount is increased from $3,755 as calculated at trial to $170,704.

[7] An outlier is a calculated unit value that significantly exceeds the expected unit value for that lease and month. The expected unit value is reasonably determined by analyzing existing sales transactions for that lease and month, crude oil posted prices for the relevant type of crude oil and other available data.

27. Attachment 1 also illustrates that including any price paid anywhere on the reservation as an offered price, rather than limiting the use of such higher prices paid to the lease on which they were paid increases the calculated royalty amount potentially due in the Tranche One months of February 1986 and July 1989 from $3,048 as calculated at trial to $3,195.

28. The total calculated difference between the crude oil royalty due and the royalty paid for the five Tranche One months is $173,899.

29. Attachment 1 also demonstrates the effect of using the MMS 2014 data as an additional source of offered prices for the purpose of calculation of royalty under the Osage regulations. MMS 2014 data had no impact on prices for the first three Tranche One months as MMS 2014 data did not exist prior to 1983. While the MMS 2014 data did not create a higher offered price for February 1986, it did provide the basis for a higher offered price for July 1989. This higher offered price increased the royalty potentially due for July 1989. The calculated difference between the crude oil royalty due and the royalty paid using the MMS 2014 data as an additional source of offered price is $178,179.

30. I calculated the interest that could be owed the Tribe for the oil royalty underpayment. I was provided lost interest multipliers by counsel that reflects lost interest through next quarterly annuity and lost interest through December 31, 2006. A description of the two interest methodologies is shown in Attachment 1. Using The United State's Trial Calculation Revised for Price Controls and Offered Prices, the calculated difference and interest using lost interest through next quarterly annuity rate is $174,539. The calculated difference and interest using lost interest through December 31, 2006 is $1,135,348. Using The United State's Trial Calculation Revised for Price Controls, Offered Prices and MMS 2014 Data, the calculated difference and interest using lost interest through next quarterly annuity rate is $178,856. The calculated difference and interest using lost interest through December 31, 2006 is $1,145,178.

Executed on November 16, 2006

Ronnie A. Martin

Ronnie A. Martin