EXHIBIT 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | Nos. 99-550 & 00-169 L |
| v. | ) | Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DECLARATION**
**OF**
**Gregory J. Chavarria**

**NOVEMBER 17, 2006**

## INTRODUCTION

1. My name is Gregory J. Chavarria. I am a certified public accountant licensed in the State of New Mexico. I have been engaged by the United States to provide damage calculations related to the Court ruling dated September 21, 2006, for the following breaches of defendant's fiduciary duties:

- Failure to Maintain Appropriate Cash Balances (Part IV.B.2.a.)
- Failure to obtain Investment Yields in Accordance With the Law (Part IV.B.2.b).
- Failure promptly to Deposit Funds Because of Unreasonable Failure to Certify a Federal Depositary (Part IV.B.2.a)

2. I have served clients in the areas of audit, management consulting and litigation consulting for approximately 20 years. I am a founding member (partner) in the public accounting firm of Chavarria, Dunne & Lamey LLC (CD&L), a limited liability company established in 1996. Prior to founding CD&L, I worked for Arthur Andersen (Andersen) beginning in 1985 when I received my Bachelor of Accountancy degree from New Mexico State University.

3. Through the course of my 20 year career I have served clients in a variety of industries and services. I am experienced in planning and performing large complex audit and consulting engagements and have served several industries including financial institutions, investment companies, federal, state and tribal governments. I have extensive experience and personal knowledge regarding accounting issues related to Native American Trust Funds, having served on a large number of audit and consulting engagements for various offices within the U.S. Department of the Interior responsible for managing Native American Trust Funds. As a senior auditor at Andersen, I was responsible for the performance of the first

financial audit of Tribal and Individual Indian Monies Trust Funds managed by the U.S. Department of the Interior Bureau of Indian Affairs and as audit manager, I was the overall engagement manager responsible for the planning and performance of the Tribal Trust Funds Reconciliation Project for the period of July 1972 through September 1992. This directly related experience has allowed me to gain a solid understanding of accounting issues relating to these trust funds.

## INVESTMENT BREACHES

4. The following describes my estimation of damages for the following breaches:

- Failure to Maintain Appropriate Cash Balances (Part IV.B.2.a.)
- Failure to obtain Investment Yields in Accordance With the Law (Part IV.B.2.b).

5. To compute damages pursuant to the Court's September 21, 2006 Opinion, I calculated the difference between average monthly actual returns and average monthly expected returns on cash and invested funds, and added the lost interest or investment returns on damages. My calculations are set forth in Attachment 1A. The following describes, in detail, the steps that I took for these calculations. The column references in the following description are to columns appearing in Attachment 1A.

### Actual Returns

6. To calculate average actual returns for the Tranche One months, I first identified actual interest postings in account 7386 from the Tribal Trust account statements and related data prepared by Arthur Andersen as part of the Agreed-Upon

Procedures and Findings Report dated December 31, 1995 ("Andersen Report")(Column C).

7. Next, I determined the actual interest postings related to "cash," which in the first three Tranche One months earned 4% interest and, in the last two Tranche One months, earned interest on short-term Treasury investments made on a daily basis, called the Overnighter (Column D). I determined the interest for fiscal years 1976, 1979, and 1981 from the Tribal Trust account statements and related data for account number 7886 prepared as part of the Andersen Report. Account 7886 is the account where the interest for account number 7386 was posted. It is my understanding that the plaintiff identified no interest postings to account 7886 for fiscal year 1976 since Arthur Andersen reported all collections as other receipts. Further examination of the data, however revealed that interest collections were credited to account 7886 in 1976. These collections are referenced in the Andersen data with the element component (revenue type code) 9701, which is used to designate Overnighter/statutory interest and the alpha characters "AW" in the document description field, which identifies the transaction as investment related.

8. As to fiscal years 1986 and 1989, an adjustment was required for the returns from the Overnighter. The Interior Department did not post the Overnighter returns associated with cash balances during the years 1985 through 1988 in the years in which that interest was earned. It is my understanding, based on my extensive work with the historical account transactions contained in the data used by Andersen, that the Overnighter interest postings in 1986 included 1985 earnings. Further, in March 1989, Overnighter interest postings included interest that had been earned for

the years 1987 through 1989. In order to include the appropriate Overnighter interest earnings in the appropriate fiscal years, I identified Overnighter postings in subsequent fiscal years that actually were applicable to 1986 and 1989 earnings and attributed those posted earnings to these fiscal years. I then subtracted posted earnings from 1986 and 1989 that were applicable to other fiscal years. If I had not adjusted the earnings and instead used the actual postings in these fiscal years, the end result of my damages calculation would not have changed because the actual performance for the Tranche One months in 1986 and 1989 would still have exceeded the expected returns for those months.

