# In the United States Court of Federal Claims

No. 99-550 L
(into which has been consolidated No. 00-169 L)
(E-Filed: February 15, 2007)

| | |
|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA,<br><br>Plaintiff,<br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Indian Trust Claim; Post-trial Proceedings to Determine Damages; Damages for Breach of Trust Obligations with Respect to Royalty Calculation and Collection; Damages for Breach of Trust Obligations with Respect to Deposit and Investment of Royalties |

Wilson K. Pipestem, Washington, DC, for plaintiff.

Brett D. Burton, with whom were Sue Ellen Wooldridge, Assistant Attorney General, and Martin J. LaLonde, Kevin S. Webb, and Kevin J. Larsen, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Judge

## I. Background

### A. Prior Proceedings

On September 21, 2006, the court issued an opinion regarding the allegations of plaintiff Osage Tribe of Indians of Oklahoma[1] (Osage Nation or Osage Tribe) that the

[1]The original complaint in this case was filed on August 2, 1999 by "The Osage Nation and/or Tribe of Indians of Oklahoma" and assigned case no. 99-550L by the court. Two amendments of that complaint were filed under the name "The Osage Tribe of Indians of Oklahoma" in March and August of 2004. A separate suit was brought by "The Osage Nation and/or Tribe of Indians of Oklahoma" on March 31, 2000 and assigned case no. 00-169L. The

United States violated its fiduciary duties by failing to collect, deposit and invest all moneys due from Osage oil leases. Osage Tribe of Indians of Okla. v. United States, 72 Fed. Cl. 629, 631 (2006) (Osage II). The rulings in the Osage II opinion relate to the Tranche One[2] trust fund mismanagement claims. Id. The Osage Nation identified two trust fund mismanagement claims which this court found, Osage II, 72 Fed. Cl. at 631, to be within the parameters set in Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339, 1350-51 (Fed. Cir. 2004) (Shoshone). First, plaintiff claimed that the United States failed to collect payments due under the Tranche One leases, failed to compute royalty payments in accordance with regulations, and deprived the Osage Nation of late payment fees for royalty payments not collected in a timely manner. Osage II, 72 Fed. Cl. at 631. The plaintiff's second claim was that the United States failed to invest the income it collected from the Tranche One leases in accordance with the law governing defendant's trust obligations to the Osage Tribe. Id.[3]

In Osage II, the court held that the Osage Tribe is entitled to compensation for the following breaches of five of defendant's fiduciary duties:

---

court consolidated the cases on September 14, 2005 and designated the earlier-filed suit, case no. 99-550L, as the lead case. See Order of Sept. 14, 2005 at 1. As does plaintiff in its briefs, the court refers to plaintiff interchangeably as the Osage Tribe or the Osage Nation.

[2]Plaintiff's claims were divided into two tranches with the first tranche (Tranche One) encompassing trust fund mismanagement claims within the parameters described by the United States Court of Appeals for the Federal Circuit in Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339, 1350-51 (Fed. Cir. 2004) (Shoshone). Osage Tribe of Indians of Okla. v. United States, 72 Fed. Cl. 629, 631 (2006) (Osage II). The second tranche (Tranche Two) encompasses all other claims. See Order of April 15, 2005 at 1 (filed in The Osage Nation and/or Tribe of Indians of Okla. v. United States, case no. 00-169L); see also Osage II, 72 Fed. Cl. at 631. Tranche One was further limited to consideration of four oil and gas leases for the following five months: January 1976, May 1979, November 1980, February 1986, and July 1989. See Order of February 22, 2006 at 2. The four oil and gas leases at issue are known as the East Hardy Unit, the North Burbank Unit, the North Avant Unit, and the Osage Hominy Unit. See Osage II, 72 Fed. Cl. at 631 n.2.

[3]As more particularly addressed in Osage Tribe of Indians of Oklahoma v. United States, 68 Fed. Cl. 322 (2005) (Osage I), plaintiff's claims are founded on the alleged breach of duties assumed by the United States under the terms of an agreement between the Osage Tribe and the United States enacted into law in 1906. See Act of June 28, 1906, ch. 3572, 34 Stat. 539 (1906 Act). In Osage I, the court found that "the plain language of section 4 of the 1906 Act establishes fiduciary duties that include both the proper management of Osage funds on deposit with the Treasury and the proper accounting of 'all moneys due, and all moneys that may become due,' 34 Stat. at 544, in accordance with the terms of the oil and gas leases." Osage I, 68 Fed. Cl. at 327. The court also found that proper accounting of oil and gas royalty payments necessarily encompasses "verification that the royalty paid is the amount contractually owed under the terms of the lease." Id. at 328.

1. Failure to Collect Full Royalties During Price Controls

During the first three Tranche One months (January 1976, May 1979, and November 1980), prices for crude oil were subject to price and allocation controls. Pub. L. No. 93-159, 87 Stat. 627 (1973) (codified at 15 U.S.C. §§ 751-760(h)), repealed by Pub. L. No. 94-163, tit. IV § 461 (Dec. 22, 1975); see Osage II, 72 Fed. Cl. at 658-59. The court held that plaintiff "is entitled to royalties determined under the 1974 Regulations for the first three Tranche One months" because "[t]he Osage Agency incorrectly applied the royalty value formula under 25 C.F.R. § 226.11 to the maximum legal price for the first three Tranche One months, rather than to the 'actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area.'" Osage II, 72 Fed. Cl. at 661.

2. Failure to Collect Royalties Based on Highest Offered Prices

The court held that the United States breached its fiduciary duties because it failed to collect royalties based on the highest offered prices. Id. at 671. The court noted that government records are a "satisfactory proxy" for the data necessary to calculate damages, and that "[p]laintiff is entitled to have its royalties calculated, as nearly as may now reasonably be determined, in accordance with the requirements of the 1974 Regulations that bonus prices offered by major purchasers throughout the Kansas-Oklahoma area be used in determining royalty value." Id. at 654.

3. Failure Promptly to Deposit Funds Because of Unreasonable Failure to Certify a Federal Depositary

The court held that defendant is liable for investment income lost as a result of its failure to meet its own policy objective of depositing royalty payments within 24 hours or no later than the next business day following receipt of payment. Id. at 665. The court stated that "[i]f a depositary had been established in Pawhuska, defendant could have complied with its own policy objective." Id.

4. Failure to Maintain Appropriate Cash Balances (Underinvestment)

In response to plaintiff's allegation that "the United States lost a substantial amount of interest income by keeping unreasonably large balances in the cash account," id., the court held "that the United States is liable for additional investment income that would have been earned had the United States made prudent investments of any cash balances of royalty income in excess of $25,000," id. at 667. In connection with this ruling, the court directed that damage may be calculated based on the assumption that "for each of the Tranche One months, the average daily cash balance was the same as the average daily cash balance for the year (as nearly as such amount may be determined) in which that Tranche One month occurs." Id. at 671.

5. Failure to Obtain Investment Yields in Accordance with Law (Investment Underperformance)

The court held that the "United States is liable for any failure to achieve the expected return of a combination of 3-month CD rates (80%) and 3-month T-bill rates (20%) on average daily balances in excess of $25,000." Id. at 671 (quotation and citation omitted). The court stated that the "Osage Tribe is entitled to damages reasonably estimated based on existing information." Id. at 670. The court also held that the calculation of damages must "assume that, for each of the Tranche One months, the average daily investment[] of Osage tribal income from the Tranche One leases in CDs and T-bills [were] proportional to the average daily investment in CDs and T-bills of all funds in account 7386 for the year (as nearly as such amount may be determined) in which that Tranche One month occurs." Id. at 671.

The court directed the parties to "jointly calculate and present to the court the amount of damages to which plaintiff is entitled." Id. At trial, the issue of interest as an element of damages was not fully addressed and the parties did not agree on the interest rate that should apply. Id. Therefore, the court further directed the parties to "brief the basis for the appropriate rate or rates to apply in determining the current value of the damages for which defendant has been found liable" and to address in briefing the question of plaintiff's possible entitlement to late fees. Id.

B. Briefing on Damages

Pursuant to the court's direction in Osage II, the parties submitted their Joint Submission on Calculation of Tranche One Damages (Joint Submission) to explain the damage calculation elements as to which they agreed.[4] Because the parties disagreed on several elements of damages calculations, each submitted a brief explaining its position. See Plaintiff Osage Nation's Brief In Support of Proposed Calculation of Tranche One Damages, Appropriate Rate of Interest to Apply in Determining the Current Value of Those Damages, and Entitlement to Late Fees (plaintiff's Brief or Pl.'s Br.); Defendant's Calculation and Supporting Brief about Damages Owed to Plaintiff Pursuant to Court's September 21, 2006 Opinion and Order (defendant's Brief or Def.'s Br.). Plaintiff timely filed its brief on November 16, 2006. Pursuant to the court's order allowing defendant an additional day to submit its brief and allowing plaintiff an additional day to amend or supplement its brief, plaintiff filed a corrected version of its brief on November 17, 2006. Order of November 17, 2006 at 1. All citations to plaintiff's brief refer to the brief filed on November 17, 2006.

