UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | 00-169 L |
| Plaintiff, | ) | |
| vs. | ) | No. |
| UNITED STATES OF AMERICA, by and through THE DEPARTMENT AND SECRETARY OF THE INTERIOR and BUREAU OF INDIAN AFFAIRS, | ) | FILED MAR 31 2000 |
| Defendant. | ) | RESPONSE DUE 5-30-00<br>DOCKETED 4-07-00 cmi |

COMPLAINT

Jurisdiction

1. This action is filed pursuant to 28 U.S.C. § 1491 and 28 U.S.C. § 1505, the due process clause of the Fifth Amendment and equal protection clause of the Fourteenth Amendment to the United States Constitution.

Parties

2. The Plaintiff, the Osage Nation, or Tribe of Indians of the State of Oklahoma ("Osage"), is a federally recognized Indian tribe.

3. The Defendant is the United States of America ("United States").

Nature of the Action

4. This is an action for money damages for breach of fiduciary duty in the mismanagement of tribal trust funds and for failure to account.

Contractual Basis for Damages

5. Article 1 and 10 of the United States Treaty with the Osage dated November 10, 1808, states:

> Art. 1. The United States being anxious to promote peace, friendship and intercourse with the Osage tribes, to afford them every assistance in their power, . . .
>
> Art. 10. The United States receive the Great and Little Osage nations into their friendship and under their protection; and the said nations, on their part, declare that they will consider themselves under the protection of no other power whatsoever, disclaiming all right to cede, sell or in any manner transfer their lands to any foreign power, or to citizens of the United States or inhabitants of Louisiana, unless duly authorised by the President of the United States to make the said purchase or accept the said cession on behalf of the government.

and parts of Articles I, II and X of the United States Treaty with the Osage Indians dated September 29, 1865, states:

> ARTICLE I. The tribe of the Great and Little Osage Indians, having now more lands than are necessary for their occupation, and all payments from the government to them under former treaties having ceased, leaving them greatly impoverished, and being desirous of improving their condition by disposing of their surplus lands, do hereby grant and sell to the United States the lands contained within the following boundaries, that is to say: beginning at the southeast corner of their present reservation, and running thence north with the eastern boundary thereof fifty miles to the northeast corner; thence west with the northern line thirty miles; thence south fifty miles, to the southern boundary of said reservation; and thence east with said southern boundary to the place of beginning: *Provided*, That the western boundary of said land herein ceded shall not extend further westward than upon a line commencing at a point on the southern boundary of said Osage country one mile east of the place where the Verdigris river crosses the southern boundary of the State of Kansas. And, in consideration of the grant and sale to them of the above-described lands, the United States agree to pay the sum of three hundred thousand dollars, which sum shall be placed to the credit of said tribe of Indians in the treasury of the United States, and interest thereon at the rate of five per centum per annum shall be paid to said

tribes semi-annually, in money, clothing, provisions; or such articles of utility as the Secretary of the Interior may from time to time direct.

* * *

ARTICLE II. The said tribe of Indians also hereby cede to the United States a tract of land twenty miles in width from north to south, off the north side of the remainder of their present reservation, and extending its entire length from east to west; which land is to be held in trust for said Indians, and to be surveyed and sold for their benefit by the Secretary of the Interior, under such rules and regulations as he may from time to time prescribe, under the direction of the commissioner of the general land office, as other lands are surveyed and sold. The proceeds of such sales, as they accrue, after deducting all expenses incident to the proper execution of the trust, shall be placed in the treasury of the United States to the credit of said tribe of Indians; and the interest thereon, at the rate of five per centum per annum, shall be expended annually for building houses, purchasing agricultural implements and stock animals, and for the employment of a physician and mechanics, and for providing such other necessary aid as will enable said Indians to commence agricultural pursuits under favorable circumstances: *Provided*, That twenty-five per centum of the net proceeds arising from the sale of said trust lands, until said percentage shall amount to the sum of eighty thousand dollars, shall be placed to the credit of the school fund of said Indians: and the interest thereon, at the rate of five per centum per annum, shall be expended semi-annually for the boarding, clothing, and education of the children of said tribe.

* * *

The Osage acknowledge their dependence on the government of the United States, and invoke its protection and care: they desire peace, and promise to abstain from war, and commit no depredations on either citizens or Indians; . . .

