# Exhibit A

FILE

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

RECEIVED
JUL 2 5 2001
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

No. 00-169 L
Judge James T. Turner

**DEFENDANT'S MOTION TO DISMISS**

R. ANTHONY ROGERS
Attorney of Record for Defendant
General Litigation Section
Environment & Natural Resources Division
United States Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0483
Fax: (202) 305-8865/0506

01 JUL 26 PM 4:46
DEPARTMENT OF JUSTICE
GENERAL LITIGATION SECTION

Of Counsel for Defendant:

Alan Woodcock
Stephen Simpson
Attorneys
Office of the Solicitor
Division of Indian Affairs
U.S. Department of the Interior
Washington. D. C. 20240

96-2-26-0922

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 00-169 L<br>Judge James T. Turner |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS**

R. ANTHONY ROGERS
Attorney of Record for Defendant
General Litigation Section
Environment & Natural Resources Division
United States Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0483
Fax: (202) 305-8865/0506

Of Counsel for Defendant:

Alan Woodcock
Stephen Simpson
Attorneys
Office of the Solicitor
Division of Indian Affairs
U.S. Department of the Interior
Washington, D. C. 20240

## TABLE OF CONTENTS

BRIEF IN SUPPORT OF MOTION TO DISMISS . . . . . 1

STATEMENT OF THE CASE . . . . . 3

ISSUES PRESENTED . . . . . 6

SUMMARY OF ARGUMENT . . . . . 7

ARGUMENT . . . . . 9

I. SHOULD THE COURT CONSIDER THE STATUTE OF LIMITATIONS ARGUMENT HEREIN TO BE BASED ON INFORMATION NOT WITH THE FOUR CORNERS OF COMPLAINT, PARTIAL SUMMARY JUDGMENT ON THAT ISSUE IS STILL APPROPRIATE . . . . . 9

II. PLAINTIFF'S CLAIMS ACCRUING PRIOR TO OCTOBER 1, 1994, ARE BARRED BY THE STATUTE OF LIMITATIONS, 28 U.S.C. § 2501, BARRING EXPRESS WAIVER OR TOLLING, AND, EVEN ASSUMING THEY APPLY, THE ANNUAL INTERIOR DEPARTMENT APPROPRIATIONS ACTS SINCE 1990 WOULD TOLL THE RUNNING OF § 2501 ONLY AS TO CLAIMS THAT HAD NOT GONE STALE AS OF OCTOBER 1, 1984 . . . . . 10

A. Plaintiff's Claims Accruing More Than Six Years Before Suit Was Filed Are Barred by the Statute of Limitations, 28 U.S.C. § 2501, in the Absence of an Express Waiver or Express Tolling . . . . . 11

1. The Osage Tribe's Complaint Demonstrates the Alleged Wrongs Here State Separate and Distinct Claims Most of Which Would Have Accrued and Expired Decades Ago . . . . . 13

2. The Osage Tribe Has Long Been Well Aware of the Facts Underlying Its Claims Here . . . . . 16

B. The Interior Department Appropriations Acts Since 1990 Contain Identical Provisions Precluding the Statute of Limitations from Running on Only Those Trust Funds Mismanagement Claims That Had Not Already Become Stale by October 1, 1984 . . . . . 21

III. PLAINTIFF'S CLAIMS ACCRUING PRIOR TO 1946 ARE BARRED BY §12 OF THE INDIAN CLAIMS COMMISSION ACT, 60 STAT. 1052 (1946) . . . . . 23

IV. THIS COURT LACKS JURISDICTION TO ORDER A PRE-LIABILITY ACCOUNTING OF OSAGE TRIBAL TRUST FUNDS . . . . . 25

V. TO THE EXTENT THAT IT MAY BE ASSERTING SUCH CLAIMS, THE TRIBAL PLAINTIFF LACKS STANDING TO PROSECUTE CLAIMS ON BEHALF OF OSAGE HEADRIGHT OWNERS . . . . . 27

VI. THE COURT HAS NO JURISDICTION TO ADJUDICATE ANY CLAIMS ARISING UNDER THE DUE PROCESS CLAUSE OR THE EQUAL PROTECTION CLAUSE NOR TO GRANT DECLARATORY JUDGMENT IN THIS CASE . . . . . 30

CONCLUSION . . . . . 31

timber, and farming and grazing leases. The Court agreed with the United States, specifically relying upon Klamath, and did not order the accounting because plaintiff had not first proven government liability. Id., at 582. The same result has specifically obtained previously in White Mountain Apache Tribe v. United States, 4 Cl.Ct. 586, 589 (1984).

Thus, the Osage are precluded from receiving an accounting of their trust funds here. The Tribe must prove its own case without a prior ordered accounting.

## V. TO THE EXTENT THAT IT MAY BE ASSERTING SUCH CLAIMS, THE TRIBAL PLAINTIFF LACKS STANDING TO PROSECUTE CLAIMS ON BEHALF OF OSAGE HEADRIGHT OWNERS.

Although plaintiff does not complain specifically about losses of trust funds or mismanagement of those funds that affect the numerous individuals or entities who now hold what are known as Osage headrights, the amount of damages plaintiff does claim seemingly as its own tribal damages are of such a magnitude that it suggests the headright interests are included in the total alleged. To the extent, plaintiff does claim on behalf of headright interests, defendant moves to dismiss the effort from this Complaint, except to the extent of the headright interest the Tribe itself holds.

This suit is being brought in the name of the "Osage Nation and/or Tribe of Indians of Oklahoma" as "a federally recognized Indian tribe." The claims alleged, however, concern the trust funds comprised largely of various income derived from royalties and other payments on oil and gas produced from Osage lands. Yet the Osage

mineral estate income is not ultimately held by the Osage Tribe. Pursuant to section 4 of the Osage Allotment Act of 1906, Pub. L. 59-321, 34 Stat. 539, 544:

> . . . the royalty received from oil, gas, coal, and other mineral leases upon the lands for which selection and division are herein provided, . . . shall be placed in the Treasury of the United States to the credit of the members of the Osage Tribe of Indians . . . and the same shall be distributed to the individual members of said Osage Tribe according to the roll provided for herein.

