# In the United States Court of Federal Claims

No. 99-550 L

(into which has been consolidated No. 00-169 L)

(E-Filed: March 31, 2008)

| | |
|---|---|
| ───────────────────────────────────── ) <br><br> THE OSAGE TRIBE OF INDIANS <br> OF OKLAHOMA, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. <br><br> ───────────────────────────────────── ) | Motion to Disqualify Counsel; <br> RCFC 83.2(c)(2); ABA Model <br> Rules of Professional Conduct <br> Rule 1.9(a); Whether State <br> Cases Interpreting State Rules <br> of Professional Conduct Bind <br> the U.S. Court of Federal <br> Claims; Whether the Sovereign <br> Osage Nation Enjoys <br> Continuing Identity Under "An <br> Act for the Division of Lands <br> and Funds of the Osage Indians <br> in Oklahoma Territory, and for <br> Other Purposes" and "An Act to <br> Reaffirm the Inherent Sovereign <br> Rights of the Osage Tribe to <br> Determine Its Membership and <br> Form of Government" |

## OPINION AND ORDER

On October 15, 2007, eight individuals who identify themselves as "personal owners of allotted shares or 'headrights' of the Osage Tribe of Indians of Oklahoma" (proposed intervenors) filed their Motion to Intervene and Amend Complaint and Brief in Support (Mot. Int. or motion to intervene) 1. Plaintiff responded to the motion to intervene by filing Plaintiff Osage Nation's[1] Motion to Disqualify Bradley D. Brickell as Counsel for the Proposed Intervenors (Pl.'s Mot. or plaintiff's motion to disqualify) on November 16, 2007. The proposed intervenors filed their Response of Proposed Intervenors to the Osage Nation's Motion to Disqualify (Prop. Int. Resp. or proposed intervenors' response) on December 14, 2007. Plaintiff (plaintiff or the Osage) filed Plaintiff Osage Nation's Reply Brief in Support of its Motion to Disqualify Bradley D.

---

[1]Case number 99-550 L is captioned as above. Case number 00-169 is captioned The Osage Nation v. The United States of America in the court's electronic docketing system.

Brickell as Counsel for the Proposed Intervenors (Pl.'s Reply or plaintiff's reply) on December 21, 2007.  The court held a telephonic status conference with the parties on January 4, 2008 at which Mr. Brickell requested and was, by Order of January 4, 2008, granted an opportunity to provide further briefing.  See Transcript of Jan. 4, 2008; Order of Jan. 4, 2008.  The proposed intervenors filed their additional briefing on January 18, 2008 (Prop. Int. Add'l Br. or Proposed Intervenors' Additional Briefing) to which plaintiffs replied on January 25, 2008 (Pl.'s Add'l Br.).  For the following reasons, plaintiff's motion to disqualify is GRANTED.

I.      Background

Bradley D. Brickell previously represented plaintiff in both of the cases now consolidated in this case.  Mr. Brickell filed the complaint for case number 99-550 L on August 2, 1999 and the complaint for case number 00-169 L on March 31, 2000.[2]  See Case No. 99-550 L, Complaint and Case No. 00-169 L, Complaint.

On May 16, 2003, Wilson K. Pipestem became counsel for the Osage Nation in case number 99-550 L.  This court terminated Mr. Brickell as counsel of record in case number 00-169 L on April 23, 2003 by granting a motion to substitute Mr. Pipestem for Mr. Brickell.  Order of Apr. 23, 2003, 1.  A similar motion was filed in case number 99-550 L and granted by Judge Williams on May 16, 2003.  Case No. 99-550 L, Motion to Substitute Attorney William [sic] K. Pipestem in Place of Bradley Dean Brickell; Order of May 16, 2003.

On July 1, 2003, Mr. Brickell filed a motion in case number 00-169 L on behalf of six individual headright owners seeking leave to appear as amicus curiae and to file a brief on the pending motion to dismiss.  Case No. 00-169 L, Motion for Leave to File Memorandum Brief Amicus Curiae (filed July 1, 2003).  The Osage Nation opposed the motion.  See Case No. 00-169 L, Plaintiff Osage Tribe's Opposition to Motion of Individual Osage to File Memorandum Brief Amicus Curiae (filed July 21, 2003).  The

---

[2]Prior to consolidation on May 5, 2000, see Case No. 99-550, Docket No. 12, Order of May 5, 2000, these cases have been assigned at different times to several judges.  As to case number 99-550 L, the case was assigned to Judge John P. Wiese on August 2, 1999, Notice of Assignment, Docket No. 2, to Judge Mary Ellen Coster Williams on August 15, 2003, Order Reassigning Case, Docket No. 46, and to Judge Emily C. Hewitt on September 2, 2005, Order of Reassignment, Docket No. 90.  As to case number 00-169 L, the case was assigned to Judge James T. Turner on March 31, 2000, Notice of Assignment, Docket No. 2, to Judge Wiese on May 4, 2000, Notice of Reassignment, Docket No. 4, to Judge Turner on September 15, 2000, Notice of Reassignment, Docket No. 7, and to Judge Hewitt on May 1, 2002, Notice of Reassignment, Docket No. 39.

court declared the amicus motion moot in light of its decision to deny the motion to dismiss. Case No. 00-169 L, Order of July 28, 2003.

Mr. Brickell then submitted a motion to seal a letter to Chief Gray, Motion to Place Exhibit Under Seal, which he signed as "Attorney for Proposed Amicus Curiae," Case No. 00-169 L, Motion for Leave to file Memorandum Brief Amicus Curiae 2, a motion which the Osage opposed. Plaintiff Osage Tribe's Response to Former Counsel's Motion to Place Exhibit Under Seal. The court, noting that "former counsel is not an attorney of record in the case," denied the motion to seal and stated that "[f]ormer counsel shall not file additional briefing in this case unless first granted amicus curiae status in this case or unless requested by the court." Case No. 00-169 L, Order of Aug. 27, 2003, 1.[3]

Mr. Brickell filed the proposed intervenors' motion to intervene on October 15, 2007.[4] Plaintiff filed its motion to disqualify in response. This Opinion and Order reviews the briefing submitted by plaintiff's counsel and Mr. Brickell. For the following reasons, plaintiff's motion to disqualify Mr. Brickell is GRANTED.

