66 Cong. Ch. 120, March 3, 1921, **41 Stat. 1249**

UNITED STATES STATUTES AT LARGE
66TH CONGRESS - 3RD SESSION
Convening December 6, 1920

An Act

To amend section 3 of the Act of Congress of June 28, 1906, entitled An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes.

March 3, 1921

41 Stat. 1249-1251

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

extended for the further and additional period of twenty-five years from the date of this Act: *Provided, however,* That the Secretary of the Interior may, with or without application of the Indian owner, remove such restrictions, wholly or in part, after he has found such Indian owner to be as competent as the average white man to conduct his own business affairs with benefit to himself, under such rules and regulations as he may prescribe in regard thereto, and concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians: *Provided further,* That all said lands allotted to or inherited by the Quapaw Indians may, when subject to restrictions against alienation, be leased for mining purposes for such period of time and under such rules, regulations, terms, and conditions only as may be prescribed by the Secretary of the Interior, and said lands while restricted against alienation may be leased for mining purposes only as provided herein: *And provided further,* That the production of minerals on said lands may be taxed by the State of Oklahoma in all respects the same as that produced on unrestricted lands, and the Secretary of the Interior is hereby authorized and directed to cause to be paid from out of the individual Indian funds held under his supervision, belonging to the Indian owner of the land, the tax so assessed against the royalty interests of the respective Indian owner in such production: *Provided, however,* That such tax shall not become a lien or charge of any kind or character against the land or other property of said Indian owner.

*Provisos.* Removal if Indian owner be found competent.

Mining leases permitted on restricted allotments.

State tax, allowed on mineral produced.

Payment.

Not a lien on property of Indian.

SEC. 27. That the Secretary of the Interior be, and he is hereby, authorized and directed to pay to Clarence W. Turner and Mrs. William B. Hord, widow of William B. Hord, deceased, one-half to each, out of any funds in the Treasury of the United States belonging to the Creek Nation, the sum of $6,967.50, being in full settlement of the claim of the said Clarence W. Turner and William B. Hord, deceased, against the said Creek Nation growing out of services performed by them under an act of the National Council of the Creek Nation approved January 31, 1895.

Clarence W. Turner and Mrs. William B. Hord. Payment to, from Creek funds.

Approved, March 3, 1921.

---

March 3, 1921. [S. 4039.] [Public, No. 360.]

CHAP. 120.—An Act To amend section 3 of the Act of Congress of June 28, 1906, entitled "An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes."

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all that part of the Act of June 28, 1906 (Thirty-fourth Statutes at Large, page 539), entitled "An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes," which reserves to the Osage Tribe the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is made in that Act is hereby amended so that the oil, gas, coal, or other minerals covered by said lands are reserved to the Osage Tribe for the period ending April 7, 1946: *Provided,* That all valid existing oil and gas leases on the 7th day of April, 1931, are hereby renewed upon the same terms and extended, subject to all other conditions and provisions thereof, until the 8th day of April, 1946, and as long thereafter as oil or gas is found in paying quantities, and the Secretary of the Interior and the Osage Council are hereby authorized and directed to offer for lease for oil and gas purposes all of the remaining portion of the unleased Osage land prior to April 8, 1931, offering the same annually at the rate of not less than one-tenth of the unleased area.

Osage Indians, Okla. Oil, etc., lands reserved to, for further 25 years.

*Proviso.* Existing oil and gas leases extended.

Unleased land to be offered for oil and gas leases.

SEC. 2. That the bona fide owner or lessee of the surface of the land shall be compensated, under rules and regulations prescribed by the

Surface owners to be paid for damages from mining operations.

ceived by the Osage Tribe of Indians as royalties from production of oil and gas, the per centum levied as gross production tax, to be distributed as provided by the laws of Oklahoma: *Provided*, That the Secretary of the Interior is hereby authorized and directed to pay, through the proper officers of the Osage Agency, to Osage County, Oklahoma, an additional sum equal to 1 per centum of the amount received by the Osage Tribe of Indians as royalties from production of oil and gas, which sum shall be used by said county only for the construction and maintenance of roads and bridges therein: *Provided further*, That the proper officials of Osage County shall make an annual report to the Secretary of the Interior showing that said fund has been used for road and bridge construction and maintenance only.

*Provisos.* Payment to Osage County for roads and bridges, from royalties.

Report on use of fund.

Approved, March 3, 1921.

---

March 3, 1921. [S. 5023.] [Public, No. 361.]

**CHAP. 121.**—An Act To provide for the closing of Cedar Road between Quincy Street and Shepherd Street northwest, in the District of Columbia.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the commissioners are hereby authorized to close Cedar Road between Quincy Street and Shepherd Street northwest, in the District of Columbia.

District of Columbia. Cedar Road NW., to be closed.

Approved, March 3, 1921.

---

March 3, 1921. [H. R. 2328.] [Public, No. 362.]

**CHAP. 122.**—An Act Relating to the title to land to be acquired as a site for a post-office building at Spring Valley, Illinois.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Secretary of the Treasury is hereby authorized, in his discretion, in the acquisition, by purchase, condemnation, or otherwise, of a suitable site for a post office at Spring Valley, Illinois, pursuant to authority granted by the public building Act, approved March 4, 1913 (Thirty-seventh Statutes at Large, Sixty-second Congress, third session, page 877), to accept title to land reserving or excepting all ores or minerals on or in such lands, with the rights of mining the same.

Spring Valley, Ill. Purchase of site for post office authorized at. Vol. 37, p. 877.

Title reserving minerals may be accepted.

Approved, March 3, 1921.

---

March 3, 1921. [H. R. 12045.] [Public, No. 363.]

**CHAP. 123.**—An Act To provide for the conveyance of lots on the low grounds of Washington, District of Columbia.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That in carrying into effect the provisions of the Act of July 1, 1879, entitled "An Act to provide for the conveyance of the low grounds in the city of Washington, under the provisions of the Act of Congress approved May 7, 1822" (Twenty-first Statutes, page 47), the Secretary of the Interior be, and he hereby is, authorized at his discretion to execute and deliver the deeds therein provided for without proof of compliance with the building conditions under which the lands were sold, upon a satisfactory showing of inability to supply such evidence and the buildings are now upon such lands that comply with or exceed the original building requirements.