9. I then added the interest postings (Column C) to the interest on cash (Column D) to obtain the total annual interest earnings (Column E). I divided this amount by 12 to obtain the average monthly actual interest earnings (Column F).

**Average Daily Funds Available for Investment**

10. I calculated the average daily fund balances based on the daily ending balance in account 7386 for each of the fiscal years containing Tranche One months (January 1976, May 1979, November 1980, February 1986 and July 1989) as determined from the electronic data generated for the Andersen Report. I determined each day's ending balance by first referencing the fiscal year beginning balance from the Arthur Andersen generated account statements. I then determined the net effect of each day's transactions on the beginning balance to calculate each day's ending balance. Since transactions do not occur each day, I determined the number of days each new balance was outstanding prior to the next day on which transactions occurred. I then assigned that number (days outstanding) as a weight value to that

account balance. The total weight value assigned was 365 days (366 days for leap year). I then took each ending day's account balance multiplied by the number of days outstanding (the assigned weight), totaled the resulting values and divided by 365 days (366 for leap year) to determine the average daily fund balance (Column G) (See detail at Schedule B).

11. I relied on schedules provided by plaintiff for the average daily fund balances for account 7886 (Column H), as their method for determining balances was consistent with my method. The average daily balances for Account 7386 (Column G) were added to the average daily balances for Account 7886 (Column H) to derive the total average daily balances (Column I).

12. I next adjusted the average daily fund balance for purposes of calculating the average daily expected invested balance (i.e., the average daily funds available for investment) (Column J). Pursuant to the Court's opinion, I subtracted $25,000 from the average daily fund balance. I also deducted the average balance of funds that remained in cash for one day following deposit of non-investment (e.g., oil royalty) receipts thereby providing a one-day grace period between the deposit of funds and their investment. I accomplished this by first determining the actual average daily cash balance as a component of the average daily fund balance (unaltered cash). I then calculated an altered average daily cash balance by adjusting the posting date for all non-investment receipt transactions forward by one day (i.e., original posting date plus 1 day). This adjustment resulted in a reduced average daily cash balance (i.e., funds available for investment). If such adjustment, however would have caused the immediate actual cash balance to become a negative balance or to become a larger

negative balance, the adjustment was not made. By not allowing cash to go negative, I did not allow a grace period for funds that were invested on the same day as the collection. The difference between the unaltered cash balance and the altered cash balance represents a reduction in expected investment funds to allow for this grace period (see calculation at Schedule A). For purposes of my calculation, allowable cash was increased to the same extent that expected invested funds was decreased, as these funds would be subject to interest at the expected cash rate. The total fund balance was not reduced by these adjustments. These adjustments resulted in a decrease in the average daily expected invested balance and an equal offsetting increase in the cash balance of $9,757 for 1976, $33,302 for 1979, $184,776 for 1981, $83,420 for 1986 and $59,201 for 1989. The increased funds in cash were calculated to earn the applicable statutory/Overnighter rate of interest on cash.

**Calculated Expected Earnings**

13. I calculated monthly expected earnings on invested funds (Column N) by multiplying the average daily expected investment balance (Column J) by the expected rate of return applicable to each Tranche One month (Column M) and dividing the product by 12. The expected rates were determined by identifying monthly Federal Reserve published rates for 3 month CD's and 3 month T-bills for the applicable Tranche One months (Column K and L). I converted the published three month CD rates to a discount basis, which is consistent with the basis of the rate published for the 3 month T-bill by the Federal Reserve (Column K).

14. In determining the appropriate rate of return to use in calculating the expected returns, one may use a rate based on an investment basis or on a discount

basis. The investment rate is a yield to maturity rate that assumes reinvestment of earnings throughout the remainder of the year, thus incorporating compound interest. To appropriately apply the investment rate for calculating expected returns, the average fund balance should be reduced to the principal balance of the account to exclude investment earnings that have already been posted to the account throughout the year. If the investment rate was applied to a fund balance that included posted investment earnings, the expected return would lead to double compounding.

15. In contrast, a discount rate is based on future cash flows which includes earnings in the determination of the rate. For example, where simple interest of $10 on a $100 investment is calculated as $10/100 = 10%, the discount rate is calculated with the base including interest as 10/110 = 9%. The lower rate results in the same earnings ($10) on a higher base that includes both principal and interest. To appropriately apply the discount rate for calculating expected returns, the average funds balance should include both the principal and posted earnings.

16. To reflect the accurate expected return for the account, I had to either reduce the average balance of the account by excluding posted investment earnings and then apply the investment rate, or apply the discount rate to the average balance, which includes both principal and earnings. I have included an attachment that further illustrates the foregoing principles (Attachment 4).

17. My damage estimate utilizes the discount rate and the average daily account balance which includes both principal and investment earnings (Attachment 1A). I have also provided a second calculation utilizing investment rates and the average daily principal balance to determine the expected returns (Attachment 1B).