[4]The original due date for submission of the joint calculation was November 2, 2006. Osage II, 72 Fed. Cl. at 671. That date was extended until November 16, 2006 by Order of October 30, 2006.

On November 21, 2006, plaintiff filed Plaintiff Osage Nation's Motion to Strike Newly Filed Evidence (plaintiff's Motion or Pl.'s Mot.) requesting that the court strike defendant's exhibits to Defendant's Calculation and Supporting Brief About Damages Owed to Plaintiff Pursuant to Court's September 21, 2006 Opinion and Order filed on November 17, 2006. Pl.'s Mot. 1. Specifically, plaintiff argues that the "Ronnie Martin Declaration of November 17, 2006, with attachments," and "Gregory Chavarria Declaration of November 17, 2006, with attachments" should be stricken. Id. Defendant filed Defendant's Brief in Response to Plaintiff's Motion to Strike Newly Filed Evidence (defendant's Response or Def.'s Resp.) on December 8, 2006. Def.'s Resp. 1. Plaintiff filed Plaintiff Osage Nation's Reply to United States' Response to Motion to Strike Newly Filed Evidence (plaintiff's Reply or Pl.'s Reply) on December 18, 2006. Pl.'s Reply 1.

In its Motion, plaintiff argues that defendant should not be allowed to submit "new testimony and evidence" beyond what the court directed the parties to submit regarding damages calculations. Pl.'s Mot. 2. Plaintiff contends that defendant's "new evidence . . . revise[s] the United States' trial presentation and trial positions." Id.[5] Defendant argues

---

[5]Plaintiff argues that the following issues reflect arguments that defendant should not be allowed to make: 1) defendant reverses its expert witness's position regarding the royalty rate on the East Hardy lease; 2) defendant provides additional expert testimony on whether the East Hardy price was for a sale made on a date of delivery (DOD) or equal daily quantity (EDQ) basis which is inconsistent with its expert's testimony at trial; 3) defendant launches "a new post-trial attack" on the 1989 Total Petroleum Price of $20.25, arguing that this price is a DOD price and therefore should not be used to determine royalty value for July 1989; 4) defendant advocates the use of "a new set of 'discount' interest rates, derived by Mr. Chavarria, that are lower than the investment-basis rates used at trial" by Mr. Lundelius to calculate the 80/20 expected rate; 5) defendant contradicts the court's order that all amounts above $25,000 are to be counted as being available for investment by using Mr. Chavarria's calculations that manipulate the interest rate and reduce "the average balance of the account [available for investment]"; and 6) defendant offers new opinion testimony from Mr. Chavarria that "advocates the reallocation of overnighter interest to years other than those in which it was actually paid to the trust according to the Statements of Account for 7386 in the record." Plaintiff Osage Nation's Motion to Strike Newly Filed Evidence (plaintiff's Motion or Pl.'s Mot.) 2-3. Plaintiff also clarifies that it does not object to defendant's arguments that are "based on jointly agreed-to materials," but it does object to "the United States' unilateral submission of expert witness testimony to supplement those materials." Id. at 4. Plaintiff argues that defendant's "new expert testimony . . . contradicts the plain meaning of the materials" because: 1) Mr. Chavarria offers new explanations of the Andersen data in the context of alleged interest collections credited in 1976, and 2) Mr. Chavarria's new "expert testimony" suggests that the MMS prices paid by major purchasers, already agreed upon by both parties, should not be used. See id. at 4-5. The issues raised by plaintiff's Motion are addressed below in Part III(A)(2) (East Hardy Royalty Rates); Part III(B)(2)(a) (whether East Hardy sales were DOD or EDQ); Part III(B)(2)(b) (1989 Total Petroleum Price); Part V(B)(2)(b) (discount rates); Part V(B)(2)(a) (calculation of $25,000 cash balance); Part (V)(B)(1) (allocation of overnighter interest); Part V(B)(1) (1976 interest); and Part III(B)(1) (MMS prices paid by major purchasers).

that the court's directive to the parties "contemplates additional factual development" and defendant's experts' explanations and declarations are within the scope of what the court contemplated in its directive. Def.'s Resp. 2.

While the parties' damages briefing was under consideration, the court directed the parties to submit further explanation regarding damages calculations for Tranche One month July 1989. Order of January 16, 2007 at 1. Plaintiff filed Plaintiff Osage Nation's Statement in Response to the Court's Order of January 16, 2007 (plaintiff's Statement or Pl.'s Statement) on January 19, 2007. Pl.'s Statement 1. On January 22, 2007, defendant filed Defendant's Brief About Appropriate Highest Offered Price for July 1989 Pursuant to Court's January 16, 2007 Order (defendant's Supplemental Brief or Def.'s Supplemental Br.). With respect to defendant's additional filing, plaintiff filed Plaintiff Osage Nation's Second Motion to Strike Newly Filed Evidence (plaintiff's Second Motion or Pl.'s Second Mot.) on January 31, 2007. Pl.'s Second Mot. 1. Plaintiff argues that defendant's submissions in response to the Order of January 16, 2007 are "outside the scope" of the order and contravene the September 21, 2006 opinion of the court. Id. Specifically, plaintiff argues that "paragraphs 4-13 and 14(c)-(e) of the 'Declaration of Ronnie A. Martin' dated January 22, 2007 [and] Exhibits 2 and 3 to the Declaration" should be stricken. Id.

II. Standards of Review

According to general trust law principles, a beneficiary is entitled to damages for "improper management of the trust's investment assets." Confederated Tribes of the Warm Springs Reservation of Ore. v. United States, 248 F.3d 1365, 1371 (Fed. Cir. 2001) (Warm Springs). When determining the amount of damages due to the beneficiary, the court should "attempt to place the beneficiary in the position in which it would have been absent a breach." Id. Principles of trust law also dictate that any ambiguities or doubts regarding potential investment earnings are resolved against the trustee. Id. Moreover, "if a trustee fails to keep proper accounts, 'all doubts will be resolved against [the trustee] and not in [the trustee's] favor.'" Id. (quoting William F. Fratcher, Scott on Trusts, § 172 (4th ed. 1987)).

In addition to damages for a trustee's breach of its fiduciary duties, a beneficiary may be entitled to interest damages on the amount that the trustee mismanaged or failed to collect. Shoshone, 364 F.3d at 1353-54. The Court of Appeals for the Federal Circuit held that "when the Government has a clear statutory fiduciary duty to collect or manage funds and further undertakes the duty to earn interest on those funds, the failure of the Government to collect or manage such funds in accordance with its obligations will result in an award of damages for that failure and an award of interest on the amount mismanaged or not collected." Shoshone, 364 F.3d at 1353-54. In Shoshone, the court held that the tribes were entitled to interest on monies that the government was obligated to collect pursuant to mineral regulations and the general trust management statutes of 25 U.S.C. §§ 161a, 161b, and 162a. Shoshone, 364 F.3d at 1353-54. The court in Shoshone pointed to the holdings in Peoria Tribe of Indians of Okla. v. United States, 390 U.S. 468

(1968) (Peoria Tribe) and Short v. United States, 50 F.3d 994 (Fed. Cir. 1995) to support its finding that the tribes were entitled to an interest award. Shoshone, 364 F.3d at 1353. In Peoria Tribe, the Supreme Court held that because a treaty required the government to sell tribal lands at public auctions and then invest the proceeds, the government must pay interest on proceeds from the sale of tribal land that it should have collected but did not in fact collect. 390 U.S. at 471-72. In Short, the Court of Appeals for the Federal Circuit held that the general tribal trust management provisions in 25 U.S.C. §§ 161a, 161b, and 162a may require payment of interest. 50 F.3d at 999.

## III. Damages for Undercollection of Royalties

### A. Failure to Collect Full Royalties During Price Controls

#### 1. Areas of Agreement

The parties agree[6] on "the amount of royalty undercollections for the Tranche One leases in the first three Tranche One months, with the sole exception of the East Hardy unit in May 1979." Joint Submission 1-2, ¶ 1. The parties therefore agree as to the difference between the minimum royalty due under the regulations and the reported royalty paid for all leases in January 1976 and November 1980 and all leases in May 1979, excluding the East Hardy Unit lease. The parties also agree to the amount of the gravity adjustment deduction to be used in determining royalty undercollections for Tranche One. Id. at 2, ¶ 3.

#### 2. Area of Disagreement - May 1979 East Hardy Unit Lease

The East Hardy lease provides for either a 12.5% or 16.67% royalty rate depending upon the formation in which the oil or gas is found or the method of extraction that is utilized. Plaintiff's Exhibit (PX) 751-0133 to 751-0135; see also Pl.'s Br. 8.

The parties disagree on which portion of the East Hardy Unit lease is subject to the 16.67% royalty rate and which portion is subject to the 12.5% royalty rate. Pl.'s Br. Ex. 4; Def.'s Br. Attach. 2. Plaintiff argues that the portion of the East Hardy Unit lease with a volume output of 5,254 standard barrels (bbls) is subject to the 12.5% royalty rate and the portion with a volume output of 345 bbls is subject to the 16.67% royalty rate. Pl.'s Br.