## Statutory Basis for Damages

6. By Act of June 28, 1906, Chapter 3572, 34 Stat. 539; Act of March 31, 1921, Chapter 120, 41 Stat. 1249; Act of March 2, 1929, Chapter 493, 45 Stat. 1478; Act of June 24, 1938, Chapter 645, 52 Stat. 1034; Act of July 25, 1947, Chapter 334, 61 Stat. 459; Act of October 6, 1964, 78 Stat. 1008; and Act of October 21, 1978, 92 Stat. 1660, title and/or control and the rights and responsibilities appurtenant to ownership of the Osage estate in Oklahoma have been continuously, at all times relevant to this case, and is currently vested in the United States in trust for the benefit of the Osage Tribe:

> (a) Act of June 28, 1906, Ch. 3572, 34 Stat. 539 at 542, Sec. 2, seventh paragraph: ... *And provided further*, that nothing herein shall authorize the sale of the oil, gas, coal, or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of twenty-five years, and the royalty to be paid to said tribe as hereinafter provided; ...
>
> (b) Act of June 28, 1906, Ch. 3572, 34 Stat. 539 at 543, Sec. 3. That the oil, gas, coal or other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage tribe for a period of twenty-five years from and after the eighth day of April, nineteen hundred and six; ...
>
> (c) Act of June 28, 1906, Ch. 3572, 34 St. 539 at 544, Sec. 4. That all funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States for the period of twenty-five years from and after the first day of January, nineteen hundred and seven, except as herein provided;
>
> First. That all the funds of the Osage tribe of Indians, and all the moneys now due or that may hereafter be found to be due to the said Osage tribe of Indians, and all moneys that may be received from the sale of their lands in Kansas under existing laws, and all moneys found to be due to said Osage

tribe of Indians on claims against the United States, after all proper expenses are paid, shall be segregated as soon after January first, nineteen hundred and seven, as is practicable and placed to the credit of the individual members of the said Osage tribe on a basis of a pro rata division among the members of said tribe, as shown by the authorized roll of membership as herein provided for, or to their heirs as hereinafter provided, said credit to draw interest as now authorized by law; and the interest that may accrue thereon shall be paid quarterly to the members entitled thereto, except in the case of minors, in which case the interest shall be paid quarterly to the parents until said minor arrives at the age of twenty-one years; *Provided*, That if the Commissioner of Indian Affairs becomes satisfied that the said interest of any minor is being misused or squandered he may withhold the payment of such interest: *And provided further*, That said interest of minors whose parents are deceased shall be paid to their legal guardians as above provided.

(b) Act of March 31, 1921, Ch. 120, 41 Stat. 1249 at 1250, Sec. 3. That all members of the Osage Tribe of Indians are hereby declared to be citizens of the United States, but this shall not affect their interest in tribal property or the control of the United States over such property as is now or may hereafter be provided by law; . . .

SEC. 4. That from and after the passage of this Act the Secretary of the Interior shall cause to be paid at the end of each fiscal quarter to each adult member of the Osage Tribe having a certificate of competency his or her pro rata share, either as a member of the tribe or heir of a deceased member, of the interest on trust funds, the bonus received from the sale of leases, and the royalties received during the previous fiscal quarter, and so long as the income is sufficient to pay to the adult members of said tribe not having a certificate of competency $1,000 quarterly except where incompetent adult members have legal guardians, in which case the income of such incompetents shall be paid to their legal guardians, and to pay for maintenance and education to the parents or natural guardians or legal guardians actually having minor members under twenty-one years of age personally in charge $500 quarterly out of the income of said minors all of said quarterly payments to legal guardians and adults, not having certificates of competency to be paid under the supervision of the Superintendent of the Osage Agency,