The rights of individuals, originally only Osage Tribal members, to these payments are called Osage "headrights." Logan v. Andrus, 457 F. Supp. 1318, 1321 n. 2 (N.D. Okla. 1978). These headrights are explained more fully in Felix S. Cohen's Handbook of Federal Indian Law, 1982 Edition ("Cohen Handbook"), D.Ex. 14, App. 126. The Osage Allotment Act has been amended several times through the years, but the rights of the headright owners have remained the same. Id., at 1328-30. The income from the Osage mineral estate does initially go into a tribal account where is remains for approximately one calendar quarter before it is distributed to the headright owners. Vale Deposition, D.Ex. 8, App. 72.[11] At that point, the Tribe qua Tribe has no further interest or claim to those funds.

There is one exception to the last statement. The Tribe itself is also a headright owner, in fact, approximately one and a quarter headright. Id., 74.

---

[11] The headright distribution of the funds generated that quarter is net of a small portion retained for Osage Tribal operations and a portion paid for the Oklahoma gross receipts tax. Cohen Handbook, D.Ex. 14, App. 130.

To the extent the Tribe here seeks to recover for the other approximately 98.75% of headright owners that it itself does not own, then, under traditional standing principles, the Tribe's suit as currently pled must fail. In order to have standing to bring suit under Article III of the Constitution:

> [T]he party who invokes the court's authority [must] show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision.

Valley Forge College v. Americans United for Separation of Church and State, 454 U.S. 464, 472 (1982). The Tribe cannot claim that it has "personally suffered some actual or threatened injury" as a Federally-recognized Tribe, because the overwhelming bulk of interests for the trust funds at issue here ultimately belong to others.

Furthermore, the Osage Tribe could not maintain a suit for the other headrights as parens patriae.[12] Kickapoo Tribe of Oklahoma v. Lujan, 728 F. Supp. 791, 795 (D.D.C. 1990); Alabama and Coushatta Tribes of Texas v. Trustees of the Big Sandy Independent School District, 817 F. Supp. 1319, 1327 (E.D. Tex.. 1993). See also Northern Paiute Nation v. United States, 10 Cl. Ct. 401, 406-07 (1986).

---

[12] We are still investigating how many Osage Tribal members are not headright owners. This is a complex and controversial issue, but we know that there are at least some. See, e.g., Fletcher v. United States, 116 F.3d 1315 (10th Cir. 1997) (suit concerning Osage voting rights filed by four Osage Tribal members, some of whom were not headright owners). See also Cohen Handbook, D.Ex. 14, App. 130.

This plaintiff is precluded from bringing a suit for money damages on behalf of the other headright owners without their becoming parties to this case.

Any claims for royalties, therefore, must be brought by the true owners of such claims, the headright owners themselves.

## VI. THE COURT HAS NO JURISDICTION TO ADJUDICATE ANY CLAIMS ARISING UNDER THE DUE PROCESS CLAUSE OR THE EQUAL PROTECTION CLAUSE NOR TO GRANT DECLARATORY JUDGMENT IN THIS CASE.

The Tribe rather obliquely suggests that it has claims arising under the due process clause of the Fifth Amendment and the equal protection clause of the Fourteenth Amendment of the Constitution of the United States. Complaint, ¶ 1. Its Complaint makes no further mention of the allegation.

To the extent that the Tribes my seek to press the issue, however, this Court lacks the authority to hear constitutional claims unless the constitutional provision at issue requires payment of money damages. Murray v. United States, 817 F.2d 1580, 1582-83 (Fed. Cir. 1987). Consequently, the Court of Federal Claims cannot hear claims based on violations of the due process or equal protection clauses of the Fifth and Fourteenth Amendments because no language in those clauses calls for payment of money damages. Monsanto v. United States, 231 Ct.Cl. 980, 982-83 (1982); New York Power Auth'y v. United States, 42 Fed.Cl. 795, 801 (1999); Bounds v. United States, 1 Cl.Ct. 215, 216, aff'd without op., 723 F.2d 68 (Fed. Cir. 1983).

The Tribe here also asks for declaratory judgment "requiring the United States to properly manage assets of the Osage" or to protect the Tribe from future alleged mismanagement." Complaint, Prayer for Relief (d), p. 22.

Here again, such equitable relief is beyond the jurisdiction of the Court of Federal Claims in such a case as this. United States v. King, 395 U.S. 1 (1969); Vanalco, Inc. v. United States, 48 Fed.Cl.68, 75 (2000).

Thus, any claims of plaintiff here calling for the foregoing forms of relief must be dismissed.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss should be granted as to plaintiff's money damage claims accruing before October 1, 1984, as to plaintiff's demand for a pre-liability accounting, as to any possible claims plaintiff makes on behalf of other headright owners, and as to any due process, equal protection or equitable claims.

Dated this 25th day of July, 2001.

Respectfully submitted,

R. ANTHONY ROGERS
Attorney of Record for Defendant
General Litigation Section
Environment & Natural Resources Division
United States Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0483
Fax: (202) 305-8865/0506

Of Counsel for Defendant:

Stephen Simpson
Attorney
Office of the Solicitor
Division of Indian Affairs
U.S. Department of the Interior
Washington, D. C. 20240
Telephone: (202) 219-1659
Fax: (202) 208-3490

Alan Woodcock
Attorney
Office of the Field Solicitor
U.S. Department of the Interior
Tulsa, Oklahoma
Telephone: (918) 669-7730
Fax: (918) 669-7736

# Exhibit B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 00-169 |
| | ) | Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA | ) | |
| Defendant. | ) | |

**PLAINTIFF'S CORRECTED RESPONSE TO MOTION TO DISMISS AND BRIEF IN SUPPORT**

**BRADLEY D. BRICKELL OBA No. 1117**
Brickell & Associates, P.L.C.
950 Hightower Building
105 North Hudson
Oklahoma City, OK 73102
Telephone: 405-236-0008
Facsimile: 405-236-0013

**ATTORNEY FOR PLAINTIFF**

# TABLE OF CONTENTS


PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS. . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PROPOSITION I: The Statute of Limitation Does Not Bar Any of Plaintiff's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. Jurisdiction is Proper With This Court . . . . . . . . . . . . . . . . . . . . . . 5

B. Only the Defendant's Action Can Cause The Statute of Limitation to Begin to Run . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

C. The Indian Claims Commission Act, 60 Stat. 1052 (1946) Does Not Bar Any of Plaintiff's Claims . . . . . . . . . . . . . . . . . . . . 11

PROPOSITION II: THIS COURT MAY ORDER AN ACCOUNTING WHICH IS PENDENT TO THE TRIBE'S CLAIMS FOR MONEY DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

PROPOSITION III: THE TRIBE HAS STANDING TO ASSERT ALL CLAIMS AT ISSUE HEREIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. The Tribe's Suit is Founded on the Tribe's "Injury." . . . . . . . . . 15

B. At a minimum, the Tribe has "Associational Standing." . . . . . . 19

PROPOSITION IV: THE TRIBE IS NOT ASKING THIS COURT TO ISSUE DECLARATORY RELIEF WHICH IS NOT ANCILLARY TO A MONEY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

> Thus, for the purposes of section 2501, it would appear more accurate to state that a cause of action against the government has "first accrued" only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence (cites omitted).