II.   Discussion

A.   Legal Standards

The Code of Responsibility that governs this court is the American Bar Association Model Rules of Professional Conduct (ABA Model Rules). Rules of the Court of Federal Claims (RCFC) 83.2(c)(2).[5] ABA Model Rule 1.9(a) provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." ABA Model Rule 1.9(a). ABA Model Rule 1.9(a) contains several elements, including the following: the rule applies to 1) a lawyer who once had an attorney-client relationship with a former client; 2) to

---

[3]The court does not here examine the question whether Mr. Brickell is in violation of the court's Order of August 27, 2003 in his filing of the papers which prompted plaintiff's motion to disqualify.

[4]Briefing on the motion to intervene has been stayed pending resolution of the motion to disqualify. See Order of Nov. 29, 2007.

[5]The ABA Model Rules are substantially similar to the provision of § 132 of the Restatement (Third) of Law Governing Lawyers: "a lawyer who has represented a client in a matter may not thereafter represent another client in the same or substantially related matter in which the interests of the former client are materially adverse" absent consent. Restatement (Third) of Law Governing Lawyers § 132 (2000).

prohibit representation in the same or substantially related matter when; 3) there is material adversity between the interests of the former and current clients; unless 4) the former client "gives informed consent, confirmed in writing." Id.

Several courts, including two federal appellate courts, have addressed ABA Model Rule 1.9(a) in their rulings.  In Cole v. Ruidoso Municipal Schools (Cole), 43 F.3d 1373 (10th Cir. 1994), the Tenth Circuit set out a three-pronged test for determining whether a lawyer has violated ABA Model Rule 1.9(a), which appears to the court to follow closely the terms of the rule:

> A party seeking to disqualify opposing counsel on the ground of a former representation must establish that:  (1) an actual attorney-client relationship existed between the moving party and the opposing counsel; (2) the present litigation involves a matter that is 'substantially related' to the subject of the movant's prior representation; and (3) the interests of the opposing counsel's present client are materially adverse to the movant.

Cole, 43 F.3d at 1384 (citations omitted).[6]  The court understands the omission of a reference to "the same matter," as stated in the rule, to be the use of the shorthand because "the same . . . matter" could be viewed as subsumed in the category of "substantially related matter."

The Supreme Court of New Hampshire articulated a test, one that includes four prongs and highlights the requirement addressed in ABA Model rule 1.9(a) - that the moving party did not grant informed consent to its former attorney:

> First, there must have been a valid attorney-client relationship between the attorney and the former client.  Second, the interests of the present and

---

[6]The Fifth Circuit has articulated a similar test, one the court refers to as "the 'substantial relationship' test," In re American Airlines, Inc., 972 F.2d 605, 614 (1992), containing two prongs:

> A party seeking to disqualify opposing counsel on the ground of a former representation must establish two elements:  (1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and (2) a substantial relationship between the subject matter of the former and present representations.

In re American Airlines, Inc., 972 F.2d at 614 (citations omitted).  The court, for reasons of completeness, prefers the articulation in Cole v. Ruidoso Municipal Schools (Cole), 43 F.3d 1373, 1384 (10th Cir. 1994) and Sullivan County Regional Refuse Disposal District v. Town of Acworth (Sullivan), 686 A.2d 755, 757 (N.H. 1996).

former clients must be materially adverse.  Third, the former client must not
have consented, in an informed manner, to the new representation.  Finally,
the current matter and the former matter must be the same or substantially
related.

Sullivan County Reg'l Refuse Disposal Dist. v. Town of Acworth (Sullivan), 686 A.2d
755, 757 (N.H. 1996) (citations omitted).  Consent is not an issue in this case.  There is no
consent.  The case turns on the other elements in ABA Model Rule 1.9(a).

      B.      Whether There Was a Valid Attorney-Client Relationship Between the
              Attorney and Former Client

The first prong of the test requires the court to determine whether there was a valid
attorney-client relationship between the attorney and former client.  ABA Model Rule
1.9(a); see Cole, 43 F.3d at 1384; Sullivan, 686 A.2d at 757.  It is undisputed that Mr.
Brickell was counsel of record in case number 99-550 L, which, on its face, might appear
to put beyond dispute that he "has formerly represented a client in a matter [and] shall not
thereafter represent another person in the same or a substantially related matter."  See
ABA Model Rule 1.9(a).  However, Mr. Brickell asserts that, because of changes to the
Osage Nation's constitution in 2006, the Osage Nation that he represented previously is
not the same as the one currently represented by plaintiff's counsel.  Prop. Int. Resp. 1.
Proposed Intervenors argue that "[t]he current [p]laintiff, the Osage Nation, is the
reorganized form of government pursuant to the new 'constitution' of the Osage[,] which
became operative in 2006" and that "[t]his new form of government is not the
representative body of the ultimate beneficiaries of this case, the 'closed roll' tribe of
Osage pursuant to the Act of 1906."  Id.  Plaintiff claims that "[t]here is no question that
this is the 'same . . . matter' in which Mr. Brickell had an attorney-client relationship with
the Osage Nation" because "Mr. Brickell was counsel of record for the Osage Nation in
both [cases] No. 99-550 [L] and No. 00-169 [L] from inception through the spring of
2003."  Pl.'s Mot. 7.  Plaintiff further replies that the Osage's "2006 Constitution did not
create a 'new' Osage Nation that is inconsistent with the 1906 Act and outside federal
law," Pl.'s Reply 5, but that the constitution reflects sovereign authority of the Osage
Nation "to expand its membership and change its government in 2006 without . . .
creating an entirely new entity," id.

The United States Constitution recognizes Indian tribes as sovereign governments.
Article I, § 8 of the Constitution gives Congress the power "[t]o regulate Commerce with
foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const.
art. I, § 8, cl. 3.  The Supreme Court of the United States has held that "Indian tribes are

unique aggregations possessing attributes of sovereignty over both their members and their territory." United States v. Mazurie, 419 U.S. 544, 557 (1975) (citing Worcester v. Georgia, 31 U.S. 515, 557 (1832)).  The Supreme Court further described the sovereignty of Indian tribes by stating that "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." United States v. Wheeler, 435 U.S. 313, 323 (1978).