District of Columbia. Deeds for certain low lands in, to be executed, etc. Vol. 21, p. 47. Vol. 3, p. 691.

Approved, March 3, 1921.

66th Congress, 3d Session. } HOUSE OF REPRESENTATIVES. { Report No. 1377.

# REORGANIZING THE INDIAN SERVICE.

February 26, 1921.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed.

Mr. Snyder, from the Committee on Indian Affairs, submitted the following

## REPORT.

[To accompany S. 4039.]

The Committee on Indian Affairs, to whom was referred S. 4039, entitled "An act to amend section 3 of the act of Congress of June 28, 1906, entitled 'An act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes,'" having had the same under consideration, report it to the House with the recommendation that it do pass with the following amendments:

Strike out all after the enacting clause and insert the following:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That all that part of the act of June 28, 1906 (Thirty-fourth Statutes at Large, page 539), entitled "An act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes," which reserves to the Osage Tribe the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is made in that act is hereby amended so that the oil, gas, coal, or other minerals covered by said lands are reserved to the Osage Tribe for the period ending April 7, 1946: *Provided*, That all valid existing oil and gas leases on the 7th day of April, 1931, are hereby renewed upon the same terms and extended, subject to all other conditions and provisions thereof, until the 8th day of April, 1946, and as long thereafter as oil or gas is found in paying quantities, and the Secretary of the Interior and the Osage Council are hereby authorized and directed to offer for lease for oil and gas purposes all of the remaining portion of the unleased Osage land prior to April 8, 1931, offering the same annually at the rate of not less than one-tenth of the unleased area.

Sec. 2. That the bona fide owner or lessee of the surface of the land shall be compensated, under rules and regulations prescribed by the Secretary of the Interior in connection with oil and gas mining operations, for any damage that shall accrue after the passage of this act arising as a result of the use of such land for oil and gas mining purposes or out of damages to the land or crops thereon occasioned thereby, but nothing herein contained shall be construed to deny to the surface owner or lessee the right to appeal to the courts without the consent of the Secretary of the Interior, in the event he is dissatisfied with the amount of damages awarded him.

Sec. 3. That all members of the Osage Tribe of Indians are hereby declared to be citizens of the United States, but this shall not affect their interest in tribal property or the control of the United States over such property as is now or may hereafter be

provided by [illegible] all restrictions against alienation of their allotment selections, both surplus [illegible]stead, of all adult Osage Indians of less than one-half Indian blood are hereby [illegible]ved, and the Secretary of the Interior shall, within four months after the passage [illegible]is act, determine what members of said tribe are of less than one-half Indian blood, and their ages, and his determination thereof shall be final and conclusive. The homestead allotments of the members of the Osage Tribe shall not be subject to taxation if held by the original allottee prior to April 8, 1931.

SEC. 4. That from and after the passage of this act the Secretary of the Interior shall cause to be paid at the end of each fiscal quarter to each adult member of the Osage Tribe having a certificate of competency his or her pro rata share, either as a member of the tribe or heir of a deceased member, of the interest on trust funds, the bonus received from the sale of leases, and the royalties received during the previous fiscal quarter, and so long as the income is sufficient to pay to the adult members of said tribe not having a certificate of competency $1,000 quarterly except where incompetent adult members have legal guardians, in which case the income of such incompetents shall be paid to their legal guardians, and to pay for maintenance and education to the parents or natural guardians or legal guardians actually having minor members under twenty-one years of age personally in charge $500 quarterly out of the income of said minors all of said quarterly payments to legal guardians and adults not having certificates of competency to be paid under the supervision of the Superintendent of the Osage Agency, and to invest the remainder after paying all the taxes of such members either in United States bonds or in Oklahoma State, county, or school bonds, or place the same on time deposits at interest in banks in the State of Oklahoma for the benefit of each individual member under such rules and regulations as the Secretary of the Interior may prescribe: *Provided*, That at the beginning of each fiscal year there shall first be reserved and set aside out of the Osage tribal funds available for that purpose a sufficient amount of money for the expenditures authorized by Congress out of the Osage funds for that fiscal year: *Provided further*, That [illegible] existing individual obligations of adults not having certificates of competency outstanding upon the passage of this act, when approved by the Superintendent of the Osage Agency, shall be paid out of the money of such individual as the same may be placed to his credit in addition to the quarterly allowance provided for herein.

SEC. 5. That the State of Oklahoma is authorized from and after the passage of this act to levy and collect a gross production tax upon all oil and gas produced in Osage County, Oklahoma, and all taxes so collected shall be paid and distributed as in lieu of all other State and county taxes levied upon the production of oil and gas as provided by the laws of Oklahoma, the Secretary of the Interior is hereby authorized and directed to pay, through the proper officers of the Osage Agency, to the State of Oklahoma, from the amount received by the Osage Tribe of Indians as royalties from production of oil and gas, the per centum levied as gross production tax, to be distributed as provided by the laws of Oklahoma: *Provided*, That the Secretary of the Interior is hereby authorized and directed to pay, through the proper officers of the Osage Agency, to Osage County, Oklahoma, an additional sum equal to 1 per centum of the amount received by the Osage Tribe of Indians as royalties from production of oil and gas, which sum shall be used by said county only for the construction and maintenance of roads and bridges therein: *Provided further*, That the proper officials of Osage County shall make an annual report to the Secretary of the Interior showing that said fund has been used for road and bridge construction and maintenance only.

Section 1: Under this section provision is made for the extension of an act entitled "An act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes."

It will be noted that the committee provides for an extension for 15 years, from April 7, 1931, which period would end on April 8, 1946. It will be also noted that the bill provides for an extension of the oil and gas leases and that it also provides definitely for leasing all of the remaining unleased lands on or before April 8, 1926. There are some 1,000,000 acres of land yet to be leased, under which there is supposed to be oil and gas.