The reason the calculations reflect slightly different damage amounts, is the result of the fact that investment earnings are not posted evenly throughout the year. Since the average balances I calculated are daily weighted balances, the effect on the account balance of the interest may be more or less than ½ of the earnings for the year. For the two calculations to be equal, interest would need to have been received evenly throughout the year. Since investments mature at different times, and earnings are posted when cash is received, equal results are not likely. I utilized the higher of the two alternatives for my damage estimate.

18. Once I determined the annual 3 month CD and T-Bill rates for the appropriate Tranche One months (Columns K and L) after converting to discount basis, I applied a weighting which assumes 80% in 3 month CD's and 20% in 3 month T-bills (Column M). I then multiplied the rate by the expected investment balance (Column J) and divided that figure by 12 as an estimate of the Tranche One month expected return on invested funds (Column N).

19. Next, I calculated the estimated Tranche One month expected earnings on allowable cash (Column Q) by multiplying Allowable Cash (Column O) by the statutory rate of 4% for years prior to 1985 and the average annual overnighter rate for years subsequent to 1984 (Column P), and then dividing that figure by 12.

20. The combined expected earnings on invested funds and expected earnings on cash represents the total expected earnings for the purpose of quantifying damages (Column R).

## Calculated Estimated Damages

21. To determine estimated damages, I calculated the difference between the total expected earnings and the actual interest posted for those months in which the actual returns were less than the expected returns (Column S). The resulting damages are **$16,723.41**. I then calculated a lost interest multiplier (Column T) to determine the principal value and lost interest or investment returns that would have been earned up until the next annuity payment in which the royalty payments and any lost interest or investment returns would have been disbursed to headright owners (Column U), based on the higher of either the actual annual rate of return earned in Account 7386 or the rate that should have been earned based on an 80% investment in 3-month CDs and 20% investment in 3-month T-Bills (Attachment 2). The multiplier represents the value of $1 beginning the day after the Tranche One month and ending the day of the next quarterly annuity payment. The resulting damages, including lost interest or investment returns, for this scenario are **$16,809.33**. I then calculated a lost interest multiplier (Column V) to determine the principal value and lost interest or investment returns that would have been earned on the estimated damages up to December 31, 2006 (Column W), based on the higher of either the actual annual rate of return earned in Account 7386 or the rate that should have been earned based on an 80% investment in 3-month CDs and 20% investment in 3-month T-Bills (Attachment 2). The multiplier represents the value of $1 beginning the day after the Tranche One month through December 31, 2006. The resulting damages, including lost interest or investment returns, are **$93,957.22**.

## DEPOSIT LAG TIME

22. I next calculated the estimated damages as a result of the following Breach:

- Failure promptly to Deposit Funds Because of Unreasonable Failure to Certify a Federal Depositary (Part IV.B.2.a)

23. In calculating estimated damages for deposit lag time, I relied on the detailed collection documentation produced at trial by both parties. For payments made via check, I accounted for the time period between the receipt of checks in the Osage Agency mailroom as reflected in the source documents, including the Agency's Mailroom Schedule of Collections and the posting reflected on Andersen generated account statements. For deposits via electronic funds transfer ("EFT"), I relied on the documents including Fedwire deposit listings and electronically generated SF215 deposit tickets (referenced in Attachment 3) and the Andersen generated account statements. I then deducted one day from the number of days that existed between the receipt of funds and the crediting of those funds to Account 7386, pursuant to the Court's opinion.

24. From the documentation produced by both parties at trial, I determined that payments were made via check for all deposits for the January 1976 Tranche One month and for one payment for May 1979. All of the payments for the remaining Tranche One months were made via EFT. There were four check deposits for January 1976. For two of those deposits, the processing time exceeded the allowable deposit processing time by one day. The one check deposit in 1979 also exceeded the allowable processing time by one day. The EFT payments had no lag time associated with them.

25. Next, I calculated the lost interest due to the one day lag on the deposits using the expected rate, which represents the higher of either the actual annual rate of return earned in Account 7386 or the rate that should have been earned based on an 80% investment in 3-month CDs and 20% investment in 3-month T-Bills (Attachment 2). That amount totaled: **$228.03**. I then calculated the lost interest or investment returns that would have been earned up until the next annuity payment in which the royalty payments and any interest earnings would have been disbursed to headright owners applying the same method for determining rates (Attachment 2). The resulting damages, including lost interest or investment returns, for this scenario are **$230.57**. In addition, I calculated lost interest or investment returns through December 31, 2006, again based on the higher of either the actual annual rate of return earned in Account 7386 or the rate that should have been earned based on an 80% investment in 3-month CDs and 20% investment in 3-month T-Bills (Attachment 2). The resulting damages, including lost interest or investment returns, are **$1,656.64**.

Greg Chavarria
Gregory J. Chavarria

11/17/06
Date