---

[6]The parties' agreement is subject to minor discrepancies in calculations with respect to: the North Burbank Unit Lease for May 1979; the North Avant Unit Lease for January 1976, May 1979, and November 1980; and the Osage Hominy Unit Lease for January 1976 and May 1979. Plaintiff Osage Nation's Brief In Support of Proposed Calculation of Tranche One Damages, Appropriate Rate of Interest to Apply in Determining the Current Value of Those Damages, and Entitlement to Late Fees (plaintiff's Brief or Pl.'s Br.) Ex. 4; Defendant's Calculation and Supporting Brief about Damages Owed to Plaintiff Pursuant to Court's September 21, 2006 Opinion and Order (defendant's Brief or Def.'s Br.) Attach. 11.

Ex. 4.[7] Defendant asserts that the portion with a volume output of 5,254 bbls is subject to the 16.67% royalty rate and the portion with a volume output of 346 bbls is subject to the 12.5% royalty rate. Def.'s Br. Attach. 11.[8] Plaintiff explains that Mr. Reineke's assumption regarding the royalty rates "leads to a more consistent royalty rate for the higher volume producing portion of the East Hardy unit over several relatively closely spaced Trance One months." Pl.'s Br. 8 n.3.

The court finds plaintiff's position on the East Hardy lease royalty rate for May 1979 more persuasive. At trial, Mr. Reineke explained that there are no documents indicating what the correct royalty rate was for the East Hardy Unit for May 1979. Tr. 130:4 - 131:16; see Pl.'s Br. 8 n.3. Defendant points to a document that was not admitted at trial to support its alternative argument.[9] Def.'s Br. 11 n.12. Because there are no

---

[7]With regard to the East Hardy Unit lease for May 1979, plaintiff asserts that the minimum royalty due for oil subject to the 12.5% royalty rate is $12,708.11. Pl.'s Br. Ex. 4. Plaintiff also asserts that the reported royalty paid at this royalty rate on the East Hardy lease is $3,953.64, resulting in a difference of $8,754.48 that was underpaid. Id. For the portion of the East Hardy lease that was subject to a royalty rate of 16.67%, plaintiff asserts that the minimum royalty due is $1,112.63 and that the reported royalty paid was the same amount. Id. Therefore, there is no underpayment due for the portion of the East Hardy lease subject to the 16.67% royalty rate.

[8]Defendant argues that the portion of the East Hardy lease subject to 12.5% royalty rate has a minimum royalty due of $1,115.00, with a reported royalty paid of $1,115.00. Def.'s Br. Attach. 2. Defendant, therefore, asserts that there was no underpayment of the portion of the East Hardy lease subject to 12.5% royalty rate. Defendant argues that the minimum royalty due for the portion of the East Hardy lease subject to the 16.67% royalty rate is $16,944.00 and the reported royalty paid is $5,271.00. Id. Defendant asserts that the difference of underpayment is $11,672.00 for this portion of the East Hardy Unit lease. Id.

[9]Defendant attaches to its brief a copy of a resolution of the Osage Tribal Council, dated September 21, 1977. Def.'s Br. Attach. 3. The resolution was not introduced at trial. Plaintiff objects to this new evidence because it "revers[es] the United States' expert witness's position [at trial] with respect to the royalty rate on the East Hardy lease." Pl.'s Mot. 2. Plaintiff argues that the resolution, "which is not in the record, is taken out of context, and says nothing about which of the two royalty rates in the Layton formation applied to the particular oil at issue in Tranche One." Id. at 2 n.1. Defendant explains that "because [it] did not consider the price paid on the East Hardy lease as a valid offered price for determining royalties on other leases, the issue of which royalty rate applied to the lease was not critical to [d]efendant's determination of whether the correct royalties were calculated." Defendant's Brief in Response to Plaintiff's Motion to Strike Newly Filed Evidence (defendant's Response or Def.'s Resp.) 10 n.8. Defendant contends that because of the court's direction to the parties to calculate damages and because the East Hardy price now stands to serve as a "proxy for offers to other lessees, the royalty rate on the East Hardy unit is of greater prominence." Id. Despite defendant's new found recognition of the importance of the royalty rate on the East Hardy Unit, defendant is not allowed to utilize the court's direction to the parties to calculate damages as an opportunity to introduce evidence contradicting defendant's position at trial. The Tribal Resolution offered by defendant

documents in the record that definitively indicate the correct royalty rate for the East Hardy Unit and because adverse inferences affecting damages are not drawn against a trust plaintiff, the court adopts plaintiff's contention regarding the royalty rates for the East Hardy Unit. See Warm Springs, 248 F.3d at 1371 (holding that when trustee fails to keep proper records, any doubts must be resolved in favor of the beneficiary).

B. Damages Calculations for February 1986 and July 1989

The parties disagree on the calculation of damages for February 1986 and July 1989. Pl.'s Br. 6-11; Def.'s Br. 7-10.

First, the parties disagree about the propriety of using the MMS data as the sole means of obtaining the highest offered prices of major purchasers. Defendant produced price information collected by the Minerals Management Services (MMS) during the mid-1980s through 1990 to use in calculating damages to comply with the court's ruling that government records are a satisfactory proxy for evidence that should have been obtained contemporaneously by defendant, but was not. Joint Submission 2, ¶ 4. Plaintiff's expert utilized the highest offered prices of major purchasers obtained from either the MMS data or based on prices supported at trial. Pl.'s Br. 3-5. Defendant's expert utilized "proxies for offered prices from major purchasers in Kansas-Oklahoma area" extracted from "offered prices from the highest posted or offered price by a Major Purchaser in Kansas or Oklahoma on the day of sale or removal; the highest price that was actually paid on a Tranche One lease; and MMS data." Def.'s Br. 7.

Second, the parties disagree on whether the sales transactions should be treated as date of delivery (DOD) sales or equal daily quantity (EDQ) sales for determining the highest offered price in February 1986 and July 1989. Pl.'s Br. 6-11; Def.'s Br. 7-11. A DOD price refers to the price that is in effect for sales on a particular day of the month. Def.'s Br. 7 n.7. EDQ transactions reflect a "monthly average price" based upon the "concept [that] equal volumes [are] purchased and delivered each day of the month either physically or by agreement of the parties." Id. at 7 n.8. Defendant asserts that DOD prices, which are specific to particular days in the month, should not be used to determined the royalty value for an entire Tranche One month because the result is an "inaccurate . . . oil royalty underpayment claim for that month." Id. at 10-11.

1. Use of MMS Data for February 1986 and July 1989 Damages Calculations

Although defendant itself utilized MMS data for calculating damages, defendant alleges that "[t]here are several problems with using this MMS data" for February 1986 and July 1989 damages calculations. Def.'s Br. 9. Defendant asserts that "MMS data is not an appropriate source of data for offered prices because it does not comport with Osage Regulations." Id. Defendant notes that the regulations require that "settlement

---

SHALL NOT BE RECOGNIZED AS PART OF THE RECORD.

shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal." Id. (citing 25 C.F.R. § 226.11(a)(2)) (emphasis omitted). Defendant argues that the MMS data does not specify the day on which the sale transpired. Id. Defendant also notes that the MMS data does not "identify major purchasers or consistently contain information about the quality (gravity) of the oil" and the "data contains errors in calculated royalties and implied unit values." Id. Therefore, defendant's expert, Mr. Ronnie Martin, "excluded transactions that contained (a) data anomalies and outliers; (b) a volume of less than one barrel per month; and (c) DOD sales." Id. Mr. Martin only considered "transactions for companies that were major purchasers under the Osage Regulations and assumed that payors were major purchasers if the company name was identical to that of a major purchaser for the applicable month." Id. at 9-10.

Plaintiff argues that defendant "unjustifiably disregards a number of MMS prices paid by major purchasers" because defendant "deems the purchase volumes too small to be relevant – yet the Osage Regulations compel the use of the highest price paid by a major purchaser regardless of the volume of the particular sale that generated that price." Pl.'s Br. 10.[10] The court agrees with plaintiff. Plaintiff's argument is consistent with the text of the regulations. As plaintiff points out, there is "nothing on the face of the MMS data [that] suggests" a sale is a DOD sale or that a "price must have been the result of an 'incorrect royalty rate.'" Id. Defendant cannot attack the plain meaning of its own records to gain an advantage when the records must serve as a proxy for data defendant failed initially to collect in accordance with its fiduciary duties. Warm Springs, 248 F.3d at 1375 (holding that the consequences of the difficulties in determining an accurate accounting due to the government's failure to keep proper records "should not be visited upon the Tribes").