> and to invest the remainder after paying all the taxes of such members either in United States bonds or in Oklahoma State, county, or school bonds, or place the same on time deposits at interest in banks in the State of Oklahoma for the benefit of each individual member under such rules and regulations as the Secretary of the Interior may prescribe: . . .
>
> (c) Act of March 31, 1929, Ch. 493, 45 Stat. 1478 at 1479. . . . The lands, moneys, and other properties now or hereafter held in trust or under the supervision of the United States for the Osage Tribe of Indians, the members thereof, or their heirs and assigns, shall continue subject to such trust and supervision until January 1, 1959, unless otherwise provided by Act of Congress.
>
> (d) Act of June 24, 1938, Ch. 645, 52 Stat. 1034 at 1035, Sec. 3. . . .The lands, moneys, and other properties now or hereafter held in trust or under the supervision of the United States for the Osage Tribe of Indians, the members thereof, or their heirs and assigns, shall continue subject to such trusts and supervision until January 1, 1984, unless otherwise provided by Act of Congress. . . .
>
> (e) Act of October 21, 1978, 92 Stat. 1606 at 1606, Sec. 2(a). The first paragraph of section 3 of the Act of June 24, 1938 (52 Stat. 1034, 1035), as amended, extending the mineral estate reserved to the Osage Tribe by the Act of June 26, 1906 (34 Stat. 539), is further amended by striking the phrase "until the eighth day of April, 1983, and thereafter until otherwise provided by Act of Congress" and substituting, in lieu thereof, the phrase "in perpetuity".

7. The above statutes also provide for the management of the Osage mineral estate by the Secretary of the Interior ("Secretary") for the United States:

> (a) Act of June 28, 1906, Cha. 3572, 34 Stat. 539 at 543, Sec. 3. . . . leases for all oil, gas, and other minerals, covered by selections and division of land herein provided for, may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe: *Provided*, That the royalties to be paid to the Osage tribe under any mineral lease so made shall be determined by the President of the United States. . . .

(b) Act of March 31, 1921, Ch. 120, 41 Stat. 1249 at 1249. . . .the Secretary of the Interior and the Osage Council are hereby authorized and directed to offer for lease for oil and gas purposes all of the remaining portion of the unleased Osage land prior to April 8, 1931, offering the same annually at the rate of not less than one-tenth of the unleased area.

(c) Act of March 2, 1929, Ch. 493, 45 Stat. 1478 at 1479. . . . The Secretary of the Interior and the Osage tribal council are hereby authorized and directed to offer for lease for oil, gas, and other mining purposes any unleased portion of said land in such quantities and at such times as may be deemed for the best interest of the Osage Tribe of Indians: *Provided*, That not less than twenty-five thousand acres shall be offered for lease for oil and gas mining purposes during any one year: *Provided further*, That as to all lands hereafter leased, the regulations governing same and the leases issued thereon shall contain appropriate provisions for the conservation of the natural gas for its economic use, to the end that the highest percentage of ultimate recovery of both oil and gas may be secured. . . .

(d) Act of June 24, 1938, Ch. 645, 52 Stat. 1034 at 1035. . . . The Secretary of the Interior and the Osage tribal council are hereby authorized and directed to offer for lease for oil, gas and other mining purposes any unleased portion of said land in such quantities and at such times as may be deemed for the best interest of the Osage Tribe of Indians: *Provided*, That not less than twenty-five thousand acres shall be offered for lease for oil- and gas-mining purposes during any one year: *Provided further*, That as to all lands hereafter leased, the regulations governing same and the leases issued thereon shall contain appropriate provisions for the conservation of the natural gas for its economic use, to the end that the highest percentage of ultimate recovery of both oil and gas may be secured. . . .

(e) Act of October 21, 1978, 92 Stat. 1660 at 1661. Sec. 4. In order to conserve natural resources and provide for the greatest ultimate recovery of oil and gas underlying the Osage mineral estate, the Secretary of the Interior is authorized to establish rules and regulations under which oil and gas leases producing from a common source of supply may be unitized.

8. Some of the more recent statutes which also require the secretary to account for and properly manage the assets of the Osage are as follows:

25 U.S.C. § 161a. provides:

> (a) All funds held in trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of Indian tribes shall be invested by the Secretary of the Treasury, at the request of the Secretary of the Interior, in public debt securities with maturities suitable to the needs of the fund involved, as determined by the Secretary of the Interior, and bearing interest at rates determined by the Secretary of the Treasury, taking into consideration current market yields on outstanding marketable obligations of the United States of comparable maturities.

25 U.S.C. § 162a(d) provides:

> (d) **Trust responsibilities of Secretary of Interior**
>
> The Secretary's proper discharge of the trust responsibilities of the United Sates shall include (but are not limited to) the following:
>
> (1) Providing adequate systems for accounting for and reporting trust fund balances.
>
> (2) Providing adequate controls over receipts and disbursements.
>
> (3) Providing periodic, timely reconciliations to assure the accuracy of accounts.
>
> (4) Determining accurate cash balances.
>
> (5) Preparing and supplying account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis.
>
> (6) Establishing consistent, written policies and procedures for trust fund management and accounting.
>
> (7) Providing adequate staffing, supervision, and training for trust fund management and accounting.