The Court in *Manchester Band of Pomo Indians* also recognized the "knew or should have known" rule applies finding that the "statue does not run where the [Tribe] did not know or reasonably could not have known of the factual basis of its claim more than six years before suit was filed." *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F.Supp. 1238, 1249 (U.S.D.C., N.D.Calif. 1973).

Herein, the active concealment by the Defendant of its many errors and accounting/reconciliation failures involving, at a minimum, hundreds of millions of dollars belonging to the Osage mandates a tolling of any limitations period that may have already accrued. *See, Spevack v. United States*, 182 Ct. Cl. 884, 390 F.2d 977, 988 (1968).

**PROPOSITION II: THIS COURT MAY ORDER AN ACCOUNTING WHICH IS PENDENT TO THE TRIBE'S CLAIMS FOR MONEY DAMAGES**

While this Court does not have independent jurisdiction to order an accounting, where, as here, an accounting is incidental to the claims for damages. *John Samuel Austin v. The United States,* 206 Ct.Cl. 719 (1975). This Court's ability to render a judgment for declaratory relief under RCFC 57 and injunctive relief under RCFC 65 are adequate jurisdictional grounds upon which such relief may be granted.

**PROPOSITION III: THE TRIBE HAS STANDING TO ASSERT ALL CLAIMS AT ISSUE HEREIN.**

In its Motion to Dismiss (pp. 27-30), the United States advances the argument that "*to the extent*" (if any) that the Osage Nation or the Osage Tribe is seeking the prosecution of "headright"

claims, rather than "tribal" claims, that the Tribe lacks "standing" in that the Tribe itself has not "personally suffered some actual or threatened injury.[7] Significantly, the United States does not assert that a valid Article III "case or controversy" is lacking; rather, the Defendant asserts solely that the Tribe may lack standing because "*ultimately*" the injury caused by the federal government's trust fund mismanagement is spread to the headright owners. In a sophistic argument, the Defendant deduces that the headright owners **own** all Osage minerals---because under the Osage Allotment Act of 1906, the mineral royalty is ultimately "*distributed*" by headright ownership. *See* Motion to Dismiss, p. 28. Here, the Defendant's reasoning is inherently flawed, and its argument is both factual and legally incorrect.

The legal concept of "standing" springs from both the constitutional considerations related to the "case or controversy" limitations of Article III, and also prudential concerns "that, apart from Article III's minimum requirements, serve to limit the role of the courts in resolving public disputes." *Warth v. Seldin*, 422 U.S. 490, 498-500 (1975). As the United States Supreme Court explained in *Warth*:

In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art. III. This

---

7/ Inconsistent with its "standing" argument, the Defendant admits that: **(1)** a portion of all quarterly royalty income is retained by the Tribe for use in Osage Tribal operations (Motion, p. 28, n. 11), **(2)** the Osage Tribe itself receives an "ultimate" undivided portion of all royalty income (Motion, p. 29), and that **(3)** the Tribe initially receives all royalty income (*as the Tribe itself in fact **owns** the mineral interests*) and for a time holds the funds until they are distributed as required by law (Motion, pp. 28-29). That the funds are "ultimately" distributed to headright owners, and thereafter to others such as Sears, McDonald's, the IRS, *etc.*, is simply immaterial to the issue of whether the Tribe has suffered a loss at some point, and thus has standing. *See Northern Paiute Nation v. United States*, 10 Cl. Ct. 401, 413 (Ct. Cl. 1986) (holding that a tribe has "standing" where tribe owns property and suffers a loss, regardless of whether harm is ultimately suffered by allottees.) [Cited by the Defendant, Motion to Dismiss, p. 29]

is the threshold question in every federal case, determining the power of the court to entertain the suit. **As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf**. *Baker v. Carr, 369 U.S. 186, 204 (1962).* (emphasis added)

While the standing issues may raise both constitutional and prudential considerations (*See First Hartford Corp. Pension Plan & Trust*, 194 F.3d 1279, 1290 (Fed. Cir. 1999), in this case, only the prudential considerations are advanced by the Defendant's argument.[8] In its Motion, the Defendant does not maintain that no "actual injury" has resulted from its alleged trust fund mismanagement to be remedied by a damage award, rather, that Defendant maintains that the issue is whether the Tribe is merely asserting the rights of third parties. In this circumstance, the Court clearly has jurisdiction under Article III of the United States Constitution (*Warth* at 501, n. 12), but may as a matter of judicial self-governance, refrain from exercising such jurisdiction if it is shown that the Tribe itself is not the party that suffered the injury.

Because it is the Osage Nation itself which owns the beneficial interest in the minerals, and it is the Tribe itself which executes the underlying oil and gas leases (*See 25 C.F.R. § 226.1(b)*, § 226.2(b), (f), § 226.11(a)(2)), it is the Tribe itself that has been injured by the Defendant's failure

---

8/ The three elements to establish Article III standing were set forth in the recent United States Supreme Court decision of *Vermont Agency of Natural Resources v. United States, ex rel., Jonathan Stevens*, 529 U.S. 765, 771, 120 S.C. 1858, 1861-62, 146 L.Ed.2d. 836, 844 (2000). The elements are: (1) the demonstration of an "injury in fact," (2) causation, that is, a "fairly... traceable" connection between the alleged injury and the alleged conduct of the defendant, and (3) redressability, that is, a "substantial likelihood" that the requested relief will remedy the alleged injury in fact. *Id.*

to collect and maintain the mineral royalty and trust account. The Osage Tribe clearly has a "personal stake" in this lawsuit.