Congress first enacted legislation specific to the Osage Nation in 1906 by passing "An Act for the Division of Lands and Funds of the Osage Indians in Oklahoma Territory, and for Other Purposes" (1906 Act).  See 34 Stat. 539; Logan v. Andrus, 640 F.2d 269, 270 (10th Cir. 1981) ("The Osage Allotment Act of June 28, 1906 set up the machinery for the administration of the Osage mineral estate and described and declared the rights vested in the individuals.").  The 1906 Act established a form of Osage government that had general authority over all tribal matters, including those involving non-shareholder Osages.  34 Stat. 544-45.  The 1906 Act states:

> [T]he roll of the Osage tribe of Indians, . . . as it existed on the first day of January, nineteen hundred and six, and all children born between January first, nineteen hundred and six, and July first, nineteen hundred and seven, to persons whose names are on said roll on January first, nineteen hundred and six, and all children whose names are not now on said roll, but who were born to members of the tribe whose names were on the said roll on January first, nineteen hundred and six, including the children of members of the tribe who have, or have had, white husbands, is hereby declared to be the roll of said tribe and to constitute the legal membership thereof . . . .

34 Stat. 539-40.  The 1906 Act further provided that "there shall be a biennial election of officers for the Osage tribe." Id. at 545.  In its interpretation of the 1906 Act, the court in Logan specifically held that the Osage's sovereign power extends beyond its authority under the 1906 Act to manage the proceeds of the mineral estate:  "The Osage Allotment Act of June 28, 1906 set up the machinery for the administration of the Osage mineral estate and described and declared the rights vested in the individuals. . . .  The statute was basically for allotments but this portion [the provision providing for the election of tribal officers] in no way limited the authority of the officers therein named to mineral administration or any other specific function." Logan, 640 F.2d at 270.

At the instance of the Osage, the 1906 Act was clarified in 2004 by "An Act to Reaffirm the Inherent Sovereign Rights of the Osage Tribe to Determine Its Membership and Form of Government" (2004 Act).  Pub. L. No. 108-431, 118 Stat. 2609 (2004).  The court finds the text of the 2004 Act to be clear on its face. See 2004 Act.  However, in

order to provide an historical context for the legislation, the court reviews aspects of its legislative history.[7]

Chief Jim Gray, then principal chief of the Osage, testified on March 15, 2004 "in strong support of this legislation." H.R. 2912, To Reaffirm the Inherent Sovereign Rights of the Osage Tribe to Determine its Membership and Form of Government:  Legislative Field Hearing Before the Comm. on Resources, 108th Cong. 15 (2004) (statement of Chief Jim Gray).  Chief Gray stated that the 2004 Act "would reaffirm the Osage Nation's inherent sovereign rights to establish its own form of government and membership criteria without diminishing the Osage mineral estate."  Id.  Chief Gray testified that, under the 1906 Act, "Osage membership for purposes of voting and eligibility for elected tribal office is limited to Osages with headrights," a mandate that Chief Gray characterized as "not Osage" because "[i]t is not of our making.  It does not reflect Osage values.  It is an imposition."  Id.  Chief Gray testified that House Resolution (H.R.) 2912, which became the 2004 Act, "would allow the Osage people to define who we are and who we will be" by enabling the Osage "the freedom to define our own citizenship, our own form of government, and our own future."  Id. at 15, 16.

The report from the House of Representatives that accompanied H.R. 2912 states: "The purpose of H.R. 2912 is to reaffirm the inherent sovereign rights of the Osage Tribe to determine its membership and form of government."  H.R. Rep. No. 108-502, at 1 (2004) (House Report).  The House Report explains that "[t]he Osage Tribe is a federally recognized tribe with a nearly 1.5 million-acre reservation in northeast Oklahoma," id., and that, "[i]n 1906, Congress enacted the [1906 Act], which is unique among federal Indian laws in that it restricts the Osage Tribe from defining its own membership rules,

---

[7]The court's use of legislative history is permissible even when the statute itself is clear on its face:

> Source materials other than intrinsic aids are considered relevant in construing statutes. Sources outside the text are known as extrinsic aids . . . [which] consist of background information about circumstances which led to the enactment of a statute, events surrounding enactment, and developments pertinent to subsequent operation.  These facts comprise the history of the statute. . . . Ambiguity is not always considered a prerequisite to the use of extrinsic aids.

2A Norman J. Singer, Sutherland Statutory Construction, § 48:1 (7th ed. 2007) (footnotes omitted); see also United States v. Am. Trucking Ass'ns, 310 U.S. 534, 543-44 (1940) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" (citations omitted)); Fed. Commc'n Comm'n v. Cohn, 154 F.Supp. 899, 910 (S.D.N.Y. 1957) (holding that the "plain meaning rule . . . is not to be used to thwart or distort the intent of Congress by excluding from consideration enlightening material from the legislative files").

and prescribes a particular form of government which the tribe cannot change," id.  The result of the 1906 Act, the House Report claims, is the exclusion of "many thousands of Osage persons from being members of the tribe because they do not have headright shares," which denies such persons "important services and benefits, such as Native American academic scholarships, and more importantly, a role in participating in the life and government of the tribe."  Id. at 2.  The House Report declares that "H.R. 2912 clarifies the 1906 Act and enables the Osage Tribe to craft its own membership and tribal government rules on the same footing as all other federally-recognized tribes."  Id. Further, the House Report states that "[t]he bill provides that no one's rights to shares in the mineral estate are diminished through the Osage Tribe's new ability to determine its own membership," id., and the House Report points out that "a representative of an association of headright owners [Robert E. Yarbrough, then chairman of the Osage Shareholders Association] testified in support of the legislation," id.

The discussion of H.R. 2912 on the floor of the House of Representatives further places the bill in its historical context.  When introducing H.R. 2912 in the House of Representatives, Representative Gibbons stated that "[t]his legislation would put the Osage Tribe on the same footing as every other sovereign, federally recognized tribe in the United States in terms of defining its own membership criteria and its form of government."  150 Cong. Rec. H3562, H3562 (2004).  Representative Gibbons explained that "[u]nder the [1906 Act], as interpreted by subsequent Federal court decisions, the only legal members of the Osage Tribe are the lineal descendents of those Osage persons living before July 1, 1907, who also possess what is called a 'headright share' . . . [which] had the unfortunate result of excluding people who have a high degree of Osage blood from membership in the tribe."  Id.  The purpose of the bill, Representative Gibbons stated, was to enable "the tribe . . . [to] determin[e] its membership and form of government" and to "decide how to govern itself as it sees fit."  Id.  Representative Gibbons further stated that the bill "includes language to ensure that no one's interest in headright shares is touched" and that "there is no intent to affect them [headright owners] under this bill."  Id.