Section 2: In this section it is provided that the bona fide owner of the surface of the land shall be compensated for any loss which shall accrue, after the passage of this act, arising out of the use of such land for oil and gas mining purposes. And it will be noted, also, that it is also provided that "nothing herein contained shall be construed to prevent any surface owner from going directly to a court of competent jurisdiction upon the question of damages." It will be observed that this bill makes it unnecessary for the surface owner to appeal to the Secretary of the Interior for the right to go to court to settle his damage against the oil operator who desires the use of his land.

Section 3 declares the members of the Osage Tribe of Indians to be citizens of the United States. The Supreme Court of the State of Oklahoma has already held that members of the Osage Tribe are citizens of the United States, but the matter has not been passed upon by the Supreme Court of the United States, and it was thought advisable to insert such a provision in this bill. Conferring citizenship does not interfere with the control of the United States over the tribal property of the members of the tribe and restrictions are removed from the members of less than one-half Indian blood. This is in line with the policy toward all Indian tribes throughout the United States. The homestead allotments are nontaxable under the act of April 8, 1906, for 25 years. The last provision of section 12 makes it clear that the homestead allotments shall not be subject to taxation until the date provided in the act of 1906.

Section 4: In the hearings it was disclosed that, during the past few years, the Osage Tribe has been receiving what seemed to the committee fabulous sums of money—far beyond their requirements and beyond the desire of some of them—and so your committee has provided in this section a provision for the care and the responsibility of these Indians, and the prospects are that the amount which would be received by them under the present law would greatly increase, and so the committee has thought it wise to prescribe methods for the benefit of these Indians, and yet leaving them, it is believed in the best judgment of the committee, a sufficient amount of money to properly care for their families and educate their children. During the present fiscal year each of these Osages—some 2,100 in number—will receive not less than $10,000 cash, in quarterly payments.

It was disclosed that there were families, including as many as seven people, each one of whom drew the amount above mentioned, and the parent has the right of the disposal of all this money. Your committee, after careful consideration, has presented a section which will provide for the impounding of a large amount of these funds for the future benefit of these people, particularly the minors. There is a provision in this bill which will automatically make these children citizens, and at that time they will come into possession of the funds which have been impounded for them and credited to their individual accounts.

It has also been provided that any of these Indians who are found competent, without regard to their quantum of Indian blood shall be declared, and in that event they would come into possession of any funds which had been so impounded.

Your committee found that a very large portion of the money which is being paid to these Indians quarterly is being wasted in riotous living, and much of it is being taken away from the Indians by unscrupulous persons. In fact, it seemed to the committee that the manner in which this matter is being at present handled is almost criminal.

Section 5 deals with taxation. It will be noted that it is provided that the Osage Tribe shall be taxed, beginning with the passage of this act, as are all other citizens of Oklahoma under the tax laws of that State. And it will also be noted that the Secretary of the Interior is authorized and directed to pay to Osage County, Okla., an additional sum, equal to 1 per cent of the amount received by the Osage Tribe of Indians from royalties from the production of oil and gas, which sum shall be used by said county only for the construction and maintenance of roads and bridges therein. It is believed that this provision, if properly applied, will enhance the value of all Osage property, on the principle that good roads and bridges enhance the value of property in every other section of the country; and, since there is plenty of money for the purpose, it certainly will be a great advantage to the Osages themselves, as well as to those who must carry on business relations with them.

O

66TH CONGRES
*3d Session.*

AGRI(

Mr. ANDERSO

The commit
Houses on the
making appro
fiscal year end
ference have
spective House
That the Se
14, 17, 20, 21,
75, 81, 88, 96,
That the H
of the Senate
51, 59, 68, 69,
and agree to t

Amendment
That the H
of the Senate
ment as follo
In lieu of t
to the same.

Amendment
That the H
of the Senate
ment as follow
In lieu of th
to the same.

Sec 7 ... 1977

66TH CONGRESS, 3d Session. } HOUSE OF REPRESENTATIVES. { REPORT No. 1278.

Sec. 2.

# REORGANIZING THE INDIAN SERVICE.

FEBRUARY 1, 1921.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed.

Mr. SNYDER, from the Committee on Indian Affairs, submitted the following

## REPORT.

[To accompany S. 4039.]

The Committee on Indian Affairs, to whom was referred S. 4039, entitled "An act to amend section 3 of the act of Congress of June 28, 1906, entitled 'An act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes,'" having had the same under consideration, report it to the House with the recommendation that it do pass with the following amendments:

Strike out all after the enacting clause and insert House bill 15955, the provisions of which are as follows:

Section 1: Under this section provision is made for the extension of an act entitled "An act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes."

It will be noted that the committee provides for an extension for 15 years, from April 7, 1931, which period would end on April 8, 1946. It will be also noted that the bill provides for an extension of the oil and gas leases, and that it also provides definitely for leasing all of the remaining unleased lands on or before April 8, 1926. There are some 1,000,000 acres of land yet to be leased, under which there is supposed to be oil and gas.

Section 2: In this section it is provided that the bona fide owner of the surface of the land shall be compensated for any loss which shall accrue, after the passage of this act, arising out of the use of such land for oil and gas mining purposes. And it will be noted, also, that it is also provided that "nothing herein contained shall be construed to prevent any surface owner from going directly to a court of competent jurisdiction upon the question of damages." It will also be observed that this bill makes it unnecessary for the surface owner to appeal to the Secretary of the Interior for the right to go to court to

settle ... age against the oil operator who desires the use of his land.

Section ... declares the members of the Osage Tribe of Indians to be citizens of the United States. The Supreme Court of the State of Oklahoma has already held that members of the Osage Tribe are citizens of the United States, but the matter has not been passed upon by the Supreme Court of the United States, and it was thought advisable to insert such a provision in this bill. Conferring citizenship does not interfere with the control of the United States over the tribal property of the members of the tribe and restrictions are removed from the members of less than one-half Indian blood. This is in line with the policy toward all Indian tribes throughout the United States. The homestead allotments are nontaxable, under the act of April 8, 1906, for 25 years. The last provision of section 12 makes it clear that the homestead allotments shall not be subject to taxation until the date provided in the act of 1906.