The court does not accept defendant's arguments regarding the alleged flaws of the MMS data. In compliance with the court's ruling, defendant supplied its own records to serve as a proxy for price information. The court agrees with plaintiff's position that the plain meaning of the records should control and any ambiguities should be resolved in favor of plaintiff. Moreover, defendant is not allowed to benefit from alleged ambiguities in its own records or from the lack of accurate accounting information that it failed collect.

---

[10]Plaintiff objects to defendant's "[p]resenting unsupported expert opinion testimony – without any reference to the record or to any basis in MMS records – that, despite the parties' agreement as to which MMS prices were paid by 'major purchasers' within the meaning of the Osage Regulations, see Joint Submission at ¶ 7, such prices should not be used as royalty prices for purposes of damages." Pl.'s Mot. 5. Defendant contends that it "merely agreed on which prices in the MMS data were offered by major purchasers" and that "disagreements remain over whether particular prices by major purchasers in the MMS dataset may be used to set royalty value." Def.'s Resp. 7-8. Defendant also argues that, in accordance with the court's request for additional briefing, its experts' declarations properly explain and provide support for its positions and calculations. Id. at 8-9. Because the court declines to accept defendant's manipulations and assumptions regarding the MMS data, plaintiff's objection is MOOT.

Id. The court therefore declines to accept defendant's manipulations of the MMS data for the purpose of determining the amount of damages due for February 1986 and July 1989.

The parties also contest offered price data for two months based on conflicts in and between defendant's interpretation of the MMS data and the evidence presented at trial. The court finds that where conflicts exist and where a highest offered price was supported at trial and where that price exceeds a "higher" price shown in the relevant MMS data, plaintiff should have the benefit of the trial record.

2. Date of Delivery (DOD) or Equal Daily Quantity (EDQ) Sales

a. February 1986 Highest Offered Price

Plaintiff's expert used "the price of $24.69 paid by Sun Oil on the East Hardy lease" to calculate damages for February 1986 because this price "appears to be the highest price paid by a major purchaser." Pl.'s Br. 5. The $24.69 price was the price used by both parties at trial. PX751-0646; Defendant's Exhibit (DX) 2675-0100. Plaintiff notes that the "MMS data . . . show that major purchasers in other parts of Oklahoma paid more than the next highest price on a Tranche One lease ($20.74 on Osage Hominy)." Pl.'s Br. 5. Plaintiff also notes that although $24.69 is "perhaps at the high end of the market, [it] was not an anomaly" because "other large (though not 'major') purchasers . . . paid more than $24.69 elsewhere in Oklahoma." Id. (emphasis omitted).

Defendant's expert, Mr. Martin, "assumed oil sales for the East Hardy lease as [date of delivery] DOD sales, as opposed to equal daily quantity (EDQ) sales." Def.'s Br. 7. Defendant explains that Mr. Martin based his treatment of East Hardy sales as DOD sales "on his discussions with Osage Agency supervisory personnel involved in the operations and management of Osage crude oil leases." Id.[11] Mr. Martin therefore "only utilized the price for oil from the East Hardy lease as a price for particular days of the month" and did not apply the price to other Tranche One leases for February 1986. Id. at 7-8.

---

[11]Plaintiff objects to defendant's use of "additional expert testimony on whether the East Hardy price was for a sale made on a 'Date of Delivery' (DOD) or 'Equal Daily Quantities' (EDQ) basis, wherein Mr. Martin characterizes his 'discussions' with 'Agency personnel' in a manner inconsistent with his testimony at trial." Pl.'s Mot 3. At trial, Mr. Martin responded that he did not have "any documentary evidence indicating definitively that East Hardy was a date of delivery sales method." Tr. 1613:16-20. Defendant emphasizes that, at trial, Mr. Martin responded that he did not have any "documentary evidence," but he said that he thought he based his assumption regarding the East Hardy unit data on his "discussions with agency staff." Def.'s Resp. 9 (citing Tr.1613:6-20) (emphasis omitted). Defendant therefore argues that it is not "offering new evidence to supplement the trial record," but rather it "is providing additional factual development so that its damages calculations comport with the [c]ourt's Opinion related to offered prices." Id. Because the court resolves the ambiguity regarding the method of sale in favor of plaintiff, plaintiff's objection to defendant's use of expert testimony to support its argument that the sales were DOD sales is MOOT.

Plaintiff argues that Mr. Martin's "assumption does not withstand scrutiny" because there is no evidence that indicates that East Hardy was paid on a DOD basis. Pl.'s Br. 6. As an example, plaintiff points out that the "East Hardy records for January 1976 indicate that 8,181 barrels of oil were sold – all on January 1." Id. Plaintiff notes that "[i]t is highly improbable that such a quantity of oil was sold and picked up on New Year's Day." Id. Plaintiff also argues that the "few extant records for the East Hardy unit in the other Tranche One months also support the conclusion that sales from the East Hardy unit were on an EDQ basis." Id. Plaintiff indicates that "no reference to a specific date of sale or delivery" is included in the records. Id. at 7 (emphasis omitted).

Defendant's assumption that oil sales for the East Hardy lease were DOD sales instead of EDQ sales is not persuasive. Under Warm Springs, any ambiguities in the government's records must be resolved in favor of plaintiff. Warm Springs, 248 F.3d at 1371. As plaintiff notes, the records do not specify a date of sale or delivery that would indicate that the sales were DOD sales. Defendant's expert's alleged discussions with Agency personnel does not overcome the ambiguity or lack of information in the records regarding the date of sale. For the purposes of determining the highest offered price for the Tranche One leases for February 1986, the East Hardy Unit lease transactions shall be treated as EDQ sales instead of DOD sales. Accordingly, because $24.69 is the highest offered price for February 1986, plaintiff's calculation of damages based on the price of $24.69 paid by Sun Oil for the East Hardy Unit lease control.

b. July 1989 Highest Offered Price

Plaintiff states that, during trial, plaintiff's expert Mr. Reineke primarily utilized price data from Osage County, with the exception of price data for July 1989, which includes the Kansas-Oklahoma area. Pl.'s Br. 3. At trial, Mr. Reineke used the price of $20.25, which was the price for the "purchase of oil in Oklahoma by Total Petroleum, a major purchaser." Id. However, after obtaining the MMS data from the United States, plaintiff adjusted the highest offered price to reflect the highest offered price by major purchasers throughout the Kansas-Oklahoma area. Id. at 3-4. Plaintiff explains that Mr. Reineke utilized $21.00 for July 1989 because it was the highest offered price by a major purchaser, Mobil Oil Corporation,[12] included in the MMS data. Id.

In its Supplemental Brief, defendant asserts that the appropriate price for July 1989 is "$20.12 paid by Conoco-Phillips Company." Def.'s Supplemental Br. 1. Defendant does not regard the $21.00 Mobil price as the highest offered price because it is associated with a small volume and "may have been an adjustment to correct errors in previous data entries." Id. at 2-3. Defendant proffers several inferences of inaccuracy to explain why $21.00 "is not [a] logical" price to use as a highest offered price and suggests that the

---

[12]Plaintiff notes that in the MMS data Mobil Oil Corporation is listed under the name of its successor company, Exxon Mobil Corporation. Pl.'s Br. 4.

"correct unit price" paid by Mobil is $20.58. Id. at 3. Despite the $20.58 price suggestion, defendant argues that $20.12 is the appropriate highest offered price because it reflects an EDQ transaction. Id. at 4. Defendant disqualifies $21.00 and $20.58 as appropriate highest offered prices because they reflect DOD transactions. Id. The court declines to accept defendant's argument that $20.12 is the appropriate highest offered price. As explained in Part III(B)(1), the court does not accept defendant's manipulations of the MMS data for the purpose of determining the amount of damages due for February 1986 and July 1989. See Warm Springs, 248 F.3d at 1375.[13]

The $21.00 price is associated with Exxon Mobil Corporation in the MMS data. Pl.'s Br. Ex. 3; Def.'s Br. Attach. 9. Although Mobil Oil Corporation was a major purchaser for July 1989, Exxon Corporation was not. See PX751-519. However, defendant explained that this particular transaction "pertains to a royalty transaction for Mobil and not for Exxon." Def.'s Supplemental Br. 2 (explaining that the payor identification number in the MMS data is a Mobil payor code). Therefore, the court adopts the $21.00 Mobil Oil Corporation price as the appropriate highest offered price for July 1989.