(8) Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands.

25 U.S.C. § 4011 provides:

**Responsibility of Secretary to account for the daily and annual balance of Indian trust funds**

**(a) Requirement to account**

The Secretary shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a)

**(b) Periodic statement of performance**

Not later than 20 business days after the close of a calendar quarter, the Secretary shall provide a statement of performance to each Indian tribe and individual with respect to whom funds are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a). The statement, for the period concerned, shall identify-

(1) the source, type and status of the funds;
(2) the beginning balance;
(3) the gains and losses;
(4) receipts and disbursements; and
(5) the ending balance.

**(c) Annual audit**

The Secretary shall cause to be conducted an annual audit on a fiscal year basis of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a), and shall include a letter relating to the audit in the first statement of performance provided under subsection (b) of this section after the completion of the audit.

25 U.S.C. § 4043 provides, in part:

**(b) Duties**

**(1) General oversight of reform efforts**

The Special Trustee shall oversee all reform efforts within the Bureau, the Bureau of Land Management, and the Minerals Management Service relating to the trust responsibilities of the Secretary to ensure the establishment of policies, procedures, systems and practices to allow the Secretary to discharge his trust responsibilities in compliance with this chapter.

**(2) Bureau of Indian Affairs**

**(A) Monitor reconciliation of trust accounts**

The Special Trustee shall monitor the reconciliation of tribal and Individual Indian Money trust accounts to ensure that the Bureau provides the account holders, with a fair and accurate accounting of all trust accounts.

**(B) Investments**

The Special Trustee shall ensure that the Bureau establishes appropriate policies and procedures, and develops necessary systems, that will allow it --

(i) properly to account for and invest, as well as maximize, in a manner consistent with the statutory restrictions imposed on the Secretary's investment options, the return on the investment of all trust fund monies, and

(ii) to prepare accurate and timely reports to account holders (and others, as required) on a periodic basis regarding all collections, disbursements, investments, and return on investments related to their accounts.

**(C) Ownership and lease data**

The Special Trustee shall ensure that the Bureau establishes policies and practices to maintain complete, accurate, and timely data regarding the ownership and lease of Indian lands.

3. **Bureau of Land Management**

The Special Trustee shall ensure that the Bureau of Land Management establishes policies and practices adequate to enforce compliance with Federal requirements for drilling, production, accountability, environmental protection, and safety with respect to the lease of Indian lands.

(4) **Minerals Management Service**

The Special Trustee shall ensure that the Minerals Management Service establishes policies and practices to enforce compliance by lessees of Indian lands with all requirements for timely and accurate reporting of production and payment of lease royalties and other revenues, including the audit of leases to ensure that lessees are accurately reporting production levels and calculating royalty payments.

__**Regulatory Basis for Damages**__

9. 25 C.F.R. Part 226 contains the current regulations for leasing the Osage mineral estate by the United States:

a. § 226.2 establishes oil and gas lease "sale" procedures.

b. § 226.3 describes the procedure to surrender an oil and/or gas lease.

c. § 226.4 requires payment of oil and gas lease obligations to the Bureau of Indian Affairs ("BIA").

d. § 226.5 makes oil and gas leases subject to the regulations of the Secretary.

e. § 226.6 requires certain bonds of lessee.

f. § 226.7 requires oil and gas leases to be on forms prescribed by the Secretary.

g. § 226.8 sets forth information required of corporate lessees.

h. § 226.9 describes delay rental and drilling obligations to keep an oil and/or gas lease in effect.

i. § 226.10 governs the primary term of an oil and/or gas lease.

10. The following regulations govern the marketing of minerals and the payment of royalty revenue for production attributable to the Osage.

a. § 226.11 provides for payment of royalties based on "gross proceeds", except where payments are made on division orders in which case settlement is based on "actual selling Price" but not less than the "highest posted price" and provides for taking royalty oil in kind.

b. § 226.12 allows the United States to purchase Osage oil at the highest posted price.

c. § 226.13 sets forth the time when payment is due and requires certain operational information.

d. § 226.14 provides for the lessee to contract for the sale of oil and the effect of division orders.

e. § 226.15 contains rules governing unitization of oil and/or gas leases and assignments of leases and overriding royalty interests.