### A. The Tribe's Suit is Founded on the Tribe's "Injury"

The Tribe **owns** the beneficial interest in the Osage Mineral Estate (of course, the title is held in trust by the United States), and thus, the Tribe itself has the **legal right** to insure that the proper royalties are collected by the Defendant, and if such are not collected, it is the Tribe which is "injured." The Tribe's ownership of the entire mineral estate of the Osage Nation (what is now Osage County, State of Oklahoma) has its genesis in the 1868 Treaty of Drum Creek, drafted by the federal government, which provided in part:

> Article 1. The tribe of the Great and Little Osage Indians are desirous of removing from Kansas to a new and permanent home in the Indian territory (now Oklahoma), and of making an advantageous and absolute sale of their lands in the state of Kansas. They desire, moreover, to dispose of these lands as to aid in the speedy extension of the Leavenworth, Lawrence and Galveston railroad [. . .]
>
> Article 14. The United States hereby agrees to sell to the Great and Little Osage tribe of Indians, for their future home, at a price not to exceed twenty-five censs [sic, cents] per acre, the following described district of country. viz . . . [describing Osage County, State of Oklahoma, by metes and bounds] [. . .]. (emphasis added)

Although the Drum Creek treaty was never ratified, the Relocation Act of 1870 accomplished the same end. *See* Act, attached hereto as Exhibit "20", Pl. App. pp. 173 & 174. Because of the Relocation Act and a separate treaty between the United States and the Cherokee Nation, on June 14, 1883, the Cherokee Nation executed a "Deed from the Cherokee Nation, through is Delegates, to the United States in Trust for the Use and Benefit of the Osage Indians." *See* Deed, attached hereto as Exhibit "21", Pl. App. pp. 175-179. In relevant part, the Cherokee Deed provides:

> [. . .] delegates of the Cherokee Nation, are authorized and empowered, in the name of the Cherokee Nation, to execute deeds of conveyance [which] . . . sell, remise,

release, relinquish and confirm unto [the United States], forever, in trust nevertheless and for the use and benefit of the said

Osage and Kansas Indians, all those certain tracts of land lying and being in the Indian Territory, embracing the following townships, and fractional townships, north and east of the Indian meridian---the fractional townships being on the left bank of the Arkansas river: [*describing what is now Osage County, State of Oklahoma*] [. . .] containing an area of one hundred thousand, one hundred and thirty-seven and thirty-two hundredths acres, (100,137.32 [acres]), which aforesaid lands were paid for by the Osage to the Cherokees [. . .]

To Have and to Hold the said premises above described with the appurtenances unto the said party of the second part, for the use and purposes aforesaid.

*See* Deed, attached hereto as Exhibit "21", Pl. App. pp. 175-179. By the terms of the Cherokee Deed, the United States received a freehold estate, as the conveyance was "forever" and limited only to the extent that the United States held title "for the use and benefit of the Osage and Kansas Indians." The mere expression of the purpose for which the property is to be used, does not limit the estate conveyed. *Choctaw & Chickasaw Nations v. Board of County Com'rs*, 361 F.2d 932, 934 (10th Cir. 1966).

The fee simple estate conveyed to the United States in 1883, for the use and benefit of the **Osage Tribe**, included the underlying mineral exploration rights. *See Rich v. Doneghey*, 177 P. 86, (Okla 1918) (Ownership of land includes right to search for and reduce minerals to possession). In non-ownership jurisdictions [such as Oklahoma], the "mineral rights" may be "severed" or "reserved" from the rest of the land, and is considered a *profit a prendre* if of limited duration, or a fee interest if perpetual. *Id.*; Hemingway, The Law of Oil and Gas, § 1.3, p. 21, West Publishing Co. © 1983.

Clearly it is the Osage Tribe which in 1883, received title to the Osage mineral estate. Indeed, the Constitution of the Osage Nation (approved December 31, 1881), further provides in

Article I, Sec.2: "The lands of the Osage Nation shall remain common property, until the National Council shall request an allotment of the same, . . . " *See* Osage Constitution, attached as Exhibit "22", Pl. App. Pp. 180-187.

Confirming the Osage Tribe's present day ownership of the Osage Mineral Estate, notwithstanding the 1906 Osage Allotment Act, is the very authority the Defendant submits in Support of its Motion to Dismiss. Exhibit 14 to the Appendix to Defendant's Motion to Dismiss (filed July 25, 2001), is a relevant excerpt from Cohen's Handbook of Federal Indian Law. The Defendant's Exhibit 14 (Cohen's Handbook, p. 127, n. 174) explains:

> In 1906 Congress passed a complex statute attempting to individualize much of the Osage tribal property and to provide some protection for tribal members. [. . .] **The tribal mineral estate was severed and retained in tribal trust ownership, 174** [Footnote 174, cited *infra*] . . . **(emphasis added)**

(Cohen's Handbook, p. 127, n. 174) [Act of June 28, 1906. ch. 3572, 34 Stat. 539] § 3, 34 Stat. at 543. This section retained the mineral estate in tribal trust for 25 years. The Act provided for remainders to allottees in severalty thereafter "unless otherwise provided for by Act of Congress." §§ 2, para. 7; 5, 34 Stat. at 542, 544. Congress has repeatedly extended the tribal trust. Act of Mar. 3, 1921, ch. 120, § 1, 41 Stat. 1246 (to 1946); Act of Mar. 2, 1929, ch. 493, § 1, 45 Stat. 1478 (to 1958); Act of June 24, 1938, ch. 645, § 3, 52 Stat. 1034, 1035 (to 1983). The trust period was made indefinite by the Act of October 6, 1964, Pub. L. No. 88-632, 78 Stat. 1008, and was extended "in perpetuity" by the Act of October 21, 1978, Pub. L. No. 95-496, § 2(a), 92 Stat. 1660. The validity of the 1921 and 1929 extensions was sustained in *Adams v. Osage Tribe*, 59 F.2d 653 (10th Cir. [1932]), cert. denied, 287 U.S. 652 (1932). (And, the Defendant's RCFC 30(b)(6) witness, Douglas

Lords, testified that the minerals underlying Osage County are owned by "the tribe". Pl.App. pp. 132-133.)