The 2004 Act affirms the sovereignty of the Osage Tribe:

Congress hereby reaffirms the inherent sovereign right of the Osage Tribe to determine its own membership, provided that the rights of any person to Osage mineral estate shares are not diminished thereby . . . [and] the inherent sovereign right of the Osage Tribe to determine its own form of government.

8

2004 Act § 1(b)(1)-(2) (emphasis added).  The 2004 Act clarifies the distinction between "legal" membership in the Osage Nation as defined in the 1906 Act (for the purpose of determining which individuals would receive surface land allotments and the right to monies derived from the tribal mineral estate) and membership in the Osage Nation granted by the Nation itself as a sovereign.  The 2004 Act states that "the term 'legal membership' in section 1 of the [1906 Act] . . . means the persons eligible for allotments of Osage Reservation lands and a pro rata share of the Osage mineral estate [proceeds] as provided in that [1906] Act, not membership in the Osage Tribe for all purposes."  Id. at § 1(b)(1).

The court reads the 1906 Act and 2004 Act together as recognizing two kinds of membership in the Osage Nation:  "legal" and "for all purposes."  However, there is only one Osage Nation.  The Osage Nation has the sovereign power to determine its own membership "for all purposes" and to determine its own form of government, and that government is the beneficiary of the Osage mineral estate and tribal trust fund account created by the 1906 Act.  See 34 Stat. 545; 2004 Act § 1(b)(1)-(2).  Notably, the 2004 Act recognizes the Osage Nation's pre-existing sovereign power to adopt measures such as the 2006 Constitution without ceasing to be the trust beneficiary named in the 1906 Act:

> (b) Reaffirmation of Certain Rights of the Osage Tribe.
>
> (1) Membership.  Congress hereby clarifies that the term "legal membership" in section 1 of the [1906 Act] . . . means the persons eligible for allotments of Osage Reservation lands and a pro rata share of the Osage mineral estate as provided in that Act, not membership in the Osage Tribe for all purposes.  Congress hereby reaffirms the inherent sovereign right of the Osage Tribe to determine its own membership, provided that the rights of any person to Osage mineral estate shares are not diminished thereby.
>
> (2) Government. . . . Congress hereby reaffirms the inherent sovereign right of the Osage Tribe to determine its own form of government.

2004 Act § 1(b)(1)-(2).

Having determined that the Osage's right to sovereignty includes the right "to determine its own membership" and "its own form of government," the court now turns to the identities of the Osage and the proposed intervenors.  In the proposed intervenor's briefing, Mr. Brickell refers to the proposed intervenors, eight individual Osages, as "the exact same parties" he formerly represented in case numbers 99-550 L and 00-169 L.

Prop. Int. Resp. 7; see also id. at 2-3, 9, 10. By so doing, however, Mr. Brickell is attempting to define the "Osage Nation" as certain individuals rather than an entity. Mr. Brickell's former clients are the Osage and the Osage Nation (both referred to in this consolidated case as the Osage). The Osage is not comprised of individual headright owners only. The 2004 Act recognizes two types of membership within the Osage but it does not create a new entity. An Indian tribe recognized by federal law is not created or destroyed merely because the types of membership recognized within the tribal government are clarified. As another court has stated, "[A] tribe is not a static group. Its existence is preserved by new generations succeeding to membership. Though the membership changes, the tribe is potentially forever." United States v. 43.47 Acres of Land, 855 F. Supp. 549, 551 (D. Conn. 1994).

Mr. Brickell further argues that "the Osage Tribe, as it existed until 2006, was, by definition, a closed roll tribe consisting of only those persons owning a share or headright interest, as defined in the 1906 Act." Prop. Int. Resp. 2 (emphasis omitted). According to Mr. Brickell, the definition of the Osage Nation changed with the tribe's adoption of a new constitution in 2006. Id. at 1; see Transcript of Oral Argument, Feb. 5, 2008 (Feb. 5, 2008 Tr.) 25:3-26:18. Mr. Brickell states that, prior to his filing case numbers 99-550 L and 00-169 L, he "was hired by the council elected solely by the headright owners to represent their constituency and their members." Feb. 5, 2008 Tr. 22:20-22. Mr. Brickell claims that, at that time, the Osage Tribe "had standing to prosecute this case . . . because of the powers of [the council elected by the headright owners] that were given to govern the Osage shareholders and prosecute the case on their behalf." Id. at 25:6-9. Mr. Brickell argues that the current plaintiff differs from what he understood to be the Osage Tribe when he was counsel of record, stating that "[t]he current government of the Osage . . . is not elected by the shareholders . . . but is elected by all the Osage people as a whole." Id. at 25:10-15. Thus, he asserts, "There is no current form of government that is under the 1906 Act representative of only the Osage shareholders. . . . [T]herefore, it is not the same client that I represented back in 2002." Id. at 25:16-20.

However, Mr. Brickell's argument is contradicted both by his own prior statements and by the text of the 2006 Constitution itself. The 2006 Constitution provides that the mineral estate is reserved to the Osage Nation itself, not to the headright owners:

> The Mineral Estate of the Osage Reservation is reserved to the Osage Nation. The government of the Osage Nation shall have the perpetual obligation to ensure the preservation of the Osage Mineral Estate. The government shall further ensure that the rights of members of the Osage Nation to income derived from that Mineral Estate are protected.

2006 Const. art. XV, § 4.  When an asset is said to be "reserved" to an entity, it is "retained or stored for future use."  Black's Law Dictionary 1334 (8th ed. 1999). Reserved rights are created and defined by federal law, and federal courts may determine those rights.  Cohen's Handbook of Federal Indian Law, § 19.05 (Nell Jessup Newton et al. eds., 2005); see also  Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 805 (1976) ("The reserved rights of the United States extend to Indian reservations . . . and other federal lands . . . " (citations omitted).); Winters v. United States, 207 U.S. 564, 576-77 (1908) (holding that the United States reserved water rights to a number of Indian tribes when it created reservations for those tribes).