Section 4: In the hearings it was disclosed that, during the past few years, the Osage Tribe has been receiving what seemed to the committee fabulous sums of money—far beyond their requirements and beyond the desire of some of them—and so your committee has provided in this section a provision for the care and the responsibility of these Indians, and the prospects are that the amount which would be received by them under the present law would greatly increase, and so the committee has thought it wise to prescribe methods for the benefit of these Indians, and yet leaving them, it is believed in the best judgment of the committee, a sufficient amount of money to properly care for their families and educate their children. During the present fiscal year each of these Osages—some 2,100 in number—will receive not less than $10,000 cash, in quarterly payments.

It was disclosed that there were families, including as many as seven people, each one of whom drew the amount above mentioned, and the parent has the right of the disposal of all this money. Your committee, after careful consideration, has presented a section which will provide for the impounding of a large amount of these funds for the future benefit of these people, particularly the minors. There is a provision in this bill which will automatically make these children citizens, and at that time they will come into possession of the funds which have been impounded for them and credited to their individual accounts.

It has also been provided that any of these Indians who are found competent, without regard to their quantum of Indian blood, shall be declared, and in that event they would come into possession of any funds which had been so impounded.

Your committee found that a very large portion of the money which is being paid to these Indians quarterly is being wasted in riotous living, and much of it is being taken away from the Indians by unscrupulous persons. In fact, it seemed to the committee that the manner in which this matter is being at present handled is almost criminal.

Section 5 deals with taxation. It will be noted that it is provided that the Osage Tribe shall be taxed, beginning with the passage of this act, as are all other citizens of Oklahoma under the tax laws of that State. And it will also be noted that the Secretary of the Inte-



rior is authorized and directed to pay to Osage County, Oklahoma, an additional sum, equal to 1 per cent of the amount received by the Osage Tribe of Indians from royalties from the production of oil and gas, which sum shall be used by said county only for the construction and maintenance of roads and bridges therein. It is believed that this provision, if properly applied, will enhance the value of all Osage property, on the principle that good roads and bridges enhance the value of property in every other section of the country; and, since there is plenty of money for the purpose, it certainly will be a great advantage to the Osages themselves as well as to those who must carry on business relations with them.

It is realized by your committee that there necessarily will be several fundamental changes in the operation and execution of the laws under the Indian Bureau by reason of the enactment of this bill. But it will be easily understood by everyone that sometime (and this seems to be the time) the Government must put itself in a position to reduce its responsibility to the Indian. And it is firmly believed by your committee, after nearly a year and a half spent in intensive investigation, that the enactment of this bill will have the effect of automatically and annually reducing the Government's responsibility to Indians who are fully able to exercise citizenship; it will aid the young Indian, male or female, when he is best fitted to become a citizen, to care for himself, either on Indian land or on the public domain or in any part of the United States. It will do away with the parental control over the Indian child, which it has been found is of such a nature under existing conditions to make it almost impossible for the child to become a citizen of the United States. It has been conclusively shown that a very small percentage of those who are educated actually break away from the tie; and it has been also conclusively shown that those who return to the tribes from the school do very little in the way of improving tribal conditions, and the system as it now exists is simply revolving and stops nowhere.

Your committee, in its judgment, believes this is the time to change present conditions and go forward in the right direction.

Section 6 declares that every Indian born within the limits of the United States is declared to be a citizen of the State in which he may reside and renders him amenable to the civil and criminal laws thereof.

Section 7 of the bill provides that all Indians of any quantum of Indian blood who have reached the standard of the seventh grade in Indian or other schools and becomes 21 years of age, male or female, shall be citizens, and certificates of competency shall issue to those who have arrived, or shall hereafter arrive at the age of 23, and they shall receive anything due them from the Government. Certificates of competency were issued during the fiscal year of 1920, to 285 Indians, and restrictions to the number of 2,578 were removed from members of the Five Civilized Tribes in Oklahoma. The total Indian population of the United States is stated to be 336,337. Of this number 82,856 Indian children are eligible for school attendance; the number in schools of all kinds is 61,800, and the number not in school is 21,056. There were 28,452 patents in fee issued to the Indians from May 8, 1906, to June 30, 1920, and during the year 1920, 6,426 applications for patents were approved. In the seventh grade,

academic course of study in the schools, where 750 Indian pupils are stud[ ] comprises English grammar and composition, spelling (basic tex[ ] that grade); elementary physiology; history (United States in p[ ] elementary civics; vocational arithmetic; seventh year industrial geography; agricultural botany; theory; etc.

In vocational work elective courses are given in the study of agriculture, engineering, carpentry, masonry, blacksmithing, painting, and printing for the boys and home economics and nursing for the girls.

This system of education is pursued in 21 nonreservation boarding schools, 95 reservation boarding schools, and 195 day schools. Appropriations for the education of Indian children for 1922 amount to $4,116,875, and the appropriations for hospitals amounts to $390,000.

Section 8 of the bill directs the removal of restrictions and the issuance of certificates of competency to all allotted Indians of less than one-half Indian blood and to all competent Indians who have arrived at the age of 21 years, of any degree of blood, without filing application for such purpose, and the issuance of patents in fee in such cases is ordered by this legislation. The object of this provision is to make it possible for the Indian who is adjudged competent to care for himself without supervision and to reduce the necessity for the various steps heretofore demanded to attain this result. The section is compulsory and it is believed, it will prove both beneficial to the Indian and the Government.

In support of this legislation the following quotation is made from the report of the Secretary of the Interior for 1914:

There are many thousand Indians in our charge who are entirely self-supporting, capable, thrifty, farsighted, sensible men. And singularly enough, these are most often found among those tribes which were most savage and ruthless in making war upon the whites. Some of these are indeed so farsighted that they do not wish to enjoy full independence because their property would then become subject to taxation. Others are attached by a tribal sentiment and by the natural conservation of the Indian to existing conditions. Still others are held to governmental control in part because of the entanglement of their tribal affairs. The Government will not do its duty toward itself or toward these Indians until men of this class are fully released.

Section 9 provides for compulsory attendance of Indian pupils at schools and fixes penalties for dereliction of parents or guardians in this respect. Your committee, in its investigation, found, everywhere, a disposition on the part of the Indian to oppose education. It was shown that Indian children could be induced to enter school only with great effort and urgent action on the part of superintendent and teachers. Therefore, your committee makes this recommendation and respectfully urges that it become law.