IV. Damages for Failure Promptly to Deposit Funds Because of Unreasonable Failure to Certify a Federal Depositary

The parties disagree on how to calculate damages for deposit lag and on the present value of damages for deposit lag. Plaintiff determined "deposit-lag calculations on an average annual basis." Pl.'s Br. 22. Plaintiff asserts that this method was its only recourse because it is "impossible to attribute royalty payments to specific Tranche One leases" due to incomplete records and the practice of paying multiple royalties with a single check. Id. at 21. Plaintiff disagrees with defendant's position that "deposit lag can be analyzed accurately on a lease-by-lease basis." Id. at 27. Plaintiff argues that the average annual basis method is more efficient because it "can be applied across broad time periods without the need to resolve the unnecessary disputes over what is or is not included in Tranche One." Id. at 22. Plaintiff explains that it "estimated lag delays and resulting damages in two parts. Id. First, plaintiff "estimated . . . the damages resulting from the one-business-day delay for each check mailed in Pawhuska to reach Muskogee and be deposited. Second, plaintiff estimated . . . damages from the additional lag days, over and above the mailing time, as show[n] in the Andersen report's summary chart." Id. at 22-23. To estimate damages resulting from the one-business-day delay, Plaintiff utilized an average lag of 1.4 days because "one fifth of [payment] mailings–any check mailed on a

[13]In Plaintiff Osage Nation's Second Motion to Strike Newly Filed Evidence (plaintiff's Second Motion or Pl.'s Second Mot.), plaintiff argues that portions of defendant's Brief About Appropriate Highest Offered Price for July 1989 Pursuant to Court's January 16, 2007 Order (defendant's Supplemental Brief or Def.'s Supplemental Br.) should be stricken. Pl.'s Second Mot. 1. Because the court declines to accept defendant's arguments regarding the highest offered price for July 1989, plaintiff's Second Motion is MOOT.

Friday–would be subject to 3 lag days due to the intervening weekend." Id. at 23. To calculate the dollar amount that is subject to the mailing lag, plaintiff subtracted the "amount of all payments shown to have been made during the fiscal year by Electronic Funds Transfer (EFT)"[14] from "the annual total for royalty receipts, taken from the Andersen Statement of Account for the fiscal year." Id. Plaintiff then multiplied this dollar amount by the "prudent rate for the fiscal year" and by "the portion of the year the payments lagged (1.4 divided by the number of days in the year)" to obtain "[a]n annual damages figure for mailing lag." Id. at 25. Lastly, plaintiff divided the annual damages figure "by 12 to produce a damages figure for the Tranche One month." Id.

Regarding the additional lag days indicated in the Andersen report's summary chart, plaintiff points out that, at trial, its expert Mr. Jay stated that "some checks deposited during the fiscal years containing the Tranche One months were, days, weeks, or even over a month late." Id. at 26. Plaintiff notes that "[e]xhibit 9, titled 'Andersen Deposit Lag,' estimates the damages caused by such lateness, i.e., damages over and above those resulting from the 1.4-day mailing lag. Id. Plaintiff adjusted the lag days by subtracting 2.4 lag days from the Andersen numbers based on its assumption that "all payments within a particular range had a lag equal to the average in the range." Id. Plaintiff's assumption is based on the "ranges instead of precise numbers quantifying the number of lag days" included in the Andersen data. Id.

The court disagrees with plaintiff's contention that there is no need to resolve "disputes over what is or is not included in Tranche One." Pl.'s Br. 22. The point of a trial on specific leases for specific months has been to provide the parties an opportunity to focus on discovery and factual presentation in a manageable format. To the extent reasonably practicable, the parties and the court should proceed on that basis.

While there are many uncertainties regarding payments due for the Tranche One months, those uncertainties have been reasonably resolved in Part III based on the law and the evidence. Consistent with the court's finding that equal daily quantities should be assumed in calculating royalties due, the parties shall assume that those royalties were paid in equal daily amounts throughout the relevant Tranche One months. It therefore remains for the court to determine the extent of lag time to be applied to each payment.

---

[14]Plaintiff states that it "accepts the United States' representation that, in general, a 'Z' in the middle of the 'document number' listed in the Statement of Account denotes an EFT deposit." Pl.'s Br. 24. However, plaintiff argues that "the United States has not adequately explained why any payments without such a designation should be considered EFTs." Id. In particular, plaintiff disputes defendant's contention that the March 25, 1986 payment of $2,124,094.52 is an EFT payment. Id. Plaintiff suggests that if the court adopts plaintiff's analysis of deposit lag, "the United States should have an opportunity to produce reasonably conclusive documentary evidence that other non-'Z' payments were made by EFT." Id. Plaintiff notes that it "would be willing to stipulate to the EFT nature of other deposits." Id.

Defendant's expert, Mr. Gregory Chavarria, "calculated the time period between the receipt of royalty receipts in the Osage Agency mailroom and the posting of those funds to Account No. 7386" by using information obtained "from the Osage Agency Mailroom Schedule of Collections and the Andersen Report Account Statements." Def.'s Br. 19. Mr. Chavarria reviewed this information to identify "instances where payments were not deposited in a timely manner." Id. Mr. Chavarria then "count[ed] the number of business days between receipt and posting of royalty payments and then subtract[ed] one day." Id. "For the funds that were not posted within 24 hours or by the end of the next business day following receipt, Mr. Chavarria used the blended 80% 3-month CD and 20% 3-month T-Bill expected rate to calculate the lost investment income that could have been earned on those funds." Id. After "review[ing] Fedwire deposit listings, electronically generated deposit tickets, and Andersen Report Account Statements" to determine which royalties were paid by EFT, defendant contends that "all royalty payments for production in January 1976 and one payment for production in May 1979 were made by check" and "[a]ll of the remaining payments were made by EFT." Id. at 19-20. Defendant argues that only "two of [the] check deposits exceeded the Court's permissible time for deposit by one day." Id. at 20. Defendant also contends that according to "Fedwire deposit listings, electronically generated deposit tickets and Andersen Report Account Statements[,] . . . all EFT payments were timely deposited in Account No. 7386." Id.

The court is not persuaded that defendant's lease-by-lease basis of determining deposit lag provides a fair representation of the actual lag time of deposits for rents paid with respect to January 1976. As the court noted in Osage II, "[t]he Osage Tribe is entitled to damages reasonably estimated based on existing information." 72 Fed. Cl. at 670. Moreover, doubts should be resolved against the trustee when proper trust records are missing. Warm Springs, 248 F.3d at 1373. Records presented at trial indicate that, in some cases, the lease for which a payment is made is not specified in defendant's records and that a royalty payment could be listed for deposit with several other companies' royalty payments. See e.g., DX451-0001 (indicating that twenty-six payments from different companies were scheduled for a single deposit); PX578-0012, -0013 (indicating that the Bigheart Pipeline Company January 1976 payment did not indicate the lease for which the payment was made and that the payment was listed for deposit with other companies' royalty payments). In some cases, the records also fail to indicate the date a deposit was credited to plaintiff's account. See e.g., DX446, 485, 487 (showing a "Date Prepared" but not indicating a "Date of credit in Treasurer's account"); PX578-0014 (showing a "Date Prepared" but not indicating a "Date of credit in Treasurer's account"). These examples illustrate the difficulty of determining the date a deposit was credited to plaintiff's account after receipt. Because of incomplete records and defendant's practice of depositing multiple royalties with a single check, the court adopts, as to January 1976, plaintiff's estimate of "one business-day delay for each check mailed," Pl.'s Br. 22, (resulting in an average lag of 1.4 days to account for weekends, Pl.'s Br. 23), plus an estimate of additional lag days as developed in the Andersen report, PX476 (copy of Arthur Andersen report); Pl.'s Br. 26.

There are two remaining issues: the number of royalty payments made by check as to May 1979 and whether royalty payments in March 1986 was made by check, see Pl.'s Br. 24 (disputing defendant's assertion that the March 25, 1986 payment of $2,124,094.52 was an EFT payment). If the parties, after direct negotiations, are unable to agree on a resolution, they shall, on or before Thursday, March 15, 2007, submit briefs describing the remaining differences and arguments for their respective proposed resolutions.

## V. Underinvestment and Investment Underperformance Damages (Damages For Failure to Maintain Appropriate Cash Balances and For Failure to Obtain Investment Yields in Accordance With Law)

### A. Areas of Agreement

The parties agree on some elements of damages calculations for Underinvestment and Investment Underperformance Damages. Trial testimony primarily focused on Account 7386. However, the parties agree that "both Account 7386 and Account 7886 should be evaluated for purposes of computing investment damages, because Account 7886 was the interest-related account for Account 7386 until FY 1985, when the Accounts were combined." Joint Submission 3, ¶1. The parties included Statements of Account for 7886 in Appendices A, B, and C to their Joint Submission. The parties state that "[f]or purposes of this submission only, and not for any other or future purpose or calculation of damages," they "agree on the average daily balance for each of these accounts during the fiscal years containing the Tranche One months." Joint Submission 3, ¶ 1.

The parties also "agree on the amounts of interest derived from CDs and Government Securities that were credited to Accounts 7386 and 7886 during the fiscal years containing the Tranche One months" and "on the amounts of Treasury Interest on Cash for the 1979, 1981, 1986, and 1989 fiscal years." Id. at 3, ¶2. The parties agree to utilize data from the Federal Reserve Historical Release in order to compute "expected rates on funds not part of the permissible cash balance." Id. at 4, ¶3. The parties agree to use algebraic formulas to convert three-month discount-basis interest rates to three-month investment-basis interest rates, and vice versa.[15] Id. at 4, ¶4. The parties agree to use the interest rate of 4% to calculate the expected return on permissible cash balances for the first three Tranche One months and the "overnighter rates of 7.12% and 9.01%, respectively, for the last two Tranche One months." Id. at 4, ¶5. The parties also agree that the court should not assess damages for the Tribe when defendant's actual performance exceeded the expected rate of return and "that the court should not assess

[15]The formula for determining the investment basis interest rate is (365*D) ÷ (360 - (91*D)); D represents the discount-basis interest rate. Joint Submission on Calculation of Tranche One Damages (Joint Submission) 4, ¶4 n.3. Conversely, the formula for determining the discount-basis interest rate is (360*I) ÷ (365+(91*I)); I represents the investment-basis interest rate. Id.