11. The following regulations further show the pervasive control the Secretary exercises over the Osage mineral estate:

§ 226.16 through § 226.27 govern operations; § 226.28 and § 226.29 govern cessation of operations; § 226.30 through § 226.41 set forth the requirements on lessees, including record keeping, prevention of waste, measurement of oil and other matters; § 226.42 and § 226.43 describe penalties for violations of the regulations and § 226.44 through § 226.46 govern appeals and notices. Further, 25 C.F.R. § 1.2 provides any regulation may be waived, if such would be in the best interest of the Osage.

## STATEMENT OF FACTS

12. By virtue of the above treaties, statutes and regulations, the United States has exercised involuntary, pervasive management and complete control over the mineral assets of the Osage, which minerals were purchased by the Osage, with their own funds. These monies, in excess of 8 million dollars, were held by the United States "in escrow" for almost ten (10) years, prior to payment and transfer of title to the lands now comprising Osage County, Oklahoma, to the Osage Nation from approximately 1873 to 1883. No interest or other consideration or compensation for holding of the Osage funds by the United States before that time has ever been credited to the Osage. The United States' involuntary, pervasive management and control, includes, but is not limited to funds originally held in trust pursuant to treaty, funds appropriated or allotted pursuant to legislation or statute, lease bonus and rentals, royalties, and income from investments of funds since the early 1800s.

13. Under the above-described treaties, statutes and regulations, the decisions of this Court, other applicable Federal decisions and the United States Supreme Court, the United States has a fiduciary duty to the Osage requiring the exercise of "the most exacting fiduciary standards" in managing Plaintiff's assets and trust funds. United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); Navajo Tribe of Indians v. United States, 176 Ct. Cl. 502, at 507 (1966); Seminole Nation v. United States, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942), and Cheyenne-Arapaho Tribes of Oklahoma v. United States, 33 Fed.Cl. 464 at 469 (1995).

14. The United States, as trustee of all Osage assets, has never rendered to the Osage an accounting of the United States management of the Osage assets held by the United States in trust for the Osage from inception of the trust.

15. According to the findings of the Court in Cobell v. Babbitt, Case No. 96-1285, United States District Court for the District of Columbia, the United States has breached its trust and cannot account for the monies which the United States has held in trust for many Indians under I.M. accounts (including some Osage) even though said parties are clearly entitled by law to a full accounting and reconciliation.

16. The United States has provided the Osage with what might be best described as a "data entry verification" report, which the United States chose to label a reconciliation project for the time period from July 1, 1972, to September 30, 1992. This report, although fatally flawed by any standards, concludes that as of September 30, 1994, the Osage were owed a minimum of $791,046.37, due to the errors of the United States in managing tribal funds.

17. The above referenced Tribal Trust Funds Reconciliation Project (hereinafter Arthur Andersen Report) was furnished to the Osage Tribe in 1996, under signature date of December 31, 1995. A partial listing of facially evident flaws, showing the Arthur Andersen Report falls far short of what the federal law required in 25 U.S.C. § 4044, includes the following:

a. the vast majority of transactions were not reconciled to source documents;

b. only a minuscule number of transactions were tested;

c. alternative procedures weighted in favor of the United States were used in lieu of reconciliation;

d. the procedures used were not applied consistently and reliably to all of the time period purportedly covered;

e. no credit was given to the Osage for the United States' failure to properly invest Tribal trust funds;

f. there was a total failure to attempt to reconcile some tribal accounts;

g. only for one year out of twenty were the Osage accounts reconciled with the "bank statement" or treasury system;

h. so many documents were missing that no conclusions could be reached relating to the Osage's largest source of income -- oil and gas lease activity;

i. the opening balances brought forward were not audited, reconciled or even examined on a test basis.

18. The Arthur Andersen Report further states "**Because the above procedures do not constitute an audit made in accordance with generally accepted auditing standards, we do not express an opinion on any of the elements referred to above**". In the Arthur Anderson Report, the government has failed to reconcile any portion of the Osage tribal account under generally accepted accounting principles for both investment and non-investment transactions.