Clearly by successive Acts passed by Congress in 1906, 1921, 1929, 1938, 1964, and most recently in 1978, the Osage Mineral Estate has remained the beneficial property of the **Osage Tribe** itself. It is especially noteworthy that the legal argument now advanced by the United States, that is, that the 1906 Osage Allotment Act transferred the rights and interests to the minerals to the Osage allottees, **is directly contrary** to the argument made by the United States to the Tenth Circuit Court of Appeals in the 1932 *Adams* case. In rejecting the mineral ownership claims of Osage allottees, the Tenth Circuit wrote in *Adams v. Osage Tribe,* 59 F.2d 653 (10th Cir. 1932), cert denied, 287 U.S. 652 (1932):

> [The Plaintiffs (*individual Indian allottees*) in these three suits . . .] assert ownership in themselves severally to the oil, gas, coal and other minerals under their allotments on and after April 8, 1931. [. . .] The United States alleges that it is the owner of all said minerals **holding them in trust for the use and benefit of the Osage Tribe**, having acquired the same by deed from the Cherokee Nation pursuant to certain acts of Congress. [. . . The United State] alleges that [the individual allottees . . .] have claimed and are now claiming to be the owners of all of the minerals under their several allotments, and it prays that its title be adjudged and said adverse claims removed as clouds thereon and the **rights of said tribe** and said lessees be also confirmed and quieted. [. . .]

The *Adams* court, affirming the trial court, accepted the United State's contention that the Osage Mineral Estate belonged to the **Osage Tribe**, noting that the 1906 Osage Allotment Act "provided that minerals under lands to be allotted were reserved to the Osage Tribe and were not to be sold." The court wrote that the "purpose of Congress as disclosed in the Allotment Act and the extension acts is plain. The contention of the appellants [the individual allottees,][ ***and now the United States***

***in the instant case***] is without merit." *Id.* Moreover, even the Defendant's Brief admits the Tribe's "personal stake", and direct injury, in the government's conduct now at issue. *See* footnote 7, Supra.

**B. At a minimum, the Tribe has "Associational Standing"**

Even if the Osage headright owners are the **only ones** injured by government's mismanagement of the Osage trust assets, which theory Plaintiff does not believe is the case, the doctrine of "associational standing" is a well established exception to strict "standing" requirements. It has long been settled that "[even] in the absence of injury to itself, an association may have standing solely as the representative of its members." *E.g., National Motor Freight Assn.* v. *United States,* 372 U.S. 246 (1963); *Warth v. Seldin,* 422 U.S. 490, 511 (1975). While the "possibility of such representational standing . . . does not eliminate or attenuate the constitutional requirement of a case or controversy," [*ibid.*; *See Sierra Club v. Morton,* 405 U.S. 727 (1972)], the United States Supreme Court has held that, under certain circumstances, injury to an organization's members will satisfy Article III, and will allow that organization to litigate in federal court on their behalf. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40 (1976).

In *Warth, supra,* the United States Supreme Court set out the nature of these circumstances:

> The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.[ . . .] _ So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction. Id., at 511.

Subsequently, this doctrine was stated as a three-part test:

> [An] association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim

> asserted nor the relief requested requires the participation of individual members in the lawsuit.

*See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977).

As applied to this case, the Osage Tribe, at a minimum, has "associational standing" to sue on behalf of the headright members of the tribe. First, as the Defendant concedes in its Brief (p. 30), and under the Defendant's analysis (assuming *arguendo* that it is correct), the headright owners themselves have legitimate claims in their own right. Accordingly, it is not disputed that the headright members would otherwise have standing to sue in their own right. Second, it is beyond doubt that the interest the Osage Tribe seeks to protect is germane to its purpose; the Osage Tribe receives all the funds in the first instance in order to protect the interests of its members. In this lawsuit the Osage Tribe does not seek to advance the cause of unrelated others, in a misguided effort to oppress the Defendant.

To this end, the Tribe also has standing as *parens patriae*. As set out in *Alabama & Coushatta Tribes of Texas v. Trustee of the Big Sandy Independent School District,* 817 F. Supp 1319, 1327 (U.S.D.C. E.D.-TX 1993):

> the doctrine of parens patriae allows a sovereign to bring an action on behalf of the interest of all its citizens. *Lousiana v. Texas*, 176 U.S. 1, 19, 44 L.Ed. 347, 20 S. Ct. 251 (1900).

However, the doctrine is only applicable where the sovereign tribe is pursuing an action which will ultimately benefit all its members. *Id.*, (cites omitted). In this case, whatever ultimate recovery the Plaintiff should make will benefit all its members. The recovery may be used in projects for the Tribe (with Congressional approval) and/or be distributed to the headright owners. Therefore, the doctrine is applicable and provides yet another basis for standing.

Lastly, it is clear that the claims asserted by the Osage Tribe do not require the participation of the individual headright owners. Here, the issue of the case is the Defendant's (mis)management of the Osage trust assets, and the Osage headright owners had no role or impact on the Defendant's conduct. The Osage headright owners are unnecessary parties, just at they are unnecessary witnesses. At a minimum, the Osage Tribe has "associational standing" to bring the claims now at issue.

**PROPOSITION IV: THE TRIBE IS NOT ASKING THIS COURT TO ISSUE DECLARATORY RELIEF WHICH IS NOT ANCILLARY TO A MONEY JUDGMENT**

The Defendant and its authorities set forth in its Motion at Proposition VI correctly state that this Court does not have jurisdiction to order declaratory relief which is not ancillary to a judgment for money damages. Therefore, to the extent the Tribe has requested any relief outside this Court's jurisdiction by way of declaratory judgment, the same should be denied only if all factual issues material thereto are undisputed.

## CONCLUSION

WHEREFORE, premises considered, this Court should deny Defendant's Motion to Dismiss.

BRADLEY D. BRICKELL, OBA No. 1117
Brickell & Associates, P.L.C
950 Hightower Building
105 North Hudson
Oklahoma City, OK 73102
Telephone 405-236-0008
Facsimile 405-236-0013

**ATTORNEY FOR PLAINTIFF**

**CERTIFICATE OF MAILING**

I hereby certify that on the 24 day of October, 2002, I mailed a true and correct copy of the above and foregoing to:

R. Anthony Rogers
ENRD General Litigation Section
United States Department of Justice
601 D Street, N.W., Ste. 3108
Washington, D.C. 20004

BRADLEY D. BRICKELL

# Exhibit C

# UNITED STATES
# COURT OF FEDERAL CLAIMS

FILED
FEB 2 4 2003
U.S. COURT OF FEDERAL CLAIMS

THE OSAGE NATION, )
)
Plaintiff, )
)
v. ) Docket No.: 99-550L
)
UNITED STATES, )
)
Defendant. )

Pages: 1 through 72

Place: Washington, D.C.

Date: January 23, 2003

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE OSAGE NATION, )
)
Plaintiff, )
)
v. ) Docket No.: 99-550L
)
UNITED STATES, )
)
Defendant. )

Courtroom F, Room 508
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Wednesday,
January 23, 2003

The parties met, pursuant to notice of the Court, at 4:04 p.m.