Mr. Brickell's current argument is also contradicted by his previous statements made in both case number 99-550 L and case number 00-169 L.  Soon after Mr. Brickell had filed the complaint in case number 00-169 L, the government filed Defendant's Motion to Dismiss challenging, among other things, the Osage Nation's standing to recover the proceeds of the Osage mineral estate.  See Case No. 00-169 L, Defendant's Motion to Dismiss 27-30 (filed July 25, 2001).  Defendant argued in its July 25, 2001 motion to dismiss that "[a]ny claims for royalties . . . must be brought by the true owners of such claims, the headright owners themselves."  Id. at 30.  Plaintiff, represented by Mr. Brickell at that time, opposed the motion to dismiss.  Case No. 00-169 L, Plaintiff's Response to Defendant's Motion to Dismiss (filed Oct. 24, 2002).  In plaintiff's October 24, 2002 response to defendant's July 25, 2001 motion to dismiss, Mr. Brickell argued that "the Tribe initially receives all royalty income (as the Tribe itself in fact owns the mineral interests) and for a time holds the funds until they are distributed as required by law." Id. at 13 n.7 (emphasis and citation omitted).  Mr. Brickell criticized the government's "sophistic argument . . . that the headright owners own all Osage minerals," id. at 14, and argued that "it is the Osage Nation itself which owns the beneficial interest in the minerals," id. at 15.

While the government's motion to dismiss in case number 00-169 L was pending, the government raised its standing argument in case number 99-550 L at a status conference with Judge Wiese on January 23, 2003.  Transcript of Status Conference, Jan. 23, 2003 (Jan. 23, 2003 Tr.) 6:23-7:7.  During that status conference, Judge Wiese questioned Mr. Brickell about "the underlying legal relationship between the individual [headright owner] and The Tribe that permits The Tribe to be a representative."  Id. at 63:20-22.  Mr. Brickell explained that "it's through the various acts of Congress and the tribal government itself, and the way it was set up pursuant to those Acts," id. at 63:23-25, and he argued that "with regard to The Osage . . . , the tribal body itself is the elected government, just like the United States can prosecute claims on behalf of its citizens . . . because of the way the procedure was set up in 1906," id. at 64:13-18 (emphasis added). Judge Wiese did not rule on the issue at the status conference, choosing instead to wait

until this court filed its opinion in case number 99-550 L.  Id. at 67:11-13 ("If we can make a non[-]problem out of this, why not do that? . . . Let me read the decision [in case number 99-550 L] when it comes down.").

On March 13, 2003, Judge Wiese held another status conference in case number 99-550 L, and Mr. Brickell argued that the tribe had standing to sue because "the minerals always remained as an undivided whole owned by the tribe."  Transcript of Status Conference, Mar. 13, 2003 (Mar. 13, 2003 Tr.) 15:15-16.  Mr. Brickell also asserted that the "minerals . . . are and always have been since 1906 owned undivided by the tribe," id. at 15:22-24, and that "the legislative intent [in the 1906 Act], obviously, was that those [minerals] were to be owned by the tribe," id. at 15:5-7; accord id. at 14:11-15 ("[T]he intent of Congress was . . . that the oil, gas, coal or other minerals are to be owned by the tribe.").  Judge Wiese agreed with Mr. Brickell's argument and asked Mr. Brickell to withdraw the motions to intervene and amend and to file a revised motion and draft complaint with the Osage Nation and the Osage Tribe Council as co-plaintiffs.  Id. at 16:14-18; 17:16-20; 22:10-13.

Mr. Brickell made similar arguments in case number 99-550 L before this court. In a status conference held August 9, 2002, Mr. Brickell stated that "the tribe does have the authority to prosecute this kind of case . . . and any money damages that this Court might award as a result of trial of the matter . . . would inure to the ultimate benefit of the tribe's account."  Transcript of Aug. 9, 2002 (2002 Tr.) 30:5-11 (emphasis added).  When the court asked Mr. Brickell about the relationship between the headright owners and the "Osage Nation," Mr. Brickell answered:

> Today the tribe has more members and some of the members with Osage blood do not own a head right.  The tribe considers them to be a part of the Osage but not the part of the tribe that inures to the benefit of the resources which are held in trust by the government pursuant to the 1906 Act and subsequent legislation.

Id. at 31:10-15 (emphasis added).

This court filed its opinion on the issue of standing on July 28, 2003 and ruled that "the Tribe, not the headright holders, is the direct trust beneficiary."  Osage Nation v. United States, 57 Fed. Cl. 392, 395 (2003) (citation and footnote omitted).  Specifically, the court stated:

> The court finds that, under the terms of the 1906 Act relating to the tribal
> trust fund, there is sufficient injury to the Tribe to establish standing.  The

mineral royalties at issue go first into a tribal trust fund account where they stay for at least one quarter of a calendar year before being transferred to individual headright owners.  The responsibility of the government is to the tribal trust fund account.  The tribal trust fund is then responsible for the ultimate distribution to the individual headright owners.  Importantly, the alleged mismanagement of the mineral royalties is described as taking place when the funds were within the tribal trust fund.  The mismanagement is not alleged to take place at the point of distribution of the funds to the individual headright holders.  Although the Tribe may have no further interest or claim to the funds once they are distributed to the headright owners, the court finds that the Tribe does have both an interest in and a claim to the funds when those funds are within the tribal trust account that was established by the 1906 Act.  Moreover, defendant's concern that any damages awarded to the Tribe would not "flow down" to the headright holders is addressed in the first subsection of Section 4 of the 1906 Act which requires that "all moneys found to be due said Osage tribe of Indians on claims against the United States, after all proper expenses are paid, shall be . . . placed to the credit of the individual members of the said Osage tribe on a basis of a pro rata division . . . ."  34 Stat. 539, 544 § 4(1).

Id. at 395 (citations omitted) (alteration in original).

Because the Osage is the direct trust beneficiary, and because the "Osage" has included and continues to include all members of the Osage tribe, not merely the headright owners, the court finds that the "Osage" as represented by Mr. Brickell from the time of filing case numbers 99-550 L and 00-169 L to the present day is the same "Osage."  The court determines that there was a valid attorney-client relationship between Mr. Brickell and the Osage.  Therefore, the first prong of the Sullivan and Cole tests for determining a violation of ABA Model Rule 1.9(a) is satisfied.