It is much desired and needed. Congress has provided liberally for the education of the Indian and an insufficient school capacity does not now exist as an excuse, so far as Indian pupils are concerned, except on certain reservations. Therefore, your committee, after careful consideration of the matter, believes that the Secretary of the Interior should be empowered to make this section effective after its enactment.

Section 10: In the investigation by the committee in the field, as well as in Washington, it was developed that there were very large areas of land on many of the reservations which were not being

[uti]lized for any purposes. Much of it is in demand, b[ ] [wou]ld not see no good reason why the surface on reservations, b[ ] required for the purposes set forth in this section, should n[ ] leased or sold for the benefit of the tribes affected and in the gen[ ] interest of the taxpayers of the United States. It will be noted t[ ] the interests of the Indians are carefully preserved by reserving any lands which are cultivated for farms, or which are necessary for grazing, by any Indian or Indians having rights on the reservation not in excess of his or their pro rata share.

Section 11: One of the original objects of the investigation was to do away with overlapping divisions in the various departments, and the committee has found, upon careful investigation, that the Indian Health Division carries on exactly the same activities that are carried on by the Public Health Service, except that the committee does not believe that the service is anywhere nearly as efficient as it would be if transferred to the Public Health Service, and it believes, also, that the expense for handling the same would be much reduced and that the service would be under the direction of much more competent authority than now exists in the Indian Health Division of the Indian Service. And so it is recommended, under this section, that the work now being carried on in the Indian Bureau, under a bureau known as the Indian Health Division, should be wholly transferred to the Public Health Department.

Section 12: During the committee's investigation it was found that there was in the Indian Service a bureau known as the Indian Forestry Division, whose activities were identically the same as those carried on under the National Forest Service, and with much inferior facilities to perform this work. We found that frequently the activities of these two departments met with each other and sometimes overlapped in the field. Your committee, after careful investigation, has decided that this service should be wholly eliminated from the Indian Bureau and placed under the Federal Forest Service as provided for in the section referred to. The committee believes that if such transfer is made there will be a great improvement in the handling of the forests on Indian reservations and much greater benefit will accrue to the Indians, as well as to all of the people of this country.

Section 13. Your committee, in its investigation, went very deeply into the matter referring to the Indian Irrigation Division in the Indian Service, and it was disclosed that practically all of the larger irrigation projects in existence or in construction are now being operated by the Reclamation Service under the supervision of the Indian Bureau. It was found that a very large per cent of all of these irrigation systems was mostly in the interest of white users of water. It is believed by the committee that since the Reclamation Service is much better prepared for the handling of this work this division should be transferred wholly from the Indian Service to the Reclamation Service, thereby placing the responsibility in the hands of a thoroughly competent body of men who are fully qualified, thus being able to finally place the responsibility for the expenditure of such moneys as are appropriated from time to time for these projects. It was frequently developed in the testimony that those who were connected with the Indian Irrigation Division, from the commissioner down, were unable to give the committee satisfactory infor-

...mation ... gard to these tremendous expenditures and the reimbursemen... he same to the Government. The committee sees no reason, sin... e money is nearly all expended by the Reclamation Service unc... the direction of the Indian Service, why the estimates should not be made by the Reclamation Service, and this service be held wholly responsible for the execution of that work by the Congress of the United States direct, rather than through another bureau. It will be noted that it is provided that the Secretary of the Interior, in his discretion, may transfer the operation and maintenance of any completed irrigation project, which is principally for the benefit of Indians, to the Bureau of Indian Affairs. It was found that there are several small irrigation systems which are used wholly by Indians where the systems are complete and no further extensions are to be made, and the operation and maintenance of the same are carried on by the employees on the reservation. It seemed to the committee that in cases like this it might be feasible and advisable to transfer such projects. However, this does not contemplate maintaining in the Indian Bureau any division which would be known as the "Indian Irrigation Division," neither would it contemplate any departmental employees, and this is the reason for the last paragraph in section 7.

Section 14 provides for the sale of the remaining unsold coal and asphalt deposits in the Choctaw-Chickasaw segregated mineral area, Oklahoma.

The three sales provided by the act of February 8, 1918, have been carried out by the Secretary of the Interior, leaving a considerable residue of these deposits unsold and this legislation is necessary for the consummation of these sales as contemplated by Congress and in compliance with agreements with the Choctaws and Chickasaws.

After careful consideration of the matter your committee reported a bill (H. R. 15011) for this purpose on December 17, 1920 (Rept. No. 1126, 66th Cong., 3d sess.), and under date of December 15, 1920, the Secretary of the Interior recommended favorable action on this bill in the following letter:

DEPARTMENT OF THE INTERIOR,
*Washington, December 15, 1920.*

MY DEAR MR. SNYDER: I am in receipt of H. R. 15011, introduced in the House of Representatives on December 13, 1920, by Mr. Carter of Oklahoma, entitled "A bill authorizing the Secretary of the Interior to offer for sale remainder of the coal and asphalt deposits in segregated mineral land in the Choctaw and Chickasaw Nations, State of Oklahoma," with your informal request for a report thereon.

The act of Congress approved February 8, 1918 (40 Stat. L., 433), authorized the Secretary of the Interior to offer for sale at public auction the coal and asphalt mineral deposits belonging to the Choctaw and Chickasaw Tribes in Oklahoma, covering an area of 441,107 acres, and three sales have been held as provided by that act.

At the first sale held December 11, 12, 13, and 14, 1918, 54 tracts, leased and unleased, covering an area of 42,103 acres, were sold at an average price per acre of $32.39, for a total of $1,363,645.17.

At the second sale held November 13, 14, and 15, 1919, seven tracts, leased and unleased, covering an area of 4,426.44 acres, were sold at an average price per acre of $25.10, for a total of $111,116.

At the third sale held June 16 and 17, 1920, 33 tracts, leased and unleased, covering an area of 15,293.10 acres, were sold at an average price per acre of $33.04, for a total of $505,312.96.