'negative damages' for the months of February 1986 and July 1989 . . . against damages for the months of January 1976, May 1979, and November 1980." Id. at 4, ¶6.

B. Areas of Disagreement

Both parties utilized a three-step process to calculate underinvestment and investment underperformance damages, which includes: 1) calculating the average monthly actual returns for the Tranche One months; 2) calculating the expected earnings for each Tranche One month; and 3) determining the difference between the actual returns and the expected earnings in order to calculate damages. Pl.'s Br. 12; Def.'s Br. 12-18. The parties disagree on what amounts should constitute the actual returns; on how to calculate the average daily balances; and on whether to use an investment-basis or discount-basis rate to calculate the expected earnings.

1. Actual Returns

In the first step, plaintiff determined "how much interest the [g]overnment actually credited to the trust accounts" by reviewing the Arthur Andersen statements of account. Pl.'s Br. 12. Plaintiff explains that it first added the three interest components[16] listed on the report for accounts 7386 and 7886. Id. Plaintiff then divided the annual amount of actual interest by 12 "to obtain the estimated interest credited for [each] Tranche One month." Id. at 13.

Defendant's expert, Mr. Chavarria, "identified interest postings from investments in CDs and T-bills posted to Account No. 7386." Def.'s Br. 12. Mr. Chavarria added the income earned on cash to this amount. Id. Defendant asserts that for "the first three Tranche One months, the statutory interest of 4% earned on cash under 25 U.S.C. § 161a was posted to Account No. 7886. Mr. Chavarria divided the total annual interest earnings by 12 to obtain the average monthly actual interest earnings." Id. However, for the last two Tranche One months, defendant contends that "using the actual postings in the fiscal years does not accurately reflect the Overnighter interest that was earned in those years" because DOI "posted the 1985 Overnighter interest in 1986 and the 1986 Overnighter interest in subsequent periods." Id. at 13. After reviewing overnighter postings from 1985 to 1989 and identifying postings associated with interest earned in 1986 and 1989, defendant asserts that both actual and adjusted calculations "produced a result where the actual earnings exceeded the expected returns." Id. Defendant therefore argues that it does not owe damages for 1986 or 1989 Tranche One months. See id.

Defendant claims that "in FY 1976 two of the entries to account 7886 labeled 'other receipt,' one positive and the other negative, are attributable to statutory (4%) interest."

[16]Plaintiff notes that the statements of account list interest under the "receipt" heading in three components: "Treasury Interest" (or "Overnighter Interest"); "Interest on CDs" and "Interest on Government Securities." Pl.'s Br. 12.

Pl.'s Br. 20. Plaintiff contends that "no evidence in the record support[s] such a claim" and also notes that "the first page of the Statement of Account that the United States cites shows that 'Treasury Interest' for the year was '$.00.'" Id. at 21. Defendant explains that Mr. Chavarria came to his conclusion regarding 1976 interest "by referring to Andersen Report collection entries for 1976 identified by the revenue type code '9701,' which was used to designate Overnighter/statutory interest, and the alpha characters 'AW' in the document description field, which identifies the transaction as investment related." Def.'s Br. 12 n.14. Plaintiff argues that defendant's use of Mr. Chavarria's new testimony "effectively revis[es] the 1976 Statement of Account for 7886 (Appendix A to the Joint Submission), based on Mr. Chavarria's '[f]urther examination of the data,' and evidence of a so-called 'element component' of '9701' in unspecified 'Andersen data,' Chavarria Decl. at ¶ 7 – none of which is in the trial record or in Appendix A." Pl.'s Mot. 4. Defendant notes that "[t]he parties agreed to provide the statements for Account 7886," but "[d]efendant should not be precluded . . . from providing its understanding of the meaning of those statements, especially when it is not plain on the face of the statements." Def.'s Resp. 13. However, the plain face of the records indicates that there was no treasury interest with respect to account 7886 in 1976, Joint Submission App. A, and there is nothing in the document or the relevant associated documents that indicates a reference to code "9701" or that "AW" signals an investment-related transaction. The court therefore declines to accept defendant's argument based on newly-introduced expert testimony concerning the 1976 data for account 7886. The court adopts plaintiff's method of determining actual returns for 1976.

Plaintiff also argues that there is no evidence in the record to support defendant's claim "that certain amounts of interest credited to account 7386 in fiscal years 1986 and 1989 are attributable to previous years and [that the amounts] should be reallocated to those years in the calculation of damages." Pl.'s Br. 21. Plaintiff further argues that "even if credits in later years were made to compensate for a failure to credit interest in previous years, the Osage Nation would be entitled [to] damages for the United States' delay in crediting the funds to the trust." Id. Plaintiff objects to defendant's "[o]ffering new opinion testimony from Mr. Chavarria, based on his 'extensive work with the historical account transactions contained in the data used by Andersen,' Chavarria Decl. at ¶ 8, that advocates the reallocation of overnighter interest to years other than those in which it was actually paid to the trust according to the Statements of Account for 7386 in the record." Pl.'s Mot. 3. The court is not in a position, based on a record focused on the Tranche One months (and, for purposes of certain damages calculations, the years in which the Tranche One months occur) to reallocate moneys between years. If such a reallocation were in fact required, it of necessity would be performed in Tranche Two of the case, when the remaining years of the account will be before the court. The court SUSTAINS plaintiff's objection to defendant's newly-introduced expert testimony. The court declines to accept defendant's argument for use of overnighter postings for years other than 1986 and 1989.

2. 80/20 Monthly Expected Rate

The court previously held that the appropriate monthly expected rate is "a combination of contemporaneous 3-month CD rates (80%) and 3-month T-bill rates (20%)." Osage II, 72 Fed. Cl. at 671 (citation omitted). This holding is implicated in two additional disputes in which the Unites States now attempts to shift from its position at trial in ways that appear to undermine the 80/20 monthly expected rate as determined at trial. Plaintiff indicates that its "assent at trial to use of the 80/20 rate as the standard of care was premised on the United States' position at trial." Pl.'s Br. 19 n.6.

a. Average Daily Balances for Each Tranche One Month

With respect to the calculation of expected earnings, plaintiff "calculated expected earnings for [each] Tranche One month by first calculating the expected earnings on invested funds (all but the $25,000 permitted to be left in cash) and then adding to that [amount] the expected earnings for the $25,000 left in cash." Pl.'s Br. 13. Similarly, defendant's expert added the average daily balances of Account No. 7386, determined by "each day's ending balance in the relevant fiscal years," and Account No. 7886, determined by account schedules provided by plaintiff. Def.'s Br. 13. Defendant then reduced the average daily balance by $25,000 to provide for the cash balance allowed by the court. Id. at 14. Defendant claims that to be "consistent with the [c]ourt's ruling," it also "adjusted the daily cash balance to reflect a reasonable time between the deposit of funds and the investment of those funds." Id. Defendant asserts that "the [c]ourt presumably recognized that [an investment] conversion could not occur immediately," because the court stated that "cash balances . . . would be quickly converted into higher-yielding investments." Id. (quoting Osage II, 72 Fed. Cl. at 666) (emphasis omitted). Defendant emphasizes the court's use of "quickly converted" to bolster its assertion that some delay should be assumed. Id. Defendant also argues that the court's assumed recognition of the inability immediately to convert the cash balances "comports with the principle that a trustee can properly take a reasonable amount of time in looking out for proper trust investments and is not liable for failure to make the property productive during such time." Id. (citing E.F. Hutton S.W. Props. v. Union Planters Nat'l Bank, 953 F.2d 963, 973 (5th Cir. 1992) (quotation omitted)). Defendant cites Cheyenne-Arapaho Tribes of Indians v. United States, 512 F.2d 1390, 1394 (Cl. Ct. 1975) to indicate that the Court of Claims has previously applied the principle of allowing the trustee "a reasonable time to make the initial investment." Id. (quoting Cheyenne-Arapaho, 512 F.2d at 1394).

Defendant asserts the necessity of "reasonable time" to explain its one-day adjustment to the average daily balances. Defendant points to the Price Waterhouse Report which states that "[i]nvestments in market bills are made daily by telephoning the Department of Treasury by 9:00 a.m. Albuquerque time." Id. at 15 (quoting DX 1668-0133). Defendant argues that "the earliest [the funds] could have been invested would have been the morning of the next business day." Id. Defendant also argues that "[i]nvestment in bank CDs required additional time" due to CD investment cycles. Id. Defendant claims that "placing the funds in CDs could . . . take at least three business days." Id. at 16. Therefore, defendant "adjusted the account balances to reflect a reasonable time (one day) needed for investing in Treasury securities and CDs." Id.