Even the facially flawed methods used by the government (apparently under the direction and agreement of the government as the report contains the following on each page, "agreed upon procedures and findings report," the government was unable to reconcile deposit, disbursement and investment transactions and the investment transactions on said monies, required by federal statute, totaling **$2,527,210,314.00**. The United States has failed, even with "agreed upon procedures" to reconcile over 67% of the total dollar value of transactions for the tribe over just the 20 year period covered by the project, much less the time period required to be reconciled by both federal law and common trust law, i.e., from inception of the trust to the present.

19. By any standards, much less the exacting standards to which the Defendant is held, the United States has failed to comply with the above cited federal laws to reconcile and to protect trust assets and monies derived from the sale of those trust assets of the Osage, including royalty revenues derived from the production of oil and gas and other minerals from Osage land for any time

period which would include, the date of first production in Osage County, approximately 1906, up to the present. The United States continues in its failure to this day. The time period under which the United States is mandated to fully account and reconcile its management of assets and monies belonging to the Osage Tribe, include oil and gas royalty income, span almost a century of time. Upon information and belief, the unreconciled funds are in the billions of dollars.

20. The Department of Interior, additionally through its Office of Special Trustee, is obligated to account for and reconcile trust funds belonging to the Osage and has failed to fulfill that statutory duty on behalf of the United States - Department of Interior. Under the above referenced federal laws and common law trust principles, the United States, has failed to account under generally accepted accounting principles, and has breached its duties as trustee to fully reconcile the monies belonging to the Osage Tribe from the sale and leasing of their trust assets. The U.S. must pay to the Osage all sums not fully accounted for and reconciled under the most exacting of fiduciary standards.

21. The United States' duty, pursuant to the above referenced treaties and laws, also requires the United States to maximize the funds received in trust for the Tribe for the leasing and sale of trust assets and natural resources. The United States has further damaged the Osage and violated its duty under the above laws, more specifically as follows:

a. Improperly charging and/or overcharging the Osage tribal account and/or using monies belonging to the Osage Tribe for expenses associated with the Bureau of Indian Affairs office, which is directly associated with the management of Osage trust assets, including the mis-use of said monies;

b. Failure to independently reconcile volumes of oil and gas produced with the amount of royalty paid by producers of said oil and gas under Osage oil and gas leases;

c. Failure to obtain the price required to be paid to the Osage for royalty under the terms of said oil and gas leases;

d. Failure to collect the lawful rate of interest on late payments on the royalty proceeds on the sale of oil and/or gas from producers within Osage County;

e. Failure to timely deposit oil and gas royalty revenue to the Osage tribal account upon receipt from producers/purchasers of minerals;

f. Failure to credit the Osage Tribe with interest or statutory investment income applicable to all oil income actually received from the date of its receipt; and the lawful rate of investment interest applied to the time period from the date of receipt by the U.S. Treasury, up through the date of deposit into the tribal account, and thereafter.

g. Failure to credit interest on the amount of monies involuntarily held by the United States in escrow for the purchase of Osage County, up through and including the release of such funds in approximately 1883;

The above evidences the clear failure of the United States to enforce and comply with not only its own law, but its own Department of Interior regulations which were enacted obstensively to protect and maximize the trust assets of the Osage.

22. The Arthur Andersen Report appears to be published in such a way that would evidence an intent not to accurately account to and/or reconcile the Osage, tribal account, their trust assets, and trust monies, but to minimize or limit the liability of the United States. This is evidenced as follows:

a. The United States knew that it had been ordered by Congress under 25 O.S. §4044 to reconcile and account to the Tribe for all past assets, including monies derived from the production of oil and gas and other minerals from Osage County;

b. The United States published the Arthur Andersen Report as its "compliance" with the requirements of 25 O.S. § 4044;

c. The fine print and "agreed upon procedures" facially evidenced in the Arthur Andersen Report, when carefully analyzed, attempts to minimize the failure of the United States to perform their duties, both under federal law, treaty, and common law trust, and is stated in such a way to disguise the failure of the United States to provide reconciliation, accurate record keeping, auditing, and accounting.

23. The publication of the Arthur Andersen Report by the United States under the above premises is unconscionable, in breach of their duty and constitutes an additional breach of its fiduciary relationship with the Osage. The United States, by and through its agent, Arthur Andersen, has published the Report with the intention that the Osage believe that the funds and assets upon which the United States cannot reconcile are minimal, by the use of the "agreed upon procedures," terminology and references, none of which were authorized by federal law.