BEFORE: HONORABLE JOHN P. WIESE
Judge

APPEARANCES:

For the Plaintiff:

(Via Telephone)

BRADLEY D. BRICKELL, Esquire
105 N. Hudson
Suite 950
Oklahoma City, Oklahoma
(405) 236-0008

APPEARANCES Cont'd

For the Defendant:

EDWARD J. PASSARELLI, Esquire
U.S. Department of Justice
ENRD
P. O. Box 663
Washington, D.C. 20004-0663
(202) 305-0468

STEPHEN L. SIMPSON, Esquire
Division of Indian Affairs
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, N.W.
MS-6456-MIB
Washington, D.C. 20240
(202) 219-1659

For the Agency:

(Via Telephone)

ALAN WOODCOCK, Esquire
Department of the Interior
7906 East 33rd Street
Tulsa, Oklahoma 74145
(918) 6699-7730 (Ext. 225)

MR. WOODCOCK: I will almost walk a copy from Oklahoma up here to you.

THE COURT: Well, my guess is that, from what you have told me, it is going to be in your favor. I think the dispute here is really going to be about whether you people were given information sufficient to have triggered your suspicions? But that's a distant ruling, and may not stand by a year, months from now. But, anyway, we've got enough to do.

Mr. Passarelli, you wanted to speak.

MR. PASSARELLI: Yes. I was just going to say we had an understanding before that I think was in order -- or in the conference where you'd indicated that with the three kinds of discovery that we've been getting that the parties would agree that the disclosure documents that there might be a privilege attached to wouldn't raise that privilege.

THE COURT: Absolutely, absolutely, absolutely.

MR. PASSARELLI: The only other thing, Your Honor, it seems to me that what we could do is also, in addition to, once we get the amended complaint that we could also focus the other threshold issue, which is an issue that doesn't make the rest of the case go away; but does focus the Plaintiff and the government on what the bottom line pot can be for recovery for money damages.

And that's: Whether or not The Osage Tribe has the

ability to assert a claim on behalf of all the head-right owners, Indians and non-Indians alike. Certainly, I think they're trying just for Indian head-right owners.

MR. BRICKELL: Your Honor, that may, and I'd be happy to entertain that issue, and this may not be knowledge that Mr. Passarelli has, but that issue was raised by the government, and has already been briefed in front of Judge Hewitt on the companion case, the other Osage case here. And it is merely awaiting final oral arguments before decision on the standing of The Tribe to bring claims on behalf of the head-right owners. But, again, we'd be happy to address that here also.

THE COURT: Assuming there's a problem, why isn't that problem correctable administratively simply by virtue of an authorization from the individual to The Tribe allowing The Tribe to present the individual's suit? Now I'm not going to call out an assignment because that's going to get us into trouble. But simply an authorization for representation making The Osage the class representative. Making The Osage Nation or Osage Tribe, however it's referred to, the representative of what Mr. Passarelli had identified as 2,230 head-right owners. Why can't we simply solve that problem that way and do away with --

MR. PASSARELLI: One of the problems is, of course, this wasn't filed as a class action. But number

two, the head-right owners may disagree with The Tribe as to the method of computation and the kinds of claims that they may have.

THE COURT: Well, but there's a way to find that out. Wouldn't it make better sense to find out whether we can get that type of -- we can constitute this as a class?

MR. PASSARELLI: We would prefer not.

THE COURT: Well, it's not going to really make any difference if all are otherwise willing to join into the suit. That's an indication that they maintain a separate claim from one that would be presented on their behalf by The Osage and then --

MR. PASSARELLI: We would have to go through the opt-in procedures that --

THE COURT: That's not really that difficult. We would issue notice and say: Here's this lawsuit that's pending. You're free to come in if you want to. But, if you don't in, you have got to file your own suit, buddy, because we are not going to put you in this one.

MR. BRICKELL: Your Honor, I don't really, and, again, this is opposite of the government's opinion, but The Osage and other tribes have been bringing these sorts of claims on behalf of the tribal members for more years than any of us have been alive. And I know they like to raise this argument a lot and have argued a lot, but I do not

think that it's going to come to the fact that we would need to issue those notices. Although we'd be happy to entertain that if it's necessary.

MR. WOODCOCK: Your Honor, I do point out that first it's not 2,229, it's much more fractionated than that now. I think there's something like 4-5,000 head-right holders. But, also, I point out that they're not all tribal members. There's a minority of them and a fair size minority of them who are not Osage at all, who have inherited or otherwise acquired a head-right interest.

MR. BRICKELL: Both of those statements are factually correct, Your Honor.

THE COURT: Okay. I need a moment to think about what you have just told me.

MR. BRICKELL: Well, the first thing --

THE COURT: Mr. Brickell, when you said you didn't envision there being any difficulty with respect to having The Tribe stand as the litigating representative for the individuals and that similar suits having raised similar issues saw no difficulty, what is the underlying legal relationship between the individual and The Tribe that permits The Tribe to be a representative?

MR. BRICKELL: Your Honor, I believe it's through the various Acts of Congress and the tribal government itself, and the way it was set up pursuant to those Acts.

THE COURT: Would that be limited to Native American Indians only so as to exclude those head-right owners that are not Native Americans?

MR. BRICKELL: No, I don't believe it would, Your Honor.

THE COURT: It would not exclude them?

MR. BRICKELL: I don't believe it would. I believe the way the provisions have been set up from the 1800s forward with respect to The Osage, and again, there, how many? Alan, are there 400 recognized tribes?

MR. WOODCOCK: I don't remember how many recognized tribes there are.

MR. BRICKELL: But with regard to The Osage and I know a number of other tribes, the tribal body itself is the elected government, just like the United States can prosecute claims on behalf of its citizens. The same thing holds true for The Osage and its citizens, in this case, because of the way the procedure was set up in 1906, supplying that the minerals, that the beneficiaries of the minerals state monies that would go to The Tribe and then be disbursed on a certain basis to 2,226, I believe, head-right owners.

of course, since then, all of the original head-right owners, I believe, except maybe one or two exceptions, all of them have passed on and their interests have been

fractionated on among other Osage Indians and Indians of other tribes besides Osage, even to some through various wills and that sort of thing even in foundations and corporate entities. Although that's the minority.

THE COURT: Yes. And you say this issue, which we are now discussing, has also been briefed in the case before Judge Hewitt?