C.  Whether the Interests of the Current and Former Clients are Materially Adverse

The second prong of the Sullivan test and the third prong of the Cole test requires the court to determine whether the interests of the current and former clients are materially adverse.  Plaintiff argues that the interests of the proposed intervenors are materially adverse to those of the Osage Nation.  Pl.'s Mot. 8-11; Pl.'s Reply 7-9. Plaintiff states that the proposed intervenors' positions are adverse to the Osage Nation in three ways:  "(1) the proposed intervenors claim to own the Osage mineral estate, contrary to the Osage Nation's position (as previously articulated by Mr. Brickell himself); (2) the proposed intervenors attack the Court's ruling on standing (for which

Mr. Brickell himself advocated); and (3) the Osage Nation opposes the [proposed intervenors' motion to intervene]."  Pl.'s Mot. 8.

The proposed intervenors argue that "there has been no showing that the positions taken by the Proposed Intervenors against the United States herein is 'materially adverse' to that of the Osage Nation (even if it was a former client)."  Prop. Int. Resp. 4-5.  The court disagrees.  Indeed, the proposed intervenors state that "the claims by the Osage Nation that it owns the minerals is not being litigated in the instant proceeding," id. at 5, and the proposed intervenors state that no "confidential or privileged information [was] revealed or discussed with the undersigned counsel by the new Osage Nation at any time that will prejudice its case herein against the United States," id.  Both of these arguments depend for any force that they may have on a determination that there is no continuity of identity between the Osage when the complaints were filed in 1999 and in 2000 and the Osage today.

On the contrary, the court finds that the Osage before it today is the same as the Osage that filed the complaints in both case number 99-550 L and case number 00-169 L. Morever, the proposed intervenors simply ignore the fact that the Osage obtained an opinion stating that the Osage were the owners of the minerals in the "instant proceeding."  See Osage Nation, 57 Fed. Cl. at 392.  The proposed intervenors also ignore the fact that they admitted that privileged information was communicated to Mr. Brickell by the Osage.  Feb. 5, 2008 Tr. 52:11-15 (Mr. Brickell stating that "in the case of confidential information and in the telephonic hearing[,] I say have confidential information and it is not materially adverse to the Plaintiff").  Indeed, the proposed intervenors do not even attempt to deny that privileged information was revealed by plaintiff to Mr. Brickell at the time that Mr. Brickell was counsel of record in case numbers 99-550 L and 00-169 L.  Prop. Int. Resp. passim; Feb. 4, 2008 Tr. passim.

The court finds that Mr. Brickell, as counsel for the proposed intervenors, does indeed argue for positions that are adverse to plaintiff.  At the present time, Mr. Brickell advocates a position that is contradictory to the position he took in previous proceedings in this case and is adverse to the interest of the Osage.  Whereas Mr. Brickell now argues that the headright owners are "the ultimate beneficiaries of this case," Prop. Int. Resp. 1, he has represented in the past that the tribe itself owns the beneficial interest in the minerals.  For example, in case number 00-169 L, Mr. Brickell countered defendant's argument that "the headright owners own all Osage minerals" by stating that "it is the Osage Nation itself which owns the beneficial interest in the minerals."  Case No. 00-169 L, Plaintiff's Response to Defendant's Motion to Dismiss and Brief in Support 15.  In that same brief, Mr. Brickell again asserted that "[c]learly[,] it is the Osage Tribe [that] . . . in 1883 . . . received title to the Osage mineral estate."  Id. at 15.  Mr. Brickell also

14

explained that "the Tribe initially received all royalty income (as the Tribe itself in fact owns the mineral interests) and for a time holds the funds until they are distributed [to headright owners] as required by law." Id. at 12 n.7.  During argument before Judge Wiese, Mr. Brickell again asserted the position that he had taken in the briefs.  In response to Judge Wiese's question regarding the "underlying legal relationship between the individual [headright owner] and The Tribe that permits The Tribe to be a representative," Jan. 23, 2003 Tr. 63:20-22, Mr. Brickell answered that, under the 1906 Act, "the tribal body itself is the elected government, just like the United States can prosecute claims on behalf of its citizens," id. at 64:14-18.

Mr. Brickell made similar representations before this court in case number 00-169 L.  During a status conference held on August 9, 2002, in response to the court's inquiry about "whether or not the tribal plaintiff has standing to prosecute claims on behalf of the [headright] owners," 2002 Tr. 29:25-30:2, Mr. Brickell stated:

> I think we have clear legislative and case law authority that[,] for virtually over 100 years[,] . . . the tribe does have the authority to prosecute this type of case. . . .  Any money damages that this Court might award as a result of trial of the matter . . . would inure to the ultimate benefit of the tribe's account.

Id. at 30:3-11.  The court then asked Mr. Brickell about the relationship between the headright owners and the "Osage Nation," id. at 31:3-7, and Mr. Brickell responded:

> In 1906[,] the Osage Nation consisted of a tribe with 2,229 [members - the headright share owners].  Today[,] the tribe has more members[,] and some of the members with Osage blood do not own a [headright].  The tribe considers them to be part of the Osage . . .

Id. at 31:9-12.  During oral argument held on April 3, 2003, Mr. Brickell again stated that the entire tribe, not merely the headright owners, would recover any damages awarded in the case.  Specifically, Mr. Brickell stated:

> The most important thing I wanted to say, Judge, was we've got this issue of who recovers here totally resolved.  There is no issue as to well, does all the money go to the tribe if the tribe recovers here.  It is very clear in the 1906 Act.
>
> . . . .

15

It's Chapter 3572 out of the 59th Congress. It couldn't be clearer. "All monies found to be due to said Osage Tribe on claims against the United States after expenses are paid shall be placed to the credit of the individual members of the tribe on a prorata division . . .", and then it gets into the headrights situation. "All royalty received from oil and money received from town lots shall be placed in the Treasury to the credit of the members of the Osage Tribe." I mean, it's a non-issue, Your Honor.

2003 Tr. 131:3-7, 16-25.

Mr. Brickell now argues that the headright owners are "the ultimate beneficiaries of this case," Prop. Int. Resp. 1, but he previously presented in briefings and oral arguments before both Judge Hewitt and Judge Wiese that the Osage Nation is the proper beneficiary of this case. He has argued that "it is the Osage Nation itself which owns the beneficial interest in the minerals," Case No. 00-169 L, Plaintiff's Response to Defendant's Motion to Dismiss 15, and that "the Tribe initially received all royalty income (as the Tribe itself in fact owns the mineral interests) and for a time holds the funds until they are distributed [to headright owners] as required by law," id. at 13 n.7 (emphasis and citation omitted); see also Jan. 23, 2003 Tr. 64:14-18 (arguing that the "underlying legal relationship between the individual [headright owner] and The Tribe . . . permits The Tribe to be a representative," and that, under the 1906 Act, "the tribal body itself is the elected government, just like the United States can prosecute claims on behalf of its citizens").