At the three sales held, a total of 94 tracts, leased and unleased, covering an area of 61,822.54 acres, were sold at an average price per acre of $32.03, for a total of $1,980,074.13, thus leaving unsold 423 tracts covering an area of 379,284.46 acres, of an estimated value (excluding surface) of $11,273,715.98.

Under existing law there is no provision for any further offering of the ... and asphalt deposits of the Choctaw and Chickasaw Nations, and H. R. 15011 is i... to vest authority in the Secretary of the Interior to sell the remaining unsold c... asphalt mineral deposits under rules and regulations to be prescribed by h... I recommend that favorable action thereon be taken.

Cordially, yours,

JOHN BARTON PAYNE, *Secretary.*

Hon. H. P. SNYDER,
*Chairman Committee on Indian Affairs, House of Representatives.*

Section 15 of the bill extends the provisions of the act of February 25, 1920, to unallotted lands within Indian reservations so that the same general law now applicable to the public domain will hereafter apply to deposits of coal, phosphate, oil, oil shale, gas, and sodium found in such lands, except that all of the royalties and rentals are to be paid to the Indians. It is also provided that this same method of leasing shall likewise apply to deposits of potassium, asbestos, precious stones, and other nonmetalliferous minerals discovered on unallotted Indian lands. Your committee believes that the enactment of this section will be the cause of much mining development and that a number of Indian tribes will receive sufficient income from this source to make gratuity appropriations for their benefit unnecessary. The Secretary of the Interior has recommended the enactment of legislation of this character in the following letter:

DEPARTMENT OF THE INTERIOR,
*Washington, December 23, 1920.*

MY DEAR MR. SNYDER: I am in receipt of your letter inclosing for report a copy of H. R. 13851, a bill to authorize mining for nonmetalliferous minerals on Indian reservations.

Authority was granted in section 3 of the act of February 28, 1891 (26 Stat. L., 795), for leasing lands within treaty Indian reservations, but there is no authority under existing law for leasing unallotted land on Indian reservations created by Executive order or legislative enactment for farming, grazing, mining, or business purposes, except under section 26 of the Indian appropriation act approved June 30, 1919, which authorizes the leasing of unallotted land on Indian reservations in several States for the purpose of mining metalliferous minerals.

It is reported that there are deposits of asbestos on the Apache Reservation in Arizona and that part of the Navajo Indian Reservation is underlain with coal. There have also been reports to the effect that on some of the reservations not subject to lease under existing authority there is oil and gas.

Many applications for leases on unallotted land on various reservations have been received from time to time and I believe it would be to the advantage of both the Indians and the public generally to authorize the leasing of unallotted land on all Indian reservations. The resources of the reservations would be developed and the Indians would benefit by reason of royalties and rentals and thus need less financial aid from the Government.

In view of the fact that many requests are being received for leases on unallotted lands not subject to lease under existing authority it is hoped that early and favorable consideration will be given the proposed legislation by your committee and the Congress.

Cordially, yours,

JOHN BARTON PAYNE, *Secretary.*

Hon. HOMER P. SNYDER,
*Chairman Committee on Indian Affairs,*
*House of Representatives.*

It is further proposed to amend the title that it may conform to the text of the bill.

…ased melada, concrete
e seventy-five degrees,
by the polariscope test
ial, and fractions of a
ees, 45 per centum ad
degrees, 6¼ cents per
ugar draining and sugar
se may be, according to

tion to the rates of duty
er affect or impair such
s herein shall have the
of duty paid ninety-six
iba beyond 8 cents per
States of similar sugars
se the price in the ports
ess of refining, or sugars
id, then the emergency
o prevent the prices of
named.

r other processes, includ-
milk, 5 cents per pound.
cked with more than 15
uct of two or more coun-
mmed, $2.85 per pound;
ided for in this section, if
nd.
ans that quality of leaf
d is of sufficient size for
leaf tobacco.
r pickled, 15 per centum
de fr… imported hides,
… on such hides,
… ay prescribe.
…e tariff on apples
…han 30 cents a box,
e increased so as to make
me as the tariff on apples

se, 4 cents per pound.
d insert "17, 19, and

Sen. 7774

# Calendar No. 660.

66TH CONGRESS, 3d Session. | SENATE. | REPORT No. 704.

## EXTENSION OF THE OSAGE TRUST PERIOD.

JANUARY 18 (calendar day, JANUARY 20), 1921.—Ordered to be printed.

Mr. OWEN, from the Committee on Indian Affairs, submitted the following

## REPORT.

[To accompany S. 4039.]

The Committee on Indian Affairs, to whom was referred the bill (S. 4039) to amend section 3 of the act of Congress of June 28, 1906, entitled "An act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes," having considered the same, report favorably thereon with the recommendation that the bill do pass with amendments.

On page 2, section 2, line 24, after the word "hereby" insert the words "renewed on the same terms and," and on line 25, same page, insert the word "other" before the word "conditions."

Add the following additional section 4:

> That the bona fide owner of the surface of the land shall be compensated by the oil and gas lessees for any damage that may accrue to him arising out of the use of such land for oil and gas mining operations during the period of his ownership; and nothing herein contained shall be construed to deny to the surface owner the right to bring action for such damages in a court of competent jurisdiction.

As amended, your committee recommends the passage of the bill.

By the act of June 28, 1906 (34 Stats. L., 539), the mineral rights of the Osage Indian lands were reserved to the tribe as a whole in order that each member might obtain his equal share therein in lieu of having some allottees receive very large returns from productive land and other allottees receive little or nothing from unproductive land.

Since the lands were allotted to the Osages quite a large development has taken place, but in the main on the east side of the Osage country. If the mineral rights were now to pass to the allottees severally it would result in the allottees holding land on the west side who have already received their participant part of the royalties from the mining development on the east side of the Osage country, receiving in addition thereto the oil on the west side, which would

be an [illegible] distribution of the benefits and contrary to the intention of Con[illegible]

The [illegible] are apparently unanimous in desiring the period within which th[illegible] may enjoy the values in the oil beneath the soil to be extended from 1931 for 25 years longer to 1956, in order that they may have time within which to enjoy the values distributed per capita, according to the original intent of Congress. The Osages favor this bill and I believe it to their best interest.