Defendant disregards the court's holding that defendant is liable for failing to achieve to the expected return "on average daily balances in excess of $25,000." Osage II, 72 Fed. Cl. at 671. Plaintiff charges that defendant "propos[es] that it should not be liable for failure to invest all funds 'in excess of $25,000'" because defendant "adjust[s] the cash balance upward from $25,000 to account for a 1-day 'grace period' for investing funds received." Pl.'s Br. 18. Plaintiff notes that defendant did not assert this position at trial. Id.[17] Plaintiff contends that "at trial the United States agreed that the 20% T-bills in the 80/20 rate already builds in the liquidity that the United States is now claiming needs to be added in." Id. at 19. In response to defendant's point that T-bill investments had to be consummated before "9:00 a.m. Albuquerque time," see DX 1668-0133, plaintiff argues that "it was undisputed at trial that because Osage funds on deposit were already in the Treasury, Treasury bills could be obtained by simply picking up the telephone." Id. (emphasis omitted).

The court agrees with plaintiff. Defendant's adjustment of the average daily balance is an inappropriate shift of its position at trial. At trial, defendant's expert explained that, among other factors, the "weight given to Treasuries in the Expected Rate metric was also impacted by the time needed to locate appropriate CD investments." DX2695-0013 to 14, ¶¶ 28-31 (Charles R. Lundelius, Jr., Expert Report (Revised), March 13, 2006). The court understands the 80/20 rate to include a reasonable time for defendant to make its initial investment. Therefore, defendant's proposed one-day adjustment to account for this time is already incorporated into the 80/20 rate. Accordingly, the court declines to adopt defendant's proposed one-day adjustment of the average daily balance.

b. Investment-Basis Rate or Discount-Basis Rate

After determining the average daily balance, the parties multiplied the amount available for investment by the appropriate monthly expected rate. Pl.'s Br. 14; Def.'s Br. 17-18. Plaintiff notes that it "used the Federal Reserve Statistical Release . . . to obtain contemporaneous three-month CD rates and three-month T-bill rates on a month-by-month basis." Pl.'s Br. 14. Plaintiff explains that "the T-bills rates required an extra step in the first three Tranche One months" to conform Federal Reserve data to the "scope of the trustee's duty." Id. at 15. In this extra step, the parties part company on which algebraic formula should apply: the investment basis interest rate formula (argued by plaintiff) or the discount basis interest rate formula (argued by defendant). Plaintiff argues that "discount rates do not accurately reflect the investment return on the amount of principal invested, and should not be used in calculating investment yield." Id. Therefore, plaintiff

[17]In its motion to strike, plaintiff argues that defendant "contradict[s] the [c]ourt's order that all amounts above $25,000 are counted as being available for investment; Mr. Chavarria admits that his manipulation of interest rates has the same effect as 'reduc[ing] the average balance of the account [available for investment],' Chavarria Decl. at ¶ 12." Pl.'s Mot. 3. Plaintiff's objection is SUSTAINED.

converted discount rates to investment rates for these three months [January 1976, May 1979, and November 1980] using a formula agreed upon by the parties." Id.

Instead of applying the investment-basis interest rate formula, defendant applied the discount-basis interest rate formula. Defendant explains "the appropriateness of using an investment rate or a discount rate depends on the calculation of the average daily fund balance." Def.'s Br. 17. Defendant asserts that "[a]n annual investment rate incorporates compound interest" because "it reflects a yield that assumes reinvestment of earnings from the date that the rate is available through the remainder of the year." Id. Defendant argues that to obtain "appropriate expected returns" through an investment rate, one must "reduce the average funds balance by the interest earnings posted to the account during the year" to ensure consideration of "only the principal balance of the account" and avoid "a compounding effect on the balance." Id. Defendant also argues that "[i]f one applies the investment rate to a fund balance that includes both principal and interest, then one is creating a double compounding effect on the expected return." Id. Defendant explains that the compounding effect can be avoided "by multiplying the average daily fund balance (which includes earnings and principal) by the discount rate (based on future cash flows)" to obtain the interest earnings. Id. Therefore, defendant applied "the discount rate to the average fund balance that included both principal and interest." Id. Defendant explains that Mr. Chavarria also applied "the investment rate to the average fund balance that excluded interest," but ultimately decided to apply only the discount basis method "because it resulted in a higher expected return on invested funds than the investment basis." Id. at 18.

Plaintiff challenges defendant's use of the discount-basis rate, arguing that it "does not comport with the trustee's duty here to earn a return on the funds invested," because use of the discount-basis rate does not count "interest earned by the trust and reflected in the average daily balance . . . as having been available for investment." Pl.'s Br. 19. In particular, plaintiff objects to defendant's "[a]dvocating the use of a new set of 'discount' interest rates, derived by Mr. Chavarria, that are lower than the investment-basis rates used at trial by the United States' expert on this issue, Mr. Lundelius, to calculate the 80/20 'expected' rate." Pl.'s Mot. 3. Defendant contends that "calculation of damages based on an average daily balance of funds that should have been invested . . . require[s] a different approach." Def.'s Resp. 12. Defendant argues that the "separate and distinct purpose" of the rates used at trial was to "compare actual rates of return on specific royalty collections with an expected rate of return." Id. The court does not perceive why interest on average balances should require a different treatment. Plaintiff's objection is SUSTAINED. The court declines to accept defendant's application of the discount-basis rate in its calculation of damages.

## VI. Interest

Based on the opinion of the Court of Appeals for the Federal Circuit in Shoshone, plaintiff is entitled to interest damages on amounts defendant failed to collect and on amounts defendant failed properly to invest in accordance with its fiduciary duties owed to

the Tribe. 364 F.3d at 1353-54. In Shoshone, the Federal Circuit held that the tribe was entitled to an award of damages for failure to manage the trust and an award of interest on the amount mismanaged because the government breached a "clear statutory fiduciary duty to collect or manage funds," and the government assumed the duty to earn interest on those funds. Id. Here, defendant is obligated under the 1906 Act to hold "all moneys that . . . may hereafter be found to be due the [Tribe]" in trust and "draw interest" on such funds. 1906 Act, § 4. Therefore, because defendant has a "clear statutory fiduciary duty to collect or manage funds" and earn interest on those funds, plaintiff is entitled to interest as a part of the damages award. Shoshone, 364 F.3d at 1353. Moreover, under Shoshone, plaintiff is entitled to interest under 25 U.S.C. §§ 161a and 162a. 364 F.3d at 1353 (finding that §§ 161a and 162a "create an obligation for the Government to pay interest on amounts that the Government failed to collect").

A. Current Value or Interest to Date of Next Quarterly Disbursement

Plaintiff argues that "[i]nterest on damages . . . should be measured as though the amounts awarded as initial damages had been collected or earned at the proper time, then invested by the standards of 25 U.S.C. § 162a until the funds are paid in satisfaction of judgment." Pl.'s Br. 28. Plaintiff contends that this measure of damages is due because the United States has a continuing duty to collect, earn, and invest prudently the funds through the date that the funds are disbursed. Id. Plaintiff therefore argues that "initial damages must be treated as though such funds had been in trust all along, and additional damages must be assessed for the trustee's consequent failure to invest such funds." Id.

Defendant asserts that plaintiff is not entitled to "present value or time value of the lost interest." Def.'s Br. 23. Id. Defendant seeks support from Warm Springs for its argument that "[t]o place [p]laintiff in the position in which it would have been, absent the breach, the [c]ourt should limit the award of forgone interest or investment earnings to the period of time in which the funds, under law, would have been held in the Tribe's trust fund." Id. at 24. Specifically, defendant contends that plaintiff should not receive interest damages for the period after defendant would have disbursed the quarterly annuity payments to the headright owners. Id. at 25. Defendant's rationale for its argument is that "[a]ny lost interest or investment returns post-dating the relevant quarterly annuity payments would have been a loss incurred by Tribal headright owners" and the United States "cannot be held liable" for such "indirect or consequential damages." Id. Defendant contends that any award of interest damages "beyond the period of breach[,] . . . would amount to providing pre-judgment interest without statutory authorization." Id. at 26 (citing Warm Springs and Shoshone, 364 F.3d at 1353).