The misleading terminology, procedures and references include, but are not limited to, foundational documents, deposit lag times, volumes of oil production, pricing for oil production, and reference to meeting with the Osage Tribal Council. By way of example, the United States, through its agent, Arthur Andersen, in the fine print of the Report, states **"as a result of the large number of unlocated documents, the statistical sampling results could not be extrapolated with meaningful precision"**, but goes on to the very next page in a chart and with underlining, to leave the impression that 94% of all tribal trust royalty revenues from oil production were verified. Transactions characterized within the Arthur Andersen Report as "reconciled" were only done so through procedures and methods not approved by any generally accepted accounting principles or

the more stringent standards which the United States must apply in accordance with federal and common law in dealing with the trust assets and trust monies of the Osage.

## FIRST CAUSE OF ACTION

**(Breach of the Act of June 28, 1906, and Other Mismanagement of Trust Funds)**

**Money Damages**

The Osage hereby incorporate the above paragraphs herein, and further state as follows:

24. The United States caused to be prepared and delivered to the Osage the Arthur Andersen report for July 1, 1972 through September 30, 1992 which concludes that the United States owes the Osage **$791,046.37** as of September 30, 1994, for mismanagement of trust funds.

25. Pursuant to federal statutes referenced herein, and common law trust principles, the United States has failed in its duty to properly manage the trust assets of the Osage, including the management of mineral deposits, protection of minerals and royalty attributable to those minerals, including, but not limited to the collection or marshaling of assets, proper investment of those assets and proper distribution of the assets to the Tribe. The United States has failed to reconcile and account to the Osage for the management of the Osage trust assets, as it is legally obligated to do, has caused damage to the Plaintiff in the amount of money which the Defendant cannot account for or reconcile to the Osage trust account. Even crediting the United States with reconciliation of transactions through unacceptable procedures expressed in the Arthur Andersen report, the amount unreconciled and thus owed by the United States to the tribe, for the period July, 1972, through September, 1992, is in excess of **$2.5 billion dollars** as more specifically set forth above.

The Osage, however, do not accept the substandard "procedures" referenced in the Arthur Andersen report, nor did the Osage agree to such procedures in lieu of the accounting reconciliation

required by federal law. (The reference to "agreed upon procedures and findings report" appears on virtually every page of the report.) The monetary damages caused by the failure of the United States to verify deposits, disbursements, and reconcile all transactions, as required by federal law, is not optional and is not a matter to be "agreed upon" by the Osage or the government. The Defendant has, put simply, "lost track of" vast amounts of oil royalty monies paid into the United States Treasury from the production and sale of hundreds of millions of barrels of crude oil from Osage County from 1906 to the present, and continue to do so. The money damages due the Osage as a result of the Defendant's failure to account, reconcile and manage the trust assets of the Osage over a century of time cannot be precisely determined by the Osage at this time, but is clearly in excess of the **$2.5 billion dollars** shown in the Arthur Andersen report. Such money damages include (1) vast amounts of federally mandated investment interest due the account; (2) monies wrongfully expended or mis-expended upon expenses of running the Bureau of Indian Affairs Agency for the Osage Tribe; and (3) interest due the Tribe on monies held by the United States involuntarily in escrow, relating to the purchase of Osage County in and around 1883.

## SECOND CAUSE OF ACTION

### Request for Enforcement of 25 O.S. § 162a(d), 25 O.S. § 4044, and Other Statutes, Failure to provide a Comprehensive Audit or Accounting

The Osage hereby incorporate the above paragraphs herein, and further states as follows:

26. Based upon the treaties, statutes and regulations cited herein and in aid of the Court's jurisdiction to render a money judgment, the Osage are entitled to an accounting of all assets

administered by the United States in its capacity as trustee and fiduciary for the Osage from the inception of the Trust.