MR. BRICKELL: Yes, Your Honor. The same issue was raised there. It's been briefed. It was set for oral argument but that was continued for a brief time for the government to file a reply brief, and which is due, I believe, next week.

THE COURT: Okay. So there really isn't any issue as to, reason, I should say, Mr. Passarelli, for rebriefing that same issue in this case, if it has been fully briefed before Judge Hewitt and will soon be awaiting a decision.

MR. PASSARELLI: I understand the duplication of effort that would occur. But, also, I understand fully, that you as a Claims Court Judge, are not bound by anything --

THE COURT: Right.

MR. PASSARELLI: -- that Judge Hewitt issues and that the circuit court, to the extent that Judge Hewitt rules one way and the circuit might well benefit from your view on that issue as a, you know, -- the circuit's going to

the Supreme Court and that get the Supreme Court's view of the law. And it would give us the opportunity to brief it and have it resolved by you in this case. Something could happen in the other one where it goes away as an issue for some reason and never gets to the circuit.

THE COURT: I apologize. There is some construction going on just outside that door.

MR. PASSARELLI: They're drilling an oil well.

(Laughter).

THE COURT: Let me ask, Mr. Brickell, are you familiar with the Quinault case?

MR. BRICKELL: Very vaguely.

THE COURT: Yes, well I had that case for more years of my life than I want to tell you. But I, too, would only be unable to say at this juncture: very vaguely. In that case, we had among the litigating claimants the Quinault Tribe and then we had, I guess, thousands of individual allottees.

So, if what you said to me a moment ago about The Tribe being a representative of its members for litigating purposes, then I don't know why we went through that elaborate procedure in the Quinault, if setting up an opt-in class, and I must say to you the following about that: The judge who prescribed the class-action treatment in the Quinault case, and incidentally, the case goes by the name

of Helen Mitchell. It was Judge Oscar Davis who had an encyclopedic understanding of the law, having served as acting and then later Solicitor General, so he was well aware of the law relating to government trust management of Indian assets. I think he would have immediately identified the Quinault Tribe as the proper representative and have bypassed entirely the opt-in class concept as unnecessary, if it were the case that The Tribe spoke for everybody.

So it may be that you, meaning you, Mr. Brickell, are not right on this. And that brings me to the point that: If we can make a nonproblem out of this, why not do that? Why don't we wait to see what Judge Hewitt does with this. Let me read the decision when it comes down. I'm not anxious to write opinions. I've got plenty to do.

MR. PASSARELLI: You're so good at it, Judge.

THE COURT: No, no, no. We have got enough to do here. Mr. Brickell has to amend his complaint. We have got to get to a joint motion for issuance of notice, and we have got to get going with discovery on an informal basis. That's enough on the plate. If we can make a nonissue out of anything that's an issue so much the better for all of us. I don't want to go looking for fights.

MR. PASSARELLI: Okay. Maybe if we can tie up a loose end -- we would normally have, I think, for an amended complaint maybe only 10 or 20 days.

THE COURT: Mr. Passarelli, you have litigated in my Court long enough to know that I know you are busy. Give me the answer in due time. Don't take more than 30 or 60 days. Mr. Brickell is not going to be held up on his discovery by your answer for the complaint. This litigation can go forward very comfortably even without an answer. But I will need one anyway. So that's all. We have said and covered so much. Can we leave this transcript stand as the marching orders for all of us without my having to enter an order for any of these points?

MR. BRICKELL: Plaintiffs would be satisfactory with that, Your Honor.

THE COURT: Would that serve your needs, as well, Mr. Passarelli?

MR. PASSARELLI: I think that would serve our needs, as well.

THE COURT: Mr. Woodcock, you are not going to come demanding an order from me?

MR. WOODCOCK: No, that's fine, except Your Honor --

THE COURT: I'm sorry?

MR. WOODCOCK: -- could we strike the part about the fact that I might be wrong?

THE COURT: I'll strike that part. (laughter)

MR. WOODCOCK: Just kidding, just kidding. Your

Honor, we really appreciate the extreme amount of time you have spent with us today and we'll proceed on that basis.

THE COURT: All right. Now, one last thing that I think I told you in the past, but it's worth repeating. I don't mind telephone calls to the office. The young lady to whom the call goes is: Catherine Bernard, (202) 219-9654. If you have a problem, just let us know. We're available to give you our best guidance with respect to an answer. Sometimes it dismays the people when they get the answer but we're always available anyway.

That's all I have, Mr. Brickell. It's good to talk to you again and I'm glad Judge Hewitt is ahead of me on this. It's going to be nice to follow in the wake of somebody for once.

MR. BRICKELL: Your Honor, we certainly appreciate your time and patience and effort expended on this case on behalf of my client; and we promise you we'll do everything we can to keep the discovery disputes, if any, to a minimum. From my experience so far, I'm going to predict that the only disputes that you may see in this case will be just the third-party issues with the oil companies, if any.

THE COURT: Yes.

MR. BRICKELL: I think that I've --

THE COURT: Well, there can't be any question -- I hope there's no question in their mind that I have the

subpoena power with respect to their documents.

MR. BRICKELL: I think --

THE COURT: If they think otherwise, then they are going to run into a very hard time.

MR. BRICKELL: I appreciate that, Judge. I just think, more or less, trying to put in a statement that so far my experience with the government and the government representative on discovery have been very favorable. And we've enjoyed good cooperation there.

THE COURT: Excellent. I am delighted to hear that and let's hope it will continue that way. I am sure it will.

MR. BRICKELL: Thank you, Your Honor.

THE COURT: I thank you, Mr. Passarelli, Mr. Simpson, Mr. Woodcock and Mr. Brickell.

ALL: Thank you, Your Honor.

THE COURT: Now, Madame Reporter, before I let them go, do you have any spellings you need?

REPORTER: I do, but I will ask them.

THE COURT: Okay. You're free to go, Mr. Brickell and Mr. Woodcock.

MR. BRICKELL and MR. WOODCOCK: Thank you, goodbye.

MR. BRICKELL: You have a nice evening.

THE COURT: Yes, thank you.

//

(Whereupon, the hearing in the above-entitled matter was concluded at 5:55 p.m.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

REPORTER'S CERTIFICATE

DOCKET NO.: 99-550L

CASE TITLE: The Osage Nation v. United States

HEARING DATE: January 23, 2003

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

January 23, 2003

Maureen Huber

Official Reporter

Heritage Reporting Corporation

Suite 600

1220 L Street, N.W.

Washington, D.C. 20005-4018

# In the United States Court of Federal Claims

**NOTICE**

**THE OSAGE NATION**

**No. 99-550L**

**V.**

**THE UNITED STATES**

**CLERK'S OFFICE**
**Washington, D.C., February 24, 2003**

To Attorney of Record, Assistant Attorney General and Judge John P. Wiese:

Please take notice that in the above cause there has been filed this day, on behalf of the parties,

Transcript of proceedings (1 volume) taken at Washington, D.C., on January 23, 2003.