Mr. Brickell's argument thus attempts to undermine the court's previous ruling sought by Mr. Brickell himself that the Osage Nation has standing to bring the case. Osage Nation, 57 Fed. Cl. at 392 (holding that "under the terms of the 1906 Act relating to the tribal trust fund, there is sufficient injury to the Tribe to establish standing").

Also related to the "materially adverse" prong is Mr. Brickell's argument that ABA Model Rule 1.9(a) "has never been applied to exclude an attorney from representation of an additional or new client against a common Defendant." Prop. Int. Resp. 11 (emphasis omitted). If there is, as Mr. Brickell claims, an absence of authority on the subject, it may well be because the arguments he presents have not been set forth in other cases. Mr. Brickell is incorrect to characterize his attempts to represent the headright owners as "representation of an additional or new client against a common Defendant." In this case, the fact is that Mr. Brickell was terminated as counsel for the plaintiffs by the plaintiffs themselves. The parties have not cited, and the court has not found, any cases that present facts similar to the facts in this case: a terminated attorney who attempts to intervene in the very case in which his representation was terminated.

Nevertheless, and contrary to the gravamen of Mr. Brickell's assertions, ABA Model Rule 1.9(a) has excluded an attorney from representing a single client in the same case in which that attorney previously represented that client and a second client. The United States Court of Appeals for the Third Circuit has held that counsel representing two co-plaintiffs, one of whom chooses to settle and the other who does not, may not withdraw from one client and represent the other only. In In re Corn Derivatives Antitrust Litigation, 748 F.2d 157 (3d Cir. 1984), a group of attorneys representing two companies, Pan-O-Gold and Land O'Lakes, tried to maintain its representation of Pan-O-Gold once that company had chosen to accept the settlement but Land O'Lakes objected to settlement. Id. at 159-60. Land O'Lakes filed a motion to disqualify counsel under ABA Model Rule 1.9(a), and the Third Circuit held that, although recognizing the "interests of Pan-O-Gold in retaining its chosen counsel," those interests had to yield to "Land O'Lakes' interests in the loyalty of its [former] attorney." Id. at 162. The court found that the lawyers had violated their duty of loyalty to Land O'Lakes by continuing to represent Pan-O-Gold. Id. at 161. Specifically, the court stated that "[a] client has an expectation that the attorney will diligently pursue his goals until the matter is completely resolved, absent an effective waiver. In litigation, an attorney may not abandon his client and take a[n] adverse position in the same case." Id. It is the court's view that a similar rule should apply with even greater force if the attorney was, as here, terminated. Other courts have disqualified counsel from representing additional or new clients against a common defendant. See, e.g., United States v. Cooley, 243 F.Supp. 2d 329, 333 (2003) (holding that a defense attorney could not represent a criminal defendant in a case in which the government planned to call as witnesses two individuals that the attorney had represented in other proceedings).

Furthermore, a plain-language reading of ABA Model Rule 1.9(a) demonstrates that the rule's requirement for "materially adverse" interests are not limited to plaintiff-defendant adversity. The rule plainly states that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." ABA Model Rule 1.9(a). The rule provides that a lawyer cannot represent "another person," not necessarily the opposing party, in "the same or a substantially related matter" so long as that person's "interests are materially adverse to the interests of the former client." Id.

Mr. Brickell's present arguments regarding the headright owners' claims to the Osage minerals and the standing of the Osage to bring this suit are materially adverse to plaintiff's interests. The requirement under ABA Model Rule 1.9(a) for "materially adverse" interests are not limited to plaintiff-defendant adversity. See ABA Model Rule

1.9(a).  For the foregoing reasons, the court finds that the proposed intervenors' interests are materially adverse to those of plaintiff.

      D.      Whether the Current Matter and Former Matter are the Same or Substantially Related

The court finds that there is no question that this case is the "same . . . matter" in which Mr. Brickell had an attorney-client relationship with the Osage Nation.  Mr. Brickell was counsel of record for the Osage Nation in both case numbers 99-550 L and 00-169 L from the inception of the lawsuits through the spring of 2003, the same cases into which he now attempts to re-insert himself by representing the proposed intervenors. Because Mr. Brickell is proposing to represent another party in the same cases in which he previously represented plaintiff, the court finds that ABA Model Rule 1.9(a) bars the representation.

      E.      Proposed Intervenors' Argument that Oklahoma State Law Applies and Requires an Evidentiary Hearing

The proposed intervenors argue that Oklahoma state law applies to plaintiff's motion to disqualify Mr. Brickell.  See Prop. Int. Resp. 3-6.  They state that "[t]he procedure for disqualification under [ABA Model] Rule 1.9 must follow the requirements of Piette v. Bradley & Leseberg, 1996 OK 124, 930 P.2d 183," id. at 5, but they give no support for the contention that this court is bound by Oklahoma state law.  Rather, the proposed intervenors quote Bayside Federal Savings & Loan Ass'n v. United States (Bayside), 57 Fed. Cl. 18 (2003) (citing Tannahill v. United States, 25 Cl. Ct. 149, 160-61 (1992) (emphasis omitted and second emphasis added)) and state:  "In evaluating a disqualification motion, the Court of Federal Claims is guided by the Model [R]ules of Professional Conduct of the American Bar Association, the Rules of Professional Conduct of the Bar to which the attorney at issue is admitted to practice, and relevant case law."  Prop. Int. Resp. 3.

The proposed intervenors' reliance on Bayside and Tannahill is misplaced.  As an initial matter, neither of those cases addressed ABA Model Rule 1.9(a).  Bayside concerned a motion to disqualify an attorney under ABA Model Rule 3.7, which states that an attorney "shall not act as an advocate of a trial in which the lawyer is likely to be a necessary witness."  Bayside, 57 Fed. Cl. at 19 (quoting ABA Model Rule 3.7).  The attorney in question was a member of the Texas bar, and the court found that the analogous provisions under Texas law "apply substantially similar standards to whether an attorney should be disqualified for his role as a necessary witness in the underlying dispute."  Id. at 20.  The court then determined that, because the ABA Model Rule 3.7 is

substantially similar to the Texas rule, and because the attorney is licensed in Texas, that the Texas law would govern the court's analysis. Id. at 21.