This policy meets the views of the Indian Office and also of the Secretary of the Interior, who has written a report upon this matter as of March 29, 1920, a copy of which is hereto attached and made a part thereof. (Exhibit A.)

The bill provides that all of the land shall be leased for oil and gas prior to the 1st day of January, 1930, in order that the Osages may be assured of obtaining the values of the oil within as early a period as seems to be entirely practicable. The total lands involved are 1,465,100 acres.

Under the act of June 28, 1906, some of the surface lands have been sold to various purchasers at a price averaging from $6.21 per acre in 1916 up to $18.44 per acre in 1919.

Since March, 1916, oil leases have been sold covering 303,635 acres at an average bonus of $95.55 per acre.

Those buying the surface lands have naturally desired to enjoy the value of the oil beneath such lands, and some of them have been disposed to oppose the extension of the mineral rights to the Osage Tribe in order that in 1931 they, themselves, might enjoy the value of the oil if it should be found beneath the land of which they have bought the surface rights. They are entitled to be compensated, of course, if the oil and gas lessees do any damage to the surface which they have bought, and this is provided for in the additional section offered as an amendment by your committee.

The Osages naturally object to those who paid for the surface taking from the Osages the mineral values which belong to the tribe and which Congress, under the act of June 28, 1906, intended should be enjoyed by the tribe. When the act of June 28, 1906, was passed, it was contemplated by Congress that possibly the oil would not have been extracted by 1931, and the act expressly provided that Congress might extend the trust period, which now the Osages desire shall be extended.

It appears also that the extension is necessary in order to enable the Osages to advantageously make additional oil and gas leases upon such property between now and 1931, because commercial leases in the contiguous territory run for a period as long as oil and gas are found in paying quantities, and if the oil operators were given only 10 years in which to recoup their investments, as is urged by the surface landholders in the Osage Nation, they would naturally prefer to go to contiguous territory where they would have a longer term in which to enjoy the oil and gas produced. Ordinarily a 10-year term is too short to enable them to fully recoup themselves or to promise a reward for the risk incurred, especially where they pay a one-sixth royalty on small wells and one-fifth royalty on larger wells as prevails in the Osage Nation. For this reason, among others, your committee deems it advisable to extend the period as contemplated in the original act without req[illegible] a rewriting of contracts in 1931. The Osages believe this prop[illegible] is against their interest.

There are other considerations of importance in this matter. The original act of June, 1906, passed before Oklahoma came into the Union as a State, contained no provision by which the State, which has the expense of administering the law in the Osage country, should receive taxes from the oil produced from this territory. Under the proposed bill the State of Oklahoma is authorized, from and after the passage of the act, to levy and collect a gross production tax upon all oil and gas belonging to oil and gas lessees produced in Osage County, not to exceed 3 per cent of the value of the same, and this shall be in lieu of all other State and county taxes of every kind and character on production leaseholds and other property used in the production of oil and gas, one-third of all taxes so collected to be paid to Osage County and distributed as now provided by the laws of Oklahoma.

By an act of February 14, 1916, the Legislature of the State of Oklahoma provided that persons, firms, and associations engaged in the mining of petroleum and other minerals shall pay a tax equal to 3 per cent of the gross value of the petroleum or natural gas less the royalty interest and that the owner of any royalty interest shall also pay such tax. It provided that the tax shall be divided—two-thirds for the current expense of the State government, one-sixth to the common schools of the county from whence the minerals are produced, and one-sixth for the construction of permanent roads and bridges in such counties. Under the proposed bill the disposition of the tax now contemplated would follow this State law.

The bill itself provides for a 3 per cent tax on royalties received by the Osage Tribe, to be used by Osage County only for the construction and maintenance of roads and bridges therein.

Under this legislation the better interests of the Osages, of the oil and gas lessees, of the State of Oklahoma, and of the public generally will be served.

The Osage Indians will obtain the value of the minerals, as Congress originally intended.

The lessees will be enabled to develop their leases systematically and obtain a return from the capital invested comparatively equal to what they might obtain in other oil-bearing territory in the mid-continent field.

Osage County will benefit by the development of its public roads and bridges and of its public schools.

The State of Oklahoma will benefit by a large amount of taxes which it does not at present receive.

### EXHIBIT A.

DEPARTMENT OF THE INTERIOR,
*Washington, March 29, 1920.*

DEAR SENATOR: Receipt is acknowledged of your letter of March 10, 1920, inclosing with request for report thereon copy of S. 4039, a bill to amend section 3 of the act of Congress of June 28, 1906, entitled "An act for the division of the lands and funds of Osage Indians in Oklahoma, and for other purposes."

The act of June 28, 1906 (34 Stat. L., 539) provided for making a final roll of the Osage Indians and dividing the lands and funds of the tribe among the members. A

[illegible] of the reservation was leased at that time for oil and gas mining purposes and [illegible] rdance with the desire of the Indians, while the surface of the land was allott[illegible] severalty to them, all the mineral rights were reserved to the tribe as a whole in order that each member might obtain an equal share therein instead of having it all go to a few allottees who were so fortunate as to obtain allotments underlain with minerals. The seventh subdivision of section 2 provides at the expiration of the 25-year period "that the oil, gas, coal, and other minerals upon said allotted lands shall become the property of the individual owner of said land at the expiration of said 25 years, unless otherwise provided for by act of Congress."

Under the provisions of the said act the Indians own all the minerals in common, and they maintain it is their understanding they are to be given time to have the minerals removed. There are two factions of Osage Indians—the mixed bloods and the full bloods—who are at odds on practically every question that comes up concerning Osage affairs. They are, however, a unit on the subject that the title of the tribe to the minerals should be extended until such time as the minerals shall have been removed. As it is evident that all the minerals can not be mined before the expiration of the 25-year period, April 8, 1931, they are accordingly requesting Congress to exercise its authority to extend the trust period for another 25 years, so that all the Indians will get the benefit of the minerals, as was intended by the act of June 28, 1906.

All the surface of the land on the Osage Indian Reservation, consisting of approximately 1,465,400 acres, was allotted to members of the tribe, excepting certain lands reserved for town sites, cemeteries, and railroads, each member receiving four selections, of which one was the homestead which "shall be inalienable and nontaxable until otherwise provided by act of Congress." The other selections may be sold under certain conditions with the approval of the Interior Department, and in the case of competent Indians certificates of competency may be issued removing the restrictions from their land and permitting them to dispose of it as they see fit. As the allottees are entitled only to the surface, the purchasers obtain no right to the minerals. The form of deed in use contains specific reference to reserving the minerals as provided in the act of June 28, 1906. Therefore it must be apparent that it was the understanding of the purchasers that they obtained only the surface rights to the land. This may also be shown by a comparison of the amounts received for the sale of the surface through the agency office and the sale of oil leases which gives the lessee only the right to drill on the land and to own five-sixths of the production.

Surface lands sold through the agency office.

By public auction during the fiscal year ended June 30, 1916, 13,126 acres, average price per acre, $6.31; fiscal year ended June 30, 1917, 10,346 acres, average price per acre, $6.51; no lands sold in fiscal years 1917 and 1918; in November, 1919, 5,886 acres, average price, $18.44 per acre. Private sales of surface lands sold through agency office during fiscal year 1919, 3,549 acres, average price, $20.66 per acre. These private sales embraced 24 tracts of from 29 to 240 acres each, sold at different times, desired for townsite and other special purposes and in nearly all cases embraced lands of mixed bloods.

Since March, 1916, oil leases have been sold covering 303,635 acres of Osage lands at a total bonus of $29,011,874.36, an average of $95.55 per acre.

Some of the purchasers of the surface of the land are opposing the extension of the Osage trust period in the minerals although many others, some of whom have purchased large tracts, have recently indicated that they are not opposed to such extension. That the value of the minerals was not taken into consideration when they purchased the surface is evidenced by the price they paid therefor as compared with the price obtained as bonuses for oil and gas leases in addition to stipulated royalties.

Under the law and the terms of the oil and gas leases they will expire in 1931 unless Congress grants an extension of the trust period. If an extension is not granted at an early date it will seriously interfere with the further leasing for oil, as oil operators will not feel justified in purchasing any more leases on the Osage Reservation because of the danger of losing them in 1931 before they shall have had time to compensate themselves for their expenditures and they will then be required to enter into new leases with the surface owners while in the midst of their operations. Furthermore, although existing leases require early development, it is necessary in many cases to grant extensions of time within which to drill owing to the inability of the operators to procure steel equipment required for operations. Should the mineral trust period be extended for an additional 25 years it is believed the lessees will have ample time within which to obtain the oil and gas deposits.

S. 4039 provides for extending the mineral trust period to April 8, 1956, for the leasing of all unleased land prior to January 1, 1930, for the extension of oil and gas leases existing on April 7, 1931, for as long as oil or gas is found in paying quantities and the title to the minerals remains in the Osage Tribe, and for the mineral to become the property of the individual owner of the land at the expiratio[illegible] 50 years unless otherwise provided by act of Congress. The bill further autho[illegible] State of Oklahoma, from and after the passage of this act, to levy and collect a g[illegible] duction tax of not to exceed 3 per cent on all oil and gas belonging to oil and [illegible] ssees in Osage County, one-third of such tax to be paid to Osage County and [illegible] ibuted as now provided by the laws of Oklahoma. Said bill further authorizes and directs the Secretary of the Interior to pay to Osage County a sum equal to 3 per cent of the amount received by each member of the Osage Tribe as royalties from oil and gas, which sum shall be used by the county for the construction and maintenance of roads and bridges therein, the county officers to make an annual report to the Secretary showing that the money has been used for such purpose.

By the act of February 14, 1916, the Legislature of the State of Oklahoma provided that persons, firms, and associations engaged in the mining of petroleum and other minerals shall pay a tax equal to 3 per cent of the gross value of the petroleum or natural gas less the royalty interest and that the owner of any royalty interest shall also pay such tax. It provides that the tax shall be divided two-thirds for the current expenses of the State government, one-sixth to the common schools of the county from whence the minerals are produced, and one-sixth for the construction of permanent roads and bridges in said county. This tax as held by the Supreme Court of the United States in the cases of the Indian Territory Illuminating Oil Co. *v.* Oklahoma (240 U. S., 522) and E. B. Howard *v.* Barnsdall Oil Co. (247 U. S., 503) does not apply to the production in Osage County either as to the share of the Indians or the lessee.

It is believed that the legislation proposed by S. 4039 is for the best interests not only of the Osage Indians and the lessees but also for Osage County, the State of Oklahoma, and the public generally. The Indians will obtain the value of the minerals to which they are entitled. The lessees will be enabled to develop their leases systematically and thoroughly and obtain the maximum return for the capital invested. The State will benefit by the large amount of taxes which it does not receive at present. Osage County will benefit by having developed a good permanent system of public roads and bridges and receive a large amount of money for its public schools. The construction of good roads throughout the county will, of course, enhance the value of the land, both that belonging to the allottees and the white purchasers, and will render more accessible the lands leased for oil and gas mining purposes.

I inclose a copy of Statement and Argument by the Osage Tribal Council on Behalf of the Osage Tribe of Indians in Support of Legislation to Extend the Osage Mineral Trust, recently filed with the House Committee on Indian Affairs. The statistics in said brief were compiled from departmental records. A few corrections have been made therein, as indicated in red ink.

Should the present production be continued at present prices, such production will be worth at least $50,000,000 annually, of which the Indians' share will be more than $8,000,000. Three per cent of the Indians' royalty interest would give to Osage County $240,000 annually for permanent road development. Moreover, the tax on the $42,000,000 belonging to the lessees would bring in about $1,260,000, of which one-sixth, or $210,000, would go to said county for road construction, making a total of $450,000 annually for this purpose. The public schools of said county would also get $210,000 and the State $840,000 for its current expenses. I recommend that the bill be given favorable consideration.

Cordially, yours,

JOHN BARTON PAYNE, *Secretary.*

Hon. CHARLES CURTIS,
*Chairman Committee on Indian Affairs,*
*United States Senate.*