Plaintiff contends that defendant's argument that it "had no duty to invest [uncollected] funds beyond the date of the quarterly disbursement following the [g]overnment's breach of the duty to collect," improperly turns the defendant's

"disbursement obligation . . . into a limit on liability." Pl.'s Br. 33.[18] Plaintiff points to the language of the 1906 Act and argues that it "imposes a duty on the trustee to earn interest on [uncollected royalties and unearned investment income] until they are actually disbursed." Id. at 34. Plaintiff argues that "Peoria Tribe and Shoshone make clear that the [g]overnment's breach of an antecedent duty (collection) does not excuse the [g]overnment's failure to perform other duties that the breach rendered impossible (investment)." Id. The court agrees with plaintiff. Defendant cannot escape liability for its breach in failing properly to manage the trust by arguing that it was required to disburse the funds, an act it was incapable of accomplishing due to its initial breach. Defendant's argument would, in effect, "reward the [g]overnment for inaction that violates the [g]overnment's fiduciary duties to collect funds and accrue interest." Shoshone, 364 F.3d at 1352 n.7. Under the 1906 Act, defendant was obligated to earn interest on "all moneys due, and all moneys that may become due" until the funds were disbursed. 1906 Act, § 4. Similarly, in Peoria Tribe, the Supreme Court held that the government's obligation to invest the funds and pay interest on those funds "'continues until the money is paid over.'" 390 U.S. at 472 (quoting United States v. Blackfeather, 155 U.S. 180, 193 (1894)). Because defendant has not disbursed the funds, interest is still owing and plaintiff is entitled to interest up to the date the money is paid over. Id.

B. Appropriate Investment Instruments

Plaintiff argues that under the prudent investor standard, the funds should have been invested in "long-term instruments . . . because the funds at issue have been held in trust for between 17 and 30 years." Pl.'s Br. 32, 33. Plaintiff states that 25 U.S.C. § 162a, enacted in 1938, "would have allowed any funds held from 1976, 1979, 1980, 1986, or 1989 to the present to be invested in long-term T-bills or CDs." Id. at 32. Relying on the Warm Springs principle that a beneficiary should be placed in a position it would have been if not for a breach of trustee's fiduciary duties, plaintiff contends that long-term instrument rates are the appropriate rates to determine interest damages because "[t]he beneficiary has been deprived and continues to be deprived of funds that could have been put to use during this decades-long delay." Id. at 33 (citing Warm Springs, 248 F.3d at 1371). Plaintiff offers 7-year T-bill rates "as a reasonable estimate" of the appropriate long-term investment rates.[19] Id.

Defendant also points to 25 U.S.C. §§ 161a and 162a and argues that both sections "vest the Secretary of the Interior with discretion in the investment of tribal trust funds."

---

[18] Plaintiff also contends that defendant's argument is "presumably a placeholder" for appeal because the court "has already ruled on this issue and accordingly did not invite the Government to revisit the issue here." Pl.'s Br. 34.

[19] Plaintiff notes that it could have argued for an "even higher rate[] using terms of up to 30 years, because the funds at issue here were by definition not subject to any liquidity demands." Pl.'s Br. 38.

Def.'s Br. 26. Defendant explains that the Secretary of Interior, according to congressional direction, may exercise discretion in selecting investments for tribal trust funds. Id. Defendant contends that the Secretary "would have abused his discretion under Section 162a and would have violated the terms of Section 6 of the 1906 Act if he had invested the funds in instruments with long-term maturities." Id. at 27. Defendant explains that the "amount the trust fund should have earned was limited by the purpose of the fund," which was a short-term account for quarterly annuity payment deposit, and it was limited by "the available investments given that purpose," short-term instruments." Id.

The court does not agree with defendant's argument. Under § 162a, the Secretary's discretion to earn interest on tribal trust funds is based on "the best interest of the Indians." 25 U.S.C. § 162a; see also Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States, 69 Fed. Cl. 639, 658-60 (2006) (Chippewa Cree) (discussing congressional intent regarding the enactment of and amendments to § 162a). Based upon this discretion, and in the absence of relevant statutory guidelines providing otherwise, the Secretary could have chosen to invest in long-term instruments, such as the 7-year T-bill rates, because the funds at issue here are deemed by the court to have been held in trust for 17 to 30 years. As plaintiff points out, defendant's expert did not "indentif[y] any statutory limit preventing investments over 90 days." Pl.'s Br. 36. Plaintiff notes that defendant's expert "recognized that the only barrier to investment in long-term investments is the potential for loss if the investment is liquidated on the secondary market before maturity." Id. However, this limitation operates in the context of actual disbursement to the beneficiary. Because defendant did not actually disburse the funds,[20] defendant is not allowed to benefit from its failure to satisfy its fiduciary duties. Shoshone, 364 F.3d at 1352 n.7 (noting that the government should not be rewarded by its inaction that violates its fiduciary duties). Therefore, the court adopts the plaintiff's suggestion of the 7-year rates.

## VII. Late Fees

The court also directed the parties to include in their briefing consideration of "whether, in lieu of or in addition to interest, plaintiff should be awarded late fees on, and as part of, its damages." Osage II, 72 Fed. Cl. at 671. The parties disagree as to whether plaintiff should be awarded late fees.

---

[20]Plaintiff argues that defendant's "quarterly disbursements in the period between the time the damages occurred and the present [are] irrelevant to the standard of care applicable for funds not collected or disbursed," on the basis of a ruling of the court in Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States, 73 Fed. Cl. 154 (2006) (Chippewa Cree). Pl.'s Br. 36. In that case, the court held that "[t]he act of distributing funds held in trust by the United States does not dispel the trustee's fiduciary responsibility to the tribe or group for moneys unpaid or losses sustained while the tribe or group's funds were in the government's care." Chippewa Cree, 73 Fed. Cl. at 164; see also Pl.'s Br. 36. The court agrees that the principle advanced by the court in Chippewa Cree is equally applicable in the circumstances of this case.

Plaintiff argues that it "is entitled to late fees in addition to interest, but not [to] penalties." Pl.'s Br. 38 (capitalized in original). Because there are outstanding uncollected royalties for Tranche One leases, plaintiff contends that it is entitled to late fees under § 183.13(c). Id. at 39. Plaintiff adopts the government's explanation of the purpose of § 183.13(a), which is "to encourage timely payment by purchasers or lessees rather than as a means of earning income on the Osage mineral resources." Id. at 40 (citing United States Post Trial Brief 34). Plaintiff contends that "[w]ithout such deterrence, lessees have little incentive to seek out and report the correct royalty values." Id. at 40-41. Accordingly, plaintiff argues that "[f]ailure to collect late fees is a failure to deter underpayment that may otherwise be undetectable." Id. at 41. Plaintiff argues that because the defendant's duty to collect late fees is "distinct from the obligation to invest trust funds," the remedies for each are also distinct. Id. Plaintiff asserts that an inappropriate overlap of interest and late fees damages would result if defendant is "allowed to 'dip into' outstanding late fees to pay its liability for failure to invest uncollected funds." Id.

Defendant challenges plaintiff's entitlement to late fees. Def.'s Br. 29. Defendant contends that an award of late fees would "amount to a windfall on the uncollected funds and would not further the purpose of the Osage Regulations, which is to impose a penalty or sanction so as to encourage timely oil royalty payments." Id. Defendant distinguishes itself from the party responsible for paying the late fees. Defendant asserts that "the purpose of the late fee provision was to encourage timely payment from the parties owing royalties, that is, from the lessees or purchasers, not from [d]efendant." Id. at 30. Defendant also argues that the imposition of late fees on defendant would not serve the purpose of encouraging "prompt payment by the lessees or purchasers of the deficient royalty payments only now that have been ruled to be as due and owing from Defendant." Id. Defendant asserts that "it is not part of the purpose of the late fee provision to provide the Tribe with the lost value of the unpaid funds between the date the payment was due and when it was actually paid." Id.

The court agrees with defendant. The court believes that the Osage Tribe has, in effect, conceded the point by its adoption of defendant's explanation of the purpose of § 183.13(a). Pl.'s Br. 39, 40 (concluding that "[t]he natural reading of [§ 183.13(a)] is that a lessee or purchaser must pay royalties in full on time or be charged a late fee" and stating the purpose "is intended to deter underpayment by lessees"). A judgment by this court awarding late fees could not vindicate the purpose of the regulation, which is apparently intended to influence the behavior of purchasers and lessees – persons and entities not before the court. Furthermore, given the court's view that the Osage Tribe is entitled to the present value of royalties unpaid, the imposition of a late fee award could be viewed as a recovery that exceeds the purpose of damages for breach of trust, that is "to place the beneficiary in the position in which it would have been absent a breach." Warm Springs, 248 F.3d at 1371. Therefore, plaintiff is not entitled to an award of late fees.

VIII. Conclusion

The parties are directed jointly to calculate total damages in accordance with the foregoing opinion. In connection with the foregoing, the parties shall resolve the minor discrepancies, as noted in footnote 6 supra, regarding their agreement on "the amount of royalty undercollections for the Tranche One leases in the first three Tranche One months, with the sole exception of the East Hardy unit in May 1979." Joint Submission 1-2, ¶ 1. The parties shall file their damages calculations on or before Thursday, March 15, 2007. If the parties avail themselves of the opportunity to provide further briefing on the manner in which royalty payments were deposited, see Part IV supra, they shall, at the time such further briefing is filed on or before March 15, 2007, file all other damages calculations, excepting only damages affected by the disputed calculation of deposit lag.

IT IS SO ORDERED.

s/Emily C. Hewitt
EMILY C. HEWITT
Judge