# PRAYER FOR RELIEF

**WHEREFORE**, in consideration of the above premises and each of them, the Osage hereby pray they recover a money judgment against the United States, including their costs, accounting attorney's fees as may be allowed by law, and such relief as the Court may deem appropriate, compensable, just and equitable, including, but not limited to the following:

(a) **An order** requiring the United States to comply with 25 U.S.C. § 162a(d) and 25 U.S.C. § 4044, regarding the Osage tribal trust assets and fund account(s);

(b) **Money damages** be awarded the Osage against the United States and paid by the Defendant to the Osage under federal law, in an amount necessary to fully reconcile the Trust monies and assets of the Osage, as required by the treaties, federal statutes, and common law trust principles, as well as the duties by the Office of the Special Trustee. The damages awarded must equal all such money damages, including, but not limited to, the value of those volumes of oil produced and sold from Osage County, the amount and price of royalty due thereon, the value of additional assets of the Osage which have been used, wasted, mismanaged, as may be proven at trial, from the inception of the trust, to date, including vast amounts of investment interest due the Osage trust account, as mandated by federal law, which money was earned or was to be earned by the proper accounting and timely deposit of monies and assets belonging to the Osage, including interest

due from the escrow of purchase funds above described prior to 1883, in a sum to be proven at trial, in excess of $2.5 **billion dollars**; and

(c) Additional money damages against the United States in an amount necessary to compensate the Osage for unlawfully removing funds from the Osage tribal account for alleged "operational expenses" of the Osage Agency of the Bureau of Indian Affairs and the overcharging and/or mis-expenditure of those funds in an amount to be proven at trial, but upon verification and belief, in excess of $100,000.00; and

(d) Equitable relief by way of a **declaratory judgment** requiring the United States to properly manage the assets of the Osage, including the monies derived from their mineral production. IN THE ALTERNATIVE, upon a finding and/or admission that the Defendant cannot do so, to grant relief that would protect the Osage from such mismanagement in the future, as may be authorized under the broad remedial powers of this Court.

Respectfully submitted,

**MAHAFFEY & GORE, P.C.**

By: ______________________________

BRADLEY D. BRICKELL, OBA #1117
RICHARD J. GORE, OBA # 3479
Two Leadership Square, Suite 1100
211 North Robinson
Oklahoma City, Oklahoma 73102
Telephone: (405) 236-0478
Facsimile: (405) 236-1520
ATTORNEYS FOR PLAINTIFF

Attorneys Lien Claimed

C:\Wpdocs2\BDB\50761003\plead\complaint.wpd

# ATTACHMENT 2

## DAMAGE MODEL

Oil and gas exploration has been conducted on the Osage Reservation since the first well was drilled in 1897. More than 16,000 wells have been drilled to this date. The Osage Reservation is the most prolific oil producing area in the state of Oklahoma. More than 1,250,000,000 barrels of oil have been produced from wells on the reservation.

Many of the Osage leases that are administered by the Department of the Interior state that the Tribe should be paid royalty based upon the "actual selling price or higher posted price or offered price by a major purchase in Kansas/Oklahoma area, whichever is higher on day of sale or removal". Other leases provide that the Osage should be paid on the "actual selling price or the highest posted price in the mid-continent [area of U.S.], when sold". Over a two year period, the attorneys for the Tribe and oil experts have been reviewing hundreds of boxes of records along with independent pricing information to determine what royalty was received and what should have been received.

Documented receipts from producers and oil purchasers showed the following for the first three months of 1995:




For the first 3 months of 1995, the Osage received an average of $0.71 less than the highest posted price.

Many oil and gas leases contain royalty rates that show the NYMEX Price, known as the "Cushing Price", should have been used by the BIA to calculate the tribes royalties, because the Cushing price would have been the "highest offered price," shown as follows.

3 MONTHS 1995
JANUARY - MARCH
Cushing Price vs BIA Receipts




For the first 3 months of 1995, the Osage received an average of $1.51 less than the highest offered price.

The production during January 1995 averaged 13,845 barrels of oil per day. This calculates an underpayment to the Osage of **$3,385 per day**, or about **$105,881 per month,** or about **$1,270,573 for 1995**. The underpayment using the posted price comparison, average $0.71 less per barrel, would be about **$598,000 for 1995.**

The following shows an estimate of total Osage Oil production over the last 32 years from the Osage reservation.




Over the last 30 years, the oil production from the Osage lands has decreased from 40,000 barrels of oil per day down to about 8,000 barrels of oil per day, presently.

During this time period current oil prices varied widely, along with the variance between the royalty rate collected by the BIA and the price that was required by the Osage oil and gas lease contracts.

The Bureau of Indian Affairs regulations now require oil and gas lease royalty payments to be based upon only the highest posted price in Osage County. Those regulations were passed after most of the Osage oil and gas leases went into production and did not affect the rate of royalty specified in the thousands of leases already existing.