Margaret M. Earnest, Clerk

# Exhibit D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
FEB 1 0 2003
U.S. COURT OF FEDERAL CLAIMS

THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA )
)
Plaintiff, )
)
v. ) No. 00-169
) Judge Emily C. Hewitt
THE UNITED STATES OF AMERICA )
)
Defendant. )

## MOTIONS TO INTERVENE AND AMEND COMPLAINT

COME NOW the undersigned parties, owners of allotted shares or "headrights" of the Osage Tribe of Indians of Oklahoma and request this Court grant leave to intervene in the captioned case made under RCFC 5 and 24 as follows:

## MOTION TO INTERVENE

1. The Complaint in the captioned case concerns issues based on the duty of the Defendant to collect and payover trust funds and interest to the Osage, including proper payment of monies due from lands subject to treaties and statutes, for interest due on other sums and for damages from the loss of Osage trust account monies. Plaintiff's Complaint alleges the Defendant has breached its fiduciary duty in the mismanagement, investment and payment of Osage trust funds.

2. The Defendant, United States of America, has argued, both in pleadings and in oral arguments before the Court that the Osage Nation and/or Tribe of Indians of Oklahoma is the owner of less than 2 allotted shares or headrights and that the individual and/or corporate owners of headrights are additional "real parties in interest" proper parties to the instant proceeding; and further, that the interest of all owners of headrights (originally, less than 2,300 headrights or allotted shares issued in 1906) is not and cannot be represented by the original Plaintiff, a governmental entity. Through devise, descent and assignment those headright shares are further fractionated and

shares or fractions of shares are now owned by more than 4,000 different individuals and/or entities.

3. In a recent lengthy Scheduling Conference in a related case (previously consolidated) of the *Osage Nation And/or Tribe Of Indians of Oklahoma v. United States of America*, by and through the Department and Secretary of the Interior and Bureau of Indian Affairs, No. 99-550 L (Judge John P. Wiese), the Court stated the Defendants' above premise was correct, and that matter would be properly prosecuted by the actual owners of the allotted shares / headright owners. Judge Weiss indicated agreement with the Defendant's contention that the Tribe did not have the ability to represent the interest of all owners of allotted shares or headrights, other than its own (approximately (2) allotted share ownership).

4. The undersigned movants have been verified by the Defendant as owners of allotted shares and/or headright interest. The undersigned parties further represent that they are ready, willing and able to prosecute this matter to its conclusion, not only on their behalf, but on behalf of all other similarly situated parties, that being all other owners of full or fractional allotted shares or headrights.

**WHEREFORE,** Movants request that a this Court allow them to Intervene as party Plaintiffs and award such other relief, to which Movants are entitled.

## MOTION TO AMEND

Movants Joseph Andrew Trumbly, Elizabeth Bartnek, Charles O. Tillman, Jr., Julia L. Mushrush, Marlene Ware, Patricia L. Beasley, Russell Warrior, Jr. and John P. Essley file their Application for Leave to Amend the complaint in the instant matter against the Defendant United States of America, and in support of their position they state:

The Rules of the United States Court of Federal Claims, RCFC 15(a) provides that leave to amend "shall be freely given when justice so requires." The Supreme Court has held that leave to nend should be granted absent some substantial reason to deny leave:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962), 83 S. Ct. 227, 230 (1962); *see Glenn v. First National Bank*, 868 F.2d 368, 370 (10th Cir. 1989). "The liberal granting of motions for leave to amend reflects the basic policy that pleadings should enable a claim to be heard on its merits." *Calderon v. Kansas Department of Social and Rehabilitation Services*, 181 F.3d 1180, 1186 (10th Cir. 1999).

A true copy of the proposed Amended Complaint is attached hereto as **Exhibit "A"**. This amendment is timely, in that it is made before the end of fact discovery. The amendment does not prejudice the Defendant.

The Amended Complaint adds the following new Plaintiffs: Joseph Andrew Trumbly, a resident of the State of Oklahoma, Elizabeth Bartnek, a resident of the State of California, Charles O. Tillman, Jr., a resident of the State of Oklahoma, Julia L. Mushrush, a resident of the State of Oklahoma, Marlene Ware, a resident of the State of Oklahoma, Patricia L. Beasley, a resident of the State of Oklahoma, Russell Warrior, Jr., a resident of the State of Oklahoma and John P. Essley, a resident of the State of Oklahoma and adds a claim that this action should be certified as a class action.

There is no Scheduling Order in the case preventing the addition of additional party Plaintiffs. The addition of these Plaintiffs will not effect any other deadlines in the case. In short, there is no reason to deny leave to amend. *See* 6 CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1474, p. 533 (2d ed. 1990) ("[A] party may make an amendment to amplify a previously alleged claim or defense."); 3 MOORE'S FEDERAL

PRACTICE § 15.14[1] ("During the pretrial phase, a court should allow amendments to ensure that all the issues are before the court.").

Plaintiffs' counsel has provided Defendant's counsel a copy of the proposed Amended Complaint, attached hereto as **Exhibit "A"**. Defendant's counsel has not yet advised whether the Defendant objects to Plaintiffs' application.

**WHEREFORE**, the undersigned movants request that the Court grant their Motion to Intervene and for Leave to Amend and allow the filing of the Amended Complaint and for such further relief to which they may be entitled.

Respectfully submitted,

BRADLEY D. BRICKELL, OBA 1117
Brickell & Associates, P.L.C
950 Hightower Building
105 North Hudson
Oklahoma City, OK 73102
Telephone 405-236-0008
Facsimile 405-236-0013

Attorney For Plaintiff,
THE OSAGE NATION AND/OR
TRIBE OF INDIANS OF OKLAHOMA

And

Attorney for Movants
JOSEPH ANDREW TRUMBLY,
ELIZABETH BARTNEK, CHARLES
O. TILLMAN, JR., JULIA L.
MUSHRUSH, MARLENE WARE,
PATRICIA L. BEASLEY, RUSSELL
WARRIOR, JR. and JOHN P. ESSLEY