Tannahill involved a motion to disqualify an attorney under ABA Model Rule 4.2, which addresses communications made by counsel. Tannahill, 25 Cl. Ct. at 161; see ABA Model Rule 4.2 ("In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."). The court found that ABA Model Rule 4.2 was "substantially similar" to Rule 4.2 of the Rules of Professional Conduct of the Supreme Court of Louisiana, Tannahill, 25 Cl. Ct. at 161, and conducted its analysis relying on federal, not Louisiana, case law, id. at 161-168. Neither Bayside nor Tannahill is binding or persuasive with respect to the court's analysis of ABA Model Rule 1.9(a).[8]

Mr. Brickell expands his argument about the application of Oklahoma law to argue that the court must hold an evidentiary hearing before ruling on plaintiff's motion to disqualify. He cites an order filed by the Supreme Court of Oklahoma to support his argument that "the district court . . . [must] hold a[n] evidentiary hearing" and that "if it is determined that a part[y's] attorney should be disqualified, this disqualification order must include specific factual finding that the attorney had knowledge of material and confidential information." Prop. Int. Resp. 5 (emphasis omitted) (citing Piette v. Bradley & Leseberg (Piette), 930 P.2d 183 (Okla. 1996); Prospective Investment & Trading Co. v. GBK Corp. (Prospective Investment), 60 P.3d 520 (Okla. Ct. App. 2002)). Plaintiff argues that the order issued in Piette "is of no relevance" in this case because it makes no mention of ABA Model Rule 1.9(a) nor Oklahoma Rule 1.9(a): "It provides no statement of facts regarding the decision on review, and it cites without explanation two cases involving [ABA Model] Rule 1.10." Pl.'s Reply 10-11. With regard to Mr. Brickell's citation of Prospective Investment, plaintiff argues that the court in that case "incorrectly viewed Piette as binding precedent in the context of 1.9(a)," Pl.'s Reply 11, even though that court "noted that its obedience to Piette violated the established principle that 'to hold a hearing when disqualification is sought solely under Rule 1.9 would frustrate the reason underlying the rule,'" id. (citing Prospective Trading, 60 P.3d at 525 n.1).[9]

_____

[8]The court in Bayside did not explain its decision to rely upon Texas law, and this court is not persuaded by its doing so.

[9]If it were proper to consider Oklahoma Rule 1.9(a), codified at Rule 1.9(a) of Title 5, Chapter 1, Appendix 3-A of the Oklahoma Statutes, that rule is substantially similar to ABA Model Rule 1.9(a). As of January 1, 2008, the Oklahoma state rule reads:

(continued...)

As an initial matter, the court is not required to follow Oklahoma law because Oklahoma law is not binding on this court.  The parties have not identified, and the court is not aware of, any authorities binding on this court and addressing the question of whether the Court of Federal Claims must take state law into account when determining a motion to disqualify under its own rules and ABA Model Rule 1.9(a).  Other federal appellate courts do not appear to consider state law when a motion to disqualify is before them unless the rules of the district court so direct.  The Fifth Circuit, for instance, considers motions to disqualify counsel to be "substantive motions" that must be "decided under federal law."  Federal Deposit Ins. Corp. v. U.S. Fire Ins. Co., 50 F.3d 1304, 1312 (5th Cir. 1995).  The Tenth Circuit considered Utah state law when it adjudicated an appeal of a disqualification of a lawyer in a case that arose in Utah because "[t]he Rules

---

[9](...continued)

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Okla. Stat. Ann. tit. 5, chap. 1, app. 3-A, Rule 1.9(a) (2008).  Oklahoma Rule 1.9(a) now is identical to ABA Model Rule 1.9(a).  ABA Model Rule 1.9(a) provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

ABA Model Rule 1.9(a).  Prior to January 1, 2008, and at the time that the proposed intervenors submitted their response to defendant's motion, see Prop. Int. Resp. 4, Oklahoma Rule 1.9(a) read:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

Okla. Stat. Ann. tit. 5, chap. 1, app. 3-A, Rule 1.9(a) (2007) (expired Oklahoma Rule 1.9(a)).  The only difference between the language of the ABA Model rule 1.9(a) and the expired Oklahoma Rule 1.9(a) is the type of consent required in the circumstance that the lawyer's former client consents to the lawyer's representing another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client.  Specifically, ABA Model Rule 1.9(a) requires the former client to give informed consent in writing, while expired Oklahoma Rule 1.9(a) did not specify that the former client give informed consent nor submit his or her consent in writing, but instead required that the "former client consents after consultation."  Because there is no dispute that the Osage Nation did not provide any sort of consent, whether it be "informed consent, confirmed in writing," "consent[] after consultation," or otherwise, to Mr. Brickell's representing the proposed intervenors, the court's analysis under ABA Model Rule 1.9(a) is exactly the same as it would be under either the current Oklahoma Rule 1.9(a) or expired Oklahoma Rule 1.9(a).  The proposed intervenors have failed to meet the requirement of the rule.

20

of Practice of the District of Utah provide that '[a]ll attorneys practicing before this court . . . shall be governed by and shall comply with the rules of practice adopted by this court . . . and the Utah Rules of Professional Conduct.'" <u>SLC Ltd. V v. Bradford Group West, Inc.</u>, 999 F.2d 464, 466 (10th Cir. 1993) (alterations in original).

The Code of Responsibility that governs the conduct of attorneys practicing before this court is the ABA Model Rules, <u>see</u> RCFC 83.2; Part II.A <u>supra</u>, which do not direct this court to consider state rules or case law when determining whether or not to disqualify an attorney for a materially adverse conflict of interest.  Under ABA Model Rule 1.9(a), there is no requirement for an evidentiary hearing, and the court does not find Mr. Brickell's arguments to the contrary persuasive.  Therefore, the court determines that no evidentiary hearing will be held on plaintiff's motion to disqualify.

III.    Conclusion

For the foregoing reasons, plaintiff's motion to disqualify is GRANTED.  Mr. Brickell is disqualified as counsel for proposed intervenors.  Proposed intervenors shall, if they wish to pursue their Motion to Intervene and Amend Complaint, retain other counsel who shall file an appearance with the court on or before June 2, 2008.


IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge